1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF LOUISIANA
2

3   ********************************************************************
    AHMED BAQER, ET AL
4                                      CIVIL ACTION
    VERSUS                             NO. 20-980
5                                      SECTION "D" (2)
    ST. TAMMANY PARISH GOVERNMENT, ET AL
6   ********************************************************************

7

8             TRANSCRIPT OF MOTION PROCEEDINGS
       HEARD BEFORE THE HONORABLE JUDGE WENDY B. VITTER
9              UNITED STATES DISTRICT JUDGE
               FRIDAY, APRIL 10, 2020
10

11

12   APPEARANCES:

13

    FOR THE PLAINTIFF:              Maria B. Glorioso, Esquire
14                                  THE GLORIOSO LAW FIRM
                                    2716 Athania Parkway
15                                  Metairie, LA 70002

16

17                                  Devon M. Jacob, Esquire
                                    JACOB LITIGATION, INC.
18                                  P.O. Box 837
                                    Mechanicsburg, PA 17055
19

20

                                    Antonio M. Romanucci, Esquire
21                                  Bhavani K. Raveendran, Esquire
                                    Nicolette A. Ward, Esquire
22                                  Ian P. Fallon, Esquire
                                    ROMANUCCI & BLANDIN
23                                  321 North Clark Street, Suite 900
                                    Chicago, IL 60654
24

25

                        OFFICIAL TRANSCRIPT

```
1   APPEARANCES CONTINUED:

2

3   FOR THE DEFENDANTS:           Chadwick W. Collings, Esquire
                                  Cody J. Acosta, Esquire
4                                 MILLING BENSON WOODWARD
                                  68031 Capital Trace Row
5                                 Mandeville, LA 70471

6

7

8

9

10  Official Court Reporter:      Alexis A. Vice, RPR, CRR
                                  500 Poydras Street, HB-275
11                                New Orleans, LA 70130
                                  (504) 589-7777
12

13

14

15

16
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
17  PRODUCED BY COMPUTER.

18

19

20

21

22

23

24

25
```

OFFICIAL TRANSCRIPT

```
1                    P-R-O-C-E-E-D-I-N-G-S
2                   (FRIDAY, APRIL 10, 2020)
3           (MOTION PROCEEDINGS VIA TELECONFERENCE)
4
5           THE COURT: All right, good morning, everybody.  The
6   case before us is Baqer, et al, versus St. Tammany Parish
7   Government, et al, Case No. 20-CV-980.  And I would like
8   everyone to make their appearances.  Counsel, make your
9   appearances.
10          And because of the number of people, instead of
11  having you speak one at a time, I'm going to sort of roll call
12  the names listed in CM/ECF, and please let me know if you are
13  present.
14                  Ms. Glorioso, Maria Glorioso?
15          MS. GLORIOSO: Yes, present, Judge.
16          THE COURT: Good morning, Ms. Glorioso.
17                  Mr. Antonio Romanucci?
18          MR. ROMANUCCI: Present, Your Honor.
19          THE COURT: Good morning.
20                  Ms. Bhavani Raveendran?
21          MS. RAVEENDRAN: Present, Your Honor.
22          THE COURT: Mr. Devon Jacob?
23          MR. JACOB: Present, Your Honor.
24          THE COURT: Mr. Ian Fallon?
25          MR. FALLON: Good morning, Your Honor.


                    OFFICIAL TRANSCRIPT
```

```
1              THE COURT: And Ms. Nicolette Ward?
2              MS. WARD: I'm here.  Good morning, Your Honor.
3              THE COURT: All right.  Is anybody else here for the
4    plaintiffs?
5              MR. JACOB: No, Your Honor.
6              THE COURT: All right.  And for the defendants,
7    specifically for -- let me make sure I have everybody correct.
8    For the St. Tammany Parish Sheriff's Office, for Randy Smith in
9    his official and individual capacity, Greg Longino in his
10   official and individual capacity, Lacey Kelly in her official
11   and individual capacity, and Rodney Strain in his official and
12   individual capacity, Mr. Collings, Chadwick Collings?
13             MR. COLLINGS: I'm here, Your Honor.  Good morning.
14             THE COURT: Good morning.
15                  And Mr. Acosta?
16             MR. ACOSTA: Yes, Your Honor, I'm also here this
17   morning.
18             THE COURT: All right.  Is anybody else here present
19   for those defendants?  No?
20             All right.  There is another named defendant, and
21   that's St. Tammany Parish Government also known as
22   St. Tammany Parish Council.  They have not been served and have
23   not previously made an appearance.  Is anybody present for the
24   hearing for St. Tammany Parish Government or
25   St. Tammany Parish Council?
```

OFFICIAL TRANSCRIPT

```
 1              All right.  And as I said, the record reflects that
 2   they have not been served and have not made an appearance.
 3   Before I get into that, I'd like to discuss the -- introduce
 4   the other parties that I believe are on the call.  My law
 5   clerks, Derbigny Daroca and Frannie Montegut are both on the
 6   call.  Frannie and Derbigny, are you both on?
 7              LAW CLERK: Yes, ma'am.
 8              LAW CLERK: Yes, Judge.
 9              THE COURT: All right.  My case manager Melissa
10   Verdun, Melissa, are you on the call?
11              DEPUTY CLERK: Yes, ma'am.  Good morning, Judge.
12              THE COURT: Good morning.  My judicial assistant Marie
13   Firmin, Marie, are you on the call?
14              JUDICIAL ASSISTANT: Yes, ma'am.
15              THE COURT: All right, and would the court reporter
16   please introduce yourself so that I know who it is?
17              COURT REPORTER: Hi, Your Honor, good morning.  This
18   is Alexis Vice, court reporter.
19              THE COURT: All right, good morning.  Alexis, please
20   let me know your last name?
21              COURT REPORTER: Vice as in vice president.
22              THE COURT: Got it.  All right, good morning,
23   Ms. Vice.
24              I'm going to give some general housekeeping
25   procedures, I don't want to call them rules, that I think will
```

OFFICIAL TRANSCRIPT

1  make this go a lot smoother, both for the parties and for

2  Ms. Vice.  You know, things are different.  We're -- this is a

3  very unusual time without a doubt.  And the Court has a job to

4  do, and we're going to find a way to do it.  And we're doing

5  this hearing by audio recording.

6          And I want to make sure there's no objections to

7  proceeding by audio recording.  I previously had this

8  conversation -- for the plaintiffs, I am going to naturally

9  reach out to Mr. Jacob only because we've had status

10 conferences this week, and he tended to be the spokesperson.

11 If you would like me to naturally reach out to anyone else,

12 please advise.  But Mr. Jacob, is that correct, there is no

13 objection to proceeding with this hearing by audio recording?

14          MR. JACOB: No objection.

15          THE COURT: And is it okay if I naturally ask you for

16 your input as to the plaintiffs?

17          MR. JACOB: That's fine.  And if it's something that

18 another attorney has prepared to answer, I'll simply advise you

19 accordingly.

20          THE COURT: Of course.  Mr. Collings or Mr. Acosta, is

21 there any objection by the defendants to proceeding by audio

22 recording for this hearing?

23          MR. COLLINGS: None, Your Honor.

24          THE COURT: Okay.  And I should have asked plaintiffs,

25 are any of your clients present and participating in this

OFFICIAL TRANSCRIPT

```
 1   hearing?
 2              MR. JACOB: They are not present currently.
 3   Mr. Klabert Guillot is incarcerated, but will be participating
 4   by telephone at an appropriate time; and Mr. Ahmed Baqer will
 5   be calling in at an appropriate time.
 6              THE COURT: All right.  And Mr. Klabert Guillot,
 7   Junior or Senior?
 8              MR. JACOB: Junior.  I'm sorry, Your Honor.
 9              MR. COLLINGS: Judge, this is Chad Collings.  I just
10   sent a note, an email to the prison administration asking that
11   they get him on the phone now because I don't know how long it
12   takes to get him, you know.  He may be joining us at any
13   moment.
14              MR. GUILLOT, JR.: Hello?
15              THE COURT: Somebody just joined the call.  Would you
16   please introduce yourself?
17              MR. GUILLOT, JR.: Klabert Guillot, Junior.
18              THE COURT: All right, Mr. Guillot, good morning.
19   This is Wendy Vitter.  I'm the judge in this case.  All of the
20   attorneys are on the phone right now, and we're in the middle
21   of the hearing.  For now -- can you hear everything okay?
22              MR. GUILLOT, JR.: Yes.
23              THE COURT: For now, you're just going to listen.  And
24   if your attorneys decide that they want you to testify, then
25   we'll walk you through exactly what that means and when you
```

OFFICIAL TRANSCRIPT

```
 1  will speak at that time, all right?
 2             MR. GUILLOT, JR.: Yes, ma'am.
 3             THE COURT: But for now, you are welcome to listen to
 4  the proceedings.  So we were just starting.
 5             Obviously, these are unusual proceedings that we're
 6  having an audio hearing, but we wanted to find a way to
 7  expedite this hearing a little bit quickly, and this was the
 8  best way to do it.
 9             I would ask that whenever anybody speaks do exactly
10  what Mr. Collings just did and announce your name before you
11  speak even for an objection which I know is unusual, but I
12  think that will be very helpful to the court reporter as she
13  attempts to transcribe this hearing.
14             The second thing I would ask is that everyone speak a
15  little more slowly than normal.  I mean audio alone is a little
16  different than having a hearing in person, and I think that too
17  would be helpful.
18             This hearing is open to the public through the media
19  just as any hearing in our court would be open to the public.
20  I do want to remind everybody that the local rules still apply;
21  and just as though we would be in court right now, there's no
22  recording of the proceeding by anyone.  But certainly, anyone
23  can participate or hear the matter.
24             And finally, we've had several status conferences or
25  two status conferences this week with the attorneys, and we set
```

OFFICIAL TRANSCRIPT

```
 1  out some parameters of what would be allowed and what they
 2  requested as far as timing of this.  And it was agreed that
 3  each side would have 10 minutes for an opening statement that
 4  they can use or waive, up to them, but that's per side.  They
 5  would present whatever exhibits or evidence they have, and then
 6  they would have 15 minutes per side for closing.
 7           Is there anything else that I forgot to go over that
 8  will help streamline this?
 9           May I ask who just joined the call?
10           MR. BAQER: Ahmed Baqer.
11           THE COURT: Okay, good morning, Mr. Baqer.  This is
12  Judge Wendy Vitter, and we're just going over some of the
13  procedural issues for this hearing.  Your attorneys are also on
14  the call, and I don't know if you're in communication with them
15  in some other manner during this hearing.  You are, of course,
16  welcome to be on the call and to participate, and your
17  attorneys want you here.
18           I would ask that you not speak during the hearing
19  unless and until your attorneys call you to testify in which
20  case they will walk you through exactly what they want you to
21  answer at that time.  But until then, you are more than welcome
22  to listen in on the hearing and be a participant in that
23  manner.  Do you understand that, sir?
24           MR. BAQER: Yes, Your Honor.
25           THE COURT: All right.  Counsel --
```

OFFICIAL TRANSCRIPT

```
 1              JUDICIAL ASSISTANT: Excuse me, Judge, it's Marie,
 2    your judicial assistant.  I don't think that the two reporters
 3    have announced and are on the record.
 4              THE COURT: Oh, okay.  I'm sorry, the media.  I
 5    thought you were talking about court reporters.
 6              JUDICIAL ASSISTANT: Media.
 7              THE COURT: I should have asked them that.  I didn't
 8    ask.  Is there any media present?
 9              MR. ZURIK: Judge Vitter, this is Lee Zurik from WVUE
10    TV.  Just for the record, we understand, and we are not
11    recording this call.
12              THE COURT: Okay, good morning.
13              MR. ZURIK: Good morning.
14              THE COURT: And is there somebody else?
15              MR. LILLICH: Also Cody Lillich from WVUE.  Good
16    morning, Your Honor.
17              THE COURT: Good morning.  Okay, if anyone else joins,
18    I apologize, just as people join, I will stop the proceeding
19    just to see who it is and make sure that we're aware of who it
20    is; even though it is open to people joining.
21              All right, plaintiff's counsel Mr. Jacob,
22    Mr. Collings, did I leave anything else out, or do you have any
23    questions before we begin?
24              MR. JACOB: No questions, Your Honor.  I'll just state
25    that we did make a push last night to try to resolve.  I don't
```

OFFICIAL TRANSCRIPT

  1  know if you want a status update on that.

  2          THE COURT: Who is that speaking?  Is that Mr. Jacob?

  3          MR. JACOB: I'm sorry, Devon Jacob.

  4          THE COURT: Okay, not at this time, Mr. Jacob.  May I

  5  surmise by the fact that we're proceeding that discussions

  6  weren't productive and that we're going to proceed with this

  7  hearing?

  8          MR. JACOB: Yes.

  9          THE COURT: All right.  We can --

 10          MR. COLLINGS: Your Honor, this is Chad Collings.  I

 11  just wanted to inquire, were you going to make a ruling on the

 12  objected to exhibits and witnesses prior to the hearing, or is

 13  that going to come later?

 14          THE COURT: No, I am.  I'm going to do that right now.

 15  Thank you, Mr. Collings.

 16          All right, one other thing I would ask, because I'm

 17  noticing this, if you're not speaking, I would ask that

 18  everyone mute their phone because I hear some static on the

 19  phone right now.  So if you have the ability to mute your

 20  phone, please do so.  And then when you need to speak, unmute

 21  it.  That resolved the issue that I was hearing.

 22          By court order, the plaintiffs and the defendants

 23  were ordered to submit an exhibit and witness list.  The

 24  plaintiffs have submitted a witness list, an exhibit and

 25  witness list that we have gone over yesterday during a status

                          OFFICIAL TRANSCRIPT

 1   conference.  Of those exhibits, the defendant objected to --
 2   I'm sorry, I'm getting the objections.  The defendant objected
 3   to six of them.
 4        Before I rule on all of those objections, I do want
 5   to confirm something with Mr. Jacob.  Mr. Jacob, I have
 6   received your Dropbox of exhibits this morning, and I thank you
 7   for that.
 8        MR. JACOB: Yes.
 9        THE COURT: I notice in the exhibit list that you had
10   filed in CM/ECF, there are some exhibits that are not in the
11   Dropbox, and specifically, Department of Health data,
12   Department of Corrections data, the St. Tammany Parish
13   Government website, the St. Tammany Parish Sheriff's Office
14   website.  Do you intend to offer those?
15        MR. JACOB: Yes, Your Honor.  I was not sure in light
16   of this format how you wanted that to be done.  Those are
17   websites, and we did cite to certain statistics in the brief
18   that we'd ask the Court to take judicial notice of.  And that
19   is why they are listed on the exhibit list, and that is the
20   extent that we intended to use them.
21        THE COURT: All right.  And there were no objections
22   to those by the defendants, but I just noticed that what you
23   submitted today in the Dropbox, they were not included, and I
24   wanted to clarify that.  So they are being offered, and they
25   will be in.

OFFICIAL TRANSCRIPT

1          As I mentioned to counsel yesterday, those exhibits

2    without objections are automatically and hereby entered into

3    evidence.  I am going to number those exhibits sequentially

4    right now so that we know, and I would ask that Counsel note

5    these exhibit numbers as well so that when you refer to them we

6    can have the same exhibit numbers.  And I'll rule on the

7    objections as I'm going through.

8          The first exhibit was a Public Report issued on

9    July 7th, 2012 offered by plaintiff.  Defendant has objected

10   to that Public Report.  Defendant's objection is lack of

11   foundation and relevancy because of the age of the report.

12         The Court has reviewed it.  The Court is going to

13   allow it.  The Court notes that the defendant has offered into

14   evidence a letter dated -- a 2017 letter from the Department of

15   Justice which, in fact, references this 2012 report.  So to the

16   extent that the objection is based on the time of the report

17   and that it is eight years old, the Court will give it whatever

18   due weight the Court feels appropriate because of the age of

19   the report.  But as to the relevance, the Court does think it's

20   relevant, and especially, it's relevant in light of the 2017

21   letter that the defendants have offered.  So I'm going to

22   overrule that objection and allow that into evidence.  That

23   will be Plaintiff Exhibit No. 1.

24         Plaintiff Exhibit No. 2 will be the Proclamation, the

25   Governor's Proclamation issued by the Governor of the State of

OFFICIAL TRANSCRIPT

 1   Louisiana.

 2              Plaintiff 3, Executive Order issued by St. Tammany

 3   Parish Government.

 4              Plaintiff 4, a Declaration of a State of Emergency

 5   issued by the City of Covington.

 6              Plaintiff 5, CDC Guidelines for Management of

 7   COVID-19 in Correctional and Detention Facilities.

 8              Plaintiff 6 was Title 22, Part III, Subpart 2 of the

 9   Louisiana Administrative Code.  Defendants have objected to

10   this as relevancy, saying they have no relevance to the issues

11   at hand and the pending motion for preliminary injunction.  The

12   Court is going to overrule that objection and allow that into

13   evidence as Exhibit 6.

14              Exhibit 7 is a Fox8 news story dated February 26,

15   2020.  I'm sorry, I'm making my own numbering system as I

16   speak.  And I'm going to speak about Plaintiff Exhibit 8, a

17   Fox8 news story dated March 5th, 2020 and speak about those

18   together because as to those two exhibits, 7 and 8, which are

19   two news stories, defendants have objected, asserting a lack of

20   foundation and to relevancy and that each of these -- neither

21   of these reports has any relevancy to the issues at hand on the

22   pending motion for preliminary injunction.

23              The Court has reviewed both of those news stories.

24   And while I agree that some of the information contained in the

25   news stories is not relevant, and further, some of the

                          OFFICIAL TRANSCRIPT

1   information are legal conclusions and expert testimony that is

2   not appropriate in this case, because no one has offered

3   anybody as an expert, and there is some testimony by Mr. Baqer

4   or statements by Mr. Baqer that I note are not under oath and

5   are not subject to cross-examination, the Court will afford

6   those news stories the weight that I think is appropriate.

7           But I do think there are parts of them that are

8   relevant to this.  And I am going to be a little more lenient

9   with the rules of evidence in this expedited hearing, and I'm

10  going to allow both of those news stories.  So I will overrule

11  the defendant's objections.

12          Those will be listed, the February 26, 2020 news

13  story will be Plaintiff Exhibit 7.

14          The March 5th, 2020 news story will be Plaintiff

15  Exhibit 8.

16          Plaintiff Exhibit 9 will be a Johns Hopkins

17  Coronavirus Resource Center data.

18          10 will be a March 9th, 2020 Press Release from, I

19  believe, the State of Louisiana.

20          11 is a March 14th, 2020 KATC news story that has

21  been objected to by the defendants.  The defendant's objection

22  to that exhibit is lack of foundation and relevancy.  This

23  report has no relevancy to the issues at hand on the pending

24  motion for preliminary injunction.

25          The Court has reviewed that exhibit, and the Court

OFFICIAL TRANSCRIPT

1  agrees that that exhibit has no relevancy and/or is duplicative

2  of other exhibits.  And so I'm going to sustain that objection

3  and not allow that exhibit.

4          Plaintiff Exhibit 11 will be the Department of Health

5  data, the specific website they have listed.

6          12, Department of Corrections data.

7          13, St. Tammany Parish Government website.

8          14, St. Tammany Parish Sheriff's Office website.

9          15, St. Tammany Parish Sheriff's Office Inmate

10 Rosters and Counts.

11         And I believe that is it for plaintiff's exhibits.

12 Mr. Jacob, did I miss anything?

13         MR. JACOB: I believe that is correct, Your Honor.

14         THE COURT: All right.  So does anyone have any

15 questions about the exhibit labeling so that we're all

16 referring to the same exhibit numbering system?  There will be

17 15 plaintiff exhibits.  Those are all automatically introduced

18 into evidence now.  So you do not need to ask that they be

19 introduced to use them.

20         Defendant also submitted an exhibit list of six

21 exhibits, and I will go ahead and number those.  Plaintiffs

22 have offered no objections to the defendant's exhibits, and

23 they are all introduced at this time into evidence.  Those are

24 Defendant's Exhibit No. 1, the affidavit of Major Lacey Kelly,

25 Warden of the St. Tammany Parish Jail with attachments.

OFFICIAL TRANSCRIPT

1          Mr. Collings, that is meant with attachments; is that
2   correct?
3          MR. COLLINGS: Yes, Your Honor.
4          THE COURT: All right, that's Defense Exhibit No. 1.
5          Defense Exhibit No. 2, January 31st, 2017
6   correspondence from the United States Department of Justice
7   regarding St. Tammany Parish Jail.
8          Defense Exhibit 3, relevant excerpts of the jail rule
9   book related to administrative remedy procedures.
10         Defense Exhibit 4, photographs of signage placed
11  around the St. Tammany Parish Jail.
12         Defense Exhibit 5, Guidance on Management of
13  Coronavirus Disease 2019 in Correctional and Detention
14  Facilities by the Centers for Disease Control, CDC.
15         And Defense Exhibit 6, the inmate ARP packet attached
16  to the affidavit of Major Kelly.
17         Mr. Collings, did I miss any of the defense exhibits?
18         MR. COLLINGS: No, ma'am, you got them all.  This is
19  Chad Collings.
20         THE COURT: Thank you.  And Mr. Jacob, am I correct
21  that there's no objection by the plaintiffs to any of those
22  exhibits?
23         MR. JACOB: That's correct, Your Honor.
24         THE COURT: All right.  So all of the exhibits as I
25  referenced are now introduced into evidence.

OFFICIAL TRANSCRIPT

1          And with that, unless there is anything else we have

2    procedurally, and I apologize for taking that time, but I

3    wanted to make this go as quickly as possible, and I thought

4    that would help.  I think we're ready to begin the hearing.

5          Is there anything else that anyone needs to bring up

6    before I ask the plaintiffs to begin by making an opening

7    statement?

8          MR. COLLINGS: This is Chad Collings.

9          THE COURT: Yes, Mr. Collings.

10          MR. COLLINGS: We had also entered an objection to

11    Mr. Baqer on relevancy to his testifying.  We sought to strike

12    him.

13          THE COURT: And it's not clear to me that they are

14    going to call him to testify.  So I'll rule on that if they

15    call Mr. Baqer to testify.  I think it's premature at this

16    point.

17          MR. COLLINGS: Thank you.

18          MR. ROMANUCCI: Your Honor, this is Tony Romanucci.

19          THE COURT: Yes, Mr. Romanucci.

20          MR. ROMANUCCI: Your Honor, I'll be giving the opening

21    statement and very likely the closing also.  I think combined

22    you're allowing the plaintiff and defendant each 25 minutes.

23    Can we use that as combined time, or are you holding us

24    strictly to the 10 minutes and 15 minutes?

25          THE COURT: I hadn't thought it out, Mr. Romanucci,

OFFICIAL TRANSCRIPT

```
1  but I'm happy to use it as combined time and say 25 minutes
2  total for anything.
3          MR. ROMANUCCI: Thank you, Your Honor, I appreciate
4  that.
5          THE COURT: Of course.  Anything else?  Mr. Romanucci,
6  are you ready to proceed?
7          MR. ROMANUCCI: I am, Your Honor.
8          THE COURT: All right, let's, please, your opening.
9          MR. ROMANUCCI: Good morning to all, and especially,
10 Your Honor for accommodating this hearing under these
11 circumstances and also counsel for defendants and may it please
12 this Court.
13          Plaintiffs do bring this motion for preliminary
14 injunction against the St. Tammany Parish Sheriff's Office to
15 enjoin inhuman and unconstitutional practices of confinement of
16 arrestees in the St. Tammany Parish Jail holding cells.  The
17 plaintiffs pray that this Court order injunctive relief, and
18 this is temporary -- this is a motion for temporary injunctive
19 relief assuring that the longstanding practices of the
20 St. Tammany Parish Sheriff's Office be stopped in light of the
21 crisis of COVID-19 and the particular threat it poses to
22 incarcerated individuals in the St. Tammany Parish Jail.
23          It is not acceptable to place a human being at risk
24 of serious illness or possibly death when one has the means and
25 knowing ability to prevent it.  Those are our allegations
```

OFFICIAL TRANSCRIPT

1  against St. Tammany Parish in this motion for preliminary
2  injunction.
3        Our country is facing a crisis that it has not seen
4  since 1918.  We are now faced with fighting an enemy that
5  cannot be spoken to, emailed, or Zoomed.  This enemy resides at
6  any given moment on any one of us in this hearing, and that is
7  the novel coronavirus or COVID-19.  We now know that the simple
8  intuitive or habitual act as simple as a handshake, a high-five
9  to a friend, and even a hug or a kiss to a loved one may result
10 in serious, grave, or deadly illness.  Without a doubt, that
11 would be considered a life-altering consequence for exchanging
12 a mere salutation.
13       Worst yet, the World Health Organization and the CDC
14 now recognize that the sole manner in which to prevent the
15 spread of an infection now known as COVID-19 for which there is
16 no vaccine is to create a minimum space distance of 6 feet
17 between people, avoid all physical contact among strangers, do
18 not be around anyone who has even shown symptoms as simple as a
19 sneeze because that sneeze may disperse water droplets that can
20 linger for hours and cause multiple contaminations among
21 people.
22       Your Honor, the evidence in this request for relief
23 is plain.  The St. Tammany County Parish Jail was doing none of
24 the required, let alone recommended protocols as pronounced by
25 the CDC even as early as March 13th.  This virus became known

OFFICIAL TRANSCRIPT

1   to the United States that we know on or about December 31st

2   of 2019 when China and Europe were already under siege.  The

3   No. 1 solution and recommended precaution is social distancing.

4   The No. 1 violation that we are alleging in this motion for

5   preliminary injunction is social distancing.

6           Indeed, when you look at the conditions as reported

7   in Plaintiff's Exhibit -- let me just get it correct -- No. 7

8   when there were approximately 24 people being held in a

9   10-by-20 cell, each person was afforded approximately 8.33

10  square feet, and that's assuming the person was standing.

11  Certainly, there was no chance at all of complying with the CDC

12  Guidelines of the 6-foot social distance.  Indeed, these

13  people, these jail detainees were being held for a period of

14  time of up to 18 days, lying down which clearly put them within

15  the proximity which was recommended by the CDC to not follow.

16  Be no closer than 6 feet.

17          So now I want to go through some of the issues that

18  we face here, and one of them is standing, Your Honor.  As

19  alleged in the plaintiff's complaint, the defendants have long

20  maintained a custom of housing as many as 24 inmates in a

21  crowded 10-foot by 20-foot holding cell for as long as 18 days,

22  and that's referenced in the 2012 and the 2017 DOJ report.  You

23  have it listed in our order now as Plaintiff's Exhibit No. 1.

24          While maintaining this custom, defendants deprived

25  inmates of showers, a clean and safe living environment, and

1  the ability to practice basic hygiene.  As a result, inmates
2  slept, if at all, on top of each other on concrete floors and
3  benches covered in vomit due to infrequent cleaning and
4  sanitation.  You will hear evidence of this today.

5          Plaintiffs Ahmed Baqer, Joseph Guillot, Junior, and
6  Joseph Guillot, Senior were subjected to these and other
7  conditions of confinement that violated the Fourteenth
8  Amendment.  As pretrial detainees at the time, their Fourteenth
9  Amendment rights were violated.  They were subjected to conduct
10 that is capable of repetition, and yet evading review, and
11 we've seen that in not only as far back as 2012, but now in
12 2020.

13         Constitutional violations that are inflicted upon
14 pretrial detainees are justiciable notwithstanding the fact
15 that said detainees may no longer be in pretrial detention
16 particularly where the constant existence of a class of persons
17 suffering the deprivation is certain.  These plaintiffs fit
18 that address -- redressability.  For example, Guillot, Junior
19 would benefit in a tangible way from the Court's intervention
20 since by issuing a preliminary injunction and not yet a
21 mandatory one -- we are not asking for that -- this Court will
22 have succeeded in preventing sickness and possible death.

23         It has been repeatedly stated by all of our
24 governments that successful social distancing and hygiene will
25 prevent the spread.  We've all heard, "Stay home.  Save lives."

OFFICIAL TRANSCRIPT

1   These pretrial detainees who are being held in holding cells
2   can't stay home.  They can't on their own save lives.  This
3   Court and Your Honor has to do it for them.
4           To earn a preliminary injunction, as Your Honor
5   stated yesterday and I'm not going to repeat them, we have four
6   burdens that we must establish.  And Your Honor knows them.
7   I'm not going to go through it to exactly what they are as to
8   use up precious time that we have based upon the time limits
9   that we have on opening and closing.  However, on our burden at
10  No. 1, a likelihood of success on the merits, the Fourteenth
11  Amendment secures for pretrial detainees the basic needs such
12  as medical care and safety, and that's what this case is about.
13  It's about safety, not only for the detainees, but also for the
14  employees of the jail.  And not only that, Your Honor, it
15  extends even further to the community at large when they are
16  released, if they are, from the jail population.
17          Chief Justice Rehnquist, perhaps, put it best when he
18  stated, "When the state, by the affirmative exercise of its
19  power, so restrains an individual's liberty that it renders him
20  unable to care for himself, and at the same time fails to
21  provide for his basic human needs -- food, clothing, shelter,
22  medical care, and reasonable safety -- it transgresses the
23  substantive limits on state action set by the due process
24  clause."
25          And that's where I bring you back to, Your Honor,

OFFICIAL TRANSCRIPT

1   that you have the ability to prevent the serious injury and

2   death that is lingering in this jail.  The defendants will have

3   you believe that because they are stating in their affidavit

4   that no one has become positive that the virus does not exist

5   within the jail, and that would be nearly medically impossible

6   by what we know.  Because they have claimed that there is no

7   positive COVID-19 tests, we don't know how many of the inmates

8   have been tested, and clearly, we don't know how many are

9   infected which may lead to the infection and/or death.

10          Plaintiff has also established the substantial threat

11  of irreparable injury if injunctive relief is not granted, and

12  that, Your Honor, we would refer you to the Johns Hopkins

13  article which is referenced now as No. 9.  Numerous district

14  courts have noted that inmates are at a heightened risk of

15  contracting COVID-19, and that's why the CDC Guidelines on

16  Plaintiff's Exhibit No. 5 were created.

17          Across the country, communities are frantically

18  trying to slow the spread of the virus by mandating social

19  distancing practices and instructing individuals to

20  self-quarantine.  And that's evident by the Louisiana

21  Governor's Proclamation which is Plaintiff Exhibit No. 3, Your

22  Honor.  Nothing less than injunctive relief will prevent the

23  defendants from continuing the practices that have been well

24  documented in plaintiff's complaint and the local reporting of

25  the Department of Justice's findings even back in 2012.

OFFICIAL TRANSCRIPT

1          The threat and injury certainly outweighs any harm

2   that will result if the injunction is granted.  You will hear

3   evidence to that.  Defendants failed to identify any real harm

4   that will be imposed upon them by the entry of injunctive

5   relief ensuring that whatever practices they claim are in place

6   will be maintained to ensure that while we are in this pandemic

7   crisis that the detainees are safe and that the prevention and

8   spread of this virus will not become rampant and become a

9   pandemic in and of itself within the jail.  The defendants

10  bemoan court oversight of the St. Tammany County Jail, but any

11  harm resulting from an entry of an order that would compel them

12  to maintain certain practices that they claim pales in

13  comparison to the serious risk of harm and/or death posed to

14  pretrial detainees.

15          And especially here, Your Honor, when we are

16  referring to pretrial detainees, we are referring also to the

17  new arrivals, the new arrivals who are held in holding cells.

18  And defense will argue the vociferously that these individuals,

19  that nobody here satisfied the standings of the PLRA, the

20  Prison Litigation Reform Act, and that therefore, none of them

21  have standing.  But that's a hollow argument, Your Honor, and

22  this is why.  When you listen to what the requirements of the

23  PLRA are, when you consider a new arrival, if, indeed, he

24  subjected himself to the PLRA and availed himself of that

25  administrative process, it would take him a full 80 days in

OFFICIAL TRANSCRIPT

1  order for him to have due process through that system.  And

2  that would be an impossibility for a new arrival who would be

3  held for 48 hours, 72 hours, or unjustifiably so even for

4  18 days in a holding cell with minimal hygienic ability, no

5  sleeping quarters, and maybe at best a blanket to cover himself

6  or herself.

7         The injunction will not disserve the public interest

8  at all.  An issuance of a preliminary injunction serves the

9  public interest in slowing the spread of COVID-19.  Pretrial

10 detainees can be released into the public after they come into

11 contact with other detainees and the

12 St. Tammany Parish Jail staff.  If they are subjected to the

13 conditions of confinement above, the community of St. Tammany

14 Parish is put at greater risk to the COVID-19 crisis without an

15 order for injunctive relief.  We've all --

16         DEPUTY CLERK: Mr. Romanucci, sorry, this is Melissa,

17 the judge's case manager.  You have 10 minutes of your

18 25 minutes left.

19         MR. ROMANUCCI: Thank you.  I have completed.

20         My closing sentence is that the Fourteenth Amendment

21 rights to St. Tammany Parish Jail inmates will be protected by

22 the entry of such an order in a manner that cannot be satisfied

23 by the self-serving statements of the sheriff and the warden of

24 the jail.  Thank you all.

25         THE COURT: Thank you, Mr. Romanucci.  I'm sorry I had

OFFICIAL TRANSCRIPT

1    to unmute myself.

2            Mr. Collings or Mr. Acosta, who will it be for the

3    defendants, or will you make an opening?

4            MR. COLLINGS: This is Chadwick Collings, Your Honor,

5    for the defendants.  It is my intention to go ahead and waive

6    our opening right now.  And I assume that means I'll have the

7    full 25 minutes, if I need it, for closing which I hopefully

8    will not.

9            I think what I would have said in opening is fully

10   within our brief that you have and you said you were reading

11   yesterday; so I don't want to say again what you've probably

12   already read.  So we'll go ahead and waive an opening at this

13   point.

14           THE COURT: All right, thank you, Mr. Collings.

15           Okay, counsel for plaintiffs.

16           MR. JACOB: Yes, Your Honor.  Can you hear me?

17           THE COURT: Is this Mr. Jacob?

18           MR. JACOB: Yes, this is Mr. Jacob, Attorney Jacob,

19   yes.  I will be presenting evidence at this time.

20           I'd like to call Ahmed Baqer as a witness.

21           THE COURT: All right, Mr. Baqer, you're on the call?

22           MR. BAQER: Yes, Your Honor.

23           THE COURT: All right.  Mr. Baqer, I'm going to ask

24   that you raise your right hand.  Do you swear that the

25   testimony you're about to give is the truth, the whole truth,

OFFICIAL TRANSCRIPT

1   and nothing but the truth so help you God?

2            COURT REPORTER: I'm sorry, I couldn't understand what

3   he said.

4            THE COURT: I'm sorry, who just spoke?

5            COURT REPORTER: The court reporter couldn't

6   understand the witness's response to the oath.

7            THE COURT: Mr. Baqer, what was your response to the

8   oath?  Do you swear to tell the truth, the whole truth, and

9   nothing but the truth so help you God?

10           MR. BAQER: Yes, Your Honor.

11           MR. COLLINGS: Your Honor, this is Chadwick Collings.

12           THE COURT: Mr. Collings, I'll take you in a moment.

13           Did the court reporter hear Mr. Baqer's answer at

14  this time?

15           COURT REPORTER: Yes, Your Honor.  Thank you.

16           THE COURT: Okay.  Mr. Collings, you want to raise

17  your objection?

18           MR. COLLINGS: Yes, Your Honor.  I would reurge my

19  objection.  I would stipulate on the record that Mr. Baqer was

20  held in the St. Tammany Parish Jail from December 2nd through

21  December 18th, and he was in holding from December 2nd to

22  December 17th.

23           Beyond that, Your Honor, I don't think any testimony

24  that he can provide is relevant or germane to these

25  proceedings.

OFFICIAL TRANSCRIPT

```
 1              THE COURT: Did you offer that stipulation to
 2   plaintiffs before this morning?
 3              MR. COLLINGS: I did not because I didn't know how you
 4   were going to -- if you were going to just exclude him or not;
 5   so I didn't.  I kind of thought of that as we were on the phone
 6   this morning.
 7              THE COURT: Mr. Jacob, is that stipulation acceptable
 8   to you?
 9              MR. JACOB: No, Your Honor.  We have just a little bit
10   more testimony from this individual to present that is relevant
11   directly to the motion at hand.
12              THE COURT: All right.  Mr. Collings, I'm going to
13   overrule your objection and allow him to testify taking
14   Mr. Jacob at his word and letting you know that let's keep it
15   streamlined and keep it narrow.  But I do think that he should
16   be allowed to testify, and I want to hear what he has to say.
17              So proceed.  Mr. Baqer, I think we all know your
18   name, but just state your name for the record, and spell it for
19   the court reporter, please.
20              THE WITNESS: Yes, Your Honor.  Ahmed Baqer,
21   A-H-M-E-D, last name, B-A-Q-E-R.
22              THE COURT: All right, Mr. Baqer, your attorney
23   Mr. Jacob is going to ask you some questions, and then possibly
24   the defense attorney will ask you some questions.  You're under
25   oath, and you must answer all the questions truthfully.
```

OFFICIAL TRANSCRIPT

1    Proceed, Mr. Jacob.

2    MR. JACOB: Thank you, Your Honor, and thank you for

3  your indulgence, and I promise to keep both witnesses very

4  short.

5                    DIRECT EXAMINATION

6  BY MR. JACOB:

7  Q.   Mr. Baqer, at some point in time, were you held as an

8  inmate at the St. Tammany Parish Jail?

9  A.   Yes, sir.

10 Q.   And do you recall the date when that occurred?

11 A.   December 2nd.

12 Q.   And when you were held at the jail, do you recall where

13 you were held?

14 A.   Holding Tank No. 4.

15 Q.   And do you recall how many days you were in Holding Tank

16 No. 4?

17 A.   14.

18 Q.   And do you recall how many people were in that holding

19 tank with you while you were in that holding tank?

20 A.   The average would be around, I'd say about 15 to 16

21 people, but there would be times there would be about 20, 22

22 people.

23 Q.   Okay.  At any point in time -- or would you just describe

24 the cell, the holding cell itself to the Court?

25 A.   The holding cell, there's four of them, 1, 2, 3, 4.

```
 1  They're very small, you know.  10-by-20, I wouldn't even give
 2  it that.  They're always dirty, overcrowded because they don't
 3  have anyone --
 4          COURT REPORTER: I'm sorry, Mr. Baqer, this is the
 5  court reporter.  I'm having trouble hearing you.  If you could
 6  speak more closely into your phone.
 7          THE COURT: Do you understand that, Mr. Baqer?  Try to
 8  speak a little closer.
 9          THE WITNESS: Yes, Your Honor.
10          THE COURT: Okay.  You were describing the holding
11  cell.
12          THE WITNESS: The holding cells are very small, like
13  10-by-20.  They're always very dirty and overcrowded definitely
14  because they don't move many people to the back.  You know,
15  there's nothing to do in there.  You're not going anywhere
16  unless you're getting moved to the back, and that's going to
17  take a week, you know, at the very least a week.  It's -- it
18  can be dangerous in there.
19  BY MR. JACOB:
20  Q.  Let me ask you some follow-up questions to break this down
21  a little bit.  I want to talk about what you just said about
22  the cell being dirty.
23      Can you describe the floor of the cell?  First of all,
24  what is it made of?
25  A.  It's concrete.
```

OFFICIAL TRANSCRIPT

1    Q.    And was there a toilet in the cell?

2    A.    Yes, sir.

3    Q.    And can you describe whether the area around the toilet

4    was clean or dirty?  Can you give us any description?

5    A.    The area around the toilet, there would be a lot of urine

6    around there.

7    Q.    And so that was urine on the floor?

8    A.    Yes, sir.

9    Q.    And would there be anything else on the floor?

10   A.    There would be food for -- probably the longest I've seen

11   food on the floor, the same food without them cleaning it up,

12   about four days.  And also, you know, somebody throwing up,

13   detoxing, a few people come in there detoxing because they're

14   hooked on something, and they come in there throwing up.  They

15   don't have, you know, they don't take them anywhere.

16   Q.    So there was vomit on the floor?

17   A.    Yes, sir.

18   Q.    And how long did the vomit remain on the floor before it

19   was cleaned up?

20   A.    A few of the inmates would bug the guards for about

21   six hours until they gave us a mop and made us clean it up.

22   Q.    So the vomit was on the floor for about six hours?

23   A.    Yes, sir, the first time.  But he was in there for a few

24   days, and he was vomiting all those days.

25   Q.    Did the same problem occur with the delay in getting the

OFFICIAL TRANSCRIPT

1  vomit cleaned?

2  A.   Yes, sir.

3  Q.   Was there any toilet paper on the floor?

4  A.   Always.

5  Q.   And where were you to sleep?

6  A.   I would sleep usually close to the door.  You don't really

7  have much of a choice to be honest.  You know, it's so crowded.

8  A lot of people would put their head near the toilet.  There's

9  a lot of urine on the ground, you know.  It's very overcrowded.

10 There's people in there that they move in there with, you know,

11 staph infections.

12 Q.   Okay.  Now, so am I to understand that you saw inmates

13 laying on the floor where there was urine and toilet paper, old

14 food and vomit?

15 A.   Yeah.

16       MR. COLLINGS: Your Honor, this is Chad Collings.  I

17 just object.  Counsel is leading this witness.  I kind of let

18 it go a couple of times.

19       THE COURT: Sustained, sustained.

20       MR. COLLINGS: Thank you.

21       THE COURT: Go ahead, Mr. Jacob.

22 BY MR. JACOB:

23 Q.   Were you provided with soap in the cell?

24 A.   We were provided with soap.  But if we didn't have any,

25 you know, we'd have a hard time getting clean, you know.

OFFICIAL TRANSCRIPT

1   Sometimes for whatever reason, they would -- they just wouldn't
2   give it to us, and you know, we'd bug them.  We'd bang on the
3   door, and nothing would happen for, you know, hours at a time.
4   Q.   Were you able to wash your --
5           THE COURT: I have a -- this is the judge
6   interrupting.  I'm sorry, I didn't fully understand that.
7           Mr. Baqer, did you say you were provided with soap?
8           THE WITNESS: Not regularly.  If we asked, you know,
9   it would take hours to get their attention to actually get, you
10  know, hygiene stuff.
11          THE COURT: Okay.
12          MR. JACOB: Thank you.
13  BY MR. JACOB:
14  Q.   Were there times that you were not able to wash your
15  hands?
16  A.   I'm thinking of the -- there was never enough soap for
17  everyone to wash their hands.  So I don't think anyone washed
18  their hands regularly at all.
19  Q.   Okay.  Was there any trash that was produced from eating
20  or otherwise?
21  A.   There's always a brown paper bag that they gave us to put
22  trash in usually by the door, but it's not big enough to hold
23  all the inmates' trash.  So the trash ends up everywhere in the
24  cell.  And then --
25  Q.   And how often -- I'm sorry, I cut you off.  I apologize.

OFFICIAL TRANSCRIPT

1        How often was the trash removed from the cell?

2   A.    Every time we got showers.

3   Q.    Okay.  And how often would you get showers?

4   A.    One week, I got a shower three times.  And one week, I got

5   a shower two times.

6   Q.    And when you are provided access to the shower, was there

7   soap available to you?

8   A.    A few times, there weren't because they keep them in big

9   bottles; so a lot of people can use it.  But I'd tell you about

10  50 percent of the time they had it, 50 percent not.

11  Q.    And I think you mentioned that they cleaned the cell or

12  removed trash on shower days; is that correct?

13  A.    Yes, sir.

14  Q.    Can you explain what the cleaning process was for the

15  holding cell?

16  A.    Pretty much somebody comes in there taking out the trash

17  and mopping, sweeping and mopping, you know, very quickly.

18  Q.    Was the floor clean in your opinion after the floor was

19  mopped?

20  A.    No, sir.

21  Q.    Were there any cleaning supplies provided to you in the

22  holding cell?

23  A.    No, sir.

24  Q.    And at any point in time, did you see any inmates in the

25  cell with open wounds?

OFFICIAL TRANSCRIPT

```
 1  A.   Yes, sir.

 2            MR. JACOB: I have no further questions, Your Honor.

 3            THE COURT: All right.  Mr. Collings or Mr. Acosta, do

 4  you have questions for Mr. Baqer?

 5            MR. COLLINGS: I have a few, Your Honor.  This is

 6  Chadwick Collings.

 7                         CROSS-EXAMINATION

 8  BY MR. COLLINGS:

 9  Q.   Mr. Baqer, why were you in the St. Tammany Parish Jail?

10            MR. JACOB: Objection, relevance.

11            THE COURT: I'm going to allow it.  It goes to

12  credibility, and I want to hear.

13  BY MR. COLLINGS:

14  Q.   Mr. Baqer, did you hear my question?

15            THE COURT: I'm sorry, Mr. Baqer, you're right to wait

16  when I rule on something.  So I will tell you when you can

17  answer.  Yes, you may answer that question.

18            THE WITNESS: Yes, Your Honor.

19            I went to St. Tammany Jail because I was speeding on

20  my motorcycle, and I didn't stop.  And I ended up getting

21  charged with obstruction of a highway which is a felony.  But

22  the second time I went was because I missed court and didn't

23  have a bond.

24  BY MR. COLLINGS:

25  Q.   Okay.  Mr. Baqer, again, this is Chad Collings.  I looked
```

OFFICIAL TRANSCRIPT

1  at some of your records, and I'm kind of confused by your

2  answer.  I have records that indicate you were arrested in

3  March of 2019 and arrested again in April of 2019.  Are those

4  the charges you just described?

5  A.   No.  In April, I was arrested for speeding, and that

6  wasn't even in St. Tammany.

7  Q.   Okay.  And where did you -- did you get taken to a

8  different jail in April of 2019?

9  A.   No, sir.

10  Q.   Well, if you were arrested, where did you go in April of

11  2019?

12  A.   Gretna.

13  Q.   Okay.  And is there a jail in Gretna that you went into?

14  A.   Whatever jail is in Metairie, you know.  I'm not from

15  there; so I don't know what jail it would be.  But whatever

16  jail is in Metairie, the police take me to.

17  Q.   All right, and how long -- I'm sorry.  How long were you

18  in that jail in Gretna?

19          MR. JACOB: Objection to relevance.

20          THE COURT: What's the objection?

21          MR. JACOB: It's not relevant to the prison conditions

22  at this current jail.

23          THE COURT: And is this Mr. Jacob making the

24  objection?

25          MR. JACOB: Yes, I'm sorry, Your Honor, Devon Jacob.

OFFICIAL TRANSCRIPT

 1          THE COURT: Okay.  Mr. Collings, what is the relevance

 2    of this line?

 3          MR. COLLINGS: Well, he's testifying as to the

 4    unsanitary conditions, how often the jail was cleaned, how

 5    often he got to take a shower, that sort of thing, how many

 6    people were in the holding cells with him.  So I'm just trying

 7    to understand was his experience in the St. Tammany Parish Jail

 8    unique or were there other jails that he experienced in his

 9    past that were comparable.

10          I'm sorry, Judge, I would just ask for a little

11    latitude because I have not had an opportunity to depose the

12    gentleman given our very abbreviated schedule so far.

13          THE COURT: I'll give you a little latitude.  I

14    understand that.  But we're not going to go into all the

15    specifics about other times he was detained or incarcerated

16    because the questions are only relevant to this incarceration;

17    so I'll give you a little bit of latitude.

18          The question, Mr. Baqer, was:  How long were you in

19    jail when you were arrested in April of 2019?

20          THE WITNESS: Yes, Your Honor.  If I am correct and

21    that was when I went to Jefferson Parish, I was only in there

22    for about one day.  And I did not have to sleep on concrete,

23    and it was very, very clean.

24    BY MR. COLLINGS:

25    Q.   Mr. Baqer, how did you get out after that one day in jail?

OFFICIAL TRANSCRIPT

```
 1  A.   They let you out --
 2  Q.   Did you bond out?
 3  A.   -- because of overcrowding.
 4  Q.   The jail in Jefferson Parish was too crowded; so they let
 5  you out?
 6  A.   Yes, sir.
 7  Q.   All right.  And did those charges -- what was the
 8  disposition of those charges from Jefferson Parish; do you
 9  know?
10  A.   Disposition, I just had to pay a ticket.
11  Q.   So that's been resolved?
12  A.   I believe I owe the speeding.
13  Q.   So did you pay the speeding or not?
14            MR. JACOB: Objection, Your Honor.
15            THE COURT: Okay, I'm going to sustain it.
16  Mr. Collings, we're going far afield.
17            MR. COLLINGS: I just had -- he talked about being a
18  felony.  He was out on a warrant or he missed court.  I'm just
19  trying to nail down what court did he miss and from where
20  because that was part of why I believe he was in our jail.
21            THE COURT: All right.  Not to advise you, but you
22  could ask him that.
23            But I'm going to sustain the objection whether he's
24  paid the speeding ticket or not.
25            MR. COLLINGS: All right.
```

                          OFFICIAL TRANSCRIPT

1   BY MR. COLLINGS:

2   Q.   Mr. Baqer, this is Chad Collings.   Question for you:   You

3   mentioned that you failed to appear in court.   Which court did

4   you fail to appear in?

5   A.   St. Tammany Jail, St. Tammany court.

6   Q.   Okay.   And was that for the March of 2019 arrest?

7   A.   Yes, sir.

8   Q.   Okay.   So tell us exactly what happened in March of 2019.

9   Was that on the Causeway?

10          MR. JACOB: Objection, Your Honor.   This is Devon

11   Jacob.

12          THE COURT: Mr. Jacob, you're making an objection.

13   Why?

14          MR. JACOB: This is completely irrelevant.   He got the

15   charge in for credibility.   But the underlying facts to the

16   charge, it's just not, it's not relevant to this proceeding.

17          THE COURT: Okay.   I'm going to overrule it and give

18   him a little bit of time, short, to get an understanding of why

19   he was in jail.   I do think it's relevant.

20          Mr. Collings, proceed.

21          Mr. Baqer, you can answer the question.

22          THE WITNESS: Yes, Your Honor.

23   BY MR. COLLINGS:

24   Q.   If you wouldn't mind telling us, Mr. Baqer, as I

25   understand it, you had an interaction with law enforcement in

1  March of 2019.  Tell me what happened, what were you charged

2  with, and by whom?

3             MR. JACOB: Your Honor, can I just state one more

4  objection, Devon Jacob, just to build a record here?

5             THE COURT: Go ahead, Mr. Jacob.

6             MR. JACOB: Yes, this is very prejudicial and

7  absolutely not relevant to the underlying facts.  He has

8  testified why he was in that jail.  And under 403, this

9  confuses the issue, and it's overly prejudicial.

10             THE COURT: Your objection is noted, and it's

11  overruled.

12             You may answer the question, Mr. Baqer.

13             THE WITNESS: What happened when I got arrested, I got

14  stopped, and there were probably a few police cars.  And they

15  booked me, I believe, in the sheriff's office first.  I'm not

16  sure.  I'm not sure how they arrest people in St. Tammany.  I'm

17  not used to getting arrested at all to be honest.  I got

18  booked.  I went to jail, and I bonded out probably a couple of

19  days later the first time I went to jail.

20             And then actually, I missed court because I didn't

21  have a ride, and it's so far.  And my mom lives in Texas; so

22  there's no way I could get there.  And the next thing you know,

23  a bounty hunter, you know, come after me.  And that's why I was

24  in jail this last time in December.  And the reason I didn't

25  get out is because I couldn't afford the bond.

OFFICIAL TRANSCRIPT

1   BY MR. COLLINGS:

2   Q.    Okay, I think I understood.  I want you to correct me if

3   I'm wrong on what I just -- basically, I'm taking notes, and I

4   want to make sure I understood you correct.

5   A.    Yes.

6   Q.    So in March of 2019, you were arrested.  Was it for

7   speeding?  You just said you were stopped.

8   A.    At the end of it all.

9   Q.    Okay.  Well, what did they charge you with in March of

10  2019?  What did they arrest you for specifically?

11  A.    Obstruction of highway.

12  Q.    That's it?

13  A.    Aggravated flight, DWI.  There's two more.  I'm not sure

14  what they are.

15  Q.    Okay.

16  A.    But I ended up getting just obstruction, the DWI, and I

17  think possession of marijuana.  But I'm not sure to be honest.

18  Q.    Okay.  But that arrest, you said you were out in about a

19  day; is that right?

20  A.    I think it was two days.

21  Q.    Okay.  And your experience in March of 2019 for that

22  arrest in the St. Tammany Parish Jail, was it different than

23  your experience in December of 2019?  Meaning, were you in the

24  same holding cell, was it the same number of people in the

25  holding cells approximately, that sort of thing?

OFFICIAL TRANSCRIPT

1  A.    Same number of people in the holding cells, I remember.  I

2  remember people talking about being in there for a long time.

3  It still wasn't very sanitary, you know.  Sleeping on concrete

4  isn't great even if it is two days, you know.

5  Q.    Okay.  Now I have some information that you may have also

6  been arrested in Florida.  Is that true?

7             MR. JACOB: Objection, Your Honor, Devon Jacob.

8             THE COURT: And your objection being?

9             MR. JACOB: Again, relevance.  We are talking about

10  the St. Tammany Parish Jail prison conditions.  What's going on

11  in Florida in a different environment in a different situation

12  is not relevant to what's going on in St. Tammany and what

13  St. Tammany can and cannot do and what the Constitution frankly

14  requires.

15             THE COURT: Mr. Collings, what's the time period we're

16  talking about because I do think we're going far astray?

17             MR. COLLINGS: One second, Your Honor.  It looks like

18  it was around 2015.  The reason I asked that is because he just

19  testified he doesn't have a lot of experience with jails and

20  law enforcement, and I'm trying to make sure I understand

21  whether that's true or not.

22             THE WITNESS: I'd like to answer that, Your Honor.

23             THE COURT: All right, Mr. Baqer.

24             THE WITNESS: I was given adjudication withheld.

25  BY MR. COLLINGS:


                          OFFICIAL TRANSCRIPT

1   Q.   I didn't understand what you just said, Mr. Baqer.  Can

2   you repeat that, please?

3   A.   I was given adjudication withheld.  I did nothing wrong.

4   Q.   So you were arrested in 2015 in Florida; is that right?

5   A.   I was arrested, but I was only in there for probably a day

6   max.  And I got adjudication withheld.

7   Q.   Does that mean the district attorney chose not to

8   prosecute you, or you went into diversion?  Explain what that

9   means.

10  A.   They chose not to prosecute me.

11  Q.   Did you ever have to pay any fines, go through diversion,

12  or anything like that?

13  A.   I paid about $800 court fees.

14  Q.   Okay.  Was there what we call in Louisiana, it's called

15  diversion.  Is there some kind of program you were in that

16  allowed you to have the charges dropped?

17  A.   They offered me pretrial diversion, three months, and I

18  refused because I was not guilty of that.

19  Q.   Who found you not guilty?

20  A.   I wasn't found not guilty.  The judge gave me adjudication

21  withheld.

22  Q.   Okay, all right.  Have you been arrested anywhere else

23  other than the ones you've already described for us?

24  A.   No, sir.

25  Q.   Okay.  To make sure I understand your testimony from

OFFICIAL TRANSCRIPT

1  earlier, sir, am I correct that you were in the holding cell
2  for 15 days; is that correct?
3  A.   14.
4  Q.   14 days.  And that in that time, you were allowed to
5  shower twice one week and three times the other week; is that
6  correct?
7  A.   Yes, sir.
8  Q.   All right.  Were you provided a blanket in the holding
9  cell?
10  A.   Yes, sir.
11  Q.   Were you ever denied medical attention in the holding
12  cell?
13  A.   Yes, sir.
14  Q.   I couldn't hear you, sir.  Can you repeat your answer?
15  A.   Yes, sir, I was denied medical attention.
16  Q.   Describe what you -- describe that.  How did that happen?
17  A.   I suffer from anxiety and depression, and I didn't have my
18  medication that I take.  And they couldn't do anything about it
19  pretty much.  So I had to sit in there for those days and
20  suffer.
21  Q.   Okay, so let me make sure I understand you.  When you
22  arrived at the jail, they asked you what medications you were
23  on, and what were those?  Sir?
24  A.   Anxiety medication which is Xanax.
25  Q.   Anything else?

OFFICIAL TRANSCRIPT

1   A.   That's it.

2   Q.   Did you have that medication on you when you were booked

3   into the jail?

4   A.   No, I did not.

5   Q.   And so your complaint is that the sheriff did not provide

6   you with Xanax while you were in the jail; am I correct?

7   A.   That's not my complaint.

8   Q.   Well, you said you were denied medical care.  Is there any

9   other medical care that you were not given?

10  A.   It's not about the medicine.  It's the, you know, it's

11  mental health.  And even though I would, you know, beg them if

12  I could see a doctor or somebody, you know, they won't do

13  anything.  They didn't do anything.  They didn't do anything

14  for anybody.

15  Q.   Okay.  Let me make sure and drill down just a little bit.

16  When you came to the jail, did you have a prescription with you

17  for Xanax?

18  A.   I did not.

19  Q.   All right.  And so how did you get denied your medication?

20  Explain that to me.

21          MR. JACOB: Objection, Your Honor, Devon Jacob.

22          THE COURT: Yes, Mr. Jacob.

23          MR. JACOB: This is not relevant to what has been

24  raised in this particular motion.  That's certainly something

25  we're going to address in the overall complaint.  It's way

OFFICIAL TRANSCRIPT

```
 1   outside the scope of direct.  And again, we're not focused on
 2   the medication, prescription medication in this hearing at this
 3   time.
 4             THE COURT: Overruled.  Mr. Jacob, you understand that
 5   in order to prevail on the motion for preliminary injunction
 6   you need to show substantial likelihood on the merits on your
 7   complaint; so it is relevant.  What is alleged in the complaint
 8   is relevant to this.  In fact, it's the first factor.
 9             MR. JACOB: No, I understand that, Your Honor, and I
10   apologize.  What I meant to say was there are other conditions
11   that we were focused on which we absolutely should prevail on
12   in this particular hearing for injunctive relief related to
13   prescription medication.  That's all I was saying.
14             THE COURT: Objection is overruled.
15             I'd also ask -- somebody is speaking in the
16   background, and I understand that the attorneys have to
17   consult.  I think it's an attorney.  I don't know that.  I
18   would ask, again, anyone else not speaking, mute your phones
19   while defense is doing their cross-examination; so we don't
20   interrupt them and just unmute it if you have an objection.
21             Mr. Collings, proceed.
22   BY MR. COLLINGS:
23   Q.  Mr. Baqer, this is Chad Collings again.  I need to ask
24   you, I think you already answered that you did not have a
25   prescription with you when you came to the jail.  But did you
```

OFFICIAL TRANSCRIPT

1  have a prescription somewhere else for Xanax?

2  A.   I was prescribed it definitely.  I had a prescription for

3  it, but I didn't have my prescription bottle.

4  Q.   Okay.  And did you ask the sheriff to provide you with

5  that Xanax while you were in the jail?

6  A.   The nurse or?

7  Q.   The sheriff or his employees, I'm sorry.

8        THE COURT: Mr. Baqer, you were saying you asked the

9  nurse?

10       THE WITNESS: Yeah.  When we first get there, the

11  nurse is the person that we see to tell which medications we're

12  taking.

13 BY MR. COLLINGS:

14 Q.   And you told the nurse you were on Xanax?

15 A.   And I also think it was bupropion which is an anti -- I

16 don't know.  I think it's to right my mood or something like

17 that.

18 Q.   Did you --

19       THE COURT: Mr. Baqer -- excuse me, Mr. Collings.  I

20 didn't hear the answer.

21       Mr. Baqer, Mr. Collings asked:  Did you advise the

22 intake nurse that you were on Xanax?  I didn't hear your

23 answer.

24       THE WITNESS: Yes.  Yes, Your Honor, multiple times.

25       THE COURT: All right, thank you, sir.


OFFICIAL TRANSCRIPT

BY MR. COLLINGS:

Q.   And is it your testimony, sir, that the sheriff's office at the jail did not provide you with the Xanax that you believe you were -- that you needed?

A.   Could you repeat that one more time, please?

Q.   Is it your testimony, sir, that the sheriff's office did not provide you with the Xanax and the other medication, and I couldn't quite make it out either.  But is it for those two medications that you said you were on that you had a prescription for, is it your testimony that you were not provided those medications while you were in the sheriff's office for 14 days, the jail rather?

A.   That's true that I said that, but that wasn't the main point of my testimony.  The main point of my testimony was that we don't get the, you know, medical attention that we need.

Q.   Okay.  Well, what other medical attention do you believe you needed while you were in the sheriff's jail, St. Tammany Parish Sheriff's Jail for 14 days that you did not receive other than the medication you just described?

A.   I mean anxiety, depression, you know.  I couldn't -- sometimes I can't sleep.  I'd ask to see the nurse, or you know, the doctor.  I'd write out a little slip that they give us probably about five times, you know.  People give them in all day, and they still don't see them for like a week.

Q.   All right.  Did you see a nurse while you were in the

OFFICIAL TRANSCRIPT

1   St. Tammany Parish Jail?

2   A.   Yes, sir.

3   Q.   Did you ever see a physician while you were in the

4   St. Tammany Parish Jail?

5   A.   No, sir.

6   Q.   All right.   What was the name of the doctor that

7   prescribed the medications you just told us about?

8   A.   The name of the doctor?

9   Q.   Yes.   You had a prescription for two medications you just

10  testified about.   Who prescribed them to you?

11  A.   I go to a mental health clinic, and it's not -- it's the

12  person that works in the front or whatever that writes up

13  prescriptions.   It's not the person that works in the mental

14  health.

15  Q.   All right.   Sir, do you understand how prescriptions are

16  prescribed, that a physician actually has to see you and give

17  them to you?

18       Who is that person?   What is the name of the doctor?

19            MR. JACOB: Objection, Your Honor.

20            THE COURT: Sustained.   Mr. Collings, I don't know

21  what the relevance is of this, but I'm sustaining the

22  objection.   We're going far afield.

23            MR. COLLINGS: Fair enough.

24  BY MR. COLLINGS:

25  Q.   All right, sir, what else -- besides the complaints you

OFFICIAL TRANSCRIPT

1  just described to us about the medical treatment you received

2  in the jail and the testimony you've already given to your

3  counsel on direct, what other issues did you have at the jail

4  that you'd like to tell the Court about?

5  A.   Trying to get the CO's attention.  Feeding us at different

6  times of the day.  Bringing us blankets at 2:00 o'clock in the

7  morning and taking them at 4:00 o'clock in the morning.  And

8  feeding us at 4:00 o'clock in the morning and feeding us at

9  11:00 and giving us a small sandwich at 1:00 p.m., 2:00 p.m.

10  People fighting in the cell blocks, and y'all watching them and

11  not even doing anything about it.  People throwing up and

12  detoxing so bad that they're shaking, and you know, they can't

13  breathe and not doing anything about it, you know.  There's a

14  lot of things that go on.

15  Q.   You told us a lot of stuff.  Let's start with the

16  fighting.  Who fought in the holding cell that you observed?

17  Give me the names, please.

18  A.   I remember this one guy.  His name was Kyle Cavalier or

19  Coley or something like that, but he was in there with me, and

20  he got in a fight with about two people.  And there was another

21  guy in there that laid up against the window.  I believe he got

22  in there one day before me.  He was in my -- he was in Holding

23  Tank No. 4 too, and he punched an old man in the face because

24  he didn't like what he said.

25  Q.   All right.  Did anybody ever strike you?

OFFICIAL TRANSCRIPT

1  A.   No, sir.

2  Q.   Did you ever strike anyone while you were in holding?

3  A.   No, sir.

4  Q.   You testified that meals came at hours that you did not

5  like; is that correct?

6  A.   That's not what I said.

7  Q.   All right.  Well, you talked about a sandwich coming at

8  11:00 p.m., sometimes at 11:00 a.m.  Were you ever denied food

9  by the sheriff's office?

10  A.   Yes.

11  Q.   Tell me about that.  How long were you denied food?

12  A.   When I first got there, I probably didn't get food until

13  probably about 18 hours.

14  Q.   So you arrived at the jail, as I appreciate it, on

15  December 2nd, 2019; is that correct?

16  A.   Uh-huh.

17  Q.   You have to say yes or no, please.

18  A.   Yes, sir.

19  Q.   All right.  And what time of day did you arrive at the

20  jail?

21  A.   It was about 1:00 o'clock, 2:00 o'clock in the morning.

22  Q.   Okay.  It's your testimony that you didn't receive

23  anything to eat for approximately 18 hours after you arrived at

24  the jail at approximately 1:00 or 2:00 o'clock in the morning;

25  is that right?

OFFICIAL TRANSCRIPT

1   A.   I didn't even get breakfast.  I didn't get breakfast.

2   Q.   That wasn't my question, sir.  Can you just, please,

3   answer the question I asked you which is:  From 1:00 or 2:00

4   o'clock in the morning on December 2nd, is it your testimony

5   that you didn't receive anything to eat until approximately

6   18 hours later; is that correct?

7   A.   Yes, yes, sir.

8   Q.   All right.  And from that point forward, were you ever

9   denied food for an entire 18 hours or longer period?

10   A.   Not that long, no, sir.

11   Q.   Okay.  You talked about staph infections and open wounds

12   during your testimony to -- during the questioning by your

13   counsel.  Do you have any medical training, sir?

14   A.   I've had CPR training in the past.

15   Q.   Okay.  Other than CPR training, do you have any other

16   medical training?

17   A.   No, sir.

18   Q.   I'm sorry, what was that?

19   A.   No, sir.

20   Q.   Mr. Baqer, have you been inside of the St. Tammany Parish

21   Jail at any time subsequent to December 18, 2019?

22   A.   No, sir.

23   Q.   Do you have any knowledge of the current conditions within

24   the jail?

25   A.   I know that -- I'm not sure if it's true or not, but I was

OFFICIAL TRANSCRIPT

1    told that they are not holding them in the holding cell longer
2    than three days now which was illegal anyways.
3                MR. COLLINGS: All right, Your Honor, I would just
4    make an objection to the responsiveness of the witness, that he
5    is providing hearsay about he was told.  I don't know who told
6    him that, so.
7                THE COURT: I am sustaining, Mr. Collings, and I'll
8    give that the weight that -- yeah, I'm not going to listen to
9    hearsay or what he was told by somebody else.
10   BY MR. COLLINGS:
11   Q.   Mr. Baqer, now I'm only asking you about what --
12               MR. JACOB: Your Honor.
13               THE COURT: Wait.  I believe Mr. Jacob is speaking.
14   Mr. Jacob.
15               MR. JACOB: Yes, Your Honor.  Just to respond to that
16   argument, I believe hearsay is permissible in a preliminary
17   injunction setting, and he did open the door and ask the
18   question.
19               THE COURT: Mr. Jacob, so you want in evidence that
20   he's heard that they're no longer holding anybody beyond two or
21   three days?  Is that what you're asking me to hear?
22               MR. JACOB: I'll withdraw my comments, Your Honor.
23               THE COURT: Okay.
24   BY MR. COLLINGS:
25   Q.   Mr. Baqer, this is Chad Collings again.  Let me make my

                          OFFICIAL TRANSCRIPT

```
 1   question a little bit clearer for you.  I'm not really
 2   interested in what you may have been told by other people.
 3        I want to know specifically, sir, do you have any
 4   firsthand knowledge about the current conditions inside the
 5   St. Tammany Parish Jail?
 6   A.   No, sir.
 7   Q.   Do you have any firsthand knowledge about the protocols in
 8   place in the St. Tammany Parish Jail right now for the COVID-19
 9   epidemic?
10   A.   No, sir.
11        MR. COLLINGS: That's all I have, Your Honor.  Thank
12   you.
13        THE COURT: Thank you, Mr. Collings.
14             Mr. Jacob, do you have anything else for
15   Mr. Baqer?
16        MR. JACOB: Just two follow-up questions, Your Honor.
17                 REDIRECT EXAMINATION
18   BY MR. JACOB:
19   Q.   The first question, Mr. Baqer, you talked about a staph
20   infection.  How was it that you knew it to be a staph
21   infection?
22   A.   The first time I actually went back and see the nurse, I
23   went to the back.  They called a few people in our holding
24   cell, and a few of us went back there.  And I was in there with
25   one guy, and they told him that he had a staph infection.  And
```

OFFICIAL TRANSCRIPT

1  the next thing you know, when we were going back to our blocks,
2  he ends up on the floor.
3  Q.   And as to the blanket, could you describe the condition of
4  the blanket that you received?
5  A.   They're torn, gray, you know, very scratchy.  Some people
6  would like get like half blankets, quarter blankets.  Nothing
7  that would keep you warm.
8  Q.   Was the blanket clean?
9  A.   Yes, sir, they did clean them.
10 Q.   And was the blanket dry?
11 A.   No, sir.
12         MR. JACOB: Nothing further, Your Honor.
13         THE COURT: Mr. Baqer, I just have a couple of
14 questions just to clarify something.  And before I do that, I
15 would again ask people to mute their telephones because I
16 continually hear conversations, Counsel.
17         MR. JACOB: Your Honor, I believe that's the jail.  I
18 just say that because of my prior conversation with my client
19 at the jail and my experience during that.
20         THE COURT: It may well be.
21         Mr. Baqer, I just have a couple of questions because
22 I want to make sure that I have an understanding.  Can you give
23 me an idea of how many times you saw a nurse or medical
24 assistant or anyone at the jail?
25         THE WITNESS: A nurse or medical assistant did come in

OFFICIAL TRANSCRIPT

1  for detox and I believe two more times a day.  But that didn't
2  necessarily mean you could get their attention for them to
3  check you out more.

4          THE COURT: Am I understanding that the nurse or
5  medical assistant would come into the holding cell three times
6  a day?  You said two more times, three times a day?

7          THE WITNESS: No, Your Honor, they would open the
8  little latch.

9          THE COURT: Okay.  And how often would that be opened?

10          THE WITNESS: About three times a day until everyone
11  got their meds.

12          THE COURT: I understand, okay.  All right, that
13  clears that up for me.  Thank you.  I don't have anything else.

14          Mr. Jacob, would you like Mr. Baqer to remain on, or
15  can he be released and hang up if he wishes?

16          MR. JACOB: He can be released.  And again, though,
17  since he is a party, if the Court will permit, I think you just
18  said it, but I think he should be permitted to listen if he so
19  desires.

20          THE COURT: Of course, of course.  Mr. Baqer, you're
21  not -- you've concluded your testimony, and I appreciate it.
22  Sir, you're not going to be testifying anymore.  You may listen
23  to the rest of the hearing because you're a party.  If you have
24  the ability to mute your telephone, I would ask that you mute
25  it because you will not be testifying anymore.

OFFICIAL TRANSCRIPT

 1              THE WITNESS: Yes, Your Honor.

 2              THE COURT: But you're more than welcome to stay on,

 3  but you do not have to.

 4              THE WITNESS: Yes, Your Honor.  Thank you.  I

 5  appreciate it.

 6              THE COURT: Thank you.  Mr. Jacob, next?

 7              MR. JACOB: Your Honor, I'd like to call Klabert

 8  Guillot.

 9              THE COURT: Okay, is Mr. Guillot on the phone?

10              MR. GUILLOT, JR.: Yes.  Yes, I am.  This is Klabert

11  Guillot.

12              THE COURT: All right, Mr. Guillot, would you raise

13  your right hand?

14              MR. GUILLOT, JR.: Yes, Your Honor.

15              THE COURT: Do you swear to tell the truth, the whole

16  truth, and nothing but the truth so help you God?

17              MR. GUILLOT, JR.: Yes, Your Honor.

18              THE COURT: Okay.  Would you spell your name for the

19  court reporter, sir?

20              MR. GUILLOT, JR.: Klabert Guillot.  It's

21  K-L-A-B-E-R-T, Guillot, G-U-I-L-L-O-T, Junior, J-R.

22              THE COURT: Thank you, Mr. Guillot.  Just as you were

23  hearing before, your attorneys will ask some questions, and

24  then we may have some questions by defense counsel.

25              Mr. Jacob or any counsel for the plaintiff.

OFFICIAL TRANSCRIPT

1        MR. JACOB: Yes, Your Honor, Mr. Jacob, thank you.

2                    DIRECT EXAMINATION

3    BY MR. JACOB:

4    Q.   Mr. Guillot, are you presently incarcerated at the

5    St. Tammany Parish Jail?

6    A.   Yes.

7    Q.   And do you recall the date that you entered the jail for

8    this present incarceration?

9    A.   December 18th, 2019.

10   Q.   And when you were brought into the facility, where were

11   you housed?

12   A.   I was housed in Holding Tank 3 and 4.

13   Q.   And how long do you believe that you were in those holding

14   cells combined in total?

15   A.   19 days.

16   Q.   And while you were in those holding cells, do you recall

17   how many people on average were in the cells with you?

18   A.   Above 30 most of the time and --

19   Q.   And -- I'm sorry, go ahead.

20   A.   The most was like 37 on one occasion.

21   Q.   What was that occasion?

22   A.   It was New Year's, New Year's Eve, New Year's Day.  That's

23   the reason I recall it because I remember saying this was a bad

24   way to spend New Year's Eve.  We couldn't even lay down.

25   Q.   And again, how is it that you can recall that it was 37 on

                    OFFICIAL TRANSCRIPT

1  New Year's Eve?

2  A.   Because we counted them in there because it seemed like it

3  was too much, you know.  We were used to being packed, but that

4  was exceptionally a lot, you know.

5  Q.   Did the number of people in that cell on that evening

6  change anything about whether you could stand, sit, lay down?

7  A.   No, you couldn't lay down.  Barely, you know.  We were

8  laying on top of each other pretty much.

9  Q.   Okay.  While you were in the holding cells, were you

10  provided with any bedding?

11  A.   No.  No, we were not.

12  Q.   Were you provided with a blanket?

13  A.   Yes.  We were provided with a blanket late at night from

14  like 10:30, 11:00 o'clock p.m. until like 4:00 a.m.

15  Q.   Can you describe the condition of the blanket?

16  A.   Usually, damp, wet, or musky.

17  Q.   And where did you sleep, if you did sleep, while you were

18  in the holding cells?

19  A.   On the concrete, on the floor.

20  Q.   And can you describe the condition of the floor that you

21  slept on?

22  A.   Dirty, usually left over food from the prior days because

23  they only cleaned them maybe once or twice a week.  And so they

24  would always have food and urine and stuff by the toilets.

25  Q.   Now when you say stuff by the toilets, what kind of stuff?

OFFICIAL TRANSCRIPT

1   A.   Toilet paper, wads of toilet paper, and you know, empty

2   cups because they give you little cups to drink out of.   There

3   would be cups on the floor and juice wrappers and cookie

4   wrappers and stuff like that.

5   Q.   Do you recall seeing any other bodily fluids on the floor?

6   A.   Yes, blood.   They had a fight, and they had some blood on

7   the floor for a few days before anybody would clean it up.

8   Q.   Okay.   Now you mentioned that at some point there was some

9   cleaning that occurred in the cell?

10  A.   Yes.

11  Q.   Can you tell us when that occurred to your recollection?

12  A.   When we would go shower.

13  Q.   And how often was it that you would go shower?

14  A.   Usually, a Monday, Wednesday, and Friday if everything

15  would go as planned, but usually, three times a week or twice a

16  week.   But most of the time, two or three times a week, and

17  they would clean while we were in the showers.

18  Q.   Now when you were in the showers, were you provided with

19  soap?

20  A.   Not all the time.   Some of the times.   They'd have bottles

21  for the soap.   And sometimes they'd have some, and sometimes

22  they wouldn't.   They'd bring 30 of us to go shower so there

23  wasn't -- if you got in there quick enough, you can get some.

24  But if not, you didn't get no soap.

25  Q.   Now this cleaning process, when you went back to your

OFFICIAL TRANSCRIPT

1  cell, was the cell clean?

2  A.    No, no, it was not.  They still had food and trash on the

3  floors.  And --

4  Q.    So -- I'm sorry, go ahead.

5  A.    They had empty wrappers.  And urine, it still smelled like

6  urine.

7  Q.    Okay.  Was the floor dry when you returned to the cell?

8  A.    No.  Usually, it would be wet, and you would have to lay

9  down on a wet floor.

10  Q.    Was there any -- you mentioned trash.  Can you explain

11  what was done with trash in the cell?

12  A.    They would give you a little paper bag, a brown paper bag.

13  They put it by the door for the trash, and they'd only take it

14  out probably two or three times a week usually when they would

15  clean.  So they'd usually have trash mounded up by the door or

16  wherever you slept.  People just throw it on the floor.

17  Q.    Now what kind of trash are we talking about?  Are we

18  talking about paper or food?

19  A.    Both, paper and food.  Because they give you a sandwich at

20  night to eat and that's usually wrapped in a white paper.  So

21  people would just throw it on the floor, and crusts from bread

22  and all, stuff like that.

23  Q.    While you were housed in the holding cell, were you

24  provided with soap?

25  A.    Usually not -- usually we're not provided with soap.

OFFICIAL TRANSCRIPT

1  Q.   Okay.  Were you able -- was there some means or some
2  ability for you to wash your hands before you ate?
3  A.   No, no.
4  Q.   Were you provided with clothing?
5  A.   They give you one set of jumpers you could wear, but no
6  socks or no underwear or nothing like that.
7  Q.   And how often was that provided?
8  A.   When you went shower.  When you went shower, you got a new
9  jumper.
10 Q.   Now with respect to showers, obviously, am I correct you
11 left the holding cell to go to the showers?
12 A.   Yes.
13 Q.   And during -- I think you said you believed you were in
14 the holding cells, was it for 19 days in total?
15 A.   Yes, yes.
16 Q.   During that 19 days, do you recall how many times you were
17 taken out of the holding cell for any reason other than a
18 shower?
19 A.   Just once.
20 Q.   And what was -- how do you recall that one time?  Why do
21 you recall that?
22 A.   It was on Christmas Day.  Christmas Day, they brought us
23 to the outside yard for half an hour.
24 Q.   Was there any sunlight in your cell?
25 A.   Very, very little.  They have a very little, small window

OFFICIAL TRANSCRIPT

1  in the top of the cell.

2  Q.   And was that window functioning?

3  A.   No.  Actually, it didn't open or nothing like that.  And

4  it had a leak.  Water would come through it whenever it would

5  rain.

6  Q.   Was anything done about that leak?

7  A.   No, nothing was done.  Numerous times, the cell, it

8  flooded.

9  Q.   And were you moved out of the cell when this happened?

10  A.   No, no, sir.  We had a -- the one -- like it happened

11  twice.  But the one time it happened and we begged for a mop or

12  some towels, it took them three or four hours before they

13  brought us a mop to clean up the water because half the cell

14  was flooded with about a half-inch of water.

15  Q.   Were you provided with any cleaning products to use in the

16  cell?

17  A.   No, never, never.

18          MR. JACOB: Your Honor, just one minute, please, if I

19  could check my notes if the Court will indulge?

20          THE COURT: Of course.

21          MR. JACOB: Your Honor, I have no further questions.

22          THE COURT: All right, Mr. Collings or Mr. Acosta, do

23  you have any questions for Mr. Guillot?

24          MR. COLLINGS: I do, Your Honor.

25                      CROSS-EXAMINATION


                        OFFICIAL TRANSCRIPT

```
 1  BY MR. COLLINGS:
 2  Q.   Again, this is Chad Collings.  I've got a few questions
 3  for you, Mr. Guillot.  Now you're Junior; correct?
 4  A.   Yes, sir.
 5  Q.   And Mr. Klabert Guillot, Senior, is your father, the other
 6  plaintiff in this matter?
 7  A.   Yes, yes.
 8  Q.   All right.  Just so we avoid confusion, if I call you
 9  Mr. Guillot, I'm talking about you, okay?
10  A.   Yes, sir.
11  Q.   All right.  So Mr. Guillot, could you tell me -- you
12  mentioned that you've been in the St. Tammany Parish Jail since
13  December 18th, 2019; is that correct?
14  A.   Yes, sir.
15  Q.   All right.  And you mentioned that you were in holding for
16  how many days?
17  A.   I believe it was 19.  And I --
18  Q.   Let me ask --
19  A.   -- just -- go ahead.
20         THE COURT: Go ahead, Mr. Guillot, you can finish your
21  answer if you have more.
22         THE WITNESS: Yeah, on the 19th day, they moved us
23  to the back.
24  BY MR. COLLINGS:
25  Q.   Well, Mr. Guillot, my records from the sheriff's office
```

OFFICIAL TRANSCRIPT

1  would indicate you were in holding from December 18th to
2  January 3rd.  Is that incorrect?
3  A.   That's incorrect.
4  Q.   All right.  What day did you go from the holding cell to
5  somewhere else in the jail?
6  A.   The 6th.
7  Q.   January 6th.  You're positive about that?
8  A.   We didn't have a calendar.  I'm pretty positive.  I mean
9  we didn't have a calendar, and it was pretty hard to find
10 dates.  But yeah, I mean, because it was day 18, at night, they
11 came tell us that we were going to go back, and then they come
12 get us the next day.
13 Q.   All right.  Well, let me just read to you what I have in
14 our records.  Our records indicate you were in Holding Cells 4,
15 3, 2, and 3 from the period of December 18 through
16 January 2nd; and then on January 3rd, you were moved to
17 Dorm C800, then C829.  Is that right or wrong?
18 A.   That is the dorm I'm in.
19 Q.   All right.  So the records indicating that you were
20 assigned to that dorm on January 3rd and that bed on
21 January 3rd, you're telling me that those records are wrong?
22 A.   What day was January 3rd?
23 Q.   What day of the week?
24 A.   Yes, yeah.  What day of the week?  That's how we kept
25 time.  We didn't have a calendar.

OFFICIAL TRANSCRIPT

1  Q.   Bear with me.  I'll look it up.  January 3rd, I'm

2  looking at the calendar in my phone, it looks like that was a

3  Friday.

4  A.   I'm pretty sure they moved us back on Saturday.  But then

5  again, that's three months ago.  I'm not 100 percent sure, but

6  I thought it was on Saturday we moved back.  So I might be off

7  one day or so.  I'm sorry, my apologies.

8  Q.   All right.  So it is possible that these records are, in

9  fact, correct, that you were in holding from the period

10 December 18th through January 2nd, and that is correct;

11 right?

12 A.   How many days is that?

13 Q.   That would be 16 days, I believe, as I count them.

14 A.   I mean it's possible if that's what y'all records say.

15 Like I said, I'm not 100 percent sure.  We didn't have a

16 calendar.  We just counted on our fingers.

17 Q.   Okay, all right.  So you don't have any information that

18 these records are somehow false, do you?

19 A.   No, sir.  I mean I've been incarcerated.

20 Q.   Okay, all right.  Well, let's talk about why you're there.

21 Tell me the circumstances about how you ended up in the

22 St. Tammany Parish Jail.

23 A.   I got arrested.

24 Q.   Tell me what you got arrested for.

25 A.   Aggravated flight, aggravated assault with a motor

OFFICIAL TRANSCRIPT

1  vehicle, resisting arrest, fugitive warrant.  I think it's ten

2  charges.  There were ten charges if I'm correct.

3  Q.   All right.  As I appreciate it, you had an incident in

4  Mississippi or there was an attempt to pull you over and that

5  you then fled into Mississippi and were not apprehended; is

6  that correct?

7  A.   Would that, I mean, would that be admitting to guilt?  I

8  don't want to admit to guilt on something I'm still facing

9  charges for.

10 Q.   All right.  Well, as I appreciate it looking at the

11 records, and again, I may not have everything, but I understand

12 that there was an incident that you may have been involved

13 in -- let's do it this way.

14     Is it true that it's alleged that you fled into

15 Mississippi and that it's alleged you escaped; is that correct?

16 A.   Alleged, yes.

17 Q.   And is it true that the sheriff's office then came to your

18 house the next day, and is it true that it is alleged you tried

19 to escape once again?

20 A.   No, it is not -- that is false.

21 Q.   They did not?

22             MR. JACOB: Objection, Your Honor.

23             THE COURT: What's the objection, Mr. Jacob?

24             MR. JACOB: I believe these are ongoing criminal

25 charges.

OFFICIAL TRANSCRIPT

1          THE WITNESS: Yes.

2          MR. JACOB: Pursuant to the Fifth, he should not be

3   answering these.

4          MR. COLLINGS: It's a civil proceeding, Your Honor,

5   and his refusal to answer under the Fifth Amendment is

6   admissible and goes to the weight of his credibility.  So if

7   that's what his counsel is instructing him to do, I would ask

8   the Court to take notice of that.

9          THE COURT: And that's fine, but he does have a Fifth

10  Amendment privilege, and he does not need to incriminate

11  himself.

12         Now the questions that I heard Mr. Collings asking

13  are asking is it true that it's alleged whatever he is saying.

14  So he is not asking him to incriminate himself.  But

15  Mr. Guillot, if you believe that answer would incriminate

16  yourself, you may take the Fifth Amendment and say that it may

17  incriminate you or just take the Fifth.

18         THE WITNESS: Okay, Your Honor.

19         THE COURT: Mr. Collings, you may ask the question.

20         MR. JACOB: Your Honor.

21         THE COURT: Wait, I'm sorry.  Mr. Jacob, you have

22  something?

23         MR. JACOB: Yes, just because I don't have the ability

24  to have my client right in front of me, if I could just say

25  that if the question is, "Is it alleged," then I'm okay with

OFFICIAL TRANSCRIPT

 1  that.

 2          THE COURT: And that you're directing your client to

 3  that?  I understand.

 4          MR. JACOB: Correct.

 5          THE COURT: Mr. Guillot, you already made mention that

 6  you don't want to say something that is going to incriminate

 7  you.

 8          THE WITNESS: Yes.

 9          THE COURT: If you believe, again, I'm going to advise

10  you, if you believe that something is going to incriminate you,

11  you may take the Fifth.

12          THE WITNESS: All right, Your Honor, thank you.

13          THE COURT: Just say, "I take the Fifth."  Go ahead.

14  We'll ask the attorney if he can rephrase it in some way, and

15  if not, that is your constitutional right.  So you may do that.

16          Go ahead, Mr. Collings.

17  BY MR. COLLINGS:

18  Q.   Okay.  Mr. Guillot, as I appreciate it -- and again, I

19  apologize.  I may not have all the records.  But my

20  understanding is that it is alleged that the sheriff's office

21  went to your house the following day after the Mississippi

22  incident, and it's alleged that you tried to escape, and a K9

23  was employed; is that correct?

24      Was that correct that I've alleged it correctly?

25  A.   No, sir.  It was two weeks prior to the alleged incident

OFFICIAL TRANSCRIPT

```
 1    where the K9 was deployed.  It was not the next day.  And it
 2    was not at my residence at all.
 3    Q.    Whose residence was that?
 4    A.    It was a friend of mine's residence that I was at that the
 5    St. Tammany Sheriff's department came to and arrested me.
 6    Q.    What's the name of your friend?
 7    A.    Bill.
 8              MR. JACOB: Objection.
 9              MR. COLLINGS: Bill who?
10              THE COURT: Sustained.  Sustained.
11              THE WITNESS: I don't know his last name.
12              THE COURT: Sustained.  Mr. Guillot, you don't need to
13    answer that.
14              THE WITNESS: I'm sorry.
15              THE COURT: That's all right.  When you hear somebody
16    speak, please wait, and I'll advise you whether you need to
17    answer it.
18              Proceed, Mr. Collings.
19              MR. COLLINGS: Okay.
20    BY MR. COLLINGS:
21    Q.    All right.  Have you been in the jail -- what charges are
22    currently pending against you?
23    A.    Aggravated assault with a motor vehicle, aggravated
24    flight, possession of meth, and resisting arrest.
25    Q.    All right.  And are there any other charges pending
```

OFFICIAL TRANSCRIPT

1  against you currently; do you know?

2  A.   Yes.  In Lafourche Parish.

3  Q.   All right, I was going to ask you about that.  So let's

4  just go to that right now.  I'm looking at some records that

5  show -- and tell me if these charges have been resolved, and if

6  so, how.

7       But the records I have show that you have charges or you

8  were arrested in Lafourche Parish for possession of

9  methamphetamines, possession of drug paraphernalia, resisting

10  an officer with force or violence, unauthorized entry of an

11  inhabited dwelling, contempt of court, contempt of court,

12  contempt of court, contempt of court, and prohibited acts

13  schedule II and drug paraphernalia; is that correct?

14       Are all those your charges currently pending from

15  Lafourche?

16  A.   Yes.

17  Q.   And were those -- have any of those charges been resolved?

18  A.   No.

19  Q.   You have contempt of court here.  Is that -- why are you

20  charged with contempt of court to your knowledge?

21  A.   I have contempt of court for Lafourche Parish because I

22  missed a court date.  I was out of town.  All them charges that

23  are pending over there, them contempt of courts are for them

24  charges.

25  Q.   Okay.  It looks like the arrest date on these Lafourche

OFFICIAL TRANSCRIPT

1  charges was April 13, 2019.  Does that sound correct?

2  A.   Yes.

3  Q.   I'm looking at another arrest date from Lafourche Parish

4  of August 13, 2019.  That's charge 1, prohibited acts drug

5  paraphernalia; charge 2, prohibited acts schedule II.  Do you

6  know anything about those charges?

7  A.   Yeah.  I was arrested, yes.

8  Q.   Okay, so that was another arrest.  Now were those charges

9  resolved?

10  A.   No.  I'm still fixing in the court.

11  Q.   All right.  Were you ever arrested in Jefferson Parish?

12  A.   Yes.

13  Q.   When were you arrested in Jefferson Parish?

14  A.   2015, I believe.  April 13th, I believe, or

15  April 12th.

16  Q.   All right.  And the records I've got are not very clear to

17  me.  So tell me, do you know if those charges were resolved?

18  A.   Yes.

19  Q.   All right.  How were they resolved?  Did you plead guilty?

20  Did you get acquitted?  Tell me what happened.

21  A.   I took probation.

22  Q.   Okay.  So you pled guilty; correct?

23  A.   Yes, yes.

24  Q.   And what did you plead guilty to, sir?

25  A.   Possession of meth three counts.

OFFICIAL TRANSCRIPT

1    Q.    Two counts of possession of methamphetamines?

2    A.    Three.   Three counts.

3    Q.    Three?

4    A.    Three counts, yes.

5    Q.    And how long were you on probation for that, for those

6    three charges?

7    A.    About three years.

8    Q.    You believe that was 2015?

9    A.    It might have been 2016.  I'm not, I'm not sure.  It might

10   have been 2016.  Like I said, I don't have a computer to look

11   at them.  I'm incarcerated.

12   Q.    All right.  The records I have, have two arrests in

13   Jefferson Parish, one from April 18th, 2014 and one from

14   April 12, 2016.  Those were both arrests --

15   A.    Yeah, yes, sir.

16   Q.    -- in Jefferson Parish.

17   A.    Yes, sir.

18   Q.    Are those the three charges that you pled guilty to, those

19   two different arrest dates?

20   A.    No, no, sir.  The one for 2014 was possession of

21   marijuana.

22   Q.    All right.  And what happened with that arrest and charge?

23   A.    I took one year of probation.

24   Q.    Okay.  Was that a misdemeanor or a felony; do you know?

25   A.    I'm not sure.  It was probably -- it's one year probation.

OFFICIAL TRANSCRIPT

```
 1   I'm not sure how that works.  It wasn't on my record.  So no,
 2   it might have been a misdemeanor.
 3   Q.    All right.  You also have charges against you for what I
 4   guess is a wildlife and game charge?
 5   A.    That's the charge with the marijuana.  I was on Elmer's
 6   Island beach in Grand Isle, and they arrested me.
 7   Q.    All right.  So other than the arrest you just told us
 8   about in Jefferson Parish in 2014 and 2016, the arrest in
 9   Lafourche Parish which I believe were all in 2019; is that
10   correct?
11   A.    Yes.
12   Q.    All right.  Well, I'm looking at another Lafourche charge
13   for --
14   A.    Yeah, yes, sir.
15   Q.    I'm seeing a Lafourche charge from October 15, 2018.
16         THE COURT: Mr. Collings, let me interrupt you for one
17   moment because I thought I heard -- this is the judge.  I
18   thought I heard somebody else join the hearing.
19         Did someone else join the hearing?  Did anyone else
20   just join this call?
21         MR. COLLINGS: We may have lost somebody, Judge.
22         THE COURT: It may have been.
23         All right.  I'm sorry, Mr. Collings.  Please proceed
24   with your questioning.
25   BY MR. COLLINGS:
```

OFFICIAL TRANSCRIPT

1  Q.   Okay, so I'm looking at another arrest from October 15,
2  2018 in Lafourche Parish.  Do you know what happened with that
3  arrest?
4  A.   A child support warrant, yes.
5  Q.   And what happened with that charge?  Did you plead guilty?
6  Was it --
7  A.   I had to serve 90 days for a child support warrant, but I
8  did 60 days and paid my child support.
9  Q.   Okay, all right.  Have you been arrested in any other
10  jurisdictions that we have not talked about?
11  A.   No.  You missed one Lafourche one, though, from 2016.
12  Q.   Okay.  What was that one?
13  A.   That was, I got -- when I got out of Jefferson Parish in
14  April, I had Lafourche warrants also that I had to deal with.
15  I just took probation for it too, a possession of meth.
16  Q.   I'm looking at that one right now.
17  A.   Okay.
18  Q.   It says arrest date May 12, 2016, Lafourche Parish.  You
19  got three charges:  One for contempt of court, one for
20  distribution of heroin, and one for distribution of
21  methamphetamines.  Did you plead guilty to any of those three
22  charges?
23  A.   They dropped the charges down to possessions.
24  Q.   On the two, heroin and methamphetamines?
25  A.   Yes, yeah.  The contempt was for a speeding ticket.

OFFICIAL TRANSCRIPT

```
 1  Q.   All right, and did you plead guilty to contempt?
 2  A.   The contempt, I paid the fine.
 3  Q.   All right.  So that's a plea of guilty; correct?
 4  A.   I took probation.
 5  Q.   Okay.  So you pled guilty to possession of heroin and
 6  possession of methamphetamines and contempt of court from 2016;
 7  correct?
 8  A.   Yes.
 9  Q.   All right.  And you also pled guilty for those Jefferson
10  Parish charges; right?
11  A.   Yes.
12  Q.   Are there any charges in any other states or have you been
13  arrested in any other states besides Louisiana?
14  A.   No.
15  Q.   All right.
16  A.   Well, I take that back.  I was.
17  Q.   Tell me about that.  When and where?
18  A.   Mississippi, Mississippi.
19  Q.   When, sir?
20  A.   I don't remember the exact time.  It was a shoplifting
21  charge.
22  Q.   Do you know if it was in the last five years, ten years?
23  A.   Yes, it was two years ago or something, three years ago.
24  I didn't plead guilty or nothing.  The charges were withdrawn.
25  Q.   Okay.  Other than that, any other arrests or charges in
```

OFFICIAL TRANSCRIPT

1  any other states?

2  A.   No, sir.

3  Q.   Okay.  Now you mentioned a moment ago about a fight in the

4  jail when you were being asked questions by your lawyer.  Do

5  you remember that?

6  A.   Yes.

7  Q.   Isn't it true, sir, that you yourself have been in

8  altercations in the jail; is that right?

9  A.   Yes, I was.  Yes.

10  Q.   Is it true, sir, that there's -- on one occasion, you

11  walked up to a gentleman who was sitting down and punched him

12  in the head?  Do you remember that?

13              MR. JACOB: Objection, Your Honor.

14              MR. COLLINGS: Do you remember that, sir?

15              THE COURT: Wait, excuse me.  Mr. Jacob, you have an

16  objection?

17              MR. JACOB: Yes, objection to relevance.

18              THE COURT: I'm going to give him some leeway.  It

19  goes to credibility.  But it's time to move on.  What was your

20  question, Mr. Collings?

21              MR. COLLINGS: He mentioned there was a fight in a

22  holding cell.  I've got video evidence that suggests he walked

23  up to an individual who was sitting down on the floor and

24  punched him in the head, and I'm asking him if that is true or

25  not.

OFFICIAL TRANSCRIPT

1          THE WITNESS: Yes.

2          MR. JACOB: Objection, Your Honor.

3          THE COURT: Objection noted.  Overruled.  Mr. Guillot

4   may answer.

5          THE WITNESS: Yes, that took place.

6   BY MR. COLLINGS:

7   Q.   All right.  And as a matter of fact, sir, you talked about

8   earlier that you had only been out of the jail, other than to

9   shower, one time on Christmas; is that right?

10  A.   Yes.  We went outside, yes.

11  Q.   Okay.  But for the fight you just told us and admitted to,

12  isn't it true that the gentleman you walked up to and punched

13  in the head got up and started punching back, and in fact, put

14  you on the ground, and they had to take you out on a gurney; is

15  that right?

16  A.   Nope, you're 100 percent wrong, sir.  Wrong guy.

17  Q.   Wrong guy.  That wasn't you?

18  A.   Nope, it definitely was not me.  That was Jonathan

19  something if I recall.  You got the wrong fellow.

20  Q.   Okay.  So what was the -- what happened after you punched

21  that gentleman in the head?  What happened?

22  A.   I didn't punch that guy.  That's a whole different

23  occasion.  I thought you were talking about a different

24  incident.  The incident I'm talking about, a man stepped on my

25  face, and the whole place was overcrowded.  And I hit him back

OFFICIAL TRANSCRIPT

1  because he stepped on my face because of the overcrowdedness.

2  That would be the incident I'm talking about.  His name was

3  Derek Bunches.

4  Q.   All right.  I asked you a very specific question, sir.

5  There was a man sitting down.  You walked up to him and punched

6  him in the head, and you admitted to that.  Are you taking --

7  A.   Yes, 100 percent.  You can review the video evidence.

8  It's not me.  I know the incident you're talking about.

9  Q.   All right, don't guess at what I'm talking about.  My

10 question is a very simple one.  Isn't it true that you punched

11 someone in the head who was sitting down and you were standing

12 over them?

13 A.   No.

14          MR. JACOB: Objection, Your Honor.

15          THE COURT: Okay.  Everyone, stop.  Mr. Collings, I

16 will instruct the witness what he can answer and how he can

17 answer.  You ask the questions.  Opposing counsel will make any

18 objections.

19          Now, Mr. Jacob, you have an objection right now, sir?

20          MR. JACOB: Yes.  This was asked and answered.  He

21 said it was not him, that the --

22          THE COURT: Right, sustained.  Sustained.  Move on.

23 BY MR. COLLINGS:

24 Q.   All right.  Have you had any other fights in the jail?

25 A.   Yes.

OFFICIAL TRANSCRIPT

```
 1  Q.    How many?
 2  A.    Two.
 3  Q.    So there have been -- in the time that you've been in the
 4  St. Tammany Parish Jail from December until now, you've been in
 5  a total of three fights; is that correct?
 6  A.    No.  It's during the -- one, one fight in the holding
 7  tank, and yeah, one fight in the holding tank and two fights in
 8  the dorm.  Yes, three.
 9  Q.    Okay.  The holding cell, we talked about; and you moved to
10  C800.  Am I correct in that?
11  A.    Yes.
12  Q.    And that's a housing tier; correct?
13  A.    Yes.
14  Q.    And does that housing tier, is that where you are
15  presently incarcerated?
16  A.    I was up until yesterday, yes.
17  Q.    All right.  Where are you presently incarcerated?
18  A.    It's a small tier.  I think it's called A600.
19  Q.    Okay.  Do you know why you were moved to A600?
20  A.    Quarantine.
21  Q.    Okay.  Why?  Do you know why?
22  A.    Because I went to the University Hospital for a checkup on
23  my hand.
24  Q.    Ah, all right.  So as I appreciate it, sir, you went to
25  the University Medical Center to see an orthopedist; is that
```

OFFICIAL TRANSCRIPT

1  correct?

2  A.   Yes.

3  Q.   And the reason why you were there is because you injured

4  your hand punching someone; is that correct?

5  A.   No.

6  Q.   All right.  Tell me how you injured your hand.

7  A.   I fell in the shower on March, I want to say it was the

8  17th or 18th.

9  Q.   March 17th or 18th of this year?

10  A.   Yes.

11  Q.   And when you came back to the jail, because you had left

12  the jail, you have to go in quarantine; is that correct?

13  A.   Yes, that is.

14  Q.   And do you know how long you will be in quarantine?

15  A.   I think they said 10 or 14 days.  I'm not 100 percent.

16  Q.   Okay, all right.  Can you tell us your knowledge about all

17  the protocols that are in place for COVID-19 at the

18  St. Tammany Parish Jail?

19  A.   Can you rephrase that?  Can you phrase your question

20  better on like what are you exactly asking for?  Protocols, I'm

21  not faculty of the jail, you know.  I don't work here.  I'm

22  just incarcerated here.

23  Q.   Right.  Well, there is testimony in the record already

24  from the warden at the St. Tammany Parish Jail detailing in

25  exact detail all of the various protocols that are in place at

OFFICIAL TRANSCRIPT

1  the St. Tammany Parish Jail for dealing with COVID-19.

2      My question is very simple.  Do you have any reason to

3  disagree with any of that testimony?

4          MR. JACOB: Objection, Your Honor.

5          THE COURT: Sustained.

6  BY MR. COLLINGS:

7  Q.   I'm going to read to you some portions of an affidavit

8  from the warden.

9      Let me back up.  I skipped one question.  Do you -- hold

10  on one second.  Have you made -- before I get into the

11  COVID-19, sir, let me ask you this.  Have you made any kind of

12  grievance, have you filed any kind of grievance in the jail?

13  Do you know what that is?

14  A.   No, I don't.  I'm not sure what you're saying.

15  Q.   All right, there is a thing called administrative review

16  where --

17          MR. JACOB: Again, Your Honor.

18          THE COURT: What's your objection?

19          MR. JACOB: He asked if he knows what a grievance is.

20  He said no.  But there's no foundation as to there being a

21  grievance process in the facility.

22          THE COURT: Okay.  And Mr. Collings, I'm going to

23  overrule it and allow him to ask the question and explain what

24  you're asking.

25          MR. COLLINGS: All right.

OFFICIAL TRANSCRIPT

1  BY MR. COLLINGS:

2  Q.   Mr. Guillot, there is testimony in the record already from

3  the warden that there is an administrative review process for

4  dealing with grievances filed by inmates.

5       My question for you is this.  Have you ever filed a

6  grievance while you've been incarcerated at the

7  St. Tammany Parish Jail from December 18, 2019 through today's

8  date?

9            MR. JACOB: Objection.

10            THE COURT: What's your objection?

11            MR. JACOB: It's asked and answered.  He asked him

12  about a grievance.  He said he doesn't even know what it is.

13  So if he doesn't know what it is, he couldn't have filed one.

14            THE COURT: Okay, overruled.  I'm going to allow him

15  to answer.

16            Mr. Guillot, did you understand the question?  Have

17  you ever filed a grievance?

18            THE WITNESS: I don't know what a grievance is.  I

19  just don't know what a grievance is.

20            THE COURT: Okay.

21  BY MR. COLLINGS:

22  Q.   So is it safe to say then, sir, that you've never filed

23  one because you don't know what it is?

24  A.   Yeah, yes, sir.

25  Q.   Okay, fair enough, I'll move on.  There is testimony in

OFFICIAL TRANSCRIPT

1   the record, sir, from the warden of the St. Tammany Parish Jail
2   that there have been, as of two days ago, zero incidences of
3   COVID-19 infection within the St. Tammany Parish Jail.
4        My question to you is this.  Do you have any information
5   that contradicts that sworn testimony?
6   A.   We asked the guards if they had tests.  They said they
7   don't even have tests here to test people.  So they couldn't
8   even tell us.  They said they just check their temperatures,
9   but they have no tests to test them if they have COVID-19.
10  Q.   That wasn't my question, sir.
11  A.   Oh, I'm sorry.
12  Q.   And I appreciate you trying to answer.  My question is
13  more tailored and more narrow than that.  Do you have any
14  evidence that anyone has been infected with COVID-19 from
15  December 18 through today's date at the
16  St. Tammany Parish Jail?
17  A.   No.
18  Q.   All right.  Do you have any evidence that any of the
19  screening processes already in the record as sworn to by the
20  warden for COVID-19 are not being implemented?
21  A.   Not of my knowledge.  I don't know.
22  Q.   Do you have any information that the plan for quarantine
23  to take people who do test positive and bring them into the
24  medical area of the jail for further observation, do you have
25  any information that that is, in fact, not true?

                        OFFICIAL TRANSCRIPT

1  A.   No.

2  Q.   Do you have any information that should the medical area

3  of the jail become overwhelmed that there is, in fact, a plan

4  in place to move inmates who test positive to another area of

5  the jail?

6  A.   No, I don't know anything.

7  Q.   And if that area should become overcrowded, do you have

8  any information that suggests that the plan to bring them to

9  Camp J at Angola is, in fact, not going to happen?

10  A.   I don't -- not of my knowledge.  I don't know, sir.

11       MR. COLLINGS: Okay, one second, sir.  I'm just

12  looking at some records.

13  BY MR. COLLINGS:

14  Q.   Other than the issues you've described to your attorney

15  about a blanket seeming wet, about the holding cells not being

16  cleaned to your satisfaction while you showered, and there are

17  some times -- and the only time you were taken out of holding

18  other than to take showers was for a brief period of time on

19  Christmas, and this is only about your time in holding, do you

20  have any other issues that you would -- complaints that you

21  would like to address?

22       MR. JACOB: Objection, Your Honor.

23       THE COURT: What's your objection, Mr. Jacob?

24       MR. JACOB: Just mischaracterizes his testimony.  I

25  mean he talked about much more than what was just stated.

OFFICIAL TRANSCRIPT

1          THE COURT: Okay, overruled.  I'm going to allow him
2    to answer.
3          Mr. Guillot, the question I heard was:  Do you have
4    any other complaints about your time while in the pretrial or
5    detention holding cells?
6          THE WITNESS: No, no, ma'am.
7    BY MR. COLLINGS:
8    Q.   All right, let me ask you this, sir.  There is an
9    allegation in the complaint that the sheriff is violating
10   Title 22, a section of Title 22 dealing with the amount of time
11   individuals should be kept in, quote, individual, closed quote,
12   holding cells.
13        Do you know what an individual holding cell is?
14   A.   No, sir.
15   Q.   All right.  And you testified earlier, and tell me if I'm
16   wrong, that the holding cells that you were in were not
17   individual; is that correct?  Because there was more than one
18   person in them; correct?
19   A.   Yes, sir.
20   Q.   Do you know if the sheriff of St. Tammany Parish even has
21   individual holding cells?
22   A.   Not to my knowledge.  Actually, they have them in the
23   medical tier, I believe.
24   Q.   Okay.  Is that what you would call suicide watch cells?
25   A.   I believe that's what they call them.  I'm not sure

OFFICIAL TRANSCRIPT

1  100 percent because I never went to them.

2  Q.   All right, that was my next question.   So you've never

3  actually been inside any individual holding cells.   Am I

4  correct in that?

5  A.   Yes.

6           MR. COLLINGS: All right.   I may be very close to the

7  end, Judge, if I could just have a brief second to look through

8  my notes.

9           THE COURT: Of course.

10 BY MR. COLLINGS:

11 Q.   All right, sir, do you know what date this lawsuit was

12 filed?

13 A.   No, sir.

14 Q.   If I were to tell you it was filed on March 22nd, 2020,

15 do you have any reason to disagree with that?

16 A.   No, sir.

17 Q.   Okay.   And is it true then, sir, on March 22nd, 2020,

18 you were no longer in the holding area; correct?

19 A.   Yes, sir.

20 Q.   You've been in a tier since January of this year; correct?

21 A.   Yes, sir.

22           MR. COLLINGS: That's all I have, Your Honor.   Thank

23 you.

24           THE COURT: All right.   Any redirect, Mr. Jacob?

25           MR. JACOB: No, Your Honor.

                        OFFICIAL TRANSCRIPT

```
 1              THE COURT: Excuse me one minute, Mr. Guillot, to see.
 2              I have just a couple of questions.  I want to make
 3   sure I understand.  Sir, you testified that you are currently
 4   in quarantine; is that correct?
 5              THE WITNESS: Yes, ma'am.
 6              THE COURT: And explain to me why you're in
 7   quarantine, sir.
 8              THE WITNESS: Because I left the facility to go to
 9   University Hospital to get my hand checked.
10              THE COURT: Oh, okay.  So it has nothing to do with
11   COVID-19, the virus?
12              THE WITNESS: Well, they said for precautions.
13              THE COURT: Okay.  So as a precaution so that you
14   didn't bring something back, you're quarantined for, you said,
15   10 to 14 days?
16              THE WITNESS: Yes, ma'am.
17              THE COURT: And do you know if that's the policy at
18   the jail?
19              THE WITNESS: That's what I was informed.  If anybody
20   leaves the facility, they have to go to quarantine for 10 to
21   14 days.
22              THE COURT: I understand.  Thank you, sir.  And when
23   did you return to the jail and were put in quarantine?
24              THE WITNESS: Yesterday morning.
25              THE COURT: Did you testify, I may have missed this,
```

OFFICIAL TRANSCRIPT

1  but you were at any other time in quarantine during your time
2  in St. Tammany Parish Jail?
3         THE WITNESS: No, ma'am.
4         THE COURT: Oh, okay, I understand.  Thank you for
5  clarifying that.  All right.
6         MR. JACOB: Your Honor?
7         THE COURT: Yes, Mr. Jacob.
8         MR. JACOB: Devon Jacob, can I redirect based on the
9  question that you asked?
10        THE COURT: Yes, sir, go ahead.
11                    REDIRECT EXAMINATION
12 BY MR. JACOB:
13 Q.   Mr. Guillot, you just testified about what you understand
14 to be the policy today; correct?
15 A.   Yes.
16 Q.   Do you know what the policy is going to be tomorrow?
17 A.   No, sir.
18        MR. JACOB: Thank you.  No further questions.
19        THE COURT: All right.  Mr. Guillot, the same as I
20 said to Mr. Baqer, you are welcome if the jail allows, you are
21 welcome to stay on the phone, or you may hang up and leave the
22 hearing.  You are excused and no longer have to testify and
23 will not be allowed to testify further, but you certainly may
24 remain on as a party to this matter and listen.
25        THE WITNESS: All right, thank you.


                         OFFICIAL TRANSCRIPT

```
 1              THE COURT: All right, sir.
 2              Mr. Jacob, Plaintiffs?
 3              MR. JACOB: I believe I'm going to be passing to one
 4  of my colleagues to continue from here, Your Honor.
 5              THE COURT: Who would that be?
 6              MS. RAVEENDRAN: Your Honor, this is Bhavani
 7  Raveendran for the plaintiff.  If the Court is okay with it, I
 8  can -- under normal circumstances, we would possibly present on
 9  the Elmo or in person some of the exhibits and point out
10  particular admissions to the Court to assist with the review
11  and decision-making process that you have to do with all of
12  these documents.
13              Would it be appropriate at this time if I just
14  present information from two exhibits in particular, one of the
15  defendant's exhibits and one from plaintiff's exhibits, not in
16  the way of argument, but just to point sections out to this
17  Court?
18              THE COURT: Of course.  I have them in front of me.
19  So tell me what you're referencing, and you certainly may.
20              MS. RAVEENDRAN: Thank you, Your Honor.  I will be
21  referencing Defendant's Exhibit 1, the affidavit.
22              THE COURT: From Major Kelly?
23              MS. RAVEENDRAN: Yes.  And I will be referencing
24  Plaintiff's Exhibit 5, the CDC Guidelines.
25              And just briefly, Your Honor, paragraph 40 of
```

OFFICIAL TRANSCRIPT

1  Defendant's Exhibit 1 --

2           THE COURT: Excuse me one moment, Ms. Raveendran.

3           Did anybody just get on the call in this hearing, or

4  did somebody hang up?  That's two questions.  Did anybody just

5  join the hearing?

6           Okay, I think somebody probably just hung up.

7           All right, please proceed.

8           MS. RAVEENDRAN: Thank you.  Actually, I would like to

9  refer to Plaintiff's Exhibit 5, the CDC Guidelines.  CDC

10  Guidelines indicate that several times a day, correctional

11  facilities are to clean and disinfect surfaces and objects that

12  are touched frequently, and those objects included toilets,

13  sink handles, and toilet handles.

14           The affidavit, Exhibit 1, in paragraph 40 indicates

15  that high-touched items are sanitized twice a day, but does not

16  indicate if toilets are included as high-touched items and does

17  not indicate if the benches mentioned are also including those

18  in the holding cells.

19           And going forward, back to Plaintiff's Exhibit 5, the

20  CDC Guidelines ask that correctional facilities provide paper

21  towels for hand washing, tissues to be available, and no-touch

22  trash receptacles be available to inmates.  And it also

23  requests intensified cleaning and disinfecting.

24           Exhibit 1, the defendants have presented in paragraph

25  44 indicates that inmates in dormitory tiers and housing units

1  have dedicated cleaning supplies to disinfect all surfaces that
2  are provided twice daily.  It indicates in paragraph 45 that
3  dormitory tier housing units are provided dedicated supplies,
4  paper towels, toilet brushes, mops, brooms, dustpans, and
5  garage bags twice daily, and paragraph 45 indicates that
6  restrictive housing units are cleaned at least once daily by an
7  inmate or worker.
8         But paragraph 42 is the only paragraph regarding
9  cleaning of the holding area, and it indicates that pressure
10 washing of the holding area is provided once a week.
11        Moving back to Plaintiff's 5 --
12        MR. COLLINGS: Your Honor, could I enter an objection,
13 Your Honor?  This is Chad Collings.
14        THE COURT: Mr. Collings, yes.
15        MR. COLLINGS: I'm not really sure what's going on
16 right now.  It would seem to me if they're going to put on
17 evidence, they need a witness.  Otherwise, this attorney who is
18 speaking -- and I'm sorry, I didn't write down who it was.
19        MS. RAVEENDRAN: Bhavani Raveendran.
20        MR. COLLINGS: Okay.  It sounds like this is witness
21 testimony.  Otherwise, the document speaks for itself.  It's in
22 evidence.  So I don't know what -- why the attorney is reading
23 to you what's already in evidence.  She's not a witness.
24        THE COURT: Okay, I hear you, and I understand.
25        Ms. Raveendran, when you asked if you could point

OFFICIAL TRANSCRIPT

1   matters out, I said yes.  But this is not argument, and this is
2   not the appropriate time for argument because it's just giving
3   you extra time for argument.
4          All of the exhibits, Mr. Collings is correct, are in
5   evidence and before me.  And I think what you are doing, while
6   I appreciate where you are going with it, I think is better
7   left for argument at the end.
8          MS. RAVEENDRAN: Would Your Honor -- I understand your
9   position, of course, Your Honor.  We are trying to present the
10  information so that instead of looking through hundreds of
11  documents, you can see where the plaintiffs would like Your
12  Honor to look in the exhibits.  Could I give Your Honor --
13         THE COURT: That's exactly, that's exactly what the
14  point of closing arguments are, to stress what you think is
15  important in your case.  Ms. Raveendran, I appreciate it.
16  There are hundreds of documents, and I have spent every day
17  this week looking at every document.  So I'm well aware of
18  them, and I will hear you or whoever, one of your co-counsels,
19  in closing arguments.
20         Is there any other evidence that plaintiffs would
21  like to present?
22         MS. RAVEENDRAN: Your Honor, I can --
23         MR. JACOB: Your Honor, Devon -- I'm sorry, go ahead.
24         MS. RAVEENDRAN: The point of this CDC document that I
25  wanted to bring to the Court's attention, but I can --

OFFICIAL TRANSCRIPT

```
1          THE COURT: I look forward to that in argument.  I
2   have the entire document in front of me.
3          MS. RAVEENDRAN: Of course.  And then just referring
4   briefly to Plaintiff's Exhibit 9, the Johns Hopkins Coronavirus
5   Map Testing and Update regarding Louisiana, that is the website
6   that was included in the list of exhibits, but not contained as
7   a physical exhibit.  If Your Honor would permit me to give the
8   update as of April 9, 2020 for St. Tammany, Louisiana.
9          MR. COLLINGS: We would object, Your Honor.  It sounds
10  like she wants to testify about an exhibit.  I think the Court
11  can take cognizance of whatever it deems necessary from
12  whatever is publicly available.
13         THE COURT: I will sustain that objection.
14         But I do have a question, Ms. Raveendran, that you
15  can help me with.  Is the website updated?  And if you're
16  drawing my attention to a website, once I look at it, will it
17  automatically be updated and I'll have that information?
18         MS. RAVEENDRAN: Yes.  So the Johns Hopkins
19  Coronavirus Map is updated daily, and you can click on the map
20  for any specific state.  And St. Tammany itself is its own city
21  that specifically -- or not city.  It's its own parish; so it
22  has its own bubble.  And if you click on the bubble, it will
23  tell you that information up to date.  So you might have
24  different information for April 10$^{th}$.
25         THE COURT: Okay, I understand that, and I appreciate
```

OFFICIAL TRANSCRIPT

1  that.

2         MR. JACOB: Your Honor, Devon Jacob, if I can just on

3  that point since I've spent a lot of time on that website, if

4  you look at it on a mobile device, it actually does not show

5  all the information.

6         THE COURT: I'm not looking at it on a mobile device.

7         MR. JACOB: Okay.  I was just going to say on a

8  computer it actually will show it all.

9         THE COURT: And that's the way I'm looking at it.

10  Thank you, sir.  Anything else from plaintiffs?

11         MR. JACOB: No, Your Honor.

12         THE COURT: All right, Mr. Jacob, you rest your case?

13         MR. JACOB: Let me just check with my team

14  electronically, please, before I answer that question.

15         THE COURT: Of course.

16         MR. JACOB: Yes, Your Honor, we rest our case.

17         THE COURT: All right.  Mr. Collings, you've already

18  put into evidence six exhibits which are before the Court.  Do

19  you have anything further?

20         MR. COLLINGS: At this time we would ask for a

21  directed verdict in favor of the defendants.  I don't think the

22  plaintiffs can meet their burden of proof with the evidence

23  that is now before you, Your Honor.

24         THE COURT: You know what, I'm going to hold off

25  ruling on that and have you present whatever other information

OFFICIAL TRANSCRIPT

1  or exhibits that you want to present, and I'll then rule on
2  that.
3          MR. COLLINGS: Okay.  Well, Your Honor, at this time
4  we would just reiterate that we've already placed into evidence
5  the affidavit with the attachments from the warden.  We have no
6  other evidence to submit to the Court.  So that is the close of
7  the evidence for the defendants in this matter.
8          THE COURT: Okay.  Then I will hear -- I will rule on
9  your motion for directed verdict.  Do you want to make a
10  separate argument as to that?
11          MR. COLLINGS: I do, Your Honor.  It's very simple.  I
12  don't believe based on the record you have in front of you that
13  the plaintiffs have come even remotely close to carrying their
14  burden.  I don't think closing arguments are even necessary.
15  Their evidence is what it is, and it is wholly, wholly lacking.
16  They do not have enough to meet their burden under Rule 65.
17          THE COURT: Okay.  Plaintiff, Mr. Jacob or anyone for
18  plaintiff, would you like to respond?
19          MR. JACOB: Yes, Your Honor.  I'm going to have
20  Mr. Romanucci respond to that argument.
21          THE COURT: Mr. Romanucci.
22          MR. ROMANUCCI: Yes, Your Honor, just give me -- can I
23  have maybe 15 seconds to get my papers in order?  This is not
24  closing.  This is just response to the motion for directed
25  verdict; correct?

OFFICIAL TRANSCRIPT

1          THE COURT: Correct.

2          MR. ROMANUCCI: So Your Honor, the response is that,

3     as you've heard, St. Tammany Parish has a duty to its inmates.

4     Those inmates are classified as detainees.  Those detainees are

5     either considered new arrivals or they are placed into, you

6     know, the dormitory which is a longer-term situation than the

7     holding cell.

8          I believe that we have met our burden in order for

9     the defendant's motion for directed verdict to be denied based

10    upon the fact that all the detainees are at risk based upon the

11    pandemic that's been declared in this country as of

12    March 11th and the virus that was in existence for over

13    ten weeks prior to that time.  Everyone is at risk in the

14    St. Tammany Parish Jail, and that includes the new arrivals,

15    the detainees, the employees, and the community.  We have met

16    our --

17         THE COURT: You know what, I apologize, Mr. Romanucci,

18    for interrupting you.  But I know you're going to give the

19    closing.  And I really think, Mr. Collings, that this is going

20    to end up being much of Mr. Romanucci's closing arguments in

21    responding to the motion for directed verdict which is all

22    wrapped up into one.  And so I'm going to ask that you go ahead

23    and consolidate it and make your closing argument as to both,

24    and then I will rule on it.

25         And I apologize for that.  But otherwise, we're going

OFFICIAL TRANSCRIPT

 1  to draw this out even more and have almost identical closing

 2  arguments or arguments as to the motion for directed verdict

 3  and closing arguments if I deny the motion for directed verdict

 4  on this.  We're going to have one closing argument.

 5         So with that, I am going to have Mr. Romanucci,

 6  because I believe you're going to be arguing for the

 7  plaintiffs, I'm going to have you begin your entire closing

 8  argument.  And you had 10 minutes left, all right?

 9         MR. JACOB: Your Honor, Devon Jacob.

10         THE COURT: Yes.

11         MR. JACOB: Your Honor, in light of the fact that he

12  needs to respond to the motion as well, can the Court indulge

13  with a little bit more time?

14         THE COURT: Mr. Jacob, you're a fine co-counsel there.

15  Of course.  How much time?  How much additional time would you

16  like to respond to the motion for directed verdict?

17         MR. ROMANUCCI: So Your Honor, this is Tony Romanucci,

18  and I appreciate Mr. Jacob for jumping in there.

19         What I would ask for is this.  If you do give us any

20  additional time, I promise you that we won't go over

21  15 minutes.  But what I am asking, and I hope that Your Honor

22  can indulge this, is because we certainly believe that we have

23  very important legal arguments and factual arguments, I would

24  like co-counsel Nicolette Ward to begin the close with the

25  legal argument which I think is equally as important as the

OFFICIAL TRANSCRIPT

1  facts, and that's how we would like to split it up.  Maybe 5 to
2  6 minutes from Ms. Ward and then I'll take up the 10 or
3  9 minutes or less if Your Honor would indulge that.
4          THE COURT: That's fine.  I have no problem with that.
5  And do you need -- because my case manager normally times
6  people or looks at the time.  Are you going to self-time, or
7  would you like us to advise you when five or six minutes is up?
8          MR. ROMANUCCI: I would appreciate if the Court would
9  advise us.  And Ms. Ward is aware of her time constraints, and
10 she's listening, she's on, she's aware.  And so at the
11 six-minute mark, if she does go to six minutes, if the Court
12 would give us the warning, and then I will fill in.  Thank you.
13         THE COURT: Melissa, will you do that?
14         DEPUTY CLERK: Yes, ma'am.
15         THE COURT: All right, thank you.
16         All right, Ms. Ward, please begin.
17         MS. WARD: Thank you very much, Your Honor.  For the
18 record, this is Nicolette Ward speaking.
19         Your Honor, I want to thank you for taking the time
20 and all of your staff for taking the time on this very
21 important matter today.
22         Plaintiffs have brought allegations in their
23 complaint about the conditions at the St. Tammany Parish Jail.
24 The lawsuit claims that crowded, unhygienic conditions with
25 limited cleaning, and deprivation of soap.  Your Honor has

OFFICIAL TRANSCRIPT

1    heard testimony now of inmates lying on the concrete ground
2    with wet blankets with their heads in urine.  You've heard of
3    inmates' exposure to vomit, blood, used toilet paper, to open
4    wounds, and the inability to wash their hands.  Some so crowded
5    that they couldn't lie down.

6          And Your Honor is well aware, so I won't belabor the
7    point, the duty that St. Tammany Parish has to its inmates.
8    Mr. Romanucci said in opening statement, this duty is because
9    the sheriff is in a unique constitutional position to provide
10   and oversee for those who cannot do that themselves.  And I
11   want to be clear that duty exists to each and every inmate and
12   every detainee regardless of what they're being held for.
13   Those duties are the same for both inmates under the Eighth and
14   pretrial detainees under the Fourteenth.

15         And as Your Honor said at the top of this hearing,
16   these are strange times.  Now more than ever, the
17   responsibility held by the sheriff is life and death to those
18   that they're overseeing.  Your Honor is also aware that the
19   Fifth Circuit has held unequivocally that conditions of
20   confinement can create constitutional violations either alone
21   or in combination with one another.  This is particularly true
22   when those conditions have the effects they're acting with and
23   amplifying one another to deprive the inmates.  The Fifth
24   Circuit has held that overcrowding, deprivation of adequate
25   bedding, exposure to bodily fluids, and denial of hygiene can

OFFICIAL TRANSCRIPT

1  and do work in combination to deprive inmates of their very

2  basic rights to health, to safety, and to bodily integrity.

3  That's true even under the best circumstances.

4          Right now, we're in an emergent situation.  We're

5  under a pandemic.  There is no vaccine.  There's no antiviral

6  treatment, and there's no cure for COVID-19.  This disease is

7  transmitted via droplets that can be transmitted during either

8  close interpersonal contact, or these droplets can survive on

9  surfaces for days and spread the disease.  There is evidence

10 that people with the virus can transmit it to other people even

11 when they are not yet symptomatic.  People can be transmitting

12 it without knowing that they're doing it.  But there are

13 clear-cut ways the CDC has given us to prevent the spread of

14 that:  Social distancing and increased hygiene.

15         The violations raised in our complaint and now in the

16 instant motion that's before you and the evidence presented

17 before the Court speak directly to the potential for the

18 transmission of the virus.  We're seeing a number of people in

19 and out, packed closely together without the ability to --

20         THE COURT: Ms. Ward, I'm going to interrupt you for a

21 moment, and I apologize.  But I do have questions, and I don't

22 know if they're better addressed to you at this point or to

23 Mr. Romanucci when he begins.

24         Are you going to address the statements sworn to in

25 the affidavit by the defendant by Major Kelly about the

OFFICIAL TRANSCRIPT

1  policies in place at the jail now to address this?

2          MS. WARD: Yes, Your Honor, I think I'll be addressing

3  that briefly, and Mr. Romanucci will also be addressing that

4  briefly.

5          THE COURT: Okay, because I'm going to tell you, I

6  want that addressed.  Go ahead, and I apologize for that.  But

7  I will have some questions.

8          MS. WARD: Absolutely.  Your Honor, the closest

9  detainees of all these inmates, when we add in contact by

10  detainees with droplets of human bodily fluid, that's urine,

11  vomit, blood, or the respiratory droplets normally transmitted

12  during talking or coughing or sneezing, I don't have to tell

13  you or anyone here today the danger that that poses.  And the

14  limited provision of cleaning measures, including, regular

15  access by detainees to soap and cleaning supplies will only

16  amplify the risk.  Droplets can sit there on shared services

17  for days.  And in a space that small, every detainee will be in

18  contact with every surface in there, including, surfaces that

19  they have to use like a toilet.  This is why the CDC recommends

20  disinfecting high-touch areas several times a day.

21          To go through some of the things Ms. Raveendran had

22  addressed earlier that we wanted to address in closing

23  statements, we're seeing comparisons with the CDC Guidelines,

24  and we're seeing that there is no indication -- there are

25  certain indications as to what's happening in the general

OFFICIAL TRANSCRIPT

1   population, but there are areas where we're seeing a very

2   particular concern as to holdings that are not addressed.

3   While we have information that general population high-touch

4   items are being sanitized multiple times a day, we don't have

5   information about whether disinfection is happening with the

6   rest of the detainees, including, toilets, sink handles, and

7   things like that.

8           We're hearing that inmates -- that pressure washing

9   of the holding areas has been increased to once a week.  We

10  don't have evidence of how often that was happening before, but

11  obviously less than that.  But we don't have indication of

12  what's being disinfected within these cells.  CDC Guidelines

13  very clearly call for intensified cleaning and disinfecting.

14          We're also hearing that inmates have access to a bar

15  of soap that they can use at any time, and I'm referring to

16  inmates within the -- the detainees within the holding cells.

17  The CDC is very clear that you have to have continuous access

18  to hygiene supplies, no-cost access to hygiene supplies, and to

19  liquid soap whenever that is possible because of the risk of

20  contacting droplets and sharing droplets among individuals.

21          Your Honor, other courts including the Middle

22  District of Pennsylvania, Southern District of New York,

23  Central District of California have acted under these emergent

24  circumstances.  Middle District of Pennsylvania recognized

25  what's called, "the very real risk of serious, debilitating

OFFICIAL TRANSCRIPT

```
 1  illness or death.  There can be no injury more irreparable."
 2          And so we submit to Your Honor that the time to act
 3  with respect to the coronavirus is now.  We would respectfully
 4  submit to you that granting our request for relief is the way
 5  to ensure that the rights of inmates and detainees are
 6  preserved and that their health is protected under these
 7  emergent circumstances.
 8          DEPUTY CLERK: Attorney Ward, it's Melissa, the
 9  judge's case manager.  Your six minutes is up.
10          MS. WARD: Thank you very much.
11          THE COURT: Thank you.  Was that the conclusion of
12  your part of the argument, Ms. Ward?
13          MS. WARD: Yes.  As to my part of the argument, I
14  respectfully pass it along to my colleague Mr. Romanucci to use
15  the remaining time.
16          THE COURT: Perfectly timed.  Let me ask you a couple
17  of questions before you pass it on to Mr. Romanucci.
18          And it won't get into your time, Mr. Romanucci.
19          Ms. Ward, do you want to give me a citation for what
20  you just cited from the Middle District of Pennsylvania?
21          MS. WARD: Yes, Your Honor.  One second here.
22          MR. COLLINGS: Your Honor, this is Chad Collings.  I
23  would just note an objection if this is something that's not in
24  their pleadings or any of their briefs.  Now we're bringing in,
25  in closing argument case law that's never been addressed.  We
```

OFFICIAL TRANSCRIPT

1  never had an opportunity to look at or address ourselves.  I

2  think it's improper.

3       THE COURT: All right, your objection is overruled.

4  Bringing case law to the attention of the Court is always

5  appropriate.

6       MS. WARD: That Middle District of Pennsylvania case,

7  Your Honor, is T-H-A-K-K-E-R, *Thakker versus Doll*, D-O-L-L.

8  And I have Lexis citation, Your Honor.  I don't know if that's

9  going to be helpful to the Court, but I can provide that.

10       THE COURT: Yes.

11       MS. WARD: 2020 U.S. District, that's Lexis, No. 59459

12  at paragraph 10.  That's the Middle District of Pennsylvania.

13       THE COURT: And are those facts from that case similar

14  to the facts that we're addressing here?

15       MS. WARD: Yes, Your Honor, it's addressing crowded

16  conditions within a prison in conjunction with alleged hygienic

17  violations.

18       THE COURT: And was there any evidence in the record

19  in that case of action, such as we have here in this case, that

20  the jail has taken to address this pandemic?

21       MS. WARD: One moment, Your Honor.

22       THE COURT: Ms. Ward, I don't mean to put you on the

23  spot.  Everybody's got a lot that they've been doing.  I can

24  look up the case.  I just wanted to ask the question because as

25  you know the facts in each case vary.  So I can look at it.

OFFICIAL TRANSCRIPT

1          I have another question.  Go ahead.  Do you want to
2    answer something?

3          MS. WARD: Oh, I was just going to say that to the
4    extent to ameliorate counsel's concerns or if the Court wishes,
5    we could also submit very brief supplemental briefing on this
6    issue.

7          THE COURT: Thank you.  I don't think that's
8    necessary.  There's plenty of briefing.

9          MS. WARD: Thank you, Your Honor.

10          THE COURT: Ms. Ward, just so the record is clear, the
11   CDC Guidelines that you and your co-counsel have talked about,
12   I have the entire guidelines, and they're called Interim
13   Guidance on Management of Coronavirus Disease 2019, COVID-19,
14   in Correctional and Detention Facilities.  For the record, is
15   this a law?

16          MS. WARD: They're not laws, Your Honor, but the CDC
17   can issue incredibly, incredibly helpful guidelines as to limit
18   the spread.  At these times, we look to the federal government
19   and the federal oversight, especially in light of this
20   pandemic, to give us the best ideas as to how these conditions
21   can best be managed.

22          So while we concede that this is not a law, we
23   concede that it should have great weight in Your Honor's
24   consideration given that this is the best information we have
25   now as to how we can control coronavirus, particularly,

OFFICIAL TRANSCRIPT

1  particularly within the context of jails.

2          THE COURT: I appreciate that.  I just wondered, for

3  the record, these are guidelines, best practices.  Thank you,

4  Ms. Ward, very helpful.

5          Mr. Romanucci.

6          MR. ROMANUCCI: Thank you, Your Honor.  And I will

7  take any questions that Your Honor has also following my

8  shorter closing here.

9          Your Honor, with respect to COVID-19, it's also

10  referred to as novel coronavirus because, indeed, it is novel.

11  It's new.  And the defendant, in its own response to our motion

12  for preliminary injunction, referred to this virus causing a,

13  "global sea-change that has occurred as a result of this

14  virus."  And that is their quote in their brief.  So indeed, if

15  we're going to continue on with business as usual in the realm

16  of assumptions we once made about contact, infection, hygiene,

17  that's all thrown out now.  It's all thrown out the window.

18          Indeed, it's even been proclaimed publicly that as a

19  society we may never be able to resume shaking hands again.  So

20  what does that mean then for jail and prisons if we possibly

21  have this ability to never ever shake hands again because we

22  may be spreading the virus by having this close social contact?

23          So Ms. Ward appropriately pointed out that the CDC

24  Guidelines are guidelines.  They are governmental guidelines

25  that have been made out for the jails and the prisons for

OFFICIAL TRANSCRIPT

1  recommendations.  And if Your Honor looks at Exhibit No. 5

2  page 2, it clearly points out what I referenced in my opening

3  statement.  That incarcerated, detained persons live, work,

4  eat, study, and recreate within congregate environments

5  heightening the potential for COVID-19 to spread once

6  introduced.

7         Now we don't have any evidence, because of the lack

8  of testing, that the virus does not live on anybody within that

9  jail.  Therefore, it places everyone at risk unless everyone is

10  tested, and indeed, then Mr. Collings can proclaim that there

11  is zero COVID-19 within the jail.  His proclamation that there

12  is zero infection does not hold water.  The fact that someone

13  is symptomatic, that could make them COVID-19 positive.  But

14  nobody has been tested; so we don't know that.

15         Further, the CDC Guidelines point out that in most

16  cases, incarcerated and detained persons are not permitted to

17  leave the facility.  Meaning, that once the virus does begin to

18  spread, there's no avoiding it.  They cannot escape it.

19  Nowhere in defendant's affidavit of Master Officer Lacey do

20  they claim to have tested all inmates, even a percentage of the

21  inmates and detainees in the holding cell.

22         So what does this mean?  When you look at the

23  conditions from 2012 which is pointed out as exhibit -- that

24  was Exhibit No. 1 and the totality of the plaintiff's exhibits,

25  No. 1, No. 5, No. 6, No. 8, and No. 9, look at the totality of

OFFICIAL TRANSCRIPT

1  those exhibits from 2012, 2017, December of 2019, the testimony

2  of Ahmed Baqer, January 2020, the testimony of Guillot, Junior,

3  the report from February of 2020 from Lee Zurik.  That is the

4  evidence that I pointed out in opening statement of capable of

5  repetition, yet evading review.

6          Without an order from this Court, the sheriff can

7  cancel or suspend any of its current protocol that they claim

8  to have in place and return to a status quo.  If, indeed, any

9  of the allegations of Officer Lacey are to be considered as

10 true, then there should be no issue with an order from this

11 Court stating that they are to continue with those, with those

12 protocols that they have put in place.

13         New arrivals are not subject to the PLRA.  There is

14 no way that they can have the 80 days or even less days to go

15 through the administrative review process to get them the due

16 process that's required from the PLRA.  Individual intake

17 holding cells are not adequate for the long-term housing of new

18 inmates.  And now you've heard testimony that two of them have

19 been held for a minimum of 14 days up to whether it's either

20 16 days or 18 days.  I don't think that top line is relevant.

21 Those holding cells were meant for 48 to 72 hours max.  And now

22 we've heard that detainees have been in there for over

23 two weeks.  That, in and of itself, poses a threat to all jail

24 detainees based upon the fact that Ms. Ward pointed out with

25 the vomit on the floor, half blankets, open wounds, and lack of

OFFICIAL TRANSCRIPT

1  medicine, and some of the other facts that she pointed out to
2  you.

3          Plaintiff has made the allegation that as of
4  January 2020 defendants kept 97 inmates in four holding cells
5  despite having 137 open beds which would have created more of a
6  social distance, if not, indeed, the social distance
7  recommended by the CDC Guidelines.

8          Plaintiff has also alleged, and you heard the
9  testimony from Baqer and Guillot, Junior and I believe we've
10 proven those to be true, that each were placed in holding cells
11 with as many as 19 up to 37 other detainees despite the
12 availability of the open beds.

13         With respect to standing, I believe that we covered
14 that issue, Your Honor.  If you have any questions on it, I
15 will be happy to answer them, but Ms. Ward went through them,
16 and I don't want to be repetitive.

17         With respect to irreparable harm, I don't know that
18 there can be any dispute whatsoever that if, indeed, any inmate
19 contracts corona or tests positive for it that it can, indeed,
20 be a cause for irreparable harm.

21         The balance of the public interest, the defendants
22 attempt to downplay the risk of this failure to adequately
23 address the COVID crisis by appealing to the broad risk of
24 infection within any community.  And indeed, you heard
25 Mr. Collings question Mr. Baqer about other jails, and in fact,

OFFICIAL TRANSCRIPT

1    Mr. Baqer said that the Metairie jail was clean.  So we have

2    established that there are differences here.

3            What defendants overlook is that they are

4    constitutional officers here carrying constitutional

5    responsibilities to their inmates by merit of the custodial

6    system.  And the general population should not and cannot be

7    treated any differently than the new arrivals being held in the

8    holding cells.  And we've heard the many differences that exist

9    now between the new arrivals and the general population.  I

10   don't have the time to go through all of them.  I think we've

11   established that prima facie case which gives us more than

12   enough evidence to overcome the directed verdict on the

13   preliminary injunction.

14           By the way, Your Honor, the purpose of this

15   preliminary hearing is to preserve the status quo that must

16   prevent irreparable harm until the respective rights of the

17   parties can be ascertained during the trial on the merits.  If

18   defendants are truly doing the things they claim that are

19   contained in the affidavit, then they should be able -- then

20   there is no harm in entering an order protecting the health of

21   the prisoners.  And that's what we are simply asking this Court

22   to do is preservation of the status quo if, indeed, that is

23   what is happening.

24           They invoked the PLRA to indicate that relief must be

25   narrowly tailored.  What could be less of an intrusive need of

OFFICIAL TRANSCRIPT

1  protecting inmates and making sure that they have the absolute

2  basics now as we know them to protect their health and welfare

3  and safety as proposed by the CDC Guidelines.

4       And I think that meets our burden of proof for this

5  preliminary motion under the Fourteenth Amendment and under the

6  four tenets that we are responsible for in proving our burden

7  under this motion for preliminary hearing.  Thank you, Your

8  Honor.

9       THE COURT: Mr. Collings, before you begin -- and

10  Mr. Romanucci, I don't mean to cut you off.  You were finished;

11  correct?

12       MR. ROMANUCCI: Yes.

13       THE COURT: All right, thank you.

14       Mr. Collings, before you begin, I'm going to take

15  this opportunity to ask some questions because Mr. Romanucci

16  has used his time, and I'm going to give him additional time to

17  answer some questions.

18       Mr. Romanucci, if I understood you and I'm taking

19  notes, you indicated -- one of your arguments is that, yes,

20  St. Tammany Parish Jail has put these policies and practices in

21  place, and they've put that into evidence.  But they can return

22  to the status quo, and what is to happen and what is to prevent

23  them from returning to the status quo.

24       MR. ROMANUCCI: True.

25       THE COURT: I think that's what I heard you're

OFFICIAL TRANSCRIPT

1  arguing.  Don't plaintiffs, whether it's Mr. Guillot or some

2  future inmate, have a remedy if the jail returns to either old

3  ways or takes away the policies that are now in place?

4          And the second question, how is that argument not

5  speculating as to some possible future harm and not a real

6  harm?

7          MR. ROMANUCCI: I want to make sure you're done with

8  your question before I begin, Your Honor.

9          THE COURT: Yes.  Well, I'm done with that question.

10 So again, how is that not speculating on possible future harm

11 when the Court is obliged to rule on immediate and irreparable

12 harm?

13         MR. ROMANUCCI: Understood.  With respect to the -- I

14 believe those are two-part questions.  The first part is with

15 respect to remedy, and the second part is with respect to

16 speculation versus real harm.  I think on No. 1, the remedy,

17 the new arrivals do not have a remedy, Your Honor.  They have

18 none.  The PLRA is not available to them in a real fashion.

19 It's only a de facto application of a remedy because they don't

20 have enough time.  Even if you take the worst case scenario

21 that we presented today of 16 days, that would not afford a new

22 arrival enough time to exhaust his remedy under PLRA.

23         No. 2, we heard evidence and testimony that even if a

24 new arrival had a medical issue or had a concern with respect

25 to his medical condition, his particular medical condition,

OFFICIAL TRANSCRIPT

1   that it would not and certainly might not ever be addressed.

2   Mr. Baqer testified that he has a medical diagnosis, one that

3   required a prescription, and those needs went unmet.  So the

4   remedy, whether it's a direct one or indirect one, through PLRA

5   or direct through a nurse, those needs cannot be met.  New

6   arrivals being held in holding cells do not have an adequate

7   remedy at law to address what their needs could be.

8         With respect to somebody in a holding -- I'm sorry,

9   in the dormitory, I think that's a different issue, and I can

10  certainly address that one also.

11        Secondly, speculation versus real harm, I don't think

12  we're speculating at all here, Your Honor.  We've all been told

13  and the CDC Guidelines point out that we are all to assume that

14  we are carriers of the virus.  That is a real harm.  And the

15  reason that we must -- it's not even a question anymore.  I

16  believe 45 out of the 50 states have imposed an actual

17  executive order to social distance, and the remaining ones have

18  made it a recommendation.  For example, Louisiana and Illinois

19  and Pennsylvania, those are the three states in which we're

20  conducting this are under executive order to social distance.

21        It's not speculation anymore.  We have all been told

22  that we are all carriers of the virus, and whether or not

23  somebody gets infected that that's up to that individual

24  person's response to their own immune system.  So it is a real

25  harm.  It's not speculation.  I think it would be speculative

OFFICIAL TRANSCRIPT

1  if we were told that we could all go to the beaches and go to

2  work and congregate and socialize and be in a bar and a

3  restaurant.  This is a real and imminent threat, not only to

4  the jails, but to our entire country and our economy and

5  everyone's individual health.

6         THE COURT: How do you -- okay.  Another question, how

7  do you distinguish the case of *Allen versus*

8  *St. Tammany Parish Jail* where this Court found that it is not a

9  constitutional violation when an inmate was held with 28 other

10  inmates for 15 days in a pretrial holding cell?

11         MR. ROMANUCCI: Well, if I may have a moment on that,

12  Your Honor, because I'm going to counsel with my co-counsel to

13  see who is best to respond that.  So just we probably just need

14  15 seconds on that.

15         THE COURT: Of course, of course.

16         MR. ROMANUCCI: Your Honor, I'm back on the phone.  I

17  think I can quickly answer that.  So with respect to the

18  distinction between that case in *Allen*, I believe it was said

19  that there was no indication that any of those conditions were

20  being done punitively.  In this instance, we know under the

21  allegations of the complaint that there were 137 open beds, and

22  this was during the time that the COVID-19 virus was existing.

23  There was no basis for not using the open beds when there were

24  97 inmates that were being kept in four holding cells.

25  Therefore, had those 97 inmates been appropriately socially

OFFICIAL TRANSCRIPT

1  distanced according to the CDC Guidelines, we wouldn't have
2  this issue.  But it was the opposite.  So I think there's the
3  difference.
4          You know, when someone has food withheld, if they
5  have medical attention being withheld, if there's vomit on the
6  floor, they don't have cleaning supplies, they have used toilet
7  paper, they're lying in urine and feces, that -- the totality
8  of the circumstances can be deemed or looked at to be punitive
9  to these member -- to these detainees who are being held in
10 holding cells.
11         As a matter of fact, Your Honor, I do have the quote,
12 and I do want to reference it.  I believe it was Officer Strain
13 who indicated in one of the interviews -- and I'm looking for
14 the exact quote because I do have it.  One moment, Your Honor.
15 Officer Strain, during one of the interviews when Lee Zurik was
16 interviewing him, his quote was, "If you don't commit a crime,
17 you don't have to go to holding at all."  His next quote was,
18 "Someone with a probable cause arrest, a warrant or warrantless
19 arrest, is someone who will be held in this holding cell."
20         All those new arrivals are afforded the
21 constitutional right of innocence before guilt, and that's a
22 period after that statement.  And what St. Tammany Parish is
23 telling this Court and everybody out there who listened to his
24 words, "Hey, you know, don't get yourself arrested," but the
25 point is, what the point that's being missed is all those

OFFICIAL TRANSCRIPT

1  people are presumed innocent.  So certainly, we can look at
2  what that statement, if you look at that statement in totality
3  with the conditions that exist within that cell as being
4  punitive, and that's the difference between -- and that is the
5  distinction that's being made.
6               THE COURT: Point being --
7               MS. RAVEENDRAN: Your Honor.
8               THE COURT: I'm sorry, did somebody want to say
9  something?  Is that Ms. Ward, or who was that?
10              MS. RAVEENDRAN: No, Your Honor, that was
11 Ms. Raveendran.  I had another case that may exist in
12 responding to your question, but I think you had a follow-up to
13 Mr. Romanucci.
14              THE COURT: Go ahead, Ms. Raveendran.
15              MS. RAVEENDRAN: I just want to bring the Court's
16 attention to a case called *Hines versus Youssef*.  That's 2015
17 U.S. District, Lexis 3869 at Star 10, and that's the Eastern
18 District of California in January of 2015.  To quote, "Unless
19 there is something about a prisoner's conditions of confinement
20 that raises the risk of exposure substantially above the risk
21 experienced by the surrounding communities, it cannot be
22 reasoned that the prisoner is involuntarily exposed to a risk
23 the society would not tolerate."
24              And the case itself is about failure to state a claim
25 on which relief may be granted, and the court talks about that

1  the Eighth Amendment requires to -- the Eighth Amendment which

2  is very analgous to the Fourteenth Amendment requires that you

3  show that there is a risk that is substantially above the

4  surrounding community.

5          What we have in this case and the reason that we can

6  have a constitutional violation or we have established a prima

7  facie constitutional violation is in the affidavit presented to

8  this Court by the defendant.  They show that holding cell

9  detainees are being held with higher risk than the surrounding

10  community of general population.  That's not even to say that

11  holding cell detainees are clearly at a higher risk than

12  society in general.  But as far as COVID-19 is concerned,

13  holding cell detainees are sharing a bar of soap which is a

14  threat to the community of general population.

15          Holding cell detainees are only allowed three showers

16  a week when sharing a space with strangers.  Holding cell

17  detainees as compared to the surrounding community of general

18  population inmates are basically facing an unreasonable

19  additional risk of harm because they don't have the same access

20  to showers, to soap, to cleaning materials, to toiletries.  And

21  the fact is in the affidavit the sheriff's office is saying we

22  have 12 such detainees right now.  Those 12 detainees are being

23  treated differently than the society at large.

24          And another paragraph in the affidavit, paragraph 67,

25  indicates that the numbers of -- that restricted inmate

OFFICIAL TRANSCRIPT

1   movements are now being used in the jail.  And that could mean

2   that individuals are being held in the holding cell longer

3   which means that those numbers in the holding cells could

4   increase from 12 very quickly if that is the exact number that

5   are currently there.

6           So I would just ask Your Honor to look at the facts

7   with *Hines versus Youssef.*

8           THE COURT: I appreciate that, Ms. Raveendran.

9           Can anyone from the plaintiffs direct me to any

10  evidence in this record that shows punitive intent on the part

11  of the defendants?

12          MR. ROMANUCCI: I think as a totality, Your Honor, I

13  believe I raised that issue.  As a totality, you can look at

14  the withholding of medication, the withholding of medical

15  services, the withholding of food, the dirty conditions, the

16  swapping of bodily fluids on the floor, no cleaning supplies,

17  the overcrowding in and of itself.  You know, when I mentioned

18  earlier, you know, that the 24 people in a 200-square-foot

19  room, well, you can throw that 8.3 square feet right out the

20  window if you put 37 in there.  You're down to about 4 square

21  feet per person.  That's not even enough room for someone to

22  sit down cross-legged.

23          But if you look at the totality of that, that's

24  punitive.  And when you look at the statements that I read into

25  the record that if you don't commit a crime, well, then you

OFFICIAL TRANSCRIPT

1   don't go to a holding cell, what if you're innocent of that

2   crime?  How many people were placed in a holding cell in

3   overcrowded conditions that were released without any charges

4   or any convictions at all?  That, that --

5               THE COURT: Mr. Romanucci.

6               MR. ROMANUCCI: Yeah, I'm sorry.

7               THE COURT: Go ahead.  Go ahead.

8               MR. ROMANUCCI: So I was just going to wrap that by

9   saying that the totality of all those conditions are punitive

10  right there.

11              THE COURT: How do you distinguish or say it's

12  punitive rather than deliberate indifference, negligent, or any

13  other standard?  Punitive, to me, requires a specific intent to

14  be punitive.  Why is this not deliberate indifference or

15  negligence?

16              MR. ROMANUCCI: Well, I think you can refer to Ahmed

17  Baqer's testimony.  He asked the nurse, I believe his testimony

18  was five times, for medication, and he never received his

19  medication.  And Mr. Collings, sure, he got Mr. Baqer to admit

20  that he entered the St. Tammany Parish Jail without his

21  prescription.  Does that really make him not eligible to

22  receive a prescribed medication?

23              So when you -- if the request was made once and

24  denied and we only have evidence of that, then maybe we'd be

25  talking about deliberate indifference.  This is punitive.

OFFICIAL TRANSCRIPT

1  Nobody, no doctor examined or visited with Ahmed to determine
2  whether or not he was in requirement of those medications or
3  not.  And had there been a visitation and the medications were
4  denied based upon a physical examination, then we might be back
5  to deliberate indifference.  This is punitive.

6        When you ask for something and you are denied it over
7  and over and over again, that's punitive.  That is intent.
8  That certainly is intentional.  The denial of food for
9  18 hours, that's intentional.  The denial of soap or cleaning
10  supplies or even toilet paper, which nobody needs to talk about
11  the internal pandemic that's surrounding toilet paper right
12  now, that is punitive.  That's intentional.

13        THE COURT: I appreciate it, Mr. Romanucci.  And I
14  know, because I've spoken to all of you during this week, that
15  you understand fully what the Court is obligated to do here and
16  the factors that the Court has to take into consideration and
17  must take into consideration, and they are very specific
18  factors, before a Court can issue a preliminary injunction that
19  a plaintiff must prove.  And that's why I'm asking these
20  questions.

21        There is no doubt that whether a pretrial detainee
22  who has not been adjudicated or somebody who has been
23  adjudicated guilty has constitutional rights when incarcerated,
24  period.  Just because you are incarcerated pretrial, again, or
25  after an adjudication, you do not lose all of your

OFFICIAL TRANSCRIPT

1    constitutional rights.  But the question is, because this is

2    the first factor that you must prove, the question is:  Have

3    you proven that there is a substantial likelihood of success on

4    the merits of your complaint?

5          And your complaint has nothing to do with COVID-19,

6    all right.  Do you agree with that?  I have searched your

7    complaint and did a word search.  COVID-19, COVID, virus,

8    coronavirus, none of those words are in your complaint, and

9    it's your obligation to show to the Court and to prove to the

10   Court that there is substantial likelihood of success on the

11   merits of the complaint.

12         So I'm going to ask you:  What can you point me to in

13   the record now that this hearing is completed that supports

14   that the plaintiffs have borne their burden of substantial

15   likelihood of prevailing on their complaint?

16         MR. JACOB: Your Honor, Devon Jacob, if I may.

17         THE COURT: Of course.

18         MR. JACOB: First of all, with respect to this issue,

19   I think we have to look at the totality, the collection of

20   harms here.

21         But as to the question as to what indicates punitive

22   conduct, when a guard intentionally places inmates into a wet

23   cell that the guard knows he did not clean, that is intentional

24   conduct.  That is just simply mean.  When a guard makes inmates

25   beg for soap to wash their hands before they eat, that is

OFFICIAL TRANSCRIPT

1   simply mean.  When you hand an inmate a wet blanket, you know

2   it's wet when you're handing it to that inmate, that is just

3   punitive, punishment.  I don't sleep with a wet blanket at

4   night.  I'm sure Your Honor doesn't either, and nor should an

5   individual -- frankly, an animal should not be provided with a

6   wet blanket in order to sleep.

7          So these are things that once they reach the level of

8   common sense, one can say are being done intentionally.  For

9   instance, when the guards walk by numerous empty cells that are

10  clean that they can simply put the inmates in and then look in

11  a cell and see 37 people crammed in there, not just overcrowded

12  which may alone be okay, but 37 people in there standing,

13  unable to lie down, and if they do lie down, they're laying

14  down in vomit and urine, that is intentional conduct because

15  all they needed to do was move them to another cell.

16         So I think there's enough here that in the cumulative

17  we have absolutely met the burden as far as showing that this

18  goes way beyond deliberate indifference.

19         THE COURT: Mr. Jacob, I appreciate your follow-up to

20  that question, and I appreciate that.  So I got your response

21  and Mr. Romanucci's response on that.

22         So answer my, if you don't mind, the next question

23  which I know you were getting to, but I've held Mr. Collings

24  off long enough.  Point me to where in the record or what

25  evidence plaintiffs have provided in the record that support a

OFFICIAL TRANSCRIPT

```
 1    finding of substantial likelihood of success on the merits of
 2    the complaint.
 3              MR. JACOB: Well, again, Your Honor, I think it goes
 4    back to Nicolette Ward's argument as far as the legal
 5    requirement.  Yes, the Court is correct that simply
 6    overcrowding, that's not enough.  And if that's what we
 7    alleged, then that would be enough here.  But it is when you
 8    start to add these violations one on top of another, that is
 9    when it becomes a violation of the constitutional standard.
10              And when you're intentionally holding one group of
11    inmates, that being the pretrial detainees, in a different
12    condition than the rest of the jail, meaning, you've already
13    proven that you can hold them in clean, safe conditions, then
14    again, you're showing that we can meet the Fourteenth Amendment
15    standard.
16              THE COURT: Okay, thank you.  And I obviously put a
17    lot of questions to you.  Anything else are y'all going to add
18    because I'd like to move to Mr. Collings?
19              MR. ROMANUCCI: Just real quickly just because the
20    Court had a concern about it, the irreparable harm, if I can
21    just indicate that without belaboring the point.  In our brief,
22    we talked about how you don't have to first get the virus
23    before it's irreparable harm.  A significant and substantial
24    increase in risk for certainly a deadly condition is enough in
25    the case law, and again, that's listed in our brief.  So I
```

OFFICIAL TRANSCRIPT

1  won't belabor the point.

2          THE COURT: Thank you.  All right, thank you to

3  everybody who participated for the plaintiffs.

4                  Mr. Collings or Mr. Acosta.

5          MR. COLLINGS: Well, Your Honor, you had some great

6  questions.  I would, again, urge my motion that you rule on

7  what is before you now because what I've heard for the last

8  three hours is a lot of supposition, a lot of conjecture, a lot

9  of asking the Court to, you know, make some leaps and assume

10  some things.  But you just asked the same question about four

11  or five different times, where in the record, where is the

12  evidence, and I have not heard any of it.  There is no

13  evidence.

14          We got two witnesses who testified today.  One of

15  whom I would submit to the Court is not even qualified to give

16  evidence in this setting because he is an incarcerated

17  individual.  And he has to under the jail -- I'm sorry, I got

18  the acronym here -- PLRA, Prison Litigation Reform Act, under

19  that act, he has to go through his administrative remedies

20  before he can even come to you and ask for any relief.  Not

21  only did he not do that, he doesn't even know what it is; even

22  though it's given to him.  It's readily available in the jail

23  as we have testimony in the record to show, and that testimony

24  is uncontroverted from the major at the jail.  They all have

25  that.  She does it.

OFFICIAL TRANSCRIPT

1          So this individual has chosen not to avail himself of

2    the administrative procedures.  He simply has walked into your

3    courtroom and said, "Give me some relief.  I don't care about

4    the Prison Litigation Reform Act."  And the Fifth Circuit

5    couldn't be more clear on what you should do in this instance

6    which is to deny him relief because you don't have the

7    discretion at this point to give him any relief.  He has to.

8    It is affirmative duty on his part to utilize that process

9    before he can come to you and ask for any relief at all.  So

10   that was my first point.

11         I did want to, if the Court -- I don't know how much

12   you want to hear from me.  Honestly, Judge, the questions I

13   heard from you raise the same issues that I want to address in

14   closing if you want to hear them again.  I'm just --

15         THE COURT: I'm going to interrupt you for a moment,

16   Mr. Collings, because I interrupted plaintiff's counsel plenty

17   of times; so I think it's only fair.

18         You asked for a ruling on your motion for directed

19   verdict, and this might help guide you in your closing.

20         MR. COLLINGS: Yes, ma'am.

21         THE COURT: And I've given the plaintiffs plenty of

22   opportunity; so I'm going to rule on that.  I'm going to note

23   that a directed verdict is appropriate only after the Court

24   determines that there is no evidentiary basis, however minimal,

25   that a trier of fact could use to reach a different conclusion.

OFFICIAL TRANSCRIPT

1  It is a bare minimum.  It doesn't rise to more likely than not

2  and certainly not to beyond a reasonable doubt, but it is a

3  bare minimum that there is legally sufficient evidentiary basis

4  for the case to proceed.

5        So I am going to deny your motion for directed

6  verdict at this time finding that there is at least some basis

7  for it to proceed further for a ruling on the motion for

8  preliminary hearing, and now that's where we are.

9        So that might help you in how you want to proceed in

10 your closing.

11       MR. COLLINGS: Fair enough, Your Honor.

12       If I could, I would turn the floor over to Mr. Acosta

13 to address one of the legal issues that has been brought up by

14 both the Court and opposing counsel.

15       THE COURT: Certainly.  Mr. Acosta.

16       MR. ACOSTA: Good afternoon, Your Honor, Cody Acosta.

17       Your Honor had mentioned the doctrine of capable of

18 repetition, yet evading review both this morning as well as

19 previously in our status conference.  I just wanted to touch on

20 that briefly.

21       The Supreme Court has stated that this exception is

22 only available if the challenged action is, quote, "in duration

23 too short to be fully litigated prior to cessation or

24 expiration, and there is a reasonable expectation that the same

25 complaining party will be subject to the same action again."

OFFICIAL TRANSCRIPT

1  That quote is from *Turner versus Rogers*, 564 U.S. 431.
2  That's pages 439, 440.  That's a 2011 case.
3           THE COURT: Mr. Acosta, just to make sure I've got
4  that, I'm sorry, *Turner versus Rogers*, 564 U.S. 431?
5           MR. ACOSTA: 564 U.S. 431, yes, Your Honor.
6           THE COURT: All right, thank you.
7           MR. ACOSTA: So you know, that kind of lays the
8  foundation for how we look at this exception.  And I want to
9  point Your Honor's attention specifically to the second factor,
10 that there be a reasonable expectation that the same
11 complaining party will suffer the same alleged injury.
12           In 2018, in a case called *United States versus*
13 *Sanchez-Gomez*, the Supreme Court elaborated upon that second
14 factor.  In particular, the Supreme Court looked with that to
15 determine whether a plaintiff would satisfy this exception for
16 jail contact by asking a Court to say that it was reasonably
17 likely that the plaintiff would again come back to jail.
18           In *Sanchez-Gomez*, the Supreme Court refused to
19 officially let the plaintiff's potential alleged violations of
20 law that require them to return to the jail.  That case is
21 138 S.Ct. 1532.
22           And I'm sorry, Your Honor, I'm kind of looking at the
23 case as I speak, but it's officially the Court's opinion held
24 that it's unreasonable for a court to expect that any citizen
25 or resident of this country to violate the law and allow them

OFFICIAL TRANSCRIPT

1  to take advantage of that exception.

2          The Supreme Court has also talked about inherent

3  transitory exception for class action.  Although this has been

4  filed as a class action, no motion for certification has been

5  filed at least as of this morning.  And with the inherent

6  transitory exception for class action standing, the Court has

7  to look at whether any main plaintiff or class representative

8  has standing at any point in time up through the certification

9  of the class.

10         Now in this case, Mr. Baqer and Guillot, Junior were

11  out of holding at the time that they filed this lawsuit.

12  Therefore, they had no redressability concern with respect to

13  the conditions of the holding cell because in Mr. Baqer's case

14  he was out of the jail completely.  He's affirmatively alleged

15  that.  And in Mr. Guillot, Junior's case, he was out of holding

16  in either a dormitory or a tier housing unit.  So even if the

17  Court were to grant the relief that these two individuals have

18  sought, they wouldn't actually stand to receive any benefit or

19  have any of their injuries redressed by such a relief.

20         For those reasons, Your Honor, we don't think that

21  there's a justiciable case or controversy under Article III or

22  is there the application of inherent transitory exception for

23  class action, not only because the class hasn't been certified,

24  but also because at the time of the institution of this action,

25  those two individuals did not have standing to seek injunctive

OFFICIAL TRANSCRIPT

1  relief.  I'm not saying that they don't have standing to seek
2  monetary relief for damages or declaratory relief potentially.
3  But we're only here talking about injunction this morning, and
4  we don't think that the record can support the standing in
5  these contexts.

6          THE COURT: Thank you, Mr. Acosta.

7          Mr. Collings, did you have anything further?

8          MR. COLLINGS: I'm just going to touch on a couple of
9  things, Your Honor, and then I'm going to rest.

10         Again, I am struck by how little there is in this
11 case up to now.  What we have is, and you touched on it, Your
12 Honor, when you asked the questions about the complaints and
13 how you were cognizant of the fact that the complaint, which is
14 really what we should be looking at primarily in this context,
15 the complaint itself at no point mentions the word
16 "coronavirus" or any other type of infectious disease.  And the
17 court case law which set it out in our brief does not allow for
18 individuals to file a motion like this, motion for preliminary
19 injunction, and expand their complaint.  The complaint is why
20 we're here, not the motion itself.

21         The motion, it's interesting what I've heard in the
22 last few days, but it's a constant back and forth and a
23 commingling of two entirely separate issues.  And every time
24 they don't like where one issue may be leading, they jump to
25 the other, and I've heard that back and forth for three and a

OFFICIAL TRANSCRIPT

1    half hours so far today which is -- we're here today about the

2    complaint filed on the 22nd of March.  This was only

3    three weeks ago.  And at that point, coronavirus existed and

4    was well publicized, and there were orders and things issued by

5    various government agencies already.  Nevertheless, they chose

6    not to file that complaint and seek any relief for some sort of

7    coronavirus epidemic or exposures.  They simply said here it

8    is, these people are being held in the holding cells for too

9    long, and that's a violation of the law.  So give us some

10   relief under the federal 1983 statute.

11          Well, the Court has already addressed that.  I heard

12   the question, and it was something, you know, it's already in

13   our brief, and I think it's a great question.  And they didn't

14   really give you an answer.  And I listened very carefully

15   because I was hoping to hear something I didn't know, and I

16   didn't which is the very courthouse where you are, not

17   physically, but your courthouse, Your Honor, has heard these

18   similar arguments already.

19          Judge Africk, your colleague on the bench in the

20   Eastern District of Louisiana, has heard the same type of

21   complaint already as little as a year ago.  I think it was

22   2018, so two years ago.  Judge Africk made a ruling which could

23   not be any more clear which is a violation of Title 22, which

24   is an administrative code, mind you, a Louisiana administrative

25   code, does not give one the key to the federal courthouse in

OFFICIAL TRANSCRIPT

1   effect by giving someone a 1983 claim.

2          Now they may have a claim somewhere in the state

3   court, state proceedings, but that's really not an issue here.

4   And maybe they need to go do that, file something in the state

5   courts of Louisiana if they think the administrative code gives

6   them a right of action.  But no, they jumped over to the

7   federal courthouse, and they want to bootstrap down an

8   administrative code and say we have a 1983 claim because

9   they're arguing a violation of an administrative code.

10          Judge Africk, I think, has addressed that squarely.

11  I think he was correct.  I would ask the Court to basically

12  adopt that same holding which is that, you know, the federal

13  courts have limited jurisdiction; and that's been, you know,

14  there's a list of cases as long as your arm that say that over

15  and over and over again.  Simply because someone has a claim in

16  state court doesn't then give them a right to the federal

17  courthouse and all the relief under 1983.  It's got to be a

18  constitutional violation under 1983.

19          Well, what is the constitutional violation?  So

20  putting aside all the issues with respect to COVID-19 and

21  everything else we've heard about today and the things they put

22  into evidence with their motion, the constitutional violation

23  alleged in the complaint is wholly lacking, and they have yet

24  to put on any real evidence to suggest that they have a claim.

25  There's allegations, an unverified complaint, mind you.  The

OFFICIAL TRANSCRIPT

1  two individuals who testified today gave you no real

2  information that there is a constitutional violation.  There

3  are generalized complaints about how long it took to get fed,

4  how many people were in a holding cell, that sort of thing.

5  Those things while, I guess, interesting and maybe unpleasant

6  to them at the time is not in and of itself a violation of the

7  constitution.  The case law on that is pretty clear and already

8  established.

9       So they would have -- the plaintiffs in this case

10  would have you ignore all these other cases that have addressed

11  these same issues that have already been basically adjudicated

12  and have you say, "No, I find differently.  I find when someone

13  sits in a holding cell more than 48 hours that's a violation of

14  their constitutional rights.  Therefore, I'm going to give them

15  the relief, and they have access to this courthouse under

16  1983."  I think that is asking this Court to make a leap well

17  beyond what is allowed under the law.  It's just not there.

18  They have not come close to meeting their burden of proof.

19       The first criteria under Rule 65 to get their

20  injunctive relief is likelihood of success.  Frankly, I don't

21  think they even come close to likelihood.  I don't even think

22  they meet 51 percent at this point because their evidence is

23  lacking.  And every time -- for example, I made notes of what's

24  in their briefing.  There was an interesting comment in their

25  motion for preliminary injunction where they say -- to the memo

OFFICIAL TRANSCRIPT

1  in support, "It is believed that the same unlawful and

2  dangerous policies and practices that existed since at least

3  2012 remain in effect."

4       That's what the frustration I've got in this case.

5  It is conjecture, supposition throughout, no evidence at all.

6  That statement in their memorandum, what evidence do they have

7  to support that?  None.  They had two people testify today.  I

8  didn't hear one of them talk about the conditions of 2012 as

9  opposed to conditions today.  One individual, Mr. Baqer, has

10 been gone from the jail since December of 2019.  So I don't

11 know what basis does he have to allow the Court to rule that

12 the sheriff violated his constitutional rights in 2019 because

13 he was in holding for approximately 14 days.  I don't know what

14 that is.  I didn't hear it.

15      Now there was complaint that he didn't get his

16 medication.  But I do a lot of jail litigation as a result of

17 representing the sheriff.  I've had these kinds of issues come

18 up before.  There is case law, long-established case law that

19 suggests prisoners and inmates in jails and prisons, they don't

20 have a right to the very best care available.  It's not the

21 Mayo Clinic standard that's required under the Constitution.

22 It is, in fact, the minimally constitutionally required

23 threshold that is required of us.  They have not provided any

24 evidence at all.  No healthcare providers testified today or

25 anyone else other than Mr. Baqer who said, "I had medication.


OFFICIAL TRANSCRIPT

1  I don't know who prescribed it, and I didn't get it.  I didn't
2  have it with me, but I didn't get it when I was in jail for
3  14 days."

4          But where is the evidence that suggests that the
5  medication that he didn't get was actually minimum -- was the
6  minimally constitutionally required threshold that we gave him
7  something that put him at risk that violated his rights.  There
8  are healthcare professionals, nurses, and doctors in the jail
9  that make calls with respect to medication on a daily basis.
10 They will make a call from time to time if a prisoner says, "I
11 was on X," but the jail medical staff don't believe that that's
12 required.  Doctors disagree about medications all the time.
13 Our jail staff does that routinely.

14         They did not put before you any evidence to suggest
15 that the call made by the medical staff at the jail not to give
16 Mr. Baqer his Xanax was somehow violative of his rights and put
17 him at risk in some way.  He may not have enjoyed his time in
18 the jail as much as if he had continued to take his Xanax.
19 That, I can't speculate on.  But the evidence is what's
20 important, and they didn't give you any evidence.

21         I was thinking I was going to hear from a doctor
22 today to talk about some of these issues.  They didn't provide
23 that doctor.  What they do is they want you to go leap out into
24 the world, read CDC, Johns Hopkins, and then, you know, cobble
25 all of these things to say, well, yeah, you know, COVID-19 is

OFFICIAL TRANSCRIPT

```
1    bad, and it may be harmful; and therefore, if there's a
2    possibility of harm, then I have to give them some relief.
3    That's not the standard.
4         And the Court -- I heard your questions, and I was
5    glad to hear them because I think you've already gotten it.
6    There is no likelihood of success.  The very first criteria
7    right out of the shoot, they fail because they didn't give you
8    any evidence at all, none.  They gave you a lot of things to
9    talk about, conjecture.  You know, there is a possibility.  I
10   heard opposing counsel mention the fact that even though we've
11   given sworn testimony, sworn testimony that we've had zero
12   cases of COVID-19 infection inside the jail from whenever it
13   hit the shores of the United States, and I guess that's
14   somewhat debatable, but at some point earlier this year through
15   today's date or at least the date of the filing of our
16   affidavit which was, I guess, yesterday, there's been zero
17   cases.
18        And yet, nevertheless, I heard in closing argument
19   that you can't rely on that, Judge, because we're not testing
20   everyone in the jail; so maybe there's someone in the jail
21   that's got it that we just don't know about.  So that seems to
22   suggest the burden is now back on us.  It's our burden of proof
23   to prove to you that there's no one in the jail that has
24   COVID-19 other than the fact that we've told you in sworn
25   testimony.  That, to me, is turning the entire object of who
```

OFFICIAL TRANSCRIPT

1    has the burden on its head.  We don't have the burden.

2            We've given the Court ample, ample evidence that we

3    are doing not only the minimum required under the Constitution

4    in that jail to provide for those inmates -- I wish that the

5    sheriff could be commended by this Court.  And I know that's

6    not your role, but let me just tell you.  Reading that

7    affidavit, I don't see how any reasonable person could come to

8    a conclusion other than the fact that the sheriff in

9    St. Tammany Parish is doing everything humanly possible within

10   the jail confines to keep those inmates safe.  That's the

11   issue, you know.  And I guess I'm doing -- to some extent, I'm

12   going back to COVID-19 which I don't think is even truly before

13   the Court because it's not in their complaint.  But we have

14   to -- we're addressing them both because I know the Court is

15   considering them both.

16           But the fact is, Judge, there simply is no evidence.

17   None.  There's conjecture.  There's speculation, but there is

18   no evidence that the Sheriff of St. Tammany Parish has done

19   anything wrong whatsoever with respect to the safety and the

20   custody of those inmates.  None.  The only thing they've really

21   got is there's an administrative code somewhere in the State of

22   Louisiana that says pretrial inmates should not be held in

23   individual holding cells.  Now that word is important,

24   quote/unquote, individual.  Individual holding cells for longer

25   than 48 hours, I believe that's Title 22, Section 3301,

OFFICIAL TRANSCRIPT

1   Subsection F.  The word "individual" is utilized.  That's the

2   subsection that they point to in both their complaint and their

3   motion for preliminary injunction which they say we're

4   violating.

5          All right.  Well, the fact of the matter is, you

6   heard testimony, none of these individuals who testified today,

7   neither one of them, and there's no other evidence to the

8   contrary, have ever been inside an individual holding cell,

9   i.e., a solitary holding cell.  So if the statute, the very --

10  it's not even a statute.  The very things within Title 22 of

11  which they complain doesn't even apply because our jail doesn't

12  have individual holding cells for pretrial detainees other than

13  what is there for people who have the possibility of harming

14  themselves.  We do segregate them, and we also, as put forth in

15  the affidavit, have a means to segregate prisoners who test

16  positive for an infectious decease.  We have that ability to

17  isolate them.

18         But the idea that this one provision of the

19  administrative code, that you cannot, you should not as a law

20  enforcement agency keep individual inmates longer than 48 hours

21  in an individual holding cell simply doesn't apply to us.  It's

22  an apples-and-oranges argument.  We are not -- we don't keep

23  these people in individual holding cells.  There is a group

24  holding cell.  So that one provision from Title 22 doesn't even

25  apply.

OFFICIAL TRANSCRIPT

1        So at the end of the day, I don't even know why we're

2   really here, Your Honor.  I really don't.  Because at the end

3   of the day, you've got an administrative code that I don't even

4   think applies.  It certainly doesn't give a plaintiff the key

5   to the courthouse in federal court to allege a 1983 claim as

6   addressed by Judge Africk already.  The lengths of stay are

7   almost exactly the same.  I believe Africk's decision was an

8   individual who had been there for 15 days while Mr. Baqer

9   testified he was out in 14.  So it's one day less.

10       Mr. Guillot, I don't think the Court should even

11  consider anything at all with respect to him because the key to

12  the federal courthouse are closed to him at present until he

13  goes through the Prison Litigation Reform Act and the

14  administrative reviews that are provided and required for him

15  to go through.

16       So again, the evidence is lacking, Your Honor.  It's

17  wholly lacking, and we would ask the Court to deny the motion

18  for summary judgment -- I'm sorry, motion for preliminary

19  injunction.

20       THE COURT: Thank you, Mr. Collings.  All right.

21       MR. ROMANUCCI: Your Honor, this is Tony Romanucci.

22  Is there any opportunity for rebuttal, or are we done?  We'll

23  follow your lead on that.  I certainly wasn't going to

24  interrupt Mr. Collings.  I don't know that, you know, clearly,

25  he was on a roll, wasn't taking a breath, and I think that he

OFFICIAL TRANSCRIPT

1  interjected a lot of personal opinions and viewpoints which I
2  know mean a little bit less when we're arguing to the Court as
3  opposed to a jury.  But there was a lot of personal opinion in
4  there that I think could have been objected to, but we didn't
5  just because out of respect to let him argue.
6            THE COURT: I think, Mr. Romanucci, you are out of
7  time.  But if you wanted a couple of minutes, if there's
8  something specific, I certainly want to give you that
9  opportunity.
10            MR. ROMANUCCI: I think very briefly, I think we do
11  need to touch upon the issue that you brought up and that
12  Mr. Collings, you know, jumped upon as you being correct with
13  respect to COVID or corona not being mentioned in the
14  complaint.
15            I think that's misleading.  It's not -- it doesn't
16  need to be in the underlying complaint because the overcrowding
17  situation, the 24 people within a cell of 200 feet is a
18  derivative of exactly what we're talking about.  The corona,
19  the spreading of the corona doesn't derive unless you don't
20  social distance.  So their argument is specious at best.
21  That's why I'm saying it's misleading.  It's wrong.  It's
22  absolutely wrong.
23            And when you look at the rapidly evolving situation
24  of this virus, I mean every day you need to click on the
25  website in order to determine how many infections there are and

OFFICIAL TRANSCRIPT

1    how many deaths there are.  We've already heard and seen that.

2    So I don't believe that it needed to be in the complaint

3    because, indeed, the overcrowding, the failure to distance

4    inmates is a derivative of exactly what we're pleading for in

5    this preliminary injunction.  I'm not sure if any of my

6    co-counsel wanted to add onto that, but I have nothing further

7    to say.

8              THE COURT: Thank you, Mr. Romanucci.  All right.

9              I'm sorry, is somebody else speaking?

10             MR. ROMANUCCI: No, that was my Siri for some reason

11   on my iPhone that picked up a word and decided to respond, so.

12             MR. JACOB: Your Honor, Devon Jacob, if I could just

13   have one more minute, then I promise we'll be done.

14             THE COURT: Yes, Mr. Jacob.

15             MR. JACOB: I heard a lot about Title 22.  And yes, it

16   was, at least, referenced, and it is a guide, and it certainly

17   can lead one to wonder why would you intentionally be violating

18   Title 22 when you don't have to.  However, we did not base our

19   motion on Title 22 alone.  In fact, we did not even base it in

20   large part.

21             It's based on the constitutional violation, and

22   that's because vomit, urine, blood on the floor, that's not

23   really discussed in Title 22.  Interestingly, the sheriff knew

24   what was in the complaint.  We put on some very strong evidence

25   of some deplorable conditions in the cell that the sheriff knew

                    OFFICIAL TRANSCRIPT

1  was going to be discussed today, and yet the sheriff did not

2  show up.  They did not put on any evidence to rebut any of what

3  we told you and our witnesses told you is happening.  Instead

4  there was -- the only evidence is a subordinate's affidavit

5  drafted by probably counsel and signed to simply state what's

6  going on now.

7           MR. COLLINGS: Judge, can I interrupt?  I mean I think

8  that's out of line to suggest that I'm somehow directing

9  testimony.

10           THE COURT: Mr. Jacob, if that didn't cross the line,

11  it certainly came very close because that's the way I took it

12  as well.

13           MR. JACOB: Well, I apologize.

14           THE COURT: I also want to be clear.  Evidence is

15  evidence.  And evidence can be in the form of testimony;

16  evidence can be in the form of exhibits.  And so the defense

17  has presented evidence through an affidavit.

18           MR. JACOB: I apologize, Your Honor.

19           THE COURT: And the affidavit that was presented is by

20  somebody, and it has not been refuted, somebody who says that

21  she is responsible for much of the implementation of the

22  policies.

23           So proceed.  But let's remember we're professionals

24  here and remember that obligation.

25           MR. JACOB: It came out wrong.  I was just trying to

OFFICIAL TRANSCRIPT

1  say that it's not the voice of the sheriff himself.  That's all
2  I was trying to say.  And I apologize.  It was not meant to be
3  disparaging, I assure you of that.
4          But again, we put in substantial evidence that has
5  not been rebutted about the conditions of those cells.  And
6  while maybe one or two of them alone does not meet our burden,
7  the cumulative of the conditions does meet the burden.  And
8  that's it, Your Honor.
9          THE COURT: Thank you, Mr. Jacob.
10          Again, thank everybody for your professionalism, and
11  I think in these times today, for your passion.  Clearly, we
12  are talking about very serious issues.  We're talking about
13  people and not just, you know, somebody that -- some paper.
14  We're talking about people and possible harm to those people.
15  And that goes for the sheriff's office and for plaintiffs in
16  this case, a whole bunch of people.  It's very serious; so
17  everyone is very passionate, and I appreciate that.  I
18  appreciate your professionalism all this week as we have met
19  and communicated to try to resolve this.
20          And I want to take a moment and especially thank the
21  court staff because today, and I know everyone knows this, not
22  only is everyone teleworking, but this is a holiday for many,
23  many people, a significant religious holiday.  And it's
24  important that the Court continue to work.  And when we granted
25  the motion to expedite the hearing, I was going to do

OFFICIAL TRANSCRIPT

1 everything I needed to do to have it heard this week.  And so I
2 very much appreciate everybody on the court staff who came in
3 to do their job and help us resolve this, and I know it created
4 a problem for many of them.

5        Because this is so serious, I am going to take it
6 under advisement to review everything, all the exhibits, the
7 new case law that was provided during argument, and make sure
8 that I have a full and total grasp of the case law because of
9 the importance of this matter.  I want and it is my duty to
10 have a full and complete review, and I owe you nothing less
11 than that, and that's what I'm going to do.

12        With that being said, I granted this motion for an
13 expedited hearing and plan on ruling on it very quickly.  So
14 I'm not going to sit on it for a long time at all.  I plan on
15 issuing a ruling as soon as possible after the review, and I
16 can tell you that that will start almost as soon as I hang up
17 this phone call.  So with that, I'm going to take it under
18 advisement and will notify you when I have a ruling.

19        And with that, I think unless there's something else,
20 Court is adjourned, and again thank everybody.

21        MR. ROMANUCCI: Thank you, Your Honor.  Happy holidays
22 to you.

23        MR. COLLINGS: Thank you, Your Honor.

24        THE COURT: Thank y'all.

25 (Whereupon this concludes the proceedings.)


                    OFFICIAL TRANSCRIPT

1                          **<u>CERTIFICATE</u>**

2

3       I, Alexis A. Vice, RPR, CRR, Official Court Reporter for

4    the United States District Court, Eastern District of

5    Louisiana, do hereby certify that the foregoing is a true and

6    correct transcript, to the best of my ability and

7    understanding, from the record of the proceedings in the

8    above-entitled and numbered matter.

9

10                            */s/Alexis A. Vice, RPR, CRR*
                              Alexis A. Vice, RPR, CRR
11                            Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         OFFICIAL TRANSCRIPT