**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| AHMED BAQER, *et. al.*,<br><br>Plaintiffs;<br><br>v.<br><br>ST. TAMMANY PARISH GOVERNMENT, a/k/a ST. TAMMANY PARISH COUNCIL, *et. al.*<br><br>Defendants. | * * * * * * * * * * * | **CIVIL ACTION NO.: 20-00980-WBV-JCW**<br><br>JUDGE VITTER<br><br>MAGISTRATE JUDGE PHILLIPS CURRAULT<br><br>JURY TRIAL |

******************************************************************************

**MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

NOW COME the Plaintiffs, AHMED BAQER; KLABERT JOSEPH GUILLOT, JR.; and KLABERT JOSEPH GUILLOT, SR., by and through their counsel of record, and pursuant to F.R.C.P. 23(a) and 23(b)(3), respectfully submit this memorandum of law in support of their Motion for Class Certification, and state:

## I. STATEMENT OF FACTS

The St. Tammany Parish Sheriff's Office ("STPSO") operates a detention facility known as the St. Tammany Parish Jail, located in Covington, Louisiana. Major Lacey J. Kelly serves as the Major over Corrections and warden of the St. Tammany Parish Jail and has served in that role since appointed by Sheriff Randy Smith on April 9, 2018. *See* Ex. 1, ECF Doc. 37-1 at 1 (filed under seal), Affidavit of Major Lacey J. Kelly. Major Kelly is responsible for the day-to-day operations of the St. Tammany Parish Jail. Pursuant to STPSO Policies and Procedures, the Warden must ensure that the day-to-day administrative practices of the jail comply with the Constitutions of Louisiana and the United States; the Laws of the State of Louisiana, the United

States, and St. Tammany Parish; state and federal detention and corrections standards; and all court rulings. *See* Ex. 2, STPSO Policies and Procedures DR.02.05.120.01.

The STPSO requires that the Jail be inspected to ensure adequate safety and sanitation in accordance with "all applicable laws and regulations of the State Sanitation Officer[.]" *See* Ex. 3, STPSO Policies and Procedures SOP.0700:01.100. The STPSO policies and procedures call for weekly sanitation inspections of all facility areas by a qualified departmental staff member, comprehensive and thorough monthly inspections made by a sanitation specialist for compliance with sanitation standards; and annual inspections by the State Sanitation Officer. *Id.* "The STPSO Jail facility shall be kept clean and in good repair. The STPSO staff shall follow the written housekeeping plan for the ongoing cleanliness and sanitation of the facility.

The STPSO also requires that inmates be provided three meals per day at regular meal times, with no more than fourteen hours between the evening meal and breakfast. *See* Ex. 4, STPSO Policies and Procedures SOP 0700:03.100. *Id.*

Inmates must have access to operable showers at minimum three times a week. *See* Ex. 5, STPSO Policies and Procedures SOP.0700:03.120. Pursuant to STPSO policy, the Jail must provide "adequate bedding and linen, including a clean mattress, sheets, pillow and blanket, not to exclude a mattress with integrated pillow." *Id.* Notably, this policy does not differentiate between offenders housed in general population and those in holding cells. Further, each offender shall be provided soap, toilet paper, toothbrush, and toothpaste. *Id.*

All offenders must receive a health screening upon intake into the Jail unless there is documentation of a prior medical screening within the last 90 days. *See* Ex. 6, STPSO Policies and Procedures SOP.0700:03.130. The health screening requirement is in place "to protect newly admitted offenders who pose a health safety threat to themselves or others from not receiving

adequate medical attention. This shall include inquiry into current medical, dental, or mental health problems and communicable disease, a current treatment plan, current medications, including psychotropic, any history of hospitalization, suicide risk assessment, and use of alcohol or other drugs including need for possible detoxification. *Id.* Further, all inmates are entitled to "be provided medication as prescribed."

"Offenders shall have access to exercise and recreation opportunities…Outdoor exercise shall be available on a regular basis (at least three times per week-weather permitting) for state inmates." *See* Ex. 7, STPSO Policies and Procedures SOP.0700:04.110." *See* Ex. 8, STPSO Policies and Procedures SOP.07004:V-B-005.900.

Within the St. Tammany Parish Jail are four holding cells that measure approximately twenty feet long by eight feet wide. Each holding cell has one partially exposed toilet, one sink, and two concrete "benches" on either side of the holding cell. Notwithstanding the above policies and procedures, former inmates at the St. Tammany Parish Jail have come forward to report horrific conditions of confinement in the holding cells. From March 22, 2019 to the present, individuals have reported being kept in holding for extended periods of time, overcrowding in the holding cells, deplorable sanitation practices in the holding cells, and other conditions that, when taken together, subject St. Tammany Jail holding cell inmates to unconstitutional confinement prohibited by the Fourteenth Amendment.

Inmates in the holding cells were routinely kept in holding cells for days and weeks at a time. Floyd Williams[1], one of the named Plaintiffs, was kept in holding for fourteen days with as many as thirty other inmates. *See* Ex. 9, Declaration of Williams. Plaintiff Ahmed Baqer was

1 Plaintiffs Kevin Louviere, Terry Matthew Hall, Jr., and Floyd Williams, are named plaintiffs in a similar action challenging the unconstitutional conditions of confinement at the St. Tammany Parish Jail. His claims are subject to a pending and unopposed motion to consolidate filed on September 17, 2020.

detained in holding for fourteen days with as many as twenty-two other inmates. *See* Ex. 10, April 10, 2020 Hearing Transcript, at 30. Plaintiff Kevin Louviere was caged in the holding cells for twelve days with as many as thirty others. *See* Ex. 11, Declaration of Louviere. Other inmates grieved this practice. *See* Ex. 25, Grievance of Joshua Cavanaugh (noting his confinement in the "booking holding tank" over 48 hours), Ex. 26, Grievance of Brian Gitz (noting his confinement in the holding tanks for 15 days).

The Sheriff and Warden demonstrated indifference to the inhumanity of this practices, captured in a response that the Warden provided to grieving inmate Joshua Cavanaugh.

> In your grievance you state that your complaint is, that you were 'kept in holding tank over the 48 hour maximum holding hours in the booking holding tank.' You go on to state that your specific relief desired is 'to be contemplated for the unhumane time spent over the 48 hour max.'
> ….
>
> The '48 hours' from the Louisiana Administrative Code that you are referencing, provides guidelines for jails. Those guidelines are not laws, but recommended standards for the use of jail administration for inmate management.
> …
> [T]his grievance is considered unfounded and the matter closed.

*See* Ex. 16, Cavanaugh Grievance Response. If being held in such holding cells for extended periods of time and with dozens of other inmates were not enough, the conditions of confinement therein were unbearable. The cell floors and benches were made of concrete, yet the state of overcrowding forced many of the inmates, when they could sleep, to sleep on the floor and practically on top of one another "with their heads near the toilet." *See* Ex. 10 at 31, 33. Grievances from the proposed class period note that inmates were "forced to sleep on bare concrete floor and slab," without a mattress, "while being crammed into an approx. 22' by 12' with anywhere from 16 to 24 other men" for as much as 15 days at a time. *See* Ex. 27, Grievance of James Stickley; Ex. 28, Grievance of Michael Vanderslice.

Each named Plaintiff described a holding cell that routinely had old food, blood, urine, feces, dirty toilet paper, vomit, used bandages, trash, and water on the floor. *See* Ex. 9-13. The cells were never cleaned with water or soap, and instead were only swept, sprayed with bleach and dry-mopped every two or three days. *See* Ex. 12, Hall Declaration, at 3. Witnesses describe reporting to the Warden that cellmates were defecating in their pants. Ex. 28. As a result, a foul odor was ever-present and emanated from the floor. *Id.*

The inmates would routinely complain about these conditions, but were either ignored or mocked by Jail staff. Mr. Louviere was told "you're not in Kansas anymore, you're in 'St. Slammity'", this ain't a federal facility," or "well, if you don't act stupid, you won't have to deal with this kind of stuff." *See* Ex. 11, at 5. When inmates would complain about the conditions, guards would rub their eyes in a mock crying gesture. *Id.* at 6. Guards would often use offensive and pejorative language when addressing inmates. *Id.* at 6. When pressed on the conditions of confinement at the Jail, the Sheriff's communications officer Captain Lee simply stated "I would say don't commit a crime in St. Tammany Parish and you won't have to go to holding at all." *See* Ex. 14, Statement of Scott Lee.

Inmates in the holding cells were never provided mattresses or pillows. Klabert Guillot, Jr., testified that the blankets provided to inmates were often damp or musty. *See* Ex. 10, at 60. Terry Hall reported that guards would threaten to withhold blankets if inmates would not "stay quiet." Ex. 12, Declaration of Hall, at 26. He was not provided a blanket at all for several nights during his 15 days in holding. *Id.* As a result, he and other inmates were forced to sleep on the floor, which as previously noted, was routinely covered in blood, vomit, urine, feces, and other foul matter. *Id.* Mr. Baqer testified that blankets were often given to inmates at 2 a.m. and then taken back by Jail staff at 4 a.m. Ex. 10, at 41. Further, in response to a grievance filed by inmate

Michael Vanderslice, counsel for the STPSO Sheriff stated that it was the policy of the Jail that inmates would not be provided with mattresses "while in a holding cell awaiting an assignment to an available bed. Only a blanket is provided in the evening and that is what you were supplied." Ex. 15, Vanderslice Grievance Response.

Beyond the indifference to these conditions, several inmates have reported egregious indifference to medical needs of inmates. Many inmates were ignored when complaining of medical conditions. Plaintiff Baqer testified that he takes medication for anxiety and depression, and repeatedly reported as much to Jail staff. Mr. Baqer testified that even though he would "beg [Jail staff] if I could see a doctor or somebody", they would not allow him or others with pressing medical needs to seek medical consultation. *See* Ex. 10, at 46.

In similar fashion, the food provided to inmates was often cold, and sometimes spoiled and inedible. *See* Ex. 11, at 4. The policies and procedures for the Jail outlined above bind the Sheriff and Jail staff to "provide sanitary facilities for the storage of all foods that comply with applicable state and/or federal guidelines." *See* Ex. 4. Nevertheless, inmates were routinely and effectively denied adequate nutrition by the provision of spoiled food in place of the meals to which they were entitled. Ex. 11, at 4.

The troubling conditions of confinement detailed at length above have been in place since before April 2011, when the United States Department of Justice notified the Parish that it was investigating the conditions of confinement at the Jail. Ex. 17, at 1 (DOJ Investigation Letter). The DOJ coordinated with the then Sheriff Rodney Strain to provide access to prisoner records and personnel, and assigned responsibility for overseeing the jail to Sheriff Strain and his staff. *Id.* at 3-4. In finding that the Jail provided constitutionally inadequate mental health care and suicide prevention, the DOJ noted:

> we observed, while on site, as many as 30 prisoners held in holding cells that are designed for 20 prisoners. Many prisoners complained of not being seen by medical staff for several days. Even more concerning, we noted that prisoners were sleeping on floors and benches in the holding cells with little or no bedding articles. When asked about the deplorable conditions in the holding cells and the delays in providing timely medical screenings, Jail staff admitted that overcrowded conditions at the Jail limited the ability to provide timely assessments of prisoners held in the holding cells at the Jail. Jail staff further noted that because of security staffing shortages, prisoners were required to remain in the holding cells for days if not weeks…

*Id.* at 5. It is apparent that, notwithstanding the passage of time, conditions at the Jail have returned to a place of Constitutional deficiency. Ex. 18 (Jan. 2017 Letter from DOJ to St. Tammany Parish).

Plaintiffs bring counts pursuant to 42 U.S.C. §1983 for violations of the Fourteenth Amendment (Count I), for violations of the Louisiana state constitution (Count II), for negligence (Count III), for *respondeat superior* liability (Count IV), and for injunctive relief (Count V).

## II. LEGAL STANDARD

"[E]fficiency and economy of litigation" is "a principal purpose of the [Rule 23 Class Action] procedure." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974). The Rule "continues to have as its objectives the efficient resolution of the claims or liabilities of many individuals in a single action, the elimination of repetitious litigation and possibly inconsistent adjudications involving common questions, related events, or request for similar relief, and the establishment of an effective procedure for those whose economic position is such that it is unrealistic to expect them to seek to vindicate their rights in separate lawsuits." *Ridgely v. Fed. Emergency Mgmt. Agency*, 2007 U.S. Dist. LEXIS 43009 *6 (E.D. La. 2007).

District courts have broad discretion in determining whether to certify a class. *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122, 1123 (5th Cir. 1969). In determining whether to

certify a class, the question is not whether the plaintiffs have stated a cause of action or will prevail on the merits. *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 268 (5th Cir. 2007) (noting the "unremarkable proposition that the strength of a plaintiff's claim should not affect the certification decision.") Before certifying a class action, the district court must ensure that the proposed class satisfies all the requirements of Rule 23. *Oscar*, 487 F.3d at 277, However, the Fifth Circuit has noted unequivocally that "class certification hearings 'should not be mini-trials on the merits of the class or individual claims." *Oscar,* 487 F.3d at 277, citing *Unger,* 401 F.3d. at 321. A district court may not inquire into merits issues beyond those necessary to determine whether Rule 23 is satisfied. *Oscar*, 487 F.3d at 278, citing *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) and *Szabo v. Bridgeport Machs, Inc.*, 249 F.3d 672, 677 (7th Cir. 2001) ("A court may not say something like …'I'm not going to certify a class unless I think that the plaintiffs will prevail.'").

## III. <u>ARGUMENT</u>

### A. The Plaintiffs' Allegations Exceed the Requirements of Rule 23(a).

The four threshold requirements of Federal Rule of Civil Procedure 23(a) are: (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy of representation. F.R.C.P. 23(a). The provisions of Rule 23 are to be liberally construed. *Ridgley*, 2007 U.S. Dist. LEXIS 43009 at *6. In class actions, particularly in the civil rights field, the Fifth Circuit has noted that the "the general rules on burden of proof must not be applied rigidly or blindly. The court too bears a great responsibility to insure the just resolution of the claims presented; it should be loath to deny the justiciability of class actions without the benefit of the fullest factual background." *Jones v. Diamond*, 519 F.2d 1090, 1099 (5th Cir. 1975). *See also Guerine v. J. & W. Investment, Inc.*, 544 F.2d 863 (5th Cir. 1977); *Huff v. N.D. Cass Co.*, 485 F.2d 710, 713 (5th Cir. 1973).

**i. The members of the class are so numerous that joinder of all members is impracticable.**

. In determining whether numerosity is satisfied, the focus is not solely on the number of class members, but rather on whether joinder of the proposed class is impracticable in view of the nature of the class, judicial economy, the ability of members to bring an individual lawsuit, and the individual circumstances of the case. *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981). "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Id.*, (citing *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980)). The court may "make common sense assumptions as to the size of the proposed class." *Washington v. CSC Credit Services Inc*, 178 F.R.D 95, 100 (E.D. La 1998). Although the number of members in a proposed class is not determinative of impracticability, it has been noted that any class consisting of more than forty members should raise the presumption that joinder is impracticable. *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999).

According to documents produced by the STPO, in excess of 5,000 men were incarcerated in Holding Cells 1-4 of St. Tammany Parish Jail from March 22, 2019[2] to the present. Joinder would be impracticable with such a numerous class of individuals. The class mechanism would preserve judicial resources in adjudicating the rights of these individuals in a way that joinder could not. Under any consideration, the putative class members are far above the threshold necessary to meet Rule 23's numerosity requirement.

**ii. Plaintiffs' claims hinge on common questions of law or fact.**

Before a putative class may be certified, Rule 23(a)(2) requires that questions of law or

---

2 This number was determined based on review of movement reports produced by Defendant in discovery, consisting of 735 pages of individual inmates. As these movement reports contain information on the movement of incarcerated individuals, Plaintiffs will file the movement reports, marked as Ex. 19, under seal.

fact common to the class exist. In order to certify a class, "Even a single common question of law or fact can suffice to establish commonality." *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016). In *Gen. Tel. Co. of Sw. v. Falcon*, the Supreme Court stated:

> The commonality … requirements of Rule 23(a) … serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiffs' claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

457 U.S. 147 (1982) at 155, 158 n.1.3. Courts, including the 5th Circuit, have emphasized the light burden imposed by commonality, referring to the requirement as one that is easily met and as a requirement that should be liberally construed. See, *Jenkins*, 782 F.2d at 472 (noting that the commonality “threshold [was] not high”).

Commonality must be found where a putative class’s claims depend upon a common contention which is capable of class-wide resolution, meaning that “determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.” *Wal-Mart v. Dukes,* 564 U.S. at 350. Thus "what matters . . . is the capacity of a proceeding to generate common answers apt to drive the resolution of the litigation." Commonality requires the plaintiff[s] to demonstrate that the class members have suffered the same injury. *Wal-Mart*, 564 U.S. at 349–50. This does not, however, mean that each individual in the putative class must be injured to the same extent. "[A] class will often include persons who have not been injured by the defendant's conduct…Such a possibility or indeed inevitability does not preclude class certification[.]” A class is appropriately defined where the class members “are linked by [a] common complaint, and the possibility that some may fail to prevail on their individual claims will not defeat class membership.” *Mullen*, 186 F.3d at, 623, 624 n.1. Fifth Circuit Courts have noted that “[i]t would drive a stake through the heart of the class action device, in cases in which

damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages." *Slipchenko v. Brunel Energy, Inc.*, 2013 WL 4677918, at *13 (S.D. Tex. Aug. 30, 2013) citing *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 2013 WL 4478200, at *5 (7th Cir. 2013).

At the core of the instant litigation is Plaintiffs' contention that they and the members of the putative class experienced common, unconstitutionally punitive conditions while housed in the Jail's holding cells. The "common questions" derived from Plaintiffs' claims, such that resolution of these questions would resolve the putative class's claims "in one fell swoop," are the conditions of the cells during the relevant class period, and whether those conditions were unconstitutionally punitive in violation of the class members' Fourteenth Amendment rights. The commonality of the claims at issue are demonstrated in the relevant facts.

Only four of the holding cells at issue cells existed, and all were housed within St. Tammany Jail, attended to by the same staff, and overseen by the same supervisory personnel. Each holding cell was subject to the same policies and procedures. Each cell had dimensions of approximately 20 feet by 10 feet. All surfaces of these holding cells, including floors and "benches" upon which inmates were forced to sleep, were made of concrete. Evidence reveals that these surfaces were typically covered in bodily fluids, including feces, urine, and vomit, resulting in foul odors due to the failure of the Jail to routinely clean. *See* Ex. 9-13. Inmates were forced to sleep on these dirty floors in very cold temperatures without mattresses and with minimal access to blankets, which were damp and musty and provided only for a few short hours per night. *Id.* Plaintiffs and other inmates in the holding cells at the St. Tammany Parish Jail were forced to endure these conditions for periods in excess of the two-day limit prescribed by St. Tammany policy, with as many as 37 other inmates in a given cell. *Id.* Inmates were frequently

refused medication and care, were deprived of access to recreational activity, and were given sparing access to showers. *Id.* Plaintiffs experienced and observed Jail staff taunting inmates in response to complaints of the conditions of confinement. *Id.*

Each of these violations were perpetrated under the control of the named Defendants or in a perpetuation of customs they had used in their command. Defendant Major Lacey J. Kelly has submitted an affidavit outlining her control over the Jail. Major Kelly serves as the warden of the St. Tammany Parish Jail and is responsible for the day-to-day operations of the Jail. *See* Ex. 1, ECF Doc., 37-1, (filed under seal). Further, Maj. Kelly demonstrated in her affidavit that she has considerable control over sanitation practices within the Jail. Sheriff Randy Smith also exercised control over the conditions at the St. Tammany Parish Jail holding cells. As set forth above, Captain Scott Lee, spoke on behalf of Sheriff Smith and the office of the Sheriff relation to the conditions in holding at the Jail. *See* Ex. 14. In addition, Capt. Lee admitted "the sheriff in his administration makes the decision on how many DOCs we're doing to take, how many federal inmates we're going to take and ultimately what it boils down to – it does ultimately boil down to dollar and cents. There's a dollar figure associated with a DOC inmate and a dollar figure associated with a federal inmate." *Id.* As is evidenced by a grievance submitted over the failure of Jail staff to provide inmates with mattresses in holding, it often fell to Sheriff Smith or his designee to review complaints where an inmate requested the Sheriff's review. *See* Ex. 20, at Bates No. 001086. Further, on the top of every grievance form, displayed prominently are the words "St. Tammany Parish Sheriff's Office, Randy Smith, Sheriff."

Each of the named class members experienced common conditions of confinement. The central allegations are common among them and are representative of those conditions experienced by the members of the class. Each of the named Plaintiffs was kept in holding for an

extensive period of time: Mr. Baqer, 14 days; Mr. Louviere: 12 days; Mr. Williams, 14 days; Mr. Hall, 5 days. Each of these named Plaintiffs were caged in the holding cell with numerous other inmates: Mr. Baqer, 22 other inmates; Mr. Louviere: 30 other inmates; Mr. Williams: 30 other inmates; Mr. Hall: 15 other inmates. The allegations of Constitutionally inadequate conditions of confinement were not only present for all, but were also present throughout the proposed class period. Mr. Louviere experienced these conditions from June 17, to June 29, 2019; Mr. Hall from October into early November of 2019; Mr. Williams from September 28, 2019 to approximately October 3, 2019; and Mr. Baqer and Mr. Guillot, Sr. in late December of 2019. That these inmates experienced these conditions months apart instructs that the harm suffered by the named Plaintiffs is part of a common scheme suffered by members of the class.

Here, putative class members satisfy the commonality requirement because their claims "depend upon a common contention" for which the class action will "generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (emphasis omitted).

iii. **The named Plaintiffs can clearly establish typicality with the putative class members.**

Rule 23(a) requires the claims or defenses of the representative parties be typical of the claims or defenses of the class. F.R.C.P. 23(a)(3). Subsection (a)(3) focuses on whether the named representatives' claims have the same essential characteristics as the claims of the class at large. *Ward v. Hellerstedt*, 753 F. App'x 236, 247 (5th Cir. 2018)). A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory. *Dugas v. Hoffpauir*, 1995 WL 556317, at *5 (W.D. La. Apr. 13, 1995). *See also Falcon*, 457 U.S. at 157 n.13 ("The commonality and typicality requirements of Rule 23(a) tend to merge.").

As with the commonality requirement, "The typicality requirement may be satisfied even

if there are factual distinctions between the claims of the named plaintiffs and those of other class members." *Dugas* at *Id.* "Thus, similarity of legal theory may control even in the face of differences of fact." *Id.* at 232. If the lead plaintiffs' claims "arise from a similar course of conduct and share the same legal theory," typicality will not be defeated by factual differences. *Adickes v. Hellerstedt*, 753 Fed. Appx. 236, 246-247 (5th Cir. 2018). The Plaintiffs in this matter and the members of the proposed class in this case share common experiences and common questions of fact and law. The named Plaintiffs in this matter are incentivized to pursue the same legal theories and elements as those of the class generally- namely, whether the conditions to which they were subjected within the St. Tammany Parish Jail men's holding cells were unconstitutional and tortious. These claims arise from a common and longstanding course of conduct by like Defendants, demonstrated during the periods of the named Plaintiffs' incarcerations.

Any minor variation therein cannot defeat typicality. Whether or not there are "differences in the extent of injury between class representatives and unnamed class members does not defeat certification in this case." *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 297 (5th Cir. 2001). *See also Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009). Accordingly, the named plaintiffs satisfy the typicality requirement of Rule 23(a)(3).

iv. **The Named Plaintiffs and Class Counsel will fairly and adequately protect the interests of the class.**

Representative parties will fairly and adequately protect the interests of the class. Adequacy encompasses the following three inquiries: "(1) the zeal and competence of the representatives' counsel; (2) the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees; and (3) the risk of

conflicts of interest between the named plaintiffs and the class they seek to represent." *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017).

1. One or more of the Named Plaintiffs is an adequate class representative.

Rule 23(a)(4) mandates that the class representative "fairly and adequately protect the interests of the class." F.R.C.P. 23(a)(4). A named representative must be capable and have a sufficient interest in the outcome to ensure vigorous advocacy while having no interest antagonistic to the interests of the class. *Johnson v. United States*, 208 F.R.D. 148, 169 (W.D. Tex. 2001). Class representatives must have some minimal degree of participation and knowledge of the action. *Buford v. HR Block, Inc.*, 168 F.R.D. 340, 353 (S.D. Ga. 1998). Rule 23(a)(4) requires that a class representative possess the same interest and suffer the same injury as the class. *Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 594–95 (1997). Not every potential disagreement between a class representative and the class members will stand in the way of a class suit. Conte & Newberg, Newberg on Class Actions § 3:26 (4th ed. 2002). Rather, "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." Wright, et. al, Federal Practice & Procedure § 1768 (3d ed. 2005).

Here, the class representatives adequately represent the class' interests. All class representatives suffered the same injury as putative class members- namely, deprivation of their rights pursuant to the Fourteenth Amendment through unconstitutionally punitive conditions of confinement- and have the same interest in the outcome. As demonstrated by their appearance at the Hearing on Plaintiff's Motion for Injunctive Relief and their submitted statements, they are willing and able to advocate vigorously on behalf of the class members. The class representatives have been participating and had continuous knowledge of this action, and have been apprised of their obligations as class representatives. Moreover, the class representatives do not have

conflicting claims from the class. None of the class members' claims are antagonistic from one another or would serve to deprive one another of the sought relief. The class representatives and putative class members have the same interest in seeking redress for Defendants' violation of the class members' constitutional rights.

2. <u>Counsel is adequately qualified to act as Class Counsel.</u>

In the present case, this court is presented with three firms ready, willing and capable of zealously advocating on behalf of both the named Plaintiffs' and the putative class. Co-counsel from Romanucci & Blandin, LLC are adequately qualified to act as class counsel together with Jacob Litigation and the Glorioso Law Firm.

Romanucci & Blandin, LLC focuses a significant part of its practice on civil rights cases, including prison and police matters, and mass torts. Romanucci & Blandin, LLC also has extensive experience serving plaintiffs in federal and state class action cases. Romanucci & Blandin, LLC was appointed class- co-counsel in a red-light class action lawsuit against the City of Chicago. *See Willis v. City of Chicago*, 16 CH 14304 (Cook Cty. Cir. Ct.), The putative class included approximately 1.2 million individuals. The case recently settled for $38.5 million and $85 million in debt relief. Romanucci & Blandin, LLC served as co-counsel on the stop and frisk class action pending against the City of Chicago. *See, Smith, et al. v. City of Chicago, et al.*, 15 CV 3467 (N.D. Ill.). The proposed putative class of covered 700,000 individuals. Romanucci & Blandin, LLC is also currently lead or co-counsel on the following: a proposed class action lawsuit against Southwest Airlines for violations of the Illinois Biometric Information Privacy Act, *Miller, et al. v. Southwest Airlines Co.*, 18 CV 86 (N.D. Ill.) (co-counsel); mass tort litigation on behalf of 80 plaintiffs arising from the Pulse Night Club Shooting *Colon, et al. v. G4S, et al.*, 502017CA003447 MB AG (lead counsel); mass tort litigation on behalf of up to

20,000 people) at the Mandalay Bay shooting in Las Vegas, Nevada (leadership committee); mass tort litigation against Sterigenics International, Inc. for toxic air pollution (co-counsel); mass tort litigation against manufacturers of vape pens; and mass tort litigation for Business Interruption Insurance.

Founding partner and principal attorney Mr. Romanucci has thirty-five (35) years of legal experience. As lead counsel, Mr. Romanucci has obtained numerous significant verdicts and settlements, including a $17.6 million verdict against the City of Chicago; a $4.5 million settlement against the City of Chicago; a $2.3 million verdict in the Middle District of Florida; a $1.31 million settlement in the District Court of New Jersey; a $1.1 million settlement in a wrongful shooting case of a suicidal person in the Eastern District of Wisconsin; a $44.7 million verdict including a complex *Monell* claim against the City of Chicago (co-counsel including Nicolette Ward); and most recently a $21.3 million verdict against the City of Chicago in a police pursuit case (co-counsel including Bhavani Raveendran and Nicolette Ward). *See* Ex. 21 Resume of Antonio Romanucci.

Senior Associate, Ms. Raveendran, has been practicing for eight years. Ms. Raveendran practices primarily in claims in federal venues across over fourteen (14) states. Ms. Raveendran acts as the primary attorney for a caseload including wrongful death, prison abuse and other catastrophic injuries. Ms. Raveendran focuses her practice on civil rights and constitutional law, which involves complex legal research, including substantive and procedural due process claims and Section 1983 claims. Ms. Raveendran has first-chaired state court and multiple federal trials. Ms. Raveendran is currently handling cases involving civil rights violations in prisons in three jurisdictions. Ms. Raveendran currently serves as the Chairperson of the Police Misconduct

Litigation Group and an Executive Committee Member of the Civil Rights Section for the American Association for Justice (AAJ). *See* Ex. 22, Resume of Bhavani Raveendran.

Associate Ms. Ward has been practicing law for four years. As an associate attorney, Ms. Ward handles multiple civil rights cases as lead attorney. She has served as trial attorney on numerous occasions, including civil rights matters in multiple jurisdictions. She served as trial attorney in the $44.7 million verdict awarded in *First Midwestern Bank v. City of Chicago*. Ms. Ward's current caseload consists primarily of civil rights matters, including police misconduct and prison abuse cases. More than half of her work is in federal court, including district courts across seven states. She was handling attorney on litigation in the Pulse Nightclub shootings, representing nearly seventy (70) plaintiffs at its peak. *See* Ex. 23, Resume of Nicolette Ward.

Associate Mr. Fallon has been practicing law for one year and has been with Romanucci & Blandin, LLC for two years. As an associate attorney, Mr. Fallon handles multiple civil rights cases. As a law clerk, he has assisted trial teams on numerous occasions, including civil rights, premises liability, and medical malpractice matters in Illinois. Mr. Fallon's current caseload consists primarily of civil rights matters, including police excessive force, prisoner medical treatment, and discrimination cases. He is admitted as a member of the bar for the State of Illinois, and the United States District Courts for the Northern District of Indiana, Northern District of Illinois, Mr. Fallon is a member of the Civil Rights Section of AAJ. *See* Ex. 24, Resume of Ian Fallon.

Attorney Devon Jacob has been practicing law for 18 years. He previously served as a deputy attorney general for the Commonwealth of Pennsylvania, working extensively in civil rights cases. Mr. Jacob subsequently served as the head of civil litigation at a plaintiffs' law firm, supervising staff and overseeing a practice devoted largely to the prosecution of civil rights

cases. Mr. Jacob has been principal of Jacob Litigation, a firm practicing civil rights law in jurisdictions across the country, since November of 2013. Mr. Jacob has served as lead counsel in civil rights cases in federal courts in twelve jurisdictions, and has obtained a verdict in excess of $4,000,000.00 in a federal civil rights matter. In 2019, Attorney Jacob recently conducted an eight-day federal jury trial, as lead counsel in the civil rights case of *L. Alicia Rascon, et al. v. Clinton H. Brookins*, No. CV-14-00749-PHX-JJT (D. AZ). He is an active member of the National Police Accountability Project (NPAP). Mr. Jacob is also an active member of the AAJ. In 2015, Attorney Jacob was elected Chair of the national civil rights section of AAJ. In 2017, the Honorable Richard A. Posner, former judge for the Seventh Circuit Court of Appeals, selected Attorney Jacob to be the Director of Team Posner, Inc., a national *pro bono* organization created to assist *pro se* litigants for the Commonwealth of Pennsylvania. In July of 2018, Attorney Jacob was elected Chair of the national police misconduct litigation group of AAJ.

Maria B. Glorioso, managing partner of The Glorioso Law Firm, has been licensed in the State of Louisiana and practicing for 24 years and is admitted to practice in all Louisiana courts including all State District Courts, all Federal District Courts, Fifth Circuit Court of Appeals and the Louisiana Supreme Court. She has handled cases in state and federal courts involving complex litigation, multi-district litigation, mass tort and class actions, including but not limited to: asbestos litigation, breast implant litigation, pedicle screw litigation, Wal-Mart wage litigation, 3M Combat Ear Plug litigation, child car seat defect litigation, auto manufacturer defect litigation, and medical malpractice litigation. She has taught trial advocacy to lawyers and law students all over the country, and has co-chaired AAJ’s Law School Trial Advocacy program for over 20 years.

Vincent J. Glorioso, Jr, with the Glorioso Law Firm, has been practicing law for over 54 years. He is admitted to practice in all Louisiana state and U.S. District Courts, the Louisiana Supreme Court, the U..S. Supreme Court, the United States Court of Military Appeals, and the U.S. Court of Appeals for the Fifth Circuit. He has served on the faculty of the Tulane School of Law Trial Advocacy Program, as an adjunct professor of law at the Loyola School of Law, and a member of the faculty of the National College of Advocacy ("NCA") at Hastings School of Law, San Francisco, California. He chaired the NCA Advance College on proof of damages at Hastings College of Law. He has previously taught similar courses at Yale University, Stanford University and the National Judicial College at Reno, Nevada. Mr. Glorioso has been a lecturer for the Association of Trial Lawyers of America, Louisiana Trial Lawyers Association, Louisiana State Bar Association CLE, Tulane University Law School CLE, Loyola School of Law CLE programs and various state trial lawyers' association programs. He is a past president of the Southern Trial Lawyers Association and has received its prestigious War Horse Award for his extraordinary contributions to the trial bar of the nation. He has served on the President's Advisory Committee of the Louisiana Trial Lawyers Association since its inception, as well as on its Board of Governors. He is also the co-author of Trial Advocacy in Louisiana, National Business Institute (NBI). He has held leadership positions in the American Bar Association's Section of Tort and Insurance Practice (TIPS) including, Past Vice Chair of the Admiralty and Economics of Torts and Insurance Law Practice Committees.

a. Counsel's commitment to the present matter.

Counsel in this matter have contributed significant work to date on the present case. Shortly after filing the Complaint in the instant case, counsel assembled and filed their motion for a preliminary injunction, ultimately preparing for and appearing at a hearing before this

Court. Counsel have responded to motions to dismiss the instant matter. Counsel have overseen written discovery and have conducted a document review of items received from Defendants.

The firms have agreed to split financial requirements and costs of litigation on a go forward basis. Romanucci & Blandin's team includes a principal and partner, a senior associate, two associates, two paralegals, and two law clerks who share primary responsibility for the case in office. In addition, Jacob Litigation commits its funding and the work of principal and founding partner Devon Jacob and his full staff. Partner Maria Glorioso, her fellow partners and team of two paralegals are also committed to assist in this matter as local and co-counsel.

**B. Plaintiffs meet the threshold requirements of F.R.C.P. 23(b)(3).**

In addition to satisfying the above requirements, the parties seeking class certification must show that the action is maintainable under Rule 23(b). Under Rule 23(b)(3), a class should be certified if common questions predominate and a class action is superior to other methods for resolving the controversy. F.R.C.P. 23(b)(3).

Class certification is appropriate pursuant to Rule 23(b)(3) where questions of law or fact common to the members of the class predominate over questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3). The (b)(3) class action was intended to dispose of cases in which a class action would be "convenient and desirable," including those involving large-scale, complex litigation for money damages. See *Amchem*, 117 S. Ct. at 2245.

1. <u>Common questions predominate over individual questions.</u>

Rule 23(b)(3)'s predominance requirement is satisfied when there are "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and

efficiently adjudicating the controversy." *Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318, 325–26 (5th Cir. 2008). The "predominance test" obligates the court to find that the proposed class seeks to remedy a common legal grievance, and that the central legal and factual questions raised in this litigation are common to all class members. *Id* citing *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir.2003) Common questions predominate where a common nucleus of operative facts and issues underlies the claims brought by the proposed class. *See In re Nassau County Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006) quoting *Waste Mgmt. Holdings, Inc*. v. *Mowbray*, 208 F.3d 288, 299 (1st Cir. 2000). The rule requires only that individual questions not predominate over the common questions affecting the class as a whole.

Analysis of predominance under Rule 23(b)(3) "begins, of course, with the elements of the underlying cause of action." *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 636 (5th Cir. 2016). Predominance can be based on the question of liability, if the liability issue is common to the class, common questions are held to predominate over individual questions. *Melo v. Gardere Wynne Sewell, LLP*, No. 3-04-CV-2238-BD, 2007 WL 92388, at *2 (N.D. Tex. Jan. 12, 2007). To establish a *prima facie* case of 14th Amendment Violations under Section 1983, a Plaintiff must prove a constitutional violation either by demonstrating an unconstitutional condition of confinement or by demonstrating an unconstitutional episodic act or omission. *Cadena v. El Paso Cty*., 946 F.3d 717, 727 (5th Cir. 2020). For a conditions of confinement claim, "the proper inquiry is whether those conditions amount to punishment of the detainee. *Id.* "In some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice." *Id.* The elements of an unconstitutional conditions of confinement claim are (1) a rule or restriction or an identifiable

intended condition or practice; (2) which was not reasonably related to a legitimate governmental objective; and (3) causation. *Id*. Under Section 1983, the Fifth Circuit assumes that challenged conditions of confinement, by the municipalities very promulgation and maintenance of the complained-of condition, were intended to cause the alleged constitutional deprivation. *Flores v. County of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997).

In *Oladipupo v. Austin*, 104 F.Supp.2d 626, (W.D.La 2000), this Court's sister District recognized that conditions of confinement, when taken in the aggregate, amount to violations of the Fourteenth Amendment. In *Oladipupo*, a pretrial detainee alleging constitutional violations for being subjected to the following jail conditions: sleeping without a mattress for his first thirty-six hours of detainment, inadequate recreation, denial of towels and underwear, confiscation of vitamins, overcrowding and frequent flooding of the segregation unit, verbal threats and abuse, unsanitary conditions, denial of medical and dental care, housing with HIV-infected detainees, and exposure to second hand smoke. The Western District denied summary judgement on the overcrowding claims, finding

> In *Bell,* 441 U.S. at 542, the Supreme Court recognized that subjecting a pretrial detainee to overcrowded conditions can, in some circumstances, violate the constitution. Factors the Supreme Court considered in assessing whether 'overcrowding' amounts to a constitutional violation are the length of time an individual detainee must spend in a confined area both ultimately and on a daily basis, and the adequacy of the given sleeping space. *Id.* at 543, 99 S.Ct. at 1876. The constitutional right of detainees to be free from overcrowding is firmly established.

The Court proceeded to find that alleged failure to provide medication, ignoring repeated requests for dental care, maintenance of a jail cell that always had an unpleasant smell and was overcrowded, and deprivation of a mattress for 36 hours, as a cognizable Fourteenth Amendment Claim. *Id.* at 635-640. Further the Court found that alleged deprivation of recreational

opportunities, flooding, lack of adequate sanitation, lack of adequate heat and ventilation were strong enough allegations to deny summary judgment. *Id.* at 643.

Here, several of the conditions of confinement present in *Oladipupo* were present in the St. Tammany holding cells during the applicable period, including overcrowding, deprivation of bedding, and unsanitary conditions. The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004). Prisons must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measure to ensure the safety of the inmates. *Id.* The Fifth Circuit described this test as "requiring extreme deprivation of any 'minimal civilized measures of life's necessities.'" *Id.*; (citing *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998)). The Plaintiffs must show that the conditions offend "evolving standards of decency that mark the progress of a maturing society." *Id.* at 332-33. One of the indicators of evolving standards of decency is legislative enactment. *Woodson v. North Carolina*, 428 U.S. 280, 293 (1976). The clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures. *Penry v. Lynaugh*, 492 U.S. 302 (1989). As set forth above, in relation to several grievances initiated by holding inmates, Defendants and actually referred to Louisiana's own "standards of decency" by referencing Title 22 of the Louisiana Administrative Code. When directed to these embodiments of evolving standards of decency, representatives from the Jail dismissed them as "guidelines."

Here, all of the elements of a Fourteenth Amendment claim can be established as common questions. The elements of the claim will be demonstrated through collective proof for all class members. The conditions themselves may be established through common proof through testimony of witnesses present in the one-year class period and agents of the Defendants

responsible for the creation and execution of policy relating to holding cell conditions. The relationship of these conditions, or lack thereof, to a reasonable government objective, may also be established through like testimony- that of policymakers, correctional officers, former inmates, and witnesses with expertise in nationwide standards of prison conditions3. Causation may be gathered from the same testimony. Plaintiffs, as inmates subject to the state's custody, are uniquely situated to demonstrate the causation of their constitutional deprivations.

Individualized proof may include the length of time the class members experienced the conditions of confinement, and the resultant extent of damages. This individual damage question does not preclude a (b)(3) class action when liability issues are common to the class. *See, e.g., Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700, 710-11 (5th Cir. 2020), citing *Steering Comm. V. Exxon Mobil Cop.*, 461 F.3d 598, 602 (5th Cir. 2006) ("The necessity of calculating damages on an individual basis will not necessarily preclude class certification.); *see also* William B. Rubenstein, *Newberg on Class Actions*, § 4:54 (5th ed. Dec. 2016 Update) ("[C]ourts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations and a recent dissenting decision of four Supreme Court Justices characterized the point as 'well nigh universal'").

---

3 While the Court need not engage in merits analysis, Plaintiff respectfully submits that the evidence adduced distinguishes this matter *from Allen v. St. Tammany Parish*, 2018 WL 558503 (E.D. La. Jan. 02, 2018), which denied a *pro se* plaintiff's conditions of confinement claim on the grounds that Allen had not demonstrated punitive intent by the Defendants. Here, Plaintiff has submitted statements that correctional officers mocked inmates complaining of the problem conditions, referred to the jail as "St. Slammity," forced inmates to beg for sanitary products, threatened to withhold blankets as punishment, and admitted that these conditions were intended to "teach a lesson" to inmates. The unsanitary conditions alleged by Plaintiffs in this matter- urine, feces, blood, vomit, and old food as an ever-present fixture of the cells- are much closer to those present in *Gates v. Cook*: "confinement in 'extremely filthy cells with crusted fecal matter, urine, dried ejaculate, peeling and chipping paint, and old food particles on the walls.". *Id.* at *4; (*quoting Gates*, 376 F.3d 323, 338 (5th Cir. 2004)). *See also Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999) (concluding that plaintiff stated a Constitutional claim when "his only option was to urinate and defecate in the confined area that he shared with forty-eight other inmates"); *LaReau v. MacDougal*, 473 F.2d 974, 978 (2d Cir. 1972) ("Causing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted"); Harper v. Showers, 174 F.3d 716, 717 (5th Cir. 1999); *Bienvenu v. Beauregard Par. Police Jury*, 705 F.2d 1457, 1460 (5th Cir. 1983).

Though the submission of a trial plan is not a prerequisite for a finding of superiority (*Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 139 (5th Cir. 2005)), to the extent there is concern regarding the narrow issue of individualized damages, bifurcating a class action into two phases avoids the possibility that individualized questions will predominate common questions. This approach has been used by numerous courts. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001) ("There are a number of management tools available to a district court to address any individualized damages … including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class."); *In re Whirlpool Corp. Front-Loading Washer Products Liability Litig.*, 722 F.3d 838, 860 (6th Cir. 2013) (finding predominance when the district court certified only a liability class and reserved all damages issues for individual determination); *Butler,* 727 F.3d at 801 ("If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification."); *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003).

The instant matter is subject to neither sprawling questions of fact nor variations in applicable law that would eliminate predominance. *See, e.g., Castano v. American Tobacco Co* 84 F.3d 734, 741 (5th Cir. 1996). The instant case is subject to only a single jurisdiction, and indeed, four rooms within a single building. Like *Jenkins*- a matter with which the *Castano* court contrasted its state of affairs, the instant case involves a limited number of cases, the law of

only a single state, and the prospect of trial occurring in only one district. *See Castano*, 84 F.3d at 744, citing *Jenkins*, 782 F.2 468. Common issues in the instant matter predominate over individual matters, and thus (b)(3) certification is appropriate.

2. Class action is the superior means of resolving class members' claims.

A class action must be the superior means of litigating the claims of the class members. *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*, 910 F. Supp. 2d 891, 920 (E.D. La. 2012). Factors to be considered include the interest of members of the class in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; the desirability of undesirability of concentrating the litigation of the claims in the particular forum; and the difficulties likely encountered in the management of a class action. F.R.C.P. 23(b)(3).

With respect to the first and second elements, there is no indication that individual agents seek to control their cases in a way conflicting with the instant action. Plaintiffs know of only one matter- *Louviere v. St. Tammany*- making similar class-based allegations. The *Louviere* plaintiffs are represented by the same counsel as the instant matter; the *Baqer* plaintiffs have filed to consolidate the instant matter with the *Louviere* matter.

With respect to the third element, there is inherent desirability for putative class members to concentrate class resolution in this matter in this forum. A federally filed class action for the class-wide violation of 14th Amendment rights is the only forum where permanent judicial relief can be obtained. This litigation is not at all duplicative of any relief available to the putative class. The only way Plaintiffs and class members can obtain such relief in this forum is to go forward in this matter. It is thus, the most appropriate forum to prosecute this class action -and, in its aptness to speed resolution- is superior to other means of resolving this class-wide dispute.

The final factor is manageability. *In re S. Cent. States Bakery Prod. Antitrust Litig.*, 86 F.R.D. 407, 423 (M.D. La. 1980). There is a strong presumption against denying class certification for management reasons. *Id.* As Plaintiffs have described *supra*, many elements of its proposed liability class are susceptible to generalized class-wide proof, including the existence of unconstitutional conditions of confinement and the liability of the Defendants in causing such conditions. As previously described, the only individualized fact to be established is particularized damages, hinging in part on the length of time each member of the putative class was held in the Holding Cells, and the corresponding value of this deprivation.

As such, this matter is easily managed as a class case and at trial. Liability discovery can be completed as one unit. A trial in this matter can be held for all members of the class as to matters of liability. As to the particularized damages, Plaintiffs propose to streamline the trial process by gathering such information through questionnaires, affidavits, expert testimony, or even during testimony given during the liability portion of the trial. Such a process will avoid duplicative and overlapping liability testimony, and allow individualized testimony as to subjective damages. This process will conserve judicial resources and will reduce the parties' respective litigation costs. *Jenkins* concerned certification of a class of all plaintiffs with asbestos-related personal injury actions pending in the Eastern District of Texas as of December 31st, 1984- including nearly nine hundred cases with over one thousand Plaintiffs. 782 F.2d at 470. The district court in that matter approved of Rule 23(b)(3) certification, noting that defenses would vary little as to individual Plaintiffs and that considerable savings could be gained for the Court through class certification. *Id.* That court certified the class as to common questions, to be resolved be a class jury which would decide common issues. *Id.* The Fifth Circuit held that the plan was "clearly to superior to the alternative of repeating, hundreds of

times over….days of the same witnesses, exhibits, and issues from trial to trial." 782 F.2d at 473. The court noted that attorneys' fees for all parties would be greatly reduced under that plan, and that "the defendants enjoy all of the advantages, and the plaintiffs incur the disadvantages, of the class action[.]" *Id.* So, too, in the instant matter, Plaintiffs' proposed organization will reduce attorneys' fees, prevent the Court and counsel from the repeated presentation of duplicative evidence, and permit swift resolution of common matters. For these reasons, class resolution is the superior means of resolving putative class members' claims.

**C. <u>Plaintiffs additionally request certification pursuant to Rule 23(c)(4).</u>**

As a further alternative, if this Court finds that Rule (23)(b)(3)'s requirements are met and that issue certification is appropriate, Plaintiffs respectfully request that the Court certify particular issues as appropriate under Rule 23(c)(4). Rule (23)(c)(4)(A) provides that "when appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). In *Horton v. Goose Creek Indep. School Dist*., the Fifth Circuit certified a class issue pursuant to Rule (23)(c)(4) for purposes of determining whether the drug and alcohol sniff searches that were taking place at the school were unconstitutional despite certain class members agreeing with the search. 690 F.2d 470 (5th Cir. 1982). The Court directed certification "on the issue of liability only, a procedure explicitly provided by Rule 23(c)(4)(A)." 690 F.2d at 488, n.33. Should the Court determine that it is appropriate to determine liability issues separately from damages issues, Plaintiffs request liability certification pursuant to the Rule.

Courts have the discretion to utilize Rule 23(c)(4) *sua sponte*. *See Bertulli*, 242 F.3d at 296 n.24 (5th Cir. 2001). The efficiency and consistency gained by answering these questions once, as opposed to at every individual trial, strongly supports class treatment pursuant to Rule

23(c)(4). "A class action limited to determining liability on a class-wide basis . . . will often be the sensible way to proceed." *Slocum v. Int'l Paper Co.*, 2019 WL 2192099, *9. (E.D. La. 2019). Accordingly, should this Court decline to certify Plaintiffs' putative class pursuant to Rule 23(b)(3), it should certify the particular class issues as the Court deems appropriate..

## IV. Conclusion

WHEREFORE, Plaintiffs respectfully request that this Honorable Court grant Plaintiffs' Motion and certify this a class action pursuant to F.R.C.P. 23(a) and (b)(3) or 23(c)(4).

Respectfully Submitted,

By: __*/s/ Nicolette A. Ward*__________
Attorney for Plaintiffs

**Dated: September 30, 2020**

Maria B. Glorioso (#24435), T.A.
Vincent J. Glorioso, Jr. (#6064)
**THE GLORIOSO LAW FIRM**
2716 Athania Parkway
Metairi, LA 70002
Tel: (504) 569-9999
maria@gtorts.com

Devon M. Jacob (*pro hac vice*)
**JACOB LITIGATION, INC.**
P.O. Box 837
Mechanicsburg, PA 17055-0837
Tel: (717) 796-7733
djacob@jacoblitigation.com

Antonio M. Romanucci (*pro hac vice*)
Bhavani K. Raveendran (*pro hac vice*)
Nicolette A. Ward (*pro hac vice*)
Ian P. Fallon (*pro hac vice*)
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark Street, Suite 900
Chicago, IL 60654
Tel: (312) 458-1000
aromanucci@rblaw.net