UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

****************************************************************
AHMED BAQER, ET AL

CIVIL ACTION
NO. 20-980
SECTION "D" (2)

VERSUS

ST. TAMMANY PARISH GOVERNMENT, ET AL
****************************************************************

TRANSCRIPT OF MOTION PROCEEDINGS
HEARD BEFORE THE HONORABLE JUDGE WENDY B. VITTER
UNITED STATES DISTRICT JUDGE
FRIDAY, APRIL 10, 2020

APPEARANCES:

FOR THE PLAINTIFF:

Maria B. Glorioso, Esquire
THE GLORIOSO LAW FIRM
2716 Athania Parkway
Metairie, LA 70002

Devon M. Jacob, Esquire
JACOB LITIGATION, INC.
P.O. Box 837
Mechanicsburg, PA 17055

Antonio M. Romanucci, Esquire
Bhavani K. Raveendran, Esquire
Nicolette A. Ward, Esquire
Ian P. Fallon, Esquire
ROMANUCCI & BLANDIN
321 North Clark Street, Suite 900
Chicago, IL 60654

APPEARANCES CONTINUED:

FOR THE DEFENDANTS: Chadwick W. Collings, Esquire
Cody J. Acosta, Esquire
MILLING BENSON WOODWARD
68031 Capital Trace Row
Mandeville, LA 70471

Official Court Reporter: Alexis A. Vice, RPR, CRR
500 Poydras Street, HB-275
New Orleans, LA 70130
(504) 589-7777

*PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY. TRANSCRIPT PRODUCED BY COMPUTER.*

P-R-O-C-E-E-D-I-N-G-S

(FRIDAY, APRIL 10, 2020)

(MOTION PROCEEDINGS VIA TELECONFERENCE)

THE COURT: All right, good morning, everybody. The case before us is *Baqer, et al, versus St. Tammany Parish Government, et al*, Case No. 20-CV-980. And I would like everyone to make their appearances. Counsel, make your appearances.

And because of the number of people, instead of having you speak one at a time, I'm going to sort of roll call the names listed in CM/ECF, and please let me know if you are present.

Ms. Glorioso, Maria Glorioso?

MS. GLORIOSO: Yes, present, Judge.

THE COURT: Good morning, Ms. Glorioso.

Mr. Antonio Romanucci?

MR. ROMANUCCI: Present, Your Honor.

THE COURT: Good morning.

Ms. Bhavani Raveendran?

MS. RAVEENDRAN: Present, Your Honor.

THE COURT: Mr. Devon Jacob?

MR. JACOB: Present, Your Honor.

THE COURT: Mr. Ian Fallon?

MR. FALLON: Good morning, Your Honor.

THE COURT: And Ms. Nicolette Ward?

MS. WARD: I'm here. Good morning, Your Honor.

THE COURT: All right. Is anybody else here for the plaintiffs?

MR. JACOB: No, Your Honor.

THE COURT: All right. And for the defendants, specifically for -- let me make sure I have everybody correct. For the St. Tammany Parish Sheriff's Office, for Randy Smith in his official and individual capacity, Greg Longino in his official and individual capacity, Lacey Kelly in her official and individual capacity, and Rodney Strain in his official and individual capacity, Mr. Collings, Chadwick Collings?

MR. COLLINGS: I'm here, Your Honor. Good morning.

THE COURT: Good morning.

And Mr. Acosta?

MR. ACOSTA: Yes, Your Honor, I'm also here this morning.

THE COURT: All right. Is anybody else here present for those defendants? No?

All right. There is another named defendant, and that's St. Tammany Parish Government also known as St. Tammany Parish Council. They have not been served and have not previously made an appearance. Is anybody present for the hearing for St. Tammany Parish Government or St. Tammany Parish Council?

All right. And as I said, the record reflects that they have not been served and have not made an appearance. Before I get into that, I'd like to discuss the -- introduce the other parties that I believe are on the call. My law clerks, Derbigny Daroca and Frannie Montegut are both on the call. Frannie and Derbigny, are you both on?

LAW CLERK: Yes, ma'am.

LAW CLERK: Yes, Judge.

THE COURT: All right. My case manager Melissa Verdun, Melissa, are you on the call?

DEPUTY CLERK: Yes, ma'am. Good morning, Judge.

THE COURT: Good morning. My judicial assistant Marie Firmin, Marie, are you on the call?

JUDICIAL ASSISTANT: Yes, ma'am.

THE COURT: All right, and would the court reporter please introduce yourself so that I know who it is?

COURT REPORTER: Hi, Your Honor, good morning. This is Alexis Vice, court reporter.

THE COURT: All right, good morning. Alexis, please let me know your last name?

COURT REPORTER: Vice as in vice president.

THE COURT: Got it. All right, good morning, Ms. Vice.

I'm going to give some general housekeeping procedures, I don't want to call them rules, that I think will

make this go a lot smoother, both for the parties and for Ms. Vice. You know, things are different. We're -- this is a very unusual time without a doubt. And the Court has a job to do, and we're going to find a way to do it. And we're doing this hearing by audio recording.

And I want to make sure there's no objections to proceeding by audio recording. I previously had this conversation -- for the plaintiffs, I am going to naturally reach out to Mr. Jacob only because we've had status conferences this week, and he tended to be the spokesperson. If you would like me to naturally reach out to anyone else, please advise. But Mr. Jacob, is that correct, there is no objection to proceeding with this hearing by audio recording?

MR. JACOB: No objection.

THE COURT: And is it okay if I naturally ask you for your input as to the plaintiffs?

MR. JACOB: That's fine. And if it's something that another attorney has prepared to answer, I'll simply advise you accordingly.

THE COURT: Of course. Mr. Collings or Mr. Acosta, is there any objection by the defendants to proceeding by audio recording for this hearing?

MR. COLLINGS: None, Your Honor.

THE COURT: Okay. And I should have asked plaintiffs, are any of your clients present and participating in this

hearing?

MR. JACOB: They are not present currently. Mr. Klabert Guillot is incarcerated, but will be participating by telephone at an appropriate time; and Mr. Ahmed Baqer will be calling in at an appropriate time.

THE COURT: All right. And Mr. Klabert Guillot, Junior or Senior?

MR. JACOB: Junior. I'm sorry, Your Honor.

MR. COLLINGS: Judge, this is Chad Collings. I just sent a note, an email to the prison administration asking that they get him on the phone now because I don't know how long it takes to get him, you know. He may be joining us at any moment.

MR. GUILLOT, JR.: Hello?

THE COURT: Somebody just joined the call. Would you please introduce yourself?

MR. GUILLOT, JR.: Klabert Guillot, Junior.

THE COURT: All right, Mr. Guillot, good morning. This is Wendy Vitter. I'm the judge in this case. All of the attorneys are on the phone right now, and we're in the middle of the hearing. For now -- can you hear everything okay?

MR. GUILLOT, JR.: Yes.

THE COURT: For now, you're just going to listen. And if your attorneys decide that they want you to testify, then we'll walk you through exactly what that means and when you

will speak at that time, all right?

MR. GUILLOT, JR.: Yes, ma'am.

THE COURT: But for now, you are welcome to listen to the proceedings. So we were just starting.

Obviously, these are unusual proceedings that we're having an audio hearing, but we wanted to find a way to expedite this hearing a little bit quickly, and this was the best way to do it.

I would ask that whenever anybody speaks do exactly what Mr. Collings just did and announce your name before you speak even for an objection which I know is unusual, but I think that will be very helpful to the court reporter as she attempts to transcribe this hearing.

The second thing I would ask is that everyone speak a little more slowly than normal. I mean audio alone is a little different than having a hearing in person, and I think that too would be helpful.

This hearing is open to the public through the media just as any hearing in our court would be open to the public. I do want to remind everybody that the local rules still apply; and just as though we would be in court right now, there's no recording of the proceeding by anyone. But certainly, anyone can participate or hear the matter.

And finally, we've had several status conferences or two status conferences this week with the attorneys, and we set

out some parameters of what would be allowed and what they requested as far as timing of this. And it was agreed that each side would have 10 minutes for an opening statement that they can use or waive, up to them, but that's per side. They would present whatever exhibits or evidence they have, and then they would have 15 minutes per side for closing.

Is there anything else that I forgot to go over that will help streamline this?

May I ask who just joined the call?

MR. BAQER: Ahmed Baqer.

THE COURT: Okay, good morning, Mr. Baqer. This is Judge Wendy Vitter, and we're just going over some of the procedural issues for this hearing. Your attorneys are also on the call, and I don't know if you're in communication with them in some other manner during this hearing. You are, of course, welcome to be on the call and to participate, and your attorneys want you here.

I would ask that you not speak during the hearing unless and until your attorneys call you to testify in which case they will walk you through exactly what they want you to answer at that time. But until then, you are more than welcome to listen in on the hearing and be a participant in that manner. Do you understand that, sir?

MR. BAQER: Yes, Your Honor.

THE COURT: All right. Counsel --

JUDICIAL ASSISTANT: Excuse me, Judge, it's Marie, your judicial assistant. I don't think that the two reporters have announced and are on the record.

THE COURT: Oh, okay. I'm sorry, the media. I thought you were talking about court reporters.

JUDICIAL ASSISTANT: Media.

THE COURT: I should have asked them that. I didn't ask. Is there any media present?

MR. ZURIK: Judge Vitter, this is Lee Zurik from WVUE TV. Just for the record, we understand, and we are not recording this call.

THE COURT: Okay, good morning.

MR. ZURIK: Good morning.

THE COURT: And is there somebody else?

MR. LILLICH: Also Cody Lillich from WVUE. Good morning, Your Honor.

THE COURT: Good morning. Okay, if anyone else joins, I apologize, just as people join, I will stop the proceeding just to see who it is and make sure that we're aware of who it is; even though it is open to people joining.

All right, plaintiff's counsel Mr. Jacob, Mr. Collings, did I leave anything else out, or do you have any questions before we begin?

MR. JACOB: No questions, Your Honor. I'll just state that we did make a push last night to try to resolve. I don't

know if you want a status update on that.

THE COURT: Who is that speaking? Is that Mr. Jacob?

MR. JACOB: I'm sorry, Devon Jacob.

THE COURT: Okay, not at this time, Mr. Jacob. May I surmise by the fact that we're proceeding that discussions weren't productive and that we're going to proceed with this hearing?

MR. JACOB: Yes.

THE COURT: All right. We can --

MR. COLLINGS: Your Honor, this is Chad Collings. I just wanted to inquire, were you going to make a ruling on the objected to exhibits and witnesses prior to the hearing, or is that going to come later?

THE COURT: No, I am. I'm going to do that right now. Thank you, Mr. Collings.

All right, one other thing I would ask, because I'm noticing this, if you're not speaking, I would ask that everyone mute their phone because I hear some static on the phone right now. So if you have the ability to mute your phone, please do so. And then when you need to speak, unmute it. That resolved the issue that I was hearing.

By court order, the plaintiffs and the defendants were ordered to submit an exhibit and witness list. The plaintiffs have submitted a witness list, an exhibit and witness list that we have gone over yesterday during a status

conference. Of those exhibits, the defendant objected to -- I'm sorry, I'm getting the objections. The defendant objected to six of them.

Before I rule on all of those objections, I do want to confirm something with Mr. Jacob. Mr. Jacob, I have received your Dropbox of exhibits this morning, and I thank you for that.

MR. JACOB: Yes.

THE COURT: I notice in the exhibit list that you had filed in CM/ECF, there are some exhibits that are not in the Dropbox, and specifically, Department of Health data, Department of Corrections data, the St. Tammany Parish Government website, the St. Tammany Parish Sheriff's Office website. Do you intend to offer those?

MR. JACOB: Yes, Your Honor. I was not sure in light of this format how you wanted that to be done. Those are websites, and we did cite to certain statistics in the brief that we'd ask the Court to take judicial notice of. And that is why they are listed on the exhibit list, and that is the extent that we intended to use them.

THE COURT: All right. And there were no objections to those by the defendants, but I just noticed that what you submitted today in the Dropbox, they were not included, and I wanted to clarify that. So they are being offered, and they will be in.

As I mentioned to counsel yesterday, those exhibits without objections are automatically and hereby entered into evidence. I am going to number those exhibits sequentially right now so that we know, and I would ask that Counsel note these exhibit numbers as well so that when you refer to them we can have the same exhibit numbers. And I'll rule on the objections as I'm going through.

The first exhibit was a Public Report issued on July 7th, 2012 offered by plaintiff. Defendant has objected to that Public Report. Defendant's objection is lack of foundation and relevancy because of the age of the report.

The Court has reviewed it. The Court is going to allow it. The Court notes that the defendant has offered into evidence a letter dated -- a 2017 letter from the Department of Justice which, in fact, references this 2012 report. So to the extent that the objection is based on the time of the report and that it is eight years old, the Court will give it whatever due weight the Court feels appropriate because of the age of the report. But as to the relevance, the Court does think it's relevant, and especially, it's relevant in light of the 2017 letter that the defendants have offered. So I'm going to overrule that objection and allow that into evidence. That will be Plaintiff Exhibit No. 1.

Plaintiff Exhibit No. 2 will be the Proclamation, the Governor's Proclamation issued by the Governor of the State of

Louisiana.

Plaintiff 3, Executive Order issued by St. Tammany Parish Government.

Plaintiff 4, a Declaration of a State of Emergency issued by the City of Covington.

Plaintiff 5, CDC Guidelines for Management of COVID-19 in Correctional and Detention Facilities.

Plaintiff 6 was Title 22, Part III, Subpart 2 of the Louisiana Administrative Code. Defendants have objected to this as relevancy, saying they have no relevance to the issues at hand and the pending motion for preliminary injunction. The Court is going to overrule that objection and allow that into evidence as Exhibit 6.

Exhibit 7 is a Fox8 news story dated February 26, 2020. I'm sorry, I'm making my own numbering system as I speak. And I'm going to speak about Plaintiff Exhibit 8, a Fox8 news story dated March 5th, 2020 and speak about those together because as to those two exhibits, 7 and 8, which are two news stories, defendants have objected, asserting a lack of foundation and to relevancy and that each of these -- neither of these reports has any relevancy to the issues at hand on the pending motion for preliminary injunction.

The Court has reviewed both of those news stories. And while I agree that some of the information contained in the news stories is not relevant, and further, some of the

information are legal conclusions and expert testimony that is not appropriate in this case, because no one has offered anybody as an expert, and there is some testimony by Mr. Baqer or statements by Mr. Baqer that I note are not under oath and are not subject to cross-examination, the Court will afford those news stories the weight that I think is appropriate.

But I do think there are parts of them that are relevant to this. And I am going to be a little more lenient with the rules of evidence in this expedited hearing, and I'm going to allow both of those news stories. So I will overrule the defendant's objections.

Those will be listed, the February 26, 2020 news story will be Plaintiff Exhibit 7.

The March 5th, 2020 news story will be Plaintiff Exhibit 8.

Plaintiff Exhibit 9 will be a Johns Hopkins Coronavirus Resource Center data.

10 will be a March 9th, 2020 Press Release from, I believe, the State of Louisiana.

11 is a March 14th, 2020 KATC news story that has been objected to by the defendants. The defendant's objection to that exhibit is lack of foundation and relevancy. This report has no relevancy to the issues at hand on the pending motion for preliminary injunction.

The Court has reviewed that exhibit, and the Court

agrees that that exhibit has no relevancy and/or is duplicative of other exhibits. And so I'm going to sustain that objection and not allow that exhibit.

Plaintiff Exhibit 11 will be the Department of Health data, the specific website they have listed.

12, Department of Corrections data.

13, St. Tammany Parish Government website.

14, St. Tammany Parish Sheriff's Office website.

15, St. Tammany Parish Sheriff's Office Inmate Rosters and Counts.

And I believe that is it for plaintiff's exhibits. Mr. Jacob, did I miss anything?

MR. JACOB: I believe that is correct, Your Honor.

THE COURT: All right. So does anyone have any questions about the exhibit labeling so that we're all referring to the same exhibit numbering system? There will be 15 plaintiff exhibits. Those are all automatically introduced into evidence now. So you do not need to ask that they be introduced to use them.

Defendant also submitted an exhibit list of six exhibits, and I will go ahead and number those. Plaintiffs have offered no objections to the defendant's exhibits, and they are all introduced at this time into evidence. Those are Defendant's Exhibit No. 1, the affidavit of Major Lacey Kelly, Warden of the St. Tammany Parish Jail with attachments.

Mr. Collings, that is meant with attachments; is that correct?

MR. COLLINGS: Yes, Your Honor.

THE COURT: All right, that's Defense Exhibit No. 1.

Defense Exhibit No. 2, January 31st, 2017 correspondence from the United States Department of Justice regarding St. Tammany Parish Jail.

Defense Exhibit 3, relevant excerpts of the jail rule book related to administrative remedy procedures.

Defense Exhibit 4, photographs of signage placed around the St. Tammany Parish Jail.

Defense Exhibit 5, Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities by the Centers for Disease Control, CDC.

And Defense Exhibit 6, the inmate ARP packet attached to the affidavit of Major Kelly.

Mr. Collings, did I miss any of the defense exhibits?

MR. COLLINGS: No, ma'am, you got them all. This is Chad Collings.

THE COURT: Thank you. And Mr. Jacob, am I correct that there's no objection by the plaintiffs to any of those exhibits?

MR. JACOB: That's correct, Your Honor.

THE COURT: All right. So all of the exhibits as I referenced are now introduced into evidence.

And with that, unless there is anything else we have procedurally, and I apologize for taking that time, but I wanted to make this go as quickly as possible, and I thought that would help. I think we're ready to begin the hearing.

Is there anything else that anyone needs to bring up before I ask the plaintiffs to begin by making an opening statement?

MR. COLLINGS: This is Chad Collings.

THE COURT: Yes, Mr. Collings.

MR. COLLINGS: We had also entered an objection to Mr. Baqer on relevancy to his testifying. We sought to strike him.

THE COURT: And it's not clear to me that they are going to call him to testify. So I'll rule on that if they call Mr. Baqer to testify. I think it's premature at this point.

MR. COLLINGS: Thank you.

MR. ROMANUCCI: Your Honor, this is Tony Romanucci.

THE COURT: Yes, Mr. Romanucci.

MR. ROMANUCCI: Your Honor, I'll be giving the opening statement and very likely the closing also. I think combined you're allowing the plaintiff and defendant each 25 minutes. Can we use that as combined time, or are you holding us strictly to the 10 minutes and 15 minutes?

THE COURT: I hadn't thought it out, Mr. Romanucci,

but I'm happy to use it as combined time and say 25 minutes total for anything.

MR. ROMANUCCI: Thank you, Your Honor, I appreciate that.

THE COURT: Of course. Anything else? Mr. Romanucci, are you ready to proceed?

MR. ROMANUCCI: I am, Your Honor.

THE COURT: All right, let's, please, your opening.

MR. ROMANUCCI: Good morning to all, and especially, Your Honor for accommodating this hearing under these circumstances and also counsel for defendants and may it please this Court.

Plaintiffs do bring this motion for preliminary injunction against the St. Tammany Parish Sheriff's Office to enjoin inhuman and unconstitutional practices of confinement of arrestees in the St. Tammany Parish Jail holding cells. The plaintiffs pray that this Court order injunctive relief, and this is temporary -- this is a motion for temporary injunctive relief assuring that the longstanding practices of the St. Tammany Parish Sheriff's Office be stopped in light of the crisis of COVID-19 and the particular threat it poses to incarcerated individuals in the St. Tammany Parish Jail.

It is not acceptable to place a human being at risk of serious illness or possibly death when one has the means and knowing ability to prevent it. Those are our allegations

against St. Tammany Parish in this motion for preliminary injunction.

Our country is facing a crisis that it has not seen since 1918. We are now faced with fighting an enemy that cannot be spoken to, emailed, or Zoomed. This enemy resides at any given moment on any one of us in this hearing, and that is the novel coronavirus or COVID-19. We now know that the simple intuitive or habitual act as simple as a handshake, a high-five to a friend, and even a hug or a kiss to a loved one may result in serious, grave, or deadly illness. Without a doubt, that would be considered a life-altering consequence for exchanging a mere salutation.

Worst yet, the World Health Organization and the CDC now recognize that the sole manner in which to prevent the spread of an infection now known as COVID-19 for which there is no vaccine is to create a minimum space distance of 6 feet between people, avoid all physical contact among strangers, do not be around anyone who has even shown symptoms as simple as a sneeze because that sneeze may disperse water droplets that can linger for hours and cause multiple contaminations among people.

Your Honor, the evidence in this request for relief is plain. The St. Tammany County Parish Jail was doing none of the required, let alone recommended protocols as pronounced by the CDC even as early as March 13th. This virus became known

to the United States that we know on or about December 31st of 2019 when China and Europe were already under siege. The No. 1 solution and recommended precaution is social distancing. The No. 1 violation that we are alleging in this motion for preliminary injunction is social distancing.

Indeed, when you look at the conditions as reported in Plaintiff's Exhibit -- let me just get it correct -- No. 7 when there were approximately 24 people being held in a 10-by-20 cell, each person was afforded approximately 8.33 square feet, and that's assuming the person was standing. Certainly, there was no chance at all of complying with the CDC Guidelines of the 6-foot social distance. Indeed, these people, these jail detainees were being held for a period of time of up to 18 days, lying down which clearly put them within the proximity which was recommended by the CDC to not follow. Be no closer than 6 feet.

So now I want to go through some of the issues that we face here, and one of them is standing, Your Honor. As alleged in the plaintiff's complaint, the defendants have long maintained a custom of housing as many as 24 inmates in a crowded 10-foot by 20-foot holding cell for as long as 18 days, and that's referenced in the 2012 and the 2017 DOJ report. You have it listed in our order now as Plaintiff's Exhibit No. 1.

While maintaining this custom, defendants deprived inmates of showers, a clean and safe living environment, and

the ability to practice basic hygiene. As a result, inmates slept, if at all, on top of each other on concrete floors and benches covered in vomit due to infrequent cleaning and sanitation. You will hear evidence of this today.

Plaintiffs Ahmed Baqer, Joseph Guillot, Junior, and Joseph Guillot, Senior were subjected to these and other conditions of confinement that violated the Fourteenth Amendment. As pretrial detainees at the time, their Fourteenth Amendment rights were violated. They were subjected to conduct that is capable of repetition, and yet evading review, and we've seen that in not only as far back as 2012, but now in 2020.

Constitutional violations that are inflicted upon pretrial detainees are justiciable notwithstanding the fact that said detainees may no longer be in pretrial detention particularly where the constant existence of a class of persons suffering the deprivation is certain. These plaintiffs fit that address -- redressability. For example, Guillot, Junior would benefit in a tangible way from the Court's intervention since by issuing a preliminary injunction and not yet a mandatory one -- we are not asking for that -- this Court will have succeeded in preventing sickness and possible death.

It has been repeatedly stated by all of our governments that successful social distancing and hygiene will prevent the spread. We've all heard, "Stay home. Save lives."

These pretrial detainees who are being held in holding cells can't stay home. They can't on their own save lives. This Court and Your Honor has to do it for them.

To earn a preliminary injunction, as Your Honor stated yesterday and I'm not going to repeat them, we have four burdens that we must establish. And Your Honor knows them. I'm not going to go through it to exactly what they are as to use up precious time that we have based upon the time limits that we have on opening and closing. However, on our burden at No. 1, a likelihood of success on the merits, the Fourteenth Amendment secures for pretrial detainees the basic needs such as medical care and safety, and that's what this case is about. It's about safety, not only for the detainees, but also for the employees of the jail. And not only that, Your Honor, it extends even further to the community at large when they are released, if they are, from the jail population.

Chief Justice Rehnquist, perhaps, put it best when he stated, "When the state, by the affirmative exercise of its power, so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs -- food, clothing, shelter, medical care, and reasonable safety -- it transgresses the substantive limits on state action set by the due process clause."

And that's where I bring you back to, Your Honor,

that you have the ability to prevent the serious injury and death that is lingering in this jail. The defendants will have you believe that because they are stating in their affidavit that no one has become positive that the virus does not exist within the jail, and that would be nearly medically impossible by what we know. Because they have claimed that there is no positive COVID-19 tests, we don't know how many of the inmates have been tested, and clearly, we don't know how many are infected which may lead to the infection and/or death.

Plaintiff has also established the substantial threat of irreparable injury if injunctive relief is not granted, and that, Your Honor, we would refer you to the Johns Hopkins article which is referenced now as No. 9. Numerous district courts have noted that inmates are at a heightened risk of contracting COVID-19, and that's why the CDC Guidelines on Plaintiff's Exhibit No. 5 were created.

Across the country, communities are frantically trying to slow the spread of the virus by mandating social distancing practices and instructing individuals to self-quarantine. And that's evident by the Louisiana Governor's Proclamation which is Plaintiff Exhibit No. 3, Your Honor. Nothing less than injunctive relief will prevent the defendants from continuing the practices that have been well documented in plaintiff's complaint and the local reporting of the Department of Justice's findings even back in 2012.

The threat and injury certainly outweighs any harm that will result if the injunction is granted. You will hear evidence to that. Defendants failed to identify any real harm that will be imposed upon them by the entry of injunctive relief ensuring that whatever practices they claim are in place will be maintained to ensure that while we are in this pandemic crisis that the detainees are safe and that the prevention and spread of this virus will not become rampant and become a pandemic in and of itself within the jail. The defendants bemoan court oversight of the St. Tammany County Jail, but any harm resulting from an entry of an order that would compel them to maintain certain practices that they claim pales in comparison to the serious risk of harm and/or death posed to pretrial detainees.

And especially here, Your Honor, when we are referring to pretrial detainees, we are referring also to the new arrivals, the new arrivals who are held in holding cells. And defense will argue the vociferously that these individuals, that nobody here satisfied the standings of the PLRA, the Prison Litigation Reform Act, and that therefore, none of them have standing. But that's a hollow argument, Your Honor, and this is why. When you listen to what the requirements of the PLRA are, when you consider a new arrival, if, indeed, he subjected himself to the PLRA and availed himself of that administrative process, it would take him a full 80 days in

order for him to have due process through that system. And that would be an impossibility for a new arrival who would be held for 48 hours, 72 hours, or unjustifiably so even for 18 days in a holding cell with minimal hygienic ability, no sleeping quarters, and maybe at best a blanket to cover himself or herself.

The injunction will not disserve the public interest at all. An issuance of a preliminary injunction serves the public interest in slowing the spread of COVID-19. Pretrial detainees can be released into the public after they come into contact with other detainees and the St. Tammany Parish Jail staff. If they are subjected to the conditions of confinement above, the community of St. Tammany Parish is put at greater risk to the COVID-19 crisis without an order for injunctive relief. We've all --

DEPUTY CLERK: Mr. Romanucci, sorry, this is Melissa, the judge's case manager. You have 10 minutes of your 25 minutes left.

MR. ROMANUCCI: Thank you. I have completed.

My closing sentence is that the Fourteenth Amendment rights to St. Tammany Parish Jail inmates will be protected by the entry of such an order in a manner that cannot be satisfied by the self-serving statements of the sheriff and the warden of the jail. Thank you all.

THE COURT: Thank you, Mr. Romanucci. I'm sorry I had

to unmute myself.

Mr. Collings or Mr. Acosta, who will it be for the defendants, or will you make an opening?

MR. COLLINGS: This is Chadwick Collings, Your Honor, for the defendants. It is my intention to go ahead and waive our opening right now. And I assume that means I'll have the full 25 minutes, if I need it, for closing which I hopefully will not.

I think what I would have said in opening is fully within our brief that you have and you said you were reading yesterday; so I don't want to say again what you've probably already read. So we'll go ahead and waive an opening at this point.

THE COURT: All right, thank you, Mr. Collings.

Okay, counsel for plaintiffs.

MR. JACOB: Yes, Your Honor. Can you hear me?

THE COURT: Is this Mr. Jacob?

MR. JACOB: Yes, this is Mr. Jacob, Attorney Jacob, yes. I will be presenting evidence at this time.

I'd like to call Ahmed Baqer as a witness.

THE COURT: All right, Mr. Baqer, you're on the call?

MR. BAQER: Yes, Your Honor.

THE COURT: All right. Mr. Baqer, I'm going to ask that you raise your right hand. Do you swear that the testimony you're about to give is the truth, the whole truth,

and nothing but the truth so help you God?

COURT REPORTER: I'm sorry, I couldn't understand what he said.

THE COURT: I'm sorry, who just spoke?

COURT REPORTER: The court reporter couldn't understand the witness's response to the oath.

THE COURT: Mr. Baqer, what was your response to the oath? Do you swear to tell the truth, the whole truth, and nothing but the truth so help you God?

MR. BAQER: Yes, Your Honor.

MR. COLLINGS: Your Honor, this is Chadwick Collings.

THE COURT: Mr. Collings, I'll take you in a moment.

Did the court reporter hear Mr. Baqer's answer at this time?

COURT REPORTER: Yes, Your Honor. Thank you.

THE COURT: Okay. Mr. Collings, you want to raise your objection?

MR. COLLINGS: Yes, Your Honor. I would reurge my objection. I would stipulate on the record that Mr. Baqer was held in the St. Tammany Parish Jail from December 2nd through December 18th, and he was in holding from December 2nd to December 17th.

Beyond that, Your Honor, I don't think any testimony that he can provide is relevant or germane to these proceedings.

THE COURT: Did you offer that stipulation to plaintiffs before this morning?

MR. COLLINGS: I did not because I didn't know how you were going to -- if you were going to just exclude him or not; so I didn't. I kind of thought of that as we were on the phone this morning.

THE COURT: Mr. Jacob, is that stipulation acceptable to you?

MR. JACOB: No, Your Honor. We have just a little bit more testimony from this individual to present that is relevant directly to the motion at hand.

THE COURT: All right. Mr. Collings, I'm going to overrule your objection and allow him to testify taking Mr. Jacob at his word and letting you know that let's keep it streamlined and keep it narrow. But I do think that he should be allowed to testify, and I want to hear what he has to say.

So proceed. Mr. Baqer, I think we all know your name, but just state your name for the record, and spell it for the court reporter, please.

THE WITNESS: Yes, Your Honor. Ahmed Baqer, A-H-M-E-D, last name, B-A-Q-E-R.

THE COURT: All right, Mr. Baqer, your attorney Mr. Jacob is going to ask you some questions, and then possibly the defense attorney will ask you some questions. You're under oath, and you must answer all the questions truthfully.

Proceed, Mr. Jacob.

MR. JACOB: Thank you, Your Honor, and thank you for your indulgence, and I promise to keep both witnesses very short.

DIRECT EXAMINATION

BY MR. JACOB:

Q. Mr. Baqer, at some point in time, were you held as an inmate at the St. Tammany Parish Jail?
A. Yes, sir.
Q. And do you recall the date when that occurred?
A. December 2nd.
Q. And when you were held at the jail, do you recall where you were held?
A. Holding Tank No. 4.
Q. And do you recall how many days you were in Holding Tank No. 4?
A. 14.
Q. And do you recall how many people were in that holding tank with you while you were in that holding tank?
A. The average would be around, I'd say about 15 to 16 people, but there would be times there would be about 20, 22 people.
Q. Okay. At any point in time -- or would you just describe the cell, the holding cell itself to the Court?
A. The holding cell, there's four of them, 1, 2, 3, 4.

They're very small, you know. 10-by-20, I wouldn't even give it that. They're always dirty, overcrowded because they don't have anyone --

COURT REPORTER: I'm sorry, Mr. Baqer, this is the court reporter. I'm having trouble hearing you. If you could speak more closely into your phone.

THE COURT: Do you understand that, Mr. Baqer? Try to speak a little closer.

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. You were describing the holding cell.

THE WITNESS: The holding cells are very small, like 10-by-20. They're always very dirty and overcrowded definitely because they don't move many people to the back. You know, there's nothing to do in there. You're not going anywhere unless you're getting moved to the back, and that's going to take a week, you know, at the very least a week. It's -- it can be dangerous in there.

BY MR. JACOB:

Q. Let me ask you some follow-up questions to break this down a little bit. I want to talk about what you just said about the cell being dirty.

Can you describe the floor of the cell? First of all, what is it made of?

A. It's concrete.

Q. And was there a toilet in the cell?
A. Yes, sir.
Q. And can you describe whether the area around the toilet was clean or dirty? Can you give us any description?
A. The area around the toilet, there would be a lot of urine around there.
Q. And so that was urine on the floor?
A. Yes, sir.
Q. And would there be anything else on the floor?
A. There would be food for -- probably the longest I've seen food on the floor, the same food without them cleaning it up, about four days. And also, you know, somebody throwing up, detoxing, a few people come in there detoxing because they're hooked on something, and they come in there throwing up. They don't have, you know, they don't take them anywhere.
Q. So there was vomit on the floor?
A. Yes, sir.
Q. And how long did the vomit remain on the floor before it was cleaned up?
A. A few of the inmates would bug the guards for about six hours until they gave us a mop and made us clean it up.
Q. So the vomit was on the floor for about six hours?
A. Yes, sir, the first time. But he was in there for a few days, and he was vomiting all those days.
Q. Did the same problem occur with the delay in getting the

vomit cleaned?
A. Yes, sir.
Q. Was there any toilet paper on the floor?
A. Always.
Q. And where were you to sleep?
A. I would sleep usually close to the door. You don't really have much of a choice to be honest. You know, it's so crowded. A lot of people would put their head near the toilet. There's a lot of urine on the ground, you know. It's very overcrowded. There's people in there that they move in there with, you know, staph infections.
Q. Okay. Now, so am I to understand that you saw inmates laying on the floor where there was urine and toilet paper, old food and vomit?
A. Yeah.
MR. COLLINGS: Your Honor, this is Chad Collings. I just object. Counsel is leading this witness. I kind of let it go a couple of times.
THE COURT: Sustained, sustained.
MR. COLLINGS: Thank you.
THE COURT: Go ahead, Mr. Jacob.
BY MR. JACOB:
Q. Were you provided with soap in the cell?
A. We were provided with soap. But if we didn't have any, you know, we'd have a hard time getting clean, you know.

Sometimes for whatever reason, they would -- they just wouldn't give it to us, and you know, we'd bug them. We'd bang on the door, and nothing would happen for, you know, hours at a time.
Q. Were you able to wash your --
THE COURT: I have a -- this is the judge interrupting. I'm sorry, I didn't fully understand that.
Mr. Baqer, did you say you were provided with soap?
THE WITNESS: Not regularly. If we asked, you know, it would take hours to get their attention to actually get, you know, hygiene stuff.
THE COURT: Okay.
MR. JACOB: Thank you.
BY MR. JACOB:
Q. Were there times that you were not able to wash your hands?
A. I'm thinking of the -- there was never enough soap for everyone to wash their hands. So I don't think anyone washed their hands regularly at all.
Q. Okay. Was there any trash that was produced from eating or otherwise?
A. There's always a brown paper bag that they gave us to put trash in usually by the door, but it's not big enough to hold all the inmates' trash. So the trash ends up everywhere in the cell. And then --
Q. And how often -- I'm sorry, I cut you off. I apologize.

How often was the trash removed from the cell?
A. Every time we got showers.
Q. Okay. And how often would you get showers?
A. One week, I got a shower three times. And one week, I got a shower two times.
Q. And when you are provided access to the shower, was there soap available to you?
A. A few times, there weren't because they keep them in big bottles; so a lot of people can use it. But I'd tell you about 50 percent of the time they had it, 50 percent not.
Q. And I think you mentioned that they cleaned the cell or removed trash on shower days; is that correct?
A. Yes, sir.
Q. Can you explain what the cleaning process was for the holding cell?
A. Pretty much somebody comes in there taking out the trash and mopping, sweeping and mopping, you know, very quickly.
Q. Was the floor clean in your opinion after the floor was mopped?
A. No, sir.
Q. Were there any cleaning supplies provided to you in the holding cell?
A. No, sir.
Q. And at any point in time, did you see any inmates in the cell with open wounds?

A. Yes, sir.
MR. JACOB: I have no further questions, Your Honor.
THE COURT: All right. Mr. Collings or Mr. Acosta, do you have questions for Mr. Baqer?
MR. COLLINGS: I have a few, Your Honor. This is Chadwick Collings.

CROSS-EXAMINATION

BY MR. COLLINGS:
Q. Mr. Baqer, why were you in the St. Tammany Parish Jail?
MR. JACOB: Objection, relevance.
THE COURT: I'm going to allow it. It goes to credibility, and I want to hear.
BY MR. COLLINGS:
Q. Mr. Baqer, did you hear my question?
THE COURT: I'm sorry, Mr. Baqer, you're right to wait when I rule on something. So I will tell you when you can answer. Yes, you may answer that question.
THE WITNESS: Yes, Your Honor.
I went to St. Tammany Jail because I was speeding on my motorcycle, and I didn't stop. And I ended up getting charged with obstruction of a highway which is a felony. But the second time I went was because I missed court and didn't have a bond.
BY MR. COLLINGS:
Q. Okay. Mr. Baqer, again, this is Chad Collings. I looked

at some of your records, and I'm kind of confused by your answer. I have records that indicate you were arrested in March of 2019 and arrested again in April of 2019. Are those the charges you just described?
A. No. In April, I was arrested for speeding, and that wasn't even in St. Tammany.
Q. Okay. And where did you -- did you get taken to a different jail in April of 2019?
A. No, sir.
Q. Well, if you were arrested, where did you go in April of 2019?
A. Gretna.
Q. Okay. And is there a jail in Gretna that you went into?
A. Whatever jail is in Metairie, you know. I'm not from there; so I don't know what jail it would be. But whatever jail is in Metairie, the police take me to.
Q. All right, and how long -- I'm sorry. How long were you in that jail in Gretna?
MR. JACOB: Objection to relevance.
THE COURT: What's the objection?
MR. JACOB: It's not relevant to the prison conditions at this current jail.
THE COURT: And is this Mr. Jacob making the objection?
MR. JACOB: Yes, I'm sorry, Your Honor, Devon Jacob.

THE COURT: Okay. Mr. Collings, what is the relevance of this line?

MR. COLLINGS: Well, he's testifying as to the unsanitary conditions, how often the jail was cleaned, how often he got to take a shower, that sort of thing, how many people were in the holding cells with him. So I'm just trying to understand was his experience in the St. Tammany Parish Jail unique or were there other jails that he experienced in his past that were comparable.

I'm sorry, Judge, I would just ask for a little latitude because I have not had an opportunity to depose the gentleman given our very abbreviated schedule so far.

THE COURT: I'll give you a little latitude. I understand that. But we're not going to go into all the specifics about other times he was detained or incarcerated because the questions are only relevant to this incarceration; so I'll give you a little bit of latitude.

The question, Mr. Baqer, was: How long were you in jail when you were arrested in April of 2019?

THE WITNESS: Yes, Your Honor. If I am correct and that was when I went to Jefferson Parish, I was only in there for about one day. And I did not have to sleep on concrete, and it was very, very clean.

BY MR. COLLINGS:

Q. Mr. Baqer, how did you get out after that one day in jail?

A. They let you out --
Q. Did you bond out?
A. -- because of overcrowding.
Q. The jail in Jefferson Parish was too crowded; so they let you out?
A. Yes, sir.
Q. All right. And did those charges -- what was the disposition of those charges from Jefferson Parish; do you know?
A. Disposition, I just had to pay a ticket.
Q. So that's been resolved?
A. I believe I owe the speeding.
Q. So did you pay the speeding or not?

MR. JACOB: Objection, Your Honor.

THE COURT: Okay, I'm going to sustain it. Mr. Collings, we're going far afield.

MR. COLLINGS: I just had -- he talked about being a felony. He was out on a warrant or he missed court. I'm just trying to nail down what court did he miss and from where because that was part of why I believe he was in our jail.

THE COURT: All right. Not to advise you, but you could ask him that.

But I'm going to sustain the objection whether he's paid the speeding ticket or not.

MR. COLLINGS: All right.

BY MR. COLLINGS:
Q. Mr. Baqer, this is Chad Collings. Question for you: You mentioned that you failed to appear in court. Which court did you fail to appear in?
A. St. Tammany Jail, St. Tammany court.
Q. Okay. And was that for the March of 2019 arrest?
A. Yes, sir.
Q. Okay. So tell us exactly what happened in March of 2019. Was that on the Causeway?
MR. JACOB: Objection, Your Honor. This is Devon Jacob.
THE COURT: Mr. Jacob, you're making an objection. Why?
MR. JACOB: This is completely irrelevant. He got the charge in for credibility. But the underlying facts to the charge, it's just not, it's not relevant to this proceeding.
THE COURT: Okay. I'm going to overrule it and give him a little bit of time, short, to get an understanding of why he was in jail. I do think it's relevant.
Mr. Collings, proceed.
Mr. Baqer, you can answer the question.
THE WITNESS: Yes, Your Honor.
BY MR. COLLINGS:
Q. If you wouldn't mind telling us, Mr. Baqer, as I understand it, you had an interaction with law enforcement in

March of 2019. Tell me what happened, what were you charged with, and by whom?

MR. JACOB: Your Honor, can I just state one more objection, Devon Jacob, just to build a record here?

THE COURT: Go ahead, Mr. Jacob.

MR. JACOB: Yes, this is very prejudicial and absolutely not relevant to the underlying facts. He has testified why he was in that jail. And under 403, this confuses the issue, and it's overly prejudicial.

THE COURT: Your objection is noted, and it's overruled.

You may answer the question, Mr. Baqer.

THE WITNESS: What happened when I got arrested, I got stopped, and there were probably a few police cars. And they booked me, I believe, in the sheriff's office first. I'm not sure. I'm not sure how they arrest people in St. Tammany. I'm not used to getting arrested at all to be honest. I got booked. I went to jail, and I bonded out probably a couple of days later the first time I went to jail.

And then actually, I missed court because I didn't have a ride, and it's so far. And my mom lives in Texas; so there's no way I could get there. And the next thing you know, a bounty hunter, you know, come after me. And that's why I was in jail this last time in December. And the reason I didn't get out is because I couldn't afford the bond.

BY MR. COLLINGS:
Q. Okay, I think I understood. I want you to correct me if I'm wrong on what I just -- basically, I'm taking notes, and I want to make sure I understood you correct.
A. Yes.
Q. So in March of 2019, you were arrested. Was it for speeding? You just said you were stopped.
A. At the end of it all.
Q. Okay. Well, what did they charge you with in March of 2019? What did they arrest you for specifically?
A. Obstruction of highway.
Q. That's it?
A. Aggravated flight, DWI. There's two more. I'm not sure what they are.
Q. Okay.
A. But I ended up getting just obstruction, the DWI, and I think possession of marijuana. But I'm not sure to be honest.
Q. Okay. But that arrest, you said you were out in about a day; is that right?
A. I think it was two days.
Q. Okay. And your experience in March of 2019 for that arrest in the St. Tammany Parish Jail, was it different than your experience in December of 2019? Meaning, were you in the same holding cell, was it the same number of people in the holding cells approximately, that sort of thing?

A. Same number of people in the holding cells, I remember. I remember people talking about being in there for a long time. It still wasn't very sanitary, you know. Sleeping on concrete isn't great even if it is two days, you know.

Q. Okay. Now I have some information that you may have also been arrested in Florida. Is that true?

MR. JACOB: Objection, Your Honor, Devon Jacob.

THE COURT: And your objection being?

MR. JACOB: Again, relevance. We are talking about the St. Tammany Parish Jail prison conditions. What's going on in Florida in a different environment in a different situation is not relevant to what's going on in St. Tammany and what St. Tammany can and cannot do and what the Constitution frankly requires.

THE COURT: Mr. Collings, what's the time period we're talking about because I do think we're going far astray?

MR. COLLINGS: One second, Your Honor. It looks like it was around 2015. The reason I asked that is because he just testified he doesn't have a lot of experience with jails and law enforcement, and I'm trying to make sure I understand whether that's true or not.

THE WITNESS: I'd like to answer that, Your Honor.

THE COURT: All right, Mr. Baqer.

THE WITNESS: I was given adjudication withheld.

BY MR. COLLINGS:

Q. I didn't understand what you just said, Mr. Baqer. Can you repeat that, please?
A. I was given adjudication withheld. I did nothing wrong.
Q. So you were arrested in 2015 in Florida; is that right?
A. I was arrested, but I was only in there for probably a day max. And I got adjudication withheld.
Q. Does that mean the district attorney chose not to prosecute you, or you went into diversion? Explain what that means.
A. They chose not to prosecute me.
Q. Did you ever have to pay any fines, go through diversion, or anything like that?
A. I paid about $800 court fees.
Q. Okay. Was there what we call in Louisiana, it's called diversion. Is there some kind of program you were in that allowed you to have the charges dropped?
A. They offered me pretrial diversion, three months, and I refused because I was not guilty of that.
Q. Who found you not guilty?
A. I wasn't found not guilty. The judge gave me adjudication withheld.
Q. Okay, all right. Have you been arrested anywhere else other than the ones you've already described for us?
A. No, sir.
Q. Okay. To make sure I understand your testimony from

earlier, sir, am I correct that you were in the holding cell for 15 days; is that correct?
A. 14.
Q. 14 days. And that in that time, you were allowed to shower twice one week and three times the other week; is that correct?
A. Yes, sir.
Q. All right. Were you provided a blanket in the holding cell?
A. Yes, sir.
Q. Were you ever denied medical attention in the holding cell?
A. Yes, sir.
Q. I couldn't hear you, sir. Can you repeat your answer?
A. Yes, sir, I was denied medical attention.
Q. Describe what you -- describe that. How did that happen?
A. I suffer from anxiety and depression, and I didn't have my medication that I take. And they couldn't do anything about it pretty much. So I had to sit in there for those days and suffer.
Q. Okay, so let me make sure I understand you. When you arrived at the jail, they asked you what medications you were on, and what were those? Sir?
A. Anxiety medication which is Xanax.
Q. Anything else?

A. That's it.
Q. Did you have that medication on you when you were booked into the jail?
A. No, I did not.
Q. And so your complaint is that the sheriff did not provide you with Xanax while you were in the jail; am I correct?
A. That's not my complaint.
Q. Well, you said you were denied medical care. Is there any other medical care that you were not given?
A. It's not about the medicine. It's the, you know, it's mental health. And even though I would, you know, beg them if I could see a doctor or somebody, you know, they won't do anything. They didn't do anything. They didn't do anything for anybody.
Q. Okay. Let me make sure and drill down just a little bit. When you came to the jail, did you have a prescription with you for Xanax?
A. I did not.
Q. All right. And so how did you get denied your medication? Explain that to me.
MR. JACOB: Objection, Your Honor, Devon Jacob.
THE COURT: Yes, Mr. Jacob.
MR. JACOB: This is not relevant to what has been raised in this particular motion. That's certainly something we're going to address in the overall complaint. It's way

outside the scope of direct. And again, we're not focused on the medication, prescription medication in this hearing at this time.

THE COURT: Overruled. Mr. Jacob, you understand that in order to prevail on the motion for preliminary injunction you need to show substantial likelihood on the merits on your complaint; so it is relevant. What is alleged in the complaint is relevant to this. In fact, it's the first factor.

MR. JACOB: No, I understand that, Your Honor, and I apologize. What I meant to say was there are other conditions that we were focused on which we absolutely should prevail on in this particular hearing for injunctive relief related to prescription medication. That's all I was saying.

THE COURT: Objection is overruled.

I'd also ask -- somebody is speaking in the background, and I understand that the attorneys have to consult. I think it's an attorney. I don't know that. I would ask, again, anyone else not speaking, mute your phones while defense is doing their cross-examination; so we don't interrupt them and just unmute it if you have an objection.

Mr. Collings, proceed.

BY MR. COLLINGS:

Q. Mr. Baqer, this is Chad Collings again. I need to ask you, I think you already answered that you did not have a prescription with you when you came to the jail. But did you

have a prescription somewhere else for Xanax?
A. I was prescribed it definitely. I had a prescription for it, but I didn't have my prescription bottle.
Q. Okay. And did you ask the sheriff to provide you with that Xanax while you were in the jail?
A. The nurse or?
Q. The sheriff or his employees, I'm sorry.
THE COURT: Mr. Baqer, you were saying you asked the nurse?
THE WITNESS: Yeah. When we first get there, the nurse is the person that we see to tell which medications we're taking.
BY MR. COLLINGS:
Q. And you told the nurse you were on Xanax?
A. And I also think it was bupropion which is an anti -- I don't know. I think it's to right my mood or something like that.
Q. Did you --
THE COURT: Mr. Baqer -- excuse me, Mr. Collings. I didn't hear the answer.
Mr. Baqer, Mr. Collings asked: Did you advise the intake nurse that you were on Xanax? I didn't hear your answer.
THE WITNESS: Yes. Yes, Your Honor, multiple times.
THE COURT: All right, thank you, sir.

BY MR. COLLINGS:
Q. And is it your testimony, sir, that the sheriff's office at the jail did not provide you with the Xanax that you believe you were -- that you needed?
A. Could you repeat that one more time, please?
Q. Is it your testimony, sir, that the sheriff's office did not provide you with the Xanax and the other medication, and I couldn't quite make it out either. But is it for those two medications that you said you were on that you had a prescription for, is it your testimony that you were not provided those medications while you were in the sheriff's office for 14 days, the jail rather?
A. That's true that I said that, but that wasn't the main point of my testimony. The main point of my testimony was that we don't get the, you know, medical attention that we need.
Q. Okay. Well, what other medical attention do you believe you needed while you were in the sheriff's jail, St. Tammany Parish Sheriff's Jail for 14 days that you did not receive other than the medication you just described?
A. I mean anxiety, depression, you know. I couldn't -- sometimes I can't sleep. I'd ask to see the nurse, or you know, the doctor. I'd write out a little slip that they give us probably about five times, you know. People give them in all day, and they still don't see them for like a week.
Q. All right. Did you see a nurse while you were in the

St. Tammany Parish Jail?
A. Yes, sir.
Q. Did you ever see a physician while you were in the St. Tammany Parish Jail?
A. No, sir.
Q. All right. What was the name of the doctor that prescribed the medications you just told us about?
A. The name of the doctor?
Q. Yes. You had a prescription for two medications you just testified about. Who prescribed them to you?
A. I go to a mental health clinic, and it's not -- it's the person that works in the front or whatever that writes up prescriptions. It's not the person that works in the mental health.
Q. All right. Sir, do you understand how prescriptions are prescribed, that a physician actually has to see you and give them to you?
Who is that person? What is the name of the doctor?
MR. JACOB: Objection, Your Honor.
THE COURT: Sustained. Mr. Collings, I don't know what the relevance is of this, but I'm sustaining the objection. We're going far afield.
MR. COLLINGS: Fair enough.
BY MR. COLLINGS:
Q. All right, sir, what else -- besides the complaints you

just described to us about the medical treatment you received in the jail and the testimony you've already given to your counsel on direct, what other issues did you have at the jail that you'd like to tell the Court about?

A. Trying to get the CO's attention. Feeding us at different times of the day. Bringing us blankets at 2:00 o'clock in the morning and taking them at 4:00 o'clock in the morning. And feeding us at 4:00 o'clock in the morning and feeding us at 11:00 and giving us a small sandwich at 1:00 p.m., 2:00 p.m. People fighting in the cell blocks, and y'all watching them and not even doing anything about it. People throwing up and detoxing so bad that they're shaking, and you know, they can't breathe and not doing anything about it, you know. There's a lot of things that go on.

Q. You told us a lot of stuff. Let's start with the fighting. Who fought in the holding cell that you observed? Give me the names, please.

A. I remember this one guy. His name was Kyle Cavalier or Coley or something like that, but he was in there with me, and he got in a fight with about two people. And there was another guy in there that laid up against the window. I believe he got in there one day before me. He was in my -- he was in Holding Tank No. 4 too, and he punched an old man in the face because he didn't like what he said.

Q. All right. Did anybody ever strike you?

A. No, sir.
Q. Did you ever strike anyone while you were in holding?
A. No, sir.
Q. You testified that meals came at hours that you did not like; is that correct?
A. That's not what I said.
Q. All right. Well, you talked about a sandwich coming at 11:00 p.m., sometimes at 11:00 a.m. Were you ever denied food by the sheriff's office?
A. Yes.
Q. Tell me about that. How long were you denied food?
A. When I first got there, I probably didn't get food until probably about 18 hours.
Q. So you arrived at the jail, as I appreciate it, on December 2nd, 2019; is that correct?
A. Uh-huh.
Q. You have to say yes or no, please.
A. Yes, sir.
Q. All right. And what time of day did you arrive at the jail?
A. It was about 1:00 o'clock, 2:00 o'clock in the morning.
Q. Okay. It's your testimony that you didn't receive anything to eat for approximately 18 hours after you arrived at the jail at approximately 1:00 or 2:00 o'clock in the morning; is that right?

A. I didn't even get breakfast. I didn't get breakfast.
Q. That wasn't my question, sir. Can you just, please, answer the question I asked you which is: From 1:00 or 2:00 o'clock in the morning on December 2nd, is it your testimony that you didn't receive anything to eat until approximately 18 hours later; is that correct?
A. Yes, yes, sir.
Q. All right. And from that point forward, were you ever denied food for an entire 18 hours or longer period?
A. Not that long, no, sir.
Q. Okay. You talked about staph infections and open wounds during your testimony to -- during the questioning by your counsel. Do you have any medical training, sir?
A. I've had CPR training in the past.
Q. Okay. Other than CPR training, do you have any other medical training?
A. No, sir.
Q. I'm sorry, what was that?
A. No, sir.
Q. Mr. Baqer, have you been inside of the St. Tammany Parish Jail at any time subsequent to December 18, 2019?
A. No, sir.
Q. Do you have any knowledge of the current conditions within the jail?
A. I know that -- I'm not sure if it's true or not, but I was

told that they are not holding them in the holding cell longer than three days now which was illegal anyways.

MR. COLLINGS: All right, Your Honor, I would just make an objection to the responsiveness of the witness, that he is providing hearsay about he was told. I don't know who told him that, so.

THE COURT: I am sustaining, Mr. Collings, and I'll give that the weight that -- yeah, I'm not going to listen to hearsay or what he was told by somebody else.

BY MR. COLLINGS:

Q. Mr. Baqer, now I'm only asking you about what --

MR. JACOB: Your Honor.

THE COURT: Wait. I believe Mr. Jacob is speaking. Mr. Jacob.

MR. JACOB: Yes, Your Honor. Just to respond to that argument, I believe hearsay is permissible in a preliminary injunction setting, and he did open the door and ask the question.

THE COURT: Mr. Jacob, so you want in evidence that he's heard that they're no longer holding anybody beyond two or three days? Is that what you're asking me to hear?

MR. JACOB: I'll withdraw my comments, Your Honor.

THE COURT: Okay.

BY MR. COLLINGS:

Q. Mr. Baqer, this is Chad Collings again. Let me make my

question a little bit clearer for you. I'm not really interested in what you may have been told by other people.

I want to know specifically, sir, do you have any firsthand knowledge about the current conditions inside the St. Tammany Parish Jail?

A. No, sir.

Q. Do you have any firsthand knowledge about the protocols in place in the St. Tammany Parish Jail right now for the COVID-19 epidemic?

A. No, sir.

MR. COLLINGS: That's all I have, Your Honor. Thank you.

THE COURT: Thank you, Mr. Collings.

Mr. Jacob, do you have anything else for Mr. Baqer?

MR. JACOB: Just two follow-up questions, Your Honor.

REDIRECT EXAMINATION

BY MR. JACOB:

Q. The first question, Mr. Baqer, you talked about a staph infection. How was it that you knew it to be a staph infection?

A. The first time I actually went back and see the nurse, I went to the back. They called a few people in our holding cell, and a few of us went back there. And I was in there with one guy, and they told him that he had a staph infection. And

the next thing you know, when we were going back to our blocks, he ends up on the floor.
Q. And as to the blanket, could you describe the condition of the blanket that you received?
A. They're torn, gray, you know, very scratchy. Some people would like get like half blankets, quarter blankets. Nothing that would keep you warm.
Q. Was the blanket clean?
A. Yes, sir, they did clean them.
Q. And was the blanket dry?
A. No, sir.
MR. JACOB: Nothing further, Your Honor.
THE COURT: Mr. Baqer, I just have a couple of questions just to clarify something. And before I do that, I would again ask people to mute their telephones because I continually hear conversations, Counsel.
MR. JACOB: Your Honor, I believe that's the jail. I just say that because of my prior conversation with my client at the jail and my experience during that.
THE COURT: It may well be.
Mr. Baqer, I just have a couple of questions because I want to make sure that I have an understanding. Can you give me an idea of how many times you saw a nurse or medical assistant or anyone at the jail?
THE WITNESS: A nurse or medical assistant did come in

for detox and I believe two more times a day. But that didn't necessarily mean you could get their attention for them to check you out more.

THE COURT: Am I understanding that the nurse or medical assistant would come into the holding cell three times a day? You said two more times, three times a day?

THE WITNESS: No, Your Honor, they would open the little latch.

THE COURT: Okay. And how often would that be opened?

THE WITNESS: About three times a day until everyone got their meds.

THE COURT: I understand, okay. All right, that clears that up for me. Thank you. I don't have anything else.

Mr. Jacob, would you like Mr. Baqer to remain on, or can he be released and hang up if he wishes?

MR. JACOB: He can be released. And again, though, since he is a party, if the Court will permit, I think you just said it, but I think he should be permitted to listen if he so desires.

THE COURT: Of course, of course. Mr. Baqer, you're not -- you've concluded your testimony, and I appreciate it. Sir, you're not going to be testifying anymore. You may listen to the rest of the hearing because you're a party. If you have the ability to mute your telephone, I would ask that you mute it because you will not be testifying anymore.

THE WITNESS: Yes, Your Honor.

THE COURT: But you're more than welcome to stay on, but you do not have to.

THE WITNESS: Yes, Your Honor. Thank you. I appreciate it.

THE COURT: Thank you. Mr. Jacob, next?

MR. JACOB: Your Honor, I'd like to call Klabert Guillot.

THE COURT: Okay, is Mr. Guillot on the phone?

MR. GUILLOT, JR.: Yes. Yes, I am. This is Klabert Guillot.

THE COURT: All right, Mr. Guillot, would you raise your right hand?

MR. GUILLOT, JR.: Yes, Your Honor.

THE COURT: Do you swear to tell the truth, the whole truth, and nothing but the truth so help you God?

MR. GUILLOT, JR.: Yes, Your Honor.

THE COURT: Okay. Would you spell your name for the court reporter, sir?

MR. GUILLOT, JR.: Klabert Guillot. It's K-L-A-B-E-R-T, Guillot, G-U-I-L-L-O-T, Junior, J-R.

THE COURT: Thank you, Mr. Guillot. Just as you were hearing before, your attorneys will ask some questions, and then we may have some questions by defense counsel.

Mr. Jacob or any counsel for the plaintiff.

MR. JACOB: Yes, Your Honor, Mr. Jacob, thank you.

DIRECT EXAMINATION

BY MR. JACOB:

Q. Mr. Guillot, are you presently incarcerated at the St. Tammany Parish Jail?

A. Yes.

Q. And do you recall the date that you entered the jail for this present incarceration?

A. December 18th, 2019.

Q. And when you were brought into the facility, where were you housed?

A. I was housed in Holding Tank 3 and 4.

Q. And how long do you believe that you were in those holding cells combined in total?

A. 19 days.

Q. And while you were in those holding cells, do you recall how many people on average were in the cells with you?

A. Above 30 most of the time and --

Q. And -- I'm sorry, go ahead.

A. The most was like 37 on one occasion.

Q. What was that occasion?

A. It was New Year's, New Year's Eve, New Year's Day. That's the reason I recall it because I remember saying this was a bad way to spend New Year's Eve. We couldn't even lay down.

Q. And again, how is it that you can recall that it was 37 on

New Year's Eve?
A. Because we counted them in there because it seemed like it was too much, you know. We were used to being packed, but that was exceptionally a lot, you know.
Q. Did the number of people in that cell on that evening change anything about whether you could stand, sit, lay down?
A. No, you couldn't lay down. Barely, you know. We were laying on top of each other pretty much.
Q. Okay. While you were in the holding cells, were you provided with any bedding?
A. No. No, we were not.
Q. Were you provided with a blanket?
A. Yes. We were provided with a blanket late at night from like 10:30, 11:00 o'clock p.m. until like 4:00 a.m.
Q. Can you describe the condition of the blanket?
A. Usually, damp, wet, or musky.
Q. And where did you sleep, if you did sleep, while you were in the holding cells?
A. On the concrete, on the floor.
Q. And can you describe the condition of the floor that you slept on?
A. Dirty, usually left over food from the prior days because they only cleaned them maybe once or twice a week. And so they would always have food and urine and stuff by the toilets.
Q. Now when you say stuff by the toilets, what kind of stuff?

A. Toilet paper, wads of toilet paper, and you know, empty cups because they give you little cups to drink out of. There would be cups on the floor and juice wrappers and cookie wrappers and stuff like that.
Q. Do you recall seeing any other bodily fluids on the floor?
A. Yes, blood. They had a fight, and they had some blood on the floor for a few days before anybody would clean it up.
Q. Okay. Now you mentioned that at some point there was some cleaning that occurred in the cell?
A. Yes.
Q. Can you tell us when that occurred to your recollection?
A. When we would go shower.
Q. And how often was it that you would go shower?
A. Usually, a Monday, Wednesday, and Friday if everything would go as planned, but usually, three times a week or twice a week. But most of the time, two or three times a week, and they would clean while we were in the showers.
Q. Now when you were in the showers, were you provided with soap?
A. Not all the time. Some of the times. They'd have bottles for the soap. And sometimes they'd have some, and sometimes they wouldn't. They'd bring 30 of us to go shower so there wasn't -- if you got in there quick enough, you can get some. But if not, you didn't get no soap.
Q. Now this cleaning process, when you went back to your

cell, was the cell clean?
A. No, no, it was not. They still had food and trash on the floors. And --
Q. So -- I'm sorry, go ahead.
A. They had empty wrappers. And urine, it still smelled like urine.
Q. Okay. Was the floor dry when you returned to the cell?
A. No. Usually, it would be wet, and you would have to lay down on a wet floor.
Q. Was there any -- you mentioned trash. Can you explain what was done with trash in the cell?
A. They would give you a little paper bag, a brown paper bag. They put it by the door for the trash, and they'd only take it out probably two or three times a week usually when they would clean. So they'd usually have trash mounded up by the door or wherever you slept. People just throw it on the floor.
Q. Now what kind of trash are we talking about? Are we talking about paper or food?
A. Both, paper and food. Because they give you a sandwich at night to eat and that's usually wrapped in a white paper. So people would just throw it on the floor, and crusts from bread and all, stuff like that.
Q. While you were housed in the holding cell, were you provided with soap?
A. Usually not -- usually we're not provided with soap.

Q. Okay. Were you able -- was there some means or some ability for you to wash your hands before you ate?
A. No, no.
Q. Were you provided with clothing?
A. They give you one set of jumpers you could wear, but no socks or no underwear or nothing like that.
Q. And how often was that provided?
A. When you went shower. When you went shower, you got a new jumper.
Q. Now with respect to showers, obviously, am I correct you left the holding cell to go to the showers?
A. Yes.
Q. And during -- I think you said you believed you were in the holding cells, was it for 19 days in total?
A. Yes, yes.
Q. During that 19 days, do you recall how many times you were taken out of the holding cell for any reason other than a shower?
A. Just once.
Q. And what was -- how do you recall that one time? Why do you recall that?
A. It was on Christmas Day. Christmas Day, they brought us to the outside yard for half an hour.
Q. Was there any sunlight in your cell?
A. Very, very little. They have a very little, small window

in the top of the cell.

Q. And was that window functioning?

A. No. Actually, it didn't open or nothing like that. And it had a leak. Water would come through it whenever it would rain.

Q. Was anything done about that leak?

A. No, nothing was done. Numerous times, the cell, it flooded.

Q. And were you moved out of the cell when this happened?

A. No, no, sir. We had a -- the one -- like it happened twice. But the one time it happened and we begged for a mop or some towels, it took them three or four hours before they brought us a mop to clean up the water because half the cell was flooded with about a half-inch of water.

Q. Were you provided with any cleaning products to use in the cell?

A. No, never, never.

MR. JACOB: Your Honor, just one minute, please, if I could check my notes if the Court will indulge?

THE COURT: Of course.

MR. JACOB: Your Honor, I have no further questions.

THE COURT: All right, Mr. Collings or Mr. Acosta, do you have any questions for Mr. Guillot?

MR. COLLINGS: I do, Your Honor.

CROSS-EXAMINATION

BY MR. COLLINGS:
Q. Again, this is Chad Collings. I've got a few questions for you, Mr. Guillot. Now you're Junior; correct?
A. Yes, sir.
Q. And Mr. Klabert Guillot, Senior, is your father, the other plaintiff in this matter?
A. Yes, yes.
Q. All right. Just so we avoid confusion, if I call you Mr. Guillot, I'm talking about you, okay?
A. Yes, sir.
Q. All right. So Mr. Guillot, could you tell me -- you mentioned that you've been in the St. Tammany Parish Jail since December 18th, 2019; is that correct?
A. Yes, sir.
Q. All right. And you mentioned that you were in holding for how many days?
A. I believe it was 19. And I --
Q. Let me ask --
A. -- just -- go ahead.
THE COURT: Go ahead, Mr. Guillot, you can finish your answer if you have more.
THE WITNESS: Yeah, on the 19th day, they moved us to the back.
BY MR. COLLINGS:
Q. Well, Mr. Guillot, my records from the sheriff's office

would indicate you were in holding from December 18th to January 3rd. Is that incorrect?
A. That's incorrect.
Q. All right. What day did you go from the holding cell to somewhere else in the jail?
A. The 6th.
Q. January 6th. You're positive about that?
A. We didn't have a calendar. I'm pretty positive. I mean we didn't have a calendar, and it was pretty hard to find dates. But yeah, I mean, because it was day 18, at night, they came tell us that we were going to go back, and then they come get us the next day.
Q. All right. Well, let me just read to you what I have in our records. Our records indicate you were in Holding Cells 4, 3, 2, and 3 from the period of December 18 through January 2nd; and then on January 3rd, you were moved to Dorm C800, then C829. Is that right or wrong?
A. That is the dorm I'm in.
Q. All right. So the records indicating that you were assigned to that dorm on January 3rd and that bed on January 3rd, you're telling me that those records are wrong?
A. What day was January 3rd?
Q. What day of the week?
A. Yes, yeah. What day of the week? That's how we kept time. We didn't have a calendar.

Q. Bear with me. I'll look it up. January 3rd, I'm looking at the calendar in my phone, it looks like that was a Friday.
A. I'm pretty sure they moved us back on Saturday. But then again, that's three months ago. I'm not 100 percent sure, but I thought it was on Saturday we moved back. So I might be off one day or so. I'm sorry, my apologies.
Q. All right. So it is possible that these records are, in fact, correct, that you were in holding from the period December 18th through January 2nd, and that is correct; right?
A. How many days is that?
Q. That would be 16 days, I believe, as I count them.
A. I mean it's possible if that's what y'all records say. Like I said, I'm not 100 percent sure. We didn't have a calendar. We just counted on our fingers.
Q. Okay, all right. So you don't have any information that these records are somehow false, do you?
A. No, sir. I mean I've been incarcerated.
Q. Okay, all right. Well, let's talk about why you're there. Tell me the circumstances about how you ended up in the St. Tammany Parish Jail.
A. I got arrested.
Q. Tell me what you got arrested for.
A. Aggravated flight, aggravated assault with a motor

vehicle, resisting arrest, fugitive warrant. I think it's ten charges. There were ten charges if I'm correct.
Q. All right. As I appreciate it, you had an incident in Mississippi or there was an attempt to pull you over and that you then fled into Mississippi and were not apprehended; is that correct?
A. Would that, I mean, would that be admitting to guilt? I don't want to admit to guilt on something I'm still facing charges for.
Q. All right. Well, as I appreciate it looking at the records, and again, I may not have everything, but I understand that there was an incident that you may have been involved in -- let's do it this way.
Is it true that it's alleged that you fled into Mississippi and that it's alleged you escaped; is that correct?
A. Alleged, yes.
Q. And is it true that the sheriff's office then came to your house the next day, and is it true that it is alleged you tried to escape once again?
A. No, it is not -- that is false.
Q. They did not?
MR. JACOB: Objection, Your Honor.
THE COURT: What's the objection, Mr. Jacob?
MR. JACOB: I believe these are ongoing criminal charges.

THE WITNESS: Yes.

MR. JACOB: Pursuant to the Fifth, he should not be answering these.

MR. COLLINGS: It's a civil proceeding, Your Honor, and his refusal to answer under the Fifth Amendment is admissible and goes to the weight of his credibility. So if that's what his counsel is instructing him to do, I would ask the Court to take notice of that.

THE COURT: And that's fine, but he does have a Fifth Amendment privilege, and he does not need to incriminate himself.

Now the questions that I heard Mr. Collings asking are asking is it true that it's alleged whatever he is saying. So he is not asking him to incriminate himself. But Mr. Guillot, if you believe that answer would incriminate yourself, you may take the Fifth Amendment and say that it may incriminate you or just take the Fifth.

THE WITNESS: Okay, Your Honor.

THE COURT: Mr. Collings, you may ask the question.

MR. JACOB: Your Honor.

THE COURT: Wait, I'm sorry. Mr. Jacob, you have something?

MR. JACOB: Yes, just because I don't have the ability to have my client right in front of me, if I could just say that if the question is, "Is it alleged," then I'm okay with

that.

THE COURT: And that you're directing your client to that? I understand.

MR. JACOB: Correct.

THE COURT: Mr. Guillot, you already made mention that you don't want to say something that is going to incriminate you.

THE WITNESS: Yes.

THE COURT: If you believe, again, I'm going to advise you, if you believe that something is going to incriminate you, you may take the Fifth.

THE WITNESS: All right, Your Honor, thank you.

THE COURT: Just say, "I take the Fifth." Go ahead. We'll ask the attorney if he can rephrase it in some way, and if not, that is your constitutional right. So you may do that.

Go ahead, Mr. Collings.

BY MR. COLLINGS:

Q. Okay. Mr. Guillot, as I appreciate it -- and again, I apologize. I may not have all the records. But my understanding is that it is alleged that the sheriff's office went to your house the following day after the Mississippi incident, and it's alleged that you tried to escape, and a K9 was employed; is that correct?

Was that correct that I've alleged it correctly?

A. No, sir. It was two weeks prior to the alleged incident

where the K9 was deployed. It was not the next day. And it was not at my residence at all.
Q. Whose residence was that?
A. It was a friend of mine's residence that I was at that the St. Tammany Sheriff's department came to and arrested me.
Q. What's the name of your friend?
A. Bill.
MR. JACOB: Objection.
MR. COLLINGS: Bill who?
THE COURT: Sustained. Sustained.
THE WITNESS: I don't know his last name.
THE COURT: Sustained. Mr. Guillot, you don't need to answer that.
THE WITNESS: I'm sorry.
THE COURT: That's all right. When you hear somebody speak, please wait, and I'll advise you whether you need to answer it.
Proceed, Mr. Collings.
MR. COLLINGS: Okay.
BY MR. COLLINGS:
Q. All right. Have you been in the jail -- what charges are currently pending against you?
A. Aggravated assault with a motor vehicle, aggravated flight, possession of meth, and resisting arrest.
Q. All right. And are there any other charges pending

against you currently; do you know?
A. Yes. In Lafourche Parish.
Q. All right, I was going to ask you about that. So let's just go to that right now. I'm looking at some records that show -- and tell me if these charges have been resolved, and if so, how.
But the records I have show that you have charges or you were arrested in Lafourche Parish for possession of methamphetamines, possession of drug paraphernalia, resisting an officer with force or violence, unauthorized entry of an inhabited dwelling, contempt of court, contempt of court, contempt of court, contempt of court, and prohibited acts schedule II and drug paraphernalia; is that correct?
Are all those your charges currently pending from Lafourche?
A. Yes.
Q. And were those -- have any of those charges been resolved?
A. No.
Q. You have contempt of court here. Is that -- why are you charged with contempt of court to your knowledge?
A. I have contempt of court for Lafourche Parish because I missed a court date. I was out of town. All them charges that are pending over there, them contempt of courts are for them charges.
Q. Okay. It looks like the arrest date on these Lafourche

charges was April 13, 2019. Does that sound correct?
A. Yes.
Q. I'm looking at another arrest date from Lafourche Parish of August 13, 2019. That's charge 1, prohibited acts drug paraphernalia; charge 2, prohibited acts schedule II. Do you know anything about those charges?
A. Yeah. I was arrested, yes.
Q. Okay, so that was another arrest. Now were those charges resolved?
A. No. I'm still fixing in the court.
Q. All right. Were you ever arrested in Jefferson Parish?
A. Yes.
Q. When were you arrested in Jefferson Parish?
A. 2015, I believe. April 13th, I believe, or April 12th.
Q. All right. And the records I've got are not very clear to me. So tell me, do you know if those charges were resolved?
A. Yes.
Q. All right. How were they resolved? Did you plead guilty? Did you get acquitted? Tell me what happened.
A. I took probation.
Q. Okay. So you pled guilty; correct?
A. Yes, yes.
Q. And what did you plead guilty to, sir?
A. Possession of meth three counts.

Q. Two counts of possession of methamphetamines?
A. Three. Three counts.
Q. Three?
A. Three counts, yes.
Q. And how long were you on probation for that, for those three charges?
A. About three years.
Q. You believe that was 2015?
A. It might have been 2016. I'm not, I'm not sure. It might have been 2016. Like I said, I don't have a computer to look at them. I'm incarcerated.
Q. All right. The records I have, have two arrests in Jefferson Parish, one from April 18th, 2014 and one from April 12, 2016. Those were both arrests --
A. Yeah, yes, sir.
Q. -- in Jefferson Parish.
A. Yes, sir.
Q. Are those the three charges that you pled guilty to, those two different arrest dates?
A. No, no, sir. The one for 2014 was possession of marijuana.
Q. All right. And what happened with that arrest and charge?
A. I took one year of probation.
Q. Okay. Was that a misdemeanor or a felony; do you know?
A. I'm not sure. It was probably -- it's one year probation.

I'm not sure how that works. It wasn't on my record. So no, it might have been a misdemeanor.

Q. All right. You also have charges against you for what I guess is a wildlife and game charge?

A. That's the charge with the marijuana. I was on Elmer's Island beach in Grand Isle, and they arrested me.

Q. All right. So other than the arrest you just told us about in Jefferson Parish in 2014 and 2016, the arrest in Lafourche Parish which I believe were all in 2019; is that correct?

A. Yes.

Q. All right. Well, I'm looking at another Lafourche charge for --

A. Yeah, yes, sir.

Q. I'm seeing a Lafourche charge from October 15, 2018.

THE COURT: Mr. Collings, let me interrupt you for one moment because I thought I heard -- this is the judge. I thought I heard somebody else join the hearing.

Did someone else join the hearing? Did anyone else just join this call?

MR. COLLINGS: We may have lost somebody, Judge.

THE COURT: It may have been.

All right. I'm sorry, Mr. Collings. Please proceed with your questioning.

BY MR. COLLINGS:

Q. Okay, so I'm looking at another arrest from October 15, 2018 in Lafourche Parish. Do you know what happened with that arrest?
A. A child support warrant, yes.
Q. And what happened with that charge? Did you plead guilty? Was it --
A. I had to serve 90 days for a child support warrant, but I did 60 days and paid my child support.
Q. Okay, all right. Have you been arrested in any other jurisdictions that we have not talked about?
A. No. You missed one Lafourche one, though, from 2016.
Q. Okay. What was that one?
A. That was, I got -- when I got out of Jefferson Parish in April, I had Lafourche warrants also that I had to deal with. I just took probation for it too, a possession of meth.
Q. I'm looking at that one right now.
A. Okay.
Q. It says arrest date May 12, 2016, Lafourche Parish. You got three charges: One for contempt of court, one for distribution of heroin, and one for distribution of methamphetamines. Did you plead guilty to any of those three charges?
A. They dropped the charges down to possessions.
Q. On the two, heroin and methamphetamines?
A. Yes, yeah. The contempt was for a speeding ticket.

Q. All right, and did you plead guilty to contempt?
A. The contempt, I paid the fine.
Q. All right. So that's a plea of guilty; correct?
A. I took probation.
Q. Okay. So you pled guilty to possession of heroin and possession of methamphetamines and contempt of court from 2016; correct?
A. Yes.
Q. All right. And you also pled guilty for those Jefferson Parish charges; right?
A. Yes.
Q. Are there any charges in any other states or have you been arrested in any other states besides Louisiana?
A. No.
Q. All right.
A. Well, I take that back. I was.
Q. Tell me about that. When and where?
A. Mississippi, Mississippi.
Q. When, sir?
A. I don't remember the exact time. It was a shoplifting charge.
Q. Do you know if it was in the last five years, ten years?
A. Yes, it was two years ago or something, three years ago. I didn't plead guilty or nothing. The charges were withdrawn.
Q. Okay. Other than that, any other arrests or charges in

any other states?
A. No, sir.
Q. Okay. Now you mentioned a moment ago about a fight in the jail when you were being asked questions by your lawyer. Do you remember that?
A. Yes.
Q. Isn't it true, sir, that you yourself have been in altercations in the jail; is that right?
A. Yes, I was. Yes.
Q. Is it true, sir, that there's -- on one occasion, you walked up to a gentleman who was sitting down and punched him in the head? Do you remember that?
MR. JACOB: Objection, Your Honor.
MR. COLLINGS: Do you remember that, sir?
THE COURT: Wait, excuse me. Mr. Jacob, you have an objection?
MR. JACOB: Yes, objection to relevance.
THE COURT: I'm going to give him some leeway. It goes to credibility. But it's time to move on. What was your question, Mr. Collings?
MR. COLLINGS: He mentioned there was a fight in a holding cell. I've got video evidence that suggests he walked up to an individual who was sitting down on the floor and punched him in the head, and I'm asking him if that is true or not.

THE WITNESS: Yes.
MR. JACOB: Objection, Your Honor.
THE COURT: Objection noted. Overruled. Mr. Guillot may answer.
THE WITNESS: Yes, that took place.
BY MR. COLLINGS:
Q. All right. And as a matter of fact, sir, you talked about earlier that you had only been out of the jail, other than to shower, one time on Christmas; is that right?
A. Yes. We went outside, yes.
Q. Okay. But for the fight you just told us and admitted to, isn't it true that the gentleman you walked up to and punched in the head got up and started punching back, and in fact, put you on the ground, and they had to take you out on a gurney; is that right?
A. Nope, you're 100 percent wrong, sir. Wrong guy.
Q. Wrong guy. That wasn't you?
A. Nope, it definitely was not me. That was Jonathan something if I recall. You got the wrong fellow.
Q. Okay. So what was the -- what happened after you punched that gentleman in the head? What happened?
A. I didn't punch that guy. That's a whole different occasion. I thought you were talking about a different incident. The incident I'm talking about, a man stepped on my face, and the whole place was overcrowded. And I hit him back

because he stepped on my face because of the overcrowdedness. That would be the incident I'm talking about. His name was Derek Bunches.
Q. All right. I asked you a very specific question, sir. There was a man sitting down. You walked up to him and punched him in the head, and you admitted to that. Are you taking --
A. Yes, 100 percent. You can review the video evidence. It's not me. I know the incident you're talking about.
Q. All right, don't guess at what I'm talking about. My question is a very simple one. Isn't it true that you punched someone in the head who was sitting down and you were standing over them?
A. No.
MR. JACOB: Objection, Your Honor.
THE COURT: Okay. Everyone, stop. Mr. Collings, I will instruct the witness what he can answer and how he can answer. You ask the questions. Opposing counsel will make any objections.
Now, Mr. Jacob, you have an objection right now, sir?
MR. JACOB: Yes. This was asked and answered. He said it was not him, that the --
THE COURT: Right, sustained. Sustained. Move on.
BY MR. COLLINGS:
Q. All right. Have you had any other fights in the jail?
A. Yes.

Q. How many?
A. Two.
Q. So there have been -- in the time that you've been in the St. Tammany Parish Jail from December until now, you've been in a total of three fights; is that correct?
A. No. It's during the -- one, one fight in the holding tank, and yeah, one fight in the holding tank and two fights in the dorm. Yes, three.
Q. Okay. The holding cell, we talked about; and you moved to C800. Am I correct in that?
A. Yes.
Q. And that's a housing tier; correct?
A. Yes.
Q. And does that housing tier, is that where you are presently incarcerated?
A. I was up until yesterday, yes.
Q. All right. Where are you presently incarcerated?
A. It's a small tier. I think it's called A600.
Q. Okay. Do you know why you were moved to A600?
A. Quarantine.
Q. Okay. Why? Do you know why?
A. Because I went to the University Hospital for a checkup on my hand.
Q. Ah, all right. So as I appreciate it, sir, you went to the University Medical Center to see an orthopedist; is that

correct?
A. Yes.
Q. And the reason why you were there is because you injured your hand punching someone; is that correct?
A. No.
Q. All right. Tell me how you injured your hand.
A. I fell in the shower on March, I want to say it was the 17th or 18th.
Q. March 17th or 18th of this year?
A. Yes.
Q. And when you came back to the jail, because you had left the jail, you have to go in quarantine; is that correct?
A. Yes, that is.
Q. And do you know how long you will be in quarantine?
A. I think they said 10 or 14 days. I'm not 100 percent.
Q. Okay, all right. Can you tell us your knowledge about all the protocols that are in place for COVID-19 at the St. Tammany Parish Jail?
A. Can you rephrase that? Can you phrase your question better on like what are you exactly asking for? Protocols, I'm not faculty of the jail, you know. I don't work here. I'm just incarcerated here.
Q. Right. Well, there is testimony in the record already from the warden at the St. Tammany Parish Jail detailing in exact detail all of the various protocols that are in place at

the St. Tammany Parish Jail for dealing with COVID-19.
My question is very simple. Do you have any reason to disagree with any of that testimony?
MR. JACOB: Objection, Your Honor.
THE COURT: Sustained.
BY MR. COLLINGS:
Q. I'm going to read to you some portions of an affidavit from the warden.
Let me back up. I skipped one question. Do you -- hold on one second. Have you made -- before I get into the COVID-19, sir, let me ask you this. Have you made any kind of grievance, have you filed any kind of grievance in the jail? Do you know what that is?
A. No, I don't. I'm not sure what you're saying.
Q. All right, there is a thing called administrative review where --
MR. JACOB: Again, Your Honor.
THE COURT: What's your objection?
MR. JACOB: He asked if he knows what a grievance is. He said no. But there's no foundation as to there being a grievance process in the facility.
THE COURT: Okay. And Mr. Collings, I'm going to overrule it and allow him to ask the question and explain what you're asking.
MR. COLLINGS: All right.

BY MR. COLLINGS:
Q. Mr. Guillot, there is testimony in the record already from the warden that there is an administrative review process for dealing with grievances filed by inmates.
My question for you is this. Have you ever filed a grievance while you've been incarcerated at the St. Tammany Parish Jail from December 18, 2019 through today's date?
MR. JACOB: Objection.
THE COURT: What's your objection?
MR. JACOB: It's asked and answered. He asked him about a grievance. He said he doesn't even know what it is. So if he doesn't know what it is, he couldn't have filed one.
THE COURT: Okay, overruled. I'm going to allow him to answer.
Mr. Guillot, did you understand the question? Have you ever filed a grievance?
THE WITNESS: I don't know what a grievance is. I just don't know what a grievance is.
THE COURT: Okay.
BY MR. COLLINGS:
Q. So is it safe to say then, sir, that you've never filed one because you don't know what it is?
A. Yeah, yes, sir.
Q. Okay, fair enough, I'll move on. There is testimony in

the record, sir, from the warden of the St. Tammany Parish Jail that there have been, as of two days ago, zero incidences of COVID-19 infection within the St. Tammany Parish Jail.

My question to you is this. Do you have any information that contradicts that sworn testimony?

A. We asked the guards if they had tests. They said they don't even have tests here to test people. So they couldn't even tell us. They said they just check their temperatures, but they have no tests to test them if they have COVID-19.

Q. That wasn't my question, sir.

A. Oh, I'm sorry.

Q. And I appreciate you trying to answer. My question is more tailored and more narrow than that. Do you have any evidence that anyone has been infected with COVID-19 from December 18 through today's date at the St. Tammany Parish Jail?

A. No.

Q. All right. Do you have any evidence that any of the screening processes already in the record as sworn to by the warden for COVID-19 are not being implemented?

A. Not of my knowledge. I don't know.

Q. Do you have any information that the plan for quarantine to take people who do test positive and bring them into the medical area of the jail for further observation, do you have any information that that is, in fact, not true?

A. No.
Q. Do you have any information that should the medical area of the jail become overwhelmed that there is, in fact, a plan in place to move inmates who test positive to another area of the jail?
A. No, I don't know anything.
Q. And if that area should become overcrowded, do you have any information that suggests that the plan to bring them to Camp J at Angola is, in fact, not going to happen?
A. I don't -- not of my knowledge. I don't know, sir.
MR. COLLINGS: Okay, one second, sir. I'm just looking at some records.
BY MR. COLLINGS:
Q. Other than the issues you've described to your attorney about a blanket seeming wet, about the holding cells not being cleaned to your satisfaction while you showered, and there are some times -- and the only time you were taken out of holding other than to take showers was for a brief period of time on Christmas, and this is only about your time in holding, do you have any other issues that you would -- complaints that you would like to address?
MR. JACOB: Objection, Your Honor.
THE COURT: What's your objection, Mr. Jacob?
MR. JACOB: Just mischaracterizes his testimony. I mean he talked about much more than what was just stated.

THE COURT: Okay, overruled. I'm going to allow him to answer.

Mr. Guillot, the question I heard was: Do you have any other complaints about your time while in the pretrial or detention holding cells?

THE WITNESS: No, no, ma'am.

BY MR. COLLINGS:

Q. All right, let me ask you this, sir. There is an allegation in the complaint that the sheriff is violating Title 22, a section of Title 22 dealing with the amount of time individuals should be kept in, quote, individual, closed quote, holding cells.

Do you know what an individual holding cell is?

A. No, sir.

Q. All right. And you testified earlier, and tell me if I'm wrong, that the holding cells that you were in were not individual; is that correct? Because there was more than one person in them; correct?

A. Yes, sir.

Q. Do you know if the sheriff of St. Tammany Parish even has individual holding cells?

A. Not to my knowledge. Actually, they have them in the medical tier, I believe.

Q. Okay. Is that what you would call suicide watch cells?

A. I believe that's what they call them. I'm not sure

100 percent because I never went to them.

Q. All right, that was my next question. So you've never actually been inside any individual holding cells. Am I correct in that?

A. Yes.

MR. COLLINGS: All right. I may be very close to the end, Judge, if I could just have a brief second to look through my notes.

THE COURT: Of course.

BY MR. COLLINGS:

Q. All right, sir, do you know what date this lawsuit was filed?

A. No, sir.

Q. If I were to tell you it was filed on March 22nd, 2020, do you have any reason to disagree with that?

A. No, sir.

Q. Okay. And is it true then, sir, on March 22nd, 2020, you were no longer in the holding area; correct?

A. Yes, sir.

Q. You've been in a tier since January of this year; correct?

A. Yes, sir.

MR. COLLINGS: That's all I have, Your Honor. Thank you.

THE COURT: All right. Any redirect, Mr. Jacob?

MR. JACOB: No, Your Honor.

THE COURT: Excuse me one minute, Mr. Guillot, to see.

I have just a couple of questions. I want to make sure I understand. Sir, you testified that you are currently in quarantine; is that correct?

THE WITNESS: Yes, ma'am.

THE COURT: And explain to me why you're in quarantine, sir.

THE WITNESS: Because I left the facility to go to University Hospital to get my hand checked.

THE COURT: Oh, okay. So it has nothing to do with COVID-19, the virus?

THE WITNESS: Well, they said for precautions.

THE COURT: Okay. So as a precaution so that you didn't bring something back, you're quarantined for, you said, 10 to 14 days?

THE WITNESS: Yes, ma'am.

THE COURT: And do you know if that's the policy at the jail?

THE WITNESS: That's what I was informed. If anybody leaves the facility, they have to go to quarantine for 10 to 14 days.

THE COURT: I understand. Thank you, sir. And when did you return to the jail and were put in quarantine?

THE WITNESS: Yesterday morning.

THE COURT: Did you testify, I may have missed this,

but you were at any other time in quarantine during your time in St. Tammany Parish Jail?

THE WITNESS: No, ma'am.

THE COURT: Oh, okay, I understand. Thank you for clarifying that. All right.

MR. JACOB: Your Honor?

THE COURT: Yes, Mr. Jacob.

MR. JACOB: Devon Jacob, can I redirect based on the question that you asked?

THE COURT: Yes, sir, go ahead.

REDIRECT EXAMINATION

BY MR. JACOB:

Q. Mr. Guillot, you just testified about what you understand to be the policy today; correct?

A. Yes.

Q. Do you know what the policy is going to be tomorrow?

A. No, sir.

MR. JACOB: Thank you. No further questions.

THE COURT: All right. Mr. Guillot, the same as I said to Mr. Baqer, you are welcome if the jail allows, you are welcome to stay on the phone, or you may hang up and leave the hearing. You are excused and no longer have to testify and will not be allowed to testify further, but you certainly may remain on as a party to this matter and listen.

THE WITNESS: All right, thank you.

THE COURT: All right, sir.

Mr. Jacob, Plaintiffs?

MR. JACOB: I believe I'm going to be passing to one of my colleagues to continue from here, Your Honor.

THE COURT: Who would that be?

MS. RAVEENDRAN: Your Honor, this is Bhavani Raveendran for the plaintiff. If the Court is okay with it, I can -- under normal circumstances, we would possibly present on the Elmo or in person some of the exhibits and point out particular admissions to the Court to assist with the review and decision-making process that you have to do with all of these documents.

Would it be appropriate at this time if I just present information from two exhibits in particular, one of the defendant's exhibits and one from plaintiff's exhibits, not in the way of argument, but just to point sections out to this Court?

THE COURT: Of course. I have them in front of me. So tell me what you're referencing, and you certainly may.

MS. RAVEENDRAN: Thank you, Your Honor. I will be referencing Defendant's Exhibit 1, the affidavit.

THE COURT: From Major Kelly?

MS. RAVEENDRAN: Yes. And I will be referencing Plaintiff's Exhibit 5, the CDC Guidelines.

And just briefly, Your Honor, paragraph 40 of

Defendant's Exhibit 1 --

THE COURT: Excuse me one moment, Ms. Raveendran.

Did anybody just get on the call in this hearing, or did somebody hang up? That's two questions. Did anybody just join the hearing?

Okay, I think somebody probably just hung up.

All right, please proceed.

MS. RAVEENDRAN: Thank you. Actually, I would like to refer to Plaintiff's Exhibit 5, the CDC Guidelines. CDC Guidelines indicate that several times a day, correctional facilities are to clean and disinfect surfaces and objects that are touched frequently, and those objects included toilets, sink handles, and toilet handles.

The affidavit, Exhibit 1, in paragraph 40 indicates that high-touched items are sanitized twice a day, but does not indicate if toilets are included as high-touched items and does not indicate if the benches mentioned are also including those in the holding cells.

And going forward, back to Plaintiff's Exhibit 5, the CDC Guidelines ask that correctional facilities provide paper towels for hand washing, tissues to be available, and no-touch trash receptacles be available to inmates. And it also requests intensified cleaning and disinfecting.

Exhibit 1, the defendants have presented in paragraph 44 indicates that inmates in dormitory tiers and housing units

have dedicated cleaning supplies to disinfect all surfaces that are provided twice daily. It indicates in paragraph 45 that dormitory tier housing units are provided dedicated supplies, paper towels, toilet brushes, mops, brooms, dustpans, and garage bags twice daily, and paragraph 45 indicates that restrictive housing units are cleaned at least once daily by an inmate or worker.

But paragraph 42 is the only paragraph regarding cleaning of the holding area, and it indicates that pressure washing of the holding area is provided once a week.

Moving back to Plaintiff's 5 --

MR. COLLINGS: Your Honor, could I enter an objection, Your Honor? This is Chad Collings.

THE COURT: Mr. Collings, yes.

MR. COLLINGS: I'm not really sure what's going on right now. It would seem to me if they're going to put on evidence, they need a witness. Otherwise, this attorney who is speaking -- and I'm sorry, I didn't write down who it was.

MS. RAVEENDRAN: Bhavani Raveendran.

MR. COLLINGS: Okay. It sounds like this is witness testimony. Otherwise, the document speaks for itself. It's in evidence. So I don't know what -- why the attorney is reading to you what's already in evidence. She's not a witness.

THE COURT: Okay, I hear you, and I understand.

Ms. Raveendran, when you asked if you could point

matters out, I said yes. But this is not argument, and this is not the appropriate time for argument because it's just giving you extra time for argument.

All of the exhibits, Mr. Collings is correct, are in evidence and before me. And I think what you are doing, while I appreciate where you are going with it, I think is better left for argument at the end.

MS. RAVEENDRAN: Would Your Honor -- I understand your position, of course, Your Honor. We are trying to present the information so that instead of looking through hundreds of documents, you can see where the plaintiffs would like Your Honor to look in the exhibits. Could I give Your Honor --

THE COURT: That's exactly, that's exactly what the point of closing arguments are, to stress what you think is important in your case. Ms. Raveendran, I appreciate it. There are hundreds of documents, and I have spent every day this week looking at every document. So I'm well aware of them, and I will hear you or whoever, one of your co-counsels, in closing arguments.

Is there any other evidence that plaintiffs would like to present?

MS. RAVEENDRAN: Your Honor, I can --

MR. JACOB: Your Honor, Devon -- I'm sorry, go ahead.

MS. RAVEENDRAN: The point of this CDC document that I wanted to bring to the Court's attention, but I can --

THE COURT: I look forward to that in argument. I have the entire document in front of me.

MS. RAVEENDRAN: Of course. And then just referring briefly to Plaintiff's Exhibit 9, the Johns Hopkins Coronavirus Map Testing and Update regarding Louisiana, that is the website that was included in the list of exhibits, but not contained as a physical exhibit. If Your Honor would permit me to give the update as of April 9, 2020 for St. Tammany, Louisiana.

MR. COLLINGS: We would object, Your Honor. It sounds like she wants to testify about an exhibit. I think the Court can take cognizance of whatever it deems necessary from whatever is publicly available.

THE COURT: I will sustain that objection.

But I do have a question, Ms. Raveendran, that you can help me with. Is the website updated? And if you're drawing my attention to a website, once I look at it, will it automatically be updated and I'll have that information?

MS. RAVEENDRAN: Yes. So the Johns Hopkins Coronavirus Map is updated daily, and you can click on the map for any specific state. And St. Tammany itself is its own city that specifically -- or not city. It's its own parish; so it has its own bubble. And if you click on the bubble, it will tell you that information up to date. So you might have different information for April 10th.

THE COURT: Okay, I understand that, and I appreciate

that.

MR. JACOB: Your Honor, Devon Jacob, if I can just on that point since I've spent a lot of time on that website, if you look at it on a mobile device, it actually does not show all the information.

THE COURT: I'm not looking at it on a mobile device.

MR. JACOB: Okay. I was just going to say on a computer it actually will show it all.

THE COURT: And that's the way I'm looking at it. Thank you, sir. Anything else from plaintiffs?

MR. JACOB: No, Your Honor.

THE COURT: All right, Mr. Jacob, you rest your case?

MR. JACOB: Let me just check with my team electronically, please, before I answer that question.

THE COURT: Of course.

MR. JACOB: Yes, Your Honor, we rest our case.

THE COURT: All right. Mr. Collings, you've already put into evidence six exhibits which are before the Court. Do you have anything further?

MR. COLLINGS: At this time we would ask for a directed verdict in favor of the defendants. I don't think the plaintiffs can meet their burden of proof with the evidence that is now before you, Your Honor.

THE COURT: You know what, I'm going to hold off ruling on that and have you present whatever other information

or exhibits that you want to present, and I'll then rule on that.

MR. COLLINGS: Okay. Well, Your Honor, at this time we would just reiterate that we've already placed into evidence the affidavit with the attachments from the warden. We have no other evidence to submit to the Court. So that is the close of the evidence for the defendants in this matter.

THE COURT: Okay. Then I will hear -- I will rule on your motion for directed verdict. Do you want to make a separate argument as to that?

MR. COLLINGS: I do, Your Honor. It's very simple. I don't believe based on the record you have in front of you that the plaintiffs have come even remotely close to carrying their burden. I don't think closing arguments are even necessary. Their evidence is what it is, and it is wholly, wholly lacking. They do not have enough to meet their burden under Rule 65.

THE COURT: Okay. Plaintiff, Mr. Jacob or anyone for plaintiff, would you like to respond?

MR. JACOB: Yes, Your Honor. I'm going to have Mr. Romanucci respond to that argument.

THE COURT: Mr. Romanucci.

MR. ROMANUCCI: Yes, Your Honor, just give me -- can I have maybe 15 seconds to get my papers in order? This is not closing. This is just response to the motion for directed verdict; correct?

THE COURT: Correct.

MR. ROMANUCCI: So Your Honor, the response is that, as you've heard, St. Tammany Parish has a duty to its inmates. Those inmates are classified as detainees. Those detainees are either considered new arrivals or they are placed into, you know, the dormitory which is a longer-term situation than the holding cell.

I believe that we have met our burden in order for the defendant's motion for directed verdict to be denied based upon the fact that all the detainees are at risk based upon the pandemic that's been declared in this country as of March 11th and the virus that was in existence for over ten weeks prior to that time. Everyone is at risk in the St. Tammany Parish Jail, and that includes the new arrivals, the detainees, the employees, and the community. We have met our --

THE COURT: You know what, I apologize, Mr. Romanucci, for interrupting you. But I know you're going to give the closing. And I really think, Mr. Collings, that this is going to end up being much of Mr. Romanucci's closing arguments in responding to the motion for directed verdict which is all wrapped up into one. And so I'm going to ask that you go ahead and consolidate it and make your closing argument as to both, and then I will rule on it.

And I apologize for that. But otherwise, we're going

to draw this out even more and have almost identical closing arguments or arguments as to the motion for directed verdict and closing arguments if I deny the motion for directed verdict on this. We're going to have one closing argument.

So with that, I am going to have Mr. Romanucci, because I believe you're going to be arguing for the plaintiffs, I'm going to have you begin your entire closing argument. And you had 10 minutes left, all right?

MR. JACOB: Your Honor, Devon Jacob.

THE COURT: Yes.

MR. JACOB: Your Honor, in light of the fact that he needs to respond to the motion as well, can the Court indulge with a little bit more time?

THE COURT: Mr. Jacob, you're a fine co-counsel there. Of course. How much time? How much additional time would you like to respond to the motion for directed verdict?

MR. ROMANUCCI: So Your Honor, this is Tony Romanucci, and I appreciate Mr. Jacob for jumping in there.

What I would ask for is this. If you do give us any additional time, I promise you that we won't go over 15 minutes. But what I am asking, and I hope that Your Honor can indulge this, is because we certainly believe that we have very important legal arguments and factual arguments, I would like co-counsel Nicolette Ward to begin the close with the legal argument which I think is equally as important as the

facts, and that's how we would like to split it up. Maybe 5 to 6 minutes from Ms. Ward and then I'll take up the 10 or 9 minutes or less if Your Honor would indulge that.

THE COURT: That's fine. I have no problem with that. And do you need -- because my case manager normally times people or looks at the time. Are you going to self-time, or would you like us to advise you when five or six minutes is up?

MR. ROMANUCCI: I would appreciate if the Court would advise us. And Ms. Ward is aware of her time constraints, and she's listening, she's on, she's aware. And so at the six-minute mark, if she does go to six minutes, if the Court would give us the warning, and then I will fill in. Thank you.

THE COURT: Melissa, will you do that?

DEPUTY CLERK: Yes, ma'am.

THE COURT: All right, thank you.

All right, Ms. Ward, please begin.

MS. WARD: Thank you very much, Your Honor. For the record, this is Nicolette Ward speaking.

Your Honor, I want to thank you for taking the time and all of your staff for taking the time on this very important matter today.

Plaintiffs have brought allegations in their complaint about the conditions at the St. Tammany Parish Jail. The lawsuit claims that crowded, unhygienic conditions with limited cleaning, and deprivation of soap. Your Honor has

heard testimony now of inmates lying on the concrete ground with wet blankets with their heads in urine. You've heard of inmates' exposure to vomit, blood, used toilet paper, to open wounds, and the inability to wash their hands. Some so crowded that they couldn't lie down.

And Your Honor is well aware, so I won't belabor the point, the duty that St. Tammany Parish has to its inmates. Mr. Romanucci said in opening statement, this duty is because the sheriff is in a unique constitutional position to provide and oversee for those who cannot do that themselves. And I want to be clear that duty exists to each and every inmate and every detainee regardless of what they're being held for. Those duties are the same for both inmates under the Eighth and pretrial detainees under the Fourteenth.

And as Your Honor said at the top of this hearing, these are strange times. Now more than ever, the responsibility held by the sheriff is life and death to those that they're overseeing. Your Honor is also aware that the Fifth Circuit has held unequivocally that conditions of confinement can create constitutional violations either alone or in combination with one another. This is particularly true when those conditions have the effects they're acting with and amplifying one another to deprive the inmates. The Fifth Circuit has held that overcrowding, deprivation of adequate bedding, exposure to bodily fluids, and denial of hygiene can

and do work in combination to deprive inmates of their very basic rights to health, to safety, and to bodily integrity. That's true even under the best circumstances.

Right now, we're in an emergent situation. We're under a pandemic. There is no vaccine. There's no antiviral treatment, and there's no cure for COVID-19. This disease is transmitted via droplets that can be transmitted during either close interpersonal contact, or these droplets can survive on surfaces for days and spread the disease. There is evidence that people with the virus can transmit it to other people even when they are not yet symptomatic. People can be transmitting it without knowing that they're doing it. But there are clear-cut ways the CDC has given us to prevent the spread of that: Social distancing and increased hygiene.

The violations raised in our complaint and now in the instant motion that's before you and the evidence presented before the Court speak directly to the potential for the transmission of the virus. We're seeing a number of people in and out, packed closely together without the ability to --

THE COURT: Ms. Ward, I'm going to interrupt you for a moment, and I apologize. But I do have questions, and I don't know if they're better addressed to you at this point or to Mr. Romanucci when he begins.

Are you going to address the statements sworn to in the affidavit by the defendant by Major Kelly about the

policies in place at the jail now to address this?

MS. WARD: Yes, Your Honor, I think I'll be addressing that briefly, and Mr. Romanucci will also be addressing that briefly.

THE COURT: Okay, because I'm going to tell you, I want that addressed. Go ahead, and I apologize for that. But I will have some questions.

MS. WARD: Absolutely. Your Honor, the closest detainees of all these inmates, when we add in contact by detainees with droplets of human bodily fluid, that's urine, vomit, blood, or the respiratory droplets normally transmitted during talking or coughing or sneezing, I don't have to tell you or anyone here today the danger that that poses. And the limited provision of cleaning measures, including, regular access by detainees to soap and cleaning supplies will only amplify the risk. Droplets can sit there on shared services for days. And in a space that small, every detainee will be in contact with every surface in there, including, surfaces that they have to use like a toilet. This is why the CDC recommends disinfecting high-touch areas several times a day.

To go through some of the things Ms. Raveendran had addressed earlier that we wanted to address in closing statements, we're seeing comparisons with the CDC Guidelines, and we're seeing that there is no indication -- there are certain indications as to what's happening in the general

population, but there are areas where we're seeing a very particular concern as to holdings that are not addressed. While we have information that general population high-touch items are being sanitized multiple times a day, we don't have information about whether disinfection is happening with the rest of the detainees, including, toilets, sink handles, and things like that.

We're hearing that inmates -- that pressure washing of the holding areas has been increased to once a week. We don't have evidence of how often that was happening before, but obviously less than that. But we don't have indication of what's being disinfected within these cells. CDC Guidelines very clearly call for intensified cleaning and disinfecting.

We're also hearing that inmates have access to a bar of soap that they can use at any time, and I'm referring to inmates within the -- the detainees within the holding cells. The CDC is very clear that you have to have continuous access to hygiene supplies, no-cost access to hygiene supplies, and to liquid soap whenever that is possible because of the risk of contacting droplets and sharing droplets among individuals.

Your Honor, other courts including the Middle District of Pennsylvania, Southern District of New York, Central District of California have acted under these emergent circumstances. Middle District of Pennsylvania recognized what's called, "the very real risk of serious, debilitating

illness or death. There can be no injury more irreparable."

And so we submit to Your Honor that the time to act with respect to the coronavirus is now. We would respectfully submit to you that granting our request for relief is the way to ensure that the rights of inmates and detainees are preserved and that their health is protected under these emergent circumstances.

DEPUTY CLERK: Attorney Ward, it's Melissa, the judge's case manager. Your six minutes is up.

MS. WARD: Thank you very much.

THE COURT: Thank you. Was that the conclusion of your part of the argument, Ms. Ward?

MS. WARD: Yes. As to my part of the argument, I respectfully pass it along to my colleague Mr. Romanucci to use the remaining time.

THE COURT: Perfectly timed. Let me ask you a couple of questions before you pass it on to Mr. Romanucci.

And it won't get into your time, Mr. Romanucci.

Ms. Ward, do you want to give me a citation for what you just cited from the Middle District of Pennsylvania?

MS. WARD: Yes, Your Honor. One second here.

MR. COLLINGS: Your Honor, this is Chad Collings. I would just note an objection if this is something that's not in their pleadings or any of their briefs. Now we're bringing in, in closing argument case law that's never been addressed. We

never had an opportunity to look at or address ourselves. I think it's improper.

THE COURT: All right, your objection is overruled. Bringing case law to the attention of the Court is always appropriate.

MS. WARD: That Middle District of Pennsylvania case, Your Honor, is T-H-A-K-K-E-R, *Thakker versus Doll*, D-O-L-L. And I have Lexis citation, Your Honor. I don't know if that's going to be helpful to the Court, but I can provide that.

THE COURT: Yes.

MS. WARD: 2020 U.S. District, that's Lexis, No. 59459 at paragraph 10. That's the Middle District of Pennsylvania.

THE COURT: And are those facts from that case similar to the facts that we're addressing here?

MS. WARD: Yes, Your Honor, it's addressing crowded conditions within a prison in conjunction with alleged hygienic violations.

THE COURT: And was there any evidence in the record in that case of action, such as we have here in this case, that the jail has taken to address this pandemic?

MS. WARD: One moment, Your Honor.

THE COURT: Ms. Ward, I don't mean to put you on the spot. Everybody's got a lot that they've been doing. I can look up the case. I just wanted to ask the question because as you know the facts in each case vary. So I can look at it.

I have another question. Go ahead. Do you want to answer something?

MS. WARD: Oh, I was just going to say that to the extent to ameliorate counsel's concerns or if the Court wishes, we could also submit very brief supplemental briefing on this issue.

THE COURT: Thank you. I don't think that's necessary. There's plenty of briefing.

MS. WARD: Thank you, Your Honor.

THE COURT: Ms. Ward, just so the record is clear, the CDC Guidelines that you and your co-counsel have talked about, I have the entire guidelines, and they're called Interim Guidance on Management of Coronavirus Disease 2019, COVID-19, in Correctional and Detention Facilities. For the record, is this a law?

MS. WARD: They're not laws, Your Honor, but the CDC can issue incredibly, incredibly helpful guidelines as to limit the spread. At these times, we look to the federal government and the federal oversight, especially in light of this pandemic, to give us the best ideas as to how these conditions can best be managed.

So while we concede that this is not a law, we concede that it should have great weight in Your Honor's consideration given that this is the best information we have now as to how we can control coronavirus, particularly,

particularly within the context of jails.

THE COURT: I appreciate that. I just wondered, for the record, these are guidelines, best practices. Thank you, Ms. Ward, very helpful.

Mr. Romanucci.

MR. ROMANUCCI: Thank you, Your Honor. And I will take any questions that Your Honor has also following my shorter closing here.

Your Honor, with respect to COVID-19, it's also referred to as novel coronavirus because, indeed, it is novel. It's new. And the defendant, in its own response to our motion for preliminary injunction, referred to this virus causing a, "global sea-change that has occurred as a result of this virus." And that is their quote in their brief. So indeed, if we're going to continue on with business as usual in the realm of assumptions we once made about contact, infection, hygiene, that's all thrown out now. It's all thrown out the window.

Indeed, it's even been proclaimed publicly that as a society we may never be able to resume shaking hands again. So what does that mean then for jail and prisons if we possibly have this ability to never ever shake hands again because we may be spreading the virus by having this close social contact?

So Ms. Ward appropriately pointed out that the CDC Guidelines are guidelines. They are governmental guidelines that have been made out for the jails and the prisons for

recommendations. And if Your Honor looks at Exhibit No. 5 page 2, it clearly points out what I referenced in my opening statement. That incarcerated, detained persons live, work, eat, study, and recreate within congregate environments heightening the potential for COVID-19 to spread once introduced.

Now we don't have any evidence, because of the lack of testing, that the virus does not live on anybody within that jail. Therefore, it places everyone at risk unless everyone is tested, and indeed, then Mr. Collings can proclaim that there is zero COVID-19 within the jail. His proclamation that there is zero infection does not hold water. The fact that someone is symptomatic, that could make them COVID-19 positive. But nobody has been tested; so we don't know that.

Further, the CDC Guidelines point out that in most cases, incarcerated and detained persons are not permitted to leave the facility. Meaning, that once the virus does begin to spread, there's no avoiding it. They cannot escape it. Nowhere in defendant's affidavit of Master Officer Lacey do they claim to have tested all inmates, even a percentage of the inmates and detainees in the holding cell.

So what does this mean? When you look at the conditions from 2012 which is pointed out as exhibit -- that was Exhibit No. 1 and the totality of the plaintiff's exhibits, No. 1, No. 5, No. 6, No. 8, and No. 9, look at the totality of

those exhibits from 2012, 2017, December of 2019, the testimony of Ahmed Baqer, January 2020, the testimony of Guillot, Junior, the report from February of 2020 from Lee Zurik. That is the evidence that I pointed out in opening statement of capable of repetition, yet evading review.

Without an order from this Court, the sheriff can cancel or suspend any of its current protocol that they claim to have in place and return to a status quo. If, indeed, any of the allegations of Officer Lacey are to be considered as true, then there should be no issue with an order from this Court stating that they are to continue with those, with those protocols that they have put in place.

New arrivals are not subject to the PLRA. There is no way that they can have the 80 days or even less days to go through the administrative review process to get them the due process that's required from the PLRA. Individual intake holding cells are not adequate for the long-term housing of new inmates. And now you've heard testimony that two of them have been held for a minimum of 14 days up to whether it's either 16 days or 18 days. I don't think that top line is relevant. Those holding cells were meant for 48 to 72 hours max. And now we've heard that detainees have been in there for over two weeks. That, in and of itself, poses a threat to all jail detainees based upon the fact that Ms. Ward pointed out with the vomit on the floor, half blankets, open wounds, and lack of

medicine, and some of the other facts that she pointed out to you.

Plaintiff has made the allegation that as of January 2020 defendants kept 97 inmates in four holding cells despite having 137 open beds which would have created more of a social distance, if not, indeed, the social distance recommended by the CDC Guidelines.

Plaintiff has also alleged, and you heard the testimony from Baqer and Guillot, Junior and I believe we've proven those to be true, that each were placed in holding cells with as many as 19 up to 37 other detainees despite the availability of the open beds.

With respect to standing, I believe that we covered that issue, Your Honor. If you have any questions on it, I will be happy to answer them, but Ms. Ward went through them, and I don't want to be repetitive.

With respect to irreparable harm, I don't know that there can be any dispute whatsoever that if, indeed, any inmate contracts corona or tests positive for it that it can, indeed, be a cause for irreparable harm.

The balance of the public interest, the defendants attempt to downplay the risk of this failure to adequately address the COVID crisis by appealing to the broad risk of infection within any community. And indeed, you heard Mr. Collings question Mr. Baqer about other jails, and in fact,

Mr. Baqer said that the Metairie jail was clean. So we have established that there are differences here.

What defendants overlook is that they are constitutional officers here carrying constitutional responsibilities to their inmates by merit of the custodial system. And the general population should not and cannot be treated any differently than the new arrivals being held in the holding cells. And we've heard the many differences that exist now between the new arrivals and the general population. I don't have the time to go through all of them. I think we've established that prima facie case which gives us more than enough evidence to overcome the directed verdict on the preliminary injunction.

By the way, Your Honor, the purpose of this preliminary hearing is to preserve the status quo that must prevent irreparable harm until the respective rights of the parties can be ascertained during the trial on the merits. If defendants are truly doing the things they claim that are contained in the affidavit, then they should be able -- then there is no harm in entering an order protecting the health of the prisoners. And that's what we are simply asking this Court to do is preservation of the status quo if, indeed, that is what is happening.

They invoked the PLRA to indicate that relief must be narrowly tailored. What could be less of an intrusive need of

protecting inmates and making sure that they have the absolute basics now as we know them to protect their health and welfare and safety as proposed by the CDC Guidelines.

And I think that meets our burden of proof for this preliminary motion under the Fourteenth Amendment and under the four tenets that we are responsible for in proving our burden under this motion for preliminary hearing. Thank you, Your Honor.

THE COURT: Mr. Collings, before you begin -- and Mr. Romanucci, I don't mean to cut you off. You were finished; correct?

MR. ROMANUCCI: Yes.

THE COURT: All right, thank you.

Mr. Collings, before you begin, I'm going to take this opportunity to ask some questions because Mr. Romanucci has used his time, and I'm going to give him additional time to answer some questions.

Mr. Romanucci, if I understood you and I'm taking notes, you indicated -- one of your arguments is that, yes, St. Tammany Parish Jail has put these policies and practices in place, and they've put that into evidence. But they can return to the status quo, and what is to happen and what is to prevent them from returning to the status quo.

MR. ROMANUCCI: True.

THE COURT: I think that's what I heard you're

arguing. Don't plaintiffs, whether it's Mr. Guillot or some future inmate, have a remedy if the jail returns to either old ways or takes away the policies that are now in place?

And the second question, how is that argument not speculating as to some possible future harm and not a real harm?

MR. ROMANUCCI: I want to make sure you're done with your question before I begin, Your Honor.

THE COURT: Yes. Well, I'm done with that question. So again, how is that not speculating on possible future harm when the Court is obliged to rule on immediate and irreparable harm?

MR. ROMANUCCI: Understood. With respect to the -- I believe those are two-part questions. The first part is with respect to remedy, and the second part is with respect to speculation versus real harm. I think on No. 1, the remedy, the new arrivals do not have a remedy, Your Honor. They have none. The PLRA is not available to them in a real fashion. It's only a de facto application of a remedy because they don't have enough time. Even if you take the worst case scenario that we presented today of 16 days, that would not afford a new arrival enough time to exhaust his remedy under PLRA.

No. 2, we heard evidence and testimony that even if a new arrival had a medical issue or had a concern with respect to his medical condition, his particular medical condition,

that it would not and certainly might not ever be addressed. Mr. Baqer testified that he has a medical diagnosis, one that required a prescription, and those needs went unmet. So the remedy, whether it's a direct one or indirect one, through PLRA or direct through a nurse, those needs cannot be met. New arrivals being held in holding cells do not have an adequate remedy at law to address what their needs could be.

With respect to somebody in a holding -- I'm sorry, in the dormitory, I think that's a different issue, and I can certainly address that one also.

Secondly, speculation versus real harm, I don't think we're speculating at all here, Your Honor. We've all been told and the CDC Guidelines point out that we are all to assume that we are carriers of the virus. That is a real harm. And the reason that we must -- it's not even a question anymore. I believe 45 out of the 50 states have imposed an actual executive order to social distance, and the remaining ones have made it a recommendation. For example, Louisiana and Illinois and Pennsylvania, those are the three states in which we're conducting this are under executive order to social distance.

It's not speculation anymore. We have all been told that we are all carriers of the virus, and whether or not somebody gets infected that that's up to that individual person's response to their own immune system. So it is a real harm. It's not speculation. I think it would be speculative

if we were told that we could all go to the beaches and go to work and congregate and socialize and be in a bar and a restaurant. This is a real and imminent threat, not only to the jails, but to our entire country and our economy and everyone's individual health.

THE COURT: How do you -- okay. Another question, how do you distinguish the case of *Allen versus St. Tammany Parish Jail* where this Court found that it is not a constitutional violation when an inmate was held with 28 other inmates for 15 days in a pretrial holding cell?

MR. ROMANUCCI: Well, if I may have a moment on that, Your Honor, because I'm going to counsel with my co-counsel to see who is best to respond that. So just we probably just need 15 seconds on that.

THE COURT: Of course, of course.

MR. ROMANUCCI: Your Honor, I'm back on the phone. I think I can quickly answer that. So with respect to the distinction between that case in *Allen*, I believe it was said that there was no indication that any of those conditions were being done punitively. In this instance, we know under the allegations of the complaint that there were 137 open beds, and this was during the time that the COVID-19 virus was existing. There was no basis for not using the open beds when there were 97 inmates that were being kept in four holding cells. Therefore, had those 97 inmates been appropriately socially

distanced according to the CDC Guidelines, we wouldn't have this issue. But it was the opposite. So I think there's the difference.

You know, when someone has food withheld, if they have medical attention being withheld, if there's vomit on the floor, they don't have cleaning supplies, they have used toilet paper, they're lying in urine and feces, that -- the totality of the circumstances can be deemed or looked at to be punitive to these member -- to these detainees who are being held in holding cells.

As a matter of fact, Your Honor, I do have the quote, and I do want to reference it. I believe it was Officer Strain who indicated in one of the interviews -- and I'm looking for the exact quote because I do have it. One moment, Your Honor. Officer Strain, during one of the interviews when Lee Zurik was interviewing him, his quote was, "If you don't commit a crime, you don't have to go to holding at all." His next quote was, "Someone with a probable cause arrest, a warrant or warrantless arrest, is someone who will be held in this holding cell."

All those new arrivals are afforded the constitutional right of innocence before guilt, and that's a period after that statement. And what St. Tammany Parish is telling this Court and everybody out there who listened to his words, "Hey, you know, don't get yourself arrested," but the point is, what the point that's being missed is all those

people are presumed innocent. So certainly, we can look at what that statement, if you look at that statement in totality with the conditions that exist within that cell as being punitive, and that's the difference between -- and that is the distinction that's being made.

THE COURT: Point being --

MS. RAVEENDRAN: Your Honor.

THE COURT: I'm sorry, did somebody want to say something? Is that Ms. Ward, or who was that?

MS. RAVEENDRAN: No, Your Honor, that was Ms. Raveendran. I had another case that may exist in responding to your question, but I think you had a follow-up to Mr. Romanucci.

THE COURT: Go ahead, Ms. Raveendran.

MS. RAVEENDRAN: I just want to bring the Court's attention to a case called *Hines versus Youssef*. That's 2015 U.S. District, Lexis 3869 at Star 10, and that's the Eastern District of California in January of 2015. To quote, "Unless there is something about a prisoner's conditions of confinement that raises the risk of exposure substantially above the risk experienced by the surrounding communities, it cannot be reasoned that the prisoner is involuntarily exposed to a risk the society would not tolerate."

And the case itself is about failure to state a claim on which relief may be granted, and the court talks about that

the Eighth Amendment requires to -- the Eighth Amendment which is very analgous to the Fourteenth Amendment requires that you show that there is a risk that is substantially above the surrounding community.

What we have in this case and the reason that we can have a constitutional violation or we have established a prima facie constitutional violation is in the affidavit presented to this Court by the defendant. They show that holding cell detainees are being held with higher risk than the surrounding community of general population. That's not even to say that holding cell detainees are clearly at a higher risk than society in general. But as far as COVID-19 is concerned, holding cell detainees are sharing a bar of soap which is a threat to the community of general population.

Holding cell detainees are only allowed three showers a week when sharing a space with strangers. Holding cell detainees as compared to the surrounding community of general population inmates are basically facing an unreasonable additional risk of harm because they don't have the same access to showers, to soap, to cleaning materials, to toiletries. And the fact is in the affidavit the sheriff's office is saying we have 12 such detainees right now. Those 12 detainees are being treated differently than the society at large.

And another paragraph in the affidavit, paragraph 67, indicates that the numbers of -- that restricted inmate

movements are now being used in the jail. And that could mean that individuals are being held in the holding cell longer which means that those numbers in the holding cells could increase from 12 very quickly if that is the exact number that are currently there.

So I would just ask Your Honor to look at the facts with *Hines versus Youssef.*

THE COURT: I appreciate that, Ms. Raveendran.

Can anyone from the plaintiffs direct me to any evidence in this record that shows punitive intent on the part of the defendants?

MR. ROMANUCCI: I think as a totality, Your Honor, I believe I raised that issue. As a totality, you can look at the withholding of medication, the withholding of medical services, the withholding of food, the dirty conditions, the swapping of bodily fluids on the floor, no cleaning supplies, the overcrowding in and of itself. You know, when I mentioned earlier, you know, that the 24 people in a 200-square-foot room, well, you can throw that 8.3 square feet right out the window if you put 37 in there. You're down to about 4 square feet per person. That's not even enough room for someone to sit down cross-legged.

But if you look at the totality of that, that's punitive. And when you look at the statements that I read into the record that if you don't commit a crime, well, then you

don't go to a holding cell, what if you're innocent of that crime? How many people were placed in a holding cell in overcrowded conditions that were released without any charges or any convictions at all? That, that --

THE COURT: Mr. Romanucci.

MR. ROMANUCCI: Yeah, I'm sorry.

THE COURT: Go ahead. Go ahead.

MR. ROMANUCCI: So I was just going to wrap that by saying that the totality of all those conditions are punitive right there.

THE COURT: How do you distinguish or say it's punitive rather than deliberate indifference, negligent, or any other standard? Punitive, to me, requires a specific intent to be punitive. Why is this not deliberate indifference or negligence?

MR. ROMANUCCI: Well, I think you can refer to Ahmed Baqer's testimony. He asked the nurse, I believe his testimony was five times, for medication, and he never received his medication. And Mr. Collings, sure, he got Mr. Baqer to admit that he entered the St. Tammany Parish Jail without his prescription. Does that really make him not eligible to receive a prescribed medication?

So when you -- if the request was made once and denied and we only have evidence of that, then maybe we'd be talking about deliberate indifference. This is punitive.

Nobody, no doctor examined or visited with Ahmed to determine whether or not he was in requirement of those medications or not. And had there been a visitation and the medications were denied based upon a physical examination, then we might be back to deliberate indifference. This is punitive.

When you ask for something and you are denied it over and over and over again, that's punitive. That is intent. That certainly is intentional. The denial of food for 18 hours, that's intentional. The denial of soap or cleaning supplies or even toilet paper, which nobody needs to talk about the internal pandemic that's surrounding toilet paper right now, that is punitive. That's intentional.

THE COURT: I appreciate it, Mr. Romanucci. And I know, because I've spoken to all of you during this week, that you understand fully what the Court is obligated to do here and the factors that the Court has to take into consideration and must take into consideration, and they are very specific factors, before a Court can issue a preliminary injunction that a plaintiff must prove. And that's why I'm asking these questions.

There is no doubt that whether a pretrial detainee who has not been adjudicated or somebody who has been adjudicated guilty has constitutional rights when incarcerated, period. Just because you are incarcerated pretrial, again, or after an adjudication, you do not lose all of your

constitutional rights. But the question is, because this is the first factor that you must prove, the question is: Have you proven that there is a substantial likelihood of success on the merits of your complaint?

And your complaint has nothing to do with COVID-19, all right. Do you agree with that? I have searched your complaint and did a word search. COVID-19, COVID, virus, coronavirus, none of those words are in your complaint, and it's your obligation to show to the Court and to prove to the Court that there is substantial likelihood of success on the merits of the complaint.

So I'm going to ask you: What can you point me to in the record now that this hearing is completed that supports that the plaintiffs have borne their burden of substantial likelihood of prevailing on their complaint?

MR. JACOB: Your Honor, Devon Jacob, if I may.

THE COURT: Of course.

MR. JACOB: First of all, with respect to this issue, I think we have to look at the totality, the collection of harms here.

But as to the question as to what indicates punitive conduct, when a guard intentionally places inmates into a wet cell that the guard knows he did not clean, that is intentional conduct. That is just simply mean. When a guard makes inmates beg for soap to wash their hands before they eat, that is

simply mean. When you hand an inmate a wet blanket, you know it's wet when you're handing it to that inmate, that is just punitive, punishment. I don't sleep with a wet blanket at night. I'm sure Your Honor doesn't either, and nor should an individual -- frankly, an animal should not be provided with a wet blanket in order to sleep.

So these are things that once they reach the level of common sense, one can say are being done intentionally. For instance, when the guards walk by numerous empty cells that are clean that they can simply put the inmates in and then look in a cell and see 37 people crammed in there, not just overcrowded which may alone be okay, but 37 people in there standing, unable to lie down, and if they do lie down, they're laying down in vomit and urine, that is intentional conduct because all they needed to do was move them to another cell.

So I think there's enough here that in the cumulative we have absolutely met the burden as far as showing that this goes way beyond deliberate indifference.

THE COURT: Mr. Jacob, I appreciate your follow-up to that question, and I appreciate that. So I got your response and Mr. Romanucci's response on that.

So answer my, if you don't mind, the next question which I know you were getting to, but I've held Mr. Collings off long enough. Point me to where in the record or what evidence plaintiffs have provided in the record that support a

finding of substantial likelihood of success on the merits of the complaint.

MR. JACOB: Well, again, Your Honor, I think it goes back to Nicolette Ward's argument as far as the legal requirement. Yes, the Court is correct that simply overcrowding, that's not enough. And if that's what we alleged, then that would be enough here. But it is when you start to add these violations one on top of another, that is when it becomes a violation of the constitutional standard.

And when you're intentionally holding one group of inmates, that being the pretrial detainees, in a different condition than the rest of the jail, meaning, you've already proven that you can hold them in clean, safe conditions, then again, you're showing that we can meet the Fourteenth Amendment standard.

THE COURT: Okay, thank you. And I obviously put a lot of questions to you. Anything else are y'all going to add because I'd like to move to Mr. Collings?

MR. ROMANUCCI: Just real quickly just because the Court had a concern about it, the irreparable harm, if I can just indicate that without belaboring the point. In our brief, we talked about how you don't have to first get the virus before it's irreparable harm. A significant and substantial increase in risk for certainly a deadly condition is enough in the case law, and again, that's listed in our brief. So I

won't belabor the point.

THE COURT: Thank you. All right, thank you to everybody who participated for the plaintiffs.

Mr. Collings or Mr. Acosta.

MR. COLLINGS: Well, Your Honor, you had some great questions. I would, again, urge my motion that you rule on what is before you now because what I've heard for the last three hours is a lot of supposition, a lot of conjecture, a lot of asking the Court to, you know, make some leaps and assume some things. But you just asked the same question about four or five different times, where in the record, where is the evidence, and I have not heard any of it. There is no evidence.

We got two witnesses who testified today. One of whom I would submit to the Court is not even qualified to give evidence in this setting because he is an incarcerated individual. And he has to under the jail -- I'm sorry, I got the acronym here -- PLRA, Prison Litigation Reform Act, under that act, he has to go through his administrative remedies before he can even come to you and ask for any relief. Not only did he not do that, he doesn't even know what it is; even though it's given to him. It's readily available in the jail as we have testimony in the record to show, and that testimony is uncontroverted from the major at the jail. They all have that. She does it.

So this individual has chosen not to avail himself of the administrative procedures. He simply has walked into your courtroom and said, "Give me some relief. I don't care about the Prison Litigation Reform Act." And the Fifth Circuit couldn't be more clear on what you should do in this instance which is to deny him relief because you don't have the discretion at this point to give him any relief. He has to. It is affirmative duty on his part to utilize that process before he can come to you and ask for any relief at all. So that was my first point.

I did want to, if the Court -- I don't know how much you want to hear from me. Honestly, Judge, the questions I heard from you raise the same issues that I want to address in closing if you want to hear them again. I'm just --

THE COURT: I'm going to interrupt you for a moment, Mr. Collings, because I interrupted plaintiff's counsel plenty of times; so I think it's only fair.

You asked for a ruling on your motion for directed verdict, and this might help guide you in your closing.

MR. COLLINGS: Yes, ma'am.

THE COURT: And I've given the plaintiffs plenty of opportunity; so I'm going to rule on that. I'm going to note that a directed verdict is appropriate only after the Court determines that there is no evidentiary basis, however minimal, that a trier of fact could use to reach a different conclusion.

It is a bare minimum. It doesn't rise to more likely than not and certainly not to beyond a reasonable doubt, but it is a bare minimum that there is legally sufficient evidentiary basis for the case to proceed.

So I am going to deny your motion for directed verdict at this time finding that there is at least some basis for it to proceed further for a ruling on the motion for preliminary hearing, and now that's where we are.

So that might help you in how you want to proceed in your closing.

MR. COLLINGS: Fair enough, Your Honor.

If I could, I would turn the floor over to Mr. Acosta to address one of the legal issues that has been brought up by both the Court and opposing counsel.

THE COURT: Certainly. Mr. Acosta.

MR. ACOSTA: Good afternoon, Your Honor, Cody Acosta.

Your Honor had mentioned the doctrine of capable of repetition, yet evading review both this morning as well as previously in our status conference. I just wanted to touch on that briefly.

The Supreme Court has stated that this exception is only available if the challenged action is, quote, "in duration too short to be fully litigated prior to cessation or expiration, and there is a reasonable expectation that the same complaining party will be subject to the same action again."

That quote is from *Turner versus Rogers*, 564 U.S. 431. That's pages 439, 440. That's a 2011 case.

THE COURT: Mr. Acosta, just to make sure I've got that, I'm sorry, *Turner versus Rogers*, 564 U.S. 431?

MR. ACOSTA: 564 U.S. 431, yes, Your Honor.

THE COURT: All right, thank you.

MR. ACOSTA: So you know, that kind of lays the foundation for how we look at this exception. And I want to point Your Honor's attention specifically to the second factor, that there be a reasonable expectation that the same complaining party will suffer the same alleged injury.

In 2018, in a case called *United States versus Sanchez-Gomez*, the Supreme Court elaborated upon that second factor. In particular, the Supreme Court looked with that to determine whether a plaintiff would satisfy this exception for jail contact by asking a Court to say that it was reasonably likely that the plaintiff would again come back to jail.

In *Sanchez-Gomez*, the Supreme Court refused to officially let the plaintiff's potential alleged violations of law that require them to return to the jail. That case is 138 S.Ct. 1532.

And I'm sorry, Your Honor, I'm kind of looking at the case as I speak, but it's officially the Court's opinion held that it's unreasonable for a court to expect that any citizen or resident of this country to violate the law and allow them

to take advantage of that exception.

The Supreme Court has also talked about inherent transitory exception for class action. Although this has been filed as a class action, no motion for certification has been filed at least as of this morning. And with the inherent transitory exception for class action standing, the Court has to look at whether any main plaintiff or class representative has standing at any point in time up through the certification of the class.

Now in this case, Mr. Baqer and Guillot, Junior were out of holding at the time that they filed this lawsuit. Therefore, they had no redressability concern with respect to the conditions of the holding cell because in Mr. Baqer's case he was out of the jail completely. He's affirmatively alleged that. And in Mr. Guillot, Junior's case, he was out of holding in either a dormitory or a tier housing unit. So even if the Court were to grant the relief that these two individuals have sought, they wouldn't actually stand to receive any benefit or have any of their injuries redressed by such a relief.

For those reasons, Your Honor, we don't think that there's a justiciable case or controversy under Article III or is there the application of inherent transitory exception for class action, not only because the class hasn't been certified, but also because at the time of the institution of this action, those two individuals did not have standing to seek injunctive

relief. I'm not saying that they don't have standing to seek monetary relief for damages or declaratory relief potentially. But we're only here talking about injunction this morning, and we don't think that the record can support the standing in these contexts.

THE COURT: Thank you, Mr. Acosta.

Mr. Collings, did you have anything further?

MR. COLLINGS: I'm just going to touch on a couple of things, Your Honor, and then I'm going to rest.

Again, I am struck by how little there is in this case up to now. What we have is, and you touched on it, Your Honor, when you asked the questions about the complaints and how you were cognizant of the fact that the complaint, which is really what we should be looking at primarily in this context, the complaint itself at no point mentions the word "coronavirus" or any other type of infectious disease. And the court case law which set it out in our brief does not allow for individuals to file a motion like this, motion for preliminary injunction, and expand their complaint. The complaint is why we're here, not the motion itself.

The motion, it's interesting what I've heard in the last few days, but it's a constant back and forth and a commingling of two entirely separate issues. And every time they don't like where one issue may be leading, they jump to the other, and I've heard that back and forth for three and a

half hours so far today which is -- we're here today about the complaint filed on the 22nd of March. This was only three weeks ago. And at that point, coronavirus existed and was well publicized, and there were orders and things issued by various government agencies already. Nevertheless, they chose not to file that complaint and seek any relief for some sort of coronavirus epidemic or exposures. They simply said here it is, these people are being held in the holding cells for too long, and that's a violation of the law. So give us some relief under the federal 1983 statute.

Well, the Court has already addressed that. I heard the question, and it was something, you know, it's already in our brief, and I think it's a great question. And they didn't really give you an answer. And I listened very carefully because I was hoping to hear something I didn't know, and I didn't which is the very courthouse where you are, not physically, but your courthouse, Your Honor, has heard these similar arguments already.

Judge Africk, your colleague on the bench in the Eastern District of Louisiana, has heard the same type of complaint already as little as a year ago. I think it was 2018, so two years ago. Judge Africk made a ruling which could not be any more clear which is a violation of Title 22, which is an administrative code, mind you, a Louisiana administrative code, does not give one the key to the federal courthouse in

effect by giving someone a 1983 claim.

Now they may have a claim somewhere in the state court, state proceedings, but that's really not an issue here. And maybe they need to go do that, file something in the state courts of Louisiana if they think the administrative code gives them a right of action. But no, they jumped over to the federal courthouse, and they want to bootstrap down an administrative code and say we have a 1983 claim because they're arguing a violation of an administrative code.

Judge Africk, I think, has addressed that squarely. I think he was correct. I would ask the Court to basically adopt that same holding which is that, you know, the federal courts have limited jurisdiction; and that's been, you know, there's a list of cases as long as your arm that say that over and over and over again. Simply because someone has a claim in state court doesn't then give them a right to the federal courthouse and all the relief under 1983. It's got to be a constitutional violation under 1983.

Well, what is the constitutional violation? So putting aside all the issues with respect to COVID-19 and everything else we've heard about today and the things they put into evidence with their motion, the constitutional violation alleged in the complaint is wholly lacking, and they have yet to put on any real evidence to suggest that they have a claim. There's allegations, an unverified complaint, mind you. The

two individuals who testified today gave you no real information that there is a constitutional violation. There are generalized complaints about how long it took to get fed, how many people were in a holding cell, that sort of thing. Those things while, I guess, interesting and maybe unpleasant to them at the time is not in and of itself a violation of the constitution. The case law on that is pretty clear and already established.

So they would have -- the plaintiffs in this case would have you ignore all these other cases that have addressed these same issues that have already been basically adjudicated and have you say, "No, I find differently. I find when someone sits in a holding cell more than 48 hours that's a violation of their constitutional rights. Therefore, I'm going to give them the relief, and they have access to this courthouse under 1983." I think that is asking this Court to make a leap well beyond what is allowed under the law. It's just not there. They have not come close to meeting their burden of proof.

The first criteria under Rule 65 to get their injunctive relief is likelihood of success. Frankly, I don't think they even come close to likelihood. I don't even think they meet 51 percent at this point because their evidence is lacking. And every time -- for example, I made notes of what's in their briefing. There was an interesting comment in their motion for preliminary injunction where they say -- to the memo

in support, "It is believed that the same unlawful and dangerous policies and practices that existed since at least 2012 remain in effect."

That's what the frustration I've got in this case. It is conjecture, supposition throughout, no evidence at all. That statement in their memorandum, what evidence do they have to support that? None. They had two people testify today. I didn't hear one of them talk about the conditions of 2012 as opposed to conditions today. One individual, Mr. Baqer, has been gone from the jail since December of 2019. So I don't know what basis does he have to allow the Court to rule that the sheriff violated his constitutional rights in 2019 because he was in holding for approximately 14 days. I don't know what that is. I didn't hear it.

Now there was complaint that he didn't get his medication. But I do a lot of jail litigation as a result of representing the sheriff. I've had these kinds of issues come up before. There is case law, long-established case law that suggests prisoners and inmates in jails and prisons, they don't have a right to the very best care available. It's not the Mayo Clinic standard that's required under the Constitution. It is, in fact, the minimally constitutionally required threshold that is required of us. They have not provided any evidence at all. No healthcare providers testified today or anyone else other than Mr. Baqer who said, "I had medication.

I don't know who prescribed it, and I didn't get it. I didn't have it with me, but I didn't get it when I was in jail for 14 days."

But where is the evidence that suggests that the medication that he didn't get was actually minimum -- was the minimally constitutionally required threshold that we gave him something that put him at risk that violated his rights. There are healthcare professionals, nurses, and doctors in the jail that make calls with respect to medication on a daily basis. They will make a call from time to time if a prisoner says, "I was on X," but the jail medical staff don't believe that that's required. Doctors disagree about medications all the time. Our jail staff does that routinely.

They did not put before you any evidence to suggest that the call made by the medical staff at the jail not to give Mr. Baqer his Xanax was somehow violative of his rights and put him at risk in some way. He may not have enjoyed his time in the jail as much as if he had continued to take his Xanax. That, I can't speculate on. But the evidence is what's important, and they didn't give you any evidence.

I was thinking I was going to hear from a doctor today to talk about some of these issues. They didn't provide that doctor. What they do is they want you to go leap out into the world, read CDC, Johns Hopkins, and then, you know, cobble all of these things to say, well, yeah, you know, COVID-19 is

bad, and it may be harmful; and therefore, if there's a possibility of harm, then I have to give them some relief. That's not the standard.

And the Court -- I heard your questions, and I was glad to hear them because I think you've already gotten it. There is no likelihood of success. The very first criteria right out of the shoot, they fail because they didn't give you any evidence at all, none. They gave you a lot of things to talk about, conjecture. You know, there is a possibility. I heard opposing counsel mention the fact that even though we've given sworn testimony, sworn testimony that we've had zero cases of COVID-19 infection inside the jail from whenever it hit the shores of the United States, and I guess that's somewhat debatable, but at some point earlier this year through today's date or at least the date of the filing of our affidavit which was, I guess, yesterday, there's been zero cases.

And yet, nevertheless, I heard in closing argument that you can't rely on that, Judge, because we're not testing everyone in the jail; so maybe there's someone in the jail that's got it that we just don't know about. So that seems to suggest the burden is now back on us. It's our burden of proof to prove to you that there's no one in the jail that has COVID-19 other than the fact that we've told you in sworn testimony. That, to me, is turning the entire object of who

has the burden on its head. We don't have the burden.

We've given the Court ample, ample evidence that we are doing not only the minimum required under the Constitution in that jail to provide for those inmates -- I wish that the sheriff could be commended by this Court. And I know that's not your role, but let me just tell you. Reading that affidavit, I don't see how any reasonable person could come to a conclusion other than the fact that the sheriff in St. Tammany Parish is doing everything humanly possible within the jail confines to keep those inmates safe. That's the issue, you know. And I guess I'm doing -- to some extent, I'm going back to COVID-19 which I don't think is even truly before the Court because it's not in their complaint. But we have to -- we're addressing them both because I know the Court is considering them both.

But the fact is, Judge, there simply is no evidence. None. There's conjecture. There's speculation, but there is no evidence that the Sheriff of St. Tammany Parish has done anything wrong whatsoever with respect to the safety and the custody of those inmates. None. The only thing they've really got is there's an administrative code somewhere in the State of Louisiana that says pretrial inmates should not be held in individual holding cells. Now that word is important, quote/unquote, individual. Individual holding cells for longer than 48 hours, I believe that's Title 22, Section 3301,

Subsection F. The word "individual" is utilized. That's the subsection that they point to in both their complaint and their motion for preliminary injunction which they say we're violating.

All right. Well, the fact of the matter is, you heard testimony, none of these individuals who testified today, neither one of them, and there's no other evidence to the contrary, have ever been inside an individual holding cell, i.e., a solitary holding cell. So if the statute, the very -- it's not even a statute. The very things within Title 22 of which they complain doesn't even apply because our jail doesn't have individual holding cells for pretrial detainees other than what is there for people who have the possibility of harming themselves. We do segregate them, and we also, as put forth in the affidavit, have a means to segregate prisoners who test positive for an infectious decease. We have that ability to isolate them.

But the idea that this one provision of the administrative code, that you cannot, you should not as a law enforcement agency keep individual inmates longer than 48 hours in an individual holding cell simply doesn't apply to us. It's an apples-and-oranges argument. We are not -- we don't keep these people in individual holding cells. There is a group holding cell. So that one provision from Title 22 doesn't even apply.

So at the end of the day, I don't even know why we're really here, Your Honor. I really don't. Because at the end of the day, you've got an administrative code that I don't even think applies. It certainly doesn't give a plaintiff the key to the courthouse in federal court to allege a 1983 claim as addressed by Judge Africk already. The lengths of stay are almost exactly the same. I believe Africk's decision was an individual who had been there for 15 days while Mr. Baqer testified he was out in 14. So it's one day less.

Mr. Guillot, I don't think the Court should even consider anything at all with respect to him because the key to the federal courthouse are closed to him at present until he goes through the Prison Litigation Reform Act and the administrative reviews that are provided and required for him to go through.

So again, the evidence is lacking, Your Honor. It's wholly lacking, and we would ask the Court to deny the motion for summary judgment -- I'm sorry, motion for preliminary injunction.

THE COURT: Thank you, Mr. Collings. All right.

MR. ROMANUCCI: Your Honor, this is Tony Romanucci. Is there any opportunity for rebuttal, or are we done? We'll follow your lead on that. I certainly wasn't going to interrupt Mr. Collings. I don't know that, you know, clearly, he was on a roll, wasn't taking a breath, and I think that he

interjected a lot of personal opinions and viewpoints which I know mean a little bit less when we're arguing to the Court as opposed to a jury. But there was a lot of personal opinion in there that I think could have been objected to, but we didn't just because out of respect to let him argue.

THE COURT: I think, Mr. Romanucci, you are out of time. But if you wanted a couple of minutes, if there's something specific, I certainly want to give you that opportunity.

MR. ROMANUCCI: I think very briefly, I think we do need to touch upon the issue that you brought up and that Mr. Collings, you know, jumped upon as you being correct with respect to COVID or corona not being mentioned in the complaint.

I think that's misleading. It's not -- it doesn't need to be in the underlying complaint because the overcrowding situation, the 24 people within a cell of 200 feet is a derivative of exactly what we're talking about. The corona, the spreading of the corona doesn't derive unless you don't social distance. So their argument is specious at best. That's why I'm saying it's misleading. It's wrong. It's absolutely wrong.

And when you look at the rapidly evolving situation of this virus, I mean every day you need to click on the website in order to determine how many infections there are and

how many deaths there are. We've already heard and seen that. So I don't believe that it needed to be in the complaint because, indeed, the overcrowding, the failure to distance inmates is a derivative of exactly what we're pleading for in this preliminary injunction. I'm not sure if any of my co-counsel wanted to add onto that, but I have nothing further to say.

THE COURT: Thank you, Mr. Romanucci. All right.

I'm sorry, is somebody else speaking?

MR. ROMANUCCI: No, that was my Siri for some reason on my iPhone that picked up a word and decided to respond, so.

MR. JACOB: Your Honor, Devon Jacob, if I could just have one more minute, then I promise we'll be done.

THE COURT: Yes, Mr. Jacob.

MR. JACOB: I heard a lot about Title 22. And yes, it was, at least, referenced, and it is a guide, and it certainly can lead one to wonder why would you intentionally be violating Title 22 when you don't have to. However, we did not base our motion on Title 22 alone. In fact, we did not even base it in large part.

It's based on the constitutional violation, and that's because vomit, urine, blood on the floor, that's not really discussed in Title 22. Interestingly, the sheriff knew what was in the complaint. We put on some very strong evidence of some deplorable conditions in the cell that the sheriff knew

was going to be discussed today, and yet the sheriff did not show up. They did not put on any evidence to rebut any of what we told you and our witnesses told you is happening. Instead there was -- the only evidence is a subordinate's affidavit drafted by probably counsel and signed to simply state what's going on now.

MR. COLLINGS: Judge, can I interrupt? I mean I think that's out of line to suggest that I'm somehow directing testimony.

THE COURT: Mr. Jacob, if that didn't cross the line, it certainly came very close because that's the way I took it as well.

MR. JACOB: Well, I apologize.

THE COURT: I also want to be clear. Evidence is evidence. And evidence can be in the form of testimony; evidence can be in the form of exhibits. And so the defense has presented evidence through an affidavit.

MR. JACOB: I apologize, Your Honor.

THE COURT: And the affidavit that was presented is by somebody, and it has not been refuted, somebody who says that she is responsible for much of the implementation of the policies.

So proceed. But let's remember we're professionals here and remember that obligation.

MR. JACOB: It came out wrong. I was just trying to

say that it's not the voice of the sheriff himself. That's all I was trying to say. And I apologize. It was not meant to be disparaging, I assure you of that.

But again, we put in substantial evidence that has not been rebutted about the conditions of those cells. And while maybe one or two of them alone does not meet our burden, the cumulative of the conditions does meet the burden. And that's it, Your Honor.

THE COURT: Thank you, Mr. Jacob.

Again, thank everybody for your professionalism, and I think in these times today, for your passion. Clearly, we are talking about very serious issues. We're talking about people and not just, you know, somebody that -- some paper. We're talking about people and possible harm to those people. And that goes for the sheriff's office and for plaintiffs in this case, a whole bunch of people. It's very serious; so everyone is very passionate, and I appreciate that. I appreciate your professionalism all this week as we have met and communicated to try to resolve this.

And I want to take a moment and especially thank the court staff because today, and I know everyone knows this, not only is everyone teleworking, but this is a holiday for many, many people, a significant religious holiday. And it's important that the Court continue to work. And when we granted the motion to expedite the hearing, I was going to do

everything I needed to do to have it heard this week. And so I very much appreciate everybody on the court staff who came in to do their job and help us resolve this, and I know it created a problem for many of them.

Because this is so serious, I am going to take it under advisement to review everything, all the exhibits, the new case law that was provided during argument, and make sure that I have a full and total grasp of the case law because of the importance of this matter. I want and it is my duty to have a full and complete review, and I owe you nothing less than that, and that's what I'm going to do.

With that being said, I granted this motion for an expedited hearing and plan on ruling on it very quickly. So I'm not going to sit on it for a long time at all. I plan on issuing a ruling as soon as possible after the review, and I can tell you that that will start almost as soon as I hang up this phone call. So with that, I'm going to take it under advisement and will notify you when I have a ruling.

And with that, I think unless there's something else, Court is adjourned, and again thank everybody.

MR. ROMANUCCI: Thank you, Your Honor. Happy holidays to you.

MR. COLLINGS: Thank you, Your Honor.

THE COURT: Thank y'all.

(Whereupon this concludes the proceedings.)

**CERTIFICATE**

I, Alexis A. Vice, RPR, CRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

*/s/Alexis A. Vice, RPR, CRR*
Alexis A. Vice, RPR, CRR
Official Court Reporter