**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General* *Washington, D.C. 20530*

JUL 12 2012

**VIA E-MAIL AND U.S. MAIL**

The Honorable Patricia P. Brister
St. Tammany Parish President
Post Office Box 628
Covington, LA 70434

**Re: United States' Investigation of the St. Tammany Parish Jail Pursuant to the Civil Rights of Institutionalized Person Act**

Dear President Brister:

We write to report the findings of the Civil Rights Division's investigation of conditions of confinement at the St. Tammany Parish Jail ("St. Tammany" or "Jail"), conducted pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 ("CRIPA"). During our investigation, we assessed St. Tammany's compliance with the Constitution, which requires the Jail to provide prisoners with humane conditions of confinement, including adequate mental health care.

Consistent with the statutory requirements of CRIPA, we now write to inform you of our findings that St. Tammany fails to comply with the Constitution and of the steps St. Tammany needs to take to meet its obligations under the law. As described more fully below, we conclude that conditions of confinement at St. Tammany violate the constitutional rights of prisoners. In particular, we find that prisoners confined at St. Tammany do not receive adequate mental health care, including proper suicide prevention.

As we were conducting our investigation, St. Tammany reported to us that it had begun to make necessary changes to its mental health care program. Many of these changes are consistent with or responsive to our critique and suggestions at the end of our onsite visit to the Jail. In October 2011, Jail officials submitted a letter detailing purported changes in policies, practices, and procedures including in the areas of mental health and substance abuse screening and assessment; the implementation of a suicide database and suicide watch log; increased psychiatric staffing, including hiring a masters-level social worker; abandoning its use of booking cages for housing prisoners with suicidal ideation; constructing five suicide-resistant cells, including one outfitted for physical restraints; eliminating its policy that allowed prisoners to self-administer medications; redrafting the mental health sections of its policies and

procedures; and expanding its quality improvement program. More recently, St. Tammany has provided information that will be of use to us in verifying the claimed structural and operational changes at the Jail. In our opinion, these purported changes are both significant and long overdue.

St. Tammany has been cooperative throughout our investigation and receptive to our preliminary findings and initial recommendations. We commend St. Tammany's stated efforts in enhancing mental health care at the facility. The changes described in the October 2011 letter, however, are a small part of the comprehensive reform necessary to ensure that St. Tammany provides treatment to prisoners in a manner that comports with the Constitution. Many of the changes described are either in the planning stages or too newly-initiated to allow for close assessment. Other announced changes have encountered barriers in implementation, and some of our concerns remain unaddressed. Institutional reform can only occur after deficient, broken systems are repaired, and we are encouraged that the Jail is taking some necessary steps to repair its deficient, broken mental health care system.

St. Tammany is an integral part of the community's public safety system. The constitutional treatment of prisoners in St. Tammany is not only an important legal obligation, but will have a direct effect of the success of prisoners on release and on public safety. As a result, we believe that a court enforceable agreement will be necessary to ensure sustainable reform. We look forward to beginning discussions with the Parish in the coming months to find an appropriate resolution.

## I. SUMMARY OF FINDINGS AND CONCLUSIONS

We have concluded that St. Tammany is deliberately indifferently to the mental health care needs of its prisoners. St. Tammany fails to provide minimally adequate mental health care to prisoners at St. Tammany in violation of the Eighth and Fourteenth Amendments to the Constitution. This failure has led to the unnecessary suffering of prisoners with mental illness. Specifically, we found:

- St. Tammany fails to provide adequate mental health screenings and assessments, treatment, and medication management for its prisoners with mental illness. Prisoners therefore wait several weeks and sometimes months before they are treated by mental health professionals and the care that they eventually receive falls below constitutional minima and generally accepted professional standards.

- St. Tammany provides grossly inadequate suicide prevention care. Prior to and during our investigation, these practices included placing prisoners with mental illnesses in booking cages ("squirrel cages"). For some time, St. Tammany's policy clearly established that booking cages were only to be used as a mechanism of last resort, yet we routinely found instances where booking cages were used to house prisoners with suicidal ideation, regardless of other available housing options. Though St. Tammany told us that they abandoned this practice in September 2011, unless and until we are able to verify that the changes described to us are clearly set out in policy and procedure, and these changes in policy and procedures are fully implemented, we remain concerned that this long

overdue improvement in the Jail's treatment of suicidal prisoners will not be realized.

- Many of St. Tammany's Licensed Practical Nurses ("LPNs"), who are primarily responsible for conducting initial medical screenings and initial and periodic evaluations of suicidal prisoners, have not been trained to identify or treat suicidal prisoners.

- St. Tammany fails to provide adequate suicide prevention training to Jail staff.

- St. Tammany's quality assurance program, including the means by which it examines suicide prevention and the Jail's response to suicide attempts and completed suicides, is inadequate.

## II. INVESTIGATION

On April 21, 2011, we notified then-Parish President Kevin Davis that we were opening an investigation of conditions of confinement at St. Tammany pursuant to CRIPA. The initial focus of our investigation was the inappropriate use of booking cages ("squirrel cages")[1] for suicidal prisoners. On June 20-23, 2011, we conducted an onsite inspection of the Jail with consultants in the fields of correctional mental health care and suicide prevention. During our investigation, we observed facility processes, interviewed staff and prisoners, and reviewed an array of documents, including incident reports, grievances, medical records, and policies and procedures. Consistent with our pledge of transparency, and with our intent to provide technical assistance where appropriate, our consultants conveyed their preliminary determinations and concerns to Parish officials and St. Tammany command staff during an exit presentation at the close of our onsite visit. After our visit, we reviewed additional information and conducted additional interviews.

Sheriff Strain and his entire staff have been helpful and professional throughout the course of our investigation. St. Tammany has provided us with access to prisoner records and personnel, and has responded to our requests, before, during, and after our onsite visit, in a transparent and forthcoming manner. We appreciate St. Tammany's receptiveness to our consultants' onsite and post-tour recommendations, and note that at every opportunity, the Sheriff and St. Tammany's staff have expressed their commitment to working with the United States to provide prisoners with safe and humane conditions of confinement, as required by the Constitution. We expect that we will continue to work with St. Tammany in a cooperative manner as the Jail addresses the issues that we have identified both previously and in this letter.

## III. BACKGROUND

St. Tammany is a parish-wide detention facility located in Covington, Louisiana. St. Tammany is designed to house more than 1200 pre-trial and sentenced prisoners in four facilities. The original jail was constructed in 1985 and a new facility was built in 2001. St.

---

[1] St. Tammany staff and prisoners referred to the small cells used to house suicidal prisoners and prisoners being booked at the jail as "squirrel cages."

Tammany also serves as overflow for the Louisiana Department of Corrections and the federal prison system. The St. Tammany Sheriff's Office employs approximately 190 jail employees and is overseen by Sheriff Strain. Since taking office in 1996, Sheriff Strain has reportedly secured funds to build the new jail and has expanded the Jail's capacity from 330 prisoners to over 1200. The average length of stay for prisoners at St. Tammany is 159 days.

Health care, including mental health care, is provided to prisoners on site. The contract for health care services is managed by the Parish itself. St. Tammany employs one full-time physician, a part-time psychiatrist who is available on an "as needed" basis and Friday afternoons, and a "resident" psychiatrist who only works on Saturdays or Sundays.

## IV. FINDINGS AND CONCLUSIONS

We conclude that St. Tammany fails to provide prisoners with constitutionally adequate mental health care and suicide prevention. These findings are detailed below.

### A. ST. TAMMANY PROVIDES CONSTITUTIONALLY INADEQUATE MENTAL HEALTH CARE

Prisoners have a constitutional right to adequate medical and mental health care, including psychological and psychiatric services. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004) (holding that "mental health needs are no less serious than physical needs"). Jail officials violate the constitutional rights of prisoners if they are deliberately indifferent to their serious medical needs, including prisoners' psychological needs. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *See Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996)(en banc). Grossly incompetent or inadequate care can constitute deliberate indifference. *See Cotton v. Hutto*, 540 F.2d 412, 414 (8th Cir. 1976). Moreover, correctional officers act with deliberate indifference when they intentionally deny or delay access to medical care, or intentionally interfere with treatment or medication that has been prescribed. *See Woodall v. Foti*, 648 F.2d 268, 272 (5th Cir. 1991).

Courts have consistently held that prisons are required to maintain a "minimally adequate mental health treatment program." *See Ruiz v. Estelle*, 503 F. Supp. 1265, 1339 (S.D. Tex. 1990) *aff'd in part and rev'd in part on other grounds*, 679 F.2d 1115 (5th Cir. 1982). The *Ruiz* court recognized six basic principles of an adequate mental health treatment program, which include:

- a systematic program for screening and evaluating inmates in order to identify those who require mental health treatment;
- treatment entailing more than segregation and close supervision of the inmate patients;
- the participation of trained mental health professionals, who must be employed in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders;
- accurate, complete, and confidential records of the mental health treatment process;

- disallowing the prescription and administration of behavior-altering medications in dangerous amounts, by dangerous methods, or without appropriate supervision; and
- a basic program for the identification, treatment, and supervision of inmates with suicidal tendencies. *Id*.

Our investigation, however, found that St. Tammany fails to provide care consistent with basic principles of an adequate mental health treatment program. We consequently found systemic failures in St. Tammany's treatment of prisoners with mental illness, resulting in hundreds of prisoners not receiving the care they needed. Indeed, the Jail does not provide adequate screening and evaluations; adequate follow-up care; appropriate medication administration; or adequate suicide precautions.

St. Tammany's constitutionally deficient mental health care system is directly related to the Jail's grossly inadequate mental health staffing levels. At the time of our visit, St. Tammany only employed two part-time psychiatrists —neither of who are onsite for more than two consecutive days - to manage more than 200 prisoners with diagnosed mental illness or who are currently taking psychotropic medications. As a result, we repeatedly found instances where care was delayed and prisoners unnecessarily suffered. St. Tammany has reported that it intends to address its staffing shortages by adding key personnel to its current mental health care staff, including a full-time social worker to provide follow-up care and to conduct group therapy and regular counseling sessions at the Jail. The Jail also stated that it plans to hire a full-time psychiatrist in July 2012 to assist with the mental health needs at St. Tammany.

These staffing additions are significant and necessary. We further believe that hiring a social worker and a full-time psychiatrist would enable St. Tammany to provide timely and sufficient assessment on a daily basis, conduct group therapy and regular counseling sessions, and provide follow-up care for prisoners removed from suicide precautions. However, we recently learned that St. Tammany was unsuccessful in its attempt to hire a social worker. As a result, the problems we indentified during our onsite inspection related to timely assessments and follow-up care will likely continue until St. Tammany hires dedicated staff to augment its current staffing levels.

Beyond the staffing shortages that we noted during our tour, we observed, while on site, as many as 30 prisoners held in holding cells that are designed for 20 prisoners. Many prisoners complained of not being seen by medical staff for several days. Even more concerning, we noted that prisoners were sleeping on floors and benches in the holding cells with little or no bedding articles. When asked about the deplorable conditions in the holding cells and the delays in providing timely medical screenings, Jail staff admitted that overcrowded conditions at the Jail limited the ability to provide timely assessments of prisoners held in the holding cells at the Jail. Jail staff further noted that because of security staffing shortages, prisoners were required to remain in the holding cells for days if not weeks before they were assigned to housing units.

1. *St. Tammany is deliberately indifferent to the serious mental health needs of prisoners by failing to provide adequate mental health screenings and evaluations*

St. Tammany fails to adequately identify and address prisoners' serious mental health needs. The Constitution protects prisoners not only from ongoing harms, but also from the risk of future harm. *Helling v. McKinney*, 509 U.S. 25, 33 (1993). When prisoners are not screened and evaluated properly, those who require mental health treatment will not receive the treatment they need. We found St. Tammany's mental health screening and suicide risk practices deficient in several respects. First, we found that prisoners waited between 18-24 hours before they were screened by nursing staff. During the delay before being screened, prisoners waited in overcrowded conditions.

Second, we found that St. Tammany failed to address the needs of its prisoners by giving untrained Licensed Practical Nurses ("LPNs") the primary responsibility of completing initial medical screenings, initial evaluations of suicidal inmates, and periodic evaluations of suicidal prisoners. Correctional mental health programs should minimally include "the participation of trained mental health professionals, who must be employed in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders." *Ruiz*, 505 F. Supp 1339. St. Tammany's use of LPNs falls below this standard. Indeed, St. Tammany's staff acknowledged that its LPNs are not qualified or trained to identify warning signs of prisoners with mental illness. We were particularly concerned by the fact that prisoners must depend on LPNs to carry out key aspects of Jail mental health care despite both the admission by St. Tammany senior medical staff that LPNs are untrained by the Jail, and the assertion that LPNs are too unsophisticated to receive instruction on how to identify warning signs of suicidal ideation.

Third, in our review of the quality of mental health and suicide risk screenings, we noted that most screenings were cursory and failed to gather information regarding current suicidal ideation or past suicidal history. Although the screening form that we reviewed included three questions related to mental health and suicide risks, the form lacked specific questions about whether the prisoner was *currently* thinking about hurting himself. In addition to the deficient screening form, we found St. Tammany's method of screening prisoners ineffective. Mental health screenings took place in the old medical room, which limited privacy because officers and occasionally other prisoners were in hearing range of staff and prisoner. This is a serious deficiency because the lack of privacy can have a chilling effect on prisoners' willingness to communicate with medical staff, thus significantly compromising the likelihood of receiving accurate mental health information.

We reviewed at least 40 medical charts onsite and noted that none of the charts contained a comprehensive health assessment of any prisoner who screened positive for signs of severe mental illness. Consequently, we found multiple instances where prisoners with a history of psychiatric illness, suicidal behavior, or prior psychiatric treatment were not referred to a mental health professional until a major crisis occurred. Even though the Jail had the capacity to electronically maintain information regarding previous incarcerations and prisoners' suicide risks in order to more effectively manage mental health care at the Jail, at the time of our onsite visit, St. Tammany staff failed to utilize this feature. This failure along with screening deficiencies contributed to the delays in access to care.

In our onsite observations and record review, we identified prisoners who were harmed by the Jail's inadequate screening and assessment practices. For example:

- AA[2] was brought to the jail in March 2011. Even though AA told staff during booking that "I'd rather die than be here," he had to wait over three months before he was finally evaluated by a mental health professional. During this three month delay, AA continued to exhibit "bizarre behavior," including complaints of hearing "occasional voices when he prayed." It was not until our onsite visit that AA was finally evaluated by a mental health professional.

- BB was evaluated in July 2010. During his initial screening, staff noted that BB became agitated while answering questions and that his leg was bouncing during questioning. His initial screening and assessment form further noted that he took a high dose of a prescription drug used to treat schizophrenia and bipolar disorder. Despite this, BB was placed in general population.

St. Tammany told us in October 2011 that it is in the process of implementing a new computer system that will enable the medical staff to perform more medical screenings daily. The new computer system will also allow medical staff to input and gather more detailed information about prisoners' past psychiatric treatment, previous incarcerations, and medication history – all of which are designed to ensure better treatment of prisoners at the Jail. The Jail also stated that it has redesigned its prisoner health assessment questionnaire to include questions about physical abuse, sexual abuse, and developmental disability. Purportedly, the redesigned assessment now requires nursing staff to complete a suicide assessment to ensure that high-risk prisoners are identified and treated with little delay. If properly implemented, these changes should improve the quality of mental health and substance abuse screenings at the jail. However, the effectiveness of these changes will likely be limited if other problems we identified, most notably inadequate LPN screening and overcrowding, are not addressed.

2. *St. Tammany is deliberately indifferent to the serious mental health needs of prisoners by failing to provide adequate care to individuals with known mental illness*

We found many examples of St. Tammany's failure to provide adequate mental health care to prisoners with known mental health needs. In evaluating the obligation to provide adequate mental health care, a number of competing considerations are relevant, including the prisoner's need for immediate treatment, the seriousness of the prisoner's illness, and the extent to which the prisoner presents a risk of danger to himself and other prisoners. *See Woodall*, 648 F.2d at 272. At St. Tammany, we observed and/or reviewed records of prisoners with severe mental health histories, suicidal behavior, histories of receiving psychiatric treatment, and prisoners who were a danger to themselves or others, who were not seen by mental health professionals for several weeks and in some instances months. We found that St. Tammany elected to allow non-psychiatric physicians to have primary responsibility for managing and treating the most vulnerable prisoners at the Jail. By allowing non-psychiatric physicians to manage these prisoners, St. Tammany is allowing unqualified professionals to make mental

---

2 To protect the identity of prisoners, we use coded initials throughout this letter.

health determinations. Moreover, St. Tammany is ignoring the standard of care, which requires daily assessment of suicidal prisoners by a qualified mental health professional.

The lack of treatment endured by prisoners in the following examples demonstrates St. Tammany's deliberate indifference to prisoners' serious mental health needs:

- CC was brought to the Jail in May 2011 after being released from a psychiatric hospital. Instead of referring CC to a mental health professional for evaluation, it appears that CC was placed in general population. Four days later, CC was observed banging her fist on the cell door and running into the walls of her cell, complaining that she needed her mood stabilizing medications. She thereafter was placed on suicide precaution in a booking cage for two days. During this period, CC was neither assessed for suicide risk nor did she receive a psychiatric evaluation by a mental health professional.

- DD was placed on suicide watch in April 2011 after receiving a 30-year sentence. DD was taken off suicide watch without a referral to a mental health professional. Several weeks after being taken off suicide watch, still untreated, DD was involved in an altercation and fractured both of his hands. One month later, DD again was placed on suicide watch and was released without a mental health evaluation. When we interviewed DD during our tour, he reported being irritable, impulsive, uncomfortable around others, and unable to remain focused. However, he still had not been seen by a psychiatrist, nearly three months after having initially been placed on suicide watch. It was only after our intervention that he was scheduled to be seen.

- EE, who has history of mental illness, was admitted in January 2011. Even though EE reported during admission that he attempted to overdose on his psychotropic medications, he was not referred to a mental health professional for evaluation. He instead was allowed to self-administer his lithium. Less than five months later, EE was rushed to the emergency room after he overdosed on lithium. When EE returned to the Jail, the psychiatrist discontinued his medication and failed to prescribe an alternate therapy.

- FF was brought to the Jail in November 2009. He reported a history of severe mental illness. Despite this history, FF was neither treated nor seen by a mental health professional for nearly six weeks after admission. During this period of time, FF complained to Jail staff that he wanted to "find the end of all ends," was placed on suicide watch two times, placed in protective custody, denied placement in general population because of his mental status, and was described as "visibly unstable, mentally afflicted." It appears that FF's mental illness went untreated for weeks before he was finally prescribed psychotropic medications.

3. *St. Tammany violates the Constitution by failing to provide adequate follow-up care*

In order to satisfy the minimum requirements of the Constitution, a correctional mental health care program must "… treat in an individualized manner those treatable inmates suffering

from serious mental disorders." *Ruiz*, 503 F. Supp. at 1339. During our review, we found many examples of prisoners who needlessly suffered because the Jail provided little or no follow-up mental health care. The total lack of an effective system for scheduling, monitoring, and providing adequate care resulted in unnecessary delays at St. Tammany. The delays in providing necessary care likely occurred because St. Tammany uses a medical request system for scheduling follow-up appointments, which requires prisoners to ask for follow-up mental health care.

During our interviews, prisoners reported that even after submitting medical request slips, they had to wait four to six weeks before they were evaluated by the psychiatrist. Our review of grievances and medical records confirmed the four to six week wait period. In addition, reliance on a medical request system places prisoners with severe mental illness at serious risk of harm because of the likelihood that these vulnerable individuals may be too impaired to access the system. We found several examples of vulnerable prisoners who remained untreated at the Jail, and who experienced deterioration in their mental health status, including the following:

- BB has a history of severe mental illness. In January 2011, BB was seen by the psychiatrist. During the next three months, it appears that BB began to decompensate, yet the psychiatrist did not schedule a follow-up appointment. During this period, BB was involved in several altercations at the Jail, and medical staff deemed him a "danger to others." Despite his changes in condition and aggressive behavior towards others, he remained untreated.

- GG, who entered St. Tammany in 2009, also has a history of severe mental illness. Despite being diagnosed with severe psychosis, GG was only seen every 90 days by a psychiatrist – a frequency of treatment typically expected of stable prisoners. GG was described as "pressured, animated, bizarre behavior and with flight ideas." He also was observed ripping his uniform pants, wiping the toilet with toilet paper, ripping his mattress apart so that he could climb inside it, and spitting at staff. Still, St. Tammany failed to schedule timely follow-up appointments to address his mental illness. GG was only seen by the psychiatrist six times between May 2009 and May 2011.

In addition, we found that St. Tammany has not implemented a system for designing treatment plans for prisoners with mental illness. Treatment plans should be designed and implemented to address environmental, historical, and psychiatric factors that contribute to a prisoner's mental illness. Treatment plans should minimally include the frequency of follow-up care, evaluations, and treatment goals. Although treatment plans are a critical component to an adequate follow-up care program and the National Commission on Correctional Health requires treatment plans for prisoners, the Jail has yet to implement this crucial treatment mechanism. In fact, the Jail's medical staff told us that such a practice is "unrealistic in the jail environment." As a consequence, we found instances where untreated prisoners attempted suicide, or were not effectively treated for substance abuse, and others who simply languished for months.

4. *St. Tammany violates the Constitution by failing to provide adequate monitoring of the administration of psychotropic medications*

In assessing the effectiveness of a facility's medication administration practices, courts have ruled that the "prescription and administration of behavior-altering medications in dangerous amounts, by dangerous methods, or without appropriate supervision and periodic evaluation, is an unacceptable method of treatment." *Ruiz*, 503 F. Supp. at 1339. We found that the Keep on Person ("KOP") medication administration protocol in operation at St. Tammany at the time of our onsite visit fell below this standard, and violates the Constitution by failing to ensure that Jail staff appropriately administer psychotropic medications or supervise prisoners taking these medications. We found that St. Tammany permits prisoners with serious mental health needs to self-administer dangerous amounts of psychotropic medications with little or no supervision or evaluation. In fact, medical staff reported that custody staff - not physicians or nurses - monitored psychotropic medication intake while prisoners were housed in the housing units.

Based on our review of medical charts, we found an alarmingly high number of prisoners who were prescribed significant amounts of psychotropic medications, yet were not consistently monitored or evaluated by mental health professionals. As a result, we found instances where prisoners were hoarding medications, fighting over medications, and even misusing medications while in housing units.

Prisoners who we interviewed during our tour told us that they were attacked for their medications. These acts of violence persisted because there is no way that prisoners can safely secure their medications. Because the Jail does not have specialized units for prisoners with mental illness and does not allow prisoners to secure dangerous drugs in secured boxes, it was not uncommon to find that prisoners hid drugs under their beds and in various other discrete places in the housing units. Consequently, we found that prisoners were taking other prisoners' drugs and in some instances with near fatal results.

The following examples illustrate the harm caused by St. Tammany's psychotropic medication administration program:

- In March 2011, HH overdosed on his medication. He was rushed to the emergency room after staff discovered that HH ingested large quantities of lithium. Despite HH's history of mental illness, and two suicide attempts in a six-month period, he was allowed to self-administer dangerous psychotropic medications.

- In August 2010, II was rushed to the emergency room after taking large amounts of prescribed medications. II has a learning disorder that should have alerted nursing staff that he was unable to self-administer medication. Rather, he was allowed to take multiple medications that likely contributed to his critically low potassium levels, which could have caused him to die.

- In May 2010, JJ ingested 20 Ultran pills that he received from another prisoner. JJ was taken to the emergency room where he was treated for an overdose. In an illustration of inadequacies in both St. Tammany's medication administration and mental health practices, we noted that even after returning from the emergency room, JJ was not evaluated by a mental health professional or assessed by any medical professional to determine if he continued to be a suicide risk.

St. Tammany is reportedly making efforts to improve its KOP medication protocol. The Jail has made necessary changes, such as eliminating its KOP policy for medication administration and has implemented changes in the administration of psychotropic medications, including requiring that prisoners are supervised while psychotropic medications are administered and that nursing staff will only administer medications two times daily. These long overdue changes mark a good beginning in ensuring that psychotropic medications are administered safely. Although St. Tammany has taken positive steps to address pervasive problems in its troublesome medication administration practices, we still believe it is necessary to monitor new medication protocols to ensure that policies and procedures are revised and implemented, that all nursing staff are trained and understand their new responsibilities under the new protocols, that prisoners receive their prescribed medications in a timely manner, and that all errors in medication administration are tracked.

## B. ST. TAMMANY IS DELIBERATELY INDIFFERENT TO THE SUICIDE RISKS OF PRISONERS

Our investigation found that St. Tammany is deliberately indifferent to prisoners' suicide risks. Courts have consistently found that conditions posing a substantial risk of serious harm to prisoners violate the Constitution, even if no prisoner has suffered actual harm at the time the violation is found. *See Farmer*, 511 U.S. at 845-47; *Helling*, 509 U.S. at 34 (finding that "a remedy for unsafe conditions need not await a tragic event"). Courts have further found that compliance with prisoners' right to a minimally adequate mental health treatment program requires, at a minimum, that correctional mental health programs provide more treatment than mere "segregation and close supervision" of suicidal prisoners. *See Ruiz*, 503 F. Supp. at 1339. In fact, adequate treatment requires the participation of mental health professionals, who are employed in sufficient numbers. *Id.* Unfortunately, we found that St. Tammany's care of suicidal prisoners is a significant departure from constitutional requirements. As with our general mental health findings, we found that inadequacies in the care that St. Tammany provides to suicidal prisoners is related to the Jail's failure to employ a sufficient number of qualified mental health staff to manage the number of prisoners with mental illness, and to the Jail's failure to provide sufficient training about suicide prevention for security staff and LPNs, who are charged with the primary day-to-day responsibility for managing suicidal prisoners.

### 1. *St. Tammany violates the Constitution by inhumanely placing prisoners in booking cages ("squirrel cages") and confining prisoners to security benches*

Prison officials must provide humane conditions of confinement; and they must ensure that prisoners receive adequate shelter and medical care, and must take reasonable measures to ensure the safety of prisoners. *See Gates*, 376 F.3d at 332, *quoting Farmer v. Brennan*, 511 U.S. 825, 832. Courts have measured prison conditions by looking at "evolving standards of decency

that mark the progress of a maturing society." *Estelle*, 429 U.S. at 102. Courts have also held that conditions that are designed to prevent life's basic needs violate the Constitution. *See Harpers v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999).

At the time of our tour, St. Tammany engaged in routine, long-term use of booking cages to house suicidal prisoners despite instructions to the contrary in the Jail's written policy. The booking cages are heavy gauge three feet wide and deep and seven feet tall chained-link cages. We observed and documented St. Tammany's routine use of the cages to house prisoners with mental illness although other housing options were available. As discussed below, these cages deprive prisoners of adequate mental health care, as well as adequate shelter. As recently as June 2011, St. Tammany's medical staff boasted that the booking cages were the "front line of defense in suicide prevention" and justified placing prisoners in the booking cages "because there is no other safe place in our facility to house that person." When asked, the Sheriff admitted that St. Tammany is the only parish-run jail in the state utilizing the booking cages to manage prisoners with mental illness.

Although St. Tammany's suicide prevention policy directs that the booking cages would be used a mechanism of last resort, we found a pervasive tendency to place prisoners in the cages as mechanism of first resort. The Jail's Suicide Watch Placement Form contradicts the suicide prevention policy by directing all prisoners on suicide precaution be "PLACED IN BOOKING CAGES UNTIL MEDICAL ORDERS OTHERWISE." (Emphasis in original.) In our suicide prevention expert's opinion, this method of managing prisoners is overly restrictive, seemingly punitive. The policy also indicates that prisoners would not remain in the booking cages for more than a period of 10 hours. We found, however, that prisoners were placed in the cages beyond 10 hours – in fact, several prisoners complained that they were placed and remained in the booking cages in excess of 24 hours and in some instances for days if not weeks. In most of these instances, we found that prisoners had little or no access to water or toilets. Prisoners reported that they were required to urinate in cups because jail staff limited their access to restroom facilities. While this practice clearly deprives prisoners of basic needs, it also exposes them to health risks.

We also found that prisoners were forced to remain standing in cages for the balance of the time that they remained on suicide watch because the cages were too small for prisoners to sit or even lay down. Prisoners therefore were unable to sleep in the cages, which in effect is a deprivation of a basic need. In addition to this deprivation, we noted that prisoners were not afforded access to telephone calls, visits, reading materials, mattresses, out-of-cell time, or even showers while in the booking cages. Prisoners also complained that there were instances where multiple prisoners were placed in the same booking cage because of staffing shortages.

To exacerbate the inhumane conditions of the cages, we noted that the cages are in full view of several large multiple-occupancy holding cells, where they were subjected to ridicule by other prisoners at the Jail. We found this unnecessary exposure of suicidal prisoners to other prisoners humiliating and offered no therapeutic value. We further found that unnecessarily confining prisoners to a booking cage for 24 hours only enhances isolation and is anti-therapeutic. We also find that confining prisoners with mental illness in booking cages contributes to the difficulty of obtaining accurate information to determine the source of suicidal ideation. Instead of appropriately managing and treating prisoners with mental illness, the

booking cages are a deterrent for reporting suicide ideation. Many prisoners were reluctant to express suicidal ideation to avoid the cages, even if the alternative was to suffer from their untreated mental illnesses and suicidal thoughts.

The following examples illustrate prisoners' aversion to being placed in the booking cages:

- In May 2011, CC was placed in a booking cage after banging her fists on the cell door and running into the walls of her cell. The following day CC was seen by a non-mental health physician and reported that she needed her mood stabilizing medication. After being in the booking cage for two days, CC denied suicidal ideation and was discharged from the booking cages. CC told us that she was not feeling better, but just wanted to be removed from the cage.

- In May 2011, LL was placed in the booking cage after she reported feeling suicidal because she did not receive her medication. While in the booking cage, she began banging her head on the steel bars and refused to wear a safety helmet to protect her head. She was then removed and placed in four-point restraints for several hours before she was returned to the booking cage. LL was later assessed by a non-mental health physician, where she denied any further suicidal ideation. When we interviewed LL, she told us that "It was not that I was feeling any better, it's just I wanted to get out of the cage."

We find that the use of booking cages is inconsistent with evolving standards of decency and does not mark the progress of a maturing society. This practice is unconstitutional, and is also inconsistent with professional standards and inhumane. Unsurprisingly, neither the American Correctional Association ("ACA") nor other national correctional standards condone the use of booking cages for managing prisoners with mental illness. Still, at the time of our visit, the Jail was using this practice to manage its prisoners with mental illness.

Months after we completed our onsite tour and in response to the concerns we conveyed at the exit interview of our tour, St. Tammany reported that it was making efforts to improve its management of suicidal prisoners. In fact, the Jail told us that it abandoned its use of booking cages for treating suicidal prisoners in September 2011, although the Jail admitted that it will continue to use the cages for booking prisoners in the Jail. The Jail also told us that it began construction of five suicide-resistant cells. The construction of the new cells and the departure from the practice of placing prisoners with mental illness in booking cages marks a significant cultural change at St. Tammany. This cultural change still is only the first step in ensuring that prisoners at St. Tammany are treated in a manner that comports with the Constitution.

Despite these changes, we continue to have serious concerns about suicide prevention at St. Tammany. The booking cages will still be present in the jail, although St. Tammany told us that staff have been informed that they cannot be used to house suicidal prisoners. Even if appropriate policies and procedures have been adopted, at present we do not have confidence that they will be consistently implemented. Finally, through our investigation, we learned that St. Tammany had previously informed advocacy organizations that it had enacted new policies related to managing suicidal prisoners and would halt or curtail its use of the cages, only to

continue their use. These reasons are the basis both for our continued concerns about the booking cages, and for our decision to retain in this letter a detailed description of our findings about the cages and the observations made during our tour.

Besides the unconstitutional use of the booking cages, we found that St. Tammany also handcuffs prisoners with mental illness to security benches. During our tour, we observed several metal-enforced benches throughout the jail. The benches were primarily designed to manage disruptive prisoners, but we found that St. Tammany was using these metal chairs to confine prisoners with mental illness. The Jail's suicide prevention policy authorizes the Jail to shackle prisoners to metal benches on a limited basis. When asked about using security benches to manage prisoners with mental illness, the Jail's Medical Director adamantly insisted that this practice was neither used nor accepted by any staff at the Jail. Yet, we found at least two examples where security benches were used to treat prisoners with mental illness. In both instances, we found that correctional staff confined prisoners to security benches without consulting with medical staff. The inconsistent application of security benches to manage prisoners with mental illness suggests that correctional staff and medical and mental staff fail to consistently coordinate appropriate treatment.

Other inadequate suicide prevention and treatment strategies include permitting staff to confine prisoners to security benches in the booking area, to house them in juvenile isolation cells, and to house them in female holding cells. These cells are unsafe. In each of these housing alternatives, we found multiple means that prisoners could use to commit suicide by hanging, including: ventilation grates on the ceiling and wall; telephones with metal cords; restraint bolts and privacy screens that could be used as anchoring points; and bunk holes that could be used as a ligature. Every reported suicide and the most recent suicide attempts occurred in the holding cells.

2. *St. Tammany is deliberately indifferent to prisoners who pose a significant risk of suicide and self-harm by falling to adequately monitor prisoners on suicide watch*

During the past five years, two prisoners have committed suicide and two have attempted suicide at the facility. Although the reported suicide rate at St. Tammany is not high, we remain concerned with St. Tammany's ineffective suicide prevention practices. For example, we found gross deficiencies in St. Tammany's monitoring of the cells used for prisoners on suicide watch. St. Tammany's policies require correctional staff to conduct monitoring (direct physical observation) of cells continuously, but we found that staff were not providing direct observation; rather, they relied on closed-circuit televisions located in the booking room to observe prisoners. This practice is a significant departure from generally accepted practice and is an unreliable instrument for observing and preventing suicides. Most notably, the last two successful suicides at St. Tammany occurred in cells that were monitored by closed-caption television. The following examples further illustrate the harm to which prisoners are subjected by the Jail's grossly deficient monitoring practices:

- In both January 2011 and June 2011, MM was placed in a holding cell, tied his shirt to one of the ventilation gates and attempted to commit suicide. Even after MM made these attempts to commit suicide, St. Tammany did not take any steps to make the holding cells suicide resistant.

- In September 2010, less than three minutes after being placed on suicide watch, NN attempted to commit suicide by tying an article of his clothes around his neck. After jail staff intervened, NN was transported to the emergency room where he received mental health treatment. Less than 24 hours later, NN was returned to the Jail and placed on suicide watch. He was not evaluated by the mental health staff upon his return to determine appropriate treatment.

- In November, 2009, OO, a 40-year-old male, committed suicide by asphyxiation with a bed sheet around his neck. OO was transferred to St. Tammany from a psychiatric facility where he had been treated for severe mental illness. Less than three days after being housed at St. Tammany, OO was placed on suicide watch after he threatened to kill himself. Although OO was seen by a psychiatrist in October 2009, he again was placed on suicide watch six days later but was not referred to the psychiatrist. For the next five weeks, OO's behavior was described as bizarre and he attempted suicide on at least another occasion; still he was not seen by the psychiatrist. We note that OO was in full rigor mortis when officers found him, which suggests that OO was dead for several hours before he was discovered.

We also found an alarming practice of prisoners being removed from suicide watch without being timely assessed by a qualified mental health professional. Instead, St. Tammany's suicide prevention policy allows its medical doctor to make a determination on whether the prisoner will remain on suicide precaution. Medical staff admitted that in cases where physicians were not onsite, physicians were allowed to make decisions regarding removal of prisoners from suicide watch without a one-on-one assessment. This grossly inadequate method of managing suicidal prisoners is inconsistent with generally accepted standards of care, which requires that decisions such as determining whether a prisoner should be removed from suicide watch be made only by a qualified mental health professional.

St. Tammany has begun to make changes to its suicide monitoring process to ensure that all prisoners on suicide watch are identified and monitored by staff. The Jail recently created a suicide database to track and monitor all prisoners placed on suicide watch. The database is designed to track the number of times a prisoner is placed on suicide watch during the current or previous incarceration. In addition, the Jail now requires medical staff to generate a daily list of all prisoners on suicide watch, and the Jail will now monitor all prisoners in suicide-resistant cells by direct observation. These changes mark a good beginning; however, we note concern with one officer possibly monitoring five prisoners on suicide watch. Although the purported changes allow for direct observation of prisoners on suicide watch, we do not believe that an effective monitoring system should permit one officer to potentially monitor as many as five prisoners on suicide precautions. In our mental health expert's opinion, this unacceptably high ratio is another factor that leads us to believe that St. Tammany's new suicide precaution protocol is insufficient.

3. *St. Tammany's Suicide Prevention Training is Grossly Inadequate*

St. Tammany fails to provide adequate suicide prevention training to all corrections, medical, and mental health staff. A failure to adequately train jail personnel to handle prisoners with known mental problems can be the basis for finding deliberate indifference to a prisoner's constitutional rights. *See Patridge v. Two Unknown Police Officers of the Houston*, 791 F.2d 1182 (5th Cir 1986). *See also Silva v. Donley County Texas*, 32 F.3d 566, 1994 WL 442404, *5-7 (5th Cir. 1994) (unpublished) (holding that sheriff's failure to provide suicide prevention training for jail personnel may rise to deliberate indifference to known risk of suicide in jail setting). Jail officials violate the constitutional rights of prisoners when they fail to provide training in situations where the need for training is so obvious that failure to train could properly be characterized as deliberate indifference. *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989). Liability attaches when officials have actual or constructive knowledge that the lack of training causes employees to violate individuals' constitutional rights. *See Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011)

As a general matter, the need to provide suicide training in a correctional facility that houses suicidal and severely mentally ill individuals should be obvious. Both the ACA and the National Commission on Correctional Health Care stress the importance of training in any suicide prevention program. At least on paper, St. Tammany recognizes the importance of suicide prevention – in reviewing the Jail's policy, we found clear direction that staff should receive training. Moreover, the need for training at St. Tammany is evident from the harm and risk of harm suffered by suicidal and mentally ill prisoners who were under the supervision of poorly trained staff and staff who were given important assignments that they clearly were not qualified to perform. During the past five years, two prisoners have committed suicide, at least two others have attempted suicide, various others have been inadequately screened and/or monitored for risk of suicide, and suicidal prisoners have been placed in booking cages. Despite the Jail's own policies, however, and despite these disturbing conditions and events, the lack of staff training persisted.

St. Tammany failed to provide suicide prevention training for its nursing staff. For example, St. Tammany's policy requires that nursing staff be able to identify and manage prisoners on suicide watch. Yet, we found that nursing staff were unable to complete these required tasks. When asked about whether nursing staff received training on identifying and managing suicidal prisoners, St. Tammany's medical director admitted that no such training was provided. Moreover, the medical director told us that even if training was available, he would not be confident that the staff would learn. Despite the lack of training and the medical director's views of LPNs' inability to be successfully trained, St. Tammany continued to direct nursing staff to provide care and services to suicidal and mentally ill prisoners that they clearly were not trained to provide.

We found similar severe deficiencies in security staff training. Successful suicide prevention is a collaborative process among all staff; however, training is particularly critical for corrections officers because they are often the only staff available 24 hours per day and who have regular contact with the prisoners. In fact, correctional staff form the front line of defense in suicide prevention. St. Tammany's policies recognize the need for providing security staff

with a minimum level of training on suicide prevention. But in practice, the Jail does not provide the training that officials know must be provided. When asked, the Jail was unable to furnish curricula or lesson plans for correctional officer suicide prevention training. We learned after reviewing training records that no suicide prevention training was provided to Jail staff. As a result of the Jail's grossly inadequate training, security staff unnecessarily placed suicidal prisoners in non-therapeutic booking cages, inadequately monitored prisoners in holding cells, and were unable to identify prisoners with mental illness or to identify and manage prisoners' mental health conditions. Moreover, St. Tammany allowed unqualified mental health professionals to perform assessments on suicidal prisoners.

These facts all indicate the clear need for staff training as a part of any effort to reform mental health care and suicide prevention at St. Tammany. Despite these obvious deficient training practices, St. Tammany failed to address training needs when it described purported facility improvements to us in its October 2011 letter.

## C. ST. TAMMANY FAILS TO PROVIDE ADEQUATE QUALITY ASSURANCE SYSTEMS

St. Tammany does not currently have a consistent and effective process for quality assurance. Correctional facilities should have systems in place to ensure accountability for errors that lead to grievous harm. *See generally Helling,* 509 U.S at 33 (holding that prison authorities may not ignore a condition that is likely to cause future harm). An adequate quality assurance instrument is essential in examining the effectiveness of mental health care delivered at St. Tammany, by ensuring that mental health care results are analyzed, and that corrective actions are implemented so that the quality of care is improved. We found during our onsite tour that St. Tammany had not maintained lists of prisoners receiving mental health services, taking psychotropic medications, on suicide precautions, or who had attempted suicide. As we found, without this basic information, prisoners' right to adequate mental health care and suicide prevention were violated, because staff did not have the knowledge to identify and treat them.

We also found that St. Tammany failed to conduct self-critical mortality reviews. Mortality reviews typically are conducted after a completed suicide, serious suicide attempt, or an in-custody death. Mortality reviews are essential in order to determine the cause of death and how to prevent future incidents from occurring. Our expert reviewed mortality reviews of the last two suicides at the Jail and found a pattern of deficient monitoring of suicidal prisoners by staff that should have easily been identified. Both incidents occurred in the same holding cell under substantially similar circumstances. Indeed, both prisoners were placed on suicide watch in a holding cell that correctional staff were supposed to be monitoring by closed-captioned television, yet both prisoners manage to commit suicide. St. Tammany failed to respond to either of these incidents by making necessary changes to its monitoring or care of prisoners in the holding cells, and took steps to remedy these inadequacies only after our tour.

Equally troubling, we found that the medical director failed to identify these deficiencies in staff members' monitoring of suicidal prisoners and failed to implement remedial measures to reduce the likelihood of futures suicides. Instead, he completed only a chart review, which was simply a self-serving defense of the care provided at the Jail. There was no analysis in the chart

review of whether St. Tammany policies, procedures, staffing patterns or training contributed to these tragic deaths and suicide attempts. There was no discussion of how St. Tammany might change its practices in order to avoid future suicides and attempts. The lack of an adequate quality assurance review of these incidents allowed the continued existence of conditions and practices at the facility that exposes prisoners to harm and risk of harm.

Recently, St. Tammany has begun to make changes in its quality assurance systems. The Jail has described significant changes, such as revamping its mortality and morbidity review process, performing peer reviews on all of its medical providers, implementing a system to monitor administrative functions of the clinic and nursing staff, installing a new computer system, and holding more quality assurance meetings to ensure that important information is timely disseminated to the health care staff. If properly implemented, these purported changes should improve the quality assurance systems at St. Tammany. We would, however, like to carefully monitor St. Tammany's purported changes to ensure that they are implemented in a timely and appropriate manner.

## V. RECOMMEDED REMEDIAL MEASURES

To remedy its failure to provide constitutionally adequate mental health care to St. Tammany prisoners, the Jail should promptly implement the minimum remedial measures set forth below. As noted above, in the process of negotiating a resolution to our concerns, we expect to more fully explore St. Tammany's implementation of the changes it has recently described to us.

### 1. Mental Health Care Treatment

Mental health treatment should comport with constitutional requirements and generally accepted standards of care to aid in classification, identification of emergent mental health care needs, provision of continuous care, and management of medication. Specifically, St. Tammany should ensure that:

a. Intake procedures and forms adequately screen incoming prisoners for mental health issues and ensure timely access to mental health professionals when the prisoner is presenting symptoms requiring such care.

b. Mental health screening results are incorporated into prisoners' files and implement a formal communication process between intake and classification staff.

c. All staff conducting intake screening are trained adequately, including identification and assessment of suicide risk, and are given appropriate tasks and guidance.

d. Intake screening is conducted in a setting that provides the privacy consistent with correctional security and which includes specific inquiry regarding whether an incoming prisoner is currently suicidal or has a history of suicidal behavior.

e. All reasonable efforts are made to obtain a prisoner's prior mental health records and that this information, along with all St. Tammany screenings, is incorporated into prisoners' charts.

f. Policies and procedures exist for appropriate assessments of prisoners with serious mental illness, and these policies and procedures are implemented.

g. There are policies and procedures to ensure prisoners with serious mental health needs receive timely treatment as clinically appropriate, in a clinically appropriate setting, and these policies and procedures are implemented.

h. Treatment plans adequately address prisoners' serious mental health needs and contain interventions, including therapy services that are specifically tailored to prisoners' diagnoses and problems.

i. Mental health staff conduct documented in-person assessments of prisoners prior to placement on suicide watch (segregation) and on regular intervals thereafter as is clinically appropriate.

j. Treatment of suicidal prisoners involves more than segregation and close supervision (i.e., providing group therapy, regular counseling sessions, and follow-up care).

k. There is inpatient level of care for all prisoners who need it, including regular, consistent therapy and counseling.

l. There is adequate on-site psychiatric coverage and psychiatric support staff in order to timely address prisoners' serious mental health needs.

m. Psychiatrists provide documented diagnoses of prisoners.

n. An adequate scheduling system is implemented to ensure that mental health professionals see prisoners with mental illness as clinically appropriate, regardless of whether the prisoner is prescribed psychotropic medications.

o. Prisoners receive psychotropic medications in a timely manner and have proper diagnoses for each psychotropic medication they receive.

p. Adequate psychotherapeutic medication administration is provided, including a prohibition on prisoners self-administering medications.

q. Psychotherapeutic medications are administered only with appropriate supervision and periodic evaluation and proper monitoring of prisoners.

r. Mental health evaluations conducted as part of the disciplinary process include recommendations based on the prisoner's mental status.

s. Mental health care staff are able to access prisoner medical records that are up-to-date, accurate, and that contain all clinically appropriate information.

t. St. Tammany's quality assurance program is adequately maintained to identify and correct deficiencies with the mental health care system.

u. Outpatient treatment, including regular, consistent therapy and counseling, is provided to general population prisoners who are on the mental health caseload.

v. Discharge/transfer planning, including services for prisoners in need of further treatment at the time of transfer to another institution or discharge to the community is provided. These services should include the following:

   i. arranging an appointment with mental health agencies for all prisoners with serious mental illness;

   ii. providing referrals for prisoners with a variety of mental health problems;

   iii. notifying reception centers at state prisons when mentally ill prisoners are going to arrive; and

   iv. arranging with local pharmacies to have prisoners prescriptions renewed.

**2. Suicide Prevention**

To be consistent with constitutional requirements and generally accepted standards of care with respect to the identification and treatment of suicidal prisoners, St. Tammany should ensure that:

a. There are policies and procedures to ensure appropriate management of suicidal prisoners and the establishment of a suicide prevention program.

b. St. Tammany does not resume its use of booking cages to confine prisoners with mental illness.

c. St. Tammany does not use security benches to restrain prisoners with mental illness.

d. Suicide watch cells are suicide resistant (e.g., suicide-resistant vents).

e. St. Tammany's suicide prevention policies include an operational description of the requirements for both pre-service and annual in-service training.

f. Ensure that, before assuming their duties and on a regular basis thereafter, all staff who work directly with prisoners have demonstrated competence in identifying and managing suicidal prisoners.

g. Any staff who are exempt from suicide prevention training have limited prisoner contact.

h. Intake staff are sufficiently experienced and qualified to identify prisoners that pose a risk for suicide, and conduct appropriate follow-up evaluations by mental health professionals of new prisoners within 14 days of intake.

i. All prisoners are screened upon intake, including questioning to assess current and past suicide risk.

j. All prisoner suicide attempts at St. Tammany are documented in the prisoner's correctional record in the classification system, in order to ensure that intake staff will be aware of past suicide attempts

k. Prisoners on suicide precautions receive adequate mental status examinations by a mental health clinician.

l. Suicidal prisoners are housed in an area that is safe for them with appropriate supervision and observation by staff.

m. Ensure that 15minute checks of prisoners under observation for risk of suicide are timely performed and appropriately documented.

n. Different levels of supervision of prisoners based on the presenting risk factors for suicide are provided.

o. Prisoners placed on suicide watch are assessed adequately, monitored appropriately to ensure their health and safety, and released from suicide watch as their clinical condition indicates according to generally accepted standards of care.

p. Administrative review is implemented following a suicide or a suicide attempt to identify what could have been done to prevent the suicide.

**3. Quality Assurance and Review**

To be consistent with the obligation to address conditions that are likely to cause future harm, St. Tammany should ensure that:

a. The Jail has a quality assurance program to assist in identifying and correcting serious deficiencies within the mental health system, prioritizing its efforts at reform, and developing appropriate remedies.

b. St. Tammany’s quality assurance program is capable of assisting in managing and treating prisoners’ mental health needs. At a minimum, such systems should be reliable and capable of tracking medically-related incidents.

***********

We hope to continue working with St. Tammany Parish in an amicable and cooperative fashion to resolve our outstanding concerns regarding conditions at St. Tammany. Since our onsite visit, St. Tammany has made significant and necessary changes to its mental health care program. We appreciate the Jail's proactive efforts, and are confident that the Jail will be able to resolve all the matters we raised.

CRIPA obligates us to advise you that, in the event we are unable to reach a resolution regarding our concerns, the Attorney General may initiate a lawsuit pursuant to CRIPA to correct the constitutional deficiencies we have identified in this letter 49 days after the appropriate officials have been notified of them. 42 U.S.C. § 1997b(a)(1). We would prefer, however, to resolve this matter by working cooperatively with you and are confident that we will be able to do so in this case. The lawyers assigned to this investigation will be contacting you to discuss this matter in further detail.

Please note that this letter is a public document. It will be posted on the Civil Rights Division's website.

Should you have any questions or concerns regarding this letter, please feel free to contact Jonathan M. Smith, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-5393.

Sincerely,

Thomas E. Perez
Assistant Attorney General