UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

AHMED BAQER, ET AL. NO. 2:20-cv-00980-WBV-DPC
DISTRICT JUDGE:
WENDY B. VITTER
VERSUS SECTION "D"
MAGISTRATE JUDGE:
DONNA PHILLIPS CURRAULT
ST. TAMMANY PARISH SECTION "2"
GOVERNMENT, ET AL.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KEVIN LOUVIERE, ET AL. NO. 2:20-cv-01840-WBV-DPC
DISTRICT JUDGE:
WENDY B. VITTER
VERSUS SECTION "D"
MAGISTRATE JUDGE:
DONNA PHILLIPS CURRAULT
ST. TAMMANY PARISH SECTION "2"
GOVERNMENT, ET AL.

DEPOSITION OF SHERIFF RANDY SMITH, 300 BROWNSWITCH ROAD, SLIDELL, LOUISIANA 70458, taken at the LAW OFFICES OF MILLING BENSON WOODWARD, LLP, 68031 CAPITAL TRACE ROW, MANDEVILLE, LOUISIANA 70471, in the above-entitled cause on the 20th day of February, 2023.

APPEARANCES:

JACOB LITIGATION, INC.
BY: DEVON M. JACOB, ESQ.
P.O. BOX 837
MECHANICSBURG, PENNSYLVANIA 17055-0837
(717) 796-7733
djacob@jacoblitigation.com
ATTORNEY REPRESENTING PLAINTIFFS

MILLING BENSON WOODWARD, LLP
BY: CHADWICK W. COLLINGS, ESQ.
68031 CAPITAL TRACE ROW
MANDEVILLE, LOUISIANA 70471
(985) 292-2000
ccollings@millinglaw.com
ATTORNEY REPRESENTING DEFENDANT,
ST. TAMMANY PARISH SHERIFF'S OFFICE

# I N D E X


| | PAGE: |
|---|---|
| Caption | 1 |
| Appearances | 2 |
| Agreement of Counsel | 4 |
| Witness' Certificate | 148 |
| Reporter's Certificate | 149 |


## E X A M I N A T I O N


| BY: | PAGE: |
|---|---|
| Mr. Jacob | 6, 124 |
| Mr. Collings | 116 |


REPORTED BY:

ANNA M. ROTH, RPR, CCR

CERTIFIED COURT REPORTER

S T I P U L A T I O N

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, for trial purposes, in accordance with law;

That the formalities of sealing, certification, and filing are specifically waived;

That the formality of reading and signing is specifically not waived;

That all objections, save those as to form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * *

ANNA M. ROTH, Certified Court Reporter, in and for the Parish of St. Tammany, State of Louisiana, officiated in administering the oath to the witness.

SHERIFF RANDY SMITH, 300 BROWNSWITCH ROAD, SLIDELL, LOUISIANA 70458, after having first been duly sworn by the above-mentioned Court Reporter, did testify as follows:

MR. COLLINGS:

Before we get started, we're going to put something on the record just to memorialize an agreement we made before the depo started.

Counsel has indicated -- there's going to be -- we're having an inspection later today at the jail. He has indicated he would like to take some pictures of the holding areas. We will agree to allow pictures to be made so long as we will enter into a protective order so that the photographs -- any photographs taken will not be utilized in any way outside the confines of this litigation and will remain confidential. Do we agree?

MR. JACOB:

Yes. As former law enforcement, I will just say I'm in complete agreement. I understand the security issues. I absolutely don't want to undermine

anybody's security. So they will be held confidential. In fact, I will even check with counsel before we use them for anything.

MR. COLLINGS:

Okay.

MR. JACOB:

And, of course, get rid of them when we're done.

MR. COLLINGS:

With that said, please proceed.

EXAMINATION BY MR. JACOB:

Q. Sheriff, we met a few seconds ago. I'm Devon Jacob. I represent the plaintiffs, actually, in two lawsuits that have been consolidated, both dealing with the exact same thing, though. I'm sure you're already aware of that because you have very able counsel as I have come to learn.

We are here for a deposition. I don't know. Have you ever done a deposition before?

A. Yes, sir.

Q. Excellent. So you at least understand the process. I'm sure counsel has

also told you. Sadly, there are some lawyers who get a bad reputation. I'm not here to play games. I don't trick or anything like that. I'm just going to ask you straightforward questions and ask that you provide me with straightforward answers. Okay?

A. You got it.

Q. All right. If at any point in time you need a break for any reason, you don't even have to tell me why, just say, you know, if you're tired of looking at my face, don't tell me why, just say, "I need a break." I'll happily accommodate. I just ask if there's a question pending before you take the break that you answer that question. Okay?

A. Okay.

Q. The court reporter has two hands. But it's not one for you, one for me. So I'm going to do my best to let you finish your answers before I begin my next question. But I'm going to ask that you do the same. Even if you can guess what my question is going to be or what I'm about to say, if you could just let me get it out so she can get it down on the record before you begin your answer. Okay?

A. You got it.

Q. All right. And if at any point in time you don't understand something that I say, I am almost certain it would be my fault, so just ask me to repeat it, restate it, clarify, whatever you need, and I'll be happy to do so before you answer. Because, again, I'm not here to play games with you. I just want the actual facts that answer the question. Okay?

A. You got it.

Q. All right.

MR. JACOB:

Counsel, you're ready, too?

MR. COLLINGS:

Uh-huh (affirmatively).

BY MR. JACOB:

Q. All right. So I can tell that you are a sheriff in uniform. How long have you been the sheriff?

A. I am in my second term. So about seven-and-a-half years now.

Q. All right. So during the 2019, 2020 time frame you were sheriff?

A. Yes, sir.

Q. And can you just tell us generally,

what does that mean? What are your responsibilities generally?

A. My responsibilities is to represent and lead the St. Tammany Parish Sheriff's Office, which is probably the third largest in the state of Louisiana based on our population, the size of our department, the sworn deputies, and our budget. I am also responsible to secure and oversee and manage the jail here in St. Tammany Parish. Right now we currently house just under 1,200 inmates on a given day-to-day basis.

Q. Okay. Now, am I correct with respect to the jail, the parish is responsible for building the facility and for paying for a doctor, but pretty much everything else falls on you as the sheriff?

A. The parish, the St. Tammany Parish owns the facility and the property it sits on. They are responsible for covering most of the costs for our pretrial inmates that are individuals arrested here, you know, in St. Tammany Parish that we house pending a trial.

Q. Okay. But you're not, as a sheriff -- the sheriff's budget is not responsible for building the building?

A. No, sir.
Q. But the sheriff's responsibility is to run the jail?
A. To oversee and manage respectfully under the state legislation. I am the caretaker of that jail.
Q. Is it fair to say then the buck stops with you at the jail?
A. As far as the management, overseeing, managing, and securing the jail, yes.
Q. Okay. So, for instance, if you have -- I'm assuming you have appointed supervisors?
A. Yes, sir.
Q. And they work subject to your authority to permit them to work, correct?
A. Yes, sir.
Q. And so any authority that they have -- outside of their law enforcement authority. But any authority that they have is delegated by you to them; is that fair?
A. Yes, sir.
Q. With respect to policy making at the jail, can you explain that process?
A. Policy making at the jail, there's three stages. There's our general operating

policy, which fits just about every division within the agency, our policy procedure manual. There's also policies and procedures that we have to fulfill according to the Department of -- Louisiana Department of Corrections. Also, due to the fact that we house federal inmates, we are obligated to file or to be in compliance with the DOJ, Department of Justice. We also have to remain in compliance along with the fire marshal guidelines from the Louisiana State Fire Marshal's office here. So when you add that up, we have a lot of different policies and procedures in place to follow.

Q. Now, you mentioned state inmates. You mentioned federal inmates. You also mentioned parish detainees, correct?

A. Correct.

Q. So it's my understanding, the parish detainees, you have to take; is that correct?

A. Yes.

Q. And then the state and federal inmates, are you required by the state constitution or state legislation to take those inmates?

A. No, sir.

Q. So am I correct then to say that that was something that was not required of the sheriff to do but was done?

A. Prior to my administration and the former sheriff, there were contracts in place with the DOJ and the DOC to house federal and state inmates on top of the pretrial inmates here in our parish.

Q. Is it fair to say then that you, as the sheriff, have a statutory and constitutional duty in the state to provide for the parish detainees?

A. Yes.

Q. But the obligations to the state and federal inmates are not statutorily delegated to you; is that correct?

A. They are on a contract. We are on a contract basis with both, the federal and state DOC, to house their inmates. We're also a hub in southeast Louisiana for their probation and parole through state probation and parole where we also house and process and hold violators from the department of probation and parole.

Q. With respect to the state and federal inmates -- well, first of all, let me

rewind on that a little bit. I think you mentioned that there are some federal detainees that you have?

A. Yes, for the U.S. marshal service.

Q. Okay. Just so we're clear on the record, what does it mean to you when I say "detainee" as opposed to "an inmate"? Or is it the same thing?

A. The same thing. We may house them for weeks. We may house them for days. It just depends on the U.S. Marshal Service. But our contract, we are subject to house U.S. Marshal pretrial or whatever the U.S. Marshal Service seems -- or deems as an inmate or a pretrial detainee.

Q. So I guess what I'm hearing you say is, when they come to you from the federal government, it doesn't matter whether they're classified with the federal government as a detainee or an inmate. They are an inmate for you?

A. That is correct.

Q. And with respect to the parish inmates, am I also correct, you have both detainees and inmates?

A. Yes.
Q. And is there a separate understanding to you as to what that means, a detainee versus an inmate?
A. The parish pretrial detainees, they haven't been convicted. We bring them in. They're charged. There's a bond usually set, or we contact a commissioner or a judge to get them a bond. They could be there a day or two, or they could be there for a long time depending on whether or not they can produce a bond and get out of the facility. Those are pretrial detainees, what we call parish arrestees, if you would.
Q. Okay. And then as opposed to inmates, what does that mean to you?
A. That is our -- that is our primary obligation. We house on an any given day basis probably between 450 and 500 pretrial inmates. And these are individuals that, for some reason, committed a crime within our parish that cannot afford or post a bond or have no bond.
Q. Okay. But, again, you have the parish detainees, and we just spoke about those, but then you have parish inmates? Or are they

the same thing for you?
A. No. The same thing.
Q. All right. Is there a difference to you between a convicted inmate or a pretrial detainee?
A. Yes.
Q. And what would that difference be?
A. On the state, Department of Corrections, we house plenty of their inmates. That's based on a contract separate from the feds. Those inmates are usually convicted and sent to us on a contractual basis because they're either -- they're housed there by us, and the service is reimbursed, or we charge the state to house them.
We're also a hub for a program, which is a nonviolent offender program. And what we do is we try to -- you know, we bring them in. We get funding to pay for our employees to train and teach these inmates on reentry so hopefully when they get out as a nonviolent offender, they don't re-offend. And it's a good program. As long as the funds are there to provide those services, we're going to continue to do that.
Q. Sure. My question, though -- and I

appreciate that -- relates back to just the parish inmates. So you have pretrial detainees, and then you have convicted inmates; am I correct?

A. The only convicted inmates that we have housed at our facility are Louisiana Department of Corrections' inmates that have already been sentenced.

Q. Okay. Because I thought you said, and maybe I misunderstood earlier, that with respect to your statutory and constitutional duties under the state, that the inmates were your primary responsibility, not the pretrial detainees. Or did I misunderstand?

A. You misunderstood. Pretrial detainees are our primary responsibility. We have to get them in. We have to book them, process them. We have to screen them for medical and mental health issues and make sure they're safe. That's a big concern.

Q. Okay. So --

A. And we can house them from a day or two, or we can house them from the time they go to trial.

Q. So through statutory and

constitutional state law, you're required to take the parish detainees?

A. Yes.

Q. But you're not required to take the Department of Corrections for the state or the federal inmates; is that correct?

A. We do have a contract with them to house both. And we will provide that service as long as the funds are available for us to do so.

Q. But, again, statutorily and through the constitution, you have no obligation legally to take the Department of Corrections for the state or the federal inmates?

MR. COLLINGS:

I'm just going to enter an ongoing objection just to the extent that it may call for a legal conclusion.

MR. JACOB:

Sure. And I'll just quickly respond that in the context where the deponent needs to know the law in order to perform their job, it is permissible. But we don't debate it. Just throwing it on there.

BY MR. JACOB:

Q. So, again, maybe if I ask it more clearly.
I understand that the sheriff before you, or you, are in a contract?
A. Correct.
Q. And so that there puts -- connotes some sort of legal responsibility, correct?
A. Yes.
Q. All right. Setting aside the contract, though, statutorily or through the state constitution, am I correct there's no legal obligation for the sheriff to take in state or federal inmates?
A. Based on the contract we have with them, yes. Constitutionally, no. That's a decision that we took following the previous administration that we followed to bring in additional funds to operate the jail effectively, efficiently, and, most importantly, safely.
Q. Okay. So am I correct that those contracts are in exchange for money? You're housing inmates, and they're paying money for that?
A. That is correct.
Q. Can you explain how your budget

comes to be at the sheriff's office?

A. Yes. Our budget runs roughly around $74 million a year. Most of the money that we collect comes from a millage. We also -- I'm also the ex officio tax collector. A percentage of what we collect in property tax, we give back to the agency as well. But most of the funds that we collect come from a millage. There's two millages. And one is perpetual. The other one is renewable every ten years.

The bulk of our budget comes from the taxpayers, the property tax millage that we have on the ballot.

The rest of our funds come from the parish as far as anything to do with operating, maintaining, and securing the jail. Half of that money comes out of my budget because it's a responsibility by us, and the other half usually comes from the parish.

Q. I saw the --

A. Usually.

Q. Look, I did ten years on the defense side with government, so I can sort of understand where that smile is coming from.

Are there times that that becomes an

issue?

A. That is, unfortunately. And it's not just here. It's everywhere.

Q. Yeah. And is that by virtue of the fact that the money is just not available at the parish to provide, or is it a political issue?

A. It's not a political issue. It's a money issue. It was a tax that was in effect for many years to run the courthouse and the jail at the parish -- it was their tax. It was a sales tax, I believe. And after it was up for renewal, it failed. Just basically lack of trust on the people who were responsible for renewing that tax.

And we made cuts. And we looked in areas that we could cut to help, you know, offset the cost of going up, which has increased. But when the tax failed, it causes me to fight with them, basically argumentatively, on how much we need to successfully run the jail.

So far we're still in that area, and we're working together. We've offset some costs and they're -- as long as they're paying me, I don't have to sue them. But we don't know what next year brings.

Q. And I was actually going to get to what you just said. There is a legal remedy that you could pursue in the event that the parish forces you into being underfunded; is that correct?

A. That is correct.

Q. And can you explain that?

A. There are other agencies that are just like us that have successfully filed lawsuits against the police jury or their parish government in their responsibility to fund the jail. We've looked into that, and we have followed up on some court proceedings. And, again, I don't want to do that. If necessary, we would. But as long as we're getting the funding that we need to operate successfully and safely and then keep not only the inmates but our deputies safe, I think we'll get through it. But if the money runs out for them and they don't pay me for what we need to successfully keep the jail in operation, you know, it could lead to a lawsuit.

Q. Okay. Has there been any legal proceedings related to funding of the jail?

A. No. There has been --

Q. Are there any plans -- sorry. Go ahead.
A. No. There has been some discussion. I would call it more mediation than a lawsuit. But so far it's working out, so --
Q. Am I correct, though, to make ends meet during the time that the parish is putting a squeeze on the funds, for lack of a better term, you're required to cut services in order to make that happen, correct?
A. As long as those services do not interfere with the safety, health care, and well-being of the inmates, or, again, of the deputies I have assigned to work there.
Q. Isn't that a subjective determination, though?
A. No.
Q. So there's objective guidelines that you look to to determine what constitutes safe operation?
A. No. What I'm saying is that we have to look at the entire budget on what my responsibility is and the parish's responsibility. And we have, probably over the last four or five years, made additional cuts to

offset the increase on what it takes to run a jail. The food costs are going up. The medical costs are going up, personnel, benefits, and equipment. Salary and benefits. Everything continues to go up. And, unfortunately, the jail, we see increases a lot of times in the inmate control that we have.

Q. But am I correct, I mean, whether you serve filet mignon or ham and cheese, that is a subjective determination and certainly can affect the underlying finances of the facility?

A. True.

Q. And whether or not you're willing to staff for overtime or not, again, that's sometimes subjective and affects the bottom line?

A. True. We do what we have to do to, again, provide the best quality of service possible without jeopardizing the safety of our inmates or our staff.

Q. So what's the standard then? I mean, I keep hearing about the safety and doing the best we can. What standard are you measuring yourself against?

A. I measure the safety of, again, the inmates, the quality of health care, the mental

health, the -- what we have to do as far as fill and stay in compliance with the DOJ, the DOC, the fire marshals, that we are providing the best quality of service possible with the amount of money we have available to do so.

Q. When you were talking about the budget, I heard you talk about the millage taxes. What else did you mention? Well, what I didn't hear you talk about was the DOC and federal contracts. They contribute to the budget, correct?

A. Yes.

Q. And in what percentages?

A. That, I do not know. But it does offset some of our costs from the sheriff's office to house these individuals and to make sure we have adequate staff to oversee all the inmates, not just the DOJ or the DOC inmates.

Q. Is it fair to say, though, this isn't a break-even proposition? I mean, you're not in a contract to end up at zero? It's to hopefully end up in the plus column, correct?

A. Or at least break even. And, again, with the continuous cost in running a facility like that, every amount of revenue that we have

helps out tremendously to prevent us from using funds that go towards the general operation budget to provide public safety to our citizens.

Q. When the budget is prepared, I mean, are you assigning cost to each of these projects so you can see what the money is being brought in and what that project's actually costing you?

A. Yes.

Q. And so you then have the ability to see, did housing federal inmates cost us, or did we make money on that, correct?

A. And that's based on not the amount per day we charge. It's based on the amount of inmates that we house from the DOJ.

Q. Okay.

A. It could be 100. It could be 150. Of course, the more inmates that we house, yeah, there could be a better revenue --

Q. So --

A. -- to offset our cost.

Q. I'm sorry. So let's just take a single federal inmate. When you take that inmate in under contract, presumably, you didn't take that where the contract doesn't say you're going to make nothing on taking this inmate in,

correct?

A. It's got to be worth our while, or we wouldn't do it.

Q. Okay. So you're in agreement with me. This is a for-profit venture to house federal inmates?

A. It's a revenue source to help my general obligated budget to offset those costs that we have incurred with the increase in running a facility like that.

Q. Understood. But it's a part of your budget that is expected to always be in the positive; is that correct?

A. As long as we house the amount obligated by contract. But the amount of inmates makes a difference on whether or not we're breaking even or seeing revenue.

Q. Okay. No. That's fair.

A. Okay?

Q. And I'll just do a hypothetical, and tell me if I understand you then. So if the contract is for 50, 50 is the point where you break even, so more -- or, no, 50 is the point where you're probably profitable. But below 50 you could start to lose money. Above 50 you

could start to really show a benefit; is that fair to say?

A. Yes.

Q. Okay. I think we're on the same page then.

A. Okay.

Q. And the same situation then for the State Department of Corrections' inmates?

A. Which we house more than the feds, of course. But the rate of pay per day is less.

Q. Okay. But same situation. Same dynamic as far as the contract is set up. The expectation is the more that you house, the higher in the profit side -- I call it a profit, but increased revenue side.

A. Yeah. I call it revenue.

Q. Yeah, that's fair. That's fair.

A. Increased revenue to offset our general obligation budget. I try to keep it separate from the parish, our responsibility as far as our annual budget running that facility the best we can with the funds we have.

Q. Sure.

A. The problem we've seen, again, is an increase in the cost of housing inmates.

Q. Sure.
A. We're not getting additional funds. We're having to seek other means of doing so to offset those costs. That's all.
Q. And when you say you're not getting additional funds, I'm assuming you're meaning through the millage?
A. Through the millage that was lost and from the parish government, yes.
Q. Okay. So the amount coming in through the taxes and from the parish, that's remaining constant. But your costs are increasing to do the same job?
A. Correct.
Q. And the only place where you can see an increase is through the DOC -- well, through the state and federal contracts; is that correct?
A. Yes.
Q. Is there a rate increase that's built into those two contracts, the state and federal contracts?
A. They usually stay the same. Periodically, the legislators or lawmakers at the state capitol will give us an increase. But when it's done, it's for everybody, any of the

facilities that house DOC inmates, state inmates.

Q. I want to rewind just a little bit and sort of switch gears a bit.

A. Okay.

Q. I mean, you are in charge of running a jail. How is it that you have the -- and I'm not questioning you. But can you tell us, for the record, how you have the knowledge and the experience in order to operate a jail?

A. How do I have the knowledge and experience?

Q. Yeah. Is there certain degrees that you hold, or did you work at another city for a while and learned it? That's what I'm trying to get at.

A. Prior to -- yes, that's true. Yeah, prior to me becoming the sheriff here in St. Tammany Parish, I was the city police chief in Slidell.

Q. Okay.

A. I was there. I was elected and served six years before running for sheriff. We had a small -- a very small jail. We only housed 40 inmates, which was a little different because we housed very few DOC inmates and most were

pretrial under a misdemeanor basis. If there was a felony committed, we would house them for a day or two, then bring them to the St. Tammany Parish Jail.

So my knowledge in running and operating a jail started in the City of Slidell, a smaller facility, of course.

Q. Sure.

A. But then learning to comply with DOC and the fire marshal all started there.

Q. Okay. How about education-wise? Are there certain degrees that you hold in those?

A. No, not in management of a jail. I oversee and hire individuals, like a warden or assistant warden, to help manage, oversee the correctional facility, and also put people in place underneath them that have some knowledge, education, and training on running a jail.

Q. So you essentially assembled a toolbox?

A. Correct.

Q. All right. And as long as you get the right tools, everything is good?

A. Right.

Q. All right. I'm a quick learner.

How about on the education side? Do you have a college degree? What do you have there?

A. I'm in my 35th year of doing this job from starting at the bottom and working myself up to the top. My education is high school, some college. I graduated from the law enforcement academy at LSU in Baton Rouge. I then went on to management schools and other training throughout the years. And even to this day, we still have continuous education as a sheriff, as we all know, to continue to learn not only what the obligations are but to keep us from hopefully being in this situation.

We do have warden correctional training facilities. I don't usually go because I save those spots for our warden and assistant warden and some of their staff. But they have the same requirements through our state lawmakers to continuously be educated on running these facilities. And it's always a learning experience because it changes daily, as we know.

Q. On-the-job training is, in my opinion, some of the best training. So fair enough.

And so how long did you manage the -- what is it, Slidell?
A. Slidell.
Q. Slidell's --
A. Six years.
Q. Okay. And then I think you said, what, you're in your second term now? So total time is what?
A. 14.
Q. So you have about 20 years' experience in corrections; is that fair to say?
A. 20?
Q. Or more? Well, in supervising corrections. I'm sorry.
A. Supervising corrections, 14.
Q. Okay.
A. And, again, that's reading the manual and being in compliance with those inspections and audits that come up on a regular basis.
Q. No, I mean, it's --
A. It is. It was different from going from a 40-man jail to a 1,200-man jail. It's pretty different.
Q. No. It's clear that you're, you

know, reaching to get different experience. And that's good.

So in that regard, are there professional agencies or organizations that you're involved with that you reach to to get more knowledge and education on how to operate?

A. We have -- actually, I have had contracts with individuals that come in and do inspections on our jail. When I was elected, we had a consent decree from the former administration, and something I thought, well, I know it doesn't seem fair as the new sheriff inheriting a consent decree that was already in place from the DOJ. So we worked and hired a company to come in just to do an offset or an on-site audit to make sure that we were in compliance but also to use that information and audit so we could get out from underneath the consent decree, which saves us and the taxpayers more money.

Q. Sure. Sure.

A. And then we want to be in compliance with --

Q. Sure. I'm just going to pull something up here if that's okay.

When was the consent decree -- I'm familiar with it. And that was in place a very long time. Not to your fault. I'm just saying it was in place a very long time. When was that lifted; do you recall?

A. I would -- it was in my first year, year-and-a-half. I would say probably 2016, '17.

Q. And the process for getting it lifted, I think you said you brought in a group to do an inspection to prove to the DOJ that we're good?

A. That we were in full compliance and requested to get out from underneath the consent decree, which we did.

Q. Okay. And I'm sorry. You told me the year. Did you say '16?

A. I'm thinking more '16, '17.

Q. Okay.

A. Within, my first year or two of taking office.

Q. Trump administration? I think so.

MR. COLLINGS:

If you want me, I can help you fill in the blanks here.

MR. JACOB:

Yeah, please do. Just go for it.

MR. COLLINGS:

So just so you know, it wasn't actually a consent decree. It was called a memorandum of understanding between the Department of Justice, the parish government, because they owned the jail, and the sheriff's office because they ran the jail. And they were looking at mostly mental health at the end. That was really their focus. And they brought in some professor from Yale or whatever, I don't know, some Ivy League lady who would come down and do these inspections and write reports. You're compliant here. You need to work here. That process unfolded over the first couple years of his first term. I was kind of the point person on dealing with them.

MR. JACOB:

So you know where to find the final reports then?

MR. COLLINGS:

I probably would. And, like I said, it was not a consent decree. We didn't go

to court. We just told the Department of Justice, "We feel like we're in compliance, and we're going to go ahead and terminate it."

MR. JACOB:

Sometimes you just got to take bold moves.

MR. COLLINGS:

Right.

BY MR. JACOB:

Q. Okay. Any pushback from the DOJ when you terminated it?

A. No.

Q. Okay.

MR. JACOB:

And it was my understanding that that dealt with more the mental health issue side. I read up on some of that. And you said around 2016 you think it was?

MR. COLLINGS:

I think he's correct. I think it was '17. Maybe even into '18. He took office July 1, 2016. So you understand, his first year in office was July 1, '16 to July 1, '17. So it was probably within

the first two years of his first term.
But I don't know the dates.

MR. JACOB:
Okay.

BY MR. JACOB:

Q. So it sounds like you have a lot of experience, a lot of contact with different agencies, both professional -- or state or federal agencies with respect to the operation of the jail. So I'm going to ask you this. So presumably since there has been funding issues, I think you even noted many jurisdictions struggle with that issue, have you researched other ways to add to the bottom line of your budget?

A. You brought up overtime. Overtime is very important to fill the spots when there's openings, open billets, that they're hard to fill when there's manpower shortages. And we see that across our country in the correctional business. We normally do not have a problem with filling those billets and paying the overtime, but, of course, we're always trying to get those costs down, get them where they're manageable.

Q. All right. So cutting overtime is one area. I know the DOC federal contracts is

another area that adds to -- you have no control over the taxes, correct?

A. Correct. Except collect them and distribute them.

Q. So get out there and collect more. So I know the responses that don't happen here in depositions.

But, in any case, other than those, you know, what else do sheriffs do to bring more revenue in? What other type of programs have you heard of?

A. The programs through the early release programs that was initiated by the state, we had a three-year, $3 million contract, and that's going up for either renewal to continue that program, which gives us additional funding to offset our employee benefits, our benefits to provide those programs to nonviolent offenders. It also allows us to house those inmates as well from a state basis from the DOC perspective. And to continue those programs to, again, help, hopefully, offset them re-offending and winding up back in jail. It is a good program.

I don't know how long the funds will continue from the state. And if it's making that

big of a difference on their side. But it does help offset the costs for us to provide it. If they don't fund the programs and reimburse me for what it costs to house their inmates, then we would probably look at going a different route.

Q. And so, I guess, that's what I'm getting at. What are the different routes that are available to sheriffs out there?

A. Well, I mean, it would be either go to the voters and ask for more money or try to get a new tax passed, which is pretty tough right now. I don't see it happening. And it's the obligation more on the parish that owns the facility, not the guy who runs it, which is me. We have enough taxes to not only offset our budget, but we have enough taxes to collect for all the other governmental entities in our parish.

There is some talk about the parish going to the voters and asking possibly for a rededication of some roads and drainage tax that would help offset any and all costs that we may have with the failure of the former tax that was on the ballot.

Q. What kind of loss are we talking

about with that former tax? How bad did it hit your budget? I won't hold you to --
A. 10 million.
Q. Okay. I was going to say, I'm not going to hold you to exact numbers.
A. 10 million.
Q. Okay. So out of a, I think you said 75, $74 million budget, that's a pretty big chunk?
A. Yes.
Q. Okay. And when did that hit start?
A. That hit started two years ago.
Q. So roughly --
A. '20.
Q. -- 2019 maybe?
A. When it started, yes.
Q. Around the time that these events of the litigation happened?
A. I'm not sure.
Q. What was the name of that tax; do you know?
A. It was two propositions.
Q. Okay.
A. One proposition was for the jail. The other one was for the courthouse. Both,

roughly, brought in 20 million. 10 million for each.

Q. Okay. How is the courthouse funded; do you know?

A. It was off that proposition.

Q. I know. But they're not now, so --

A. They lost that, too.

Q. And what did they do to make up the money, I guess, is what I'm asking?

A. I don't know.

Q. So I hear litigation to force the parish to provide more money. The parish could raise taxes, presumably. Right now one of those programs you mentioned, the early --

A. Release.

Q. -- early release. 3 million coming in in exchange for providing services. Federal and state inmate housing.

What else can a sheriff do to bring more money to the bottom line? What other type programs are out there? Or how are other sheriffs doing it?

A. That, I don't know. I know that a lot of wardens and sheriffs that own correctional facilities use the programs through the DOC and

the DOJ to house those inmates to offset our costs. So it is a way to, I guess, offset our costs from my general obligated budget. It helps the parish in some sense because they get a benefit from it by reducing their costs and still continue to provide good service.

Q. Would you agree with me then, how you proceed to fund your budget, those are policy-making decisions that you, as a sheriff, make?

A. Correct.

Q. So it would be a policy-making decision whether or not you want to proceed with litigation against the parish, for instance?

A. True.

Q. And it would be a policy-making decision whether you want to reduce overtime instead, correct?

A. And we have. Yes.

Q. And it would be a policy-making decision whether you want to continue with the federal/state contracts?

A. Correct.

Q. And it would be a policy-making decision, then, within the facility what services

are ultimately provided?

A. Yes.

Q. Okay. So switching gears a little bit more, going to the jail itself, I mean, the buck stops with you. So I understand that you have -- you know, you create the toolbox. You hire the tools. I hate to call them tools. But you put them in place. You delegate authority. They do what they do. But, presumably, you need a way to make sure that --

A. It's being done.

Q. -- it's being done. How do you do that?

A. Based on just the protocols that we have in place, that they're following not only our policy and procedures, but, again, the DOC, the DOJ, the fire marshal's. We have to be in compliance and inspected and audited on an annual and regular basis.

And, again, some things come up. Like the pandemic, for instance, that was a learning experience that we -- what nobody was used to. But we had to fulfill the obligation of us and our inmates and our staff to get through that, whatever it took, and provide the right

equipment and necessary areas that we could house individuals separately for quarantine and that type of stuff.

And we've also taken in other areas that were affected by a hurricane, that we filled our obligation to another department that were wiped out where we took in 40 or 50 of their inmates and still had to fulfill the obligation for the COVID protocol.

Q. So you would agree with me then, hurricanes, COVID, those are emergency situations where the government puts different systems in place to deal with the emergency, correct?

A. Yes.

Q. Okay.

A. But it is a learning experience, and to adapt to those requirements and regulations is -- can be very challenging.

Q. But setting aside the emergency situations, the disasters, what are you doing, though, on a day-to-day basis to ensure that the persons that you put in place, delegated authority to, are performing as they're supposed to perform?

A. Well, they have policies and

regulations to fulfill. I won't know if there's something not right until we're audited or inspected. And we're then forced to make those changes and correct them, whether it be a personnel issue or a policy issue.

Q. So, for instance, if I'm running a shift and I know five guys are supposed to be there at 5:00 p.m., I mean, I wouldn't just go home and hope they show up. I mean, I'm not going to wait for a call. You know, there's some level of supervision to make sure that I got my guys there at 5:00 p.m. So I guess that's what I'm asking. Is it just wait until the yearly audit and --

A. No. On a regular day-to-day basis, these are the people I have in place to make sure that it's happening. I don't go to the jail every day and inspect what's going on and how things are being conducted and what leadership is present. I expect those individuals to lead and fulfill the obligations that are there to run and operate that facility for me.

Q. So it's fair to say trust but verify?

A. I would say, yes.

Q. So when it comes to verify, do you wait yearly? Or do you from time to time walk through the jail?
A. Well, I do my own inspections, and I go over there and just see what's going on, who's in charge, and get to introduce myself and find out what we need to change or if there's anything that we need to change. There's always, to me, room for improvement.
Q. When you go and do your inspections, are they announced inspections?
A. No.
Q. Just show up?
A. Show up. Some are announced, but most aren't.
Q. Okay.
A. And we do a lot of tours with, you know, rotary clubs and chambers and leadership groups. We do that on a regular basis as well.
Q. Your inspections, though, what do they entail? Are they an actual ordered inspection that I go here, here, here, and here, and this is what I'm checking, or is it just whatever?
A. If there's an area that we know

there's room for improvement, then I will go and inspect it with some of my command staff and get an idea better on the outlaying. What we need to do is normally work with the parish to see if there is a problem, or a roof that's leaking, I want to see it. I want to know what's going on. I'm the negotiator, I guess, with the parish, so that they help fund the projects so we can stop the roof from leaking or falling in on somebody.

So, yes, I do fulfill obligations to do my own walk-throughs to inspect anything that needs to be inspected and fight the parish for the funding to fix it.

Q. It sounds like you talk to guards and your leadership. Do you speak to inmates as well?

A. Very seldom. We do follow up with any grievances that are filed from our inmates, regardless of pretrial, DOC, or DOJ.

Q. Do you ever just walk through and, you know, spot check inmates, just say, "How is it going in here"?

A. Periodically. And one of the biggest complaints that I've had were we hired a new food vendor on contract, which is to save

money from me paying individuals to do it in-house. And it seems to be working. But the first few months were a little tough, as you can imagine. But those are the areas. Those are some of the areas that we looked at. The same with medical. Finding a -- it's on a bid process, but to find a company to come in and save us money and still provide the right service, the best service for our inmates.

Q. There are security cameras, obviously, in the facility. Are those something that you have the ability to monitor from wherever your office is?

A. No.

Q. I guess, what's the highest level where those are monitored?

A. Those are main control. And there's a branch of the jail that is security. And their obligation -- their main objective is to provide the best security in and around that facility.

Q. And do you visit control and --

A. Yes.

Q. -- the security branch, and do you have conversations with them?

A. Yes.

Q. Going back to overall operation of the jail, what standards -- I know you mentioned that there are DOC and federal standards because of those contracts. But setting those aside, what standards are you required to follow as a result of your constitution and statutorial duties through the state with respect to parish inmates?

A. The policy that the -- our general -- our departmental policy?

Q. Well, I'm saying like Title 22. Are you familiar with Title 22?

A. No.

Q. Are there any administrative codes through the government that says, "Hey, you must operate this jail that we're telling you to operate at this certain level"?

A. Most of that comes from the Department of Corrections.

Q. But would you agree with me if you didn't have a contract with the Department of Corrections, would you not have to follow those standards?

A. Probably through the ADA, which was the American --

Q. Disabilities Act?
A. No. No. I'm trying to think. The American -- the jail -- that oversees the jail and operations.
Q. The ACA is it?
THE WITNESS:
What is it?
MR. COLLINGS:
(Shrugs.)
THE WITNESS:
I can't remember. Some of the training that we send our guys to are put on from the American Jail Association. Maybe it's the AJA. I don't know.
BY MR. JACOB:
Q. But do you know what the standards are? If I came to you and said -- well, at trial if I ask you, "Sheriff, what standards must you comply with with respect to parish detainees and convicted inmates in the operation of a jail," you would say?
A. What is my requirement?
Q. Yes. What sets the minimum level of care that must be provided in that jail?
A. We have a policy and procedure that

we follow, and I, you know, expect my employees to follow. As far as anything other than that through the parish, I don't know of any.

Q. Meaning how do you know on a day-to-day basis whether your policies conform with state or federal law?

A. Because the policies we have in place are normally set in format with the DOJ and the DOC.

Q. Okay. So --

A. But it becomes a humanity issue that we are following and expected -- to follow the guidelines that we're expected to. And that comes from, again, the Department of Corrections, are the ones who audit us. Regardless if we house DOC or not, we house inmates. They're going to be there to conduct those audits and inspections.

Q. Do --

A. And there is a manual -- I'm sorry.

Q. No. My bad.

A. There is a manual that we have to follow that I think provides the best understanding of managing and operating a jail.

Q. So what I'm hearing you say is when

you came into office, these contracts were already in place with the state and federal government, correct?

A. Yes.

Q. And by virtue of that, there were standards that they handed down that had to be complied with for their inmates, correct?

A. Yes.

Q. And those you've adopted for the entire facility?

A. Yes.

Q. Okay.

A. And I go back to running a 40-man jail to an 800-man jail. The same guidelines existed from the Department of Corrections, who -- no federal inmates, very few pretrial were conducted. And the manual that we had in place was from the Department of Corrections and the State of Louisiana, if that helps.

Q. No. It does. So what I'm hearing you say is, you know, if this passes muster for state and federal, then we're going to use that for the whole facility?

A. And we're obligated to do so, yes. Whether or not we house DOC inmates or have a

contract, yes.
Q. Okay. And that's a policy-making decision that has been made or at least continued by you?
A. Yes.
Q. Are there operations within the facility -- let me ask this differently.
To my understanding, the state and federal inmates are housed in their own buildings; is that correct?
A. The same building, different dormitories.
Q. Are there places that state and federal inmates just never go within the facility?
A. Yes.
Q. Where would those places be?
A. General population. We keep the federal and DOC inmates separate from our general pop, general population.
Q. Okay. How about holding? Are they back in the holding area?
A. Repeat that. I'm sorry.
Q. My poor question. State and federal inmates, are they ever back in the holding cells?

A. Not to my knowledge, no.
Q. Why not?
A. I have no idea. That's a good question. I don't know.
Q. Okay. So --
A. Normally, when we bring them in, they go through intake. They may go through holding. But we have areas designed by contract to place them in.
Q. So if you have a state or federal inmate that is pretrial -- would you ever have a pretrial state or federal inmate?
A. Not a state. Unless they're convicted in our jurisdiction, we may house them until DOC decides we're going to keep them or they go to another facility, a state facility.
Q. But what I'm hearing you say is they would go not into the holding where the parish detainees are but by contract into --
A. They could wind up in a holding cell, yes, to be processed now as a DOC inmate, not a pretrial inmate, if they were sentenced while still in our facility.
Q. I see. So if they come into your facility as a parish detainee, they may be

sitting in holding convicted and then processed out of holding now to go wherever a DOC inmate would go?

A. That is correct.

Q. And once they're sentenced as a DOC inmate, they leave holding, and they go to the contracted area for DOC inmates?

A. Yes.

Q. So is it fair to say then, except for that scenario where they're by virtue of being turned into a DOC inmate, they're not -- am I correct, DOC and federal are not in the holding except for that scenario?

A. Yes, they could be. They could be in holding during their transition to the back and being processed, just like any inmate that comes in.

Q. Okay. But I guess what I'm saying is, parish detainees, they can be in holding until they get a bed in the back in general pop, correct?

A. Yes.

Q. But a DOC or a parish detainee who goes to court today, gets sentenced, comes back, they are leaving holding as soon as possible to

go to the DOC area?

A. I don't know if it would be fair to say as quick as possible. But there's a possibility they would be put in holding until they're -- they're already in the system, so they would probably -- they're not getting out, if that makes sense. They're not posting a bond. They're not going anywhere. They would probably be subject to those areas that we have in place for DOC and federal inmates, yes.

Q. So what I'm hearing you say is they come back from court. They're still listed in the system as a parish detainee. The paperwork, all that needs to get caught up. DOC needs to say, "This is where we want them to go. We're going to either take them out of here" --

A. True.

Q. -- "or we're going to use them as one of our contracted spots at your facility for a DOC inmate"?

A. That is true. We don't know if that's two weeks, two months, two years. We don't know.

Q. Fair enough.

MR. JACOB:

We've been going a while. You probably want a quick break. Anybody? Five minutes?

MR. COLLINGS:

It's up to the sheriff. I'm good.

MR. JACOB:

It never hurts to stretch.

You good?

THE REPORTER:

I'm good.

MR. JACOB:

Oh, if you guys are good. I'm most concerned about her hands. Are you sure you're good?

THE REPORTER:

I'm fine.

MR. JACOB:

All right. Let's keep going. I was going to say, "This guy can really keep going."

BY MR. JACOB:

Q. So let's talk about that a little bit. So the DOC and federal inmates, once they're classified as DOC and federal and taken over by those agencies, or jurisdictions taken

over by those agencies, they're no longer in holding; is that fair to say?

A. Yes.

Q. All right. So the only persons in holding would be parish detainees or convicted inmates who have not been classified as a DOC or federal inmate yet?

A. No.

Q. Go ahead. Tell me.

A. Inmates that are brought in from not just our -- just from the sheriff's department, but all felony arrests, all felony arrests and a lot of misdemeanor arrests throughout other municipal agencies, state agencies, are brought to our jail, the St. Tammany Parish Correctional Facility, to be processed. That's then put into holding awaiting to be processed, fingerprinted, AFISed. They got to get the paperwork done. Probable cause has to be submitted.

We can usually determine how long somebody may or may not be eligible for a bond. We then want to process each and every person within three to four hours to not only make sure they're in the system but to make sure they see medical. They have to be screened by a medical

professional because 80-plus percent of the individuals we bring in are under some type of alcohol or illegal narcotic or both. And then it's the responsibility, again, back on us to provide that public safety to make sure they don't die in our custody or have a seizure or something like that. So the holding cells are used to house these individuals. And we also provide a mental health screening as well.

Once we realize that they're not able to make a bond and might be there for a day or two, we may look at getting them a bed because we don't see -- either the bond is too high, or there is no bond. The charge was a serious offense. So we know we're going to be housing them for a while. And that could be three to four years sometimes before they can go to trial. Now, they don't stay in holding that long.

And, like I said, when the feds bring somebody in, when the probation and parole brings somebody in, everybody has to go through holding. It's not they come in and automatically go to the back, if that helps answer your question.

Q. Understood.

A. We have female holding. We have male holding. You know, we have areas set up to house individuals to keep different populations separated.
Q. Okay.
A. Especially if there's something going on where it's gang related, and we have somebody that's -- have tensions between this group and that group. We want to try to identify that and keep them separated.
Q. Now, we have general population, we have DOC, and we have feds. They all are on different wings, so to speak, dormitories?
A. As far as I know, yes.
Q. Okay. With respect to the holding cells themselves, presumably, you walk through at times and saw those?
A. Yes.
Q. And saw them in use?
A. Absolutely. Yes.
Q. And when you saw them in use, tell me the things that you saw within the cell, meaning what's the most inmates you have seen in those cells?
A. I don't know the exact number. In

any given time, it's different.

Q. What's the maximum number that you think has been held in those cells?

A. The maximum amount of people?

Q. Yes.

A. Seven, eight. That's just maximum. Maybe ten.

Q. Did you read the lawsuits?

A. No, I have not.

Q. So as sheriff, you weren't concerned about what it was that you were being sued for?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Yes, I'm concerned. I don't remember the count. And, again, it could change on a day-to-day basis.

BY MR. JACOB:

Q. No. I'm asking more why -- what was the decision-making process to -- I understand that there's been two federal civil lawsuits filed against several of my staff and myself, so I'm not going to read those?

A. Yeah. I'm aware of the lawsuits themselves. But I have not read them to see what

actually we're in violation of.

Q. Why not?

A. I just haven't done it.

Q. Not concerned?

A. Very concerned.

Q. Very concerned. So what were you doing to investigate? Did you start an internal affairs investigation?

A. No, I did not.

Q. You have an internal affairs --

A. Yes.

Q. -- bureau, though, correct?

A. Yes.

Q. Why didn't you start an internal affairs investigation if you're very concerned and have two federal civil lawsuits pending?

A. We get -- you know, we get sued a lot. We get sued for different things and different accusations that sometimes they're not true.

And on this one, I'm aware of the lawsuits that were filed. And, of course, meeting with my staff to make sure if there was overcrowding in the holding cells, that we make sure we fall in compliance, whether it was from

the lawsuit, the fire marshals who inspect us on a regular basis, whatever the case may be. Yeah, it is concerning.

Q. You said you get sued a lot. That would be disconcerting to me. Is that a concern of yours?

A. It's people make -- you know, people can sue for just about everything.

Q. Sure.

A. So it doesn't mean they're going to win.

Q. So, presumably, a lot of those lawsuits are from inmates who are not represented by attorneys?

A. I don't know. A lot of them represent themselves. But we do find ourselves being sued by inmates on a regular basis.

Q. Is your facility on the news, though, on a regular basis for overcrowding situations?

A. No, sir.

Q. Do you often get sued by multiple law firms by two different lawsuits coming into your jurisdiction?

A. No, sir.

Q. So would you agree with me this one kind of stands out a little bit different as far as how it lands in your lap?
A. Again, I did not read the lawsuit verbatim. I'm aware of the lawsuit. That's why we have a legal team on staff and outside legal to handle these type of cases.
Q. You said, "verbatim." So you did or didn't read it?
A. I didn't read it.
Q. Have you seen it?
A. I have seen it. I was made aware of it. But, no, I did not sit down and read it.
Q. So when you were very concerned about the allegations, what did you do to learn about the allegations?
A. It was brought to me, brought to my attention, from our staff.
Q. And what's being alleged in the litigation?
A. Overcrowdingness in the holding cells.
Q. What else?
A. As far as I know, that was it.
Q. Anything about food?

A. No, sir.
Q. Anything about the conditions of cells?
A. No, sir.
Q. Anything about sleep or no sleep?
A. No, sir.
Q. Anything about urine in the cells?
A. No, sir.
Q. Anything about 20-plus inmates in cells for up to two weeks?
A. No, sir.
Q. So you have no idea what's going on in this litigation, do you?
A. Yes, I do.
MR. COLLINGS:
Object to the form.
BY MR. JACOB:
Q. Well, how come that's all in the complaints, and you're sitting here for your deposition as sheriff, the policymaker, where the buck stops with you, and you don't even know that that's what's being alleged in the litigation?
A. I know it's being alleged. I'm not saying it happened. And if it was happening, we would fix it. We would correct it if there was a

problem. We would make sure that that doesn't happen.

Q. So now you do know that it's being alleged? Because before you said you didn't know that it was being alleged.

A. No. You asked me if I read the lawsuit, and I said, "No."

Q. And then I asked you what's being alleged, and you said, "Overcrowding." And I said, "Are these things being alleged," and you said, "No."

A. Not that I'm aware of.

Q. You're not aware that they are being alleged?

A. Overcrowding, yeah, that's what I'm aware of.

Q. Well, since we're a couple years into this litigation, you might want to read the lawsuit and become aware of the allegations because there's other things that are alleged in there, such as the fact that there were up to 20 inmates in a holding cell for up to two weeks at a time. Has that ever happened at your facility?

A. Not that I'm aware of.

Q. Well, wouldn't you be aware, though,

if there were -- there are reports of open beds. There's daily reports of the housing numbers. Is that something you don't review?

A. I do.

Q. So you do review that on a daily basis, correct?

A. The number of inmates we have in the facility, not daily, but on a regular basis, yes. I'd say weekly.

Q. Weekly. Okay. So weekly then, do you go back and look at how you are housing inmates and how many in which sections on which days?

A. I don't personally. But I do rely on the deputy chief that I have assigned that's over that facility to update us and correct any issues if they come forward.

Q. What's considered an issue to you?

A. Overcrowdingness.

Q. What's overcrowding in a holding cell?

A. That's when the fire marshal comes in and says, "Hey, you're not compliant. You must make room." That's when we have to get on the phone and say, "Let's get these individuals a

bond or get them out or get them to a bed."
Q. Okay. How many can you house in a holding cell before it becomes overcrowding?
A. I don't know that number.
Q. Then how do you supervise if you don't know what's overcrowding or not?
A. That's a good question. We usually rely on the fire marshal to come in. And if they give us an order to say, you got too many, there's more than one holding cell.
Q. So does the fire marshal come in daily to tell you?
A. Normally, they come on a regular basis. I don't know how regular. But they do pay us a visit on a regular basis.
Q. Well, let's talk about regular. Is that once a month? Is that a once a quarter?
A. I would say monthly. Sometimes, unless there's a complaint, they come unannounced and say we have an overcrowding issue.
Q. So why does the fire marshal know how many is supposed to be in a holding cell, and the sheriff who's required to actually operate the jail doesn't?
A. Because I depend on my staff to make

sure that those numbers are -- that we're in compliance with those numbers with overcrowding.

Q. But don't they need to know what the numbers are in order to tell you whether they're --

A. They should. They're there every day.

Q. Right. How do they know what the numbers are then if you haven't told them?

MR. COLLINGS:

Object to the form.

THE WITNESS:

How would they know what the numbers are?

BY MR. JACOB:

Q. Yes.

A. They're there. They're there every day.

Q. Okay. What do you mean, "They're there"? You mean the numbers?

A. The supervisors are there.

Q. Okay. The supervisors came in here and told us that the fire marshal's number -- that they've housed in excess of the fire marshal's number.

A. That, I don't know.
Q. Why not?
A. I don't know what they said.
Q. So you're very concerned. We deposed a representative of the agency last time I was here when you were sick and couldn't appear, and you didn't go back and review what they said?
A. I did not.
Q. But wouldn't that have been a way for you to alleviate your concern about whether things were good or bad?
A. Again, I don't know whether the allegations are true or not. And if they were, we would correct any issues that were found in our holding cells.
Q. Right. You don't know whether they're true or not. In fact, it sounds like you didn't even know what the allegations were. But putting that aside -- putting that aside, --
MR. COLLINGS:
Object to the form.
BY MR. JACOB:
Q. -- what did you do then to find out if they're true and correct? What's the process

you put in place?
A. To make sure if we have overcrowding issues and it's brought to our attention, to fix them, to correct them, and make improvements.
Q. Right. You said, though, that you don't know if they're true. You're responsible for running the jail. So I want to know what investigation -- you say you didn't do an internal investigation. You didn't read the lawsuits. You didn't review the deposition of your representative. So what are you doing to find out if they're true?
A. I depend on the supervisors I have in place there to make sure that we alleviate any issues that come up.
Q. But your supervisor came and testified, and then you didn't read what your supervisor had to say?
MR. COLLINGS:
Object to the form. Argumentive.
THE WITNESS:
I have not.
BY MR. JACOB:
Q. Do you plan on it?
A. I don't know.

Q. So even as you sit here today, you don't plan to find out what your supervisor said at a deposition in two federal lawsuits that you haven't read?

A. I have not read the full -- no. No, I have not read what he said or what the allegations completely are, no.

Q. Is there any point in time when you're going to decide that maybe I should find out what's being alleged in that litigation?

A. Overcrowding, yes.

Q. Okay. No. No. I'm asking not what you think is being alleged. I'm asking is there going to be any point in time when you're going to say, "Oh, this is serious enough that I should probably read the lawsuits and find out what's being alleged"?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Do I plan on reading the lawsuit or the testimony from someone else?

BY MR. JACOB:

Q. No. I'm asking, are you ever going to find out what's been alleged in this

litigation?

A. Overcrowdingness. I'm aware of that.

MR. COLLINGS:

Object to the form.

BY MR. JACOB:

Q. That's one of the things. Are you going to find out what else is being alleged?

A. I don't know.

Q. So as you sit here today under oath, you can't say, "Oh, yeah, you know what, you bring up a good point. I should probably read that"?

MR. COLLINGS:

Counsel, you've asked that question.

BY MR. JACOB:

Q. You still don't know whether you're going to read it?

MR. COLLINGS:

Counsel, you've asked that question a number of times. Let's try to move on, please.

BY MR. JACOB:

Q. That's correct? You still don't know as you sit here?

A. I don't know.
Q. Have you ever come to learn that the inmates in the holding cells share one toilet?
A. Yes.
Q. Did you ever come to learn that inmates were sleeping on the floor where there was urine?
A. No.
Q. Did you ever come to learn that up to 20 inmates and sometimes more were in the holding cells and only taken out for showers?
A. No.
Q. Did you ever come to learn that inmates were sleeping on the floor because there was no other room to sleep?
A. Alleged.
Q. Well, it's on video. Did you know that?
A. No.
Q. It's on video, sir. Maybe --
A. I don't know how many were in the cell at the time the video was taken.
Q. Okay.
A. But alleged, yes, there were people -- the people in holding sleep on the floor and

on the benches that are in there.
Q. Did you know that these inmates were sleeping on cement --
A. Yes.
Q. -- for up to two weeks?
A. No.
Q. Did you know that these inmates were in a cell eating in the cell where they had -- some of them reported feces, blood, vomit, and urine on the floor?
A. I'm not aware of that, no, sir.
Q. Does that concern you?
A. It concerns me, yes.
Q. Why is that?
A. Because it's alleged, and I just -- I don't see it happening.
Q. If it happened, does that concern you?
A. Yes.
Q. And if it happened, why would that concern you?
A. Because it's not humane --
Q. Exactly. So --
A. -- and would be a violation on what we do there, what we're obligated to do there.

Q. So if it happened, what would you do to fix that?

MR. COLLINGS:

Object to the form.

THE WITNESS:

If it was alleged and proven that it was a fact? Normally, those cells are kept clean.

BY MR. JACOB:

Q. How do you know that?

A. Because we have a standard of keeping them clean.

Q. What is that standard?

A. Usually twice a day.

Q. And how are they cleaned?

A. By other inmates.

Q. And how are they cleaned?

A. I don't know.

Q. Why don't you know?

MR. COLLINGS:

Object to the form.

THE WITNESS:

I don't know what they would use to clean it. I would imagine bleach.

BY MR. JACOB:

Q. And why would you imagine bleach? Is that because that's what they should be using, or that's what you hope they should be using?

A. I hope they should be using. I don't know.

Q. Do you know that these inmates, the 20-plus inmates in these cells, were forced to sleep with the lights on for 24 hours a day?

A. No.

Q. Is that a problem?

A. I don't think it's a problem.

Q. Why is that?

A. Lights are on in the holding areas for safety. They have 24-hour surveillance, not only just video, but people that are working intake can keep an eye on what's going on in those cells.

Q. What's the difference between a holding cell, the purpose of a holding cell, and the purpose of a general population cell?

A. Again, holding is where we bring in inmates that have to be processed. They have to be screened for medical and mental health issues. We have to check to see whether or not -- what substance abuse they may be on. We have to make

sure that they're eligible to be processed and brought into our jail and not rejected for a medical reason, say, if they've been in a fight, a car wreck, or a stabbing, or something like that. They could be rejected and sent back to see a physician at a local hospital before we would even accept them.

Q. What is the purpose of a holding cell as opposed to a general population cell?

A. A holding cell is temporary.

Q. And how long is temporary?

A. 48 hours.

Q. So if there's an inmate in a holding cell for more than 48 hours, it's your understanding that you have now exceeded the purpose of a holding cell?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Yes.

BY MR. JACOB:

Q. And is that happening in your facility?

A. Not that I'm aware of, no.

Q. Why aren't you aware of that

happening since it did happen?
A. That, I don't know. It's alleged.
Q. No. There's actual documentation and admissions from your staff that that happened under your watch. So why is that?
A. I have no idea.
Q. Did you know that there were inmates reporting dirty toilet paper on the floor?
A. No, sir.
Q. Did you know that there were inmates who are alleging that they were provided with a single roll of toilet paper for up to 20, 20-plus inmates and that inmates were hoarding it, and they basically had to beg for more toilet paper from the guards?
A. No, sir.
Q. Did you know that your staff was coming in here and reporting that some of these things are actually documented and happened?
A. I'm not aware of that, no, sir.
Q. What kind of bedding is provided in the holding cells?
A. Usually it's a 2-inch mattress. It's almost the same mattresses they use in the general population bunk areas.

Q. What else do they get?
A. Blankets.
Q. What else?
A. Pillows.
Q. In holding, correct?
A. I believe.
Q. Okay. What else do they get?
A. Toilet paper.
Q. Okay. Actually, in holding they get a blanket. They don't get a mat. They don't get a pillow. And they sleep on the cement floor in their clothing, their clothing that they wear for three days at a time, only getting fresh clothing after a shower, and that's if the shower is provided. Did you know that?
A. No. I'm unaware of that.
Q. Okay. Well, your staff came in here and were aware of it.
A. I'm unaware of it. I have seen mattresses -- thrown-in mattresses on those floors and on those benches.
Q. What type of hygiene products are provided to the inmates?
A. I'm not exactly sure. It's been a long time since I worked on a tier at the jail.

Q. Tell me about the recreation that's provided to inmates in the holding.

A. I don't know.

Q. Well, let's start with, are they to get recreation?

A. Yes.

Q. And tell me about that. Why do they need recreation?

A. Normally, they would be released out of the holding cell for recreation at a certain period of their time being in there.

Q. Okay. Explain that to me.

A. I don't know the exact amount of time. I know we have an exercise yard that is used to get inmates out of a holding cell, or any cell, for that matter. But I'm unaware that -- I don't know the timing or the amount of time that they're allowed.

Q. Well, let's start with your time frame of 48 hours for a holding cell. Are you saying that once a day? Once -- what's your understanding, if at all?

A. I don't know.

Q. Is it twice a day? Once a day?

MR. COLLINGS:

Object to the form. Asked and answered.

BY MR. JACOB:

Q. You don't know?

A. I don't know.

Q. Okay. But you're sure, though, that the recreation is provided because it's for their health and safety, correct?

MR. COLLINGS:

Object to the form. Asked and answered.

THE WITNESS:

I don't know.

BY MR. JACOB:

Q. You don't know if it's provided?

A. No.

Q. But you know it's supposed to be provided?

MR. COLLINGS:

Object to the form. Asked and answered.

THE WITNESS:

That, I don't know.

BY MR. JACOB:

Q. You don't know. So do you know if

your inmates in the holding cell are getting any recreation at all?

MR. COLLINGS:

Object to the form.

THE WITNESS:

No, sir.

BY MR. JACOB:

Q. Would you be concerned if you came to learn that inmates for up to two weeks at a time were getting no recreation at all?

A. No, sir.

Q. It wouldn't concern you?

A. Yeah, it would concern me. But I'm not aware of that.

Q. No. I'm asking would it concern you if you learn that that was occurring in your facility under your watch?

A. Absolutely. Yes.

Q. And why is that? Did you give an instruction to anybody that that's not to occur in your facility?

A. No, not at all.

Q. Aren't these things, though, that a sheriff should know, like whether the holding cells are being maintained in a safe condition?

Because you said safety was a top priority of yours.

A. Absolutely. For our inmates and our employees.

Q. Right. So wouldn't you agree with me then, since safety is a top priority of yours, that it's something that you, as the sheriff, should know, whether the holding cells are being maintained in a healthy condition?

A. Absolutely.

Q. And wouldn't you agree with me then, whether or not the inmates in the holding cells are receiving recreation is something that you, as sheriff, should know?

MR. COLLINGS:

Object to the form. Asked and answered multiple times.

MR. JACOB:

I never asked that question.

MR. COLLINGS:

You've asked it every different way.

MR. JACOB:

Just object. No speaking.

MR. COLLINGS:

I'm not. I'm just addressing your

response to my objection.
MR. JACOB:
Well, I'm giving you the federal rules, which is you say, "Objection." Nothing further, please. Thank you.
MR. COLLINGS:
I can say, "Objection. Asked and answered." And that's what he has done multiple times.
BY MR. JACOB:
Q. In any case, whether or not inmates in a holding cell are getting recreation, am I correct that you, as the sheriff, responsible for their health and safety, should know that?
A. Yes, I should.
Q. And am I correct that whether or not there are 20-plus inmates in a holding cell at any given time is something that you, as the sheriff, should know?
A. Yeah.
Q. And am I correct that whether or not inmates are being held in the holding cells in excess of 48 hours is something that you, as the sheriff, should know?
A. Yes.

Q. And am I correct that if inmates are being held in a holding cell and not receiving bedding, such as mats, that's something you, as the sheriff, should know?

A. Absolutely.

Q. Let's switch gears a little bit to empty beds.

Am I correct that you could have inmates in the holding cell with empty beds in the DOC dormitory or in the federal dormitory, but those inmates are going to remain in the holding cell?

A. Repeat the question. I'm confused on this one.

Q. Sure. A parish detainee in the holding cell, okay, with empty beds back in the DOC dormitory and/or the federal dormitory, that parish detainee is going to remain in the holding cell; is that correct?

A. Per contract, I would say, yes.

Q. Per policy of your office that would hold, too, correct?

A. That, I don't know.

Q. Well, you say, "per contract," but the contract is only followed because you, as the

sheriff, say to follow it, correct?
A. Right. We're under an obligation to house those DOC and federal inmates and have areas for them, yes.
Q. Correct. And that's because you, as sheriff, have continued to operate under the contract, correct?
A. That is correct.
Q. And that's a policy decision, correct?
A. It's a policy -- well, it's not a policy decision, more of a contract basis that we have with those two organizations.
Q. You could break the contract, correct? You could violate it?
MR. COLLINGS:
Object to the form.
THE WITNESS:
No.
BY MR. JACOB:
Q. You can't violate a contract?
A. I prefer not to.
Q. Well, I understand you prefer not to. But I'm just saying, you can violate the contract, correct?

A. I choose not to.
Q. Okay. So you made a policy decision to keep following the contract, correct?
A. Yes.
Q. All right. And so then am I correct that you can have a parish detainee in a holding cell at the same time -- you can have him in there past 48 hours at the same time that there's an empty bed in the DOC or federal dormitory?
A. I'm unaware of that.
Q. No, I'm not asking whether you're aware it happened. I'm asking am I correct that as your policy is set up, that is what's to occur?
A. Is bed space available for pretrial inmates, I think is what you're asking me, in the DOC dorm or the federal dorm?
Q. We'll go with that question, and then I'll ask you another. Go ahead.
A. We do not do that because it could violate the policy that we have in place with those two entities. And I'm unaware of anyone remaining in a holding cell after the 48 hours.
Q. Understood. Am I correct, though, you can be in an overcrowded situation in a

holding cell, and it's going to remain overcrowded even if there are available beds in the DOC and federal wing; is that correct?

A. That, I don't know.

Q. Is there any scenario where an inmate, a pretrial detainee in the holding cell, a parish pretrial detainee in a holding cell, is ever going to be placed into a DOC bed or a federal bed except for being reclassified as a DOC or --

A. Not that I'm aware of.

Q. Let me finish the question, please.
-- except for being reclassified as a DOC or federal inmate?

A. Not that I'm aware of.

Q. And why not?

MR. COLLINGS:
Object to the form.

THE WITNESS:
I don't know. I don't know if it has happened. I don't know. I know we have bed space available not all the time but sometimes for DOC inmates.

BY MR. JACOB:

Q. Understood.

A. And the feds that we keep separate, yes.
Q. Your policy, am I correct, is that at no time does a pretrial detainee for the parish get put into a DOC or federal bed unless they're classified as a DOC or federal inmate; --
A. Correct.
Q. -- is that correct?
A. Yes.
Q. All right. No exceptions, correct?
A. Not to my understanding, no.
Q. Well, you set the policy. So are there any exceptions you can think of?
A. No, sir.
Q. Would overcrowding cause an exception?
A. It could.
Q. Has it ever?
A. Not that I'm aware of.
Q. But you are aware that at times there was overcrowding? I think you already said that, correct?
A. Yes.
Q. And when there was overcrowding, did you ask how many available beds do we have in the

DOC or federal dormitories?
A. I have not.
Q. Okay. Careful. You were stepping on me there.
You have not?
A. I have not, no.
Q. Why not?
A. Because there's other means of getting these individuals out of holding.
Q. Okay. But when that didn't work, and we know it didn't work because of the documents, what did you do?
A. We find them a bed in general population.
Q. And when beds weren't available in general population, why weren't they put in DOC or federal beds?
A. I don't know.
Q. Okay. Is it because of your policy?
A. Because of a contract.
Q. Okay. And that contract being followed pursuant to your policy?
A. Correct.
Q. Do you know who the plaintiffs are in this litigation?

A. No, sir.
Q. Did you ever ask who the plaintiffs are?
A. I have heard their names, but I'm not familiar with either one of them.
Q. Did you ever say, "Hey, these guys" -- "it's my understanding that they're only alleging overcrowding. Can I have their files to see what was going on around that time"?
A. I have not.
Q. Why not?
A. I don't know.
Q. You must have delegated it to someone then?
A. Yes.
Q. Who did you delegate it to?
A. Normally, the warden or the assistant warden.
Q. No. Who did you delegate it to?
A. I don't know.
Q. So wouldn't that be documented somewhere, that this is something that the sheriff takes very seriously, and I'm going to delegate it for an investigation by so-and-so?
A. Not that I'm aware of, no.

Q. Has anybody ever reported back to you whether those allegations were true and correct that were contained in the federal litigation?

A. No.

Q. In all the time that this litigation has been pending, did you ever say, "Hey, nobody ever told me whether those allegations were true"?

A. There was some -- yes, there was some understanding of the allegations by me, and I was directed -- I directed if there were issues, that they be corrected.

Q. That was the extent of your direction?

A. Yes.

Q. And who did you tell that to?

A. The deputy chief.

Q. And what issues -- well, I guess you already told us.

A. If there were issues. There were allegations. That we stay in compliance.

Q. Any follow-up to make sure that your directives were followed this time?

A. Yes.

Q. And what was that follow-up?
A. That we do not have any overcrowding in our holding cells. And, if so, we make the necessary improvements to keep that from happening.
Q. So are you telling me then that you took corrective action?
A. I ordered corrective action.
Q. So if we look at the records then as far as housing numbers from the point of your direction to the present, we'll see that the issue is corrected, right, because you took it seriously?
A. I sure hope so.
Q. Okay. So when did you give this directive?
A. After made aware of the lawsuit and the allegations.
Q. When were you made aware of the lawsuit and the allegations?
A. 2019, I believe.
Q. Okay. And you would agree with me that if you didn't take corrective action and this, in fact, was occurring, that that would kind of be deliberate indifference?

MR. COLLINGS:
Object to the form. Calls for a legal conclusion.
THE WITNESS:
I don't agree with that, no.
BY MR. JACOB:
Q. Okay. Well, would you agree with me that if it's continuing under your watch, it certainly would raise questions as far as how seriously you're taking this?
MR. COLLINGS:
Object to the form.
THE WITNESS:
I disagree.
BY MR. JACOB:
Q. Why is that?
A. Because the allegations, again, are in the form of a lawsuit that we did address and that did show some concern -- I did have some concern, that if it did occur, that it doesn't happen again. Again, I'm always about room for improvement.
Q. Okay. And so you went to your staff and said, "Make sure this doesn't happen again"?
A. Yes, sir.

Q. And that was the extent of the investigation and corrective action, correct?
A. Yes, sir.
Q. All right. And so from that, is there anything that gets more serious attention than that, or is that considered a serious response?
A. Repeat the question.
Q. Well, you said this is something you took really seriously, but then you told me that you said, "Don't do that again." So I'm wondering, are there different levels of response other than that, or is that --
A. Again, that was an allegation. Is there something more serious? Yes. When somebody passes away or expires in our jail, it's a big concern. And there's always an investigation.
Q. But conditions of confinement didn't warrant an investigation, too?
A. Normally, it would warrant an investigation from the Department of Corrections. If there's a complaint made and they're aware of it, they would come in and do an audit to see if these allegations are true and correct. And if

they are, we repair or fix the allegations so they don't occur again.

Q. So the fact of federal litigation was not enough to trigger an investigation in your agency, correct?

A. Not by our agency. Internally, yes. But not from my perspective as internal affairs.

Q. Okay. So not internal affairs. But, yes, internally, I think you said?

A. We have internal investigators assigned to the jail. If there's a complaint, normally it would be handled through them.

Q. So when you say, "internal investigators," you mean internal affairs investigators?

A. They're assigned to the jail but they do -- they follow up on any grievances and issues within the inmates or the personnel assigned to the jail.

Q. So what's the process when there has been a federal lawsuit filed? Any investigation, or is it just grievances?

A. Usually grievances on the allegations --

Q. I'm sorry. Go ahead.

A. -- on the allegations in question.
Q. So if there's a grievance filed by an inmate, it gets investigated? But if there's federal litigation filed, there's no investigation?
A. Again, they're allegations that we want to make sure they don't occur, whether -- we don't know whether these occurred or not.
Q. Right. So, again, my question is, you have a grievance, which is an allegation, that gets investigated. But you have a lawsuit, which is an allegation, and I'm hearing it's not investigated?
A. On this particular case, I can't tell you whether there was a grievance filed and an investigation done at that time prior to this lawsuit.
Q. So the only way this would have been investigated is if there was a grievance?
A. Not necessarily. I don't know if that was a grievance filed prior to this lawsuit.
Q. Let's assume no grievance. Two lawsuits come in for this case. Is it investigated by your policy or not?
A. It should be, yes.

Q. No. What does your policy say? Investigate it or not?
A. I don't know what the policy says.
Q. Do you have a policy on whether such matters should be investigated or not?
A. I do not know of one.
Q. Why don't you have a policy on whether or not federal litigation about prison conditions is investigated or not?
MR. COLLINGS:
Object to the form. Asked and answered.
BY MR. JACOB:
Q. Why don't you have a policy?
MR. COLLINGS:
Object to the form. Asked and answered.
THE WITNESS:
I don't know if we do or we don't.
BY MR. JACOB:
Q. But you're the sheriff. Shouldn't that be something you know?
MR. COLLINGS:
Object to the form.
THE WITNESS:

I do not know the answer, whether we have a policy that we would investigate a federal lawsuit.

BY MR. JACOB:

Q. What bigger complaint could be made other than a federal civil rights lawsuit?

A. There could be allegations of a death in our jail. Would it be investigated? Absolutely.

Q. What more serious format could a complaint take other than a federal civil rights lawsuit?

A. Death of an inmate.

Q. No, that's an action. Meaning you can have a federal civil rights lawsuit over the death of an inmate, correct?

A. Yes, because it's an allegation.

Q. Okay. So I'm saying in what format, lawsuit, what more serious format could you have other than a federal lawsuit about allegations?

A. I don't know.

Q. So you're not aware of any more serious format or more official format that you can have other than a federal civil rights lawsuit, but you're not telling me that you --

you're telling me you don't know whether those are investigated?

MR. COLLINGS:

Object to the form. Argumentative. Asked and answered.

BY MR. JACOB:

Q. So if somebody files a grievance over a death, it would get investigated. But if someone files a federal civil right lawsuits over a death, you're telling me it wouldn't be investigated?

A. I'm not saying it wouldn't be investigated. I don't know if this was investigated, this particular grievance.

Q. What I'm hearing you say is as sheriff in charge of the facility, running an operation, the safe operation, which you take very seriously, you don't know whether there's a policy to investigate any allegation that's made in a federal lawsuit?

A. I don't know if this particular case was investigated.

Q. All right. Well, let's expand it. Is there a policy for investigating allegations made in federal civil litigation?

MR. COLLINGS:
Asked and answered.
THE WITNESS:
I don't know.
BY MR. JACOB:
Q. Why is your jail referred to as St. Slammany?
A. I have no idea.
Q. But you do know that?
A. I have heard it, yes, prior to my administration.
Q. Well, no. Just last night when I was out to dinner, I purposely asked a few people in a restaurant whether they have ever heard of that, and they laughed and said, yes, they have. So why does the general public seem to know this about your administration but you don't?
A. Well, that's not my administration.
Q. Do you know what it means?
A. I do not. I know it was something that was brought up, again, prior to my administration.
Q. Do you go out in the public and talk to people and ask them?
A. Absolutely.

Q. Ask a few next time. You'll find out it's your administration, too.

MR. COLLINGS:

Object to the form. It's not a question.

MR. JACOB:

I'll withdraw it.

BY MR. JACOB:

Q. What process did you order to investigate whether there was any e-mails or any documents related to this lawsuit?

A. I don't know of any.

Q. Okay. Do you know whether -- for instance, do your guards have e-mail?

A. Yes.

Q. And so do you know whether your guards were e-mailing each other about --

A. I do not know that, no, sir.

Q. Let me finish the question, please. I'll restate it.

Do you know whether guards were e-mailing each other about the allegations in this lawsuit?

A. No.

Q. Why don't you know that?

A. It's the first I'm hearing about it.
Q. Would you do me a favor and instruct that your e-mail system be examined to find out if your guards were e-mailing about the allegations in this lawsuit?
MR. COLLINGS:
Object to the form. That's not a question.
BY MR. JACOB:
Q. Would you do that?
MR. COLLINGS:
Object to the form. It's not a question.
BY MR. JACOB:
Q. Would you do that, question mark?
A. If I had knowledge?
Q. No. I'm asking you, will you do that? Will you go and have your e-mail system searched for relevant and discoverable documents, such as e-mails about your guards discussing the allegation in this litigation?
MR. COLLINGS:
Counsel --
BY MR. JACOB:
Q. Will you do that?

MR. COLLINGS:
Counsel, let me interrupt.
MR. JACOB:
No.
MR. COLLINGS:
I need to put something on the record.
MR. JACOB:
No.
MR. COLLINGS:
Yeah. I need to put something on the record. If you're asking for additional discovery through this disposition --
MR. JACOB:
No.
MR. COLLINGS:
-- of the sheriff individually, we can talk about that later. But I don't think that's an appropriate question in this setting.
MR. JACOB:
Duly noted. I'm not. I'm asking for what was already asked for.
MR. COLLINGS:

And that was addressed, I think, in the 30(b)(6) deposition.

BY MR. JACOB:

Q. Again, do you have a problem with your e-mail being checked for communications between guards about the allegations?

A. No. And I'm unaware of any.

Q. No. The question was: Do you have a problem with it being checked?

A. I would not object to having it looked into.

Q. Okay. So if we went to a federal judge and asked, you're not going to come and say, "That's not fair," or, "I don't want to do that"? You're saying you would be willing to do it, correct?

MR. COLLINGS:

Object to the form. Speculation.

THE WITNESS:

I'm unaware of any e-mails --

BY MR. JACOB:

Q. We're aware you didn't investigate. I'm asking you --

MR. COLLINGS:

Hold on. Object to the form.

Argumentative.

BY MR. JACOB:

Q. I'm asking you.

A. I'm unaware that there was an investigation --

Q. Okay.

A. -- into the allegations in this lawsuit.

Q. So would you agree with me one thing, since you have law enforcement experience as well, would be what are people talking about internally about allegations? That would be one thing would you look at to determine the truth of the matter, correct?

A. That's a possibility.

Q. It certainly would be relevant, wouldn't you agree?

A. Again, this is the first I'm hearing about any allegations of --

Q. Understood.

A. -- communications on e-mails within the jail.

Q. I'm asking you generally about investigations. If you were asked to investigate these allegations, how would you do it?

A. Through an internal affairs investigation.
Q. And what would an internal affairs investigation look at?
A. They could possibly look at e-mails.
Q. And why could they possibly look at e-mails? What would be the relevance?
A. It could have a bearing on the count of what the allegations are.
Q. Okay. And would you agree with me that work e-mail is not private to the guards, correct? It's on the work e-mail system, correct?
A. Correct.
Q. So it's something that the employer, you, as sheriff, you're permitted to look at your guards' e-mails, correct?
A. Correct.
Q. All right. And so I think you said that you don't disagree that e-mail could be relevant to such an investigation, correct?
A. There's a possibility, yes.
Q. Okay. Anything else? How else would you have this investigated? Look at e-mail. What else?

A. Probably if we were doing an investigation, it would -- we would look at the logs, like you said, like what -- who would be -- how many -- a bed count, if that would be, how many is in holding, how many is in general population, how many -- an update on the amount of inmates currently housed at that facility.

Q. Okay. And what else would you look at?

A. Who was working. How many people we had on duty at the time.

Q. What else would you look at?

A. Several things during an investigation.

Q. Security footage?

A. Yes.

Q. Okay. Anything else?

A. Not that I can think of.

Q. Okay. But you would agree with me what you just mentioned is certainly within the parameters of a reasonable investigation?

A. Yes.

Q. Okay. What's the problem with overcrowding generally? Why can't you have overcrowding? Or why shouldn't you have

overcrowding? Obviously, you can. But why shouldn't you have overcrowding?

A. Our jail is only set up to occupy so many inmates. We try to keep those numbers from exceeding the full capacity of what that facility allows us to house. Then it also becomes a security issue. If we have too many inmates and not enough guards, it poses a security threat.

Q. Okay. How about within a particular cell? Why wouldn't you want to have overcrowding in a particular cell?

A. Why wouldn't we?

Q. Yes.

A. We wouldn't because of the safety issue.

Q. What's the safety issue, though?

A. The safety issue would be if we have room to put them somewhere else, then we want to do that. And that's to keep them from fighting, keep them from, you know, annoying one another, spreading germs, and whatever the case may be. But we want to follow the guidelines set forth by the DOC, the DOJ, and our own policy.

Q. Okay. How often are the general population cells overcrowded?

A. I don't know that question.
Q. Okay. Are they ever?
A. Yes.
Q. Okay. What's overcrowding in general population? What does that look like? How many per cell?
A. I don't know how many per cell. But for the general population, it's an open dorm area.
Q. Okay. And, again, what's the maximum -- I don't remember if you said it or not. This time I do apologize if I'm asking again. How many are you permitted to have in a holding cell before it's overcrowded?
MR. COLLINGS:
Objection. Asked and answered.
THE WITNESS:
And I don't know the exact number, no.
BY MR. JACOB:
Q. Okay. But you did mention that when there is overcrowding, phone calls need to be made?
A. Absolutely.
Q. And who are these calls made to?

A. It's usually to the warden, the assistant warden. It comes from the deputy chief who then makes me aware of those calls.

Q. And you're made aware of it, and then what do you do?

A. I want to make sure that the overcrowding is eliminated, if there is any.

Q. And how do you do that?

A. Get them a bed. Call the commissioner. Call the judge. Get bonds set.

Q. Okay. And when the judge or commissioner says, "No, they're staying," what do you do?

A. Go another avenue.

Q. Such as?

A. Well, we could always look at the less violent inmate to see if they would qualify for release.

Q. But you don't have the authority to release them, do you?

A. No.

Q. Okay. So, again, judge and commissioner say, "No, they're staying," and you need --

A. If they can't post a bond, then we

get them a bed.

Q. But if there's no beds in general, what do you do? Do they stay in holding?

A. Normally, we try to make arrangements. There's more than one holding cell.

Q. Okay. Again, no beds in general. The judge and commissioner say, "No." What's your policy? What do you do?

A. We do the best we can with the amount of people we have to get them out.

Q. Great. But what do you actually do?

MR. COLLINGS:

Object to the form.

THE WITNESS:

I don't know the --

MR. COLLINGS:

Calls for speculation.

BY MR. JACOB:

Q. Do they stay in holding, or do they move somewhere else?

A. We move them somewhere else.

Q. Where do you move them?

A. We find spots for them.

Q. Where?

A. In the facility.
Q. Where?
A. I'm not sure which dorm but we try to --
Q. DOC?
A. No.
Q. "No." Federal?
A. Nope.
Q. "Nope." So where?
A. Usually in an area that has an opening that we don't overcrowd in the general population area.
Q. And when general population --
A. When a bed -- when someone is released, that opens up a bed.
Q. When general population is full, judge and commissioner say, "No," and you're overcrowded in holding, where do they go? Do they stay in holding or not?
A. They will stay in holding up to 48 hours.
Q. Okay. Is there a reason why your agency's representative said they stay in holding until a bed becomes available in general pop?
A. I don't know.

Q. So you're stepping on me again.

Is there a reason why the representative of your agency that you run said that what happens is they stay in the holding cell until a bed frees up in the general pop?

A. I don't know that.

Q. Is there a reason why the agency, also, the representative, couldn't really define the word "temporary" for temporary holding?

A. I don't know that either.

Q. Have you ever put a policy in place saying no more than 48 hours in a holding cell?

A. That I'm aware of?

Q. Yes.

A. No.

Q. How long would it be okay for an inmate to lay on a floor, sleep on a floor with urine?

MR. COLLINGS:

Object to the form.

BY MR. JACOB:

Q. How many hours?

MR. COLLINGS:

Object to the form.

THE WITNESS:

For me?

BY MR. JACOB:

Q. Yes.

A. None.

Q. Why?

A. That's inhumane. I don't -- I wouldn't want that.

Q. Okay. You wouldn't want that for yourself?

A. No. For anyone.

Q. Okay. So you agree --

A. I've never heard of that.

Q. Okay. So you agree with me, though, that if an inmate is forced to sleep on a floor that has bodily fluids on it, that that would be inhumane even if it's for a few hours?

A. Yes.

Q. Okay.

MR. JACOB:

I have no further questions.

MR. COLLINGS:

We'll take a break.

(Brief recess was taken.)

EXAMINATION BY MR. COLLINGS:

Q. All right. Sheriff, it's a little

after noon. I've got just a couple of follow-up questions if you don't mind.

Let me start with this 48-hour business. You were asked during your deposition about the number of hours in holding. Sheriff, do you have any knowledge whether or not there's a requirement that an inmate cannot be held in holding longer than 48 hours?

A. No, sir.

Q. So when you say, "48 hours," is that sort of like a goal that you would have?

A. Yes, sir.

Q. All right. And if an individual was held in holding longer than 48 hours, would that surprise you?

A. No, sir.

Q. And if those individuals were held in holding sometimes more than a week, would that surprise you?

A. Not that I'm aware of that they would be in there that long, no, sir.

Q. There was no policy requiring individuals to be held in holding longer than 48 hours, was there?

A. No.

Q. And if individuals were, in fact, held there longer than 48 hours, would that be something that you would expect to be the result of there simply not being available space in the rest of the jail for them?

MR. JACOB:

Objection.

THE WITNESS:

Yes, sir.

BY MR. COLLINGS:

Q. All right. And the jail operates, as I assume the rest of your agency and as probably every organization, there are finite resources, correct?

A. Yes, sir.

Q. And the finite resources available in the jail limits what can be done for any of the inmates, right?

A. Yes, sir.

Q. And if there simply was not available space in the jail for someone in holding until a bed opened up, that's a result of finite resources, correct?

MR. JACOB:

Objection.

THE WITNESS:
Yes, sir.
BY MR. COLLINGS:
Q. And was there ever a punitive intent on the part of the sheriff's office to keep people in holding longer than necessary?
A. Absolutely not.
Q. All right. You were asked a lot of questions about DOJ, Department of Justice, and DOC, Department of Corrections. Those are the federal and the state agencies that maintain inmates inside your facility, correct?
A. Yes, sir.
Q. Now, those two contracts with the DOJ and the DOC, was that something you inherited from your predecessor?
A. Yes. Those contracts were in place before I took office.
Q. And without the funding that comes with those two agencies housing inmates inside the facility, would you be able to maintain the facility and pay for all the pretrial detainees?
A. It would be very difficult because of the tax that failed and the amount of cuts that we had to establish and balance the increase

of costs to run a jail and the cuts established by the parish.

Q. So as it stands now, the sheriff's office essentially funds the entire jail, and you get reimbursements from other entities, and in this case, the parish government?

A. Right.

Q. Department of Corrections, state agency, and the Department of Justice, federal agency, correct?

A. Yes, sir.

Q. So the inmates are there. You feed them. You take care of them. You provide them with medical care. You pay the deputies that watch them 24 hours a day, seven days a week, correct?

A. Yes, sir.

Q. And then to fund all of that, you have to get money from all these other, basically, avenues in order to keep that operation going?

A. Yes. To make it successful.

Q. And has parish government been paying what they should be paying in your estimation since the jail tax expired?

A. No.

Q. And then you're forced to make up the shortfall out of your own funds and from those other agencies?

A. Yes, sir.

Q. You were asked some questions about internal affairs investigations. The way I understand internal affairs, and tell me if I'm wrong, is that an internal affairs investigation only occurs when there has been a complaint of a violation of a policy of the sheriff's office; is that correct?

A. Yes, sir.

Q. And in this case, to your knowledge, was there ever an IA investigation made as a result of a complaint received from any of these five plaintiffs?

A. Not that I'm aware of, no, sir.

Q. And is it sheriff's office policy to kick off IA investigations without a complaint?

A. Repeat the question.

Q. Would the sheriff's office normally initiate an internal affairs investigation without a complaint?

A. No, sir.

Q. All right. And there was mention about the severity and the significance of federal litigation and whether there should or should not be investigations every time a lawsuit is filed in a federal courthouse. Let me ask you this. Do inmates routinely file their own federal lawsuits from the jail?
A. Yes.
Q. And that's something you see pretty often, correct?
A. Yes.
Q. And do you then go kick off investigations every time a lawsuit is filed in the federal courthouse regarding something that's going on in the jail?
A. No, sir.
Q. You actually hire attorneys generally, and then that is handled through the court system, correct?
A. Yes. Either through our internal legal department or outside legal counsel.
Q. And then the courts are the ultimate ones to decide whether or not these allegations are meritorious or not, correct?
A. Correct.

Q. So that is, in fact, an investigation through a court? Yes?

MR. JACOB:

Objection.

THE WITNESS:

Yes.

BY MR. COLLINGS:

Q. All right. Are you aware, Sheriff, that there was -- or there is a policy with respect to cleaning the holding cells every day?

A. From what I know, normally there would be a cleaning at least twice day.

Q. And that if an inmate were to alert a guard that someone, for example, would have vomited on the floor, would it be the policy of the sheriff's office then to have someone come in and address that then and there and not wait for 12 hours for the next cleanup?

A. Yes. Absolutely.

Q. And that's your expectation?

A. That is.

Q. And that's what you understood happened at the jail routinely, correct?

MR. JACOB:

Objection.

THE WITNESS:
That is correct.
BY MR. COLLINGS:
Q. Do you have any knowledge that that didn't happen for some reason?
A. No, sir.
MR. COLLINGS:
That's all I have, Counsel. Thank you.
REEXAMINATION BY MR. JACOB:
Q. A couple things. You were asked whether attorneys come in and investigate as opposed to internal affairs investigations. Do you recall that?
A. No, sir.
MR. COLLINGS:
Just object to the form. That's not what I asked. But that's what you might have heard.
BY MR. JACOB:
Q. In any case, I think -- tell me if I'm wrong, there is either an internal investigation, correct, or there's an investigation from an outside body?
A. No. No. No. No. No.

Q. Okay.
A. Investigation. The question was, do I normally request an internal investigation into a lawsuit that's been filed.
Q. But I thought it was one step further, that you'd rather rely on attorneys and the court to investigate?
A. No. That's not --
Q. Okay. So you weren't saying that this is an investigation by the court, correct?
A. No.
Q. And you're not saying that your attorney here is an investigator, correct?
A. Not at all.
Q. Okay. So you're not aware of any investigation that would occur except for internally, correct, and only if it's ordered?
A. Correct.
Q. All right. Now, you indicated that the investigation would pertain to whether there were violations of policies and only if there has been a complaint made alleging a violation of policy; is that correct?
A. Yes.
Q. Okay. I know you didn't read the

lawsuit. But do you know if you had anyone read the lawsuit to determine whether any of the allegations that were stated in there could potentially be violations of policy?

A. The possibility? Yes.

Q. Okay. And so what did they tell you? There's no possibility that any of what happened violated policy?

A. There were allegation made in the lawsuit. Was there an investigation conducted based on the allegation or prior to the lawsuit?

Q. So I guess what I'm saying is, you agree with me, then, overcrowding in certain context could be a violation of policy?

MR. COLLINGS:

Object to the form.

THE WITNESS:

No.

BY MR. JACOB:

Q. In certain context?

MR. COLLINGS:

Object to the form.

THE WITNESS:

If there's a complaint -- if we receive a complaint or a grievance, it

would be investigated, but not based on the allegations in the lawsuit do I order an internal investigation.

BY MR. JACOB:

Q. Okay. You completely lost me. I think you said that an internal investigation would only happen pursuant to a complaint that would allege a violation of policy; is that correct?

A. It could be a violation of policy or a grievance filed by an inmate.

Q. Okay. So two possibilities then. Either, one, a grievance filed by an inmate. Or, two -- or I should say, "and/or," because the grievance could be about a violation of policy, correct? So it would be either a grievance or an alleged violation of policy?

A. With a complaint, yes, it would be investigated internally by our agency.

Q. Are you aware that a federal lawsuit, the first document, the lawsuit itself, is called a complaint?

A. No, sir.

Q. Okay. It is. And it was served on your agency. So do you know then when you

received that official complaint that was filed in federal court, whether that's something that under your policy should have been investigated?

A. No. Not that I'm aware of.

Q. You don't know, or it shouldn't have been?

MR. COLLINGS:

Objection. Asked and answered.

THE WITNESS:

I don't know if it was.

BY MR. JACOB:

Q. Okay. And, if fact, as you sit here today, despite the seriousness in which you're taking this, you don't even know if there was an investigation?

A. I don't know if there was a complaint prior to the serving of the lawsuit.

Q. And you also don't know if there was an investigation after? Or you know there wasn't an investigation?

A. Not that I'm aware of, no.

Q. Okay. You were asked about whether any of these actions occurred for a punitive reason. Do you recall that?

A. Yes.

Q. But, again, at the same time, you're not aware of what happened because they're just allegations, correct?
A. Correct.
Q. So if they're still allegations, you can't make a judgment on whether it occurred because of a punitive nature, correct?
MR. COLLINGS:
Object to the form.
THE WITNESS:
I disagree with the question.
BY MR. JACOB:
Q. Well, wouldn't you agree with me, if you haven't investigated it, then you have no idea, number one, if it happened; and, number two, why it happened?
A. That, I'm unaware of.
Q. As you sit here, would you agree with me, you don't even know if the stuff that's been alleged happened?
A. That's correct.
Q. And as you sit here, if you don't know whether the alleged stuff has happened, you certainly don't know why it did happen if it happened; is that fair?

MR. COLLINGS:
Object to the form.
BY MR. JACOB:
Q. Well, it's actually not funny.
A. I'm confused. I'm sorry.
Q. Because, in reality, if you don't even know if something happened, then how could you know that when it did happen it wasn't for a punitive reason?
A. Again, it's an allegation.
Q. Exactly. So you have no idea if it was for a punitive or for a legitimate business reason, correct?
MR. COLLINGS:
Object to the form.
THE WITNESS:
That, I do not know.
BY MR. JACOB:
Q. Okay. So when you said, no, it didn't happen because of a punitive reason, in reality, you don't even know if it happened, and, therefore, you don't know whether it was punitive, you don't know if there was a legitimate business reason? You simply don't know?

MR. COLLINGS:
Object to the form.
BY MR. JACOB:
Q. Is that fair?
MR. COLLINGS:
Object to the form.
THE WITNESS:
A legitimate business reason? It's an allegation.
BY MR. JACOB:
Q. Right. And so you have no idea if it happened, and if it did happen, why it happened; fair?
A. If it happened, yes.
Q. And you don't know if it happened, why it happened, correct, --
MR. COLLINGS:
Object to the form.
BY MR. JACOB:
Q. -- because you haven't investigated yet; --
MR. COLLINGS:
Object to the form.
BY MR. JACOB:
Q. -- is that fair?

A. Not that I'm aware of.

Q. As you sit here, if you're not aware of an investigation, then you certainly don't know what the outcome was as far as why it happened if it happened; is that correct?

A. If it happened.

Q. So that's a "yes"?

MR. COLLINGS:

Object to the form.

THE WITNESS:

If it happened.

BY MR. JACOB:

Q. Correct. Let's assume it happened. As you sit here, you have no idea why it happened because you haven't reviewed any investigation, correct?

A. Yes.

MR. COLLINGS:

Object to the form. What is "it"?

BY MR. JACOB:

Q. Is that correct?

MR. COLLINGS:

I need some clarity on the question.

MR. JACOB:

Sure.

BY MR. JACOB:
Q. We can do this all day, but we all know what the answer is, which is, if you don't know if something happened, such as all these allegations, then you certainly don't know why they happened if they happened, correct?
A. But, again, they're allegations.
Q. Correct. I know that, sir. And we can do this dance all day.
But if you don't know if something happened, then you certainly can't tell me why it happened?
MR. COLLINGS:
Object to the form.
BY MR. JACOB:
Q. Would you agree with that?
A. No.
Q. Okay. So then why did all this stuff that you don't know if it happened happen?
MR. COLLINGS:
Object to the form.
THE WITNESS:
We don't know if it happened.
BY MR. JACOB:
Q. Oh, okay. So then you don't know

why it happened, correct?

MR. COLLINGS:

Object to the form.

THE WITNESS:

It was an allegation.

BY MR. JACOB:

Q. Correct. So if you don't even know if it happened yet, you certainly can't tell me why it happened because the first predicate thing that must happen is you need to know whether it happened, correct?

A. Yes.

MR. COLLINGS:

Object to the form.

BY MR. JACOB:

Q. Okay. So you need to know whether it happened before you can get to why it happened; is that correct?

MR. COLLINGS:

Object to the form.

BY MR. JACOB:

Q. Is that correct?

MR. COLLINGS:

I just got to keep saying that because I have an objection.

BY MR. JACOB:
Q. Is that correct?
A. I don't know. I'm telling you this is an allegation --
Q. Right. Let's start over again.
MR. COLLINGS:
Hold on. Don't interrupt each other.
MR. JACOB:
Well, we might need a lunch break and come back and ask this question 47 more times.
BY MR. JACOB:
Q. Because the question is, if you can't tell me whether something happened, then you certainly can't tell me why it happened, correct?
MR. COLLINGS:
Object to the form. Asked and answered.
THE WITNESS:
I don't know if it happened.
BY MR. JACOB:
Q. All right. So then why -- if it did happen, why did it happen?

MR. COLLINGS:
Object to the form. Asked and answered.
BY MR. JACOB:
Q. Exactly. You can't tell me because you need to first know whether it happened, correct?
MR. COLLINGS:
Object to the form. Asked and answered.
BY MR. JACOB:
Q. Correct?
A. We haven't established --
MR. JACOB:
You have a standing objection.
BY MR. JACOB:
Q. Correct.
MR. COLLINGS:
No. I'm going to keep making the objection. At some point, we're going to call the magistrate because you keep asking --
MR. JACOB:
Hey, that's fine. Dial her up.
MR. COLLINGS:

-- because you keep asking --

MR. JACOB:

Oh, absolutely. Dial her up, Chad.

MR. COLLINGS:

-- the question over and over.

MR. JACOB:

Dial it up.

MR. COLLINGS:

Counsel --

MR. JACOB:

No. Dial it up.

MR. COLLINGS:

Counsel, I'm just trying to bring us all to a point where we can finish this.

MR. JACOB:

Oh, so am I.

MR. COLLINGS:

You're asking a question. He's answering it.

MR. JACOB:

Do you want to call the judge?

MR. COLLINGS:

I'm just trying to get to a point of finish, where we can finish.

MR. JACOB:

Good. Good.

MR. COLLINGS:

What is the next question?

MR. JACOB:

DO you want to call the judge or not? Because I am more than happy to ask that question in front of a judge.

MR. COLLINGS:

If that's what you want to do, call her.

MR. JACOB:

No. I'm asking you. You threatened it.

MR. COLLINGS:

I'm just saying at some point, that's the next step.

MR. JACOB:

All right. Well, you go ahead with that next step. You get the number.

BY MR. JACOB:

Q. Sir, am I correct that as you sit here, you cannot tell us under oath that any of these allegations, if they happened, were not for a punitive reason; is that correct?

MR. COLLINGS:

Object to the form.
THE WITNESS:
That's not correct.
BY MR. JACOB:
Q. Then how can you tell me that it wasn't for a punitive reason?
A. Because we haven't even established that it happened.
Q. Right.
A. It's an allegation.
Q. Right. So how can you tell me then that --
A. I'm not telling you.
Q. How can you just answer that it didn't happen for a -- no matter what, it didn't happen for a punitive reason? How can you tell me that?
MR. COLLINGS:
Object to the form. Asked and answered.
THE WITNESS:
We haven't established whether it even happened or not.
BY MR. JACOB:
Q. Oh, I know. But you've already

established that it wasn't for a punitive reason if it did. So how did you reach that conclusion?

A. I haven't even reached a conclusion that it happened based on the allegation in your lawsuit.

Q. I know. But you did tell counsel that you reached a conclusion that it wasn't for a punitive reason. So how did you reach that conclusion?

MR. COLLINGS:

Object to the form. Asked and answered.

MR. JACOB:

No. He has never told us how he reached that conclusion.

BY MR. JACOB:

Q. What did you review --

MR. COLLINGS:

You're misstating my question, which was about the number of days in the holding cell.

MR. JACOB:

He doesn't know how it happened.

MR. COLLINGS:

If people can be in a holding cell

more than 48 hours. You conflate all the allegations into one and then asked a question.

MR. JACOB:

He doesn't know how -- whether that even happened.

BY MR. JACOB:

Q. So since you don't know whether that happened, how are you able to tell him it wasn't for a punitive reason?

A. Because we haven't established the allegation to be correct.

Q. Okay. But that doesn't mean that it didn't happen for a punitive reason if it happened, correct?

A. I'm telling you we haven't established whether or not this incident, this grievance, this lawsuit, even occurred.

Q. Correct. So now I want to know, though, why you are able to say, though, that what he asked you, it wasn't for a punitive --

A. Because we don't know if the incident occurred.

Q. Okay. So you're saying that you don't know whether it was for punitive reasons or

not; is that correct?

MR. COLLINGS:

Object to the form. Asked and answered.

THE WITNESS:

Not that I'm aware of because the accusations have not been proven.

BY MR. JACOB:

Q. SO you have no fact to point to, no evidence to point to that this didn't happen for a punitive reason, correct? You're just saying just because I don't even know what happened, it wasn't for a punitive reason?

A. That's not true.

Q. Oh, okay. Well, then, again, when you concluded that overcrowding, if it happened, or in a cell for over 48 hours, if it happened, wasn't for punitive reasons, how did you reach that conclusion?

A. We haven't established whether the accusation is true --

Q. It doesn't matter.

A. -- or correct.

Q. You were able -- I'm asking you how you did conclude?

MR. COLLINGS:
You've got to stop interrupting.
Let him finish his answer, and then you start another question.

BY MR. JACOB:

Q. I understand we haven't established that. But I also understood very clearly what you said under oath, which was if it did happen, it wasn't for a punitive reason. And I'm asking you how you know that?

A. Because we never established whether that this even occurred, that the overcrowding --

Q. Not my question. You did say, though, under oath that if it happened it wasn't for a punitive reason. So please explain to me how you determined that.

A. I'm still confused on whether or not this incident even occurred.

Q. Right. So am I. But my question is -- according to your answers. But my question is, when you told him, though, that it wasn't for a punitive reason, how did you reach that conclusion?

A. If there was any intent to cause these issues based on our policy or the people we

have in place to oversee our correctional facility.

Q. So you investigated their intent?

A. I didn't say that.

Q. Oh, okay. Well, then, again, how do you know it wasn't punitive? How do you know you didn't have somebody or a shift who just got tired of these inmates and said, "You know what, we can put them back in general, but screw it. Let's put 20 in here just to piss them off"?

MR. COLLINGS:

Object to the form.

BY MR. JACOB:

Q. How do you know that?

MR. COLLINGS:

Pure speculation.

THE WITNESS:

I don't know that.

BY MR. JACOB:

Q. Okay. So then you would agree with me that would be punitive, correct?

MR. COLLINGS:

Object to the form. Speculation.

THE WITNESS:

Again, we haven't even established

that these accusations or grievances occurred.

BY MR. JACOB:

Q. Correct. But you have determined that it wasn't punitive, is what you told him?

MR. COLLINGS:

Object to the form.

BY MR. JACOB:

Q. You told him that if they were in a cell for over 48 hours, when he asked you if that was for a punitive reason, you said, "No"?

MR. COLLINGS:

I said did he have any knowledge that that was for a punitive intent. I think my question was more specific.

BY MR. JACOB:

Q. Ah. So you have no knowledge it was for a punitive? You have no knowledge that it wasn't for a punitive; is that fair?

A. I have no knowledge that it was for a punitive.

Q. Do you have any knowledge that it wasn't for a punitive?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Repeat the question.

BY MR. JACOB:

Q. You said, "I have no knowledge that if they were in the cell for over 48 hours, that it was for a punitive reason." And I'm asking you, do you have any knowledge if they were in a cell for over 48 hours that it wasn't for a punitive reason -- or excuse me -- that it was for a punitive -- let me ask it again.

You said that if they were in the cell for 48 hours, you have no knowledge that it was for a punitive reason?

A. I do not.

Q. And I'm asking you the opposite. If they're in a cell for 48 hours, do you have knowledge that it was for a legitimate penological interest?

A. I do not.

Q. Okay.

MR. JACOB:

No further questions.

MR. COLLINGS:

Okay. Thank you.

(Whereupon the proceedings were concluded at 12:27 p.m.)

# WITNESS' CERTIFICATE

I, SHERIFF RANDY SMITH, do hereby certify that the foregoing testimony was given by me, and the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.

__________________ ___________________________

DATE SIGNED (Witness' Signature)

Signed with corrections as noted.

Signed with no corrections as noted.

DATE TAKEN: February 20, 2023

# REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original seal on this page.

I, ANNA M. ROTH, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that SHERIFF RANDY SMITH, to whom oath was administered, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 148 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter nor is there any such relationship between myself and a party litigant in this matter. I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

ANNA M. ROTH, RPR, CCR

CERTIFIED COURT REPORTER

NO. 2010021