UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


AHMED BAQER, KLABERT JOSEPH
GUILLOT, JR. And KLABERT JOSEPH
GUILLOT, SR.    NO. 2020-cv-980-WBV-DPC
          Plaintiffs

VERSUS            JUDGE VITTER

ST. TAMMANY PARISH GOVERNMENT,      MAGISTRATE CURRAULT
a/k/a ST. TAMMANY PARISH COUNCIL,
ST. TAMMANY PARISH SHERIFF'S
OFFICE, RANDY SMITH, in his
official and individual capacity,
RODNEY J. STRAIN, in his official
and individual capacity, GREGCONSOLIDATED WITH Louvier
LONGINO, in his official and v. St. Tammany Parish Government
individual capacity, and LACEY      No. 2:20-cv-01840-WBV-DPC
KELLY, in her official and individual
capacity
          Defendants   ALL CASES



          DEPOSITION OF KLABERT JOSEPH GUILLOT,

SR., given in the above-entitled cause, pursuant

to the following stipulation, before Raynel E.

Schule, Certified Shorthand Reporter in and for

the State of Louisiana, at St. Tammany Parish

Jail, 1200 Champagne Street, Covington,

Louisiana, 70433, commencing at 10:10 o'clock

a.m., on Wednesday, the 12th day of October,

2022.

```
 1                    I N D E X

 2                                       Page

 3    Caption                            1

 4    Appearances                        3

 5    Agreement of Counsel               4

 6    Examination

 7         MR. COLLINGS                  5, 61

 8         MR. JACOBS                    47

 9    Reporter's Certificate             64

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1    APPEARANCES:

2
     For the Plaintiffs:
3
     JACOB LITIGATION
4    Attorneys at Law
     BY:  DEVON M. JACOB, ESQ.
5    P.O. BOX 837
     Mechanicsburg, PA   17055-0837
6    (Via Telephone)

7    And

8    GLORIOSO LAW FIRM
     Attorneys at Law
9    MARIA B. GLORIOSO, ESQ.
     2716 Athania Parkway
10   Metairie, Louisiana   70002

11
     For the Defendants:
12
     MESSRS. MILLING, BENSON, WOODWARD, L.L.P.
13   Attorneys at Law
     BY:  CHADWICK W. COLLINGS, ESQ.
14   68031 Capital Trace Row
     Mandeville, Louisiana   70471
15

16

17
     Reported By:  Raynel E. Schule
18                 Certified Shorthand Reporter
                   State of Louisiana
19

20

21

22

23

24

25
```

1                  S T I P U L A T I O N

2              It is stipulated and agreed by and

3      among Counsel for the parties hereto that the

4      deposition of KLABERT JOSEPH GUILLOT, SR. is

5      hereby being taken pursuant to the Federal Rules

6      of Civil Procedure for all purposes in

7      accordance with law;

8              That the formalities of reading and

9      signing are specifically waived;

10             That the formalities of sealing,

11     certification, and filing are hereby

12     specifically waived.

13             That all objections, save those as to

14     the form of the question and responsiveness of

15     the answer, are hereby reserved until such time

16     as this deposition or any part thereof is used

17     or sought to be used in evidence.

18                      *  *  *  *  *

19             Raynel E. Schule, Certified

20     Shorthand Reporter in and for the State of

21     Louisiana, officiated in administering the oath

22     to the witness.

23

24

25

```
 1        KLABERT JOSEPH GUILLOT, SR., having

 2        been first duly sworn by Raynel E. Schule,

 3        was examined and testified on his oath as

 4        follows:

 5                     EXAMINATION

 6   BY MR. COLLINGS:

 7   Q.   All right.  Good morning, sir.  My name is

 8        Chadwick Collings.  I represent the St.

 9        Tammany Parish Sheriff along with several

10        other defendants in this matter.  I need

11        you to please state your full name and your

12        current address for the record.

13   A.   Klabert Joseph Guillot, Sr., ███████████

14        ██████████████████████████████████████.

15   Q.   All right, and that is your home address?

16   A.   Yes, it is.

17   Q.   All right.  What is your date of birth?

18   A.   ██████████.

19   Q.   All right, and we're taking this deposition

20        today at the St. Tammany Parish Jail where

21        you are currently incarcerated, correct?

22   A.   Yes.

23   Q.   And how long have you been incarcerated

24        here?

25   A.   Since April 21st.
```

```
 1   Q.   Of this year?
 2   A.   This year.
 3   Q.   All right.  So this lawsuit was filed back
 4        in 2020 regarding an incarceration you had
 5        previously here at the St. Tammany Parish
 6        Jail --
 7   A.   Yes.
 8   Q.   -- and so we're going to talk about --
 9        we're going to talk about your entire
10        history, but I wanted to just make sure
11        we're clear that we're talking about your
12        time in the jail back in -- in, let's see,
13        December and January of -- December of 2019
14        and January of 2020.  You understand that?
15   A.   Yes, sir.
16   Q.   All right.  So have you ever been deposed
17        before?
18   A.   No, sir.
19   Q.   All right.  So this is a
20        question-and-answer session.  I ask
21        questions; you provide answers, and
22        everything you say is transcribed and under
23        oath.  You understand that?
24   A.   Yes, sir.
25   Q.   All right.  It's important for our court
```

reporter that you allow me to answer -- oh, I'm sorry, that you allow me to ask questions, and then you wait, and then you provide your responses, because if we talk over each other, it's very difficult for her, okay?
A. Yes, sir.
Q. If you don't understand a question I ask you, I need you to tell me you don't understand, and I'll try to rephrase it so that you can. Again, if you don't say anything, I'm going to assume you understand my questions and all of your answers are truthful, okay?
A. Yes, sir.
Q. All right. Last, I need you to give verbal responses to all of my questions. A shake of the head or a huh-huh or an unh-unh, I understand what you mean; however, the court reporter can't really transcribe that effectively, okay?
A. Yes, sir.
Q. All right. So we are here today to talk about a lawsuit that you filed back in 2020 in which you were one of a number of

```
 1        individuals who sued the Sheriff along with
 2        some other defendants alleging some
 3        unconstitutional conditions of confinement.
 4        Are you aware of that?
 5   A.   Yes, sir.
 6   Q.   All right.
 7                  MR. JACOB:
 8                  Chad --
 9                  MR. COLLINGS:
10                  Yes.
11                  MR. JACOB:
12                  -- I'm just going to insert an
13             objection to one of your
14             instructions where you said that
15             you're going to assume the he's
16             answering the question that you're
17             asking.  I'm just going to object
18             and say that your assumption is at
19             your own peril.
20                  MR. COLLINGS:
21                  Well, that's the same instruction
22             I gave your three -- your clients
23             three times yesterday, so I'm a
24             little surprised that you're
25             objecting now, but I -- I will take
```

```
 1              whatever you say, and the record
 2              will reflect it, okay?
 3                   MR. JACOB:
 4                   That's okay, but that's always
 5              the case with depositions anyway,
 6              but go ahead.
 7    BY MR. COLLINGS:
 8    Q.   Okay.  So right now, let's start with a
 9         little bit about you.  We've got your date
10         of birth.  Let's talk about your
11         educational background.  Where did you go
12         to school?
13    A.   Holy Cross.
14    Q.   And you graduated from Holy Cross?
15    A.   Yes, I did.
16    Q.  All right.  What year?
17    A.   '85.
18    Q.   All right.  Did you have any education
19         beyond high school?
20    A.   USL in Lafayette.
21    Q.  All right.  Did you graduate from USL?
22    A.   No, I did not.
23    Q.   All right.  How long did you attend USL?
24    A.   One year.
25    Q.  All right, and what did you study?
```

1    A.    General studies.

2    Q.    All right, and would that have been 1986?

3    A.    Yeah, year after I graduated from high

4          school.  I had a scholarship to go there

5          for five years, but I didn't succeed.  I

6          didn't go.

7    Q.    All right.

8    A.    I went one year.

9    Q.    And after your one year at USL, have you

10         attended any other educational

11         institutions?

12   A.    I went to work.

13   Q.    All right.  Where did you go to work?

14   A.    I worked in the gaming business for a

15         while.  I worked in the -- off the coast of

16         Mississippi, coast of Galveston on daily

17         cruise ships before they legalized gaming,

18         and then I went into the underground

19         utility business for about 25 years.

20   Q.    All right.  So that would have been 1986.

21         How long were you -- how long did you work

22         in the gaming business?

23   A.    'Til '92.

24   Q.    All right, and --

25   A.    Well, '95.

```
1    Q.   Okay, and in 1995, you then started working
2         in the underground utilities?
3    A.   Right.
4    Q.   What company did you work for?
5    A.    My own.
6    Q.   All right.  What was the name of that
7         company?
8    A.    K&R Construction, one of them.
9    Q.    KNR?
10   A.    K&R.
11   Q.    K&R.  Okay.  K&R Construction, and that
12        company, does it still exist?
13   A.    No, it does not.
14   Q.    All right.  When did it go out of business?
15   A.   Early 2000.
16   Q.    All right.  So after K&R went out of
17        business, then what did you do for
18        employment?
19   A.    I opened my own business a couple of years
20        later, Guillot's Underground Utilities.
21   Q.    All right, and how long did that business
22        stay in operation?
23   A.    About three years.
24   Q.    All right.  You're starting -- starting to
25        talk right at the end of my sentence.
```

```
 1        You've got to give her at least a
 2        one-second pause or so so she can get
 3        everything down, okay?
 4   A.   Yes, sir.
 5   Q.   All right.  So -- so you were -- you had
 6        Guillot Construction?  What was the name of
 7        the company again?
 8   A.   Underground Utility.
 9   Q.   Guillot Underground Utility, and that was
10        in business for how long?
11   A.   About three years.
12   Q.   All right, and why did it close?
13   A.   Just my partner had a lack of wanting to do
14        it anymore, so we sold it.
15   Q.   All right, and then after you sold that
16        business, then what did you do for a
17        living?
18   A.   I went to work for someone in that same
19        field.
20   Q.   And who was that?
21   A.   Guy named John Moore out of Jackson,
22        Tennessee.
23   Q.   John Moore?
24   A.   John Moore.  Before that I worked for a guy
25        name Steve Ecksted (phonetic).  I'm trying
```

```
1          to think of the name.  I can't think of the
2          name of his company.  Ecksted Utilities,
3          something to that effect.  He was out of
4          Minnesota.
5     Q.   All right.  So Mr. Moore, what was his --
6          what was the name of his company?  Do you
7          recall?
8     A.    Yeah, J&M -- J&M Drilling.
9     Q.    All right, and how long did you work for
10         him?
11    A.   About seven years.
12    Q.    All right, and why did you leave?
13    A.    Just conflict of interest.  No real reason.
14         I went back to subbing on my own a little
15         bit.  He did some jobs with me together,
16         and then I went out of business again, you
17         know, and --
18    Q.    You went out of business?
19    A.    A lot of times in this business, you don't
20         get paid for your work.  Went to go do a
21         big job.  This company didn't pay that
22         company.  I didn't get paid, lost
23         everything, that kind of thing.
24    Q.   Is that what happened to Mr. Moore's
25         business?
```

```
1    A.    No.  Mr. Moore I'm sure is still in
2          business.  We just separated.  I went
3          another way.
4    Q.    Okay.  All right.  So after you left Mr.
5          Moore's business, then where did you go?
6    A.    I worked for a guy named Tony Bishop.
7    Q.    And what kind of business was that?
8    A.    Underground utility business, fiberoptics.
9          We did some jobs in Florida.  We did some
10         jobs in north Mississippi all the way to El
11         Paso, and then in El Paso, it turned out
12         bad.  Drilling in rock, a lot of times, it
13         don't work out that well.
14   Q.    All right, and how -- and what year did
15         that stop?
16   A.    About four years ago --
17   Q.    Okay.
18   A.    -- five years ago.
19   Q.    And why did you leave that company?
20   A.    I lost all my money.
21   Q.    How did you lose all your money?
22   A.    I did not get paid for my work.
23   Q.    Okay.  So approximately four years ago, you
24         left that company, and then where did you
25         go after that?
```

1    A.   I went to prison.

2    Q.   Okay.

3    A.   In El Paso.

4    Q.   You were in prison.  All right.  We're

5         going to get into your criminal background

6         in just a minute.  I just want to get your

7         work history nailed down.

8    A.   That's it.

9    Q.   So you haven't worked since about four

10        years ago?

11   A.   That's probably correct, yeah.

12   Q.   Okay.  All right.  So let's talk -- let's

13        talk about your prior interactions with law

14        enforcement.  Now, I assume you've been

15        arrested at least twice that we know of,

16        right, once for the incarceration in 2019

17        and once for the incarceration here in

18        2020.  I want to go back before 2019 and

19        tell me about any other interactions you

20        would have had with law enforcement prior

21        to that time.

22   A.   What does that have to do with what we're

23        here for?

24   Q.   This is a discovery deposition.  We get to

25        explore everything there is about your

1      life, your claim, your background.  Whether

2      it's ultimately relevant and admissible at

3      trial would be another question for another

4      day, so --

5              MR. JACOB:

6              Mr. -- Mr. Guillot, as you and I

7          discussed, unless either Maria or

8          myself instructs you not to answer

9          --

10              THE WITNESS:

11              Okay.

12              MR. JACOB:

13              -- you can -- you can be assured

14          that it's an appropriate question,

15          and you should feel free and

16          actually are obligated to then

17          answer those questions.

18              THE WITNESS:

19              All righty.

20              MR. JACOB:

21              All right?  I -- I promise you

22          Maria and I are listening and we'll

23          simply --

24              THE WITNESS:

25              We're good.  We're good.

```
 1              MR. JACOB:
 2                   -- we'll simply say don't answer
 3              if it's not appropriate.
 4  BY MR. COLLINGS:
 5  Q.   So let's start with your first interaction
 6       with law enforcement.  Do you recall when
 7       that would have been?
 8  A.   Yeah.  1991.
 9  Q.   All right.  Where was that and what were
10       the circumstances of it?
11  A.   It was a -- a case involving -- I was in
12       Mississippi, and the Federal Government
13       went to my house, my mother's house in
14       Arabi, Louisiana, and said they wanted to
15       talk to us, me and my brother, and wanted
16       to talk about something that happened in
17       1986.
18              MR. JACOB:
19                   I'm going to -- I'm going to --
20              see, now, this is one of those
21              instances where I'm going to object
22              if the scope of the question goes to
23              the underlying facts of any criminal
24              charge and instruct Mr. Guillot not
25              to answer those questions --
```

```
 1              MR. COLLINGS:
 2              I haven't asked the --
 3              MR. JACOB:
 4              -- because --
 5              MR. COLLINGS:
 6              I haven't asked a question.
 7              MR. JACOB:
 8              Excuse me.  Excuse me.  You asked
 9         the circumstance related to same.
10         So I was going to wait and see what
11         the extent of his answer was going
12         to be since your question was overly
13         broad, but in any case I'm going to
14         be very clear right now since
15         respectfully I raised this exact
16         same proper objection three times
17         yesterday.  For the first time in 20
18         years, I've had to do that, and the
19         admissibility is to convictions only
20         of a certain type, but I -- since
21         discovery is more broad, I will
22         allow you to ask for any arrests of
23         any kind, jurisdictions, and the
24         nature of the charges, but that is
25         it.  So anything more, he is
```

```
 1              instructed not to answer.
 2                   MR. COLLINGS:
 3                   Okay.  Well, with respect, Devon,
 4              I haven't even gotten there.  I
 5              asked him about the year and where
 6              and what were the circumstances so
 7              that's --
 8                   MR. JACOB:
 9                   Thank you for -- thank you for
10              admitting the circumstances, because
11              that's exactly what he's not going
12              to be speaking about.
13                   MR. COLLINGS:
14                   Well, he needs to tell me what
15              the charges were.
16   BY MR. COLLINGS:
17   Q.   What -- what were you arrested for?
18                   MR. JACOB:
19                   Don't answer that.
20   BY MR. COLLINGS:
21   Q.   Who arrested you?
22                   MR. JACOB:
23                   Then ask that.
24                   MR. COLLINGS:
25                   I did.
```

1    BY MR. COLLINGS:

2    Q.   Can you answer the question, sir.

3    A.   Yes, I can.  It was -- actually, I'm not

4         even positive who exactly arrested me

5         because they didn't arrest me, but it was

6         something to do with ectasy, five, six

7         years prior to the fact.  There was 352

8         co-defendants in the case.  Told me if I

9         didn't plead guilty, I'd do 20 years; plead

10        guilty, I might do no time.

11                    MR. JACOB:

12                    Mr. Guillot.

13                    THE WITNESS:

14                    That's what I did.

15   BY MR. COLLINGS:

16   Q.   Did you ultimately plead guilty?

17   A.   Yes, I did.

18   Q.   All right.  You pled guilty.  Do you know

19        where you pled guilty?

20   A.   Yeah.  In New Orleans.

21   Q.   Was it in State Court or Federal Court?

22   A.   I thought it was Federal, but I -- I have a

23        DOC number, so I don't know honestly.

24   Q.   So this would have been about 1991?

25   A.   It was exactly 1991, '92.

21

```
1    Q.  And what was the actual charge that you
2        pled guilty to?  Do you recall?
3    A.   Possession of ecstasy.
4    Q.  Okay.  All right.  Did your brother also
5        plead guilty?
6                    THE WITNESS:
7                    Do I answer that?  I mean, he's
8              talking about my brother?
9    BY MR. COLLINGS:
10   Q.  You mentioned your brother and you --
11   A.  They came and questioned us.
12   Q.  Did you --
13   A.  Yeah, he also actually did plead guilty.
14   Q.  Okay, and what is your brother's name?
15                   MR. JACOB:
16                   Mr. -- Mr. Guillot, even though
17             it's not at all relevant to the
18             claims asserted, a relevancy
19             objection, I'm really not supposed
20             to make, so you can answer that
21             question.
22                   THE WITNESS:
23                   Willard -- Willard Guillot.
24   BY MR. COLLINGS:
25   Q.  Willard Guillot.  Okay.  All right.  So did
```

```
 1        you -- were you ultimately sentenced to
 2        jail for those charges?
 3   A.   Halfway house and five years' probation,
 4        which I did successfully.
 5   Q.   All right, and where was the halfway house
 6        located?
 7   A.   First started out in Mississippi, Biloxi,
 8        on top of the Post Office.  That's where I
 9        was living, and then I moved to Colorado,
10        Golden, Colorado, and then I moved back to
11        Mississippi.
12   Q.   Okay.
13   A.   And that's it.
14   Q.   Did you have a supervised probation after
15        that?
16   A.   Yeah.  No.  Five years.  That's all I had.
17        I got 60 days in a halfway house and five
18        years supervised probation.  I reported
19        every month for five years, 60 months.
20   Q.   And were ever deemed to be in violation of
21        any of the terms --
22   A.   No.
23   Q.   You've got to let me finish my question
24        before you start answering.  I understand
25        you're anxious to respond, but you've got
```

```
 1        to let her --
 2   A.   I understand.
 3   Q.   -- have time to respond, all right?  All
 4        right.  So did you ever violate any of the
 5        terms of your probation?
 6   A.   No.
 7   Q.   Okay.  So this would have been 1991 then.
 8        So fast forward.  When was the next time
 9        you had an interaction with law
10        enforcement?
11   A.   '97.
12   Q.   All right.  Where was that?
13   A.   That was in Birmingham, Alabama.
14   Q.   All right, and tell me about what was the
15        incident.  What incident was that
16        interaction?  Was it an arrest, a
17        questioning?
18   A.   I was arrested.  I was questioned.  I went
19        to trial, and I was null processed.
20   Q.   Okay.  What were you arrested for?
21   A.   I was in a hotel room with some people, and
22        they had a stolen car outside, and they
23        came in, and they told lies about it or
24        something, and they had dope in the room.
25                  MR. JACOB:
```

```
 1                    Mr. -- Mr. Guillot --
 2                    THE WITNESS:
 3                    Yes, sir.
 4                    MR. JACOB:
 5                    -- he asked what you were
 6              arrested for, what the charge was
 7              but --
 8                    THE WITNESS:
 9                    Possession of crack.
10                    MR. JACOB:
11                    -- but that's all he's asking
12              for.
13                    THE WITNESS:
14                    Possession of crack in someone
15              else's room.
16   BY MR. COLLINGS:
17   Q.   You were arrested for possession of crack
18        cocaine, and that -- that charge was
19        ultimately nolle prosse'd by the
20        prosecution in that case?
21   A.   Yes, sir.
22   Q.   All right, and do you know if that was in
23        State Court or Federal Court?
24   A.   Birmingham, Alabama, just a state -- state,
25        Birmingham, Alabama.  State charge I guess.
```

```
 1   Q.   Okay, and it was in the city of Birmingham?
 2        Was it Birmingham Police Department that
 3        arrested you?
 4   A.   Homewood I believe.
 5   Q.   Homewood?
 6   A.   Homewood.
 7   Q.   Homewood.  All right.  Is that a town near
 8        Birmingham?
 9   A.   It is in Birmingham.
10   Q.   Okay.  All right.  So were you incarcerated
11        for that charge?
12   A.   No.
13   Q.   You didn't have to spend any time in jail?
14   A.   No.
15   Q.   Okay.  So this would have been 1997, right?
16   A.   Pretty sure.  Not positive.  I believe it
17        was '97, yes.
18   Q.   All right.  Fast forward with me again.
19        Tell me about your next interaction with
20        law enforcement.  When did it happen?
21   A.   2003.
22   Q.   All right.  Where?
23   A.   In the same place, Birmingham, Homewood.
24        No, not Homewood.  Hueytown.  My bad.
25   Q.   Hueytown?
```

1    A.    Hueytown.

2    Q.    How do you spell that?

3    A.    Just like the name Hueytown.

4    Q.    Huey as in H-u --

5    A.    Yes.

6    Q.    -- e-y?

7    A.    Yes.

8    Q.    Okay.  All right.  Were you arrested?

9    A.    Yes.

10   Q.    What were you arrested for?

11   A.    Possession of cocaine.

12   Q.    And were you ultimately convicted of that

13         charge?

14   A.    I went to prison.  Yes, I had a ten-year

15         sentenced.

16   Q.    And you were sentenced by the State of

17         Alabama?

18   A.    Yes.

19   Q.    And how many years did you stay in prison

20         as a result of that conviction?

21   A.    30 months, something like that.

22   Q.    All right.  Were you -- did you have

23         probation after that 30 months was

24         complete?

25   A.    Parole.

1    Q.   Parole.  All right.

2    A.   Yes.

3    Q.   And were you ever deemed to have violated

4         any of the conditions of your parole as a

5         result of that early release?

6    A.   No.

7    Q.   All right.  So that would have been in

8         2003, plus 30 minutes -- 30 months, give or

9         take.  So when your next interaction with

10        law enforcement?

11   A.   2017 or '18.

12   Q.   All right.  Tell me where and what was the

13        circumstance of that.

14   A.   El Paso, Texas.

15   Q.   All right, and what -- who arrested you?

16   A.   El Paso Police Department.

17   Q.   All right, and what was the charge?

18   A.   Methamphetamine.

19   Q.   All right, and this would have been 2014

20        you think?

21   A.   No, I didn't say that.  I said '17 or '18.

22   Q.   2018, my apologies.

23   A.   It was '18, yeah, not '17.

24   Q.   Okay.  Methamphetamine?

25   A.   Huh-huh.

```
 1    Q.   You have to say yes or no.
 2    A.    Yes, sir.
 3    Q.    All right, and did you go to trial on those
 4         charges?
 5    A.   I did.
 6    Q.    And what was the ultimate disposition?
 7    A.    Possession of methamphetamine --
 8    Q.   My --
 9    A.    -- two years.
10    Q.   Okay.  My question -- I'm sorry.
11    A.   Guilty.  I pleaded guilty, and I spent two
12         years -- two-year sentence.
13    Q.    I've got you, okay.  So you pled guilty,
14         and you were sentenced to two years?
15    A.    Huh-huh.
16    Q.    Were you incarcerated?
17    A.    Yes, I was.
18    Q.    All right, and where were you incarcerated?
19    A.    Started out in El Paso and went to
20         Huntsville, Texas.
21    Q.   Okay.
22    A.   The Gurney Unit.
23    Q.    What was that?
24    A.    The Gurney Unit.
25    Q.    What is a Gurney Unit?
```

```
1    A.    The Gurney Unit.  It's a prison in
2          Huntsville, Texas.  TDC is the name of the
3          prison system.
4    Q.    What prison were you sent to in Alabama?
5    A.    Ventress.  It's in Clayton, Alabama.
6    Q.    Did you also --
7    A.    I need some water.  Can I get some water by
8          any chance?
9    Q.    All right.  Did you -- I neglected to ask
10         you this earlier.  When you were arrested
11         in Birmingham, Alabama, did you spend any
12         time in the Birmingham County Jail?
13   A.    Yeah, a day or night, one day or two days.
14   Q.    All right, and then after you were
15         adjudicated guilty in that, did you spend
16         any additional time in the jail or did you
17         go straight to Ventress, Alabama?
18   A.    I -- I spent four months in -- for the
19         2003-2004 charge.  Then I went to Kilby,
20         Alabama, for processing, and then I went to
21         Ventress.
22   Q.    Okay.  So you had three different
23         correctional institutions in Alabama that
24         you stayed in?
25   A.    Yeah.
```

```
 1   Q.   The county --
 2   A.   The county, then prison, DOC, and one place
 3        processes you, and the next place, you
 4        stay.
 5   Q.   Understood, and then in 2018, did you spend
 6        time in the county jail there when you were
 7        arrested?
 8   A.   El Paso, yes, I did.
 9   Q.   And how long were you there before you were
10        transferred --
11   A.   Five -- five months, maybe six.
12   Q.   All right.  You're -- you're talking, like,
13        right before I'm finishing.
14   A.   Sorry.
15   Q.   That's all right.  I understand you're
16        nervous.
17   A.   Five or six months.  I'm not nervous.
18   Q.   All right.  You've just got to let me
19        finish so we can make it easy on her, and
20        everybody can get out of here.  All right.
21        So five or six months in the county jail,
22        then transferred to a Department of
23        Corrections facility in Texas?
24   A.   Right.
25   Q.   Okay, and you spent how many years there in
```

```
 1        that correctional facility -- or how many
 2        years were you sentenced for the
 3        methamphetamine in 2018?
 4   A.   Two years.
 5   Q.   So at this point in time as of 2018, you've
 6        got what, three -- this will be your third
 7        -- that's your third felony conviction,
 8        right?  You had the 1991 meth and ecstasy
 9        conviction, the Birmingham, Alabama,
10        narcotics conviction, and then the 2018
11        narcotics conviction, right?  Am I --
12   A.   Yes.
13   Q.   Am I getting those correct?  Okay.  So did
14        we leave out any felony convictions during
15        any of that time?
16   A.   No.
17   Q.   Okay.  So after you got out of the
18        Department of Corrections facility in the
19        State of Texas, tell me about your next
20        interaction with law enforcement.
21   A.   Here in St. Tammany.
22   Q.   All right, and who arrested you?
23   A.   Slidell.
24   Q.   Slidell PD?
25   A.   Yes, sir.
```

```
1   Q.   And what were you arrested for?
2   A.   Well, possession of -- really wasn't --
3        wasn't really what it was, but, I mean,
4        yeah, they said possession of heroin,
5        methamphetamine, and hydrocodone.  I walked
6        out a store, and the person I was riding
7        with, they pulled out --
8                    MR. JACOB:
9                    Mr. Guillot, just --
10                   THE WITNESS:
11                   Well, I mean, yeah --
12                   MR. JACOB:
13                   -- just the charge.
14                   THE WITNESS:
15                   Okay.  Just the charge.
16              Methamphetamine, heroin, and
17              hydrocodone.
18   BY MR. COLLINGS:
19   Q.   All right.
20   A.   I pled guilty.
21   Q.   All right.  So this would have been in 2019
22        that arrest?
23   A.   I'm -- I'm not positive.  You probably got
24        it written down right there, huh?
25   Q.   Well, we have that you were, let's see --
```

```
 1        yeah, December 18, 2019.
 2   A.    2000 -- yeah.
 3   Q.    Does that -- does that sound right to you?
 4   A.    Yeah, December, yeah, December 7th,
 5         something like that?
 6   Q.    Well, this says December 18th.
 7   A.    Oh, I don't know.  Maybe.  I -- I'm
 8         guessing they got -- they got -- it's on
 9         the paper, huh?
10   Q.    Was there another arrest somewhere in
11         December of 2019 that we're not talking
12         about?
13   A.    No, no.
14   Q.    Okay.  So in your Complaint, the one -- the
15         one that you filed in this lawsuit, and in
16         particular I'm looking at Page 18,
17         Paragraph 100 says, from -- quote, "From
18         December 18, 2019, to present Defendants
19         have held Mr. Guillot, Jr." -- I'm sorry.
20         This is Junior.  I'm looking at the --
21   A.    Wrong person.
22   Q.    Oh, you're right.  I'm looking at your son
23         I think.  That is your son, right?
24   A.    Yes, it is.
25   Q.    All right.  Let's see.  Page 17, Paragraph
```

```
 1        108, "Agents of the St. Tammany Parish
 2        Sheriff's Office arrested Mr. Guillot, Sr.
 3        on December 22nd, 2019."  Does that sound
 4        right to you?
 5   A.   Where at?
 6   Q.   It doesn't say.
 7   A.   Okay.
 8   Q.   This is your lawsuit, so I'm reading what
 9        you pled in the Federal Court system.  It
10        says you -- "as of December 22nd, 2019, Mr.
11        Guillot, Sr. was held in the St. Tammany
12        Parish Jail."
13   A.   Yeah, I was definitely held here.
14   Q.   Okay, and that was for, again, possession
15        of heroin and what else?
16   A.   Methamphetamine.
17   Q.   All right.
18   A.   And they said hydrocodone.  I never seen
19        none of it, so I don't really know.  That's
20        what I told -- that's what I was told.  I
21        never seen any of it, and none of it was on
22        my person so that's -- that's that, and I
23        pled guilty.
24   Q.   When did you plead guilty?
25                 MR. JACOB:
```

```
 1                    Mr. Guilott --
 2                    THE WITNESS:
 3                    Four months later.
 4                    MR. JACOB:
 5                    Mr. Guillot --
 6                    THE WITNESS:
 7                    Yes, sir.
 8                    MR. JACOB:
 9                    -- just, it's charges and
10            convictions.  That's all he's asking
11            you about.
12                    THE WITNESS:
13                    Well, I --
14                    MR. JACOB:
15                    Don't talk about the underlying
16            circumstances, please.
17                    THE WITNESS:
18                    Okay.  Well, he's kind of asking
19            about them, but --
20     BY MR. COLLINGS:
21     Q.   Okay.  So --
22     A.   I pled guilty.
23     Q.   You pled guilty to -- to what exactly?  Do
24        you recall?
25     A.   Possession.
```

```
 1    Q.    Of?
 2    A.    The three things, heroin --
 3    Q.    All three?
 4    A.    -- methamphetamine and, yeah, I pled
 5          guilty.
 6    Q.    Okay, and what was the ultimate sentence
 7          that was imposed when you pled guilty?
 8    A.    Wound up being two years.  I did my time.
 9    Q.    Two years' incarceration?
10    A.    Yeah.
11    Q.    Okay, and you were incarcerated where for
12          those two years?
13    A.    Here.
14    Q.    Here at the St. Tammany Parish Jail?
15    A.    I didn't do two years.  Went out on parole.
16    Q.    So you got out before the two years was up?
17    A.    Yeah.
18    Q.    Approximately how long were you
19          incarcerated here at the jail as a result
20          of your conviction in 2019?
21    A.    Eight, nine months.
22    Q.    Okay.  So now that's your fourth felony,
23          and you were then arrested yet again,
24          correct?
25    A.    Correct.
```

```
1    Q.   And when were you arrested?

2    A.   December.

3    Q.   Okay.  Earlier you told me April of 2022.

4    A.   That's what I'm right here for right now,

5         yeah.

6    Q.   Okay.  So in 2019, you got -- you were

7         convicted -- I'm sorry, you were arrested.

8         2020 you were convicted, sentenced to two

9         years, did eight months.  So you got out

10        sometime at the end of 2020, correct?

11   A.   I got out last November.

12   Q.   November of 2021?

13   A.   Yeah, I had come back between that time.

14   Q.   Okay.  That's -- that's my mistake.

15   A.   Huh-huh.

16   Q.   So let's talk about -- let's -- let's keep

17        it chronological at this point.  So in

18        2020, you pled guilty to those three

19        charges for drug possession in Slidell,

20        right?

21   A.   Yes.

22   Q.   You were sentenced to two years.  You did

23        about eight or nine months, right?

24   A.   Yes.

25   Q.   All right, and then when was the next time
```

```
 1        you had an interaction with law
 2        enforcement?
 3   A.   Nine months later.
 4   Q.   So this would have been early 2021?
 5   A.   December.
 6   Q.   Of 2020 or 2021?
 7   A.   Nine months after I got out.  I don't know
 8        what -- I guess '21 I'm -- I'm assuming,
 9        yeah.
10   Q.   So December of 2021, you were arrested for
11        what?
12   A.   Possession.
13   Q.   By whom?
14   A.   Slidell and -- and St. Tammany.
15   Q.   The Sheriff's Office?
16   A.   Huh-huh.
17   Q.   You have to say yes or no.
18   A.   Yes.
19   Q.   Okay, and have you gone to court for those
20        charges?
21   A.   Yes.
22   Q.   And what was the ultimate --
23   A.   I pleaded guilty.
24   Q.   Now, you've got to let me finish before you
25        start talking.  So in 2021, you pled guilty
```

```
 1        to additional narcotics charges?
 2   A.   Yes.
 3   Q.   And do you recall what you -- exactly what
 4        you pled guilty to?
 5   A.   Yes.
 6   Q.   That was?
 7   A.   Possession of methamphetamine.
 8   Q.   All right.  So that's your fifth felony,
 9        correct?
10   A.   I'm guessing.  You're -- you're counting
11        there.  I'm not.  Yes.
12   Q.   Okay, and how long were you sentenced?
13   A.   Two years.
14   Q.   And did you get released before those two
15        years were completed?
16   A.   Yes.
17   Q.   All right, and then you -- so you were
18        arrested yet again this year?
19   A.   Yes.
20   Q.   What were you arrested for?
21   A.   Same thing.
22   Q.   Possession of --
23   A.   Methamphetamine and cocaine.
24   Q.   All right.  Who arrested you?
25   A.   Slidell PD Task Force.
```

1    Q.   Okay, and have you gone to court on those

2         charges yet?

3    A.   I was arraigned.

4    Q.   All right.  So you haven't been to trial?

5    A.   Nope.

6    Q.   And did you plead not guilty?

7    A.   That's what you do at arraignment, right.

8    Q.   You could plead guilty at an arraignment as

9         well if you'd like?

10   A.   I pled not guilty at arraignment.

11   Q.   All right.  When was that arraignment?

12   A.   The 14th of last month.

13   Q.   14th of September?

14   A.   Yes.

15   Q.   Okay.  So have we covered the entirety of

16        your history with respect to law

17        enforcement?

18   A.   Yes, yes, you did.

19   Q.   All right.  Didn't leave anything out?

20   A.   Not that I know of.

21   Q.   Okay.  So this lawsuit was filed again in

22        April of -- I'm sorry, March of 2020, and

23        it -- and it pertains to the conditions of

24        your confinement here at the St. Tammany

25        Parish Jail.  You're aware of that?

```
1   A.   Yes, I am.
2   Q.   All right.  So let's talk about that.  So
3        according to the allegations made in your
4        Complaint, beginning on December 22nd,
5        2019, you were held at the St. Tammany
6        Parish Jail as a pretrial detainee.  You're
7        aware of that?
8   A.   Correct.
9   Q.   All right.  It states that you were in a
10       holding cell with 19 other pretrial
11       detainees.  Is that correct?
12  A.   Approximately, yeah.
13  Q.   And that you were in this holding cell for
14       13 days.  Is that correct?
15  A.   Or 14, maybe 14.  I'm not exactly positive
16       of the amount of days.  They running --
17       they run together, but yes, that is
18       correct.
19  Q.   All right, and that you were ultimately
20       then transferred to the general population
21       on January 4th, 2020.  Is that correct?
22  A.   Yes.
23  Q.   Okay.  So tell us if you can how the
24       conditions of your confinement within the
25       holding cell at the St. Tammany Parish Jail
```

```
 1        for those 13 or 14 days was
 2        unconstitutional.
 3   A.   Okay.
 4                  MR. JACOB:
 5                  Objection to form.
 6   BY MR. COLLINGS:
 7   Q.   Answer the question, please.
 8                  MR. JACOB:
 9                  You can answer if he wants you
10             to.
11                  THE WITNESS:
12                  Okay.  Well, sleeping on the
13             floor with no blanket, no mat, one
14             toilet, dirty all the time, 19, 20
15             people in the holding cell.  You've
16             seen them.  You know, give you a
17             blanket for two hours at night and
18             take it back from you in the morning
19             before breakfast, pretty, pretty
20             rough.
21   BY MR. COLLINGS:
22   Q.   Okay.
23   A.   Come in and sweep once or twice after a
24        meal, you know, a day, and, you know, you
25        got 20 people in there.
```

```
 1   Q.   So it's your belief that the holding cell
 2        was -- had too many people?
 3   A.   Too many people, too long, yeah.
 4   Q.   What do you mean, "too long"?
 5   A.   Staying in there too long, I mean, you
 6        know.
 7   Q.   Is there a requirement that you're aware of
 8        legally --
 9   A.   I -- I --
10   Q.   Hold on, hold on.  You've got to let me
11        finish.
12   A.   Yes, sir.
13   Q.   All right.  Now, is there a legal
14        requirement to your knowledge that the
15        Sheriff has to move you out of holding into
16        the general population area of the jail by
17        a certain day?
18   A.   Well, I believe I saw it on the news where
19        Lee Zurik did a little thing on it that
20        said 48 hours.  That's what I believe.
21   Q.   So that's the basis of your -- your belief.
22   A.   Huh-huh.
23   Q.   Anything else?
24   A.   As far as laws go, no, that's it, I mean,
25        you know.
```

```
 1   Q.   Okay.  All right, and is there a legal
 2        requirement to your knowledge that the
 3        Sheriff give you a blanket for a certain
 4        amount of time?
 5   A.   Just -- just a human right, I guess.  I
 6        don't know what -- what their rules are,
 7        but I would think you cover somebody up
 8        when it's 60 degrees, you know.
 9   Q.   It was 60 degrees in the holding cell?
10   A.   It was cold.  I don't know exactly what
11        degrees it is.  There's not a thermometer
12        there, but it was real cold all the time.
13   Q.   Okay.
14   A.   You know, freezing.
15   Q.   Were they -- did they feed you while you
16        were in the holding cell?
17   A.   Sure.
18   Q.   Okay.  How many times a day?
19   A.   Three times, yeah.
20   Q.   All right.  Was there anything -- was there
21        wrong -- anything wrong with the food to
22        your knowledge?
23   A.   It's just standard food.  No, nothing wrong
24        with it.
25   Q.   Okay.  So as it compared to the -- all --
```

```
 1          all the other incarcerations in your
 2          lifetime, how did the food fare compare?
 3     A.   Not that great, but it wasn't as good as
 4          any others, you know.  It was -- I wouldn't
 5          it's -- you know, I'd say the food been
 6          better elsewhere, but, I mean, you know.
 7     Q.   And of the other places that you've been
 8          incarcerated, Birmingham, Alabama --
 9     A.   Huh-huh.
10     Q.   -- other Department of Corrections
11          facilities in Alabama, El Paso, Texas,
12          Department of Corrections facilities in
13          Texas, how was the jail here any different?
14     A.   Well, it's not even close.  El Paso, Texas,
15          it's the cleanest place you've ever been
16          in.  The structures there and everything is
17          just wonderful.  I mean, not that a jail
18          could be wonderful, but yeah, you're clean
19          all day; you have cleaning supplies, all
20          the right stuff, yeah, and, you know, you
21          don't have the stuff going on that you got
22          here.
23     Q.   And just so that we're clear, the basis of
24          your lawsuit is solely related to your time
25          as a pretrial detainee in December of 2019
```

```
 1        and January of 2020, correct?
 2   A.   Yes, sir.
 3   Q.   Okay.  Do you have any other complaints
 4        with respect to your time as a pretrial
 5        detainee in December of 2019 and January of
 6        2020 that you have not told us about?
 7   A.   I don't believe so.  I mean, I believe I
 8        told my lawyer everything.  We haven't
 9        really talked about that.  We talked about
10        my history so --
11   Q.   Well, I'm not going to ask you about what
12        you told your lawyer.  I'm here to ask you
13        about your time as a pretrial detainee in
14        January of 2020 and December of 2019, and I
15        want to know if we've covered everything
16        that you complain of that was
17        unconstitutional in your view?
18   A.   Okay.  Yeah, having to wait to go to the
19        bathroom, not having toilet paper, you
20        know, one roll of toilet paper for 20
21        people.  Messy conditions, too long on a
22        concrete floor, you know, having to sleep
23        on the floor with people sleeping in your
24        face and that kind of stuff.  Yeah, that's
25        -- that's pretty much what the lawsuit is
```

```
 1        about I guess.
 2   Q.   Okay.  Anything else?
 3   A.   Basically just the conditions of the
 4        holding cell were miserable.  You know, I
 5        mean, yeah, it's my fault I was there, but
 6        still, you have to be treated --
 7   Q.   Okay.
 8                  MR. COLLINGS:
 9                  All right.  Madam Court Reporter,
10              we're going to attach as Exhibit 1
11              or, I'm sorry, "Exhibit A" the
12              Notice of Deposition for Mr.
13              Guillot's deposition this after --
14              this morning, and "Exhibit 2" will
15              be the Complaint filed on March
16              22nd, 2020, of which I have
17              referenced in particular Pages 17
18              and 18.
19                  I tender the witness.
20                  EXAMINATION
21   BY MR. JACOB:
22   Q.   Yes.  Sorry about that.  My headset.  I'm
23        still getting used to these things.  Mr.
24        Guillot, Devon Jacob, as you know, your
25        lawyer --
```

```
 1   A.   Huh-huh.
 2   Q.   -- on the phone here.  I have a few
 3        questions for you just to follow up.  First
 4        of all just for purposes of the record, I'm
 5        sure Chad would agree we should probably
 6        put it on the record that your deposition
 7        is being conducted pursuant to the Court's
 8        authority to conduct it.  Since you're an
 9        incarcerated person, there had to be a
10        Motion and an Order approving that, and
11        that has occurred.  Now, going forward to
12        some things that you discussed, you
13        indicated that you were in a holding cell
14        for a period of time, and you were asked
15        about the conditions related to same.  Do
16        you recall that?
17   A.   Just now?
18   Q.   Do you recall that -- do you recall that
19        questioning?
20   A.   Just now?
21   Q.   Yes.
22   A.   Yeah, I recall.  We just -- we just talked
23        about it.
24   Q.   Okay.  Now, in that holding cell, was there
25        a toilet?
```

1    A.    Yes.

2    Q.    And can you describe that toilet for us.

3    A.    Very, very dirty.  You know, it was no crew

4          that came in and cleaned the toilet.  It

5          was nasty, and we had one roll of toilet

6          paper.

7    Q.    Now, different people will use those

8          adjectives differently.  So can you tell me

9          what you mean by, "very dirty and nasty."

10   A.    People peeing on it all day, brushing their

11         teeth and spitting in it, you know,

12         spitting all over the sides of it and --

13         and not having nothing to clean it with, no

14         having -- no cleaning supplies or anything.

15         A trustee come through once or twice a day

16         and sweep, and that's it, you know.

17   Q.    And so I heard urine.  Was there any other

18         bodily fluids that were on the toilet?

19   A.    I don't really think so, but it was very

20         nasty, very dirty.  You know, I don't think

21         I actually made a bowel movement for the

22         whole time I was in there, because it was

23         that -- you know, but I probably did, and

24         -- and it was something you had to spend

25         time to clean up.

```
1    Q.   Okay.  Did you see feces on the toilet?
2    A.   Not on top of the toilet, but, yeah, inside
3         of the toilet, you know, it -- there was no
4         cleaning of it.  The whole time I was there
5         that -- that whole little sink and toilet
6         was not cleaned.
7    Q.   I see.  Was there any vomit around the
8         toilet?
9    A.   I don't remember anything like that.  I do
10        remember pee all over, smelling of urine,
11        you know.
12   Q.   Okay.  Was the floor wet with urine?
13   A.   Yes, constantly, and --
14   Q.   And -- I'm sorry.  Go ahead.
15   A.   Yes, constantly.  Grown men don't know how
16        to aim I guess.  I don't know, but yes,
17        urine all over the toilet, all over, you
18        know.  There's a little partition there.
19   Q.   And when --
20   A.   -- you know, about two feet away from the
21        toilet if that far.
22   Q.   When -- when the cell was swept, what
23        happened to the urine that was around the
24        toilet?
25   A.   Well, they would mop, just mop it up.
```

1     Basically, they come with a broom.  One guy
2     come -- runs through with a broom and then
3     one runs through with a mop and just back
4     and forth and then goes out, not in there a
5     total of a minute maybe.  You know, it was
6     grateful that they came, but it really
7     didn't do a whole lot of good, you know.
8  Q.  Now, when they mopped, could you smell any
9     cleaners being used or could you tell if
10     cleaner was being used?
11  A.  I wouldn't say yes or no, because I don't
12     know what they had in the bucket, but it
13     didn't -- you wouldn't even have smelled no
14     bleach by no means, which we don't use
15     bleach in this facility --
16  Q.  Okay.
17  A.  -- anyway.  It's called Hepacide, you know.
18  Q.  Okay, but you're not aware of or you don't
19     recall seeing any type of disinfectant
20     process?
21              MR. COLLINGS:
22              Object to the form.
23              THE WITNESS:
24              But no, I do not.  I don't know
25         if they use it, but I -- I -- you

1          know, I wasn't the one cleaning it.

2    BY MR. JACOB:

3    Q.   Okay.  After it was -- that process of

4         cleaning that you described, was it, in

5         fact, clean?

6    A.   As clean as you can get it in a minute, you

7         know.  I mean, there was nobody coming in

8         and scrub the toilets or anything or given

9         anything to do that with.  They just swept

10        and mopped.

11   Q.   So was it clean or not in your opinion?

12                   MR. COLLINGS:

13                   Object to the form.

14                   THE WITNESS:

15                   It was clean until it -- you

16            know, we got another meal or

17            something, you know, and then --

18   BY MR. JACOB:

19   Q.   Okay.  Okay.  So in that minute, it was

20        your conclusion that it was clean when they

21        were done or it was not clean when they

22        were done?

23                   MR. COLLINGS:

24                   Object to the form.

25                   THE WITNESS:

```
 1              I wouldn't say it would be clean
 2              the way you need to be cleaned for
 3              19 people to live in it.
 4   BY MR. JACOB:
 5   Q.   Okay.
 6   A.   It was swept and mopped, one pass.
 7   Q.   And how about -- I think you started to
 8        talk about, but what types of -- of smells,
 9        if any existed in the cell?
10   A.   Urine, bowel gas.  You know, you got 20
11        people in there defecating and peeing and
12        whatever.  You know, it wasn't a pleasant
13        smell, but you know.
14   Q.   And I'm going to ask you to take a moment
15        and think back.  Do you recall ever trying
16        to use the toilet to make a bowel movement,
17        for instance?
18              MR. COLLINGS:
19              Object to the form.
20              THE WITNESS:
21              I'm -- I'm sure I did, and I'm
22        sure I had to put toilet paper all
23        over the seat and, you know, grit my
24        teeth and do what I had to do.  I
25        was in there for 14 days.
```

1    BY MR. JACOB:

2    Q.    And can you explain what that -- what that

3          felt like to have to do that in front of

4          all these inmates.

5    A.    It wasn't nothing nice.  You know, there is

6          definitely no privacy in this facility at

7          all.

8    Q.    Okay.

9    A.    It's humiliating.

10   Q.    And with respect to the -- the sleep

11         arrangements, you mentioned the concrete

12         floor.  Can you tell us, did you sleep on

13         the floor?

14   A.    Yes.

15   Q.    And then how often did you sleep on the

16         floor?

17   A.    Every day.

18   Q.    And what was the reason for sleeping on the

19         floor?

20   A.    Because there's nowhere else to sleep.

21         There's --

22   Q.    And what --

23   A.    -- concrete benches on both sides, and

24         everyone can't sleep there.  Like, two or

25         three people can fit up there, and the rest

```
 1        have to go to the floor.
 2   Q.   And when you were on the floor, was that
 3        floor clean or dirty?
 4   A.   No, it wasn't clean.  Basically just lay
 5        down and put your shoes underneath your
 6        head, your slippers, whatever they are, and
 7        cover with a blanket for the few hours that
 8        they gave it to you.
 9   Q.   And that floor that you were on, did you
10        ever have to be on the floor near the
11        toilet area where there was urine on the
12        floor?
13   A.   People were there, yes.  Yes, there's no
14        room.
15   Q.   Were you --
16   A.   I wasn't.  I was able to be five, six feet
17        away from it at most times or more, but,
18        you know, people come in and go out every
19        day.  So the bad luck ones got.  When one
20        is leave, the ones comes in, get their
21        spots.
22   Q.   I see.  So when you originally came in,
23        though, were you relegated to that bad
24        spot?
25   A.   I wasn't far away, but no, I didn't have to
```

```
 1        go put my head by the toilet or my foot --
 2        my feet by the toilet.  I was -- I was
 3        always able to get, you know, away from it
 4        a little bit, but some people had to get
 5        back there, you know.
 6   Q.   Now, even though you didn't have to go
 7        directly by the toilet, am I correct,
 8        though, that people walking back to the
 9        toilet and then to other parts of the cell
10        were tracking urine throughout the cell?
11   A.   Of course, yes.
12   Q.   And then you were forced to sleep on that,
13        correct?
14   A.   Yes.
15                   MR. COLLINGS:
16                   Object to the form.
17   BY MR. JACOB:
18   Q.   And you were forced to continue to wear the
19        clothing that made contact with the urine
20        covered floor.  Is that correct?
21                   MR. COLLINGS:
22                   Object to the form.
23                   THE WITNESS:
24                   Yes.  Every --
25   BY MR. JACOB:
```

```
 1    Q.    And --
 2    A.    We took a shower every other day and you
 3          got -- or every three -- twice a week or
 4          something like that if, and then you got a
 5          change of clothes.
 6    Q.    Okay, but other than the -- the times that
 7          you left the cell for showers, were you
 8          provided with an opportunity to leave the
 9          cell for recreation or exercise?
10    A.    No.
11    Q.    And you mentioned blankets.  Can you tell
12          me or describe those blankets.
13    A.    Just a grey wool blanket, probably six feet
14          long, four foot wide, something like that.
15    Q.    And what --
16    A.    Enough to cover you.
17    Q.    What was the condition of those blankets?
18    A.    It depends.  Sometimes you got a half of
19          blanket; sometimes you got a whole blanket;
20          you got a tore-up blanket, you know.
21    Q.    And were these blankets clean or dirty?
22    A.    I -- you got me, but, I mean, I'm sure they
23          were clean when we got them.  You know,
24          they -- whoever brought them in threw them
25          out; you got them, and then they come took
```

```
 1         them off you the next morning and threw
 2         them in a basket.  I'm sure they went and
 3         washed I would -- I would assume.  I don't
 4         know for real.
 5    Q.   Okay.  So even though the assumption would
 6         be that that's what someone would do, you
 7         don't know whether they were washed or not?
 8    A.   I do not know.  They didn't have a Bounty,
 9         you know, fresh smell to them, but nothing
10         does.
11    Q.   Now, tell me about the food a little bit
12         more.  Where did you guys eat?
13    A.   On -- sitting down on the floor or sitting
14         down on the concrete bench on your lap.
15    Q.   And then what happened to the -- the food
16         or anything related to the meal when you
17         were done?
18    A.   Put it up by the door.  When you had the
19         tray, you stacked the trays by the door,
20         and they'd come get them within a couple of
21         hours or, you know, whenever they came and
22         got them, and when you have a sandwich
23         every evening, all the trash was just
24         thrown in the corner until they come and
25         picked it up.  There was no garbage can.
```

1   Q.   Well, that was what I was going to ask.

2        Was there a garbage can or garbage bag or

3        something?

4   A.   No.

5   Q.   So food and trash was just thrown into a

6        pile in the corner?

7   A.   Huh-huh.

8   Q.   I'm sorry.  Yes?

9   A.   Yes, sir.  Yes.  They'd come sweep it up

10       and put it in a bag.

11  Q.   Okay.  Did you see any -- any fights inside

12       the cell?

13  A.   Yeah.

14  Q.   Were you involved in any?

15  A.   No.

16  Q.   Did you see anybody injured in the cell?

17  A.   I don't think so.

18  Q.   Okay.  Was anybody getting sick in the

19       cell, like, vomiting or -- or anything that

20       led you to believe that they were not

21       physically well?

22  A.   I believe you had a couple of people throw

23       up, you know, come in there detoxing off of

24       drugs, you know, and going through

25       withdrawals.

```
1    Q.   And -- and what happened when they threw
2         up?  Was the area where they vomited
3         disinfected?
4    A.   Oh, they would go to the toilet area.  No,
5         there wasn't no coming in and disinfecting
6         nothing afterwards.  Just the normal
7         sweeping and cleaning.  There was no
8         special effort made for vomit, you know.  I
9         mean, I didn't see anybody throw up on the
10        floor where we were at, but people got up
11        and ran to the toilet and threw up.  You
12        know, that's part much detoxing I guess.  I
13        don't know.  I've never done it.
14   Q.   And how did you feel -- I want to talk your
15        emotional a little bit.  How did you feel
16        to be housed in that type of condition?
17   A.   Real stupid, putting myself in that
18        situation, but it's -- it's terrible.
19   Q.   Okay, but I -- I understand you may have
20        been angry at yourself for putting yourself
21        in that situation, but I'm more asking
22        about what it felt like as a person to be
23        treated in that manner?
24   A.   Pretty bad.  You know, nothing good about
25        it.  Not a good memory.  Not -- I don't
```

```
 1            know how -- just -- just pretty awful.
 2     Q.    And -- and I think you mentioned you had
 3            been in other jails, correct?
 4     A.    Yes, I have unfortunately.
 5     Q.    And have you ever been treated in a similar
 6            manner in any of the other jails you've
 7            been in?
 8     A.    Honestly, I'd have to say no that I've --
 9            I've been never housed that way or even
10            when I go to the back --
11     Q.    Okay.
12     A.    -- you know.  Of course this morning we had
13            a yard call, but I think that's the second
14            one in six months.  You know, you're on
15            lock down 24/7 --
16     Q.    I see.
17     A.    -- with 50 people in a room, you know.
18     Q.    Okay.  I have no further questions.  Thank
19            you.
20                      FURTHER EXAMINATION
21     BY MR. COLLINGS:
22     Q.    You mentioned some of the issues you had as
23            a result of being in the holding cell and
24            the conditions therein.
25     A.    Huh-huh.
```

1    Q.   Have you -- have you had any occasions to
2         see any kind of mental health professional
3         regarding the time that you had in the
4         holding cell in December of '19 and January
5         of 2020?
6    A.   Have I seen mental health?
7    Q.   For the time that you were at the St.
8         Tammany Parish Jail in the holding cell for
9         those 14 days?
10   A.   I'm trying to get your question.  Do you
11        mean did I seek mental health for that?
12   Q.   Yes.
13   A.   No, I didn't.
14   Q.   Okay.  All right.
15   A.   No.
16   Q.   Have you had occasion to seek any treatment
17        for mental health issues in any other time
18        in your life?
19   A.   I -- I'm not a mental health patient, no,
20        but I believe I've seen a psychiatrist once
21        or twice.
22   Q.   Have you seen one in last three years?
23   A.   No, but I probably should.
24   Q.   Okay.  All right.  That's all I have.
25        Thank you.

```
1    A.    I probably will when I get out.
2    Q.    Okay.
3                    MR. JACOB:
4                    Thank you.
5                    (Whereupon, the taking of the
6              witness' testimony was concluded.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          C E R T I F I C A T E
2               THIS CERTIFICATION IS VALID ONLY FOR
   A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
3  SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
   PAGE.
4
             I, RAYNEL E. SCHULE, Certified Court
5  Reporter, #77005, in good standing, in and for
   the State of Louisiana, as the officer before
6  whom this testimony was taken, do hereby certify
   that KLABERT JOSEPH GUILLOT, SR., after having
7  been duly sworn by me upon authority of R.S.
   37:2554, did testify as hereinbefore set forth
8  in the foregoing 63 pages; that this testimony
   was reported by me in stenotype reporting
9  method, was prepared and transcribed by me or
   under my personal direction and supervision, and
10 is a true and correct transcript to the best of
   my ability and understanding; that the
11 transcript has been prepared in compliance with
   transcript format guidelines required by statute
12 or by rules of the Board, that I have acted in
   compliance with the prohibition on contractual
13 relationships, as defined by Louisiana Code of
   Civil Procedure Article 1434 and in rules and
14 advisory opinions of the Board; that I am not of
   counsel, not related to counsel or to the
15 parties herein, nor am I otherwise interested in
   the outcome of this matter.

16
17
18 _____   _____
   Date                    Raynel E. Schule, CSR
19                          Certified Shorthand Reporter
                            State of Louisiana
20
21
22
23
24
25

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**