UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO. 2020-CV-980-WBV-DPC

JUDGE VITTER

MAGISTRATE CURRAULT

JURY DEMAND

AHMED BAQER, KLABERT JOSEPH GUILLOT, JR, AND KLABERT JOSEPH GUILLOT, SR.
Plaintiffs

VERSUS

ST. TAMMANY PARISH GOVERNMENT, a/k/a ST. TAMMANY PARISH COUNCIL, ST. TAMMANY PARISH SHERIFF'S OFFICE, RAND SMITH, in his official and individual capacity, RODNEY J. STRAIN, in his official and individual capacity, GREG LONGINO in his official and individual capacity, and LACEY KELLY, in her official and individual capacity
Defendants

CONSOLIDATED WITH

NO. 2:20-cv-01840-WBV-DPC

LOUVIERE

VERSUS

ST. TAMMANY PARISH GOVERNMENT

Deposition of KEVIN JAMES LOUVIERE, JR., taken on Tuesday, October 11, 2022, at the Glorioso Law Firm, 2716 Athania Parkway, Metairie, Louisiana 70002, commencing at 9:27 AM.

REPORTED BY:

Lori L. Marino
Certified Court Reporter

APPEARANCES:

(PRESENT IN PERSON:)

MILLING BENSON WOODWARD, LLP
68031 CAPITAL TRACE ROW
MANDEVILLE, LOUISIANA 70471
TELEPHONE: (985) 292-2000

BY: CHADWICK W. COLLINGS, ESQ.
ccollings@millinglawcom
REPRESENTING THE DEFENDANTS

GLORIOSO LAW FIRM
2716 ATHANIA PARKWAY
NEW ORLEANS, LOUISIANA 70130
TELEPHONE: (504) 569-9999

BY: MARIA B. GLORIOSO, ESQ.
maria@gtorts.com

and

(PRESENT BY TELEPHONE:)

JACOB LITIGATION
P.O. BOX 837
MECHANICSBURG, PA 17055-0837
TELEPHONE: (717) 796-7733

BY: DEVON M. JACOB, ESQ.
djacob@jacoblitigation.com
REPRESENTING THE PLAINTIFFS

## WITNESS INDEX

KEVIN JAMES LOUVIERE, JR.
74390 DOWNS AVENUE
COVINGTON, LOUISIANA 70435


| | |
|---|---|
| TITLE | 1 |
| APPEARANCES | 2 |
| INDEX | 3 |
| AGREEMENT OF COUNSEL | 4 |
| EXAMINATION BY MR. COLLINGS | 5 |
| EXAMINATION BY MR. JACOB | 54 |
| EXAMINATION BY MR. COLLINGS | 64 |
| REPORTER CERTIFICATE | 69 |


## EXHIBIT INDEX


| | |
|---|---|
| EXHIBIT A - NOTICE OF DEPOSITION | 46 |
| EXHIBIT B - COMPLAINT | 46 |

S T I P U L A T I O N

It is stipulated and agreed by and between counsel that the deposition of KEVIN JAMES LOUVIERE, JR. is hereby being taken under the Federal Code of Civil Procedure for all purposes in accordance with law;

That the formalities of signing, sealing and certification are hereby waived. The party responsible for service of the discovery material shall retain the original.

That all objections, except those as to the form of the question and/or responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof may be used in evidence.

* * * * * * * *

LORI L. MARINO, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

KEVIN JAMES LOUVIERE, JR,
having been first duly sworn was examined and testified on his oath as follows:

EXAMINATION

BY MR. COLLINGS:

Q Good morning, Mr. Louviere. Is it Louviere?

A Louviere.

Q My name is Chadwick Collings. I represent the sheriff and the other defendants in this matter. There was a lawsuit filed by you and a number of other individuals. You're aware of that?

A Yes.

Q So let's go through some basic, standard stuff to begin with. This is a deposition. Have you ever been deposed before?

A No.

Q A deposition is a question and answer session. Everything I say and everything you say is going to be transcribed by our court reporter. So as a result, everything you tell me needs to be a verbal response. While a

shake of the head or um-huh or unh-unh, I may understand what you mean. She can't really transcribe that, okay?
A Okay.
Q Also, when I ask you a question, I need you to let me finish it before you start. Again, we do that for the court reporter's benefit, because it's very difficult for her to transcribe when we're both talking at the same time, okay?
A Okay.
Q If there's anytime you do not understand one of my questions, please tell me. Otherwise, I'm going to assume you understand, and I'm going to take your answer at face value, okay?
A Okay.
Q So let's start with just some basic background information. So please state your full name and address for the record.
A Kevin James Louviere, Jr., [redacted] 70435.
Q All right, and what is your phone number?

A [redacted]
Q How old are you, sir?
A Thirty-six.
Q Your date of birth?
A [redacted]
Q How long have you lived at that address?
A Five years.
Q Prior to that address, where did you live?
A New Orleans.
Q Do you recall the address there?
A 120 North Rendon Street, Apartment 3, New Orleans 70119.
Q Approximately, how long were you at that address?
A Four years.
Q Let's talk a little bit about your educational background. How far did you go in school?
A I graduated high school.
Q From what high school?
A Jewel Sumner High School in Kentwood, Louisiana.
Q Is that where you're from originally?

A Yes.
Q So you were born and raised in Tangipahoa Parish?
A Yes.
Q Where in Kentwood did you live? Do you recall the address?
A Hillary Simmons Road, Kentwood, Louisiana 70444. I don't remember quite the number.
Q Do you still have parents that live in Kentwood?
A No. My parents live in Covington now.
Q You graduated what year?
A 2004.
Q Did you attend any other schools or any college after 2004?
A I attend college right now.
Q You're in college presently?
A Yes.
Q Where are you in school?
A Southeastern in Hammond.
Q When did you start at Southeastern?
A I started December 2021.
Q What are you currently studying?

A Accounting.
Q And prior to attending Southeastern, had you attended any other schools between high school and then?
A No.
Q Let's talk about your work history now. When you left high school, give me -- just start listing some of the jobs you've held and where?
A My first job was McDonald's, 2002.
Q Do you recall where that McDonald's was located?
A That was in Belle Chasse. It was only for a few months. I held several different service jobs, waiting tables, selling seafood up until 2008. I started working for my stepfather and his business. He owns a project management consulting business for offshore type jobs. Did that until 2016, and I was unemployed for sometime until November 29th of 2022. I began working with Volunteers of America, and I'm still there currently.
Q So let's back up a little bit. Tell me the name of your parents.

A James and Peggy Poole.
Q That's the name of your father or stepfather?
A Stepfather.
Q What about your natural father?
A Kevin James Louviere, Sr.
Q Is he still alive?
A No, he's not.
Q Do you know when he passed away?
A November of 2001.
Q And your mother remarried when?
A In 1991. No. February 9, 1990.
Q So you were essentially raised by your stepfather most of those years?
A Yes.
Q She had custody of you throughout?
A Yes.
Q Do you have any brothers or sisters.
A I have two older sisters.
Q And what are their names?
A Kristie Michelle Louviere Graham, Tiffany Rachel Louviere.
Q Where do they live?
A They live in Covington also.
Q Your mother and Mr. Poole, they live

in --
A At the address -- I live with them.
Q Are you currently married?
A No.
Q Have you ever been married?
A No.
Q Do you have any children?
A No.
Q All right, what was the name of your stepfather's business that you worked at?
A Poole Consulting, LLC.
Q What exactly did you do?
A Various office type work: Filing stuff, organizing. That's pretty much it.
Q That business is located where?
A [redacted]
Q How many other employees are employed there?
A Just me. Well, except for the owners.
Q And that would be your stepfather?
A Um-huh (affirmative expression).
Q You have to say yes or no.
A Yes. Sorry.
Q You were employed with Poole, and

you're still employed there?
A No.
Q When did you say you stopped there?
A 2020 -- 2016. I'm sorry.
Q So from 2016 after, where were you employed?
A I was unemployed.
Q So you've been unemployed from 2016 until now?
A Yes. Quite sometime.
Q Did you say you work for Volunteers of America?
A I began working with them November 29th of 2022.
Q Is that a paid position?
A Yes.
Q So from 2016 until 2022, you had no income?
A (Witness nods head affirmatively.)
Q You have to say yes or no.
A Yes.
Q Let's go through some of your criminal background, because you understand this is a suit regarding your time as an inmate at the St. Tammany Parish Jail,

correct?

A Yes.

Q As I understand it you were arrested in June of 2019, correct?

A Yes.

Q What were you arrested for?

A Monetary instrument abuse.

Q Explain to me the nature of those charges to the best of your knowledge.

A I had written a check for a cash advance that was unapproved at the time; and when I was fired, they became aware of that and wanted to press charges.

Q Fired by who?

A Oh, the people I worked for. I'm sorry. I forgot that job. It was -- I was administrative assistant for -- I can't remember the name. Oxlot 9 is the name. Oxlot 9 is the name.

Q It's a restaurant?

A Yeah. I was only employed with them for six months in 2019. Sorry about that.

Q So in 2019, you were hired by Oxlot as an administrative assistant?

A (Witness nods head affirmatively.)

Q Yes or no?
A Yes.
Q And you worked for the owner?
A Yes.
Q What was his name?
A I don't recall.
Q You wrote a check?
A Yes.
Q And the check was made payable to what?
A Kevin Louviere.
Q And who signed the check?
A I did.
Q Did the owner give you authorization to sign that check?

MR. JACOB:

I'm going to object. Chad?

MR. COLLINGS:

Yes.

MR. JACOB:

The underlying circumstances of any criminal charge is not the basis for the litigation, and as you know, only convictions of a certain type would even be admissible. So mere

allegations are not something we're going to get into today about unrelated matters. If you need to get into the underlying events of any particular criminal charge other than to say whether or not it was a violence crime or not for purposes of his incarceration, we'll seek a protective order. That's clearly not going to be permitted by the judge.

MR. COLLINGS:

Well, I don't think you know what's going to be permitted and what's not. I can't say with certainty what's going to be permitted and what's not. This is a discovery deposition, as you are aware.

MR. JACOB:

Correct. Correct.

MR. COLLINGS:

We are simply exploring the reasons behind this individual's incarceration with the St. Tammany Parish Jail.

MR. JACOB:
Correct, and we --
MR. COLLINGS:
Let me see --
MR. JACOB:
I'm sorry. Go ahead.
MR. COLLINGS:
No, I was just --
MR. JACOB:
We stipulate that he was, in fact, at the jail, and we also -- we'll permit you for discovery purposes to discover all types of arrest even though that wouldn't be admissible; but for purposes of this deposition, we're not going to get into a deep dive into the factual circumstances and ask him to admit every allegation of every alleged crime that he's ever made; and if that's your desire, again, pursuant to Rule 30, and I'll seek a protective order, and he's not going to answer those questions. So if you want to get to what we're here for

today, the actual allegations in the civil matter, by all means, you're permitted to ask those questions.

MR. COLLINGS:

Well, I appreciate that, and I'm going to ask the questions that I'm going to ask. If you want to instruct your client not to answer any questions, then, certainly we'll revisit that with the magistrate at a later time.

MR. JACOB:

Well, we can do it right now if you want, if you want to dial up the judge so we can resolve that.

MR. COLLINGS:

No. I'm going to continue on with the deposition. If you want to stop the deposition and seek some relief from the court, certainly, that's your right; but right now, we're simply asking questions; and if you think that I don't have a right to ask them, then, certainly you have some options available to you at

that point.

MR. JACOB:

All right, well, then, he's instructed not to answer any questions related to the underlying facts of the various criminal charges that may or may not have been asserted against him, but again, I'll permit you to ask him what he was arrested for, and you can go from there.

MR. COLLINGS:

All right.

BY MR. COLLINGS:

Q So picking back up with where we were, sir, you were arrested for instrument fraud or instrument abuse, correct?

A Monetary instrument abuse.

Q Was that one or two counts or multiple counts? Do you know?

A I don't recall.

Q Ultimately, what was the disposition of those charges?

A What do you mean by disposition?

Q Well, did you plead guilty? Did you

go to trial? Did you get found guilty? Did you plead to something else?
A I plead to a misdemeanor theft.
Q And do you recall when that was?
A No, I don't recall.
Q Was it one count of misdemeanor theft?
A Yes.
Q Have you ever been arrested for anything other than monetary instrument abuse?
A Yes.
Q Give me the list of what other things you've been arrested for and times, dates if you can?
A Drug paraphernalia, 2018, and distribution of methamphetamine, also 2018.
Q Anything else?
A No.
Q So the drug paraphernalia and distribution charges in 2018, do you recall where you were arrested?
A New Orleans.
Q Do you know the disposition of those charges?
A Yes. Two years suspended sentence on

account of completing drug court, which I will be graduating on December 29th of this year.

Q So you plead guilty and received a suspended sentenced?

A Yes.

Q And you were sentenced to drug court?

A Yes.

Q Was that guilty plea, was that to a felony charge?

A Yes.

Q Do you know what charge you ultimately pled guilty to?

A It was the distribution charge.

Q The distribution of methamphetamine?

A Yes.

Q And the drug paraphernalia charge, was that --

A I believe that might have been dismissed, but I'm not -- I don't recall.

Q As part of your guilty plea agreement, they dismissed the paraphernalia, and you plead to methamphetamine distribution?

A Yes.

Q You said you were finishing drug court when?

A December 29th.
Q Have you ever been removed from your drug court?
A No.
Q Have you ever tested positive for any drugs while you have been within the drug court program?
A Yes.
Q How many times?
A Two.
Q What happened as a result of your testing positive?
A One was a warning. The second one was I was sanctioned to community service.
Q Did you complete the community service?
A Yes.
Q Okay, so the monetary instrument abuse would have been in 2019?
A Yes.
Q You pled guilty to that, as well?
A I pled to a misdemeanor theft charge.
Q Right. I'm sorry. Misdemeanor theft. So we got one misdemeanor theft charge in 2019 and one felony conviction in 2018,

correct?
A Yes.
Q Any other criminal charges against you --
A No.
Q -- at any point in your life?
A No.
Q When you were arrested in 2018 for drug paraphernalia and distribution of methamphetamine, were you held in a jail?
A For a short period.
Q Which jail?
A OPP, Orleans Parish Correctional.
Q How many days were you in the Orleans Parish Correctional facility?
A Yes. Less than one.
Q Less than one day?
A (Witness nods head affirmatively.)
Q You have to say yes or no.
A Yes.
Q Did you ever return to that jail, --
A No.
Q -- the Orleans Parish?
A No.
Q The time that you were in the Orleans

Parish Jail, were you in a holding cell the entire time?
A No.
Q Tell me about your -- walk me through your stay at Orleans Parish Prison.
A Well, there is a giant lobby. I guess you could call it that. Whenever you go in and there is a big desk with, I guess, administrators that sit behind it. You visit each one. They ask you a number of questions, and then, you sit down until, I'm assuming, when they know where they're going to put you. That's when they put you in a holding cell. However, I was bailed out prior to that. So I wasn't put in a holding cell.
Q So you were there less than 24 hours?
A Yes.
Q Who bailed you out?
A My mother.
Q Do you recall who arrested you for the monetary instrument abuse?
A I turned myself in.
Q To what agency?
A Covington Police Department.
Q When you turned yourself in, were you

then transcribed to the St. Tammany Parish Jail?

A Yes.

Q Walk me through what happened next. Once you got to the jail, Covington PD transported you to the sally port, walk me through from that moment on.

A I was brought in, sat on a bench for a couple of hours, and then, I was put into the first holding cell after that.

Q And the date of that was June 17, 2019; am I correct?

A I don't recall.

Q If that's what it says in your complaint, the lawsuit that you filed, do you have any reason to disagree with that?

A No.

Q So you were placed in a holding cell after a few hours?

A Yes.

Q Describe the holding cell.

A It was -- I don't quite know the dimensions, but it was very small, and there was -- I think I counted 22 other men in there, also.

Q So you would have been among 23 other human beings?
A Among 22.
Q Right. You were one of 23?
A Right.
Q I got you. You were in that holding cell for how long?
A Thirteen days.
Q In that time, describe the conditions.
A It was very dirty. They gave us a brown paper bag to put in front of the door for trash that nobody cleaned up after -- I believe, it was seven days, whenever they finally came in and cleaned the place.
Q How many days did you say you were there?
A I was in the holding cell for 13 days.
Q Were you ever transported to any other room while you were incarcerated in the St. Tammany Parish Jail?
A After 13 days, I was put into a dorm until the 29th day is when I was able to -- is when they released me.

Q So you were in a dorm from day 13 to day 29?
A Yes.
Q And you were released why? Did someone bail you out?
A No. My probation officer released me, because they weren't giving me my medication that I need for HIV.
Q So let's walk through that. You had 13 days in the holding cell. Did you stay in the same holding cell the entire 13 days?
A No.
Q So you were moved from one to another?
A Yes.
Q Do you know how many times that would have occurred?
A Two.
Q Do you know what day you transferred from the original holding cell to the next holding cell?
A I don't recall.
Q Do you know when you were transferred from the second holding cell to the third holding cell?

A I don't recall.
Q In those 13 days, when you would have been moved from one holding cell to another to another, describe the differences between the holding cells if there were any.
A There were no differences.
Q Did the number of people in the holding cells change during those 13 days?
A Yes.
Q Did they go up? Did they go down?
A They went up.
Q What was the maximum number of people in the holding cell that you recall in those 13 days that you were there?
A The most I counted was 28.
Q How long were 28 people in a holding cell?
A I don't recall.
Q How did that affect you?
A I couldn't sleep. I was assaulted.
Q When you say you were assaulted, tell me what happened.
A I had been laying on the floor, and I was trying to sleep. At the time, I was also coming off of a lot of drugs. So I wasn't

quite -- I guess you could say fully aware. Apparently, a gentleman had been trying to move me from being in front of the phone, but I didn't move. So he -- I woke up to being punched in the head. Mentally, it was very draining.

Q Did you ask to press charges against the individual who hit you?

A I was told not to press charges, because I would be beaten worse, and at the time, they wouldn't remove me to another holding cell.

Q Who told you not to press charges?

A The gentleman that did it.

Q The guy that punched you?

A Yeah.

Q So no one at the sheriff's office told you not to press charges?

A No.

Q We got to be careful with our pronoun usage, because it kind of can be confusing.

A Okay.

Q When you say he or she, let's try to identify who those folks are.

A Okay.

Q So an individual, do you remember his name that would have punched you?
A I do not.
Q So after he punched you, he informed you it would be bad for you to press charges?
A Yes.
Q And you made the determination not to press charges.
A Yes.
Q Did you ever seek medical attention while you were in the holding cell?
A No.
Q Did you ever complain to anyone at the sheriff's office while you were in the holding cells about any medical issues that you might have?
A Yes. I actually alerted them a lot. I had two appointments with the psychologist also, and he's the one that made the call to my probation officer to let me out, because they weren't giving me the medication.
Q Did you show up at the jail with the medication on you?
A They wouldn't let me. They told me they wouldn't accept any medication that I

brought.

Q Well, let's back up and talk about who they are.

A They, is the sheriff's office, because my mother tried to ask them if she could bring my medication, and they told her no.

Q Do you know who they are, the names?

A Whoever she spoke to at the sheriff's office.

Q So when you turned yourself in to the Covington PD, did you have your medication on you at the time?

A No.

Q So it's your understanding that at some point, your mother tried to bring your HIV medication to the jail?

A She didn't try to bring it. She called the jail wanting to, but they told her she couldn't do it. They as the sheriff's office told her that she couldn't.

Q Was there any other medical issue that you can recall while you were in the jail that you would have experienced?

A No.

Q So is it safe to say then that your time in those 13 days in the holding cells, there was a lack of sleep?
A Lack of sleep, being assaulted, being threatened, because somehow or another, they -- in the second holding cell, they overheard me talking to one of the sheriffs outside the holding cell, and I was telling them that I had HIV, and I require medication. They heard that. So basically, I just -- I couldn't -- I couldn't -- I was -- I don't know how to explain it to you. I'm sorry.
Q I'm confused, but you were going somewhere with that story.
A I just felt threatened the entire time.
Q You felt threatened?
A I felt threatened. I was threatened.
Q By whom?
A By people in the holding cell.
Q What were the nature of the threats?
A They were going to beat my ass if they saw me out in the streets. I couldn't look at them. I couldn't make eye contact with nobody.

Q Did they tell you why they were going to beat your ass, quote, unquote?
A No.
Q Did any of them ever act on that threat?
A Yes.
Q Who?
A The gentleman I told you earlier.
Q So that happened after, that assault?
A Yes.
Q I was thinking it happened subsequent. So the one and only assault happened, and it was by someone who had earlier threatened to assault you.
A Yes.
Q Or batter you. And you don't recall his name?
A No.
Q And it happened one time?
A Yes.
Q And you don't recall his name or the date and time of those 13 days when that would have occurred?
A I don't recall. It's been so long.
Q Were you fed while you were in the

holding cells?
A We were fed spoiled food. So yes, spoiled food, but yes.
Q When you say spoiled food, how do you know it was spoiled?
A Well, we were given ham sandwiches. The smell of rotten ham made me assume that it was spoiled, mold on the cheese, mold on the bread.
Q Did anyone bring that to the sheriff's attention?
A Yes.
Q Who?
A We all did.
Q What happened after that?
A Nothing.
Q So who exactly told someone at the sheriff's office that the food was no good?
A We all did.
Q So everybody in the holding said this food is no good?
A Yeah. We were hungry.
Q Do you recall the name of the deputy that that was communicated to?
A I don't recall.

Q Do you know if there was any report issued as a result of the complaints that the food was no good?

A They told us they would let us -- the deputies told us they would allow us to submit complaints, but we were never given any forms.

Q And that was true the entire 13 days?

A Yes.

Q Subsequent to the 13 days in holding when you were moved back to the dorm, were you given an opportunity to file a grievance or complaint?

A No.

Q Did you ever try to file a grievance or complaint?

A I asked about it, because I needed my medication. I need that medication to survive, but I was never given the opportunity.

Q So you never actually formally complained about anything in the jail. Is that safe to say?

A No. Yes, it's safe to say.

Q So you recall a ham sandwich --

MR. JACOB:

Objection. Sorry. I had the mute on, and I couldn't get it off quick enough, but objection to your last statement, Chad.

MR. COLLINGS:

Okay.

BY MR. COLLINGS:

Q So when you were in holding, you recall an occasion where the ham was no good correct? That was one time?

A No.

Q How many times did that happen?

A Twenty-six.

Q Twenty-six times?

A (Witness nods head affirmatively.)

Q There were 26 occasions, you were given a ham sandwich, and the ham appeared to be spoiled?

A Yes.

Q How are you certain it's 26?

A We were given ham sandwiches twice a day. So twice a day is 26.

Q And did you eat any of that ham?

A No.

Q So for 26 days, you didn't eat?

A I didn't eat the ham sandwiches.
Q I'm sorry. For 13 days, you didn't eat?
A I didn't eat the ham sandwiches.
Q Was there other food provided?
A Yes.
Q What was provided in addition to the ham sandwiches?
A Red beans and rice.
Q And you ate that?
A I ate that.
Q Did that appear to be spoiled?
A It was cold.
Q Other than the fact that it was cold, was there anything wrong with it?
A No.
Q All right, so when you were fed, you were given red beans and rice and a sandwich?
A No. The red beans was given first, I'm assuming, as like a midday snack; that's when the sandwiches came. Then, there would be more red beans and rice for a dinner, I guess.
Q So you had two meals a day?
A Three.

Q So you had ham sandwiches, red beans and rice, red beans and rice?
A Yes.
Q You would just not each the ham sandwich, but you would eat the red beans and rice twice a day?
A Yes.
Q Were you allowed to shower while you were in the holding cell?
A Yes.
Q How often?
A Once a week.
Q They would remove you from the holding cell and bring you to a place to shower?
A Yes.
Q Are there any other issues with the conditions of your confinement while you were in the holding cells that you recall?
A I don't recall.
Q So then, if I can safely kind of summarize the issues that you had with your time at the St. Tammany Parish Jail, it was the fact that you were in a holding cell for 13 days, correct?

A Yes.
Q It was the fact that there were 20, plus approximate people in that holding cells with you during those 13 days?
A Yes.
Q It was the fact that you were assaulted by an inmate in the holding cell on one occasion?
A Yes. On camera.
Q Okay. Do you have that film?
A They have it. The sheriff's department has it.
Q How do you know that?
A Because they keep a camera on each holding cell at all times.
Q But do you know if that incident was ever communicated to the anyone at the sheriff's office?
A Yes.
Q Because you told us earlier, you didn't relay that story.
A Right. No, I didn't.
Q And you've never seen any video of that incident, have you?
A I haven't.

Q You don't know that gentleman's name at this point, do you?
A No, I don't.
Q In addition to the number of people and the number of days you were in the holding cell, you also are complaining about the quality of the food, correct?
A Yes.
Q Any other issues that you believe were unconstitutional with respect to your confinement at the St. Tammany Parish Jail?
A I was not given lifesaving medication.
Q You understand you didn't have that medication on you, correct?
A I was told that the jail had a pharmacy. They very well could have given -- went and got my medication from the pharmacy and given it to me.
Q They could have?
A They were supposed to.
Q Did you ever get a copy of your jail medical records?
A No.
Q Have you ever asked for them? Have

you ever look at any of it?
A No.
Q So you don't know whether or not the issue with respect to the denial of your HIV medication was ever communicated, do you?
A They knew from the time I got there that I had HIV. I filled out forms saying that I was HIV positive, and that I required medication. The jail nurse was made aware of the HIV, and she also assured me that they would get the medication from the pharmacy, and it was never done.
Q So you were without your HIV medication for, approximately, 29 days?
A Twenty-nine days.
Q To your knowledge, was there any repercussion as a result of that, being off the medication for 29 days?
A Not that I can say for certain without proof.
Q Has any doctor ever told you the fact that you were off your medication for 29 days has compromised your medical condition?
A Yes. The -- when you are on this type of medication, you can't deviate from it,

because it would cause the HIV levels to rise and your what they call CD4 cells to decline, anytime you don't -- anytime you go off of it and it goes back on, you risk the chance of becoming resistant to medication.

Q Well, my question was not in the abstract. My question was specific as to has any health care provider ever told you that as a result of the 29 days that you were allegedly off your HIV medication, that your medical condition has been compromised in some way?

A Yes.

Q What doctor told you that?

A My doctor, Paula Seal.

Q I'm sorry. Say again.

A Dr. Paula Seal.

Q Paula Seal?

A Paula Seal, University Medical Center in New Orleans.

Q When did you talk to her about this?

A I went to see her two days after I was -- I'm sorry. I didn't see her. I spoke to her on the phone. It's very hard to get an appointment with her. I spoke to her on the

phone two days after I got out of jail.

Q She told you your medical condition has been aggravated or worsened as a result?

A It had been compromised. I had to go submit blood work, and we ultimately switched to a different medication that I'm still currently taking.

Q So were there any actual physical manifestations of a worsening medical condition as a result of you being off of the HIV medication?

A No.

Q You weren't hospitalized?

A No.

Q You weren't home sick or anything like that, correct?

A No.

Q And you were placed back on your medication, and you've been on it ever since?

A We switched to a different medication, and I've been on it ever since.

Q Everything is proceeding according to your doctor's expectation of your continued prognosis?

A Yes.

Q Now, in paragraph 106 of your complaint, you mentioned that you were battered twice while you were in the holding cell. You only told me about one.
A It did happen twice. One was in the dorm. The other was in the holding cell.
Q Okay. So the second battery would have occurred sometime between day 13 and day 29?
A Yes.
Q Do you recall the individual that would have battered you the second time?
A No.
Q Different individual than the first?
A Different.
Q Did you relay the fact that you were battered by that person to anyone at the jail, the employees?
A Yes. Yes.
Q Do you know who you told that to?
A No, I don't recall?
Q Did they take a report? Did they write anything down to your knowledge?
A No.
Q It was just a verbal communication,

and that's where it ended?

A I was moved into a hallway for about four hours and then ultimately moved to a different dorm.

Q So you were on a bench in a hall for four hours after that assault?

A Yes.

Q Or that battery?

A Yes.

Q And then, approximately, four hours later, you were put into a different dorm, without -- that other individual was no longer there?

A Yes.

Q Did you seek medical attention for that battery?

A No.

Q According to your complaint, you allege that the holding cell was only cleaned every four days; is that accurate?

A From what I can recall, yes.

Q In your complaint, you also allege that you were only allowed to leave the holding cell to take a shower; is that correct?

A Yes.
Q Once you were moved back to the dorm, were you able to take showers more regularly?
A Yes.
Q Once a day?
A Yes.
Q Did the quality of the food improve once you were moved out of the holding and into a dormitory?
A Yes.
Q You also complained that you were not provided an opportunity while you were in the holding cells for recreational or other physical activity; is that accurate?
A Yes.
Q Do you have any other allegations about your confinement while you were in the holding cell at the St. Tammany Parish Jail that you have not told me about?
A No.
Q Subsequent to your release from the St. Tammany Parish Jail in 2019, have you had any other interaction with law enforcement?
A No.
MR. COLLINGS:

Madam court reporter, I'm going to attach as Exhibit A, a copy of the notice of deposition. Exhibit B will be a copy of the complaint filed by Mr. Louviere or Mr. Matthews and Mr. Williams, the second and third depositions today, at least one of which I think we will use this same exhibit for B to that deposition, as well. I'm not going to give you three copies of the same document.

Let's go off the record. I'm going to look at my notes, and we may be done.

(Brief pause.)

BY MR. COLLINGS:

Q Let's just wrap up if we could, Mr. Louviere. Let's talk about your damages. Do you have an idea as to how you were damaged as a result of your time in the holding cells?

A Yes. Some mental problems. I'm claustrophobic now. Other than mental problems, there's nothing I can really say.

Q Let's drill down a little bit on that. When you say mental problems, first,

have you seen anyone as a mental health professional: Psychiatrist, psychologist or counselor?

A Yes.

Q Name for me those individuals you have seen as a result of your time in the St. Tammany Parish Jail?

A I saw a psychiatrist in rehab. I don't know her name, I'm sorry, but the rehab was Edgefield Rehab Facility, and I don't remember, but it's Edgefield Rehab Center, the psychiatrist there.

Q Etchfield, E-T-C-H?

A E-D-G-E.

Q Edgefield, okay, and where is that located?

A Close to Alexandria. I don't quite remember the name -- I mean the name of the city, but it's close to Alexandria.

Q So in Alexandria, Louisiana?

A Yes. That's the closest city to it.

Q Is that a government facility or private facility?

A I believe it's -- I mean, they took Medicaid. So would that be considered private

or --

Q I don't know.

A Private. I'll say private.

Q So you were in the Edgefield Rehab Center from when to when?

A From -- I don't recall. It was less than a week after I got out of jail.

Q So sometime in June or July of 2019?

A Yes.

Q How did you end up there?

A I just decided to go.

Q Was it because you were abusing narcotics?

A Yes.

Q You were on narcotics when you were initially booked into the St. Tammany Parish Jail, as well, correct?

A Yes. Yes.

Q What had you been taking at the time that you were booked?

A Heroin and methamphetamine.

Q How long had you been taking that?

A Four years.

Q You were at the Edgefield Rehab Center for a week?

A Thirty days.
Q It's your belief at some point during that 30 days, you told a psychiatrist, whose name you couldn't recall, that you were suffering some kind of mental issue with respect to your time in the jail?
A Yes.
Q Did she prescribe any kind of medication or other treatment for that?
A Yes.
Q What did she prescribe?
A I don't recall. I don't recall the name. I could get back with my lawyer, because I still have like my paperwork from when I was there. I can get back to you on it. I just don't recall.
Q We'll send a supplemental discovery request for that the paperwork. So you believe you were given a prescription?
A I was. Yes.
Q Were you prescribed anything else?
A No.
Q So no treatment, no therapy or anything like that?
A No.

Q So just a single prescription or multiple prescriptions?
A Single prescription.
Q You don't recall the type of medication?
A It was a tranquilizer. I don't recall the name, no.
Q How many days of the prescription were you given?
A Twenty-six days of the 30 days that I was at the rehab center, and I continued taking it for three months after I -- after I left rehab, and then, I stopped after that.
Q And this tranquilizer was in your view something you were taking, because of the issues you developed as a result of being in the holding cell?
A Yes.
Q Did a psychiatrist at Edgefield ever diagnose you with something, any kind of mental disorder?
A I believe it was psychosis.
Q She diagnosed you with psychosis?
A Yes.
Q How many times did you see this

psychiatrist?
A Once.
Q That would have been at the beginning of your 30-day stay, middle, end?
A It was four days after I got there.
Q And you presented to Edgefield not as a result of the jail but because of your drug addiction, correct?
A Yes.
Q So other than Edgefield, have you ever gone to seek any other type of treatment, mental health, physical health, anything at all as a result of damages you allege were sustained as a result of your time at the St. Tammany Parish Jail?
A No.
Q Did you have any economic damages as a result of your time in the St. Tammany Parish Jail?
A No.
Q Have you had to pay an attorney for this lawsuit?
A No.
Q This suit is being funded on a contingent basis, where they get paid if you

get paid essentially?
A I don't recall. I assume yes.
Q So you haven't come out of pocket, in other words, for anything regarding this lawsuit?
A No.
Q Other than the mental problems you just described and the time that you were at Edgefield -- and Edgefield, you checked in there for your drug issue, right?
A Yes.
Q So other than the mental problems that you communicated to the psychiatrist there, any other damages that you can tell us about with respect to your alleged damages that were as a result of your time at the St. Tammany Parish Jail?
A No.
Q You brought suit against the sheriff and against a number of other folks who were involved in the sheriff's office, including a lady by the name of Lacey Kelly. Do you know who she is?
A I don't recall.
Q Do you know what role she would have

had in the jail while you were an inmate there?

A I don't recall.

Q Did you ever have any conversations with her?

A I don't recall.

Q Do you know if she did anything that would have in any way impacted your time at the jail?

A I don't recall.

Q What about the sheriff himself, do you know anything about the sheriff's role with respect to your time as an inmate at the St. Tammany Parish Jail?

A No.

Q Can you tell us what decisions he would have made that impacted your time at the jail?

A No.

Q Do you know of any other evidence that would support any of your allegations made against either the sheriff or Ms. Kelly?

A There would be video footage from cameras that would be -- from what I can assume.

Q Did you at anytime or anyone on your behalf ever request the video footage from those cameras?
A No.
Q You've never seen them?
A No.
Q Anything else?
A No.
MR. COLLINGS:
I think that's all I have for you, sir. Thank you for your time this morning.
MR. JACOB:
I have a couple of follow-up questions.
EXAMINATION
BY MR. JACOB:
Q Just a couple of follow-up questions. You mentioned sleep. Do you recall that?
A Yes.
Q Where did you sleep again?
A On the ground.
Q What was the ground?
A The concrete floor.
Q Can you describe the condition of the

floor that you slept on?
A It was really dirty.
Q When you say dirty, what do you mean by dirty?
A With dust. There was a gentleman that had staph infection who had, from what I can assume, pus and blood on the floor, trash.
Q Anything else?
A From what I can recall, yes.
Q Was there a toilet in there?
A Yes.
Q Who used that toilet?
A Everyone did.
Q Was that toilet clean or dirty?
A It was dirty.
Q And what was on that toilet?
A Fecal matter, urine, throw up. Dry throw up, dry --
Q I'm sorry. I cut you off. Go ahead.
A It was like dry throw up.
Q Did any of those substances, the feces, urine or vomit, end up on the floor?
A Not that I can recall.
Q Is that a place where people slept near the toilet?

A Yes.
Q Is that a place where you slept?
A I was within less than a feet from the toilet at one point.
Q Were there any odors in the cell?
A Yes.
Q Can you describe that?
A Feces and trash mostly.
Q How did it make you feel emotionally to be in that environment?
A Emotionally, that would be quite hard to express in words, because it was horrible, horrible to experience. Is horrible a word for emotion?
Q Okay. I mean, tell me how you felt as a person just being in that environment.
A Oh, well, definitely not a human being, not treated as a human being.
Q Did you feel like you were equal to the people who were outside the cell?
A Absolutely not.
Q Did it make you feel good inside or bad inside?
A Very bad inside.
Q Did it cause you to have any types of

emotions that you were able to or did show while you were in the cell?

A I began experiencing symptoms of psychosis.

Q Okay, but I mean, were you happy? Were you sad? Were you laughing? Were you crying?

A Sad and crying pretty much the whole time.

Q What was the temperature like in the cell?

A One holding cell was extremely hot. The second and third cells I was in were extremely cold.

Q The times when you were able to sleep or lay down, were you ever provided with any type of bedding?

A We were given a blanket at three in the morning, and they would take it away at five.

Q I think I missed you. Did you answer?

A Yeah, I'm sorry. They would give us a blanket at 3:00 AM and take it away at 5:00 AM.

Q Do you know why it was that they waited until 3:00 and then took them away at 5:00?
A They claimed it was because they didn't have enough blankets. They as in the deputies.
Q I'm sorry. Go ahead.
A They as in the deputies.
Q Did the deputies ever say anything to you about why you were being treated in the manner that you were being treated?
A On multiple occasions, they referred to the jail as St. Slammany. This is what you get in St. Slammany.
Q Do you know what they meant by that?
A I would assume that's the infamous name that people have for it.
Q Did they say though why it was that they were treating you in that manner other than the fact that this is just what you get?
A Well, we were criminals. Criminals and junkies. That's the only thing I can recall from then, recall up at this point.
Q So those were two names that you were referred to as?

A Yes.
Q Were you referred to anything else?
A Not that I can recall.
Q Were you ever told whether this was simply a matter of policy of the jail, that this is simply how we operate?
A Yes.
MR. COLLINGS:
Object to the form.
BY MR. JACOB:
Q And how was it or who was it that said this to you?
A The deputies.
Q And did they, did the deputies indicate for you whose policy they were following?
A Yes.
Q And whose policy were they following?
A The jail's.
Q Do you know whether when they said that they were following the jail's policy, do you know if they were referring to, for instance, a warden?
MR. COLLINGS:
Object to the form.

THE WITNESS:
No.
BY MR. JACOB:
Q Do you know whether -- do you know whether the sheriff operates the jail?
A I don't. I didn't see the sheriff at all.
Q Okay, you didn't see him, but was it always your understanding that the deputies were following the sheriff's policy?
MR. COLLINGS:
Object to the form.
THE WITNESS:
No.
BY MR. JACOB:
Q Whose policy were they following then, the jail's?
A Yes.
Q If the sheriff was operating the jail, then, would it be your belief then that that policy was the sheriff's policy?
MR. COLLINGS:
Object to the form.
THE WITNESS:
What's the question again? I'm

sorry.

BY MR. JACOB:

Q Yeah. If you were told that the sheriff operates the jail, then, would it be your understanding that that was the policy that was being followed was the sheriff's?

A Yes.

MR. COLLINGS:

Object to the form.

BY MR. JACOB:

Q I guess what I'm trying to say, and I'm trying to understand your answer. Is your answer that whoever runs the jail, it's their policy?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Yes.

BY MR. JACOB:

Q And it was the guards who led you to believe that that they were following policy?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Yes.

BY MR. JACOB:
Q And you mentioned something about showers. How often did you get a shower?
A I showered twice during the 13 days that I was there.
Q Did you ever get clean clothes?
A No.
Q How about after your showers?
A No.
Q Was there any soap or shampoo or toothpaste, things of that nature provided to you?
A No.
Q During your shower though, was there at least soap and shampoo provided?
A We were given De-Licer.
Q And when was that?
A During the showers.
Q I see. So you were to clean yourself with a De-Licer?
A Yes.
Q Going back to the toilet, did you ever have to use the toilet?
A Yes.
Q Tell me about that experience, you

know, having to use the toilet in front of people.
A Well, it would be attempts to use the toilet, but I could never do it, because of feeling embarrassed.
Q But at some point, I'm assuming while you had been in there for that long, you eventually had to use the toilet, correct.
A Yes.
Q Tell me about that experience. What did it feel like? How did it happen?
A Well, I had to take the sheet off of my bed and wrap it around where they had some bars next to the toilet, and there was a way you could connect your sheet from the bars next to the toilet to the handle on the shower to get a little bit of privacy. However, people would come and knock it down.
Q Okay, I think we're talking about two different times. I'm talking about when you were in the holding cell.
A Oh, in the holding cell.
Q Yeah. I'm sorry.
A In the holding cell, there was no privacy, and I would always attempt to -- like

if I had to number two, I couldn't take a number two the whole time I was in the holding cell.

Q And if you needed to though, was there toilet paper there?

A No. Well, some of the gentlemen in the holding cells had toilet paper that we could ask them for, and there was three occasions in the 13 days that I was there where we were given one toilet paper roll from the guards.

MR. JACOB:

Okay, I have no further questions. Thank you.

MS. GLORIOSO:

He might have some.

THE WITNESS:

Oh, okay.

EXAMINATION

BY MR. COLLINGS:

Q Specifically identify for us, if you can, the policies that you believe were unconstitutional at the jail.

MR. JACOB:

Objection.

THE WITNESS:

Cleanliness, access to medication, safety, providing not spoiled food. I know they had to at least give us toothbrush and toilet paper and shampoo, which they never did. Cold water. We were supposed to have cold water and hot water. We only had hot water. That's all I can remember.

BY MR. COLLINGS:

Q You told me earlier that when you arrived at the St. Tammany Parish Jail, you had been taking heroin and what?

A Methamphetamine.

Q How much prior to the time that you checked into the jail had you taken heroin?

A Right before I turned myself in, I did. I did some.

Q So is it safe to say then that you were impaired at the time that you would have arrived at the St. Tammany Parish Jail?

A Yes.

Q Heroin, does it impact your ability to remember?

A No.

Q What about the other drugs that you were on?

A No.

Q Everything that happened, you remember distinctly?

A Yes.

Q How does heroin impact you?

A Heroin, if you can imagine a warm blanket covering your body, that's what I could compare it to.

Q What was the other drug you were on?

A Methamphetamine.

Q How does that impact you?

A It's speed. So it would increase your alertness. That's what I can describe it as.

Q How long do you suppose it was before you came down off these narcotics?

A Two days. It would have been different -- the heroin withdrawal started two days. The methamphetamine withdrawal, I was still experiencing even when I got out of jail.

Q So do you take issue with the design

of the holding cell? You were asked a series of questions about the location of the toilet and having to use the toilet.

A No.

Q And there were benches in the holding cell, as well, correct?

A Yes.

Q And some people sat on the benches, slept on the benches, and some people sat on the floor --

A Yes.

Q -- and slept on the floor, correct?

A Yes.

Q That pretty much was true throughout your time at the jail, correct, when you were in holding?

A Yes.

Q You were given blankets to sleep every night, correct?

A Yes.

Q And you were fed three meals a day, correct?

A Yes.

Q You were allowed to shower every seven days --

A Yes.
Q -- while you were in holding?
A Yes.
Q And you were allowed to see jail health care personnel, correct?
A When I got there, yes. Yes.
MR. COLLINGS:
That's all I have for you, sir. Thank you.
MR. JACOB:
Nothing further.
(Whereupon, these proceedings were concluded at 10:35 AM.)

C E R T I F I C A T E

I, LORI L. MARINO, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that KEVIN JAMES LOUVIERE, JR., after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 68 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

Dated this 13th day of October, 2022.

LORI L. MARINO, CCR
CCR #87069
STATE OF LOUISIANA