CARSEL & AYVES, Inc.
*Jail and Prison Consulting*

May 31, 2023

Mr. Chadwick W. Collings, Esq.
Milling Benson Woodward, L.L.P.
68031 Capital Trace Row
Mandeville, LA 70471

Regarding: Expert Review in the matter of:

**Ahmed Baqer et al. v. St. Tammany Parish Government, et al.**
**Civil Action No.: 20-980**
**United States District Court – Eastern District of Louisiana**

*Consolidated with*

**Kevin Louviere et al. v. St. Tammany Parish Government, et al.**
**Civil Action No.: 20-1840**
**United States District Court – Eastern District of Louisiana**

Dear Mr. Collings:

Thank you for contacting me to review the above-stated case on behalf of the defendants – Tammany Parish Government. I have had the opportunity to review all the documents related to this matter and wanted to provide you with a summary list of opinions. This is a preliminary set of opinions based upon my review so far and I may offer additional opinions if presented with supplementary materials to review.

## I. INTRODUCTION

I have over 26 years of experience working in jails and prisons. I have been a senior warden at three state prisons in the state of Nevada and have worked at all levels of inmate classifications including both male and female correctional institutions. I have experience

working in minimum custody and community corrections facilities to maximum custody institutions with death-row inmates and I have served as the chairperson of the County parole board making risk-factor-based decisions on inmate parolees.

Beginning in 2008, I served as the jail director and corrections administrator over the Napa County Department of Corrections for 10 years before retiring from public service. I then served as the Chief Operating Officer for an international inmate electronic monitoring company that also provided community corrections programs in juvenile facilities and county jails. I left that position in 2020 and moved to Texas.

I was certified as a Hostage Negotiator through the Public Safety In-Service Program under the Southeastern Public Safety Institute (SEPSI) and the Federal Bureau of Investigations' Hostage Negotiations Training program and served as a hostage and crisis negotiator while working for the Nevada Department of Corrections.

I am a trainer on the topic of *Preventing In-Custody Deaths by Suicide* and have trained numerous law enforcement and probation agencies on this topic. Specifically, I provided training to San Francisco County Probation, Riverside County Probation, and Solano County Probation agencies in California on the topic of preventing suicides in juvenile facilities.

I hold a bachelor's degree in Criminal Justice Administration and a master's degree in Justice Management. I have served as an adjunct criminal justice professor for six years and have been involved in training various sheriff's departments on topics related to corrections and inmate management. I have significant experience in the topic of deaths in-custody, and suicidal deaths in-custody, conducting suicide/death investigations and homicide investigations in a correctional setting, and overseeing Critical Incident Teams following deaths in custody. I have

represented both the plaintiffs and the defendants on cases related to in-custody death, homicides, and suicides in several states as a corrections expert for the past six years.

## II. METHODOLOGY

I am not a medical expert and any statements or opinions regarding medical health services and care are focused on the process and operation of healthcare staff as it relates to the care of individuals while in the care and custody of the St. Tammany Parish Sheriff's Office (STPSO) at that St. Tammany Parish Jail (STPJ). Although this is not a case specifically involving health care concerns, issues were raised in the plaintiffs' complaints related to a single plaintiff not being able to receive his medications. To this end, I requested and obtained documents that provided me with information regarding the specific health care provided to this individual. My opinions related to medical response focused on whether medical staff were responsive to the individual and not whether the treatment was medically appropriate.

I will approach the review of this case from the standpoint of acceptable standards as it relates to policies and procedures, contract requirements, mandates, and best practices from my years of training and experience in these types of cases. If called to testify, I would be able to offer testimony related to this matter as a corrections expert and consultant. My opinions are formed based on my education, knowledge, and experience, and from the perspective of a former prison warden and jail administrator.

I was provided with numerous documents and evidence including video recordings, inspection reports, incident reports, and policies and procedures. Additionally, I was allowed to speak with Major Daniel Fleischman to request specific information regarding jail operations as it related to this case. Major Fleischman serves as the warden of the jail facility and was

knowledgeable about the day-to-day operations of the jail as well as classification issues. I had several telephonic communications with Major Fleischman as part of my review and have identified the questions asked and responses provided by him in various parts of my report.

The focus of my report is related to the conditions of confinement in the holding cell areas of the St. Tammany Parish Jail. My report will not take into consideration whether my opinions are favorable to the plaintiffs or the defense. It is vital that a corrections expert hired to provide a report does so in a thorough, professional, and unbiased manner.

In addition to reviewing the totality of the complaints filed by the plaintiffs, I will specifically consider whether the conditions of confinement at St. Tammany Parish Jail during the relevant period presented a substantial risk of serious harm to pretrial detainees.

## III. PLAINTIFFS' COMPLAINTS

I have reviewed the plaintiffs' complaints and have included the allegations noted in the complaints. There were two separate complaint documents filed. The following section summarizes the information from the two complaint documents.

- The plaintiffs allege that the defendants of this action forced pre-trial detainees to endure days to weeks of prolonged pretrial detainment in dirty, cramped holding cells, with as many as twenty-four (24) detainees confined within a ten-foot by twenty-foot space. Detainees were forced to sleep on the concrete floor and urinate and defecate in front of one another in an open toilet visible to all other detainees within the holding cell. Detainees were deprived of hygienic products and denied access to showers for days at a time. As such, Defendants subjected prisoners to deprivations of their constitutional rights and excessive, cruel punishment.

- Plaintiff Ahmed Anwar Ali Taqi Baqer (hereinafter "Ahmed Baqer" or "Mr. Baqer"); Plaintiff Klabert Joseph Guillot, Jr. (hereinafter "Mr. Guillot, Jr."); Plaintiff Klabert Joseph Guillot, Sr. (hereinafter "Mr. Guillot, Sr."); Plaintiff Kevin Louviere (hereinafter "Kevin Louviere" or "Mr. Louviere"); Plaintiff Terry Matthew Hall, Jr. (hereinafter "Terry Matthew Hall, Jr." or "Mr. Hall"); and Plaintiff Floyd Williams (hereinafter "Floyd Williams" or "Mr. Williams") were pre-trial detainees housed in the St. Tammany Parish Jail.
- Plaintiffs have stated in their complaint that in January 2020, the St. Tammany Parish Jail had as many as one hundred and thirty-seven (137) open beds. At the same time, the STPJ housed as many as sixty-three (63) federal inmates and as many as three-hundred eighty-seven (387) Louisiana Department of Corrections inmates. During this period, there were instances when the holding areas exceeded their capacity with 24 individuals being held in a location designated to hold 20.
- Plaintiffs claim that the defendants placed violent and non-violent offenders in the same holding cells, placing non-violent offenders in unnecessary danger. Further, the plaintiffs claim that at all relevant times, the defendants failed to intervene in altercations that would occur between detainees in the crowded cells, placing detainees in danger.
- Plaintiffs allege that the defendants housed new inmate arrivals in unsanitary holding cells by allowing inmates to vomit on the floor of the holding cells and failing to promptly clean the holding cells. According to the plaintiffs' complaint, the defendants withheld hygiene items, blankets, and medication from inmates as punishment.

- Mr. Baqer resided in a holding cell for a duration of 17 days. Mr. Guillot, Sr. was in a holding cell for 13 days.[1] Plaintiff Louviere was in the holding cell for 12 days, Hall for 14 days, and Mr. Williams for 6 days.
- Plaintiffs have claimed that the defendants violated the plaintiff's rights under the Fourteenth Amendment because the placement of the plaintiffs in the holding cells of St. Tammany Parish Jail presented a substantial risk of serious harm to pretrial detainees, including all named Plaintiffs.
- Plaintiffs have claimed that the defendants violated the plaintiff's rights under Article I, Section 20 of the Louisiana Constitution, which states that "no law shall subject any person to euthanasia, to torture, or to cruel, excessive, or unusual punishment." Plaintiffs allege that STPJ deprived pretrial detainees of rights including reasonable safety, adequate hygiene, and adequate medical care. Further, the plaintiffs claim that the defendants were aware of a substantial risk of serious harm to pretrial detainees held in STPJ's holding cells.
- Plaintiffs' complaints refer to a United States Department of Justice investigation that noted that in 2012, there were instances when the holding areas exceeded capacity and the sheriff at the time was notified of this concern.
- Plaintiffs allege that the STPJ staff placed violent and non-violent offenders in the same holding cells, placing non-violent offenders in unnecessary danger.

[1] Mr. Guillot Jr. was initially included in the complaint. However, his claims were dismissed by the Court (R.DOC #151)

- Plaintiffs assert that the crowded conditions of the holding cells of St. Tammany Parish Jail presented a substantial risk of serious harm to pretrial detainees, including all named plaintiffs and all members of the class.

**Based on my review of the complaints, other than being housed in the holding cells when these areas were over capacity, plaintiffs Baqer, and Guillot, Sr. suffered no harm from being assaulted by any inmates or staff nor were they deprived of any medications or medical/mental health treatment.** The other plaintiffs in this case – Louviere, Hall, and Williams made specific allegations of misconduct related to health, hygiene, and safety conditions.

- Plaintiff Louviere claims that he was not allowed to take a shower until the seventh day of his being in custody. He claims that blankets were issued only between 3 a.m. and 5 a.m. and taken away by the staff at that point. He allegedly received bruises to his head and face after being battered by other inmates. He claims to have not received any medical attention following these assaults. Finally, Louviere alleged that the food provided to him was cold and spoiled.
- Plaintiff Hall alleges that he was given a shower twice each week and given clean clothing two times per week. He claims that he was not given a blanket for seven days. He reported that the holding cell areas were only cleaned once per week.
- Plaintiff Williams alleges that he was not provided with a medical or mental health screening until his last day in the holding cells. He claims that he was provided with an inhaler that was to be shared with other inmates on the fifth day of his being in custody.

## IV. MATERIALS REVIEWED

- Baquer Complaint (25 pages)
- Louviere Complaint (31 pages)
- Deposition of Sgt Lacey Robertson (213 pages)
- Deposition of Sheriff Randy Smith (147 pages)
- Deposition of Ahmed Baquer (75 pages)
- Deposition of Floyd Williams (83 pages)
- Deposition of Klabert Guillot (63 pages)
- Deposition of Terry Mathew Hall (44 pages)
- Deposition of Greg Longino (160 pages)
- Deposition of Keven James Louviere (68 pages)
- Deposition of Major Richard OKeefe Jr. (101 pages)
- Fire Marshal Reports (12 pages)
- Fire Marshall Inspection Reports (2.2019 - 12.2020) (44 pages)
- Inspection report CB-18-036466-1 - May 30, 2019 (3 pages)
- Inspection report GE-19-031169-1 - Jul 23, 2019 (3 pages)
- Inspection report GE-19-031169-2 - Jul 24, 2019 (2 pages)
- Inspection report GE-20-000453-1 - Jan 6, 2020 (2 pages)
- Inspection report GE-20-000453-2 – Jan 7, 2020 (2 pages)
- Inspection report GE-20-002166-1 - Jan 15, 2020 (2 pages)
- Inspection report GE-20-004235-1 - Jan 31, 2020 (2 pages)
- Department of Homeland Security Site Inspection (51 pages)
- STPSO Inspection Reports (2019-2020) (69 pages)
- US DOJ Site Inspection (7-23-2020) (18 pages)
- Ahmed Baquer Plaintiff Discovery Answers (20 pages)
- Terry Matthew Hall Plaintiff Discovery Answers (18 pages)
- Kevin Louviere Plaintiff Discovery Answers (18 pages)
- Floyd Williams Plaintiff Discovery Answers (37 pages)
- Plaintiff's Supplemental Discovery Responses (Floyd Williams Medical Records) (119 pages)
- Supplemental Disclosure Williams Medical Bills Disclosed (1 page)
- <u>Policies and Procedures</u>
  - Basic Jail Guidelines - April 25, 2019 (64 pages)
  - C-01-022 Jail PREA (64 pages)
  - I-A-001 Jail Safety Section (10 pages)
  - I-A-002 Jail Safety – Disposal of materials (94 pages)
  - I-A-003 Vermin and Pest Control (2 pages)
  - I-A-004 Housekeeping (4 pages)
  - I-A-005 Jail Safety – Water Supply (1 page)
  - I-B-001 Offender Transport (15 pages)
  - I-C-001 Jail Safety – Emergency Plans (63 pages)
  - I-C-002 Immediate Release of Offenders (1 page)

- I-C-003 State Fire Marshal Requirements (3 pages)
- I-C-004 Facility Furnishings New BJG (1 page)
- I-C-005 Jail Safety - FTC Materials (3 pages)
- I-C-006 Operational Capacity (2 pages)
- II-A-001 Control (5 pages)
- II-A-002 Secure Perimeter (3 pages)
- II-A-003 Jail Security – Sufficient Staff (3 pages)
- II-A-004 Jail Security – Female Offenders and female Staff (3 pages)
- II-A-005 Jail Security – No Offender Control Over Others (3 pages)
- II-A-006 Jail Security – Staff Log (3 pages)
- II-A-007 Jail Security – Inmate Counting Procedures (4 pages)
- II-A-008 Jail Security – Inmate Population Management System (3 pages)
- II-A-009 Jail Security – Reception– Legal Commitment and Medical (4 pages)
- II-A-010 Jail Security – Admissions (34 pages)
- II-A-011 Jail Security – Out of State Offenders (1 page)
- II-A-012 Jail Security – Classification (21 pages)
- II-A-013 Jail Security – Prohibition on Youthful Offenders (3 pages)
- II-A-014 Jail Security – Separation in Classification (4 pages)
- II-A-016 Jail Security – Photo Identification (1 page)
- II-A-017 Jail Security – Drug Free Workplace (5 pages)
- II-A-018 Jail Security – Offender Drug Testing (1 page)
- II-A-019 Jail Security – Offender Transfers (1 page)
- II-B-001 Jail Security – Use of Force (3 pages)
- II-B-002 Jail Security – Use of Restraints (12 pages)
- II-B-002-1 Jail Security – Use of Restraints for Pregnant Offenders (1 page)
- II-B-003 Jail Security – Use of Firearms (3 pages)
- II-B-004 Jail Security – Written Reports (1 page)
- II-C-001 Jail Security – Searches (7 pages)
- II-D-001 Jail Security – Key Tool and Utensil Control (7 pages)
- III-A-001 Jail Security – And Order - Rules and Discipline (13 pages)
- IV-A-001 Jail Care – Food Storage (2 pages)
- IV-A-002 Jail Care – Food Service Facilities (1 page)
- IV-A-003 Jail Care – Dietary Allowances (2 pages)
- IV-A-004 Jail Care – Records of Meals Served (1 page)
- IV-A-005 Jail Care – Meals not Withheld (1 page)
- IV-A-006 Jail Care – Meal Schedule (3 pages)
- IV-A-007 Jail Care – Special Diets (1 page)
- IV-A-008 Jail Care – Kitchen Workers Hygiene (1 page)
- IV-B-001 Jail Care – Plumbing Fixtures Toilets and Washbasins (1 page)
- IV-B-002 Jail Care – Plumbing Fixtures Showers (1 page)
- IV-B-003 Jail Care – Clothing (2 pages)
- IV-B-004 Jail Care – Clothing and Linen Exchange (3 pages)
- IV-B-005 Jail Care – Inmate Personal Hygiene (3 pages)

- IV-C-013-1 Jail Care – Medical Releases (1 page)
- IV-C-015 Jail Care – Offender Deaths (3 pages)
- IV-C-016 Jail Care – Notification (1 page)
- IV-E-001 Jail Care – Alleged and Substantiated Sexual Assaults (2 pages)
- V-A-001 Jail Offender Programs – Volunteers Registration (1 page)
- V-A-002 Jail Offender Programs – Volunteer Services (1 page)
- V-A-003 Jail Offender Programs – Programs and Services (2 pages)
- V-A-003-1 Jail Offender Programs – Educational Programming (1 page)
- V-B-001 Jail Offender Programs – Release of Inmates (7 pages)
- V-B-002 Jail Offender Programs – Visiting (13 pages)
- V-B-003 Jail Offender Programs – Library Services (1 page)
- V-B-004 Jail Offender Programs – Religious Programs (3 pages)
- V-B-005 Jail Offender Programs – Exercise and Recreation Access (2 pages)
- V-B-006 Jail Offender Programs and Activity – Transitional Work Programs (1 page)
- V-B-007 Jail Offender Programs – Participation in Transitional Work Programs (1 page)
- V-B-008 Jail Offender Programs – Offender Work Programs (5 pages)
- V-B-009 Jail Offender Programs – Approval for Transitional Work Programs (1 page)
- V-B-010 Jail Offender Programs – Proposed Expansions (1 page)
- V-B-011 Jail Offender Programs – Mail and Correspondence (5 pages)
- V-B-012 Jail Offender Programs – Outside Packages (1 page)
- V-C-001 Jail Offender Programs – Substance Abuse Programs (1 page)
- V-C-002 Jail Offender Programs – Re-Entry Programs (1 page)
- V-C-003 Jail Offender Programs – Pre-Parole Preparation (1 page)
- V-C-004 Jail Offender Programs – Parole Board Procedures (1 page)
- VI-A-001 Jail Offender Programs – Access to Courts Legal Materials (3 pages)
- VI-A-002 Jail Offender Programs – Access to Counsel (5 pages)
- VI-A-003 Jail Offender Programs – Protection from Abuse (3 pages)
- VI-B-001 Jail Justice – Discrimination (3 pages)
- VI-B-002 Jail Justice – Administrative Remedy Procedure (3 pages)
- VII-A-001 Jail Administration and Management – Administration and Management – Training and Staff Development (16 pages)
- VII-A-002 Jail Administration and Management – Weapons Training (10 pages)
- VII-B-001 Jail Administration and Management – Authority (1 page)
- VII-B-002 Legal Assistance for Staff (1 page)
- VII-B-003 Jail Administration – Independent Financial Audit (2 pages)
- VII-B-004 Jail Administration – Facility Insurance (2 pages)
- VII-B-005 Jail Administration – Offender Funds (4 pages)
- VII-B-006 Jail Administration – Organization (1 page)
- VII-B-007 Jail Administration – Annual Compliance Statement (1 page)
- VII-B-008 Jail Administration – Monthly Reporting (3 pages)
- VII-B-009 Jail Administration – Staff Meetings (1 page)

    - VII-C-001 Jail Administration – Facility Equipment Reasonable Accommodation (1 page)
- 2020-08-10 Handwritten TOC (8 pages)
- 2020-08-11 A-Team-1-1-2020 (2 pages)
- 2020-08-11 A-Team-1-2-2020 (18 pages)
- 2020-08-11 A-Team-1-7-2020 (2 pages)
- 2020-08-11 A-Team-12-28-2019 (9 pages)
- 2020-08-11 B-Team-1-3-2020 (4 pages)
- 2020-08-11 B-Team-1-5-2020 (3 pages)
- 2020-08-11 B-Team-12-31-2019 (3 pages)
- 2020-08-11 C-Team-1-2-2020 (9 pages)
- 2020-08-11 C-Team-1-6-2020 (3 pages)
- 2020-08-11 C-Team-1-7-2020 (6 pages)
- 2020-08-11 C-Team-12-24-2019 (4 pages)
- 2020-08-11 C-Team-12-31-2019 (9 pages)
- 2020-08-11 D-Team-1-4-2020 (5 pages)
- 2020-08-11 D-Team-12-25-2019 part a (4 pages)
- 2020-08-11 D-Team-12-25-2019 part b (6 pages)
- 2020-08-11 D-Team-12-30-2019 21:30 hours (10 pages)
- 2020-08-11 D-Team-12-30-2019 5:30 hours (7 pages)
- C-Team-12-29-2019 (2 pages)
- 2020-08-11 C-Team-12-19-2019 (4 pages)
- 2020-08-11 A-Team-12-19-2019 (6 pages)
- 2020-08-11 A-Team-12-23-2019 (3 pages)
- 2020-08-10 C-Team Unusual Occurrence Report (2 pages)
- 2020-08-10 B-Team Unusual Occurrence Report (4 pages)
- 2020-08-10 C-Team UOF (8 pages)
- 2020-08-10 UOF Intake 12-4-2019 (48 pages)
- <u>Videos</u>
    - Punch 12-31-19 (1:37 minutes)
    - 103f 12-25-19 (2:26 minutes)
    - 103f c800 04-02-20 p1 (1:02 minutes)
    - 103f c800 04-02-20 p2 (1:25 minutes)
    - 103f mh3 1-1-20 (18:14 minutes)
    - 103f mh3 12-25-2019 (3:14 minutes)
    - 103f mh4 12-21-2019 (2:10 minutes)
    - UOF Intake 1-2-2020 Part 1 (3:59 minutes)
    - UOF Intake 1-2-2020 Part 2 (2:58 minutes)
    - UOF Intake 1-2-2020 Part 3 (0:10 minutes)
    - UOF Intake 1-2-2020 Part 4 (2:31 minutes)
    - UOF Intake 1-2-2020 Part 5 (2:00 minutes)
    - C800 Bed Area 060120 (11:18 minutes)
    - C800 Bed Area 060320 (11:18 minutes)

- C800 Bed Area 052520 (19:31 minutes)
- C800 DR 0530 (9:14 minutes)
- C800 DR 060720 (7:11 minutes)
- C800 DR 060820 (14:23 minutes)
- UOF Intake 12-4-19 part 1 (4:29 minutes)
- UOF Intake 12-4-19 part 2 (4:29 minutes)
- UOF Intake 12-4-19 part 3 (0:15 minutes)
- UOF Intake 12-4-19 part 4 (0:10 minutes)
- UOF Intake 12-4-19 part 5 (0:09 minutes)
- Intake 12-5-19 part 1(0:30 minutes)
- Intake 12-5-19 part 2 (0:19 minutes)
- 103f 12-17-19 med (2:15 minutes)
- 103f mh2 12-17-19(6) (0.08 minutes)
- 103f 12-17-19 med (2:15 minutes)
- 103f mh2 12-17-19(6) (0:08 minutes)
- 103f mh2 12-17-19(7) (0:06 minutes)
- 103f mh2 12.17.19 (2) (2:10 minutes)
- 103f mh2 12.17.19 (3) (4:30 minutes)
- 103f mh2 12.17.19 (4) (0:10 minutes)
- 103f mh2 12.17.19 (5) (0:27 minutes)
- 103f mh2 12.17.19 (8) (0:25 minutes)
- 103f mh2 12.17.19 (9) (1:05 minutes)
- 103f mh2 12.17.19 (2:05 minutes)
- William Colliver 1 (0:25 minutes)
- William Colliver 2 (0:20 minutes)
- William Colliver 3 (0:32 minutes)
- William Colliver 4 (0:22 minutes)
- William Colliver 5 (0:27 minutes)
- 12-19 UOF Intake (3:12 minutes)
- UOF INTAKE 12.28.2019 PT 1 (0:22 minutes)
- UOF INTAKE 12.28.2019 PT 2 (4:19 minutes)
- UOF INTAKE 12.28.2019 PT 3 (0:10 minutes)
- Intake UOF 123019 p1 (6:24 minutes)
- Intake UOF 123019 p2 (6:37 minutes)
- Intake UOF 123019 p3 (3:19 minutes)
- Male Intake Floor 1.1.2020 (0:41 minutes)
- UOF mh2 1-1-20 (1:35 minutes)
- Slap MH4 1-3-20 (0:09 minutes)

- St. Tammany Parish Sheriff's Office. Financial Reporting. *https://www.stpso.com/financial-reporting/*

- Intergovernmental Service Agreement – Housing of Federal Prisoners (Signed 9.19.1997). *https://www.usmarshals.gov/sites/default/files/media/document/IGA-Louisiana-St-Tammany-Parish-Jail.pdf*

- October 2020 RTC Act 1 Corrections. Letter from DPS&C Undersecretary Thomas Bickham, III dated October 8, 2020 to the Chairman of the Joint Legislative Committee on the Budget. *https://jlcb.legis.la.gov/Docs/2020/oct/October%202020%20RTC%20Act%201%20Corrections.pdf*

- Armstrong, A. & Kondkar, M. (2022) Louisiana Justice: Pre-trial, Incarceration, & Reentry. Public Welfare Foundation. Loyola University, New Orleans. *https://www.incarcerationtransparency.org/wp-content/uploads/2022/10/PWF-Data-Report-Final-Compressed-Nov-2022.pdf*

- 101 Arrests: "Summer Drug Operation" Targets Dealers in Slidell. Romero. M. (October 5, 2022). WGNO – ABC *https://wgno.com/news/louisiana/st-tammany-parish/101-arrests-summer-drug-operation-targets-dealers-in-slidell/*

## V. ST. TAMMANY PARISH SHERIFF'S OFFICE AND PARISH JAIL PROFILE

I researched the St. Tammany Parish Sheriff's Office and the STPJ facilities and discovered many publicly available websites which provided information regarding the Parish and its jail operations. The STPSO has a website[2] which includes financial reports, operating budgets, jail commissary fund reports, jail expansion fund reports, and information on the general fund. For the section related to the overall Sheriff's budget, I relied primarily on the most recent annual financial report as it would include the most contemporaneous information. The report is titled – *Annual Comprehensive Financial Report for the fiscal year ended June 30, 2022*. From the above-mentioned documents and reports, I was able to gather the following information.

---

[2] St. Tammany Parish Sheriff's Office – Financial Reporting - *https://www.stpso.com/financial-reporting/*

Additionally, I reviewed a document titled – *St. Tammany Sheriff's Office Budget Document – July 1, 2021 – June 30, 2022 (Budget Book)*. This document provided me with specific information regarding jail operations.

Formed in 1812, the St. Tammany Parish Sheriff's Office is a stand-alone political entity led by an elected Sheriff. St. Tammany Parish, located in southeast Louisiana, has the fourth largest population in the state with an estimated 269,388 residents.

Article V, Section 27 of the Louisiana Constitution of 1974 requires that the St. Tammany Parish Sheriff serves a four-year term as the Chief Executive Officer of the law enforcement district and is responsible for executing all court orders and processes, such as providing bailiffs, executing orders of the court, serving subpoenas, etc.

Louisiana law also stipulates that the sheriff is responsible for collecting and dispersing all Parish ad valorem taxes, Parish occupational license fees, state revenue-sharing funds, fines and costs, and bond forfeitures imposed by the District Court. In 1992, the sheriff began serving as ex-officio tax collector with duties including the collection and distribution of taxes on behalf of various taxing bodies of St. Tammany Parish. Those duties have expanded to include the collection of taxes for local municipalities.

Many sheriffs throughout the nation fall under the financial direction of a countywide governing authority, such as a board of commissioners or a single county official. **In Louisiana, sheriffs are financially autonomous. The sheriff, as a separately elected official overseeing a separate legal entity that is not dependent on the Parish Council for revenue, is considered a "stand-alone" government.** The agency's budget creation and approval process fall entirely within the control of the sheriff, who approves and adopts the budget for the General Fund, Jail

Special Revenue Fund, Capital Projects Fund, Jail Commissary Fund, and Crime Lab Special Revenue Fund.

**Keeping of Prisoners accounts for 34.59% of the overall revenue in the Jail Fund for fiscal year 2022 and 7.56% of total governmental funds revenue.** This revenue source is derived from agreements with the Louisiana Department of Corrections, the U.S. Department of Justice - United States Marshals Service, Immigration and Customs Enforcement, and the Bureau of Prisons. These agreements allow the St. Tammany Parish Jail to house state and federal detainees.

The inmate population includes individuals charged with offenses being detained while awaiting trial; individuals who have been sentenced and are awaiting designation and transport to different facilities; and individuals who are awaiting a hearing on their immigration status or deportation.

Per Louisiana law, the sheriff is responsible for operating the Parish jail and the Parish government is responsible for providing sufficient facilities and for all expenses incurred by the arrest, confinement, and prosecution of persons accused or convicted of crimes in the parish. **In 2019, the St. Tammany Parish Government and the Sheriff's Office entered into an intergovernmental agreement in which the sheriff pays all operating costs directly and the Parish government makes monthly payments to the sheriff towards the Parish's financial obligation.**

A sales tax dedicated to jail operations expired in March 2018 after three renewal attempts by the St. Tammany Parish Government, which owns the Parish jail. The Jail Special Revenue Fund was fully depleted in fiscal year 2020, even with drastic cuts. The Parish Government went

to the taxpayers a fourth time to ask for a tax so they could fully fund their mandates for a criminal justice system, and it failed.

The Sheriff adopted a budget for 2022-2023 that expects the Parish to pay their full mandated costs. **The Parish adopted a budget to provide $3.0 million for jail medical and $6.2 million for other mandated costs, which is $3.4 million short of the Sheriff's estimate of the Parish's mandated costs for inmate care and jail operations in calendar year 2023.**

The Parish's adopted budget also includes $5.0 million for capital outlay projects which have been postponed for many years due to lack of funding. Negotiations have been taking place to transfer maintenance of the facility to the Parish and reduce the reimbursable amount due to the Sheriff's Office. This ongoing uncertainty in funding could have a major impact on the fiscal year 2023 amended budget.

**During fiscal year 2022, the fund balance of the Jail Special Revenue Fund remained fully depleted at year-end. Despite conservative spending practices in the Jail Special Revenue Fund, available revenue is insufficient to cover all expenditures, resulting in a General Fund transfer to fund the excess costs. For fiscal year 2022, transfers were made from the General Fund to the Jail Special Revenue Fund in the amount of $1,114,993.**

The St. Tammany Parish Jail operates with a capacity of 1,192 beds to house pre-trial detainees and adjudicated offenders. Managing a facility of its size requires multiple departments, including administration, security, support services, operations, classification, and transportation. The Corrections Division includes 168 trained staff and deputies. There is an existing contract with a healthcare company to ensure that inmates receive adequate healthcare services, including medical, mental health, and dental care.

The 2022 Budget Book indicates that the 2021 average daily population was 941 inmates. In 2021, the annual bookings of new inmates into the facility were 4,625 with an annual release of 4,428 individuals. **The booking numbers for 2020 indicate that over 7000 individuals were booked and released during that year.**

On May 25, 2023, I spoke with Major Fleischman and received updated numbers for 2022. I was informed that the booking numbers had increased to 5448 new bookings/intakes for the dates of January 1, 2022, through December 31, 2022. It is noteworthy that nationally, jail bed usage and arrests declined in 2020 and continued to decline throughout 2022. This was primarily a result of Covid-19 and the pandemic-related restrictions which led to fewer arrests on a national level.

**The costs related to personnel services, personnel benefits, insurance, operating expenditures, communications-related expenditures, maintenance costs, materials and supplies, capital outlay, and staff training expenses in 2020 was approximately $15.5 million.**

St. Tammany Parish Sheriff's Office contracted Correct Health LLC to administer health care services to the jail population. Correct Health provides numerous ancillary health-related functions, including quality improvement, education and training, infection control, medical supply, pharmaceutical services, and maintenance of medical records. In 2020, the medical staff logged in 21,156 medical events for providing care to inmates which included intake screening, sick calls, labs, imaging, wound care, mental health evaluations, women's care, and counseling services. **The total cost for the healthcare contract in 2020 was over approximately $3.7 million.**

**Based upon the above figures from 2020, I estimated that the total costs related to jail operations including health care and other expenditures including staffing, training, materials, etc., was approximately $19.2 million.** The average daily bed rate is generally derived from dividing the total number of beds by the total expenditures. In this case, with a bed rating capacity of 1,192, the annual cost of housing one inmate in one bed at the jail was approximately $16,107 in 2020. **Per day, this translates to approximately $44 to house an inmate at the STPJ facility.**

I researched public websites to obtain information on the federal contracts that STPJ had regarding the housing of inmates at the jail. I found a contract document[3] from 1997 which showed that the **per diem rate to house a federal prisoner at STPJ was $43.00.**



United States Department of Justice
United States Marshals Service

Intergovernmental Service Agreement
*Housing of Federal Prisoners*

Page 1 of 11

| 1. AGREEMENT NUMBER | 2. EFFECTIVE DATE | REQUISITION/PURCHASER/REQUEST NO. | 4. CONTROL NO. |
|---|---|---|---|
| J-D34-M-576 | 08 / 01 / 97 | 178-97 | |

5. ISSUING OFFICE
UNITED STATES MARSHALS SERVICE
PRISONER OPERATIONS DIVISION
IGA SECTION
600 ARMY NAVY DRIVE
ARLINGTON, VA 22202-4210

6. GOVERNMENT ENTITY — FACILITY CODE(S): 6UP
NAME AND ADDRESS (Street, city, county, State and ZIP code):
St. Tammany Parish Jail
P.O. Box 1120
Covington, LA 70433

7. APPROPRIATION DATA: 15X1020

Contact Person: Laron Hunter, Warden
Area Code & Telephone No.: (504) 898-2320

| 8. ITEM NO. | 9. SUPPLIES/SERVICES | 10. QUANTITY | 11. UNIT | 12. UNIT PRICE | 13. AMOUNT |
|---|---|---|---|---|---|
| | This agreement is for the housing safekeeping and subsistence of adult male and female federal prisoners including guard services in accordance with the contents set forth herein. | ESTIMATED USMS PRISONER DAYS/YR 1,060 | PDs | PER DIEM RATE $43.00 | ESTIMATED ANNUAL PAYMENT $45,580.00 |
| | | ESTIMATED GUARD HRS 100 | GHs | $12.00 | $1,200.00 |

14. AGENCY CERTIFYING: *To the best of my knowledge and belief, data submitted in support of this agreement is true and correct, the document has been duly authorized by the governing body of the Department or Agency and the Department or Agency will comply with ALL PROVISIONS SET FORTH HEREIN.*

15. NAME AND TITLE OF PERSON(S) AUTHORIZED TO SIGN OFFER
(Signature) — Date 9-19-97
Rodney J. Strain Jr. — Sheriff
Name (Type or Print) — Title
(Signature) — Date
Name (Type or Print) — Title

[3] https://www.usmarshals.gov/sites/default/files/media/document/IGA-Louisiana-St-Tammany-Parish-Jail.pdf

I also researched online for any publicly available contract documents that would show the rate that the Louisiana Department of Corrections pays to house its inmates at the STPJ facility. I discovered a letter signed by the DOC Undersecretary to the Chairman of the State Legislative Budget Committee[4] dated October 8, 2020. The letter included several spreadsheet documents that outlined the allocated expenditures related to local housing of state prisoners. A section of this document is included below.

**September 18, 2020**
**D.P.S.&C./C.S.**
**Local Housing of Adult Offenders**
**FY 2020-2021**

| MONTH | PREV. MONTH'S CENSUS | PROJECTED NEW BEDS | INC./DEC. PAR.PRIS. | SUBTOTAL ADULT CENSUS | PROJECTED SUPPLEMEN. PAYMENTS b | CURRENT MONTH'S TOTAL | RATE PER DAY $26.39 PROJECTED HOUSING PAYMENTS | PROJECTED MEDICAL PAYMENTS c | PROJECTED HAMILTON V. MORIAL d | PROJECTED Intensive Sub. Abuse e |
|---|---|---|---|---|---|---|---|---|---|---|
| JULY | 12,573 a | 0 | (421) | 12,152 | 0 | 12,152 | 9,941,430 | 0 | 7,628 | 0 |
| AUGUST | 12,152 | 0 | 0 | 12,152 | 265 | 12,417 | 10,158,224 | 50,000 | 12,000 | 25,000 |
| SEPTEMBER | 12,152 | 0 | 0 | 12,152 | 265 | 12,417 | 9,830,539 | 50,000 | 12,000 | 25,000 |
| OCTOBER | 12,152 | 0 | 0 | 12,152 | 265 | 12,417 | 10,158,224 | 50,000 | 12,000 | 25,000 |
| NOVEMBER | 12,152 | 0 | 0 | 12,152 | 265 | 12,417 | 9,830,539 | 50,000 | 12,000 | 25,000 |
| DECEMBER | 12,152 | 0 | 0 | 12,152 | 265 | 12,417 | 10,158,224 | 50,000 | 12,000 | 25,000 |
| JANUARY | 12,152 | 0 | 0 | 12,152 | 265 | 12,417 | 10,158,224 | 50,000 | 12,000 | 25,000 |
| FEBRUARY | 12,152 | 0 | 0 | 12,152 | 265 | 12,417 | 9,502,854 | 50,000 | 12,000 | 25,000 |
| MARCH | 12,152 | 0 | 0 | 12,152 | 265 | 12,417 | 10,158,224 | 50,000 | 12,000 | 25,000 |
| APRIL | 12,152 | 0 | 0 | 12,152 | 265 | 12,417 | 9,830,539 | 50,000 | 12,000 | 25,000 |
| MAY | 12,152 | 0 | 0 | 12,152 | 265 | 12,417 | 10,158,224 | 50,000 | 12,000 | 25,000 |
| JUNE | 12,152 | 0 | 0 | 12,152 | 265 | 12,417 | 9,830,539 | 50,000 | 12,000 | 25,000 |
| TOTALS | 12,187 | 0 | (421) | 12,152 | 243 | 12,395 | 119,715,784 | 550,000 | 139,628 | 275,000 |

**Although it costs nearly $44 per day, per inmate to be housed at the STPJ facility, the Louisiana Department of Corrections only pays $26.39 per day.** I spoke with Major Fleischman who confirmed that the DOC payment to house inmates was approximately $27 per day. When asked if the agency was making any profits from renting out beds to other agencies, Major Fleischman informed me that any revenue coming in from the renting of beds only serves to offset the total costs and expenditures required to run the jail. **There is no profit possible when**

[4] https://jlcb.legis.la.gov/Docs/2020/oct/October%202020%20RTC%20Act%201%20Corrections.pdf

**beds are being rented out at a cost lower than what it might take to house an individual in the STPJ facility.**

**Because of classification requirements and safety and security reasons, any empty beds available in the dorms that house Louisiana Department of Corrections inmates and Federal inmates cannot be shared with persons who are pre-trial and unsentenced.**

## VI. PHYSICAL LAYOUT OF ST. TAMMANY PARISH JAIL

On May 26, 2023, I spoke with Major Fleischman regarding the proximity of the holding areas from where corrections deputies were stationed. Major Fleischman informed me that the holding cells were directly in front of the booking/intake area with staff having a direct view of each of the cells and less than ten feet in distance from deputies who were stationed in that location. On most days, there would be a complement of five deputies in the area. At times, there may be over ten deputies immediately in front of the holding areas when staff were engaged in moving inmates and conducting transportation functions.



The above shown screen capture is from a video recording of the jail booking area[5]. The video recording was provided to me among several other recordings. I asked Major Fleischman to identify the locations, which he did by informing me of various areas that can be seen on the screen. Inmate trustee workers are seen in the area wearing green and white uniforms. From the photo, it is easy to identify sheriff's deputies who are wearing dark-colored uniforms. In the photo, I can count six deputies immediately outside the holding areas of the jail. Based upon my conversation with Major Fleischman, I have identified the areas of the jail facility shown in the photo above:

**A:** Booking/intake area that runs the length of the corridor with windows facing the hallway and throughout the holding areas across the corridor.

**B:** The sally port door from where arrestees are brought into the facility.

**C:** The holding areas. There are four holding areas in this location with a Fire Marshal rated capacity of 20 individuals for a total of 80 spaces.

I asked Major Fleischman to provide me with information regarding the physical plant layout of other parts of the jail to include areas that are used to house federal inmates and offenders from the Louisiana Department of Corrections. Based on the information provided, the following is a description of the jail housing areas.

**The jail housing primarily consists of dormitory-style accommodations. There are very few beds available in the jail that are single and double-occupancy beds.**

**Building A** houses the kitchen, laundry, medical areas, and special housing cells. The special housing cells include 16 Restricted Housing Unit cells, 4 suicide watch cells, and two inmate

[5] Video recording screen capture dated 2019-12-17 at 07:13:31 - 103f mh2 12.17.19 (2).avi

worker dorms. There is also a 60-bed dorm unit as well as three 10-man tiers with five double-occupancy cells. In speaking with Major Fleishman, I was informed that these areas were occupied by inmates during the time related to this lawsuit. The worker dorms – one with 40 beds and the other with 60 beds for a total of 100 beds are all inmate workers that are sentenced Louisiana Department of Corrections inmates. No pre-trial detainees are allowed to be inmate workers because of their status as pre-trial individuals. Federal inmates are also prohibited from being used as inmate workers. Building A also includes four 30-man tiered housing with double-occupancy cells on the bottom tier and single bed top tier. This area is used for administrative segregation, disciplinary detention and disciplinary segregation, and inmates that need to be isolated from the general population. Most recently, this area has been used to isolate inmates with respiratory issues including inmates with Covid19. Due to the restrictive nature of this section, general population inmates cannot be housed in this section of the jail. Building A has 30 beds assigned to federal inmates and these inmates cannot be housed with other individuals.

**Building B** includes female housing with two 66-bed dorms for a total of 132 beds. Female housing is required to be separate from male housing areas and vacant beds in this section of the jail cannot be considered for anyone other than female offenders. Additionally, Building B also houses the administration offices, booking areas, and the temporary holding cells.

**Buildings C and D** have virtually identical dormitory-style arrangements. Each of the two buildings has 8 dorms. Four of these dorms hold 40 inmates each and the other four can hold 50 inmates for a total of 720 beds. Building C, dorm 300 and Building D, dorm 200 holds 40 federal inmates each. Additionally, all the Louisiana Department of Corrections inmates are in

Building D for a total of 200 beds in a dorm setting. I was provided with the below photograph to show the typical bed configuration in a dorm housing area.



To get a sense of what a typical dorm unit looks like when there are inmates housed in the areas, I went to several videos that showed inmates inside dorm housing areas. The following photo[6] is taken from a video in Building C and shows the close placement of sentenced inmates inside the dorm units.

[6] C800 Bed Area 060120.Avi



**There would be significant challenges for an unsentenced individual to be placed inside one of these areas even if the facility had numerous empty beds in such locations due to classification issues and concerns over detainee safety. The facility assumes substantial risks when deciding to house someone who may be pre-trial and unsentenced and possibly even awaiting charges to be housed with a group of sentenced offenders who may have high-risk factors.**

Major Fleischman informed me that classification protocols dictate where inmates can be housed. Upon arrest, every individual brought into custody is placed in the holding areas. There are times when even federal inmates and Louisiana Department of Corrections inmates are temporarily placed in the holding areas. The holding area serves as a triage or waiting area until classification can process individuals based upon various criteria such as severity of crimes, gang involvement, medical and/or mental health issues, behavioral issues, etc.

Although the facts of this lawsuit predates Covid19 lockdowns and quarantines that started around February – March of 2020, it is important to note that almost all jails and prisons in the

nation had to modify their housing limitations and restrictions on how long individuals could be in a certain location due to the highly infectious nature of the coronavirus. Suffice it to say, most of the corrections agencies that I am familiar with suspended numerous requirements to deal with new procedures to ensure public health and safety.

In the case of STPJ, I was informed that during Covid19, there were many requirements placed on operations to ensure that inmates were quarantined for a duration followed by a step-down housing location where they were monitored for a period before they could be placed into general population housing.

Since all arrestees are placed into these holding areas initially, staff are trained to respond immediately to address any safety concerns. According to Major Fleischman, the holding areas are perhaps more secure than other parts of the jail because of the immediate proximity of corrections deputies directly outside the holding areas.

## VII. STPJ CAPACITY ISSUES AND CROWDING

STPJ is like many medium to large jails in the United States where male and female arrestees are housed and processed daily with a constant flow of people going in and out of the jail facility utilizing beds, services, and resources. I work as a consultant for many large jurisdictions with large jail facilities and the challenges faced by STPJ are not uncommon.

Classification and housing decisions inside a jail facility is a continuous process that serves as the basis for any inmate placement. An incorrect classification assignment can be dangerous and lead to severe consequences. In my experience, classification of individuals without having completed a thorough review of their background, criminal history, gang involvement, medical and mental health screening, understanding of any enemies within the existing group of

inmates, type of crime, notoriety of the crime, whether there are codefendants in the case, whether multiple persons were arrested during the same incident, etc., are all factors that must be taken into consideration in making housing assignment decisions.

As stated earlier, during Covid19 jails across the nation had to deviate from existing policies and procedures to consider the issues with public health, and inmates were kept warehoused in quarantined conditions for months at a time with normal classification protocols being suspended. This two-year process of dealing with Covid19 created many special challenges to an already overburdened corrections system around the country.

In my experience, many jail policies in other jurisdictions include policy language regarding exigent circumstances. In exigencies such as when there is a large-scale infectious disease breakout or when there is a riot or major disturbance involving inmates, jail administrators have the authority to suspend routine services and programs to address the urgent situation on the ground. Usually this is indicated in policy which informs that there may be times when the policy may not be followed due to specific circumstances until such issues have been addressed.

While working as the jail administrator over Napa County Jail in Napa, CA, I was responsible for an aging jail facility that needed replacement. In 2014, a major earthquake in Napa created severe damage to the jail facility and 80% of the inmate population had to be transported to other county jails in nearby jurisdictions. For the next 8 months, the jail underwent upgrades and repairs that caused most of the county inmates to be housed in other counties. The conditions caused by this resulted in crowding in the other jails and limited access to attorneys,

family visits, courts, etc. I received authorization from the presiding judge to make the determination on which inmates should be transferred to other jurisdictions.

Prior to the earthquake, I was already facing crowded conditions daily and every week I went before the presiding judge and requested authorization to make emergency release decisions. After the earthquake and once the inmates were brought back into the facility, I was given the authority to make the determination on when the jail capacity limitation could be triggered. We determined that once the total population of the jail or any single housing unit with specialized classification reached a bed capacity of 90%, I was then authorized to start releasing inmates based on their risk factors determined by classification staff. I was allowed to use house arrest, electronic monitoring, and daily check-in as a means of managing the group of individuals I was planning to release into the community. The process remained in place for the entire duration I was in my role until my retirement in 2018. To my knowledge, the process continues under the new jail commander to this day.

STPJ had a similar release valve mechanism in place in previous years. When jail crowding occurred, a “code 6” was put in place so that staff could release inmates. This process was discontinued a few years ago. Subsequently, staff had to go through a commissioner’s office to get people bonded out or released. When this did not happen, jail crowding occurred.

Staff reported that the jail population and the ebb and flow of inmates coming in and out of jail was fluid and ever-changing. I believe this to be an accurate description of jails throughout the nation. Jail staff know that at certain times of the day, week, or year, there will be more arrests such as on weekends when people gather socially and on long holidays or when the weather is hot. Sometimes more arrests occur when local law enforcement decides to perform

a DUI checkpoint or when there are concerts or special events. It is incredibly difficult to plan for surprise population increases as it overwhelms the jail's resources, and everything slows down. In many cases, these slowdowns or bottlenecks are caused by the unintended consequences of actions beyond the control of the jail staff.

When Code 6 releases ceased, the STPJ experienced significant challenges in its ability to release individuals from custody to maintain appropriate population control. Former Deputy Chief Gregory Longino reported that he was aware of the numbers allotted to each holding cell in the jail. He summed up the concerns in his deposition by stating that staff were doing their best but there were few, if any, ways to correct the issue. The first action that the agency would take was to call the commissioner's office and inform them that the jail was crowded, and some individuals needed to be released. If the commissioner's office was unable to provide the needed relief, the sheriff's staff would then go to the judge. There was no way to release individuals from jail without a petition to the judge. The decision to stop Code 6 releases resulted in jail crowding conditions. Some time ago, the process changed, and the jail staff had to go through the commissioner for any jail crowding concerns. Without the commissioner's approval, individuals continued to be held in jail until they underwent the normal process of adjudication and placement.

As discussed earlier in this report, there is no safe way to house unsentenced, pre-trial detainees in areas which are occupied by sentenced offenders in a dormitory-style housing space. This set of circumstances occasionally resulted in the jail holding areas becoming crowded and exceeding capacity as set by the Fire Marshal's office.

## VIII. FIRE MARSHAL INSPECTIONS

I spoke with Major Fleischman about Fire Marshal inspections and was informed that inspections occurred monthly. He also informed me that more frequent inspections have occurred in the past whenever an inmate or detainee’s family members contact the Fire Marshal's office to report concerns over specific areas of the jail being crowded. The Fire Marshal could show up unannounced to conduct capacity inspections. In all instances, according to Major Fleischman, staff would try their best to bring the areas into compliance by reducing population numbers in the impacted areas.

I reviewed several Fire Marshal inspection reports and the steps taken by STPJ staff to address any concerns that were noted as deficient. I considered the following reports based primarily on concerns related to capacity issues in the holding cells.

- **Fire Marshal Inspection Report – May 30, 2019**

  On this date, the Fire Marshal noted that the total capacity in the male holding area was 53 and in compliance.

- **Fire Marshal Inspection Report – July 1, 2019**

  The report noted no deficiencies, and the jail was reported to be in full compliance.

- **Fire Marshal Inspection Report – August 23, 2019**

  The inspection noted that there was crowding in some of the holding cells and some inmates were held over 72 hours. The following is a section of the inspection report with comments regarding the corrective action that was taken immediately by STPJ administrative staff upon meeting with the Fire Marshal following the inspection. Once the issue was corrected, the report noted that no one was being held past 72 hours.

| Comments |
|---|
| MET WITH CORRECTION ADMINISTRATION ON THE ISSUE OF OVER CROWDING THE HOLDING CELLS AND HAVING INMATES IN THE CELLS OVER 72 HOURS. CAPTAIN PAYNE IS ENSURING THAT THE HOLDING CELLS WILL BE UNDER CAPACITY BY THE END OF THE DAY. CURRENTLY THEY HAVE STARTED MOVING OUT OF HOLDING NOW THAT OTHER BEDS HAVE BECOME AVAILABLE.<br><br>CURRENT CAPACITY:<br>MALE HOLDING 1: 20 ON HAND: 32<br>MALE HOLDING 2: 20 ON HAND: 25<br>MALE HOLDING 3: 20 ON HAND: 24<br>MALE HOLDING 4: 20 ON HAND: 18<br><br>FEMALE HOLDING 1: 13 ON HAND 10<br>FEMALE HOLDING 2: 13 ON HAND 3<br><br>CURRENTLY THERE IS CROWDING AND NO ONE IS BEING HELD LONGER THAN 72 HOURS. |

| Inspector Information | | |
|---|---|---|
| Name: Cathryn R Guilott | Badge Number: 635 | Inspector Signature: |

- **<u>Fire Marshal Inspection Report – August 24, 2019</u>**

  The Fire Marshal returned to reinspect the jail the next day. No deficiencies were found.

  The following section comes from the inspection conducted on this date.

| Comments |
|---|
| ALL PREVIOUS DEFICIENCIES HAVE BEEN CORRECTED. IN COMPLIANCE. |
| CURRENT CAPACITY:<br>MALE HOLDING 1: 20 ON HAND: 8<br>MALE HOLDING 2: 20 ON HAND: 14<br>MALE HOLDING 3: 20 ON HAND: 9<br>MALE HOLDING 4: 20 ON HAND: 7<br><br>FEMALE HOLDING 1: 13 ON HAND 4<br>FEMALE HOLDING 2: 13 ON HAND 0 |

| Inspector Information | | |
|---|---|---|
| Name: Cathryn R Guilott | Badge Number: 635 | Inspector Signature: |

- **<u>Fire Marshal Inspection Reports – October 14, 2019</u>**

  There are two inspections on this date. The first report noted that there were 87 individuals held in the holding area of the jail and this was identified as a deficiency. The jail staff immediately corrected the issue, and a second inspection was done by the Fire Marshal. The second report noted that no apparent deficiencies were found, and the jail complied with the Fire Marshal requirements.

- **<u>Fire Marshal Inspection Report – October 15, 2019</u>**

  The Fire Marshal reported back to the jail on the following day. The following is a section from the inspection report showing continued compliance.

| Comments |
|---|
| MALE HOLDING IS NOW AT NOW AT 72 PERSONS. |
| THE FIRE ALARM HAS BEEN BLUE TAGGED BY ADS SYSTEMS, LLC., ON 10/14/2019 |
| ALL PREVIOUS DEFICIENCIES HAVE BEEN CORRECTED. IN COMPLIANCE. |
| THE CAPACITY FOR THIS FACILITY IS 1300. |

| Inspector Information | | |
|---|---|---|
| Name: Cathryn G Thurman | Badge Number: 635 | Inspector Signature: |

- **<u>Fire Marshal Inspection Report – January 6, 2020</u>**

  The inspection report indicates that there were more individuals in the holding cells than permitted by the Fire Marshal. The issue was addressed with STPJ Captain Shariqueka Weary who assured the inspector that she would be bringing the holding cells to below capacity by the following morning. A section of the inspection report is included below.

**Comments**

MET WITH CORRECTION ADMINISTRATION ON THE ISSUE OF OVER CROWDING THE HOLDING CELLS AND HAVING INMATES IN THE CELLS OVER 72 HOURS, WHICH IS THE LIMIT. SHARIQUEKA WEARY IS ENSURING THAT THE HOLDING CELLS WILL BE UNDER CAPACITY BY TOMORROW MORNING.

CURRENT CAPACITY:
MALE HOLDING 1: 20 ON HAND: 21
MALE HOLDING 2: 20 ON HAND: 23
MALE HOLDING 3: 20 ON HAND: 24
MALE HOLDING 4: 20 ON HAND: 22

FEMALE HOLDING 1: 13 ON HAND 6
FEMALE HOLDING 2: 13 ON HAND 0

CURRENTLY THERE IS CROWDING AND NO ONE IS TO BE HELD LONGER THAN 72 HOURS

| Inspector Information | | |
|---|---|---|
| Name: Cathryn G Thurman | Badge Number: 635 | Inspector Signature: |

- **Fire Marshal Inspection Report – January 7, 2020**

  Captain Weary managed to bring the holding cells into compliance with the Fire Marshal's requirements. The Fire Marshal conducted an inspection the following day and found no deficiencies.

**Comments**

CURRENT CAPACITY:

MALE HOLDING 1: 20 ON HAND: 14
MALE HOLDING 2: 20 ON HAND: 20
MALE HOLDING 3: 20 ON HAND: 16
MALE HOLDING 4: 20 ON HAND: 18

FEMALE HOLDING 1: 13 ON HAND 4
FEMALE HOLDING 2: 13 ON HAND 1

ALL PREVIOUS DEFICIENCIES HAVE BEEN CORRECTED. IN COMPLIANCE.

**Inspector Information**

| Name: Cathryn G Thurman | Badge Number: 635 | Inspector Signature: |
|---|---|---|

- **Fire Marshal Inspection Report – January 15, 2020**

  A follow-up inspection by the Fire Marshal on this date showed that the holding cells were not over capacity and the facility was complying.

- **Fire Marshal Inspection Report – January 31, 2020**

  The inspection addressed concerns with a fire system after a report had been submitted to the Fire Marshal that four smoke detectors needed to be replaced and that a secondary phone line was not operational. The inspection performed by the Fire Marshal indicated no concerns with crowding in the holding cells.

## IX. STPJ CORRECTIONS POLICIES

I reviewed several policies related to jail operations. The following are some of the relevant policies that I considered in my review of this case.

- **<u>SOP.07001: I-C-006.390. Initial Offender Housing Assignment</u>**:

  It is the policy of the St. Tammany Parish Jail to assign all newly admitted offenders to areas that are under close supervision for the first 72 hours of detention, in order to ensure close observation of new offenders at the most crucial period of detention.

- **<u>SOP.07001: I-C-006.391. Initial Offender Housing Assignments Procedure</u>**:

  The STPSO jail has an operational capacity of 1180 beds. Of this number, 1048 beds shall be assigned to male offenders and 132 beds shall be assigned to female offenders.

  - The number of offenders present shall not exceed the operational capacity as determined by the state Fire Marshal and the Louisiana Department of Health and hospitals.
  - The state Fire Marshal shall determine a capacity primarily based upon existing capabilities. The Louisiana Department of Health and hospitals will determine a capacity based upon the ratio of plumbing fixtures to offenders and square footage. The operational capacity shall be the lower of these two figures.
  - The intake staff will implement and complete initial offender classification procedures within the first 48 hours of detention.

- **<u>SOP.07002: II-A-009.150. Reception – Legal Commitment and Medical Pre-Admission Procedures</u>**:

  Pre-admission procedures will be carried out before accepting A prisoner to ensure that:

  - The delivering officer has the authority to have a person detained in the St. Tammany Parish Jail,
  - The prisoner is not in need of emergency medical attention, and

- prisoners do not have contraband in their possession when entering the jail facility.

- **SOP.07002: II-A-009.170.01 Reception – Check for Obvious Injury Procedure**:

  St. Tammany Parish Jail will not accept custody of a prisoner who appears to the deputy to be injured or sick until the jail medical staff provides a written statement verifying that the prisoner has been treated and is not in need of hospitalization. Intake personnel will make inquiries about the physical condition of the prisoner from the delivering agent and the prisoner being received. Intake personnel will observe the behavior of the prisoner being received to ensure that he/she is not injured. Offenders will be directed to jail medical staff for processing.

- **SOP.07002: II-A-010.375. Clothing Exchange, Linen, and Personal Hygiene Items Policy**:

  In order to maintain the personal hygiene of offenders at the St. Tammany Parish Jail and to reduce the frequency of contamination, offenders will be issued a complete set of clean clothing, linen, and personal hygiene items at admission.

- **SOP.07002: II-A-012.100. Classification System - Policy**:

  The St. Tammany Parish Jail houses pre-trial inmates, DPS&C (Department of Public Safety and Corrections) inmates, and Federal inmates under the jurisdiction of both The US Marshals Service and Immigration and Customs Enforcement. All inmates are classified according to guidelines established by the respective agencies.

  The St. Tammany Parish Jail inmate classification system is designed to provide a manageable, fair, and consistent process for classifying inmates according to their

individual custodial assignment - minimum, medium, or maximum. Inmate classification cannot ensure that inmate-on-inmate violence will not occur or that classification procedures will ensure the protection of any inmate.

All offenders are classified using an objective classification process that at a minimum:

- Identifies appropriate level of custody for each offender.
- Identifies appropriate housing assignment.
- Identifies the offender's interests and eligibility to participate in available programs.

- **SOP.07003: IV-B-002.100. Jail Care – Plumbing Fixtures - Showers**:

Offenders in the St. Tammany Parish Jail, including those in STPJ medical, have access to operable showers with temperature controlled hot and cold running water 24 hours per day.

- Offenders in housing units are allowed to shower daily.
- Offenders in holding cells are allowed to shower three times per week.
- Offenders in STPJ medical are allowed to shower a minimum of three times per week.

## X. DISCUSSION

Jails around the country are required to consider the rights and responsibilities towards the housing of pre-trial individuals. Sentenced offenders give up certain rights once they have been found guilty of a crime and placed into a status where they are serving time for their criminal conduct. Jail personnel must exercise great caution in determining when a pre-trial,

unsentenced individual can be placed with other general population inmates. A decision point when jail classification staff determines that a pre-trial individual can be housed with general population occurs after prosecutors file charges against the individuals.

Most states give prosecutors 72 hours to file charges against a defendant before release occurs. In California, the statute allows for 48 hours for prosecutors to file charges. In New York, the statute allows for six days. Louisiana allows for prosecutors to file charges within 30 days for misdemeanors, 60 days for felonies, and 150 days for a felony that is punishable by death or life imprisonment[7].

According to a study titled ***Louisiana Justice: Pre-trial, Incarceration, & Reentry*** completed by the Public Welfare Foundation of Loyola University (2022), prosecutors in St. Tammany Parish took a median of 69 days in 2016 and 57 days in 2017 to reach decisions on whether to prosecute felony suspects. This inevitably creates situations where jail staff are unable to reach a decision-making point on where to place pre-trial detainees as their status remains in limbo.

---

[7] Louisiana Justice: Pre-trial, Incarceration, & Reentry. *https://www.incarcerationtransparency.org/wp-content/uploads/2022/10/PWF-Data-Report-Final-Compressed-Nov-2022.pdf*

## XI. OPINIONS AND RATIONALE

After careful examination of all the evidence and circumstances that are known in this matter, I formed several opinions regarding this case. These are my opinions thus far and I reserve the right to change them if presented with new facts or additional information regarding this case.

In forming my opinions, I have considered the various deposition statements, records and documents, independent research, and the review of evidence, as well as applied my knowledge and experience on the topic of jail operations and management.

I did not form opinions on whether the parties involved in this case provided untruthful statements. However, when I discovered inconsistencies between the evidence I reviewed against other actions or statements, I have noted those inconsistencies in my findings. My opinions are not meant to invade the role of the Court or the jury to determine the ultimate issues in this case.

**OPINION 1: I find that the allegation that the St. Tammany Parish Jail was motivated by profit to house inmates from external agencies to be without merit. I do find evidence that the revenue generated by renting beds only serves to offset some of the costs, but it does not appear to be profitable, and the sheriff's office is operating the jail without sufficient funds in providing an essential public safety function.**

**I also find that the crowding conditions created at the STPJ facility is partly due to the facility design of having mostly dormitory-style housing and in part due to delays in the prosecutor's office deciding whether to charge individuals. A significant level of responsibility**

**for the incidents of crowding is due to the sheriff's office not having the legal and statutory authority to release individuals from custody without approval from the courts.**

In most jurisdictions that I am familiar with, the function of operating and maintaining a jail is a public safety requirement and is funded by the local government authority. In many states, this function falls within the scope of authority of the County government and funds are allocated annually based upon the actual needs and projected costs related to jail operations. This allows the agency or person in-charge of operating the jail – whether it is under the oversight of a sheriff or a county-appointed warden or director of corrections, to focus on operational needs instead of finding ways to fund this important public safety function.

In Louisiana, by statute, the function of jail operations rests primarily on the elected sheriff. The sheriff’s office is a “stand-alone” government agency creating the unusual situation where the sheriff is entirely responsible for the control, approval, and adoption of the budget for the agency and the jail. By statute, the sheriff is ultimately responsible for operating the Parish jail.

The records indicate that the most recent budget for calendar year 2023 is $3.4 million below the actual projected costs to operate the jail for this year. Prior attempts to get the voters to support a sales tax to pay for jail operations failed repeatedly. Without a possible source for paying for the operations of a jail facility, the sheriff’s office has continued to rely on some revenue being generated from renting beds to other agencies. In 2022, the renting of jail beds contributed to a little over approximately 34% of the overall revenue in the jail fund.

The revenue generated falls well short of the actual revenue needed to operate the jail facility. From my review of the revenue generated by the rental of beds, it is highly likely that the renting of beds to the federal government only recovers the actual costs related to housing

the federal inmates. The jail may be operating at a loss by renting beds to the Louisiana Department of Corrections based on the actual operating daily bed cost of approximately $44 compared to the approximately $27 that the jail receives for housing DOC inmates. The shortfall in revenue in 2022 resulted in the general fund transferring over $1.1 million to the jail special revenue fund.

Faced with no other options but to rent out a portion of the jail beds to outside agencies, the sheriff's office has run into operational issues from having to classify individuals appropriately to keep sentenced offenders separated from pre-trial detainees. The issue is further exacerbated by the design limitations of the jail which was built with most of the inmate housing in dormitory-style units. Adding to this are the delays caused by prosecutors taking an extraordinarily long time in making prosecutorial decisions.

St. Tammany Parish took a median of 69 days in 2016 and 57 days in 2017 to reach decisions on whether to prosecute felony suspects. This leads to individuals being held in custody on an unknown status with jail staff having to decide whether there is a probability of release or if the individual will most likely be charged with a crime and remain in the jail facility. This inefficiency creates a bottleneck in the classification process and slows the ability of jail staff to move individuals into programming units.

**<u>OPINION 2</u>: I do not find evidence indicating that the St. Tammany Parish Jail staff engaged in a practice of deliberately creating crowded conditions inside the holding cells. While crowding may have occurred intermittently, staff constantly worked towards reducing this deficiency as evidenced by the numerous Fire Marshal inspections in which the facility**

**constantly brought the population numbers below capacity to gain compliance with the Fire Marshal's requirements.**

My review of the Fire Marshal's inspections is included in Section VIII of this report. The Fire Marshal's office was proactive in its duties and conducted frequent inspections. Whenever the inspection indicated that the holding cells were over capacity, a notice of deficiency was issued, and immediate corrective action was taken. The Fire Marshal's office frequently came back to reinspect the facility to ensure continued compliance.

There were times when the holding cells exceeded the Fire Marshal's requirements. There were also times when the holding cells were well below the required maximums. Examples of this can be found in the inspection report dated May 30, 2019, when the holding cells were inspected and 53 individuals were being held between the four cells and on August 24, 2019, the Fire Marshal found only 38 individuals being held between the four cells.

**<u>OPINION 3</u>: I find no evidence to substantiate the allegation that the holding cells were unsafe or that individuals placed in the holding cells were at substantial risk of serious harm. Although fights did occur inside the holding cells as well as in other parts of the jail, there were more staff available to respond to incidents inside the holding cells due to the proximity of corrections deputies assigned to the booking/intake area of the jail which was approximately 10 feet from the holding cells.**

**Conversely, one plaintiff was involved in multiple incidents attacking and assaulting other persons who were inside the holding cell, and another had a prior history of violence, and a third plaintiff was recently arrested for serious drug crimes. The evidence indicates that some**

**of the alleged unsafe conditions inside the holding cells were created by at least one of the original named plaintiffs in this case[8].**

In Section VI of this report, I included a photograph of the holding cell areas which shows its proximity to corrections deputies in the booking/intake areas. The holding cells have windows facing the hallway which provides the deputies with a clear view of the inside of these cells. There is a complement of at least five deputies in the area on any given day with up to ten or more deputies during a transportation run.

Numerous incident reports that I reviewed suggest that the staff response time is usually less than one to two minutes from the time an incident starts. This is corroborated by several video recordings that I examined. In addition to rapidly responding to any inmate fights, the custom and practice as evidenced by the video recordings is that medical staff is immediately involved either by responding to the scene or by staff escorting individuals to be seen by medical personnel.

Jails in the United States are dangerous places and there is no guarantee that a general population housing unit will be any safer than the holding cells. In fact, in this case with STPJ, the holding cell areas might be safer because of the number of staff present immediately outside the cells.

I could find no incidents where any of the plaintiffs had been injured or assaulted by another person. Plaintiff Louviere's claims of being assaulted by an unknown individual is unsubstantiated and not supported by the evidence I have reviewed.

---

[8] Guillot Jr., now dismissed.

Whereas plaintiffs have alleged that the placement inside the holding cells created a substantial risk of harm, there is no explanation provided as to why the degree of risk may be elevated simply because an individual is in the holding cell for longer than 48 hours. Since every arrestee is required to be brought in through the holding cell areas and must await a processing and evaluation period, there would be no way for a pre-trial detainee to circumvent placement inside a holding cell. Nothing in my examination of this case indicates that there is any increased substantial risk for harm after the first 48 hours of detention or that the risk in the holding cells is greater than in any other parts of the jail.

I also find it unlikely that the plaintiffs in this case were all feeling unsafe based on their charges, actions while in the holding cells, and prior arrests. As an example, although plaintiff Williams alleged that he was a nonviolent felon, his responses provided in the answers to the interrogatories to the defendants indicates that he was arrested previously on terroristic threats and on charges of unlawful firearm possession and attempted rape/abduction. He had two prior convictions related to domestic violence charges.

Plaintiff Guillot Sr. had recently been arrested in a targeted operation focused on arresting narcotics dealers engaged in the trafficking of fentanyl, methamphetamine, and heroin. Slidell Police Department identified Guillot Sr. as a narcotics dealer[9].

Original plaintiff Guillot Jr. was involved in three separate incidents while he was in the holding cells where he used violence against other detainees. A report[10] from December 25, 2019, states that Mr. Guillot Jr. was seen on video surveillance striking another individual.

---

[9] 101 Arrests: "Summer Drug Operation" Targets Dealers in Slidell. *https://wgno.com/news/louisiana/st-tammany-parish/101-arrests-summer-drug-operation-targets-dealers-in-slidell/*
[10] 2020_8_11_D-Team-12-25-2019.pdf

After reviewing video surveillance, it was discovered that Inmate Guillot, Klabert was also involved in the incident. Corporal Robin observed Inmate Guillot strike Inmate Carter with an open handed strike to the facial region moments before the aforementioned incident. Upon discovery, Corporal Robin removed Inmate Gulliot from Male Holding #3. Inmate Guilliot refused medical treatment and was relocated to Male Holding #2 to deter further incident.

***Nothing further to report at this time.***

| | | | |
|---|---|---|---|
| *Signature of Reporting Officer:* 6541 Corporal Ryan Robin #6541 | | Supervisor's Signature: Date: | 1/2/2020 |
| *Date of Report:* | 12/25/2019 | *Time of Report:* | 1300 Hours |

An incident report[11] from December 31, 2019, indicates that plaintiff Guillot Jr. was involved in another assault on an individual while housed in the holding cell. According to the report, Guillot Jr. was seen by corrections staff punching another inmate in the face.

| Date of Incident: | | Time of Incident: | Location of Incident: (include dayroom, bunk area, etc) |
|---|---|---|---|
| 31 December 2019 | | Approximately 1436 Hours | Male Holding 3 |
| *If applicable* Signal: | 103F (Fight) | Responding Deputies: | Corporal Van Cavin 6531<br>Deputy William Cosban<br>Deputy Justin Thompson |

On Tuesday, December 31, 2019, at approximately 1436 hours, Corporal Van Cavin was conducting his duties as the Corporal of B-Team Support when he observed Inmate Klabert Guillot (W/M) (DOB: 04/10/1991) punch Inmate Thurlow Mayer in the face and walked away.

On January 1, 2020, plaintiff Guillot Jr. was again involved in an incident during which he claimed to have become engaged when two other individuals were fighting. Staff were called to respond to a fight in the holding cell[12]. Deputies observed Guillot Jr. bear-hugging another inmate and forcing him toward the cell door. He told the deputies that he was attempting to break up a fight. One of the inmates involved in the fight had sustained a head injury and was

---

[11] 2020_08_11_B-Team-12-31-2019.pdf

[12] 2020_08_11_C-Team-1-2-2020.pdf

losing consciousness and had to be transported to the nearest hospital. Surveillance footage showed that Guillot Jr. had tackled one of the inmates to stop him from continuing the fight.

It is also important to note that immediately after the incident, Guillot Jr. and other inmates in the area were given the opportunity to shower again and get clean uniforms because of possible blood contamination.

**<u>OPINION 4</u>: I find no evidence to support the allegation that staff did not respond to inmate-on-inmate assaults while individuals were being held in the holding cells. I did find supporting evidence which showed that staff were proactive and responsive to inmate concerns over physical safety and took appropriate measures as necessary.**

Plaintiff Louviere claimed that he allegedly received bruises to his head and face after being battered by other inmates. He claims to have not received any medical attention following these assaults.

Regarding the alleged attack on Mr. Louviere, a search was done to find any incident reports related to Mr. Louviere being assaulted by any other individual(s) at the jail. No incident reports could be located. **This leads to the conclusion that either no such incident occurred or if it did occur, Mr. Louviere failed to inform staff and did not seek medical attention.**

I reviewed other videos from the holding area which showed inmate disturbances. For instance, on January 17, 2019, a detainee in the holding area can be seen punching another detainee. This led to several deputies responding inside the holding area and removing the two involved persons. Several videos related to this event show the aggressor being moved through various jail hallways until he is escorted into the medical unit for evaluation.

The aggressor is uninjured from what I can observe on the video and does not require medical attention. Nonetheless, he is taken to the medical office for evaluation. This is one of several videos that were provided for me to review. **In all instances, the custom and practice appears to be that when corrections deputies respond to any incidents of violence, they always escort the involved parties to medical or have medical respond to the area where the injured individual might be at the time.**

The photograph[13] below is from the incident reported on December 17, 2019, and indicates a time stamp of 06:08 a.m.




In addition to checking for staff responses in getting inmates' medical attention, I also reviewed incident reports regarding events that occurred inside the holding areas. One incident report[14] that I considered described an event inside the holding area identified as Male Holding 4. In this report, it was noted that on January 4, 2020, an inmate told a deputy that another

[13] 103f 12-17-19 med.avi
[14] Unusual Occurrence Report - 2020_08_11_B-Team-1-3-2020.pdf

inmate had slapped him while they were in the holding area together. This act was not witnessed by the deputies. However, as soon as the information was shared with staff, the deputies removed the inmate and placed him in an area away from other individuals.

The inmate could only provide a physical description of the aggressor and did not know the person by name. STPJ staff then investigated this incident and reviewed CCTV recording. They identified the aggressor. Both the aggressor and the inmate who had been slapped were taken to medical for examination. This incident serves as an example that **staff proactively investigates allegations of inmate-on-inmate assaults even when such events occur outside of the view of corrections personnel.**

**OPINION 5: I find that the STPJ facility was following proper food service and handling protocols and could find no evidence to support the allegation that the food provided to individuals in the holding cells was spoiled and cold.**

I considered the issue of food service and spoke with Major Fleischman who assured me that food was prepared daily and served properly. Inmate workers were trained in food handling and service, and they were utilized in serving food to the inmates in the holding areas.

Plaintiff Guillot Sr. stated in his deposition that the food was standard and there was nothing wrong with the food being served at the jail.

It has been my experience that any issues with food service will result in inmates filing grievances and complaining about their concerns. That does not seem to be the case here as there were no grievances filed related to food service in the holding cells.

In a screenshot from a video[15] inside the holding area dated January 1, 2020, at 11:53 a.m., two inmate workers dressed in green and white are seen serving food trays and drinks to the detainees inside the holding area. A corrections deputy is also present. The two inmate workers are wearing hair nets and gloves on their hands indicating that proper food safety procedures were being followed.




**<u>OPINION 6</u>: I find that the allegations made by plaintiff Williams regarding staff depriving him of access to medical and withholding his medications is contrary to the evidence and records that I have examined. In fact, it is my opinion that Mr. Williams was provided with prompt medical attention and his allegations are without merit.**

Plaintiff Williams had alleged in his complaint that he was not provided with a medical or mental health screening until his last day in the holding cells, despite having told jail staff that

[15] uof mh2 1-1-20.avi

he needed medications for his heart and breathing. He claims that he was provided with an inhaler that was to be shared with other inmates on the fifth day of his being in custody.

When I requested a copy of Mr. Williams' medical records to investigate his claim of not receiving his medications, Major Fleischman could not locate those records because the healthcare provider during that period was a different company. However, I was informed that staff were going to search for any paper records that may exist at the jail facility. I asked about any grievances that Mr. Williams might have filed for not receiving his medications. There were several grievances filed by Mr. Williams in the past and he was aware of how to file such documents. However, **Mr. Williams filed no grievances related to his alleged complaints related to not receiving his medications while in the holding area of the jail.**

Staff at STPJ was able to locate the hard-copy medical records from the time immediately after his arrest and detention at the jail. According to the plaintiffs' complaint, Mr. Williams was reported to have been in jail since September 28, 2019. However, a medical prescreen of Mr. Williams was done on September 27, 2019, at 0955 hours. The medical records that Major Fleischman located shows the following information:

**A medical and mental health screening was completed on September 28, 2019, at 1503 hours. On September 28th, Mr. Williams was given two different inhalers. One was for his COPD[16] and another one to be used as a rescue inhaler. On the same day, he was prescribed and given oral medication for his hypertension.**

[16] Chronic Obstructive Pulmonary Disease

The following screen capture shows a section of the first page of the medical prescreen document completed on Mr. Williams on September 27, 2019. The entire document is attached as *Exhibit A* to my report.



St. Tammany Parish Sheriff's Office
Pre-Intake Screening

Arrestee: Floyd Williams D.O.B.: __/__/__
Date: 9/27/19 Time: 9:55AM Drug Allergies: ____

Reason for Evaluation:
☐ Reports a serious medical problem
☐ Inmate coming from the hospital treated for:
☐ Report MVA (24 hours)
☐ Diabetes Mellitus
☐ Suicidal Ideation
☐ Possible Pregnancy
☐ Abnormal Behavior or Altered LOC
☐ Other:

Home Medications:
Albuterol Inhaler
Breo Ellipta Inhaler

Limited Examination: (Only complete the pertinent items.)
BP- 127/82 P- 97 R- 18 Pox- 98%

General Appearance:
☒ NAD; speaks in full sentences easily w/o tachypnea
☒ Alert and oriented to person, place, and day
☐ Other:

CBG: ____ Preg Test ____
Drug Screen: ____

Disposition: ☒ Accepted ☐ Refused; referred to hospital for further evaluation/treatment

Preliminary Orders:
Hx of COPD & Asthma. No SOB and/or dyspnea reported and/or noted. Denies any chest pain and/or discomfort.

Medical Staff: [signature], LPN

The document shows that Mr. Williams informed the nurse that he suffered from COPD and asthma but denied having any chest pains or discomfort. He told the nurse about the two types of inhalers that he was using at the time. His vital signs were taken. The document continues for several pages with electronic recordings of various physical and mental health-related

questions and responses. Page 9 of the document includes a signature by Mr. Williams signed on September 28, 2019, at 3:03 p.m.



*I have answered all questions fully. I have been instructed on and received information on how to obtain/access medical services. I have been instructed on and received information on sexual assault awareness. I hereby give my consent for the facility medical provider to provide health care services and share information with health information exchanges which allows medical records, including certain alcohol and substance abuse treatment information; child abuse and neglect reports and records; sexual assault evidence and information; veterans' homes resident records; and any other health information that requires individual consent in order to be disclosed under Federal or State law.*

☐ *I do NOT consent to sharing data with external sources.*

**Patient Signature**

☑ *Sign Form* **FLOYD A WILLIAMS Date 09/28/2019 3:03:30 PM**

**OPINION 7: There is no evidence to support the allegation that individuals held in the holding cells were deprived of hygiene items, showers, and were not provided access to blankets.**

Major Fleischman informed me that the current and historical practice at the jail has been to offer blankets to everyone in the holding areas in the evening hours. These are removed in the morning and washed and sanitized. There would be no explanation for the claim that one of the plaintiffs only received a blanket at 3 a.m. There were no blankets being issued at that time of the day.

Plaintiff Hall in his deposition stated that he received hygiene items such as toilet paper, toothbrush, and deodorant but felt that it took almost 10 hours to get the requested supplies. Hall stated that he took a shower twice during the first week he was in the holding cell. He also reported having received clean clothes following the shower.

Plaintiff Baqer was asked if he was given showers and clean clothing. He responded in his deposition by stating: "*Yeah. We took a shower. I said, like three times probably, four times max, maybe a fourth time…*" He also stated that each time they took a shower, they received clean clothing.

In *Opinion 3* of this report, I provided information related to a fight in which original plaintiff Guillot Jr. was involved. At the conclusion of the incident, staff offered showers and clean clothing to address any blood contamination concerns. A section of the report is included below:

> **Detraites was checked out by medical staff and placed on a detention bench for a cool down period. Guilliot and several other inmates were given an opportunity to shower again and get clean uniforms due to being contaminated by blood. Another inmate, Mark Schilling, was checked by medical due to having the combatants fall on him during the fight. There is nothing further to report at this time.**

According to Major Fleischman, the current and historical practice at the jail has been to offer showers to individuals in the holding area three times each week. This is consistent with the department's policy *SOP.07003: IV-B-002.100. Jail Care – Plumbing Fixtures – Showers.*

Sgt. Robertson also reported that the practice at the jail was that individuals received toothpaste, toothbrushes, comb, and soap which they were allowed to keep on their person. Toilet paper was kept inside the cells and replaced as needed.

Since I was provided with numerous videos to review, I randomly sampled some of the videos from inside the holding areas and found multiple recordings showing individuals wrapped up in blankets inside the holding locations. The screen capture from a video recording dated January 1, 2020, shows several inmates wrapped up in blankets at 11:55 p.m. Several blankets can be seen on the floor and on the benches inside the holding area. Based on the

video evidence I have reviewed, **there is no indication that staff was not issuing blankets to individuals during the evening hours.**




Plaintiff Guillot Sr. stated the following about the cleanliness of the blankets he received while in the holding cell: "*I am sure they were clean when we got them. You know, they – whoever brought them in threw them out; you got them, and then they come took them off you the next morning and threw then in a basket. I'm sure they went and washed I would – I would assume.*"

Sgt. Robertson also testified that the facility performed weekly and monthly inspections. Additionally, the Louisiana Department of Corrections, the US Marshal's office, Immigration, the Louisiana Department of Health, and the Fire Marshal all conducted periodic inspections of the jail facility.

The Department of Homeland Security conducted an inspection on August 20, 2019. According to the inspection report, detainees were issued appropriate and sufficient clothing

and bedding for the climatic conditions and the facility was providing and replenishing personal hygiene items as needed.

Major Fleischman also informed me that cells were cleaned daily and more frequently as needed. Inmates would sometimes be moved from one holding cell to another so that proper cleaning could be accomplished. This is corroborated by statements made by Sergeant Lacey Robertson who confirmed that twice a day, each of the holding cells was being emptied so that they could be cleaned.

*** * * End of section * * ***

Thank you for allowing me the opportunity to work on this matter. Please let me know if you have any questions regarding my report.

Respectfully submitted,

Lenard Vare

**QUALIFICATIONS AS A CORRECTIONS CONSULTANT AND EXPERT**

My background and qualifications are set forth in the C.V. attached to this report. I highlight some of that material that I believe is particularly relevant to my review and evaluation of this case. My opinions are based in part on my training, professional experience, and education. I have more than 26 years of experience in corrections.

I have been involved in training correctional officers, conducting internal affairs investigations, and operating correctional facilities at both the local level and in a prison setting. Additionally, I have been involved in training staff in probation departments and sheriff's departments and aiding various agencies in the development of policies and procedures.

I started my career working in corrections at the Claremont Custody Center in Coalinga, California in 1992 where I worked as a correctional officer. I promoted to the position of correctional sergeant and was in-charge of managing a 450-bed medium custody prison, which was operated by the City of Coalinga under a contract with California Department of Corrections. As an officer I was also involved in the corrections officers' union and served as the president of the local chapter of PORAC (Peace Officers Research Association of California). In this role, I was involved in union negotiations and representing employees during disciplinary proceedings.

I began working for the State of Nevada, Department of Corrections (NDOC) in 1995 as a correctional officer. I worked with inmate fire crews assigned to wild-land firefighting under a contract with the Nevada Division of Forestry. I was promoted to the position of sergeant and then lieutenant and worked in multiple prisons with increasing levels of responsibility.

During my career, I conducted training on several topics including courses on Interpersonal

Communications, Use of force, Inmate Classification, and Inmate Programs. I taught various courses in corrections and inmate management at the POST academy for Nevada corrections officers. I served as SERT commander and was part of the Hostage and Crisis Negotiation team for the department. I received training from the Las Vegas Metropolitan Police Department and the National Institute of Corrections on SERT and emergency response teams. I received training in hostage negotiations and crisis management with the Federal Bureau of Investigations through the Southeastern Public Safety Institute (SEPSI). I also trained staff on ethics, professional responsibility and conduct, report writing, and managing critical incidents.

Over the course of my career with NDOC, I handled numerous emergencies in the role of facility commander. These emergencies included handling critical incidents such as fires, riots and other mass disturbances, hostage and other critical incidents, officer involved shootings, escapes, inmate assaults, major gang fights, inmate suicides and deaths in custody.

I was promoted to the role of Corrections Manager and was responsible for the operation of the only reentry facility in the State of Nevada. Subsequently, I was appointed to the position of Warden by then Governor Kenny Guinn in 2004. I managed the operations over three major institutions during my term as warden. As warden, I was ultimately responsible for the entire operations of the correctional institution. These duties included overseeing staff management, emergency operations, overseeing policies and procedures, ensuring contract compliance with program and service providers, managing the oversight of prison hospital and medical facilities, overseeing fire and life safety processes, and ensuring the proper care and custody of all inmates assigned to each of the correctional institutions.

Over the next four years, I managed a women's prison, a men's medium/maximum

institution along with a sex offender unit, and a youthful offender facility. I also oversaw the operations of three minimum custody fire camps and a regional transitional housing facility located in Las Vegas, NV. I have served on the executive team overseeing executions on death row and other specialized teams such as the investigations unit and fugitive apprehension teams.

In 2008, I moved to California after accepting a position as the Director of the Napa County Department of Corrections. Napa County is one of only two counties where the corrections function is separated from the Sheriff's office and the department head reports directly to the County Board of Supervisors. In this role, I served as the facility commander and was ultimately responsible for all facets of the running of the county jail. I also acted as the chairperson of the County Parole Board and had oversight over the disciplinary and classification process in the jail. I retired in May 2018 from Napa County.

I then began working as the Executive Director over a company that provided alternative sentencing programs, treatment and employment services for justice-involved persons, electronic monitoring, and day reporting centers under contract with various government agencies. I was promoted to the Chief Operations Officer of the parent company which was a publicly traded international organization and worked in that role until February 2020.

I have completed the Nevada Category III POST academy, the California POST (PC 832) course and the California Standards and Trainings in Corrections (STC) academy. I have attended numerous trainings in inmate management as well as attended conferences with the National Institute of Corrections, American Jail Association, American Corrections Association, and the California State Sheriff's Association. I completed my corrections training through the

San Joaquin Valley College in 1991 in Fresno, CA completing my Corrections CORE classes and earning college credits toward a criminal justice degree.

I graduated with honors with a bachelor's degree in criminal justice administration from the University of Phoenix. I was then accepted into the master's degree program with the University of Nevada, Reno and graduated with honors with a master's degree in justice management in 2010.

In my role as the department head over Napa County Department of Corrections as well as warden with the Nevada Department of Corrections, I have been involved in several lawsuits related to Religious Land Use and Institutionalized Persons Act (RLUIPA), deaths in custody, use of force, inmate medical issues, and classification and management of inmates.

I served as the Vice President of the California Jail Programs Association between 2012 and 2014 and as a board member on the Napa Valley Crime Stoppers organization. I was a past member of the International Association of Chiefs of Police during my tenure as a warden with NDOC. I am regularly involved in local criminal justice issues and attend meetings at the Board of State and Community Corrections and have served on various committees and work groups. I was formerly involved in both the Northern California Jail Manager's (NCJM) and Bay Area Jail Manager's (BAJM) Associations and regularly participated in the Detentions and Corrections Subcommittee meetings at the California Board of State and Community Corrections.

As a member of the California Jail Programs Association and through my participation in NCJM and BAJM, I attended numerous trainings and conferences involving practices and programs in various jails throughout the State of California. These trainings have allowed me to tour several facilities including San Quentin State Prison, Folsom State Prison, Los Angeles

County Jails, and jails in Sonoma County, Solano County, Alameda County, Contra Costa County, San Francisco County, Placer County, Fresno County, San Diego County, Riverside County, Orange County, Santa Cruz County, Marin County, and San Mateo County. I have participated in several training courses where agencies have described new programs and processes that they use to manage their jails and prisons.

I have also served as an instructor and trainer in criminal justice and corrections. In 2010, I began working as an Adjunct Professor at the University of Phoenix, Sacramento region and have taught over 32 courses in criminal justice. I have also guest lectured at the University of Nevada, Reno, University of Nevada, Las Vegas and Sierra College in Rocklin, CA in law enforcement and corrections related courses. I have provided department wide trainings to the Fresno County Probation Department, Fresno County Sheriff's office, and the San Joaquin Sheriff's office on issues related to realignment and changes in inmate profile within California jails.

Since 2019, I have provided training to probation agencies in Riverside, Santa Clara, Marin, San Francisco, San Mateo, Alameda, Solano, Siskiyou, San Benito, Lake, and Placer County. I have provided several training sessions on preventing jail and prison suicides to various agencies. The following is a partial list of agencies and the subject matter included in the training sessions:

May 15, 2013 – Evidence Base Practices, Demystified (8 hours) – Fresno County Probation Department.

September 11, 2013 – The Jail Inmate vs. the Prison Inmate (8 hours) – San Joaquin County Sheriff.

September 12, 2013 – The Jail Inmate vs. the Prison Inmate (8 hours) – San Joaquin County Sheriff.

October 2, 2013 – Evidence Base Practices, Demystified (8 hours) -Fresno County Probation.

October 9, 2013 – The Jail Inmate vs. the Prison Inmate (8 hours) – San Joaquin County Sheriff.

October 10, 2013 – The Jail Inmate vs. the Prison Inmate (8 hours) – San Joaquin County Sheriff.

November 25, 2013 – The Jail Inmate vs. the Prison Inmate (8 hours) – San Joaquin County Sheriff.

November 26, 2013 – The Jail Inmate vs. the Prison Inmate (8 hours) – San Joaquin County Sheriff.

February 24, 2014 – The Jail Inmate vs. the Prison Inmate (8 hours) – San Joaquin County.

February 25, 2014 – The Jail Inmate vs. the Prison Inmate (8 hours) – San Joaquin County.

March 13, 2014 – The Jail Inmate vs. the Prison Inmate (8 hours) – San Joaquin County.

March 14, 2014 – The Jail Inmate vs. the Prison Inmate (8 hours) – San Joaquin County.

June 3, 2020 – Courtroom Testimony (8 hours) – Solano County Probation.

June 17, 2020 – Strengthening Your Writing Skills (4 hours) – Marin County Probation.

August 18, 2020 – Courtroom Testimony (4 hours) – Santa Clara County Probation.

August 26, 2020 – Courtroom Testimony (4 hours) – San Francisco County Juvenile Probation.

October 28, 2020 – Courtroom Testimony (4 hours) – San Francisco County Juvenile Probation.

November 18, 2020 – Suicide Detection and Prevention in Juvenile Facilities (4 hours) – San Francisco County Juvenile Probation.

January 27, 2021 – Suicide Detection and Prevention in Juvenile Facilities (4 hours) – San Francisco County Juvenile Probation.

February 3, 2021 – Courtroom Testimony (4 hours) – Alameda County Probation.

February 10, 2021 – Courtroom Testimony (4 hours) – Santa Clara County Probation.

February 11, 2021 – Suicide Detection and Prevention in Juvenile Facilities (8 hours) – Santa Clara County Probation.

March 4, 2021 – Suicide Detection and Prevention in Juvenile Facilities (8 hours) – Riverside County Probation.

**Published Articles:**

Vare, L. (2014, November). Of Elephants and Men. American Jails, 28(5), p35 -39.

Vare, L. (2015, September). Manipulation Revisited. American Jails, 29(4), p31-36.