UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

AHMED BAQER, ET AL. NO. 2:20-cv-00980-WBV-DPC

DISTRICT JUDGE:

WENDY B. VITTER

VERSUS SECTION "D"

MAGISTRATE JUDGE:

DONNA PHILLIPS CURRAULT

ST. TAMMANY PARISH SECTION "2"

GOVERNMENT, ET AL.

VIDEOTAPED 30(b)(6) DEPOSITION OF ST. TAMMANY PARISH SHERIFF'S OFFICE, taken through its corporate representative, SERGEANT LACEY JOI KELLY ROBERTSON, AND INDIVIDUAL DEPOSITION OF SERGEANT LACEY JOI KELLY ROBERTSON, 300 BROWNSWITCH ROAD, SLIDELL, LOUISIANA 70458, taken at the LAW OFFICES OF MILLING BENSON WOODWARD, LLP, 68031 CAPITAL TRACE ROW, MANDEVILLE, LOUISIANA 70471, in the above-entitled cause on the 17th day of January, 2023.

APPEARANCES:

JACOB LITIGATION, INC.
BY: DEVON M. JACOB, ESQ.
P.O. BOX 837
MECHANICSBURG, PENNSYLVANIA 17055-0837
(717) 796-7733
djacob@jacoblitigation.com
ATTORNEY REPRESENTING PLAINTIFFS

ROMANUCCI & BLANDIN, LLC
BY: SAM A. HARTON, ESQ.
321 N. CLARK STREET
CHICAGO, ILLINOIS 60654
(312) 253-8590
sharton@rblaw.net
ATTORNEY REPRESENTING PLAINTIFFS

APPEARANCES: (Continued)

MILLING BENSON WOODWARD, LLP
BY: CHADWICK W. COLLINGS, ESQ.
68031 CAPITAL TRACE ROW
MANDEVILLE, LOUISIANA 70471
(985) 292-2000
ccollings@millinglaw.com

ATTORNEY REPRESENTING DEFENDANT,
ST. TAMMANY PARISH SHERIFF'S OFFICE

I N D E X


| | PAGE: |
|---|---|
| Caption | 1 |
| Appearances | 2, 3 |
| Agreement of Counsel | 5 |
| Witness' Certificate | 214 |
| Reporter's Certificate | 215 |


E X A M I N A T I O N


| BY: | PAGE: |
|---|---|
| Mr. Jacob | 7, 196, 212 |
| Mr. Collings | 188, 212 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE: |
|---|---|---|
| Exhibit 1 | Notice of Video Deposition | 188 |
| Exhibit 2 | Document Production | 188 |


REPORTED BY:

ANNA M. ROTH, RPR, CCR

CERTIFIED COURT REPORTER

S T I P U L A T I O N

IT IS HEREBY STIPULATED AND AGREED by and among counsel for the parties hereto that the videotaped deposition of ST. TAMMANY PARISH SHERIFF'S OFFICE, through its corporate representative, SERGEANT LACEY JOI KELLY ROBERTSON, and individual deposition of SERGEANT LACEY JOI KELLY ROBERTSON, is hereby being taken under the Federal Rules of Civil Procedure, for trial purposes, in accordance with law;

That the formalities of sealing, certification, and filing are specifically waived;

That the formality of reading and signing is specifically not waived;

That all objections, save those as to form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * *

ANNA M. ROTH, Certified Court Reporter, in and for the Parish of St. Tammany, State of Louisiana, officiated in administering the oath to the witness.

ST. TAMMANY PARISH SHERIFF'S OFFICE, through its corporate representative, SERGEANT LACEY JOI KELLY ROBERTSON, AND INDIVIDUAL DEPOSITION OF SERGEANT LACEY JOI KELLY ROBERTSON, 300 BROWNSWITCH ROAD, SLIDELL, LOUISIANA 70458, after having first been duly sworn by the above-mentioned Court Reporter, did testify as follows:

MR. COLLINGS:

Can I just say one thing on the record first?

MR. JACOB:

Sure.

MR. COLLINGS:

I understand counsel is videotaping the deposition himself. I've never researched this. I assume it's permissible. But to the extent it's not, I need to lodge an objection. I'm going to lodge an objection to a video deposition taken by counsel of record and not a certified videographer. But with that --

MR. JACOB:

Sounds good.

MR. COLLINGS:

-- on the record, --

MR. JACOB:

All righty.

MR. COLLINGS:

-- please begin.

MR. JACOB:

All right. Let me just let this sign in. I thought it was signed in.

EXAMINATION BY MR. JACOB:

Q. Can you state your full name for the record?

A. Yes. Lacey Joi Kelly Robertson.

Q. Okay. And you're here for the video deposition of the St. Tammany Parish Sheriff's Office; is that correct?

A. That's correct.

Q. And it is very clear -- I was going to say, have you prepared for today's deposition, but I think that's pretty evident that you've prepared for today's deposition.

So you're here to answer questions that would bind the entity itself, meaning I'm not asking for your personal knowledge, even though that may be the case, but rather I'm

asking for the knowledge of the entity. You understand that, correct?

A. Correct.

Q. So when you answer a question here today, I'm going to assume that it's not you personally answering but rather the entity itself. Okay?

A. Okay.

Q. All right. The court reporter has two hands, but it's not one for you, one for me. So I'm going to do my best to let you finish your answers before I begin my question, but I'm going to ask you to do the same. Even if you can guess where I'm going, just do your best to let me get the question out. That way it can be taken down on the record before you begin your answer. Okay?

A. Okay.

Q. All right. If you need a break for any reason -- I'm going to think with all this you're probably going to need a break at some point. Sometimes I get going, and then I don't stop. So just let me know that you need a break. I'll be more than happy to accommodate. And you don't even have to tell me the reason why. Just

say, "Hey, you know, can we have a break?" But I'm just going to ask that if there's a question pending, that you answer the question that is pending before we take the break. Is that okay?
A. Yes.
Q. All right. Okay. Since you are the representative, what is your position with the agency?
A. I am a sergeant.
Q. And how long have you been in that capacity?
A. About two-and-a-half years.
Q. And so for the years 2019, 2020, were you also employed by the entity?
A. Yes.
Q. And in what capacity were you employed during those years?
A. I was a major, which was the warden over the corrections division.
Q. Okay. So I don't know the hierarchy over there. So the position that you're in now, is that a step up from where you were in 2019 and '20?
A. No. It's a lower rank.
Q. Okay. And the reason for the

switch?

A. I don't know. We are a paramilitary organization, so we work at the pleasure of the sheriff. So periodically they reorganize and we work where --

Q. Where you're told to work?

A. -- they tell us to work.

Q. Fair enough. Was there any investigation that resulted in that or any disciplinary matter, or was this just an administrative move as far as you're concerned?

A. No. There was no disciplinary action or anything of that nature.

Q. Okay. So what position during the years 2019 and '20 -- unless I ask otherwise, those are the years I'm referring to.

A. Sure.

Q. What position did Randy Smith hold?

A. Sheriff.

Q. And then what position did Greg Long -- is it Longino?

A. Longino.

Q. Longino hold?

A. He was the deputy chief over corrections and vehicle maintenance.

Q. And as a deputy chief over corrections, what were his duties and responsibilities?
A. To oversee everything that happened within the corrections division.
Q. Okay. And when you say, "oversee everything that happens in the corrections division," can you give me an example of what that would entail or encompass?
A. Basically, making sure that I was doing my job and that the jail was performing the way it was supposed to and running the way it was supposed to as far as budget, operations, staffing, things like that.
Q. So is that an administrative position as opposed to being back at the cells and, you know, overseeing guards?
A. Yes, sir. It's administrative.
Q. And then the position that you were in during that time, what were your duties and responsibilities?
A. Similarly. His, obviously, were on a larger scale. Mine was more administrative. Not boots on the ground with people doing the day-to-day operations but similar things like

budget, staffing, making sure we were in compliance with, you know, standards and things of that nature.

Q. Okay. During the years 2019, '20, who would have the policy-making authority for the entity?

A. The sheriff.

Q. And is there anybody else that is involved or who has delegated responsibility with respect to policy making?

A. He has sole responsibility.

Q. And while he has sole responsibility, do you know if he delegated some of that responsibility to others, either in whole or in part?

A. I don't know.

Q. And in regards to whether he delegated, do you know if there was anybody who ever shared in that responsibility, that he said, "Hey, listen, you're going to be able to make decisions on this project"?

A. Not in -- I don't think -- I don't believe so.

Q. So if there is an official policy of the sheriff's agency -- is it agency or office?

I guess it's office, right?

A. Sheriff's office.

Q. Okay. So if there is a policy, an official policy of the office during that period of time, it is because the sheriff signed off on it?

A. Correct.

Q. Is there anybody who has the authority to overrule the sheriff with respect to policy making?

A. No.

Q. So is it basically if the sheriff says it, that's the way it's going to be?

A. I guess so.

Q. Okay. I mean, you're not aware of any either entity, person, board, anybody who can say, "No, Sheriff, you can't do that," and veto what he wants to do?

A. No, sir.

Q. You're familiar, I'm going to assume, with the holding cells at the St. Tammany Parish Jail?

A. Yes.

Q. And can you explain how their design would differ from just a normal general

population cell?
A. Sure. They're smaller. They're designed for temporary housing until someone is placed in a normal housing unit, which would have beds, showers readily available for them to just walk into, TVs, multiple phones. Obviously, larger housing, flooring space, tables, things like that.
Q. Okay. Now, I know some of that, I'm going to assume, that you mentioned is not directly inside the general population cells, correct?
A. It is, yes, sir.
Q. Oh, it all is?
A. Yes.
Q. Okay. So inside a general population cell there's a telephone and a TV?
A. Yes, sir.
Q. It's not another room that the inmate has to go to?
A. Correct.
Q. Roughly, how big then is a general population cell?
A. I wouldn't -- I wouldn't know right off the bat.

Q. Okay. Now, you mentioned that the holding cells, though, are different?
A. (Nods head affirmatively.)
Q. They're temporary, correct?
A. Correct.
Q. When you say, "temporary," what do you mean by "temporary"?
A. The people in holding are housed there until they can either be transitioned into a general population housing unit or until they bond out or are released per court documents or by the agency that is detaining them.
Q. Okay. So a hypothetical, just so I understand, if somebody comes in, they haven't bonded out yet, but you don't know when they're going to bond out, how do you know, as an office, when it's time to move them back to general pop?
A. When a bed becomes available based on the date they were booked into the facility.
Q. Okay. Now, based on the date when they were booked into the facility, explain that to me. How does that control the time?
A. Because you want the person that has been waiting, I guess, the longest, so to speak, gets the bed first.

Q. Okay. That's makes sense. So it's not that they're in the holding cell for a certain amount of time, and the deadline hits, and then they got to move. You're just saying priority-wise, whoever is there the longest gets the bed?

A. Correct.

Q. Is there a difference in how the holding cell is constructed or organized since it's only going to be short-term confinement as opposed to long-term confinement?

A. I think I just kind of went over that when I described the differences in general population and the cell.

Q. Okay.

A. Unless I'm not understanding what you're asking.

Q. Okay. Yeah. Let me ask it a little differently then. You told us what the differences are between the two. But tell me what is in a holding cell?

A. Okay. So there's benches, and then there's a toilet with an incorporated sink. There's phones that they can access. And that's it.

Q. So there is a phone in the holding cell?
A. Yes. There are multiple phones in each holding cell.
Q. Okay. And those phones in the holding cell, do they go directly to an outside line?
A. They have to -- they can get a free call to set up an account with the vendor, and then from there they can make the calls to whoever they need to based on whatever the vendor sets up with them.
Q. And then how does that work? Are they limited to how many calls, or is it just whatever they can afford basically?
A. It's set up with the family or the friend.
Q. Okay. The size of the holding cell, do you know what that is?
A. Approximately, 12-by-22 feet.
Q. And there's more than one holding cell; am I correct?
A. Correct.
Q. I think there's four?
A. Yes, sir.

Q. And are the four holding cells all in the same area?
A. Yes.
Q. And with respect to the four cells, how do you decide who goes into what cell of the four?
A. There can be several factors. We look at -- or they look at how many people are already in a cell, if someone has enemies, physical stature, needs of an inmate or an offender, things like that.
Q. Needs being?
A. Like I was saying, if he's smaller stature. If he maybe is larger or has more violent offenses, he may want to be -- you may want to keep him somewhere where he's -- everything is in view but closer view to the supervisor on duty so he's in direct sight, line of sight, if that makes sense.
Q. That does. No, I appreciate that.
The benches that you mentioned, are -- does each cell have the exact same setup for the holding cells?
A. Yes, sir.
Q. And how many benches are in there?

A. There's two, one on each side of the cell.
Q. And what are they constructed of?
A. Concrete.
Q. And is there any padding on these benches?
A. No.
Q. Is there any -- I don't know if you've seen them, but they can -- they're sort of made into a mold, so they, you know, have curves for sitting, or is it just a block?
A. No. They're flat.
Q. Okay. And then the floor, what is the floor of the holding cell made of?
A. Concrete.
Q. And are there any drains?
A. Yes.
Q. And is there anything else on the floor?
A. No.
Q. I'm sorry. That was a terrible question on my part.
I mean, as far as construct, is there anything other than cement and the drains?
A. I mean, the toilet unit that I was

describing before, obviously, sits on top.

Q. Okay. Is there any privacy with respect to how the toilet is situated?

A. There's a partition at the end of one of the benches. Depending on which side of the cell the toilet is sitting on, there's a small partition between the toilet and the bench.

Q. And then how tall is that partition?

A. I'm not exactly sure on the height.

Q. But if you're sitting on the toilet, can you still see out the cell, or would it be at least above head level?

A. I would say probably in most cases they would be able to see out of the cell.

Q. And if you're sitting on the toilet, would your -- would the partition come out at least enough to block view of your knees?

A. Yes. I believe so. It's been a little while, so --

Q. Sure. No worries. How about the walls of the cell? How are -- what are they constructed of?

A. Concrete block.

Q. And is there any paint on them?

A. Yes, sir.

Q. And is there anything affixed to the walls other than, I guess, the benches, correct?
A. Benches, yes. But the telephones are also affixed to the wall.
Q. And those telephones are --
A. Excuse me.
Q. Yeah, sure -- are they telephones that have cords attached to them?
A. Yes, sir, they do.
Q. And other than the telephones, the benches, and, I guess, the sink, toilet, is that attached to the wall, too?
A. Yes.
Q. Anything else attached to the walls?
A. No.
Q. And then I'm going to assume that one side of the cell is bars?
A. No. There's no bars in the holding cells.
Q. I'm glad I asked. Okay. Tell me about the -- I guess, you would call it the front of the cell. What is that wall constructed of?
A. So about halfway up is concrete block, and then the rest of -- most of the rest of the way up is window that sees out into the

intake area where staff can see in, and the offenders can see out.

Q. And the window, I'm assuming it's something that's indestructible or relatively indestructible?

A. I wouldn't say indestructible, but tough. A double-pane glass.

Q. And you're saying so it's about half block, and then the other half the window?

A. Yes.

Q. And then how about the doorway? What is -- how is that constructed?

A. So it's a steel door with a large window about probably a little more than halfway down, from top to bottom -- downwards towards the bottom.

Q. So the door window would be taller than the wall window? Would that be accurate?

A. Taller than --

Q. Meaning it goes -- it's closer to the ground?

A. They're probably pretty close in size or in height.

Q. Okay. So three walls are block all the way, floor to ceiling, correct?

A. With the exception of the back wall, there are windows, small, narrow windows that go across the back wall that see to the outside.

Q. And what -- approximate, what level are those windows? Are they ceiling level or are they --

A. Close to the ceiling.

Q. So when you say, "see to the outside," it's not that the inmate can actually see outside? They can just see light coming in from the outside? Would that be correct?

A. I mean, they can see the sky or light coming in.

Q. Okay. But they can't see out and see trees and --

A. Correct. It's not eye level.

Q. Okay. And then how about the ceiling? What is the ceiling constructed of?

A. I can't remember the name of the material, but it's some sort of fiberglass-type -- not fiberglass. That's not right. It's not a concrete material.

Q. Is it like a drop ceiling-type thing?

A. It's not a drop ceiling. I don't --

I can't recall at this time the material that it's made out of.

Q. And then what type of lighting is in the cell, if there is any?

A. Yeah, there is lighting. It's the -- I think at that time maybe we had switched to LED. I can't remember at what point those got swapped out.

Q. Okay. And how many lights do you think are in the cell or were in the cell at that time?

A. I can't remember.

Q. When the lights are on, though, is it bright like a normal office-type setting or --

A. Yes.

Q. Okay. So it's not a dimly lit area?

A. Correct.

Q. And the inmates can't choose when to turn on or off that light, correct?

A. Correct.

Q. That's controlled by the staff?

A. No. Those lights are not turned off or on. Sorry. They're on all the time. They can't be turned off. We don't turn them off.

Q. I see. So the cell is lit up the

entire day?
A. Correct.
Q. 24/7?
A. Yes, sir.
Q. So if you need to sleep, you're sleeping in the light?
A. Yes.
Q. With respect to the temperature in the cell, how is -- air circulation, purification, how does all that work?
A. So the temperature was kept at about 68 to 69 degrees. And the maintenance division has the controls. It's not like the staff could just walk over and change the temperature whenever they felt like it.
Q. And is there something that logs the temperature? So if somebody said, "Hey, I want to see what the temperature was at 11 o'clock on such and such a day," is there a computer that someone can log in to to see that?
A. Maintenance may have a mechanism for that. I'm not entirely sure.
Q. And when you say it's 68, 69 degrees, is that by policy or --
A. It's more of a practice. If it gets

too much warmer than that, condensation starts to build throughout the facility, not just in the holding area, which, obviously, causes windows to fog and floors to get slick and causes safety issues for everybody.

Q. Do we know why the condensation forms at that temperature?

A. Just I think because of the sheer setup and population of the facility. There's a lot of bodies in the facility, staff and offenders.

Q. So there's no dehumidification that takes place?

A. Not as far as I know when the temperature gets that high.

Q. How about as far as fresh air? Does any fresh air get into the cell, meaning from outside the building?

A. Into the holding cell?

Q. Yes.

A. No, sir.

Q. Meaning the windows, for instance, they're never opened?

A. No, sir. They don't open.

Q. There's no vent to the outside?

A. No.
Q. And from what you've described, you have pretty much a sealed cell. So how does air go between the inside of the cell and the rest of the facility?
A. Through the vent system.
Q. So there is air returns and air vents going into that cell?
A. Yes, sir.
Q. You mentioned that the holding cells are for -- I don't want to put your words in your mouth -- temporary -- did you say, "temporary holding"?
A. Temporary housing, yes.
Q. Temporary housing. I'm sorry. See, I didn't want to put words in your mouth.
How long does an inmate stay -- during those years, stay in those cells?
A. It's hard to say. We try to get them out of there as soon as we can into a bed. But if there's not a bed to put them in, then, like I said, we try to facilitate as quickly as we could either getting them out of the facility, you know, per the Court's order or whatever, or getting them into a bed. But there's no way to

say "X," "Y," "Z" this time -- in this time frame.

Q. Was there a policy in place that governed how long an inmate is to stay or not stay in the holding cell?

A. So we have a policy that says we're going to watch an offender for the first 72 hours because that's when they're most at risk. But specifically to say they're going to stay in holding "X" number of hours, no, sir, there's not.

Q. Is there any policy that limits the amount of time that they're to be in the holding area?

A. No.

Q. With respect to the general population cells -- and I know we had talked about the lighting in the holding cells always staying on. How about the general pop area?

A. Yes. Those are able to be turned off.

Q. Those are able to be turned off. And are they turned off?

A. Yes, sir.

Q. And when are they turned off?

A. 10:30.
Q. And when do they turn back on?
A. 6 o'clock.
Q. Why is that?
A. Why are they turned back on?
Q. No. Why do they turn off and back on?
A. I would -- because they need to rest -- excuse me.
Q. Sure.
A. Sorry. So they can rest and recoup for the next day.
Q. But why do they need to do that, I guess?
A. I suppose everybody has their own reason.
Q. How is it determined, though, that the lights will turn off in general pop at a certain time?
A. Well, that was -- that's always been the practice in that facility as long as I was there, is that they got turned off at 10:30.
Q. I see. So it was recognized that inmates need some time to sleep overnight, correct?

A. Yes.
Q. And that's on a daily basis?
A. Yes.
Q. Did anyone ever -- actually, let me ask something else.
With respect to the amount of time that the lights are off in the general population, how is that amount of time determined?
A. I'm not sure how that was determined.
Q. So it's about eight hours off; is that correct?
A. Yes.
Q. Okay. Now, how about the inmates who are in the holding cell and they want to sleep, where do they sleep?
A. They sleep on the bench or on the floor.
Q. On the cement bench?
A. Yes.
Q. And how wide is this bench?
A. I'm not sure what the dimensions are.
Q. Roughly, if you had to guess? I

mean, is it 10-feet wide, or is it 1-foot wide?

A. It's -- I don't know the dimensions.

Q. All right. But you would agree with me, though, that if I asked, "Is this table 1-inch long," you could give me an educated guess that it's not 1-inch long, correct?

A. Correct. Yes.

Q. All right. So can you give me -- realizing that it's an educated guess, can you give me an idea of how big the benches are?

A. I don't know the length. I do know that if someone's laying on it, it's normally wider than a body, a normal body, --

Q. Okay.

A. -- if that helps.

Q. All right. And can the -- I mean, have you ever seen anybody roll off one of these benches?

A. No.

Q. But could you put two people side by side on these benches?

A. Possibly.

Q. Okay. Meaning, you know, laying length-wise, you think you could have two bodies on their backs laying next to each other?

A. Yes. Possibly.
Q. Possibly. What type of bedding, if any, is provided to inmates in the holding cell?
A. They're given blankets.
Q. And when you say, "blankets," each inmate is given one?
A. Correct.
Q. And are they given more than one?
A. No.
Q. And are they given a pillow?
A. No.
Q. Are they given a pad?
A. No.
Q. So it is -- it is basically their body, their clothing, the blanket, and the cement?
A. Correct.
Q. Now, you mentioned moisture in the cells over a certain temperature. Do you know if the concrete block benches remain dry?
A. To my knowledge, they were dry.
Q. In 2019, 2020, was there a policy that dictated how the holding cells were to be used?
A. Like I described before, we have the

policy where we monitor them for the first 72 hours. Again, it doesn't speak specifically to the holding cell. But that is where they're monitored for those 72 hours.

Q. Okay. So that's a monitoring policy. It says how they're going to be monitored, correct?

A. Correct.

Q. But with respect to the holding cell, was there any policy in place saying, "We have four holding cells, and they are to be used as follows"?

A. No, sir.

Q. Why was there no policy to that effect?

A. I can't speak for that.

Q. Was there any policy explaining how the general population cells are to be used?

A. We had a policy to explain how to assign people to those beds and things of that nature.

Q. So there was a policy that explained the purpose for the general pop cells?

A. Yes.

Q. And there is no policy that

explained the purpose of the holding cells.
Would that be a correct statement?

A. Correct.

Q. And so then in that respect, am I also correct, then, that the persons working back in the holding area would be left to determine how those holding cells are going to be used?

A. No. There's systems in place -- systems and practices that take place every day. They just don't walk in and decide on their own that they're going to do whatever they feel like doing on a given day.

Q. Well, I'm not -- I'm not saying that. You know, I mean, obviously, they know what time to take lunch, they know what time --

A. Okay.

Q. -- you know, they know to lock the doors at a certain time.

What I'm saying is the purpose of the holding cell, though, it's -- there's nothing that's saying you can use the holding cell for this, that, and the other thing, correct?

A. Correct.

Q. Okay. So because there's no policy that says you can use the holding cell for this,

that, and the other thing, it's for the guards who are working at the time to figure that out; is that correct?

A. I would say yes.

Q. Okay. What is the -- what is the purpose of a policy, just generally? What is the reason for policies?

A. So that there is a -- something in place so that people know what needs to be done and how it needs to be done.

Q. And why is it that agencies need policies?

A. Well, for the reasons I just stated, and, you know, to protect not just the agency but the individuals they're dealing with.

Q. So, for instance, in this situation, a policy would protect the agency, correct?

A. Yes.

Q. A policy would protect the persons working in the holding area, correct?

A. Yes.

Q. And a policy would protect the persons being served by the agency, in this case, the customers, the inmates?

A. Yes.

Q. And when there is no policy, then there's no guidance; is that correct?
A. I wouldn't say there's no guidance. Because you have a management staff that, you know, lets the deputies know, you know, we need to work within this realm. This is what's appropriate, and this is what's not, even though there is no policy.
Q. I see. So if I, a new corrections officer, comes back and says, "Can you explain the range of uses for this cell," to my supervisor, what is my supervisor going to look to to provide me with that information?
A. Their -- the way they -- their level of training and their work experience.
Q. So hand-me-down knowledge?
A. I would call it work experience and training.
Q. So just whatever happened previously, that's now the experience, and that's what you're to follow?
A. Yes.
Q. Okay. We talked about the issue of whether there was a policy regarding how the holding cell is to be used, and you indicated

that there was not during that period of time. Was there any other document, though, maybe -- maybe an inmate handbook or something that would have discussed that?

A. No.

Q. Where -- I mean, I'm looking at these books, and I'm assuming there's a lot of policies in them. Where does the St. Tammany Parish Jail keep the policies?

A. They're on a -- an electronic drive on the server.

Q. And let's say I'm working back in holding. I, as the employee, do I have direct access to the policies?

A. Yes.

Q. And where would I -- is it back at a desk or something?

A. There are computers throughout the facility in every work area, and everybody has a log-on to the system, so they can log on in any workspace.

Q. I see. The physical requirements of the holding cells themselves, is there a policy that dictates the -- for instance, the minimum size of the cell?

A. No. There's no policy. No. There's no policy.

Q. Is there a standard in the industry that, for instance, the sheriff would look to to say, "Okay. Standard 'X,' 'Y,' 'Z' says we're allowed to have a 40-by-40 cell"?

A. There's -- there are standards depending on the age of your facility and things like that.

Q. Okay.

A. And the -- yeah.

Q. Do you know what standards would have governed in 2019 and '20?

A. I'm not sure. That would have been something that the architect would know, what the industry standard was for the design.

Q. I see. And then setting design aside, are there standards for -- like we were talking about, for uses of a holding cell that were in place at that time?

A. Again, it was for temporary holding purposes until they could be assigned to general population.

Q. And so if, for instance, the general population beds were filled, then somebody would

stay in holding?

A. Correct.

Q. And let's say they're filled for a year, I mean, conceivably, could somebody stay in holding for a year?

A. I've not seen that, but I suppose anything is possible.

Q. Okay. Meaning there's no policy that says, "No, you can't do that"?

A. Correct.

Q. So temporary could mean a year because there's nothing defining temporary; is that correct?

A. Correct. Again, it has never happened but --

Q. Understood. But there's -- but there's nothing that said -- there's no written policy, there's no directive from the sheriff that says, "Temporary, in our office, means no more than three days"?

A. That's correct.

Q. And so if guards or employees put somebody in a holding cell for two weeks, they cannot be disciplined because they're not violating any policy; is that correct?

A. Correct.

Q. During the years 2019 and '20, how much unencumbered floor space was provided for each detainee in the holding cell?

A. That's not something that we would know. There wasn't anything that was set up or in writing with regard to that.

Q. Meaning there was no directive or policy from the sheriff that said, "Listen, you can put people in holding cells temporarily, but each inmate needs to at least have 3 square feet"?

A. No, sir.

Q. So, again, if a guard put 30 people in a holding cell, they're not violating any office policy, correct?

A. Correct. We wouldn't set occupancy anyway. The fire marshal does that.

Q. Well, am I correct, the fire marshal sets maximum capacity for fire safety?

A. That's correct.

Q. But doesn't necessarily set maximum capacity for 24-hour living?

A. It's my understanding, my appreciation, that they set the capacity based on

the size of the area and what amenities are in that area.

Q. So, for instance, the fire marshal may say, "At any given time, you can put a hundred people in this room," but that doesn't mean that the room is really built for a hundred people. Would you agree with me?

A. That's not my understanding of it.

Q. I guess what I'm saying is, this is a room that can -- the room that we're sitting in, let's just say, that the fire marshal could come in and say, "You can put a hundred people in here, no more, or I'm going to empty your building." But if I wanted to use this room for the hundred people to sleep, even though the fire marshal would say I can have up to a hundred people in here, I think you and I would agree, a hundred people sleeping in here might get a little uncomfortable?

MR. COLLINGS:

Object to the form.

Answer.

THE WITNESS:

I didn't understand that.

MR. COLLINGS:

I sometimes have to make an objection on the record as to the form of the question, but unless I instruct you not to answer it, then try to give the best answer you can to the question on the table. Okay?

THE WITNESS:

Okay.

MR. COLLINGS:

I just made an objection to the form. That's all.

THE WITNESS:

Okay.

So now can you repeat that all? I'm sorry.

BY MR. JACOB:

Q. Sure. I guess what I'm saying is --

(OFF RECORD.)

BY MR. JACOB:

Q. I guess what I'm saying is, if the -- let's say the fire marshal comes in and says, "300 people can occupy this room safely." The fire marshal isn't saying, "But 300 people can also sleep in here comfortably"?

A. Correct. In that respect, he's not

setting the capacity for what the room is being used for.

Q. Right.

A. Does that make sense?

Q. Yes. He's setting it for fire safety at any given moment. Would that be a correct statement?

A. He's setting the capacity. He's telling us how many people can be in that area, whether it's the holding cell or a general population living area.

Q. Fair enough. And then it's for you, the agency, to determine whether, based on the particular use, you can go to max capacity. Would that be fair?

A. Yes.

Q. Okay. Do you know what the fire marshal set the max capacity to be in the holding cell area?

A. Yes. 20 people per cell.

Q. 20 people per cell?

A. Yes, sir.

Q. So then would you agree with me that at times the jail was violating the fire marshal's max capacity?

A. Yes.
Q. And why?
A. Well, because we cannot turn people away without proper documents. That's not the function of the agency or the sheriff. So if people are being brought to jail, we have a responsibility, and we have to detain them. So unless they bond out or unless a bed becomes available, they stay in that area until one of those two things can happen.
Q. I see. So did the sheriff ever write to the fire marshal and explain to him that he doesn't care what the max capacity is, that he'll put however many he wants in his facility at any given time?
A. I don't believe that something like that ever happened.
Q. Is the fire marshal aware that that was happening?
A. There were times when the fire marshal would come in and inspect, and there would be -- he would find deficiencies in the capacity.
Q. And then what would happen?
A. We would do -- we were always

working on relieving the overcrowding issue.

Q. But when the fire marshal came in and said, "You have 25" -- just a hypothet. I'm not saying he did this -- but, "You have 25 people in the cell. I told you 20. You need to move five," did five get moved?

A. We would work towards moving however many needed to be moved.

Q. But did they get moved?

A. Without having a specific date, time of that deficiency, I couldn't speak specifically to that situation.

Q. But I think you would agree with me, you can say that there were times that even when the fire marshal said, "You can't do that," you still did that?

A. Was over capacity?

Q. When the fire marshal said, "You can't have this many people in this cell," there were times that when the fire marshal left, you guys continued to have that many people in the cell?

A. Probably, yes, sir.

Q. Okay. And you would agree with me, and I think you just said, that the fire

marshal's directive was for safety reasons?
A. Yes.
Q. So then you would agree with me that by violating the fire marshal's directive, the jail was intentionally placing inmates in danger?
A. I think that there's -- again, because we can't -- we don't have the authority to release. We don't have a -- we're not being punitive or malicious in our intent, but we cannot just release people to the streets. We have to detain them.
Q. So, again, so when the fire marshal said, "No more than 20," and the office put more than 20, you would agree with me that the office was knowingly placing inmates in danger?
A. We knowingly were over our capacity, yes.
Q. And since the capacity is for safety purposes, you would agree with me then that the office was knowingly placing inmates in danger?
A. It could potentially cause issues, yes, sir.
Q. So, again, not issues. The capacity you already told me was for safety, correct?
A. Yes.

Q. And so when the office was intentionally placing inmates in the cells over the maximum capacity, the office was intentionally placing those inmates in danger?

A. I disagree with that. I don't think we were purposely placing people in a position to be harmed.

Q. Okay. So you knew it was unsafe to do it, correct?

MR. COLLINGS:

Object to the form.

THE WITNESS:

We knew we were over capacity, yes.

BY MR. JACOB:

Q. And you put the inmates in there anyway, correct?

A. Yes.

Q. And you knew that that was an unsafe practice according to the fire marshal, correct?

A. Yes.

Q. Okay. What special precautions were taken to increase the safety for the inmates that were being placed in cells at a number that was deemed to be unsafe by the fire marshal?

A. So that was a process that we did

every day starting at the beginning of the day. As far as if there was movement that could be done within the facility, if we could get in touch with the courts to help get bonds lowered or facilitated, get people who were serving nonsupport or drug court sanctions, get them out. If there were people that had parish jail sentences, credit them early time served so that we could open up beds and get that movement facilitated. That was a daily -- a daily function.

Q. And just to rewind a little bit. Because, again, I just don't know, you know, about the jail. What type of inmates are brought in? Meaning are they all county inmates?

A. No. We have -- we house parish inmates, Department of Corrections' inmates, and U.S. Marshal prisoners.

Q. And how is it then -- I mean, if you're a county -- or excuse me -- if you're a parish -- I forget you guys have parishes down here. I'm so sorry.

MR. COLLINGS:

We know what you mean.

MR. JACOB:

Sorry about that.

BY MR. JACOB:

Q. If you're a -- if you're a parish facility, you have to take the parish detainees, correct?

A. Yes.

Q. How is it, though, that the parish facility ends up taking Department of Corrections and the federal inmates?

A. There's a contract.

Q. I see. And so how is it, though, that the contract came to be? Meaning why? Why is there a contract?

A. That, I couldn't speak to the specifics of why. Again, that's something that has always been in place.

Q. Is that because the Department of Corrections needs places to house their inmates?

A. Yes. We serve as a hub for reentry to do rehabilitative services for seven parishes, I believe.

Q. Oh, wow. Okay.

A. So they come, and we facilitate those services before we send them back out.

Q. And so when those inmates come

through the rehabilitative services, are they in general pop?

A. They're in a DOC general population housing unit.

Q. So you -- "you" being the office -- there are different parts of the facility dedicated for the different classifications of inmates as far as parish, DOC, federal?

A. Correct.

Q. Are they ever mixed?

A. Once in a while there may be a DOC inmate with a -- like in a pretrial bed, like if he goes to court that day and gets a DOC sentence. And that's part of the process when we're trying to open up beds. We run that report, find out that he went to court that day, got sentenced to DOC time, so we would move him out of that pretrial bed into a DOC bed to open that bed up for somebody in holding.

Q. So how is it determined the limit that DOC can send to you?

A. By the amount of beds we have available.

Q. Meaning you don't have to take the DOC inmates, correct? You contracted to take

them?

A. Correct.

Q. And you don't have to take the federal inmates? You contracted to take them?

A. Correct.

Q. And is there any limit on the number that they are permitted to send?

A. I can't remember the limit on the marshal prisoners. But, again, it's based on the housing units that's -- excuse me -- the housing units that they're assigned to, the bed availability.

Q. But, for instance, if the DOC calls you and says, "We have five inmates we want you to house," you, as a facility, can say, "No"?

A. We can, yes.

Q. Okay. But when you were at overcapacity, you didn't, correct?

A. Correct.

Q. So even though you could have turned away the DOC and the federal inmates, you permitted the facility to become overcapacitated, and people sat in holding because there weren't beds available, correct?

A. Correct.

Q. And the reason is because you got -- the facility got paid for those DOC and federal inmates, correct?
A. Yes, the facility does get paid for those.
Q. And, in fact, when your budget is tight, that's a good source of revenue, correct?
A. Yes.
Q. So while you could have treated the parish inmates better in the sense of giving them an open bed, you gave their beds away to people that you could get money for; is that correct?
A. There were beds dedicated to other agencies, yes.
Q. Okay. So, for instance, when the fire marshal said, "Hey, you can't have 25 people in here," you guys put 25 people in because you could use those beds and make money from them, correct?
A. Those beds were already full.
Q. Okay. But you could have sent them back to DOC, could you not?
A. We could, I suppose. Again, without knowing the specifics in times of when that happened, without being able to go back and look

at what was going on at that particular point in time, but I suppose that, yes, that could be an alternative.

Q. Well, actually, not suppose. You actually could call DOC and say, "You got to get your inmates out of here because we need -- we're at overcapacity as far as what the fire marshal said," correct?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Yes.

BY MR. JACOB:

Q. And the reason that that didn't occur is because you got paid daily for those DOC and federal inmates, correct?

A. Yes.

MR. COLLINGS:

Object to the form.

BY MR. JACOB:

Q. Is that correct?

A. Yes.

Q. All right.

A. Can I take a quick break real quick?

Q. Just one more question, and then

yes.

A. Okay.

Q. And you didn't get paid for the parish inmates that you're housing; is that correct?

A. The -- correct.

MR. JACOB:

Okay. Yeah. Let's take a break.

(Brief recess was taken.)

MR. COLLINGS:

So I think the question that was posed to the witness was beyond the scope of the notice. And I just had a discussion with her outside in the next room. I just want -- we can bring someone for finance if you want to get into the accounting issues of how the sheriff gets paid from various sources for different types of inmates.

I will tell you that the parish -- I know from first-hand experience, the parish does pay the sheriff for pretrial detainees. Okay? And the way that's happened has changed because of a tax that's no longer collected. But that

system has not changed in many years.
So I just don't want her to have something on the record that's arguably incorrect. But I think, again, it's not part of the notice, so she wasn't prepared for it. I just wanted to make that clear the best I can.
BY MR. JACOB:
Q. Okay. You've had an opportunity for a break?
A. Yes.
Q. Now, we had talked earlier about whether we would be deposing you tomorrow --
A. Yes.
Q. -- or not. If I were to ask you those same finance questions tomorrow, the answers that you provided, were they, to the best of your knowledge, truthful?
A. Yes.
Q. All right. So while those answers, I guess, were saying don't apply as far as the 30(b)(6) deposition, if I were to ask you at your personal deposition, that would be your answer?
A. Yes.
Q. All right. Are you aware then --

MR. JACOB:
I'm going to just stay on that one more minute, Chad, if that's okay, at a personal level.
BY MR. JACOB:
Q. Are you aware, though, that the DOC and the federal inmates, they provide more money than the parish inmates?
A. Yes.
Q. Okay. Meaning you -- just stated another way, you get more as an office for housing a DOC inmate or a federal inmate than you do a parish inmate?
A. Correct.
Q. Switching back to the 30(b)(6). One second, please, here.
Did the -- the office understood, though, that the more inmates you place in one place, the increased risk of danger; is that correct?
A. Yes.
Q. And what I mean by that is, there's an increased risk of health problems?
A. Sure.
Q. There's an increased risk of fights?

A. Yes.
Q. And, I mean, I guess conceivably, there's an increased danger for fire safety?
A. Yes.
Q. And despite that knowledge -- again, I think we already covered it -- the holding cells were being utilized at times at a capacity above what the fire marshal said was safe?
A. Yes.
Q. During 2019 and '20, was there a policy in place regarding the provision of potable water to inmates -- or excuse me -- to the detainees in the holding cells?
A. Yes, there is. And our water is supplied by Covington City.
Q. Okay.
A. And then as a backup, we had a well. And all that's inspected on a monthly basis.
Q. And so if I'm an inmate in the holding cell, how do I get to that potable water?
A. Via the sink.
Q. The sink that's attached to the toilet?
A. Yes.
Q. And in a cell that at times is

overcrowded?

A. Yes.

Q. And what was done, if anything, to ensure, though, that the water that inmates were getting access to in the holding cell, even though it may be in the pipes potable, was actually coming out into a clean area that it could be consumed?

A. There's -- the cleaning and sanitizing of the cell was done.

Q. And was that according to a particular policy?

A. I'd have to refer to some of this material, if we can.

Q. Sure. Yes. Absolutely.

A. Let me see. What number are you referencing?

Q. I am on No. 8. Well, we started on No. 8 about potable water.

A. Yeah.

Q. But then you got into the cleaning, so --

A. Which one was that?

Q. So, actually, I guess that would be 9. It would be about sanitation, --

A. Yeah.

Q. -- if that helps.

A. Let me see if I can find that policy in here. I saw it in here earlier. Give me just a minute. Sorry.

Q. No. No. You're good. I'd rather get it right than --

A. I don't see it.

MR. JACOB:

Chad, feel free to -- if you know where it is, then guide her to it. I'd rather just get the right answer.

MR. COLLINGS:

What is it? I'm sorry.

MR. JACOB:

For cleaning the area where the water -- potable water is coming.

MR. COLLINGS:

Do we know what topic that's in?

MR. JACOB:

Between 8 and 9.

MR. COLLINGS:

So it's going to be tabbed 8 or 9 if we have any documents responsive to it.

THE WITNESS:

Okay. Well, it's not in those tabs, so I thought -- but I thought I had seen the policy about the cleaning. So it's not under those tabs, so --

BY MR. JACOB:

Q. Okay. With respect to office policy, though, is there a policy that governs the issue of potable water to inmates in the cells, in the holding cells?

A. Not specific to the holding cells, no.

Q. So it's for general pop?

A. It's for the entire facility. It's not specific to the holding cells.

Q. And do you know what that policy provides?

A. Yes. Can I refer to it?

Q. Sure.

A. All right. Okay. So it says that the, "...water source and supply shall be certified at least annually by an independent, outside source and in compliance with the State Sanitary Code." And, "...comply with the requirements of the...health officer." And the, "...Jail staff shall adhere to the Agency's plan

for addressing deficiencies." And, "This plan shall be approved by the state health officer."

Q. Can you -- there's a Bates number at the bottom there. Can you read that out?

A. Sure. 001164.

Q. And with respect to the -- you said certain certifications have to be followed. Where is it written what that is, though? Like, how does a guard know how to comply with the sanitary requirements?

A. It wouldn't -- the maintenance staff are the ones that ensure that the -- all of that is handled and inspected by the respective agencies.

Q. Okay. How is it that -- well, is there a policy that directs when inmates in the holding cells are provided with an opportunity to clean their bodies?

A. There is not a written policy. The practice is that they shower Monday, Wednesday, and Friday. If for some reason, because of whatever was happening in the facility, an emergency or -- that had to be responded to and everybody didn't get showered on that night, it would be done on the next shift or the next

morning or something like that.

Q. Okay. So is that logged somewhere, that the inmates were provided with a shower on a certain date?

A. Yes.

Q. And where would I, as a corrections officer, go to look to know that no matter what we have to give these inmates showers today?

A. So it's an electronic logbook. And there's logbooks on every workstation, again. However, most of the logs of that nature were kept in the main control area on the various workstations up there. And it was also part of pass-on. So one sergeant would pass it on to the next sergeant or supervisor, whether that was a corporal or a sergeant, to say, "This is where we stopped. This is where you need to pick up, or we need to pick up tonight to get this done."

Q. But if the guards decided not to provide showers forever, they wouldn't be violating the office's policy?

A. There is not a policy.

Q. And if they decided to give showers once a week, again, the guards wouldn't be violating any policy?

A. Correct. Can you say that again?

Q. If guards decided we're only going to give inmates in the holding cells showers once a week, those guards wouldn't be violating any department policy?

A. Correct. There's no policy specific to the holding cells.

Q. How about the ability to wash one's hands before you eat? Was there any policy that discussed that issue, that inmates need to have an opportunity to clean their hands before they eat?

A. There's not a policy. When they are -- there's soap. And then when they're showered and the clothing exchange is done, they're given certain hygiene items, and one of those is soap that they can keep on their person so that they have the ability to wash their hands after using the bathroom or before eating.

Q. Okay. And is there some log that shows who got those hygiene items?

A. So it would be on the same log usually as the log where they log that they got their showers. Sometimes it was logged specifically that they got hygiene items, and

sometimes it wasn't. It just said, "Showers provided to holding." People phrased it differently.

Q. So an inmate comes in, or a detainee comes into the holding cell. I think you said Monday, Wednesday, and Friday are showers?

A. Yes.

Q. Comes in Friday night after showers, they don't get the soap until Monday?

A. There's soap in the cell as well. And they can request it, too. Or if for some reason they're significantly dirty, or there's a situation, they had an accident or something like that, then they -- obviously, that's outside of the Monday, Wednesday, Friday practice, and we would shower them immediately or as quickly as possible so they're not sitting like that.

Q. But there's no policy that discusses that?

A. Correct.

Q. With respect to the years 2019 and '20, and, again, the holding cells, was there any assigned sanitary inspections, meaning a weekly, monthly, annually?

A. So there is weekly and monthly

inspections in-house. And then we're inspected by DOC, the marshals' office, immigration, Louisiana Department of Health, and, again, the fire marshal.

Q. Okay. And those inspections, not the internal ones, but the other ones, on what type of schedule do those occur?

A. The fire marshal, obviously, whenever somebody makes a complaint, or annually. The Department of Health, annually. And then DOC is also annually. U.S. Marshals' office is annually. And at the time, immigration was also an annual inspection.

Q. How about Department of Health? I don't know if you covered that one.

A. Yes. Annually.

Q. Annually, too?

A. Yes.

Q. Okay. And then internal inspections, I think you said weekly?

A. Weekly and monthly.

Q. Weekly and monthly. So is there a difference between the weekly and monthly internal inspections?

A. Those are in here. If I could refer

to them, if you don't mind.

Q. Whenever. Yes, please.

A. Okay. They're separated here. Okay. So the way they have it broken down, if I can show you, --

Q. Sure.

A. -- the weekly inspection checklist is done, and the officer or the supervisor doing it will list any deficiencies and corrective action that needs to be taken for whatever was found. And then -- this is a weekly one, too. I'm sorry.

Q. No. That's all right. And can you just read the Bates number of the one that you were referring to, just for the record?

A. Yes. 001245.

Q. Thank you.

A. They're for different areas, --

Q. Sure.

A. So -- oh, this is the Department of Health one. I'm sorry. Oh, here's the monthly inspection checklist. So it looks like the monthly inspection was done by the supervisor, the lieutenant, whereas the weekly ones were done by the -- one of the lower rank or the

maintenance people.

Q. Okay. And is there a difference between the monthly and the weekly as far as what they're inspecting?

A. These -- they appear to be the same.

Q. So weekly we inspect the same things we inspect monthly. It's just a matter of the hierarchy as far as who's doing the inspection?

A. Correct.

Q. So monthly we're getting a higher-level supervisor doing the inspection?

A. Correct.

Q. And then weekly we're getting your everyday guard or people who are working back in the holding cell area?

A. Not just the holding cell. The entire facility.

Q. Okay. How about as far as the holding cells, though? Is there an inspection specific to those?

A. No. The entire facility is looked at. It's not specific just to the holding cell.

Q. And can you give us an example of what it is that is being looked at during these inspections?

A. Sure. They're looking at if hatches work, locks are working, toilets are working, flushing properly, water is coming out properly. You know, things are -- dispensers are functioning, present, things like that. Windows aren't cracked. Any type of maintenance issue. Cleanliness issue. If there's something -- if there's graffiti on the walls that needs to come off. Pretty much anything that's out of the ordinary that would need to be rectified, that's what they're looking for.
Q. So it's been reported that there was dried-on toilet paper on ceilings in holding cells and stuff.
A. Yes.
Q. But that remained; is that correct?
A. I couldn't speak on that specifically because I'm not -- if there was, there's a possibility that even during one of the cleaning sessions or the times when cleaning took place throughout the day that that was taken down. The deputy instructed the inmate worker to take it down. So I wouldn't know without a specific instance and being able to research it.
Q. So you wouldn't know one way or the

other?

A. Correct.

Q. All right. Is there a policy with respect to how holding cells are to be cleaned?

A. No. Not specific, no.

Q. So how do -- I mean, we talked about the Department of Health inspection, the certain standards that need to be met. The guards are obligated to inspect for cleanliness and keep it clean, correct?

A. Correct.

Q. But how do they know how to do that?

A. The instruction is to -- that everything has -- even the walls, the benches, the phones, all of that has to be cleaned -- the floors. All of that has to be cleaned and disinfected when the cell is cleaned. Toilet, sink.

Q. How does the guard know that, though?

A. That's the direction given by the supervisor. And that's the way that they're trained when they work with a -- when the new guy comes in and he works with his field training officer, that's the way that they're trained to

do it.

Q. And so there's a training program that covers this?

A. Yes.

Q. Is it in writing?

A. The training program? Yes.

Q. I mean, with respect to cleanliness, as far as sanitation, there's a written section that is taught?

A. It's not that specific similarly to the policy. It's not -- it doesn't say, "You will wipe this, this, this, and this." No, sir, it's not.

Q. So then what does the training say?

A. Again, the training is hands-on. And it'd be the officer -- the training officer would document what was taught to the recruit.

Q. But there's no standardized training saying, "When you clean a cell, we want you to spray down all the walls with, you know, a certain level of disinfectant to comply with Department of Health standards"?

A. No. Everybody -- well, it's common practice, but there's nothing in writing saying "X," "Y," and "Z."

Q. All right. So what is that common practice? How do they clean the holding cell? What do they use?

A. So the inmate worker uses -- in 2019, I believe it was Hepacide Quat. And then at some point we switched to Fight Bac. But, anyway, the inmate worker works under the supervision of the intake staff to clean the floors, spray the benches, phones, toilets, sinks, do all of that, wipe it down, clean the windows, handles, things of that nature.

MR. COLLINGS:

And for the benefit of our court reporter, Hepacide Quat is spelled how?

THE WITNESS:

H-e-p-i-c-i-d-e Q-u-a-t (sic).

THE REPORTER:

Thank you.

MR. COLLINGS:

You're welcome. Otherwise, you're going to be digging through that book for an hour looking for it.

BY MR. JACOB:

Q. Fair enough. And, again, though, the -- who supervises the inmate who's cleaning?

A. The intake staff. Whoever is working the floor.

Q. And the intake staff, if they just decide we're not cleaning the cell today, there's no discipline for that?

A. There would be because that's part of their duties. So if they put their foot down and say, "We're not going to do our job today," then, yes, there would be repercussions for them not doing their job.

Q. Okay. So if the staff says, "We're just going to wipe down the benches today," they have now cleaned. But there's no policy that they violated for not wiping down the walls or the telephones, correct?

A. That's correct. But they would be -- they would not be in compliance with what their supervisor told them to do.

Q. How would they not be in compliance?

A. Because if the instruction is to wipe one, two, three, and four, and they don't, then they're being insubordinate to the direction they were given.

Q. So then there's an assumption, then, that the -- that every supervisor is going to

say, "This is how we want our cell cleaned on each shift," correct?
A. Yes.
Q. But there's no directive to the supervisor requiring that?
A. The direction is that that's how the cells are supposed to be cleaned.
Q. Okay. And that direction, though, is where? Just through verbal hand-me-down?
A. That is -- yes. There's no policy for that.
Q. All right. So the hope is then that each supervisor has the same oral tradition as far as sanitation?
A. Yes. You hope they're consistent, and they're doing what they're supposed to be doing.
Q. But, really, you have no idea because there's no directive as far as a uniform way in which to comply with Department of Health sanitation; is that correct?
A. Can you say that again? That was a lot.
Q. Yes. But while you're hoping that the oral tradition matches Department of Health

standards, we don't know that, correct?

A. Correct. You're not going to know every time.

Q. Well, you're not going to know at any time; is that correct?

A. Correct.

Q. Okay. And, in fact, as you sit here today as the representative, you can't tell me that those cells were ever sanitized to the level required by the Department of Health, can you?

A. Some of those log entries are -- they did log specifically that that cleaning was done. The walls were wiped, the benches were wiped, things like that. But, again, like I had said before, sometimes the logs were not that specific. And that could have been because of time constraints. There could have been one person trying to get everything done down there. And it was just a matter of, let me get this in here that we did this, and I need move on to the next thing.

Q. But if I went back to the holding cell and asked the supervising guard, "Well, what is the Department of Health requirement for sanitation," they're not going to be able to tell

me, correct?
A. Probably not. I don't know.
Q. And if I say, "Is this cell sanitized to the level required by the Department of Health in 2019 and '20," they're going to say, "I have no idea," correct?
MR. COLLINGS:
Object to the form.
THE WITNESS:
I can't speak for what they're going to tell you. I don't know.
BY MR. JACOB:
Q. Well, is it your expectation then as the representative that if I go back there in 2019 and '20 and ask the guard if this sanitation complied with the Department of Health standard, do you think, based on the policies and training provided, that that guard is going to be able to answer my question?
MR. COLLINGS:
Object to the form.
Answer the question, if you can.
THE WITNESS:
I think that based on their training, that, yes, they'd be able to

tell you if that was -- if that cell was sanitized the way it was supposed to be sanitized. Yes.

BY MR. JACOB:

Q. And then if I followed up that question with, "Well, then, how does the Department of Health say that that cell is to be sanitized," they're not going to be able to tell me, correct?

A. Probably not, no.

Q. And that's because there's no policy laying that out for the guards, correct?

A. Correct.

Q. I'm going to presume now that you are familiar with these inmates who brought the litigation in this matter; is that correct?

A. Yes.

Q. And with respect to when they were in the holding cells during those periods of time, again, 2019, 2020, do you know the number of inmates who were housed with those various inmates at any given time?

A. I do not.

Q. And is there a document or a log that would provide that information?

A. No.
Q. Why not?
A. Our computer system is not capable of extracting that information.
Q. Am I correct, though, that there is at least information with respect to how many inmates were in cells on any given days?
A. No.
Q. Okay. I have seen counts as far as how many people were in holding cells at particular times. Do you know where that information would have come from then?
A. No, I don't. I know there's a count that shows an overall holding count. But specific to how many were in each cell, I don't know where that information would have come from.
Q. Okay. With respect to overall counts then, --
A. Yes.
Q. -- can you tell us for those five inmates the overall counts that were in the holding area in its entirety?
A. Well, that's several days. So which one is that? Is that 8? Okay. So there's counts for the entire year. So it's broken down.

So if you have a date in question for when any of these guys -- I can explain to you. But it does show on the -- one, two, three, four, five, six, seven -- on the eighth column where it says, "Today's Holding Count."

Q. Okay. And just real quick, let me just get to something on my computer, too. And where would that -- where is it?

A. Oh, it's under Tab 10A.

Q. 10A?

A. Yes.

Q. I see. Okay. And, for the record, the Bates number?

A. 001300.

Q. Okay.

A. This is January of 2019.

Q. I'm with you.

A. And the count sheet is the same day to day with regard to how it's set up.

Q. Okay.

A. So it doesn't change.

So, anyway, the eighth tab over shows what the holding count is. And nine and ten break it down by male and female holding.

Q. Okay. And those numbers, then, that

is times -- for the total of the four cells?
A. Correct.
Q. Okay. But we don't know -- like, let's say, for instance, when it says -- I see one that says, "59" down there. We don't know how many are -- of those 59 are in any given cell itself?
A. That's correct.
Q. Okay. I just want to see something here. And then on this sheet that you're showing us, does it also show open beds?
A. Yes, it does. If you go back over to the left, it's broken down. You have a total on the second column, "Total Open Beds." That's overall. Third column, "Pre-Trial," those are the open pretrial beds. "Pre-Trial Male" beds.
Q. So what's the difference between open beds total and open beds pretrial?
A. Open bed pretrial male is beds that people -- that pretrial males would be assigned to. So those are open beds for them -- people who are not serving a DOC sentence or people who are not U.S. Marshal prisoners would be assigned to.
Q. Okay. So am I correct, though, that

the "Total Open Beds" is literally the number of open beds back in general pop?

A. Yes. Amongst all of these. When you add all these columns together, yes.

Q. All right. So if -- for instance, I see that you have some -- "you," the office, has some designated, though, open beds for DOC, open beds for Federal/ICE; am I correct?

A. Yes.

Q. So those beds are reserved for those categories of inmates?

A. Yes, sir.

Q. And so if there's an open bed in DOC Male, a pretrial detainee in the holding cell who's a male, who's a parish detainee, is not going to be moved into that open DOC bed?

A. Correct.

Q. And the only reason is because we're keeping it available for in the event a DOC inmate becomes available?

A. Yes.

Q. Is there any other business reason or penological reason why that holding cell inmate is not going to get that DOC bed?

A. No. They weren't -- no. They

weren't being kept in there for any malicious reason. Again, it's a rotation of the pretrial beds that are available.

Q. No. What I'm asking is, is there any -- not whether they were in there for punitive. I'm asking was there any legitimate penological reason other than we're just holding that for DOC?

A. No.

Q. Okay.

A. And this count is just a snapshot of a moment in time, just so you know. This was done very early in the morning. So this is fluid throughout the day. So this -- probably while we're typing it, things are changing. People are moving around, so --

Q. Okay. So conceivably -- and I'm just looking here. So looking at the page that you said, ending in 1300.

A. Uh-huh (affirmatively).

Q. Conceivably, there could be a day where there's 114 open beds, but parish inmates who are pretrial, they're only going to get 11 of them?

A. Correct.

Q. While DOC -- there could be six empty beds at DOC and 56 empty beds for federal inmates, correct?

A. Correct.

Q. Would you agree with me that based on the number of detainees that were being held in the holding cells, that there were times when there was urine, feces, blood, vomit, and other bodily fluids on the floor?

A. It's possible, yes.

Q. Not just possible. You're aware that that did happen, correct?

A. I'm not aware of a specific incident, no. I'm saying it's possible because things happen in facilities.

Q. Okay. And am I correct that inmates only had the benches or the floor to sleep on?

A. Correct.

Q. And so they were sleeping on the same floor that people were walking back to the toilet and walking back out into the main area of the cell, correct?

A. Yes, sir.

Q. And have you -- were you back to those holding cells when inmates were in them?

A. Periodically. Once in a while I was.
Q. And did you ever see people sleeping on the floors?
A. Yes.
Q. And did you see people sleeping on the floors back by the toilet area?
A. No. Not that I can recall.
Q. But how many inmates do you think you've seen sleeping on the floor at any given time?
A. Oh, I don't know.
Q. How many inmates do you think you've seen, maximum, in a holding cell at any given time?
A. I don't know.
Q. One?
A. No. I've seen more than one in a holding cell.
Q. Five?
A. No. More than five.
Q. You've never seen more than five in the holding cells?
A. Yes. I just said I've seen more than five.

Q. Oh, more than five. I'm sorry.

A. Yes.

Q. I thought you said, "No more than five." My apologies.

MR. COLLINGS:

I think it was, "No," comma, "more than five."

MR. JACOB:

I apologize.

BY MR. JACOB:

Q. 10?

A. Yes.

Q. 20?

A. Possibly.

Q. 25?

A. I don't know.

Q. What is the maximum number of inmates that have -- or detainees that have ever been held in a holding cell area at any given time?

A. I don't know. I would have to refer to these numbers. I don't know. And probably everything before that.

Q. Okay. Fair enough. What is the maximum number of inmates in any one given

holding cell that you've ever heard being held in there?

A. I don't know.

Q. I mean, have you ever heard that there has been up to 30 inmates in one of the holding cells?

A. No.

Q. Have you ever heard that there has been up to 25 in it?

A. No.

Q. Have you ever heard that there has been up to 20?

A. Yes.

Q. Have you ever heard that there has been more than 20?

A. Yes.

Q. And what is the length of time that an inmate -- excuse me -- that -- I think we already covered that. There is no minimum or maximum amount of time that a detainee is going to be in a holding cell; is that correct?

A. Correct. We try to get them out of there as fast as we can.

Q. What is the longest that a detainee has remained in the holding cells?

A. I don't know.

Q. Three weeks?

A. I don't know.

Q. Have you ever heard of one being there over a month?

A. Not that I can recall.

Q. Have you ever heard of one being there for three weeks?

A. I believe one of -- one of these (indicating).

Q. "These" being the plaintiffs?

A. Yeah. I'm sorry.

Q. No. No. That's all right. Just because --

A. Sorry.

Q. No. I'm not trying to be smart with you. I'm just trying to make sure it's clear on the record.

A. Yes.

Q. So have you read the complaint in these two cases that have been consolidated?

A. Yes.

Q. And you heard the numbers that were alleged as far as the number of inmates that were housed with these various plaintiffs at any given

time, correct?
A. Yes.
Q. Do you have any reason to dispute any of those numbers?
A. I can't recall them off the top of my head but --
Q. When you read it, did you ever say, "Nah, that's just -- that's not possible"?
A. The numbers in the holding cell?
Q. Right.
A. No. Because I know that there were times when we were overcrowded.
Q. Okay. And I think you said that there's no record that the office has that could dispute the numbers that they're claiming in an individual holding cell because those individual numbers were not kept and logged, correct?
A. Yeah. We can't extract that information.
Q. All right. So if the inmate says, "I counted, and there were 24 in the cell with me," the office would have no way of refuting that claim?
A. Correct.
Q. And if an inmate said, "I was

sleeping on the floor, and there was urine on the floor," there's no way for the office -- you have no evidence to refute that claim, correct?

A. Correct.

Q. How about the provision of access to medical care? And I'm not asking for the -- I know you're not a doctor. I'm not going to say what care was actually provided. But is there a policy with respect to when detainees who are in the holding cell can have access to medical care?

A. So there's access to medical care 24/7. And we've included the policy in here. And they're screened when they come in initially. And then, obviously, depending on their particular health situation, then medical would decide at that point how consistently they need to be evaluated thereafter. And then within 14 days, they have to be given a more comprehensive medical evaluation. But, really, outside of those general parameters, I would have to refer you to medical for -- the medical vendor for any other details.

Q. Okay. But if an inmate comes into the facility, is brought back to, you know, the holding area -- do you call it intake?

A. Yes.

Q. So brought back to intake, is there an initial policy screening of that inmate for medical reasons?

A. Yes. They're -- they are assessed based on these five initial questions and looked at for obvious signs of injury and illness so that the provider, whether it's the nurse, the doctor, can come up and say, "Yes, we're going to accept them," or, "No, we're going to send them back out for further evaluation."

Q. Okay. So that is for whether they get into the facility?

A. Correct.

Q. Now, you bring one into the facility, and let's say that inmate says, "I am on certain heart medicine," what happens with that information?

A. I would have to refer you to the medical -- the medical staff.

Q. Well --

A. The vendor.

Q. I'm sorry. I cut you off. Go ahead.

A. No. That was it. I would have to

refer you to them because I can't speak for what they're going to do with that information.

Q. But what is your guard going to do when the inmate tells the guard that?

A. He's going to call medical and say, "This individual says that they're on" -- sorry, I'm trying to find it.

Q. Yeah. Yeah.

A. "That this individual is saying they're in need of medication, or they take medication. Can somebody please come assess them and talk to them?"

Q. And that's by policy?

A. Yes.

Q. And I think you were looking for the policy?

A. Yeah. Sorry.

Q. No. Go ahead.

A. I got sidetracked. Let's see. I think it's under the admissions policy.

Q. Is it under 10G?

A. It might be. No. I think it's actually under the admissions policy.

Q. Oh, sorry.

A. Just a second.

Q. No worries.
A. Okay. So under 3, there -- it's in our admissions policy.
Q. Okay.
A. Do you need the number?
Q. Yes, please.
A. Okay. 001111.
Q. Okay.
A. Where -- No. 4 on the policy where it says, "Offenders will be directed to jail medical staff for processing."
Q. Okay. So it says -- the extent of that -- of the policy with respect to that issue as far as the inmate who comes in, says, "I'm on heart medicine," is, "Offenders will be directed to jail medical staff for processing"?
A. Uh-huh (affirmatively).
Q. Is that a "yes"?
A. Oh, I'm sorry. Yes.
Q. Okay. When does that referral happen?
A. When the deputy or staff member is made aware that that person needs or says they need treatment or medication. When they become aware of an issue.

Q. But it doesn't say that in the policy?

A. No, it does not. It's not that specific, no, sir.

Q. No, it's not specific at all. I'm a little confused, actually. In fact, there's -- am I correct that for the policy, there's nothing in there that says, "Hey, if an inmate says, 'I'm on a prescription medication,'" what that guard should do?

A. Correct. It's not -- it's not specific to medication.

Q. In fact, it doesn't even say when that referral will take place; is that correct?

A. Correct.

Q. So how does the guard know when that referral shall take place?

A. When they're made aware of -- again, that's part of their training.

Q. Okay. But where does it say that that's part of the training? Is there a written program?

A. There is a written program, yes.

Q. Would you agree with me, policy sets the rules by which the office or agency wants

their employees to follow?
A. Correct. I would agree.
Q. And then would you agree with me that training is what's provided to explain to the employees how it is to apply and follow that policy?
A. Correct.
Q. So if there's no policy, then there's no implementation training?
A. There is a policy. It's just not specific to when, because it could be at different times. So to answer your question, there is a policy. It just isn't specific to it should happen at this time, this date, and this instance. Their training tells them, when you become aware of a problem, you do this about it. You notify this person.
Q. And the training officer or the teacher of the training knows to tell the students that how?
A. Based on their training and experience.
Q. So if it never happened, then that training officer never experienced it, correct?
MR. COLLINGS:

Object to the form.

THE WITNESS:

Correct.

BY MR. JACOB:

Q. And so then they couldn't pass down that knowledge, correct?

A. Correct.

Q. So, again, I'm back to how do we know whether guards are being told and trained that when an inmate comes in and says they're on a heart medication, you need to refer them to medical?

A. You don't a hundred percent know.

Q. In fact, you don't know at all, do you?

A. You don't a hundred percent know.

Q. What percentage would you put it then?

A. I wouldn't give it a percentage. The supervisors review the training logs and the checklists that are in those training logs to ensure that the material that they need to be trained on is being taught.

Q. So, for instance, they would review the training log and say, yes, so-and-so was

trained on the security admissions policy, correct?

A. There's various things in there, yes.

Q. Okay. And so then we would go to the policy and say, well, then, let's see what it was that they learned. "Offenders will be directed to jail medical staff for processing"?

A. So it's more in depth than that. There's other documentation in that training. The training officer would actually write out what they did, what they were instructed on, how they responded and so forth.

Q. So then we would be able to get those writings, that detail, the training that was provided to explain No. 4 here in the Security-Admissions policy at Bates 1111, correct?

A. Yes. Anything they were trained on in a given day would be documented in their training manual.

Q. All right. So then you, as the office, is that something then that you can easily find?

A. Yes. Everything is kept in their

training folder.
Q. In their training folder?
A. Yes. On the electronic database.
Q. So each individual guard's training folder?
A. Correct.
Q. But I want to know what the curriculum was. Where do I find that?
A. There is not -- there's not.
Q. So there's no curriculum. There's no detail in the policy. And then that means that the office can't tell me what each guard was told to do as far as when to make the referral, for instance?
A. Correct.
Q. All right. In fact, the office can't tell me anything that was specifically instructed with respect to that issue, correct?
A. Without going through everyone's training, no.
Q. Well, am I correct, the training file -- I mean, I -- look, I've been doing it 20 years. I've seen training files.
A. Yeah.
Q. It's basically a course name, a

date, and a -- and, you know, whether they attended or not. Would you agree with me?

A. No. That's not the training that I'm talking about. I'm talking about when they are the new guy, and they're training with the training officer. It's a comprehensive book, and there are daily logs that are filled out with how they're responding to training. Again, like I referenced before, this took place. This is how he responded. He responded well. It's more detailed than just a certificate that says, oh, he did this on this date.

Q. I see. So what I'm hearing you say is that there's a uniform training program that each guard is put through?

A. Correct.

Q. And it's a book that is used, and it's signed off whether they -- how they performed and how they did?

A. Correct.

Q. So then you would be able to produce -- "you," the agency -- would be able to produce one of those blank books for the years 2019 and '20, correct?

A. Yes.

Q. All right. So -- and that would cover the complete training provided to the guards, correct?

A. Correct.

MR. JACOB:

So I'm going to ask, Chad, if you guys would provide those blank training books for 2019 and 2020.

MR. COLLINGS:

We'll look into it.

MR. JACOB:

Thank you, sir.

BY MR. JACOB:

Q. And would that book relate to all of the policies that the agency wants to train internally?

A. All of the policies?

Q. Whatever they want to provide training for, I'm saying.

A. I would have to look at it. Again, it's been a while.

Q. Sure. Meaning there's no -- it's not like Book 1, Book 2, Book 3. There's a training book, and that's what is used?

A. There's a -- there are different

training books for different areas within corrections.

Q. Okay.

MR. JACOB:

So then my request would be a little bit more specific for the training books related to the holding cell areas for the years 2019 and '20. And I'm -- what I'm -- just so we're clear on the record, I'm not asking for each guard's filled out one. I'm saying the training book that was used. So the blank one that was used for each of those years.

MR. COLLINGS:

We'll look into it. But I would suggest you might went to do a formal request for production because I don't want to get into a, well, we gave you this, but I wanted "X" instead of "Y." It might be better to do it in writing.

MR. JACOB:

It's very clear on the record. So, yes, the training book that is used for the holding cell areas for years 2019 and 2020, please.

BY MR. JACOB:

Q. And so I guess the same thing. It's going to be the same answers then for the provision of prescription medication or the provision of any other medical service. It's going to be No. 4, directed to jail medical staff, correct?

A. For the most part, yes. It's, again, 24-hour access to medical care. If there's anything that they needed, we would call medical for that. And that's how they're trained, to contact the medical staff for medical needs.

Q. So as far as the guards are concerned, then, if I'm correct, intake, somebody comes in, they're checked over for whether they're suitable medically to come into the facility. If there's any question, medical is contacted; is that correct?

A. Yes.

Q. And then they're -- presumably they're going to come in. They come into the facility. It says here in that policy, 1111 -- sorry -- that the inmate is observed for behavior and to make sure they're not injured, correct?

A. Yes.

Q. And then they will be directed to jail medical staff for processing. But as we sit here today, the policy is silent with respect to when that occurs?

A. Correct.

Q. Or under what instance that occurs?

A. Correct.

Q. And so it could go a week before they're referred to medical?

A. No. Medical has access to the booking system, so they know when people are booked in. And, again, like I said, they have their own processes. And I would have to refer you to them for them to speak on at what point after the initial booking they actually pull them in and talk to them to get the rest of their information or their initial assessment done. I would have to direct you to them.

Q. So nonmedical personnel could conceivably interact with the detainee coming into the facility, and they could go into the cell, be held in the cell, and they could not see medical until medical discovers them in the booking system and follows their policy?

MR. COLLINGS:
Object to the form.
THE WITNESS:
Well, they wouldn't see them on paper. There's -- but they do med pass and things of that nature several times a day. So there would be somebody coming up, and if they -- the person had to be triaged for something, whatever, I don't want to -- any kind of condition, they would have the opportunity to ask that nurse or whoever was coming through even if they hadn't been assessed yet. There would be an opportunity for them to say that.
But, again, outside of that general instance, I would have to refer you to the vendor --
BY MR. JACOB:
Q. Okay.
A. -- for specifics.
Q. So is there a policy, though, that says that med pass is going to occur "X" amount of times a day?
A. No. That wouldn't be our policy.

That would be the vendor's policy or practice.

Q. Well, am I correct, I mean, the facility has a duty to provide medical care? In this case, the facility contracted out that --

A. Correct.

Q. -- duty?

A. Uh-huh (affirmatively).

Q. So, really, would you agree with me that it's for the sheriff's office to know when their inmates have access to medical care?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Yes. And they have access to medical care 24 hours a day.

BY MR. JACOB:

Q. Okay. How about meals and dietary requirements? Any policy?

A. So we have a dietician on staff, or we did at that time, who does the -- what number are you on?

Q. I am on 10I.

A. 10I?

Q. 10I, yes.

A. Okay. So the policy is included in

there along -- I don't know if it's in this section or not. Yes. So the food service policy is included right there. Do you need the number?
Q. No. I think I found it at 1388?
A. Yes.
Q. Okay. And so the policy says three meals a day; is that correct?
A. Yes, that's correct.
Q. Two hot and one cold?
A. Yes, sir.
Q. And do you know whether that policy was complied with in 2019 and '20?
A. Yes, it was.
Q. And how is it that you know that it was complied with?
A. The meals, when they're served, they're logged.
Q. Okay. And so has a log been produced for these inmates?
A. Yes. I just have to find what section it's in. It may be in this next book. Apologies. Okay. So under Q. Wait. I'm sorry. 14Q is actually going to be the logs for the feed up.
Q. Okay.

A. It's in the second book.
Q. Okay. All right. And so it's going -- it lays it out in there?
A. Yes. You need the number?
Q. Yeah. Why don't -- for the record, why don't you just --
A. Okay. 002436 is the number that starts those logs.
Q. The bedding, what type of bedding was provided in 2019, '20 in the holding cell area?
A. Again, none. They received a blanket at night.
Q. And is there a policy that dictates that or discusses that?
A. No, sir.
Q. So if we go to -- let me see here -- under 10I, Bates 1392, Section III.
A. Uh-huh (affirmatively).
Q. Do you see where it says, "Hygiene/Bedding Issue"?
A. Uh-huh (affirmatively).
Q. I'm sorry, "yes"?
A. Yes. Sorry.
Q. It says, "The STPSO Jail facility

shall provide adequate bedding and linen, including a clean mattress, sheets, pillow, and blanket, not to exclude a mattress with integrated pillow. Provisions shall be made for linen and towel exchange at least weekly; blanket exchange at least monthly."

What is that referring to then?

A. That refers to when they're actually admitted onto the jail count and assigned to a bed.

Q. And where does it say that? Or how do you know that?

A. Because that's the way that the procedures are done. That's the -- when they're rolled to the back, they get those items. They're state issued.

Q. Okay. But --

A. That's what we refer to it as.

Q. I'm sorry.

A. Yeah. The policy is not specific as to that this -- it happens when they are rolled to the back.

Q. Okay. But, again, I mean, I'm looking at the policy, and it just simply says that that's what's to be provided to the inmates,

correct?

A. Correct.

Q. It doesn't say, "Inmates except for those in holding"?

A. Correct.

Q. And so inmates in holding did not get what is referenced in that policy?

A. That's correct.

Q. Even though the policy doesn't say this excludes the holding cell inmates?

A. Correct.

Q. Why is it that inmates in general pop need those items? Why do they need a mattress and blanket and sheet and pillow?

A. Well, they need those items, all the other things that you named, to cover their mattress. But those are what the -- what DOC and the other agencies -- the recommendation or the guidelines that are set in place for them to have.

Q. Well, the parish inmates that get put in gen pop, they get that, too?

A. Yes, that's correct.

Q. So it's not just the outside agencies that you're contracting with? It's also

you, as a parish, decided that those inmates need that in general pop, correct?

A. Correct.

Q. And so why do they need that?

A. Because that's what we're -- they're supposed to have when they're -- when they roll to the bed. That's what the recommendations and the guidelines that we are complying with say that we need to give them.

Q. What guidelines are you referring to?

A. The guidelines set forth by, again, DOC. And I realize that we're not talking about DOC inmates. But we're not going to say, "Because you're not DOC, you can't have this."

Q. Okay. But -- okay. So that's why I guess it's provided. But why do they need those items?

A. Maybe I'm not -- maybe I'm not following what you're asking.

Q. Yeah. I mean, who cares what DOC says. Why does a parish inmate who's back in general pop, why do they need a mattress, a pillow, and a blanket?

MR. COLLINGS:

Object to the form.
THE WITNESS:
I guess I'm not following where you're going with this. I feel like I answered your question.
BY MR. JACOB:
Q. Yeah. I mean, is there a health reason for that? Or is there a physical need for that? Why provide it?
A. Well, sure. I mean, I guess there's a reasonable necessity for it.
Q. So the office thinks it's a necessity for an inmate to have access to those items?
A. Yes.
Q. Okay. But not when you're in a holding cell for two weeks?
MR. COLLINGS:
Object to the form.
THE WITNESS:
Correct.
BY MR. JACOB:
Q. And why is that?
A. First, it was -- excuse me. The holding cell is not meant as a long-term housing.

It's temporary. And there's not -- you know, obviously, if all those things were in the cell, then we'd have an even bigger issue. But, again, it's not -- we're not trying to punish or hurt people. So that's the way it is done. They're not issued those items in the holding cell.

Q. I see. So it's a necessity when you're in general pop. But you're not trying to punish anybody, but you're just depriving them of things that you've identified as necessities?

MR. COLLINGS:

Object to the form. Argumentative.

BY MR. JACOB:

Q. Would that be a correct statement?

A. Yes. They don't have a -- they don't have a mattress or the sheets.

Q. Okay. And, in fact, they don't have a mattress, sheets, and they sleep with the lights on for 24 hours a day, correct?

A. Correct.

Q. Even though I think you identified that in the gen pop, that's actually a necessity, too, to have sleep in the dark, correct?

A. Correct.

MR. COLLINGS:

Object to the form.

BY MR. JACOB:

Q. And you're telling me that the reason it's not provided back in the holding cell area is because, well, it was never designed to house inmates for two weeks, was it?

A. It was not designed for long-term housing, correct.

Q. And the office knew that it's not designed for anything other than short, temporary time, a couple days, tops, correct?

A. Correct.

Q. Okay. But the office knows that even though it was designed that way, they're going to use it a different way? They're going to use it in violation of fire code, and they're going to use it for a lot longer than a common definition of temporary, and they're going to deprive those inmates of things that are identified as necessities, correct?

MR. COLLINGS:

Object to the form.

Answer, if you can.

THE WITNESS:

We're going to manage it the best

way we can --

BY MR. JACOB:

Q. So it's correct?

A. -- under the -- under the circumstances that we have.

BY MR. JACOB:

Q. So correct?

MR. COLLINGS:

No. Object to the form.

THE WITNESS:

Again, we manage it the best that we can.

BY MR. JACOB:

Q. Well, actually, I think we discussed earlier, the way you could do it is to reject the DOC and federal inmates and then provide those beds to the inmates that are back in the holding, correct?

MR. COLLINGS:

Object to the form.

THE WITNESS:

That could be an option.

BY MR. JACOB:

Q. Right. But it was something that -- it was not chosen, correct?

A. That's correct.
Q. Instead it was chosen to deprive these inmates of necessities and allow the DOC and federal inmates to get the beds with the mattresses and the pillows, correct?
MR. COLLINGS:
Object to the form.
THE WITNESS:
I think we -- I think I answered that already.
BY MR. JACOB:
Q. So that's correct?
A. I think we did that already.
Q. So that's correct?
MR. COLLINGS:
Object to the form.
THE WITNESS:
Yeah, I answered that already.
BY MR. JACOB:
Q. So that's correct?
MR. COLLINGS:
Object to the form.
THE WITNESS:
I answered that already, sir.
BY MR. JACOB:

Q. I don't remember it. Can you remind me? Was that a "yes"?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Well, would -- can you repeat it?

BY MR. JACOB:

Q. Sure. It was chosen not to reject the DOC and federal inmates and instead to deprive the holding cell inmates of things that were identified as necessities, darkness to sleep, bedding, and to give those necessities and those empty beds to the DOC and federal inmates?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Yes. We did not deny them, the DOC prisoners, correct.

BY MR. JACOB:

Q. You just denied the holding cell inmates, correct?

A. They did not have the same things. Yes, that's correct.

Q. Okay.

THE WITNESS:

Can I grab a water real quick?

MR. COLLINGS:

Sure.

MR. JACOB:

In fact, let's take a little break.

(Lunch recess was taken.)

BY MR. JACOB:

Q. We just took a break for lunch. Are you prepared to proceed?

A. I am.

Q. Okay. Let me see where we are. We were talking about the bedding issue. I did have one other question.

A. Okay.

Q. If you're in the outline, I'm at 10K, just so you're aware.

A. Okay.

Q. It's with respect to -- I mean, I understand just generally what's provided and what's not provided. But there was some talk among some of my plaintiffs, clients, that the bedding was -- or the blankets that were provided were sometimes new. Sometimes not new. Sometimes damp still from being cleaned. Do you know anything about any of that as far as like

where the bedding comes from, how it's cleaned, when it's cleaned?

A. Well, it's cleaned daily.

Q. Okay.

A. When they're picked up, they're taken to be laundered. As far as if it's damp or wet, I don't have any knowledge of that.

Q. Okay. But it's your understanding that they -- they would go through some laundry process daily?

A. Correct.

Q. And who is it that does that? Is it an outside service, or is it done in-house?

A. In-house.

Q. And is that for the whole facility? I mean, is all the laundry done in-house?

A. Yes.

Q. Oh, wow. That must be a pretty significant operation in and of itself.

A. Every day.

Q. Wow. Okay. I think we also discussed showers already.

A. Yes.

Q. And I think you said with respect to the showers, that is when they would be provided

with the clean clothing?
A. Yes. We did a clothing exchange.
Q. And so --
A. Or as necessary.
Q. Okay. So for emergencies, there would be exceptions?
A. Correct.
Q. But other than an emergency, it would be, they take a shower, they get clean clothing?
A. Correct.
Q. With respect to clothing, what are the detainees wearing in the holding cell area?
A. When they -- when we do the clothing exchange, they get a jail top, which is the stripes, bottoms, underwear, and a pair of jail shoes. Usually -- they call them slides, but they're some slip-on shoes.
Q. And their slip-on shoes, are they -- do they have like a sole?
A. Yes.
Q. Like a rubber sole or something?
A. Yes.
Q. So if they're stepping on a wet floor, it's not going to soak through the shoe?

A. Correct.

Q. And I think you also testified that the personal hygiene products are provided on the shower days or if they ask for it?

A. Correct.

Q. And I wasn't sure, though. Did you say that when they first come in they're provided with something?

A. There's soap in the holding cell.

Q. Oh, it's in the holding cell. Okay.

A. Yes.

Q. So I know some facilities -- and I'm not saying this is a fault. But I know some facilities you come in to, they hand you a -- like a pack of stuff. That doesn't happen at St. Tammany?

A. When -- no. When they -- that's part of the rollback process. When they're given their allotment of what we call state issues, what you're referring to, and their mattress and all of that, that's part of the rollback package.

Q. So that's when they go back to general?

A. Correct.

Q. And so when they're in the holding

cells, what hygiene products do they have access to?

A. Again, it's when they're showered, they're given -- after they shower and get dressed, they're given their toothpaste and toothbrush, their comb, and their soap. And they're allowed to keep that on their person.

Q. And is it -- does it come in some kind of container or holder?

A. No. Well, it's all, obviously, smaller sizes, so it can all be held in the pocket on the shirt.

Q. I see. And, again, same, if they ask for it, that's what they would get and would put into their pocket?

A. Correct.

Q. How about toilet paper?

A. Toilet paper is kept in the cell and replaced as needed.

Q. And how much of it is in the cell?

A. It depends. The common practice is not to put too much because what happens is, generally, other inmates would hoard it, so to speak, and either try to keep it for themselves and not share it. So we don't really want to put

20 rolls in there because they'll go missing, and, you know -- so we put five rolls. And then when those are used or getting close to running out, they'll be replaced.

Q. There were reports, though, that there was one roll at a time?

A. That's not -- to my knowledge, that was not the case.

Q. Is there any policy that governs that issue as far as toiletries that are provided?

A. Specific to toilet -- again, that would be specific to issuing the hygiene items when they're rolled to the back, not specific to the holding cell.

Q. So for the holding cell, there's no directive that says they're entitled to three per cell all the time?

A. Correct.

Q. It's just whatever the practice is for that particular shift?

A. Correct.

Q. So if some of the inmates reported only having one roll in the cell and then having to ask for more, is there anything -- is there

any evidence to refute that?
A. There may be logbook entries of times that rolls of toilet paper were placed in the cell. Again, without specifics, I don't know without being able to research it, so --
Q. Okay. But if you were to have that evidence, it's certainly something you would be providing, correct, to refute the one roll claim?
A. Sure.
Q. Okay. How about access to indoor recreation?
A. There's no recreation when people are in holding.
Q. Okay. And then when they're back in general, do they have some sort of recreation?
A. Yeah. Outdoor recreation, weather permitting, that is available to them if they decide to go outside. Some of them don't.
Q. How about indoor recreation?
A. No. Some of them work out, run around the dayroom or throughout the dayroom in the sleeping area, jog, things like that.
Q. Okay. You said, "work out." Are there -- is there like a weightlifting area?
A. No. They do body weight exercises.

Like, on the walls. Pushups, dips, things like that on the benches. I guess that's what you call it.

Q. Any sport activities available to them outdoors, like basketball?

A. Basketball.

Q. And so why is it that the inmates in general pop have this outdoor recreation?

A. Again, that's just something that's set up, that's provided. Again, that's a DOC requirement that's provided to all inmates in general population. Not specific to just DOC. It's everybody in general population.

Q. But why was there a decision to -- I mean, it sounds like that would be a big hassle to take inmates outside for recreation and supervise basketball games. Doesn't that burden the facility?

A. I mean, it's a function of the facility. It's part of the daily operations.

Q. Okay. So is it just that there are guards outside anyway, so --

A. There are certain guards that are dedicated to recreation.

Q. Okay. But is there like a mandatory

health issue or something? I mean, how is it that the facility decided we're going to allow these inmates to go outside for a period of time?

A. Again, that's part of the DOC requirement, and we apply that facility-wide. Of course, not to holding because it's not general population.

Q. Okay. But, I mean, do holding inmates need exercise?

A. I'm sure they do. However, it's not something -- again, that's a temporary assignment. People are bonding in and out of there all the time or rolling into general population. So it's not provided to people in holding.

Q. So it's an indefinite length temporary holding?

A. Correct.

Q. Okay.

A. But, again, like I said before, we do work every day to get them out of there as quickly as possible.

Q. Sure. So would you agree with me, though, that when inmates have access to areas to walk around, to exercise, to get fresh air, to

play basketball, that it would tend to lower the stress level of the inmates?
A. I would agree.
Q. And so when you don't provide that to a set of inmates who are in an overcrowded holding cell for a lengthy period of time, would you agree with me that the opposite, that that's going to not give them the ability to decrease their stress level?
A. I would think that, yes, it could cause some stress.
Q. Do you think recreation and outdoor activity, you know, physical fitness, that that's a necessity for a human?
A. I think it's important to an individual, yes.
Q. For their health?
A. Sure.
Q. To maintain their mental health and their physical health, correct?
A. Yes.
Q. And then when you deprive an inmate of that, that would negatively impact their health and mental health, correct?
A. I think long, long term, yes.

Again, we're talking about temporary. We're not talking months at a time. We're talking about a short period of time that they don't have access to go outside for recreation.

Q. Is there a log as far as which corrections officers were assigned to the holding area when these plaintiffs were back in the holding area?

A. Yes. Which --

Q. No. 11.

A. 11. I think that that is in the second book.

Q. Second book.

A. Yeah. Would you like the number on that one?

Q. Sure. Let me just get this out of the way. Sorry.

A. It's 001811.

Q. All right. So what are we looking at in this set of documents?

A. Okay. So those are all shift rosters for people that would be working up front in the intake area. Again, much like the daily count report, this is snapshot of an instance in time. This is what was started with. So whereas

you may be looking at it and go, "Oh, well, they weren't shorthanded. They had six people working." Well, there's six people on the schedule, but because of staffing or some type of emergency or a situation that had to be handled, somebody had to go home sick, people may have had to have been moved to another area of the facility, which would take away a staff member from the front of the house or -- I mean, again, without speaking specifically to an instance. I just want you to know that this is just a snapshot of an instance in time. But these would be people assigned to that area when your clients were in holding.

Q. So I'm understanding, and tell me if I'm wrong, you say that these documents show what was scheduled?

A. Correct.

Q. But not necessarily what actually showed up in those various positions?

A. No. They were here.

Q. Okay.

A. They were here. If they were off or something, it should be notated. If they were on annual leave or out for another reason, it should

be notated on here. But at the beginning of the shift, this is the assignment, and that was the plan, where this person was going to be working and what function they were going to be performing.

Q. But does this mean that they at least actually showed up and started in those positions?

A. Yes.

Q. But what you're telling me is you just don't know if they left those positions or were reassigned during the shift for some reason?

A. Correct.

Q. All right. As far as I'm seeing, Building B, is that where the holding cells are?

A. Yes, sir.

Q. And these assignments, Intake 1, Booking 1, suicide watch, are those specific to the holding area?

A. The intake, Intake 1 and Intake 2, those would be deputies working on the floor that would be dealing with inmates in holding. Did that answer your question?

Q. Yes. Yes. No, that did.

A. Okay.

Q. Runner, what would that be?
A. So in B Building, that's a pod with the female housing units. So if there's a -- if staffing allows, there would be a runner that would run, do feed up, bring female inmates to medical. Whatever needed to be done for that pod that runner would handle.
Q. And then there's a -- yeah, I think it's on each one, a CP-BB1 100-200 and a name. What --
A. That is the female pod.
Q. Oh, okay. So you have a guard, or an employee assigned to the female pod, and a runner going between the female pod and the rest of the facility; is that correct?
A. That's the runner for the pod. And if one of these intake guys needs something or the female -- the person working female intake, if a female comes in, the female deputy running would go up there and do the female pat down or handle the females in female holding.
Q. So the runner serves as basically a backup to any of the positions?
A. Could, yes.
Q. And then Booking 1 and Booking 2.

What's the difference between booking and intake?

A. Booking is an administrative position. Those are people doing the data entry for people being booked into the facility.

Q. Suicide watch?

A. So the females that are on suicide watch are observed in one of the female holding tanks that has been modified as such. So if there was a female that was on suicide watch, that would be notated, who was sitting there doing the observations, actually physically down on the floor for that function.

Q. So am I correct, you're not going to always have someone scheduled to that position? Someone is going to be scheduled to that position if there happens to be someone on suicide watch?

A. Correct. A female.

Q. A female?

A. Yes.

Q. So is there a male suicide watch?

A. There is. It's in another part of the facility.

Q. Bonding 1, Bonding 2?

A. Again, those are administrative positions. They're actually in a separate office

across the hall.

Q. B-Main Panel?

A. That is similar to a pod. That's the person that's controlling the doors to the sally port and the outside, answering phones, things of that nature.

(OFF RECORD.)

BY MR. JACOB:

Q. Okay. And then I see down below, it says, "Others," and then there's a "Hospital," "Off Vacation," "Military Leave." So that's where it would explain anyone who's not -- who's on the shift but not assigned to a spot?

A. Correct. And down below where it says, "Being FTOed," --

Q. Yes.

A. -- where you see on that one "Collins," Collins is also up top as a runner because she's in training with that deputy.

Q. Okay. All right. I see.

A. So that's why she's listed twice.

Q. I see. What's LWOP?

A. Leave without pay.

Q. That wouldn't be a good spot to be in.

A. Well, not necessarily. Maybe just ran out of annual leave or something like that, so --

Q. And then EIB?

A. Sick leave.

Q. Just to make sure I know what these are.

Okay. All right then. So as far as guards overseeing the holding cell themselves, who are watching the holding cell, am I understanding correctly then that there would be two?

A. At times. It could be less. It could be more. And, also, the -- if you look up at the top of that page, there are -- there's a shift sergeant and a shift corporal that are on duty for this particular shift. The lieutenant is over all of the shifts. She's not there all the time, but they list her on their report because that is their chain of command. So these two supervisors are there in that main control booth, that B-Main Panel area, and they're also doing the logging, making sure everybody is doing what they're supposed to be doing. And they can also see in the holding cells from where they are

stationed.

Q. Okay. So which of these spots can see the holding cells?

A. Everybody except the people in bonding and the pod, CP-BB1.

Q. And potentially the lieutenant?

A. Correct. Yes.

Q. Okay.

A. And the runner, depending on where the runner is, of course.

Q. Right. That makes sense. Okay. And I think we covered this, but I want to make sure. Just going back to 12. Because we took a few out of order just as the --

A. Okay.

Q. -- as the questioning went.

But I think you said that while we can -- while there is information that you directed me to showing how many total persons were in booking on a particular -- or excuse me -- were in holding on a particular day, there is no separate log showing how many were in each of the respective four cells on any given day?

A. That's correct.

Q. So we have the aggregate, but we

don't have each individual count?

A. Correct.

Q. But we do have, based on what you showed me, the total number of empty beds and how those empty beds were designated on any particular day?

A. Yes.

Q. Okay. I think I'm following this. Okay. So then going back to some of this information, would you know which holding cell in particular a detainee was held in, or you just know that they're in holding?

A. So specific to your clients, I do only because I have their inmate assignment. If we were just wanting to know in general who was there on a certain day, again, we can't extract that information out of the system.

Q. Because you would then presumably have to go and review every single file?

A. Correct.

Q. All right. But since you know which inmates we were looking for, you were able to pull their files and see the information?

A. Correct.

Q. All right. So with respect to No.

14 then, I guess we're going to go to No. 14. And so what are we looking at under Section 14?

A. Okay. So this is for each of your clients. This is what is called the Inmate Cell Movement Report, which any time they were moved within the facility, it gives their location. And just so that you are aware, each inmate has an Inmate ID.

Q. Okay.

A. So it may not be just specific to that booking. Because when they run the Inmate ID, it's going to show every time they've been in the facility. So you may have -- like the next one is kind of lengthy, so you just have to pick out that section that you're looking for.

But, anyway, it shows each time they were moved to a different spot within the facility.

Q. No. No. No. I actually appreciate that. That makes sense.

So, again, we're looking at Section 14, but the set of documents that are Bates stamped 1943. Would that be correct?

A. Oh, yeah. I'm sorry.

Q. No. No. No.

A. I didn't know what you were asking. Yes.
Q. I just want to make sure for the record.
A. Yes.
Q. We're in agreement. Okay. So I see an "Inmate ID." That stays with that inmate for life, basically, even if they're not at the facility? If they come back, they get that ID?
A. Yes. They should, yes.
Q. Okay. Then we have the inmate name. We have the "Booking Date." That's the date that they go into the holding cell?
A. That they're booked into the facility, yes.
Q. Okay. But is that the same date that they go into the cell?
A. Yes. Yes, sir.
Q. Okay. And then the "Holds," is that -- is there a hold for another jurisdiction or something?
A. Correct.
Q. So if there's another set of charges in another state, there would be a hold on them?
A. Could be. Or probation/parole, DOC,

anything.

Q. And that's to tell the person looking at this that, hey, even if they bond out on this one charge, there may be another charge that's holding them here still?

A. Correct.

Q. "Assign. Date," what is that?

A. That's when they were assigned to that particular area or bed.

Q. And then it shows the current cell assignment. Presumably, that's the assignment that they were given, correct?

A. Yes.

Q. And then what's "Current"?

A. Where are you looking?

Q. I'm sorry. The last column.

A. Oh, so --

Q. Oh, yeah, --

A. Oh, "Current Cell." Okay. I see. That is where they were assigned on that assigned date.

Q. Okay. And then the last column, though, where it says, "Current" again, is that just saying whether they're actually there now?

A. Oh. Yes. That's what that is.

Yes. I'm sorry.
Q. No. It's okay.
A. I was lost because I didn't -- okay.
Q. No. No. I didn't see that there were two "Currents," so we're both -- we're good.
Up on the top of the page, there's like Level 1. Do you see Level 1, Level 2, Level 3? What are those levels for?
A. Those are specifications that you can add when you type in your report function. And I don't remember what all those drop-downs contain.
Q. Okay. So this shows when they go in. Does it show when they go out?
A. Well, it -- could you clarify that a little bit?
Q. Yeah. That was -- that was terrible.
So, for instance, we're looking at 1943, and let's just look at the first line for Mr. Baqer, B-a-q-e-r. It shows the "Booking Date," 3/21/19, but does it show when he leaves the holding cell?
A. So because that was a separate booking date, based on this report, he would have

stayed in that cell until he bonded out. Because if you look at his next assignment, it's under a different booking date.

Q. Right. Okay. So -- but what I'm saying is, we can't look at this and see when he bonded out?

A. Correct. Correct.

Q. This is just when they go into a new cell?

A. Correct.

Q. Whatever that cell would be?

A. Yes.

Q. Okay. Is there a document that -- or is there a way to just search, you know, when they're in and when they're out?

A. Yes. There's a way to run a report of their -- I don't -- I can't remember what the report is called. But, yes, there's a way to generate their release date.

Q. Okay. And is that contained in this information?

A. I'm not sure. I would have to go through it and look again.

Q. Okay. Are the holding cells each the same size?

A. Yes.
Q. And I -- I think you gave us the size. I'm sorry. I know general pop you didn't give a size but --
A. Right. Because all of those are various sizes. But the holding cells are approximately 12 feet by 22 feet.
Q. Would there be any documentation of the condition of the inside of any holding cell on any given date?
A. Could you be more specific?
Q. Yeah. So I think you said that there are weekly inspections and monthly inspections. But is there any report that -- daily, as far as the status of that cell? Dirty, clean, we cleaned vomit, any of that stuff?
A. Probably not. As far as vomit, those would have been things that were cleaned up as they were reported. If there was a maintenance issue or something of that nature, there would have been a maintenance request submitted. But we don't generally just make a report of, you know, blood or vomit or things like that.
Q. How often -- I mean, if you have --

I think you said at times there could be more than 20 people in a holding cell, correct?

A. Yes.

Q. And how often, or is it even daily, that the cell is cleaned?

A. At least twice a day. And, again, as needed, if there was substance or somebody spilled their drink from lunch or things like that.

Q. So where do the 20 inmates go while it's being cleaned?

A. So usually what they do is they'll rotate them out. For example, let me give you this scenario, when they're doing showers. The cell will be cleaned when the inmates are in the shower. Once one cell is cleaned, they'll rotate inmates down from one cell to another and clean the next one. Or if they just have to pull them out and bring them down to another room -- it's referred to as video arraignment -- to clean the cells out. But they take them out so that everything can be sprayed down and wiped down.

Q. So twice a day they're emptying each cell completely?

A. Yeah. Excuse me. Yes, sir.

Q. That's all right. And -- and is there documentation of this?

A. I believe I referred to the logs earlier where they're cleaning. I can't remember what number it's under. But, anyway, there are -- yes. It's under I. 14I are the cleaning logs.

Q. Okay. I just want to look at those again.

A. And those start -- do you need the number on those?

Q. No. I see it on here.

A. Okay.

Q. I appreciate that.

A. And, again, those -- I mean, depending on how busy they were, they may not have logged every single time that they cleaned or swapped them around. And they're -- also, just so you're aware, there are different logbooks in these sections. So this was -- like this one's B-Main Panel. That was one logbook.

Q. Just so we're clear, 1962. So go ahead. I'm sorry.

A. No. That's fine. So this log was pulled, B-Main Panel.

Q. Okay.
A. So then you'll see after page 110, there's going to be another log that was pulled for a different logbook to give you more information on when cleaning was done. So just when you're going through this you know that the information is not contained to just this one electronic logbook.
Q. But as far as that specific area, B-Main Panel, you're saying that the log for the holding area is stored in this computer in the B-Main Panel?
A. So if you recall before lunch, remember how I was telling you how there's different computers throughout?
Q. Yes.
A. And everybody can see into the holding?
Q. Yes.
A. So in main control, in that pod area, the supervisor has a computer. The booking deputy has a computer. This guy on B-Main Panel has a computer. And they all have electronic logbooks. So they're all logging information. So the guy on B-Main Panel may have logged

cleaning. The supervisor may have logged cleaning. The guy in intake may -- it may be logged in different places is what I'm trying to let you know.

Q. Well, am I correct, though, that regardless of which station they use to log it, it's going to go into the same log?

A. Each -- each log is independent on its own. That's why I brought it to your attention, so that you knew that once you got to page 110, there's more information from -- let's see, this one is B-Main Panel. So when you get to Main Control, Front Window, which is 002 -- excuse me -- 002072, that's a different logbook.

Q. Okay. So then each station really --

A. Has its own independent log.

Q. But then how do all the guards stay in use? And, I mean, how do they all know what the other one is doing if everyone is logging everything in their own place?

A. Pass-on communication. Again, the guy working the panel is kind of keeping log of everything going on and everything he can see. And then the supervisor is doing most of the

logging. But the guys on the floor, actual boots on the ground, are probably not logging as much as the people that are seeing everything going on.

Q. So in order for me to determine, then, when the holding cells are cleaned, I would need to put all these into a single log?

A. Correct.

Q. And there's no way to pull that information as a single log?

A. I would have to look at it. It's been a while. So I would have to -- I would have to look at it again.

Q. So if the Sheriff wants to see if his subordinates are cleaning the holding cell, presumably, he's going to have to pull every single log from every single station and read them?

A. Again, I would have to look at it again. It's been a long time since I've looked at this system. Because it would be a lot of -- it would be a lot to download. So I would have to check into that and clarify.

Q. So how are these logs useful to anyone trying to supervise the place if all the

information is not contained in one location?

A. Well, I think it's useful because it's still there. The information can still be extracted. And, again, there's pass-on. They know what information needs to be passed on to the next shift.

Q. Yeah. But, for instance, Main Control, Front Window. So pass-on, they're going to know what they did and pass that on to the next Main Control, Front Window, right? But they're not going to know what B-Main Panel did?

A. No. Again, they're all in the same area. They're all in the same enclosed space within feet of each other.

Q. Okay.

A. And they're quite possibly logging the same exact information, just in two different books. Because each workstation has its own logbook.

Q. So wouldn't it be -- wouldn't it be the information for that station being logged into that station?

A. Not necessarily. Because you got to keep in mind, this particular area of the facility is unique in the way that it operates.

So let's say the sergeant had to step away, then the guy on the panel or even by the front window would log what's going on.

Q. So there's not a single log as far as what's going on in the holding cells. Instead, there's -- how many logs do we have then at any given time?

A. Let's see. There there could be four or five maybe.

Q. So for me to understand what happened in Holding Cell 1 on June 8th of 2020, I need to pull four or five logs, lay them all out and find the entries on each log for that day and put them all together?

A. To get a -- yes. And they did a key word search on these --

Q. Okay.

A. -- for, you know, what we were looking for for you.

Q. What's the purpose of the log?

A. To reflect what was done.

Q. But for what reason? I mean, why? Why do we need this information in a log?

A. Well, so we can keep track. It's all for documentation purposes.

Q. Well, I understand it's documentation. But why? Why are we documenting this information as an office?

A. To, again, make sure that people are doing what they're supposed to do, and we can go back. If there's something that we need to check into or address, we have some reference.

Q. So, for instance, I think you said if you wanted to make sure that the employees are disinfecting, correct?

A. Correct.

Q. So that would be in a log, presumably?

A. Yes.

Q. So for a supervisor to then go check to see if Holding Cell 1 was disinfected, they can't just go into a log and say, "Let me see what happened." They have to go pull five different logs and try to piece it together to figure out if that cell was disinfected, correct?

A. So, again, like I said, it has been a while since I used the system. I don't know if they can pull everything in one.

Q. Okay. And you're a supervisor there?

A. I was, yes.

Q. And did you ever go and pull five logs to see what happened in a holding cell on any given day?

A. In a holding? Not that I can recall.

Q. Okay. Did you have a mechanism available to you as a supervisor to just sign on and see right in front of you on one screen everything that happened on a particular shift for a particular time?

A. I have the same thing everyone else has access to.

Q. Which is?

A. The logbook.

Q. The logbook. And so while you're not sure whether the system has the ability to pull it all together, you, as a supervisor, never saw it in that fashion, all pulled together, correct?

A. Not that I can recall. Again, it's been -- it's been almost three years.

Q. Understood. So if you, as a supervisor, wanted to know what was going on, you'd have to go to each station and log in and

log in to that logbook to check, correct?

A. No. You can select what logbook you want to search. Does that make sense?

Q. Yes. So you're saying --

A. I don't have to physically walk to that station, but I can tell the system, "I need to check this logbook."

Q. Okay. But you would still -- as a supervisor, if you wanted to know what was going on, you had to look at four or five logs at once and make sense of them, basically?

A. Based on what I see here. Again, I'm not sure if we can pull it just using the keyword and not the location, leaving the location blank. You understand what I'm saying?

Q. Understood. But you don't recall ever using the system that way?

A. Correct.

Q. You only recall using it as separate individual logs?

A. Correct.

Q. And for what purpose did you use the logs as a supervisor?

A. Oh, there were various reasons that I -- that we would use them, whether it was to

see if somebody went to court on a given day or anything that happened. You know, if somebody says, "I didn't get fed on a certain day," something like that.

Q. Okay. And to figure out either of those questions, you would have to pull five logs?

A. Depending on the situation --

Q. Okay.

A. -- and the location.

Q. Was it used as a daily supervision tool?

A. I guess you would have to ask the supervisors that were working how it best suited their needs. Again, a lot was done -- a lot of pass-on was done verbally, as well as in the logbook. So it's probably a duplication, if that makes senses.

Q. So -- okay. So some of the pass-on information is verbal, and some is through the logbooks. So are you telling me then that the expectation is that when these guards come on duty, they're going to each pull five logs and figure out what's happened?

A. No. That's not what I'm saying at

all.

Q. Okay.

A. What I'm saying is the pass-on, where it is in the log, is also verbal. So the supervisor is logging, "This is what needs to -- this is happened on the shift. This is what we're passing on." But they're also verbally telling the next supervisor, "This is what we're passing on to you." But the deputies themselves are not going to go to each log and look at all of that.

Q. So the supervisor for the shift, the -- what's the -- not the lieutenant. Who's the next level?

A. Sergeant.

Q. So the sergeant. You're a sergeant now?

A. I am.

Q. Do you get assigned to the holding area?

A. I'm not assigned there anymore.

Q. Okay.

A. I work in training now.

Q. Okay. So were you ever assigned to the holding area as a supervisor?

A. No.
Q. If you were a supervisor, though --
A. Let me clarify that.
Q. Yeah. Sure. Go ahead.
A. I was the lieutenant over that. So I oversaw that area. I was not boots on the ground.
Q. All right. So because --
A. Does that make sense?
Q. Yeah. So since you were the lieutenant, then you knew exactly what your sergeants were supposed to be doing?
A. Yes.
Q. So then you know whether the sergeants were supposed to come on duty and pull five logs and review them so they knew what happened on the prior shift?
A. Their direction was never, "Hey, pull five logs." The expectation is, get the pass-on, and do what needs to be done.
Q. I see. But what needs to be done could only be documented in the logs or handed down verbally?
A. If it was documented, it was documented in the log, yes. And, again, passed

on verbally as well.

Q. All right.

A. So, again, like I said before, it's probably a duplication. It's in the log, and they say, "Hey, this is what needs to be done."

Q. Okay. Is there a policy that explains this to the supervisors, that you're to pass on "X,"Y," and "Z" information or that you're to review four or five logs?

A. No.

Q. So how did the sergeants know that that's what they were supposed to do?

A. Review the logs? Is that your question?

Q. Review the logs or pass certain information on.

A. Again, that's job experience, training, things of that nature.

Q. Okay. So is there a training program then that explains it? Is that going to be in that book?

A. There's not a supervisor training book. It's -- people are taught how to utilize the logbooks and search for things, even at the deputy level, to find out information and gather

pass-on or even make entries.

Q. So Holding Cell 1, disinfected, it's not just simply posted on the wall, "Disinfected at this time by this person," like you see in, you know, in your Wal-Mart bathroom?

A. No. It's in (indicating).

Q. And for here, where it's really important, they have to go through five logs or hope someone told them about it, correct?

A. I'm not saying they have to go through five logs. I'm just saying it's in a logbook. Specifically, if it's five, I don't know. Again, I go back to, I'm not sure if the system can pull everything at once with that keyword. I haven't used this system in quite some time.

Q. But as a supervisor back in the time, you certainly didn't use it that way?

A. This time period we're talking about, I can't recall using it during that time period for the instances that you're talking about.

Q. And switching a little bit to your personal. Now as a supervisor, you're in training?

A. Yes.
Q. So you should know whether the system can do that or not?
A. No. That's incorrect.
Q. Okay.
A. So instances for which you're talking about is specialized to a specific division. What training does is gets people ready to go to whatever division they're assigned to. It's up to that division to train them the specifics, give them the meat and potatoes of what happens in their division.
Q. And the meat and potatoes we're going to find in those blank books, correct?
A. Yes.
Q. All right. So in those blank books, if there was any training with respect to what is to be reviewed or passed on, I'm going to find it in those blank books?
A. Can you repeat that?
Q. If there's any training specific to what is to be logged and/or what is to be passed on, I'm going to find it in those training books?
A. Yes.
Q. I just want to make sure we're not

covering the stuff we already did here.
The particular inmate's medical files, are they produced in here or no?
A. Yes, they were.
Q. They are? Okay.
A. Uh-huh (affirmatively).
Q. But, again, you're not here to comment on --
A. Correct.
Q. -- the actual that was provided. But we can find it in here where? Just so --
A. Under M.
Q. Under M. Okay.
For each particular plaintiff are we going to be able to see, then, when they were provided with a blanket, when they took their shower, when they ate their food, when they received their hygiene products and what?
A. Okay. So their names are not specifically going to be shown, no.
Q. Okay.
A. It will show when holding was fed, when showers were given. And, again, like I stated before, sometimes when they logged, they didn't necessarily specifically put that hygiene

items were issued. But it's the understanding that they were given that at the time they were given their clothing exchange.

Q. So we should just assume and trust?

A. Yes.

MR. COLLINGS:

Object to the form.

BY MR. JACOB:

Q. Okay. So then as far as these individual things in 14, are they -- if there's a document that supports it, I'm assuming that I would go to the number and the letter in the book?

A. Yes, sir.

Q. Okay. So if it's not in the number and letter, it doesn't exist, at least in a logged format, is that fair, as far as things such as when a blanket was provided, showers provided, clean clothing provided, hygiene products provided, toilet paper provided?

A. I don't recall seeing a specific log pulled for blankets. I did -- I do recall seeing a couple notations about blankets in the shower logs, that showers were done and blankets were given. But, anyway, so for the -- to answer your

question, if there's logs or documents here, then that should satisfy your request. Am I on track?

Q. Yes.

A. Okay.

Q. Yes. Okay. So, like, for instance, toilet paper provided on this date, that would be 14X. And if there's a 14X, then it's either there or it's not?

A. Correct. And I think we covered that anyway.

Q. Right. I just wanted to make sure we're on the same page as far as how I'm to use these --

A. Yes.

Q. -- documents.

Okay. Inmate movement throughout the facility. If an inmate comes out of a cell, is that documented somewhere?

A. It should be. Unless, of course, it was, again, showers. We didn't log individuals that went to the shower. If they went to medical, it should have been logged that this individual went to medical and when they returned. If they went to court, that should have been logged as well. So that would have to

be a specific search that was done.

Q. Okay. But it was not logged, for instance, when the inmates were taken out of the cell so the cell could be cleaned?

A. The cleaning was done. It shouldn't have -- it wouldn't have been logged each individual inmate.

Q. Would the log, though, say whether the cell was emptied or not, or just that it was cleaned?

A. It may. I didn't read every single entry because it's pretty extensive. So it may. I can't speak to every single entry.

Q. But there's no log policy that says, "You're to log the following things in each log"?

A. Correct.

Q. So it's left to either the training in the books, hand-me-down experience, or just guards figuring out what they want to log or not log as far as what goes into the logs; is that correct?

A. It's experience, of course, and what they're trained on. I don't think they just willy-nilly, "I'm not going to do that today." Again, I think I said that earlier. You know,

we're giving them some professional -- we're hoping that they do their -- we're trusting that they're doing their job the way it's supposed to be done.

Q. Okay. But I'm a guard. I'm told to keep a log. If you don't tell me that you want to know in the log when, you know, inmates are taken out of the cell or when we're handing toilet paper or when we're providing hygiene items, then it's not a matter of me not wanting to do my job? It's just -- would you agree with me, it would just be, "I don't know what you want"?

A. If that was the case. But, again, the training book and -- excuse me -- the FTO manual, which is what -- the rook book, will give that information to you.

Q. Okay.

A. And, of course, the work -- the work experience or what you're referring to as hand-me-down knowledge is going to give them that information.

Q. So if it's not in policy and it's not in that training book, there's no way for the sheriff's office to prove that the information to

be contained in the log was taught to any particular guard? Would that be a correct statement?

A. I suppose.

Q. What penological interest was caused or furthered or necessary for these inmates to be in these holding cells in these conditions?

A. There was no penological interest other than we were waiting for a pretrial bed to become available. Again, there was no punitive action or malice to why they were in the cell for an extended period of time or under crowded conditions. Again, we were working daily to facilitate movement throughout the facility.

Q. Subject to certain decisions with respect to taking of other inmates, like DOC inmates, immigration, and federal inmates?

A. Yes.

Q. Okay. So it wasn't a matter of we don't have the beds? It's we're not willing to give the beds to parish inmates. We're only willing to giving the beds to DOC or federal inmates. Would that be a correct statement?

MR. COLLINGS:

Object to the form.

THE WITNESS:
I think -- again, it's a fluid situation. And those pretrial beds that you see on that report where you see there may be, let's say, ten on a Monday, okay, when all is said and done throughout that shift and that night, those ten may have gotten filled. People may have rolled out or moved to other beds in the facility, and then people bonded out from the back. And the beds that you see open the next day may not be those same exact beds.
So I guess what I'm saying is those pretrial beds may have actually been filled, but some may have also opened up. But there's only so many hours in the day and so much staff to get things done. You may not be able to fill everything that opened up on that shift, which is when the cycle starts over the next day.
BY MR. JACOB:
Q. DOC inmates, what -- is there a name for the area where they're held?
A. I mean, they were general population, but I guess we refer to it as a DOC

housing unit.

Q. Okay. DOC housing unit. How about the federal inmates, is there a name for where they're held?

A. Federal housing unit.

Q. Federal housing unit. Immigration?

A. It would have been federal housing.

Q. Still federal. Okay. Any other classification?

A. No.

Q. Okay. So is it a correct statement, though, the only place that you're looking to move an inmate from the holding cell is to what you -- what do you call the general pop where the parish inmates are?

A. Pretrial.

Q. Okay. So the only place you're ever looking to put an inmate from holding is pretrial?

A. Pretrial beds, yes.

Q. Okay. So it's not as if it was so fluid we couldn't keep up with the DOC and the federal beds? It was we never opened the door and looked in there, correct?

MR. COLLINGS:

Object to the form.

THE WITNESS:

No. That's not correct.

BY MR. JACOB:

Q. I'm being a little sarcastic. What I'm saying, though, is that it's not that you couldn't keep on top of who is in what bed in DOC and federal? It's those beds were never considered for the parish inmates?

A. No. Well, what I'm -- what I'm telling you is -- when I say it's a fluid situation, is we look through the pretrial general population beds and, you know, did anybody get time that day? We moved that guy to the DOC housing. Or can he be a trustee? We move him so we can open up those pretrial beds so that we can get those pretrials out of holding.

There are -- there are several factors and several ways to facilitate that movement is what I'm telling you.

So, yes, we're filling those DOC beds, but we may be filling those DOC beds from in-house because of whatever happened that day.

Q. Right. But, again, the only way they're getting a DOC bed is if they come under a

DOC sentence and the DOC contract?

A. Correct.

Q. All right. So there's no scenario where they're going from -- you're going to take a parish detainee from the holding cell and put them in the federal housing?

A. Probably not. Probably not.

Q. Well, name a situation where that would occur other than they just got sentenced for federal time and switched contracts?

A. Other than -- other than them, what you just named, switching their classification, I can't think of one right now.

Q. All right. So you could have the DOC and federal wings completely empty, and there's no scenario where you're taking parish detainees out of the holding cell and putting them in the DOC empty wing or the federal empty wing unless they happen to be sentenced that day to DOC time or federal time; is that correct?

A. What I'm saying is I can't think of a scenario right now.

Q. Okay. If you think of it before the end of the deposition, by all means, let me know.

A. Okay.

Q. All right. Were there any -- anything done to these five inmates -- is it five? I mean, I'm losing count. He keeps picking them off -- to my plaintiffs that was punitive in nature?

A. No.

Q. I mean, did you ever hear of anything? Did somebody come to you and say, you know, "This happened. We lost our temper," whatever? Anything like that?

A. No.

Q. Have you ever heard of that happening back in the holding cells?

A. No.

Q. What conditions of the confinement or treatment that the plaintiffs were subject to violated any of the office policies?

A. I don't -- I don't believe any.

Q. Do you know, as an office, whether the conditions of confinement for the plaintiffs complied with State Louisiana Title 22?

A. Yes. I believe we complied with that.

Q. And when you say, "we," you're saying the office?

A. Correct.
Q. And is that something that was checked?
A. So those, to my knowledge, mirror the same as your -- the DOC policies. And, again, we're audited on that. And our jail procedures are also written around that -- or those. Excuse me.
Q. Did Randy Smith, Greg Longino --
A. Longino.
Q. -- Longino, or yourself participate in, direct, authorize, permit the conditions that the plaintiffs were subjected to?
MR. COLLINGS:
Object to the form.
THE WITNESS:
So with regard to the overcrowding, I would say that, yes, I was aware of that. And, again, we did everything we could to facilitate getting that handled.
BY MR. JACOB:
Q. So switching to you personally here since we're skipping your depo tomorrow.
A. Okay.
Q. Tell me what it is that you did to

protect these five plaintiffs from the overcrowding situation.

A. So kind of like I described before, there are several steps that are taken every day to relieve the overcrowding. And it starts with, again, reaching out to drug court or people that are there on sanctions or awaiting staffing for drug court or for nonsupport. Reaching out to -- we had somebody that actually was assigned to the commissioner's office kind of as a liaison that was assigned -- it was a jail employee, and she worked very closely with him every day to say, "This is who's in holding. Can you please look at them? Can we get any bond reductions or signature, bonds, PR bonds, to get some of these people out?" She was also the one that we would be in communication -- myself or a captain or a lieutenant would call and say, "Hey, can you go up there and talk to them, see if you can get these people on the docket, get them expedited so we can get them out of here?"

If we needed to override -- if I needed to override a classification for an inmate worker to open up a bed to get them in a -- if they just got sentenced, I would do that. If I

needed to -- again, if I needed to make phone calls to help facilitate, you know, judges doing bond reductions or getting people moved into court on the docket faster, things like that, keeping staff on track with getting the DOC classifications done, to get their medical screens expedited so that we could open up those beds, get them in inmate worker beds. Or, again, if there were any that had just had gotten sentenced that were in pretrial beds, getting them moved. I know that was a lot.

Q. But the one thing you didn't do was take detainees out of the holding cell who were parish detainees and walk them back to the open DOC beds and put them in them?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Yeah, I answered that already.

BY MR. JACOB:

Q. Correct? But, no, for you, because we're talking about you now.

A. Well, yes.

Q. So you didn't do that?

A. I did not.

Q. And you knew that there were beds open, though, at times?

A. Correct.

Q. Okay. And how about with respect to Randy Smith and Greg Longino? Does the office know whether it's the same situation as far as their participation in this?

A. If necessary, I did bump those situations up to Chief Longino's level to let him know what we were doing to alleviate that situation. If he bumped that up to the sheriff, that's something that, you know, you would need to ask him.

Q. But as you sit here today on behalf of the office, you're just not sure what level of participation Greg Longino or Randy Smith had in knowing about the overcrowding and failing to alleviate it?

A. No. That's not what I said. I just told you I bumped it up to the chief if I needed to to keep him abreast of what we were doing to alleviate the overcrowding.

Q. Okay. So is it safe to say then -- or is it fair to say then that Greg Longino and Randy Smith knew that the holding cells were

overcrowded and that there were open beds that were designated for DOC or federal that were not filled?

A. I can speak to what I passed on to Chief Longino. I can't speak for what he passed on to the sheriff.

Q. Okay.

A. And what I passed on to him was the status of the holding cells and what we were doing to alleviate that.

Q. Did you ever tell him, "Here is the status of the holding cells. And, by the way, we have 'X' amount of empty beds in DOC and 'X' amount of empty beds in the federal"?

A. He was aware of that. If I'm not mistaken, they -- he got that same daily report that we discussed earlier.

Q. Okay. Now, just to make sure we're clear, you personally passed that information on to him? Or you, as an office, passed that information on to him?

A. Okay. So that I'm clear, which information?

Q. Okay. So, again, that the holding cells are overcrowded and that there's empty beds

in DOC and federal housing.

A. Okay. So both. Because the daily report would reflect that, that there's open beds and that holding is overcrowded. And myself personally by saying, either on the phone or whatever, "Hey, this is the situation, and this is what we're doing about it."

Q. Okay. Were you ever told by Greg Longino or Randy Smith, "We're going to move those parish detainees out of the holding cell and into the empty DOC or federal beds"?

A. No.

Q. Were you ever told not to move them from the holding area into the DOC or federal beds?

A. Not that I can recall, no.

Q. Did you ever say, "Hey, we have beds we can put them in, but they're earmarked for DOC and federal, and so we need to put these detainees into those beds"?

A. No. There wasn't a conversation like that. Again, the conversations were, "This is the situation. We're moving inmates by 'X,' 'Y,' and 'Z,' making these calls, making these moves." The same fluid situation I've kind of

described a couple of times.

MR. JACOB:

Hey, Chad, just off the record for a minute.

(OFF RECORD.)

BY MR. JACOB:

Q. Going to -- well, we'll stay on the 30(b)(6). Randy Smith, Greg Longino, and yourself, as an office, do you know whether these three persons had knowledge of the conditions that we discussed here today of confinement in the holding cells?

A. So, again, myself and the chief were aware at times of the overcrowding of the holding cells. Again, as far as what was passed on to the sheriff, you would have to ask Greg Longino.

Q. Okay. But you can say that Greg Longino at least knew what was going on in those holding cells on any given day that he was at the office; is that fair?

A. You'd have to ask him. Like I said, when things had to get bumped to his level, I passed information on to him.

Q. What had to get bumped to his level? What was something that you would say, "I have to

report this to Greg Longino"?

A. So, like I described before, "Here is the situation. We have this many people. These are the steps we're taking over here. These are the calls we're making. These are the moves that we're trying to get made. I'll keep you abreast, let you know as the day progresses where we're at," things like that.

Q. Anything else that you were required to bump up to him?

A. I mean, specific to this?

Q. Yes, that's fair. Specific to all this stuff.

A. No.

Q. Okay. Did -- I understand that you're not sure about Randy Smith. But did Greg Longino ever tell you why it was that the overcrowding was going to remain in the holding cells and that those inmates were not going to be moved into DOC housing or federal housing?

A. So it's much like I explained before, we can't release them without proper documentation from the judges of the detaining agency and, again, facilitating the movement through different steps.

Q. That's not my question. I'm sorry. Maybe I misspoke. My question is more specific.
Did Greg Longino ever tell you why it was that they're going to leave the overcrowding in the -- in the holding area and not open up some of those DOC and federal beds for these inmates?
A. I don't remember a specific conversation where he said, "Don't do that." I think I answered that earlier.
Q. Right. But I'm more asking did he ever say why that the situation continued?
A. I feel like I just answered that. No?
Q. No. No.
A. Can you maybe ask it a different way or --
Q. Sure. What I'm hearing you say is, "He never told me not to do it. And I told him what we were doing to alleviate it." But what I'm not hearing is whether Mr. Longino ever said, "We're keeping this procedure in place, overcrowding here and empty beds in DOC and federal because of the following reason"?
A. Right. Well, that's what I was

trying to explain to you is, we can't release without the proper documentation, and there are procedures and practices in place to facilitate the movement.

Q. All right. But that doesn't explain whether he ever told you the reason why they're not going to open up the DOC beds or the federal beds for parish detainees.

A. I feel like I answered --

Q. Yeah. No.

A. Okay. Ask me again.

Q. Yes.

A. Sorry. I'm sorry.

Q. No. No. No. It's all right. I'm not asking why you didn't release from the holding cell to the street. I'm asking did Greg Longino ever tell you, "We know there's overcrowding in the holding. We are not under any means moving them to the DOC housing or federal housing for the following reason"?

A. No, not that I can recall.

Q. Okay.

A. Okay.

Q. Are you aware of any administrative process or procedure that is used to track or

document complaints or concerns that may have been stated by guards, corrections officers, inmates, oversight agencies, anybody, about what's going on in the holding cells?

A. So there is an in-house ARP system for the inmates to use. And we actually produced those. What number are you on? Do you mind if I ask?

Q. Yeah, no worries. I got to find it, too. No. 22.

A. 22.

Q. And can you, for the record, you said, "ARP"?

A. ARP, Administrative Remedy Procedure.

Q. Okay. Would that be your version of a grievance procedure?

A. Yes. Yes. It's a grievance procedure.

Q. All right.

A. And that is 002347. That's our policy.

Q. Okay. And this grievance procedure is used for inmates to submit complaints?

A. Correct.

Q. How about if a complaint comes in from a guard?

A. So that could be handled different ways. They could go to their supervisor. They could come to myself, the chief. Or they could go straight to internal affairs if they weren't comfortable with that.

Q. Was there a policy, though, that governed this?

A. I'm not sure.

Q. Meaning was there a policy -- just to make sure we're clear on the record.

A. Yeah.

Q. Was there a policy that informed guards or other employees, if you have the following types of complaints, this is the procedure you're to use to submit them?

A. I don't believe so, mainly because it's not here. But, yeah, I don't believe there's a formal policy for that.

Q. And how about any deficiencies noted by any third-party agencies, regulating agencies, was there a place where that was logged?

A. That would be on their actual report of their audit. Or in the case of the fire

marshal, the report that they submitted before they left. That would be noted on that document.

Q. Were there any complaints that were documented from 2019 to 2020 from guards, corrections officers, inmates, government agencies regarding the conditions of the holding cells and the treatment of inmates in the holding cells?

A. There was, I believe, a deficiency noted by the fire marshal, which is -- has been provided. And then there was -- under 23, there are -- so I'm talking about 002363, those are our grievances that were submitted outside of your clients during that time, I believe.

Q. About conditions of confinement?

A. Yes.

Q. Okay. Do you know if there was any administrative, internal, civil, criminal investigations conducted with respect to the conditions of confinement or treatment of the plaintiffs with respect to the holding cells?

A. So as far as administrative, it would have been we would have had to check into their grievance. But as far as like internal, civil, criminal, not that I'm aware of, no.

Q. Okay. Well, how about like, for instance, I mean, this complaint, federal complaints came in. I mean, those -- I think you would agree with me. They're literally titled, "Complaints." So did they kick off an internal investigation when there was the lawsuit filed?

A. We -- I mean, documents were pulled together so we could start gathering information. And then I was transferred kind of shortly after. So I can't speak for what happened. But I would assume that, you know -- obviously, based on this, that, you know, it was being looked into.

Q. Okay. So for No. 24 where it asks to identify any such investigations, do you know whether there was an internal investigation that was started after the filing of the federal lawsuits?

A. I mean, I guess I wouldn't call it an investigation. I know we're producing documents and stuff, checking -- or that doesn't sound right. So I guess by definition, then, yes, it would be called an investigation.

Q. Well, you're responding to litigation. I understand that. But I'm asking was there an internal investigation as to whether

the policies, practices, and training of the sheriff's office was actually complied with with respect to these inmates and their complaints that are stated in the federal complaint?

A. Not that I'm aware of.

Q. Do you know why not?

A. I do not.

Q. Do you know if there was any remedial training or discipline doled out as a result of the conditions of confinement that the plaintiffs were subjected to?

A. To my knowledge, there was not.

Q. And is that because there was no internal investigation, so we don't know whether there were any violations of policies or training?

A. Can you -- I'm sorry. Can you repeat that?

Q. Is that just the mere fact of there can't be remedial training or discipline unless there's an investigation first?

A. Correct.

Q. Does the office know what process was followed to search for any electronic communications like e-mail or things of that

nature that may have discussed the conditions of confinement in the holding cells?

A. So I believe IS pulls all that information together because they would have access to everything.

Q. IS being?

A. IT. I'm sorry. Information systems.

Q. Okay.

A. I know it's called different --

Q. IT. Okay.

A. Yeah.

Q. But do you know, as an office, --

A. Yes.

Q. -- was there a search done for any e-mail related to these claims?

A. As far as I know, yes.

Q. And do you know whether that included a search of inboxes, sent boxes, delete boxes, draft boxes of e-mails?

A. I believe so, yes.

Q. When you say you believe so, based on what are you basing that belief, that it should have been done, or that you have information that it, in fact, was done?

A. That's the normal process based on -- based on what I know. So I wasn't there when they did it. Does that answer your question?
Q. So when you say, "the normal process," the normal process with respect to when the agency is sued?
A. Pulling documents when documents are requested.
Q. Okay. But, again, as you sit here, you don't know whether that, in fact, has occurred?
A. No. IS pulled the information.
Q. So you can sit here as an agency and say with certainty that IS did a search of the e-mail system for anything related to these claims and these inmates?
A. Yes.
Q. Is there a policy that covers that issue?
A. I don't believe so.
Q. Now, just because we're going to forego your deposition tomorrow, I think when there were clear issues that were personal to you, we, you know, clearly deviated from that.
A. Sure.

Q. But as far as any of the information that we discussed here today, do you personally have a different recollection or understanding of any of these topics? Or is it your belief that if I ask you the exact same questions, I'd get the same answers?

A. No. No. My -- everything would be the same except I would -- I would probably clarify when we discussed as far as them receiving mattresses in the holding cells and, --

Q. Okay.

A. -- you know, us not giving them the necessities. I believe they had the necessities. They had access to medical care, you know, food. They could wash their hands and brush their teeth when they needed to, and they were given showers a couple times a week. I understand it was uncomfortable. And, again, it was temporary. But I don't -- I don't think that we deprived them of necessities.

Q. Okay. What's the definition of "temporary" as far as you're concerned for this agency?

A. Not long term. Not months. Not years.

Q. So what's the definition of "temporary"? You're a training coordinator; is that right?

A. No. I'm an instructor.

Q. I'm sorry. You're an instructor. You've been a supervisor. I think you are still considered a supervisor, right?

A. (Nods head affirmatively.)

Q. Yeah. You have rank.

So as a supervisor, I'm interviewing you, and I say, "Sergeant, what's the definition of temporary for your holding cells?" What's your answer?

A. I think that it can vary, just like when we discussed that there's nothing specific to a timeline. It can be a day or maybe longer. But, again, not months or years.

Q. Okay. So -- but weeks can still fall within the definition of temporary?

A. Yes, I think so.

Q. Four weeks? Or is that where the line is, at a month?

A. I think that, you know, several weeks would not apply, you know, when you pass -- just not long term.

Q. Okay. At trial I'm going to ask you this question. So I'm going to ask you where the line is. Can you tell me today where the line is in time that goes from temporary to no longer temporary?

A. Again, I would say that there's not a specific time because somebody could be in there for a day, or, again, like, unfortunately, in this case, where it was a couple weeks where they were in there. But at the end of the day, it's temporary. They're not staying in there. They're either bonding out, or they're moving when we can get them an available bed.

Q. Would you agree with me, though, the inmates who are in general population in the jail are there temporarily in the context of their entire life?

A. I would.

Q. Okay. So I'm going to ask you with the holding cells, at trial, where the line is for temporary. And I'm going to ask you how many days or how many weeks. And is your answer going to be what you provided, or is it going to be that the agency never told me what it was? Or what's it going to be?

A. I'm telling you that as I sit here, I can't give you a specific time.

Q. Okay. Can't give a specific time, and yet it is not permitted to be longer than that time, correct?

A. Than what time? What are you asking me?

Q. The temporary time.

A. Not weeks or months.

Q. Okay.

A. Or months or years. Sorry.

Q. Okay.

MR. JACOB:

Do you have anything?

MS. HARTON:

I'm good.

MR. JACOB:

I have no further questions.

MR. COLLINGS:

All right. Let's take a break for a minute.

THE WITNESS:

Okay.

(Brief recess was taken.)

MR. COLLINGS:

Okay. So during the break, I handed the court reporter a thumb drive which has a copy of both books that you've been using, Sergeant Kelly, and we're going to attach those to the deposition as Exhibit -- did you attach the notice, by any chance?

MR. JACOB:

No. But let's do that, actually. That's not a bad idea.

MR. COLLINGS:

So counsel is going to give the court reporter the notice and the attachment. That'll be Exhibit 1.

(Document marked as Exhibit No. 1 for identification.)

MR. COLLINGS:

And the thumb drive with everything contained on it will be Exhibit 2.

(Thumb Drive marked as Exhibit No. 2 for identification.)

MR. JACOB:

Sounds like a plan.

EXAMINATION BY MR. COLLINGS:

Q. All right. So a couple of questions

just to clarify some of my notes, Sergeant Kelly.

Let's start with finance. You reviewed the notice of deposition --

A. Yes.

Q. -- for today and the attachment?

A. Yes.

Q. And the various topics?

A. Yes.

Q. Were you asked to prepare today for any questions regarding the finances of the sheriff's office?

A. No.

Q. Did you review any information with respect to the finances of the sheriff's office?

A. No.

Q. Do you know anything about how much the sheriff is paid for the housing of parish pretrial detainees either in the years 2019 or 2020?

A. No.

Q. All right. And that's with respect to both your individual capacity and as a representative of the sheriff's office, correct?

A. Correct.

Q. Okay. You were asked a lot of

questions about sanitation inside the jail, in particular, the holding cells. Do you have any reason to believe that any employee with the sheriff's office failed to do what was expected of him or her with respect to maintaining the sanitation -- the proper sanitation levels inside the holding cells in the years 2019 or 2020?

A. No.

Q. Do you have any information to suggest that there was anything that was unsanitary within the inside of the holding cells in the years 2019 or 2020 which was not remedied once it was -- the sheriff's office was made aware of it?

A. No.

Q. You were asked a series of questions about training. And I know some of these things kind of got conflated. So let me make sure I'm clear on this.

You're currently in the training division, correct?

A. Correct.

Q. All right. So correct me if I'm wrong, but when a new hire is made by the sheriff's office, they are given an initial new

hire training program, correct?
A. Correct.
Q. And that's done at the training division, correct?
A. Yes.
Q. And then once that person finishes that basic level of training, if that person is going to be assigned to corrections, are they given a POST 3 level of training at the training academy?
A. Yes.
Q. And POST 3, that is a statewide curricula, correct?
A. That's correct.
Q. All right. And how long does that POST 3-level training last, approximately?
A. About three weeks.
Q. All right. And once that three-week level of training is then finished and that new hire is then assigned as a corrections officer at the jail, is there a next -- is there yet another level of training that occurs at the jail?
A. Yes. It's that -- what I was discussing, the FTO program where they're put with a senior deputy that's certified as a

trainer.

Q. All right. And do you have any knowledge to suggest that at any time in the years 2019 or 2020 anyone that was going through their training at the jail was not properly trained on maintaining a sanitary environment in the holding cells or making sure the inmates were properly fed and cared for?

A. No.

Q. And, to your knowledge, all the new hires during those two years were, in fact, trained to those standards, correct?

A. Yes.

Q. With respect to the necessities, the various necessities that we talked about, I heard that word used, and I wrote it down. To make sure I'm clear, new -- newly-admitted pretrial detainees to the jail are given what exactly by the sheriff's office once they're admitted into the jail?

A. When they're still in holding, or when they're admitted to the jail count?

Q. No. When they've gone -- they hit the sally port, they're brought in, they're booked, they're processed, they're medically

screened, and what is then given to them from a necessity standpoint?

A. So when they do their clothing exchange and shower, they're given the soap, comb, toothbrush and toothpaste, and they can keep that on their person.

Q. All right. And once that person then moves to the back of the jail, do they keep that -- those things that have been given to them already?

A. They can keep that, but they're given another allotment of it in their rollback pack in addition to toilet paper, another set of uniforms, their mattress, sheets, towels.

Q. Okay. All right. And while they're in this holding cell, they're also given a blanket every night to sleep with?

A. Yes.

Q. And, to your knowledge, the inmates, were they able to sleep in the holding cells notwithstanding the fact that the lights were kept on all night?

A. Yes.

Q. All right. And do you know why the lights were kept on at night?

A. I don't know a specific reason. I think, from my perspective, just from my experience, it's easy. You can see all night long through the holding cell, you know, so it's -- maybe it's a safety thing. You know, the guards can see no matter where they're standing, whether it's in B-Main or down on the floor.

Q. And is there a health concern with respect to new inmates that's heightened that's different than someone who, say, has been in the jail for weeks or months or even years? Do they come in with some -- is there a reason why they're monitored more closely in those first two or three days?

A. Yes. Because that's the time when they're most at risk for suicidal ideation, because their whole universe just changed.

Q. Right. And is it also a time when the concern is they may be coming down off of some --

A. Sure.

Q. -- some kind of narcotic or other drug --

A. Yes.

Q. -- that they may -- they may need to

detox from?

A. Yes. That's correct.

Q. So those would be two reasons why the lights would be kept on 24/7 in the holding area?

A. It could be a good reason, yes.

Q. All right. And you talked about how the jail is sort of a fluid environment. People come and go on an hourly basis into holding, out of holding. From holding, they would bond out. A lot of inmates would come into holding -- is it not true that inmates would come into holding and many of them would never even go to the back of the jail? Many would bond out before they ever were processed to the back of the jail?

A. Correct.

Q. All right. And everything that happens within the jail requires resources; is that correct?

A. Excuse me. Yes.

Q. All right. And probably the largest, the biggest, the most finite resource that dictates everything else is manpower; is that correct?

A. Yes.

Q. And is it safe to say that given the finite resources within the sheriff's office and within that St. Tammany Parish Jail, while in the years 2019 and 2020, that the sheriff's office did the very best job it could do with respect to moving inmates out of holding as quickly as possible?

A. Yes.

Q. All right.

MR. COLLINGS:

That's all I have for you, ma'am. Thank you much.

MR. JACOB:

I have a couple of follow-ups.

REEXAMINATION BY MR. JACOB:

Q. What did you review to prepare for that answer about resources during the years 2019 and 2020?

A. I'm sorry?

Q. Well, you were just asked questions about the resources of the sheriff's office in 2019 and 2020. So I was wondering on what information were you relying? What did you review to prepare on that topic today?

A. Knowing what resources are

available?

Q. Yes.

A. I mean, just experience.

Q. Okay. So how many employees were available to the sheriff's office for corrections in the year 2019?

A. I'd have to go back and look at the specific number. But being shorthanded has always been an issue. Not just for our facility but for this profession in general. But to get specific numbers, I'd have to go back and look.

Q. Okay. And so how were the resources at the facility allocated in 2009 (sic) and 2020?

A. So remember how we were talking about the shift roster?

Q. Yes.

A. That's what I'm referring to. If there's a shortage somewhere else for various reasons, then a person has to be moved from one area doing one job to another area to make up for the difference.

Q. So if you were to move five inmates from the holding cell to the DOC cells, how does the resource issue change?

A. Because there's various things that

have to be done throughout a shift. And it's not as specific as moving them from a DOC housing unit to a pretrial unit. Moving inmates at all takes staffing. So if they go to move people and an emergency happens, everything has to stop. So people may not get moved right then and there. Does that make sense?

Q. So if you have "X" number of inmates in the holding cell and it's determined that we're going to move three inmates from gen pop over to DOC cells because they got resentenced --

A. Uh-huh (affirmatively).

Q. -- and that's going to free up three beds in gen pop, and so we're going to move three inmates from the holding to those beds, same resources being used?

A. Yes.

Q. Okay. So, really, where they're housed didn't affect the resources, correct?

A. It does. Again, it depends on what is going on at the facility at that particular moment.

Q. So you're talking about at the moment of the move?

A. Correct.

Q. So the move might not be able to happen in the morning? It may need to happen in the afternoon because there was some emergency?

A. Correct. Excuse me. Correct.

Q. Okay. But it's not a two-week emergency, though, correct?

A. Correct.

Q. All right. So the issue of resources really is not the reason why there was overcrowding in the holding cells?

A. It's a factor.

Q. Explain that.

A. Well, I just did. So if you have somebody that's been in there for -- well, all -- everybody that's been in there for an extended period of time, it delays it just that much longer. Again, like I was explaining earlier, we pull the person that's been there the longest to move next. Well, if everything has to stop, that guy just got pushed back another couple hours, so -- and when you start adding all that up, it does start to push back how much longer that guy has to wait to get put in a bed.

Q. I see. But if the bed is never available to him, it's not a matter of resources?

It's just a matter of there's no circumstance in which you're getting that bed because that's for a DOC inmate?

A. No. The scenario you just talked about, you were talking about inmates that move from a pretrial bed to a DOC bed. That bed will become available, but we have to have people to move that guy so that those beds can open up by moving him -- moving those three individuals from pretrial to DOC.

Q. How about a situation, though, where all the pretrial beds are filled, nobody is moving, and you're in overcrowding in the holding cell, and you have 50 empty beds in DOC? Is it a resource issue that you're not going to put anybody from the holding cell into the DOC beds, or is it that you're not allowed to put the parish detainees into the DOC beds?

A. Well, I think -- I think all the factors are different based on whatever is going on at that time.

Q. So what resource then would need to change in order to take a parish detainee from the holding cell and put them directly into a federal or DOC bed?

A. Well, if their classification has changed, we're back to you have the staffing to move those bodies around the facility.

Q. Okay. Let me put it this way. No classification changed. Okay? So take that off the table. You just simply have 20 parish detainees in the holding cell. What resource needs to change in order to move them from the holding cell to a federal bed?

A. I mean, I think we covered that earlier, is that that's a decision that was never discussed to say they -- you can't do that one way or the other. It's not a matter of, you know, you don't have enough people because there are beds designated for those classifications of inmates.

Q. So it wasn't a resource issue but rather a refusal to provide a resource to the -- to the detainees in the holding cell, correct?

MR. COLLINGS:

Object to the form.

THE WITNESS:

No. That's -- oh, sorry.

That's not what I said. You're talking about a scenario where there's no

pretrial beds. That's what you just said.

BY MR. JACOB:

Q. Right.

A. We're talking about a scenario where there's beds and movement that can be done.

Q. My question goes to no pretrial beds and overcrowding in the holding cell area, and you have just parish detainees in the holding cell. So nobody is a DOC inmate. Nobody is a federal inmate. And nobody is moving from, you know, the pretrial beds. They're still keeping their classifications. What resource needs to change? Or what resource did the office not have that precluded taking the parish detainee and putting them in a DOC or federal bed?

A. I don't know that that was ever the case.

Q. Okay. So it wasn't a resource thing?

A. That was not a scenario that I'm aware of.

Q. I see. Okay. So when we saw on the charts, for instance, 20-something, you know, in the holding cells and we saw, you know, maybe two beds available in the pretrial, and we saw

50-something beds open in the DOC, what resource was missing to move them directly from the holding into the PA -- excuse me, into the DOC or federal beds?

A. Again, that is a -- those beds are designated for those classifications. When you have the pretrial beds, there are several things going on. So we don't know who those people were, how long they were there. Are they in their 72 hours for direct observation? We don't know all of those things right now.

Q. So let me change the hypothetical here. Let's say I give you a guard for every single empty bed in the DOC wing and every single empty bed in the federal wing, and you have overcrowding in the holding cell. Are you going to put them into -- are you going to put the detainees that are in the holding cell into those DOC and federal beds?

MR. COLLINGS:

Object to the form.

THE WITNESS:

That's a decision we have to -- have to consider.

BY MR. JACOB:

Q. So you're -- so you're telling me that it was strictly manpower is one of the reasons those DOC and federal beds weren't made available?

A. I didn't say that was strictly the reason. It is a factor.

Q. All right. So are you testifying then that if there was enough manpower, those beds would have been opened up for -- the DOC beds that were earmarked for DOC and the federal beds that were earmarked for fed, they were suddenly going to be available to holding cell parish detainees?

A. No, I never said that.

Q. Okay.

A. What I spoke to was getting those pretrial beds filled. There are several factors. And one of the factors into getting people moved around is having enough staff to move people around the facility.

Q. Understood. And I think you said those delays could be hours, maybe a half-a-day delay?

MR. COLLINGS:

Object to the form.

BY MR. JACOB:
Q. Is that correct?
A. Could be.
Q. Okay. But not a two-week delay?
A. Correct.
Q. Okay. So -- okay. We'll leave it at that.
With respect to training, you were asked about the POST training; do you recall that?
A. Yes.
Q. What does the POST training say about how to sanitize a cell?
A. It's not specific to how to sanitize. It just gives a general -- again, it's one of those that gives you the bare bones of what DOC requires, and it's up to each facility to give the meat and potatoes of what needs to be done for their facility, because each facility is different.
Q. So when we subpoena the POST training, that's what I'm going to see in there, what you just said?
A. You're going to see what their curriculum is.

Q. Okay. Are you even sure that that's even covered?
A. Yes.
Q. So you're sure, as you sit here, that sanitation of a cell and how to sanitize a cell is covered by the POST training?
A. What I said is it's not that specific. So there is a section in there on cleanliness of a facility, but it's not specific to, "You're going to use Hepacide this many times a day." It's not that specific. It's bare bones of what DOC requires.
Q. And can you give me just an example then of what the training -- so I understand your answer, when you say, "bare bones," what do you mean?
A. It's -- it's a -- like a guideline of what the facility should be doing in regard to how they're handling DOC inmates. But, again, not just specific to DOC inmates at our facility. It would be everybody in general population.
Q. So are you saying it would say, "You need to keep the cell clean"?
A. More or less, yes.
Q. Okay. It would --

A. I don't know exactly what verbiage it is. I wasn't prepared to speak to every word in the POST manual.

Q. No. That's fine. But you were answering questions about POST, so I just assumed you knew what you were discussing when you were answering those questions.

A. I do, but I don't know every single word verbatim.

Q. Sure. Sure.

A. Okay.

Q. So -- but when you were asked about whether, you know, they're taught how to train -- or excuse me -- whether they're taught in POST about how to clean to the level of, you know, sanitation that's required, what I'm hearing, though, is that's actually not covered in POST to that level of detail?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Correct. It's not a detailed outline of what we've been discussing all day.

BY MR. JACOB:

Q. Okay. So it's not there. Yet there are standards, we agree, that Department of Health requires?

A. Yes.

Q. Okay. So -- but the POST training doesn't -- doesn't detail those standards, correct?

A. Correct. It is not detailed.

Q. Okay. And I think we also talked about how policy of the sheriff's office doesn't detail those standards, correct?

A. Yes. We've covered that.

Q. And I think you said, though, that the only other place we might find that is in the training books for the holding cell; is that correct?

A. Not for the holding cell. The field training program. Rook book.

Q. The field training program workbook?

A. Rook book.

MR. COLLINGS:

Rook book.

THE WITNESS:

Rook.

MR. COLLINGS:

Rookie, as in "rookie."

MR. JACOB:

Okay. Rookie book. Thank you.

BY MR. JACOB:

Q. So is that different than the training book that you were referring to?

A. No. It's the same thing.

Q. All right. So we're on the record, it's a -- say it again.

A. It's a field training manual, but it's commonly referred to as a rook book.

Q. And the rook book is what is used to train the new hires?

A. Correct.

Q. Got it. And so do we know whether that rook book details how the sanitation is to be conducted?

A. Again, that would be one of those things that is outlined specifically with the trainer and would be notated in their daily notations of what that recruit is doing.

Q. No, I understand that. I'm saying the field training officer, though, the information that they need to provide to the rookie is detailed in that rook book, correct?

A. I'm sorry. Say that one --

Q. Yeah. I guess what I'm getting at is, the field training officer is going to take the rook book and see, "I need to train him to do 'X,' 'Y,' and 'Z,'" and they're going to train them, and how they perform will be detailed in the book?

A. Oh, correct. Yes. I'm sorry.

Q. Right. So what I'm saying is, it's not that the -- how they perform is going to dictate what they need to be trained. It's going to be in the rook book what they need to be trained?

A. Yes.

Q. Okay. You mentioned with the lights kept on that that could be one of the reasons, do you recall, when he was talking about safety?

A. Yes.

Q. But do you know what the reason was that those lights were kept on?

A. No. No. And that's what I said. I don't know that that is the reason. I don't know what the actual finite reason is for that.

Q. Okay. So when you're agreeing with counsel, it just sounds like a good possible

reason, but you don't know what that reason is?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Right. I do not know what the reason is.

BY MR. JACOB:

Q. Okay. I mean, I could say, "Hey, we'd be able to see mice better," and you would say, "Yeah, that could be true," right?

MR. COLLINGS:

Object to the form.

THE WITNESS:

I suppose.

BY MR. JACOB:

Q. Okay. So, so what? I mean, it's not the actual reason, though, is what I'm saying?

A. Right.

Q. We don't know what the actual reason is?

A. Correct. Yes. That's what I said.

MR. JACOB:

All right. I have no further questions.

MR. COLLINGS:

Just to make sure I'm clear on one thing.

REEXAMINATION BY MR. COLLINGS:

Q. You started work at the St. Tammany Parish Jail in what year?

A. 2002.

Q. All right. And you were there until when?

A. July of 2020.

Q. Okay. And the leaving the lights on, was that something that basically has been in place since you got there?

A. Yes.

Q. Inside the holding cell?

A. Yes.

Q. Okay.

MR. COLLINGS:

That's all I wanted. Thank you.

REEXAMINATION BY MR. JACOB:

Q. Okay. So this was a practice that you knew was in place that you didn't stop?

A. Correct.

MR. JACOB:

No further questions.

(Whereupon the proceedings were concluded at 2:10 p.m.)

WITNESS' CERTIFICATE

I, SERGEANT LACEY JOI KELLY ROBERTSON, do hereby certify that the foregoing testimony was given by me, and the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.

____________________ ________________________________
DATE SIGNED (Witness' Signature)

Signed with corrections as noted.

Signed with no corrections as noted.

DATE TAKEN: January 17, 2023

REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original seal on this page.

I, ANNA M. ROTH, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that SERGEANT LACEY JOI KELLY ROBERTSON, to whom oath was administered, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 214 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter nor is there any such relationship between myself and a party litigant in this matter. I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

ANNA M. ROTH, RPR, CCR

CERTIFIED COURT REPORTER

NO. 2010021