UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO. 2020-CV-980-WBV-DPC

JUDGE VITTER

MAGISTRATE CURRAULT

JURY DEMAND

AHMED BAQER, KLABERT JOSEPH GUILLOT, JR, AND KLABERT JOSEPH GUILLOT, SR.
Plaintiffs

VERSUS

ST. TAMMANY PARISH GOVERNMENT, a/k/a ST. TAMMANY PARISH COUNCIL, ST. TAMMANY PARISH SHERIFF'S OFFICE, RAND SMITH, in his official and individual capacity, RODNEY J. STRAIN, in his official and individual capacity, GREG LONGINO in his official and individual capacity, and LACEY KELLY, in her official and individual capacity
Defendants

CONSOLIDATED WITH

NO. 2:20-cv-01840-WBV-DPC

LOUVIERE

VERSUS

ST. TAMMANY PARISH GOVERNMENT

Deposition of TERRY MATTHEW HALL, JR., taken on Tuesday, October 11, 2022, at the Glorioso Law Firm, 2716 Athania Parkway, Metairie, Louisiana 70002, commencing at 1:27 PM.

REPORTED BY:

Lori L. Marino
Certified Court Reporter

APPEARANCES:

(PRESENT IN PERSON:)

MILLING BENSON WOODWARD, LLP
68031 CAPITAL TRACE ROW
MANDEVILLE, LOUISIANA 70471
TELEPHONE: (985) 292-2000

BY: CHADWICK W. COLLINGS, ESQ.
ccollings@millinglawcom
REPRESENTING THE DEFENDANTS

GLORIOSO LAW FIRM
2716 ATHANIA PARKWAY
NEW ORLEANS, LOUISIANA 70130
TELEPHONE: (504) 569-9999

BY: MARIA B. GLORIOSO, ESQ.
maria@gtorts.com

and

(PRESENT BY TELEPHONE:)

JACOB LITIGATION
P.O. BOX 837
MECHANICSBURG, PA 17055-0837
TELEPHONE: (717) 796-7733

BY: DEVON M. JACOB, ESQ.
djacob@jacoblitigation.com
REPRESENTING THE PLAINTIFFS

WITNESS INDEX

TERRY MATTHEW HALL, JR.
5708 WILDAIR DRIVE
NEW ORLEANS, LOUISIANA 70122


| | |
|---|---|
| TITLE | 1 |
| APPEARANCES | 2 |
| INDEX | 3 |
| AGREEMENT OF COUNSEL | 4 |
| EXAMINATION BY MR. COLLINGS | 5 |
| EXAMINATION BY MR. JACOB | 31 |
| REPORTER CERTIFICATE | 45 |


EXHIBIT INDEX


| | |
|---|---|
| EXHIBIT A - NOTICE OF DEPOSITION | 18 |
| EXHIBIT B - COMPLAINT | 18 |

S T I P U L A T I O N

It is stipulated and agreed by and between counsel that the deposition of TERRY MATTHEW HALL, JR. is hereby being taken under the Federal Code of Civil Procedure for all purposes in accordance with law;

That the formalities of signing, sealing and certification are hereby waived. The party responsible for service of the discovery material shall retain the original.

That all objections, except those as to the form of the question and/or responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof may be used in evidence.

* * * * * * * *

LORI L. MARINO, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

TERRY MATTHEW HALL, JR., having been first duly sworn was examined and testified on his oath as follows:

EXAMINATION

BY MR. COLLINGS:

Q Well, good afternoon, Mr. Hall. My name is Chadwick Collings. I represent the sheriff and the other defendants that you've filed a lawsuit against. How are you doing?

A How are you doing?

Q I'm doing wonderful. So let's start with just some basics. Have you ever been deposed before?

A No, sir.

Q A deposition is a question and answer session. I ask questions. You answer the questions. Everything you say is transcribed under oath by our court reporter. So as a result of that, we have a couple of things we got to make sure we're clear on. First of all, I will try to give you the courtesy of allowing you to finish all of you answers before I begin a question, and I will ask you to let me finish my questions before you begin to respond, because if we talk over each

other, it's incredibly difficult for her to transcribe our session today, okay?

A Okay.

Q The other thing is you have to give verbal responses. A shake of the head or um-huh, unh-unh, I may understand what you mean. She really can't transcribe that. So I would need you to say yes, no or some other verbal response, okay?

A Okay.

Q And if you don't understand any of my questions, I would ask of you that you tell me you don't understand it, and I will rephrase it in a way that hopefully you will understand. Otherwise, I will assume you understand it, and we'll go with your testimony, okay?

A Okay.

Q So with all of those things being said, let's just start with the very basics. Please state your full name and address for the record.

A Terry Matthew Hall, Jr. Address is [redacted]

Q How long have you been at that address?
A My whole life.
Q Your parents live there?
A Yes, my parents.
Q And you live with them?
A Yes.
Q What is your date of birth?
A [redacted]
Q Let's go through your educational background. So where did you go to school?
A High school, from seven to 12th grade, I went to McMain High School, and I had some college at Delgado.
Q You graduated from McMain?
A McMain, yes, sir.
Q And what year?
A 2008.
Q And you went to Delgado for how many semesters?
A We can say I went to Delgado six years.
Q Six straight years?
A Six straight years, yep, on and off switching majors.

Q What were you studying?
A It went from computer, computer engineering to business, and then, it went to general studies. Then, it stopped there.
Q What year was the last year you attended Delgado?
A Probably like 2013, I want to say.
Q Did you receive any kind of degree from Delgado?
A No, sir.
Q Other than Delgado, have you attended any other educational institutions subsequent to your graduation from high school?
A I went to trucking school in the East, East New Orleans.
Q What year was that?
A That was 2000 -- around Corona, 2019.
Q What was the name of that school?
A It's ran by Chris Porsche. I can't remember the name of it. The instructor is Chris Porsche.
Q Is that spelled like the car?
A Yeah, spelled like the car.
Q And is that --
A It's in Houma, Louisiana.

Q The school is in Houma?
A Um-huh (affirmative expression).
Q I thought you said it was in New Orleans East?
A Well, no, you go to the in-class part over here in Houma, and then, they bring you to New Orleans East to do the yard, the yard work, backing up the trucks and stuff like that.
Q Did you graduate from that trucking school?
A Yeah.
Q Do you have a commercial driver's license as a result?
A Yes.
Q What year did you graduate from that trucking school?
A 2020. Of July.
Q So McMain, Delgado and the trucking school. Any other education beyond that?
A No, sir.
Q Were you ever in the military?
A No, sir.
Q What is your phone number?
A It's (504) 338-8144.

Q Is that your cell?
A Yes.
Q How long have you had that number?
A Over six years.
Q Any other phone numbers other than that one?
A No, my phone number got -- since 2014, no.
Q Let's walk through your work history. So did you have any jobs while you were in high school?
A Yes.
Q Where'd you work?
A I worked at Papa John's on Claiborne across from McMain High School.
Q How long were you there?
A I was there for five years.
Q What did you do at Papa John's?
A I made pizzas, and then, I end up becoming a shift manager.
Q Then, why did you leave Papa John's?
A I end up getting a job at a security place.
Q Do you know the name of that security?

A CGI Security.
Q Where did you have to provide security for CGI?
A In New Orleans East when they was building the hospital on Read Boulevard.
Q How long did that job last?
A I did that for two years.
Q All right, and you were a uniform security officer?
A Yeah.
Q Were you licensed to carry a firearm?
A Yes.
Q Did you go through the State Police background check?
A Yep.
Q That job ended when?
A That job ended when I went to jail in 2014 for the charges that I was convicted of in 2015.
Q All right, let's talk about that. You say you were arrested in 2014.
A Yep, August 2014. It was at the end of the month, around like August 26th, 27th.
Q Where were you arrested?
A Arrested at a rental property I was

living in. It was on Pasture Boulevard. I can't remember the address, but it's right by UNO Lakefront, right by -- off Elysian Fields.

Q I thought you said earlier -- maybe, I misunderstood you that you had been living at the same address your whole life. Was there a rental place somewhere in-between that you also lived?

A Well, yeah, I was living there. My mailing address was over there. I was renting -- I was staying with a friend, renting like a room over there at that time.

Q So NOPD arrested you?

A Um-huh (affirmative expression).

Q You have to say yes or no.

A Yes.

Q What was the charge?

A NOPD arrested me -- issued a search warrant, but it came from St. Tammany. I was arrested that day. I was arrested for cultivating marijuana, possession of marijuana. The warrant, it was a shooting I had got into in Slidell. I think I ended up getting convicted of aggravated second degree battery and distribution of marijuana.

Q Let me try to dissect some of what you just told me. So in 2014, you were arrested by the NOPD --

A Um-huh (affirmative expression).

Q -- for a warrant that was issued in St. Tammany Parish?

A From St. Tammany, yeah, but when Orleans came, I had other stuff at the house. So I went to jail in Orleans first, and then, I went to St. Tammany Parish.

Q What were the charges that were in Orleans Parish?

A The cultivating of marijuana and the possession of marijuana and a possession of a firearm is what I was charged with in Orleans Parish.

Q Had you ever been arrested before that August 2014?

A Yeah. I had a possession of marijuana charge, I want to say when I was working at Papa John's. It had to be around '07, because I was still in high school.

Q So you were arrested in '07 for possession of marijuana?

A Yeah, around -- that's the first

charge I ever got, yeah.
Q After '07 but before August of '14, were there any other arrests by any other agencies?
A Nope.
Q So the aggravated second degree battery, that was a charge that came out of St. Tammany Parish?
A Yes.
Q That's a charge you ultimately pled guilty to?
A Yes.
Q You pled guilty in St. Tammany Parish?
A Yes.
Q When was your adjudication of that charge? Do you recall?
A What you mean by that?
Q Like when did you go to court and plead guilty?
A In 2015.
Q What was the sentence imposed for that charge?
A I was sentenced to -- I think it was 10 years suspended, five years of probation,

because I got convicted of that charge; and in St. Tammany, I got convicted of possession of marijuana, and I got convicted of distribution of marijuana.

Q So for those charges, that's at least two felonies, right?

A I think it was three, because I think I had like a second offense marijuana, because of the first time; and at that time, they didn't do -- the second offense marijuana was still a felony. So I caught three felonies actually.

Q How long were you in the jail for those three charges?

A The only jail time I did was when I first got arrested. I spent like maybe, a week in Orleans Parish and maybe, a week and a half in St. Tammany until I bonded out.

Q Did you bond yourself out, or did somebody do that for you?

A My mom bonded me out.

Q So the aggravated second degree battery, what were you accused of?

A I was -- basically, it was a drug deal gone bad. I was in Slidell selling

drugs, marijuana to someone, and they end up robbing me, and I end up shooting them.

Q Did you hit them?

A Yeah.

Q Where did the bullet impact that person?

A If I'm not mistaken, I think I shot him six times in the back.

Q They were running away from you?

A Yeah, because it was more like -- it wasn't just me out there. It was like 12 other people. So like the commotion broke out, and yeah, he was running away, yep.

Q Did you hit anyone else?

A No.

MR. JACOB:

Objection. Chad same instruction as before. If you want to ask about what arrests he's had, feel free, but that is more broad than the ultimate evidence rule as certain convictions are admissible; but to get into the underlying situation,s if there is criminal charges, not appropriate. So I'm

going to instruct him not to answer any of those questions, and my objection goes to what he's already been asked.

MR. COLLINGS:

Okay, I heard you. So we're going to continue on.

BY MR. COLLINGS:

Q So the aggravated second degree battery, the distribution of marijuana and the possession of marijuana, second offense, those were all three in St. Tammany Parish, right?

A Yes.

Q And those were adjudicated in 2015, correct?

A Yes.

Q Then, subsequent to 2015, have you been arrested since then?

A No. Besides going to jail for the 15-day sanction, no.

Q Fifteen day what?

A Sanction for the probation.

Q Okay, well, let's talk about that. Why were you put in jail for a probation violation?

A Because I failed drug test at the probation office.
Q So you had to go to a probation office in St. Tammany Parish?
A Well, no. They transferred me to Orleans, because I lived in Orleans.
MR. COLLINGS:
For a matter of housekeeping, we're going to attach as Exhibit A, a copy of the notice of deposition for today's deposition of Mr. Hall and Exhibit B will be a copy of his complaint filed in the Eastern District of Louisiana.
BY MR. COLLINGS:
Q I'll get to your particular allegations. So according to page 19, paragraph 112 of your complaint, it says Mr. Hall was arrested on October 18, 2019 and brought to St. Tammany Parish Jail for an administrative sanction; is that accurate?
A Yes.
Q The administrative sanction in this case was you went to your probation officer in Orleans Parish and tested positive for an

illegal substance?
A Yes.
Q What was the substance?
A Marijuana.
Q So they revoked your probation at that point?
A The sanction wasn't a revoke. It was just me, I guess -- that's what the option was. The option was either go see the judge and get it revoked, or I could take 15 days, and I could just keep going, and that's what I chose.
Q So you began your incarceration in St. Tammany Parish for the second time, because you were incarcerated in 2014, correct?
A Right.
Q In 2019, beginning October 18, 2019, you were then re-incarcerated in St. Tammany Parish Jail, correct?
A Correct.
Q How many days were you in the St. Tammany Parish Jail?
A Fifteen days.
Q In those 15 days, how many days were

you in a holding cell?
A Fifteen days.
Q So you stayed in the holding the entire 15 days?
A First holding tank.
Q You never left that particular holding cell?
A Only to take a shower, walk down the hall and come back.
Q So there's more than one holding cell; you're aware of that?
A Right.
Q But you were always --
A I was always in the first one.
Q And that's the number, number one?
A I guess. I mean, I say the first one, because that's where the door. If you come in through the jail door, first one you come to, them double doors, it's right there.
Q How many other inmates were in the holding cell with you during your 15 days?
A I could say it ranged from minimum 15. I done seen it get at least to 30.
Q You saw 30 inmates there at one time?
A Yes.

Q You're sure about that?
A Positive.
Q How many days were there 30 inmates in the holding cell with you?
A Maybe, the first or second day. To the first or second day it was. Then, they started adjusting and moving people around.
Q In your 15 days, how many times did you get to take a shower?
A First week, twice; the second week, once. That's because they had like a commotion, and they didn't do showers.
Q So in 15 days, you took three showers?
A Yeah.
Q Were you fed?
A Yeah, they brought food.
Q How many meals did you get a day?
A You got three.
Q Any issues with the food?
A Not with the food, no. I mean, it's jail. No.
Q Were you allowed to sleep?
A Yeah. Yes, you could sleep, yes.
Q And the holding cells, did they have

benches in them?
A No.
Q Where did you sit?
A I ain't going to say -- it's like a cement block that's made into a bench, one along each side of the wall.
Q So there's a cement block that you can sit on or lay down on, right?
A Against the wall, yep.
Q When you slept, where did you sleep?
A First day I got there, I slept on the floor, and then, like the days went by, I moved to the bench part and slept on the bench.
Q Did any inmates assault you or batter you while you were in the holding cell for 15 days?
A Not me, no.
Q Did you file any grievances with the sheriff's office while you were in there for 15 days?
A While I was in there, no.
Q Were you able to use the restroom while you were in the holding cell?
A Yes. They had a toilet in the

holding cell.

Q Did it work?

A Yeah, it worked.

Q And you were able to use it when you needed to?

A Yeah. Not so clean, but yes.

Q How many times, other than when you were taking a shower, did you leave the holding cell?

A No time.

Q When you went to take a shower, did you get clean clothes at that point?

A Yes.

Q When you were sleeping, did the sheriff's office provide you with a blanket?

A Yeah, a blanket. A couple of days, we didn't get a blanket. Like when I told you we had the commotion with the shower, them one or two nights, we didn't get a blanket; but the other days, they did hand out blankets.

Q Let's talk about that commotion. It's kind of vague. I want you to explain what you mean by commotion.

A Inmates getting rowdy with the deputies, and then, they say you know what, we

ain't doing nothing, and they're walking off, and they're saying we'll try again tomorrow.

Q So the other inmates, not you, were having issues with the correction officers?

A Right.

Q But that wasn't you?

A Right. No.

Q Did you ever have any issues with any of the correction officers at the jail?

A Other than getting the toilet paper and like, you know, just a toothbrush and stuff, I ain't have no commotion with them.

Q Let's talk about that. When you say other than, what does that mean?

A Just trying to -- you know, you just got to keep asking. So it might take like all day just to even get them to give you the toilet paper or the toothbrushes or the toothpaste. Most times, to be honest, we'll snatch it off the counter when we're coming out of the shower, because it will be on the little table. So we'll just hurry up and grab it, because we might not even get it.

Q But you ultimately got toilet paper and toothbrush and toothpaste?

A Yeah. Ultimately, yes.
Q Tell me if you can in your own words how you were mistreated, if you were at all, at the St. Tammany Parish Jail in October of 2019.
A I would say the conditions of sleeping on the cement floor, you know, all day, like 15 days straight. You know, I felt like -- I felt like I had a sentence already, and I felt like I should have got a mat, you know, or something. You know, the pillow we're using our shoes; or the pillow, I'm asking them to get a toilet paper roll just so I can just sleep with that. You still had toilet paper like thrown up at the ceilings, because the guys in there trying to block the vent, because it's freezing cold.
Q So it's too cold in your view?
A It's freezing. A lot of moisture. When I left St. Tammany after the 15 days, I had gangrene between my feet, because of the moisture of just sitting there. No socks, you know the toilet, like I said, wasn't so clean. I ain't going to even lie to you. The only time they -- I didn't see nothing. We

done spilled food on the floor, and they're using their slipper picking the food up just to pick it up, because they ain't going to come around and clean the cell for probably -- I'm gonna be honest. They came every two days and clean the cell. All they'll do is make us sit up on the benches, on the cement benches, spray bleach on the floor, hit it with the mop.

Q You think that happened every two days?

A Yeah, maybe, two days. I was only there for two weeks. So I can say I saw them probably like once a week, maybe, twice to clean a cell.

Q Let's talk about your gangrene on your feet. Now, did you ever see any nurse or doctor at the jail for your gangrene?

A I only saw the nurse like the beginning time, like when you check in, they make you do the urine test and stuff like that. I only saw the nurse for that. No, after that, no.

Q When you left the jail, did you go to a doctor's office?

A Yeah. To be correct, I think I went to an urgent care after.
Q Where was that urgent care located?
A It should have been the one -- I want to say on Leon C. Simon by the lake, by upper, like, West End Park.
Q You would have gone there how many days after you were released from the jail?
A I think maybe, my second day, because when I came home that first day, I stayed at home, took a shower and stuff, and I think I went that second day.
Q How do you attribute your gangrene to your incarceration at the jail?
A Because the gangrene coming from the moisture, it being dirty, bacteria, not being able to shower, get between my toes, you know. That's exactly what that was coming from.
Q Okay.
A And I really think the humidity made that even worse, because of how it's being so cold in there.
Q The doctor that you saw at that urgent care on Leon C. Simon Boulevard, did he diagnosis you with gangrene?

A Well, he said yeah. He said I had gangrene, and they gave me ointment and some antibiotics to take, and I want to say, if I'm not mistaken, they gave me a couple of shots, because I had told them I was in jail; and they gave me a couple, I think, it was steroid shots just to make sure I didn't have no other infections or anything going on.

Q Did that condition on your feet resolve?

A Yes, it's resolved.

Q How long do you think it took to resolve?

A I would say maybe, a week or two.

Q Did you go back and see any other doctors for any other issues related to your incarceration at the St. Tammany Parish Jail?

A No, sir.

Q Did you suffer any mental damages as a result of your incarceration at the St. Tammany Parish Jail?

A For like the first couple of weeks, I mean, my fiance said -- I'm not gonna even lie to y'all. She said I was talking in my sleep, acting like I was still in the jail. Like,

you know, yelling out, like man, y'all be quiet. You know, talking in my sleep acting like I was still there for like a week; but other than that no, other than like laying on that concrete with my back, other than that, I had a lot of back pain, and that can contribute from like sleeping on concrete for 15 days.

Q Did you see any doctors for your back pain?

A Back pain, no. To be honest, no.

Q You mentioned your fiance told you that you were talking in your sleep. What's your fiance's name?

A Danielle Mackie.

Q Are you all still together?

A Yes.

Q Are you married?

A No. Not yet, no.

Q Have you ever been married?

A No.

Q Do you have any children?

A No.

Q Did you ever go see a psychiatrist, psychologist or other mental health

professional for any of these other issues with regard to your sleeping after the jail?

A No, sir.

Q Who was it who threw the toilet paper up at the ceilings?

A The inmates.

Q Did you ever do that?

A No. To be honest, it was already -- they already had toilet paper, like, already up there.

Q And they were trying to block the air vents?

A Yes, that's what they were trying to block, the air vents.

Q So did you ever move to any other area of the jail while you were incarcerated?

A No, sir. Only place I went was to shower or, like, that beginning part to the nurse, and I stayed right in that first holding tank.

Q And you were released because your 15-day sanction was complete?

A Yes, sir.

MR. COLLINGS:

That's all I have. I tender the

witness.

EXAMINATION

BY MR. JACOB:

Q Hi, Terry. Devin Jacob?

A Hey.

Q I got a few follow-up questions for you, and then, we'll have you out of here?

A Okay.

Q I think you mentioned that there's a toilet in the cell.

A Right.

Q Can you tell me or can you tell us, describe a little bit about that toilet?

A Toilet is, I want to say, like steel, all steel. It has a fountain on top of the toilet where you drink your water from. The toilet was in the back, right corner of the holding tank.

Q While you were there, was the toilet clean, dirty?

A It was mostly urine all over the floor, because they wasn't coming clean up too often; but when they did, they'll catch it, but you know, they'll have inmates coming in now, and urine will be all over the floor. So

you have to clean it yourself every time you either go to the toilet or try to use it.

Q Just so I understand, there was urine on the floor, correct?

A Yeah, urine was on the floor. For sure, urine was all over the floor. No feces was on the floor. Maybe some toilet paper, but for sure urine was on the floor most of the time.

Q How about on the toilet itself, was there urine, feces?

A I would say urine. Maybe, water coming from when they're washing their hands, they're coming over the toilet, because that's where the sink was, but mostly urine. No feces though, no feces.

Q Did you see any vomit or blood in the cell anywhere?

A No. No vomit. You might have somebody spill their food though. That might be left, because they didn't have no broom or anything to sweep that up with. So they like sweep it with their shoe up close by the door, and we'll them to come clean it, and they'll sweep it up then; but other than that, no

vomit, no blood.

Q You mentioned something about the urine moving from that area. Was that because people would walk through it?

A Yeah, because when you go by the toilet, you know, you got to turnaround and sit in it. So if they got urine on the floor by the toilet, they're walking with urine on their feet through the holding tank. So, yeah.

Q And then, this is the same floor that you were required to sleep on if there was no bench space, correct?

A Yeah. No bench space, you had to sleep on the floor.

Q When you slept on the floor, then, you were sleeping on urine?

MR. COLLINGS:

Object to the form.

BY MR. JACOB:

Q You can answer?

A Yes. Yeah, some spots, yeah. If you was -- that's why you have to pick a good spot on the floor when it's time to lay down, yes.

Q Were you always able to find that

good spot, or did you sometimes sleep on urine?

MR. COLLINGS:
Object to the form.
THE WITNESS:
Most of the time, I did not sleep on urine. I end up sleeping, like, on the bench or getting a spot before everybody starts to go ahead and start laying down.

BY MR. JACOB:

Q That was most times. Were there any times though that you were relegated to the floor?

A Yeah. I mean, the first two nights, I slept on the floor for sure. So yeah, I slept on the floor twice for sure.

Q Again, when you slept on the floor, you were sleeping among I think you mentioned old food and urine.

MR. COLLINGS:
Object to the form.
THE WITNESS:
Yes.

BY MR. JACOB:

Q How did it smell inside that cell?
A Close to the urine, it smelled like urine, you know, urinal. It was very cold. I wouldn't say -- the smell, basically, came from the humans not taking a shower. So very musty, if I could say that.
Q What was the temperature like in the cell?
A I would say freezing, because we always had our hands inside of the jumper, because we were freezing. To me, I would say at least 60 degrees if I had to, you know, estimate.
Q How often was the floor cleaned?
A The most I've seen it cleaned in a week was maybe, twice. That's the most.
Q And how was it clean?
A How? They'll come in. We'll have to sit on the benches, and they'll come in with another, a trustee, I guess that was. He'll come with a bleach spray bottle, spray the floor and then, come with a mop.
Q And then, was the floor dry?
A It was -- it's common sense. Like we'll wait until the floor dry, but did they

dry the floor, no. Like, no.
Q Were you provided with blankets? I don't recall what you said.
A Blanket, I had probably one or two nights without a blanket, blankets was given to us, but that was only at nighttime, like time to go to bed.
Q Were you ever specifically denied blankets or bedding?
A Yes. For sure, two days I didn't have a blanket for sure.
Q And what was the reason that was provided for you not having a blanket?
A That was because of the inmates, I guess we could say, commotion in the jail, having a discrepancy with the guards.
Q What do you mean a discrepancy with the guards?
A The inmates going back and forth with the guards through the holding tank, and then, like, they tell them, like, you know, look, we're not giving y'all nothing today, so.
Q So there was an argument between the guards and the inmates.
A Right.

Q And so the withholding of blankets was a punishment?
A Right. You could say that, yes.
Q Were you provided with opportunities to go out of the cell to engage in physical activity or recreational exercise?
A No, sir.
MR. JACOB:
Hang on one second, here.
(Brief pause.)
BY MR. JACOB:
Q When you did get a blanket, can you just describe the blankets?
A I want to say it was a dark color blanket. One time we got a sheet, a white sheet, one time, a thin, white sheet; but the regular blankets, some of them had holes in it; some of them didn't; and some of them was cut all different sizes. So you might even be able to get one that is too small, like not even long enough to cover your body. So they was all different type of sizes.
Q Were they clean?
A Yeah -- I'm going to say yeah, they was. When they did give it to them -- I ain't

going to say clean. It was warm, like they came out the dryer.
Q Were they ever wet?
A Never was wet.
Q And then, when did you receive -- or let me ask this better. Did you ever receive clean clothes?
A Only the days I went and take a shower.
Q I think you said that was what, twice while you were in there?
A I was in St. Tammany 15 days. I could say I only took a shower three times.
Q Tell me how you felt emotionally while you were in the holding cell.
A It wasn't too good, because, like, it would have been better, like, if they -- they would have had like a TV or something. They didn't have no windows. I thought I was going to an area where I could lay down and do the 15 days and watch TV. So, basically, I was just stuck in this square with at least 15 people everyday, and all it is is them just talking, talking, talking, all day, all night. No clock to even see the time. You got to ask

the guards what time it is. It was an emotional distress, like, you know, and sleeping on the concrete was really the cake for me. Like, I wasn't prepared for that. Like I didn't think I was going to have to sleep on a concrete bench for 15 days straight like.

Q How did you feel as a person though, being treated in that way?

A I been to jail before, and I felt just me staying in that holding tank like that, that was kind of harsh, because that really made me -- that really messed with my brain. Like, you know what I'm saying? Just sitting in there, and all you're looking at is these four wall and a toilet all day. I know that wasn't the way that I was supposed to be just sitting in there for 15 days, because if I knew that were the way it was, I wouldn't have even failed a drug test. I wouldn't have even went that route in my situation.

Q But how did you feel as a person? Did you feel degraded or --

MR. COLLINGS:

Object to the form.

THE WITNESS:

I felt -- I ain't gone -- really, like I was a dog in a cage, and all they really had to do was feed you and make sure you was, you know, alive in there. So I mean, and they gave you the three -- the meals a day but psychologically, it mess with your brain, because it's unhuman like to sit in one area for 15 days and not move.

BY MR. JACOB:

Q Did the guards ever say anything mean to you?

A Not to me, but, you know, when they'll come in there and come in the tank, the holding tank, they'll be like man stop banging on this, you know, this f-ing door before I put y'all -- before I come lock y'all back up, and y'all ain't going to get nothing. They'll talk like that, you know. That's when they'll threaten you like, look, y'all keep cutting up like that, we ain't going to give y'all no blankets, you know. So they're using that as their will to, you know, control them,

control the inmates in the holding tank.

Q What I'm understanding you to say is that they were using the conditions to control your behavior?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Yeah, I would say, because if I'm banging on the door like, the guard would come in there. I done see him, like, man, if y'all don't get him to stop banging on the door, we're going to cancel all blankets for the night. Y'all ain't going to have no blankets. So I done seen --

BY MR. JACOB:

Q I'm sorry go ahead.

A I done seen it happen like that. Like, that's a way to control them, because them blankets was like something we needed. So, you know, everybody in the holding tank be like, all right, y'all calm down. We do need them blankets tonight. It's going to get cold.

Q Was there anything that you asked for

that was not provided?

A I would say it was provided, but it took a while. Like the deodorant, the toilet paper, the toothbrush, all that, that took forever to get. Like, it done took us like 10 hours to get that supplies, where I felt like that's kind of like something the government gives out. That should be freely at will. Like if I need toothbrush, you know, deodorant I shouldn't have to like starve off of one little pack and stretch it for weeks.

Q Right. Did the guards ever explain why they were treating you guys the way that they were treating you?

MR. COLLINGS:

Object to the form.

THE WITNESS:

No. They'll just be like -- I'm not gonna lie. They always say -- they'll tell you that we'll get it, and, you know, it's just -- you got to keep asking until you really could get his attention to get it, because he'll tell you he'll get it every time.

BY MR. JACOB:

Q Did you feel safe in the cell?

A When we got over 20 people in a holding tank together, grown men, I don't know if it really was safe. I mean, I didn't think it was, because to me, that was a lot of grown men in one cell, like, overcapacitated for sure. I know that.

Q Was there anybody in the cell that you were particularly afraid of because of their behavior?

A No. No. Not anybody particular, no.

Q Did you see any fights while you were in the cell?

A Oh, yes.

Q Tell us a little bit about that.

A While I was there, they probably had like two altercations, and the guards came in there quick and broke it up. It wasn't long-term. It was maybe, probably like a 10 minute -- 10-second scuffle, and then, the guards come busting in, making everybody sit down, and they're pulling them out the holding tank.

Q Do you know what it was the

individuals were fighting over?

A Not to my knowledge, no.

MR. JACOB:

Okay, I have no further questions.

MR. COLLINGS:

That's it. Thank you.

MR. JACOB:

Thank you.

(Whereupon, the deposition was concluded at 2:10 PM.)

C E R T I F I C A T E

I, LORI L. MARINO, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that TERRY MATTHEW HALL, JR., after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 44 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

Dated this 17th day of October, 2022.

LORI L. MARINO, CCR
CCR #87069
STATE OF LOUISIANA