UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

AHMED BAQER, KLABERT JOSEPH GUILLOT, JR. And KLABERT JOSEPH GUILLOT, SR.
Plaintiffs

NO. 2020-cv-980-WBV-DPC

VERSUS

JUDGE VITTER

ST. TAMMANY PARISH GOVERNMENT, a/k/a ST. TAMMANY PARISH COUNCIL, ST. TAMMANY PARISH SHERIFF'S OFFICE, RANDY SMITH, in his official and individual capacity, RODNEY J. STRAIN, in his official and individual capacity, GREG LONGINO, in his official and individual capacity, and LACEY KELLY, in her official and individual capacity
Defendants

MAGISTRATE CURRAULT

CONSOLIDATED WITH Louvier v. St. Tammany Parish Government
No. 2:20-cv-01840-WBV-DPC

ALL CASES

DEPOSITION OF KLABERT JOSEPH GUILLOT, SR., given in the above-entitled cause, pursuant to the following stipulation, before Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, at St. Tammany Parish Jail, 1200 Champagne Street, Covington, Louisiana, 70433, commencing at 10:10 o'clock a.m., on Wednesday, the 12th day of October, 2022.

I N D E X


| | Page |
|---|---|
| Caption | 1 |
| Appearances | 3 |
| Agreement of Counsel | 4 |
| Examination | |
| MR. COLLINGS | 5, 61 |
| MR. JACOBS | 47 |
| Reporter's Certificate | 64 |

APPEARANCES:

For the Plaintiffs:

JACOB LITIGATION
Attorneys at Law
BY: DEVON M. JACOB, ESQ.
P.O. BOX 837
Mechanicsburg, PA 17055-0837
(Via Telephone)

And

GLORIOSO LAW FIRM
Attorneys at Law
MARIA B. GLORIOSO, ESQ.
2716 Athania Parkway
Metairie, Louisiana 70002

For the Defendants:

MESSRS. MILLING, BENSON, WOODWARD, L.L.P.
Attorneys at Law
BY: CHADWICK W. COLLINGS, ESQ.
68031 Capital Trace Row
Mandeville, Louisiana 70471

Reported By: Raynel E. Schule
Certified Shorthand Reporter
State of Louisiana

S T I P U L A T I O N

It is stipulated and agreed by and among Counsel for the parties hereto that the deposition of KLABERT JOSEPH GUILLOT, SR. is hereby being taken pursuant to the Federal Rules of Civil Procedure for all purposes in accordance with law;

That the formalities of reading and signing are specifically waived;

That the formalities of sealing, certification, and filing are hereby specifically waived.

That all objections, save those as to the form of the question and responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof is used or sought to be used in evidence.

* * * * *

Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

KLABERT JOSEPH GUILLOT, SR., having been first duly sworn by Raynel E. Schule, was examined and testified on his oath as follows:

EXAMINATION

BY MR. COLLINGS:

Q. All right. Good morning, sir. My name is Chadwick Collings. I represent the St. Tammany Parish Sheriff along with several other defendants in this matter. I need you to please state your full name and your current address for the record.

A. Klabert Joseph Guillot, Sr., [redacted]

Q. All right, and that is your home address?

A. Yes, it is.

Q. All right. What is your date of birth?

A. [redacted]

Q. All right, and we're taking this deposition today at the St. Tammany Parish Jail where you are currently incarcerated, correct?

A. Yes.

Q. And how long have you been incarcerated here?

A. Since April 21st.

Q. Of this year?
A. This year.
Q. All right. So this lawsuit was filed back in 2020 regarding an incarceration you had previously here at the St. Tammany Parish Jail --
A. Yes.
Q. -- and so we're going to talk about -- we're going to talk about your entire history, but I wanted to just make sure we're clear that we're talking about your time in the jail back in -- in, let's see, December and January of -- December of 2019 and January of 2020. You understand that?
A. Yes, sir.
Q. All right. So have you ever been deposed before?
A. No, sir.
Q. All right. So this is a question-and-answer session. I ask questions; you provide answers, and everything you say is transcribed and under oath. You understand that?
A. Yes, sir.
Q. All right. It's important for our court

reporter that you allow me to answer -- oh, I'm sorry, that you allow me to ask questions, and then you wait, and then you provide your responses, because if we talk over each other, it's very difficult for her, okay?
A. Yes, sir.
Q. If you don't understand a question I ask you, I need you to tell me you don't understand, and I'll try to rephrase it so that you can. Again, if you don't say anything, I'm going to assume you understand my questions and all of your answers are truthful, okay?
A. Yes, sir.
Q. All right. Last, I need you to give verbal responses to all of my questions. A shake of the head or a huh-huh or an unh-unh, I understand what you mean; however, the court reporter can't really transcribe that effectively, okay?
A. Yes, sir.
Q. All right. So we are here today to talk about a lawsuit that you filed back in 2020 in which you were one of a number of

individuals who sued the Sheriff along with some other defendants alleging some unconstitutional conditions of confinement. Are you aware of that?

A. Yes, sir.

Q. All right.

MR. JACOB:

Chad --

MR. COLLINGS:

Yes.

MR. JACOB:

-- I'm just going to insert an objection to one of your instructions where you said that you're going to assume the he's answering the question that you're asking. I'm just going to object and say that your assumption is at your own peril.

MR. COLLINGS:

Well, that's the same instruction I gave your three -- your clients three times yesterday, so I'm a little surprised that you're objecting now, but I -- I will take

whatever you say, and the record will reflect it, okay?

MR. JACOB:

That's okay, but that's always the case with depositions anyway, but go ahead.

BY MR. COLLINGS:

Q. Okay. So right now, let's start with a little bit about you. We've got your date of birth. Let's talk about your educational background. Where did you go to school?

A. Holy Cross.

Q. And you graduated from Holy Cross?

A. Yes, I did.

Q. All right. What year?

A. '85.

Q. All right. Did you have any education beyond high school?

A. USL in Lafayette.

Q. All right. Did you graduate from USL?

A. No, I did not.

Q. All right. How long did you attend USL?

A. One year.

Q. All right, and what did you study?

A. General studies.
Q. All right, and would that have been 1986?
A. Yeah, year after I graduated from high school. I had a scholarship to go there for five years, but I didn't succeed. I didn't go.
Q. All right.
A. I went one year.
Q. And after your one year at USL, have you attended any other educational institutions?
A. I went to work.
Q. All right. Where did you go to work?
A. I worked in the gaming business for a while. I worked in the -- off the coast of Mississippi, coast of Galveston on daily cruise ships before they legalized gaming, and then I went into the underground utility business for about 25 years.
Q. All right. So that would have been 1986. How long were you -- how long did you work in the gaming business?
A. 'Til '92.
Q. All right, and --
A. Well, '95.

Q. Okay, and in 1995, you then started working in the underground utilities?
A. Right.
Q. What company did you work for?
A. My own.
Q. All right. What was the name of that company?
A. K&R Construction, one of them.
Q. KNR?
A. K&R.
Q. K&R. Okay. K&R Construction, and that company, does it still exist?
A. No, it does not.
Q. All right. When did it go out of business?
A. Early 2000.
Q. All right. So after K&R went out of business, then what did you do for employment?
A. I opened my own business a couple of years later, Guillot's Underground Utilities.
Q. All right, and how long did that business stay in operation?
A. About three years.
Q. All right. You're starting -- starting to talk right at the end of my sentence.

You've got to give her at least a one-second pause or so so she can get everything down, okay?
A. Yes, sir.
Q. All right. So -- so you were -- you had Guillot Construction? What was the name of the company again?
A. Underground Utility.
Q. Guillot Underground Utility, and that was in business for how long?
A. About three years.
Q. All right, and why did it close?
A. Just my partner had a lack of wanting to do it anymore, so we sold it.
Q. All right, and then after you sold that business, then what did you do for a living?
A. I went to work for someone in that same field.
Q. And who was that?
A. Guy named John Moore out of Jackson, Tennessee.
Q. John Moore?
A. John Moore. Before that I worked for a guy name Steve Ecksted (phonetic). I'm trying

to think of the name. I can't think of the name of his company. Ecksted Utilities, something to that effect. He was out of Minnesota.
Q. All right. So Mr. Moore, what was his -- what was the name of his company? Do you recall?
A. Yeah, J&M -- J&M Drilling.
Q. All right, and how long did you work for him?
A. About seven years.
Q. All right, and why did you leave?
A. Just conflict of interest. No real reason. I went back to subbing on my own a little bit. He did some jobs with me together, and then I went out of business again, you know, and --
Q. You went out of business?
A. A lot of times in this business, you don't get paid for your work. Went to go do a big job. This company didn't pay that company. I didn't get paid, lost everything, that kind of thing.
Q. Is that what happened to Mr. Moore's business?

A. No. Mr. Moore I'm sure is still in business. We just separated. I went another way.
Q. Okay. All right. So after you left Mr. Moore's business, then where did you go?
A. I worked for a guy named Tony Bishop.
Q. And what kind of business was that?
A. Underground utility business, fiberoptics. We did some jobs in Florida. We did some jobs in north Mississippi all the way to El Paso, and then in El Paso, it turned out bad. Drilling in rock, a lot of times, it don't work out that well.
Q. All right, and how -- and what year did that stop?
A. About four years ago --
Q. Okay.
A. -- five years ago.
Q. And why did you leave that company?
A. I lost all my money.
Q. How did you lose all your money?
A. I did not get paid for my work.
Q. Okay. So approximately four years ago, you left that company, and then where did you go after that?

A. I went to prison.
Q. Okay.
A. In El Paso.
Q. You were in prison. All right. We're going to get into your criminal background in just a minute. I just want to get your work history nailed down.
A. That's it.
Q. So you haven't worked since about four years ago?
A. That's probably correct, yeah.
Q. Okay. All right. So let's talk -- let's talk about your prior interactions with law enforcement. Now, I assume you've been arrested at least twice that we know of, right, once for the incarceration in 2019 and once for the incarceration here in 2020. I want to go back before 2019 and tell me about any other interactions you would have had with law enforcement prior to that time.
A. What does that have to do with what we're here for?
Q. This is a discovery deposition. We get to explore everything there is about your

life, your claim, your background. Whether it's ultimately relevant and admissible at trial would be another question for another day, so --

MR. JACOB:

Mr. -- Mr. Guillot, as you and I discussed, unless either Maria or myself instructs you not to answer --

THE WITNESS:

Okay.

MR. JACOB:

-- you can -- you can be assured that it's an appropriate question, and you should feel free and actually are obligated to then answer those questions.

THE WITNESS:

All righty.

MR. JACOB:

All right? I -- I promise you Maria and I are listening and we'll simply --

THE WITNESS:

We're good. We're good.

MR. JACOB:
-- we'll simply say don't answer if it's not appropriate.
BY MR. COLLINGS:
Q. So let's start with your first interaction with law enforcement. Do you recall when that would have been?
A. Yeah. 1991.
Q. All right. Where was that and what were the circumstances of it?
A. It was a -- a case involving -- I was in Mississippi, and the Federal Government went to my house, my mother's house in Arabi, Louisiana, and said they wanted to talk to us, me and my brother, and wanted to talk about something that happened in 1986.
MR. JACOB:
I'm going to -- I'm going to -- see, now, this is one of those instances where I'm going to object if the scope of the question goes to the underlying facts of any criminal charge and instruct Mr. Guillot not to answer those questions --

MR. COLLINGS:
I haven't asked the --
MR. JACOB:
-- because --
MR. COLLINGS:
I haven't asked a question.
MR. JACOB:
Excuse me. Excuse me. You asked the circumstance related to same. So I was going to wait and see what the extent of his answer was going to be since your question was overly broad, but in any case I'm going to be very clear right now since respectfully I raised this exact same proper objection three times yesterday. For the first time in 20 years, I've had to do that, and the admissibility is to convictions only of a certain type, but I -- since discovery is more broad, I will allow you to ask for any arrests of any kind, jurisdictions, and the nature of the charges, but that is it. So anything more, he is

instructed not to answer.

MR. COLLINGS:

Okay. Well, with respect, Devon, I haven't even gotten there. I asked him about the year and where and what were the circumstances so that's --

MR. JACOB:

Thank you for -- thank you for admitting the circumstances, because that's exactly what he's not going to be speaking about.

MR. COLLINGS:

Well, he needs to tell me what the charges were.

BY MR. COLLINGS:

Q. What -- what were you arrested for?

MR. JACOB:

Don't answer that.

BY MR. COLLINGS:

Q. Who arrested you?

MR. JACOB:

Then ask that.

MR. COLLINGS:

I did.

BY MR. COLLINGS:
Q. Can you answer the question, sir.
A. Yes, I can. It was -- actually, I'm not even positive who exactly arrested me because they didn't arrest me, but it was something to do with ectasy, five, six years prior to the fact. There was 352 co-defendants in the case. Told me if I didn't plead guilty, I'd do 20 years; plead guilty, I might do no time.
MR. JACOB:
Mr. Guillot.
THE WITNESS:
That's what I did.
BY MR. COLLINGS:
Q. Did you ultimately plead guilty?
A. Yes, I did.
Q. All right. You pled guilty. Do you know where you pled guilty?
A. Yeah. In New Orleans.
Q. Was it in State Court or Federal Court?
A. I thought it was Federal, but I -- I have a DOC number, so I don't know honestly.
Q. So this would have been about 1991?
A. It was exactly 1991, '92.

Q. And what was the actual charge that you pled guilty to? Do you recall?
A. Possession of ecstasy.
Q. Okay. All right. Did your brother also plead guilty?
THE WITNESS:
Do I answer that? I mean, he's talking about my brother?
BY MR. COLLINGS:
Q. You mentioned your brother and you --
A. They came and questioned us.
Q. Did you --
A. Yeah, he also actually did plead guilty.
Q. Okay, and what is your brother's name?
MR. JACOB:
Mr. -- Mr. Guillot, even though it's not at all relevant to the claims asserted, a relevancy objection, I'm really not supposed to make, so you can answer that question.
THE WITNESS:
Willard -- Willard Guillot.
BY MR. COLLINGS:
Q. Willard Guillot. Okay. All right. So did

you -- were you ultimately sentenced to jail for those charges?
A. Halfway house and five years' probation, which I did successfully.
Q. All right, and where was the halfway house located?
A. First started out in Mississippi, Biloxi, on top of the Post Office. That's where I was living, and then I moved to Colorado, Golden, Colorado, and then I moved back to Mississippi.
Q. Okay.
A. And that's it.
Q. Did you have a supervised probation after that?
A. Yeah. No. Five years. That's all I had. I got 60 days in a halfway house and five years supervised probation. I reported every month for five years, 60 months.
Q. And were ever deemed to be in violation of any of the terms --
A. No.
Q. You've got to let me finish my question before you start answering. I understand you're anxious to respond, but you've got

to let her --
A. I understand.
Q. -- have time to respond, all right? All right. So did you ever violate any of the terms of your probation?
A. No.
Q. Okay. So this would have been 1991 then. So fast forward. When was the next time you had an interaction with law enforcement?
A. '97.
Q. All right. Where was that?
A. That was in Birmingham, Alabama.
Q. All right, and tell me about what was the incident. What incident was that interaction? Was it an arrest, a questioning?
A. I was arrested. I was questioned. I went to trial, and I was null processed.
Q. Okay. What were you arrested for?
A. I was in a hotel room with some people, and they had a stolen car outside, and they came in, and they told lies about it or something, and they had dope in the room.
MR. JACOB:

Mr. -- Mr. Guillot --

THE WITNESS:

Yes, sir.

MR. JACOB:

-- he asked what you were arrested for, what the charge was but --

THE WITNESS:

Possession of crack.

MR. JACOB:

-- but that's all he's asking for.

THE WITNESS:

Possession of crack in someone else's room.

BY MR. COLLINGS:

Q. You were arrested for possession of crack cocaine, and that -- that charge was ultimately nolle prosse'd by the prosecution in that case?

A. Yes, sir.

Q. All right, and do you know if that was in State Court or Federal Court?

A. Birmingham, Alabama, just a state -- state, Birmingham, Alabama. State charge I guess.

Q. Okay, and it was in the city of Birmingham? Was it Birmingham Police Department that arrested you?
A. Homewood I believe.
Q. Homewood?
A. Homewood.
Q. Homewood. All right. Is that a town near Birmingham?
A. It is in Birmingham.
Q. Okay. All right. So were you incarcerated for that charge?
A. No.
Q. You didn't have to spend any time in jail?
A. No.
Q. Okay. So this would have been 1997, right?
A. Pretty sure. Not positive. I believe it was '97, yes.
Q. All right. Fast forward with me again. Tell me about your next interaction with law enforcement. When did it happen?
A. 2003.
Q. All right. Where?
A. In the same place, Birmingham, Homewood. No, not Homewood. Hueytown. My bad.
Q. Hueytown?

A. Hueytown.
Q. How do you spell that?
A. Just like the name Hueytown.
Q. Huey as in H-u --
A. Yes.
Q. -- e-y?
A. Yes.
Q. Okay. All right. Were you arrested?
A. Yes.
Q. What were you arrested for?
A. Possession of cocaine.
Q. And were you ultimately convicted of that charge?
A. I went to prison. Yes, I had a ten-year sentenced.
Q. And you were sentenced by the State of Alabama?
A. Yes.
Q. And how many years did you stay in prison as a result of that conviction?
A. 30 months, something like that.
Q. All right. Were you -- did you have probation after that 30 months was complete?
A. Parole.

Q. Parole. All right.
A. Yes.
Q. And were you ever deemed to have violated any of the conditions of your parole as a result of that early release?
A. No.
Q. All right. So that would have been in 2003, plus 30 minutes -- 30 months, give or take. So when your next interaction with law enforcement?
A. 2017 or '18.
Q. All right. Tell me where and what was the circumstance of that.
A. El Paso, Texas.
Q. All right, and what -- who arrested you?
A. El Paso Police Department.
Q. All right, and what was the charge?
A. Methamphetamine.
Q. All right, and this would have been 2014 you think?
A. No, I didn't say that. I said '17 or '18.
Q. 2018, my apologies.
A. It was '18, yeah, not '17.
Q. Okay. Methamphetamine?
A. Huh-huh.

Q. You have to say yes or no.
A. Yes, sir.
Q. All right, and did you go to trial on those charges?
A. I did.
Q. And what was the ultimate disposition?
A. Possession of methamphetamine --
Q. My --
A. -- two years.
Q. Okay. My question -- I'm sorry.
A. Guilty. I pleaded guilty, and I spent two years -- two-year sentence.
Q. I've got you, okay. So you pled guilty, and you were sentenced to two years?
A. Huh-huh.
Q. Were you incarcerated?
A. Yes, I was.
Q. All right, and where were you incarcerated?
A. Started out in El Paso and went to Huntsville, Texas.
Q. Okay.
A. The Gurney Unit.
Q. What was that?
A. The Gurney Unit.
Q. What is a Gurney Unit?

A. The Gurney Unit. It's a prison in Huntsville, Texas. TDC is the name of the prison system.
Q. What prison were you sent to in Alabama?
A. Ventress. It's in Clayton, Alabama.
Q. Did you also --
A. I need some water. Can I get some water by any chance?
Q. All right. Did you -- I neglected to ask you this earlier. When you were arrested in Birmingham, Alabama, did you spend any time in the Birmingham County Jail?
A. Yeah, a day or night, one day or two days.
Q. All right, and then after you were adjudicated guilty in that, did you spend any additional time in the jail or did you go straight to Ventress, Alabama?
A. I -- I spent four months in -- for the 2003-2004 charge. Then I went to Kilby, Alabama, for processing, and then I went to Ventress.
Q. Okay. So you had three different correctional institutions in Alabama that you stayed in?
A. Yeah.

Q. The county --
A. The county, then prison, DOC, and one place processes you, and the next place, you stay.
Q. Understood, and then in 2018, did you spend time in the county jail there when you were arrested?
A. El Paso, yes, I did.
Q. And how long were you there before you were transferred --
A. Five -- five months, maybe six.
Q. All right. You're -- you're talking, like, right before I'm finishing.
A. Sorry.
Q. That's all right. I understand you're nervous.
A. Five or six months. I'm not nervous.
Q. All right. You've just got to let me finish so we can make it easy on her, and everybody can get out of here. All right. So five or six months in the county jail, then transferred to a Department of Corrections facility in Texas?
A. Right.
Q. Okay, and you spent how many years there in

that correctional facility -- or how many years were you sentenced for the methamphetamine in 2018?
A. Two years.
Q. So at this point in time as of 2018, you've got what, three -- this will be your third -- that's your third felony conviction, right? You had the 1991 meth and ecstasy conviction, the Birmingham, Alabama, narcotics conviction, and then the 2018 narcotics conviction, right? Am I --
A. Yes.
Q. Am I getting those correct? Okay. So did we leave out any felony convictions during any of that time?
A. No.
Q. Okay. So after you got out of the Department of Corrections facility in the State of Texas, tell me about your next interaction with law enforcement.
A. Here in St. Tammany.
Q. All right, and who arrested you?
A. Slidell.
Q. Slidell PD?
A. Yes, sir.

Q. And what were you arrested for?
A. Well, possession of -- really wasn't -- wasn't really what it was, but, I mean, yeah, they said possession of heroin, methamphetamine, and hydrocodone. I walked out a store, and the person I was riding with, they pulled out --
MR. JACOB:
Mr. Guillot, just --
THE WITNESS:
Well, I mean, yeah --
MR. JACOB:
-- just the charge.
THE WITNESS:
Okay. Just the charge. Methamphetamine, heroin, and hydrocodone.
BY MR. COLLINGS:
Q. All right.
A. I pled guilty.
Q. All right. So this would have been in 2019 that arrest?
A. I'm -- I'm not positive. You probably got it written down right there, huh?
Q. Well, we have that you were, let's see --

yeah, December 18, 2019.
A. 2000 -- yeah.
Q. Does that -- does that sound right to you?
A. Yeah, December, yeah, December 7th, something like that?
Q. Well, this says December 18th.
A. Oh, I don't know. Maybe. I -- I'm guessing they got -- they got -- it's on the paper, huh?
Q. Was there another arrest somewhere in December of 2019 that we're not talking about?
A. No, no.
Q. Okay. So in your Complaint, the one -- the one that you filed in this lawsuit, and in particular I'm looking at Page 18, Paragraph 100 says, from -- quote, "From December 18, 2019, to present Defendants have held Mr. Guillot, Jr." -- I'm sorry. This is Junior. I'm looking at the --
A. Wrong person.
Q. Oh, you're right. I'm looking at your son I think. That is your son, right?
A. Yes, it is.
Q. All right. Let's see. Page 17, Paragraph

108, "Agents of the St. Tammany Parish Sheriff's Office arrested Mr. Guillot, Sr. on December 22nd, 2019." Does that sound right to you?
A. Where at?
Q. It doesn't say.
A. Okay.
Q. This is your lawsuit, so I'm reading what you pled in the Federal Court system. It says you -- "as of December 22nd, 2019, Mr. Guillot, Sr. was held in the St. Tammany Parish Jail."
A. Yeah, I was definitely held here.
Q. Okay, and that was for, again, possession of heroin and what else?
A. Methamphetamine.
Q. All right.
A. And they said hydrocodone. I never seen none of it, so I don't really know. That's what I told -- that's what I was told. I never seen any of it, and none of it was on my person so that's -- that's that, and I pled guilty.
Q. When did you plead guilty?
MR. JACOB:

Mr. Guilott --
THE WITNESS:
Four months later.
MR. JACOB:
Mr. Guillot --
THE WITNESS:
Yes, sir.
MR. JACOB:
-- just, it's charges and convictions. That's all he's asking you about.
THE WITNESS:
Well, I --
MR. JACOB:
Don't talk about the underlying circumstances, please.
THE WITNESS:
Okay. Well, he's kind of asking about them, but --
BY MR. COLLINGS:
Q. Okay. So --
A. I pled guilty.
Q. You pled guilty to -- to what exactly? Do you recall?
A. Possession.

Q. Of?
A. The three things, heroin --
Q. All three?
A. -- methamphetamine and, yeah, I pled guilty.
Q. Okay, and what was the ultimate sentence that was imposed when you pled guilty?
A. Wound up being two years. I did my time.
Q. Two years' incarceration?
A. Yeah.
Q. Okay, and you were incarcerated where for those two years?
A. Here.
Q. Here at the St. Tammany Parish Jail?
A. I didn't do two years. Went out on parole.
Q. So you got out before the two years was up?
A. Yeah.
Q. Approximately how long were you incarcerated here at the jail as a result of your conviction in 2019?
A. Eight, nine months.
Q. Okay. So now that's your fourth felony, and you were then arrested yet again, correct?
A. Correct.

Q. And when were you arrested?
A. December.
Q. Okay. Earlier you told me April of 2022.
A. That's what I'm right here for right now, yeah.
Q. Okay. So in 2019, you got -- you were convicted -- I'm sorry, you were arrested. 2020 you were convicted, sentenced to two years, did eight months. So you got out sometime at the end of 2020, correct?
A. I got out last November.
Q. November of 2021?
A. Yeah, I had come back between that time.
Q. Okay. That's -- that's my mistake.
A. Huh-huh.
Q. So let's talk about -- let's -- let's keep it chronological at this point. So in 2020, you pled guilty to those three charges for drug possession in Slidell, right?
A. Yes.
Q. You were sentenced to two years. You did about eight or nine months, right?
A. Yes.
Q. All right, and then when was the next time

you had an interaction with law enforcement?
A. Nine months later.
Q. So this would have been early 2021?
A. December.
Q. Of 2020 or 2021?
A. Nine months after I got out. I don't know what -- I guess '21 I'm -- I'm assuming, yeah.
Q. So December of 2021, you were arrested for what?
A. Possession.
Q. By whom?
A. Slidell and -- and St. Tammany.
Q. The Sheriff's Office?
A. Huh-huh.
Q. You have to say yes or no.
A. Yes.
Q. Okay, and have you gone to court for those charges?
A. Yes.
Q. And what was the ultimate --
A. I pleaded guilty.
Q. Now, you've got to let me finish before you start talking. So in 2021, you pled guilty

to additional narcotics charges?
A. Yes.
Q. And do you recall what you -- exactly what you pled guilty to?
A. Yes.
Q. That was?
A. Possession of methamphetamine.
Q. All right. So that's your fifth felony, correct?
A. I'm guessing. You're -- you're counting there. I'm not. Yes.
Q. Okay, and how long were you sentenced?
A. Two years.
Q. And did you get released before those two years were completed?
A. Yes.
Q. All right, and then you -- so you were arrested yet again this year?
A. Yes.
Q. What were you arrested for?
A. Same thing.
Q. Possession of --
A. Methamphetamine and cocaine.
Q. All right. Who arrested you?
A. Slidell PD Task Force.

Q. Okay, and have you gone to court on those charges yet?
A. I was arraigned.
Q. All right. So you haven't been to trial?
A. Nope.
Q. And did you plead not guilty?
A. That's what you do at arraignment, right.
Q. You could plead guilty at an arraignment as well if you'd like?
A. I pled not guilty at arraignment.
Q. All right. When was that arraignment?
A. The 14th of last month.
Q. 14th of September?
A. Yes.
Q. Okay. So have we covered the entirety of your history with respect to law enforcement?
A. Yes, yes, you did.
Q. All right. Didn't leave anything out?
A. Not that I know of.
Q. Okay. So this lawsuit was filed again in April of -- I'm sorry, March of 2020, and it -- and it pertains to the conditions of your confinement here at the St. Tammany Parish Jail. You're aware of that?

A. Yes, I am.
Q. All right. So let's talk about that. So according to the allegations made in your Complaint, beginning on December 22nd, 2019, you were held at the St. Tammany Parish Jail as a pretrial detainee. You're aware of that?
A. Correct.
Q. All right. It states that you were in a holding cell with 19 other pretrial detainees. Is that correct?
A. Approximately, yeah.
Q. And that you were in this holding cell for 13 days. Is that correct?
A. Or 14, maybe 14. I'm not exactly positive of the amount of days. They running -- they run together, but yes, that is correct.
Q. All right, and that you were ultimately then transferred to the general population on January 4th, 2020. Is that correct?
A. Yes.
Q. Okay. So tell us if you can how the conditions of your confinement within the holding cell at the St. Tammany Parish Jail

for those 13 or 14 days was unconstitutional.
A. Okay.
MR. JACOB:
Objection to form.
BY MR. COLLINGS:
Q. Answer the question, please.
MR. JACOB:
You can answer if he wants you to.
THE WITNESS:
Okay. Well, sleeping on the floor with no blanket, no mat, one toilet, dirty all the time, 19, 20 people in the holding cell. You've seen them. You know, give you a blanket for two hours at night and take it back from you in the morning before breakfast, pretty, pretty rough.
BY MR. COLLINGS:
Q. Okay.
A. Come in and sweep once or twice after a meal, you know, a day, and, you know, you got 20 people in there.

Q. So it's your belief that the holding cell was -- had too many people?
A. Too many people, too long, yeah.
Q. What do you mean, "too long"?
A. Staying in there too long, I mean, you know.
Q. Is there a requirement that you're aware of legally --
A. I -- I --
Q. Hold on, hold on. You've got to let me finish.
A. Yes, sir.
Q. All right. Now, is there a legal requirement to your knowledge that the Sheriff has to move you out of holding into the general population area of the jail by a certain day?
A. Well, I believe I saw it on the news where Lee Zurik did a little thing on it that said 48 hours. That's what I believe.
Q. So that's the basis of your -- your belief.
A. Huh-huh.
Q. Anything else?
A. As far as laws go, no, that's it, I mean, you know.

Q. Okay. All right, and is there a legal requirement to your knowledge that the Sheriff give you a blanket for a certain amount of time?
A. Just -- just a human right, I guess. I don't know what -- what their rules are, but I would think you cover somebody up when it's 60 degrees, you know.
Q. It was 60 degrees in the holding cell?
A. It was cold. I don't know exactly what degrees it is. There's not a thermometer there, but it was real cold all the time.
Q. Okay.
A. You know, freezing.
Q. Were they -- did they feed you while you were in the holding cell?
A. Sure.
Q. Okay. How many times a day?
A. Three times, yeah.
Q. All right. Was there anything -- was there wrong -- anything wrong with the food to your knowledge?
A. It's just standard food. No, nothing wrong with it.
Q. Okay. So as it compared to the -- all --

all the other incarcerations in your lifetime, how did the food fare compare?
A. Not that great, but it wasn't as good as any others, you know. It was -- I wouldn't it's -- you know, I'd say the food been better elsewhere, but, I mean, you know.
Q. And of the other places that you've been incarcerated, Birmingham, Alabama --
A. Huh-huh.
Q. -- other Department of Corrections facilities in Alabama, El Paso, Texas, Department of Corrections facilities in Texas, how was the jail here any different?
A. Well, it's not even close. El Paso, Texas, it's the cleanest place you've ever been in. The structures there and everything is just wonderful. I mean, not that a jail could be wonderful, but yeah, you're clean all day; you have cleaning supplies, all the right stuff, yeah, and, you know, you don't have the stuff going on that you got here.
Q. And just so that we're clear, the basis of your lawsuit is solely related to your time as a pretrial detainee in December of 2019

and January of 2020, correct?
A. Yes, sir.
Q. Okay. Do you have any other complaints with respect to your time as a pretrial detainee in December of 2019 and January of 2020 that you have not told us about?
A. I don't believe so. I mean, I believe I told my lawyer everything. We haven't really talked about that. We talked about my history so --
Q. Well, I'm not going to ask you about what you told your lawyer. I'm here to ask you about your time as a pretrial detainee in January of 2020 and December of 2019, and I want to know if we've covered everything that you complain of that was unconstitutional in your view?
A. Okay. Yeah, having to wait to go to the bathroom, not having toilet paper, you know, one roll of toilet paper for 20 people. Messy conditions, too long on a concrete floor, you know, having to sleep on the floor with people sleeping in your face and that kind of stuff. Yeah, that's -- that's pretty much what the lawsuit is

about I guess.
Q. Okay. Anything else?
A. Basically just the conditions of the holding cell were miserable. You know, I mean, yeah, it's my fault I was there, but still, you have to be treated --
Q. Okay.

MR. COLLINGS:

All right. Madam Court Reporter, we're going to attach as Exhibit 1 or, I'm sorry, "Exhibit A" the Notice of Deposition for Mr. Guillot's deposition this after -- this morning, and "Exhibit 2" will be the Complaint filed on March 22nd, 2020, of which I have referenced in particular Pages 17 and 18.

I tender the witness.

EXAMINATION

BY MR. JACOB:

Q. Yes. Sorry about that. My headset. I'm still getting used to these things. Mr. Guillot, Devon Jacob, as you know, your lawyer --

A. Huh-huh.
Q. -- on the phone here. I have a few questions for you just to follow up. First of all just for purposes of the record, I'm sure Chad would agree we should probably put it on the record that your deposition is being conducted pursuant to the Court's authority to conduct it. Since you're an incarcerated person, there had to be a Motion and an Order approving that, and that has occurred. Now, going forward to some things that you discussed, you indicated that you were in a holding cell for a period of time, and you were asked about the conditions related to same. Do you recall that?
A. Just now?
Q. Do you recall that -- do you recall that questioning?
A. Just now?
Q. Yes.
A. Yeah, I recall. We just -- we just talked about it.
Q. Okay. Now, in that holding cell, was there a toilet?

A. Yes.
Q. And can you describe that toilet for us.
A. Very, very dirty. You know, it was no crew that came in and cleaned the toilet. It was nasty, and we had one roll of toilet paper.
Q. Now, different people will use those adjectives differently. So can you tell me what you mean by, "very dirty and nasty."
A. People peeing on it all day, brushing their teeth and spitting in it, you know, spitting all over the sides of it and -- and not having nothing to clean it with, no having -- no cleaning supplies or anything. A trustee come through once or twice a day and sweep, and that's it, you know.
Q. And so I heard urine. Was there any other bodily fluids that were on the toilet?
A. I don't really think so, but it was very nasty, very dirty. You know, I don't think I actually made a bowel movement for the whole time I was in there, because it was that -- you know, but I probably did, and -- and it was something you had to spend time to clean up.

Q. Okay. Did you see feces on the toilet?
A. Not on top of the toilet, but, yeah, inside of the toilet, you know, it -- there was no cleaning of it. The whole time I was there that -- that whole little sink and toilet was not cleaned.
Q. I see. Was there any vomit around the toilet?
A. I don't remember anything like that. I do remember pee all over, smelling of urine, you know.
Q. Okay. Was the floor wet with urine?
A. Yes, constantly, and --
Q. And -- I'm sorry. Go ahead.
A. Yes, constantly. Grown men don't know how to aim I guess. I don't know, but yes, urine all over the toilet, all over, you know. There's a little partition there.
Q. And when --
A. -- you know, about two feet away from the toilet if that far.
Q. When -- when the cell was swept, what happened to the urine that was around the toilet?
A. Well, they would mop, just mop it up.

Basically, they come with a broom. One guy come -- runs through with a broom and then one runs through with a mop and just back and forth and then goes out, not in there a total of a minute maybe. You know, it was grateful that they came, but it really didn't do a whole lot of good, you know.

Q. Now, when they mopped, could you smell any cleaners being used or could you tell if cleaner was being used?

A. I wouldn't say yes or no, because I don't know what they had in the bucket, but it didn't -- you wouldn't even have smelled no bleach by no means, which we don't use bleach in this facility --

Q. Okay.

A. -- anyway. It's called Hepacide, you know.

Q. Okay, but you're not aware of or you don't recall seeing any type of disinfectant process?

MR. COLLINGS:

Object to the form.

THE WITNESS:

But no, I do not. I don't know if they use it, but I -- I -- you

know, I wasn't the one cleaning it.
BY MR. JACOB:
Q. Okay. After it was -- that process of cleaning that you described, was it, in fact, clean?
A. As clean as you can get it in a minute, you know. I mean, there was nobody coming in and scrub the toilets or anything or given anything to do that with. They just swept and mopped.
Q. So was it clean or not in your opinion?
MR. COLLINGS:
Object to the form.
THE WITNESS:
It was clean until it -- you know, we got another meal or something, you know, and then --
BY MR. JACOB:
Q. Okay. Okay. So in that minute, it was your conclusion that it was clean when they were done or it was not clean when they were done?
MR. COLLINGS:
Object to the form.
THE WITNESS:

I wouldn't say it would be clean the way you need to be cleaned for 19 people to live in it.

BY MR. JACOB:

Q. Okay.

A. It was swept and mopped, one pass.

Q. And how about -- I think you started to talk about, but what types of -- of smells, if any existed in the cell?

A. Urine, bowel gas. You know, you got 20 people in there defecating and peeing and whatever. You know, it wasn't a pleasant smell, but you know.

Q. And I'm going to ask you to take a moment and think back. Do you recall ever trying to use the toilet to make a bowel movement, for instance?

MR. COLLINGS:

Object to the form.

THE WITNESS:

I'm -- I'm sure I did, and I'm sure I had to put toilet paper all over the seat and, you know, grit my teeth and do what I had to do. I was in there for 14 days.

BY MR. JACOB:
Q. And can you explain what that -- what that felt like to have to do that in front of all these inmates.
A. It wasn't nothing nice. You know, there is definitely no privacy in this facility at all.
Q. Okay.
A. It's humiliating.
Q. And with respect to the -- the sleep arrangements, you mentioned the concrete floor. Can you tell us, did you sleep on the floor?
A. Yes.
Q. And then how often did you sleep on the floor?
A. Every day.
Q. And what was the reason for sleeping on the floor?
A. Because there's nowhere else to sleep. There's --
Q. And what --
A. -- concrete benches on both sides, and everyone can't sleep there. Like, two or three people can fit up there, and the rest

have to go to the floor.
Q. And when you were on the floor, was that floor clean or dirty?
A. No, it wasn't clean. Basically just lay down and put your shoes underneath your head, your slippers, whatever they are, and cover with a blanket for the few hours that they gave it to you.
Q. And that floor that you were on, did you ever have to be on the floor near the toilet area where there was urine on the floor?
A. People were there, yes. Yes, there's no room.
Q. Were you --
A. I wasn't. I was able to be five, six feet away from it at most times or more, but, you know, people come in and go out every day. So the bad luck ones got. When one is leave, the ones comes in, get their spots.
Q. I see. So when you originally came in, though, were you relegated to that bad spot?
A. I wasn't far away, but no, I didn't have to

go put my head by the toilet or my foot -- my feet by the toilet. I was -- I was always able to get, you know, away from it a little bit, but some people had to get back there, you know.

Q. Now, even though you didn't have to go directly by the toilet, am I correct, though, that people walking back to the toilet and then to other parts of the cell were tracking urine throughout the cell?

A. Of course, yes.

Q. And then you were forced to sleep on that, correct?

A. Yes.

MR. COLLINGS:

Object to the form.

BY MR. JACOB:

Q. And you were forced to continue to wear the clothing that made contact with the urine covered floor. Is that correct?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Yes. Every --

BY MR. JACOB:

Q. And --
A. We took a shower every other day and you got -- or every three -- twice a week or something like that if, and then you got a change of clothes.
Q. Okay, but other than the -- the times that you left the cell for showers, were you provided with an opportunity to leave the cell for recreation or exercise?
A. No.
Q. And you mentioned blankets. Can you tell me or describe those blankets.
A. Just a grey wool blanket, probably six feet long, four foot wide, something like that.
Q. And what --
A. Enough to cover you.
Q. What was the condition of those blankets?
A. It depends. Sometimes you got a half of blanket; sometimes you got a whole blanket; you got a tore-up blanket, you know.
Q. And were these blankets clean or dirty?
A. I -- you got me, but, I mean, I'm sure they were clean when we got them. You know, they -- whoever brought them in threw them out; you got them, and then they come took

them off you the next morning and threw them in a basket. I'm sure they went and washed I would -- I would assume. I don't know for real.
Q. Okay. So even though the assumption would be that that's what someone would do, you don't know whether they were washed or not?
A. I do not know. They didn't have a Bounty, you know, fresh smell to them, but nothing does.
Q. Now, tell me about the food a little bit more. Where did you guys eat?
A. On -- sitting down on the floor or sitting down on the concrete bench on your lap.
Q. And then what happened to the -- the food or anything related to the meal when you were done?
A. Put it up by the door. When you had the tray, you stacked the trays by the door, and they'd come get them within a couple of hours or, you know, whenever they came and got them, and when you have a sandwich every evening, all the trash was just thrown in the corner until they come and picked it up. There was no garbage can.

Q. Well, that was what I was going to ask. Was there a garbage can or garbage bag or something?
A. No.
Q. So food and trash was just thrown into a pile in the corner?
A. Huh-huh.
Q. I'm sorry. Yes?
A. Yes, sir. Yes. They'd come sweep it up and put it in a bag.
Q. Okay. Did you see any -- any fights inside the cell?
A. Yeah.
Q. Were you involved in any?
A. No.
Q. Did you see anybody injured in the cell?
A. I don't think so.
Q. Okay. Was anybody getting sick in the cell, like, vomiting or -- or anything that led you to believe that they were not physically well?
A. I believe you had a couple of people throw up, you know, come in there detoxing off of drugs, you know, and going through withdrawals.

Q. And -- and what happened when they threw up? Was the area where they vomited disinfected?
A. Oh, they would go to the toilet area. No, there wasn't no coming in and disinfecting nothing afterwards. Just the normal sweeping and cleaning. There was no special effort made for vomit, you know. I mean, I didn't see anybody throw up on the floor where we were at, but people got up and ran to the toilet and threw up. You know, that's part much detoxing I guess. I don't know. I've never done it.
Q. And how did you feel -- I want to talk your emotional a little bit. How did you feel to be housed in that type of condition?
A. Real stupid, putting myself in that situation, but it's -- it's terrible.
Q. Okay, but I -- I understand you may have been angry at yourself for putting yourself in that situation, but I'm more asking about what it felt like as a person to be treated in that manner?
A. Pretty bad. You know, nothing good about it. Not a good memory. Not -- I don't

know how -- just -- just pretty awful.
Q. And -- and I think you mentioned you had been in other jails, correct?
A. Yes, I have unfortunately.
Q. And have you ever been treated in a similar manner in any of the other jails you've been in?
A. Honestly, I'd have to say no that I've -- I've been never housed that way or even when I go to the back --
Q. Okay.
A. -- you know. Of course this morning we had a yard call, but I think that's the second one in six months. You know, you're on lock down 24/7 --
Q. I see.
A. -- with 50 people in a room, you know.
Q. Okay. I have no further questions. Thank you.

FURTHER EXAMINATION

BY MR. COLLINGS:
Q. You mentioned some of the issues you had as a result of being in the holding cell and the conditions therein.
A. Huh-huh.

Q. Have you -- have you had any occasions to see any kind of mental health professional regarding the time that you had in the holding cell in December of '19 and January of 2020?
A. Have I seen mental health?
Q. For the time that you were at the St. Tammany Parish Jail in the holding cell for those 14 days?
A. I'm trying to get your question. Do you mean did I seek mental health for that?
Q. Yes.
A. No, I didn't.
Q. Okay. All right.
A. No.
Q. Have you had occasion to seek any treatment for mental health issues in any other time in your life?
A. I -- I'm not a mental health patient, no, but I believe I've seen a psychiatrist once or twice.
Q. Have you seen one in last three years?
A. No, but I probably should.
Q. Okay. All right. That's all I have. Thank you.

A. I probably will when I get out.
Q. Okay.

MR. JACOB:

Thank you.

(Whereupon, the taking of the witness' testimony was concluded.)

C E R T I F I C A T E

THIS CERTIFICATION IS VALID ONLY FOR A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS PAGE.

I, RAYNEL E. SCHULE, Certified Court Reporter, #77005, in good standing, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that KLABERT JOSEPH GUILLOT, SR., after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 63 pages; that this testimony was reported by me in stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the Board, that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the Board; that I am not of counsel, not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

______________ ___________________________

Date

Raynel E. Schule, CSR
Certified Shorthand Reporter
State of Louisiana