UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO. 2020-CV-980-WBV-DPC

JUDGE VITTER

MAGISTRATE CURRAULT

JURY DEMAND

AHMED BAQER, KLABERT JOSEPH GUILLOT, JR, AND KLABERT JOSEPH GUILLOT, SR.
Plaintiffs

VERSUS

ST. TAMMANY PARISH GOVERNMENT, a/k/a ST. TAMMANY PARISH COUNCIL, ST. TAMMANY PARISH SHERIFF'S OFFICE, RAND SMITH, in his official and individual capacity, RODNEY J. STRAIN, in his official and individual capacity, GREG LONGINO in his official and individual capacity, and LACEY KELLY, in her official and individual capacity
Defendants

CONSOLIDATED WITH

NO. 2:20-cv-01840-WBV-DPC

LOUVIERE

VERSUS

ST. TAMMANY PARISH GOVERNMENT

Deposition of AHMED BAQER, taken on Tuesday, October 11, 2022, at the Glorioso Law Firm, 2716 Athania Parkway, Metairie, Louisiana 70002, commencing at 11:10 AM.

REPORTED BY:

Lori L. Marino
Certified Court Reporter

APPEARANCES:

(PRESENT IN PERSON:)

MILLING BENSON WOODWARD, LLP
68031 CAPITAL TRACE ROW
MANDEVILLE, LOUISIANA 70471
TELEPHONE: (985) 292-2000

BY: CHADWICK W. COLLINGS, ESQ.
ccollings@millinglawcom
REPRESENTING THE DEFENDANTS

GLORIOSO LAW FIRM
2716 ATHANIA PARKWAY
NEW ORLEANS, LOUISIANA 70130
TELEPHONE: (504) 569-9999

BY: MARIA B. GLORIOSO, ESQ.
maria@gtorts.com

and

(PRESENT BY TELEPHONE:)

JACOB LITIGATION
P.O. BOX 837
MECHANICSBURG, PA 17055-0837
TELEPHONE: (717) 796-7733

BY: DEVON M. JACOB, ESQ.
djacob@jacoblitigation.com
REPRESENTING THE PLAINTIFFS

WITNESS INDEX

AHMED BAQER
5701 BRIDGET STREET
METAIRIE, LOUISIANA 70003


| | |
|---|---|
| TITLE | 1 |
| APPEARANCES | 2 |
| INDEX | 3 |
| AGREEMENT OF COUNSEL | 4 |
| EXAMINATION BY MR. COLLINGS | 5 |
| EXAMINATION BY MR. JACOB | 65 |
| EXAMINATION BY MR. COLLINGS | 74 |
| REPORTER CERTIFICATE | 76 |


EXHIBIT INDEX


| | |
|---|---|
| EXHIBIT A - NOTICE OF DEPOSITION | 75 |
| EXHIBIT B - COMPLAINT | 75 |

S T I P U L A T I O N

It is stipulated and agreed by and between counsel that the deposition of AHMED BAQER is hereby being taken under the Federal Code of Civil Procedure for all purposes in accordance with law;

That the formalities of signing, sealing and certification are hereby waived. The party responsible for service of the discovery material shall retain the original.

That all objections, except those as to the form of the question and/or responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof may be used in evidence.

* * * * * * * *

LORI L. MARINO, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

AHMED BAQER, having been first
duly sworn was examined and testified
on his oath as follows:

EXAMINATION

BY MR. COLLINGS:

Q Good morning, sir. My name is Chadwick Collings. I represent the sheriff and the defendants in this matter in a lawsuit that you filed.

A Good morning. Yes, sir.

Q Can you please state your full name and address for the record?

A Ahmed Baqer.

Q And address, please?

A [redacted]

Q How long have you lived at that address?

A Now, about four or five years.

Q We're going to get into some of your background in just a few minutes, but I want to just go over a couple of grounds rules as far as this deposition is concerned. Let me ask you first, have you ever given a deposition before?

A No, sir.
Q A deposition is simply a question and answer session. I ask questions. You provide answers. Everything that is said is transcribed by a court reporter. So it's very important for she to be able to hear both of us, and I'm going to try to give you the courtesy of allowing you to answer before I begin my next question, and I would ask that you do the same for me: Let me finish my question before you begin your answer, again, primarily for the benefit of our court reporter, okay?
A Yes, sir.
Q If you don't understand a question, I need you to tell me you don't understand, and I'll try to rephrase it in such a way as that you can understand it. If you don't tell me you don't understand, I'm going to assume you do understand it, and the answers you give me are truthful, okay?
A Yes, sir.
Q It's also important that you give me verbal responses to each of my questions. While you may shake your head or say um-huh or

unh-unh, I understand what you're trying to communicate, but the court reporter cannot transcribe that effectively, okay?

A Yes, sir.

Q Let's start with you said your name is Ahmed Baqer?

A Yes, sir.

Q What is your date of birth, sir?

A [redacted]

Q Where did you go to school? How far did you go in school?

A I went to school, actually middle school in Gulfport, Mississippi. In high school, I went in Gulfport, Mississippi until my 12th grade. I went to high school in Pensacola, Florida.

Q Let's talk about the names of those particular schools. So your middle school in Gulfport, do you remember the name of it?

A North Gulfport Middle School. The high school was Harrison Central, and then, I went to West Harrison in 11th grade, and then, my 12th grade year, I was at Booker T. Washington, and that was when I was in Pensacola, Florida.

Q Did you graduate from Booker T. Washington High School in Pensacola, Florida?
A No, sir.
Q You dropped out before you graduated?
A Yes, sir.
Q Did you ever go back and get your GED?
A No, sir.
Q Have you had any other schooling other than the three schools that you've just told us about?
A No, sir.
Q No college, technical schools, nothing like that?
A No, sir.
Q Where were you born, sir?
A Pensacola, Florida.
Q And you moved from Pensacola to Gulfport at what age?
A From Gulfport to Pensacola.
Q So you were born where again?
A I was born in Pensacola, Florida, but I left when I was seven, and then, that's when I went to Gulfport; and then for high school, I went back to Pensacola, Florida; and then,

after high school, that's when I had moved over here into Metairie.

Q What are the names of your parents?

A My father's name is Anwar Baqer with my same name. My mom's name is Sheila Michelle Torres.

Q Are your parents still married?

A No, they're not married.

Q Did they get divorced?

A They got divorced.

Q What year was that?

A I'm not sure to be honest, I believe in 2007.

Q Is that why you moved from Pensacola to Gulfport and back to Pensacola?

A No, that's not why. I actually didn't know my father growing up.

Q So your mother moved from Pensacola to Gulfport back to Pensacola?

A No. I wasn't with my mom after the age of probably about 12.

Q Who raised you after the age of 12?

A I wound up staying with a friend until around I was 15, and I got a job, and I ended up getting my own place probably around

-- like right before I turned 16 probably to the age of 18.
Q What was the name of the friend that you stayed with?
A Daniel.
Q Did he have a last name?
A His name is Daniel Lee.
Q I'm sorry?
A Daniel Lee.
Q L-E-E?
A Yes. Daniel Lee Musterman.
Q He lived where?
A He lived in Gulfport.
Q What prompted you to leave your mother's home to live with Mr. Musterman?
A She was moving to Louisiana, because she wanted to try to have a career in acting, being an actress, --
Q All right, and --
A -- and I was more comfortable staying because I had my friends in Gulfport.
Q You say you got a job and got an apartment at around age 16?
A Yes, sir.
Q What job did you get?

A I was working on Keesler Air Force Base at the food court at Charley's Grilled Subs.
Q What did you do there?
A I was working on the grill. It's a sandwich shop.
Q So you were a cook?
A I was a cook.
Q How long did you work there?
A Not that long. Probably about six months.
Q After you stopped working there -- well, let me back up. Why did you stop working there?
A I don't remember back that far to be honest. About that job, I wouldn't remember why.
Q Did you quit, or did they terminate you?
A I think I quit.
Q After that job ended, what was your next employment?
A I probably worked like with friends doing construction. Like nothing that would have been documented. I think my next serious

job was in Pensacola, probably 2016. I believe it was Outback Steakhouse.

Q What did you do at the Outback Steakhouse?

A I was a cook.

Q How long were you there?

A Probably about six months also.

Q Why did you leave that restaurant?

A For my birthday, I remember my last day on that job was September 29th. Well, no, 27th, and I was going to Kuwait to actually meet my father for the first time. So I wanted to take that opportunity. So that's why I left that job.

Q What did you say your date of birth was again?

A September 29, 1998.

Q What is your phone number?

A Right now, it's (850) 860 -- I'm not sure. I have to look on my phone.

Q Go ahead.

A I can?

Q Yeah.

A My number is (850) 280-1260.

Q So what year was it you went to

Kuwait?
A It would have been five years ago now. So 2022, '17. So that would have been -- I'm not that great at dates. So I said it was my birthday. So it probably would have been 2017, September 27th.
Q How long were you in Kuwait?
A About eight months.
Q Do you speak Arabic?
A I don't.
Q Does your father speak English?
A He does.
Q Is he still a resident of Kuwait?
A Yes, sir.
Q Has he ever lived here?
A Around when I was born.
Q Did your parents marry?
A Yes.
Q Do you know how long they were married before they got divorced?
A Twelve, 13 years.
Q Do you have any brothers or sisters?
A Two.
Q Boys, girls what?
A One boy, one girl.

Q What are their names?
A Carl Waissy, my brother, and my little sister, Mischa Torres.
Q They're both children of your father, as well?
A No. They both have different fathers. Same mothers.
Q What are their ages?
A My brother is seven years older than me. My brother is eight years older than me, and my little sister is seven years younger. I haven't seen my brother in years. So I don't know how old he is. He's eight years older.
Q Do you know where he lives?
A Somewhere in Florida.
Q When's the last time you saw him?
A Like seven years.
Q You don't have a way to communicate with him?
A I'm sure I do. I mean, I do, but there's no reason to.
Q Did you not have a good relationship with him?
A No.

Q Why not?
A He only cares about himself.
Q What about your sister, do you still talk to her?
A Yes, sir.
Q When was the last time you talked to her?
A About a week ago.
Q Where does she live?
A She lives in Moss Point, Mississippi with her father.
Q What is her father's name?
A Enrique Torres.
Q Is that individual married to your mother?
A Yes. I believe they're still married, but they've been separated for awhile.
Q Are you married?
A Yes, sir.
Q What is your wife's name?
A Alexandra, and we're separated now.
Q Alexandra?
A Yes.
Q What is her maiden name?

A Fletcher.
Q You're separated?
A Yes, sir.
Q When did you get married?
A I think it was two -- two years ago, I believe. It could have been almost three. Honestly, I don't remember.
Q How long were you living together?
A About a year total.
Q After your marriage or before your marriage?
A Altogether.
Q So you were living together, got married, stayed living together for some period of time and then, separated?
A Yes, sir.
Q Why did you separate?
A She wasn't in a good state of mind, and she ended up leaving. I honestly don't know why.
Q When is the last time you talked to her?
A Probably a couple of months.
Q Did you all have any children?
A No, sir.

Q Do you have any children with any other women?

A No, sir.

Q Have you ever been married other than to Alexandra?

A No, sir.

Q Do you know where she lives now?

A I'm not sure.

Q Do you know if she's still in the State of Louisiana?

A I believe so.

Q Do you know what city?

A No, sir.

Q We talked about your employment background, and we kind of stopped at the Outback, because you left there to go to Kuwait. When you came back from Kuwait -- well, let's back up. Did you work in Kuwait?

A I did not.

Q Did you live with your father the entire time you were there?

A Actually when I went there, my father was in prison. So the opportunity that I got was from his wife. She started talking to me and she gave me an option to go over there. I

went over there. He was in prison. So he was going to get out in about, I think it was February. I told you I went there in September. He got out probably in February. I stayed with his wife for about a month, and it wasn't a good situation. So I ended up going with my grandmother, which is my father's mom, and that was a good situation. So I stayed there like, I think it was in the middle of April, or it could have been May. I'm not a hundred percent positive, but it was eight months total time that I was there.

Q So you left the states in September you think?

A September 27th exactly.

Q And the year was?

A 2017.

Q So September of 2017, you flew to Kuwait, and you said your father was in prison at the time?

A Yes, sir.

Q And he got out in February. So from September to February, you stayed in his home?

A No. I stayed with his wife for about a month. So probably November time, the

beginning of November, I called my grandma, and she picked me up, and then, I went to stay with her for the rest of the time.

Q You said it wasn't a good situation at your father's home. Why is that?

A I don't know. I think she made me go over there to make me -- I think she conned me in a way.

Q Explain.

A I went over there, and she gave me a taste of a good life; and when she realized if I became a citizen, then, I would have a large sum of money. Then, she no longer wanted me to become a citizen and pretty much told me to leave the country, and I called my grandmother, because that's not what I wanted to to do.

Q I may have to ask you to help me understand some of that. So your stepmother, right?

A Um-huh (affirmative expression).

Q Your stepmother convinced you to come to Kuwait, and if you had become a citizen of Kuwait, you would be entitled to receive money from the government?

A Yeah, because my father was supposed to pay me to the age of 21, and then, that would be like one-and-a-half-million Kuwaiti Dinars, so a few million dollars. She took me to see a lawyer and everything, and it was in Arabic. So I really didn't understand. Later on, I found out everything. Pretty much, she wanted me to go over there to see what would happen if I became a citizen.
Q Did you receive that million dollars?
A I didn't. I never became a citizen, because my father was still with her, and she pretty much controlled everything that he did once he got out of prison, and she would not allow him to help me gain citizenship, because that money would have to come from him.
Q So it wasn't from the government; it was from him personally?
A The government would probably pay it off, and he would owe it.
Q Why was your father in prison?
A I'm not positive to be honest.
Q Did you ever ask him?
A Not really.
Q Did you ever ask your stepmother?

A No.
Q Did you ever ask your grandmother?
A No.
Q How long was he in prison for?
A He was probably in and out --
Q Say again.
A He was probably in and out and until that time. I don't believe he's been since.
Q So you came back to the states in 2018, right, around May?
A I believe so.
Q Did you go back to work?
A I'm not sure if I went immediately back to work.
Q When is the next job you had?
A It was Outback Steakhouse in Metairie, but I been thinking about it. Like because I've been trying to put a resume together. Like I can't remember, like, any of the times that I worked. So I wouldn't be able to tell you an answer on those.
Q Let's just talk about what you can tell me. So you came back to the United States. You worked -- the first job you think you had when you came back would have been the

Outback Steakhouse here in Metairie?
A It was Outback.
Q How long were you there approximately?
A About six months.
Q Did you get another job after that?
A I did. My next job was at Commander's Palace.
Q What did you do at Commander's Palace?
A I was a line cook.
Q How long were you there?
A Probably three, four months.
Q What was your next job after that?
A Cafe Amelie in the French Quarter.
Q What did you do at Cafe Amelie?
A I was a saute cook.
Q How long were you there?
A Seven months.
Q And the next job after that?
A I think that's when I went to jail for this certain situation. So whenever I got out, my next job was at Justine.
Q At what?
A Justine.

Q Justine, is that another restaurant?
A Yes, sir, it's on Chartres.
Q In the French Quarter?
A Yes, sir.
Q So Cafe Amelie, St. Tammany Parish Jail?
A Yes, sir.
Q Then, Justine?
A Yes, sir.
Q How long were you there at Justine?
A Probably about four months.
Q And then, you left there to go somewhere else?
A And then, I got fired and COVID came, and that's been that situation since.
Q You haven't worked since?
A I have. My last job, I just left a few days ago. It was at Union Ramen restaurant.
Q Union Robin?
A Union Ramen.
Q Where is that located?
A On Magazine Street.
Q You were there for how many months?
A Probably like a month and a half. I

haven't worked that long.

Q And you left there?

A Yes, sir.

Q Why did you leave?

A Because I was seeking another opportunity for a better restaurant.

Q You mentioned you were fired from, was it Justine?

A Yes, sir.

Q Why were you terminated?

A No. I wasn't fired from that restaurant. I was fired from Cafe Amelie.

Q Why were you terminated from Cafe Amelie?

A Because when I went to jail during that time, I had missed work for a certain amount of days.

Q Have you been terminated from any other jobs in your life?

A Probably a couple, but I probably wouldn't be able to remember that.

Q Can you name any other restaurant or job that you would have had that would have terminated your employment?

A I don't remember.

Q Have we covered all the places you've worked in your life?
A Yes, sir.
Q Any places other than the ones you described?
A Probably Peche Seafood Grill, but I was probably there for about a week.
Q Pecks?
A Peche.
Q Peche?
A P-E-C-H-E.
Q That's located where?
A I can't quite remember.
Q Do you remember when you would have worked there?
A Before Justine.
Q Is that here in New Orleans?
A It is.
Q How much money were you making -- it was Cafe Amelie that you got fired from because of jail?
A Yes, sir.
Q How much money were you making at Cafe Amelie when you got fired?
A Every two week before taxes, probably

about 1,200.

Q Let's talk about your criminal history. So as I appreciate it, you tell me if I'm wrong -- because you've testified in this case once before, right?

A Yes, sir.

Q Do you remember that?

A Yes, sir.

Q You were testifying by phone when there was a hearing back in, I believe, it was April of 2020?

A Yes, sir.

Q Did you have an occasion to look at the transcript of that hearing before today's deposition?

A No, sir.

Q Did you review anything before today's deposition?

A Yes, sir.

Q What did you review?

A I spoke with -- I spoke with Devon, my lawyer, and we just reviewed everything that was brought up in the case.

Q When I say did you review, I'm not asking you about conversations you would have

had. I'm asking you about documents, pictures, paper, things of that nature. Did you look at anything prior to today's deposition?

A No, sir.

Q So you didn't review the transcript or the complaint that you filed?

A The complaint that I filed, yes, I saw it on the internet, because you can open the case.

Q When did you look at it?

A I've just viewed it multiple times in the past, probably a week.

Q A week ago?

A Yes, sir.

Q Okay. So as I appreciate, let's go back -- let's walk through some of your criminal history. As I appreciate, there was an arrest in Florida; is that right?

A Oh, yes sir. Yes, sir.

Q Tell me about that, and what were you arrested for?

A That would have been -- it was for a marijuana charge. I think I had a little bit of marijuana.

Q Do you remember when that arrest occurred?
A Before -- I think it was 2016.
Q Do you know what happened to those charges?
A Oh, they got dismissed.
Q Did you have to do any kind of probation or any kind of community service as part of that?
A No, sir.
Q So you got arrested. Did you have to spend anytime in jail?
A No, sir. Other than probably that night that I was originally arrested.
Q So you were arrested, and you were brought to the jail, and you got out the next day?
A Yes, sir.
Q Then, you went to court at some point later?
A Yes, sir.
Q When you were in court, what happened?
A I went the first time. They offered me probation. I didn't take it, and the next

time, they gave me adjudication withheld.
Q Which meant what?
A I'm not sure exactly what that meant, but I know that they're dropping the charges or -- I'm not sure what it meant to be honest.
Q Did you have to pay any fine, court costs or anything like that?
A No, sir.
Q That would have been in 2016 you said?
A Yes.
Q Had you ever been arrested before that incident in 2016?
A No.
Q I'm sorry?
A No, sir.
Q After that incident in 2016, were you ever arrested again?
A No, sir. Yes, sir. Yes, sir. My bad.
Q Tell me about the next time you were arrested after the marijuana charge in Florida in 2016.
A That probably would have been that situation for the speeding. That would have

been why I went to jail for the problem that was at hand in this situation.

Q Okay. So as I appreciate it, and again, you tell me if I'm right or wrong, but the records seem to indicate that you were arrested in St. Tammany Parish in March of 2019. Does that sound right to you?

A Yes, sir.

Q And that you spent one day in the parish jail in Covington. Does that sound right?

A Yes, sir.

Q Do you know why you were arrested on that occasion?

A Because I was speeding on a motorcycle.

Q Do you know how fast you were going?

A I'm not sure exactly how fast I was going, but I believe they have it on record, so.

Q So you were arrested for speeding?

A Yes, sir.

Q Do you know anything else about the charges from that March of 2019 incident?

A No, sir.

Q Did you ultimately plead guilty or not guilty? Did you go to court? Was there a trial?

A I went to court and they dropped most of the charges. I got charged with one felony and one misdemeanor.

Q What happened with those two charges?

A I got charged with them. I pleaded guilty to them and got probation, and I'm still on probation to this day.

Q So what exactly did you plead guilty to? Do you know?

A I believe it was -- the first one was aggravated flight. I had to plead to one felony, aggravated flight, and then, the one misdemeanor was a -- I think it was a DUI or a DWI. It was one of those. I'm not exactly sure which one, but it was one felony, one misdemeanor.

Q How is it that you ended up being arrested in December of 2019?

A So I didn't go to -- I missed my court date, and the bounty hunters came to get me, and 17 days later, 18 days later, that's when I went to court and had to plead to the

two charges.

Q Let's back up and make sure we're understanding each other. So in March of 2019, you were arrested.

A Yes, sir.

Q You were charged with aggravated flight and DWI.

A I was charged with two felonies and I think it was six misdemeanors, but ultimately, I only took two of those charges.

Q So you were arrested in March of 2019.

A Yes, sir.

Q And you were charged with a number of offenses.

A Yes, sir.

Q You missed a court date between March and December; is that correct?

A Yes, sir.

Q A bounty hunter ultimately took you into custody --

A Yes, sir.

Q -- and brought you to the jail in December of 2019.

A Yes, sir.

Q And it was 17 days after you were brought in December, on December 2, 2019. That's when your charges from March were ultimately adjudicated, correct?
A Yes, sir.
Q That's when you pled guilty to the one misdemeanor and one felony, correct?
A Yes, sir.
Q Why did you miss the court date following the March arrest?
A I don't remember honestly. I don't think that I knew that I had court. I think I tried to go the next day, and I got the wrong date. Probably it was my fault, so.
Q It was not your fault?
A It was my fault.
Q Why was there a bounty hunter? Was there a bond issue for your release back in March?
A So when I got arrested the first time, I had enough money to make bond, and I'm guessing my bond was withdrew whenever I missed court, and that's whenever they came. I'm not sure who they were, because they weren't with the people that bonded me out,

so.

Q What was the agency that arrested you in March of 2019? Do you recall?

A It was on the Causeway. I'm not sure. I don't remember.

Q Causeway Police Department?

A No, it wasn't them. It was some sheriffs closer to the Slidell end -- to the St. Tammany end, I mean.

Q So was there a pursuit on the Causeway that started with Causeway, or did it start with the St. Tammany Parish Sheriff's Office?

A Causeway.

Q So you were northbound on the Causeway coming from Jefferson into St. Tammany or the other way around?

A Yes, sir.

Q Which one?

A From Metairie to Slidell.

Q Slidell or Mandeville?

A To St. Tammany.

Q When you get off the Causeway, what town are you in northbound.

A You keep going, and you get -- you

keep going, and you end up in St. Tammany Parish.

Q Yeah, but there's -- Slidell is on the interstate, I-10.

A No. I didn't get on the interstate. So it wouldn't have been Slidell.

Q So it was Causeway?

A Yes, sir.

Q So there was a pursuit on the motorcycle initiated by the Causeway Police Department while you were northbound.

MR. JACOB:

Objection. Chad, I've you latitude just like last time. Once again, we're in an area that, frankly, everybody knows we shouldn't be in, because it's completely not relevant to anything that would be admissible at trial. So if you intend to continue down this path, I'm going to instruct him not to answer, and I'll file and move for a protective order if you still think you want those answers.

MR. COLLINGS:

Okay. So are you instructing him not to answer any questions about his incident on the Causeway?

MR. JACOB:

Again, as I said before, if you want to ask him what crimes he's been charged with, since that would be broader than what would be admissible, as far as only the facts of certain convictions, I will let you do so. However, getting into the underlying facts related to each of the charges, it's not somewhere we're supposed to be. So I'm going to instruct him not to answer.

MR. COLLINGS:

Okay, well, you just tell him not to answer the questions you don't want him to answer. I'm going to keep asking him. I'm quite confused really, because he tells me one thing and kind of move around a lot. So I'm just trying to understand what happened when, what agency, all that sort of thing.

MR. JACOB:
Right, but whether you are northbound --
MR. COLLINGS:
Feel free to make your objections.
MR. JACOB:
Excuse me, but whether you are northbound on the Causeway in pursuit is a very different question than what agency arrested you. So, frankly, respectfully I don't think you're confused; and if you'd like -- again, I'd invite you to dial up the judge so we can resolve this right not. I'm sure the judge would love to have this resolved presently as opposed to after the fact. So go ahead.
MR. COLLINGS:
I'm going to keep asking questions. If you want to instruct him not to answer, that's certainly your prerogative.
BY MR. COLLINGS:

Q I'm trying to understand. So were you northbound or southbound on the Causeway?

A I'm not sure exactly what you mean.

MR. JACOB:

Objection. I'm just going to instruct you not to answer until counsel has asked a question that I believe is appropriate for you to answer. So you just sit there silently.

Counsel, you go ahead and ask your questions; and if we get to one that's actually appropriate, I will let him answer it.

BY MR. COLLINGS:

Q So were you northbound or southbound on the Causeway?

MR. JACOB:

Next question.

THE WITNESS:

I'm not going to answer anything presenting to my charges.

BY MR. COLLINGS:

Q Okay. So you're not going to answer whether you were northbound or southbound. Do

you know what agency would have initiated the pursuit of you on the Causeway?
A I'm not sure.
Q Did they have blue lights? Did they have red lights? Did they have blue and red? Do you recall anything about the markings on the vehicles?
A I'm not sure.
MR. JACOB:
You can answer that.
THE WITNESS:
Not sure.
BY MR. COLLINGS:
Q You don't know. Do you know where, approximately, on the Causeway the pursuit initiated?
A Probably in the middle.
Q So you understand that the bridge is about 26 miles long. So you think it was somewhere in the middle?
A Yes, sir.
Q There's a line in the middle of the lake: One side is Jefferson, and one side is St. Tammany. Do you know if you would have been on the north or south side of that parish

line?
A It would have been in the middle.
Q Okay.
A Closer to the end towards St. Tammany.
Q So the pursuit of you was for speeding, right?
A Yes, sir.
Q When did you stop your vehicle?
MR. JACOB:
Objection. Don't answer that. If you want to ask where he stopped so you could figure out jurisdiction, that's certainly fine.
MR. COLLINGS:
That's what I just asked him, where did you stop your vehicle?
MR. JACOB:
Actually, you asked when did he stop.
MR. COLLINGS:
No, I said where.
MR. JACOB:
Go ahead.
BY MR. COLLINGS:

Q Where did you stop your vehicle?
A I'm not sure to be honest. I'm not sure where I was, because I turned down a bunch of roads once I got closer to the end of St. Tammany.
Q Okay, so were you still on the bridge, or were you somewhere in St. Tammany Parish.
A Somewhere in St. Tammany.
Q Approximately, how far into St. Tammany Parish did you go before you stopped?
A A mile, two miles, maybe.
Q Do you recall the agency that ultimately put you in custody?
A St. Tammany Parish Sheriff's. I believe. I'm not a hundred percent positive.
Q And we're talking about March of 2019, correct?
A Yes, sir.
Q So you were in jail for, approximately, one day in March of 2019, correct?
A Yes, sir.
Q Were you placed in a holding cell in

March of 2019?
A Yes, sir.
Q Was it the same holding cell that you were ultimately put in back in December of 2019?
A Yes.
Q Same holding cell?
A Yes, sir.
Q Were there any differences in the holding cell from March to December of 2019?
A No, sir.
Q How much was your bond when you were arrested in March of 2019?
A I don't remember, but paying cash, I paid like 850. So probably total like 8,500.
Q Did you have to forfeit the money that you paid, or did you ultimately get that back or some portion of it?
A I didn't get it back.
Q When you pled guilty to the misdemeanor and the felony charge, did you pay a fine?
A Court fines, plus the fines for the probation.
Q Do you recall the amounts that you

paid?
A Court fines is a thousand.
Q Is that it?
A Plus probably 200 a month for probation.
Q How long was probation?
A Nine-twenty.
Q I'm sorry?
A It's still going on.
Q It's still going on today?
A Yes, sir.
Q So you pay a 120 a month?
A Probably about.
Q When does it end? Do you know?
A Not exactly.
Q Do you have to talk to or engage with a probation officer every month?
A Yes, sir, but I got that transferred from St. Tammany to Metairie, so.
Q Do you know the name of your probation officer?
A I don't want to answer that question.
Q I'm sorry?
A I wouldn't like to answer that question.

Q Are you refusing to answer my question?
A Yes, sir.
Q Can I ask you why you don't want to tell me the name of your probation officer?
MR. JACOB:
No. I'll just tell my witness you do need to give him the name of your probation officer.
THE WITNESS:
I haven't been in about six months. So I don't remember which -- because they switched my probation officer. So I'm not sure which one it is.
BY MR. COLLINGS:
Q Give me your best guess who your probation officer is.
A I'm not sure to be honest.
Q Do you know the name of any of your probation officers?
A Unh-unh (negative expression).
Q Can't tell me one name?
A (Witness shakes head negatively.)
Q Have to say yes or no.

A No, sir.
Q How many different probation officers have you had?
A Two. The one starting in St. Tammany and then, the one switched over to Metairie, but I haven't had to go to the one in Metairie. It's just been monthly making payments. So that's why I don't know the answer to that one.
Q Do you have to check in with them?
A No, sir. They came check in one time in the beginning of the year, and that was it.
Q They came to your house?
A Yes, sir.
Q That was the probation officer in St. Tammany or the probation officer here in Jefferson Parish?
A In Jefferson Parish.
Q And you haven't spoken with him since?
A No, sir.
Q Is it a male or a female?
A Male.
Q So you think you had two probation officers in St. Tammany Parish?

A No, I had one, and it was a male. And then, I got switched to Metairie very quickly. They came to visit me once, and then, since I've just been making monthly payments.
Q How do you make those monthly payments?
A I sent it through the mail.
Q Do you have to submit to drug screens?
A In the beginning, I did.
Q Did you ever fail any?
A I believe one in St. Tammany Parish, and that was it.
Q Was there any repercussion of the failed drug screen?
A No, sir. If I failed again, I probably would have went to jail.
Q What did you test positive for?
A Opiates.
Q So as I appreciate it, you were arrested once in Florida, once in St. Tammany, and then, you were ultimately re-incarcerated in St. Tammany as a result of a bounty hunter taking you into custody in December of 2019,

correct?
A Yes, sir.
Q Were you also arrested in Jefferson Parish?
A No, sir.
Q During your hearing back in 2020, you mentioned a time that you were arrested in Gretna and taken to jail.
A That was -- I don't remember that. Not during that time unless I think I -- I'm not sure if that was in -- I think that was in Orleans Parish. I'm not sure if that was in Jefferson Parish. I don't remember that one to be honest.
Q Do you recall why you would have been in either Orleans or Jefferson Parish's jail?
A I went for like a few hours one time. I think it was for theft, for taking something out a store or something.
Q Do you know what year that would have been?
A I don't remember that one very well to be honest.
Q Do you know what ultimately happened to that charge?

A I had to spend like a day in jail, and then, I was given, like, a ticket.
Q But did you ultimately have to go to court plead guilty, not guilty, go to trial? Did something else happen after you got out of jail?
A I went to court and was issued a fine -- issued tickets.
Q You were found guilty?
A Yes, sir.
Q What were you found guilty of?
A I think it was like theft of property or something.
Q Do you know if that was a misdemeanor or felony?
A It was a small misdemeanor. It was a ticket ultimately.
Q It was a misdemeanor for theft?
A Yes, sir, something like that. Ultimately, it was a ticket, and I had to pay, like, $200.
Q Do you know which courthouse you went to? Was it Tulane and Broad in New Orleans, or was it Jefferson Parish courthouse in Gretna?

A It was Jefferson Parish.
Q Okay.
A No, it wasn't even that one to be honest. I don't remember which one it was. It wasn't I just had to go somewhere, like a small -- it was a very small one. It wasn't in Gretna. They told me do I plead guilty to these tickets or whatever it was, and I said yes, I'll plead guilty, and they gave me a ticket.
Q And you don't know where you were?
A No, sir.
Q Do you know what year that was?
A Not exactly, no.
Q Was it before or after 2019?
A I don't remember.
Q Other than the times that we've talked about -- now, there was the 2019 arrest by St. Tammany Parish, incarcerated twice: Once in March and once in December, --
A Yes, sir.
Q -- once in Florida and then, this other time that you can't tell me when it happened or what courthouse you went to, has there been any other arrests in your life?

A In Texas.
Q Let's talk about that. Tell me about when that was. What were the charges?
A Last year, I went to -- I got picked up for three misdemeanors.
Q Where in Texas?
A I think in San Benito, Texas. That would be -- it was for stealing or something. I got three of those charges. I spent 30 days in jail, and then, they let me out, and that's it. The charges are gone now.
Q So in 2021, correct?
A Last year, yes, sir.
Q You were arrested in San Benito, Texas?
A San Benito, Texas.
Q Is that a town, or is that a county?
A It's a city.
Q And you were arrested for what, exactly theft?
A Theft, yes, sir.
Q Theft of what?
A I'm not sure what exactly the charges, like the name of the charges, but like stealing at Walmart, something like that.

I got three of those charges, misdemeanors, and they gave me 30 days, credit for time served, and I spent 30 days, and they let me out.

Q So you had three charges all from the same day from the same incident or multiple incidents?

A Yes, sir.

Q Which one?

A It was two different incidents in one day, and I had a warrant, and they picked me up on the warrant.

Q Break that down a little bit. So you had two different incidents from two different days?

A Same day.

Q You were accused of stealing from the same place twice on the same day, correct?

A Two different places.

Q You mentioned Walmart. What was the other one?

A HEB.

Q HEB?

A Yes.

Q So you said you had a warrant,

correct?
A Yes, sir.
Q What was the warrant for?
A It was for the -- it was when they saw me on camera. They figured out what happened, and they charged me with.
Q You're using the pronoun "they." I need to know who they is?
A San Benito, the police department there.
Q So the police department viewed surveillance footage of you in a store?
A Yes, sir. I believe it was from Walmart, and then, they got that evidence and put together that I was at HEB too, and they gave me those charges.
Q So two charges, one warrant, correct?
A No. I ended up getting charged with three counts of it for some reason.
Q Was there a third charge, third alleged theft of something or someplace?
A I'm not sure to be honest with you. I just got charged with three of them on the same day.
Q You were arrested, and you were put

in a jail in San Benito?
A No. It was the county. I forgot the name of the county. I don't have internet on my phone, but it's -- I forgot the name of the county jail.
Q You were put in that jail somewhere near San Benito, Texas, and you were there for 30 days?
A Yes, sir.
Q At the end of your 30 days, you went to court, and your charges were adjudicated?
A They gave me the credit for the 30 days, and then, I was let go.
Q So were you found guilty, or did you plead guilty?
A I don't think -- like their court system works a lot different. I don't think I ever had -- oh, yeah, I did. The first day, they had the commissioner. I had to go in front of the commissioner. I just pleaded guilty to those.
Q So you plead guilty to how many counts?
A All three of them.
Q Were any of them felonies?

A No, sir.
Q They were all misdemeanors.
A Yes, sir.
Q Were you fined?
A Not fined, no, sir.
Q So your only sentence was time served?
A Yes, sir. I got time served for the 30 days. At first, I didn't know how long I would be in there. I spent 30 days, and they took me to court.
Q That jail, as opposed to the St. Tammany Parish Jail that you were also incarcerated in, in 2019, --
A Yes, sir.
Q Did you have a holding cell at the San Benito jail?
A Yes, sir.
Q How long were you in the holding cell there?
A Probably a day, a day and a half.
Q After a day and a half, you would have been transferred to a dormitory-type portion of the jail?
A I got moved to like another type of

holding cell for another day, for like two days total would be in some type of holding cell, and then, after that, we would have been moved to a dorm.

Q Was the holding cell in San Benito different than the holding cell in St. Tammany Parish?

A I would say same size, same setup, but yes, sir, same type.

Q So it's just a big room with benches and a toilet and a sink?

A Yes, sir.

Q Does that adequately describe it?

A Yes, sir.

Q How many people were in that holding cell with you in San Benito, Texas? Do you recall?

A At the most, like four or five, maybe.

Q And then, when you were in the dorm -- I'm going to call it a dorm, but an area in the jail other than the holding cell where you ultimately spent the next, approximately, 28 days, describe to me what that was like.

A So there was -- for COVID, because they had COVID protocols, we were in a separate area. I think it was called Alpha, I think, and they had four beds. So that would be eight people total in each one of these pods; and in each room, there were probably like -- there were probably four pods. So there was like a total of 32 people, but eight people are in separate rooms, but it's in one like big room -- it's hard to explain -- for the first two weeks; and then, two weeks after that, we got moved to open population, and I think there's like 56 people or something like that, 60 people.

Q Have you made any allegations that your incarceration in San Benito, Texas was in any way unconstitutional or unlawful?

A No, sir.

Q Do you plan to?

A No, sir.

Q Okay. So we've talked about an arrest in Florida, an arrest in St. Tammany, an arrest in San Benito, Texas and an arrest in either in Orleans or Jefferson Parish, you're not sure where. You ultimately had

that charge.
A Yes, sir.
Q Any other arrests of you at any point in your life other than those we've just talked about?
A No, sir.
Q So let's talk about your time in the St. Tammany Parish Jail in December of 2019. Describe for me the conditions of your confinement then.
A There's very many people in there. There's too many people to begin with. It was a very small room, and it was very dirty, and -- very, very dirty. A bunch of people were sick. There were people throwing up in there, stuff like that from detox, and they wouldn't put them in a separate room.
Q Do you know if the St. Tammany Parish Jail had separate rooms for people who were detoxing?
A I'm not sure if they did.
Q Do you know how many holding cells the St. Tammany Parish Jail has?
A Three. They had three at the front.
Q Were you in the same one the entire

time?
A Yes, sir.
Q How many people were with you in that holding cell?
A Like 15. Between 15 and 20 people.
Q You were there a total of what, 16 days, 13 days? What was it?
A Seventeen.
Q Let me see what your complaint said. Paragraph 90 of your complaint, you state that you were in a holding cell for 17 days; is that accurate?
A Yes, sir.
Q And at some point after 17 days, were you then transferred to what is sometimes referred to as the back of the jail, the dormitory section?
A Yes, sir, the 17th day.
Q How long were you then incarcerated beyond that?
A For one day.
Q So for one additional day, and then, you were released?
A Yes, sir.
Q Is that when you went to court and

had your case adjudicated?
A Yes, sir. That's when I went to court, and I plead guilty for the two charges.
Q Did you have to go back to the jail after you pled guilty?
A No, sir.
Q Were you released from the courthouse?
A Oh, yes, I had to go back to the jail. I had to go back and wait to get called to go home.
Q That would have been 2019 or 2020? I'm sorry 12/20/2019, correct?
A Yes, sir.
Q December 20th?
A Yes, sir.
Q Do you recall the names of any of the other inmates that would have shared the holding cell with you in December of 2019?
A No, I don't remember.
Q Have you ever seen any records or seen any video footage of your time in the holding cell?
A Yes, I did. I'm not sure if that was exactly mine or a different one to be honest.

So no.
Q So you think you've seen some video?
A No, I wouldn't say so.
Q Well, you said yes, and then, you kind of said --
A I'm not sure. The Lee Zurik that was on the television, I'm not sure if that was mine or someone else.
Q So you recall seeing a news segment about the allegations made in this lawsuit?
A Yes, sir.
Q And there was video footage from a holding cell. You just don't know if it was you in a holding cell at the time?
A Yes, sir.
Q Other than that, have you seen anything else regarding your time at the St. Tammany Parish Jail?
A No, sir.
Q I'm saying documents or video. Have you seen anything?
A No, sir.
Q When you were arrested in December, I guess when you were brought in, taken into custody by the bounty hunter in December of

2019, did you have any medication on you?

A No, sir.

Q Were you currently taking any medication at that point?

A No, sir.

Q So in December of 2019, was there any medication that you allege was being withheld from you by the St. Tammany Parish Jail?

A No, sir.

Q Other than the sanitary conditions at the jail while you were in holding in December of 2019, what other allegations of unconstitutional conditions do you allege?

A Just being in there for 17 days on the concrete. I mean, they could have at least gave us pads or something. A lot of people were having, you know, health issues, and a lot of people were pretty old, and they wouldn't be able to withstand that. I mean, people were going to the nurse and stuff like that.

Q I appreciate that you might have had some sympathy for other people in the holding cell, but really, I'm only concerned with the conditions that you experienced. So what

allegations other than the fact that you didn't have a pad to sleep on and the conditions were unsanitary in your opinion? Do you have anything else that you allege was unconstitutional about your time in the holding cell?
A The showers. I mean, at one point, we took a shower like one time in the week, and the COs, the COs acted how they want to. If they didn't want to give us something, they didn't have to. It would be on their own time. If they were mad at one person, then, they would take it out on everybody.
Q Okay. So when you say CO, you're talking about a correctional officer, correct?
A Yes, sir.
Q The deputies in the jail?
A Yes, sir.
Q Do you recall the name of any of those deputies?
A No, sir.
Q Can you give us the name of any deputy that you believe violated your rights in any way?
A No, sir.

Q How many times did you get to take a shower during those 17 days?
A Probably three times.
Q Were you fed?
A We were fed three times a day, I think. One day honestly was like two times a couple days, probably two times.
Q Do you have any issues with what you were fed or how often you were fed?
A No, sir.
Q Anything else you want to tell me about your time in the St. Tammany Parish Jail that you believe was unlawful in any way?
A No, sir. Honestly, it's just a lot different from, you know, other jails.
Q Let's talk about your damages. As a result of your time at the St. Tammany Parish Jail, have you sustained any alleged mental health issues?
A I mean, yeah, not -- I mean, I wouldn't say I've been to the doctor for any of them, but I mean, just being in that room for 17 days, I mean, it gave me a lot of anxiety and stuff like that. I was already going through depression. That was probably

during the time that my wife had left me. I mean, people were acting crazy in there. It just wasn't a good time being close to that people for 17 days.

Q So you mentioned depression and anxiety. Did you ever go to a health care professional, whether it's a psychologist, psychiatrist, counselor of any kind, and talk about and document these mental health damages that you alleged to have occurred?

A No, sir.

Q Other than that general anxiety and depression, any other damages that you might have sustained?

A No, sir.

Q No physical damages?

A No physical damages.

Q No economic damages?

A No, sir.

Q I see a tattoo on your cheek. I'm trying to read it, but I can't make it out. What does that say?

A Gucci.

MR. COLLINGS:

Let's go off the record for a

minute. I'm just going to look over
my notes for a second. I might be
done.

(Brief pause.)

MR. COLLINGS:

I tender the witness.

EXAMINATION

BY MR. JACOB:

Q Ahmed, are you there?
A Yeah, I'm here.
Q I have a few follow-up questions for you if that's okay. Are you prepared to proceed?
A Yes, sir.
Q You mentioned the number of persons that were in the cell or you believe to be in the cell with you at the time. Do you recall that?
A Yeah, about 15 to 20. I can't remember exactly how many.
Q During that time, would I be correct that there were periods where you wanted to sleep?

MR. COLLINGS:

Object to the form.

THE WITNESS:
Yes.
BY MR. JACOB:
Q And can you tell me about what it was like to sleep in that cell?
A You wouldn't be able to sleep.
Q But did you ever try to sleep.
A Many times, but it's not -- I probably wouldn't have been able to.
Q And why not?
A It was way too loud. Too many people moving around, way too loud. There's just no space to even sleep with that many people.
Q I'm going to assume though that during a period of 17 days, at some point, you probably got some sleep.
A Yeah, at night. Probably around 2:00 o'clock in the morning, everybody would settle down.
Q What do you believe, if you can estimate, was the longest period of unbroken sleep that you were able to get in that cell?
A Like four hours, maybe, five max.
Q And how often did that happen?
A Probably every other night.

Q When you did sleep, were you standing, sitting, laying down?
A Laying down.
Q And where would you be laying down?
A It could be anywhere in the cell. It could even be next to the toilet.
Q And can you describe what the floor was like in the cell?
A Yeah. It was -- I mean, there is a lot of bodily fluids on the ground too. I'm not -- I'm being completely honest on that situation. There's a lot of people throwing up and peeing all over the ground and stuff like that.
Q Can you tell me -- can you identify types of bodily fluid that you recall seeing on the floor?
A Primarily throw up from the people detoxing and pee from people peeing all over the place.
Q Was that just one area of the floor, or was it all over the floor?
A The throw up was everywhere. The pee was mainly like all over the ground by the toilet, but I mean, it would extend from the

toilet a few feet, so.

Q Other than urine and vomit, do you recall any other bodily fluids, such as -- or bodily excrements, such as feces or blood or anything of that type?

A No.

Q How about -- you mentioned the toilet. So was there toilet paper?

A Yes, sir, but we had to ask -- like the toilet paper wouldn't last very long. We'd would have to ask them for it, and it would take awhile for us to get it.

Q Now, when you say awhile, that may mean different things to different people. What do you mean by awhile?

A I mean, we probably have to ask for like five, six hours straight to get one roll.

Q Presumably, with the time that you were in the cell, at some point, you had to use the toilet, correct?

A Yes, sir.

Q Can you tell me about what that experience was like to use the toilet in that cell?

A That was pretty difficult, to be

honest, with that many people, but you're a man. You just got to do it. Yeah. It was very difficult with that many people.

Q Did you have to move your bowels in front of other people?

A Yes, sir.

Q And how did that make you feel?

A That's uncomfortable, but I mean, you have to. It's very uncomfortable.

Q Did other inmates simply leave you alone while you were on the toilet, or was there any interaction with you while you were on the toilet?

A Yeah. There's interaction. That's probably what made it more difficult.

Q Can you explain that? What type of interaction?

A I mean, I wouldn't let anyone mess me around like that, but people were pushing other people off the toilet and stuff like that.

Q Did anyone ever try that with you?

A Probably one or two times, but I wouldn't let that happen.

Q Did any inmates or guards ever make

any demeaning type comments to you?
A Not directly to me, no.
Q But you did hear such things?
A Yes, sir.
Q What did you hear?
A They just be like -- I mean, they get mad at some of the other guys a lot, because like I said, there's a lot of different stuff going on. They just would be like "F" you, you know, stuff like that, just being mean and pretty much disregarding a lot of the stuff that they're asking.
Q Now, when you say they were doing that, who's they?
A The COs towards the inmates.
Q When you say COs, you mean corrections officers, correct?
A Yes, sir.
Q When you were laying on the floor trying to sleep, did you ever have an occasion where you had to lay where there was vomit and urine?
A Probably a couple -- there was probably like two times that I didn't have room to sleep. So I didn't sleep that night.

So I would probably just stand up or walk around that night or something, because like every night, people fall asleep at different times. So if you end up in a bad spot, then, that's where you got to sleep.

Q I see. What did the cell smell like, if anything?

A I can't remember back to the smell like that, but I remember it smelled like pee for the most part.

Q What was the temperature like in the cell?

A It was cold, but I didn't have a problem with that, because I mean, I'd rather it be cold.

Q Were you ever provided with any bedding or blankets?

A Probably like 8:00 PM, sometimes, like 10:00 PM, they would give us the blankets, and they would take them back at like 4:00 AM.

Q Did they ever say why they were taking them back at 4:00 AM?

A No, they would never tell us why. They would just take them.

Q What were the blankets like? Were they high quality low quality clean, dirty?
A They were very low quality. Most of them are like ripped, and they weren't even full blankets. They didn't smell that great either.
Q I think you mentioned -- I could be wrong on this. Did you mention anything about getting a shower?
A Yeah. We took a shower, I said, like three times probably, four times max, maybe, a fourth time; but one time, I believe we took a shower one time in the week.
Q And were you provided with soap and shampoo and things of that nature?
A Yeah. They had that inside of the shower.
Q Did you get clean clothing?
A Every time we took a shower, we'd get clothing.
Q So the clothing only came on the days you got showers, but the schedule of the shower varied?
A Yes.
Q How did it make you feel to reside in

that cell for the period of time that you were in there?

A I mean, I didn't feel too great. It wasn't a good feeling, but I had no other option. I had no choice.

Q I mean, how did it make you feel as a person?

A It made me feel like less than a man, you know.

Q Did the guards or COs, did they ever tell you why they were treating you guys in that manner?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Because they could.

BY MR. JACOB:

Q But did they say that?

A Yeah. I think -- I remember one guy literally saying -- you know, because I think we were asking for our blankets or something one time, and one of the inmates was like why won't you give us our blankets, and he was like because I don't have to.

Q So did you understand that to be just

being vindictive?

MR. COLLINGS:

Object to the form.

THE WITNESS:

Yes, sir.

BY MR. JACOB:

Q I mean, were you ever told that there was some necessary reason to the operation of the jail that required you to be kept and housed in that manner?

A What was the question?

Q Were you ever told that hey, listen, there's a reason for this, that we need to hold you in the cell in this manner that you describe?

A No, sir.

MR. JACOB:

I have no further questions.

EXAMINATION

BY MR. COLLINGS:

Q You mentioned a CO being mean and saying things to you. Can you tell me the name of that CO?

A I can't. I don't remember. I just remember that he was African American.

Q When you were incarcerated there, when you showed up on December 2, 2019, were you detoxing?
A No, sir.
Q You weren't coming off of anything?
A No, sir.
Q You're positive about that?
A Yes, sir.
MR. COLLINGS:
That's all I have. Thank you.
We're going to attach a copy of the notice as A, and a copy of the complaint filed by Mr. Baqer as Exhibit B.
(Whereupon, the deposition was concluded at 12:21 PM.)

C E R T I F I C A T E

I, LORI L. MARINO, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that AHMED BAQER, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 75 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

Dated this 16th day of October, 2022.

LORI L. MARINO, CCR
CCR #87069
STATE OF LOUISIANA