Transcript of the Testimony of

# FLOYD WILLIAMS

October 12, 2022

BAQER vs ST. TAMMANY PARISH GOVERNMENT

2020-CV-980-WBV-DPC

ALPHA REPORTING & VIDEO

Alpha Reporting & Video
1911 S. National Ave., Suite 405
Springfield, MO 65804
Phone: 417-887-4110
transcripts@alphareportingservice.com
www.alphareportingservice.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

AHMED BAQER, KLABERT JOSEPH GUILLOT, JR., and KLABERT JOSEPH GUILLOT, SR.,

Plaintiffs,

vs.

ST. TAMMANY PARISH GOVERNMENT, a/k/a ST. TAMMANY PARISH COUNCIL, ST. TAMMANY PARISH SHERIFF'S OFFICE, RANDY SMITH, in his official and individual capacity, RODNEY J. STRAIN, in his official and individual capacity, GREG LONGINO, in his official and individual capacity, and LACEY KELLY, in her official and individual capacity,

Defendants.

No. 2020-CV-980-WBV-DPC

CONSOLIDATED WITH Louviere v. St. Tammany Parish Government
No. 2:20-cv-01840-WBV-DPC

DEPOSITION OF MR. FLOYD ALAN WILLIAMS,

produced, sworn, and examined on Wednesday, October 12, 2022, at 2:30 p.m. of that day, at Alpha Reporting & Video, 1911 South National, Suite 405, Springfield, Missouri, before COLLEEN D. HAYES, CCR, RPR, CSR, in the above-captioned cause; taken on behalf of the Defendants.

ALPHA REPORTING & VIDEO
1911 South National, Suite 405
Springfield, Missouri 65804
(417) 887-4110

Page 2

A P P E A R A N C E S

For Plaintiffs: (via Zoom)
MR. DEVON M. JACOB
JACOB LITIGATION
P.O. Box 837
Mechanicsburg, PA 17055
(717) 796-7733
djacob@jacoplitigation.com

For Defendants: (via Zoom)
MR. CHADWICK W. COLLINGS
MILLING BENSON WOODWARD
68031 Capital Trace Row
Mandeville, LA 70471
(985) 292-2000
(985) 292-2001 (fax)
ccollings@millinglaw.com

Monitor:
MR. KYLE RINNE
ALPHA REPORTING & VIDEO
1911 South National
Suite 405
Springfield, MO 65804

I N D E X

TESTIMONY OF
MR. FLOYD ALAN WILLIAMS:


| | PAGE |
|---|---|
| Examination by Mr. Collings | 4 |
| Examination by Mr. Jacob | 67 |
| Reporter's Certificate | 83 |


Phonetic spellings are signified by: [ph.]
Exactly as stated: [sic]

Page 3

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Ex. A | Notice of deposition | 44 |
| Ex. B | Complaint | 44 |

(Exhibits are attached to the original transcript and scans provided to Mr. Collings.)

Page 4

(The witness was sworn by the reporter.)
MR. COLLINGS: All right. First I just want to get on the record that by agreement of counsel, this deposition is being taken via Zoom and that all counsel agree that this deposition may be utilized as if it were being taken in person. Do we have that agreement?
THE WITNESS: Yes.
MR. JACOB: Yeah. That -- this is an appropriate method, yes.
MR. COLLINGS: Okay. All right. Just making sure. Sometimes people get a little off on that agreement at some point down the road, so I like to have that on the record, but -- anyway.
So with that understanding let's go ahead and get started.
Whereupon,
MR. FLOYD ALAN WILLIAMS,
being produced, sworn, and examined, testified as follows:
EXAMINATION
BY MR. COLLINGS:
Q. Mr. Williams, can I get you to state your full name and address for the record?
A. Floyd Alan Williams. I'm at 1304 West Sackett,

Page 5

Springfield, Missouri 65807.
Q. And is that your home address, sir?
A. Yes, sir.
Q. And how long have you been at that address?
A. I believe two -- two years, right at. Just a little over two years.
Q. Okay. And your date of birth?
A. October 18, 1965.
Q. All right. What is your phone number, sir?
A. Area code (417) 444-2704.
Q. All right. So just a couple of ground rules. Have you ever been deposed before?
A. Yes.
Q. All right. I'm going to ask you about that, but let me just go over a couple of things about depositions.
A deposition is a question-and-answer session where I ask questions and you provide the responses. Everything is being transcribed by the court reporter to your left. We need to, at the outset, agree that you're going to let me finish my question, and I will do you the courtesy of allowing you to finish your responses before I begin the next question, because when we talk over one another, it makes it very difficult for our court reporter. Can we agree on that?

A. Yes, sir.
Q. All right. In this -- in this deposition I'm going to ask you a number of questions. If you don't understand my question, I would ask that you tell me that you don't understand it, and I will then rephrase it. Can we agree on that?
A. Yes, sir.
Q. All right. If there's any time you need to take a break, just let us know. We can go off the record. I don't anticipate this deposition taking more than an hour, but if it does and you need to take a break, simply just tell us and we'll take a break. Okay?
A. Yes, sir.
Q. Okay. Are you -- have you taken any medication today that might impact your ability to provide truthful testimony?
A. No.
Q. All right. Are you on any medication currently?
A. I'm on heart medication and BREO for my breathing, for asthma, COPD. Allergy meds is a nasal spray, Flonase. And that's it.
Q. Okay. All right. Well, let's go through a little bit about your background. First let me just follow up on what you told me a moment ago.
Again, my name is Chadwick Collings, and I



represent the defendants. I don't know if I told you that when we started.
But you mentioned that you had been deposed previously. Tell me about the circumstances of your prior deposition.
A. Working for a company down in Slidell, Louisiana, called Textron. I was a welder for them and had this inspector come by and says he was going to get fired. A few days later I ran into him at Walmart, and he told me what was going on, and I said, "I've been questioning the weld practices" -- been a welder for 30-plus years -- questioned the welding procedures on some of these things that were going on military vehicles. And at that time I was told to shut up or lose my job. Don't -- don't cause no problems.
Well, my brother was in the military, and I talked to him that night and he had contacted the military and -- lawyer, which in turn came to be a whistleblowers case against Textron -- or Slidell Welding and Textron there in St. Tammany Parish. I did a deposition for them.
Q. All right. And that was it?
A. That I can remember, yeah.
Q. Okay.
A. Oh, oh, wait a second. I had -- I did -- sorry.



Kansas City Police Department came down to Slidell for a deposition, took my deposition in a -- in a murder case.
I was living in Kansas City. A friend of mine owned an apartment complex, and he was going through a bankruptcy. Well, the bank agreed for me to stay there and a couple of other tenants to watch the place because it was going through bankruptcy. I was on the third floor in the back. And it was down in the northeast part of Kansas City, which -- a lot of Hispanics down there, Italian-Hispanics.
Usually the illegal dumping at the Dumpsters were Hispanics, and I would call them in. But this one time I got out of the shower, and my roommate said, "There's somebody back there that's in a white truck."
So I went back there, towel on, and I'm knocking, beating on the window, and a week later I see the same guy on TV as -- he was missing his wife. His wife had come up missing, Shon Pernice, and I said, "That's the guy that was at the Dumpster."
Well, they come -- they took my report then, and then when it came close to the trial, they came -- they flew down -- the prosecutors flew down to Louisiana to take my deposition down there.
Subsequently -- subsequently he pleaded guilty



because I seen he -- I seen him at the Dumpster. That's where he threw his wife's -- put his wife's body.
Q. Okay. All right. Well, let's talk about a few things about your background.
You mentioned your wife. You're married?
A. No, not a wife. It was a friend of mine.
Q. So -- are you married, sir?
A. No. Never been married.
Q. Okay. Do you have any children?
A. I have one that I gave up for adoption when I was 18.
Q. Okay. All right. Let's talk about your educational background. How far did you go in school?
A. Twelfth grade completed. Grad- -- diploma plus two years vo-tech during high school, diploma or certificate in that.
Q. And where did you graduate from high school?
A. Raytown South, Raytown, Missouri.
Q. Okay. And what year did you graduate?
A. 1984.
Q. Okay. And other than your high school and vo-tech training, did you -- have you gone to school anywhere else?
A. No.
Q. All right. Let's talk about your work history.

Page 10

Following your graduation from high school and vo-tech training, where have you worked? Just walk me through your work history if you would.
A. It -- I was -- I'm a welder, so -- once jobs go in and out, you're laid off. You're hired back on when jobs come back on. It was a multitude of places. The union -- Millwrights Union 1529 is where I spent 11 years and had worked for multiple companies. Some -- I don't even remember their names.
Q. And where is that union located?
A. Kansas City, Missouri.
Q. Is it still in operation?
A. I believe so.
The main company I did work for was KCI, Kansas City Industrial, and then also Automatic Systems. They build car conveyors. They're -- both -- both of them do conveyors for manufacturing plants.
Q. Okay. And after your time with that union in Missouri, where was your next employment?
A. I went to a place called -- oh, what was that? -- Livers & Bronze. That was for a sheet metal workers union, Local No. 2. I worked there for, I believe, four years, something like that.
Q. And where was that?
A. Kansas City, Missouri.

Page 11

Q. Okay. And then after that where did you work?
A. A couple of nonunion places. American Airlines was let out, and there was a bunch of skilled laborers in Kansas City swamped. That's why I ventured towards Louisiana in 2010. There was a better job -- better job opportunities.
Q. Just one second. I'm sorry.
MR. COLLINGS: Let's go off the record for a moment.
(Interruption in proceedings.)
MR. COLLINGS: Okay. Back on the record. I'm sorry. I apologize.
Q. (By Mr. Collings) Okay. So after that employment where was your next place of employment?
A. I bounced around from a couple nonunion shops in Kansas City and then started looking out of town for work. Went -- seen -- seen Slidell, Louisiana, and I thought -- it was snowing at the time in Kansas City, and I thought, I'm going to go south. Check it out. So that's where I went.
Q. And what year about was that?
A. 2010.
Q. Okay. And that's when you began working for Textron?
A. It was a subsidiary of theirs -- Slide- -- what was it? Alliance Laser. Yeah, that's the name of it. Alliance

Page 12

Laser in Slidell.
Q. Okay. And 2010 you started there and you remained there till when?
A. I believe 2011, in April or something like that. That's when all this started, questioning the welds and stuff.
Q. Okay. So your questioning of the welds ended up with you losing your job?
A. Oh, yes. Yeah.
Q. And were you a plaintiff for a defendant in the lawsuit regarding the whistleblower about the welding?
A. I was -- I was -- we was suing them. We were suing Alliance Laser.
Q. So you were the plaintiff?
A. Yes.
Q. All right. Was this what we call a qui tam action, a suit where you're suing on behalf of the government?
A. It was whistleblowers and then also wrongful termination lawsuit.
Q. Okay. And what was -- what was the ultimate conclusion of that lawsuit? Did you win? Lose? Do you know?
A. They -- they settled out of court.
Q. All right. "They" being the defendant?
A. Yes. They settled with us.
Q. Did you receive money as a result?

Page 13

A. Yes.
Q. Okay. All right. So after your time with that -- Alliance Laser, is that right?
A. Yes.
Q. When that came to an end approximately 2011, where was your next employment?
A. I worked for Slidell Welding until -- I worked there for a year and a half, and my breathing problems came down so bad, I couldn't -- I was missing too much work. I was -- went to the emergency room. Couldn't breathe. Just couldn't breathe. All the welding that I've done over the years finally caught up to me.
Q. Okay. So after, what, 2012, 2013, is that -- is that the last time you worked?
A. Yes.
Q. Okay. And you continued to live in Slidell after that?
A. Yes.
Q. When did you move away from Slidell?
A. Right after the pandemic lifted, the borders lifted. It was May of -- what was it? -- 2000, I believe. Yeah, May of 2000.
Q. Okay. And you moved back to where you are now?
A. Yes, Springfield, Missouri, yeah. My brother, he runs the med tech department at the VA here, so -- I didn't want to go back to Kansas City, just -- he said

Page 14

everything's -- Springfield's got everything. It's nice. So I moved here. Love it.
Q. Are you a veteran?
A. No.
Q. All right. Let's talk about your experiences with law enforcement. I understand you're suing as a result of your time as an inmate at the St. Tammany Parish Jail. We're going to talk about that specifically in a minute. But I'd like to know if at any point prior to that occasion where you were an inmate at the jail here in St. Tammany Parish had you ever been arrested before.
A. Yes.
Q. All right. Tell me the date approximately when that arrest occurred.
A. It was after -- Slidell police arrested me for terrorist threats on the company that I was suing, which was later dropped. And he -- the guy showed up to my house, and I videotaped him after it hit the news of him threatening to blow my house up. Subsequently the judge dropped the charges against me and charged him with tampering with a federal witness.
Q. Charged him with what?
A. Yeah, charged Jeremy Noller, the manager at Alliance Laser.

Page 15

Q. Okay. So to your knowledge, Mr. Zoller was criminally charged?
A. Noller, yes.
Q. Okay. All right. And how do you -- is it -- Jeremy Noller? How do you spell his last name?
A. I -- I'm not for sure. I -- Noller.
Q. He's the manager of Alliance Laser?
A. Yes.
Q. All right. So you were arrested by Slidell PD. Do you know what year that would have been?
A. That would have been 2011, I believe. Yes, should have been that same year.
Q. Okay. Were you incarcerated as a result of that arrest?
A. Yes.
Q. Where were you incarcerated?
A. Slidell Police Department headquarters.
Q. They have a jail in Slidell; correct?
A. Yes. Yes.
Q. All right. Were you ever transported to the St. Tammany Parish Jail?
A. No.
Q. Okay. How long were you in the Slidell City Jail?
A. I believe 24 hours, maybe -- maybe -- just a day and a half maybe.

Page 16

Q. Okay.
A. I think I spent one night there.
Q. All right. So -- and that was sometime around 2011, 2012; right?
A. Yes. Correct.
Q. All right. Were -- have you ever been arrested other than that occasion and the occasion that ultimately led you to be incarcerated in the St. Tammany Parish Jail in 2019?
A. 2010 I was arrested in Kansas City for domestic violence or domestic assault.
Q. All right. And what was the -- all right. What was the disposition of those charges? Were you -- were you adjudicated guilty or not guilty?
A. Had to go to classes and then it was all dropped.
Q. So it was like a diversion program?
A. Correct.
Q. Okay. And were you incarcerated as a result of that arrest?
A. Yes, I was.
Q. How long were you incarcerated and where?
A. It was at the Jackson County Jail, and I believe it was -- I was in there maybe four, five days, something like that.
Q. All right. And what kind of -- what kind of diversion

Page 17

program was it? What did they require you to do?
A. Go to classes, take domestic violence classes.
Q. All right. And did you satisfactorily complete all of that?
A. Yes.
Q. Were you ever -- was it ever determined that you had breached any of the conditions of that diversion program?
A. Not that I know of. I got a certificate of completion.
Q. And -- so we talked about an arrest in Kansas City in 2010. We talked about an arrest in Slidell in 2011 or '12. Any other arrest other than the one that we're about to talk about in 2019?
A. I believe in '94, somewhere in the middle of the '90s, me and my brother got in a fight. I was arrested for domestic violence against -- me and my brother got in a fight.
Q. All right. And that would have been in Springfield?
A. No. It would have been in Kansas City, Missouri.
Q. Okay. And so you were charged with what? Some type of battery?
A. Yeah, domestic violence, me and my brother fighting.
Q. Okay. And what was the end result of that? Did you plead guilty? Were you found guilty? Were you found not guilty?

A. No contest, and I went to classes again.
Q. Okay. And were you incarcerated for that arrest?
A. I had gotten an attorney and had worked where I go in and turn myself in and sign back out.
Q. Okay. So you didn't actually spend any time in the jail for that one?
A. No. No.
Q. Okay. And is that -- have you been arrested since September of 2019?
A. No.
Q. Okay. So have we covered all of the times in which you would have been arrested except for the time that you spent some time in the St. Tammany Parish Jail which we're going to talk about now?
A. I believe so.
Q. Okay.
A. Not -- there might have been something when I was a teenager, I believe, in Belton, Missouri, some weed charges or something like that. They --
Q. All right.
A. I got an attorney, and that was expunged.
Q. All right. But were you convicted of those charges? Do you know?
A. No. No.
Q. Okay. So did you go to court? Did they have a trial?



A. No, huh-uh. The attorney took care of it.
Q. Okay. So you were arrested, and to your knowledge the case was ultimately dropped?
A. Yes.
Q. Okay. Do you know where that would have been? What town? What city?
A. It's been so long ago I can't remember.
Q. Okay. All right. In September of 2019 were you still living in Slidell?
A. Yes.
Q. And how did you end up in the St. Tammany Parish Jail in 2019?
A. Me and the neighbor had went to the church and got some food, and there was four -- two pizzas for each of us. And when she came home, she un- -- her and her boyfriend unloaded my stuff in my driveway, which they lived the next building over, and it's less than 50 feet away. And I was looking for it, and then later that night, me and my roommate -- I said, "We got pizzas." And I said, "Where's the pizzas at?"
So I went over there and knocked on her door, and her boyfriend was like, "We didn't take your pizzas. We didn't take your pizzas."
I said, "Man, nobody else got my pizzas but you guys."



And so he ends up calling his girlfriend, and we kind of had words there on the phone. The next --
MR. JACOB: Floyd, Floyd --
THE WITNESS: Yes.
MR. JACOB: -- Floyd, I'm going to stop you from talking about --
THE WITNESS: Okay.
MR. JACOB: -- the underlying facts --
THE WITNESS: Okay.
MR. JACOB: -- of any criminal charge, if that's where this is headed. I think what counsel wants to know is were you arrested and what was the charge.
THE WITNESS: I was arrested for -- I believe it was for staying on property past whatever and then phone harassment, which I didn't call. He -- her boyfriend did.
Q. (By Mr. Collings) Okay. So this stems from some missing pizzas? Is that what I understand?
A. Well, she came over that morning and kicked my door in, my door and --
MR. JACOB: Floyd --
THE WITNESS: Yeah.
MR. JACOB: -- Floyd, don't answer. We're sticking to arrests and convictions.
MR. COLLINGS: Well, I think I have some --



THE WITNESS: Yes.
MR. COLLINGS: I have a right to ask him about why he was in jail this -- this time. I'm not going to go --
MR. JACOB: Correct.
MR. COLLINGS: -- too deep with other criminal cases, but --
MR. JACOB: Correct.
MR. COLLINGS: -- I'd like to understand why he ended up in our jail in September of 2019.
MR. JACOB: Well, that's easy. He was arrested.
MR. COLLINGS: Well -- and I'm trying to understand the circumstances behind it. Has the case --
MR. JACOB: Circumstances --
MR. COLLINGS: -- been --
MR. JACOB: Circumstances is a criminal charge, so ask him what the criminal charge was and the disposition.
MR. COLLINGS: Well, I'm going to get there. I appreciate your advice. But I'd like to -- I'd like to ask your client why he was in our jail in 2019. The first --
MR. JACOB: Again, he was in your jail for a criminal charge.

MR. COLLINGS: That's generally the case.
Q. (By Mr. Collings) So, Mr. -- Mr. Williams --
A. Yes.
Q. -- the time that -- the incident that you just told us about, the telephone harassment and the -- was it criminal trespass? Is that what you were -- you were charged with?
A. Remaining on property, something like that, past --
Q. Remaining after forbidden?
A. Yeah.
Q. All right. So those two charges you were arrested for, what ultimately happened with respect to those charges? Were you found guilty or not guilty?
A. They dropped the charges.
Q. The "they" being the district attorney?
A. Yes.
Q. All right. And were you at -- were you put in any kind of diversion program as part of those charges being dropped?
A. No.
Q. All right. Do you know why the charges were dropped?
A. Because basically -- I'm the one that called 911. She kicked my door in. She dropped her --
MR. JACOB: Floyd --
THE WITNESS: Yes.



MR. JACOB: -- Floyd, you either know --
THE WITNESS: Yeah.
MR. JACOB: -- or you don't. You're not talking about the underlying --
THE WITNESS: Okay.
MR. JACOB: -- circumstances of the charge, period.
THE WITNESS: Okay.
Q. (By Mr. Collings) Do you know why the charges were dropped, sir?
A. No, I don't. Prosecuting attorney dropped the charges.
Q. Okay. And that happened the day you were supposed to go to trial? When did that happen?
A. It happened -- I -- I can't remember the exact date, but I just know it happened.
I take that back. It was 2020. Yeah, they dropped them in 2020, 2020 or '21.
Q. All right. So let's talk about that. So who arrested you? What agency? Do you know?
A. St. Tammany Parish Sheriff's Office.
Q. Okay. And so where were you living at the time that this -- this altercation or whatever you want to call it happened with your neighbors?
A. I was living on 6th Street, had been there for six years at that residence in Slidell.



Q. Do you remember the name of that -- do you remember the address, sir?
A. No, I don't remember the address. It's on 6th Street.
Q. Do you know who called -- I'm sorry.
A. Pardon me?
Q. I just -- I was about to ask you the next question, but I realized you were still talking. What did you say?
A. I said I -- it was on 6th Street. I'd been there for six years, lived at that address for six years.
Q. You don't remember the particular address?
A. I don't.
Q. Okay. All right. And who were you living with at the time?
A. My roommate, Tammy Pudas.
Q. Tammy Pudas?
A. Yes.
Q. That name rings a bell for me for some reason. Is this the lady that sometimes is a panhandler?
A. Correct.
Q. And did you transport her from place to place?
A. Sometimes I did.
Q. Did you ever go to the sheriff's office with her to file a complaint?
A. Yes.
Q. Did you give a statement to internal affairs about



that?
A. They wouldn't even take a statement.
Q. All right. Well, my question is, did you give a statement?
A. They wouldn't take one. I tried to.
Q. You tried to give a statement and they wouldn't take yours?
A. Exactly.
Q. All right. Do you know if Miss Pudas gave a statement?
A. I believe so.
Q. How long did you and Miss Pudas live together?
A. Since 2008. 2008.
Q. And are you still together now?
A. Never together, just roommates. She's just a friend.
Q. I gotcha. And when did you stop being roommates?
A. She just moved out six months ago. She got engaged.
Q. Six months ago as in this year?
A. Yes.
Q. And she lived with you up in Missouri?
A. Yes.
Q. Okay. And so both of you moved to Missouri when?
A. May of 2020.
Q. Okay. All right. Did you ever take a portion of her proceeds when she was out asking people for money on the interstate?

MR. JACOB: Objection.
Don't answer.
Can you get back to the lawsuit, please?
MR. COLLINGS: Well, this is a -- this lady is pretty well-known, and I want to -- I'm just trying to figure out if he was in business with her.
MR. JACOB: You're -- you're not here to conduct discovery for criminal investigators, so --
MR. COLLINGS: It's not a criminal investigation.
MR. JACOB: What?
MR. COLLINGS: I'm asking -- it's not a criminal investigation to my knowledge.
MR. JACOB: Well, why don't you give me a proffer as far as how this at all connects to the instant litigation --
MR. COLLINGS: I understand --
MR. JACOB: -- other than you're snooping around for the sheriff.
MR. COLLINGS: Excuse me?
MR. JACOB: Other than snooping around for the sheriff in an open investigation.
MR. COLLINGS: How do you know it's an open investigation? Because I surely don't.
MR. JACOB: Well, I do.
MR. COLLINGS: Miss Pudas is an open



investigation?
MR. JACOB: Move on.
MR. COLLINGS: Is that what you're telling me? No, you just said -- you know she's an -- this is an open investigation on Miss Pudas by the St. Tammany Parish Sheriff's Office. Is that what you telling me?
MR. JACOB: That was my understanding, but even if it's not, it has absolutely nothing to do with this and is pure harassment. So if you're going to continue --
MR. COLLINGS: It's not pure harassment. It so happens --
MR. JACOB: If you're going to continue, we'll -- you know, this is the fifth depositions where I've had problems with -- with you going too far. So if you're going to continue, I'll get a protective order. If you'd like, you can get the judge on the phone now.
MR. COLLINGS: I'm asking questions. If you're -- if you're instructing your client not to answer questions, that's your prerogative.
MR. JACOB: Yes, I'm instructing him not to answer. And you can explain to the judge how that is relevant to our case and why it's -- why you're entitled to that information if you'd like.
MR. COLLINGS: I'm just trying to understand a



little bit about your client's background and how he made a living. I understand it. He lived with someone who's -- would go out and panhandle on the side of the road.
MR. JACOB: Yeah. He lived with somebody.
THE WITNESS: I have disability.
MR. COLLINGS: And he transported -- and he transported her to place to place.
MR. JACOB: So what?
MR. COLLINGS: Excuse me?
MR. JACOB: So what?
MR. COLLINGS: All right. Let me finish, Counselor. You're making it hard for our court reporter.
So he transported this lady from place to place and took, presumably, a portion of the proceeds for her -- for panhandling.
MR. JACOB: And?
MR. COLLINGS: I'm just asking a question.
MR. JACOB: Why?
MR. COLLINGS: I don't have to explain why I'm asking questions.
MR. JACOB: Exactly.
MR. COLLINGS: This is a discovery deposition.
MR. JACOB: Right. You're discovering. What's



the scope of discovery? It's not --
MR. COLLINGS: Again, I'm not asking you -- I'm not answering -- I'm not under oath, Counselor, and I'm not going to answer your questions, so --
MR. JACOB: Well, this is unbelievable because in 20 years, I think I've told five people not to answer questions and they were all your deposition. So I'm instructing him not to answer. Move on, please.
MR. COLLINGS: Okay. We'll reserve our right to revisit this.
MR. JACOB: Go for it.
Q. (By Mr. Collings) All right. So you and Miss Pudas lived together for how many years?
A. Since 2008.
Q. All right. And what were the names of the individuals that you got into that altercation with, your neighbors, about the pizzas?
A. I don't know their names.
Q. You don't have any names?
A. I don't remember their names. I didn't talk to them hardly at all. I mean -- just by passing, that's it.
Q. All right. How did you get the pizzas again? Were you with them when you got the pizzas?
A. We -- we --
MR. JACOB: Don't answer. Floyd, don't answer.

Page 30

Just sit there until he moves on. I'll tell you when you need to answer.
I'm instructing him not to answer again about the underlying facts for a charge.
Q. (By Mr. Collings) Again, it's -- I'm trying to understand how somebody could go with a man to go get pizzas, you ride with them, you go to church together, you get these pizzas, you can't even tell me who they are? Is that your testimony?
MR. JACOB: Again, don't answer. Move on.
MR. COLLINGS: All right. We'll reserve our right to bring you back at your client -- you and your client's expense to ask -- answer these questions because I think I'm entitled to understand the context and the background of why he ended up in our jail back in 2019.
MR. JACOB: Wonderful. And if this harassment continues, I'm going to move for sanctions.
MR. COLLINGS: File whatever pleading you need to file, Counsel.
MR. JACOB: You as well, Counsel.
MR. COLLINGS: I intend to.
Q. (By Mr. Collings) All right. So -- let's see.
Do you remember the names of the deputies who arrested you?

Page 31

A. No, I do not.
Q. All right. Do you remember the time of day it was that you were arrested?
A. Morning.
Q. All right. And the altercation you had, was that that morning or the day before or sometime prior to that?
A. It started off with dinnertime around 7:00, eight o'clock. We was going to pop the pizzas in and noticed they weren't there. Went over there. I came back --
MR. JACOB: Floyd, Floyd.
THE WITNESS: Okay. Yeah.
MR. JACOB: Don't answer.
We're here to talk about prison conditions pursuant to a criminal charge. Please get to the topic.
Q. (By Mr. Collings) So the issue with your neighbor was the night before, and do you know who it was that called the sheriff's office on you, Mr. Williams?
A. I called the sheriff office on her. She showed up at my door that morning. Took her pants down, mooned me in front of kids that were on the corner waiting for the school bus.
MR. JACOB: Floyd --
THE WITNESS: Yeah.

Page 32

MR. JACOB: -- limit it to --
Q. (By Mr. Collings) So you called the sheriff's office?
MR. JACOB: -- limit it to his question.
THE WITNESS: Okay. Gotcha.
MR. JACOB: He ask you who called. You called.
THE WITNESS: I did.
Q. (By Mr. Collings) All right. And how many deputies arrived?
A. I believe two -- two different ones, and then I requested sergeant on duty.
Q. All right. So did -- ultimately there were three deputies out there?
A. I believe so, three or four.
Q. Okay. Do you know if your neighbors were ever arrested or charged as a result of that altercation that you had with them?
A. She was -- she was supposed to be. She -- I don't know if she -- he -- she said he was. He said you're both going to jail. But I believe I only did because she had children at home.
Q. I'm sorry. Say that again?
A. She had children at home. I believe they just gave her a ticket, and I went to jail.
Q. All right. So you were transported to the jail -- the St. Tammany Parish Jail this time; correct?

Page 33

A. Correct.
Q. All right. And then you were in the jail for how many days?
A. I believe five days.
Q. All right. And in the time that you were in that jail, how many other inmates were in the cell with you?
A. I -- I -- I lost count.
Q. Well, was it more than one? Was it more than five? Was it more than a hundred?
A. More than ten.
Q. Okay. Less than 20?
A. It was -- could have been 20. Could have been 25. It was a lot of people. I mean, if everybody laid down, there was two people still standing every night.
Q. Okay. And this was in a holding cell?
A. Holding cell, yes, sir.
Q. And were you ever moved out of that holding cell?
A. Only to go to take a shower and see medical on the last day.
Q. Okay. So you told me you were in that holding cell for five days. So on the fifth day is when you took a shower and saw the medical personnel?
A. I believe it was on the fourth day. I was released on the fifth day.
Q. Okay. And why did you go see a medical person on the

Page 34

fourth day?
A. Because I told them -- from the time I -- the officer put me in handcuffs, I started getting shortness of breath. They had the fire truck and ambulance show up before they took me to jail, and I asked the officer if I could get my breathing medication, my heart medication. She said, "Nope. They'll just throw it away."
So I wasn't able to take none of my medication with me or anything. And when I arrived at the jail, I told them what I had, that I needed my breathing medication and my heart stuff, and they said, "Oh, they'll -- they'll take care of you."
Q. Okay. And did you ask to see a medical person there on the first day you arrived?
A. Daily filled out requests, everything.
Q. Okay. Were you in any type of distress? Were you unable to breathe or did you feel tingling in your extremities or anything like that?
A. Yes, I did.
Q. All right. And did you communicate that to someone at the jail?
A. Yes.
Q. All right. When did you do that?
A. The first day I was there.

Page 35

Q. What about the second day?
A. Second day, same thing.
Q. Who did you tell?
A. Told the staff -- told the girl that was coming around to hand out the medication that I needed an inhaler. I couldn't breathe.
Q. Okay. That was the second day?
A. That was every day, from the time I got there.
Q. So first, second, third, fourth day?
A. Yes.
Q. All right. And on the fourth day you saw a medical person at the jail?
A. Yes.
Q. And what -- what, if anything, did they give you?
A. They gave me something for my heart because my heart rate was up. They gave me a puff off of an inhaler, and then that would come around every day, and I mean you got 20 guys puffing off the same inhaler. It was quite nasty.
Q. Okay. Let me make sure I understand what you're telling us. So you're saying on the fourth day you saw a medical person. Were you in the medical facility at the jail?
A. Yes. They -- they took us to another room. We had to shower first, then go in there to speak to medical.

Page 36

Q. All right. And you were in the medical facility and they gave you an opportunity to use an inhaler?
A. It wasn't the medical facility. It was just another room. Off to the side of the jail there's like another cell.
Q. Okay. And that's where you met with someone that works for the jail medical staff?
A. I believe so.
Q. All right. And that person gave you some medication for your heart?
A. They gave me aspirin I believe it was.
Q. Okay. You said something about your heart rate was up and they gave you something.
A. Yes.
Q. You think it was aspirin?
A. I believe it was. I believe it was Bayer. It wasn't -- it wasn't my lisinopril.
Q. Okay. And they gave you -- you told them about your breathing problem and they gave you an inhaler?
A. They didn't give me an inhaler. They gave me a puff off of an inhaler.
Q. I gotcha. Okay. And you said other people used that inhaler?
A. Yes.
Q. In your presence?

Page 37

A. Yes.
Q. So there were other people in that room also getting treatment for breathing problems?
A. We were standing in line. It was like a cafeteria line.
Q. How many people were in that line?
A. Everybody from the jail cell.
Q. So the entire holding cell went into that room and was seen by the medical person?
A. I believe there was only three maybe that didn't. Other than that, everybody else went.
Q. Okay. Anything else from a medical standpoint that you recall from your time in the jail?
A. I just was -- totally couldn't breathe. Was having -- didn't sleep at all.
Q. All right. And when you got released from the St. Tammany Parish Jail, did you go see a doctor?
A. I didn't have -- I didn't have insurance.
Q. Okay. With respect, sir, that wasn't my question. My question is, did you go see a doctor?
A. No.
Q. All right. So has anyone -- any medical person, doctor, nurse -- anyone told you since the time that you were released from the St. Tammany Parish Jail to the time that you've been sitting here now -- has

anyone ever told you that as a result of not receiving your medication or the breathing treatment for those five days that you've been -- your health has been compromised?
A. I didn't seek anybody for that situation, but I know that I was in discomfort.
Q. Okay.
A. I got sick after that.
Q. So let's -- let's make -- I'm going to ask you about you getting sick, but I want to make sure I'm clear on this. You didn't see any medical persons after you were released from the jail with respect to any complaints of your nontreatment at the jail; is that correct?
A. I didn't have the co-pay to go see anybody.
Q. Okay. So you didn't; right?
A. No. I would have if I'd had the co-pay.
Q. And do you have any evidence at all that your health was in some way compromised during those five days at the St. Tammany Parish Jail?
A. Every time I see or talk to a sheriff, I'm in discomfort from that situation because I'm the one that called 911 on her and I went to jail because the officer recognized me just as you did from Tammy Pudas. So anybody that was in law enforcement or anything, as



it -- or such, you know Tammy Pudas. Well, then they automatically associate me with her and I went to jail.
Q. And they told you that, you're going to jail because you know Tammy Pudas?
A. You -- yes. That officer, as soon as she said, "Oh, there's Miss Pudas. Oh, you're the one." Yeah.
Q. All right. You mentioned a moment ago that you got sick.
A. Yes.
Q. When did you get sick?
A. I'm -- I was sick the whole -- probably the third day I was in there, I started running a fever, and then it was for two weeks after that.
Q. All right. Other than seeing the medical person at the jail on the fourth day of your incarceration, did you see any other doctors as a result of that sickness?
A. No.
Q. So safe to say, then, that sickness is not documented anywhere?
A. No.
Q. Okay.
A. I just didn't have the money.
Q. And as you sit here today, you don't know how you got sick, do you?
A. It was from being in there.



Q. How do you know that?
A. Because I was in there with 20-some-plus people and I have breathing problems and I was susceptible to catching anything. The third day I was in there, I started --
Q. And you think your symptoms --
A. Pardon me?
Q. And you think your symptoms started on the third day of your incarceration?
A. Correct.
Q. Okay. You mentioned that you have some sort of anxiety whenever you see someone in a law enforcement uniform.
A. Correct.
Q. Have you seen any mental health professionals -- a psychiatrist, a psychologist, or other counselor -- for this mental issue you have with law enforcement?
A. No. There's a --
Q. All right. While you were in the holding cell for those five days, were you fed?
A. Yes.
Q. How many times a day were you fed?
A. I believe it was twice, but I got -- I'm allergic to peanut butter, and there was a few things that I didn't eat because of my allergies and -- I was afraid that it had got cross-contaminated, so I didn't eat a lot of



stuff.
Q. Okay. And did the holding cell have a toilet in it?
A. Yes.
Q. Was it working?
A. Sometimes it did. Sometimes it didn't.
Q. All right. Describe for me how it would not work.
A. They would -- it would get clogged up and overflow.
Q. All right. And did the jail folks come out and resolve that issue?
A. They gave us a plunger -- they gave whoever a plunger and a mop.
Q. All right. So someone with -- that worked at the jail would give somebody else a plunger, like another inmate?
A. They would give the -- they would give the inmates the plunger.
Q. Other inmates didn't --
A. Nobody from -- nobody from -- nobody from the jail that worked there came in there.
Q. Was it a trustee or someone in the holding cell that would do that?
A. It was just somebody in the holding cell.
Q. Okay. So they would get the plunger and then they would resolve whatever was holding up the toilet?
A. Yeah.

Q. And who would get -- who would get the mop? Another inmate?
A. Yes.
Q. And then they would mop up around the toilet?
A. Yes.
Q. And then would the jail personnel then take the plunger and the mop back?
A. Yes.
Q. All right. Did anyone else come -- in the -- in the five days you were there, did anyone else from the jail come in and clean that room?
A. On -- when we went to take a shower and go see the medical staff on that fourth day, they came in and washed it then.
Q. You say "they." Are you talking about people that work at the jail?
A. Trustees. Trustees came in and then they used a mop on it. That's it.
Q. They would mop the floor?
A. Yeah.
Q. Okay.
A. I mean, it -- the water in the little mop bucket was nasty. It was -- I mean, it -- they never changed it. It was gross.
Q. How do you know they never changed it?



A. Because you could see it's brown.
Q. Okay. And you think that happened one time on your fourth day?
A. I know it did.
Q. Okay. Were you allowed to sleep while you were in the holding cell?
A. They would give you one blanket and take it back in the morning and shut lights off. And you would try to -- I guess you could try to get some sleep, but it was cold. It was crowded, people coughing, people defecating. It was nasty.
Q. You say they defecated?
A. Yeah. There was one guy that defecated all over himself. He was mental. They just threw him in there.
Q. All right. And did he remain like that the entire time?
A. He stayed in there for a day and a half, I believe. Then they finally gave him something else to change in.
Q. All right. Do you remember that individual's name?
A. No, I don't.
Q. Do you know whether or not he ever made any complaints or filed a lawsuit or anything like that?
A. I -- I -- I have no idea. I know that everybody finally got the jail personnel to move him out of there.



Q. Okay. So you were given a blanket every night and it was taken back the next morning?
A. Yes.
Q. Okay.
THE WITNESS: That's where they tore that house down (indicating)? It has a little carriage house out --
MR. JACOB: Floyd, let's wait for a question.
THE WITNESS: Oh, sorry.
MR. JACOB: That's all right.
Q. (By Mr. Collings) I'm looking at your --
MR. COLLINGS: Madam Court Reporter, do you have a copy of the complaint?
THE WITNESS: Yes.
MR. COLLINGS: Okay. Let's -- let's do this: Let's attach, Madam Court Reporter, as Exhibit A the notice of deposition and as Exhibit B the complaint filed by Mr. Williams on June 29th, 2020. It's a complaint filed in the United States District Court of the Eastern District of Louisiana, in the matter of Kevin Louviere, Terry Matthews Hall, Jr., and Floyd Williams vs St. Tammany Parish Government, et al.
Q. (By Mr. Collings) All right. Look at page 23, if you would, sir. Do you see where it says on paragraph 144,



it says, "During that time, Mr. Williams" -- "Mr. Floyd Williams was only allowed to shower on his fifth day in the holding cell"? I thought you told me earlier it was your fourth day.
A. It was the fourth day.
Q. All right. So that's an error on -- on the petition?
A. Yes.
Q. Okay. And you were provided clean clothes after you showered?
A. I was provided standard issue jail cell clothes.
Q. And -- but they were not the clothes you wore before your shower; right?
A. Nope. I'd had them on for four days.
Q. Okay. I note you note on that last paragraph on page 23, No. 150, "In response to requests for medical assistance and sanitation, guards responded: 'This is St. Slamity. If you don't like it, don't commit crimes in the parish,'" close quote.
A. Correct.
Q. Who told you that?
A. The jail employees.
Q. Which one?
A. All of them. I say -- ask them if I could use the phone, if I could get my phone number, if I could have medical, anything.

Page 46

Q. So more than --
A. You know the --
Q. -- one person used those words?
A. Yes.
Q. Can you give me a name of any of the guards that would have said that?
A. I -- I can't give you a name. It was the employees that worked there.
Q. Was it more than one?
A. Yes.
Q. More than ten?
A. No.
Q. So somewhere between one and ten people told you essentially that same phrase?
A. At least five.
Q. I'm sorry?
A. At least five.
Q. Okay. Next page, 150- -- paragraph 151, "During this time, jail staff admitted that the conditions of confinement were in place to teach inmates a lesson." Who told you that?
A. Jail staff.
Q. Which jail staff?
A. Same ones that would tell you St. Slamity.
Q. So this is five individuals? Ten individuals?

Page 47

A. I -- around five.
Q. And can you give me one name of one person that would have said that?
A. I had -- they -- they didn't wear -- I didn't see a name tag, nothing.
Q. Can you describe any of them?
A. I couldn't describe them, but --
Q. I'm sorry?
A. I couldn't describe them, no. They were employees. I -- I mean, like --
Q. Were they tall? Short? White? Black? Heavy? Skinny?
A. They were both.
Q. Male? Female?
A. They were both. You name it, it was them.
Q. So someone that I just described --
MR. JACOB: Floyd, just --
Q. (By Mr. Collings) -- any of them --
MR. JACOB: Floyd, limit your answers to actual answers, not sarcasm, please.
THE WITNESS: Okay.
A. It was white, black individuals, male and female that told me this, employees of St. Tammany Parish Jail.
Q. (By Mr. Collings) And on October 3rd, 2019, is that the date you were released from the jail?

Page 48

A. I believe so.
Q. On paragraph 129, which is on page 21, there's a -- there's a -- the paragraph says, "Prior to September 28, 2019, at a time when Defendant Randy Smith was police chief, Defendant Smith stated to Plaintiff Floyd Williams in the context of an unrelated matter that" -- quote -- "'he did not care about anyone's constitutional rights. We have laws in Louisiana. We make our own laws,'" close quote. You see that?
A. Yep.
Q. Okay. Tell me when that conversation occurred.
A. That conversation occurred over the Tammy Pudas incident, I believe the summer before that.
Q. Okay. So it was summer --
A. Or -- it -- it was when he was -- it was when he was still sheriff of Slidell.
Q. Sheriff -- you mean police chief of Slidell?
A. Yeah, police chief. Police chief of Slidell, yes. Correct.
Q. Okay. And this would have been the summer of 2019?
A. It could have been 2017 or '16. It was when he was still sheriff. I believe it was -- it might have been even '14.
Q. Well, you got a big range here. You said the summer

Page 49

before and the date here is September 28, 2019. So was it --
A. This -- that incident when he told me that happened, when Tammy first went to jail in Slidell, Louisiana, I was on the phone with him talking to him about his law being unconstitutional, no ordinance.
Q. And you don't know when this occurred?
A. That happened when she was arrested for the first time. I'd have to go back and look.
Q. Okay. So you called then-Police Chief Randy Smith?
A. Yes.
Q. And she was -- she was -- let's get in the context of this. So she's arrested. She's in jail; right?
A. Correct. Correct.
Q. And you're calling him when?
A. Yes. Calling him --
Q. And you're telling him what? I'm sorry. What?
A. Calling him, questioning him about the panhandling ordinance in Slidell.
Q. All right. You said --
A. I said that -- I said, "You're breaking the law. You're not upholding the law." Subsequently, the ACLU got them to change that ordinance. She was released and charges were dropped.
Q. Okay. And you believe this occurred sometime around

Page 50

when? 2014?
A. 2014, yeah, somewhere around there.
Q. Okay. So you didn't actually go to the police check station and talk to then-Police Chief Randy Smith? This conversation occurred on the phone?
A. Yes. I was at work, actually, at lunchtime.
Q. Did you record this conversation?
A. No, I did not.
Q. Was anyone else a part of the conversation other than you and then-Chief Smith?
A. No, just me and him.
Q. All right. So when he -- when he allegedly said what you claim he said here in this paragraph, what did you say?
A. I said, "You have to uphold the laws of the constitution." I said, "Panhandling's under the Freedom of Speech Act."
And he said, "We make our own laws here. We have ordinances that prohibit that."
I said, "Your ordinance is unconstitutional. You can't break the law. You must uphold the law."
And he said he didn't care about the United States Constitution, people's rights. He makes laws, and he has to go by what the city council tells him he can and can't do.

Page 51

And I said, "That's wrong."
Subsequently --
Q. Do you have a legal background, sir?
A. I got common sense.
Q. Okay. You don't have a law degree, do you?
A. No.
Q. All right. Did a lawyer tell you that the ordinance was unconstitutional?
A. I looked at every city from here -- from L.A. to New York City. Every panhandling issue has been overturned. Each city has had to drop your -- their ordinances, just like you guys settled out of court with Tammy on that panhandling issue in St. Tammany Parish.
Q. Come again? Who settled what?
A. St. Tammany Parish settled out of court with her.
Q. Well, you said --
A. Every city -- every city across the United States has -- has this issue.
Q. And are you suggesting the sheriff's office paid Miss Pudas something?
A. The -- the parish did.
Q. Okay. But do you have any knowledge about the sheriff paying her anything?
A. No. No, the sheriff didn't pay her anything.

Page 52

Q. So when she got arrested for this ordinance that was -- that was a Slidell city ordinance at the time, how long was she in jail?
A. I don't remember. The ACLU got involved, and once the ACLU was involved, it -- the city dropped the charges and she was released. She was in there probably a week maybe.
Q. Did she share some of those settlement proceeds with you?
A. No.
MR. JACOB: Couldn't get it off mute. Objection to that last one.
THE WITNESS: Oh.
Q. (By Mr. Collings) Other than this alleged conversation you would have had with then-Police Chief Randy Smith in 2014, did you ever talk to him at any other time?
A. Yeah. I talked to him a few times after that.
Q. Okay. Tell me about those.
A. Same issue.
Q. Tell me, when.
A. I don't remember when. It was -- he -- he had arrested her again when he became sheriff up there in St. Tammany Parish.
Q. Okay. Do you know when he became the sheriff?
A. I don't remember the -- when it was.

Page 53

Q. All right. And so it was after he became sheriff Tammy was arrested again, and that's when you talked to the sheriff?
A. Yes.
Q. And was this a face-to-face conversation or a telephone conversation?
A. No, it was over the phone.
Q. All right. He called you or you called him?
A. I called him.
Q. You called his cell phone or you called him at work?
A. I -- I don't know which number -- they transferred me to him, so I don't know where -- if it was his cell phone or if it was -- he was at his desk. I don't know. They transferred me to him.
Q. All right. And you called him and told him what?
A. I didn't tell him anything. I just asked him, "What -- what you're -- you were -- you lost in Slidell. You're doing the same thing here in St. Tammany Parish. Why are you doing this?"
And he said, "Once again, the parish council has made an ordinance."
I said, "That's unconstitutional just as it was in Slidell. You're handing out tickets and breaking the law instead of upholding the law."
He said the same thing again.

Page 54

Q. And he said exactly what?
A. He's standing behind the parish ordinance. He said if -- if we didn't like it, take him to court.
Q. Okay. When you say "we," who's "we"?
A. He said if Tammy and I didn't like it or anybody, any of the panhandlers didn't like it, to take him to court.
Q. Okay. And is that what you did?
A. Tammy took him to court. Tammy did. I didn't.
Q. And that was -- was there any other conversations you've had with then-Sheriff Smith?
A. Nope. After that, after she hired an attorney, no. I told them, "Look, let's work this out. Just drop the charges." He wouldn't do it.
Q. So to your knowledge, you only had two conversations with Sheriff Randy Smith --
A. No. We had --
Q. -- one and --
A. We had numerous conversations.
Q. All right. Well, you talked about two of them. Tell me about the others.
A. Same -- same -- same thing. She was arrested, I believe, twice or three times in Slidell. So each time she was arrested, I had conversations with him.
Q. Okay. So you told me about a 2014 conversation. When

Page 55

was the next conversation you had?
A. I -- I can't recall the dates. It was around whenever she was arrested.
Q. Okay. Well, when was she arrested?
A. You'd have to look back on the paperwork. I don't remember.
Q. Was it before 2014 or after 2014?
A. Like -- as I said, you'd have to look at the paperwork. I don't remember.
Q. Okay. And these other conversations would have occurred while sheriff then was -- well, Randy Smith was then the police chief?
A. Police chief and then when she was arrested the one time in St. Tammany.
Q. By the sheriff's office?
A. Yes.
Q. Okay. So to your knowledge, you had multiple conversations with him while he was the chief of police?
A. Yes.
Q. And they were all about Tammy Pudas's activities?
A. Yes.
Q. All right. And then you had one other conversation with him while he was the sheriff?
A. Correct. I had talked to the -- Mr. -- I believe his

Page 56

name's Han [ph.]. He's an attorney for St. Tammany Parish. Is that correct? I forgot -- I forgot his name. But he instructed us that St. Tammany Parish didn't have an ordinance, that she would be okay to hold a sign in St. Tammany Parish. They would not give her a ticket. And I went by what he said. And the sheriff's office rolled up on her. I said, "Look, call him."
The officers that called him, they said the ordinance got passed, that he couldn't be out there.
Q. You said call who? Who are you telling --
A. The attorney -- the attorney for the parish.
Q. So you told the deputy to call the attorney for the parish?
A. Yeah, the supervisor.
Q. Okay. So would you sit there and wait for Miss Pudas? Is that how you ended up talking to the deputy that day?
A. I had come up to pick her up because he didn't want her to walk along the side of the highway. Plus I had -- I had a camera in my car. I was wanting to film it.
Q. Film what?
A. Film her getting arrested or getting a ticket.
Q. So let me -- let me understand. You say you would drop her off and then sit there in the car waiting for her

Page 57

to get a ticket or arrested and film it?
A. I -- I wouldn't wait there every time. I don't -- I'd go shopping, do whatever I needed to do.
Q. Well, how were you there in a car filming?
A. Because that day I just happened to be sitting at McDonald's where the camera could -- I got breakfast or lunch or whatever it was. I was sitting there eating and I seen this sheriff roll up on her.
Q. And then you stayed there or you drove over to where they were?
A. I stayed right there until she called. And I said, "Look, you need to call this attorney for the parish. He's the one that said she could be out there."
He called his supervisor. Supervisor showed up. He said, "Go ahead and pull over here. You're going to pick her up. You're getting a ticket. She's not going to jail."
Q. And did you call the sheriff after that?
A. We tried to go file a complaint on the sheriff's office, and they -- internal affairs once again wouldn't take it.
Q. Who did you talk to at internal affairs?
A. I don't remember who the name was.
Q. Can't tell me a name, one person?
A. I -- no, I don't. I can't recall their names. It was

Page 58

whoever was working in internal affairs.
Q. Do you know where you went?
A. I went to the outer road one down in Slidell, the new -- the new office.
Q. You went into the office on Brownswitch?
A. Yes.
Q. And you went in and you talked to an individual there in the internal affairs division?
A. Yes.
Q. All right. Do you know if he was a sergeant? A captain? Do you know what rank they had?
A. He was a white male. He just come out there and said, "They're not taking complaints on this."
Q. Okay. And were you and Tammy together at that point?
A. Together -- we went there together, yes. I drove.
Q. Okay. But I'm saying you two were physically in a room with someone at the sheriff's office?
A. Yes. Then they split us up, and then the next thing you know, he come back out and he said, "They're not taking a complaint."
Q. Do you know if Tammy made a complaint?
A. She tried. They wouldn't take it from either one of us.
Q. Do you know if she gave a statement?
A. I -- I can't -- she said she didn't. They wouldn't

Page 59

take it.
Q. Okay. And did you try to go talk to the sheriff on that occasion?
A. Yes, I did.
Q. The same building?
A. I called his phone.
Q. Okay. And did you talk to him?
A. Yes.
Q. That's the one time you talked to him while he --
A. Like I said -- yeah, for -- for that time, yes.
Q. Okay. Just to make sure I understand, you had one conversation with the sheriff, Sheriff Smith, while he was the sheriff. Am I correct?
A. I called him a couple times, yeah, a few times. I didn't talk to him just one time. I talked to him a couple of times there.
Q. Okay. I'm trying to drill down how many times you would have talked to him while he was the sheriff. I understand you talked to him while he was the chief in Slidell because she was arrested more than once by Slidell PD; correct?
A. Correct.
Q. All right. But as I understand it, you're telling me she was arrested once by St. Tammany Parish Sheriff's Office; correct?

Page 60

A. Correct.
Q. All right. And you had one conversation with him as the sheriff or more than one conversation with him as the sheriff?
A. I talked to him a couple times.
Q. Okay. And were both of those conversations after she was arrested by the sheriff's office?
A. Yes.
Q. And were both of those conversations on the phone?
A. Yes.
Q. And what did you and the sheriff talk about on the first time you talked?
A. I just asked him why he's continually breaking the law and not upholding the constitutional rights of people. I said, "Your job is to uphold the law, not break the law."
He said, once again, he's doing what the parish council tells him what to do.
Q. Okay.
A. That's his right and --
Q. And did you have another con- -- I'm sorry?
A. He said that's his job. That's his -- his -- what his -- what his job entitles him to do.
And I said, "If it's violating people's constitutional rights, you shouldn't be doing that."

Page 61

Q. Okay. And that was -- was that -- did you record that conversation?
A. No.
Q. All right. And then you called him again?
A. Yeah. We'd had another conversation after that. But Tammy had hired an attorney and I was just letting them take care of it.
Q. Okay. Well, you kind of confused me. So did you call the sheriff a second time when he was the sheriff?
A. Yeah, I believe so. Yeah, we talked one time after that.
Q. You called him?
A. Yes.
Q. He took your call?
A. Yes, because I complained about the internal affairs not taking the complaint.
Q. So the second call was about the internal affairs division?
A. It was about both, the panhandling ordinance and the internal affairs not taking the complaint.
Q. Okay. And what did he say in response to that?
A. He said, "Call the highway patrol. Call the FBI. Call whoever I wanted to." He said, "Call the news if I needed to do that again."
Q. Okay. So you just told me a lot. Let me break that

down. So he told you to call the highway patrol?
A. Yes.
Q. He told you to call the FBI?
A. Yes.
Q. He told you to call the -- who else?
A. Whoever I wanted to. He said, "They have laws there." He's sticking up by the -- what the parish tells him he has to do.
Q. And did you, in fact, call the FBI or the highway patrol?
A. I can't remember if I did or not.
Q. Okay. Did you have any other conversation with the sheriff on that second occasion?
A. That's it.
Q. Okay. And do you know when that -- when that conversation would have taken place?
A. It would have been after she was arrested.
Q. All right. Do you know approximately when that was?
A. I -- I can't remember that. I don't remember.
Q. Okay. Did you ever have a conversation with the sheriff subsequent to your release in 2019 from the jail?
A. I can't remember if I did or not. I know I tried to file a complaint on the arresting officer.
Q. All right. Let's talk about that. Who was the



arresting officer?
A. It was a female sergeant.
Q. You don't know the name?
A. I don't remember her name.
Q. And how did you file a complaint on her?
A. I tried to file a complaint. They wouldn't take it.
Q. All right. Explain to me how you tried and what happened.
A. I went back down to the same place I went with Tammy. I went by myself. Talked to the officer at the window. They had somebody come down from internal affairs and said, "That's her job. We're not taking that complaint."
Q. Who was that who told you that?
A. Whoever the internal affairs guy was.
Q. Can you describe him?
A. Clean-cut, medium build, probably --
Q. White? Black?
A. Probably -- white -- white male.
Q. How old?
A. Late 40s, 50s.
Q. Okay. And you said, "I'm here to file a complaint again the sergeant who arrested me." And they said they're not taking your complaint?
A. Exactly.



Q. Okay. And that conversation happened in the lobby?
A. Yes.
Q. Okay. And did you call the sheriff after that?
A. Yes.
Q. You called the sheriff?
A. Yes.
Q. And did you speak with him?
A. No.
Q. All right. Did you ever call or have occasion to talk to him again after that?
A. No, I didn't.
Q. Did you file any complaints about your time in the St. Tammany Parish Jail?
A. Did I file a complaint with the --
Q. Yeah.
A. -- at the jail? Yeah, I tried to. You -- they'd write -- have you -- they'd have you write it down, and that was it.
Q. So you wrote down a grievance?
A. Yes.
Q. All right. And that was on a piece of paper?
A. Yes. It was when I went to see medical.
Q. Say that again?
A. It was when I went to see medical.
Q. Okay. So when you were seeing the medical person, you



also wrote down your complaint?
A. Yeah. They asked if we had any grievances against medical staff or jail staff or anything.
Q. That was on the fourth day of your incarceration?
A. Correct.
Q. You wrote down your grievance and you turned it in?
A. Yes.
Q. Okay. And did you ever hear anything back on your grievance?
A. No.
Q. Okay. What do you believe were the unconstitutional conditions of your confinement in the St. Tammany Parish Jail in September of 2019?
MR. JACOB: Objection.
Q. (By Mr. Collings) You can answer.
A. What was what?
Q. What do you believe were the unconstitutional conditions of your confinement in the St. Tammany Parish Jail in September of 2019?
MR. JACOB: Same objection.
Q. (By Mr. Collings) Can you answer my question, sir?
A. Everything.
Q. I need you to be a little more specific, please.
A. You can't throw a bunch of people into a room and treat them like animals. We're not animals. We're human

beings. And not to give somebody that's got medical problems as soon as you arrive -- I should have seen medical as soon as I arrived. I knew that. I didn't see them for days.
When I told them I had a food allergy, they said, "Hmm, so's everybody else."
When I asked to use the phone, they said, "There it is."
I said, "Where's the one free phone call?"
"You don't get that here. Are you kidding me?"
Q. Anything else?
A. The sanitary conditions were -- were nasty.
Q. Okay. Anything else?
A. I know that -- it taught me a lesson. I won't go back. I won't even go back to the state of Louisiana.
Q. Okay. Anything else?
A. I'm glad I ran into -- seen Devon Jacobs on the news about the overcrowding because that needed to be solved. That's why --
Q. Anything else?
A. That's -- that's about it.
MR. COLLINGS: Okay. All right. I tender the witness.
/ / /
/ / /



EXAMINATION
BY MR. JACOB:
Q. Floyd, I do have a few questions for you, if you'll bear with me here.
We were discussing -- or at least the lawsuit was about the prison conditions, so I want to bring you back to -- to that issue.
You -- I believe you mentioned that there's a toilet in the cell; is that correct?
A. Correct.
Q. Can you describe the condition of the toilet?
A. It was a stainless steel toilet in the corner. There was no -- facing the toilet or when you're sitting on the toilet, it looks out into the jail cell. There's no privacy, nothing. There was -- the one person that was issued the toilet paper and he was in charge of the toilet paper. One roll -- one or two rolls would come in, and he would count the pieces off to you. You could only have six -- six squares.
Q. Okay. And how about the condition of the toilet with respect to -- was it clean or dirty?
A. It was -- it just depends on -- I mean, if a guy had diarrhea, then went back there, it was dirty. You would try to clean it up. It was -- they would try to clean it up as good as possible, the inmates that were



there. You had a couple of guys that were cleaning up in the jail cell, keeping things -- try to be as decent as -- as what it could be. Twenty nasty men sitting there, stinking clothes, they tried their best, you know.
Q. Tell me about -- I think you mentioned the feces. What about any urine on the toilet?
A. Oh, yeah. There was guys go back there and just -- I mean, there would be fights because guys would miss the toilet and pee on the floor or whatever. And --
Q. How about -- was there any dirty toilet paper on the toilet?
A. Oh, yeah. There's -- like I said, it would overflow.
Q. How about any -- did you see any vomit or blood in the cell?
A. Yes. There would be guys getting sick. There would be -- there was one set of inmates that were, I guess, federal inmates that they brought in. This guy had sores all over him. Another guy had got beaten up by the sheriff's department pretty bad that -- he had open bleeding wounds, and they literally had to get medical to come and get him after he was in the jail cell bleeding for at least two hours, at least two hours.
Q. And then with respect to the vomit, where was that vomit?



A. The guy would -- he ate something and just threw it up. He ate something.
Q. Was it on the floor? In the toilet?
A. Oh, yeah. Yeah. Yeah, he threw up in his shirt. And they actually didn't give him a shirt till the next day.
Q. Oh, so he sat in his own vomit?
A. Well, he threw it -- put it in the trash can, but they wouldn't give him another shirt.
Q. And then how about the blood? Where was the blood in the cell?
A. Guy just -- they brung him in from -- you know, when they bring you in, they put you on the bench and then they put you in a holding cell. That's -- he was bleeding, and they thought it had stopped, but it didn't. And then that -- later that night he -- we'd all went to sleep and he was still bleeding. They finally came and got him in the middle of the night.
Q. And where did the blood end up in the cell?
A. It was all over the floor. I mean, we -- people had to -- there was four people standing because there was blood on the floor. They had no way to clean it up because we were out of toilet paper.
Q. I see. So -- so the toilet paper that was provided was both for using the toilet and also for cleaning?

Page 70

A. Yeah.
Q. Were you provided with any other cleaning supplies?
A. No, not at all.
Q. And while you were in that cell during those five days, did you ever see the cell being cleaned by personnel of the jail?
A. It was -- it was -- like I said, the fourth day when we went to go shower and go see medical, they brought people in. The trustees would come in and wash it -- wash it down.
Q. And when you say "wash it down," tell me what -- what you observed or heard that they did.
A. They would come in and spray it with disinfectant and then take that nasty mop and water and go over the floors.
Q. Okay. Was the water that they were using clean or dirty?
A. It was brown dirty.
Q. And was there an odor in the cell?
A. Yeah. Oh, yeah, the whole time.
Q. What did it smell like?
A. Human waste. I mean, it was nasty. That and guys sweating and -- it just was nasty.
Q. Okay. And then with respect to the vomit and blood, how long until that was cleaned up, or was it ever

Page 71

cleaned up?
A. There was -- they would come in there -- nobody ever came in. It was -- they would hand us something to disinfect it, a wet rag, and then go over it, and they'd clean it up themselves. We'd have --
Q. And then you say "disinfect," but do you know exactly what that product was? Was it a disinfectant?
A. No. No. It was out of a white bottle. They -- they would spray it on the rag and then hand the rag to you through the door.
Q. So you actually don't know that it was a disinfect or a soap?
A. No. No, actually, I don't.
Q. Okay. And then you said -- was it the inmates who were required to clean it up themselves?
A. Yeah.
Q. And were the inmates who cleaned up the bodily fluids -- were they provided with anything to sterilize their own hands afterwards?
A. The one -- the one guy, he was -- he -- the girl gave him rubber gloves.
Q. Okay. How about with respect to food? Where did you guys eat?
A. We ate in the jail cell.
Q. And did you --

Page 72

A. The holding cell.
Q. Did you have table or chairs?
A. No. You just -- they gave you the food through the door and you ate right there. Just sit down where you could.
Q. Okay. And when you say "sit down where you could," you were sitting on the floor that had all the bodily fluids that you mentioned?
A. Exactly.
Q. And I think -- I don't want to put words in your mouth, but I think you said that there were inmates getting angry that other inmates were missing the toilet and peeing on the floor?
A. Yeah. It happened quite a pit.
Q. And then with respect to the urine on the floor, did it remain by the toilet or did it get tracked in the cell?
A. Yeah, it would -- yeah, it would -- you try to get the guy whoever did it to clean it up, but they sometimes -- there was a lot of mental -- a lot of mental inmates in there that shouldn't have been in there.
Q. Okay. But I -- I guess my question is, when people would go back to use that toilet and with 20 people or 15 people in there, did -- did everything stay back by the toilet or did it get tracked through the cell?

Page 73

A. It got tracked through the cell.
Q. And then --
A. You tried to clean it up as good as you could.
Q. And then I understand you to say that sleeping was done if you're lucky on a bench, but most of the time on the floor?
A. Yeah.
Q. Tell me a little bit about that. Was the floor that you were sleeping on the one that had vomit and feces and urine?
A. Yeah.
MR. COLLINGS: Object to the form.
A. Yeah. It was -- you'd sleep right on it. I mean, they shut lights off and that's it.
Q. (By Mr. Jacob) And am I correct that you -- you slept on the floor that contained the bodily fluids and then you were forced to sit in those dirty clothes until such time that you were able to get a shower or clean clothes provided; correct?
MR. COLLINGS: Object to the form.
A. Yes.
Q. (By Mr. Jacob) And then how about bedding? Was any bedding provided?
A. None. You had one blanket, one sheet. Sometimes you'd get a blanket. Sometimes you'd get a sheet.

Q. And tell me a little bit about the blankets or sheets. Were they clean? Were they new? Were they old?
A. They -- they -- they wouldn't wash them every day. You'd get this -- they just -- you put them in this 55-gallon plastic thing, and they'd come back around and they'd hand them out the same way that afternoon. They never went to wash.
Q. Were they dry or wet or --
A. Folded? No. They were just -- yeah. Well, some of them -- you would tell them that, you know, this guy was back there by the bathroom or whatever, you need to throw that one away because it would have feces on it, and they would actually take that one and put it to the side. But you never got a folded sheet, nothing like that, no.
Q. Any cushions to lay on?
A. None.
Q. And what was the temperature in the cell?
A. Freezing cold.
Q. And was the cell dry or wet?
A. It -- it was dry, but it was freezing cold. I mean, it depends on where you were. If you were back there by the bathroom and somebody had spilled their cup of tea or water, you know, you're -- it would get tracked all over the cell.


Q. Were there -- were there trash cans for trash?
A. No.
Q. So what happened with any trash?
A. They'd -- you would just put it in a -- they -- they did have like one plastic -- one plastic bag for people to throw their stuff in. But you wouldn't be able to keep anything. I mean, if you tried to keep a napkin from dinnertime, you -- hopefully you didn't get caught.
Q. Okay. So any trash went over to --
A. They --
Q. -- to where?
A. They went into -- when they come back to get the -- pick up the food, there was always a tray that had the stuff on there, the napkins and stuff.
Q. I see. Okay. Was -- was there ever -- were there times that the trash was, you know, left there for a long period of time?
A. There was -- some people didn't pick up after themselves. That's for sure. But you'd have -- try to have a couple guys that did clean up that would keep it kind of tidy, but -- I mean, soon -- they got sick of doing it or they got transferred out one day.
Q. Okay. Let me see here. How about the walls of the cell? I mean, we talked about the floor and bodily


fluids being on the floor. Was there anything on the cell walls?
A. There was stuff where people had spit loogies on the side of the wall, and, I mean, they were dried on there. You would try to get them to take that stuff off, you know, when the -- I'd come back early from medical, and I said, "Could you change the water in the thing and could you get the loogies off the side of the wall there?" And the guy tried, and it's just -- it's been on there for a long -- and it just -- you know, I can't spend no more time in here. I got to go.
Q. Okay. Did the guards ever say anything to you about why they were treating you in that manner?
A. It was --
MR. COLLINGS: Object to the form.
A. It was the same, St. Tammany Slamity Parish. That's when they're known for. If you don't -- if you don't like it, don't do the crime. You don't have to come back here.
Q. (By Mr. Jacob) Okay. But did they -- did they tell you, for instance, we have to do this because there's a legitimate business reason or penological interest that that --
A. I asked them how come there's so many people in there --


MR. COLLINGS: Object to form.
A. -- and they said it was because of money. They were taking in federal inmates so the sheriff could have money.
Q. (By Mr. Jacob) Okay. And were -- were you ever told that this is for punishment?
A. Well, it's -- it was in the St. Tammany -- St. Slamity -- when you'd say that -- complain about anything, "If you don't like it, don't do the crime."
Q. So did you take from that that this was punishment or a legitimate --
A. Oh, yeah. Oh, yeah. Oh, yes.
Q. Hold on. Hold on. Let me get the question out so our court reporter can get it down.
I just want to know your understanding. Were you understanding from that statement, then, that it was punishment or that there was a legitimate business reason that required the conduct?
MR. COLLINGS: Object to the form.
A. Both. Both.
Q. (By Mr. Jacob) All right. Did any -- other than the St. Slamity, did any of the guards, you know, threaten -- threaten you or -- or use any force against anybody?
A. No, they -- no, they wouldn't do that, but they just

wouldn't -- I mean, if you -- I asked for medical a bunch of times because of my breathing problems.
You'd go, "I thought you were going to go get them." And -- "I forgot. It's shift change." And just -- they would never come back.
Q. Okay. I think that -- give me one more second here. Let me just make sure.
When inmates would ask for sanitary items, did the guards respond to those requests?
A. Like I said --
MR. COLLINGS: Object to form.
A. -- sometimes they would. Sometimes they wouldn't. I mean, they would -- this one time I remember this guy was on the toilet. We didn't have no toilet paper. And they pounded on the door for the guard to get a roll of toilet paper. He said he was. Didn't see him for hours. Other guys had to go to the bathroom without toilet paper.
Q. (By Mr. Jacob) And did -- did the jail staff ever say that they were doing this to teach people a lesson?
A. They said that we --
MR. COLLINGS: Object to form.
A. They said --
MR. COLLINGS: Object to form.
Q. (By Mr. Jacob) Go ahead.



A. They said that there was -- you only -- if -- if they gave out toilet paper all the time, they wouldn't have no toilet paper for themselves or for -- just so -- you only got two rolls every day for that many people. And if you used it, that was too bad.
Q. Okay. My question, though, is, did the guards ever tell you that this type of treatment was to teach people a lesson?
A. Yeah.
MR. COLLINGS: Object to the form.
A. Yes.
Q. (By Mr. Jacob) And do you remember in the context in which they said that?
A. St. Slamity Parish, that's what they're known for. If you don't like it here, this will teach you not to come back.
Q. Now, I want to switch just a little bit to how all of this made you feel as a person. Can you explain how it made you feel as a person to live in those conditions?
A. Third world. It was stuff that you'd see maybe in a Russian prison that -- that -- maybe down in Mexico. You can't believe it's happening here in the United States.
Q. I mean, did it -- did it make you happy? Sad? Emasculated?



A. Oh, I -- I was depressed. I've got -- I have nightmares because of that whole deal down there.
Q. Did it make you feel confident? Anxious? Embarrassed?
A. It was a combination of all that. It's just -- it was sickening how the sheriff can tell me that he doesn't care about the United States Constitution, and actually a girl panhandling has the right to do this, but yet so many people down there objected to it, and since I was associated with her, then I automatically became a pariah. It was that bad.
Q. Well, am I correct, though, that this wasn't just happening to you, this was happening to all the other inmates in the cell?
A. It was happening to --
MR. COLLINGS: Object to form.
A. -- everybody that was in there, that -- you know, either -- whether you were in there because you committed a crime or, like me, didn't commit a crime, were just thrown in there, that people were being treated like this to show them that you don't act up in St. Tammany Parish. If you do, you come out of conformity, you will go and spend time in this rock. And it's known out there as St. Slamity, that you don't want to go there.
Q. (By Mr. Jacob) What was it like to be -- to be a



full-grown man and to be treated like this?
A. It was embarrassing. It was belittling to the utmost.
MR. JACOB: I have no further questions.
MR. COLLINGS: I have no follow-up. Thank you, sir.
THE WITNESS: You're welcome. Thank you.
THE REPORTER: Signature?
MR. JACOB: It's up to --
MR. COLLINGS: Thank you. Take care.
MR. JACOB: I don't know if Chad's asking.
THE REPORTER: Wait.
MR. COLLINGS: I don't need him to read and sign. It's up to him.
MR. JACOB: Then -- yeah, no. We're good. If Chad's -- if Chad doesn't want it, I'm fine waiving it.
THE REPORTER: Can I get copy orders, please?
MR. COLLINGS: I don't -- I mean, obviously, I took the depo, so you know to send me the original. I would like an electronic and a hard copy.
MR. JACOB: And I do not need a copy at this time. I'll contact your office.
THE REPORTER: Okay.
MR. JACOB: Thank you.
MR. COLLINGS: Thank you.

THE WITNESS: Thanks.
MR. JACOB: Thanks, Floyd.
THE WITNESS: Thank you, sir.
MR. JACOB: And to the court reporter, thank you.
(Signature waived.)
(Witness excused.)
(Proceedings concluded at 4:06 p.m.)
- - - - -



REPORTER'S CERTIFICATE

STATE OF MISSOURI )
)ss
COUNTY OF GREENE )

I, COLLEEN D. HAYES, Certified Court Reporter, Registered Professional Reporter, and Certified Shorthand Reporter, do hereby certify that the witness was duly sworn by me; that the facts stated by me in the caption hereof are true; that the said witness did make the above and foregoing answers in response to questions propounded as shown; that I did, in stenotype, report said proceedings; and that the above and foregoing typewritten pages contain a full, true, and correct transcription of my shorthand notes taken on such occasion.

I further certify that I am neither attorney for, nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

Colleen D. Hayes
COLLEEN D. HAYES, CCR, RPR, CSR
CCR No. 704

ALPHA REPORTING & VIDEO
1911 South National, Suite 405
Springfield, Missouri 65804
(417) 887-4110

Exhibits

**Exhibit A** 3:4 44:16
**Exhibit B** 3:5 44:17

1

**11** 10:8
**12** 17:12
**129** 48:2
**1304** 4:25
**14** 48:24
**144** 44:25
**15** 72:24
**150** 45:15
**150-** 46:18
**151** 46:18
**1529** 10:7
**16** 48:22
**18** 5:8 9:11
**1965** 5:8
**1984** 9:20

2

**2** 10:22
**20** 29:6 33:11,12 35:18 72:23
**20-some-plus** 40:2
**2000** 13:20,21
**2008** 25:12 29:14
**2010** 11:5,22 12:2 16:10 17:11
**2011** 12:4 13:5 15:11 16:3 17:11
**2012** 13:13 16:4
**2013** 13:13
**2014** 50:1,2 52:16 54:25 55:7
**2017** 48:22
**2019** 16:9 17:13 18:9 19:8,12 21:10,22 30:16 47:24 48:4,21 49:1 62:21 65:13,19
**2020** 23:16,17 25:22 44:18
**21** 23:17 48:2
**23** 44:24 45:15
**24** 15:24
**25** 33:12
**28** 48:4 49:1
**29th** 44:18

3

**30-plus** 7:12
**3rd** 47:24

4

**40s** 63:21
**417 444-2704** 5:10
**4:06** 82:7

5

**50** 19:18
**50s** 63:21
**55-gallon** 74:5

6

**65807** 5:1
**6th** 23:24 24:3,8

7

**7:00** 31:7

9

**90s** 17:14
**911** 22:22 38:23
**94** 17:14

A

**ability** 6:15
**absolutely** 27:8
**ACLU** 49:22 52:4,5
**act** 50:17 80:20
**action** 12:16
**activities** 55:21
**actual** 47:19
**address** 4:24 5:2,4 24:2,3,9,10
**adjudicated** 16:14
**admitted** 46:19
**adoption** 9:11
**advice** 21:21
**affairs** 24:25 57:20,22 58:1,8 61:15,17,20 63:11,15
**afraid** 40:24
**afternoon** 74:6
**agency** 23:19
**agree** 4:5 5:19,24 6:6
**agreed** 8:6
**agreement** 4:3,7,13
**ahead** 4:15 57:15 78:25
**Airlines** 11:2
**Alan** 4:18,25
**alleged** 52:14
**allegedly** 50:12
**allergic** 40:22
**allergies** 40:24
**allergy** 6:20 66:5
**Alliance** 11:25 12:13 13:3 14:24 15:7
**allowed** 43:5 45:2
**allowing** 5:21
**altercation** 23:22 29:16 31:5 32:15
**ambulance** 34:4
**American** 11:2
**angry** 72:12
**animals** 65:25
**answering** 29:3
**answers** 47:19,20
**anticipate** 6:10
**anxiety** 40:11
**Anxious** 80:3
**anyone's** 48:8
**apartment** 8:5
**apologize** 11:12
**approximately** 13:5 14:14 62:18
**April** 12:4
**Area** 5:10
**arrest** 14:15 15:14 16:19 17:10,11,12 18:2
**arrested** 14:11,16 15:9 16:6,10 17:15 18:8,12 19:2 20:12,13 21:11 22:11 23:18 30:25 31:3 32:14 49:8,13 52:1,21 53:2 54:22,24 55:3,4,13 56:23 57:1 59:20,24 60:7 62:17 63:23
**arresting** 62:24 63:1
**arrests** 20:24
**arrive** 66:2
**arrived** 32:8 34:10,15 66:3
**aspirin** 36:11,15
**assault** 16:11
**assistance** 45:16
**associate** 39:2
**asthma** 6:20
**ate** 69:1,2 71:24 72:4

**attach** 44:16

**attorney** 18:3,21 19:1 22:15 23:11 54:12 56:1, 12,13 57:12 61:6

**Automatic** 10:15

**automatically** 39:2 80:9

### B

**back** 8:9,15,16 10:5,6 11:11 13:22,25 18:4 23:16 26:3 30:12,15 31:10 42:7 43:7 44:2 49:9 55:5 58:19 63:9 65:8 66:14,15 67:7, 23 68:8 72:23,24 74:5,11, 22 75:13 76:6,19 78:5 79:16

**background** 6:23 9:5,13 28:1 30:15 51:3

**bad** 13:9 68:20 79:5 80:10

**bag** 75:5

**bank** 8:6

**bankruptcy** 8:6,8

**basically** 22:22

**bathroom** 74:11,23 78:17

**battery** 17:21

**Bayer** 36:16

**bear** 67:4

**beaten** 68:19

**beating** 8:17

**bedding** 73:22,23

**began** 11:23

**begin** 5:22

**behalf** 12:17

**beings** 66:1

**belittling** 81:2

**bell** 24:17

**Belton** 18:18

**bench** 69:13 73:5

**big** 48:25

**birth** 5:7

**bit** 6:22 28:1 73:8 74:1 79:17

**black** 47:11,22 63:18

**blanket** 43:7 44:1 73:24, 25

**blankets** 74:1

**bleeding** 68:21,23 69:15, 17

**blood** 68:14 69:10,19,22 70:24

**blow** 14:20

**bodily** 71:17 72:7 73:16 75:25

**body** 9:3

**borders** 13:19

**bottle** 71:8

**bounced** 11:15

**boyfriend** 19:16,22 20:16

**breached** 17:7

**break** 6:9,11,12 50:21 60:15 61:25

**breakfast** 57:6

**breaking** 49:21 53:23 60:13

**breath** 34:4

**breathe** 13:10,11 34:18 35:6 37:14

**breathing** 6:19 13:8 34:6, 11 36:19 37:3 38:2 40:3 78:2

**BREO** 6:19

**bring** 30:12 67:6 69:13

**Bronze** 10:21

**brother** 7:16 13:23 17:15, 16,22

**brought** 68:18 70:8

**brown** 43:1 70:18

**Brownswitch** 58:5

**brung** 69:12

**bucket** 42:22

**build** 10:16 63:17

**building** 19:17 59:5

**bunch** 11:3 65:24 78:2

**bus** 31:23

**business** 26:6 76:22 77:17

**butter** 40:23

### C

**cafeteria** 37:4

**call** 8:13 12:16 20:15 23:22 56:7,11,13 57:12,18 61:8,14,17,22,23 62:1,3,5, 9 64:3,9 66:9

**called** 7:7 10:20 22:22 24:4 31:19,20 32:2,5 38:23 49:10 53:8,9,10,15 56:9 57:11,14 59:6,14 61:4,12 64:5

**calling** 20:1 49:15,16,18

**camera** 56:21 57:6

**cans** 75:1

**captain** 58:11

**car** 10:16 56:21,25 57:4

**care** 19:1 34:13 48:7 50:22 61:7 80:6 81:9

**carriage** 44:6

**case** 7:19 8:3 19:3 21:14 22:1 27:23

**cases** 21:7

**catching** 40:4

**caught** 13:12 75:9

**cell** 33:6,15,16,17,20 36:5 37:7,8 40:18 41:2,20,22 43:6 45:3,10 53:10,12 67:9,14 68:2,15,22 69:11, 14,19 70:4,5,19 71:24 72:1,16,25 73:1 74:18,20, 25 75:25 76:2 80:13

**certificate** 9:16 17:9

**Chad** 81:15

**Chad's** 81:10,15

**Chadwick** 6:25

**chairs** 72:2

**change** 43:18 49:23 76:7 78:4

**changed** 42:23,25

**charge** 20:10,12 21:17, 18,25 23:6 30:4 31:15 67:16

**charged** 14:21,23,24 15:2 17:20 22:7 32:15

**charges** 14:21 16:13 18:19,22 22:11,12,14,18, 21 23:9,11 49:24 52:5 54:14

**check** 11:19 50:3

**chief** 48:5,18,19 49:10 50:4 52:15 55:12,13,18 59:19

**children** 9:10 32:20,22

**church** 19:13 30:7

**circumstances** 7:4 21:13,15,17 23:6

**city** 8:1,4,10 10:11,15,25 11:4,16,18 13:25 15:23 16:10 17:10,19 19:6 50:24 51:9,10,11,18 52:2,5

**claim** 50:13

**classes** 16:15 17:2 18:1

**clean** 42:11 45:8 67:21, 24,25 69:22 70:16 71:5,15 72:18 73:3,18 74:2 75:21

**Clean-cut** 63:17

**cleaned** 70:5,25 71:1,17

**cleaning** 68:1 69:25 70:2

**clear** 38:10

**client** 21:22 27:19 30:12

**client's** 28:1 30:13

**clogged** 41:7

**close** 8:22 45:18 48:9

**clothes** 45:8,10,11 68:4 73:17,19

**co-pay** 38:15,17

**code** 5:10
**cold** 43:9 74:19,21
**Collings** 4:2,11,22 6:25 11:8,11,13 20:17,25 21:2, 6,9,12,16,20 22:1,2 23:9 26:4,9,11,16,19,22,25 27:3,11,18,25 28:7,10,12, 19,21,24 29:2,9,12 30:5, 11,19,22,23 31:17 32:2,7 44:11,12,15,24 47:18,24 52:14 65:15,21 66:22 73:12,20 76:15 77:1,19 78:11,22,24 79:10 80:15 81:4,9,12,18,25
**combination** 80:4
**commit** 45:17 80:18
**committed** 80:18
**common** 51:4
**communicate** 34:21
**companies** 10:8
**company** 7:6 10:14 14:17
**complain** 77:8
**complained** 61:15
**complaint** 24:23 44:13, 17,19 57:19 58:20,21 61:16,20 62:24 63:5,6,13, 22,24 64:14 65:1
**complaints** 38:13 43:21 58:13 64:12
**complete** 17:3
**completed** 9:14
**completion** 17:9
**complex** 8:5
**compromised** 38:4,19
**con-** 60:21
**concluded** 82:7
**conclusion** 12:20
**condition** 67:11,20
**conditions** 17:7 31:14 46:19 65:12,18 66:12 67:6 79:19
**conduct** 26:7 77:18
**confident** 80:3
**confinement** 46:20 65:12,18
**conformity** 80:22
**confused** 61:8
**connects** 26:14
**constitution** 50:16,23 80:6
**constitutional** 48:8 60:14,25
**contact** 81:22
**contacted** 7:17
**contained** 73:16
**contest** 18:1
**context** 30:14 48:6 49:12 79:12
**continually** 60:13
**continue** 27:10,13,16
**continued** 13:16
**continues** 30:18
**conversation** 48:12,13 50:5,7,9 52:14 53:5,6 54:25 55:1,23 59:12 60:2, 3 61:2,5 62:12,16,20 64:1
**conversations** 54:10,15, 19,24 55:10,18 60:6,9
**conveyors** 10:16,17
**convicted** 18:22
**convictions** 20:24
**COPD** 6:20
**copy** 44:13 81:17,20,21
**corner** 31:22 67:12
**correct** 15:18 16:5,17 21:5,8 24:19 32:25 33:1 38:14 40:10,13 45:19 48:20 49:14 55:25 56:2 59:13,21,22,25 60:1 65:5 67:9,10 73:15,19 80:11
**coughing** 43:10
**council** 50:24 53:20 60:18
**counsel** 4:3,5 20:11 30:20,21
**counselor** 28:13 29:3 40:15
**count** 33:7 67:18
**County** 16:22
**couple** 5:11,15 8:7 11:2, 15 59:14,16 60:5 68:1 75:21
**court** 5:18,24 12:22 18:25 28:13 44:12,16,19 51:12, 16 54:3,7,9 77:14 82:4
**courtesy** 5:21
**covered** 18:11
**crime** 76:18 77:9 80:18
**crimes** 45:17
**criminal** 20:10 21:6,17, 18,25 22:6 26:8,9,11 31:15
**criminally** 15:1
**cross-contaminated** 40:25
**crowded** 43:10
**cup** 74:23
**cushions** 74:16

**D**

**Daily** 34:16
**date** 5:7 14:14 23:14 47:25 49:1
**dates** 55:2
**day** 15:24 23:12 31:2,6 33:19,21,23,24 34:1,15,25 35:1,2,7,8,9,11,17,21 39:11,15 40:4,8,21 42:13 43:3,17 45:2,4,5 56:18 57:5 65:4 69:6 70:7 74:3 75:23 79:4
**days** 7:9 16:23 33:3,4,21 38:3,19 40:19 42:10 45:13 66:4 70:4
**deal** 80:2
**decent** 68:2
**deep** 21:6
**defecated** 43:12,13
**defecating** 43:10
**defendant** 12:10,23 48:4, 5
**defendants** 7:1
**degree** 51:5
**department** 8:1 13:24 15:17 68:20
**depends** 67:22 74:22
**depo** 81:19
**deposed** 5:12 7:3
**deposition** 4:4,5 5:16 6:2,10 7:5,21 8:2,24 28:24 29:7 44:17
**depositions** 5:15 27:14
**depressed** 80:1
**deputies** 30:24 32:7,12
**deputy** 56:13,17
**describe** 41:6 47:6,7,9 63:16 67:11
**desk** 53:13
**determined** 17:6
**Devon** 66:17
**diarrhea** 67:23
**difficult** 5:24
**dinnertime** 31:7 75:8
**diploma** 9:14,15
**dirty** 67:21,23 68:11 70:17,18 73:17
**disability** 28:6
**discomfort** 38:6,22
**discovering** 28:25
**discovery** 26:8 28:24 29:1
**discussing** 67:5
**disinfect** 71:4,6,11

**disinfectant** 70:13 71:7
**disposition** 16:13 21:19
**distress** 34:17
**district** 22:15 44:19,20
**diversion** 16:16,25 17:7 22:18
**division** 58:8 61:18
**doctor** 37:17,20,23
**doctors** 39:16
**documented** 39:18
**domestic** 16:10,11 17:2, 16,22
**door** 19:21 20:19,20 22:23 31:21 71:10 72:4 78:15
**dried** 76:4
**drill** 59:17
**driveway** 19:16
**drop** 51:11 54:13 56:24
**dropped** 14:18,21 16:15 19:3 22:14,19,21,23 23:10,11,17 49:24 52:5
**drove** 57:9 58:15
**dry** 74:8,20,21
**dumping** 8:12
**Dumpster** 8:20 9:1
**Dumpsters** 8:12
**duty** 32:10

E

**earlier** 45:3
**early** 76:6
**Eastern** 44:20
**easy** 21:11
**eat** 40:24,25 71:23
**eating** 57:7
**educational** 9:12
**electronic** 81:20
**Emasculated** 79:25
**Embarrassed** 80:3
**embarrassing** 81:2
**emergency** 13:10
**employees** 45:21 46:7 47:9,23
**employment** 10:19 11:13,14 13:6
**end** 13:5 17:23 19:11 69:19
**ended** 12:7 21:10 30:15 56:17
**ends** 20:1
**enforcement** 14:6 38:25 40:12,16
**engaged** 25:16
**entire** 37:8 43:15
**entitled** 27:24 30:14
**entitles** 60:23
**error** 45:6
**essentially** 46:14
**et al** 44:23
**everything's** 14:1
**evidence** 38:18
**exact** 23:14
**EXAMINATION** 4:21 67:1
**examined** 4:19
**Excuse** 26:19 28:10
**excused** 82:6
**Exhibit** 44:16,17
**expense** 30:13
**experiences** 14:5
**explain** 27:22 28:21 63:7 79:18
**expunged** 18:21
**extremities** 34:19

F

**face-to-face** 53:5
**facility** 35:22 36:1,3
**facing** 67:13
**fact** 62:9
**facts** 20:8 30:4
**FBI** 61:22 62:3,9
**feces** 68:6 73:9 74:12
**fed** 40:19,21
**federal** 14:22 68:18 77:3
**feel** 34:18 79:18,19 80:3
**feet** 19:18
**female** 47:14,22 63:2
**fever** 39:12
**fight** 17:15,17
**fighting** 17:22
**fights** 68:9
**figure** 26:6
**file** 24:23 30:19,20 57:19 62:24 63:5,6,22 64:12,14
**filed** 43:22 44:18,19
**filled** 34:16
**film** 56:21,22,23 57:1
**filming** 57:4
**finally** 13:12 43:18,24 69:18
**fine** 81:15
**finish** 5:20,21 28:12
**fire** 34:4
**fired** 7:8
**flew** 8:23
**Flonase** 6:20
**floor** 8:9 42:19 68:10 69:3,20,22 72:7,13,15 73:6,8,16 75:25 76:1
**floors** 70:15
**Floyd** 4:18,25 20:3,5,21, 23 22:24 23:1 29:25 31:11,24 44:8,22 45:1 47:17,19 48:6 67:3 82:2
**fluids** 71:18 72:8 73:16 76:1
**folded** 74:9,14
**folks** 41:8
**follow** 6:23
**follow-up** 81:4
**food** 19:14 66:5 71:22 72:3 75:14
**forbidden** 22:9
**force** 77:23
**forced** 73:17
**forgot** 56:2 78:4
**form** 73:12,20 76:15 77:1, 19 78:11,22,24 79:10 80:15
**found** 17:24 22:13
**fourth** 33:23 34:1 35:9, 11,21 39:15 42:13 43:3 45:4,5 65:4 70:7
**free** 66:9
**Freedom** 50:17
**freezing** 74:19,21
**friend** 8:4 9:7 25:14
**front** 31:22
**full** 4:23
**full-grown** 81:1

G

**gave** 9:11 25:9 32:22 35:15,16 36:2,9,11,13,18, 19,20 41:10 43:18 58:24 71:20 72:3 79:2
**generally** 22:1
**girl** 35:4 71:20 80:7
**girlfriend** 20:1
**give** 24:25 25:3,6 26:13 35:14 36:20 41:13,15 43:7

46:5,7 47:2 56:5 66:1 69:5,9 78:6

**glad** 66:17

**gloves** 71:21

**good** 67:25 73:3 81:14

**gotcha** 25:15 32:4 36:22

**government** 12:17 44:22

**Grad-** 9:14

**grade** 9:14

**graduate** 9:17,19

**graduation** 10:1

**grievance** 64:19 65:6,9

**grievances** 65:2

**gross** 42:24

**ground** 5:11

**guard** 78:15

**guards** 45:16 46:5 76:12 77:22 78:9 79:6

**guess** 43:9 68:17 72:22

**guilty** 8:25 16:14 17:24, 25 22:13

**guy** 8:18,20 14:18 43:13 63:15 67:22 68:18,19 69:1,12 71:20 72:18 74:10 76:9 78:13

**guys** 19:25 35:18 51:12 68:1,8,9,16 70:22 71:23 75:21 78:17

**H**

**half** 13:8 15:25 43:17

**Hall** 44:21

**Han** 56:1

**hand** 35:5 71:3,9 74:6

**handcuffs** 34:3

**handing** 53:23

**hands** 71:19

**happen** 23:13

**happened** 22:12 23:12, 14,15,23 43:2 49:3,8 57:5 63:8 64:1 72:14 75:3

**happening** 79:22 80:12, 14

**happy** 79:24

**harassment** 20:15 22:5 27:9,11 30:17

**hard** 28:13 81:20

**headed** 20:11

**headquarters** 15:17

**health** 38:3,18 40:14

**hear** 65:8

**heard** 70:12

**heart** 6:19 34:6,12 35:15 36:10,12

**Heavy** 47:11

**high** 9:15,17,21 10:1

**highway** 56:20 61:22 62:1,9

**hired** 10:5 54:12 61:6

**Hispanics** 8:11,13

**history** 9:25 10:3

**hit** 14:19

**Hmm** 66:6

**hold** 56:5 77:13

**holding** 33:15,16,17,20 37:8 40:18 41:2,20,22,24 43:6 45:3 69:14 72:1

**home** 5:2 19:15 32:20,22

**hour** 6:11

**hours** 15:24 68:23 78:17

**house** 14:19,20 44:5,6

**huh-uh** 19:1

**human** 65:25 70:22

**hundred** 33:9

**I**

**idea** 43:23

**illegal** 8:12

**impact** 6:15

**incarcerated** 15:13,16 16:8,18,21 18:2

**incarceration** 39:15 40:9 65:4

**incident** 22:4 48:14 49:3

**indicating** 44:6

**individual** 58:7

**individual's** 43:19

**individuals** 29:15 46:25 47:22

**Industrial** 10:15

**information** 27:24

**inhaler** 35:5,16,18 36:2, 19,20,21,23

**inmate** 14:7,10 41:14 42:2

**inmates** 33:6 41:15,17 46:20 67:25 68:17,18 71:14,17 72:11,12,20 77:3 78:8 80:13

**inspector** 7:8

**instance** 76:21

**instant** 26:14

**instructed** 56:3

**instructing** 27:19,21 29:8 30:3

**insurance** 37:18

**intend** 30:22

**interest** 76:22

**internal** 24:25 57:20,22 58:1,8 61:15,17,20 63:11, 15

**interruption** 11:10

**interstate** 25:25

**investigation** 26:9,12, 21,23 27:1,5

**investigators** 26:8

**involved** 52:4,5

**issue** 31:17 40:16 41:9 45:10 51:10,13,19 52:19 67:7

**issued** 67:16

**Italian-hispanics** 8:11

**items** 78:8

**J**

**Jackson** 16:22

**Jacob** 4:9 20:3,5,8,10,21, 23 21:5,8,11,15,17,24 22:24 23:1,3,6 26:1,7,10, 13,17,20,24 27:2,7,13,21 28:5,9,11,18,20,23,25 29:5,11,25 30:10,17,21 31:11,13,24 32:1,3,5 44:8, 10 47:17,19 52:11 65:14, 20 67:2 73:15,22 76:20 77:5,21 78:19,25 79:12 80:25 81:3,8,10,14,21,24 82:2,4

**Jacobs** 66:17

**jail** 14:7,10 15:18,21,23 16:8,22 18:6,13 19:11 21:3,10,22,24 30:15 32:19,23,24,25 33:2,5 34:5,10,22 35:12,23 36:4, 7 37:7,13,17,24 38:12,13, 20,23 39:2,3,15 41:8,12, 18 42:6,10,16 43:24 45:10,21 46:19,22,23 47:23,25 49:4,13 52:3 57:17 62:22 64:13,16 65:3,13,19 67:14 68:2,22 70:6 71:24 78:19

**Jeremy** 14:24 15:5

**job** 7:15 11:5,6 12:8 60:15,22,23 63:12

**jobs** 10:4,5

**Jr** 44:21

**judge** 14:21 27:17,22

**June** 44:18

**K**

**Kansas** 8:1,4,10 10:11, 15,25 11:4,16,18 13:25

16:10 17:10,19

**KCI** 10:14

**keeping** 68:2

**Kevin** 44:21

**kicked** 20:19 22:23

**kidding** 66:10

**kids** 31:22

**kind** 16:25 20:2 22:17 61:8 75:22

**knew** 66:3

**knocked** 19:21

**knocking** 8:16

**knowledge** 15:1 19:2 26:12 51:23 54:15 55:17

L

**L.A.** 51:9

**laborers** 11:3

**lady** 24:18 26:4 28:15

**laid** 10:5 33:13

**Laser** 11:25 12:1,13 13:3 14:25 15:7

**Late** 63:21

**law** 14:5 38:25 40:12,16 49:5,21,22 50:21 51:5 53:24 60:13,15,16

**laws** 48:8 50:15,18,23 62:6

**laws,'** 48:9

**lawsuit** 12:10,19,21 26:3 43:22 67:5

**lawyer** 7:18 51:7

**lay** 74:16

**led** 16:7

**left** 5:19 75:17

**legal** 51:3

**legitimate** 76:22 77:11, 17

**lesson** 46:20 66:14 78:20

79:8

**letting** 61:6

**lifted** 13:19

**lights** 43:8 73:14

**limit** 32:1,3 47:19

**lisinopril** 36:17

**literally** 68:21

**litigation** 26:15

**live** 13:16 25:11 79:19

**lived** 19:17 24:9 25:19 28:2,5 29:13

**Livers** 10:21

**living** 8:4 19:9 23:21,24 24:12 28:2

**lobby** 64:1

**Local** 10:22

**located** 10:10

**long** 5:4 15:23 16:21 19:7 25:11 52:2 70:25 75:18 76:10

**loogies** 76:3,8

**looked** 51:9

**lose** 7:15 12:21

**losing** 12:8

**lost** 33:7 53:17

**lot** 8:10 33:13 40:25 61:25 72:19

**Louisiana** 7:6 8:23 11:5, 17 44:20 48:9 49:4 66:15

**Louviere** 44:21

**Love** 14:2

**lucky** 73:5

**lunch** 57:7

**lunchtime** 50:6

M

**Madam** 44:12,16

**made** 28:2 43:21 53:21 58:21 79:18,19

**main** 10:14

**make** 35:20 38:9,10 48:9 50:18 59:11 78:7 79:24 80:3

**makes** 5:23 50:23

**making** 4:11 28:13

**male** 47:14,22 58:12 63:19

**man** 19:24 30:6 81:1

**manager** 14:24 15:7

**manner** 76:13

**manufacturing** 10:17

**married** 9:6,8,9

**matter** 44:20 48:7

**Matthews** 44:21

**Mcdonald's** 57:6

**med** 13:24

**medical** 33:18,22,25 34:14 35:11,22,25 36:1,3, 7 37:9,12,22 38:11 39:14 42:13 45:15,25 64:22,24, 25 65:3 66:1,3 68:21 70:8 76:7 78:1

**medication** 6:14,18,19 34:6,7,9,12 35:5 36:9 38:2

**medium** 63:17

**meds** 6:20

**men** 68:3

**mental** 40:14,16 43:14 72:19,20

**mentioned** 7:3 9:6 39:7 40:11 67:8 68:6 72:8

**met** 36:6

**metal** 10:21

**method** 4:10

**Mexico** 79:21

**middle** 17:14 69:18

**military** 7:13,16,17

**Millwrights** 10:7

**mine** 8:4 9:7

**minute** 14:9

**missing** 8:18,19 13:9 20:18 72:12

**Missouri** 5:1 9:18 10:11, 18,25 13:23 17:19 18:18 25:19,21

**moment** 6:24 11:9 39:7

**money** 12:25 25:24 39:22 77:2,4

**months** 25:16,17

**mooned** 31:21

**mop** 41:11 42:1,4,7,17,19, 22 70:14

**morning** 20:19 31:4,6,21 43:8 44:2

**mouth** 72:10

**move** 13:18 27:2 29:8 30:10,18 43:24

**moved** 13:22 14:2 25:16, 21 33:17

**moves** 30:1

**multiple** 10:8 55:17

**multitude** 10:6

**murder** 8:2

**mute** 52:11

N

**name's** 56:1

**names** 10:9 29:15,18,19, 20 30:24 57:25

**napkin** 75:7

**napkins** 75:15

**nasal** 6:20

**nasty** 35:19 42:23 43:11 66:12 68:3 70:14,22,23

**needed** 34:11 35:5 57:3 61:24 66:18

**neighbor** 19:13 31:17

**neighbors** 23:23 29:17 32:14

**news** 14:19 61:23 66:17
**nice** 14:2
**night** 7:17 16:2 19:19 31:18 33:14 44:1 69:16,18
**nightmares** 80:2
**Noller** 14:24 15:3,5,6
**nontreatment** 38:13
**nonunion** 11:2,15
**northeast** 8:10
**note** 45:14
**notice** 44:17
**noticed** 31:9
**number** 5:9 6:3 45:24 53:11
**numerous** 54:19
**nurse** 37:23

O

**oath** 29:3
**Object** 73:12,20 76:15 77:1,19 78:11,22,24 79:10 80:15
**objected** 80:8
**objection** 26:1 52:11 65:14,20
**observed** 70:12
**occasion** 14:10 16:7 59:3 62:13 64:9
**occurred** 14:15 48:12,13 49:7,25 50:5 55:11
**October** 5:8 47:24
**odor** 70:19
**office** 23:20 24:22 27:6 31:19,20 32:2 51:20 55:15 56:7 57:20 58:4,5,17 59:25 60:7 81:22
**officer** 34:2,5 38:24 39:5 62:24 63:1,10
**officers** 56:9
**open** 26:21,22,25 27:5 68:20
**operation** 10:12
**opportunities** 11:6
**opportunity** 36:2
**order** 27:16
**orders** 81:17
**ordinance** 49:6,19,23 50:20 51:7 52:1,2 53:21 54:2 56:4,10 61:19
**ordinances** 50:19 51:12
**original** 81:19
**outer** 58:3
**outset** 5:19
**overcrowding** 66:18
**overflow** 41:7 68:13
**overturned** 51:11
**owned** 8:5

P

**p.m.** 82:7
**paid** 51:20
**pandemic** 13:19
**panhandle** 28:3
**panhandler** 24:18
**panhandlers** 54:6
**panhandling** 28:17 49:18 51:10,13 61:19 80:7
**Panhandling's** 50:16
**pants** 31:21
**paper** 64:21 67:16,17 68:11 69:23,24 78:14,16,18 79:2,3
**paperwork** 55:5,8
**paragraph** 44:25 45:14 46:18 48:2,3 50:13
**Pardon** 24:5 40:7
**pariah** 80:10
**parish** 7:20 14:7,11 15:21 16:8 18:13 19:11 23:20 27:6 32:25 37:17,24 38:20 44:22 47:23 51:14,16,22 52:23 53:18,20 54:2 56:2,3,5,12,14 57:12 59:24 60:17 62:7 64:13 65:13,19 76:16 79:14 80:21
**parish,'** 45:18
**part** 8:10 22:18 50:9
**passed** 56:10
**passing** 29:21
**past** 20:14 22:8
**patrol** 61:22 62:1,10
**pay** 51:25
**paying** 51:24
**PD** 15:9 59:21
**peanut** 40:23
**pee** 68:10
**peeing** 72:13
**penological** 76:22
**people** 4:12 25:24 29:6 33:13,14 36:22 37:2,6 40:2 42:15 43:10 46:13 60:14 65:24 69:20,21 70:9 72:22,23,24 75:5,19 76:3,24 78:20 79:4,8 80:8,19
**people's** 50:23 60:24
**period** 23:7 75:18
**Pernice** 8:19
**person** 4:6 33:25 34:14 35:12,22 36:9 37:9,22 39:14 46:3 47:2 57:24 64:25 67:15 79:18,19
**personnel** 33:22 42:6 43:24 70:5
**persons** 38:11
**petition** 45:6
**ph.].** 56:1
**phone** 5:9 20:2,15 27:17 45:24 49:5 50:5 53:7,10,13 59:6 60:9 66:7,9
**phrase** 46:14
**physically** 58:16
**pick** 56:19 57:16 75:14,19
**piece** 64:21
**pieces** 67:18
**pit** 72:14
**pizzas** 19:14,20,22,23,24 20:18 29:17,22,23 30:7,8 31:8
**place** 8:7 10:20 11:14 24:20 28:8,15 46:20 62:16 63:9
**places** 10:6 11:2
**plaintiff** 12:10,14 48:6
**plants** 10:17
**plastic** 74:5 75:5
**plead** 17:24
**pleaded** 8:25
**pleading** 30:19
**plunger** 41:10,13,16,23 42:6
**point** 4:13 14:9 58:14
**police** 8:1 14:16 15:17 48:5,18,19 50:3 55:12,13,19
**pop** 31:8
**portion** 25:23 28:16
**pounded** 78:15
**practices** 7:11
**prerogative** 27:20
**presence** 36:25
**pretty** 26:5 68:20
**previously** 7:4
**prior** 7:5 14:9 31:6 48:3
**prison** 31:14 67:6 79:21
**privacy** 67:15
**problem** 36:19
**problems** 7:15 13:8 27:15 37:3 40:3 66:2 78:2
**procedures** 7:12
**proceedings** 11:10 82:7

**proceeds** 25:24 28:16 52:8

**produced** 4:19

**product** 71:7

**professionals** 40:14

**proffer** 26:13

**program** 16:16 17:1,8 22:18

**prohibit** 50:19

**property** 20:14 22:8

**Prosecuting** 23:11

**prosecutors** 8:23

**protective** 27:16

**provide** 5:17 6:15

**provided** 45:8,10 69:24 70:2 71:18 73:19,23

**psychiatrist** 40:15

**psychologist** 40:15

**Pudas** 24:14,15 25:9,11 26:25 27:5 29:12 38:24 39:1,4,6 48:13 51:21 56:16

**Pudas's** 55:21

**puff** 35:16 36:20

**puffing** 35:18

**pull** 57:15

**punishment** 77:6,10,17

**pure** 27:9,11

**pursuant** 31:15

**put** 9:2 22:17 34:3 69:8, 13,14 72:10 74:4,13 75:4

## Q

**question** 5:20,22 6:4 24:6 25:3 28:19 32:3 37:19,20 44:8 65:21 72:22 77:13 79:6

**question-and-answer** 5:16

**questioned** 7:12

**questioning** 7:11 12:5,7 49:18

**questions** 5:17 6:3 27:18,20 28:22 29:4,7 30:13 67:3 81:3

**qui** 12:16

**quote** 45:18 48:7,9

## R

**rag** 71:4,9

**ran** 7:9 66:17

**Randy** 48:4 49:10 50:4 52:15 54:16 55:11

**range** 48:25

**rank** 58:11

**rate** 35:16 36:12

**Raytown** 9:18

**read** 81:12

**realized** 24:7

**reason** 24:17 76:22 77:18

**recall** 37:13 55:2 57:25

**receive** 12:25

**receiving** 38:1

**recognized** 38:24

**record** 4:3,14,24 6:9 11:8, 11 50:7 61:1

**release** 62:21

**released** 33:23 37:16,24 38:12 47:25 49:23 52:6

**relevant** 27:23

**remain** 43:15 72:16

**remained** 12:2

**Remaining** 22:8,9

**remember** 7:23 10:9 19:7 23:14 24:1,3,10 29:20 30:24 31:2 43:19 52:4,21, 25 55:6,9 57:23 62:11,19, 23 63:4 78:13 79:12

**rephrase** 6:5

**report** 8:21

**reporter** 4:1 5:18,24 28:14 44:12,16 77:14 81:7,11,17,23 82:4

**represent** 7:1

**requested** 32:10

**requests** 34:16 45:15 78:9

**require** 17:1

**required** 71:15 77:18

**reserve** 29:9 30:11

**residence** 23:25

**resolve** 41:8,24

**respect** 22:12 37:19 38:12 67:21 68:24 70:24 71:22 72:15

**respond** 78:9

**responded** 45:16

**response** 45:15 61:21

**responses** 5:17,22

**result** 12:25 14:6 15:13 16:18 17:23 32:15 38:1 39:16

**revisit** 29:10

**ride** 30:7

**rights** 48:8 50:23 60:14, 25

**rings** 24:17

**road** 4:13 28:4 58:3

**rock** 80:22

**roll** 57:8 67:17 78:16

**rolled** 56:7

**rolls** 67:17 79:4

**room** 13:10 35:24 36:4 37:2,8 42:11 58:16 65:24

**roommate** 8:14 19:19 24:14

**roommates** 25:14,15

**rubber** 71:21

**rules** 5:11

**running** 39:12

**runs** 13:23

**Russian** 79:21

## S

**Sackett** 4:25

**Sad** 79:24

**safe** 39:18

**sanctions** 30:18

**sanitary** 66:12 78:8

**sanitation** 45:16

**sarcasm** 47:20

**sat** 69:7

**satisfactory** 17:3

**school** 9:13,15,17,21,22 10:1 31:23

**scope** 29:1

**seek** 38:5

**send** 81:19

**sense** 51:4

**September** 18:9 19:8 21:10 48:4 49:1 65:13,19

**sergeant** 32:10 58:10 63:2,23

**session** 5:16

**set** 68:17

**settled** 12:22,24 51:12, 15,16

**settlement** 52:8

**share** 52:8

**sheet** 10:21 73:24,25 74:14

**sheets** 74:1

**sheriff** 26:18,21 31:20 38:21 48:17,18,23 51:23, 25 52:22,24 53:1,3 54:16 55:11,24 57:8,18 59:2,12, 13,18 60:3,4,11 61:9 62:13,21 64:3,5 77:3 80:5

**sheriff's** 23:20 24:22 27:6 31:19 32:2 51:20 55:15 56:7 57:19 58:17

59:24 60:7 68:20

**shift** 78:4

**shirt** 69:4,5,9

**Shon** 8:19

**shopping** 57:3

**shops** 11:15

**Short** 47:11

**shortness** 34:3

**show** 34:4 80:20

**showed** 14:18 31:20 57:14

**shower** 8:14 33:18,22 35:25 42:12 45:2,12 70:8 73:18

**showered** 45:9

**shut** 7:14 43:8 73:14

**sick** 38:8,10 39:8,10,11, 24 68:16 75:22

**sickening** 80:5

**sickness** 39:16,18

**side** 28:4 36:4 56:20 74:14 76:4,8

**sign** 18:4 56:5 81:12

**signature** 81:7 82:5

**simply** 6:12

**sir** 5:2,3,9 6:1,7,13 9:8 23:10 24:2 33:16 37:19 44:25 51:3 65:21 81:5 82:3

**sit** 30:1 39:23 56:16,25 72:4,6 73:17

**sitting** 37:25 57:5,7 67:13 68:3 72:7

**situation** 38:5,22

**skilled** 11:3

**Skinny** 47:12

**Slamity** 45:17 46:24 76:16 77:8,22 79:14 80:23

**sleep** 37:15 43:5,9 69:17 73:13

**sleeping** 73:4,9

**slept** 73:15

**Slide-** 11:24

**Slidell** 7:6,19 8:1 11:17 12:1 13:7,16,18 14:16 15:9,17,18,23 17:11 19:9 23:25 48:17,18,19 49:4,19 52:2 53:17,23 54:23 58:3 59:20,21

**smell** 70:21

**Smith** 48:5 49:10 50:4,10 52:15 54:11,16 55:11 59:12

**snooping** 26:17,20

**snowing** 11:18

**so's** 66:6

**soap** 71:12

**solved** 66:19

**sores** 68:19

**sort** 40:11

**south** 9:18 11:19

**speak** 35:25 64:7

**specific** 65:23

**specifically** 14:8

**Speech** 50:17

**spell** 15:5

**spend** 18:5 76:11 80:22

**spent** 10:7 16:2 18:13

**spilled** 74:23

**spit** 76:3

**split** 58:18

**spray** 6:20 70:13 71:9

**Springfield** 5:1 13:23 17:18

**Springfield's** 14:1

**squares** 67:19

**St** 7:20 14:7,11 15:21 16:8 18:13 19:11 23:20 27:5 32:25 37:17,24 38:20 44:22 45:17 46:24 47:23 51:13,16 52:23 53:18 55:14 56:1,3,5 59:24 64:13 65:12,18 76:16 77:7,8,22 79:14 80:21,23

**staff** 35:4 36:7 42:13 46:19,22,23 65:3 78:19

**stainless** 67:12

**standard** 45:10

**standing** 33:14 37:4 54:2 69:21

**standpoint** 37:12

**started** 4:16 7:2 11:16 12:2,5 31:7 34:3 39:12 40:5,8

**state** 4:23 66:15

**stated** 48:5

**statement** 24:25 25:2,4, 6,9 58:24 77:16

**States** 44:19 50:22 51:18 79:23 80:6

**station** 50:4

**stay** 8:6 72:24

**stayed** 43:17 57:9,11

**staying** 20:14

**steel** 67:12

**stems** 20:17

**sterilize** 71:18

**sticking** 20:24 62:7

**stinking** 68:4

**stop** 20:5 25:15

**stopped** 69:15

**Street** 23:24 24:3,8

**stuff** 12:6 19:16 34:12 41:1 75:6,15 76:3,5 79:20

**subsequent** 62:21

**subsequently** 8:25 14:20 49:22 51:2

**subsidiary** 11:24

**suggesting** 51:20

**suing** 12:12,17 14:6,17

**suit** 12:17

**summer** 48:14,15,21,25

**supervisor** 56:15 57:14

**supplies** 70:2

**supposed** 23:12 32:17

**surely** 26:23

**susceptible** 40:3

**swamped** 11:4

**sweating** 70:23

**switch** 79:17

**sworn** 4:1,19

**symptoms** 40:6,8

**Systems** 10:16

**T**

**table** 72:2

**tag** 47:5

**taking** 6:10 58:13,20 61:16,20 63:12,24 77:3

**talk** 5:23 9:4,12,25 14:5,8 17:13 18:14 23:18 29:20 31:14 38:21 50:4 52:16 57:22 59:2,7,15 60:11 62:25 64:9

**talked** 7:16 17:10,11 52:17 53:2 54:20 55:25 58:7 59:9,15,18,19 60:5, 12 61:10 63:10 75:25

**talking** 20:6 23:3 24:7 42:15 49:5 56:17

**tall** 47:11

**tam** 12:16

**Tammany** 7:20 14:7,11 15:21 16:8 18:13 19:11 23:20 27:5 32:25 37:17,24 38:20 44:22 47:23 51:13, 16 52:23 53:18 55:14 56:1,3,5 59:24 64:13 65:12,18 76:16 77:7 80:21

**Tammy** 24:14,15 38:24 39:1,4 48:13 49:4 51:13 53:1 54:5,9 55:21 58:14, 21 61:6 63:9

**tampering** 14:22

**taught** 66:14

**tea** 74:23

**teach** 46:20 78:20 79:7,15

**tech** 13:24

**teenager** 18:18

**telephone** 22:5 53:5

**telling** 27:3,6 35:21 49:17 56:11 59:23

**tells** 50:24 60:18 62:7

**temperature** 74:18

**ten** 33:10 46:11,13,25

**tenants** 8:7

**tender** 66:22

**termination** 12:19

**terrorist** 14:17

**Terry** 44:21

**testified** 4:19

**testimony** 6:16 30:9

**Textron** 7:7,19,20 11:23

**then-chief** 50:10

**then-police** 49:10 50:4 52:15

**then-sheriff** 54:11

**thing** 35:2 53:18,25 54:22 58:18 74:5 76:8

**things** 5:15 7:13 9:4 40:23 68:2

**thought** 11:18,19 45:3 69:15 78:3

**threaten** 77:23

**threatening** 14:20

**threats** 14:17

**threw** 9:2 43:14 69:1,4,8

**throw** 34:7 65:24 74:12 75:6

**thrown** 80:19

**ticket** 32:23 56:6,23 57:1, 16

**tickets** 53:23

**tidy** 75:22

**till** 12:3 69:5

**time** 6:8 7:14 8:13 10:18 11:18 13:2,14 14:7 18:5, 12,13 21:3 22:4 23:21 24:13 31:2 32:25 33:5 34:2 35:8 37:13,23,25 38:21 43:2,16 45:1 46:19 48:4 49:8 52:2,16 54:23 55:14 57:2 59:9,10,15 60:12 61:9,10 64:12 70:20 73:5,18 75:18 76:11 78:13 79:2 80:22 81:22

**times** 18:11 40:21 52:17 54:23 59:14,16,17 60:5 75:17 78:2

**tingling** 34:18

**today** 6:14 39:23

**toilet** 41:2,24 42:4 67:9, 11,12,13,14,16,17,20 68:7,10,11,12 69:3,23,24, 25 72:12,16,23,25 78:14, 16,18 79:2,3

**told** 6:24 7:1,9,14 22:4 29:6 33:20 34:2,11 35:4 36:18 37:23 38:1 39:3 45:3,20 46:13,21 47:23 49:3 53:15 54:13,25 56:13 61:25 62:1,3,5 63:14 66:5 77:5

**topic** 31:16

**tore** 44:5

**totally** 37:14

**towel** 8:16

**town** 11:16 19:6

**tracked** 72:16,25 73:1 74:24

**training** 9:22 10:2

**transcribed** 5:18

**transferred** 53:11,14 75:23

**transport** 24:20

**transported** 15:20 28:7, 8,15 32:24

**trash** 69:8 75:1,3,10,17

**tray** 75:14

**treat** 65:24

**treated** 80:20 81:1

**treating** 76:13

**treatment** 37:3 38:2 79:7

**trespass** 22:6

**trial** 8:22 18:25 23:13

**truck** 8:15 34:4

**trustee** 41:20

**trustees** 42:17 70:9

**truthful** 6:15

**turn** 7:18 18:4

**turned** 65:6

**TV** 8:18

**Twelfth** 9:14

**Twenty** 68:3

**type** 17:20 34:17 79:7

### U

**ultimate** 12:20

**ultimately** 16:7 19:3 22:12 32:11

**un-** 19:15

**unable** 34:18

**unbelievable** 29:5

**unconstitutional** 49:6 50:20 51:8 53:22 65:11,17

**underlying** 20:8 23:4 30:4

**understand** 6:3,5 14:6 20:18 21:9,13 26:16 27:25 28:2 30:6,14 35:20 56:24 59:11,19,23 73:4

**understanding** 4:15 27:7 77:15,16

**uniform** 40:12

**union** 10:7,10,18,22

**United** 44:19 50:22 51:18 79:22 80:6

**unloaded** 19:16

**unrelated** 48:6

**uphold** 50:15,21 60:15

**upholding** 49:22 53:24 60:14

**urine** 68:7 72:15 73:10

**utilized** 4:5

**utmost** 81:2

### V

**VA** 13:24

**vehicles** 7:14

**ventured** 11:4

**veteran** 14:3

**violating** 60:24

**violence** 16:11 17:2,16, 22

**vo-tech** 9:15,21 10:1

**vomit** 68:14,24,25 69:7 70:24 73:9

### W

**wait** 7:25 44:8 56:16 57:2 81:11

**waiting** 31:22 56:25

**waived** 82:5

**waiving** 81:15

**walk** 10:2 56:20

**wall** 76:4,9

**walls** 75:24 76:2

**Walmart** 7:9

**wanted** 61:23 62:6

**wanting** 56:21

**wash** 70:9,10,11 74:3,7

**washed** 42:14

**waste** 70:22

**watch** 8:7

**water** 42:22 70:14,16 74:24 76:7

**wear** 47:4

**weed** 18:18

**week** 8:17 52:6

**weeks** 39:13

**weld** 7:11

**welder** 7:7,11 10:4

**welding** 7:12,20 12:11 13:7,11

**welds** 12:5,7

**well-known** 26:5

**West** 4:25

**wet** 71:4 74:8,20

**whistleblower** 12:11

**whistleblowers** 7:19 12:18

**white** 8:15 47:11,22 58:12 63:18,19 71:8

**wife** 8:18 9:6,7

**wife's** 9:2

**Williams** 4:18,23,25 22:2 31:19 44:18,22 45:1,2 48:6

**win** 12:21

**window** 8:17 63:10

**Wonderful** 30:17

**words** 20:2 46:3 72:10

**wore** 45:11

**work** 9:25 10:3,14 11:1,17 13:9 41:6 42:15 50:6 53:10 54:13

**worked** 10:2,8,22 13:7,14 18:3 41:12,19 46:8

**workers** 10:21

**working** 7:6 11:23 41:4 58:1

**works** 36:6

**world** 79:20

**wounds** 68:21

**write** 64:17

**wrong** 51:1

**wrongful** 12:18

**wrote** 64:19 65:1,6

**Y**

**year** 9:19 11:21 13:8 15:10,12 25:17

**years** 5:5,6 7:12 9:15 10:8,23 13:12 23:25 24:9 29:6,13

**York** 51:10

**Z**

**Zoller** 15:1

**Zoom** 4:4