```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4   AHMED BAQER, ET AL.     NO. 2:20-cv-00980-WBV-DPC

 5                               DISTRICT JUDGE:

 6                               WENDY B. VITTER

 7        VERSUS               SECTION "D"

 8                             MAGISTRATE JUDGE:

 9                        DONNA PHILLIPS CURRAULT

10   ST. TAMMANY PARISH          SECTION "2"

11   GOVERNMENT, ET AL.

12

13

14

15        VIDEOTAPED DEPOSITION OF MAJOR RICHARD

16   SAMPSON O'KEEFE, JR., ST. TAMMANY PARISH

17   SHERIFF'S OFFICE, 2070 N. COLLINS BOULEVARD,

18   COVINGTON, LOUISIANA 70433, taken at the LAW

19   OFFICES OF MILLING BENSON WOODWARD, LLP, 68031

20   CAPITAL TRACE ROW, MANDEVILLE, LOUISIANA 70471,

21   in the above-entitled cause on the 18th day of

22   January, 2023.

23

24

25
```

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

2..5

Page 2

```
1   APPEARANCES:
2
3       JACOB LITIGATION, INC.
4       BY:  DEVON M. JACOB, ESQ.
5       P.O. BOX 837
6       MECHANICSBURG, PENNSYLVANIA 17055
7       (717) 796-7733
8       djacob@jacoblitigation.com
9           ATTORNEY REPRESENTING PLAINTIFFS
10
11
12      ROMANUCCI & BLANDIN, LLC
13      BY:  SAM A. HARTON, ESQ.
14      321 N. CLARK STREET
15      CHICAGO, ILLINOIS 60654
16      (312) 253-8590
17      sharton@rblaw.net
18          ATTORNEY REPRESENTING PLAINTIFFS
19
20
21
22
23
24
25
```

Page 4

```
1              I N D E X
2                   PAGE:
3   Caption           1
4   Appearances       2, 3
5   Agreement of Counsel    5
6   Witness' Certificate    102
7   Reporter's Certificate    103
8
9          E X A M I N A T I O N
10  BY:              PAGE:
11
12  Mr. Jacob             7, 91
13  Mr. Collings          88
14
15
16
17
18
19
20
21
22
23  REPORTED BY:
24      ANNA M. ROTH, RPR, CCR
25      CERTIFIED COURT REPORTER
```

Page 3

```
1   APPEARANCES:  (Continued)
2
3       MILLING BENSON WOODWARD, LLP
4       BY:  CHADWICK W. COLLINGS, ESQ.
5       68031 CAPITAL TRACE ROW
6       MANDEVILLE, LOUISIANA 70471
7       (985) 292-2000
8       ccollings@millinglaw.com
9           ATTORNEY REPRESENTING DEFENDANT,
10      ST. TAMMANY PARISH SHERIFF'S OFFICE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1            S T I P U L A T I O N
2       IT IS HEREBY STIPULATED AND AGREED by and
3   among counsel for the parties hereto that the
4   videotaped deposition of the aforementioned
5   witness is hereby being taken under the Federal
6   Rules of Civil Procedure, for trial purposes, in
7   accordance with law;
8       That the formalities of sealing,
9   certification, and filing are specifically
10  waived;
11      That the formality of reading and signing
12  is specifically not waived;
13      That all objections, save those as to form
14  of the question and the responsiveness of the
15  answer, are hereby reserved until such time as
16  this deposition, or any part thereof, may be used
17  or sought to be used in evidence.
18              * * * *
19      ANNA M. ROTH, Certified Court Reporter, in
20  and for the Parish of St. Tammany, State of
21  Louisiana, officiated in administering the oath
22  to the witness.
23
24
25
```

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

6..9

Page 6

1    MAJOR RICHARD SAMPSON O'KEEFE, JR., ST.
2    TAMMANY PARISH SHERIFF'S OFFICE, 2070 N. COLLINS
3    BOULEVARD, COVINGTON, LOUISIANA 70433, after
4    having first been duly sworn by the
5    above-mentioned Court Reporter, did testify as
6    follows:
7        MR. JACOB:
8           And, Chad, I'll just give you the
9    same standing objection for the video.
10       MR. COLLINGS:
11          Yeah.  I was going to do the same
12   objection as before.
13       MR. JACOB:
14          Fair enough.
15       MR. COLLINGS:
16          I made an objection to his recording
17   of the deposition in addition to having a
18   court reporter.  We made the objection in
19   the other two depositions that we've had
20   so far in this case.
21          So to the extent that there's a
22   question as to the usability,
23   admissibility of the video, we're going to
24   make an objection now.  With that, please
25   answer this gentleman's questions.

Page 7

1    EXAMINATION BY MR. JACOB:
2        Q.    All right.  Give me one second.  I'm
3    sorry.
4           Okay.  Can you state your full name
5    for the record?
6        A.    Richard Sampson O'Keefe, Jr.
7        Q.    And have you ever given a deposition
8    before?
9        A.    If so, it was a very long time ago
10   over, I think, a car accident.
11       Q.    All right.  Fair enough.  So I'm
12   Devon Jacob; my co-counsel, Sam Harton.
13       MS. HARTON:
14          Harton.
15   BY MR. JACOB:
16       Q.    Harton.  I always mispronounce her
17   last name.  I'm sorry.  But, in any case, we
18   represent the plaintiffs in this matter.
19          A deposition is an opportunity for
20   me to ask factual questions of you.  It's not an
21   opportunity for me to play games or torture you
22   or anything like that.  The reason is because I
23   was not there for events, or I don't work for the
24   agency, so, naturally, I have to go to the
25   persons who have the information in order to get

Page 8

1    my questions answered.  Okay?
2        A.    Sure.
3        Q.    All right.  So, again, we'll do the
4    best to get you in here -- in and out of here as
5    soon as possible.  The more direct the answers
6    are, the quicker this goes.
7           If at any point in time you need a
8    break for any reason, just let me know.  I'd be
9    more than happy to accommodate.  You don't have
10   to tell me why.  You can just say, "I just want a
11   break."  I just ask if there's a question
12   pending, that we at least answer that question
13   before we take a break.  Okay?
14       A.    Fair enough.
15       Q.    And you're doing a good job as far
16   as verbalizing your answers because gestures and
17   "uh-huh" and "uh-uh" --
18       A.    Sure.
19       Q.    -- are impossible to explain later
20   on the record.  So I just ask that you continue
21   to do that.  Okay?
22       A.    Yes, sir.
23       Q.    And the court reporter has two
24   hands, but it's not one for you and one for me.
25   So I'm going to do my best to let you finish your

Page 9

1    answers before I begin my questions.  But I'm
2    going to ask that you do the same.  Even if you
3    can guess where I'm going, just let me get the
4    full question out so it can be taken down before
5    you begin your answer.  Okay?
6        A.    Yes, sir.
7        Q.    Is there any reason that you
8    wouldn't be able to answer truthfully questions
9    here today?
10       A.    No, sir.
11       Q.    No medication or medical condition
12   that would prevent you from doing so?
13       A.    No, sir.
14       Q.    Fair enough.  I can tell you're in
15   uniform, so you work for an agency.  Which agency
16   do you work for?
17       A.    The St. Tammany Sheriff's Office.
18       Q.    And how long have you worked for
19   them?
20       A.    December the 26th made 24 years, and
21   I was a reserve for two years before that.
22       Q.    You say, "a reserve."  Is that still
23   with the sheriff's office?
24       A.    It is.  It's a volunteer individual
25   that gives forth their time, goes through basic

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

Page 10

1  training and such.
2      Q.   Okay.  So approximately 26 years
3  then in law enforcement?
4      A.   Yes, sir.
5      Q.   And since you are in uniform, what
6  rank do you have right now?
7      A.   Major.
8      Q.   And where does that fall in the
9  hierarchy?
10      A.   Just below chief.
11      Q.   Okay.  And then above chief would
12  be?
13      A.   Chief deputy.
14      Q.   And then above chief deputy would
15  be?
16      A.   The sheriff.
17      Q.   The sheriff.  When did you become a
18  major?
19      A.   Two years, I believe.  Pretty close
20  to that.
21      Q.   So around 2021 or 2020?
22      A.   Yes, sir.
23      Q.   And in 2019 and 2020, you were
24  employed by the sheriff's office?
25      A.   Yes, sir.

Page 11

1      Q.   And during that period of time,
2  where were you assigned?
3      A.   So I was at the jail from
4  November 19th, I believe.  8th.  Sometime
5  November 2018 until December 2019 at the jail.
6  And then I went to be the captain over the
7  traffic and marine division.
8      Q.   Okay.  Have you reviewed the federal
9  complaints, the lawsuits --
10      A.   Yes, sir.
11      Q.   -- in this matter?
12      A.   Sorry.  Yes, sir, I did.
13      Q.   Okay.  So you've seen the names of
14  the plaintiffs?
15      A.   Yes, sir.
16      Q.   Do you have any personal
17  recollection of them?
18      A.   No, sir.
19      Q.   Do you even know if you've ever
20  interacted with them personally?
21      A.   No, sir.
22      Q.   And so if I were to bring one of
23  them in here and say, "Do you know who this is,"
24  you wouldn't be able to tell me?
25      A.   No, sir.

Page 12

1      Q.   All right.  I'm sorry.  Let me just
2  get to -- sorry.  The computers are only as smart
3  as the people operating them, and so I'll just
4  leave it at that.
5          In 2019, you were not a major then,
6  correct?
7      A.   That's correct.
8      Q.   What rank did you hold then?
9      A.   Captain.
10      Q.   So as captain, what were your
11  responsibilities?
12      A.   So at the jail, I was a captain over
13  the support division, which is bonding, booking.
14  The kitchen fell under me.  Commissary.  I think
15  that was it.
16      Q.   Okay.  Now, when you said that you
17  were in charge of these respective areas, did you
18  do the direct supervision of the staff that was
19  working in these areas?
20      A.   Define "directly."
21      Q.   Meaning, like booking, would you go
22  back to booking and actually work booking with
23  the staff?
24      A.   I would not.
25      Q.   Or on any given day, would you be

Page 13

1  back in booking?
2      A.   If I went up there to grab a piece
3  of paper, just a general, "Hello.  How are y'all
4  today?"  But as far as day-to-day work, no, sir.
5      Q.   Okay.  So it's not as if you were
6  like the shift supervisor for booking?
7      A.   No, sir.
8      Q.   Where was your office, for instance,
9  in relation to Building B?
10      A.   It was in Building B.
11      Q.   Okay.  And Building B would be where
12  the pretrial detainees were, correct?
13      A.   The ones in holding.
14      Q.   In holding?
15      A.   Not the pretrial dorms.  They would
16  have been in the back of the jail.
17      Q.   Understood.
18      A.   Front end would be the B Building.
19  You have booking, bonding, administration, female
20  holding -- or female dorms, as well as female
21  holding.
22      Q.   Okay.  And then the back part of the
23  building was the pretrial parish detainees?
24      A.   Yes, sir.
25      Q.   Your office then with respect

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

14..17

Page 14

1 geographically within the building, could you see
2 the holding cells?
3     A.    No, sir.
4     Q.    Was your office even near where the
5 holding cells were?
6     A.    It was, you know, through three
7 secure doors.  But I guess, the way the bird
8 would fly, I was probably from here to the front
9 door away from them.
10     Q.    Okay.  But just so I understand, and
11 I think I do, you had sort of a business office
12 side to the building and then the corrections
13 lockdown secure part of the facility?
14     A.    That's correct.
15     Q.    And so your office would have been
16 in the business office side of the building?
17     A.    Yes, sir.
18     Q.    And would there have been whole days
19 or weeks where you never even went into the
20 secure side of the building?
21     A.    No.  That would be a stretch, you
22 know.  I mean, walk, like I said, say, "Hello,"
23 you know.  I had a disadvantage when I went
24 there, I did not work in the jail.
25     Q.    Okay.

Page 15

1     A.    I got promoted there.  So doing --
2 building relationships, you know, letting these
3 people know who I was, you know.  In essence, a
4 guy off the street who never worked in there.  So
5 I was busy doing relationship building and such.
6 Or, like I said, would go grab a piece of paper
7 off the printer or something like that.  But
8 never hung out in there and knew what the
9 day-to-day was, in essence.
10     Q.    Okay.  So if you went back to the
11 holding area, for instance, you're back there for
12 less than a half hour?
13     A.    Yeah.  Not even.
14     Q.    Not even.  Okay.  So --
15     A.    And I never -- I went into the
16 control area not necessarily where the holding
17 cells are.  I wasn't like at the door of the
18 holding cells.  I was up top, I guess, is what
19 they called it.
20     Q.    Okay.  But from where you were,
21 could you see the holding cells?
22     A.    Yes, sir.
23     Q.    And I don't mean see them on a video
24 screen.  I mean, literally with your eyes could
25 you see the holding cells?

Page 16

1     A.    Yes, sir.
2     Q.    And so you, at least, could see the
3 conditions of the cells from where you were
4 standing?
5     A.    From a bird's-eye view, I guess, per
6 se, yes, sir.
7     Q.    Okay.  And you could see that there
8 were inmates in the cells, for instance?
9     A.    Yes, sir.
10     Q.    With respect to your promotion to
11 the jail, had you been on patrol before that?
12     A.    I've been in several divisions.
13 Most recently before my promotion I was a
14 lieutenant in the narcotics division.
15     Q.    Okay.  Had you ever worked in the
16 corrections side prior to being promoted to the
17 position where you then ended up in?
18     A.    Not on a day-to-day basis.  I've
19 been in there for a shakedown, you know.  We
20 would have 40 people go in and search for
21 contraband.  When I was a reserve, it was a
22 requirement before you went out on patrol that
23 you had to do, I think it was 24 hours.  I did
24 18 hours straight one day.  I think they gave me
25 credit for time served, and I never had to go

Page 17

1 back.  So other than those limited times, I had
2 never worked in the jail.
3     Q.    Okay.  So how was it then that you
4 were moved into a supervisory position over
5 corrections personnel having not worked that job?
6     A.    I believe that my skills as far as
7 being a motivator, innovative, obviously, been in
8 the job kind of understanding what our law
9 enforcement job is in general.  I don't want to
10 use the word like "next up," but I think that an
11 opening opened up there.  I had been a lieutenant
12 for five years.  I'm not sure if I was the most
13 senior lieutenant at the time.  But I believe my
14 history, work ethic, is what got me there.
15     Q.    Okay.  Did you ever receive any
16 formal training, though, with respect to
17 corrections?
18     A.    Not other than regular POST 1
19 academy.  We had the -- whatever everybody had to
20 do.  I think it was the PREA course.  And then I
21 don't remember which months, but it wasn't a
22 requirement for me to go to the corrections POST
23 course, but I did.  I guess maybe the spring of
24 2019.
25     Q.    Okay.  But when you say, "the

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

Page 18

1  corrections POST course," is that the academy for
2  corrections?
3      A.   That's right.
4      Q.   And so you went through that whole
5  academy even though you didn't have to?
6      A.   Well, we didn't have to -- we didn't
7  have to go through all of it because our POST 1
8  was a lot of the criminal procedures and codes
9  and such.  So we didn't have to go every day of
10 the class.  There were certain blocks of
11 instruction that we had to go to.
12     Q.   Okay.  And, presumably, then it
13 helped you to know how a jail was to function?
14     A.   Sure.
15     Q.   And separate from the POST training,
16 did you have policies and procedures related to
17 the jail that you then had to learn?
18     A.   I mean, any division I've gone to,
19 familiarizing myself on the policy was
20 advantageous, for sure.  So I had already had
21 that before I got to the POST class as far as
22 familiarizing myself with the policies.
23     Q.   Were you ever provided with any
24 training, though, with respect to how to
25 supervise a jail?

Page 19

1      A.   No, sir, not specific to the jail.
2  But I had been to supervisor training before.
3      Q.   Okay.  For instance, were you ever
4  provided with training with respect to what state
5  or federal laws needed to be complied with in the
6  jail?
7      A.   Not before I was promoted there.
8      Q.   And once you were promoted there,
9  you did receive training on rules and -- not
10 rules and regulations -- sorry -- standards and
11 laws that were applicable?
12     A.   The policies and then, of course,
13 when I went through POST.
14     Q.   Okay.  What responsibilities
15 specific to the holding cells did you have, if
16 any?
17     A.   So the shifts were made up of
18 sergeants, corporals, and deputies.  There was a
19 lieutenant that oversaw those individuals, and I
20 supervised the lieutenant.
21     Q.   Okay.  So would the lieutenant be
22 out on the floor with the sergeants and the
23 deputies?
24     A.   Very rarely.  She was one person.
25 So she was responsible for all four shifts.  So

Page 20

1  she also had an office.  But she would frequent,
2  you know -- she didn't sit in her office for
3  eight hours a day, you know.  She would get on
4  the floor and, you know, make sure her folks were
5  doing what they needed to do.
6      Q.   So the highest level floor
7  supervisor, would you say that would be the
8  lieutenant?
9      A.   Sergeant.
10     Q.   Oh, sergeant.  Okay.
11     A.   Because they're always there.
12     Q.   Okay.
13     A.   A sergeant or corporal on the shift
14 is -- you know, they work the rotating shifts.
15     Q.   Okay.  And then how many lieutenants
16 did you supervise?
17     A.   Just one.  Just one over booking and
18 bonding.  The kitchen staff, I don't really
19 remember what their rank were.  I think she was
20 the only lieutenant that I supervised.  I could
21 be wrong, but I think that's pretty accurate.
22     Q.   And then I asked it, but I think I
23 took you on a tangent.  So your responsibility
24 with respect to the holding cells would have been
25 what?

Page 21

1      A.   Supervising the lieutenant ensuring
2  that I provided whatever tools necessary,
3  problem-solving.  If a problem was to come up
4  through her, or let's just say she was absent,
5  her sergeants, then I would address those issues.
6      Q.   So you answered to the next level.
7  And did they also supervise the holding cells?
8      A.   I answered to the warden.
9      Q.   Okay.
10     A.   He was responsible for the entire
11 facility.
12     Q.   Okay.  Day to day, did you have
13 responsibilities for the holding cells?
14     A.   Other than supervising the people
15 and making sure there weren't any issues, I was
16 not an overseer of day-to-day operations when I
17 was there.  Only problem-solving, human
18 resource-type issues, discipline, things of those
19 nature.
20     Q.   So for an issue to reach your desk,
21 would it have to be sort of out of the ordinary
22 of the day to day?
23     A.   I can't really recall any major
24 issues that we ever really had during my time
25 there.  So there wasn't anything major that I can

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

Page 22

1  recall that I had to address immediately.
2      Q.   Okay.  We deposed -- I deposed a
3  representative from the sheriff's office
4  yesterday.  So, in a sense, I deposed the
5  sheriff's office.  And I just had another
6  deposition with Mr. Longino, I think he said is
7  how he pronounced it.  You're familiar with him?
8      A.   I am.
9      Q.   And you're familiar with Ms. Lacey?
10      A.   I am.
11      Q.   Okay.  Those were the two deponents.
12      A.   Yes, sir.
13      Q.   It has been reported that at times
14  there was overcrowding in the holding cells.  Is
15  that your recollection?
16      A.   I don't know if "overcrowding" would
17  be the right word.  I know that we daily got
18  counts.  And so, obviously, I saw the numbers.
19  And, you know, there were -- probably weekly we
20  would try to get people to the back, get them
21  released, work with the commissioner, the
22  district attorney's office, probation and parole,
23  to try to lower that number.
24      Q.   Okay.  We were told that the fire
25  marshal sets, or set, a certain capacity limit

Page 23

1  for the holding cell area.  Are you aware of
2  that?
3      A.   I know the fire marshal is
4  responsible for that, yes, sir.
5      Q.   And do you know what that capacity
6  was?
7      A.   I do not right now.
8      Q.   I was advised -- it could be wrong
9  information -- but that you were supposed to have
10  no more than 80 people total in the aggregate in
11  the holding cell area.  Are you familiar with
12  that?
13      A.   I think there were 20-man -- fire
14  marshal had said, you know, 20 per holding cell.
15      Q.   Okay.  Other than the fire marshal
16  restriction of 20 per cell, are you aware of any
17  other standard that -- or law that would govern
18  how many you could place in a holding cell?
19      A.   No, sir.
20      Q.   How about with respect to length of
21  time that somebody could be in a holding cell?
22      A.   No, sir.
23      Q.   Was there any restriction at the
24  facility regarding how long somebody could be in
25  a holding cell?

Page 24

1      A.   Not that I'm aware of.
2      Q.   Do you know if there's even a policy
3  that was in place in 2019 regarding how long
4  somebody is to be in a holding cell?
5      A.   Yeah, I don't believe so.
6      Q.   And do you know, what was the
7  purpose of the holding cell as opposed to general
8  population?
9      A.   So holding cells gave us an
10  opportunity to keep an eye on these individuals.
11  Obviously, when they come into the facilities,
12  they are most prone to suicide, hurting
13  themselves.  Obviously, being impaired.  Keep
14  them up there.  We go through a medical screening
15  process there.  They're asked questions when they
16  come in.  Depending on what their response is,
17  sometimes a medical person comes up immediately
18  to see the individual.  Other times -- I don't
19  remember what the window was that medical had to
20  see these individuals as they came in.  What was
21  --
22      Q.   I think you pretty much hit on it.
23          Do you know, what's the purpose of a
24  holding cell, though, as opposed to general
25  population?

Page 25

1      A.   Of course, the things I mentioned.
2  And then, of course, you know, there was no
3  advantage for the staff that worked for me to
4  keep somebody up front.  If a bed was available,
5  we rolled them back as quick as possible.  That
6  was one less thing that our folks had to worry
7  about on the front side of the house, booking.
8          So there would be no reason to not
9  roll somebody back if, you know, we had 20 in
10  holding, and there are 20 beds at that time.  We
11  would do our best to get them back there as
12  quickly as possible.  Manpower.  Of course,
13  ensuring that this individual isn't a risk to
14  themselves where they would go somewhere else.
15  But going through all those assessments.  Those
16  assessments take time.  Once those were played
17  out, then we would roll them to the back.
18      Q.   Do you know if a holding cell is
19  designed for short-term confinement or long-term
20  confinement?
21      A.   I would imagine short term.
22      Q.   As a supervisor back in the holding
23  cells, do you know the answer to that question?
24      A.   Know the answer to?
25      Q.   Well, you said, "I would guess."  I

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

26..29

Page 26

1  mean, is it for short term or for long term?
2       A.   Short term.
3       Q.   And what does that mean to you based
4  on your experience and training?  What does
5  "short term" mean?
6       A.   Well, I guess in that aspect, a
7  short term of the jail stay, as quickly as we can
8  get them to the back.
9       Q.   Okay.  But, again, because I didn't
10  work in corrections, so I'm just wondering, is
11  there an actual definition of short-term
12  confinement as opposed to long-term confinement?
13      A.   I don't believe so.
14      Q.   And, I mean, is there a set of
15  standards that would apply to short-term
16  confinement as opposed to long-term confinement?
17      A.   I don't know if there would be a set
18  of standards.  Just as I mentioned, we would want
19  to get them back as quickly and feasibly as
20  possible.  You know, manpower.  Ensuring they've
21  cleared medical.  They're not suicidal.  The
22  general questions in processing, you know,
23  fingerprinting them and putting them into NCIC,
24  all those things take time.
25      Q.   Okay.  About how much time would it

Page 27

1  time, you know, in an ideal situation, to process
2  a single inmate?
3       A.   No idea.
4       Q.   I mean, I'm assuming there are set
5  procedures, though, for processing an inmate who
6  is coming in or a detainee who is coming in,
7  correct?
8       A.   Sure.  But I don't think there was a
9  stopwatch on that.  Like, you have "X" amount of
10  time to get this individual to the back,
11  processed, fingerprinted, --
12      Q.   But when you were --
13      A.   -- photographs taken.
14      Q.   Sorry.  I cut you off.  Go ahead.
15      A.   No.  I was --
16      Q.   I mean, when you were supervising,
17  though, and figuring out staffing needs and
18  resource needs, presumably, you would've had some
19  idea how long it takes to process a single
20  detainee, correct?
21      A.   I did not.
22      Q.   Meaning, would it take one day or
23  two weeks?
24      A.   I would think it would take closer
25  to one day than two weeks.

Page 28

1       Q.   Okay.  And, again, I understand.
2  We're talking averages.  We're not talking norms.
3       So you're telling me, on average,
4  about a day to get a detainee through the
5  process?
6       A.   That's not what I said.
7       Q.   Okay.  No.  I don't mean to put
8  words in your mouth.  Go ahead.
9       A.   I said closer to a day than the
10  two-week time that you had asked.
11      Q.   Okay.  So one to two days.  Would
12  that be more accurate?
13      A.   I never worked on the floor.  I
14  don't know what the exact processes and time
15  restraints are.
16      Q.   Okay.  Do you know if during 2019
17  there were any policies that pertained to the
18  holding cells?
19      A.   I do not know.
20      Q.   And, I mean, not to be smart, but
21  why don't you know that if you were overseeing
22  booking?
23      A.   Well, I don't recall a specific
24  holding policy that I read.
25      Q.   Okay.  Do you recall -- even if you

Page 29

1  don't recall there being maybe a written policy,
2  do you recall any policies or procedures just by
3  your mind, like, "Yes, I know we always did 'X,'"
4  or, "I know we always did 'Y,'" as you sit here
5  today?
6       A.   As far as booking?
7       Q.   As far as the holding cells and
8  their operation.
9       A.   Ask the question again.
10      Q.   Sure.  Even if you can't recall a
11  specific name of a written policy, do you recall
12  any rules or regulations that did pertain to how
13  the holding cells were going to be operated?
14      A.   I don't think there were rules or
15  regulations.  Maybe procedure, like, this is just
16  how we do things.
17      Q.   And this procedure, was that a
18  written procedure, or was it sort of a
19  hand-me-down training-type thing?
20      A.   I don't -- I don't know.
21      Q.   So then when you were supervising
22  the holding cell area, how did you know how to
23  supervise the holding cell area?
24      A.   I was supervising the people, the
25  lieutenant, the sergeants.  Not necessarily the

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

30..33

Page 30

1  deputies that were on the floor.
2     Q.   Okay.  So you were making sure then
3  that the supervisors who were supervising the
4  deputies were doing their job correctly?
5     A.   To the best of my knowledge, yes,
6  sir.
7     Q.   And so you were supervising the
8  supervisors to make sure that how they were
9  supervising the individual deputies was correct,
10  right?
11     A.   Yes, sir.
12     Q.   And so when you would evaluate
13  whether your supervisors were correctly
14  supervising their deputies, how did you do that
15  if you didn't know what rules or regulations were
16  to be complied with?
17     A.   As I stated, the lieutenant was who
18  I was solely responsible for on a day to day.
19  The lieutenant and the sergeant supervised the
20  deputies that are over the process, in essence.
21  But just like in any supervisory role, you're not
22  going to be able to be with them every step of
23  the day no matter what you're supervising unless
24  you're a one-man show.  And you have to depend on
25  your supervisors to point out things that are not

Page 31

1  accurate or need to be fixed and bring it up the
2  chain, which would have come to me so that I
3  could do what needed to be done from there,
4  whether it was bring it up to the warden or solve
5  the issue.
6     Q.   So if the lieutenant -- just
7  hypothetical, if the lieutenant came to you and
8  said, "We have 27 in the holding cell, is that
9  okay," you wouldn't know one way or the other
10  because you don't know what rules and regulations
11  apply to that?
12     A.   I would have asked -- obviously, I
13  knew when I got there, you know, "Hey, we have a
14  high number today.  You know, we need to do our
15  best."  And so, yes, I would know.  She would
16  come to me and say, "Hey, you know, we have more
17  than we normally have in here."
18     Q.   But what if the lieutenant said,
19  "How many are we allowed to have in here," would
20  you know the answer to that?
21     A.   I would have gone to the warden.
22     Q.   You would have gone to the warden?
23     A.   If it was my first day, you know.
24     Q.   Okay.  Do you still presently
25  oversee the booking area?

Page 32

1     A.   I do not.
2     Q.   And what area are you responsible
3  for now?
4     A.   I'm over the operations division,
5  which is nothing to do with the jail.
6     Q.   Okay.  That was going to be my very
7  next question.  Does it have anything to do with
8  corrections?
9     A.   No, sir.
10     Q.   All right.  I want to talk a little
11  about the general population for pretrial
12  detainees if we could for a second here.
13          It's my understanding that they got
14  bedding.  They got a pillow, a mattress, sheet,
15  blanket; is that correct?
16     A.   I didn't work in the back of the
17  jail. I'm not familiar with what they had.
18     Q.   All right.
19     A.   They had beds.  They had a mattress.
20  I don't know when they got those.
21     Q.   Okay.  Did you ever direct that the
22  holding cell detainee should be provided with the
23  same bedding?
24     A.   No.
25     Q.   Why not?

Page 33

1     A.   We never did that.
2     Q.   Well, I know, "We never did that,"
3  but my question is more why?
4     A.   I can't explain it.
5     Q.   Okay.  Was that ever even
6  considered, that, hey, we have people sleeping on
7  cement?
8     A.   No, sir.
9     Q.   Why not?
10     A.   I don't know.  I don't --
11     Q.   Do you know whether there's any
12  state regulation that governed whether or not a
13  pretrial detainee is to be provided with bedding?
14     A.   I do not.
15     Q.   And so do you know if there were any
16  -- let's start with federal laws.  Do you know if
17  there are any federal laws that govern how
18  holding cells or pretrial detainees are to be
19  housed?
20     A.   Not that I'm aware of.
21     Q.   Or the conditions of confinement for
22  pretrial detainees?
23     A.   No, sir.
24     Q.   And I'm talking about the time frame
25  when you were supervising this area.

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

34..37

Page 34

1    A.    Sure.
2        Q.    Are you aware of any state laws that
3    governed how -- the conditions of confinement for
4    pretrial detainees?
5        A.    I don't recall.
6        Q.    So is this something that you think
7    you knew at one time, and you just don't
8    remember?
9        A.    That's possible.
10        Q.    Okay.  But as you sit here today,
11    you can't tell me whether there is state or
12    federal law that governs how pretrial
13    detainees -- the conditions that they're
14    permitted to be housed in?
15        A.    No, sir.
16        Q.    How about standards or operating
17    procedures from any agency of the government
18    regarding how pretrial detainees are permitted to
19    be housed?
20        A.    If they're there, I'm not familiar
21    with them.
22        Q.    So that wouldn't have been a
23    conversation that you ever had with your
24    lieutenants, correct?
25        A.    Not directly.

Page 35

1        Q.    Okay.  What do you mean by, "not
2    directly"?
3        A.    Like, it wasn't something I would
4    call them in, and we'd have a discussion about.
5        Q.    Do you recall ever having a
6    conversation with your lieutenant regarding, "Are
7    we complying with all state and federal laws with
8    respect to how we're housing pretrial detainees"?
9        A.    No, sir.
10        Q.    Why not?
11        A.    I just didn't.
12        Q.    Do you recall ever having a
13    conversation at any time with your lieutenant
14    regarding, "Are we complying with all agency
15    standards, state, federal, with respect to
16    housing pretrial detainees"?
17        A.    No, sir.
18        Q.    Was there any concern about whether
19    -- did you have any concern as a supervisor
20    whether or not -- number one, whether or not
21    there were any such standards or laws that
22    governed the issue?
23        A.    Say that again.
24        Q.    Yes.  Were you as a supervisor even
25    concerned about whether there were standards that

Page 36

1    needed to be complied with?
2        A.    Sure.  I was.
3        Q.    Okay.  And so what did you do about
4    that concern to educate yourself?
5        A.    Read policy.  There were two
6    captains also in administration with me at the
7    time, the warden.  I had questions, you know,
8    obviously, like I stated, they kind of took me
9    in, kind of gave me the rundown of the jail.
10    When I got there, I didn't know where the B
11    Building was, the A Building, C Building, D
12    Building, anything like that.  So I'm sure there
13    was discussion of the operation.  But,
14    specifically, I don't recall.
15        Q.    So while you were supervising the
16    lieutenant, who oversees the boots-on-the-ground
17    supervisors with respect to the holding cell
18    area, you did not personally know whether they
19    were in compliance by law or not in compliance by
20    law?
21        A.    We kind of had an open-door policy.
22    So if she would have come to me with an issue and
23    I didn't know the answer to, such as the question
24    you're asking, I would have asked one of the
25    other captains that had been there for 20-plus

Page 37

1    years or the warden.
2        Q.    But, again, the lieutenant wasn't
3    supervising you.  You were supervising the
4    lieutenant.  So when you would go and look at the
5    lieutenant's work and look at the issue that the
6    lieutenant was supervising, in that case the
7    holding cell area, you didn't know whether you
8    were complying with all standards and laws,
9    correct?
10        A.    During my time there, I believe we
11    had three inspections, which we passed.  So if we
12    were out of line, they would have found them
13    there.  So there were no, "No, this is an issue,"
14    brought to my attention.
15        Q.    Okay.  Now, with respect to those
16    inspections, do you know if they were state DOC,
17    or were they federal government?
18        A.    Both.
19        Q.    Okay.  I think you said three?
20        A.    There were three.
21        Q.    Which three?
22        A.    Two -- I think there were two DOC
23    and one federal.
24        Q.    And when they -- I'm sorry.  Go
25    ahead.

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

Page 38

1    A.   Yeah.  It might have been three DOC
2  inspections while I was there.  I can't remember
3  if it was three total or three DOC and one
4  federal.
5    Q.   Okay.  With respect to those
6  inspections, were they with respect to the
7  housing area where -- for instance, the DOC
8  inspection was with respect to the building that
9  housed the DOC inmates?
10    A.   The whole jail.
11    Q.   So even though the DOC inmates were
12  only in one building, DOC came in and inspected
13  the entire jail?
14    A.   Yes, sir.
15    Q.   Including the pretrial detainee
16  housing area?
17    A.   I think so.  I believe so.  But I
18  wasn't walking around with them.  My
19  understanding, they were there to inspect the
20  entire jail.
21    Q.   Okay.  But as you sit here today,
22  you just don't know the scope of the inspection?
23    A.   That's correct.
24    Q.   But, I guess, you do know it was at
25  least the DOC building for the DOC inspection; is

Page 39

1  that fair?
2    A.   No.  I just said I thought it was
3  the entire facility, not specific areas.
4    Q.   No.  I understand.  I'm saying,
5  though, that while you can't say with certainty
6  the scope, could we at least agree, though, that
7  they at least were inspecting the DOC building?
8    A.   I think that would make sense.
9    Q.   Okay.  That's all I'm saying.
10         And same with the federal
11  inspection.  Can you say with certainty the scope
12  of the inspections?
13    A.   I know it wasn't as in depth as the
14  state DOC was.  I'm sure they checked where we
15  housed the federal inmates.  But I don't recall
16  specifically what areas they wanted to go to.
17    Q.   Okay.  So, again, just to make sure
18  I'm being fair here, with respect to the state
19  and federal inspections that you recall
20  occurring, while you're pretty certain that --
21  excuse me -- the DOC inspected the DOC building
22  and the feds inspected the fed building, you're
23  not sure whether the inspection encompassed the
24  rest of the jail?
25    A.   For the federal, I don't recall.  My

Page 40

1  understanding of the DOC state inspection was the
2  entire facility.
3    Q.   Was there a report generated as far
4  as the result of the inspections?
5    A.   I would imagine.  I don't have it.
6  But I think DPS or DOC, Department of
7  Corrections, after they do it, they send it back
8  to us, what areas we get approved in.
9    Q.   Okay.
10    MR. JACOB:
11         So I'm going to make a document
12    request for the inspections around the
13    time of these incidents, that they be
14    produced.
15  BY MR. JACOB:
16    Q.   How is it that -- let me ask it
17  this way.  Was there a process for logging in
18  complaints about anything related to holding?
19    A.   From inmates?
20    Q.   From anyone.
21    A.   Yeah.
22    Q.   And what was that process?
23    A.   I don't remember the name of the
24  form.  But the standard form that -- you know,
25  they could complain about anything on there.

Page 41

1    Q.   Okay.  "They" being inmates?
2    A.   Inmates.
3    Q.   Okay.
4    A.   Facility-wide.
5    Q.   All right.  What about a complaint
6  from a deputy?
7    A.   Such as?  Like, if a deputy made a
8  complaint of --
9    Q.   How the holding cell is being run.
10    A.   And so what's your question about
11  it?  If they were to make a complaint?
12    Q.   Is there a process used to log those
13  types of complaints?
14    A.   I would imagine he could speak to a
15  supervisor about it or send an e-mail.
16    Q.   Okay.  But I'm hearing you say sort
17  of speculating how it could occur.  But do you
18  know of any process that was in place?
19    A.   I would guess that it's the same as
20  any area of the sheriff's office.  I mean, we
21  don't have like a comment box where you can leave
22  a comment like, "Hey, this is what we can improve
23  on."  You would have to be forthcoming and say,
24  "We need to have this addressed," and would
25  follow the proper chain of command.

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

42..45

Page 42

1      Q.   So it's your understanding then that
2  those types of complaints would be submitted to a
3  supervisor?
4      A.   That's correct.
5      Q.   And were those -- would those types
6  of complaints be logged anywhere?
7      A.   Not that I'm aware of.
8      Q.   Do you know if there were any
9  complaints from guards with respect to how the
10  holding cell area was being run?
11      A.   Not that I'm aware of.
12      Q.   And is that because if there were,
13  they weren't logged?
14      A.   I don't know as far as logging.  I
15  can't think of one off the top of my head that
16  got to me.
17      Q.   Fair enough.  With respect to -- I
18  think you were describing a grievance process for
19  the inmates.
20      A.   That sounds right.
21      Q.   Okay.  So am I correct that when an
22  inmate submits a grievance, that grievance goes
23  with the inmate's file?
24      A.   I don't -- I don't remember.
25      Q.   And am I correct that even if the

Page 43

1  grievance is ultimately found to be unfounded,
2  that it still goes with the inmate's file?
3      A.   I don't recall.
4      Q.   And am I correct that if you had 25
5  complaints about a certain guard with respect to
6  the treatment of inmates in the holding cell, if
7  they were all unfounded, there would be no
8  separate log for that employee for those
9  complaints?
10      A.   Well, if the person had a write-up,
11  those things are logged, yes.
12      Q.   Okay.  But my question is more, if
13  25 grievances were filed against Guard A for not
14  providing water to an inmate and all 25 of them
15  were unfounded, am I correct, the only existence
16  of that data would be in the inmate's file?
17      A.   I do not know.
18      Q.   And am I correct that you, as a
19  supervisor, wouldn't be able to go into a
20  computer system and say, "I want to see how many
21  complaints were made about this guard for the
22  holding cell area"?
23      A.   Unless they were counseled on the
24  matter.
25      Q.   So that's correct?

Page 44

1      A.   If they were counseled on the
2  matter, there would be a record of it.  I'm not
3  sure of a log.  I don't recall a log.
4      Q.   But as a supervisor back there in
5  charge of supervising the lieutenant, you were
6  not aware of any place that 25 unfounded
7  grievances would be logged with respect to a
8  single deputy?
9      A.   That's correct.
10      Q.   So you wouldn't be able to see that
11  even if they were all unfounded, huh, we have a
12  pattern building with this one guard?
13      A.   No log that I'm aware of.
14      Q.   Okay.  So am I correct then, you
15  wouldn't see a pattern emerging because there was
16  no place to find that data?
17      A.   Very possible.
18      Q.   My understanding is that the holding
19  cell area, that the lights do not go off ever.
20  Are you aware of that?
21      A.   Yes, sir.
22      Q.   And my understanding is in the
23  general population, though, the lights do go off
24  from roughly 10:30 to like 6:00 something in the
25  morning.  Are you aware of that?

Page 45

1      A.   Yes.
2      Q.   And do you know why it is then that
3  the lights don't go off in the holding cell area
4  but do go off in general population?
5      A.   Sure.  I believe our personnel in
6  the booking area are responsible for every one of
7  these, as well as other tasks at the time,
8  booking, you know, taking in an inmate or such.
9  Lights stay on.
10          As I mentioned earlier to you, it's
11  the most depressing for people as they come into
12  our facility.  Suicides, we've been taught that
13  that's a time that we need to be mindful and
14  watching.  Kind of like our suicide watch areas
15  in our facility, we don't turn the lights off
16  there either.  Safety.  Lights off, it would be
17  difficult to see if people were fighting in
18  there.  So, you know, they've always covered
19  their heads sleeping in there.  That's what I
20  got.
21      Q.   Are you aware of whether it would be
22  more dangerous to house two inmates in a holding
23  cell as opposed to 20-plus inmates in a holding
24  cell?
25      A.   Am I aware?

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

46..49

Page 46

1        Q.    Whether it would be more dangerous
2    or less dangerous?
3        MR. COLLINGS:
4            Object to the form.
5            You can answer the question.  I have
6    to make objections to the form on the
7    record from time to time.
8        THE WITNESS:
9            Yeah.  No telling.  You know, a guy
10       could be suicidal and doesn't care to hurt
11       the other guy if there's two of them.  And
12       then there could be 20 in there, and none
13       of them have any -- want to do any harm to
14       the other guys.
15   BY MR. JACOB:
16       Q.    Do you believe, though, that there's
17   an increased risk of danger when you put 20
18   inmates in a cell as opposed to two?
19       A.    Again, the same.  We could have 20
20   altar boys, or we can have two murders together
21   in there at the same time.  You know, I can't
22   speak on what their threshold would be.
23       Q.    Are there certain, I don't want to
24   say, "types."  I don't know how to describe it.
25   But like, for instance, you talked about murders.

Page 47

1    Are there certain pretrial detainees who came in
2    who are just simply not put in the holding cells
3    because they're too dangerous?
4        A.    I really can't think of a time
5    where, you know, somebody got right back to a
6    tier, maximum security place.  There could have
7    been some that came in.  I can't think of one.
8        Q.    Meaning would an alleged murderer be
9    housed in a holding cell with a scofflaw for
10   parking tickets?
11       A.    Yeah.  I don't recall.  It's
12   possible, I believe.
13       Q.    Okay.  Would you agree with me that
14   20 inmates in a holding cell as opposed to two
15   inmates in a holding cell is going to make the
16   holding cell more dirty?
17       A.    Again, it could be 20 clean guys
18   versus two dirty guys.
19       Q.    Would you agree with me that 20
20   people in a holding cell, there's going to be an
21   increased risk of medical problems as opposed to
22   two inmates in a holding cell?
23       A.    Sure.
24       Q.    When you were overseeing the holding
25   cell area, were you ever aware that there was

Page 48

1    urine on the floor of the holding cells?
2        A.    No, sir.
3        Q.    Were you ever aware of the fact of
4    feces ever being on the floor of the holding
5    cells?
6        A.    No, sir.  We --
7        Q.    Go ahead.  I'm sorry.
8        A.    We had trustee that was in the B
9    Dorm and that was pretty much his sole
10   responsibility, is to mop floors and clean up.
11       Q.    Okay.  Were you aware of blood in
12   the holding cell?
13       A.    If there were blood and our deputies
14   were made aware of it, the trustee would have
15   gone in there and cleaned it up.
16       Q.    In theory?
17       A.    I guess, in theory.
18       Q.    Okay.  But I'm asking you --
19       A.    Because we can -- you know, we're
20   not talking about a specific incident.  So I
21   don't know of a specific incident where there was
22   blood in there that got cleaned up by Trustee 1,
23   2, 3.
24       Q.    Right.  I'm just asking, though.
25   Are you aware of instances where there was blood

Page 49

1    in the holding cell?
2        A.    Sure.  There have been fights
3    before, and they were cleaned afterwards.
4        Q.    And are you aware of instances where
5    there was urine on the floor of the holding
6    cells?
7        A.    No, sir, I'm not.
8        Q.    And are you aware of instances where
9    there was feces on the floor of the holding
10   cells?
11       A.    No, sir.
12       Q.    And are you aware of incidents where
13   there was vomit in the holding cells?
14       A.    No, sir.
15       Q.    With respect to meal time, did the
16   pretrial detainees that were in the holding cell
17   eat in the holding cell?
18       A.    Yes, sir.
19       Q.    And were they given items to clean
20   their hands before they ate?
21       A.    I don't recall.
22       Q.    And do you know if the inmates in
23   the holding cells were provided with outdoor
24   recreation time?
25       A.    They were not, the best I am aware

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

50..53

---

Page 50

1 of.
2    Q.    And why not?
3    A.    Again, we're trying to process those
4 individuals to either get them bonded out or get
5 them moved to the back, and it wasn't something
6 that we did.
7    Q.    Okay.  So was there -- I mean, was
8 there a penological interest that was furthered
9 by not providing them with recreation?
10    A.    Penologic -- what did you say?
11    Q.    Interest.  Was there some sort of
12 interest of corrections that was furthered by not
13 providing them with recreation?
14    A.    Other than manpower, no, sir.
15    Q.    Okay.  I mean, was there a manpower
16 issue that you were aware of that prevented the
17 ability to provide recreation?
18    A.    There was never a time that we did
19 recreation.  So I'm not sure if there was a -- if
20 that's something we did before we were
21 short-staffed.  To the best of my knowledge, they
22 never have been outside.
23    Q.    Okay.  Are you aware whether there
24 were times during 2019 that there was
25 overcrowding in the holding cells?

---

Page 51

1    A.    No, sir.
2    Q.    So at no time did any of your
3 subordinates ever come to you and say, "We are
4 now at a situation where we have overcrowding"?
5    A.    I mean, we, again, did everything we
6 could, if there was anyone in there, to do our
7 best to facilitate getting these people bonded
8 out, transferred, sent to the back.
9    Q.    I appreciate that, but my question
10 was, did any subordinate ever tell you, "We are
11 in an overcrowded status back in the holding
12 cells"?
13    A.    No, sir.
14    Q.    Are you familiar with Code 6?
15    A.    I am not.
16    Q.    Have you ever heard of Code 6?
17    A.    Code -- yes, to alleviate folks in
18 there through the district attorney's office and
19 the judges.  Is that what you're talking about,
20 Code 6?
21    Q.    The plan that was put in place to
22 deal with the overcrowding, that Code 6.
23    A.    Yes, a little bit.  I kind of know
24 how it works.
25    Q.    Okay.  So you're aware of Code 6

---

Page 52

1 that was a program to deal with overcrowding at
2 the jail?
3    A.    I didn't specifically know it was
4 for overcrowding.  I thought it was just to
5 expedite people getting bonded out and such.
6    Q.    Okay.  Are you aware of contracts in
7 place for federal inmates and for DOC inmates
8 with respect to their housing at the facility?
9    A.    Aware of them like, did I know about
10 them?  Yes.  As far as specific criteria, no.
11    Q.    Okay.  You were aware, though, that,
12 for instance, the federal government was paying
13 for their inmates to be housed at --
14    A.    Sure.
15    Q.    -- the facility?
16    A.    Yes.
17    Q.    And you were aware that there was a
18 contract that provided for DOC inmates to be
19 housed at the facility?
20    A.    Yes, sir.
21    Q.    And you're aware that -- are you
22 aware that there was more money provided for the
23 housing of a federal inmate than there was for a
24 parish detainee?
25    A.    Yes, sir.

---

Page 53

1    Q.    And are you aware that there was
2 more money provided for the housing of a DOC
3 detainee than there was for a parish detainee?
4    A.    No, sir.  I didn't know there was a
5 difference there.
6    Q.    Okay.  Am I correct that pretrial
7 detainees for the parish and for DOC and for the
8 feds were in different buildings?
9    A.    I don't know.  Those dorms are in
10 the back of the jail, and I can't specifically
11 say we housed federal inmates.  Of course, I
12 walked in that area before just doing a
13 walk-through with everyone else.  But I don't
14 recall which buildings were what, you know, if
15 this building was solely for pretrials.  I think
16 we ultimately did our best to -- that they
17 separated them.  But if there was a four-dorm
18 building, I can't say that they were all
19 pretrials, or this was fed.  But there was some
20 type of separation.  They weren't mixed together.
21    Q.    Are you aware that there were
22 certain beds designated for federal inmates?
23    A.    Yes, sir.
24    Q.    And are you aware that there were
25 certain beds designated for DOC inmates?

---

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

54..57

Page 54

1    A.    Yes, sir.
2    Q.    And are you aware that there were
3  certain beds designated for parish pretrial
4  detainees?
5    A.    Yes, sir.
6    Q.    Did the federal detainees get put in
7  the same holding cells as the parish detainees?
8    A.    I do not know.
9    Q.    Did the DOC detainees get put into
10  the same holding cells as the parish detainees?
11    A.    Again, I don't know that.  I don't
12  -- I don't recall what the procedures were, like,
13  if they came -- DOC inmates came back from court,
14  if they would put them in a holding cell before
15  they brought them back to the back.  I don't
16  recall if they went in there or not.
17    Q.    Would that be logged somewhere?
18    A.    I don't know.
19    MR. JACOB:
20        I'm going to do a document request
21        for any documentation that --
22    MR. COLLINGS:
23        You're going to need to send me a
24        written request.
25    MR. JACOB:

Page 55

1        That's fine.  I'm just putting it on
2        the record.
3    MR. COLLINGS:
4        I'm not writing all these things
5        down that you're asking for.
6    MR. JACOB:
7        I'm going to do a document request
8        for any indication or documentation that
9        federal detainees were housed in a
10        different location than parish detainees,
11        and the same request for DOC detainees.
12  BY MR. JACOB:
13    Q.    Am I correct that there were times
14  when there was more than 20 detainees in a
15  holding cell, and there were open DOC beds and/or
16  federal beds?
17    A.    I do not know.
18    Q.    And how do you not know that
19  supervising that location?
20    A.    That was three years ago.  I don't
21  know.
22    Q.    Is that something that you would
23  have known and been aware of through the
24  information that came across your desk as
25  supervisor?

Page 56

1    A.    What's the first part of the
2  question?
3    Q.    That there were more than 20
4  detainees in a holding cell and that there were
5  open DOC beds and/or federal beds at the same
6  time?
7    A.    Yes, sir.  There was a count sheet.
8    Q.    So that is information you would
9  have been aware of?
10    A.    Yes, sir.
11    Q.    And the count sheets, did you
12  receive that daily?
13    A.    I think they were e-mailed to me,
14  yes, sir.
15    Q.    Okay.  Is it fair to say then at
16  least that you looked at the count sheets, if not
17  daily, regularly?
18    A.    Yes, sir.
19    Q.    And did you ever direct that parish
20  pretrial detainees should be taken from the
21  holding cells and put in DOC beds or federal beds
22  that were open?
23    A.    No, sir.
24    Q.    Why not?
25    A.    Because those beds were not

Page 57

1  available to the pretrial detainees.
2    Q.    Why not?
3    A.    As you stated before, there was a
4  contract in place.
5    Q.    Okay.  But am I correct that the
6  only reason there was a contract in place and
7  those beds were provided -- were designated for
8  DOC or a fed was because there was a decision to
9  enter into that contract?
10    A.    I can't answer for -- I wasn't the
11  one who engaged in that contract, sir.  I don't
12  know what the logic was behind it.
13    Q.    Okay.  But other than -- or, no.  So
14  you will say, though, that you knew that there
15  were -- from the sheets, that there would have
16  been pretrial -- I want to make sure I say it
17  right -- pretrial detainees for the parish in the
18  holding cells at the time that there were open
19  beds for DOC or federal inmates?
20    A.    Say it one more time.  You keep
21  saying, "pretrial detainees."  So pretty much
22  people in holding.
23    Q.    Yes.
24    A.    Okay.
25    Q.    That you would have, let's say, more

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

58..61

Page 58

1  than 20 in holding at the same time that there
2  were open DOC beds or open federal beds?
3      A.  Are you saying would that occur?
4      Q.  Yes.
5      A.  It's possible, yes.
6      Q.  Do you recall it occurring?
7      A.  Yeah.  I mean, we had open beds and
8  --
9      Q.  Go ahead.  I'm sorry.
10     A.  -- on the feds side.  Probably
11 sometimes in DOC as well.
12     Q.  And when you say, "open," it means
13 that there was no inmate filling those beds,
14 correct?
15     A.  That's correct.
16     Q.  And that the only reason they were
17 not filled by pretrial detainees for the parish
18 was because they were designated by contract for
19 federal inmates or DOC inmates; is that correct?
20     A.  Yes, sir.
21     Q.  That's correct?
22     A.  Yeah.
23     Q.  All right.  So it was a matter of
24 policy or practice that a pretrial detainee for
25 the parish was not moved into the DOC or the

Page 59

1  federal beds; is that correct?
2      A.  Yes, sir.
3      Q.  It wasn't a staffing issue?
4      A.  No.
5      Q.  It wasn't -- there wasn't any
6  resource issue other than the fact that the beds
7  are already designated for someone else, correct?
8      A.  You might have had somebody in
9  holding that might have been coming to a DOC bed
10 or something that might have been caught up in
11 holding until the bed was cleaned.  You know, I
12 can recall times that the captain from security
13 would say that, you know, a bed was inoperable or
14 something in the back.  But, yes, there would be
15 times where there were pretrial detainees in
16 holding, and they had a federal bed available.
17     Q.  Okay.  And, again, the only reason,
18 the only interest that was being served was to
19 honor the contract with the feds or the DOC?
20     A.  Say it again.
21     Q.  That the reason that the bed was not
22 available or being provided to the holding cell
23 pretrial detainees for the parish was because
24 that bed was designated by contract to DOC or to
25 the feds?

Page 60

1      A.  Yes, sir.
2      Q.  Was there ever a time -- or do you
3  know whether despite having those contracts, the
4  DOC and federal contracts, was the parish still
5  permitted to turn away DOC or federal inmates for
6  any reason?
7      A.  Not that I'm aware of.
8      Q.  Meaning let's say you have an
9  overcrowding situation and you determine it's
10 getting to be too dangerous, could you just tell
11 the DOC, "Listen, we need to take 20 of your beds
12 to make a safer situation here at the jail"?
13     A.  I don't recall a time where we had
14 to do that.
15     Q.  Would you be permitted to do that?
16     A.  That's a question I would have to
17 ask the warden, and possibly the warden would
18 have to ask the chief.
19     Q.  Okay.  But are you aware of any
20 reason why you couldn't do that other than you
21 weren't told you were permitted to do it?
22     A.  That's correct.
23     Q.  All right.  I'm assuming you always
24 tried to do the best you could for supervising?
25     A.  Yes, sir.

Page 61

1      Q.  Were you ever frustrated, though, in
2  working with the commissioner or with the judges
3  with the status of the housing situation in the
4  holding cells?
5      A.  No.
6      Q.  I mean, did you ever have an
7  opportunity to discuss with the commissioner the
8  numbers, the amount of inmates being housed in
9  the holding cells?
10     A.  No, sir.
11     Q.  Was overcrowding ever an issue for
12 you?
13     A.  Not to where we were -- didn't have
14 anywhere for people to go.  I mean, every day you
15 came in, you know, you would if the number was,
16 you know, 80 or lower.  If it was around 80,
17 then, you know, it might take a call to -- Donna
18 Landrum was our Code 6 representative who worked
19 pretty much in the same office with the
20 commissioner the majority of the days, "Hey, can
21 you expedite getting some of these that just came
22 in here bonded out," or such.
23     Q.  Okay.  And why would you make that
24 call, though?
25     A.  To do our best to keep our number

Page 62

1 low.
2     Q.     And by keeping that number low, you
3 mean keeping the number below the amount you're
4 supposed to have in the holding cell?
5     A.     Around 80 is where we knew we needed
6 to do our best not to go over that number.
7     Q.     And why is that?  Who set that
8 number?
9     A.     The fire marshal.
10     Q.     All right.  Did you ever get
11 frustrated, though, with the information that
12 came back, that, no, we can't lower the number?
13     A.     You know, I kind of -- you got to
14 kind of -- you work with what you got, you know.
15 The judges don't work for me.  The commissioner
16 doesn't work for me.  You know, all we can do is
17 tell them what we have going on here.  And I
18 think for the most part, they have done a good
19 job of helping get people out of jail quicker.
20     Q.     In your personal opinion, though,
21 did you ever see or come to learn of situations
22 in the holding cell that are just not the way
23 people should be living?
24     A.     No, sir.
25     Q.     Did you ever know that there were

Page 63

1 certain people living in the holding cells for
2 two weeks?
3     A.     No, sir.
4     Q.     What was the longest time that you
5 recall anyone living in the holding cells?
6     A.     I don't recall.
7     Q.     So more than one day?
8     A.     Yes, more than one day.
9     Q.     More than three days?
10     A.     Possibly.
11     Q.     More than five days?
12     A.     Don't know.
13     Q.     Well, when these lawsuits came in,
14 did you ever go back and look to see were those
15 inmates housed longer than -- or at the times
16 that they say they were?
17     A.     Did I go back after it was filed to
18 look?  No.
19     Q.     Have you come to learn whether these
20 inmates were, in fact, in the holding cells for
21 the amount of time that they were stating?
22     A.     No, sir.
23     Q.     Since this issue has come up, the
24 lawsuits, have you ever -- or did you ever come
25 to learn that, in fact, there were inmates --

Page 64

1 even if it wasn't these -- but there were inmates
2 who were in the holding cells for five, seven, or
3 21 days?
4     A.     No, sir.
5     Q.     Did you ever come to learn that
6 there were inmates in the holding cells for two
7 weeks?
8     A.     No, sir.
9     Q.     Did you even care to learn whether
10 there were inmates in the holding cells during
11 the time when you were supervising that were in
12 the holding cells for up to two weeks?
13     MR. COLLINGS:
14         Object to the form.
15     THE WITNESS:
16         Yes.
17 BY MR. JACOB:
18     Q.     And when you cared to learn that,
19 did you go learn that?
20     A.     I can't think of a specific time
21 that I did that.  I can't think of a time that
22 they came and said, "Hey, this person has been in
23 here for two weeks."
24     Q.     Did you ever ask your lieutenant,
25 "How long are these people staying in these

Page 65

1 holding cells"?
2     A.     No, sir.
3     Q.     Why not?
4     A.     Because there was no reason for us
5 to hold those individuals, to keep them in there.
6 It was as soon as beds became available, we'd get
7 people to the back.  There wasn't a purpose to
8 leave somebody in the holding cell for an
9 extended amount of time.  It's a constant process
10 of people getting rolled to the back bonded out,
11 transferred, and people coming in the door being
12 arrested off the street.
13     Q.     Then why was it that it happened?
14     A.     I can't answer that, sir.
15     Q.     You understand, though, that those
16 people who were in those holding cells for those
17 periods of time were sleeping on concrete?
18     A.     Yes, sir.
19     Q.     And now that you know that, does
20 that bug you at all?
21     A.     Two weeks seems like a long time, --
22     Q.     Okay.
23     A.     -- if that's the question.
24     Q.     Do you think that that might be
25 considered a little bit inhumane?

Page 66

1    MR. COLLINGS:
2        Object to the form.
3    THE WITNESS:
4        Humane, I envision a dog does not
5    have food or water.  These individuals
6    were provided blankets, medical, showers.
7    They had all the necessities of life.
8  BY MR. JACOB:
9    **Q.   And sleeping on concrete, that**
10 **didn't change that for you?**
11     A.   They looked like they were able to
12 lay down just fine.
13     **Q.   In fact, they were sleeping on the**
14 **floor at times, correct?**
15     A.   I have slept on the floor before,
16 sir.
17     **Q.   Okay.  When did you sleep on the**
18 **floor?**
19     A.   My choice just like it was their
20 choice to go to jail.
21     **Q.   Oh.  It was their choice to go to**
22 **jail?  So are you telling me that everyone who is**
23 **in jail was definitely guilty of what they were**
24 **arrested for?**
25     MR. COLLINGS:

Page 67

1        Object to the form.
2    THE WITNESS:
3        We don't -- we're not the judges,
4    sir, of who's guilty or who's not guilty.
5  BY MR. JACOB:
6    **Q.   Okay.  But you do know it was their**
7  **choice to go to jail?**
8      A.   Well, whether it was their choice or
9  not, obviously, the officer felt there was
10 probable cause or a warrant to put the
11 individuals there.
12     **Q.   So it was the officer's choice, --**
13     MR. COLLINGS:
14        Object to the form.
15 BY MR. JACOB:
16     **Q.   -- correct?**
17     A.   I would assume so, yeah.  It could
18 be the judge if the judge sends somebody there.
19     **Q.   Okay.  But probably not the**
20 **detainee's choice?  Would you agree with me**
21 **there?**
22     A.   Well, I don't think anybody wants to
23 go to jail, if that's your question.
24     **Q.   So when you said it was their**
25 **choice, it probably wasn't their choice?**

Page 68

1    MR. COLLINGS:
2        Object to the form.
3    THE WITNESS:
4        We don't just go around and grab
5    everybody off the street and put them in
6    jail.  So I assume that individuals have a
7    right to do the right thing or the wrong
8    thing.  People that do the right thing,
9    they don't go to jail.
10 BY MR. JACOB:
11     **Q.   And sometimes there are mistakes**
12 **made, though, right?**
13     A.   Sure.
14     **Q.   And sometimes the wrong person is**
15 **arrested, right?**
16     MR. COLLINGS:
17        Object to the form.
18     THE WITNESS:
19        We're not perfect.
20 BY MR. JACOB:
21     **Q.   Okay.  So you would agree with me**
22 **that there could have been situations where there**
23 **were completely innocent people sitting in the**
24 **holding cells for two weeks?**
25     A.   I can't think of a person that was

Page 69

1  completely innocent that we put in jail.
2    **Q.   Okay.  Well, you weren't really**
3  **putting them in jail, though, I think you said,**
4  **right?**
5      A.   Not at that time.
6    **Q.   Okay.  So, again, though, you can't**
7  **rule that out, correct?**
8      A.   Yes, sir.
9    **Q.   All right.  So do you still want to**
10 **stand by it was their choice to be in jail?**
11     A.   If we're discussing words, sir, your
12 opinion is it's not their choice, and my opinion,
13 it is their choice that they made a right or
14 wrong decision.
15     **Q.   Fair enough.  And because of that,**
16 **too bad, they should just have to suffer whatever**
17 **happens in the holding cells?**
18     A.   Suffer from how?
19     **Q.   Sleeping for two weeks on cement?**
20     A.   As stated, they were provided
21 blankets in an environment that they were fed,
22 provided medical attention.  Somebody was
23 watching over them.
24     **Q.   So if you can't do the time, don't**
25 **do the crime, right?**

Page 70

1      MR. COLLINGS:
2           Object to the form.
3      THE WITNESS:
4           I've heard that phrase before.
5  BY MR. JACOB:
6      Q.   Would you agree with that?
7      A.   Sure. I would.
8      Q.   Okay. And so you didn't have any
9  empathy for people sleeping on cement for two
10 weeks?
11     A.   Again, I wasn't familiar with
12 anybody sleeping there for two weeks.
13     Q.   Okay. But you are now?
14     A.   Right.
15     Q.   And so now that you know that, do
16 you have empathy for the fact that they slept on
17 the concrete for two weeks, or is it the more, if
18 you can't do the time, don't do the crime?
19     MR. COLLINGS:
20          Object to the form.
21     THE WITNESS:
22          Yeah. If I could have waved a magic
23          wand, we would have got them to the back
24          or bonded out.
25 BY MR. JACOB:

Page 71

1      Q.   Understood. But the fact that it
2  did happen and the fact that they did sleep on
3  concrete, is it still your opinion, like, "Oh,
4  well, if you can't do the time, don't do the
5  crime"?
6      A.   I don't know if, "Oh, well," would
7  be the answer.
8      Q.   Maybe not, "Oh, well." But if you
9  don't want be in a holding cell, don't do the
10 crime?
11     MR. COLLINGS:
12          Object to the form.
13     THE WITNESS:
14          Well, again, there's a process of
15          how we get people to the back. There's no
16          reason that we would hold an individual in
17          holding for two weeks unless, of course,
18          there are no beds available.
19 BY MR. JACOB:
20     Q.   Okay. So, again, knowing that it
21 happened, though, does it really matter to you,
22 or is it just, "Oh, well, they did the crime"?
23     A.   It matters.
24     Q.   Why does it matter?
25     A.   Well, I mean, because we want to do

Page 72

1  our best to get people in beds.
2      Q.   Okay. But the fact that it took two
3  weeks at times, why does that matter to you?
4  Just because it wasn't the best?
5      A.   Wasn't the best, that it was -- what
6  are you saying?
7      Q.   Well, I'm saying the fact that it --
8  actually, let me re-ask that.
9           If it did, in fact, take two weeks
10 to do that, then am I correct you were operating
11 at your best?
12     A.   If it took two weeks, that I was
13 operating at my best. I would like to think we
14 were operating at our best in getting people to
15 the back as quickly as possible.
16     Q.   Okay. And now you've learned that
17 it has taken up to two weeks at times for -- at
18 your best, to get people into beds, correct?
19     A.   Yes, sir.
20     Q.   And are you okay with that?
21     A.   Would I be okay with that now, is
22 your question?
23     Q.   Yes.
24     A.   If a bed was open and I can
25 facilitate them getting to the back, then if

Page 73

1  somebody would have come to me then, in my
2  position then, and said, "We've had this guy for
3  however long, Do we have a bed available, Can we
4  get him to the back," "Why is he still here"?
5  Those would be questions I would ask.
6      Q.   All right. So if, as a supervisor,
7  you know, like you said, somebody comes to you
8  and says, "Listen, on average, we have detainees
9  who are sleeping on concrete for two weeks at a
10 time because of how we are running things here,"
11 is that a problem for you as a supervisor?
12     A.   If somebody came to me and asked me,
13 that was the question?
14     Q.   Uh-huh (affirmatively).
15     A.   Well, if the resources were
16 available for those individuals to go to the
17 back, then I'd say, "We have a problem. We
18 should have got these individuals to the back."
19 But if you're coming to me saying that we had no
20 beds available, and this lady or gentleman is
21 still up in the front, would it concern me, yes,
22 but there would be nothing that I can do about
23 it. I can't control how we release people.
24     Q.   Okay. But what if they said, "But,
25 by the way, we have open beds in DOC and fed, but

Page 74

1  we have people sleeping on concrete for two
2  weeks"?
3      A.   Those beds were not an option.
4      Q.   Why not?
5      A.   Again, like I said earlier, the
6  contract was in place before I got there, sir.  I
7  don't know how it was created or why.  I don't
8  know.
9      Q.   Okay.  But the bed is open, and,
10  literally, you could walk the inmate from Point A
11  to that bed, correct?
12      MR. COLLINGS:
13          Object to the form.
14      THE WITNESS:
15          I guess relatively speaking, yes.
16  BY MR. JACOB:
17      Q.   Okay.
18      A.   But there were potentially an empty
19  bed and someone in holding, yes.
20      Q.   Okay.
21      THE WITNESS:
22          Can I just get another water?
23      MR. COLLINGS:
24          Absolutely.
25      MR. JACOB:

Page 75

1          You just want to take five minutes?
2      MR. COLLINGS:
3          Sure.
4          (Brief recess was taken.)
5  BY MR. JACOB:
6      Q.   We just had an opportunity for a
7  break.  You're prepared to continue?
8      A.   Yes, sir.
9      Q.   We were talking earlier about the
10  pretrial detainees in the holding cell and about
11  whether it was their choice or not their choice
12  to be in there.  Do you recall that?
13      A.   Yes, sir.
14      Q.   Would you agree with me that people
15  are innocent until proven guilty?
16      A.   Yes, sir.
17      Q.   All right.  So it sounds to me,
18  though, that at least you were viewing the
19  detainees differently than innocent at that time?
20      A.   Again, I don't -- I don't have the
21  ability to say this person is innocent or guilty.
22  They've been brought to our facility based on
23  probable cause or warrant arrest.  To decide
24  whether they're innocent or guilty at that point
25  did not matter.

Page 76

1      Q.   Okay.  Was it because there's
2  probable cause, they probably did it?
3      A.   Probable cause -- that a judge says
4  that there was probable cause that existed for
5  their arrest.
6      Q.   Am I correct, though, there were
7  times when people would have been arrested and
8  brought right to the -- to be, you know, held at
9  your facility without going to a judge first?
10      A.   I think at that time that that was a
11  practice.  But an ex officio officer would sign
12  off on the probable cause forms until I think the
13  commissioner at the time could sign those
14  probable cause forms.
15      Q.   So even though there wasn't a
16  determination of guilt or innocence, in your
17  mind, they probably did it?
18      A.   I didn't say that.
19      Q.   Okay.  Were they to be treated like
20  anyone else then who has not been arrested?
21      A.   Sure.  That's why they come in in
22  handcuffs.
23      Q.   Do you know what the federal
24  constitution is, correct?
25      A.   Sure.

Page 77

1      Q.   And do you know what the Eighth
2  Amendment to the federal constitution is?
3      A.   Refresh my memory.
4      Q.   Well, I'm asking you if you know.
5      A.   I don't know off the top of my head.
6      Q.   Do you know what the Fourteenth
7  Amendment is?
8      A.   Not off the top of my head.
9      Q.   Do you know if the Eighth Amendment
10  or Fourteenth Amendment governs a jail?
11      A.   I do not know.
12      Q.   Were you ever provided with any
13  training with respect to what the federal
14  constitutional rights are of pretrial detainees?
15      A.   I'm not quite sure I ever got a
16  specific pretrial detainee amendment or
17  constitution.
18      Q.   Do you know whether, for instance --
19  or did you know whether pretrial detainees were
20  to be treated differently than convicted inmates?
21      A.   I do not recall.
22      Q.   Do you know whether you were ever
23  provided with any training that pretrial
24  detainees enjoy greater rights than convicted
25  inmates?

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

78..81

Page 78

1    A.    I'm not familiar with a law that
2  specifically says that, sir.
3    Q.    And so when you were supervising,
4  you certainly weren't considering those issues,
5  correct?
6    A.    The Fourth -- the Eighth and
7  Fourteenth Amendment?  I mean, number-wise, I'm
8  not going to say what they are.  I don't recall
9  specifically.
10    Q.    Did you ever know -- could you
11  articulate what any constitutional rights are at
12  the federal level enjoyed by any inmate either
13  convicted or a pretrial detainee?
14    A.    Not off the top of my head, sir.
15    Q.    And is that something that you ever
16  knew?
17    A.    Maybe.
18    Q.    I mean, do you recall, "Oh, yeah.
19  We had a whole week on these are the rights of
20  inmates.  I just can't sit here and tell about
21  it"?
22    MR. COLLINGS:
23          Object to the form.
24    THE WITNESS:
25          That's possible, sir.

Page 79

1  BY MR. JACOB:
2    Q.    And when do you think that that
3  would have occurred?
4    A.    My basic training academy or
5  possibly the corrections POST course.
6    Q.    Okay.  Was that a conversation that
7  you would have with the lieutenant, "Are we
8  complying with these inmates' federal
9  constitutional rights"?
10    A.    I don't recall having a specific
11  conversation, no, sir.
12    Q.    Is that something that was in your
13  checklist of supervising, that you're going to
14  ask your lieutenants, "Are we complying with all
15  state and federal law"?
16    A.    I didn't have a specific checklist,
17  sir.
18    Q.    Okay.  Was that one of the things,
19  though, that concerned you, whether you're
20  complying with state or federal law when you were
21  supervising the lieutenant?
22    A.    Sure.
23    Q.    And what did you do then to address
24  that concern of yours?
25    A.    Again, I can't speak of a specific

Page 80

1  incident that was presented to me or that I
2  observed, that I felt that we were violating
3  anybody's rights.
4    Q.    Okay.  But at the same time, I'm
5  hearing you say it wasn't a conversation that you
6  were having with your lieutenants as far as
7  whether or not state and federal law was being
8  complied with; is that correct?
9    A.    I can't recall a specific
10  conversation I had in reference to that.
11    Q.    Even if not specifically, can you
12  recall, "Yeah, that's something during our weekly
13  meeting I would always ask, 'Are we in compliance
14  with state and federal law'"?
15    A.    That's not a question I would have
16  asked, sir.
17    Q.    Just give me one second here, if you
18  would.
19          You said that you reviewed the two
20  lawsuits that were filed in this matter, correct?
21    A.    Yes, sir.
22    Q.    Do you -- as you sit here today, are
23  you aware of any evidence that would rebut
24  anything that these inmates were saying?
25    A.    Do you have a specific question?  I

Page 81

1  mean, it was --
2    Q.    Yes.
3    A.    -- a 50-page document.
4    Q.    Correct.  And while you were reading
5  it and reviewing it and preparing for your
6  deposition, did you ever say, "Well, I know
7  that's not true.  We have proof of that"?
8    A.    In reference to the entirety of the
9  -- if there was -- ask the question one more
10  time.
11    Q.    Sure.  With respect to any of the
12  claims that you read and reviewed, did you ever
13  say, "Oh, well, I know for a fact this is false
14  because I can show you in this document or that
15  document," or, "I can prove it this way or that
16  way"?
17    A.    I mean, one of the specifics, I
18  don't remember which person it was, but he said
19  he had a change of clothes, but he didn't have a
20  shower.
21    Q.    Okay.
22    A.    He wouldn't have gotten a change of
23  clothes unless he had a shower.
24    Q.    Okay.  If the procedure was
25  followed?

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

82..85

Page 82

1     A.    True.
2          Q.    Okay.  So what I'm hearing you say
3     is that you can't say with certainty that what he
4     said didn't happen?  You're just saying that we
5     had a procedure in place, and if the procedure
6     was followed, that wouldn't have happened; is
7     that fair?
8          A.    If the procedures were followed, it
9     wouldn't have happened.  Again, I don't remember
10    verbatim what the exact charges are, but you
11    know, when I read it, just like the example I
12    just gave you, that was one of the things it was,
13    like, well, this couldn't have been.
14         Q.    Okay.  So one of the allegations are
15    that there were bodily fluids or feces on the
16    floor at times, that inmates were sleeping on
17    these dirty floors.  Do you have any evidence to
18    establish that that, in fact, did not happen?
19         A.    No, sir.
20         Q.    Okay.  Some of the claims are that
21    these inmates at times were sleeping on these
22    feces, vomit, blood, urine floors for up to two
23    weeks at a time.  Do you have any evidence to
24    establish that that did not happen?
25         A.    I would say that daily they were

Page 83

1     cleaned by the hall trustee that was there.  When
2     they went out to showers, they clean up.  After
3     feed up, they take the food and such out of those
4     holding facilities.
5          Q.    Okay.  That was the procedure,
6     correct?
7          A.    To say that it went unclean for two
8     weeks, it would be unimaginable.
9          Q.    But how about that they had to sleep
10    on floors, though, that had those bodily fluids
11    on them for up to two weeks?
12         A.    If it was pointed out, I would hope
13    that it was addressed.
14         Q.    But, again, my question is, do you
15    have any evidence to rebut a claim that some of
16    these inmates were sleeping on feces and urine
17    each night at least -- not whether it was cleaned
18    during the day -- but at least each night for up
19    to two weeks?
20         A.    No, sir.
21         Q.    Are you aware of any evidence or any
22    information in the industry that the more inmates
23    you place in a cell, it decreases the emotional
24    well-being of the inmate?
25         A.    Am I aware of a study you said?

Page 84

1          Q.    Yeah.  Any information that, you
2     know, the more crowded the situation becomes, the
3     more stressful for the inmate it becomes?
4          A.    Am I aware of -- I'm not aware of
5     any study that would suggest that.
6          Q.    Is that a common understanding,
7     though, that the more crowded the environment,
8     the more increased stress on the inmate?
9          A.    If it's a common, as you put it, I'm
10    not aware of it.
11         Q.    And how about with respect to fresh
12    air and recreation?  Are you aware of in the
13    industry that when you take that away from an
14    individual, their stress level increases?
15         A.    Specifically, no, sir.
16         Q.    You were considered a pretty high
17    level supervisor at the facility, correct?
18         A.    Yes, sir.
19         Q.    And what did you do to keep yourself
20    informed as far as the standard in the industry?
21         A.    I guess on-the-job training with
22    associates that have been involved in corrections
23    for, at the time, their careers.  Of course, I
24    went to POST, corrections POST, and didn't have
25    to do that.  We had some maybe specific -- it was

Page 85

1     Police 1, the same thing the patrol guys get, you
2     know.  The training division can say that they
3     want our patrol guys to talk about traffic stops
4     or such.  Correction guys would have their own
5     bank, so you don't have corrections guys watching
6     traffic stop videos.  So I believe there were
7     some of those videos while I was in corrections
8     at the time.
9          Q.    Okay.  And am I correct that the
10    practice in place in 2019 was that you could have
11    a pretrial detainee sleeping on a floor that had
12    urine and other bodily fluids, and you would not
13    move that inmate into a DOC bed or a federal bed?
14         MR. COLLINGS:
15             Object to the form.
16         THE WITNESS:
17             I don't believe that was the
18         practice at all, sir.
19    BY MR. JACOB:
20         Q.    So it was that that inmate would be
21    moved to the DOC bed or the federal bed?
22         A.    I believe they would have been moved
23    to an available bed.
24         Q.    Okay.  But if there was no pretrial
25    bed available, they would stay in that

Page 86

1  environment as opposed to being moved to a DOC or
2  a federal bed, correct?
3      A.   As far as the specific, feces,
4  urine, they would be held in holding until an
5  available bed, pretrial bed, was available for
6  them.  Those are the only beds available.
7      Q.   So they would sleep on concrete,
8  either the bench or the floor, even if there's an
9  open bed back in DOC or fed?  That was the
10  practice?
11     A.   It would be possible, yes, sir.
12     Q.   Well, it's not that it would be
13  possible.  That was the practice, correct?
14     A.   Those beds were not available to
15  pretrial detainees.
16     Q.   So that was the practice, correct?
17     A.   Yes, sir.
18     Q.   All right.  And that was a practice
19  that you knew about, correct?
20     A.   Yes, sir.
21     Q.   And that you did not change?
22     A.   No, sir.
23     Q.   And you let it continue, correct?
24     A.   It wasn't a matter of letting.
25  Those beds were not available.

Page 87

1      Q.   Well, they were open, correct?
2      A.   They weren't available for me as a
3  captain.
4      Q.   Okay.  But you allowed that to
5  continue, correct?
6      MR. COLLINGS:
7          Object to the form.  Asked and
8      answered.
9      THE WITNESS:
10         Answer again?
11     MR. COLLINGS:
12         Please.
13     THE WITNESS:
14         I would not have been in a position
15     to open any additional beds up.  They
16     were, as you said, contractually assigned.
17  BY MR. JACOB:
18     Q.   So you did nothing, though, to
19  change that practice, correct?
20     MR. COLLINGS:
21         Object to the form.  Asked and
22     answered.
23     THE WITNESS:
24         I did not.
25  BY MR. JACOB:

Page 88

1      Q.   Okay.
2      MS. HARTON:
3          I'm good.
4      MR. JACOB:
5          I'm good.  Tender.
6      MR. COLLINGS:
7          Tender?
8  EXAMINATION BY MR. COLLINGS:
9      Q.   Okay.  Major O'Keefe, do you the
10  recall the years, from what year to what year,
11  you were actually assigned to the jail?
12     A.   Yes, sir.  January -- not January.
13  Excuse me.  November 2018 to December -- first,
14  second week of December of 2019.
15     Q.   So a little over one year?
16     A.   Yes, sir.
17     Q.   Okay.  So in the time that you were
18  there as a captain inside the jail in 2018 and
19  2019, is it safe to say that the resources
20  allocated to housing inmates and moving inmates
21  within the facility was scarce at times?
22     MR. JACOB:
23         Objection.
24     THE WITNESS:
25         Yes, sir.

Page 89

1  BY MR. COLLINGS:
2      Q.   And when I say, "resources," I mean
3  -- I'm defining that as available beds.  Would
4  you agree with that?
5      A.   Absolutely.
6      Q.   There was scarcity of available beds
7  from time to time in that year, correct?
8      MR. JACOB:
9          Objection.
10     THE WITNESS:
11         Yes, sir.
12  BY MR. COLLINGS:
13     Q.   And there was also scarcity of
14  manpower at times within the facility?
15     A.   Yes, sir.
16     Q.   And did those two things combine to
17  slow down the processing of inmates or detainees
18  from the holding cells to what we call the back
19  of the jail, which is the tiers?
20     A.   Yes, sir.
21     Q.   All right.  Was there any time -- to
22  your knowledge, was there ever an intent to delay
23  the transferring of detainees from the holding
24  areas to the back of the jail for any punitive
25  intent?

Page 90

1    A.   No, sir.
2        Q.   And you're certain of that?
3    A.   Absolutely certain.
4        Q.   All right.  Was there also a
5    deliberate process by which the holding cells
6    were cleaned daily?
7    A.   Yes, sir.
8        Q.   And was it also the policy and
9    practice of the sheriff's office so that if, say,
10   for example, the holding cell was mopped out in
11   the morning, but someone then would have vomited
12   on the floor later that day, that there was an
13   available trustee to come in and clean that up?
14   A.   Absolutely.
15       Q.   And did that occur during the year
16   that you were there?
17   A.   Yes, sir.
18       Q.   All right.  And, to your knowledge,
19   did the sheriff's office ever refuse to clean the
20   holding cells during the year that you were in
21   charge of your portion of the jail?
22   A.   No, sir.
23   Q.   All right.
24   MR. COLLINGS:
25       That's all I have.  Thank you.

Page 91

1    REEXAMINATION BY MR. JACOB:
2        Q.   Sir, if your family member was in
3    the holding cells, would you be okay with them
4    sleeping on concrete for up to two weeks?
5    MR. COLLINGS:
6        Object to the form.
7    THE WITNESS:
8        If I understood the process, yes,
9    sir.
10   BY MR. JACOB:
11       Q.   I don't know if you have children.
12   But I'm just going to say, if you have children,
13   would you be comfortable with your child sleeping
14   on the floor in a holding cell if you knew that
15   there was a bed that was empty in the DOC wing?
16   MR. COLLINGS:
17       Object to the form.
18   THE WITNESS:
19       If I understood the process.  If I
20   was a dad at home and his kid is in a
21   holding facility, would I want him to be
22   comfortable?  This guy, probably not.  You
23   know, but if I understood the process and
24   that there was not an available bed that
25   this individual could have gone to, for

Page 92

1    whatever reason, I'm a pretty
2    understanding guy.
3    BY MR. JACOB:
4        Q.   Do you think it's humane to have
5    people sleep on concrete for up to two weeks?
6    MR. COLLINGS:
7        Object to the form.
8    THE WITNESS:
9        Again, I don't look at it as humane
10   or inhumane when somebody is in an
11   environment with air-condition and heat
12   and blanket and food and medical and
13   whatever else they possibly could need.
14   BY MR. JACOB:
15       Q.   And locked in a cell for up to two
16   weeks with 20-something people, correct?
17   A.   Yes, sir.
18       Q.   All right.  You were asked about
19   scarcity.  Are you saying, though, that if there
20   were open DOC beds and open federal beds but no
21   pretrial beds, that the issue of beds was scarce?
22   A.   If -- say it again.
23       Q.   I just want to make sure I
24   understand your definition of "scarce."  If I
25   have all pretrial detainee beds filled and I have

Page 93

1    20 open DOC beds and 20 open federal beds, is the
2    issue of beds, that resource scarce?
3    A.   I only had access to the pretrial
4    beds in my capacity.
5        Q.   Okay.  Again, is that resource
6    scarce?
7    A.   I only had access to the pretrial
8    beds in my capacity.
9        Q.   Well, you were just using -- so are
10   you saying you didn't understand his questions
11   about scarce, --
12   MR. COLLINGS:
13       Objection.  Argumentative.
14   BY MR. JACOB:
15       Q.   -- scarce resources?
16   A.   That resources were scarce?
17       Q.   Right.
18   A.   So your question is, am I familiar
19   with were beds scarce?  Yes, they were because we
20   only had pretrial beds to deal with.  Was
21   resources scarce?  Were we short-staffed at
22   times?  Yes, sir.
23       Q.   And, again, I just want to make
24   sure, though, that I'm understanding your use of
25   the word "scarce."  What I'm understanding you to

Page 94

1  say is, if all the pretrial beds are filled but
2  you have 20 open DOC beds and 20 open federal
3  beds, if I ask you, "Was that resource, open
4  beds, scarce," your answer would be, "Yes"?
5      A.   That's not a resource that's
6  available to me.
7      Q.   So if I asked you, "Is that resource
8  scarce," you'd say, "Yes"?
9      A.   I just gave you the answer.
10     Q.   No. I'm asking you. In front of a
11 jury I'm going to say, "Is that resource scarce,"
12 and you're going to say --
13     A.   That resource was not available to
14 me. So as the captain of the booking and
15 bonding, that was not even a resource to
16 consider.
17     Q.    So it's a scarce resource?
18     MR. COLLINGS:
19         Objection. Asked and answered.
20 BY MR. JACOB:
21     Q.    You had no problem understanding
22 when he used the word "scarce," correct?
23     MR. COLLINGS:
24         I think now you're getting into an
25         argumentative -- he has given you an

Page 95

1      answer, Counsel.
2  BY MR. JACOB:
3      Q.    Am I correct? You had no problem
4  understanding when he used the word "scarce,"
5  correct?
6      A.   And I'll reiterate it. Scarce
7  places to put individuals, scarce manpower,
8  resources.
9          So your question is, if they had
10 available beds, are they scarce? They weren't
11 available to pretrial detainees.
12     Q.   No. My question was, if all the
13 pretrial beds are filled and you have 20 open
14 beds in DOC and 20 in fed and I ask you, "Is your
15 bed resource scarce," what is your response going
16 to be? Because I'm going to ask you in front of
17 the jury.
18     A.   For pretrial detainees, it is scarce
19 because they're not available to me. That's what
20 would be the answer.
21     Q.   Now, if we were to move an inmate
22 from the holding cell into a DOC bed -- I'm not
23 saying you would have, but I'm just saying if we
24 did -- is there a different manpower issue?
25     A.   Possibly.

Page 96

1      Q.   How so?
2      A.   Well, it's possible that there's not
3  a deputy to bring them to the back or oversee a
4  specific area of the jail. There might be an
5  area that's being painted or reconstructed in the
6  back of the jail. So it's possible.
7      Q.   Okay. So it's possible. But you're
8  not aware, as you sit here, of any manpower issue
9  that prevented a DOC bed from being filled or a
10 federal bed from being filled, correct?
11     A.   Not specifically manpower-wise.
12     Q.   So there was no manpower issue that
13 prevented an issue, correct?
14     MR. COLLINGS:
15         Object to the form.
16     THE WITNESS:
17         To the beds that I had access to as
18         the captain of booking and bonding were
19         the pretrial or inmates come into our
20         facility, those were the only beds
21         available to them.
22 BY MR. JACOB:
23     Q.   And I appreciate that. And thank
24 you for sharing that. But back to my question.
25 There was no manpower issue that prevented the

Page 97

1  DOC bed or the federal bed with being filled by a
2  parish detainee, correct?
3      A.   I don't know.
4      Q.   You don't know?
5      A.   I don't know.
6      Q.   But earlier you were saying the
7  resource was scarce, and it prevented it?
8      A.   For pretrial beds.
9      Q.   Oh, for pretrial beds. Okay. But
10 that's not my question. My question is, is there
11 a manpower issue preventing you from putting --
12 or from filling the DOC bed and the federal beds
13 with a pretrial detainee?
14     A.   Not that I'm aware of.
15     Q.   Okay. So if I ask you in front of
16 the jury, you're not going to say that, "Well,
17 there was a scarcity with respect to manpower
18 that prevented that," correct?
19     MR. COLLINGS:
20         Object to the form.
21     THE WITNESS:
22         I think the process, in general,
23         getting people back to the --
24 BY MR. JACOB:
25     Q.   My question. Not yours.

Page 98

1      MR. COLLINGS:
2          Hold on.  Hold on.  Oh, no.
3      MR. JACOB:
4          No.
5      MR. COLLINGS:
6          You got to let him finish.
7  BY MR. JACOB:
8      Q.   My question.  Not yours.
9      MR. COLLINGS:
10         Hold on.  He started answering, and
11         then you're jumping in.
12  BY MR. JACOB:
13     Q.   Again, my question.  Not yours.  So
14  --
15     MR. COLLINGS:
16         Finish your response and then --
17     THE WITNESS:
18         So with manpower as far as getting
19         people from the back to the -- from the
20         front to the facility, booking and
21         bonding, to the back of the facility, that
22         manpower would definitely be an issue.
23  BY MR. JACOB:
24     Q.   I see.  So if a pretrial bed was
25  open, there wouldn't be a manpower issue?  You

Page 99

1  could move them into there, correct?
2      A.   Well, sure, there's still a manpower
3  issue.  It doesn't change whether a bed becomes
4  available or not.  It's just how expeditiously we
5  can get a person into that bed.
6      Q.   That's great.  So there was no
7  manpower issue that prevented you from actually
8  filling the pretrial bed, correct?
9      A.   Well, there could be a shortage that
10  if a bed came open right now that we couldn't get
11  somebody right then and there into a bed.  It
12  would be a process.
13     Q.   So not instantaneously?
14     A.   That's correct.
15     Q.   Okay.  But within a day or two?
16     A.   Yes, sir.  Possibly.
17     Q.   Okay.  So that would be the same
18  issue, though, if you were to move them into a
19  DOC bed, correct?  Within a day or two?
20     A.   We wouldn't move them into a DOC
21  bed.
22     Q.   Understood.  But if you were
23  permitted to, there wouldn't be a manpower issue?
24  It would be the same thing as filling a pretrial
25  bed, correct?

Page 100

1      A.   We would have to talk about a
2  specific issue.  You know, if there's a portion
3  of the jail that we were housing these
4  individuals and there wasn't a guard, then you
5  would have a manpower issue.
6      Q.   Except for you have that runner who
7  plays backup who can fill any position, correct?
8      A.   Who -- we are short-staffed, and a
9  runner is not always available.
10     Q.   But when I saw a runner available on
11  the documents that I reviewed, then there was one
12  available, correct?
13     A.   I'm not reviewing those documents,
14  sir.  I don't specifically know.
15     Q.   So if there was a runner available,
16  though --
17     A.   I mean, ideally, you know, we have
18  plenty of runners.  But, realistically, we do
19  not.
20     Q.   If the pretrial bed is open, it
21  doesn't remain open?  It gets filled eventually,
22  correct?
23     A.   Yes, sir.
24     Q.   But if the DOC bed is open, it does
25  not get filled at any time with a pretrial

Page 101

1  detainee from the parish, correct?
2      A.   Not that I'm aware of.
3      Q.   And it was not because of a manpower
4  issue that it wasn't being filled?  It was
5  because of an administrative decision to simply
6  contract away those beds, correct?
7      A.   By the time I got there, those
8  decisions were already made.  I don't know who
9  made the decisions.
10     Q.   What I'm saying is, it wasn't a
11  resource issue?
12     A.   Well, those resources weren't
13  available to me in my capacity.
14     Q.   Understood.  But it wasn't a
15  manpower issue that was preventing you from
16  filling that bed?  It was you're told that the
17  bed is not available to you?
18     A.   That's correct.
19     Q.   All right.
20     MR. JACOB:
21         No further questions.
22         (Whereupon the proceedings were
23         concluded at 3:14 p.m.)
24
25

Page 102

```
 1              WITNESS' CERTIFICATE

 2

 3

 4        I, MAJOR RICHARD SAMPSON O'KEEFE, JR., do

 5   hereby certify that the foregoing testimony was

 6   given by me, and the transcription of said

 7   testimony, with corrections and/or changes, if

 8   any, is true and correct as given by me on the

 9   aforementioned date.

10

11

12

13   _____    _____

14   DATE SIGNED         (Witness' Signature)

15

16

17

18        Signed with corrections as noted.

19

20        Signed with no corrections as noted.

21

22

23

24   DATE TAKEN:  January 18, 2023

25
```

Page 103

```
 1              REPORTER'S CERTIFICATE
 2
          This certification is valid only for a
 3   transcript accompanied by my original signature
     and original seal on this page.
 4
          I, ANNA M. ROTH, Certified Court Reporter,
 5   in and for the State of Louisiana, as the officer
     before whom this testimony was taken, do hereby
 6   certify that MAJOR RICHARD SAMPSON O'KEEFE, JR.,
     to whom oath was administered, after having been
 7   duly sworn by me upon authority of R.S. 37:2554,
     did testify as hereinbefore set forth in the
 8   foregoing 102 pages; that this testimony was
     reported by me in the stenotype reporting method,
 9   was prepared and transcribed by me or under my
     personal direction and supervision, and is a true
10   and correct transcript to the best of my ability
     and understanding; that the transcript has been
11   prepared in compliance with transcript format
     guidelines required by statute or by rules of the
12   board, and that I am informed about the complete
     arrangement, financial or otherwise, with the
13   person or entity making arrangements for
     deposition services; that I have acted in
14   compliance with the prohibition on contractual
     relationships, as defined by Louisiana Code of
15   Civil Procedure Article 1434 and in rules and
     advisory opinions of the board; that I have no
16   actual knowledge of any prohibited employment or
     contractual relationship, direct or indirect,
17   between a court reporting firm and any party
     litigant in this matter nor is there any such
18   relationship between myself and a party litigant
     in this matter.  I am not related to counsel or
19   to the parties herein, nor am I otherwise
     interested in the outcome of this matter.
20
21
22
23             ANNA M. ROTH, RPR, CCR
24             CERTIFIED COURT REPORTER
25             NO. 2010021
```

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

## 1

**1**  4:3 17:18 18:7 48:22 85:1
**102**  4:6
**103**  4:7
**10:30**  44:24
**18**  16:24
**19th**  11:4

## 2

**2**  4:4 48:23
**20**  23:14,16 25:9,10 46:12,17,19
    47:14,17,19 55:14 56:3 58:1 60:11
    93:1 94:2 95:13,14
**20-man**  23:13
**20-plus**  36:25 45:23
**20-something**  92:16
**2018**  11:5 88:13,18
**2019**  10:23 11:5 12:5 17:24 24:3
    28:16 50:24 85:10 88:14,19
**2020**  10:21,23
**2021**  10:21
**2070**  6:2
**21**  64:3
**24**  9:20 16:23
**25**  43:4,13,14 44:6
**26**  10:2
**26th**  9:20
**27**  31:8

## 3

**3**  4:4 48:23
**3:14**  101:23

## 4

**40**  16:20

## 5

**5**  4:5
**50-page**  81:3

## 6

**6**  51:14,16,20,22,25 61:18
**6:00**  44:24

## 7

**7**  4:12
**70433**  6:3

## 8

**80**  23:10 61:16 62:5
**88**  4:13
**8th**  11:4

## 9

**91**  4:12

## A

**ability**  50:17 75:21
**above-mentioned**  6:5
**absent**  21:4
**Absolutely**  74:24 89:5 90:3,14
**academy**  17:19 18:1,5 79:4
**access**  93:3,7 96:17
**accident**  7:10
**accommodate**  8:9
**accordance**  5:7
**accurate**  20:21 28:12 31:1
**actual**  26:11
**addition**  6:17
**additional**  87:15
**address**  21:5 22:1 79:23

**addressed**  41:24 83:13
**administering**  5:21
**administration**  13:19 36:6
**administrative**  101:5
**admissibility**  6:23
**advantage**  25:3
**advantageous**  18:20
**advised**  23:8
**affirmatively**  73:14
**aforementioned**  5:4
**agency**  7:24 9:15 34:17 35:14
**aggregate**  23:10
**agree**  39:6 47:13,19 67:20 68:21
    70:6 75:14 89:4
**AGREED**  5:2
**Agreement**  4:5
**ahead**  27:14 28:8 37:25 48:7 58:9
**air**  84:12
**air-condition**  92:11
**allegations**  82:14
**alleged**  47:8
**alleviate**  51:17
**allocated**  88:20
**allowed**  31:19 87:4
**altar**  46:20
**amendment**  77:2,7,9,10,16 78:7
**amount**  27:9 61:8 62:3 63:21 65:9
**and/or**  55:15 56:5
**ANNA**  4:24 5:19
**answering**  98:10
**answers**  8:5,16 9:1
**anybody's**  80:3
**Appearances**  4:4
**applicable**  19:11
**apply**  26:15 31:11
**approved**  40:8
**approximately**  10:2

**area** 15:11,16 23:1,11 29:22,23 31:25 32:2 33:25 36:18 37:7 38:7,16 41:20 42:10 43:22 44:19 45:3,6 47:25 53:12 96:4,5

**areas** 12:17,19 39:3,16 40:8 45:14 89:24

**argumentative** 93:13 94:25

**arrest** 75:23 76:5

**arrested** 65:12 66:24 68:15 76:7,20

**articulate** 78:11

**aspect** 26:6

**assessments** 25:15,16

**assigned** 11:2 87:16 88:11

**associates** 84:22

**assume** 67:17 68:6

**assuming** 27:4 60:23

**ate** 49:20

**attention** 37:14 69:22

**attorney's** 22:22 51:18

**average** 28:3 73:8

**averages** 28:2

**aware** 23:1,16 24:1 33:20 34:2 42:7, 11 44:6,13,20,25 45:21,25 47:25 48:3,11,14,25 49:4,8,12,25 50:16,23 51:25 52:6,9,11,17,21,22 53:1,21,24 54:2 55:23 56:9 60:7,19 80:23 83:21,25 84:4,10,12 96:8 97:14 101:2

---

**B**

**back** 12:22 13:1,16,22 15:10,11 17:1 22:20 25:5,9,11,17,22 26:8,19 27:10 32:16 40:7 44:4 47:5 50:5 51:8,11 53:10 54:13,15 59:14 62:12 63:14,17 65:7,10 70:23 71:15 72:15, 25 73:4,17,18 86:9 89:18,24 96:3,6, 24 97:23 98:19,21

**backup** 100:7

**bad** 69:16

**bank** 85:5

**based** 26:3 75:22

**basic** 9:25 79:4

**basis** 16:18

**bed** 25:4 59:9,11,13,16,21,24 72:24 73:3 74:9,11,19 85:13,21,23,25 86:2,5,9 91:15,24 95:15,22 96:9,10 97:1,12 98:24 99:3,5,8,10,11,19,21, 25 100:20,24 101:16,17

**bedding** 32:14,23 33:13

**beds** 25:10 32:19 53:22,25 54:3 55:15,16 56:5,21,25 57:7,19 58:2,7, 13 59:1,6 60:11 65:6 71:18 72:1,18 73:20,25 74:3 86:6,14,25 87:15 89:3,6 92:20,21,25 93:1,2,4,8,19,20 94:1,2,3,4 95:10,13,14 96:17,20 97:8,9,12 101:6

**begin** 9:1,5

**bench** 86:8

**bird** 14:7

**bird's-eye** 16:5

**bit** 51:23 65:25

**blanket** 32:15 92:12

**blankets** 66:6 69:21

**blocks** 18:10

**blood** 48:11,13,22,25 82:22

**bodily** 82:15 83:10 85:12

**bonded** 50:4 51:7 52:5 61:22 65:10 70:24

**bonding** 12:13 13:19 20:18 94:15 96:18 98:21

**booking** 12:13,21,22 13:1,6,19 20:17 25:7 28:22 29:6 31:25 45:6,8 94:14 96:18 98:20

**boots-on-the-ground** 36:16

**BOULEVARD** 6:3

**box** 41:21

**boys** 46:20

**break** 8:8,11,13 75:7

**bring** 11:22 31:1,4 96:3

**brought** 37:14 54:15 75:22 76:8

**bug** 65:20

**building** 13:9,10,11,18,23 14:1,12, 16,20 15:2,5 36:11,12 38:8,12,25 39:7,21,22 44:12 53:15,18

---

**buildings** 53:8,14

**business** 14:11,16

**busy** 15:5

---

**C**

**call** 35:4 61:17,24 89:18

**called** 15:19

**capacity** 22:25 23:5 93:4,8 101:13

**captain** 11:6 12:9,10,12 59:12 87:3 88:18 94:14 96:18

**captains** 36:6,25

**Caption** 4:3

**car** 7:10

**care** 46:10 64:9

**cared** 64:18

**careers** 84:23

**case** 6:20 7:17 37:6

**caught** 59:10

**CCR** 4:24

**cell** 23:1,11,14,16,18,21,25 24:4,7, 24 25:18 29:22,23 31:8 32:22 36:17 37:7 41:9 42:10 43:6,22 44:19 45:3, 23,24 46:18 47:9,14,15,16,20,22,25 48:12 49:1,16,17 54:14 55:15 56:4 59:22 62:4,22 65:8 71:9 75:10 83:23 90:10 91:14 92:15 95:22

**cells** 14:2,5 15:17,18,21,25 16:3,8 19:15 20:24 21:7,13 22:14 24:9 25:23 28:18 29:7,13 33:18 47:2 48:1,5 49:6,10,13,23 50:25 51:12 54:7,10 56:21 57:18 61:4,9 63:1,5, 20 64:2,6,10,12 65:1,16 68:24 69:17 89:18 90:5,20 91:3

**cement** 33:7 69:19 70:9

**certainty** 39:5,11 82:3

**Certificate** 4:6,7

**certification** 5:9

**Certified** 4:25 5:19

**Chad** 6:8

**chain** 31:2 41:25

**change** 66:10 81:19,22 86:21 87:19 99:3

---

charge 12:17 44:5 90:21

charges 82:10

checked 39:14

checklist 79:13,16

chief 10:10,11,13,14 60:18

child 91:13

children 91:11,12

choice 66:19,20,21 67:7,8,12,20,25 69:10,12,13 75:11

Civil 5:6

claim 83:15

claims 81:12 82:20

class 18:10,21

clean 47:17 48:10 49:19 83:2 90:13, 19

cleaned 48:15,22 49:3 59:11 83:1, 17 90:6

cleared 26:21

close 10:19

closer 27:24 28:9

clothes 81:19,23

co-counsel 7:12

Code 51:14,16,17,20,22,25 61:18

codes 18:8

Collings 4:13 6:10,15 46:3 54:22 55:3 64:13 66:1,25 67:13 68:1,16 70:1,19 71:11 74:12,23 75:2 78:22 85:14 87:6,11,20 88:6,8 89:1,12 90:24 91:5,16 92:6 93:12 94:18,23 96:14 97:19 98:1,5,9,15

COLLINS 6:2

combine 89:16

comfortable 91:13,22

command 41:25

comment 41:21,22

Commissary 12:14

commissioner 22:21 61:2,7,20 62:15 76:13

common 84:6,9

complain 40:25

complaint 41:5,8,11

complaints 11:9 40:18 41:13 42:2, 6,9 43:5,9,21

completely 68:23 69:1

compliance 36:19 80:13

complied 19:5 30:16 36:1 80:8

complying 35:7,14 37:8 79:8,14,20

computer 43:20

computers 12:2

concern 35:18,19 36:4 73:21 79:24

concerned 35:25 79:19

concluded 101:23

concrete 65:17 66:9 70:17 71:3 73:9 74:1 86:7 91:4 92:5

condition 9:11

conditions 16:3 33:21 34:3,13

confinement 25:19,20 26:12,16 33:21 34:3

considered 33:6 65:25 84:16

constant 65:9

constitution 76:24 77:2,17

constitutional 77:14 78:11 79:9

continue 8:20 75:7 86:23 87:5

contraband 16:21

contract 52:18 57:4,6,9,11 58:18 59:19,24 74:6 101:6

contracts 52:6 60:3,4

contractually 87:16

control 15:16 73:23

conversation 34:23 35:6,13 79:6, 11 80:5,10

convicted 77:20,24 78:13

corporal 20:13

corporals 19:18

correct 12:6,7 13:12 14:14 27:7,20 30:9 32:15 34:24 37:9 38:23 42:4, 21,25 43:4,15,18,25 44:9,14 53:6 55:13 57:5 58:14,15,19,21 59:1,7 60:22 66:14 67:16 69:7 72:10,18 74:11 76:6,24 78:5 80:8,20 81:4 83:6 84:17 85:9 86:2,13,16,19,23

87:1,5,19 89:7 92:16 94:22 95:3,5 96:10,13 97:2,18 99:1,8,14,19,25 100:7,12,22 101:1,6,18

Correction 85:4

corrections 14:12 16:16 17:5,17,22 18:1,2 26:10 32:8 40:7 50:12 79:5 84:22,24 85:5,7

correctly 30:4,13

counsel 4:5 5:3 95:1

counseled 43:23 44:1

count 56:7,11,16

counts 22:18

court 4:25 5:19 6:5,18 8:23 54:13

covered 45:18

COVINGTON 6:3

created 74:7

credit 16:25

crime 69:25 70:18 71:5,10,22

criminal 18:8

criteria 52:10

crowded 84:2,7

cut 27:14

___

**D**

___

dad 91:20

daily 22:17 56:12,17 82:25 90:6

danger 46:17

dangerous 45:22 46:1,2 47:3 60:10

data 43:16 44:16

day 12:25 16:24 18:9 20:3 21:12,22 27:22,25 28:4,9 30:18,23 31:23 61:14 63:7,8 83:18 90:12 99:15,19

day-to-day 13:4 15:9 16:18 21:16

days 14:18 28:11 61:20 63:9,11 64:3

deal 51:22 52:1 93:20

December 9:20 11:5 88:13,14

decide 75:23

decision 57:8 69:14 101:5

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

decisions 101:8,9

decreases 83:23

Define 12:20

defining 89:3

definition 26:11 92:24

delay 89:22

deliberate 90:5

Department 40:6

depend 30:24

Depending 24:16

deponents 22:11

deposed 22:2,4

deposition 5:4,16 6:17 7:7,19 22:6 81:6

depositions 6:19

depressing 45:11

depth 39:13

deputies 19:18,23 30:1,4,9,14,20 48:13

deputy 10:13,14 41:6,7 44:8 96:3

describe 46:24

describing 42:18

designated 53:22,25 54:3 57:7 58:18 59:7,24

designed 25:19

desk 21:20 55:24

detainee 27:6,20 28:4 32:22 33:13 38:15 52:24 53:3 58:24 77:16 78:13 85:11 92:25 97:2,13 101:1

detainee's 67:20

detainees 13:12,23 32:12 33:18,22 34:4,13,18 35:8,16 47:1 49:16 53:7 54:4,6,7,9,10 55:9,10,11,14 56:4,20 57:1,17,21 58:17 59:15,23 73:8 75:10,19 77:14,19,24 86:15 89:17, 23 95:11,18

determination 76:16

determine 60:9

Devon 7:12

difference 53:5

differently 75:19 77:20

difficult 45:17

direct 8:5 12:18 32:21 56:19

directly 12:20 34:25 35:2

dirty 47:16,18 82:17

disadvantage 14:23

discipline 21:18

discuss 61:7

discussing 69:11

discussion 35:4 36:13

district 22:22 51:18

division 11:7 12:13 16:14 18:18 32:4 85:2

divisions 16:12

DOC 37:16,22 38:1,3,7,9,11,12,25 39:7,14,21 40:1,6 52:7,18 53:2,7,25 54:9,13 55:11,15 56:5,21 57:8,19 58:2,11,19,25 59:9,19,24 60:4,5,11 73:25 85:13,21 86:1,9 91:15 92:20 93:1 94:2 95:14,22 96:9 97:1,12 99:19,20 100:24

document 40:11 54:20 55:7 81:3, 14,15

documentation 54:21 55:8

documents 100:11,13

dog 66:4

Donna 61:17

door 14:9 15:17 65:11

doors 14:7

Dorm 48:9

dorms 13:15,20 53:9

DPS 40:6

duly 6:4

_____

### E

e-mail 41:15

e-mailed 56:13

earlier 45:10 74:5 75:9 97:6

eat 49:17

educate 36:4

Eighth 77:1,9 78:6

emerging 44:15

emotional 83:23

empathy 70:9,16

employed 10:24

employee 43:8

empty 74:18 91:15

encompassed 39:23

end 13:18

ended 16:17

enforcement 10:3 17:9

engaged 57:11

enjoy 77:24

enjoyed 78:12

ensuring 21:1 25:13 26:20

enter 57:9

entire 21:10 38:13,20 39:3 40:2

entirety 81:8

environment 69:21 84:7 86:1 92:11

envision 66:4

essence 15:3,9 30:20

establish 82:18,24

ethic 17:14

evaluate 30:12

events 7:23

eventually 100:21

evidence 5:17 80:23 82:17,23 83:15,21

exact 28:14 82:10

EXAMINATION 7:1 88:8

excuse 39:21 88:13

existed 76:4

existence 43:15

expedite 52:5 61:21

expeditiously 99:4

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

**experience** 26:4

**explain** 8:19 33:4

**extended** 65:9

**extent** 6:21

**eye** 24:10

**eyes** 15:24

---

**F**

**facilitate** 51:7 72:25

**facilities** 24:11 83:4

**facility** 14:13 21:11 23:24 39:3 40:2
 45:12,15 52:8,15,19 75:22 76:9
 84:17 88:21 89:14 91:21 96:20
 98:20,21

**Facility-wide** 41:4

**fact** 48:3 59:6 63:20,25 66:13 70:16
 71:1,2 72:2,7,9 81:13 82:18

**factual** 7:20

**fair** 6:14 7:11 8:14 9:14 39:1,18
 42:17 56:15 69:15 82:7

**fall** 10:8

**false** 81:13

**familiar** 22:7,9 23:11 32:17 34:20
 51:14 70:11 78:1 93:18

**familiarizing** 18:19,22

**family** 91:2

**feasibly** 26:19

**feces** 48:4 49:9 82:15,22 83:16 86:3

**fed** 39:22 53:19 57:8 69:21 73:25
 86:9 95:14

**federal** 5:5 11:8 19:5 33:16,17
 34:12 35:7,15 37:17,23 38:4 39:10,
 15,19,25 52:7,12,23 53:11,22 54:6
 55:9,16 56:5,21 57:19 58:2,19 59:1,
 16 60:4,5 76:23 77:2,13 78:12 79:8,
 15,20 80:7,14 85:13,21 86:2 92:20
 93:1 94:2 96:10 97:1,12

**feds** 39:22 53:8 58:10 59:19,25

**feed** 83:3

**fell** 12:14

**felt** 67:9 80:2

---

**female** 13:19,20

**fighting** 45:17

**fights** 49:2

**figuring** 27:17

**file** 42:23 43:2,16

**filed** 43:13 63:17 80:20

**filing** 5:9

**fill** 100:7

**filled** 58:17 92:25 94:1 95:13 96:9,
 10 97:1 100:21,25 101:4

**filling** 58:13 97:12 99:8,24 101:16

**find** 44:16

**fine** 55:1 66:12

**fingerprinted** 27:11

**fingerprinting** 26:23

**finish** 8:25 98:6,16

**fire** 22:24 23:3,13,15 62:9

**fixed** 31:1

**floor** 19:22 20:4,6 28:13 30:1 48:1,4
 49:5,9 66:14,15,18 82:16 85:11 86:8
 90:12 91:14

**floors** 48:10 82:17,22 83:10

**fluids** 82:15 83:10 85:12

**fly** 14:8

**folks** 20:4 25:6 51:17

**follow** 41:25

**food** 66:5 83:3 92:12

**form** 5:13 40:24 46:4,6 64:14 66:2
 67:1,14 68:2,17 70:2,20 71:12 74:13
 78:23 85:15 87:7,21 91:6,17 92:7
 96:15 97:20

**formal** 17:16

**formalities** 5:8

**formality** 5:11

**forms** 76:12,14

**forthcoming** 41:23

**found** 37:12 43:1

**four-dorm** 53:17

**Fourteenth** 77:6,10 78:7

---

**Fourth** 78:6

**frame** 33:24

**frequent** 20:1

**fresh** 84:11

**front** 13:18 14:8 25:4,7 73:21 94:10
 95:16 97:15 98:20

**frustrated** 61:1 62:11

**full** 7:4 9:4

**function** 18:13

**furthered** 50:8,12

---

**G**

**games** 7:21

**gave** 16:24 24:9 36:9 82:12 94:9

**general** 13:3 17:9 24:7,24 26:22
 32:11 44:23 45:4 97:22

**generated** 40:3

**gentleman** 73:20

**gentleman's** 6:25

**geographically** 14:1

**gestures** 8:16

**give** 6:8 7:2 80:17

**good** 8:15 62:18 88:3,5

**govern** 23:17 33:17

**governed** 33:12 34:3 35:22

**government** 34:17 37:17 52:12

**governs** 34:12 77:10

**grab** 13:2 15:6 68:4

**great** 99:6

**greater** 77:24

**grievance** 42:18,22 43:1

**grievances** 43:13 44:7

**guard** 43:5,13,21 44:12 100:4

**guards** 42:9

**guess** 9:3 14:7 15:18 16:5 17:23
 25:25 26:6 38:24 41:19 48:17 74:15
 84:21

**guilt** 76:16

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

**guilty** 66:23 67:4 75:15,21,24

**guy** 15:4 46:9,11 73:2 91:22 92:2

**guys** 46:14 47:17,18 85:1,3,4,5

---

**H**

**half** 15:12

**hall** 83:1

**hand-me-down** 29:19

**handcuffs** 76:22

**hands** 8:24 49:20

**happen** 71:2 82:4,18,24

**happened** 65:13 71:21 82:6,9

**happy** 8:9

**harm** 46:13

**Harton** 7:12,13,14,16 88:2

**head** 42:15 77:5,8 78:14

**heads** 45:19

**heard** 51:16 70:4

**hearing** 41:16 80:5 82:2

**heat** 92:11

**held** 76:8 86:4

**helped** 18:13

**helping** 62:19

**hereto** 5:3

**hey** 31:13,16 33:6 41:22 61:20 64:22

**hierarchy** 10:9

**high** 31:14 84:16

**highest** 20:6

**history** 17:14

**hit** 24:22

**hold** 12:8 65:5 71:16 98:2,10

**holding** 13:13,14,20,21 14:2,5 15:11,16,18,21,25 19:15 20:24 21:7, 13 22:14 23:1,11,14,18,21,25 24:4, 7,9,24 25:10,18,22 28:18,24 29:7, 13,22,23 31:8 32:22 33:18 36:17 37:7 40:18 41:9 42:10 43:6,22 44:18 45:3,22,23 47:2,9,14,15,16,20,22,24 48:1,4,12 49:1,5,9,13,16,17,23

**50:25 51:11** 54:7,10,14 55:15 56:4, 21 57:18,22 58:1 59:9,11,16,22 61:4,9 62:4,22 63:1,5,20 64:2,6,10, 12 65:1,8,16 68:24 69:17 71:9,17 74:19 75:10 83:4 86:4 89:18,23 90:5,10,20 91:3,14,21 95:22

**home** 91:20

**honor** 59:19

**hope** 83:12

**hour** 15:12

**hours** 16:23,24 20:3

**house** 25:7 45:22

**housed** 33:19 34:14,19 38:9 39:15 47:9 52:13,19 53:11 55:9 61:8 63:15

**housing** 35:8,16 38:7,16 52:8,23 53:2 61:3 88:20 100:3

**human** 21:17

**humane** 66:4 92:4,9

**hung** 15:8

**hurt** 46:10

**hurting** 24:12

**hypothetical** 31:7

---

**I**

**idea** 27:3,19

**ideal** 27:1

**ideally** 100:17

**imagine** 25:21 40:5 41:14

**immediately** 22:1 24:17

**impaired** 24:13

**impossible** 8:19

**improve** 41:22

**incident** 48:20,21 80:1

**incidents** 40:13 49:12

**Including** 38:15

**increased** 46:17 47:21 84:8

**increases** 84:14

**indication** 55:8

**individual** 9:24 24:18 25:13 27:10 30:9 71:16 84:14 91:25

**individuals** 19:19 24:10,20 50:4 65:5 66:5 67:11 68:6 73:16,18 95:7 100:4

**industry** 83:22 84:13,20

**information** 7:25 23:9 55:24 56:8 62:11 83:22 84:1

**informed** 84:20

**inhumane** 65:25 92:10

**inmate** 27:2,5 42:22 43:14 45:8 52:23 58:13 74:10 78:12 83:24 84:3, 8 85:13,20 95:21

**inmate's** 42:23 43:2,16

**inmates** 16:8 38:9,11 39:15 40:19 41:1,2 42:19 43:6 45:22,23 46:18 47:14,15,22 49:22 52:7,13,18 53:11, 22,25 54:13 57:19 58:19 60:5 61:8 63:15,20,25 64:1,6,10 77:20,25 78:20 80:24 82:16,21 83:16,22 88:20 89:17 96:19

**inmates'** 79:8

**innocence** 76:16

**innocent** 68:23 69:1 75:15,19,21,24

**innovative** 17:7

**inoperable** 59:13

**inside** 88:18

**inspect** 38:19

**inspected** 38:12 39:21,22

**inspecting** 39:7

**inspection** 38:8,22,25 39:11,23 40:1

**inspections** 37:11,16 38:2,6 39:12, 19 40:4,12

**instance** 13:8 15:11 16:8 19:3 38:7 46:25 52:12 77:18

**instances** 48:25 49:4,8

**instantaneously** 99:13

**instruction** 18:11

**intent** 89:22,25

**interacted** 11:20

**interest** 50:8,11,12 59:18

**involved** 84:22

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

**issue** 21:20 31:5 35:22 36:22 37:5, 13 50:16 59:3,6 61:11 63:23 92:21 93:2 95:24 96:8,12,13,25 97:11 98:22,25 99:3,7,18,23 100:2,5 101:4,11,15

**issues** 21:5,15,18,24 78:4

**items** 49:19

---

**J**

**Jacob** 4:12 6:7,13 7:1,12,15 40:10, 15 46:15 54:19,25 55:6,12 64:17 66:8 67:5,15 68:10,20 70:5,25 71:19 74:16,25 75:5 79:1 85:19 87:17,25 88:4,22 89:8 91:1,10 92:3,14 93:14 94:20 95:2 96:22 97:24 98:3,7,12,23 101:20

**jail** 11:3,5 12:12 13:16 14:24 16:11 17:2 18:13,17,25 19:1,6 26:7 32:5, 17 36:9 38:10,13,20 39:24 52:2 53:10 60:12 62:19 66:20,22,23 67:7, 23 68:6,9 69:1,3,10 77:10 88:11,18 89:19,24 90:21 96:4,6 100:3

**January** 88:12

**job** 8:15 17:5,8,9 30:4 62:19

**Jr** 6:1 7:6

**judge** 67:18 76:3,9

**judges** 51:19 61:2 62:15 67:3

**jumping** 98:11

**jury** 94:11 95:17 97:16

---

**K**

**keeping** 62:2,3

**kid** 91:20

**kind** 17:8 36:8,9,21 45:14 51:23 62:13,14

**kitchen** 12:14 20:18

**knew** 15:8 31:13 34:7 57:14 62:5 78:16 86:19 91:14

**knowing** 71:20

**knowledge** 30:5 50:21 89:22 90:18

---

**L**

**Lacey** 22:9

**lady** 73:20

**Landrum** 61:18

**law** 5:7 10:3 17:8 23:17 34:12 36:19, 20 78:1 79:15,20 80:7

**law'** 80:14

**laws** 19:5,11 33:16,17 34:2 35:7,21 37:8

**lawsuits** 11:9 63:13,24 80:20

**lay** 66:12

**learn** 18:17 62:21 63:19,25 64:5,9, 18,19

**learned** 72:16

**leave** 12:4 41:21 65:8

**length** 23:20

**letting** 15:2 86:24

**level** 20:6 21:6 78:12 84:14,17

**lieutenant** 16:14 17:11,13 19:19, 20,21 20:8,20 21:1 29:25 30:17,19 31:6,7,18 35:6,13 36:16 37:2,4,6 44:5 64:24 79:7,21

**lieutenant's** 37:5

**lieutenants** 20:15 34:24 79:14 80:6

**life** 66:7

**lights** 44:19,23 45:3,9,15,16

**limit** 22:25

**limited** 17:1

**Listen** 60:11 73:8

**literally** 15:24 74:10

**living** 62:23 63:1,5

**location** 55:10,19

**lockdown** 14:13

**locked** 92:15

**log** 41:12 43:8 44:3,13

**logged** 42:6,13 43:11 44:7 54:17

**logging** 40:17 42:14

**logic** 57:12

---

**long** 7:9 9:18 23:24 24:3 26:1 27:19 64:25 65:21 73:3

**long-term** 25:19 26:12,16

**longer** 63:15

**longest** 63:4

**Longino** 22:6

**looked** 56:16 66:11

**lot** 18:8

**Louisiana** 5:21 6:3

**low** 62:1,2

**lower** 22:23 61:16 62:12

---

**M**

**made** 6:16,18 9:20 19:17 41:7 43:21 48:14 68:12 69:13 101:8,9

**magic** 70:22

**major** 6:1 10:7,18 12:5 21:23,25 88:9

**majority** 61:20

**make** 6:24 20:4 30:8 39:8,17 40:11 41:11 46:6 47:15 57:16 60:12 61:23 92:23 93:23

**making** 21:15 30:2

**manpower** 25:12 26:20 50:14,15 89:14 95:7,24 96:8,12,25 97:11,17 98:18,22,25 99:2,7,23 100:5 101:3, 15

**manpower-wise** 96:11

**marine** 11:7

**marshal** 22:25 23:3,14,15 62:9

**matter** 7:18 11:11 30:23 43:24 44:2 58:23 71:21,24 72:3 75:25 80:20 86:24

**matters** 71:23

**mattress** 32:14,19

**maximum** 47:6

**meal** 49:15

**Meaning** 12:21 27:22 47:8 60:8

**means** 58:12

**medical** 9:11 24:14,17,19 26:21 47:21 66:6 69:22 92:12

---

medication 9:11

meeting 80:13

member 91:2

memory 77:3

mentioned 25:1 26:18 45:10

mind 29:3 76:17

mindful 45:13

minutes 75:1

mispronounce 7:16

mistakes 68:11

mixed 53:20

money 52:22 53:2

months 17:21

mop 48:10

mopped 90:10

morning 44:25 90:11

motivator 17:7

mouth 28:8

move 85:13 95:21 99:1,18,20

moved 17:4 50:5 58:25 85:21,22 86:1

moving 88:20

murderer 47:8

murders 46:20,25

N

names 11:13

narcotics 16:14

naturally 7:24

nature 21:19

NCIC 26:23

necessarily 15:16 29:25

necessities 66:7

needed 19:5 20:5 31:3 36:1 62:5

night 83:17,18

norms 28:2

November 11:4,5 88:13

number 22:23 31:14 35:20 61:15,25 62:2,3,6,8,12

number-wise 78:7

numbers 22:18 61:8

O

O'KEEFE 6:1 7:6 88:9

oath 5:21

Object 46:4 64:14 66:2 67:1,14 68:2,17 70:2,20 71:12 74:13 78:23 85:15 87:7,21 91:6,17 92:7 96:15 97:20

objection 6:9,12,16,18,24 88:23 89:9 93:13 94:19

objections 5:13 46:6

observed 80:2

occur 41:17 58:3 90:15

occurred 79:3

occurring 39:20 58:6

office 6:2 9:17,23 10:24 13:8,25 14:4,11,15,16 20:1,2 22:3,5,22 41:20 51:18 61:19 90:9,19

officer 67:9 76:11

officer's 67:12

officiated 5:21

officio 76:11

on-the-job 84:21

one-man 30:24

open 55:15 56:5,22 57:18 58:2,7,12 72:24 73:25 74:9 86:9 87:1,15 92:20 93:1 94:2,3 95:13 98:25 99:10 100:20,21,24

open-door 36:21

opened 17:11

opening 17:11

operated 29:13

operating 12:3 34:16 72:10,13,14

operation 29:8 36:13

operations 21:16 32:4

opinion 62:20 69:12 71:3

opportunity 7:19,21 24:10 61:7 75:6

opposed 24:7,24 26:12,16 45:23 46:18 47:14,21 86:1

option 74:3

order 7:25

ordinary 21:21

outdoor 49:23

overcrowded 51:11

overcrowding 22:14,16 50:25 51:4,22 52:1,4 60:9 61:11

oversaw 19:19

oversee 31:25 96:3

overseeing 28:21 47:24

overseer 21:16

oversees 36:16

P

p.m. 101:23

painted 96:5

paper 13:3 15:6

parish 5:20 6:2 13:23 52:24 53:3,7 54:3,7,10 55:10 56:19 57:17 58:17, 25 59:23 60:4 97:2 101:1

parking 47:10

parole 22:22

part 5:16 13:22 14:13 56:1 62:18

parties 5:3

passed 37:11

patrol 16:11,22 85:1,3

pattern 44:12,15

paying 52:12

pending 8:12

Penologic 50:10

penological 50:8

people 12:3 15:3 16:20 21:14 22:20 23:10 29:24 33:6 45:11,17 47:20 51:7 52:5 57:22 61:14 62:19,23 63:1 64:25 65:7,10,11,16 68:8,23 70:9 71:15 72:1,14,18 73:23 74:1 75:14

76:7 92:5,16 97:23 98:19

**perfect** 68:19

**period** 11:1

**periods** 65:17

**permitted** 34:14,18 60:5,15,21 99:23

**person** 19:24 24:17 43:10 64:22 68:14,25 75:21 81:18 99:5

**personal** 11:16 62:20

**personally** 11:20 36:18

**personnel** 17:5 45:5

**persons** 7:25

**pertain** 29:12

**pertained** 28:17

**photographs** 27:13

**phrase** 70:4

**piece** 13:2 15:6

**pillow** 32:14

**place** 23:18 24:3 41:18 44:6,16 47:6 51:21 52:7 57:4,6 74:6 82:5 83:23 85:10

**places** 95:7

**plaintiffs** 7:18 11:14

**plan** 51:21

**play** 7:21

**played** 25:16

**plays** 100:7

**plenty** 100:18

**point** 8:7 30:25 74:10 75:24

**pointed** 83:12

**Police** 85:1

**policies** 18:16,22 19:12 28:17 29:2

**policy** 18:19 24:2 28:24 29:1,11 36:5,21 58:24 90:8

**population** 24:8,25 32:11 44:23 45:4

**portion** 90:21 100:2

**position** 16:17 17:4 73:2 87:14 100:7

**possibly** 60:17 63:10 79:5 92:13 95:25 99:16

**POST** 17:18,22 18:1,7,15,21 19:13 79:5 84:24

**potentially** 74:18

**practice** 58:24 76:11 85:10,18 86:10,13,16,18 87:19 90:9

**PREA** 17:20

**prepared** 75:7

**preparing** 81:5

**presented** 80:1

**presently** 31:24

**pretrial** 13:12,15,23 32:11 33:13,18, 22 34:4,12,18 35:8,16 38:15 47:1 49:16 53:6 54:3 56:20 57:1,16,17,21 58:17,24 59:15,23 75:10 77:14,16, 19,23 78:13 85:11,24 86:5,15 92:21, 25 93:3,7,20 94:1 95:11,13,18 96:19 97:8,9,13 98:24 99:8,24 100:20,25

**pretrials** 53:15,19

**pretty** 10:19 20:21 24:22 39:20 48:9 57:21 61:19 84:16 92:1

**prevent** 9:12

**prevented** 50:16 96:9,13,25 97:7, 18 99:7

**preventing** 97:11 101:15

**printer** 15:7

**prior** 16:16

**probable** 67:10 75:23 76:2,3,4,12, 14

**probation** 22:22

**problem** 21:3 73:11,17 94:21 95:3

**problem-solving** 21:3,17

**problems** 47:21

**procedure** 5:6 29:15,17,18 81:24 82:5 83:5

**procedures** 18:8,16 27:5 29:2 34:17 54:12 82:8

**proceedings** 101:22

**process** 24:15 27:1,19 28:5 30:20 40:17,22 41:12,18 42:18 50:3 65:9 71:14 90:5 91:8,19,23 97:22 99:12

**processed** 27:11

**processes** 28:14

**processing** 26:22 27:5 89:17

**produced** 40:14

**program** 52:1

**promoted** 15:1 16:16 19:7,8

**promotion** 16:10,13

**prone** 24:12

**pronounced** 22:7

**proof** 81:7

**proper** 41:25

**prove** 81:15

**proven** 75:15

**provide** 50:17

**provided** 18:23 19:4 21:2 32:22 33:13 49:23 52:18,22 53:2 57:7 59:22 66:6 69:20,22 77:12,23

**providing** 43:14 50:9,13

**punitive** 89:24

**purpose** 24:7,23 65:7

**purposes** 5:6

**put** 28:7 46:17 47:2 51:21 54:6,9,14 56:21 67:10 68:5 69:1 84:9 95:7

**putting** 26:23 55:1 69:3 97:11

---

### Q

**question** 5:14 6:22 8:11,12 9:4 25:23 29:9 32:7 33:3 36:23 41:10 43:12 46:5 51:9 56:2 60:16 65:23 67:23 72:22 73:13 80:15,25 81:9 83:14 93:18 95:9,12 96:24 97:10,25 98:8,13

**questions** 6:25 7:20 8:1 9:1,8 24:15 26:22 36:7 73:5 93:10 101:21

**quick** 25:5

**quicker** 8:6 62:19

**quickly** 25:12 26:7,19 72:15

---

### R

**rank** 10:6 12:8 20:19

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

rarely 19:24

re-ask 72:8

reach 21:20

read 28:24 36:5 81:12 82:11

reading 5:11 81:4

realistically 100:18

reason 7:22 8:8 9:7 25:8 57:6 58:16 59:17,21 60:6,20 65:4 71:16 92:1

rebut 80:23 83:15

recall 21:23 22:1 28:23,25 29:1,2, 10,11 34:5 35:5,12 36:14 39:15,19, 25 43:3 44:3 47:11 49:21 53:14 54:12,16 58:6 59:12 60:13 63:5,6 75:12 77:21 78:8,18 79:10 80:9,12 88:10

receive 17:15 19:9 56:12

recently 16:13

recess 75:4

recollection 11:17 22:15

reconstructed 96:5

record 7:5 8:20 44:2 46:7 55:2

recording 6:16

recreation 49:24 50:9,13,17,19 84:12

REEXAMINATION 91:1

reference 80:10 81:8

Refresh 77:3

refuse 90:19

regular 17:18

regularly 56:17

regulation 33:12

regulations 19:10 29:12,15 30:15 31:10

reiterate 95:6

related 18:16 40:18

relation 13:9

relationship 15:5

relationships 15:2

release 73:23

released 22:21

remain 100:21

remember 17:21 20:19 24:19 34:8 38:2 40:23 42:24 81:18 82:9

report 40:3

reported 4:23 22:13

reporter 4:25 5:19 6:5,18 8:23

Reporter's 4:7

represent 7:18

representative 22:3 61:18

request 40:12 54:20,24 55:7,11

requirement 16:22 17:22

reserve 9:21,22 16:21

reserved 5:15

resource 27:18 59:6 93:2,5 94:3,5, 7,11,13,15,17 95:15 97:7 101:11

resource-type 21:18

resources 73:15 88:19 89:2 93:15, 16,21 95:8 101:12

respect 13:25 16:10 17:16 18:24 19:4 20:24 23:20 35:8,15 36:17 37:15 38:5,6,8 39:18 42:9,17 43:5 44:7 49:15 52:8 77:13 81:11 84:11 97:17

respective 12:17

response 24:16 95:15 98:16

responsibilities 12:11 19:14 21:13

responsibility 20:23 48:10

responsible 19:25 21:10 23:4 30:18 32:2 45:6

responsiveness 5:14

rest 39:24

restraints 28:15

restriction 23:16,23

result 40:4

reviewed 11:8 80:19 81:12 100:11

reviewing 81:5 100:13

Richard 6:1 7:6

rights 77:14,24 78:11,19 79:9 80:3

risk 25:13 46:17 47:21

role 30:21

roll 25:9,17

rolled 25:5 65:10

rotating 20:14

ROTH 4:24 5:19

roughly 44:24

RPR 4:24

rule 69:7

rules 5:6 19:9,10 29:12,14 30:15 31:10

run 41:9 42:10

rundown 36:9

runner 100:6,9,10,15

runners 100:18

running 73:10

S

safe 88:19

safer 60:12

Safety 45:16

Sam 7:12

Sampson 6:1 7:6

save 5:13

scarce 88:21 92:21,24 93:2,6,11,15, 16,19,21,25 94:4,8,11,17,22 95:4,6, 7,10,15,18 97:7

scarcity 89:6,13 92:19 97:17

scofflaw 47:9

scope 38:22 39:6,11

screen 15:24

screening 24:14

sealing 5:8

search 16:20

secure 14:7,13,20

security 47:6 59:12

send 40:7 41:15 54:23

sends 67:18

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

senior 17:13

sense 22:4 39:8

separate 18:15 43:8

separated 53:17

separation 53:20

sergeant 20:9,10,13 30:19

sergeants 19:18,22 21:5 29:25

served 16:25 59:18

set 22:25 26:14,17 27:4 62:7

sets 22:25

shakedown 16:19

sharing 96:24

sheet 32:14 56:7

sheets 56:11,16 57:15

sheriff 10:16,17

sheriff's 6:2 9:17,23 10:24 22:3,5 41:20 90:9,19

shift 13:6 20:13

shifts 19:17,25 20:14

short 25:21 26:1,2,5,7

short-staffed 50:21 93:21 100:8

short-term 25:19 26:11,15

shortage 99:9

show 30:24 81:14

shower 81:20,23

showers 66:6 83:2

side 14:12,16,20 16:16 25:7 58:10

sign 76:11,13

signing 5:11

simply 47:2 101:5

single 27:2,19 44:8

sir 8:22 9:6,10,13 10:4,22,25 11:10, 12,15,18,21,25 13:4,7,24 14:3,17 15:22 16:1,6,9 19:1 22:12 23:4,19, 22 30:6,11 32:9 33:8,23 34:15 35:9, 17 38:14 44:21 48:2,6 49:7,11,14,18 50:14 51:1,13 52:20,25 53:4,23 54:1,5 56:7,10,14,18,23 57:11 58:20 59:2 60:1,25 61:10 62:24 63:3,22 64:4,8 65:2,14,18 66:16 67:4 69:8,

11 72:19 74:6 75:8,13,16 78:2,14,25 79:11,17 80:16,21 82:19 83:20 84:15,18 85:18 86:11,17,20,22 88:12,16,25 89:11,15,20 90:1,7,17, 22 91:2,9 92:17 93:22 99:16 100:14, 23

sit 20:2 29:4 34:10 38:21 78:20 80:22 96:8

sitting 68:23

situation 27:1 51:4 60:9,12 61:3 84:2

situations 62:21 68:22

skills 17:6

sleep 66:17 71:2 83:9 86:7 92:5

sleeping 33:6 45:19 65:17 66:9,13 69:19 70:9,12 73:9 74:1 82:16,21 83:16 85:11 91:4,13

slept 66:15 70:16

slow 89:17

smart 12:2 28:20

sole 48:9

solely 30:18 53:15

solve 31:4

sort 14:11 21:21 29:18 41:16 50:11

sought 5:17

sounds 42:20 75:17

speak 41:14 46:22 79:25

speaking 74:15

specific 19:1,15 28:23 29:11 39:3 48:20,21 52:10 64:20 77:16 79:10, 16,25 80:9,25 84:25 86:3 96:4 100:2

specifically 5:9,12 36:14 39:16 52:3 53:10 78:2,9 80:11 84:15 96:11 100:14

specifics 81:17

speculating 41:17

spring 17:23

St 5:20 6:1 9:17

staff 12:18,23 20:18 25:3

staffing 27:17 59:3

stand 69:10

standard 23:17 40:24 84:20

standards 19:10 26:15,18 34:16 35:15,21,25 37:8

standing 6:9 16:4

start 33:16

started 98:10

state 5:20 7:4 19:4 33:12 34:2,11 35:7,15 37:16 39:14,18 40:1 79:15, 20 80:7,14

stated 30:17 36:8 57:3 69:20

stating 63:21

status 51:11 61:3

stay 26:7 45:9 85:25

staying 64:25

step 30:22

STIPULATED 5:2

stop 85:6

stops 85:3

stopwatch 27:9

straight 16:24

street 15:4 65:12 68:5

stress 84:8,14

stressful 84:3

stretch 14:21

study 83:25 84:5

submits 42:22

submitted 42:2

subordinate 51:10

subordinates 51:3

suffer 69:16,18

suggest 84:5

suicidal 26:21 46:10

suicide 24:12 45:14

Suicides 45:12

supervise 18:25 20:16 21:7 29:23

supervised 19:20 20:20 30:19

supervising 21:1,14 27:16 29:21, 24 30:3,7,9,14,23 33:25 36:15 37:3, 6 44:5 55:19 60:24 64:11 78:3

79:13,21

**supervision** 12:18

**supervisor** 13:6 19:2 20:7 25:22 35:19,24 41:15 42:3 43:19 44:4 55:25 73:6,11 84:17

**supervisors** 30:3,8,13,25 36:17

**supervisory** 17:4 30:21

**support** 12:13

**supposed** 23:9 62:4

**sworn** 6:4

**system** 43:20

———————————

T

———————————

**takes** 27:19

**taking** 45:8

**talk** 32:10 85:3 100:1

**talked** 46:25

**talking** 28:2 33:24 48:20 51:19 75:9

**Tammany** 5:20 6:2 9:17

**tangent** 20:23

**tasks** 45:7

**taught** 45:12

**telling** 28:3 46:9 66:22

**Tender** 88:5,7

**term** 25:21 26:1,2,5,7

**testify** 6:5

**theory** 48:16,17

**thereof** 5:16

**thing** 25:6 29:19 68:7,8 85:1 99:24

**things** 21:18 25:1 26:24 29:16 30:25 43:11 55:4 73:10 79:18 82:12 89:16

**thought** 39:2 52:4

**threshold** 46:22

**tickets** 47:10

**tier** 47:6

**tiers** 89:19

**time** 5:15 7:9 8:7 9:25 11:1 16:25 17:13 21:24 23:21 25:10,16 26:24,

25 27:1,10 28:10,14 33:24 34:7 35:13 36:7 37:10 40:13 45:7,13 46:7,21 47:4 49:15,24 50:18 51:2 56:6 57:18,20 58:1 60:2,13 63:4,21 64:11,20,21 65:9,17,21 69:5,24 70:18 71:4 73:10 75:19 76:10,13 80:4 81:10 82:23 84:23 85:8 88:17 89:7,21 100:25 101:7

**times** 17:1 22:13 24:18 50:24 55:13 59:12,15 63:15 66:14 72:3,17 76:7 82:16,21 88:21 89:14 93:22

**today** 9:9 13:4 29:5 31:14 34:10 38:21 80:22

**told** 22:24 60:21 101:16

**tools** 21:2

**top** 15:18 42:15 77:5,8 78:14

**torture** 7:21

**total** 23:10 38:3

**traffic** 11:7 85:3,6

**training** 10:1 17:16 18:15,24 19:2,4, 9 26:4 77:13,23 79:4 84:21 85:2

**training-type** 29:19

**transferred** 51:8 65:11

**transferring** 89:23

**treated** 76:19 77:20

**treatment** 43:6

**trial** 5:6

**true** 81:7 82:1

**trustee** 48:8,14,22 83:1 90:13

**truthfully** 9:8

**turn** 45:15 60:5

**two-week** 28:10

**type** 53:20

**types** 41:13 42:2,5 46:24

———————————

U

———————————

**uh-huh** 8:17 73:14

**uh-uh** 8:17

**ultimately** 43:1 53:16

**unclean** 83:7

**understand** 14:10 28:1 39:4 65:15 92:24 93:10

**understanding** 17:8 32:13 38:19 40:1 42:1 44:18,22 84:6 92:2 93:24, 25 94:21 95:4

**understood** 13:17 71:1 91:8,19,23 99:22 101:14

**unfounded** 43:1,7,15 44:6,11

**uniform** 9:15 10:5

**unimaginable** 83:8

**urine** 48:1 49:5 82:22 83:16 85:12 86:4

**usability** 6:22

———————————

V

———————————

**verbalizing** 8:16

**verbatim** 82:10

**versus** 47:18

**video** 6:9,23 15:23

**videos** 85:6,7

**view** 16:5

**viewing** 75:18

**violating** 80:2

**volunteer** 9:24

**vomit** 49:13 82:22

**vomited** 90:11

———————————

W

———————————

**waived** 5:10,12

**walk** 14:22 74:10

**walk-through** 53:13

**walked** 53:12

**walking** 38:18

**wand** 70:23

**wanted** 39:16

**warden** 21:8 31:4,21,22 36:7 37:1 60:17

**warrant** 67:10 75:23

MAJOR RICHARD O'KEEFE, JR. on 01/18/2023

**watch** 45:14

**watching** 45:14 69:23 85:5

**water** 43:14 66:5 74:22

**waved** 70:22

**week** 78:19 88:14

**weekly** 22:19 80:12

**weeks** 14:19 27:23,25 63:2 64:7,12, 23 65:21 68:24 69:19 70:10,12,17 71:17 72:3,9,12,17 73:9 74:2 82:23 83:8,11,19 91:4 92:5,16

**well-being** 83:24

**window** 24:19

**wing** 91:15

**Witness'** 4:6

**wondering** 26:10

**word** 17:10 22:17 93:25 94:22 95:4

**words** 28:8 69:11

**work** 7:23 9:15,16 12:22 13:4 14:24 17:14 20:14 22:21 26:10 32:16 37:5 62:14,15,16

**worked** 9:18 15:4 16:15 17:2,5 25:3 28:13 61:18

**working** 12:19 61:2

**works** 51:24

**worry** 25:6

**would've** 27:18

**write-up** 43:10

**writing** 55:4

**written** 29:1,11,18 54:24

**wrong** 20:21 23:8 68:7,14 69:14

---

### X

**X,'** 29:3

---

### Y

**y'all** 13:3

**Y,'** 29:4

**year** 88:10,15 89:7 90:15,20

**years** 9:20,21 10:2,19 17:12 37:1 55:20 88:10

**yesterday** 22:4