GREGORY LONGINO on 01/18/2023

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4    AHMED BAQER, ET AL.    NO. 2:20-cv-00980-WBV-DPC

 5                               DISTRICT JUDGE:

 6                               WENDY B. VITTER

 7         VERSUS                SECTION "D"

 8                               MAGISTRATE JUDGE:

 9                          DONNA PHILLIPS CURRAULT

10    ST. TAMMANY PARISH         SECTION "2"

11    GOVERNMENT, ET AL.

12

13

14

15         VIDEOTAPED DEPOSITION OF GREGORY CHARLES

16    LONGINO, 10510 LEE SETTLEMENT ROAD, FOLSOM,

17    LOUISIANA 70437, taken at the LAW OFFICES OF

18    MILLING BENSON WOODWARD, LLP, 68031 CAPITAL TRACE

19    ROW, MANDEVILLE, LOUISIANA 70471, in the

20    above-entitled cause on the 18th day of January,

21    2023.

22

23

24

25
```

Page 2

```
1   APPEARANCES:
2
3       JACOB LITIGATION, INC.
4       BY:  DEVON M. JACOB, ESQ.
5       P.O. BOX 837
6       MECHANICSBURG, PENNSYLVANIA 17055-0837
7       (717) 796-7733
8       djacob@jacoblitigation.com
9           ATTORNEY REPRESENTING PLAINTIFFS
10
11
12      ROMANUCCI & BLANDIN, LLC
13      BY:  SAM A. HARTON, ESQ.
14      321 N. CLARK STREET
15      CHICAGO, ILLINOIS 60654
16      (312) 253-8590
17      sharton@rblaw.net
18          ATTORNEY REPRESENTING PLAINTIFFS
19
20
21
22
23
24
25
```

Page 3

```
1   APPEARANCES:  (Continued)
2
3       MILLING BENSON WOODWARD, LLP
4       BY:  CHADWICK W. COLLINGS, ESQ.
5       68031 CAPITAL TRACE ROW
6       MANDEVILLE, LOUISIANA 70471
7       (985) 292-2000
8       ccollings@millinglaw.com
9           ATTORNEY REPRESENTING DEFENDANT,
10          ST. TAMMANY PARISH SHERIFF'S OFFICE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                   I N D E X
2                       PAGE:
3   Caption              1
4   Appearances          2, 3
5   Agreement of Counsel     5
6   Witness' Certificate     161
7   Reporter's Certificate   162
8
9           E X A M I N A T I O N
10  BY:              PAGE:
11
12  Mr. Jacob           6, 154
13  Ms. Harton          148
14  Mr. Collings        151
15
16
17
18
19
20
21
22
23  REPORTED BY:
24      ANNA M. ROTH, RPR, CCR
25      CERTIFIED COURT REPORTER
```

Page 5

```
1           S T I P U L A T I O N
2       IT IS HEREBY STIPULATED AND AGREED by and
3   among counsel for the parties hereto that the
4   videotaped deposition of the aforementioned
5   witness is hereby being taken under the Federal
6   Rules of Civil Procedure, for trial purposes, in
7   accordance with law;
8       That the formalities of sealing,
9   certification, and filing are specifically
10  waived;
11      That the formality of reading and signing
12  is specifically not waived;
13      That all objections, save those as to form
14  of the question and the responsiveness of the
15  answer, are hereby reserved until such time as
16  this deposition, or any part thereof, may be used
17  or sought to be used in evidence.
18          * * * *
19      ANNA M. ROTH, Certified Court Reporter, in
20  and for the Parish of St. Tammany, State of
21  Louisiana, officiated in administering the oath
22  to the witness.
23
24
25
```

Page 6

1    GREGORY CHARLES LONGINO, 10510 LEE
2  SETTLEMENT ROAD, FOLSOM, LOUISIANA 70437, after
3  having first been duly sworn by the
4  above-mentioned Court Reporter, did testify as
5  follows:
6  EXAMINATION BY MR. JACOB:
7    Q.  I keep mispronouncing your name to
8  others, and I apologize.  Is it long Longino or
9  Longino?
10    A.  Longino.
11    Q.  Longino.  All right.  I had it
12  completely wrong either way.  Longino.  Okay.
13  Fair enough.
14    A.  Most people in Louisiana say,
15  "Longino."  But I'm from Mississippi.  It's
16  Longino.
17    Q.  Longino.  Okay.  Very good.  Mr.
18  Longino, is that okay?
19    A.  (Shrugs.)
20    Q.  All right.  Sounds good.  Mr.
21  Longino, we met a second ago, but I'm Devon
22  Jacob.  I represent the plaintiffs in the
23  litigation that you're here to have a deposition
24  in respect to.  And same with my co-counsel, Sam
25  Harton.

Page 7

1    MR. JACOB:
2      Harton?  I always mispronounce your
3    name, too.  I'm sorry.
4    MS. HARTON:
5      People like Horton, but it's Harton.
6    MR. JACOB:
7      Oh, gosh.
8  BY MR. JACOB:
9    Q.  I'm terrible with names, as you can
10  tell.
11    In any case, the purpose of a
12  deposition -- I don't know, have you ever given
13  one before?
14    A.  Yes.
15    Q.  Okay.  And do you know, was that in
16  the capacity of a civil case or a criminal case?
17    A.  Civil case, criminal case, all of
18  them.
19    Q.  All right.
20    A.  Civil case more so.
21    Q.  Fair enough.  Fair enough.  So then
22  you have a general idea of how this works.  It's
23  a question-answer procedure.  It's not a time for
24  me to play games or trick you or anything.  It's
25  just simply, I wasn't there for the events in

Page 8

1  question.  I didn't work for the sheriff's
2  office.  So I need to go to the people who have
3  and do to get the factual information that I at
4  least think I need in order to litigate the case.
5  Okay?
6      So if you need a break at any time,
7  by all means, just let me know.  I'll be happy to
8  accommodate.  You don't even have to tell me why.
9  You can just simply just need a break from
10  listening to me.  And that's fine, too.  I just
11  ask if there's a question pending, that you just
12  answer that question before we take the break.
13  Okay?
14    A.  Okay.
15    Q.  The court reporter has two hands,
16  but it's not one for you, one for me.  So I'm
17  going to do my best to let you finish your
18  answers before I start my next question.  But I'm
19  going to ask that you do the same to the extent
20  that even if you can guess where I'm going, just
21  do your best to let me get the rest of the
22  question out so we can get it down on the record
23  before you begin your answer.  Okay?
24    A.  Okay.
25    Q.  And if at any point in time you just

Page 9

1  don't understand something I say, it could be I
2  misused a term of art, or maybe there's just a
3  common lingo at your office that is used, just
4  let me know.  I'll be more than happy to clarify,
5  restate, whatever you need to understand what it
6  is that I want before you answer the question.
7  Okay?
8    A.  Okay.
9    Q.  And you're doing a great job
10  verbalizing your answers.  You get it.  Again,
11  for the transcript, things like "uh-huh,"
12  "uh-uh," they're impossible later to figure out
13  what someone meant by that.  So, again, "yes,"
14  "no," "I don't know," whatever the answer is, but
15  do your best to use words and verbalize that.
16  Okay?
17    A.  Yes, sir.
18    Q.  All right.  I'm not here to ask you
19  to speculate or guess.  If you don't know
20  something, that is perfectly fine.  I'm not going
21  to think that you're playing games with me or
22  tricking me or trying to withhold information.
23  Just let me know you don't know, and, again,
24  we'll just move on to the next topic.  Because I
25  think your attorney, I'm sure, has already told

Page 10

1  you we're making a record here today, but we only
2  want actual, you know, information. It's not an,
3  "Oh, my gosh, I have to have an answer," kind of
4  exercise. Okay?
5        A.   Yes, sir.
6        Q.   All right. Is there any reason that
7  you wouldn't be able to answer truthfully
8  questions here today?
9        A.   No, sir.
10       Q.   No medication or medical condition
11  that would prevent you from doing so?
12       A.   No.
13       Q.   Okay. So with that in mind -- do
14  you need -- oh, you got water. Okay. I was
15  going to say, feel free, you know. I'm going to
16  drink my coffee, too. So if you want coffee, I'm
17  sure we can get that for you. Just let us know.
18       A.   Yes.
19       Q.   Okay. So this lawsuit stems for the
20  period of time 2019, 2020. And I, again, realize
21  it's 2023 now, unbelievably. So there's been a
22  passage of time. So, again, if you don't
23  immediately recall something, let me know. But
24  I'm going to ask if later in the deposition, as
25  we're discussing things, suddenly it comes back

Page 11

1  to the forefront, again, I'm not going to think
2  that you are playing games with me, just let me
3  know, and I'll let you clarify, you know, add to,
4  supplement any of your answers at any time.
5  Okay?
6        A.   Okay.
7        Q.   All right. During 2019, 2020, you
8  were employed by the sheriff's office?
9        A.   2019. Not 2020.
10       Q.   2019. Not '20?
11       A.   Not '20.
12       Q.   Okay. And in what capacity were you
13  employed in 2019?
14       A.   I was employed as a deputy chief of
15  corrections, of building maintenance, and of
16  vehicle maintenance. So I was part of the
17  executive staff.
18       Q.   Okay. And so what were your
19  respective duties? I can kind of guess from what
20  you just said. But what essentially were your
21  responsibilities in that capacity?
22       A.   I was, in that capacity, I managed,
23  through the warden, the jail; through the major,
24  the vehicle maintenance; and through a major, our
25  building maintenance department. I was there to

Page 12

1  bring us to a long-term -- appreciate our
2  long-term goals more so than the daily
3  operations. So I would be out ahead of what
4  we're doing at the jail, for vehicle maintenance,
5  or for building maintenance, trying to make sure
6  that we didn't get behind times.
7        Q.   And when you say building
8  maintenance for the future, did that encompass
9  the present, meaning were you also in charge of
10  the facility and the maintenance of that facility
11  in the present?
12       A.   Yes.
13       Q.   But I'm understanding you to say but
14  also to plan for the future?
15       A.   Yes.
16       Q.   And what -- you said something about
17  to be able to obtain the future goals. What were
18  the future goals in '19 that you were working on
19  for the future with respect to the building
20  itself?
21       A.   With buildings, well, I was in
22  charge of all the buildings at the sheriff's
23  office. So maintenance, for vehicle maintenance,
24  for instance, having a long-term vehicle. So
25  like I had a five- ten-year plan of which

Page 13

1  vehicles would go in and out of rotation if the
2  circumstances remained perfect.
3        Q.   Right.
4        A.   But if the circumstances -- I had
5  like a five-year retention plan. I needed to see
6  what equipment throughout the agency, generators,
7  the big ticket items, towers that needed to be
8  worked on and/or replaced, or end-of-life issues
9  that would come up, meaning that product may not
10  no longer be in service or be able to maintain
11  it, so need a new one.
12             And for the jail, just continually
13  training staff to make sure that they are
14  prepared to carry out the goals of the
15  corrections division.
16       Q.   Okay. With respect to building
17  maintenance, what was the long-term plan or goals
18  that you were working on?
19       A.   Well, some of them were to improve
20  the building, the jail, per se. But that was a
21  plan that I had that we had to submit to the
22  parish. They had to fund it or not. So I didn't
23  have complete control to say, "This is what
24  happens." I can say, "This is what I think needs
25  to happen." But the parish would have to fund

Page 14

1  that as far as the building is concerned for the
2  jail.
3      Q.   Okay.  With respect to the jail,
4  maintenance and future plans for the building, I
5  heard you mention the parish government itself --
6      A.   Yes.
7      Q.   -- needs to fund the projects,
8  correct?
9      A.   Yes.
10      Q.   Can you explain a little bit about
11  the dynamics then between your role and the
12  sheriff and your role and parish government?
13      A.   Well, my role was with the sheriff's
14  office to say this is what -- the big ticket
15  items we need at the jail, present them to the
16  sheriff so he can present them in the budget, and
17  he can ask for the money from the parish
18  government.  If they gave it, we did it.  If they
19  didn't, well, of course, we didn't.
20      Q.   Did the sheriff ever tell you what
21  his goals were that he wanted you to focus on or
22  that he wanted you to try to achieve in what you
23  were doing?
24      A.   Not a sit-down and say, "Here's --
25  here's where I want you to go," no.

Page 15

1      Q.   Meaning, and let me ask you a little
2  bit differently, did the sheriff ever have a
3  conversation with you, "Listen, this year I want
4  you to focus on just upgrading the current
5  facility that we have," or, "This year I want you
6  to focus on how we're going to build a new jail,"
7  or, "This year I want you to focus on how to
8  build a new wing," anything like that?
9      A.   No.  Basically, if we had those
10  conversations, it was more about overtime.
11      Q.   Overtime?
12      A.   Yeah.
13      Q.   Okay.  Explain.
14      A.   Maintaining the overtime and getting
15  the overtime down from where we were last year,
16  try to manage that better and better to save for
17  the general fund.
18      Q.   Okay.  So you talked about being in
19  charge of the building maintenance and future
20  aspects of the building, about the car fleet, for
21  lack of a better term.  Now you're mentioning
22  overtime.  Were there other responsibilities that
23  you had with respect to your position then?
24      A.   What type of responsibility?
25      Q.   Well, like, I guess my question is,

Page 16

1  were you supervising the employees, the
2  corrections officers on a day-to-day basis?
3      A.   No, sir.
4      Q.   But I'm hearing you also say you
5  were at least trying to help with the scheduling
6  issue or the manpower issue as it pertained to
7  overtime?
8      A.   Yeah.  That's budgetary.  That's not
9  day-to-day operations.  I wasn't over there
10  saying, "Do this.  Do that."  That was for the
11  warden, the captains, the lieutenants to try to
12  maintain or manage that particular item.  I had
13  to keep it in my sight for budgetary reasons, not
14  just day-to-day operations.
15      Q.   So is it fair to say, then, there's
16  the corrections security path, and then there's
17  the administrative business path and that you
18  were on the business side?
19      A.   No.  I was over maintaining the
20  whole entire jail.
21      Q.   So you were overseeing both then?
22      A.   Yeah.
23      Q.   Okay.  So in the hierarchy, can you
24  explain where you fell with respect to the
25  sheriff?

Page 17

1      A.   I was next to the sheriff.  It was
2  the sheriff -- at the time, it was the sheriff,
3  the deputy chief, major, captains, lieutenant,
4  sergeants.  I was in between the sheriff and the
5  major.  Or the warden.
6      Q.   I'm sorry.  I cut you off.  Go
7  ahead.
8      A.   Or the warden.  The major is the
9  warden.
10      Q.   Ah.  Okay.  So you were above the
11  warden?
12      A.   Yes.
13      Q.   And then above you is the sheriff?
14      A.   Yes.
15      Q.   And just so -- so directly below you
16  is the warden?
17      A.   Yes.
18      Q.   Anybody to the side of you, so to
19  speak?  Anybody else that is at your level?
20      A.   Yes.  But they were -- I was a
21  deputy chief of corrections, building
22  maintenance, and fleet maintenance.  I also had a
23  deputy chief of criminal patrol, SOD.  You also
24  had a deputy chief of finance administration.
25  That was the deputy chiefs at the time.  So we

GREGORY LONGINO on 01/18/2023

Page 18

1 were on the line together, but we didn't have the
2 same duties or responsibilities. I was the only
3 one there for --
4     Q.   So you handled corrections, somebody
5 else handled patrol and law enforcement, somebody
6 else handled business, for lack of a better term?
7     A.   Yes.
8     Q.   All right. And so is it fair to say
9 that the sheriff's position is more of a
10 political position than a day-to-day like
11 CEO-type position?
12     MR. COLLINGS:
13         Object to the form.
14     THE WITNESS:
15         I can answer?
16 BY MR. JACOB:
17     Q.   Yes.
18     A.   All right. So -- well, the sheriff
19 is an elected official. He is a politician. But
20 he is also the -- he's the chief operating
21 officer/executive officer of the agency, so --
22     Q.   And was he completely relying on
23 you, though, to explain to him what needed to
24 happen in order to operate and run the
25 corrections side of the business correctly?

Page 19

1     A.   No, not exactly. But I can say that
2 about every two weeks we had a meeting, where
3 that was a CompStat meeting, as we call it, where
4 we brought ideas, problems, or things that we
5 needed to handle at the jail or throughout the
6 agency. He was present in those. We also had
7 executive staff meetings where things was brought
8 out. But that was in line with when we went to
9 budgeting and we set what our goals were for this
10 year, that was what we need to stay on track
11 with.
12     Q.   Was there any document or long-term
13 plan or something that laid out the goals for
14 your division?
15     A.   Yes. And you could find it in our
16 budget document.
17     Q.   In a budget document?
18     A.   Yes.
19     Q.   Okay. And explain to me, because
20 different agencies have different types of
21 documents, what would this budget document
22 contain by way of information?
23     A.   By way of information for the jail,
24 per se, like, well, you're asking about the
25 building, what we would need for this building.

Page 20

1 This budget year, a new roof or anything that's
2 maintained, that would be submitted in the
3 budget, along with the justification and the plan
4 to implement if the budget was approved, and we
5 got that funding.
6     Q.   And in that document, would it
7 identify issues with respect to jail operations
8 that needed to be corrected to comply with, you
9 know, state or federal regulations?
10     A.   In some instances, yes. When we had
11 standards changed through Department of
12 Corrections, we had to do things differently or
13 buy equipment or things of that nature. So,
14 yeah, we had to maintain compliance with
15 standards.
16     Q.   And in that respect, you're
17 mentioning standards, what standards did the jail
18 -- was the jail obligated to comply with?
19     A.   The jail was obligated to comply
20 with?
21     Q.   Yes.
22     A.   If it pertained to the jail,
23 especially poor detention standards from the
24 feds, federal government, because we house
25 federal inmates, any standards that we house for

Page 21

1 immigrations and Department of Corrections and/or
2 pretrials.
3     Q.   Is it fair to say that, for
4 instance, the federal standards, that the only
5 reason the parish jail would need to comply with
6 the federal standards was because it housed
7 federal inmates?
8     A.   Not necessarily.
9     Q.   Okay. Could you explain that to me?
10     A.   Yeah. When we say the federal,
11 there's still standards out there that we would
12 have to maintain even though we don't house.
13 Some of them are through the jail -- the
14 Department of Corrections with their jail
15 standards. We have those as well. So we would
16 maintain the standards across the board.
17     Q.   And is that because there is just an
18 understanding in corrections that there's a
19 certain standard in the industry itself by which
20 jails are to operate?
21     A.   Yeah. Operate and inspected by and
22 evaluated by, yes.
23     Q.   So would it be fair to say, then,
24 that there are certain inspections that, of
25 course, you had to meet certain standards? It

GREGORY LONGINO on 01/18/2023

22..25

Page 22

1  might be Department of Health or Department of
2  Corrections.  But that there is also just an
3  understanding in corrections that jails are
4  normally going to operate at least at a minimum
5  level of what the DOC says or what the federal
6  government says?
7      A.  Yes.
8      Q.  Okay.  So it's not just -- or there
9  is an understanding in the industry then, and at
10  St. Tammany Parish, that even if we aren't
11  necessarily required by law to do "X," it's
12  understood in the industry that you're going to
13  at least meet this level of operation?
14      A.  I can't speak to the industry, but I
15  can speak to the St. Tammany Parish Jail.  We
16  house DOC offenders, and we knew that once a year
17  we would get inspected.  So, yeah, you had to
18  maintain those standards throughout the year.  We
19  knew that we would get inspected by immigrations.
20  We had to maintain those standards that we had
21  for immigrations.  We knew we would get inspected
22  by also the feds, the federal government, so we
23  had to maintain those as well.  So when they came
24  in and inspected it, it was a set of criteria
25  that they used to evaluate if we were housing

Page 23

1  their inmates properly.
2      Q.  So let me ask it a bit differently.
3      A.  Okay.
4      Q.  If you were not housing DOC inmates
5  and not housing federal inmates, would St.
6  Tammany Parish still maintain the jail at the
7  same level?
8      A.  No, sir.
9      Q.  And why is that?
10      A.  So as the -- we housed pretrials, we
11  housed DOC, we housed federal inmates, and
12  immigrations.  So the pretrials had a certain
13  section of the jail that they stayed in.  Feds
14  had a certain area of the jail they stayed in.
15  But through the revenue streams from the federal
16  government for feds and/or immigration inmates
17  and DOC inmates, we was able to house and hire
18  more corrections officers.
19      Q.  Okay.  And I guess it's sort of
20  circular, though.  By housing more federal
21  inmates, by housing more DOC inmates, you also
22  need more manpower; is that correct?
23      A.  They paid for the manpower that we
24  used to house them.
25      Q.  Okay.  So -- but I guess that's my

Page 24

1  question.  I mean, if you didn't have the feds
2  and didn't have the DOC, you also wouldn't need
3  that additional manpower, correct?
4      A.  I would not need that additional
5  manpower nor would I have the additional jail
6  space.
7      Q.  Okay.  You wouldn't have the
8  additional jail space for the DOC or the federal?
9      A.  The pretrials.
10      Q.  For the pretrials?
11      A.  If I got rid of the federal inmate
12  and the DOC inmate and the immigration inmate,
13  I'm only left with the pretrial inmates.
14      Q.  Okay.  But the same building,
15  correct?
16      A.  No.
17      Q.  Why is that?  Explain that to me.
18      A.  Okay.  So if we went and the feds
19  were gone, they lived in a particular housing
20  unit all to themselves, and if they left, we
21  would shut that particular building down because
22  you wouldn't have that revenue stream to keep it
23  going.  And you wouldn't have that revenue stream
24  to maintain or add pretrial beds either.
25      Q.  Okay.  So you would be left with the

Page 25

1  same pretrial that you have now?
2      A.  Yes.
3      Q.  Okay.  I guess that's what I'm
4  getting at.  So if you get rid of the DOC, you
5  get rid of the feds, you're left with what you
6  got, pretrial and that part of the building?
7      A.  Yes.
8      Q.  All right.  Where did the -- I
9  understand you said that the funds that came from
10  the federal contracts -- excuse me -- the DOC
11  contract, they were used to, I guess, maintain
12  those obligations, correct, to those respective
13  agencies; is that correct?
14      A.  Yes.
15      Q.  What else were the funds used for?
16      A.  They was used to operate the jail,
17  like the overall facility.
18      Q.  Okay.  For instance, did -- were
19  those funds used to increase pay for your
20  employees?
21      A.  Not specifically.
22      Q.  Okay.
23      A.  And I say that because that's a
24  whole different topic.  Increasing pay for
25  deputies by just housing DOC or federal inmates,

Page 26

1  that would be -- that would be throughout the
2  agency. That would be through budgetary
3  constraints or concerns that we could increase
4  our budget. We wouldn't increase our budget and
5  say, "We need to house more feds or more DOCs,"
6  you know. If the sheriff said, "You get a
7  raise," we didn't increase federal inmates, we
8  didn't increase DOC inmates, and we didn't lessen
9  pretrial inmates.
10      Q.   Okay. How were the pretrial -- or
11  the care, custody, and control of the pretrial
12  inmates, how was that funded?
13      A.   We got some funding from the parish,
14  and, like I say, through the revenue streams that
15  we had, whether that was housing DO -- to balance
16  the budget, we had to house DOC inmates, federal
17  inmates, immigrations. And the pretrials were --
18  we got paid -- I don't even know what we got paid
19  per year for housing them from the parish. But
20  you would get some funding from the parish but --
21      Q.   Would it be fair to say that the DOC
22  and the federal government, they paid their way?
23      A.   The federal inmates certainly paid
24  their way. And the DOC, yes, I would say they
25  paid their way.

Page 27

1      Q.   And then is it fair to say that with
2  respect to pretrial detainees, the parish kind of
3  put the squeeze on?
4      A.   Well, you know, I'm no longer there,
5  but they're still not funded fully from the
6  parish, the jail, for housing the pretrial
7  detainees. So I know when I was there, it wasn't
8  funded properly. So, you know, so --
9      Q.   Okay. So you're left with a
10  situation where the pretrial detainees, it's an
11  underfunded, not funded properly program, so to
12  speak. So the sheriff is left in a quandary of
13  having to find some way to pay for that, correct?
14      A.   Yes. And what he can't pay for by
15  raising the revenue, he would have to find that
16  revenue to pay for whatever is short.
17      Q.   And so one way I'm hearing was these
18  federal and DOC contracts provided a little
19  extra, at least, that helped to supplement the
20  pretrial funding. Would that be a fair
21  statement?
22      A.   I would say jail funding, but it's
23  not specifically for pretrials.
24      Q.   But without it, it undercut the
25  pretrial? Would that be fair?

Page 28

1      A.   Yeah. We would still be left with
2  the same amount of beds pretrial that you have
3  versus -- so when we would look at the buildings,
4  you would see a building with state work -- well,
5  I'll get into that if you want me to -- but the
6  different type of buildings that we had to house
7  the different type of inmates.
8      Q.   Okay. Were the buildings the same
9  size?
10      A.   No. No, they were not.
11      Q.   And are they separate buildings, or
12  are they wings of buildings? I haven't been
13  there.
14      A.   They are separate buildings.
15      Q.   And so if you were to get rid of the
16  feds and the DOC, could you simply move the
17  pretrials into a slightly -- one of the slightly
18  bigger buildings?
19      A.   No. That's why we had it like that.
20  So C Building, B Building. A Building mostly
21  housed your feds. B Building mostly housed your
22  DOCs. If those closed down, we no longer had the
23  federal funding, or we no longer had the DOC
24  funding. I wouldn't increase pretrial beds. I
25  couldn't fund them.

Page 29

1      Q.   Okay. And so if you lost the DOC,
2  lost the feds, is it fair to say that you then
3  could not properly fund the pretrial?
4      A.   No. The pretrial would stay where
5  they're at. That's what I'm saying. Like --
6      Q.   No. No. No.
7      A.   -- we wouldn't add pretrial beds --
8      Q.   Sorry.
9      A.   -- to -- if we lost the DOC, if we
10  lost the federal inmates, we wouldn't add or put
11  pretrials in those areas or add a pretrial count.
12      Q.   Right. What I'm asking, though, is
13  slightly different. Not whether --
14      A.   Okay.
15      Q.   Not whether you would add beds, but
16  rather would you be able to fund the pretrial as
17  it currently is without the DOC and the feds?
18  That's my question.
19      A.   Yes.
20      Q.   And how?
21      A.   You would have to -- you can only
22  have enough pretrials where your staff can manage
23  them. So if that means that the staff decreases,
24  that means that the beds would decrease. You can
25  only have enough beds where you can properly

GREGORY LONGINO on 01/18/2023

Page 30

1  maintain the staffing to house that number of
2  inmates.
3      Q.   Now, if you're in a situation where
4  you're in a funding squeeze, let's say, but
5  you're also getting these pretrial detainees to
6  house, what do you do?  Do you turn away pretrial
7  detainees if you can't house them if there's no
8  space?
9      A.   Well, you can't technically turn
10  away a pretrial inmate if they're legally
11  arrested and brought to your facility to be
12  booked into your facility.  But you would have to
13  book them.  You would have to process them and
14  give them the next available bed.  So you can't
15  arbitrarily say, "We're closed for business."
16      Q.   So what if you had a mass arrest
17  situation?  I mean, some of these cities have
18  them where, you know, they arrest a hundred or
19  200 people for an incident.  You know, what do
20  you do if you only have 30 beds on the pretrial
21  side and four holding cells?  What's the plan
22  there?
23      A.   The plan is when they bring the
24  inmates to the facility as pretrial arrestees, we
25  would process them in.  Once we get the legal

Page 31

1  documentation to house them, we would make sure
2  they got a bail set.  Or if they can bond out.
3  Or if they couldn't bond out, the bed space that
4  we have, we would use.  We can't put them back on
5  the street, you know.  So you would have to take
6  those prisoners in.
7          And even if they had a mass arrest
8  today, that would be the same scenario.  You only
9  have so many pretrial beds that you can put the
10  pretrial detainees in.  So once they get there,
11  they're booked in, they're housed accordingly,
12  that would be the holding cells, until the next
13  available bed was available.
14      Q.   But what do you do?  Is there a
15  maximum number of pretrial inmates that can be
16  put in the holding cells?
17      A.   There is a maximum number that the
18  holding cells are designed to hold.  But, like
19  you said, if there's a mass arrest, I can't say,
20  "I can't house them there or hold them."
21          Now, we would have to petition the
22  commissioner or the judges to do an emergency
23  overcrowding-type deal.  But I'm pretty sure in
24  that scenario, the fire marshal would be there.
25  And health also would be there.  We would have to

Page 32

1  come into compliance with those orders as well.
2          So I can't say like if I was maxed
3  out of the pretrial bed count that I wouldn't
4  take more pretrial inmates.  I don't have that
5  authority to say, "Turn them away."
6      Q.   Okay.  But you did just mention
7  something about petitioning the courts, for
8  instance, --
9      A.   Yes.
10      Q.   -- on an overcrowding situation for
11  some sort of emergency relief, correct?
12      A.   Uh-huh (affirmatively).
13      Q.   Did that ever happen that you're
14  aware of?
15      A.   Yes.
16      Q.   And when did that happen?
17      A.   To pinpoint dates and times and
18  ranges, I wouldn't be able to do that.  But I do
19  know on occasion we have sat down -- I have
20  personally sat down with the commissioner and/or
21  the chief judge to say, "Hey, look, we're
22  overcrowded.  We need some relief," and that's as
23  far as I can go.
24      Q.   And then what --
25      A.   I can't go back and release them.

Page 33

1      Q.   And then what happens, though?  I
2  mean, what's the result?  What do they do in that
3  situation?
4      A.   Sometimes they would release the
5  appropriate number of inmates to be released.
6  But that would be on the commissioner or the
7  judge to determine what and which ones they would
8  release.  I had no authority to release them.
9      Q.   Understood.  And, actually, and not
10  to parse words, though, but it wouldn't be your
11  authority anyway.  It would be the sheriff,
12  correct?
13      A.   To do what?
14      Q.   To release.  The authority to
15  release.
16      A.   As far as what?
17      Q.   Well, you were saying, "I wouldn't
18  have the authority to release them."  Do you mean
19  the sheriff wouldn't have the authority to
20  release them?
21      A.   Yeah, I don't have -- yeah, no, he
22  wouldn't have it either.
23      Q.   Okay.  And, again, I'm just -- so
24  it's clear on the record, --
25      A.   He --

Page 34

1    Q.    -- what I'm saying is the sheriff's
2    the policy maker.  The sheriff's the final
3    decision-maker, correct?
4    A.    Absolutely.
5    Q.    All right.  And, again, not to
6    belittle your position.  It's just to make sure
7    we're clear on the record of who's allowed to do
8    what.
9    A.    Yes.
10    Q.    That's all.
11         So am I correct, though, the
12    commissioners or the judge, they don't act until
13    there's a petition from the sheriff's office
14    saying that there's this problem?
15    A.    No.  The commissioner acts, and he's
16    the one set the bonds.  He's the one that does
17    the 72-hour hearing.  He's the one that sees how
18    many we have there, and the people that are in
19    holding, and he sets their bonds.  So he's not --
20    he's not there every day.  But like he'll come
21    for a 72-hour hearing.  He'll come for -- well, I
22    don't know what they do now since COVID.  But,
23    you know, at the time he would come and -- or I
24    would call and say, "We have a situation in
25    holding where we're over capacity," and he would

Page 35

1    start working on it, you know.  But that is
2    strictly the -- we've only got one commissioner.
3    But the commissioner and/or the judge, that was
4    still left up -- that was at their discretion to
5    release an inmate.
6    Q.    But am I correct the commissioner
7    and the judge -- I mean, let me ask this
8    differently or that'll come out confusing.  I'm
9    sorry.
10         The care, custody, and control of
11    inmates in the parish, that authority resides
12    with the sheriff, correct?
13    A.    Yes.
14    Q.    And so if there's an overcrowding
15    situation in the sheriff's jail, am I correct
16    that it is not addressed until the sheriff raises
17    the issue or addresses the issue?
18    A.    No, not -- no.
19    Q.    Stated another way, the commission
20    and the judge, they're not going to impose on the
21    sheriff how he's to operate that jail?
22    A.    No.
23    Q.    So, again, how the jail is operated,
24    how many go into the holding cell, or how many go
25    into DOC beds or whatever, that is ultimately up

Page 36

1    to the sheriff, correct?
2    A.    Yes.
3    Q.    Meaning the sheriff could -- I'm not
4    saying he would, but I'm saying the sheriff could
5    say, "You know what, we have an overcrowding in
6    holding, so for the next week until we can
7    alleviate this, I'm going to take five pretrial
8    parish only inmates and put them in the -- in
9    five of the available DOC beds"?
10    MR. COLLINGS:
11         Object to the form.
12    BY MR. JACOB:
13    Q.    I'm not saying he would.  I'm just
14    saying he could?
15    A.    I see a bigger problem there.
16    Q.    Well, can you first answer my
17    question?  Could he?
18    MR. COLLINGS:
19         Object to the form.
20    THE WITNESS:
21         He could.
22    BY MR. JACOB:
23    Q.    Okay.  So there's nothing legally
24    that precludes him from doing that?
25    MR. COLLINGS:

Page 37

1         Object to the form.
2    THE WITNESS:
3         Legally?
4    BY MR. JACOB:
5    Q.    Yes.  That you're aware of?
6    A.    I guess you would have a
7    legally-binding contract with the feds and with
8    Department of Corrections, that if I said to
9    them, "I'm going to house a hundred federal
10    inmates," I think they would legally expect me to
11    house them.  But I don't know if you're talking
12    about legal contracts or legal law.
13    Q.    Well, I guess what I'm saying is --
14    sure.  I mean, if you're -- if you have a
15    contract with DOC to house a hundred but they're
16    not using a hundred, and the sheriff sees that
17    he's got a couple of extra beds over in DOC.  I'm
18    just asking, is there anything that you're aware
19    of, any standard, any law, any regulation, that
20    said you cannot use five of those beds for the
21    next week to alleviate some overcrowding in the
22    holding area?
23    A.    Well, so just like you asked me
24    earlier about mass arrests, all right, so if I
25    put those pretrials in those DOC beds and

Page 38

1  tomorrow DOC comes with their five to fill those
2  beds, what do I do with the pretrial now?  Do I
3  put him back in holding?  What do I do with him?
4  Because now I'm really stuck because I gave him a
5  bed.  He's in a housing unit.  He has a bed.  He
6  has a pillow.  He has a mattress.  Now do I take
7  him out and put him on the floor or back in
8  holding?  I think that creates a more -- if I put
9  a person in a bed and they bring more DOC
10  prisoners, I've contracted with them to house
11  that amount of prisoners.
12      Q.   But you also -- there's a contract
13  with the parish to house the pretrials, correct?
14      A.   What do you mean?
15      Q.   Well, isn't there a pay or an amount
16  or -- that is sent over for each pretrial
17  detainee that's housed?
18      A.   You're talking about a per diem or
19  --
20      Q.   Yes.
21      A.   No.
22      Q.   Okay.  Is there any other funding
23  per inmate, per pretrial inmate?
24      A.   That funding is strictly received
25  from the parish.  What they give us.

Page 39

1      Q.   Now, what happens if the DOC needs
2  -- let's say you have a contract for a hundred,
3  but they have 105 to house.  What happens?
4      A.   What do you mean?
5      Q.   DOC comes to you and says, "We have
6  a contract with you to house a hundred of our
7  inmates, but we have 105 that need housing."
8  What happens?
9      A.   If they're in the DOC beds and
10  they're full, we don't have the beds.
11      Q.   So what does DOC do?
12      A.   So I would think DOC would call
13  first and say, --
14      Q.   Fair enough.
15      A.   -- "All right.  We see that you're
16  full.  Do you have any capacity to house on extra
17  five inmates?"
18          At that time, I would say, "No.
19  You're full."  Like, the DOC is full.
20          So I think they would -- I don't
21  think they would just show up at the door and
22  say, "We've got five more inmates."
23      Q.   But then -- and, I mean, I'm sure at
24  the level you were operating, you then know what
25  DOC does.  I mean, what do they -- what do they

Page 40

1  do with their extra five?  They don't take them
2  home to their houses.  I mean, so do you know
3  what they do?
4      A.   They would find a facility that
5  would house them, I'm pretty sure.  You got 64
6  parishes.
7      Q.   Is there any situation in the
8  contract with DOC that you could simply turn away
9  DOC inmates?
10      A.   In what capacity?
11      Q.   Just say, you know, they contracted
12  for a hundred, but, you know, we're having
13  staffing issues.  We can only take 50 this month?
14      A.   Had that scenario presented itself
15  like that, you could -- you may have a housing
16  unit that's down for repair.  You know, you could
17  decrease that count.  You could only have 75 beds
18  and move the inmates around until you finish the
19  repairs and then call them back and say, "Hey,
20  look."
21          But I think all of that is -- it
22  wouldn't just happen like I decide today I'm
23  going down to a hundred beds or down to 75 beds.
24  I would give them enough time to respond.  "Hey,
25  look, we're going to be doing this or that,

Page 41

1  maintaining or reconfiguring the housing unit.
2  I'm going to be absent those 25 beds," so -- and
3  give them a heads-up.
4          But I don't think like -- like I
5  say, I don't see it being they come there and
6  say, "All right.  I can't house them," if I have
7  the bed space that they have -- that we have
8  contracted with them.
9      Q.   Okay.  But you've contracted them
10  for a hundred.  So why would it be okay to go to
11  them and say, "Well, we're going to take 75 for
12  the next month because of this issue"?
13      A.   If I have a legitimate reason, like
14  a housing unit down, or I got to repair something
15  and inmates can't live in that unit, I wouldn't
16  keep them there and work around them.
17      Q.   I guess I'm confused because you
18  said, you know, "I have a contract.  I can't give
19  away those beds for other things because I have a
20  contract."  But you're also saying, "But if I had
21  an issue that required it, I could tell them
22  you're down to 75."
23      A.   Yeah.  But that wouldn't add any
24  beds or take away from any other classification
25  of inmate.

GREGORY LONGINO on 01/18/2023

42..45

Page 42

1      Q.    So what's the difference if you tell
2   the DOC, "We have overcrowding, so you're going
3   to be down to 75.  We need to borrow 25 of your
4   beds to alleviate a constitutional violation on
5   our side," as opposed to, "You're down to 75 beds
6   because we are going to do some maintenance"?
7   What's the difference?
8      MR. COLLINGS:
9          Object to the form.
10     THE WITNESS:
11         I think the difference would be that
12     they are using their beds.  There's no
13     reason to remove the beds just to send
14     them back or get rid of the DOCs and put
15     pretrials in there.  It's not like they're
16     not going to need their beds back.  That's
17     a short-term solution.  Maybe a couple of
18     days maybe.  And you still have more
19     pretrials coming in.
20  BY MR. JACOB:
21     Q.    Sure.  So if you needed, you know,
22  five of the 50 beds, let's say, for a short-term
23  solution to a temporary overcrowding situation,
24  that's not okay then to take those five beds from
25  the DOC, but it is okay to take 25 beds from the

Page 43

1   DOC that are due to a short-term maintenance
2   project or a short-term staffing issue to
3   alleviate that?
4      MR. COLLINGS:
5          Object to the form.
6      THE WITNESS:
7          The problem with that, I don't know
8      what you mean by "temporary overcrowding."
9      Once I give a person a bed, they have a
10     bed.  Like, if I take them out of holding
11     and put them in a housing unit, they're in
12     that housing unit.
13  BY MR. JACOB:
14     Q.    Until you move them?
15     A.    I can't -- I can't move them back to
16  holding.
17     Q.    You can --
18     A.    Do I just keep putting more and more
19  as -- you know?
20     Q.    But isn't more and more coming
21  anyway?  I mean, you can, you know, for five days
22  alleviate -- you know, you could lower the count
23  in holding by five, or you could leave them there
24  and have five more in holding.  I'm saying you
25  can move them anywhere you want; is that correct?

Page 44

1      MR. COLLINGS:
2          Object to the form.
3      THE WITNESS:
4          That's not correct, no.  That's not
5      correct.
6   BY MR. JACOB:
7      Q.    Meaning if suddenly DOC came back,
8   you could take those five and put them back in
9   holding?  You're no worse off, correct?
10     A.    Oh, I think I am.
11     Q.    Why?
12     A.    Because I would remove them from a
13  housing unit where they have a bed, where they
14  have access to more than they have in holding, to
15  put them back in the holding cell.  I think that
16  would be worse off than having them in holding
17  waiting for the next available bed.
18     Q.    So if somebody is going to be in
19  holding for two weeks, you're saying it's better
20  to stay in holding for two weeks instead of one
21  week in the DOC bed with actual bedding and one
22  week in holding?  Is that what you're saying?
23     A.    Well, you're putting -- I can't
24  determine how long somebody is going to be in
25  holding.  I don't know if that person is going to

Page 45

1   come in and bond out tonight, tomorrow, or in
2   three days.  So I don't -- I don't think I can
3   definitely say that I'm going to move these five
4   people out of holding to that unit for five days.
5      Q.    Okay.  But you could say, am I
6   correct, we're going to use five beds, DOC beds,
7   as pretrial beds.  And those people who you put
8   in those beds in DOC could also bond right out
9   and never have stayed in holding; is that
10  correct?
11     A.    No.  DOC doesn't bond out.
12     Q.    No.  I'm saying the pretrials.  If
13  you just simply, you're overcrowded in holding,
14  so you put them right into those DOC beds
15  instead, and then they bond out, there
16  conceivably could be that situation; am I
17  correct?
18     A.    No.  Because I wouldn't put them in
19  that housing unit.
20     Q.    I'm saying if you did, they could
21  conceivably -- you said, "I would have to put
22  them back into holding"?
23     A.    Yeah.
24     Q.    Well, but what if they bonded out?
25  Then they would go to the DOC bed and then bond

Page 46

1 out?
2    A.  Yes.
3    Q.  Okay.  So, you know, basically,
4 there's speculation as to what the -- what
5 problem may or may not happen should we put some
6 pretrial into DOC beds, correct?
7        MR. COLLINGS:
8            Object to the form.
9        THE WITNESS:
10            I think the whole thing is
11        speculation.  If I did or if I didn't,
12        it's speculation.  I don't know what the
13        outcome would be.
14 BY MR. JACOB:
15    Q.  But one outcome we could be sure of
16 is that if five of the beds from DOC were taken
17 for five pretrials, we would have five less
18 people in holding, correct?
19        MR. COLLINGS:
20            Object to the form.
21        THE WITNESS:
22            You could, yes.
23 BY MR. JACOB:
24    Q.  Well, you would.  I mean, if you
25 literally took five out and put them in DOC, you

Page 47

1 now have five less, right?
2        MR. COLLINGS:
3            Object to the form.
4        THE WITNESS:
5            Five less of what, though?
6 BY MR. JACOB:
7    Q.  In holding.
8    A.  So if I put those five in a housing
9 unit?
10    Q.  Correct.
11    A.  But I'm still overcrowded by another
12 15.
13    Q.  All right.  Let me ask it this way.
14    A.  We're speculating, right?
15    Q.  Well, here.  We're going to do a
16 math equation together here.
17    A.  Okay.
18    Q.  Let's say I have ten people in a
19 holding cell.
20    A.  Okay.
21    Q.  And I have five open beds.  So
22 nobody here in DOC.  And I take five of these
23 guys, and I walk them over to the DOC beds, and I
24 put them in here.  Would you agree with me, I now
25 have five here and five here?

Page 48

1        MR. COLLINGS:
2            Object to the form.
3        THE WITNESS:
4            Yeah, that's possible.  Yes.
5 BY MR. JACOB:
6    Q.  Well, no.  Is that -- are we in
7 agreement that ten minus five is five?
8    A.  That's not what you said.
9    Q.  Okay.  Well, I'll do it again slowly
10 here.  We have ten here, right?
11    A.  Uh-huh (affirmatively).
12    Q.  Okay.  Now these guys are walking
13 down the hall, and they're walking in the door to
14 DOC, --
15    A.  Uh-huh (affirmatively).
16    Q.  -- now how many do we have here
17 (indicating)?
18    A.  You're just --
19    Q.  How many do we have here?
20    A.  You're just fixated on the ten.
21    Q.  How many do we have here?
22    A.  If I only have ten in holding?
23    Q.  Yes.
24    A.  I would have five and five.
25    Q.  Okay.  Thank you.

Page 49

1    A.  If I only have ten in holding.
2    Q.  Thank you.  At what
3 point is there -- is there a threshold number
4 where the sheriff petitions the commissioner or
5 the judge on an overcrowding situation?
6    A.  I've never known there to be a
7 threshold number, no.
8    Q.  What -- during the instances where
9 there was this petitioning, what triggered it?
10 What made the sheriff say, "Okay.  This is --
11 this is at a level that we need to file a
12 petition"?
13    A.  We never filed a petition, per se,
14 like paperwork to the court, if that's what
15 you're asking.
16    Q.  Oh, I'm sorry.  Those were your
17 words.  I assumed that's what it was.
18    A.  They would petition the court
19 through, "Hey" -- we would call and talk to the
20 commissioner, tell him where we were at.  It was
21 a process.  We would call the commissioner, tell
22 him where we was at.  "We're overcrowded."  If he
23 tells us, "I've done all I can do," we would then
24 go to the judge and say, "We have an overcrowding
25 problem.  The commissioner has done all he can

GREGORY LONGINO on 01/18/2023

Page 50

1  do.  We need help from the court."  So at that
2  time, they would either say, "Release some
3  prisoners," or not, so --
4      Q.    And so that would have to come from
5  the sheriff's side?  You would have to tell the
6  commissioner, tell the judge, "We have an
7  overcrowding situation"?
8      A.    Yes.
9      Q.    Okay.  And so if that never occurs,
10  if there's never, "Hey, Judge, hey, Commissioner,
11  we have an overcrowding situation," then Judge
12  and Commissioner aren't going to act to fix the
13  overcrowding situation?  Would that be correct?
14      A.    Not necessarily correct.  Because
15  the commissioners there are setting bonds daily,
16  doing 72-hour hearings twice a week.  So he can
17  release what he sees fit.  I don't --
18      Q.    Right.  But I'm saying, he's not
19  going to -- he's not going to suddenly sound off
20  the alarm to himself and say, "We're
21  overcrowded."  He's going to wait until the jail
22  says, "Hey, got a problem.  You need to slow
23  down," or --
24      A.    Speed up.
25      Q.    -- "We need to come up with some

Page 51

1  other situation."  Am I right?  I mean, he's
2  going to -- unless he's told, he's just going to
3  keep doing what he's doing?
4      MR. COLLINGS:
5          Object to the form.
6  BY MR. JACOB:
7      Q.    Is that fair?
8      A.    Yes.
9      Q.    Okay.  When these overcrowding
10  situations occurred where there was a -- I think
11  you called it a petition, I'm hearing, though,
12  more of a phone call meeting --
13      A.    Yeah.
14      Q.    -- with the commissioner and judge,
15  was there any recording of this, either in
16  writing, like a letter, or a hearing or a
17  memorandum that discussed the issue and the
18  solution?
19      A.    No.
20      Q.    Or just discuss the issue, I should
21  say, maybe not the solution?
22      A.    No.
23      Q.    Meaning did the sheriff's office
24  ever formally write to the parish government and
25  say, "Listen, you're sending us 'X' number of

Page 52

1  detainees every year, but we're only able to
2  house, you know, 'X' number, you know, in a safe,
3  lawful way.  What are we going to do to fix
4  this"?
5      A.    Am I aware of that happening?  No.
6      Q.    Yes.  Do you know why that never did
7  happen?
8      A.    No.
9      Q.    What is the maximum number of
10  detainees that can be in any given holding cell?
11      A.    For the male holding cells, it was
12  20 per unit, so 80 in the four.
13      Q.    So 80 total?
14      A.    Yes.
15      Q.    Okay.  20 per holding cell?
16      A.    Yes.
17      Q.    We deposed yesterday a
18  representative from the sheriff's office who
19  admitted that those numbers were exceeded at
20  times.  Is that your recollection?
21      A.    Yes.
22      Q.    And when those numbers were
23  exceeded, what did you do in response to that
24  situation?
25      A.    It depends on what the warden told

Page 53

1  me that was in the process.  So sometimes that
2  you get a snapshot of the holding counts that
3  morning, and you may already have several people
4  that's bonding out or getting out in the next
5  four or five hours.  So you had to take all of
6  that into consideration.
7          So, like, if a DWI guy is sitting in
8  there, you know he's going to get a signature
9  bond after his time period of being in holding,
10  so he'll be gone today, or, you know.  So you had
11  to weigh everything.  Just because that was the
12  number, doesn't mean that that's going to stay
13  the number.  You may have already had some people
14  been released or scheduled for release that day
15  where the holding count would be alleviated.
16      Q.    What's the maximum number of
17  detainees that you recall in total being back in
18  holding?
19      A.    I wouldn't speculate.  I don't know.
20      Q.    I'm not asking you to speculate.
21      A.    Yeah.
22      Q.    But, surely, I mean, you would agree
23  with me, overcrowding is a serious situation?
24      A.    Yes.
25      Q.    And so, presumably, in your

Page 54

1  capacity, realizing the seriousness of the
2  situation, surely you recall at least some
3  numbers of inmates that gave you pause and
4  concern, correct?
5      A.  Anything that was -- that we knew
6  that couldn't get out, you know.  If you had them
7  over 80 and you didn't see where that was being
8  alleviated through either the commissioner or
9  people being released, yeah, we would have to get
10  that down to the 80 number.
11      Q.  Do you ever recall a situation,
12  though, where you had 160 in holding?
13      A.  I don't, no.
14      Q.  Do you ever recall a situation where
15  you had a 150 in holding?
16      A.  No.
17      Q.  Do you recall a situation where you
18  had 140 in holding?
19      A.  No.
20      Q.  Do you recall a situation where you
21  had 130 in holding?
22      A.  No.
23      Q.  Do you recall a situation where you
24  had 120 in holding?
25      A.  No.

Page 55

1      Q.  Do you recall a situation where you
2  ever had over 80 in holding?
3      A.  That happened at times, yes.
4      Q.  Okay.  And what is the number that
5  you recall being the maximum amount between 80
6  and 120 that you recall?
7      A.  I couldn't put a number on it.  I
8  don't -- I don't remember.
9      Q.  You just know that you were above
10  80, but you have no recollection ever of any high
11  number saying, "I can't believe one time we even
12  got up to 'X'"?
13      A.  No.
14      Q.  Okay.  Despite the fact that you
15  were overseeing the entire jail?
16      A.  I oversaw the jail through my major,
17  yes.
18      Q.  Okay.  So despite the fact that you
19  oversaw the jail, you oversaw an overcrowding
20  situation, you just have no recollection as to
21  any maximum number or high number to tell me here
22  today, correct?
23      A.  Correct.
24      Q.  All right.  When did you first
25  become aware that there was this overcrowding

Page 56

1  situation that was occurring periodically at St.
2  Tammany Jail?
3      A.  So you're -- it's been going on for
4  quite a time.
5      Q.  How long?
6      A.  What's our time frame that we're
7  talking about?  Like --
8      Q.  The earliest date you remember.
9  Earliest year you remember.
10      A.  Sir, it's a periodic deal where it
11  becomes overcrowded.
12      Q.  All right.  What's the earliest date
13  you remember?
14      A.  I couldn't give you a date.
15      Q.  What's the earliest year you
16  remember?
17      A.  Like I'm saying, it's been an
18  ongoing issue.
19      Q.  All right.  So since you know it's
20  been ongoing, what's the earliest time you
21  remember?
22      A.  We've been -- I've been at the jail
23  for a long time.  So --
24      Q.  Okay.
25      A.  -- late '90s, early 2000s.

Page 57

1      Q.  Okay.  So this was -- by 2019, this
2  was not a new problem?
3      A.  No.
4      Q.  Correct?
5      A.  Correct.
6      Q.  All right.  And so what had been
7  done since the '90s through 2019 to address the
8  overcrowding situation?
9      A.  So since the '90s to 2019, the -- I
10  worked under the former sheriff as well.  At the
11  time, to relieve overcrowding, we started what we
12  called a Code 6 Program.
13      Q.  All right.
14      A.  So that was then shut down by the
15  courts to not do that.
16      Q.  What was the Code 6 Program?
17      A.  The Code 6 Program is where we would
18  evaluate an inmate coming into our facility, and
19  in the event of overcrowding, we would give those
20  names to the Code 6 office.  They would do a
21  list, and we would Code 6 them if the courts
22  didn't release them --
23      Q.  I'm not sure --
24      A.  -- meaning --
25      Q.  I don't understand Code 6.

GREGORY LONGINO on 01/18/2023

Page 58

1    A.    -- that sheriff -- that sheriff at
2  that time later found out we didn't have
3  authority to release those inmates, so that
4  process was stopped.
5    Q.    What is Code 6, just because I don't
6  --
7    A.    Code 6 is where -- it was created to
8  do -- relieve our overcrowding in holding and/or
9  throughout the jail.  So a person would come to
10  jail.  They would be processed by corrections
11  staff, and they would also be looked at and given
12  a score by the Code 6 office to say, "This
13  person, if presented, we think should be
14  released."  But that would still go through --
15  well, we didn't have a commissioner at the time
16  -- but through the judges.  And if they didn't
17  release them at the time, the jail staff would
18  release them.
19    Q.    Okay.  How did that office come to
20  be named Code 6?
21    A.    It was a derivative of a Code 6
22  office they had in Jefferson Parish.  It wasn't
23  -- it wasn't -- that's what it was called.
24    Q.    I'm sorry.  I misunderstood.  You
25  said off Jefferson Parish?

Page 59

1    A.    Yeah.  They had a program called
2  Code 6.  We named ours Code 6.
3    Q.    Oh, I see.  So --
4    A.    We didn't --
5    Q.    -- the neighboring jurisdiction had
6  this program, so you guys adopted it?
7    A.    Yes.
8    Q.    Which sheriff was that?
9    A.    That was under Jack Strain, Rodney
10  Jack Strain.
11    Q.    And so Rodney Strain recognized that
12  there was an overcrowding issue and, in response,
13  developed an overcrowding plan, which was Code 6,
14  correct?
15    A.    Yes.
16    Q.    And then the Court said, "You can't
17  continue with this program," correct?
18    A.    Yes.
19    Q.    All right.  So once -- well, why was
20  it that -- why did -- why did that sheriff care
21  about the overcrowding issue, I guess?
22    MR. COLLINGS:
23      Object to the form.
24  BY MR. JACOB:
25    Q.    Do you know?  I mean, why did he

Page 60

1  even address it or try to address it?
2    A.    Because it was an issue.
3    Q.    What's the issue, though?  I mean,
4  what's the -- so what if it's overcrowded?  I
5  mean, jails are supposed to be uncomfortable a
6  bit, right?
7    A.    No.
8    Q.    All right.  Well, then, what's the
9  -- who cares if there's overcrowding?
10    A.    He cared.
11    Q.    But why?
12    MR. COLLINGS:
13      Object to the form.
14    THE WITNESS:
15      I don't know why.
16  BY MR. JACOB:
17    Q.    Well, what's the -- do you see a
18  problem?  I mean, you're clearly trained in
19  corrections, correct?
20    A.    Yes.
21    Q.    I mean, you rose to a pretty high
22  level in the sheriff's office, correct?
23    A.    Yes.
24    Q.    And you wouldn't have done so unless
25  you were both experienced and educated to handle

Page 61

1  the position and the responsibilities that were
2  provided to you, correct?
3    A.    Yes.
4    Q.    All right.  So explain to me,
5  because I don't understand, what's the problem
6  with overcrowding?  Why can't you just have it?
7    MR. COLLINGS:
8      Object to the form.
9    THE WITNESS:
10      Why would you?  I don't understand
11    your question.
12  BY MR. JACOB:
13    Q.    Well, I mean, who cares?  There's
14  more important things to focus on, isn't there?
15  Like making sure the cell doors lock or making
16  sure there's food available.  I mean, who cares
17  about overcrowding?  So what if there's five
18  extra, you know, in the jail?
19    MR. COLLINGS:
20      Object to the form.
21    THE WITNESS:
22      If nobody cared, we wouldn't be
23    sitting here today.
24  BY MR. JACOB:
25    Q.    Why?

GREGORY LONGINO on 01/18/2023

62..65

Page 62

1       A.   Because you wouldn't be sitting
2   across the table from me.
3       Q.   Why?
4       A.   Because you didn't care.
5       Q.   Okay.  I care.  Why do you -- but I
6   care for different reasons maybe.  So why would
7   you, in corrections, decide, "Oh, this is
8   something I need to focus on"?
9       A.   It's still part of jail operations.
10  If there's overcrowding, we're out of compliance
11  with capacity.
12      Q.   I still don't understand, though.
13  What's the big deal?  I mean, if you're
14  obligated, for instance, by law to take the
15  pretrial detainees and so you just take them.  I
16  mean, there's -- is there -- is there a legal
17  concern with the overcrowding?
18      A.   I don't understand that question.
19      Q.   Is it a safety concern, a legal
20  concern, a compassion concern?  Why is it that
21  there was the Code 6 Program trying to alleviate
22  overcrowding?  Why was there a focus on trying to
23  alleviate overcrowding?
24      A.   Because we knew it to be a problem.
25      Q.   But what's the problem?

Page 63

1       MR. COLLINGS:
2           Object to the form.
3       THE WITNESS:
4           The problem is overcrowding.
5   BY MR. JACOB:
6       Q.   Right.  But why -- why does that
7   present a problem to the jail?
8       MR. COLLINGS:
9           Object to the form.  Asked and
10          answered multiple times.
11      MR. JACOB:
12          No.  He just keeps saying it's a
13          problem.  I want to know what the problem
14          is.
15      MR. COLLINGS:
16          I think the record says what it
17          says.  I think he has answered you.
18      MR. JACOB:
19          Thank you.
20      MR. COLLINGS:
21          Just you want a different answer.
22      MR. JACOB:
23          No speaking.
24      THE WITNESS:
25          It's overcrowding.  That's the

Page 64

1   problem.
2   BY MR. JACOB:
3       Q.   Okay.  So what does the overcrowding
4   problem cause for the jail?
5       A.   As far as -- so the holding cells
6   were overcrowded at times.  Not each and every
7   day.
8       Q.   Understood.
9       A.   Okay.  So -- but when it became a
10  problem or a concern or the fire marshal came in
11  and said, "Get down back down to your capacity in
12  holding," we got back down.
13      Q.   I mean, is it a safety issue?
14      A.   If you got two inmates in there,
15  it's a safety issue.
16      Q.   Okay.  But I'm asking --
17      A.   It don't have to be overcrowded to
18  be a safety issue.
19      Q.   Okay.  So there's no safety issue
20  presented by overcrowding.  Is that what you're
21  saying?
22      A.   I'm not saying that.  I'm saying if
23  you've got more than two inmates, there's a
24  safety issue with that inmate --
25      Q.   Okay.  Is it an increase -- sorry.

Page 65

1   We're stepping on each other.
2           Is there an increased safety issue
3   with overcrowding?
4       A.   I look at a safety issue would be a
5   safety issue.  I don't know if there's an
6   increase or -- or not.
7       Q.   So 20 inmates in a cell is the same
8   danger as two inmates in a cell?
9       A.   I don't know.  I couldn't answer
10  that.
11      Q.   With all your training and all your
12  experience, you can't tell me if, as a deputy,
13  you know, as a -- as high as you rose, you can't
14  tell me if 20 inmates in one cell is as dangerous
15  as two inmates in a cell?
16      MR. COLLINGS:
17          Objection.  Asked and answered.
18      THE WITNESS:
19          You're asking the question like as
20          -- the same as two and 20.
21  BY MR. JACOB:
22      Q.   Correct.
23      A.   That's what I'm hearing.
24      Q.   Right.  Is it the same?
25      A.   You're not -- you're not saying that

Page 66

1  it's more dangerous with 20 than two?
2      Q.   That's literally what I asked.  Is
3  it more dangerous with 20 than two?
4      A.   I wouldn't -- I wouldn't -- no.  If
5  you got -- like I say, if you got two inmates, it
6  can be as dangerous as if you have 20.
7      Q.   Okay.  So okay.  So overcrowding
8  doesn't present a safety issue.  Does it present
9  a health problem?
10     A.   I did not say it does not prevent.
11     Q.   Oh.
12     A.   I just said that any -- any amount
13  of inmates creates a safety issue.
14     Q.   Okay.
15     A.   So you're trying to say that it
16  increases the safety issue.
17     Q.   Well, I'm not trying to say
18  anything.  I'm just trying to understand.  I
19  mean, I want to rely on your experience and
20  education to educate me as to whether it does or
21  doesn't.  It seems like you're not sure whether
22  it does or doesn't increase the safety issue?
23     MR. COLLINGS:
24         Object to the form.
25     THE WITNESS:

Page 67

1          I can't definitively say that it
2  does.
3  BY MR. JACOB:
4      Q.   Okay.  So your training and
5  experience, you're not sure if 20 inmates would
6  be a more dangerous situation than two in a
7  holding cell; is that correct?
8      MR. COLLINGS:
9          Object to the form.  Asked and
10         answered.
11  BY MR. JACOB:
12     Q.   You just have no idea?
13     A.   As to what?
14     Q.   Again, I'll ask it again.  And if
15  there's any part of my question you don't
16  understand, let me know.  I'll be happy to, you
17  know, rephrase, restate.
18     A.   Uh-huh (affirmatively).
19     Q.   So my understanding is that based on
20  your years of training and experience and the
21  trust provided in you by the sheriff, that if you
22  were asked by the sheriff, "Hey, can you explain
23  to me whether it's more dangerous to have two
24  inmates in a cell or 20 inmates in a cell," you
25  would tell the sheriff, "I have no idea"?

Page 68

1      MR. COLLINGS:
2          Object to the form.
3      THE WITNESS:
4          I said from the beginning, more than
5      two inmates in a cell together creates a
6      safety concern.
7  BY MR. JACOB:
8      Q.   More than two?
9      A.   Two.  If you got two, they can harm
10  one another.
11     Q.   Right.
12     A.   They're at -- their safety is at
13  risk.
14     Q.   All right.  So we're in agreement.
15  You would tell the sheriff that you don't know if
16  it's going to be an increased danger to have 20
17  in a cell as opposed to two?
18     A.   I can't say that.
19     Q.   Okay.  Why can't you say that?
20     A.   I don't know that to be true.
21     Q.   All right.  So then you would tell
22  -- you would tell the sheriff, "Sheriff, I don't
23  know it to be true that it would increase danger
24  to have 20 in here as opposed to two," correct?
25     A.   Yes.

Page 69

1      MR. COLLINGS:
2          Object to the form.
3  BY MR. JACOB:
4      Q.   That's what you would tell him?
5      MR. COLLINGS:
6          Object to the form.
7  BY MR. JACOB:
8      Q.   Is that correct?
9      A.   Yes.
10     Q.   Okay.  Does overcrowding present a
11  health issue?
12     A.   I don't think that it does create a
13  -- create a health issue.
14     Q.   Okay.
15     A.   Overcrowding in and of itself.
16     Q.   Does overcrowding increase the risk
17  of health issues in a cell?
18     A.   I would say that the more people
19  come into contact with one another, especially
20  experiencing the last two years with COVID, it
21  could, yes.
22     Q.   It could?
23     A.   Yes.
24     Q.   Okay.  Do 20 people -- or excuse me.
25  Does overcrowding in a cell cause a manpower

Page 70

1  issue or a staffing issue for the jail?
2      A.   If overcrowding in and of itself
3  creates a manpower issue?
4      Q.   In a holding cell.  Yes.
5      A.   You have the staff to watch the --
6  the holding cells.  So if you had -- you wouldn't
7  bring in more staff to watch.  Your staff is
8  assigned to the holding cell or to a housing unit
9  or to -- you wouldn't call in extra staff.
10      Q.   If the sheriff came to you and said,
11  "I hired you because you're experienced, you're
12  trained, and you're educated about these topics.
13  Could you write me a memo explaining to me my
14  risks of having overcrowding in the holding
15  cells," what topics would you put in that memo?
16      A.   I've been away from there for about
17  three years now, so I wouldn't -- I wouldn't be
18  posed that question.
19      Q.   Okay.  When I ask you in front of a
20  jury that same question, what would you be
21  explaining to the jury?
22      A.   Like, what's the question?
23      Q.   Okay.  So I'm going to say in front
24  of a jury -- pretend you have a federal jury
25  sitting right there.

Page 71

1      A.   Yes.
2      Q.   And a federal judge sitting right
3  there.  And I'm going to say, "Sir, based on your
4  experience and training, can you tell me what you
5  would tell the sheriff if he asked you to explain
6  to him the risks associated with overcrowding,"
7  what would you tell the jury?
8      MR. COLLINGS:
9          Object to the form.
10      THE WITNESS:
11          The risks would -- the jail
12      population, whether it's overcrowded or
13      not, you still have the same risks.
14  BY MR. JACOB:
15      Q.   Okay.  So increased overcrowding
16  presents no increased risk?  Is that -- I just
17  wanted to make sure I understand you.
18      A.   Well, you're saying it as if we're
19  always overcrowded like --
20      Q.   Nope.  I never said that.
21      A.   -- every single day.  That's what
22  I'm hearing.  That's what I'm after.
23      Q.   Well, thank you for asking.  Now we
24  --
25      A.   That's what I'm hearing.

Page 72

1      Q.   All right.  So that's good.
2      A.   Yeah.
3      Q.   So now we're going to clarify that.
4  I'm glad you did that so we can make sure we both
5  understand each other.
6      A.   Yes.
7      Q.   So periodic overcrowding, if you
8  were asked by the sheriff, "What does periodic
9  overcrowding -- what are my risks associated with
10  that?  Can you tell me based on your training and
11  education," what would you tell the sheriff?
12      MR. COLLINGS:
13          Object to the form.
14      THE WITNESS:
15          A periodic overcrowding, you would
16      have -- one is the bed space.  One is the
17      -- as you're looking at the periodic
18      overcrowding, if I got -- like I said,
19      there's a lot of variables that go into
20      periodic overcrowding.  It's just not I'm
21      overcrowded, and I'm going to do nothing
22      and hope it alleviates itself.  So you
23      start working on the overcrowding first.
24  BY MR. JACOB:
25      Q.   I'm not asking you how to solve it.

Page 73

1  I just want to make sure.  I said the sheriff
2  asked you what his risks were when periodic
3  overcrowding occurs.  I'm not asking you how to
4  solve it.
5      A.   Okay.
6      Q.   He just wants to know what his risks
7  are in the facility.  Any increased risks?  Does
8  it make it safer to have overcrowding?
9      MR. COLLINGS:
10          Object to the form.
11      THE WITNESS:
12          If it -- if it doesn't make it safer
13      to have overcrowding versus not having it
14      overcrowded.  You keep asking me if it's
15      safer.
16  BY MR. JACOB:
17      Q.   No.  I'm asking you literally to
18  just tell me what the risks are, if any?  If
19  there's no risks, then just say, "Hey, there's no
20  risks with this."
21      A.   Well, as I've said, like the -- if
22  you have inmates in holding or in the housing
23  unit, there's a risk.
24      Q.   Okay.  So there's a risk.  And then
25  if we take that holding to overcrowding, is the

Page 74

1  risk the same?
2      A.   It's still a risk.  I don't --
3      Q.   If we take that holding cell from
4  the risks as normal, you know, proper housing to
5  overcrowding, is there an increased risk?
6      MR. COLLINGS:
7          Object to the form.
8  BY MR. JACOB:
9      Q.   Or is it the same risk?
10          You have three options.  You have
11  less risk, same risk, or increased risk.  Which
12  are you choosing?
13      MR. COLLINGS:
14          Object to the form.
15      THE WITNESS:
16          I would say it's a risk.  I can't
17      tell you that it's a lesser risk or more
18      of a risk.  It's a risk.
19  BY MR. JACOB:
20      Q.   Okay.  So you just cannot tell me if
21  it's a lower risk, the same risk, or an increased
22  risk?  That's what I understand you saying; is
23  that correct?
24      MR. COLLINGS:
25          Objection.  Asked and answered.

Page 75

1      THE WITNESS:
2          Yes.
3  BY MR. JACOB:
4      Q.   Okay.  So when the Code 6 Program
5  was disbanded, were you working there at that
6  time?
7      A.   Yes.
8      Q.   And so when that program was
9  disbanded, presumably, the sheriff was still
10  concerned about the overcrowding issue, correct?
11      MR. COLLINGS:
12          Object to the form.
13      THE WITNESS:
14          Yes.
15  BY MR. JACOB:
16      Q.   And so then what was next?  What was
17  the next plan of attack for this problem?
18      A.   After the judges said, "You can no
19  longer do that, you have to go through the
20  commissioner for jail overcrowding," we had to go
21  through the commissioner for jail overcrowding.
22      Q.   Okay.  And so was there a process
23  put in place to go through the commissioner for
24  jail overcrowding?
25      A.   So at that time we still -- we have

Page 76

1  a -- well, I don't know if they still have it.
2  And I don't even know why I'm saying, "we."
3      Q.   Fair enough.
4      A.   At the time there was an employee
5  assigned to work with the commissioner on -- like
6  if we had a problem, we would say, "We have an
7  issue with overcrowding," that person would give
8  him information that he needed to alleviate it.
9  Now, it was still his discretion to release
10  inmates or not.
11      Q.   Okay.  So I'm understanding then
12  that when Code 6 was disbanded, the sheriff
13  assigned an employee to the specific
14  responsibility of staying in touch with the
15  commissioner about housing levels and any
16  overcrowding situation?
17      A.   Not only housing levels.  They
18  worked there -- well, they don't work for the
19  commissioner, but they gave him any information
20  for any inmate in our facility.  Like, if he
21  asked for, "Get the information on Greg Longino,"
22  they would get the information on Greg Longino.
23  It could be for bonding purposes.  It could be
24  for Code 6.  It could be for jail overcrowding.
25  They weren't specifically -- they was there to

Page 77

1  help the commissioner get the information from
2  the jail that he needed.
3      Q.   Okay.  But what I understood was --
4  because, remember, we were talking about once
5  Code 6 was disbanded.
6      A.   Yes.
7      Q.   And you said that there was an
8  employee that would work with the commission on
9  the issue; is that correct?
10      A.   Commissioner.
11      Q.   Commissioner.  I'm sorry.  Is that
12  correct?
13      A.   They would work on the jail
14  information and getting him that information,
15  whether it was due to overcrowding, setting a
16  bond.  Whatever information he need, they would
17  get him that information.
18      Q.   Okay.
19      A.   And it did include for jail
20  overcrowding.
21      Q.   But was that a change that was put
22  in place when Code 6 was disbanded?
23      A.   Yes.
24      Q.   All right.  So there was a change.
25  That employee had a new responsibility, correct?

Page 78

1    A.   Yes.
2    Q.   And that new responsibility was to
3 work with the commissioner on the overcrowding
4 situation, correct?
5    A.   At times they would work with the
6 commissioner on the overcrowding situation.  That
7 wasn't their only job.
8    Q.   Understood.
9    A.   They was there to provide
10 information.
11    Q.   But that was an added responsibility
12 when Code 6 was disbanded; is that correct?
13    A.   Yes.
14    Q.   All right.  And how long did that
15 continue?
16    A.   It continued up until I left the
17 agency.
18    Q.   Okay.  You had said, though, that
19 there were times that you and the sheriff would
20 petition the judge and the commissioner on the
21 overcrowding situation.  I guess, why would you
22 two need to be involved if there's already this
23 employee involved now?
24    A.   Well, I don't know that I said, "I
25 and the sheriff."  I would inform the sheriff.

Page 79

1 I've never known the sheriff to be in a meeting
2 with me and the judge.  So I don't know if I said
3 that or --
4    Q.   I must have misunderstood.
5    A.   So when I tell the sheriff, I got to
6 go handle it as the deputy chief.  I know he
7 don't come in the office with the judge.  I went
8 and did that.  So I don't -- I don't want that to
9 be like the sheriff was in the office doing this,
10 that, that.  And, you know, I may have used the
11 wrong word in "petition."  Because I think we're
12 getting into like we petitioned the Court.  But
13 we would go to the chief judge and say, "We have
14 an overcrowding problem."  And at that time they
15 would work from there.
16    Q.   The added responsibility to this
17 employee to work with the commissioner on
18 overcrowding, was that added responsibility to
19 you?  Were you that employee?
20    A.   No.
21    Q.   Okay.  So there are then two people.
22 We have that employee working on the
23 overcrowding.  But then you're telling me there
24 were times that you, as deputy chief, would say,
25 "I have to go handle this with the commissioner."

Page 80

1    When would the employee handle it,
2 and when would you have to handle it?
3    A.   That's been -- like, we keep trying
4 to give that employee the only job --
5    Q.   Nope.  Never did.
6    A.   -- well, you just keep saying --
7 boxing it to overcrowding.
8    MR. COLLINGS:
9       Just can I ask that y'all not talk
10    over each other because, you're going to
11    make it difficult for the court reporter.
12    I'm noting for the record y'all are both
13    doing it.
14    THE WITNESS:
15       Okay.
16 BY MR. JACOB:
17    Q.   Okay.  So, no, actually I never said
18 it was the only job.  What I said was the
19 employee who was responsible for the overcrowding
20 would talk to the commissioner, and you, at
21 times, would talk to the commissioner about the
22 overcrowding, is what I understood you to say; is
23 that correct?
24    A.   Yes.
25    Q.   All right.  So when was it for the

Page 81

1 employee to discuss the overcrowding with the
2 commissioner, and when was it for you, as deputy
3 chief, to discuss the issue with the
4 commissioner?
5    A.   Well, it was -- that was part of
6 their job, is to give the commissioner the
7 information.  And when I saw that we were over
8 capacity, we had no means to release any inmates,
9 no ones have been released and you're over
10 capacity, I would get with the commissioner and
11 let him know, "Hey, look, we have an issue in
12 holding, and we need some relief."  All right?
13 At that time, he would either help or help as
14 much as he could.  If it didn't alleviate the
15 situation, we would have to go to the chief
16 judge.
17    Q.   What's the purpose -- I'm sorry.  I
18 cut you off.  Go ahead.  Were you done?
19    A.   Yeah, I'm done.
20    Q.   Sorry.  What's the purpose of a
21 holding cell?
22    A.   To hold an inmate until they're
23 assigned to a permanent housing unit.
24    Q.   And how long do they stay in
25 holding?

Page 82

1    A.    How long do they stay in holding?
2  It depends.
3        Q.    On?
4        A.    On if they can bond out, if they're
5  going to be there long term, or if the courts
6  release them or not.  So it just depends.
7        Q.    According to the sheriff's office
8  policy and practice back in 2019, what was the
9  longest time that detainees were permitted to
10  remain in holding?
11        A.    We didn't have a policy on how long
12  they were permitted to stay in holding.
13        Q.    Are holding cells constructed or
14  designed, laid out differently than the main
15  housing, general population cells?
16        A.    Yes.
17        Q.    And how do they differ?
18        A.    The holding cell is -- the male
19  holding cell, the holding cells that we're
20  referring to, are concrete benches, a toilet in
21  the corner, a phone in the corner versus a
22  housing unit has bed space.
23        Q.    Bed space?  Well, they're --
24        A.    Like, they got beds, and there's all
25  their jailhouse issue, the mattress, the sheets,

Page 83

1  the blankets, the pillow, all of that.
2        Q.    Would -- would it be cheaper to
3  build a holding cell or a general population
4  cell?
5        MR. COLLINGS:
6            Object to the form.
7        THE WITNESS:
8            It depends on what you want your
9  holding cell to look like.
10  BY MR. JACOB:
11        Q.    No.  I'm saying -- I'm sorry.  The
12  current holding cells versus the current general
13  population cells, would you agree with me it's
14  cheaper to build a holding cell?
15        MR. COLLINGS:
16            Object to the form.
17        THE WITNESS:
18            It could be cheaper, yes.
19  BY MR. JACOB:
20        Q.    So why is it that the sheriff or the
21  parish would create these general population
22  cells?
23        MR. COLLINGS:
24            Object to the form.
25  BY MR. JACOB:

Page 84

1        Q.    Why wouldn't they all just be
2  holding cells throughout the whole facility?
3        MR. COLLINGS:
4            Object to the form.
5        THE WITNESS:
6            Why wouldn't they all be holding
7  cells?
8  BY MR. JACOB:
9        Q.    Yes.
10        A.    Because holding is for a person
11  getting processed in and await a bed.  And once
12  we get a bed in the back of the jail, they're
13  moved to that particular bed.
14        Q.    Right.  But why not just put -- why
15  not just have all -- I mean, don't you alleviate
16  the entire problem if all the cells are exactly
17  the same and just put them in a cell with a
18  cement bench, and let them wait out their
19  sentence?  Why not just do that?
20        A.    Because when they're admitted to
21  your count, they're going to a housing unit where
22  they're to be housed for long term.
23        Q.    Why can't they do long term in a
24  cell with a bench the same way as holding?
25        MR. COLLINGS:

Page 85

1            Object to the form.
2        THE WITNESS:
3            That's not how it's done.
4  BY MR. JACOB:
5        Q.    Well, I know that's not how it's
6  done.  I'm asking why is it not done that way?
7        A.    It's just not how it's done.
8  There's no rhyme or reason.  When a person -- we
9  have a bed in the back of the facility, and we
10  move that person out of a holding cell to that
11  bed for a pretrial detainee.
12        Q.    So it's just completely arbitrary
13  that general population cells differ from holding
14  cells in their design and layout?
15        MR. COLLINGS:
16            Object to the form.
17        THE WITNESS:
18            Well, they are completely arbitrary?
19  BY MR. JACOB:
20        Q.    Right.
21        A.    So they're designed for long-term
22  housing.
23        Q.    Okay.
24        A.    The housing unit.
25        Q.    Long-term housing?

Page 86

1      A.   Yes.
2      Q.   So what is it that you need to live
3  in long-term housing that you don't have in the
4  holding cell?
5      A.   Like the -- as far as living
6  amenities?  Or what are you talking about?
7  Design?  Amenities?  What are you saying?
8      Q.   Well, you said one is designed for
9  long-term housing.  Then I'm going to assume,
10  correct me if I'm wrong, that holding is not
11  designed for long-term housing?
12      A.   It is not designed for long-term
13  housing.
14      Q.   And I guess I'm asking what is it
15  that a detainee or an inmate would need to live
16  long term in a cell as opposed to not long term
17  in a cell?
18      MR. COLLINGS:
19          Object to the form.
20      THE WITNESS:
21          Okay.  Well, they would need -- they
22      would get a bed, so they would need
23      bedding.  They would need their sheets,
24      pillow, pillowcase, all the -- toothpaste
25      toothbrush, soap.  But some of that they

Page 87

1      get in holding.  Some of it they don't.
2      So they wouldn't get a mattress or
3      something unless it was medically
4      prescribed.  But if they're going to be
5      there long term, meaning they've done
6      their stint in the holding cell, and
7      they've gotten a bed, they're probably
8      going to be with you.
9  BY MR. JACOB:
10      Q.   Okay.  You said, "done their stint,"
11  as if it's you got to serve a period of time in
12  holding?
13      A.   Yeah.
14      Q.   And then you --
15      A.   Or served a period of time in
16  holding.
17      Q.   Okay.  Why is it that general
18  population inmates, though, need a mattress or
19  need a pillow or need sheets?
20      MR. COLLINGS:
21          Object to the form.
22      THE WITNESS:
23          Why is it they need it?
24  BY MR. JACOB:
25      Q.   Yes.

Page 88

1      A.   Because they're getting a mattress,
2  and they're getting a bed.  That's one of the
3  standards.
4      Q.   What standards?
5      A.   Like a basic jail guideline.
6      Q.   What basic jail guideline?
7      A.   Like through the Department of
8  Corrections.  They get bedding, you know, when
9  they're assigned to a permanent housing unit.
10      Q.   But those DOC guidelines only
11  pertain to DOC inmates, correct?
12      A.   Yeah.  But they're -- if you're
13  going to go by -- it goes throughout the
14  facility.  Bedding is bedding.  It's not just for
15  DOC inmates or a federal inmate.  You also give
16  it to the pretrial inmate as well when they get
17  to permanent housing.
18      Q.   But you don't have to, correct?
19      A.   Yes.
20      Q.   You do have to?
21      A.   Yes.
22      Q.   Why?
23      A.   They get bedding when they go to a
24  permanent housing unit.
25      Q.   But why, I guess, is what I'm

Page 89

1  saying?  I know you do it.  I know the jail did
2  it.  But I'm asking why did the jail do it if the
3  jail did not have to do it?
4      MR. COLLINGS:
5          Object to the form.
6  BY MR. JACOB:
7      Q.   Just to be nice?
8      MR. COLLINGS:
9          Object to the form.
10      THE WITNESS:
11          No.
12  BY MR. JACOB:
13      Q.   Okay.  So not just to be nice.  Then
14  why?  I heard there's no regulation that required
15  it in pretrial.  I hear it's not to just be nice.
16  So then why was a mattress, pillow, sheets
17  provided to the inmates in the pretrial bed -- in
18  the pretrial cells?
19      A.   So the -- when we -- when a person
20  is admitted to our jail, part of it is they get
21  out of holding into a permanent housing unit,
22  they get bedding because they get a bed.
23      Q.   Why do they get a bed?
24      A.   Because that's part of the housing
25  unit design.

GREGORY LONGINO on 01/18/2023

90..93

Page 90

1    Q.   Why was it designed that way for
2   them to have a bed?
3       MR. COLLINGS:
4           Object to the form.
5       THE WITNESS:
6           They're going to be there long term.
7   BY MR. JACOB:
8       Q.   So what?  Why can't they just sleep
9   on the floor like they did sometimes in holding?
10  What's the big deal?
11      MR. COLLINGS:
12          Object to the form.
13      THE WITNESS:
14          As far as the why, the standard is
15      when they go to the back, whether you're
16      pretrial -- well, I don't want to say,
17      "the standard is," but it's really a
18      standard -- but they get bedding.
19  BY MR. JACOB:
20      Q.   Okay.  Now, is it or is it not a
21  standard?
22      A.   There's a standard for Department of
23  Corrections that we accepted this policy to give
24  them bedding when they go to a permanent housing
25  unit.

Page 91

1       Q.   Okay.  So there's a standard for DOC
2   for DOC inmates that the jail adopted and made
3   policy for general population pretrial detainees;
4   is that correct?
5       A.   Yes.
6       Q.   And why is it that the jail decided
7   to adopt that standard as policy for the general
8   population inmates?
9       A.   Because it's a standard that we go
10  by, the State.
11      Q.   No, I understand that.  But we've
12  already established you don't have to do the DOC
13  standard for pretrial, which is why it became a
14  policy, correct?  It was a decision that, yeah,
15  we're going to follow it anyway, correct?
16      A.   It didn't happen like that.  But
17  wherever DOC inmates are housed in a facility,
18  they would need those things.  So everybody gets
19  bedding.
20      Q.   But DOC inmates are not put in
21  federal housing, correct?
22      A.   No.
23      Q.   And DOC inmates are not put in
24  pretrial housing, correct?
25      A.   No.

Page 92

1       Q.   So then as long as DOC housing has
2   it, you're complying with the standard, correct?
3       A.   The basic jail guidelines, yes.
4       Q.   For the DOC, correct?
5       A.   Yes.
6       Q.   All right.  So now we're just
7   talking about pretrial.  DOC standard does not
8   say, "By the way, not just our inmates but the
9   inmates that are pretrial parish inmates, you
10  also have to treat the following way," correct?
11      MR. COLLINGS:
12          Object to the form.
13      THE WITNESS:
14          I'm not -- I'm not getting your
15      question.
16  BY MR. JACOB:
17      Q.   Yeah.  DOC standards does not say
18  that, "If you house our inmates, then all inmates
19  that you house, even if they're not our inmates,
20  you must comply with our standards," correct?
21      A.   No, it does not say that.
22      Q.   All right.  So we can just set that
23  standard aside then for a minute.
24      A.   Okay.
25      Q.   Now, you said that the sheriff

Page 93

1   adopted a policy, though, that said, "We are
2   going to give bedding to our pretrial detainees
3   even though we don't have to," correct?
4       MR. COLLINGS:
5           Object to the form.
6       THE WITNESS:
7           The policy is we're going to give a
8       person that is admitted to a long-term
9       housing unit bedding.
10  BY MR. JACOB:
11      Q.   Okay.  Why?  Why not just have them
12  sleep on the floor?
13      MR. COLLINGS:
14          Object to the form.
15      THE WITNESS:
16          Opposed to staying in holding?  Or
17      what are you saying?
18  BY MR. JACOB:
19      Q.   Why not have the pretrials -- you
20  said funding is tight.  So why not just have them
21  sleep on the floor back in general population,
22  save the cost of bedding?
23      A.   When the jail was designed, it had
24  bedding, so --
25      Q.   Well, bedding gets replaced,

Page 94

1  correct?
2      A.   As far as?
3      Q.   Meaning you don't have the original
4  bedding from when the jail opened, do you?
5      A.   No.
6      Q.   All right.  So then at some point
7  there was a decision to continue -- after it was
8  designed, to continue to provide bedding to the
9  general population pretrial detainees, correct?
10     A.   Uh-huh (affirmatively).
11     Q.   "Yes"?
12     A.   Yes.  I'm sorry.
13     Q.   Why?
14     MR. COLLINGS:
15         Object to the form.
16     THE WITNESS:
17         It's also a jail standard, like, to
18     give bedding to a person going to a house
19     unit.  It's not only a DOC standard.  It's
20     also a standard.
21  BY MR. JACOB:
22     Q.   Is that Title 22?
23     MR. COLLINGS:
24         Object to the form.
25     THE WITNESS:

Page 95

1         I don't know exactly the title.
2  BY MR. JACOB:
3      Q.   But it's your understanding that
4  there's a jail standard that is applicable and
5  binding on the jail to provide bedding to a
6  general population detainee?
7      A.   Yes.
8      MR. COLLINGS:
9         Object to the form.
10     THE WITNESS:
11         I'm sorry.
12  BY MR. JACOB:
13     Q.   And after how much time is it that
14  that detainee is to be provided with bedding
15  according to that standard?
16     MR. COLLINGS:
17         Object to the form.
18     THE WITNESS:
19         It doesn't necessarily state, like,
20     after a certain amount of time they need
21     bedding.
22  BY MR. JACOB:
23     Q.   After -- so you could conceivably,
24  if I'm understanding, keep that detainee in the
25  holding cell and never provide them with bedding

Page 96

1  for a year?
2      A.   No.
3      Q.   Why not?
4      A.   Why would I?  I mean, it's not --
5      Q.   No.  I didn't ask why you would.  I
6  asked why can't you?
7      A.   So why wouldn't I -- why would I
8  keep them there a year?
9      Q.   Are you permitted to keep a
10  detainee, a parish detainee, in a holding cell
11  for a year without bedding?  Yes or no?
12     A.   No.
13     Q.   And why not?
14     A.   They would need a bed if they're
15  there a year.
16     Q.   Why?  Why are you not permitted,
17  though?  You said you're not permitted.  Why are
18  you not permitted?
19     A.   Oh, you're talking about like to
20  have them in holding for -- what are you asking?
21  I'm --
22     Q.   Okay.  I'll ask the question again.
23  Why is you said that you're not permitted to have
24  a parish pretrial detainee in the holding cell
25  for a year without bedding?  You said you're not

Page 97

1  permitted to do that, so I'm asking you why not?
2      A.   Not permitted to have him in holding
3  a year, period, --
4      Q.   All right.  What's the --
5      A.   -- with or without bedding.
6      Q.   Okay.  What's the limit, then, for
7  holding them in holding?
8      A.   As far as holding them in holding,
9  according to the administrative, it's 48 hours to
10  move them out of an individual holding cell.
11     Q.   You said, "according to the
12  administrative."  Do you mean according --
13     A.   Administrative law for the state of
14  Louisiana, yes.
15     Q.   According -- it's your understanding
16  that according to administrative law for the
17  state of Louisiana that you have 48 hours to move
18  an inmate from holding into a bed?
19     A.   From an individual holding cell.
20     MR. COLLINGS:
21         Object to the form.
22  BY MR. JACOB:
23     Q.   From an individual holding cell to a
24  general population bed?
25     A.   Yes.

Page 98

1    Q.    Okay.  That's your understanding?
2    A.    Yes.
3    Q.    All right.  And where did your
4  understanding come from?
5    A.    Administrative law, code.
6    Q.    And was it your understanding that
7  that was law that had to be followed?
8    A.    As it pertains to individual holding
9  cells.
10    Q.    So you did understand it to be a law
11  that had to be complied with or not?
12    A.    Yeah.  But I can't enforce it and
13  comply with it.
14    Q.    So you did understand it to be a law
15  to be complied with or not?
16    MR. COLLINGS:
17        Object to the form.
18    THE WITNESS:
19        As far as the individual holding
20        cell, we couldn't keep them in an
21        individual holding cell for 48 hours.
22  BY MR. JACOB:
23    Q.    So you did understand it to be law
24  to be complied with or not?
25    A.    Yes.

Page 99

1    Q.    All right.  And am I correct that
2  that law, that rule, was not being followed with
3  respect to the St. Tammany Parish Jail in 2019?
4    A.    I would say that that 48-hour to be
5  in holding, an individual holding cell, no.
6    Q.    Do you -- do you see any problem
7  with -- from a corrections standpoint, do you see
8  any problem with a detainee not having bedding
9  past the 48 hours?
10    A.    Do I see a problem with it?
11    Q.    Yes.
12    A.    When you say, "bedding," we did
13  issue them a blanket and stuff in holding.
14    Q.    Well, not in --
15    A.    But not a bed.
16    Q.    Well, not "and stuff."  You gave
17  them a blanket, correct?
18    A.    Gave them a blanket.  They took
19  showers and, you know, so --
20    Q.    But we're talking about bedding, so
21  --
22    A.    Bedding, no.  We gave them a
23  blanket, yes.
24    Q.    Okay.  And they slept on concrete
25  floors or benches, correct?

Page 100

1    A.    Yes.
2    Q.    Now, do you see a problem in
3  corrections with having the detainees sleep on
4  the concrete floor or concrete benches with just
5  a blanket past 48 hours?
6    A.    If they do not bond out, I can't --
7    Q.    I didn't ask that.
8    A.    Well, what are you asking then?
9    MR. COLLINGS:
10        Hold on.  You got to finish your
11        response before you start answering
12        another question.  Y'all keep doing that.
13    THE WITNESS:
14        I'm sorry.
15  BY MR. JACOB:
16    Q.    Okay.  But, actually, to expand on
17  that, you also need to answer my questions, not
18  the questions that you might want to answer.
19        So, again, is there a problem that
20  you see in corrections with having a detainee
21  sleeping on a concrete floor or concrete bench
22  with just a blanket past 48 hours?
23    A.    No.
24    Q.    And why not?
25    A.    Because if that person is admitted

Page 101

1  to our jail and they're awaiting bond or awaiting
2  trial, I have to house them, right?  So if I got
3  to house them, they've got to wait for the next
4  available bed in our facility.
5    Q.    Even if it takes a year?
6    MR. COLLINGS:
7        Object to the form.
8    THE WITNESS:
9        So it shouldn't take a year.  But if
10        he's not released by the courts, I have no
11        authority to release him.  If I don't have
12        a bed in the back of the jail, I have no
13        place to put that person.
14  BY MR. JACOB:
15    Q.    Well, you do.  You could put them in
16  POC empty beds, correct?
17    MR. COLLINGS:
18        I'm sorry, POC?
19  BY MR. JACOB:
20    Q.    Excuse me.  I'm sorry.
21  Pennsylvania.
22        The DOC beds, correct?
23    A.    I would not.
24    Q.    No, not would you.
25    A.    Well --

Page 102

1    Q.    If there's an empty bed, you could
2  put them in there, you just won't, correct?
3    A.    I would not.  And I could.
4    Q.    You could.  Okay.  And same with the
5  feds.  You wouldn't put them in there, but you
6  could, correct?
7    A.    Yes.
8    MR. COLLINGS:
9        Object to the form.
10  BY MR. JACOB:
11    Q.    All right.  So at some point, is
12  there a line crossed where you say, "This guy
13  cannot continue in holding without bedding"?
14    A.    No.
15    Q.    Okay.  So, again, you could
16  conceivably, according to how the jail -- the
17  practice in place, you would agree with me, in
18  2019, was that pretrial detainees can remain way
19  past or anytime past 48 hours in the holding cell
20  sleeping with just a blanket on a concrete floor,
21  a concrete bench even if there's an empty bed in
22  DO -- in the DOC wing and/or building and the
23  federal building, correct?
24    MR. COLLINGS:
25        Object to the form.

Page 103

1    THE WITNESS:
2        Correct.
3  BY MR. JACOB:
4    Q.    All right.  And it was the practice
5  in place that overcrowding can continue in
6  holding in 2019 even if that overcrowding could
7  have been alleviated by putting pretrial
8  detainees in DOC beds and federal beds, correct?
9    MR. COLLINGS:
10        Object to the form.
11    THE WITNESS:
12        It could, yes.
13  BY MR. JACOB:
14    Q.    Okay.  Was -- do you know what I
15  mean by a penological interest?
16    A.    An interest of the penal system or
17  jail or corrections facility.
18    Q.    Okay.  And how have you heard that
19  term utilized in the industry?
20    A.    I know it was through a training
21  that I heard that term.
22    Q.    Okay.  So you understand if I use
23  that term what I'm talking about?
24    A.    Yes.
25    Q.    Some interest that furthers or

Page 104

1  accomplishes the care, custody, and control of
2  inmates, correct?
3    A.    Yes.
4    Q.    All right.  So what penological
5  interest is furthered by overcrowding in the
6  holding cells?
7    A.    There is no penological interest in
8  overcrowding in the holding cells.
9    Q.    What penological interest is served
10  by having a detainee sleep on a cement floor?
11    A.    None.
12    Q.    What penological interest is served
13  by holding an inmate, a pretrial detainee, in a
14  holding cell when -- in an overcrowded situation
15  when there's an empty bed in the DOC and/or
16  federal buildings?
17    A.    None.
18    Q.    Okay.  Are you aware that there
19  were, as a result of overcrowding, inmates
20  sleeping on the floor of the holding cells?
21    A.    That's not as a result of
22  overcrowding.  They sleep on the floor and on the
23  benches of the holding cells when they have one
24  or two in there.  It's not specifically in
25  reference to overcrowding.

Page 105

1    Q.    Okay.  Would you agree with me,
2  though, that once there is overcrowding to the
3  extent of 20-plus inmates, it becomes a necessity
4  to sleep on floors as well as benches?
5    A.    Yes.
6    Q.    Okay.  And am I correct that the
7  lights don't turn off back in the general holding
8  area where they do in general population?
9    A.    So -- yes.
10    Q.    Okay.  Why?
11    A.    It's just like in all housing units.
12  Some lights stay on in housing units, but you cut
13  off the big lights.  But you do have lights on
14  for security measures, to see through the housing
15  unit.  And it's the same for the holding cell, so
16  that we can see in the holding cells.  Because
17  that's where a lot of your movement happens
18  throughout the day.  24 -- you're open up there
19  24 hours a day, just like in a housing unit.  But
20  you have inmates assigned to that housing unit,
21  so -- not like in the holding cell.  You may have
22  somebody come in at 1 o'clock in the morning.
23  You may have another come in at 2 o'clock in the
24  morning.  It may be constant movement, so --
25    Q.    Would you agree with me, though,

GREGORY LONGINO on 01/18/2023

Page 106

1  that back in the general population, there is a
2  set of lights that are turned off around 10:00,
3  10:30, that come back on around 6:00 or so?
4      A.   Yes.
5      Q.   And that's for purposes of allowing
6  people to sleep, correct?
7      A.   Yes.
8      Q.   And back in the holding cell area,
9  there are no lights that go off at 10:30ish and
10 come back on at 6:00; is that correct?
11     A.   No.
12     Q.   It's not correct?
13     A.   No, you're right.
14     Q.   Oh, okay.
15     A.   I'm sorry.
16     Q.   So why was it determined that
17 certain lights need to go off back in the general
18 population area?
19     A.   They are like -- that's long-term
20 housing, and whenever they're back there at
21 10:30, lights are off.  Everything goes off.  I'm
22 saying 10:30.  I don't know if that's still a
23 rule.  But at the time, the lights are off.  It's
24 time to shut down for the night.
25     Q.   Was it just generally understood

Page 107

1  that if the lights aren't turned off for people
2  to sleep that it would have a negative impact on
3  their health and mental welfare?
4      A.   No.  I don't think that was
5  generally understood.
6      Q.   Then why is it that it was designed
7  that way?
8      A.   It was designed that way because you
9  have constant movement in the holding cells.
10     Q.   No.  My question is, why is it
11 designed to go off back in the general?  Sorry.
12 That was my poor question there.
13     A.   Okay.  In the general, like I said,
14 they're assigned to a long-term housing unit, and
15 at 10:30 that's -- the lights go off.
16     Q.   Right.  But why?  Why --
17     A.   So they can go to sleep.
18     Q.   So you're saying without that, it's
19 hard to sleep?
20     A.   I'm not saying that.  Because they
21 sleep throughout the whole day.  So I'm -- so
22 inmates sleep throughout the whole day with
23 lights on or with lights off.
24     Q.   Okay.
25     A.   And some of them are up all night

Page 108

1  with lights off.  So I can't say definitively
2  like, "They go to sleep because we cut off the
3  lights."
4      Q.   Do you know anything about the
5  circada (sic) rhythm of our bodies?
6          MR. COLLINGS:
7              Object to the form.
8  BY MR. JACOB:
9      Q.   I mean, have you heard of that?
10     A.   I'm pretty sure I have, but I don't
11 know what it is.
12     Q.   I mean, do you understand that with
13 light generally our bodies are made to wake up,
14 and with darkness our bodies are generally made
15 to go to sleep?
16         MR. COLLINGS:
17             Object to the form.
18         THE WITNESS:
19             I said I don't know what it is.
20 BY MR. JACOB:
21     Q.   Oh, okay.  Well, I'm asking you,
22 though.  Do you understand that light, for most
23 people, generally, just as a layperson, do you
24 understand that sunlight or no sunlight or when
25 it's light and dark, that impacts our sleep?

Page 109

1          MR. COLLINGS:
2              Object to the form.
3          THE WITNESS:
4              Yes.
5  BY MR. JACOB:
6      Q.   And do you think that may have
7  factored into the decision for lights to be
8  turned off at a certain time back in general
9  population?
10     A.   Like I say, I don't -- like, I don't
11 know what that's -- what you called it?  Circada
12 (sic) rhythm?
13     Q.   Yeah.
14     A.   Yeah.
15     Q.   I don't even know if that's right
16 either.
17     A.   That's not why the lights go off or
18 on.  The lights go off or on because that's -- at
19 10:30, it's time to go to sleep for lockdown.
20     Q.   Okay.  So --
21     A.   Movement stops and stuff like that.
22     Q.   Okay.  So you keep saying you don't
23 know why, but you keep saying it's so inmates can
24 go to sleep.
25     A.   Yeah.  It's time for -- it's time to

Page 110

1  go to sleep.  It's time to shut it down.
2  Everything is off.
3       Q.   Okay.
4       A.   That don't mean they go to sleep.
5       Q.   Why don't you -- why don't you leave
6  the lights on in general population all night and
7  then turn them off during the day?
8       MR. COLLINGS:
9            Object to the form.
10      THE WITNESS:
11           There's no reason.  It's they just
12      go off at night at 10:30.
13  BY MR. JACOB:
14      Q.   So it was just arbitrarily decided
15  that at 10:30, coincidentally around the time
16  that we want inmates to go to sleep, we're going
17  to turn off the lights, and they're going to come
18  back on coincidentally at the time we want them
19  to wake up?
20      A.   You can say that, yes.
21      Q.   Okay.  With respect to overcrowded
22  holding cells and the fact that there's a single
23  toilet, would you say that the cell becomes
24  dirtier due to overcrowding than it would if
25  there was just two inmates in the cell?

Page 111

1       A.   Yes.
2       Q.   Okay.  And am I correct, though,
3  that there is a policy for cleaning the cells?
4       A.   Yes.
5       Q.   And am I correct, though, that the
6  frequency or the cleaning of the cell, the
7  holding cells, did not change when there was
8  overcrowding as opposed to when there wasn't
9  overcrowding?
10      A.   No, they did not.
11      Q.   Okay.  So it was the same cleaning
12  schedule even when there was overcrowding?
13      A.   Yes.
14      Q.   And even the fact that it would be
15  dirtier in those cells during overcrowding?
16      A.   It will still get cleaned at the
17  same times.
18      Q.   Right.  So --
19      A.   It's still clean.
20      Q.   Right.  The same schedule even
21  though it was dirtier, correct?
22      A.   Yes.
23      Q.   Okay.  Have you ever seen toilet
24  paper stuck to the walls and ceilings of the
25  holding cell areas?

Page 112

1       A.   Yes.
2       Q.   Okay.  And, in fact, my
3  understanding is some of it's sort of like
4  furniture there.  It's been there for a while?
5       A.   I don't know that to be true but --
6       Q.   Okay.  I mean, have you seen some
7  that's been there for a while?
8       A.   At that time, I would walk through.
9  I wouldn't know how long it's been there.
10      Q.   All right.  But it wasn't something
11  that is, you know, scraped off the ceiling,
12  scraped off the walls every time the cell is
13  cleaned, correct?
14      A.   I can't say -- I can't say that it
15  was.  No.  I can't say that.  I wasn't there to
16  see it happen.
17      Q.   Okay.  But you know it was there at
18  times?
19      A.   It was there at times, yes.
20      Q.   All right.  And you know that at
21  times there was urine on the floor?
22      A.   I'm pretty sure.
23      Q.   And you know at times there was
24  feces on the floor?
25      A.   I'm pretty sure.

Page 113

1       Q.   And you know at times there was
2  vomit on the floor?
3       A.   I'm pretty sure, yes.
4       Q.   And you know at times there was
5  blood on the floor?
6       A.   Yes.
7       Q.   And you know at times there were
8  inmates in holding cells with open wounds?
9       A.   It's possible.
10      Q.   But do you know that it has
11  happened?
12      A.   I'm pretty sure.  Inmates have come
13  in there with open wounds.
14      Q.   And am I correct that the schedule
15  for cleaning, though, still always remained the
16  same?
17      A.   So the schedule for cleaning always
18  remained the same.  But if you see some puke on
19  the floor or some urine on the floor, you clean
20  it up.
21      Q.   Well, you would hope so?
22      A.   I would hope.
23      Q.   Okay.  But there's no policy
24  requiring that the cell be sanitized if someone
25  vomited on the floor, correct?

Page 114

```
1    MR. COLLINGS:
2        Object to the form.
3    THE WITNESS:
4        I'm sorry. If any fluids come out
5    of you, it's to be cleaned up. If bodily
6    fluids hit the floor, hit the atmosphere,
7    blood, spit, urine, feces, any of that,
8    vomit, you clean it up. You know, you
9    don't let it stay there if you are aware
10   of it.
11   BY MR. JACOB:
12       Q.   Okay. So every time the cell would
13   be emptied and sterilized if someone vomited, if
14   someone bled, if somebody urinated on the floor?
15       A.   I don't know if that happened every
16   time.
17       Q.   Okay. Well, what was the policy,
18   then, that was in place if there was some blood
19   on the floor, vomit on the floor? Was the cell
20   to be emptied and resterilized in addition to the
21   regular cleaning schedule?
22       A.   It was to be cleaned. When you say,
23   "sterilized" --
24       Q.   For biohazards?
25       A.   Yes.
```

Page 115

```
1        Q.   Was it sterilized for biohazards?
2        A.   As far as the blood, urine, feces,
3    vomit, you would have to clean that up with a
4    solution. I don't know what solution it is, but
5    in goes in the water, and they mop it up.
6        Q.   All right. So they mop the cell.
7    So is it your testimony, then, that -- was there
8    a policy in place that if somebody vomits, if
9    somebody urinates on the floor, if there's blood
10   on the floor, the cell has to be emptied of all
11   inmates and the cell mopped and sterilized?
12       A.   That's -- no.
13       Q.   "No"?
14       A.   No.
15       Q.   All right. And that -- that's not
16   something that that happened in 2019, correct?
17   The cell wasn't emptied and sterilized in those
18   situations?
19       MR. COLLINGS:
20           Object to the form.
21   BY MR. JACOB:
22       Q.   Correct?
23       A.   I do not know that. No. I wasn't
24   personally there, so I can't say yea or nay, so
25   -- yes or no. I'm sorry.
```

Page 116

```
1        Q.   All right. Let me ask it this way.
2    If the plaintiffs say that that didn't happen,
3    you don't have any evidence that -- that they're
4    wrong, that, in fact, the cell was emptied and
5    was cleaned and was sterilized when that
6    happened?
7        A.   I personally have no knowledge.
8        Q.   You have no knowledge, no evidence
9    to refute that, correct?
10       A.   I do not.
11       Q.   Meaning you can't say, "No.
12   Actually, I have checked logs and every single
13   time that happened, it was we dumped the cell,
14   we, you know, sanitized"? You can't say that
15   that happened?
16       MR. COLLINGS:
17           Object to the form.
18   THE WITNESS:
19           I certainly can't say it now because
20   I've been gone since -- well, about three
21   years, since October 11th. So, no, I
22   couldn't say that.
23   BY MR. JACOB:
24       Q.   Okay. And you never knew that to be
25   the practice, correct?
```

Page 117

```
1        A.   What's that?
2        Q.   To dump the cell, mop out the whole
3    cell, sterilize it from top to bottom in those
4    situations?
5        A.   From top to bottom, no.
6        Q.   Okay.
7        A.   But they were to clean up whatever
8    is affected, get it out of there, sterilize it
9    with whatever solution they have. But it wasn't
10   a top to bottom cleaning, no.
11       Q.   Okay. But, again, you didn't know
12   it to be the practice that if someone vomited in
13   a cell, they dumped the whole cell, they mopped
14   out the whole cell, and they sterilized the cell,
15   correct?
16       MR. COLLINGS:
17           Object to the form. Asked and
18   answered.
19   BY MR. JACOB:
20       Q.   You didn't know that to be the
21   practice, correct?
22       A.   No.
23       Q.   "No," you did not know it to be the
24   practice?
25       A.   I did not know it to be the
```

GREGORY LONGINO on 01/18/2023

118..121

Page 118

1  practice.
2      Q.    All right.  Do you know, since you
3  were involved in operations, whether -- I'm
4  trying to see how to ask this right -- whether
5  the sheriff received or the jail received more
6  funds for a federal inmate or a DOC inmate than
7  for a parish detainee?
8      A.    You're talking about per diem?
9      Q.    Just in general.  However the money
10  comes in.
11      A.    You get more for housing a federal
12  inmate than housing a DOC inmate than housing a
13  pretrial inmate.
14      Q.    So the pretrial inmate brings in the
15  least amount of money?  Is that a correct
16  statement?
17      MR. COLLINGS:
18          Object to the form.
19      THE WITNESS:
20          Yes.
21  BY MR. JACOB:
22      Q.    Okay.  You've heard the jail
23  referred to as St. Slammany?
24      A.    Yes.
25      Q.    And when did you -- how long have

Page 119

1  you heard that?
2      A.    I guess since it's been around.  I
3  couldn't put a date and time on it.  But, yes,
4  I've heard that that's what it's called, St.
5  Slammany.
6      Q.    And do you know why it's called
7  that?
8      A.    Of the harsh sentences that are
9  passed out by the judges.
10      Q.    Of the what?
11      A.    The judges.
12      Q.    What about it?
13      A.    That's what St. Slammany is.
14      Q.    I don't understand.
15      A.    Like, it's for the harsh sentences,
16  what's being passed down by the judges.  That's
17  what St. Slammany is.  It's not because of the
18  jail.  It's because of the harsh sentences that
19  are passed down.
20      Q.    Well, that's interesting.  Okay.
21      A.    I'm just saying, like, that's --
22  that's why they call it -- that's my
23  understanding of St. Slammany, is you go over
24  there, if you commit a crime, you're going to
25  prison, and you're going for a mighty long time.

Page 120

1  More than if you were in another parish.
2      Q.    Okay.  Have you ever heard it in
3  reference to the jail itself?
4      A.    No, I have not.
5      Q.    Have you heard the reputation in the
6  community about the jail and whether it's a nice
7  place or not a nice place?
8      MR. COLLINGS:
9          Object to the form.
10      THE WITNESS:
11          I don't get too many people saying
12      it's a nice place.
13  BY MR. JACOB:
14      Q.    What are the -- so you're generally
15  familiar with, then, as far as the reputation of
16  the jail in the community?  Is that fair to say?
17      A.    Well, are we tying St. Slammany to
18  the jail or --
19      Q.    No.  I just asked you about the
20  jail.
21      A.    Okay.  The jail is the jail.  I
22  don't --
23      Q.    I'm not sure what that means.  But
24  are you generally familiar with the reputation of
25  the jail in the community?

Page 121

1      A.    Yes.
2      Q.    All right.  And what is the
3  reputation of the jail in the community?
4      A.    It's a jail.  It's -- it's -- you
5  know, "My son don't need to be there."  We get a
6  lot of the -- you're here in this jail, so we get
7  the brunt of, "My son shouldn't be there."  "I
8  can't help that.  I have to house him.  He's
9  here.  He's legally admitted to the jail," so --
10          But I don't get that we abuse
11  people, or I didn't get that we abused people or
12  any of that in the community.  Now, would they
13  tell me that?  I don't know but --
14      Q.    Fair enough.  Do you know the
15  reputation to be that the jail is a dirty place?
16      A.    No.
17      Q.    Do you know the reputation to be
18  that the jail is a dangerous place?
19      A.    All jails are dangerous.
20      Q.    That wasn't my question.
21      A.    All right.  But, no, I do not.
22      Q.    Do you know the reputation to be
23  that the holding cells are a horrible, inhumane
24  place to be?
25      A.    I know that people do not like our

Page 122

1  holding cells. Yes, I do know that.
2      Q.    All right.
3      A.    I don't know if the horrible,
4  inhumane place to be. They don't say it like
5  that. "It's a horrible place to be." Yes. And,
6  "I don't want to be in the holding cells."
7      Q.    And why not? Why do they say that?
8      A.    That they just don't want that
9  experience, you know. If they're there sleeping
10  on the floor, sleeping on the bench, you know,
11  they don't -- they don't like that experience.
12      Q.    And you would agree with me when the
13  holding cells are overcrowded and it's dirtier
14  than normal, there are situations where people
15  are sitting or laying on the dirty floors?
16      A.    I wouldn't just equate that to
17  overcrowding. I would say that throughout the
18  day even if you have -- the floors are -- the
19  floors get dirty until we clean them.
20      Q.    And, in fact, you know, because you
21  have a toilet area in the main area, that as
22  urine ends up on the floor, people walk around,
23  that's tracked throughout the cell, correct?
24      MR. COLLINGS:
25          Object to the form.

Page 123

1      THE WITNESS:
2          I don't know that to be true, and I
3      don't know it not to be true.
4  BY MR. JACOB:
5      Q.    Okay. And that's the same floor
6  that people would -- you've seen them sit, you've
7  have seen them lie on, correct?
8      A.    Yes.
9      Q.    All right. And that's the same
10  place where detainees are eating their meals,
11  correct?
12      A.    Not on the floor. They would sit on
13  the bench and eat their meals for the most part.
14      Q.    Even when it was overcrowded?
15      A.    They wouldn't sit on the floor, and
16  they wouldn't eat off the floor.
17      Q.    I didn't say, "eat off the floor."
18  I said, you know, you've seen inmates sitting on
19  the floor eating?
20      A.    Yes.
21      Q.    All right. And that's the same
22  dirty floor that is dirty until it's cleaned,
23  correct?
24      A.    Yes.
25      Q.    All right. How about toilet paper?

Page 124

1  Did you ever hear that only one roll was provided
2  at a time in the holding cells?
3      A.    Did I hear that?
4      Q.    (Nods head affirmatively.)
5      A.    No.
6      Q.    Did you know that?
7      A.    Yes.
8      Q.    And did you know that when that
9  occurred, it became -- when it became a scarce
10  resource, that inmates or detainees started to
11  hoard the toilet paper?
12      A.    Hence that's why we only put one
13  roll of the toilet paper in there at a time,
14  because they're going to hoard the toilet paper,
15  scarcity.
16      Q.    So if everyone had a roll, then
17  you're going to have more of a problem than if
18  there's only one roll for 20 inmates?
19      A.    No, that's -- no.
20      Q.    So I guess I'm not understanding why
21  it was that toilet paper be -- you know, was
22  reduced to one roll when inmates were hoarding
23  it?
24      A.    Yeah, it was reduced. It was one
25  roll. And if they asked for toilet paper, they

Page 125

1  got more toilet paper.
2      Q.    Did you ever hear of situations,
3  though, where the guards would delay providing
4  things that were requested?
5      A.    Yeah. I've actually, as the warden,
6  gotten grievances and things of that nature in
7  reference to those things.
8      Q.    And that that occurred back in the
9  holding cell areas, too?
10      A.    Yes.
11      Q.    And that that occurred in that 2019
12  year, too?
13      A.    I didn't see any grievances in 2019.
14  I didn't -- I didn't handle the grievance process
15  at that time.
16      Q.    But you knew that this was something
17  that had been complained about by other detainees
18  in other years, correct?
19      A.    Yes.
20      Q.    And what -- what was done about
21  that?
22      A.    It was corrected. If we got a
23  grievance, you investigated it. You gave the
24  inmate a formal answer on his grievance. And if
25  he agreed with it, it was over there. Or agreed

Page 126

1  with the action that was taken, it was over
2  there.  If he didn't, he would take it to the
3  next step.  If he agreed with the action that was
4  taken at that step, it would stop there.  He or
5  she.  They would stop there.  And if he didn't
6  agree with it, or they didn't agree with it, it
7  would go to the sheriff for the sheriff's review.
8  And at that time, they can file a legal claim.
9      Q.  Do you recall any instance where it
10  was found in favor of the inmate that -- and
11  against a guard, that guards had been withholding
12  items or not being kind to inmates in the holding
13  area?
14      A.  I've never had that specific thing
15  happen, no.
16      Q.  Any type of incident, guard verse
17  detainee treatment, that you recall back in the
18  holding cell area?
19      A.  I did grievances for a long time,
20  so, yes.  I couldn't pinpoint a date and a time.
21      Q.  Okay.  Any that were founded?
22      A.  No, not as far as the deputy doing
23  that.  It may have been that they didn't get it
24  at a specific time, but it wasn't because the
25  deputy was trying to be a -- trying to be

Page 127

1  difficult with them.
2      Q.  Okay.  So you recall complaints or
3  grievances --
4      A.  Right.
5      Q.  -- about this issue, but you don't
6  recall a single instance where it was founded?
7      A.  As far as what you're specifically
8  stating, no.
9      Q.  Okay.  Are those complaints about
10  treatment in the holding cells logged anywhere?
11      A.  They would be on the grievance form
12  in the inmate's file.
13      Q.  But was there anywhere that the jail
14  kept a record so you could just search an
15  employee on whether there has been any complaints
16  about them with respect to treatment in holding
17  cells?
18      A.  No.
19      Q.  Was there any system where you could
20  easily search or refer to to see how many
21  complaints have we had about treatment in the
22  holding cells?
23      A.  No.
24      Q.  And is that because the way that the
25  recordkeeping was kept or the data was kept was

Page 128

1  in each individual inmate's file?  So if you ever
2  wanted to find that information, you would then
3  have to go back, or the sheriff's office would
4  then have to go back, and review every single
5  inmate's file for the year in question?
6      A.  No.  We would handle that specific
7  grievance in front of you.
8      Q.  Not my question.  My question,
9  again, is, if it was ever asked, "How many
10  complaints about the treatment of detainees in a
11  holding cell did you receive in the year 2019,"
12  am I correct you would have no way -- the
13  sheriff's office would have no way of telling me
14  that information unless they took every single
15  inmate file for the year 2019 and searched it?
16      A.  I would not have.
17      Q.  Is there any way that that
18  information could be pulled other than taking
19  every single inmate's file for the year 2019 and
20  searching it?
21      A.  No.  I don't know that -- no, I do
22  not know.
23      Q.  So how was it that you, in your
24  capacity of oversight of corrections, were
25  actually supervising the holding cell area and

Page 129

1  able to track whether you were having a set of
2  complaints about a certain issue?  Did you -- did
3  you, on a daily basis, weekly basis, monthly
4  basis go through every single inmate file and
5  search for this issue, or it just wasn't done?
6      A.  As far as knowing of the complaint,
7  that would be -- because I said, as the warden, I
8  handled the grievances.  As the deputy chief, I
9  handled the second step of the grievance.  So as
10  the warden, I would see those complaints.  As a
11  deputy chief, I would see those complaints if it
12  made it to my level, and I had to answer the
13  second step, so --
14      Q.  But if by 2023, let's say, I'm
15  asking for how many complaints about overcrowding
16  did you have from detainees for the years 2000,
17  2001, 2002, and 2003, you would have absolutely
18  no idea what to tell me unless you went through
19  all the inmate files for that time, correct?
20      A.  I would not.
21      Q.  And so you would not know whether a
22  pattern was starting to emerge about a single
23  type of complaint during those years, correct?
24      A.  No, I would not.
25      Q.  Okay.  And so was that ever a

Page 130

1    concern to the sheriff or to you that, "Hey, the
2    way we're keeping our data, we have no ability to
3    see a pattern emerging about any problem that may
4    be -- may exist in the holding cell area"?
5        A.   So when I was the warden and as the
6    deputy chief, if it got to my level, it was
7    investigated.  So, no, I wouldn't be able to go
8    through every single file.  But if that complaint
9    in front of me and that guy says -- or if I know
10   that it happened or that guy says, "This has
11   happened to me multiple times," that would be
12   investigated.  But, no, I would not have a way to
13   go back 20-some-odd years and say, "This was the
14   pattern."
15       Q.   Were you trained to investigate
16   these types of complaints?
17       A.   Yes.
18       Q.   And so you would agree with me then
19   that sometimes complaints are unfounded simply
20   because there's not enough evidence to establish
21   it?
22       A.   Sometimes, yes.
23       Q.   And the fact that it's unfounded
24   doesn't mean it didn't happen, it just means it
25   can't be proven; is that fair?

Page 131

1        A.   Yes.
2        Q.   And so if it's unfounded, out of
3    sight, out of mind; am I correct?  You dealt with
4    it, let's move on, correct?
5        A.   Like I said, if I get a complaint, I
6    deal with that complaint.  And if the complaint
7    specifies that there's been an ongoing thing or
8    happened more than once, throughout the
9    investigation I try to find that out.
10       Q.   Okay.  Would you agree with me if I
11   said, "Hey, Joe told me to eff off today," and
12   you couldn't find it and it was unproven, you
13   would feel comfortable with that?  It was a
14   single complaint, it was investigated, and it
15   couldn't be proven, correct?
16       A.   I don't understand that I would be
17   comfortable with that.
18       Q.   All right.  Let me ask it this way
19   then.  If you were to look at the data, pull all
20   the inmate files, and you suddenly realized you
21   had 25 unfounded complaints about the same deputy
22   for the same conduct, would that give you pause
23   for concern even if they were all unfounded?
24       A.   Oh, absolutely.
25       Q.   All right.  And based on how the

Page 132

1    data was kept, though, you wouldn't see that
2    pattern forming, would you?
3        A.   Not as the deputy chief.
4        Q.   As anybody?  With the way the data
5    was maintained, you wouldn't see that pattern
6    emerging, would you?
7        A.   As far as the data is maintained,
8    no, I would not be able to go back to the data
9    and say, "This is a pattern."
10       Q.   So that pattern would essentially go
11   undiscovered?
12       MR. COLLINGS:
13           Object to the form.
14       THE WITNESS:
15           Not really.  As far as the data is
16       concerned, I couldn't investigate and
17       create the pattern from the data.  But if
18       this has been -- if that complaint comes
19       in front of me and I'm investigating it
20       and that comes out in the investigation,
21       it's there.  I don't -- you know, I don't
22       --
23   BY MR. JACOB:
24       Q.   But what if -- but what if the --
25   it's just a detainee complaining to you that that

Page 133

1    happened to them?  You wouldn't think to go back,
2    "Well, let me see if the 1,000 inmates that were
3    here previously had the same complaint"?  That's
4    not part of your investigation, correct?
5        A.   No.
6        Q.   But if the data was kept in a way
7    that you could just search, "Has this complaint
8    ever come up about this deputy," and it listed 25
9    unfounded incidents, you'd say, "Oh, wait a
10   minute"; am I correct?
11       MR. COLLINGS:
12           Object to the form.
13       THE WITNESS:
14           If the data was there, yeah.  Yes.
15   BY MR. JACOB:
16       Q.   Okay.  Yesterday during the
17   representative's deposition for the sheriff's
18   office, she indicated that there were times that
19   she knew that the holding cells were over
20   capacity for what the fire marshal stated was
21   safe.  Are you aware of that happening?
22       A.   Yes.
23       Q.   And did that -- in your opinion,
24   does that present as a greater risk than when
25   it's at or below capacity?

Page 134

1    A.    So the -- you're saying the
2  overcrowding?
3      Q.    Yes.  If the fire marshal said it's
4  safe to have 80 people back here, no more, --
5      A.    Yes.
6      Q.    -- and you have 90, does that mean
7  that there's an increased risk of danger to the
8  detainees?
9      A.    That means I'm over capacity, and I
10  need to go back down to 80.
11      Q.    If the fire marshal said it's unsafe
12  to have more than 80 inmates in these cells and
13  you have 90, does that mean that there's an
14  increased risk of danger to the detainees?
15      MR. COLLINGS:
16          Object to the form.
17      THE WITNESS:
18          No.  Not to the danger of the
19      detainee.
20  BY MR. JACOB:
21      Q.    So the fire marshal is wrong then?
22      A.    No.  There's two different things
23  you're asking me.
24      Q.    Really?  Explain that to me.
25      A.    You asked me about their safety.

Page 135

1  Then you asked about their danger.
2      Q.    Okay.  Well, then, let's do it that
3  way.
4      A.    Okay.
5      Q.    If the fire marshal says it is
6  unsafe to have more than 80 inmates in the
7  holding cells and you have 90, is it more unsafe
8  than -- with 90 than with 80 or less?
9      A.    That means I'm over capacity.  And
10  that's what the fire marshal is there for, life
11  safety issues.  So if he says I got to get down
12  to 80, I get down to 80.
13      Q.    So then, yes, it is less safe with
14  90 than with 80 if that's what the fire marshal
15  determined?
16      A.    I think the fire marshal is just
17  telling me I'm over capacity, and being over
18  capacity is what he's there to determine.  So if
19  I have 80 in there versus 90, you know, that is
20  I'm over capacity.
21      Q.    So are you saying that when you
22  operate the jail, you didn't understand that
23  capacity numbers are set for safety?
24      A.    No, that's not what I'm saying.
25      Q.    Oh, okay.  So then you did

Page 136

1  understand that the fire marshal capacity numbers
2  represent the total number of persons to be in an
3  area for it to be safe, correct?
4      A.    Yes.
5      Q.    Oh, okay.  So then when you have 90
6  instead of 80 when the fire marshal sets the
7  threshold as 80 for safety, would you agree with
8  me then it's less safe, or it's no longer safe?
9      A.    I would not agree with you, like --
10      Q.    Okay.  Why not?  What is it?
11  Because it's suddenly --
12      A.    No.  I'm just saying -- oh, go
13  ahead.
14      Q.    No.  No.  I guess I'm having trouble
15  understanding.  Because you said the fire marshal
16  is there to determine capacity for safety, and
17  the fire marshal tells me any more than 80 is
18  unsafe.  But when I have 90 in there, it's not
19  less safe, is what you're telling me?
20      MR. COLLINGS:
21          Object to the form.
22      THE WITNESS:
23          You're asking me like it -- I'm
24      getting your question --
25  BY MR. JACOB:

Page 137

1      Q.    Sure.
2      A.    -- like it is less safe to have 80
3  or 90 in there just because you're over capacity.
4      Q.    You said -- would you agree that the
5  fire marshal is the expert in the field with
6  respect to safety and buildings with respect to
7  capacity?
8      MR. COLLINGS:
9          Object to the form.
10      THE WITNESS:
11          I would say that they're the
12      compliance person.
13  BY MR. JACOB:
14      Q.    Okay.  And would you agree with me
15  that in that capacity --
16      A.    I'm sorry.
17      Q.    Sure.  In that capacity it is the
18  fire marshal who determines what is safe or not
19  safe for a particular building with respect to
20  capacity?
21      A.    Yes.
22      Q.    And would you agree with me, then,
23  if you do not follow the fire marshal's decision
24  with respect to what is safe or not safe, that if
25  you exceed the number, then you are now in unsafe

GREGORY LONGINO on 01/18/2023

Page 138

1  territory?
2      A.  Yes.
3      Q.  Okay.  What penological interest is
4  served by not providing recreation for pretrial
5  detainees in the holding cells?
6      A.  None.
7      Q.  Why didn't that occur then?
8      A.  As far as exercise for people in
9  holding?
10     Q.  Yes.
11     A.  Because one is constant movement of
12  the people in holding, so -- and they're there
13  awaiting a bed to go to a housing unit.  We
14  didn't exercise the people in the holding cells.
15     Q.  But am I correct, it was your
16  understanding that the state regulations require
17  no longer than 48 hours in the holding cell, so
18  once you're exceeding that, you're also leaving a
19  person in a situation where they had no fresh air
20  and no exercise and that type of activity in the
21  holding cell area?
22     A.  Yes, they did not have that
23  activity.
24     Q.  And do you know if there's a
25  regulation with respect to whether or not

Page 139

1  detainees are to have access to recreation or
2  fresh air?
3      A.  Yes.
4      Q.  And what's that regulation?
5      A.  It is -- I don't know the specific
6  number of the regulations.
7      Q.  Right.
8      A.  But they're to get three hours out a
9  week, weather permitting, and if it's safe to
10  bring them out.
11     Q.  Okay.  And that was something that
12  was not occurring with inmates in the pretrial --
13  or excuse me -- the pretrial detainees in the
14  holding cells, correct?
15     A.  That was not happening with the
16  pretrial detainees in holding.
17     Q.  And there was no penological
18  interest that you could think of for that
19  restriction, correct?
20     A.  The movement of those inmates in
21  holding.  Because they do bond out and they do --
22  the movement would be a concern of mine.
23     Q.  Okay.
24     A.  But it was no policy, procedure, or
25  anything like that to say do or don't.

Page 140

1      Q.  Okay.  And if those detainees had
2  been removed from the holding and assigned those
3  empty beds in DOC or federal, they could have had
4  that recreation, correct?
5      A.  They could have, yes.
6      Q.  And they could have had a bed,
7  correct?
8      A.  Yes.
9      Q.  And they could have had lights out,
10  correct?
11     A.  Yes.
12     Q.  And they could have had a clean
13  floor, correct?
14     A.  I don't know.  Like --
15     Q.  Cleaner floor.  How about that?
16     A.  I don't know that.
17     Q.  Would they have eaten in their cells
18  in -- back in DOC or fed?
19     A.  That's -- so they ate in their
20  housing unit.  Some of them are in cells.  So I
21  don't want to be so -- I don't want to -- I don't
22  want to answer a question where -- yeah, some of
23  them eat in their cells.  But I don't think
24  that's -- you know -- I got people that have
25  single-man cells.  They're in isolation.  They

Page 141

1  eat in their cells.
2      Q.  Okay.  I didn't understand that.
3  Thank you.
4      A.  Okay.
5      Q.  Absent the special housing, then,
6  administrative custody or whatever you called it
7  on the general pop side, the general population,
8  though, as a whole, do they eat in their cells,
9  or do they eat in a dining area?  How does that
10  work?
11     A.  Some of them eat in their cells.
12  Some of them eat in the housing unit at the
13  tables.  We didn't have a dining area that we
14  brought inmates to.
15     Q.  And were the cells in the general
16  population maintained from a cleaning perspective
17  differently than the holding cells?
18     A.  They had a scheduled cleaning.  They
19  had a cleaning schedule just like the holding
20  cell.
21     Q.  Okay.  The general population, was
22  that ever overcrowded?
23     A.  No.
24     Q.  Did anyone ever have to sleep on the
25  floors in general population?

Page 142

1      A.   No, not in that -- no.
2      Q.   What action did you take to stop the
3  overcrowding situation that you were aware of in
4  2019?
5      A.   What action did I take?
6      Q.   Yes.
7      A.   The only action, I would go to the
8  commissioner, or I would go to the judge, explain
9  what our problem was with overcrowding, and that
10  was as far as I could bring it.
11      Q.   And was that documented anywhere?
12      A.   No.
13      Q.   Did you ever get frustrated with the
14  answers that were provided?
15      A.   Yes.
16      Q.   And why is it that you got
17  frustrated with that?
18      A.   Because sometimes you would go back
19  to the jail, and it's still overcrowded.
20      Q.   But why did that frustrate you?
21      A.   I just think because it's if you
22  know that it's overcrowded, you got people in
23  there, they've been there a long period of time,
24  seven, 14 days, and you know you don't have any
25  beds.  And you go to the commissioner or the

Page 143

1  judge, and they say, "We can't do anything," or
2  sometimes they alleviate it, you know, so --
3      Q.   Did it frustrate you because you
4  didn't think that detainees should have to live
5  like that for that period of time?
6      A.   I don't think nobody should.  Not
7  just detainees.
8      Q.   Okay.  And that's because it's a
9  little bit inhumane, correct?
10      MR. COLLINGS:
11          Object to the form.
12      THE WITNESS:
13          I wouldn't say inhumane.
14  BY MR. JACOB:
15      Q.   All right.  Well, what would you
16  call it?  Why is it that you didn't think anyone
17  should have to live like that for that period of
18  time?
19      A.   That's me.  That's what I think.
20  Like, when -- when I go to the commissioner or
21  the judge and I ask for relief for the
22  overcrowding, you know, sometimes it was in
23  reference to a health -- a health officer or a
24  fire marshal.  "I need relief, or we're going to
25  be in violation," because they only give so much

Page 144

1  time to come into compliance with what they just
2  wrote you up for.
3      Q.   Right.
4      A.   So the bottom line is if -- if it
5  doesn't get relieved, that first write-up gets
6  heavier the next time.
7      Q.   Right.  And I understand that.  And
8  you clearly took your job seriously and wanted to
9  always comply with, you know, health, safety, and
10  all of that, correct?  You wanted to do the right
11  thing?
12      A.   Yes.
13      Q.   And I can tell that from talking
14  with you today that there's this push-pull, this
15  frustration, that I always wanted to do the right
16  thing, but that doesn't mean I was always able
17  to?
18      MR. COLLINGS:
19          Object to the form.
20  BY MR. JACOB:
21      Q.   Is that fair?
22      A.   I did not have the authority or just
23  that I was not able to.
24      Q.   All right.  And I did hear you say,
25  a bit of humanity crept out there, that you

Page 145

1  didn't think anybody should have to live like
2  that, correct?
3      A.   I'm a human person.
4      Q.   So at times you just thought it was
5  just wrong as far as how the detainees were
6  living, and that's why you were doing your best
7  to do whatever you could to try to stop it,
8  correct?
9      MR. COLLINGS:
10          Object to the form.
11      THE WITNESS:
12          Yes.
13  BY MR. JACOB:
14      Q.   All right.
15      MR. COLLINGS:
16          I'm going to take a moment and speak
17  to my counsel and then --
18      MR. COLLINGS:
19          Yeah, let's take a break.
20      MR. JACOB:
21          Yeah, it's a good time.
22          (Brief recess was taken.)
23      MR. COLLINGS:
24          I just want to make a note.  I
25  neglected to mention it at the beginning

Page 146

1  of the deposition.  The same objection I
2  had yesterday with respect to a video
3  camera.  I don't know that it's
4  permissible for an attorney to videotape
5  their own deposition.  And to the extent
6  this video may ultimately try -- may be --
7  there may be an effort to use the video at
8  trial, we would note our objection to its
9  use to the extent that that may be
10  something that happens at some point in
11  the future.
12      With that objection on the record, I
13  tender the witness back.
14  MR. JACOB:
15      And I'll just state on the record,
16  since we're doing this, that as far as a
17  primary means of recording, I would agree
18  with you, that the primary means of
19  recording is the certified court reporter.
20  This is an alternative means as properly
21  noticed in the notice and indicated in the
22  notice.  So it is what it is.
23      My colleague who's working with me
24  has a couple questions that she's going to
25  ask and then we're -- and then we're done.

Page 147

1  MR. COLLINGS:
2      Okay.  Well, I'm going to note an
3  objection that it's highly unusual, and
4  I'm not entirely certain it's even
5  permissible to have multiple attorneys for
6  the same parties ask questions of the same
7  witness during a deposition.  So I'll note
8  my continuing objection to this line of
9  questioning.
10  MR. JACOB:
11      And, just for completeness, can you
12  cite a federal rule that restricts that?
13  MR. COLLINGS:
14      No.  In 26 years or so practicing
15  law, I don't think I've ever seen it done,
16  so it's never been something I had to
17  research.  It's very unusual.  And maybe
18  it is permissible.  I don't know.  But if
19  the line of questioning is ultimately
20  something that is sought to be introduced
21  at trial, we will certainly look into
22  that.  And if there is a grounds to object
23  or if we need to file something with the
24  magistrate between then and now, we will.
25  MR. JACOB:

Page 148

1      Fair enough.
2  MS. HARTON:
3      And, just for the record, you're
4  only objecting to my line of questioning,
5  not the entire deposition?
6  MR. COLLINGS:
7      I'm objecting to the entire line of
8  questioning with respect to the video.
9  And I'm objecting to a line of questioning
10  from you as co-counsel for the plaintiffs.
11  I assume you are co-counsel for the
12  plaintiffs, right?
13  MS. HARTON:
14      (Nods head affirmatively.)
15  MR. COLLINGS:
16      Okay.  That's it.  With that said,
17  go ahead.
18  MS. HARTON:
19      Thank you.
20  EXAMINATION BY MS. HARTON:
21      Q.  So my name is Sam Harton.  I am -- I
22  represent the same party as my colleague here
23  that just asked you a few questions.  I just have
24  a few questions that I would like to ask you.
25      But, first, I just want to make

Page 149

1  sure, you understand that you're still under
2  oath?  Even though I'm a different human being,
3  we're representing the same party, and you're
4  still under oath?
5      A.  Yes.
6      Q.  Okay.  So do you remember earlier
7  when my colleague was asking you about risks
8  related to overcrowding?
9      A.  Yes.
10      Q.  Okay.  And do you recall stating
11  that there's always some sort of risk when two
12  inmates are together?
13      A.  There's a risk in a jail, period.
14      Q.  There's always a risk when you're in
15  a jail?
16      A.  Yeah.
17      Q.  Okay.  And what's your understanding
18  of what the word "risk" means?
19      A.  There's a risk of harming yourself
20  or a risk of safety violations or a risk of a
21  whole magnitude of things in a jail.
22      Q.  Okay.
23      A.  And maybe one person that wants to
24  harm themself and commit suicide.  That's a risk.
25      Q.  Is there a risk that an inmate might

Page 150

1  harm another person?
2      A.   In a jail?
3      Q.   Yes.
4      A.   Yes.
5      Q.   And so it sounds like a risk might
6  be some -- any situation that involves any
7  exposure to danger.  Is that your understanding
8  of a risk?
9      A.   It doesn't have to necessarily be
10  danger.
11     Q.   Okay.
12     A.   But it can be a person trying to
13  escape, you know.  It could be a multitude of
14  things.  It's not just fighting or that type of
15  stuff.
16     Q.   Okay.  When you say that there is a
17  risk with two inmates, though, are you referring
18  to some sort of exposure to danger?
19     A.   It's just a risk.  It could be
20  danger, yes.
21     Q.   It could include -- it could include
22  some sort of dangerous outcome?
23     A.   Yes.
24     Q.   Okay.  So you also said that there
25  are risks associated when you have overcrowding,

Page 151

1  for example, more than 20 people in a holding
2  cell; is that correct?
3      A.   Yes.
4      Q.   Okay.  And is one of those risks
5  exposure to some sort of dangerous outcome?
6      A.   Yes.
7      Q.   Okay.  And would a dangerous outcome
8  include something like someone getting sick?
9      A.   Possibly, yes.
10     Q.   Okay.  So when you are considering
11  how to address overcrowding, you are considering
12  how to perhaps mitigate that exposure to danger;
13  is that correct?
14     A.   Yes.
15     Q.   Okay.
16     MS. HARTON:
17         That's all I have.
18     MR. COLLINGS:
19         So do y'all tender?
20     MR. JACOB:
21         (Nods head affirmatively.)
22     MR. COLLINGS:
23         Okay.
24  EXAMINATION BY MR. COLLINGS:
25     Q.   Mr. Longino, you spent the entire --

Page 152

1  your entire career with the St. Tammany Parish
2  Sheriff's Office in corrections; is that right?
3      A.   Yes.
4      Q.   And at the end, you were over
5  corrections in addition to some other areas of
6  the sheriff's office.  But from year 1 to year
7  29, corrections was within your work space, I
8  guess?
9      A.   Yes.
10     Q.   All right.  And you left the
11  sheriff's office in 2019, correct?
12     A.   October 2019, yes.
13     Q.   Let me start it this way.  Do you
14  have any first-hand knowledge as to anything with
15  respect to any of the five individual plaintiffs
16  in this case?
17     A.   No.
18     Q.   Did you meet them, ever talk to
19  them, ever discuss anything about those five
20  individuals?
21     A.   Not in 2019.
22     Q.   All right.  Now, when you left the
23  sheriff's office in 2019, was the jail as good as
24  it had been at any time in the 29 years that you
25  worked there?

Page 153

1      A.   Yes.
2      Q.   All right.  And in your time as a --
3  from a -- just a corrections officer all the way
4  up until the point where you were the warden and
5  then the deputy chief over corrections, would you
6  agree with me that the movement of detainees from
7  holding to the back of the jail required
8  resources?
9      A.   Yes.
10     Q.   Did those resources include
11  availability of a bed in the back of the jail?
12     A.   Yes.
13     Q.   And did it require the availability
14  of human resources to be able to process them and
15  move them to the back of the jail?
16     A.   Yes.
17     Q.   And in the year 2019, in particular,
18  your last year as an employee of the sheriff's
19  office, were your resources scarce at times?
20     MR. JACOB:
21         Objection.
22  BY MR. COLLINGS:
23     Q.   Answer the question, please.
24     A.   Yes.
25     Q.   And did that scarcity of resources,

Page 154

1  in fact, hinder the ability to move inmates or
2  detainees from holding to the back of the jail as
3  timely as you might have otherwise liked?
4      MR. JACOB:
5          Objection.
6      THE WITNESS:
7          Yes.
8  BY MR. COLLINGS:
9      Q.   Was there ever an intent from the
10  sheriff's office, to your knowledge, to keep
11  people in holding for a punitive reason?
12     A.   No.
13     Q.   All right.
14     MR. COLLINGS:
15         That's all I have.  Thank you, sir.
16     MR. JACOB:
17         Just one follow-up question.
18  REEXAMINATION BY MR. JACOB:
19     Q.   Did resources or the issue of
20  resources ever stop the movement of an inmate who
21  is reclassified from going from a pretrial
22  detainee bed to a DOC bed?
23     A.   Yes.
24     Q.   Explain that.
25     A.   It's the same staff.  If I don't

Page 155

1  have one to move a DOC to the back or a pretrial
2  to the back, I don't have one to move a DOC from
3  the back -- or from holding to the back as well.
4      Q.   So what you're -- what I'm hearing
5  you say then is that when you had a -- when you
6  had an inmate switch from the pretrial detainee
7  status as a parish detainee and fall under the
8  DOC contract, you recall situations where that
9  DOC inmate remained in the pretrial bed?
10     A.   They did not -- they may have not
11  have gotten moved immediately.
12     Q.   Oh, I see.  Immediately.  So it may
13  have been an hour or two to move them, correct?
14     A.   It could have been the next day.
15     Q.   All right.  But nothing more than
16  24 hours, correct?
17     A.   Oh, sometimes, yes.
18     Q.   Okay.  How long is the longest time
19  that you recall a DOC inmate occupying a parish
20  bed?
21     A.   I don't recall.  I don't have a
22  specific time frame.
23     Q.   Do you recall it ever happening?
24     A.   Yeah.  A pretrial becomes a DOC
25  inmate, is basically what you're asking me, --

Page 156

1      Q.   Correct.
2      A.   -- and when they become a DOC
3  inmate, do they get moved from here to there
4  immediately?  No.  It depends on the resources to
5  move that person.
6      Q.   But they're put in line for the
7  movement, and as soon as it's available, they
8  move them?
9      A.   Yes.
10     Q.   Okay.  But as you sit here today,
11  you don't recall a situation where it took longer
12  than a day to make that movement?
13     A.   I'm pretty sure there are some
14  instances where it took longer than a day.  I
15  can't specifically say it took two days, three
16  days, four days, or an hour.
17     Q.   I see.
18     A.   I can't.
19     Q.   But if there was such a delay, then
20  that would be documented somewhere, correct?
21     A.   No.
22     Q.   Why not?
23     A.   Because -- so I'm a pretrial inmate
24  today.
25     Q.   Okay.

Page 157

1      A.   I go to court.
2      Q.   Right.
3      A.   I get back at 7 o'clock tonight from
4  court.  The van drops me off.  I'm now a DOC
5  inmate.
6      Q.   Okay.
7      A.   All right?  So -- and it may be
8  multiple people that need to be moved from a
9  pretrial bed to a DOC bed.  We don't -- it's not
10  just one.  So those people will be moved as soon
11  as the staffing resources are available.
12     Q.   Okay.  But in that situation where
13  you have a pretrial detainee who's been
14  reclassified to DOC because of a change in status
15  in court, they are going to get moved to a DOC
16  bed; is that correct?
17     A.   They're going to get moved to a DOC
18  bed, and the person in holding is going to go to
19  a pretrial bed.
20     Q.   And that is definitely going to
21  happen, correct?
22     A.   It may not happen immediately, but
23  it's going to happen.
24     Q.   The resources are there for it to
25  happen in a -- let's just say a reasonable amount

Page 158

1  of time?  As soon as possible?
2      A.   As soon as possible.
3      Q.   Okay.  But the situation that's
4  never going to happen is a pretrial parish
5  detainee going from holding to a DOC bed unless
6  their status changed to DOC; is that correct?
7      A.   I can't say that.  I can't say that
8  because I don't know if that's a never thing that
9  will happen.
10     Q.   Fair enough.  It never happened
11  while you were there?
12     A.   Not that I'm aware of.
13     Q.   Okay.  Because it was not permitted,
14  correct?
15     A.   Yeah, that was not permitted.  They
16  would not -- well, I did not mix and mingle
17  inmates.
18     Q.   And it wasn't a lack of manpower
19  that you didn't move that pretrial detainee into
20  a DOC or a federal bed?  It was because the
21  policy and practice was they are not allowed to
22  occupy those beds, correct?
23     MR. COLLINGS:
24         Object to the form.
25     THE WITNESS:

Page 159

1          I don't understand that question.
2  BY MR. JACOB:
3      Q.   Yes.  It wasn't because you didn't
4  have the manpower to move them from the holding
5  cell as a pre-- as a parish detainee into a
6  federal bed?  It was that they weren't permitted
7  to go into a federal bed?
8      A.   That's correct.
9      Q.   All right.  And it wasn't that -- it
10  wasn't the lack of beds that prevented the parish
11  detainee from moving from holding into a federal
12  bed?  It was that they weren't permitted to?
13     A.   No.  It was a lack of pretrial beds.
14  Not federal beds.  Because we had a federal
15  contract to house the federal inmates, and we
16  left those bed spaces available for the federal
17  inmates.
18     Q.   All right.  So it wasn't a resource
19  issue that prevented the parish detainees from
20  occupying DOC or federal beds?  It was a policy
21  issue, correct?
22     A.   It's not policy.
23     Q.   Or a practice issue, correct?
24     A.   Yes.
25     Q.   "Yes"?

Page 160

1      A.   Yes.
2      MR. JACOB:
3          All right.  No further questions.
4      MR. COLLINGS:
5          That's all I had for you, Greg.
6      Thank you.
7      MR. JACOB:
8          Thank you.  You're free.
9          (Whereupon the proceedings were
10  concluded at 12:11 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 161

1              WITNESS' CERTIFICATE
2
3
4      I, GREGORY CHARLES LONGINO, do hereby
5  certify that the foregoing testimony was given by
6  me, and the transcription of said testimony, with
7  corrections and/or changes, if any, is true and
8  correct as given by me on the aforementioned
9  date.
10
11
12
13  _____    _____
14  DATE SIGNED        (Witness' Signature)
15
16
17
18      Signed with corrections as noted.
19
20      Signed with no corrections as noted.
21
22
23
24  DATE TAKEN:  January 18, 2023
25

```
                                                    Page 162
 1              REPORTER'S CERTIFICATE
 2
        This certification is valid only for a
 3   transcript accompanied by my original signature
     and original seal on this page.
 4
        I, ANNA M. ROTH, Certified Court Reporter,
 5   in and for the State of Louisiana, as the officer
     before whom this testimony was taken, do hereby
 6   certify that GREGORY CHARLES LONGINO, to whom
     oath was administered, after having been duly
 7   sworn by me upon authority of R.S. 37:2554, did
     testify as hereinbefore set forth in the
 8   foregoing 161 pages; that this testimony was
     reported by me in the stenotype reporting method,
 9   was prepared and transcribed by me or under my
     personal direction and supervision, and is a true
10   and correct transcript to the best of my ability
     and understanding; that the transcript has been
11   prepared in compliance with transcript format
     guidelines required by statute or by rules of the
12   board, and that I am informed about the complete
     arrangement, financial or otherwise, with the
13   person or entity making arrangements for
     deposition services; that I have acted in
14   compliance with the prohibition on contractual
     relationships, as defined by Louisiana Code of
15   Civil Procedure Article 1434 and in rules and
     advisory opinions of the board; that I have no
16   actual knowledge of any prohibited employment or
     contractual relationship, direct or indirect,
17   between a court reporting firm and any party
     litigant in this matter nor is there any such
18   relationship between myself and a party litigant
     in this matter.  I am not related to counsel or
19   to the parties herein, nor am I otherwise
     interested in the outcome of this matter.
20
21
22
23              ANNA M. ROTH, RPR, CCR
24              CERTIFIED COURT REPORTER
25              NO. 2010021
```

GREGORY LONGINO on 01/18/2023

---

**1**

**1** 4:3 105:22 152:6

**1,000** 133:2

**105** 39:3,7

**10510** 6:1

**10:00** 106:2

**10:30** 106:3,21,22 107:15 109:19 110:12,15

**10:30ish** 106:9

**11th** 116:21

**120** 54:24 55:6

**12:11** 160:10

**130** 54:21

**14** 142:24

**140** 54:18

**148** 4:13

**15** 47:12

**150** 54:15

**151** 4:14

**154** 4:12

**160** 54:12

**161** 4:6

**162** 4:7

**19** 12:18

---

**2**

**2** 4:4 105:23

**20** 11:10,11 52:12,15 65:7,14,20 66:1,3,6 67:5,24 68:16,24 69:24 124:18 151:1

**20-plus** 105:3

**20-some-odd** 130:13

**200** 30:19

**2000** 129:16

**2000s** 56:25

**2001** 129:17

---

**2002** 129:17

**2003** 129:17

**2019** 10:20 11:7,9,10,13 57:1,7,9 82:8 99:3 102:18 103:6 115:16 125:11,13 128:11,15,19 142:4 152:11,12,21,23 153:17

**2020** 10:20 11:7,9

**2023** 10:21 129:14

**22** 94:22

**24** 105:18,19 155:16

**25** 41:2 42:3,25 131:21 133:8

**26** 147:14

**29** 152:7,24

---

**3**

**3** 4:4

**30** 30:20

---

**4**

**48** 97:9,17 98:21 99:9 100:5,22 102:19 138:17

**48-hour** 99:4

---

**5**

**5** 4:5

**50** 40:13 42:22

---

**6**

**6** 4:12 57:12,16,17,20,21,25 58:5,7, 12,20,21 59:2,13 62:21 75:4 76:12, 24 77:5,22 78:12

**64** 40:5

**6:00** 106:3,10

---

**7**

**7** 157:3

**70437** 6:2

**72-hour** 34:17,21 50:16

---

**75** 40:17,23 41:11,22 42:3,5

---

**8**

**80** 52:12,13 54:7,10 55:2,5,10 134:4, 10,12 135:6,8,12,14,19 136:6,7,17 137:2

---

**9**

**90** 134:6,13 135:7,8,14,19 136:5,18 137:3

**90s** 56:25 57:7,9

---

**A**

**ability** 130:2 154:1

**above-mentioned** 6:4

**absent** 41:2 141:5

**absolutely** 34:4 129:17 131:24

**abuse** 121:10

**abused** 121:11

**accepted** 90:23

**access** 44:14 139:1

**accommodate** 8:8

**accomplishes** 104:1

**accordance** 5:7

**achieve** 14:22

**act** 34:12 50:12

**action** 126:1,3 142:2,5,7

**activity** 138:20,23

**acts** 34:15

**actual** 10:2 44:21

**add** 11:3 24:24 29:7,10,11,15 41:23

**added** 78:11 79:16,18

**addition** 114:20 152:5

**additional** 24:3,4,5,8

**address** 57:7 60:1 151:11

**addressed** 35:16

**addresses** 35:17

administering 5:21

administration 17:24

administrative 16:17 97:9,12,13, 16 98:5 141:6

admitted 52:19 84:20 89:20 93:8 100:25 121:9

adopt 91:7

adopted 59:6 91:2 93:1

affected 117:8

affirmatively 32:12 48:11,15 67:18 94:10 124:4 148:14 151:21

aforementioned 5:4

agencies 19:20 25:13

agency 13:6 18:21 19:6 26:2 78:17

agree 47:24 53:22 83:13 102:17 105:1,25 122:12 126:6 130:18 131:10 136:7,9 137:4,14,22 146:17 153:6

agreed 5:2 125:25 126:3

agreement 4:5 48:7 68:14

ahead 12:3 17:7 81:18 136:13 148:17

air 138:19 139:2

alarm 50:20

alleviate 36:7 37:21 42:4 43:3,22 62:21,23 76:8 81:14 84:15 143:2

alleviated 53:15 54:8 103:7

alleviates 72:22

allowed 34:7 158:21

allowing 106:5

alternative 146:20

amenities 86:6,7

amount 28:2 38:11,15 55:5 66:12 95:20 118:15 157:25

and/or 13:8 21:1 23:16 32:20 35:3 58:8 102:22 104:15

ANNA 4:24 5:19

answering 100:11

answers 8:18 9:10 11:4 142:14

anytime 102:19

apologize 6:8

Appearances 4:4

applicable 95:4

approved 20:4

arbitrarily 30:15 110:14

arbitrary 85:12,18

area 23:14 37:22 105:8 106:8,18 122:21 126:13,18 128:25 130:4 136:3 138:21 141:9,13

areas 29:11 111:25 125:9 152:5

arrest 30:16,18 31:7,19

arrested 30:11

arrestees 30:24

arrests 37:24

art 9:2

aspects 15:20

assigned 70:8 76:5,13 81:23 88:9 105:20 107:14 140:2

assume 86:9 148:11

assumed 49:17

ate 140:19

atmosphere 114:6

attack 75:17

attorney 9:25 146:4

attorneys 147:5

authority 32:5 33:8,11,14,18,19 35:11 58:3 101:11 144:22

availability 153:11,13

await 84:11

awaiting 101:1 138:13

aware 32:14 37:5,18 52:5 55:25 104:18 114:9 133:21 142:3 158:12

---

**B**

back 10:25 31:4 32:25 38:3,7 40:19 42:14,16 43:15 44:7,8,15 45:22 53:17 64:11,12 82:8 84:12 85:9 90:15 93:21 101:12 105:7 106:1,3,8, 10,17,20 107:11 109:8 110:18 125:8 126:17 128:3,4 130:13 132:8 133:1 134:4,10 140:18 142:18 146:13

153:7,11,15 154:2 155:1,2,3 157:3

bail 31:2

balance 26:15

based 67:19 71:3 72:10 131:25

basic 88:5,6 92:3

basically 15:9 46:3 155:25

basis 16:2 129:3,4

bed 30:14 31:3,13 32:3 38:5,9 41:7 43:9,10 44:13,17,21 45:25 72:16 82:22,23 84:11,12,13 85:9,11 86:22 87:7 88:2 89:17,22,23 90:2 96:14 97:18,24 99:15 101:4,12 102:1,21 104:15 138:13 140:6 153:11 154:22 155:9,20 157:9,16,18,19 158:5,20 159:6,7,12,16

bedding 44:21 86:23 88:8,14,23 89:22 90:18,24 91:19 93:2,9,22,24, 25 94:4,8,18 95:5,14,21,25 96:11,25 97:5 99:8,12,20,22 102:13

beds 24:24 28:2,24 29:7,15,24,25 30:20 31:9 35:25 36:9 37:17,20,25 38:2 39:9,10 40:17,23 41:2,19,24 42:4,5,12,13,16,22,24,25 45:6,7,8, 14 46:6,16 47:21,23 82:24 101:16, 22 103:8 140:3 142:25 158:22 159:10,13,14,20

begin 8:23

beginning 68:4 145:25

belittle 34:6

bench 84:18,24 100:21 102:21 122:10 123:13

benches 82:20 99:25 100:4 104:23 105:4

big 13:7 14:14 62:13 90:10 105:13

bigger 28:18 36:15

binding 95:5

biohazards 114:24 115:1

bit 14:10 15:2 23:2 60:6 143:9 144:25

blanket 99:13,17,18,23 100:5,22 102:20

blankets 83:1

bled 114:14

GREGORY LONGINO on 01/18/2023

**blood** 113:5 114:7,18 115:2,9

**board** 21:16

**bodies** 108:5,13,14

**bodily** 114:5

**bond** 31:2,3 45:1,8,11,15,25 53:9 77:16 82:4 100:6 101:1 139:21

**bonded** 45:24

**bonding** 53:4 76:23

**bonds** 34:16,19 50:15

**book** 30:13

**booked** 30:12 31:11

**borrow** 42:3

**bottom** 117:3,5,10 144:4

**boxing** 80:7

**break** 8:6,9,12 145:19

**bring** 12:1 30:23 38:9 70:7 139:10 142:10

**brings** 118:14

**brought** 19:4,7 30:11 141:14

**brunt** 121:7

**budget** 14:16 19:16,17,21 20:1,3,4 26:4,16

**budgetary** 16:8,13 26:2

**budgeting** 19:9

**build** 15:6,8 83:3,14

**building** 11:15,25 12:5,7,19 13:16, 20 14:1,4 15:19,20 17:21 19:25 24:14,21 25:6 28:4,20,21 102:22,23 137:19

**buildings** 12:21,22 28:3,6,8,11,12, 14,18 104:16 137:6

**business** 16:17,18 18:6,25 30:15

**buy** 20:13

---

**C**

**call** 19:3 34:24 39:12 40:19 49:19,21 51:12 70:9 119:22 143:16

**called** 51:11 57:12 58:23 59:1 109:11 119:4,6 141:6

**camera** 146:3

**capacity** 7:16 11:12,21,22 34:25 39:16 40:10 54:1 62:11 64:11 81:8, 10 128:24 133:20,25 134:9 135:9, 17,18,20,23 136:1,16 137:3,7,15,17, 20

**captains** 16:11 17:3

**Caption** 4:3

**car** 15:20

**care** 26:11 35:10 59:20 62:4,5,6 104:1

**cared** 60:10 61:22

**career** 152:1

**cares** 60:9 61:13,16

**carry** 13:14

**case** 7:11,16,17,20 8:4 152:16

**CCR** 4:24

**ceiling** 112:11

**ceilings** 111:24

**cell** 35:24 44:15 47:19 52:10,15 61:15 65:7,8,14,15 67:7,24 68:5,17 69:17,25 70:4,8 74:3 81:21 82:18,19 83:3,4,9,14 84:17,24 85:10 86:4,16, 17 87:6 95:25 96:10,24 97:10,19,23 98:20,21 99:5 102:19 104:14 105:15,21 106:8 110:23,25 111:6,25 112:12 113:24 114:12,19 115:6,10, 11,17 116:4,13 117:2,3,13,14 122:23 125:9 126:18 128:11,25 130:4 138:17,21 141:20 151:2 159:5

**cells** 30:21 31:12,16,18 52:11 64:5 70:6,15 82:13,15,19 83:12,13,22 84:2,7,16 85:13,14 89:18 98:9 104:6,8,20,23 105:16 107:9 110:22 111:3,7,15 113:8 121:23 122:1,6,13 124:2 127:10,17,22 133:19 134:12 135:7 138:5,14 139:14 140:17,20, 23,25 141:1,8,11,15,17

**cement** 84:18 104:10

**CEO-TYPE** 18:11

**Certificate** 4:6,7

**certification** 5:9

**certified** 4:25 5:19 146:19

**change** 77:21,24 111:7 157:14

**changed** 20:11 158:6

**charge** 12:9,22 15:19

**CHARLES** 6:1

**cheaper** 83:2,14,18

**checked** 116:12

**chief** 11:14 17:3,21,23,24 18:20 32:21 79:6,13,24 81:3,15 129:8,11 130:6 132:3 153:5

**chiefs** 17:25

**choosing** 74:12

**circada** 108:5 109:11

**circular** 23:20

**circumstances** 13:2,4

**cite** 147:12

**cities** 30:17

**civil** 5:6 7:16,17,20

**claim** 126:8

**clarify** 9:4 11:3 72:3

**classification** 41:24

**clean** 111:19 113:19 114:8 115:3 117:7 122:19 140:12

**cleaned** 111:16 112:13 114:5,22 116:5 123:22

**Cleaner** 140:15

**cleaning** 111:3,6,11 113:15,17 114:21 117:10 141:16,18,19

**clear** 33:24 34:7

**closed** 28:22 30:15

**co-counsel** 6:24 148:10,11

**code** 57:12,16,17,20,21,25 58:5,7, 12,20,21 59:2,13 62:21 75:4 76:12, 24 77:5,22 78:12 98:5

**coffee** 10:16

**coincidentally** 110:15,18

**colleague** 146:23 148:22 149:7

**Collings** 4:14 18:12 36:10,18,25 42:8 43:4 44:1 46:7,19 47:2 48:1 51:4 59:22 60:12 61:7,19 63:1,8,15, 20 65:16 66:23 67:8 68:1 69:1,5 71:8 72:12 73:9 74:6,13,24 75:11 80:8 83:5,15,23 84:3,25 85:15 86:18 87:20 89:4,8 90:3,11 92:11 93:4,13 94:14,23 95:8,16 97:20 98:16 100:9

---

101:6,17 102:8,24 103:9 108:6,16 109:1 110:8 114:1 115:19 116:16 117:16 118:17 120:8 122:24 132:12 133:11 134:15 136:20 137:8 143:10 144:18 145:9,18,23 147:1,13 148:6, 15 151:18,22,24 153:22 154:8,14 158:23 160:4

**comfortable** 131:13,17

**commission** 35:19 77:8

**commissioner** 31:22 32:20 33:6 34:15 35:2,3,6 49:4,20,21,25 50:6, 10,12 51:14 54:8 58:15 75:20,21,23 76:5,15,19 77:1,10,11 78:3,6,20 79:17,25 80:20,21 81:2,4,6,10 142:8,25 143:20

**commissioners** 34:12 50:15

**commit** 119:24 149:24

**common** 9:3

**community** 120:6,16,25 121:3,12

**compassion** 62:20

**complained** 125:17

**complaining** 132:25

**complaint** 129:6,23 130:8 131:5,6, 14 132:18 133:3,7

**complaints** 127:2,9,15,21 128:10 129:2,10,11,15 130:16,19 131:21

**complete** 13:23

**completely** 6:12 18:22 85:12,18

**completeness** 147:11

**compliance** 20:14 32:1 62:10 137:12 144:1

**complied** 98:11,15,24

**comply** 20:8,18,19 21:5 92:20 98:13 144:9

**complying** 92:2

**Compstat** 19:3

**conceivably** 45:16,21 95:23 102:16

**concern** 54:4 62:17,19,20 64:10 68:6 130:1 131:23 139:22

**concerned** 14:1 75:10 132:16

**concerns** 26:3

**concluded** 160:10

**concrete** 82:20 99:24 100:4,21 102:20,21

**condition** 10:10

**conduct** 131:22

**confused** 41:17

**confusing** 35:8

**consideration** 53:6

**constant** 105:24 107:9 138:11

**constitutional** 42:4

**constraints** 26:3

**constructed** 82:13

**contact** 69:19

**continually** 13:12

**continue** 59:17 78:15 94:7,8 102:13 103:5

**continued** 78:16

**continuing** 147:8

**contract** 25:11 37:7,15 38:12 39:2,6 40:8 41:18,20 155:8 159:15

**contracted** 38:10 40:11 41:8,9

**contracts** 25:10 27:18 37:12

**control** 13:23 26:11 35:10 104:1

**conversation** 15:3

**conversations** 15:10

**corner** 82:21

**correct** 14:8 23:22 24:3,15 25:12,13 27:13 32:11 33:12 34:3,11 35:6,12, 15 36:1 38:13 43:25 44:4,5,9 45:6, 10,17 46:6,18 47:10 50:13,14 54:4 55:22,23 57:4,5 59:14,17 60:19,22 61:2 65:22 67:7 68:24 69:8 74:23 75:10 77:9,12,25 78:4,12 80:23 86:10 88:11,18 91:4,14,15,21,24 92:2,4,10,20 93:3 94:1,9 99:1,17,25 101:16,22 102:2,6,23 103:2,8 104:2 105:6 106:6,10,12 111:2,5,21 112:13 113:14,25 115:16,22 116:9, 25 117:15,21 118:15 122:23 123:7, 11,23 125:18 128:12 129:19,23 131:3,4,15 133:4,10 136:3 138:15 139:14,19 140:4,7,10,13 143:9 144:10 145:2,8 151:2,13 152:11 155:13,16 156:1,20 157:16,21

158:6,14,22 159:8,21,23

**corrected** 20:8 125:22

**corrections** 11:15 13:15 16:2,16 17:21 18:4,25 20:12 21:1,14,18 22:2,3 23:18 37:8 58:10 60:19 62:7 88:8 90:23 99:7 100:3,20 103:17 128:24 152:2,5,7 153:3,5

**correctly** 18:25

**cost** 93:22

**counsel** 4:5 5:3 145:17

**count** 29:11 32:3 40:17 43:22 53:15 84:21

**counts** 53:2

**couple** 37:17 42:17 146:24

**court** 4:25 5:19 6:4 8:15 49:14,18 50:1 59:16 79:12 80:11 146:19 157:1,4,15

**courts** 32:7 57:15,21 82:5 101:10

**COVID** 34:22 69:20

**create** 69:12,13 83:21 132:17

**created** 58:7

**creates** 38:8 66:13 68:5 70:3

**crept** 144:25

**crime** 119:24

**criminal** 7:16,17 17:23

**criteria** 22:24

**crossed** 102:12

**current** 15:4 83:12

**custody** 26:11 35:10 104:1 141:6

**cut** 17:6 81:18 105:12 108:2

---

## D

**daily** 12:2 50:15 129:3

**danger** 65:8 68:16,23 134:7,14,18 135:1 150:7,10,18,20 151:12

**dangerous** 65:14 66:1,3,6 67:6,23 121:18,19 150:22 151:5,7

**dark** 108:25

**darkness** 108:14

**data** 127:25 130:2 131:19 132:1,4,7,

8,15,17 133:6,14

**date** 56:8,12,14 119:3 126:20

**dates** 32:17

**day** 34:20 53:14 64:7 71:21 105:18, 19 107:21,22 110:7 122:18 155:14 156:12,14

**day-to-day** 16:2,9,14 18:10

**days** 42:18 43:21 45:2,4 142:24 156:15,16

**deal** 31:23 56:10 62:13 90:10 131:6

**dealt** 131:3

**decide** 40:22 62:7

**decided** 91:6 110:14

**decision** 91:14 94:7 109:7 137:23

**decision-maker** 34:3

**decrease** 29:24 40:17

**decreases** 29:23

**definitively** 67:1 108:1

**delay** 125:3 156:19

**department** 11:25 20:11 21:1,14 22:1 37:8 88:7 90:22

**depends** 52:25 82:2,6 83:8 156:4

**deposed** 52:17

**deposition** 5:4,16 6:23 7:12 10:24 133:17 146:1,5 147:7 148:5

**deputies** 25:25

**deputy** 11:14 17:3,21,23,24,25 65:12 79:6,24 81:2 126:22,25 129:8, 11 130:6 131:21 132:3 133:8 153:5

**derivative** 58:21

**design** 85:14 86:7 89:25

**designed** 31:18 82:14 85:21 86:8, 11,12 90:1 93:23 94:8 107:6,8,11

**detainee** 38:17 85:11 86:15 95:6, 14,24 96:10,24 99:8 100:20 104:10, 13 118:7 126:17 132:25 134:19 154:22 155:6,7 157:13 158:5,19 159:5,11

**detainees** 27:2,7,10 30:5,7 31:10 52:1,10 53:17 62:15 82:9 91:3 93:2 94:9 100:3 102:18 103:8 123:10 124:10 125:17 128:10 129:16 134:8,

14 138:5 139:1,13,16 140:1 143:4,7 145:5 153:6 154:2 159:19

**detention** 20:23

**determine** 33:7 44:24 135:18 136:16

**determined** 106:16 135:15

**determines** 137:18

**developed** 59:13

**Devon** 6:21

**diem** 38:18 118:8

**differ** 82:17 85:13

**difference** 42:1,7,11

**differently** 15:2 20:12 23:2 35:8 82:14 141:17

**difficult** 80:11 127:1

**dining** 141:9,13

**directly** 17:15

**dirtier** 110:24 111:15,21 122:13

**dirty** 121:15 122:15,19 123:22

**disbanded** 75:5,9 76:12 77:5,22 78:12

**discretion** 35:4 76:9

**discuss** 51:20 81:1,3 152:19

**discussed** 51:17

**discussing** 10:25

**division** 13:15 19:14

**DOC** 22:5,16 23:4,11,17,21 24:2,8, 12 25:4,10,25 26:8,16,21,24 27:18 28:16,23 29:1,9,17 35:25 36:9 37:15,17,25 38:1,9 39:1,5,9,11,12, 19,25 40:8,9 42:2,25 43:1 44:7,21 45:6,8,11,14,25 46:6,16,25 47:22,23 48:14 88:10,11,15 91:1,2,12,17,20, 23 92:1,4,7,17 94:19 101:22 102:22 103:8 104:15 118:6,12 140:3,18 154:22 155:1,2,8,9,19,24 156:2 157:4,9,14,15,17 158:5,6,20 159:20

**DOCS** 26:5 28:22 42:14

**document** 19:12,16,17,21 20:6

**documentation** 31:1

**documented** 142:11 156:20

**documents** 19:21

**door** 39:21 48:13

**doors** 61:15

**drink** 10:16

**drops** 157:4

**due** 43:1 77:15 110:24

**duly** 6:3

**dump** 117:2

**dumped** 116:13 117:13

**duties** 11:19 18:2

**DWI** 53:7

**dynamics** 14:11

———————————————

E

**earlier** 37:24 149:6

**earliest** 56:8,9,12,15,20

**early** 56:25

**easily** 127:20

**eat** 123:13,16,17 140:23 141:1,8,9, 11,12

**eaten** 140:17

**eating** 123:10,19

**educate** 66:20

**educated** 60:25 70:12

**education** 66:20 72:11

**eff** 131:11

**effort** 146:7

**elected** 18:19

**emerge** 129:22

**emergency** 31:22 32:11

**emerging** 130:3 132:6

**employed** 11:8,13,14

**employee** 76:4,13 77:8,25 78:23 79:17,19,22 80:1,4,19 81:1 127:15 153:18

**employees** 16:1 25:20

**emptied** 114:13,20 115:10,17 116:4

**empty** 101:16 102:1,21 104:15

GREGORY LONGINO on 01/18/2023

140:3

**encompass** 12:8

**end** 152:4

**end-of-life** 13:8

**ends** 122:22

**enforce** 98:12

**enforcement** 18:5

**entire** 16:20 55:15 84:16 148:5,7 151:25 152:1

**equate** 122:16

**equation** 47:16

**equipment** 13:6 20:13

**escape** 150:13

**essentially** 11:20 132:10

**establish** 130:20

**established** 91:12

**evaluate** 22:25 57:18

**evaluated** 21:22

**event** 57:19

**events** 7:25

**evidence** 5:17 116:3,8 130:20

**EXAMINATION** 6:6 148:20 151:24

**exceed** 137:25

**exceeded** 52:19,23

**exceeding** 138:18

**excuse** 25:10 69:24 101:20 139:13

**executive** 11:17 19:7

**exercise** 10:4 138:8,14,20

**exist** 130:4

**expand** 100:16

**expect** 37:10

**experience** 65:12 66:19 67:5,20 71:4 122:9,11

**experienced** 60:25 70:11

**experiencing** 69:20

**expert** 137:5

**explain** 14:10 15:13 16:24 18:23 19:19 21:9 24:17 61:4 67:22 71:5

134:24 142:8 154:24

**explaining** 70:13,21

**exposure** 150:7,18 151:5,12

**extent** 8:19 105:3 146:5,9

**extra** 27:19 37:17 39:16 40:1 61:18 70:9

---

### F

**facility** 12:10 15:5 25:17 30:11,12, 24 40:4 57:18 73:7 76:20 84:2 85:9 88:14 91:17 101:4 103:17

**fact** 55:14,18 110:22 111:14 112:2 116:4 122:20 130:23 154:1

**factored** 109:7

**factual** 8:3

**fair** 6:13 7:21 16:15 18:8 21:3,23 26:21 27:1,20,25 29:2 39:14 51:7 76:3 120:16 121:14 130:25 144:21 148:1 158:10

**fall** 155:7

**familiar** 120:15,24

**favor** 126:10

**feces** 112:24 114:7 115:2

**fed** 140:18

**federal** 5:5 20:9,24,25 21:4,6,7,10 22:5,22 23:5,11,15,20 24:8,11 25:10,25 26:7,16,22,23 27:18 28:23 29:10 37:9 70:24 71:2 88:15 91:21 102:23 103:8 104:16 118:6,11 140:3 147:12 158:20 159:6,7,11,14,15,16, 20

**feds** 20:24 22:22 23:13,16 24:1,18 25:5 26:5 28:16,21 29:2,17 37:7 102:5

**feel** 10:15 131:13

**fell** 16:24

**field** 137:5

**fighting** 150:14

**figure** 9:12

**file** 49:11 126:8 127:12 128:1,5,15, 19 129:4 130:8 147:23

**filed** 49:13

**files** 129:19 131:20

**filing** 5:9

**fill** 38:1

**final** 34:2

**finance** 17:24

**find** 19:15 27:13,15 40:4 128:2 131:9,12

**fine** 8:10 9:20

**finish** 8:17 40:18 100:10

**fire** 31:24 64:10 133:20 134:3,11,21 135:5,10,14,16 136:1,6,15,17 137:5, 18,23 143:24

**first-hand** 152:14

**fit** 50:17

**five-** 12:25

**five-year** 13:5

**fix** 50:12 52:3

**fixated** 48:20

**fleet** 15:20 17:22

**floor** 38:7 90:9 93:12,21 100:4,21 102:20 104:10,20,22 112:21,24 113:2,5,19,25 114:6,14,19 115:9,10 122:10,22 123:5,12,15,16,17,19,22 140:13,15

**floors** 99:25 105:4 122:15,18,19 141:25

**fluids** 114:4,6

**focus** 14:21 15:4,6,7 61:14 62:8,22

**follow** 91:15 137:23

**follow-up** 154:17

**FOLSOM** 6:2

**food** 61:16

**forefront** 11:1

**form** 5:13 18:13 36:11,19 37:1 42:9 43:5 44:2 46:8,20 47:3 48:2 51:5 59:23 60:13 61:8,20 63:2,9 66:24 67:9 68:2 69:2,6 71:9 72:13 73:10 74:7,14 75:12 83:6,16,24 84:4 85:1, 16 86:19 87:21 89:5,9 90:4,12 92:12 93:5,14 94:15,24 95:9,17 97:21 98:17 101:7 102:9,25 103:10 108:7, 17 109:2 110:9 114:2 115:20 116:17 117:17 118:18 120:9 122:25 127:11

132:13 133:12 134:16 136:21 137:9 143:11 144:19 145:10 158:24

**formal** 125:24

**formalities** 5:8

**formality** 5:11

**formally** 51:24

**forming** 132:2

**found** 58:2 126:10

**founded** 126:21 127:6

**frame** 56:6 155:22

**free** 10:15 160:8

**frequency** 111:6

**fresh** 138:19 139:2

**front** 70:19,23 128:7 130:9 132:19

**frustrate** 142:20 143:3

**frustrated** 142:13,17

**frustration** 144:15

**full** 39:10,16,19

**fully** 27:5

**fund** 13:22,25 14:7 15:17 28:25 29:3,16

**funded** 26:12 27:5,8,11

**funding** 20:5 26:13,20 27:20,22 28:23,24 30:4 38:22,24 93:20

**funds** 25:9,15,19 118:6

**furniture** 112:4

**furthered** 104:5

**furthers** 103:25

**future** 12:8,14,17,18,19 14:4 15:19 146:11

─────────────

G

─────────────

**games** 7:24 9:21 11:2

**gave** 14:18 38:4 54:3 76:19 99:16, 18,22 125:23

**general** 7:22 15:17 82:15 83:3,12, 21 85:13 87:17 91:3,7 93:21 94:9 95:6 97:24 105:7,8 106:1,17 107:11, 13 109:8 110:6 118:9 141:7,15,21, 25

**generally** 106:25 107:5 108:13,14, 23 120:14,24

**generators** 13:6

**give** 30:14 38:25 40:24 41:3,18 43:9 56:14 57:19 76:7 80:4 81:6 88:15 90:23 93:2,7 94:18 131:22 143:25

**glad** 72:4

**goals** 12:2,17,18 13:14,17 14:21 19:9,13

**good** 6:17,20 72:1 145:21 152:23

**gosh** 7:7 10:3

**government** 14:5,12,18 20:24 22:6,22 23:16 26:22 51:24

**great** 9:9

**greater** 133:24

**Greg** 76:21,22 160:5

**GREGORY** 6:1

**grievance** 125:14,23,24 127:11 128:7 129:9

**grievances** 125:6,13 126:19 127:3 129:8

**grounds** 147:22

**guard** 126:11,16

**guards** 125:3 126:11

**guess** 8:20 9:19 11:19 15:25 23:19, 25 25:3,11 37:6,13 41:17 59:21 78:21 86:14 88:25 119:2 124:20 136:14 152:8

**guideline** 88:5,6

**guidelines** 88:10 92:3

**guy** 53:7 102:12 130:9,10

**guys** 47:23 48:12 59:6

─────────────

H

─────────────

**hall** 48:13

**handle** 19:5 60:25 79:6,25 80:1,2 125:14 128:6

**handled** 18:4,5,6 129:8,9

**hands** 8:15

**happen** 13:25 18:24 32:13,16 40:22 46:5 52:7 91:16 112:16 116:2

126:15 130:24 157:21,22,23,25 158:4,9

**happened** 55:3 113:11 114:15 115:16 116:6,13,15 130:10,11 131:8 133:1 158:10

**happening** 52:5 133:21 139:15 155:23

**happy** 8:7 9:4 67:16

**hard** 107:19

**harm** 68:9 149:24 150:1

**harming** 149:19

**harsh** 119:8,15,18

**Harton** 4:13 6:25 7:2,4,5 148:2,13, 18,20,21 151:16

**he'll** 34:20,21 53:10

**head** 124:4 148:14 151:21

**heads-up** 41:3

**health** 22:1 31:25 66:9 69:11,13,17 107:3 143:23 144:9

**hear** 89:15 124:1,3 125:2 144:24

**heard** 14:5 89:14 103:18,21 108:9 118:22 119:1,4 120:2,5

**hearing** 16:4 27:17 34:17,21 51:11, 16 65:23 71:22,25 155:4

**hearings** 50:16

**heavier** 144:6

**helped** 27:19

**hereto** 5:3

**hey** 32:21 40:19,24 49:19 50:10,22 67:22 73:19 81:11 130:1 131:11

**hierarchy** 16:23

**high** 55:10,21 60:21 65:13

**highly** 147:3

**hinder** 154:1

**hire** 23:17

**hired** 70:11

**hit** 114:6

**hoard** 124:11,14

**hoarding** 124:22

**hold** 31:18,20 81:22 100:10

**holding** 30:21 31:12,16,18 34:19,25 35:24 36:6 37:22 38:3,8 43:10,16, 23,24 44:9,14,15,16,19,20,22,25 45:4,9,13,22 46:18 47:7,19 48:22 49:1 52:10,11,15 53:2,9,15,18 54:12,15,18,21,24 55:2 58:8 64:5,12 67:7 70:4,6,8,14 73:22,25 74:3 81:12,21,25 82:1,10,12,13,18,19 83:3,9,12,14 84:2,6,10,24 85:10,13 86:4,10 87:1,6,12,16 89:21 90:9 93:16 95:25 96:10,20,24 97:2,7,8, 10,18,19,23 98:8,19,21 99:5,13 102:13,19 103:6 104:6,8,13,14,20, 23 105:7,15,16,21 106:8 107:9 110:22 111:7,25 113:8 121:23 122:1,6,13 124:2 125:9 126:12,18 127:10,16,22 128:11,25 130:4 133:19 135:7 138:5,9,12,14,17,21 139:14,16,21 140:2 141:17,19 151:1 153:7 154:2,11 155:3 157:18 158:5 159:4,11

**home** 40:2

**hope** 72:22 113:21,22

**horrible** 121:23 122:3,5

**Horton** 7:5

**hour** 155:13 156:16

**hours** 53:5 97:9,17 98:21 99:9 100:5,22 102:19 105:19 138:17 139:8 155:16

**house** 20:24,25 21:12 22:16 23:17, 24 26:5,16 28:6 30:1,6,7 31:1,20 37:9,11,15 38:10,13 39:3,6,16 40:5 41:6 52:2 92:18,19 94:18 101:2,3 121:8 159:15

**housed** 21:6 23:10,11 28:21 31:11 38:17 84:22 91:17

**houses** 40:2

**housing** 22:25 23:4,5,20,21 24:19 25:25 26:15,19 27:6 38:5 39:7 40:15 41:1,14 43:11,12 44:13 45:19 47:8 70:8 73:22 74:4 76:15,17 81:23 82:15,22 84:21 85:22,24,25 86:3,9, 11,13 88:9,17,24 89:21,24 90:24 91:21,24 92:1 93:9 105:11,12,14,19, 20 106:20 107:14 118:11,12 138:13 140:20 141:5,12

**human** 145:3 149:2 153:14

**humanity** 144:25

**hundred** 30:18 37:9,15,16 39:2,6

40:12,23 41:10

---

**I**

**idea** 7:22 67:12,25 129:18

**ideas** 19:4

**identify** 20:7

**immediately** 10:23 155:11,12 156:4 157:22

**immigration** 23:16 24:12

**immigrations** 21:1 22:19,21 23:12 26:17

**impact** 107:2

**impacts** 108:25

**implement** 20:4

**important** 61:14

**impose** 35:20

**impossible** 9:12

**improve** 13:19

**incident** 30:19 126:16

**incidents** 133:9

**include** 77:19 150:21 151:8 153:10

**increase** 25:19 26:3,4,7,8 28:24 64:25 65:6 66:22 68:23 69:16

**increased** 65:2 68:16 71:15,16 73:7 74:5,11,21 134:7,14

**increases** 66:16

**Increasing** 25:24

**indicating** 48:17

**individual** 97:10,19,23 98:8,19,21 99:5 128:1 152:15

**individuals** 152:20

**industry** 21:19 22:9,12,14 103:19

**inform** 78:25

**information** 8:3 9:22 10:2 19:22,23 76:8,19,21,22 77:1,14,16,17 78:10 81:7 128:2,14,18

**inhumane** 121:23 122:4 143:9,13

**inmate** 24:11,12 30:10 35:5 38:23 41:25 57:18 64:24 76:20 81:22 86:15 88:15,16 97:18 104:13 118:6,

12,13,14 125:24 126:10 128:15 129:4,19 131:20 149:25 154:20 155:6,9,19,25 156:3,23 157:5

**inmate's** 127:12 128:1,5,19

**inmates** 20:25 21:7 23:1,4,5,11,16, 17,21 24:13 25:25 26:7,8,9,12,16, 17,23 28:7 29:10 30:2,24 31:15 32:4 33:5 35:11 36:8 37:10 39:7,17,22 40:9,18 41:15 54:3 58:3 64:14,23 65:7,8,14,15 66:5,13 67:5,24 68:5 73:22 76:10 81:8 87:18 88:11,15 89:17 91:2,8,17,20,23 92:8,9,18,19 104:2,19 105:3,20 107:22 109:23 110:16,25 113:8,12 115:11 123:18 124:10,18,22 126:12 133:2 134:12 135:6 139:12,20 141:14 149:12 150:17 154:1 158:17 159:15,17

**inspected** 21:21 22:17,19,21,24

**inspections** 21:24

**instance** 12:24 21:4 25:18 32:8 62:14 126:9 127:6

**instances** 20:10 49:8 156:14

**intent** 154:9

**interest** 103:15,16,25 104:5,7,9,12 138:3 139:18

**interesting** 119:20

**introduced** 147:20

**investigate** 130:15 132:16

**investigated** 125:23 130:7,12 131:14

**investigating** 132:19

**investigation** 131:9 132:20 133:4

**involved** 78:22,23 118:3

**involves** 150:6

**isolation** 140:25

**issue** 16:6 35:17 41:12,21 43:2 51:17,20 56:18 59:12,21 60:2,3 64:13,15,18,19,24 65:2,4,5 66:8,13, 16,22 69:11,13 70:1,3 75:10 76:7 77:9 81:3,11 82:25 99:13 127:5 129:2,5 154:19 159:19,21,23

**issues** 13:8 20:7 40:13 69:17 135:11

**item** 16:12

**items** 13:7 14:15 126:12

## J

**Jack** 59:9,10

**Jacob** 4:12 6:6,22 7:1,6,8 18:16
36:12,22 37:4 42:20 43:13 44:6
46:14,23 47:6 48:5 51:6 59:24 60:16
61:12,24 63:5,11,18,22 64:2 65:21
67:3,11 68:7 69:3,7 71:14 72:24
73:16 74:8,19 75:3,15 80:16 83:10,
19,25 84:8 85:4,19 87:9,24 89:6,12
90:7,19 92:16 93:10,18 94:21 95:2,
12,22 97:22 98:22 100:15 101:14,19
102:10 103:3,13 108:8,20 109:5
110:13 114:11 115:21 116:23
117:19 118:21 120:13 123:4 132:23
133:15 134:20 136:25 137:13
143:14 144:20 145:13,15,20 146:14
147:10,25 151:20 153:20 154:4,16,
18 159:2 160:2,7

**jail** 11:23 12:4 13:12,20 14:2,3,15
15:6 16:20 19:5,23 20:7,17,18,19,22
21:5,13,14 22:15 23:6,13,14 24:5,8
25:16 27:6,22 35:15,21,23 50:21
55:15,16,19 56:2,22 58:9,10,17
61:18 62:9 63:7 64:4 70:1 71:11
75:20,21,24 76:24 77:2,13,19 84:12
88:5,6 89:1,2,3,20 91:2,6 92:3 93:23
94:4,17 95:4,5 99:3 101:1,12 102:16
103:17 118:5,22 119:18 120:3,6,16,
18,20,21,25 121:3,4,6,9,15,18
127:13 135:22 142:19 149:13,15,21
150:2 152:23 153:7,11,15 154:2

**jailhouse** 82:25

**jails** 21:20 22:3 60:5 121:19

**Jefferson** 58:22,25

**job** 9:9 78:7 80:4,18 81:6 144:8

**Joe** 131:11

**judge** 32:21 33:7 34:12 35:3,7,20
49:5,24 50:6,10,11 51:14 71:2 78:20
79:2,7,13 81:16 142:8 143:1,21

**judges** 31:22 58:16 75:18 119:9,11,
16

**jurisdiction** 59:5

**jury** 70:20,21,24 71:7

**justification** 20:3

## K

**keeping** 130:2

**kind** 10:3 11:19 27:2 126:12

**knew** 22:16,19,21 54:5 62:24
116:24 125:16 133:19

**knowing** 129:6

**knowledge** 116:7,8 152:14 154:10

## L

**lack** 15:21 18:6 158:18 159:10,13

**laid** 19:13 82:14

**late** 56:25

**law** 5:7 18:5 22:11 37:12,19 62:14
97:13,16 98:5,7,10,14,23 99:2
147:15

**lawful** 52:3

**lawsuit** 10:19

**laying** 122:15

**layout** 85:14

**layperson** 108:23

**leave** 43:23 110:5

**leaving** 138:18

**LEE** 6:1

**left** 24:13,20,25 25:5 27:9,12 28:1
35:4 78:16 152:10,22 159:16

**legal** 30:25 37:12 62:16,19 126:8

**legally** 30:10 36:23 37:3,10 121:9

**legally-binding** 37:7

**legitimate** 41:13

**lessen** 26:8

**lesser** 74:17

**letter** 51:16

**level** 17:19 22:5,13 23:7 39:24
49:11 60:22 129:12 130:6

**levels** 76:15,17

**lie** 123:7

**lieutenant** 17:3

**lieutenants** 16:11

**life** 135:10

**light** 108:13,22,25

**lights** 105:7,12,13 106:2,9,17,21,23
107:1,15,23 108:1,3 109:7,17,18
110:6,17 140:9

**limit** 97:6

**lingo** 9:3

**list** 57:21

**listed** 133:8

**Listen** 15:3 51:25

**listening** 8:10

**literally** 46:25 66:2 73:17

**litigate** 8:4

**litigation** 6:23

**live** 41:15 86:2,15 143:4,17 145:1

**lived** 24:19

**living** 86:5 145:6

**lock** 61:15

**lockdown** 109:19

**logged** 127:10

**logs** 116:12

**long** 6:8 44:24 56:5,23 78:14 81:24
82:1,5,11 84:22,23 86:16 87:5 90:6
92:1 112:9 118:25 119:25 126:19
142:23 155:18

**long-term** 12:1,2,24 13:17 19:12
85:21,25 86:3,9,11,12 93:8 106:19
107:14

**longer** 13:10 27:4 28:22,23 75:19
136:8 138:17 156:11,14

**longest** 82:9 155:18

**Longino** 6:1,8,9,10,11,12,15,16,17,
18,21 76:21,22 151:25

**looked** 58:11

**lost** 29:1,2,9,10

**lot** 72:19 105:17 121:6

**Louisiana** 5:21 6:2,14 97:14,17

**lower** 43:22 74:21

**M**

**made** 49:10 91:2 108:13,14 129:12

**magistrate** 147:24

**magnitude** 149:21

**main** 82:14 122:21

**maintain** 13:10 16:12 20:14 21:12, 16 22:18,20,23 23:6 24:24 25:11 30:1

**maintained** 20:2 132:5,7 141:16

**maintaining** 15:14 16:19 41:1

**maintenance** 11:15,16,24,25 12:4, 5,8,10,23 13:17 14:4 15:19 17:22 42:6 43:1

**major** 11:23,24 17:3,5,8 55:16

**make** 12:5 13:13 31:1 34:6 71:17 72:4 73:1,8,12 80:11 145:24 148:25 156:12

**maker** 34:2

**making** 10:1 61:15

**male** 52:11 82:18

**manage** 15:16 16:12 29:22

**managed** 11:22

**manpower** 16:6 23:22,23 24:3,5 69:25 70:3 158:18 159:4

**marshal** 31:24 64:10 133:20 134:3, 11,21 135:5,10,14,16 136:1,6,15,17 137:5,18 143:24

**marshal's** 137:23

**mass** 30:16 31:7,19 37:24

**math** 47:16

**mattress** 38:6 82:25 87:2,18 88:1 89:16

**maxed** 32:2

**maximum** 31:15,17 52:9 53:16 55:5,21

**meals** 123:10,13

**meaning** 12:9 13:9 15:1 36:3 44:7 51:23 57:24 87:5 94:3 116:11

**means** 8:7 29:23,24 81:8 120:23 130:24 134:9 135:9 146:17,18,20 149:18

**meant** 9:13

**measures** 105:14

**medical** 10:10

**medically** 87:3

**medication** 10:10

**meet** 21:25 22:13 152:18

**meeting** 19:2,3 51:12 79:1

**meetings** 19:7

**memo** 70:13,15

**memorandum** 51:17

**mental** 107:3

**mention** 14:5 32:6 145:25

**mentioning** 15:21 20:17

**met** 6:21

**mighty** 119:25

**mind** 10:13 131:3

**mine** 139:22

**mingle** 158:16

**minimum** 22:4

**minus** 48:7

**minute** 92:23 133:10

**mispronounce** 7:2

**mispronouncing** 6:7

**Mississippi** 6:15

**misunderstood** 58:24 79:4

**misused** 9:2

**mitigate** 151:12

**mix** 158:16

**moment** 145:16

**money** 14:17 118:9,15

**month** 40:13 41:12

**monthly** 129:3

**mop** 115:5,6 117:2

**mopped** 115:11 117:13

**morning** 53:3 105:22,24

**move** 9:24 28:16 40:18 43:14,15,25 45:3 85:10 97:10,17 131:4 153:15 154:1 155:1,2,13 156:5,8 158:19

**moved** 84:13 155:11 156:3 157:8, 10,15,17

**movement** 105:17,24 107:9 109:21 138:11 139:20,22 153:6 154:20 156:7,12

**moving** 159:11

**multiple** 63:10 130:11 147:5 157:8

**multitude** 150:13

**N**

**named** 58:20 59:2

**names** 7:9 57:20

**nature** 20:13 125:6

**nay** 115:24

**necessarily** 21:8 22:11 50:14 95:19 150:9

**necessity** 105:3

**needed** 13:5,7 18:23 19:5 20:8 42:21 76:8 77:2

**negative** 107:2

**neglected** 145:25

**neighboring** 59:5

**nice** 89:7,13,15 120:6,7,12

**night** 106:24 107:25 110:6,12

**nods** 124:4 148:14 151:21

**normal** 74:4 122:14

**note** 145:24 146:8 147:2,7

**notice** 146:21,22

**noticed** 146:21

**noting** 80:12

**number** 30:1 31:15,17 33:5 49:3,7 51:25 52:2,9 53:12,13,16 54:10 55:4,7,11,21 136:2 137:25 139:6

**numbers** 52:19,22 54:3 135:23 136:1

**O**

**oath** 5:21 149:2,4

object 18:13 36:11,19 37:1 42:9 43:5 44:2 46:8,20 47:3 48:2 51:5 59:23 60:13 61:8,20 63:2,9 66:24 67:9 68:2 69:2,6 71:9 72:13 73:10 74:7,14 75:12 83:6,16,24 84:4 85:1, 16 86:19 87:21 89:5,9 90:4,12 92:12 93:5,14 94:15,24 95:9,17 97:21 98:17 101:7 102:9,25 103:10 108:7, 17 109:2 110:9 114:2 115:20 116:17 117:17 118:18 120:19 122:25 132:13 133:12 134:16 136:21 137:9 143:11 144:19 145:10 147:22 158:24

objecting 148:4,7,9

objection 65:17 74:25 146:1,8,12 147:3,8 153:21 154:5

objections 5:13

obligated 20:18,19 62:14

obligations 25:12

obtain 12:17

occasion 32:19

occupy 158:22

occupying 155:19 159:20

occur 138:7

occurred 51:10 124:9 125:8,11

occurring 56:1 139:12

occurs 50:9 73:3

October 116:21 152:12

offenders 22:16

office 8:2 9:3 11:8 12:23 14:14 34:13 51:23 52:18 57:20 58:12,19, 22 60:22 79:7,9 82:7 128:3,13 133:18 152:2,6,11,23 153:19 154:10

officer 18:21 143:23 153:3

officer/executive 18:21

officers 16:2 23:18

official 18:19

officiated 5:21

ongoing 56:18,20 131:7

open 47:21 105:18 113:8,13

opened 94:4

operate 18:24 21:20,21 22:4 25:16 35:21 135:22

operated 35:23

operating 18:20 39:24

operation 22:13

operations 12:3 16:9,14 20:7 62:9 118:3

opinion 133:23

opposed 42:5 68:17,24 86:16 93:16 111:8

options 74:10

order 8:4 18:24

orders 32:1

original 94:3

outcome 46:13,15 150:22 151:5,7

overcrowded 32:22 45:13 47:11 49:22 50:25 56:11 60:4 64:6,17 71:12,19 72:21 73:14 104:14 110:21 122:13 123:14 141:22 142:19,22

overcrowding 32:10 35:14 36:5 37:21 42:2,23 43:8 49:5,24 50:7,11, 13 51:9 53:23 55:19,25 57:8,11,19 58:8 59:12,13,21 60:9 61:6,17 62:10,17,22,23 63:4,25 64:3,20 65:3 66:7 69:10,15,16,25 70:2,14 71:6,15 72:7,9,15,18,20,23 73:3,8,13,25 74:5 75:10,20,21,24 76:7,16,24 77:15,20 78:3,6,21 79:14,18,23 80:7,19,22 81:1 103:5,6 104:5,8,19, 22,25 105:2 110:24 111:8,9,12,15 122:17 129:15 134:2 142:3,9 143:22 149:8 150:25 151:11

overcrowding-type 31:23

oversaw 55:16,19

overseeing 16:21 55:15

oversight 128:24

overtime 15:10,11,14,15,22 16:7

---

**P**

p.m. 160:10

paid 23:23 26:18,22,23,25

paper 111:24 123:25 124:11,13,14, 21,25 125:1

paperwork 49:14

parish 5:20 13:22,25 14:5,12,17

21:5 22:10,15 23:6 26:13,19,20 27:2,6 35:11 36:8 38:13,25 51:24 58:22,25 83:21 92:9 96:10,24 99:3 118:7 120:1 152:1 155:7,19 158:4 159:5,10,19

parishes 40:6

parse 33:10

part 5:16 11:16 25:6 62:9 67:15 81:5 89:20,24 123:13 133:4

parties 5:3 147:6

party 148:22 149:3

passage 10:22

passed 119:9,16,19

past 99:9 100:5,22 102:19

path 16:16,17

patrol 17:23 18:5

pattern 129:22 130:3,14 132:2,5,9, 10,17

pause 54:3 131:22

pay 25:19,24 27:13,14,16 38:15

penal 103:16

pending 8:11

Pennsylvania 101:21

penological 103:15 104:4,7,9,12 138:3 139:17

people 6:14 7:5 8:2 30:19 34:18 45:4,7 46:18 47:18 53:3,13 54:9 69:18,24 79:21 106:6 107:1 108:23 120:11 121:11,25 122:14,22 123:6 134:4 138:8,12,14 140:24 142:22 151:1 154:11 157:8,10

perfect 13:2

perfectly 9:20

period 10:20 53:9 87:11,15 97:3 142:23 143:5,17 149:13

periodic 56:10 72:7,8,15,17,20 73:2

periodically 56:1

permanent 81:23 88:9,17,24 89:21 90:24

permissible 146:4 147:5,18

permitted 82:9,12 96:9,16,17,18,23 97:1,2 158:13,15 159:6,12

**permitting** 139:9

**person** 38:9 43:9 44:25 58:9,13 76:7 84:10 85:8,10 89:19 93:8 94:18 100:25 101:13 137:12 138:19 145:3 149:23 150:1,12 156:5 157:18

**personally** 32:20 115:24 116:7

**persons** 136:2

**perspective** 141:16

**pertain** 88:11

**pertained** 16:6 20:22

**pertains** 98:8

**petition** 31:21 34:13 49:12,13,18 51:11 78:20 79:11

**petitioned** 79:12

**petitioning** 32:7 49:9

**petitions** 49:4

**phone** 51:12 82:21

**pillow** 38:6 83:1 86:24 87:19 89:16

**pillowcase** 86:24

**pinpoint** 32:17 126:20

**place** 75:23 77:22 101:13 102:17 103:5 114:18 115:8 120:7,12 121:15,18,24 122:4,5 123:10

**plaintiffs** 6:22 116:2 148:10,12 152:15

**plan** 12:14,25 13:5,17,21 19:13 20:3 30:21,23 59:13 75:17

**plans** 14:4

**play** 7:24

**playing** 9:21 11:2

**POC** 101:16,18

**point** 8:25 49:3 94:6 102:11 146:10 153:4

**policy** 34:2 82:8,11 90:23 91:3,7,14 93:1,7 111:3 113:23 114:17 115:8 139:24 158:21 159:20,22

**political** 18:10

**politician** 18:19

**poor** 20:23 107:12

**pop** 141:7

**population** 71:12 82:15 83:3,13,21 85:13 87:18 91:3,8 93:21 94:9 95:6 97:24 105:8 106:1,18 109:9 110:6 141:7,16,21,25

**posed** 70:18

**position** 15:23 18:9,10,11 34:6 61:1

**Possibly** 151:9

**practice** 82:8 102:17 103:4 116:25 117:12,21,24 118:1 158:21 159:23

**practicing** 147:14

**pre-** 159:5

**precludes** 36:24

**prepared** 13:14

**prescribed** 87:4

**present** 12:9,11 14:15,16 19:6 63:7 66:8 69:10 133:24

**presented** 40:14 58:13 64:20

**presents** 71:16

**pretend** 70:24

**pretrial** 24:13,24 25:1,6 26:9,10,11 27:2,6,10,20,25 28:2,24 29:3,4,7,11, 16 30:5,6,10,20,24 31:9,10,15 32:3, 4 36:7 38:2,16,23 45:7 46:6 62:15 85:11 88:16 89:15,17,18 90:16 91:3, 13,24 92:7,9 93:2 94:9 96:24 102:18 103:7 104:13 118:13,14 138:4 139:12,13,16 154:21 155:1,6,9,24 156:23 157:9,13,19 158:4,19 159:13

**pretrials** 21:2 23:10,12 24:9,10 26:17 27:23 28:17 29:11,22 37:25 38:13 42:15,19 45:12 46:17 93:19

**pretty** 31:23 40:5 60:21 108:10 112:22,25 113:3,12 156:13

**prevent** 10:11 66:10

**prevented** 159:10,19

**previously** 133:3

**primary** 146:17,18

**prison** 119:25

**prisoners** 31:6 38:10,11 50:3

**problem** 34:14 36:15 43:7 46:5 49:25 50:22 57:2 60:18 61:5 62:24, 25 63:4,7,13 64:1,4,10 66:9 75:17 76:6 79:14 84:16 99:6,8,10 100:2,19 124:17 130:3 142:9

**problems** 19:4

**procedure** 5:6 7:23 139:24

**proceedings** 160:9

**process** 30:13,25 49:21 53:1 58:4 75:22 125:14 153:14

**processed** 58:10 84:11

**product** 13:9

**program** 27:11 57:12,16,17 59:1,6, 17 62:21 75:4,8

**project** 43:2

**projects** 14:7

**proper** 74:4

**properly** 23:1 27:8,11 29:3,25 146:20

**proven** 130:25 131:15

**provide** 78:9 94:8 95:5,25

**provided** 27:18 61:2 67:21 89:17 95:14 124:1 142:14

**providing** 125:3 138:4

**puke** 113:18

**pull** 131:19

**pulled** 128:18

**punitive** 154:11

**purpose** 7:11 81:17,20

**purposes** 5:6 76:23 106:5

**push-pull** 144:14

**put** 27:3 29:10 31:4,9,16 36:8 37:25 38:3,7,8 42:14 43:11 44:8,15 45:7, 14,18,21 46:5,25 47:8,24 55:7 70:15 75:23 77:21 84:14,17 91:20,23 101:13,15 102:2,5 119:3 124:12 156:6

**putting** 43:18 44:23 103:7

---

## Q

**quandary** 27:12

**question** 5:14 8:1,11,12,18,22 9:6 15:25 24:1 29:18 36:17 61:11 62:18 65:19 67:15 70:18,20,22 92:15 96:22 100:12 107:10,12 121:20 128:5,8 136:24 140:22 153:23 154:17 159:1

**question-answer** 7:23

**questioning** 147:9,19 148:4,8,9

**questions** 10:8 100:17,18 146:24
147:6 148:23,24 160:3

―――――――――

R

**raise** 26:7

**raises** 35:16

**raising** 27:15

**ranges** 32:18

**reading** 5:11

**realize** 10:20

**realized** 131:20

**realizing** 54:1

**reason** 10:6 21:5 41:13 42:13 85:8
110:11 154:11

**reasonable** 157:25

**reasons** 16:13 62:6

**recall** 10:23 53:17 54:2,11,14,17,20,
23 55:1,5,6 126:9,17 127:2,6 149:10
155:8,19,21,23 156:11

**receive** 128:11

**received** 38:24 118:5

**recess** 145:22

**reclassified** 154:21 157:14

**recognized** 59:11

**recollection** 52:20 55:10,20

**reconfiguring** 41:1

**record** 8:22 10:1 33:24 34:7 63:16
80:12 127:14 146:12,15 148:3

**recording** 51:15 146:17,19

**recordkeeping** 127:25

**recreation** 138:4 139:1 140:4

**reduced** 124:22,24

**REEXAMINATION** 154:18

**refer** 127:20

**reference** 104:25 120:3 125:7
143:23

**referred** 118:23

**referring** 82:20 150:17

**refute** 116:9

**regular** 114:21

**regulation** 37:19 89:14 138:25
139:4

**regulations** 20:9 138:16 139:6

**related** 149:8

**release** 32:25 33:4,8,14,15,18,20
35:5 50:2,17 53:14 57:22 58:3,17,18
76:9 81:8 82:6 101:11

**released** 33:5 53:14 54:9 58:14
81:9 101:10

**relief** 32:11,22 81:12 143:21,24

**relieve** 57:11 58:8

**relieved** 144:5

**rely** 66:19

**relying** 18:22

**remain** 82:10 102:18

**remained** 13:2 113:15,18 155:9

**remember** 55:8 56:8,9,13,16,21
77:4 149:6

**remove** 42:13 44:12

**removed** 140:2

**repair** 40:16 41:14

**repairs** 40:19

**rephrase** 67:17

**replaced** 13:8 93:25

**REPORTED** 4:23

**reporter** 4:25 5:19 6:4 8:15 80:11
146:19

**Reporter's** 4:7

**represent** 6:22 136:2 148:22

**representative** 52:18

**representative's** 133:17

**representing** 149:3

**reputation** 120:5,15,24 121:3,15,
17,22

**requested** 125:4

**require** 138:16 153:13

**required** 22:11 41:21 89:14 153:7

**requiring** 113:24

**research** 147:17

**reserved** 5:15

**resides** 35:11

**resource** 124:10 159:18

**resources** 153:8,10,14,19,25
154:19,20 156:4 157:11,24

**respect** 6:24 12:19 13:16 14:3
15:23 16:24 20:7,16 27:2 99:3
110:21 127:16 137:6,19,24 138:25
146:2 148:8 152:15

**respective** 11:19 25:12

**respond** 40:24

**response** 52:23 59:12 100:11

**responsibilities** 11:21 15:22 18:2
61:1

**responsibility** 15:24 76:14 77:25
78:2,11 79:16,18

**responsible** 80:19

**responsiveness** 5:14

**rest** 8:21

**restate** 9:5 67:17

**resterilized** 114:20

**restriction** 139:19

**restricts** 147:12

**result** 33:2 104:19,21

**retention** 13:5

**revenue** 23:15 24:22,23 26:14
27:15,16

**review** 126:7 128:4

**rhyme** 85:8

**rhythm** 108:5 109:12

**rid** 24:11 25:4,5 28:15 42:14

**risk** 68:13 69:16 71:16 73:23,24
74:1,2,5,9,11,16,17,18,21,22 133:24
134:7,14 149:11,13,14,18,19,20,24,
25 150:5,8,17,19

**risks** 70:14 71:6,11,13 72:9 73:2,6,
7,18,19,20 74:4 149:7 150:25 151:4

ROAD 6:2

Rodney 59:9,11

role 14:11,12,13

roll 124:1,13,16,18,22,25

roof 20:1

rose 60:21 65:13

rotation 13:1

ROTH 4:24 5:19

RPR 4:24

rule 99:2 106:23 147:12

Rules 5:6

run 18:24

——————————

**S**

safe 52:2 133:21 134:4 135:13 136:3,8,19 137:2,18,19,24 139:9

safer 73:8,12,15

safety 62:19 64:13,15,18,19,24 65:2,4,5 66:8,13,16,22 68:6,12 134:25 135:11,23 136:7,16 137:6 144:9 149:20

Sam 6:24 148:21

sanitized 113:24 116:14

sat 32:19,20

save 5:13 15:16 93:22

scarce 124:9 153:19

scarcity 124:15 153:25

scenario 31:8,24 40:14

schedule 111:12,20 113:14,17 114:21 141:19

scheduled 53:14 141:18

scheduling 16:5

score 58:12

scraped 112:11,12

sealing 5:8

search 127:14,20 129:5 133:7

searched 128:15

searching 128:20

section 23:13

security 16:16 105:14

sees 34:17 37:16 50:17

send 42:13

sending 51:25

sentence 84:19

sentences 119:8,15,18

separate 28:11,14

sergeants 17:4

seriousness 54:1

serve 87:11

served 87:15 104:9,12 138:4

service 13:10

set 19:9 22:24 31:2 34:16 92:22 106:2 129:1 135:23

sets 34:19 136:6

setting 50:15 77:15

SETTLEMENT 6:2

sheets 82:25 86:23 87:19 89:16

sheriff 14:12,16,20 15:2 16:25 17:1, 2,4,13 18:18 26:6 27:12 33:11,19 35:12,16,21 36:1,3,4 37:16 49:4,10 57:10 58:1 59:8,20 67:21,22,25 68:15,22 70:10 71:5 72:8,11 73:1 75:9 76:12 78:19,25 79:1,5,9 83:20 92:25 118:5 126:7 130:1

sheriff's 8:1 11:8 12:22 14:13 18:9 34:1,2,13 35:15 50:5 51:23 52:18 60:22 82:7 126:7 128:3,13 133:17 152:2,6,11,23 153:18 154:10

short 27:16

short-term 42:17,22 43:1,2

show 39:21

showers 99:19

Shrugs 6:19

shut 24:21 57:14 106:24 110:1

sic 108:5 109:12

sick 151:8

side 16:18 17:18 18:25 30:21 42:5 50:5 141:7

sight 16:13 131:3

signature 53:8

signing 5:11

simply 7:25 8:9 28:16 40:8 45:13 130:19

single 71:21 110:22 116:12 127:6 128:4,14,19 129:4,22 130:8 131:14

single-man 140:25

sir 9:17 10:5,9 16:3 23:8 56:10 71:3 154:15

sit 123:6,12,15 156:10

sit-down 14:24

sitting 53:7 61:23 62:1 70:25 71:2 122:15 123:18

situation 27:10 30:3,17 32:10 33:3 34:24 35:15 40:7 42:23 45:16 49:5 50:7,11,13 51:1 52:24 53:23 54:2, 11,14,17,20,23 55:1,20 56:1 57:8 67:6 76:16 78:4,6,21 81:15 104:14 138:19 142:3 150:6 156:11 157:12 158:3

situations 51:10 115:18 117:4 122:14 125:2 155:8

size 28:9

Slammany 118:23 119:5,13,17,23 120:17

sleep 90:8 93:12,21 100:3 104:10, 22 105:4 106:6 107:2,17,19,21,22 108:2,15,25 109:19,24 110:1,4,16 141:24

sleeping 100:21 102:20 104:20 122:9,10

slept 99:24

slightly 28:17 29:13

slow 50:22

slowly 48:9

snapshot 53:2

soap 86:25

SOD 17:23

solution 42:17,23 51:18,21 115:4 117:9

solve 72:25 73:4

GREGORY LONGINO on 01/18/2023

Index: son–threshold

**son**  121:5,7

**sort**  23:19 32:11 112:3 149:11 150:18,22 151:5

**sought**  5:17 147:20

**sound**  50:19

**sounds**  6:20 150:5

**space**  24:6,8 30:8 31:3 41:7 72:16 82:22,23 152:7

**spaces**  159:16

**speak**  17:19 22:14,15 27:12 145:16

**speaking**  63:23

**special**  141:5

**specific**  76:13 126:14,24 128:6 139:5 155:22

**specifically**  5:9,12 25:21 27:23 76:25 104:24 127:7 156:15

**specifies**  131:7

**speculate**  9:19 53:19,20

**speculating**  47:14

**speculation**  46:4,11,12

**Speed**  50:24

**spent**  151:25

**spit**  114:7

**squeeze**  27:3 30:4

**St**  5:20 22:10,15 23:5 56:1 99:3 118:23 119:4,13,17,23 120:17 152:1

**staff**  11:17 13:13 19:7 29:22,23 58:11,17 70:5,7,9 154:25

**staffing**  30:1 40:13 43:2 70:1 157:11

**standard**  21:19 37:19 90:14,17,18, 21,22 91:1,7,9,13 92:2,7,23 94:17, 19,20 95:4,15

**standards**  20:11,15,17,23,25 21:4, 6,11,15,16,25 22:18,20 88:3,4 92:17,20

**standpoint**  99:7

**start**  8:18 35:1 72:23 100:11 152:13

**started**  57:11 124:10

**starting**  129:22

**state**  5:20 20:9 28:4 91:10 95:19 97:13,17 138:16 146:15

**stated**  35:19 133:20

**statement**  27:21 118:16

**stating**  127:8 149:10

**status**  155:7 157:14 158:6

**stay**  19:10 29:4 44:20 53:12 81:24 82:1,12 105:12 114:9

**stayed**  23:13,14 45:9

**staying**  76:14 93:16

**stems**  10:19

**step**  126:3,4 129:9,13

**stepping**  65:1

**sterilize**  117:3,8

**sterilized**  114:13,23 115:1,11,17 116:5 117:14

**stint**  87:6,10

**STIPULATED**  5:2

**stop**  126:4,5 142:2 145:7 154:20

**stopped**  58:4

**stops**  109:21

**Strain**  59:9,10,11

**stream**  24:22,23

**streams**  23:15 26:14

**street**  31:5

**strictly**  35:2 38:24

**stuck**  38:4 111:24

**stuff**  99:13,16 109:21 150:15

**submit**  13:21

**submitted**  20:2

**suddenly**  10:25 44:7 50:19 131:20 136:11

**suicide**  149:24

**sunlight**  108:24

**supervising**  16:1 128:25

**supplement**  11:4 27:19

**supposed**  60:5

**surely**  53:22 54:2

**switch**  155:6

**sworn**  6:3

**system**  103:16 127:19

---

T

---

**table**  62:2

**tables**  141:13

**takes**  101:5

**taking**  128:18

**talk**  49:19 80:9,20,21 152:18

**talked**  15:18

**talking**  37:11 38:18 56:7 77:4 86:6 92:7 96:19 99:20 103:23 118:8 144:13

**Tammany**  5:20 22:10,15 23:6 56:2 99:3 152:1

**technically**  30:9

**telling**  79:23 128:13 135:17 136:19

**tells**  49:23 136:17

**temporary**  42:23 43:8

**ten**  47:18 48:7,10,20,22 49:1

**ten-year**  12:25

**tender**  146:13 151:19

**term**  9:2 15:21 18:6 82:5 84:22,23 86:16 87:5 90:6 103:19,21,23

**terrible**  7:9

**territory**  138:1

**testify**  6:4

**testimony**  115:7

**that'll**  35:8

**themself**  149:24

**thereof**  5:16

**thing**  46:10 126:14 131:7 144:11,16 158:8

**things**  9:11 10:25 19:4,7 20:12,13 41:19 61:14 91:18 125:4,6,7 134:22 149:21 150:14

**thought**  145:4

**threshold**  49:3,7 136:7

GREGORY LONGINO on 01/18/2023

**ticket** 13:7 14:14

**tight** 93:20

**time** 5:15 7:23 8:6,25 10:20,22 11:4 17:2,25 34:23 39:18 40:24 50:2 53:9 55:11 56:4,6,20,23 57:11 58:2,15,17 75:6,25 76:4 79:14 81:13 82:9 87:11,15 95:13,20 106:23,24 109:8, 19,25 110:1,15,18 112:8,12 114:12, 16 116:13 119:3,25 124:2,13 125:15 126:8,19,20,24 129:19 142:23 143:5,18 144:1,6 145:21 152:24 153:2 155:18,22 158:1

**timely** 154:3

**times** 12:6 32:17 52:20 55:3 63:10 64:6 78:5,19 79:24 80:21 111:17 112:18,19,21,23 113:1,4,7 130:11 133:18 145:4 153:19

**title** 94:22 95:1

**today** 10:1,8 31:8 40:22 53:10 55:22 61:23 131:11 144:14 156:10,24

**toilet** 82:20 110:23 111:23 122:21 123:25 124:11,13,14,21,25 125:1

**told** 9:25 51:2 52:25 131:11

**tomorrow** 38:1 45:1

**tonight** 45:1 157:3

**toothbrush** 86:25

**toothpaste** 86:24

**top** 117:3,5,10

**topic** 9:24 25:24

**topics** 70:12,15

**total** 52:13 53:17 136:2

**touch** 76:14

**towers** 13:7

**track** 19:10 129:1

**tracked** 122:23

**trained** 60:18 70:12 130:15

**training** 13:13 65:11 67:4,20 71:4 72:10 103:20

**transcript** 9:11

**treat** 92:10

**treatment** 126:17 127:10,16,21 128:10

**trial** 5:6 101:2 146:8 147:21

**trick** 7:24

**tricking** 9:22

**triggered** 49:9

**trouble** 136:14

**true** 68:20,23 112:5 123:2,3

**trust** 67:21

**truthfully** 10:7

**turn** 30:6,9 32:5 40:8 105:7 110:7,17

**turned** 106:2 107:1 109:8

**tying** 120:17

**type** 15:24 28:6,7 126:16 129:23 138:20 150:14

**types** 19:20 130:16

**U**

**uh-huh** 9:11 32:12 48:11,15 67:18 94:10

**uh-uh** 9:12

**ultimately** 35:25 146:6 147:19

**unbelievably** 10:21

**uncomfortable** 60:5

**undercut** 27:24

**underfunded** 27:11

**understand** 9:1,5 25:9 57:25 61:5, 10 62:12,18 66:18 67:16 71:17 72:5 74:22 91:11 98:10,14,23 103:22 108:12,22,24 119:14 131:16 135:22 136:1 141:2 144:7 149:1 159:1

**understanding** 12:13 21:18 22:3,9 67:19 76:11 95:3,24 97:15 98:1,4,6 112:3 119:23 124:20 136:15 138:16 149:17 150:7

**understood** 22:12 33:9 64:8 77:3 78:8 80:22 106:25 107:5

**undiscovered** 132:11

**unfounded** 130:19,23 131:2,21,23 133:9

**unit** 24:20 38:5 40:16 41:1,14,15 43:11,12 44:13 45:4,19 47:9 52:12 70:8 73:23 81:23 82:22 84:21 85:24 88:9,24 89:21,25 90:25 93:9 94:19

**units** 105:11,12

**unproven** 131:12

**unsafe** 134:11 135:6,7 136:18 137:25

**unusual** 147:3,17

**upgrading** 15:4

**urinated** 114:14

**urinates** 115:9

**urine** 112:21 113:19 114:7 115:2 122:22

**utilized** 103:19

**V**

**van** 157:4

**variables** 72:19

**vehicle** 11:16,24 12:4,23,24

**vehicles** 13:1

**verbalize** 9:15

**verbalizing** 9:10

**verse** 126:16

**versus** 28:3 73:13 82:21 83:12 135:19

**video** 146:2,6,7 148:8

**videotape** 146:4

**violation** 42:4 143:25

**violations** 149:20

**vomit** 113:2 114:8,19 115:3

**vomited** 113:25 114:13 117:12

**vomits** 115:8

**W**

**wait** 50:21 84:18 101:3 133:9

**waiting** 44:17

**waived** 5:10,12

**wake** 108:13 110:19

**walk** 47:23 112:8 122:22

105:15,19,20 107:14 138:13 140:20 141:12

**walking** 48:12,13

**walls** 111:24 112:12

**wanted** 14:21,22 71:17 128:2 144:8, 10,15

**warden** 11:23 16:11 17:5,8,9,11,16 52:25 125:5 129:7,10 130:5 153:4

**watch** 70:5,7

**water** 10:14 115:5

**weather** 139:9

**week** 36:6 37:21 44:21,22 50:16 139:9

**weekly** 129:3

**weeks** 19:2 44:19,20

**weigh** 53:11

**welfare** 107:3

**wing** 15:8 102:22

**wings** 28:12

**withhold** 9:22

**withholding** 126:11

**Witness'** 4:6

**word** 79:11 149:18

**words** 9:15 33:10 49:17

**work** 8:1 28:4 41:16 76:5,18 77:8,13 78:3,5 79:15,17 141:10 152:7

**worked** 13:8 57:10 76:18 152:25

**working** 12:18 13:18 35:1 72:23 75:5 79:22 146:23

**works** 7:22

**worse** 44:9,16

**wounds** 113:8,13

**write** 51:24 70:13

**write-up** 144:5

**writing** 51:16

**wrong** 6:12 79:11 86:10 116:4 134:21 145:5

**wrote** 144:2

---

### X

**X'** 55:12

---

### Y

**y'all** 80:9,12 100:12 151:19

**yea** 115:24

**year** 15:3,5,7,15 19:10 20:1 22:16, 18 26:19 52:1 56:9,15 96:1,8,11,15, 25 97:3 101:5,9 125:12 128:5,11,15, 19 152:6 153:17,18

**years** 67:20 69:20 70:17 116:21 125:18 129:16,23 130:13 147:14 152:24

**yesterday** 52:17 133:16 146:2