# Ahmed Baqer, et al. v. St. Tammany Parish Government, et al.

## Daniel Fleischman
## March 21, 2024

All depositions & exhibits are available for downloading at
<www.brookscourtreporting.com>
Please call or e-mail depo@brookscourtreporting.com if you need a
**Username** and **Password.**



**Mississippi – Louisiana – Tennessee – New York**
**1-800-245-3376**

Daniel Fleischman 3/21/2024

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

```
AHMED BAQER, et al.,        *
                            *
          Plaintiffs;       *DEMAND FOR JURY
                            *
v.                          *No.: 2:20-cv-00980-WBV-DPC
                            *
ST. TAMMANY PARISH          *DISTRICT JUDGE:
GOVERNMENT, et al.,         *WENDY B. VITTER
                            *SECTION "D"
          Defendants.       *
                            *MAGISTRATE JUDGE:
                            *DONNA PHILLIPS CURRAULT
                            *SECTION "2"
*************************************************
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

```
KEVIN LOUVIERE, et al.,*
                            *
          Plaintiffs;       *DEMAND FOR JURY
                            *
v.                          *No.: 2:20-cv-01840-WBV-DPC
                            *
ST. TAMMANY PARISH          *DISTRICT JUDGE:
GOVERNMENT, et al.,         *WENDY B. VITTER
                            *SECTION "D"
          Defendants.       *
                            *MAGISTRATE JUDGE:
                            *DONNA PHILLIPS CURRAULT
                            *SECTION "2"
*************************************************
```

DEPOSITION OF DANIEL FLEISCHMAN

Taken at the instance of the Plaintiffs via Remote
Conferencing on Thursday,
March 21, 2024,
beginning at 11:07 a.m.
REPORTED BY:
A. VIRGINIA "GINGER" BROOKS, CCR #2010023

Daniel Fleischman 3/21/2024

```
 1    APPEARANCES:

 2

 3         DEVON M. JACOB, ESQ.
           Jacob Litigation, Inc.
 4         P.O. Box 837
           Mechanicsburg, Pennsylvania 17055-0837
 5         djacob@jacoblitigation.com

 6
                COUNSEL FOR PLAINTIFFS
 7

 8
           KENNETH R. WHITTLE, ESQ.
 9         BRUCE A. CRANNER, ESQ.
           Milling Benson Woodward L.L.P.
10         68031 Capital Trace Row
           Mandeville, Louisiana 70471
11         kwhittle@millinglaw.com
           bcranner@millinglaw.com
12
13              COUNSEL FOR DEFENDANTS
14
15
16
17
18
19
20
21
22
23
24
25
```

Daniel Fleischman 3/21/2024

```
 1                       INDEX
 2   Caption ...................................1
 3   Appearances ...............................2
 4   Index    ..................................3
 5   Certificate of Deponent  ...............111
 6   Certificate of Court Reporter  .........112
 7                    EXAMINATIONS
 8   Examination By Mr. Jacob ..................4
 9   Examination By Mr. Whittle ...............91
10   Examination By Mr. Jacob ................107
11                      EXHIBITS
12   Exhibit 1 Contract .......................94
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Daniel Fleischman 3/21/2024

```
 1                    DANIEL FLEISCHMAN,
 2     having been first duly sworn, was examined and
 3     testified as follows:
 4     EXAMINATION BY MR. JACOB:
 5          Q.   Well, I guess it's afternoon -- no, it's
 6     morning there.  It's afternoon here.  I'm in
 7     Pennsylvania, but in any case, good morning, sir.
 8          A.   Good morning.
 9          Q.   Can you state your full name for the
10     record?
11          A.   Daniel Patrick Fleischman.
12          Q.   Mr. Fleischman, have you ever given a
13     deposition before?
14          A.   Yes, I have.
15          Q.   Just to make sure we're on the same
16     page, we are on Zoom, as you know.  There is still
17     a court reporter, though.  The court reporter has
18     two hands, but it's not one for you and one for
19     me, so I will do my best to let you finish your
20     answers before I begin my questions, but I ask
21     that you do the same to the extent -- even if you
22     can guess what I'm about to ask -- if you would
23     just let me get the whole question out before you
24     begin your answer, it will make the creation of
25     the record a little bit easier here today.
```

Daniel Fleischman 3/21/2024

```
 1        A.    Yes, sir.
 2        Q.    Okay.  And you're also -- good job with
 3   the audible responses.  I just ask that you
 4   continue to do so, because nods of the head,
 5   shakes, "uh-huh" (affirmative), "uh-uh"
 6   (negative), are all things that nobody wants to be
 7   trying to figure out three weeks down the road
 8   what was meant by the witness, okay?
 9        A.    Yes, sir.
10        Q.    If at any point in time I ask a question
11   that you don't understand, just let me know.  I'll
12   be more than happy to restate it, clarify it,
13   whatever is needed for you to understand the
14   question, because I don't want you to guess.
15              Obviously, if I'm asking certain
16   questions, it's because I'm looking for the
17   answers to those questions.  I won't think you're
18   trying to play games, and, hopefully, you won't
19   think I'm trying to play games with you, but let's
20   work together. Make sure you understand the
21   question before you answer, okay?
22        A.    Yes, sir.
23        Q.    If at any point in time you need a break
24   for any reason, you don't have to tell me why.
25   Just let me know.  I'll certainly accommodate.  I
```

Daniel Fleischman 3/21/2024

```
 1    just ask that if a question is pending, that you
 2    at least answer that question before we take a
 3    break, okay?
 4         A.    Yes, sir.
 5         Q.    Is there any reason that you wouldn't be
 6    able to answer truthfully questions here today?
 7         A.    No, sir.
 8         Q.    Meaning there's no medical issue or
 9    medication that would prevent you from doing so?
10         A.    No, sir.
11         Q.    And again, you're -- I'm assuming you're
12    aware of why we're here today, with respect to
13    litigation that was filed by several former
14    inmates of the St Tammany Parish jail.
15              Are you prepared to answer questions
16    related to that?
17         A.    Yes, I am.
18         Q.    You are.  That's good.
19         A.    I say that with hesitation, because I'm
20    not a whole lot familiar, but I have familiarized
21    myself in a couple of days of what has actually
22    transpired in here.
23         Q.    Okay.  That's fair enough.
24              And at some point in time, did you speak
25    to a "Leonard" there regarding this matter?
```

Daniel Fleischman 3/21/2024

```
 1          A.    I did.

 2          Q.    Who --

 3          A.    A couple of times.

 4          Q.    And who is that individual to the best

 5    of your recollection?

 6          A.    To the best of my recollection, he was a

 7    subject expert on jails and the running of jails.

 8          Q.    Sure.

 9                And just so we're clear on the record,

10    who are you with respect to the jail?

11          A.    I am the warden of the jail.  My title

12    is Major.

13          Q.    And during what years did you serve in

14    that capacity?

15          A.    From February 2021 -- February 22nd,

16    2021 until current.

17          Q.    Okay.

18          A.    I am still the warden.

19          Q.    And prior to that, were you still

20    working at the jail?

21          A.    No. Prior to that, I was -- I don't know

22    if you want me to tell you what I was doing, but

23    no.  Prior to that, I was not working at the jail.

24          Q.    What were you doing?

25          A.    There we go.  I was the captain of
```

Daniel Fleischman 3/21/2024

```
 1    courthouse security and school resource officers.
 2         Q.   I see.
 3              And this position that you're currently
 4    in as major over the jail as warden, is that the
 5    first time you've had correctional experience?
 6         A.   Yes, it is.  It's not the first time
 7    for -- again, I'm getting ahead of you.
 8         Q.   I'm sorry.  It just cut out.  If you
 9    could just repeat what you just said.
10         A.   I was getting ahead of your questions.
11              Yes, this is my first time experiencing
12    working in the jail.  Corrections.
13         Q.   Prior to moving over to corrections,
14    what did you do to prepare to function in that
15    capacity?
16         A.   I managed, like I said, courthouse
17    security staff and the school resource officers.
18    So I'm in a managerial position as the warden.
19         Q.   Have you received any training in the
20    area of corrections?
21         A.   Yes.  I've attended basic -- our
22    Louisiana state jail training conferences.  I've
23    attended POST One, so they teach on corrections,
24    and I went to -- I've attended online several
25    PoliceOne training modules that deal specifically
```

Daniel Fleischman 3/21/2024

```
 1   with corrections.
 2        Q.   Does it deal with the administration
 3   aspect of corrections or did it deal with the
 4   safety function aspect, the day-to-day aspect of
 5   corrections?
 6        A.   The day-to-day.  I would say PREA stuff.
 7   I can't -- I mean, I can't label all of them,
 8   because I just --
 9        Q.   Have you been through the academy?
10        A.   POST One academy, yes, sir.
11        Q.   And POST One academy is what, just so
12   we're clear on the record?
13        A.   The basic police law enforcement
14   academy.
15        Q.   But with respect to corrections, am I
16   correct there's an academy?
17        A.   There is, I think, a two-week academy or
18   classroom instruction, yes.
19        Q.   And have you taken that?
20        A.   No, sir.  I'm not -- I don't deal with
21   that part of corrections.  That's for --
22        Q.   Go ahead.  I'm sorry.
23        A.   That's for the people that work
24   day-to-day, hands-on, boots on the ground,
25   interact daily with inmates.
```

Daniel Fleischman 3/21/2024

```
 1        Q.   But you are, in your capacity,
 2   responsible for supervising those persons?
 3        A.   Yes, indeed.  I'm --
 4        Q.   And --
 5        A.   For those persons, no.  For their
 6   bosses, yes.
 7        Q.   Just to be clear, then, you have
 8   supervisory responsibility over the supervisors
 9   who supervise the day-to-day correctional
10   officers?
11        A.   Yes, sir.
12        Q.   And yet you have not received a two-week
13   academy training with respect to how to do that
14   particular job?
15        A.   No, sir, not the hands-on work.
16        Q.   So if you were to look at what a
17   day-to-day event that happens, you would have no
18   standard by which to measure or evaluate that
19   against; is that correct?
20        A.   As in?  I guess I don't understand.
21   When you say, "the day-to-day" --
22        Q.   Let me ask it this way.  Am I correct,
23   then, that a deputy or a correctional officer has
24   more training than you with respect to the
25   day-to-day correctional aspect of the job?
```

Daniel Fleischman 3/21/2024

```
 1        A.   He has been through an FTO program to do
 2   his job.  That is a fact.
 3        Q.   Well, it's a fact that he's been both
 4   through the Academy and an FTO program --
 5        A.   Not necessarily.  They have up to a year
 6   to get through the POST academy -- POST
 7   corrections academy.  They have up to 365 days.
 8   So if it's a six-month employee, no, he probably
 9   hasn't yet.
10        Q.   But he would still be more trained than
11   you because he received the FTO program?
12        A.   He probably is currently going through
13   the FTO program, yes.
14        Q.   After the very first day of the FTO
15   program, am I correct that individual would be
16   more trained than you with respect to the
17   day-to-day aspects of corrections?
18        A.   Most of what he is going through is
19   going to be things I'm very familiar with, so I
20   would say "no" would be an answer.  A first day
21   corrections officer is not more equipped to do his
22   job than I could.  So --
23        Q.   You have not been through the field
24   training program, correct?
25        A.   No, sir.
```

Daniel Fleischman 3/21/2024

```
 1          Q.   And you have not been through the
 2    corrections academy, correct?
 3          A.   No, sir.
 4          Q.   "No, sir," as in that it's correct that
 5    you have not received either?
 6          A.   That is correct.
 7          Q.   And yet for -- do you know why, then,
 8    the -- the expert or the individuals presented as
 9    an expert on behalf of the jail, why you were the
10    point of contact for --
11          A.   Because I was the warden at the time --
12          Q.   Let me --
13          A.   I'm sorry.
14          Q.   That's okay, but we've got to have a
15    clear record here.  So again, do you know why you
16    were the point of contact with respect to the
17    subject matter expert presented by the jail?
18          A.   Because I was the warden.
19          Q.   Okay.
20          A.   And being asked policy questions and --
21          Q.   So you would be the point of contact for
22    policy matters?
23          A.   No, sir.  That was what was being asked
24    of me was those type of questions.
25          Q.   I see.  Okay.  Have you read through the
```

Daniel Fleischman 3/21/2024

```
 1   policy manual for the jail?
 2        A.    Yes, I have.
 3        Q.    And when do you recall doing that?
 4        A.    Over the last three years?  A couple of
 5   times.  Not necessarily the whole manual, but in
 6   times, I've had to go back and look at several
 7   parts of it.
 8        Q.    So you're the warden of the jail, and
 9   yet you have not read through the entire manual?
10        A.    Yes.  What I said was, "several times,"
11   but not the whole manual several times.  I've read
12   the whole manual, but at times, I go back and
13   reference it.
14        Q.    I understand.
15              When was the last time, or when can you
16   say you had completed reading the entire manual?
17        A.    When I started as the warden, and as
18   it's been updated, I go and look at those
19   sections.
20        Q.    Well, when you said you get --
21        A.    I'm sorry, go ahead.
22        Q.    When you said "as the warden."  My
23   question, though, is when can you testify that,
24   "As of such and such date I had made a complete
25   read-through of the policy manual for the jail"?
```

Daniel Fleischman 3/21/2024

```
 1        A.    I would testify that in the February --
 2   end of February to March -- through March of 2021,
 3   I read the entire jail policy.
 4        Q.    Okay.  Now, with respect to the
 5   allegations in this case, did you review the
 6   policy manual that was in effect at that time?
 7        A.    No, sir.  I reviewed the policy that was
 8   in effect when I took over, because I, frankly,
 9   didn't have a reason to look at what was policy
10   then.
11        Q.    You just said that the expert was coming
12   to you to ask policy questions related to the
13   facts that have been alleged in this case.
14        A.    I'm not for sure that he asked me
15   specific questions related to this case.  I may be
16   wrong, but I didn't -- I don't recall answering
17   specific questions to this case.  He was asking
18   general questions.
19        Q.    And did the expert ever ask you, "Are
20   you up to speed," or, "Have you reviewed the
21   manual that was in effect at the time of these
22   events"?
23        A.    I do not recall.
24        Q.    And that's not information that you
25   shared with the expert, correct, that you did not
```

Daniel Fleischman 3/21/2024

1    review the policies that were in effect at that
2    time?
3        A.   For me to testify to that fact, I can't
4    recall it.  I don't -- I don't recall the exact
5    conversation.
6        Q.   Is there anything that would refresh
7    your memory as to whether you discussed with the
8    expert that you were not in a position -- you were
9    not informed about the policies that were in
10   effect during the events that occurred or
11   allegedly occurred in this litigation?
12            (Sam Harton enters deposition.)
13       A.   Again, I don't recall talking about this
14   specific litigation.
15       Q.   (By Mr. Jacob)  How about the specific
16   time frame of this litigation?
17       A.    I don't believe -- I don't believe we
18   did, but again, I don't recall discussing a time
19   period that I wasn't there.
20       Q.   So it's fair to say then, that any of
21   your answers or responses provided to this expert
22   related to the policies in effect during your
23   employment but not necessarily in effect during --
24   at the time of the events in this matter?
25       A.    I think that would be a fair assessment.

Daniel Fleischman 3/21/2024

```
 1        Q.    Okay.  And there's been no distinction
 2   made by the expert in that regard, correct?
 3        A.    I'm not aware.
 4        Q.    Do you know as you sit here today if
 5   policies back during the time frame when these
 6   events allegedly occurred and the time frame of
 7   the policy that you're aware of, if there's been
 8   any changes?
 9        A.    Not that I am aware of.
10        Q.    And you're not -- sorry, you're not
11   aware of that because you didn't review any
12   prior --
13        A.    Older policies, correct.
14        Q.    I'm sorry.  You're not aware because you
15   didn't review any prior, previous versions of the
16   policies?
17        A.    That is correct.
18        Q.    And am I also correct, then, you did not
19   investigate the practices that were in place
20   during the time of these events, meaning not
21   written policy, but actual practices?
22        A.    I can agree with you on that.  No, sir.
23        Q.    All you can speak to are the practices
24   that were in place at the time you were warden?
25        A.    That's correct.  That's all I can --
```

Daniel Fleischman 3/21/2024

```
 1        Q.   Did you ever discuss with the expert
 2    that the information that you would be relaying to
 3    him regarding any policies or practices were
 4    specific only to the time frame that you were
 5    warden?
 6        A.   I don't know if it was explained that
 7    way.  I know he was under -- he knew when I was
 8    the warden, so I mean, I would assume he knew the
 9    time period I was referring to.  I don't think
10    he -- I don't recall, but I don't remember him
11    asking specifically time periods.  He knew when I
12    was warden.  He knew the dates I was warden.  So
13    when he asked a question, that's what I was
14    referring to.
15            COURT REPORTER:  I'm sorry.  If somebody
16        is objecting, I'm not getting that.
17            MR. CRANNER:  There's been no objection,
18        ma'am.
19            COURT REPORTER:  Okay.  Would y'all
20        repeat that last question and answer, because
21        I had distortion?
22            MR. JACOB:  Sure.  I heard it, too.
23        Q.   (By Mr. Jacob)  So it's pure speculation
24    that when you were speaking with the expert, that
25    he knew that you were talking about the time frame
```

Daniel Fleischman 3/21/2024

```
 1    that you were warden, as opposed to when the time
 2    frame these events allegedly occurred?
 3         A.   Yes, sir, speculation on my part.
 4         Q.   Okay.  So as you sit here today, you
 5    have no idea whether the expert knew that you
 6    referring to only the time period in which you
 7    were warden?
 8         A.   I don't recall us saying specific dates,
 9    no, sir.
10         Q.   So, again, as you sit here today, you
11    have no idea whether the expert knew that you were
12    only talking about the time period you were
13    warden?
14         A.   No, sir, I don't recall him asking about
15    specific dates.
16         Q.   Again, I am not asking if you recall if
17    he asked you.  My question is a little bit more
18    broader, which is:  As you sit here today, you
19    have no idea if that expert knew that you were
20    talking about only the time period you were
21    warden?
22         A.   No, sir, I don't.
23         Q.   Okay.  Have you reviewed the complaint
24    in this matter?
25         A.   I don't believe I've looked at the
```

Daniel Fleischman 3/21/2024

```
 1    entire complaint with all the complainants.  I
 2    didn't know I was going to be involved in it until
 3    recently, so --
 4         Q.   Obviously, you were involved when you
 5    were speaking with the expert and providing
 6    information to him.
 7         A.   I knew I was speaking with him to give
 8    him information on how my jail was ran, yes, sir.
 9         Q.   Understood.
10              You don't know as you sit here today
11    whether there's one or two lawsuits related to
12    this matter, do you?
13         A.   I briefly recall reading that they were
14    both combined into one, maybe, if that's how you
15    refer to it.  Both of them are being done at the
16    same time.  I don't know if all the people have
17    joined into one group or if it's still two
18    separate groups, but I know that it's bundled into
19    one lawsuit.
20              MR. JACOB:  There's background noise.  I
21         don't know who's causing it, but if we could
22         control that.
23              THE WITNESS:  I don't hear it.
24         Q.   (By Mr. Jacob)  Did you conduct any
25    independent investigation into any of the
```

Daniel Fleischman 3/21/2024

```
 1   allegations by any of the plaintiffs in this
 2   matter?
 3        A.   No, sir.
 4        Q.   Do you even know the names of the
 5   plaintiffs in this matter?
 6        A.   I know a couple of the names because I
 7   was at some point tasked with gathering reports
 8   or, like, medical stuff and things like that on
 9   some of them.  So I did learn their names, yes;
10   some of them, not all of them, and I know one of
11   them -- as the warden -- one of them was actually
12   deposed in the jail, so I know his name.
13        Q.   Okay.  And what was his name?
14        A.   That was Mr. Gilead.
15        Q.   And who are the other names that you
16   recall?
17        A.   The one that sticks in my mind is Baker,
18   I think is how you pronounce it, but it's spelled
19   with a "q" instead of a "k."
20        Q.   Were you ever asked by the expert
21   whether any of the allegations that were alleged
22   by the plaintiffs were, in fact, true and correct?
23        A.   I do not believe we discussed individual
24   people, but I could be wrong.  I don't recall
25   that, no.
```

Daniel Fleischman 3/21/2024

```
 1        Q.   But again, were you ever asked by the

 2   expert whether the allegations made by the

 3   plaintiffs were true and correct?

 4        A.   I don't believe so.  No, sir.  And I

 5   mean, I wasn't there.  Never mind, I can't answer

 6   a question you didn't ask.

 7        Q.   Did you ever discuss with the expert the

 8   fact that the sheriff did not adopt or implement a

 9   policy that limits the amount of time that an

10   inmate may be housed in a holding cell?

11        A.   I don't know if we discussed it, but I

12   do know there is no policy that says how long a --

13   there is no current policy on how long we can hold

14   a person in a holding cell.

15        Q.   Is there a reason why that was not

16   discussed with the expert?

17        A.   I didn't bring it up, but I mean, I

18   wasn't there to bring up questions, so I can't

19   answer that. No, sir.

20        Q.   Sure.

21             Did the expert ever discuss with you the

22   fact that the sheriff did not adopt and implement

23   a policy governing how the holding cells are

24   utilized?

25        A.   Not that I recall.
```

Daniel Fleischman 3/21/2024

```
 1        Q.   Go ahead.  I'm sorry.  I cut you off.
 2        A.   Not that I recall, and I don't remember
 3   bringing it up, because I wasn't asking the
 4   questions.
 5        Q.   Did you ever discuss the fact that the
 6   sheriff did not adopt and implement a policy
 7   dictating the minimum unencumbered floor space
 8   that must be made available to each inmate in
 9   holding?
10        A.   Not that I recall.
11        Q.   And the expert never asked you about
12   that issue?
13        A.   Not that I recall.
14        Q.   Did the sheriff ever ask you how much
15   unencumbered floor space was available to each
16   inmate in the holding cell?
17        A.   That question has never been posed to
18   me.
19        Q.   Did the expert ever ask you about the
20   fact that the sheriff did not adopt and implement
21   a policy regarding when pre-trial detainees are to
22   be provided with showers?
23        A.   I'm thinking, because I want to say we
24   did discuss -- but I -- again, I can't say for a
25   fact that we did.  And I mean, I know that we do,
```

Daniel Fleischman 3/21/2024

```
 1    but I don't know that we discussed it, no.
 2         Q.   You do what --
 3         A.   I provide showers.
 4         Q.   The question relates to policy.
 5         A.   I'm pretty sure they're provided showers
 6    three times a week, I think the policy is, but I
 7    mean, that could be practice, not policy.
 8         Q.   You're the warden.  You read the manual,
 9    so --
10         A.   You're right.  I've read it.  That was
11    quite a while back.
12         Q.   But as you sit here today, you're not
13    sure if there's a policy regarding showers?
14         A.   No, sir.
15         Q.   And you don't recall discussing the fact
16    that there was no policy with the expert?
17         A.   No, sir.
18         Q.   And, in fact, if you shared the
19    practice, that would have been the practice while
20    you were a warden but not the practice necessarily
21    during the time frame of these allegations?
22         A.   Yeah, necessarily, I can't say what the
23    practice was during this time period.
24         Q.   Did you ever discuss the fact that the
25    sheriff never adopted and implemented a policy
```

Daniel Fleischman 3/21/2024

```
 1    directing guards and supervisors regarding how to

 2    clean and sanitize the holding cell?

 3         A.    No, sir.

 4         Q.    How about the practice?  Did you ever

 5    discuss that with the expert?

 6         A.    I may have.

 7         Q.    Sorry.  What is the practice?

 8         A.    My practice currently and since I have

 9    been there is after feed up -- after they eat

10    their breakfast -- we go in and light clean, and

11    after lunch feed up we do the same, and then

12    sometime between then and dinner time, we go in

13    and move everybody out of the cell, do a deep

14    clean, and when that cell is clean, we move the

15    people from the next holding cell into that

16    holding cell and do a deep clean, and we go

17    through that procedure four times for each

18    individual holding cell.

19              MR. JACOB:  One second.

20              (Off the record.)

21         Q.    (By Mr. Jacob)  To the extent that there

22    was a discussion regarding the practice related to

23    showers, that only related to the practice while

24    you were warden?

25         A.    That's all I can testify to, yes, sir.
```

Daniel Fleischman 3/21/2024

```
 1        Q.   And so you never provided any
 2   information regarding any practice that would have
 3   been in place at the time of the events?
 4        A.   Again, I don't recall talking about
 5   specific times before I was the warden.
 6        Q.   Okay.  I just need to look something up
 7   really quickly here.  I apologize.
 8             And so am I correct, you would have --
 9   as you sit here today and when you were -- let me
10   do it this way:  When you were speaking with the
11   expert, you had no firsthand information or
12   researched information regarding what any policies
13   or practices were during the years 2019 or 2020 at
14   the jail?
15        A.   "No firsthand knowledge" would be a
16   correct statement.
17        Q.   Okay.  And you hadn't researched to
18   discover any information related to both those
19   issues?
20        A.   No, sir.
21        Q.   Yet, you were the one who was asked to
22   advise the expert regarding practices and policies
23   of the jail, correct?
24        A.   Current practices and policies of the
25   jail, yes, sir.
```

Daniel Fleischman 3/21/2024

```
 1        Q.    Well, not current.  You were the one,
 2   specific to this litigation, who was asked by the
 3   expert for the jail, or for the sheriff's office,
 4   regarding policies and practices that would have
 5   been relevant to this litigation, correct?
 6        A.    I guess if that's what he -- yes.  Yes,
 7   that would be correct.
 8        Q.    And yet there was never any attempt on
 9   your part or on the expert's part to even inquire
10   if you knew anything about those topics, correct?
11        A.    Not that I recall, no, sir.
12        Q.    How are -- well, actually, going back to
13   something you said, you said that the current
14   practice is that there's only one deep clean of
15   the holding cells, correct?  Per day?
16        A.    Yes, sir.  And that's when you went to
17   your phone call, and I was -- I was trying to
18   continue with -- in between all those times, it's
19   cleaned, cleaned, and deep cleaned.  If something
20   happens where there's an incident -- whatever that
21   incident may be -- that it requires cleaning, then
22   the trustee will be brought in to clean that.
23   Whether an inmate drops his tray or throws his
24   tray or whatever the case may be, an inmate
25   trustee is brought in to clean up the mess.  So it
```

Daniel Fleischman 3/21/2024

```
 1    could be multiple times a day.
 2         Q.    I see.
 3               But that's not per policy, correct?
 4         A.    No, sir.
 5         Q.    That's per practice?
 6         A.    Practice, yes, sir.
 7         Q.    And that's a practice that you hope all
 8    the guards are following?
 9         A.    Yes, sir.
10         Q.    And there's no way to verify that the
11    guards are, in fact, following that; correct?
12         A.    They have supervisors that watch --
13    assuming different groups of people are not doing
14    their job, then you would be correct.
15         Q.    So a lot of assumption to make sure that
16    they're following practice?
17         A.    Yes, with people in place to ensure they
18    are.
19         Q.    Okay.  And the assumption is that
20    they're following the practice during the time
21    that you were warden, but it's not related to the
22    time of the events in question?
23         A.    That would be a correct statement.
24         Q.    In fact, you have no idea if that
25    practice was even in place during the time of
```

Daniel Fleischman 3/21/2024

```
 1    these events?
 2         A.    Yes, that's correct.
 3         Q.    So if an inmate alleged that it wasn't,
 4    you'd have no way to rebut that information?
 5         A.    Currently?  If I had an inmate that --
 6         Q.    No.  If one of the plaintiffs in this
 7    matter alleged that that was not the practice back
 8    when they were in the holding cell, you would have
 9    no evidence to refute that?
10         A.    I would not.  No, sir.
11         Q.    Okay.  Did you ever discuss with the
12    expert the fact that the sheriff did not adopt and
13    implement a policy directing guards on what to do
14    if an inmate claims he was taking prescription
15    medication prior to being detained?
16         A.    "Prior to being detained" as in
17    arrested, or prior to being brought into the
18    holding cell?
19         Q.    Prior to -- prior to being detained in
20    the jail.
21         A.    If he -- if he discusses -- when he's
22    brought into the jail, and he gets his medical
23    form, which is a contract group of people -- when
24    he discusses with them what medications he's on,
25    then they would either give him those medications
```

Daniel Fleischman 3/21/2024

1    if they can confirm he's on them -- most of the

2    time, currently, if they're brought to jail, they

3    bring their medications, and then medical goes

4    through them, and whatever they decide to give

5    them, they give them.

6              However, when they're asked that -- when

7    medical asks that question, they list what

8    medications they're on, and then they go through

9    their -- whatever their policy is as doctors and

10   nurses to give them their medication or what they

11   deem they need.

12        Q.   On the corrections side, there's no

13   policy to that effect?

14        A.   As to giving them medication, no, sir,

15   if I understand that correctly.

16        Q.   Regarding directing guards on how to

17   handle the issue if a pre-trial detainee is to be

18   referred to medical or -- excuse me.  Let me

19   rephrase that.  I'm sorry.

20              On the corrections side, there's no

21   policy directing guards on what to do if an inmate

22   claims they're taking prescription medication

23   prior to being detained in the jail?

24        A.   If they're in --

25        Q.   Sir, I'm not asking you -- I'm not

Daniel Fleischman 3/21/2024

```
 1   asking what the policy is.  I'm asking you to
 2   confirm that there is not a policy.
 3        A.   No, sir, there's not a policy.  There's
 4   a practice.
 5        Q.   There's a practice, and that practice
 6   you can only testify to the time period in which
 7   you were warden?
 8        A.   Yes, sir.
 9        Q.   So you can't testify to whether that
10   practice was in place during the events in
11   question?
12        A.   No, sir.
13        Q.   And you were never asked about that
14   issue, whether the practice or policy was in
15   effect during the events in question?
16        A.   No, sir.
17        Q.   Did the expert ever discuss with you the
18   fact that the sheriff did not adopt and implement
19   a policy directing guards, when a pre-trial
20   detainee is simply required to be referred to
21   medical for medical processing?
22        A.    I don't believe we discussed it, no,
23   sir.  I can't testify to it, but I don't recall
24   talking about that particular policy, no, sir.
25        Q.   Your conversations with the expert --
```

Daniel Fleischman 3/21/2024

```
 1    and when I say "expert," I'm talking about the
 2    expert who we identified at the beginning of this
 3    deposition, okay?  Were those conversations
 4    recorded in any way?
 5         A.    Not that I'm aware of.
 6         Q.    Well, did you take notes about --
 7         A.    I'm sure he took notes.  I --
 8         Q.    Did you take notes --
 9         A.    No, sir.
10         Q.    Did you take notes regarding your
11    conversations with the expert?
12         A.    No, sir.
13         Q.    And so there's nothing that you possess
14    that can refresh your memory as to what you
15    discussed with the expert?
16         A.    No, sir.
17         Q.    So you either know it here today or you
18    don't know it, correct?
19         A.    That is correct.
20         Q.    And your memory at the time you spoke to
21    the expert is better than today, correct?
22         A.    I think my memory is probably the same.
23    I don't -- may not recall that conversation.
24         Q.    Okay.  So then if you may not recall
25    things, would you agree with me your memory around
```

Daniel Fleischman 3/21/2024

```
 1    the time of your discussions with the expert would
 2    have been better than here today?
 3         A.   My memory of those -- that is -- my
 4    memory of those specific conversations were better
 5    then than they are now.
 6         Q.   Come trial time, 2025, would you agree
 7    with me your memory today is going to be better
 8    than at trial time?
 9         A.   Yes, sir. I would agree.
10         Q.   Did you ever discuss the fact that the
11    sheriff did not adopt and implement a policy
12    directing what bedding, if any, is to be provided
13    to pre-trial detainees in the holding area?
14         A.   No, sir.
15         Q.   And did you ever discuss a practice
16    related to that issue with the -- with the expert?
17         A.   I don't believe so.  I may have, but I
18    don't recall it.
19         Q.   If you did discuss a practice or a
20    policy specific to that issue, would you agree
21    with me that only would have related to the time
22    during which you were warden?
23         A.   Yes, sir.
24         Q.   Did you discuss the fact with the expert
25    that the sheriff did not adopt or implement a
```

Daniel Fleischman 3/21/2024

```
 1    policy or process for guards to file complaints
 2    regarding jail conditions or operations?
 3         A.   For guards?  I don't recall that
 4    conversation, no.  I don't recall ever discussing
 5    it with the sheriff or the expert.  I'm sorry.
 6         Q.   Did you discuss a practice related to
 7    that issue?
 8         A.   I don't know if we discussed it, but I
 9    can tell you a practice if you want to hear it
10    or -- that's another question.
11         Q.   No, thank you.  I appreciate your offer,
12    though.
13              Am I correct, though, that had you
14    discussed that issue with the expert, that it
15    would have only related to the time frame in which
16    you were warden?
17         A.   Yes, sir.
18         Q.   That it would not have related to the
19    years 2019 or 2020?
20         A.   Yes, I would agree with that -- at the
21    jail, because I -- never mind.
22         Q.   Did you -- am I correct that -- let me
23    ask a different question.
24              During the time frame of 2018, '19, '20,
25    did the jail track the total number of inmates in
```

Daniel Fleischman 3/21/2024

```
 1    holding daily?
 2         A.   '18, '19, and '20.  I would say based on
 3    what is tracked currently, yes, they did.
 4         Q.   But you have no idea?
 5         A.   No, I don't.  I can't say without a
 6    doubt every day was tracked like it is today.
 7         Q.   Did you ever discuss that issue with the
 8    expert?
 9         A.   I don't believe so, but I may have.  I
10    can't remember.
11         Q.   I'm sorry.  Did you ever discuss a
12    practice regarding that issue?
13         A.   I don't believe so.
14         Q.   And did you ever discuss the fact that
15    the jail does not track the number of inmates in
16    each individual holding cell during that time
17    frame?
18         A.   I don't believe so.  No, sir.
19         Q.   And did you ever discuss a practice
20    related to that issue with the expert?
21         A.   I do not believe so, again.
22         Q.   And you did not provide the expert with
23    any evidence to rebut any of the plaintiffs'
24    claims with respect to the number of inmates in a
25    particular holding cell at any given time,
```

Daniel Fleischman 3/21/2024

```
 1    correct?
 2         A.   I did not.  No, sir.
 3         Q.   And, in fact, as you sit here today, you
 4    don't possess any information related to that
 5    issue?
 6         A.   No, sir, I don't.
 7         Q.   Am I correct -- or let me ask a
 8    different question.
 9              Do you have any information that during
10    the years 2018 through 2020, there were times that
11    the jail exceeded the capacity set by the fire
12    marshal and did not fix that issue after the fact?
13         A.   Immediately after or just after?
14         Q.   Immediately after.
15         A.   At some point after, yes; but
16    immediately after, I don't know if they
17    immediately fixed it or if it was a day -- if
18    it -- I don't know.
19              I know that they fixed it, because I've
20    seen previous reports, fire marshal reports.
21         Q.   So the only information you have on this
22    issue for the relevant time frame of this
23    litigation is information that you gleaned from
24    documents?
25         A.   Yes, sir.
```

Daniel Fleischman 3/21/2024

```
 1        Q.    Nothing -- no independent knowledge that
 2    you could have provided to the expert?
 3        A.    No, sir.
 4        Q.    Would you agree with me that when
 5    there -- the more inmates in a cell at any given
 6    time increase the risk of health problems?
 7              MR. CRANNER:  Let him finish his
 8        question.
 9              THE WITNESS:  Is that the end of your
10        question?
11        Q.    (By Mr. Jacob)  Yes.
12              MR. CRANNER:  Okay.  Go ahead.
13              THE WITNESS:  The more inmates -- just
14        make sure I understand it.  The more inmates
15        in a specific area increases health problems?
16        Q.    (By Mr. Jacob)  That the more inmates
17    you put into a single holding cell increases the
18    risk of a health issue.  How about that?
19        A.    I'm trying to figure out how to answer.
20              My answer would be if somebody that was
21    in there had a health problem, then yes, you would
22    increase the chances by putting that person in
23    there, but if nobody in there had a health issue,
24    then it's no different than if I sneezed in this
25    room. I could increase his chances of having a
```

Daniel Fleischman 3/21/2024

```
 1   health problem, but --
 2        Q.   Let me ask it differently.
 3             Which, if either, would -- to you in
 4   your experience as a warden, would present a more
 5   significant health hazard:  Two inmates in a
 6   holding cell or 25 inmates in a holding cell?
 7             MR. WHITTLE:  Objection, speculation.
 8        You may answer the question.
 9             THE WITNESS:  I -- I guess if there's
10        that much more chance of somebody sneezing
11        giving me something they've got, so yes, I
12        guess.
13        Q.   (By Mr. Jacob)  And you're basing that
14   not off speculation but rather off your experience
15   as a warden, correct?
16        A.   I don't think, as my three years as a
17   warden -- I don't know of any health problems that
18   occurred, whether there was two or 20, so I'm not
19   basing it off of any experience.
20             I'm basing it off of my -- just thoughts
21   of -- if there's 20 people in this space and one
22   sneezes, somebody is more likely to catch it than
23   if there's two people in this space.  I mean,
24   there's more separation.
25        Q.   So you're basing it on common sense,
```

Daniel Fleischman 3/21/2024

```
 1   correct?
 2        A.   Basically, yes.
 3        Q.   Okay.  Now, would you agree with me that
 4   the more inmates you put into a holding cell, the
 5   increased risk of altercation spikes?
 6        A.   Not necessarily.  Not necessarily.
 7             Only because -- I mean, I have dorms
 8   with 50 people in them that there's no
 9   altercation, but yet I have holding cells where
10   there's two people, and there's an altercation.
11             So to give you an answer is -- if -- if
12   you put two people in the holding cell and somehow
13   they're rivals, or somehow they have a dispute
14   with each other, then there could be an
15   altercation in there, where if you have 20 people
16   in a holding cell and everybody's sleeping, they
17   all get along, everybody is calm, there's no
18   altercation, so you have chance -- there's risk on
19   both of them.
20        Q.   Sure.
21             Did the expert ever discuss with you
22   what the Department of Health standards were for
23   cleaning or sanitizing a holding cell?
24        A.   I don't believe so.  Again, I would
25   be -- I don't remember, no.
```

Daniel Fleischman 3/21/2024

```
 1        Q.   As you sit here today, can you tell me
 2   what the Department of Health standards are for
 3   cleaning and sanitizing a holding cell?
 4        A.   No, sir.
 5        Q.   And am I correct that back in -- during
 6   the time frame of these allegations in this
 7   litigation, you have no idea if the holding cells
 8   were being sanitized and cleaned in accordance
 9   with the Department of Health standards?
10        A.   That is correct.  I do not.
11        Q.   Back in the 2018, '19, '20 time period,
12   do you have any evidence to refute the claim that
13   there were inmates sleeping on floors with urine?
14        A.   No, sir.
15        Q.   And did you advise the expert that
16   you -- that there was no evidence to refute that
17   claim?
18        A.   No, sir, that I recall.
19        Q.   Was there any discussion with the expert
20   about the fact that the jail's policy directs
21   that, "The STPSO jail facility shall provide
22   adequate bedding and linen, including a clean
23   mattress with integrated pillow"?
24        A.   Did I advise the expert?
25             No, sir.  I don't believe so.
```

Daniel Fleischman 3/21/2024

```
 1      Q.    Was there any discussion about practices
 2   or policies related to that issue regarding the
 3   time frame of these allegations?
 4      A.    No, sir.  I don't believe so.
 5      Q.    Was there any discussion of the fact
 6   that, despite the policy directing that, that the
 7   pre-trial detainees in the holding cells were
 8   being excluded from that practice?
 9      A.    I do not believe there was any
10   discussion to that.
11      Q.    As you sit here today, you have no idea
12   if pre-trial detainees are being excluded from
13   that practice, correct?
14      A.    As I sit here today, do I have an idea
15   that they were excluded from that?
16            I believe they were excluded from the
17   pre-trial detainees as opposed to the assignment
18   to a housing unit.
19            I do believe they were excluded from
20   that.  Yes, sir.
21      Q.    And can you identify any penological
22   interest that was furthered by excluding them from
23   that practice?
24      A.    I'm not sure I understand.
25      Q.    Do you know what -- when I refer to
```

Daniel Fleischman 3/21/2024

```
 1    "penological interest," do you know what that is
 2    as a warden?
 3         A.    I assume it means at a detainment level
 4    in an institution, penal institution.
 5         Q.    Is there some business reason in the
 6    corrections setting or security setting, is there
 7    some security reason that is furthered by
 8    excluding the pre-trial detainees from having that
 9    bedding that is referred to in the policy?
10         A.    I don't know that there's any reason.
11               It's practice, and I don't know that you
12    can fit 20 mattresses in that facility, and that's
13    what they're rated for.  In addition, it's not
14    permanent housing.  It's temporary.
15         Q.    Let's break that down a little bit.
16               Am I correct that the fire marshal sets
17    a maximum occupancy?
18         A.    Absolutely.
19         Q.    But also the Department of Health sets
20    an operational maximum capacity, correct?
21         A.    I don't know that the Department of
22    Health sets a maximum.
23         Q.    Bear with me one second, please, sir.
24               Am I correct that the Louisiana
25    Department of Health and Hospitals determines
```

Daniel Fleischman 3/21/2024

```
 1   capacity based -- based on the ratio of plumbing
 2   fixtures to offenders and square footage?
 3        A.   Yes, sir, I believe they do.
 4        Q.   And that the operational capacity is the
 5   lower of the two figures between the fire marshal
 6   and Louisiana Department of Health and Hospitals,
 7   correct?
 8        A.   The lower of the two figures?  I'm not
 9   sure what you're asking.
10        Q.   Let me ask it differently.
11             Am I correct that the fire marshal
12   determines the capacity primarily based on the
13   facility itself; simply, the square footage?
14        A.   Yes, I believe.  Yes.
15        Q.   But the Louisiana Department of Health
16   and Hospitals, they determine capacity based on
17   usage?
18        A.   Yes, sir, you're probably correct.
19        Q.   And am I correct it's the based on usage
20   number that the jail is supposed to be following?
21        A.   When you say "supposed to be following,"
22   the fire marshal is the one that comes in and
23   says, "Hey, you got too many people."  The health
24   department don't come in and say, "You've got too
25   many people."
```

Daniel Fleischman 3/21/2024

```
 1              I know that what we usually try to stay
 2    under is what the fire marshal says.
 3         Q.   I understand.
 4         A.   He's the one that can shut us down if he
 5    chooses.
 6         Q.   Let me ask it a little differently.
 7              Yes, the fire marshal sets maximum
 8    capacity, and if you exceed his maximum or her
 9    maximum capacity, he can shut you down, correct?
10         A.   Yes, that is correct.
11         Q.   The Louisiana Department of Health and
12    Hospitals also sets a maximum capacity based on
13    the intended use of that space, correct?
14         A.   Yes.
15         Q.   However, it's your understanding or the
16    jail's understanding that the Louisiana Department
17    of Health and Hospitals could not shut you down?
18         A.   They don't respond to inmate complaints
19    like the fire marshal does.
20         Q.   Okay.  That wasn't my question.
21              Do they have the authority to shut you
22    down?
23         A.   I've never seen a situation where they
24    did, but I'm sure -- it's a Louisiana department,
25    so I'm sure that everybody that has a hand in it
```

Daniel Fleischman 3/21/2024

```
1    can shut us down if they chose.
2         Q.   But your experience as warden is that
3    only the fire marshal will follow up on such
4    complaints?
5         A.   Yes.
6         Q.   And because of that, only the fire
7    marshal's capacity limit is what is followed?
8         A.   Yes.
9         Q.   And do you know as you sit here today
10   what the maximum capacity for the holding cells
11   are set by the Louisiana Department of Health and
12   Hospitals?
13        A.   I don't.  Twenty is the number I'm
14   familiar with.
15        Q.   But again, that number is set by the
16   fire marshal, correct?
17        A.   Absolutely.
18        Q.   And the usage number, if it's lower, you
19   don't know?
20        A.   No.
21        Q.   And you're not concerned as warden about
22   exceeding that number, correct?
23        A.   I have people that would tell me if that
24   number is exceeded, yes.
25        Q.   And how --
```

Daniel Fleischman 3/21/2024

```
 1      A.   I have a support captain, a security
 2  captain, a maintenance captain, and a programs
 3  captain that keep track of it and inform me of
 4  various things.
 5      Q.   Would you as warden, consider the
 6  holding cell overcrowded if it exceeded the
 7  Louisiana Department of Health and hospitals
 8  stated maximum capacity for its use?
 9      A.    Me, as warden, consider 20 -- the
10  number to be -- if it goes over 20, that's when I
11  get -- when I start notifying people.  When it
12  gets close to 20 is when I start notifying people.
13  That's the number I use.
14      Q.   I appreciate that's the number you use.
15           My question, though, is:  Is it
16  considered overcrowded in your jail if the number
17  in a holding cell exceeds the number set by
18  Louisiana Department of Health and Hospitals as
19  maximum capacity?
20      A.   And again, the number I consider
21  overcrowding in a holding cell is number 20, is
22  number 20 that's set by the fire marshal.
23      Q.   I appreciate that.
24           And, again, that assumes, then, that
25  it's the same number as the Louisiana Department
```

Daniel Fleischman 3/21/2024

```
 1   of Health and Hospitals, but my question is, if it
 2   exceeds -- let's say it's 19, so we'll do a
 3   hypothetical so you can better understand my
 4   question.
 5           If the fire marshal says 20 but the
 6   Louisiana Department of Health and Hospitals says
 7   19 and you have 20, are you over capacity?
 8           MR. WHITTLE:  Objection to form and
 9       objection to calls for speculation, asked and
10       answered.
11           MR. CRANNER:  You can answer, if you
12       have an answer.
13           THE WITNESS:  I've answered it the best
14       way I can answer it already.
15           The number is 20 is when it's
16       overcrowded.
17           When I concern myself with it is before
18       the number 20 because I don't want to hit
19       that 20.  However, the number that's
20       considered overcrowding is when I exceed 20.
21       Q.   (By Mr. Jacob)  You understand you're
22   only here to provide answers or expected to
23   provide answers when you have answers, correct?
24       A.   Yes, sir.
25       Q.   Okay.  Because I heard an instruction
```

Daniel Fleischman 3/21/2024

```
 1    that you could answer if you had an answer, and
 2    I'm just want to make sure we're on the same page,
 3    that that's the only time you're ever going to
 4    answer is if --
 5         A.    Absolutely, absolutely.
 6         Q.    So going forward, if you don't have an
 7    answer, you can just say, "I don't have an
 8    answer," okay?
 9         A.    Well, yes, sir.
10         Q.    So going back -- going back to my
11    question, which it seems like you don't want to
12    answer, so I want to make sure we're clear on the
13    record, though, because I'm going to ask you in
14    front of a jury the same question.
15              The question is, if the jail exceeds the
16    Louisiana Department of Health and Hospitals'
17    maximum capacity, do you as warden, consider the
18    holding cell to be overcrowded?  It's a "yes" or a
19    "no."
20              MR. WHITTLE:  Objection, asked and
21         answered.  You can't instruct the witness to
22         just answer "yes" or "no."
23              MR. JACOB:  Just object, please.  Thank
24         you.
25              MR. CRANNER:  Yeah, no.  He is -- let me
```

Daniel Fleischman 3/21/2024

```
1        make this point clear.  You've now asked that
2        five times. The last answer when I was in the
3        room is that that's the only way he can
4        answer it.
5            It has been asked and answered five
6        times.
7            Ask it one more time is all you get.
8            You're not answering.
9            Go ahead.  Go.
10           MR. JACOB:  Excuse me.  You're not the
11       Judge, first of all.
12           MR. CRANNER:  Yeah, well, I'm a lawyer.
13           He's not answering.
14           Ask a different question.
15           MR. JACOB:  Exactly.
16           So you know according to the Federal
17       Rules, there are three times you can instruct
18       a client not to answer or a deponent not to
19       answer.  That would be to enforce a
20       limitation set by the court, which we don't
21       have, to protect a privilege, which we don't
22       have.
23           So why are you telling him not to
24       answer?
25           MR. CRANNER:  Because he's been asked
```

Daniel Fleischman 3/21/2024

```
 1        that question several times, and he's being
 2        harassed.  We'll go see the magistrate.
 3            MR. JACOB:  You can call him if you'd
 4        like.  I'll wait.
 5            MR. CRANNER:  You go right ahead.  He's
 6        not going to answer the question.
 7            MR. JACOB:  No, no.  I'm -- you said you
 8        wanted the magistrate, go right ahead.  Go
 9        ahead.  Go ahead and call.
10            MR. CRANNER:  He answered the question.
11        He's answered it to the best of his ability
12        now several times.  He told you
13        specifically --
14            MR. JACOB:  You realize the Federal
15        Rules say you can object to form.  That's
16        the --
17            MR. CRANNER:  I know the Federal Rules
18        real well.  I've been practicing law 40
19        years.
20            MR. JACOB:  Ah.  Then why aren't you
21        following them?
22            MR. CRANNER:  So -- you know -- that's
23        it, man.  Ask a different question.
24            MR. JACOB:  I'm not "man."  I'm an
25        attorney, so don't refer to me as "man."
```

Daniel Fleischman 3/21/2024

```
 1            And with respect to the Federal Rules,
 2       we do need to follow them.
 3       Q.   (By Mr. Jacob)  Sir, I'm going to ask
 4   the question, and I expect an answer.
 5            Sir, if the holding cell exceeds the
 6   number set by the Louisiana Department of Health and
 7   Hospitals, is the jail overcrowded or not?
 8       A.   The number in the holding cell that's
 9   considered overcrowding is 20 in a holding cell.
10   In holding in general, the count is 80 at which it
11   becomes overcrowded.  That's 20 per holding cell.
12            That's the best way I know to answer it.
13            Other than that, I don't have an answer.
14       Q.   So just to make sure I understand you,
15   what you're saying is if the Louisiana Department
16   of Health and Hospitals sets the number at 18 but
17   you have 19, then it's your understanding as a
18   warden, based on your experience and training as a
19   warden, that the holding cell is not overcrowded,
20   correct?
21       A.   That's correct.  When it hits 20 is when
22   it's overcrowded.
23       Q.   So then going back to my other question,
24   then, it would be a correct statement that if the
25   capacity of the holding cells exceeds the
```

Case 2:20-cv-00980-DPC Document 384-10 Filed 05/30/24 Page 52 of 113

```
 1      Louisiana Department of Health and Hospitals'
 2      maximum but does not exceed the fire marshal's
 3      maximum, then the holding cell is not over
 4      capacity, correct?
 5           A.    That's correct.
 6           Q.    Well, we got there.
 7           A.    We did.
 8                 Can we take just a couple of minutes for
 9      me to go to the restroom?
10                 MR. JACOB:  Absolutely.  Thank you, sir.
11                 (A short break was taken.)
12           Q.    (By Mr. Jacob)  Sir, you've had an
13      opportunity to take, apparently, an extended
14      break.
15                 All right.  Did you discuss -- with the
16      expert, did you discuss the issue that the sheriff
17      did not adopt a policy or implement a policy that
18      directed the amount of toilet paper to be provided
19      in the holding cell?
20           A.    I don't believe so.
21           Q.    Did you discuss any practice related to
22      that issue?
23           A.    I honestly don't recall, but I don't
24      think so.
25           Q.    And if you did discuss a policy or
```

Daniel Fleischman 3/21/2024

```
 1    practice, would you agree with me it related only
 2    to the time period you were warden?
 3         A.   Yes, sir.
 4         Q.   And that you have no information
 5    regarding the time period relevant to this
 6    litigation?
 7         A.   No, sir.
 8         Q.   Did you discuss with the expert the fact
 9    that there's no policy or practice that -- sorry,
10    let me ask it again.
11              Did you discuss the fact that the
12    sheriff did not adopt or implement a shower policy
13    regarding discipline with respect to guards who
14    didn't follow providing guards -- providing
15    inmates with showers?
16         A.   No, sir.
17         Q.   And if you had discussed either a policy
18    or practice related to that issue, it would have
19    related only to the period of time that you were
20    warden?
21         A.   Yes, sir.
22         Q.   You have no information regarding
23    policies or practices in place during the relevant
24    period for this litigation?
25         A.   No, sir.
```

Daniel Fleischman 3/21/2024

```
1          Q.    In fact, do you know what years, you
2    know, that encompassed this litigation?
3          A.    I'm assuming it's 2018, '19 and '20,
4    because that's what you keep asking me.  I'm going
5    to assume those are the time periods you're asking
6    about.
7          Q.    But as you sit here today, you just
8    don't know?
9          A.    I don't know the specific time periods,
10   no, sir.
11         Q.    And when you spoke to the expert, you
12   didn't know, either; correct?
13         A.    No, sir.
14         Q.    Are you aware of any internal affairs
15   investigation related to any of the allegations
16   that were stated in the lawsuit?
17         A.    No, sir, not from that time period.
18         Q.    Were you ever asked about that issue by
19   the expert as far as, you know, whether there was
20   one, and, if not, why there wasn't one?
21         A.    I don't believe so.  No, sir.  But
22   again, it could have happened, but I don't recall.
23         Q.    Fair enough.
24               Am I correct that the jail is not
25   required by law -- by state or federal law -- to
```

Daniel Fleischman 3/21/2024

```
 1    house state or federal inmates?
 2         A.    You are correct.
 3         Q.    That the only reason they are housed
 4    there is due to a contract that exists?
 5         A.    That -- that's true.
 6         Q.    And am I correct -- let me ask it
 7    differently.
 8               Did you ever discuss the fact with the
 9    expert that it's -- the number of state and
10    federal inmates housed per year, not the per day
11    cost per inmate, that determines if the housing of
12    state and federal inmates is profitable?
13         A.    I don't know that we discussed per year,
14    because I don't think I have those numbers.  I
15    think that's a financial thing, but I know per
16    day, I think we discussed it briefly.
17         Q.    Right.
18               But more specifically, you would agree
19    with me that it's the "per year" number of inmates
20    that determine whether that program is profitable
21    or not?
22         A.    Yes.  If you -- with an explanation if I
23    might.
24         Q.    Sure.  Go ahead.
25         A.    Yes, "per year," but you have to base
```

Daniel Fleischman 3/21/2024

```
 1    the -- all the costs against that "per year" to
 2    see whether or not it's profitable.
 3              It's not just the, "Well, $26 a day is
 4    going to make you profitable at the end of 365
 5    days," because there's a lot of factors that fall
 6    into that.
 7         Q.   Am I correct, it's misleading to simply
 8    look at the per day cost for an inmate and compare
 9    those?
10         A.   In situations, yes, depending on the --
11    yes.
12         Q.   Okay.  The sheriff testified that it is
13    the number of state and federal inmates housed per
14    year, not the per day cost per inmate, that
15    determines if housing state and federal inmates is
16    profitable.
17              You would agree with that statement?
18         A.   I would, which is kind of what I was
19    saying about --
20         Q.   So to the extent that an expert would
21    come in and just discuss the per day cost to
22    explain whether it was profitable or not, that
23    would be a bit misleading?
24         A.   Unless he was comparing it to a number
25    nationally that says this is nationally what it
```

Daniel Fleischman 3/21/2024

```
 1   costs, but yes, I would agree.
 2        Q.   And am I correct that pretty much the
 3   only way for the jail to increase revenue is to
 4   either sue the Parish and force them to pay more,
 5   or take on more DOC and federal inmates?
 6        A.   Ask that question one more time.
 7        Q.   Sure.
 8             Am I correct that the only way for the
 9   jail to increase revenue for the jail is to either
10   sue the Parish and force the Parish to pay more or
11   to increase the number of DOC and federal inmates
12   housed at the jail?
13        A.   Or -- you're halfway correct.  Or the
14   sheriff can take more money from his general fund
15   and put it into the jail.  There's three ways,
16   yes.
17        Q.   Okay.  But as far as -- yes, that would
18   be one way, but am I correct that's not increasing
19   revenue?
20        A.   It's increasing jail revenue, and I'm
21   more specifically talking about the jail, so --
22        Q.   Okay.  Fair enough.
23             But there's no other way to increase
24   revenue?
25        A.   Not that I'm aware of.
```

Daniel Fleischman 3/21/2024

```
 1       Q.   Fair enough.
 2            And, in fact, you're not aware of the
 3  sheriff ever suing the Parish, correct?
 4       A.   As far as I know, as of this time?
 5            No, sir, I am not aware.
 6       Q.   Has that ever been discussed?
 7       A.   It has been brought up that, hey, this
 8  might be a method of fixing things.
 9       Q.   Do you recall the time frame during
10  which that was brought up?
11       A.   It's been brought up multiple -- a few
12  times.
13       Q.   Do you know if it was brought up in the
14  years 2018 through '20?
15       A.   I do not.
16       Q.   Am I correct that the pre-trial
17  detainees who are in the holding cell area, they
18  don't get recreational time?
19       A.   You are correct.
20       Q.   And am I correct or do you know if that
21  was the case back during the time relevant to this
22  litigation?
23       A.   It would just be an assumption on my
24  part, but I do not know for a fact, no.  I
25  would -- I would guess nothing's changed, but I
```

Daniel Fleischman 3/21/2024

```
 1   don't know for a fact.
 2        Q.   Was that issue ever discussed with the
 3   expert?
 4        A.   I don't believe so.
 5        Q.   Was it -- let me rewind and maybe set
 6   the foundation for this.
 7             You mentioned that the holding cells
 8   were for temporary housing, correct?
 9        A.   Yes, sir.
10        Q.   What does that mean?  What is temporary
11   housing?
12        A.   Depending on who you ask, it could mean
13   lots of different things.
14             I mean, during Hurricane Katrina, I was
15   in temporary housing for 11 and a half months in a
16   trailer, but I mean, that doesn't mean that we
17   house people in holding for 11 and a half months.
18             So depending on who you ask,
19   "temporary," normally I can tell you it means a
20   very short period of time.
21             COURT REPORTER:  I'm sorry.  We're
22        getting distortion.  I'm sorry.
23             (Off the record.)
24        Q.   (By Mr. Jacob)  So, again, specific to
25   the jail, how many days -- what's the limit to
```

Daniel Fleischman 3/21/2024

```
 1    where it no longer becomes temporary housing?
 2         A.   I think situations would dictate what
 3    "temporary" is.  If I didn't have no place to put
 4    them, temporary might be a little longer than what
 5    temporary is if I have a place to put them.
 6              So --
 7         Q.   Okay.
 8         A.   -- to give you what was -- what was
 9    meant when somebody said holding is a temporary
10    housing facility, originally when they first said
11    that, I can't give you a time on that.
12              Normally, it's within a couple of days
13    if situations allow for it.  If situations don't
14    allow for it, it may be a little longer.
15              Again, I go back to -- I'm sorry.  I
16    didn't mean to interrupt.
17         Q.   Am I correct that with that explanation,
18    "temporary" could be permanent?
19         A.   Permanent would indicate intent for
20    long-term housing, and that's not what it's
21    intended for.
22         Q.   What's the difference between a holding
23    cell and anywhere else in the jail that makes it
24    understood to be designed as temporary as opposed
25    to permanent?
```

Daniel Fleischman 3/21/2024

```
 1        A.    The structure in which you're housed in,
 2   the facility, itself.
 3             I mean, in a permanent housing unit, you
 4   have beds, you have showers, you have a kiosk.  I
 5   mean, you have everything that you need.  You have
 6   storage facility for commissary.  It's just like
 7   having a -- in a dorm room, it's just like --
 8   other than the fact there's 50 people instead of
 9   two, it's like going to college.  You have 49
10   other roommates, but you have the ability to store
11   your own stuff.  Temporary holding, you don't.
12        Q.    I think you said that you have what you
13   need in the permanent housing, correct?
14        A.    You have what you -- I probably should
15   say not "need," but "want."
16        Q.    Fair enough.
17        A.    I mean, you're in jail, so you probably
18   don't want anything but to be out, but you can't.
19        Q.    In temporary, you have cement to sleep
20   on, correct?
21        A.    That is correct.
22        Q.    You don't have a bed?
23        A.    No, sir.
24        Q.    And you don't have recreation time?
25        A.    No, sir.
```

Daniel Fleischman 3/21/2024

```
 1        Q.   And you don't have direct access to a
 2   shower?
 3        A.   Routinely, you have three times a week
 4   as necessary -- if it's necessary, you do have
 5   access to almost an immediate shower, and if I may
 6   back up to a permanent housing unit, showers are
 7   not available 24/7, so they're controlled by a
 8   computer that shuts them off at different times
 9   also.
10             So if I have an accident or I have
11   somebody's blood or my own blood or whatever on
12   me, I do have direct access to a shower, because I
13   get somebody's attention, and they take me to the
14   shower and get me clean clothes.
15             So, likewise, in a permanent housing
16   facility, if it's a time when the showers are
17   turned off, I still have to do the same thing.  I
18   have to get a deputy's attention and have them
19   either turn the showers manually on or take me to
20   a shower if something happened.
21        Q.   So shower every day?
22        A.   You were broken up.
23        Q.   In permanent housing, you can shower
24   every day?
25        A.   Absolutely, but not 24 hours a day.
```

Daniel Fleischman 3/21/2024

```
 1        Q.    Fair enough.
 2              In temporary housing, it's your
 3    understanding that means it's built for 48 hours?
 4        A.    It's temporary housing.  It can be
 5    anywhere from 48 to whatever is necessary that
 6    don't -- that's not permanent.
 7              I mean, I haven't looked up the legal
 8    definition of "temporary," but I mean, I know that
 9    in my military career, I was on temporary duty
10    that sometime lasted a year or more, but it wasn't
11    my permanent assignment, so it was still
12    considered temporary.  So that's why I say
13    "temporary" is very subjective.
14        Q.    Does the jail have a policy that
15    explains what's temporary and what's not?
16        A.    No, sir.  It says you have to be
17    classified in 48 hours.  It doesn't say you have
18    to be moved in 48 hours.
19        Q.    So a guard is free to keep somebody in
20    the temporary housing for six months without
21    violating any policy, correct?
22        A.    I think a guard might -- does not have
23    the ability to keep somebody in holding for six
24    months because everybody sees that this guy has
25    been there six months.
```

Daniel Fleischman 3/21/2024

```
 1              So technically, theoretically, does he
 2   have that ability?  Sure.  But somebody's going to
 3   catch it eventually.
 4              If there's bed space available, if
 5   there's not bed space available, very well six
 6   months.
 7              I mean, have I seen it?  No, I haven't
 8   seen it.
 9        Q.   What's the longest you've seen it?
10        A.   Probably 96 hours, and I did look back
11   through since I've been there, and there's always
12   been bed space, so -- and I think a lot of that
13   can be attributed to our national pandemic -- our
14   international pandemic, because space became
15   available and things got put into place in April
16   of 2020 that eased up our backlog, so to speak, of
17   people, everywhere.  Judges tried Zoom court.  The
18   Zoom was great.
19        Q.   During the 2018 through 2020 time
20   period, do you know what the longest period of
21   time that inmates were housed in temporary
22   housing?
23        A.   I'm going to guess -- strictly a
24   guess -- based on this litigation, I think --
25        Q.   I don't want you to guess.  Do you have
```

Daniel Fleischman 3/21/2024

```
 1    any information about it?
 2         A.    Well, you asked me the longest I knew
 3    of.
 4              So the longest is going to be 17 days, I
 5    believe.  I may be off a day or two.
 6         Q.    And is that temporary?
 7         A.    Yes, it's temporary.  I mean, 17 days is
 8    not a year.
 9         Q.    So a year is the limit?
10         A.    Like I said, no, it's not a limit, but I
11    mean, I don't know the -- I have not looked up the
12    legal definition of "temporary," so I don't know,
13    but 17 days does not seem like long-term to me.
14         Q.    Fair enough.
15              As warden, you have experience, and
16    you're ultimately in charge of the jail, correct?
17         A.    Absolutely.
18         Q.    So if a guard comes to you and says,
19    "Boss, what is our limit when it no longer becomes
20    temporary," what are you going to tell him?
21         A.    If I don't have beds available after
22    three or four days -- and I look at these reports
23    every morning -- if I don't have beds available,
24    I'm going to talk to people and try to get people
25    moved out so I can have beds available or I can
```

Daniel Fleischman 3/21/2024

```
 1    get those people that are there bonded out.
 2        Q.   My question was a little bit more
 3    specific.
 4             It was if a guard comes to you and says,
 5    "Boss, what is the definition of 'temporary' for
 6    our practices here," what do you tell them?
 7        A.   Depends on the situation.  If there's
 8    beds available, temporary is now.
 9        Q.   So if there's a bed available for
10    Department of Corrections or federal housing, are
11    you saying those beds would be used to alleviate
12    or to move somebody out of temporary housing?
13        A.   No, sir, that's not what I'm saying.
14        Q.   Okay.  So when you say "beds available,"
15    you're not referring to literally beds available,
16    correct?
17        A.   I'm referring to pre-trial beds
18    available.
19        Q.   And when you say "pre-trial beds
20    available," you're excluding from your
21    consideration DOC and federal housing, correct?
22        A.   Yes, sir.  Yes, sir.
23        Q.   So you would agree with me, then, that
24    if an inmate is, let's say, in the holding cell
25    for a week but there's a bed available in the DOC
```

Daniel Fleischman 3/21/2024

```
 1    or federal housing, they remain in the holding
 2    cell?
 3         A.   Yes, sir.
 4         Q.   And that's by practice that's developed
 5    at the jail, correct?
 6         A.   Yes, sir.
 7              And, if I may, I'd like to explain.  You
 8    asked me the question earlier did the risk go up
 9    if there's two people or 20 people, but now you're
10    asking me to put a guy that's not been convicted
11    of anything -- he's been arrested -- and now
12    you're asking me to put him in a dorm with
13    convicted felons.
14              Don't you think that risk -- I mean, the
15    risk goes up, so no, I'm not going to put a
16    pre-trial detainee in with a federal inmate,
17    because most of my feds are very bad people, and
18    my convicted felons.
19              I mean, that's asking -- you're putting
20    him -- I think you're putting him in more danger
21    than sleeping on a cement bench.
22         Q.   You would agree with me that if a
23    murderer or alleged murderer comes in, they're in
24    holding as -- just as anybody else?
25         A.   Absolutely, under direct supervision.
```

Daniel Fleischman 3/21/2024

```
 1        Q.    Okay.

 2        A.    And with a guard seconds away.

 3        Q.    Fair enough.

 4              With respect to DOC housing, I just

 5    haven't been back in that area.

 6              Is it compartmentalized, meaning is it

 7    all one single dorm or is it --

 8        A.    It's 50-man dorms.

 9        Q.    Okay.  How many dorms consist of DOC,

10    for instance?

11        A.    Three.

12        Q.    So how many dorms exist in federal

13    housing?

14        A.    One 40-man dorm, and three 30-man

15    tier -- or -- two 30-man tiers.

16        Q.    So if you have -- oh, I'm sorry -- in

17    the DOC how many per dorm?  Did you say 50?

18        A.    50.

19        Q.    So if you had 50 empty beds in the DOC,

20    you're still -- you're still not going to --

21        A.    If I had 50, and I don't have any -- if

22    I have a whole dorm empty, and if I have that

23    whole dorm empty -- let's say there's 30 people in

24    that dorm, but I have 30 beds available -- DOC --

25    in two other dorms, then I'll move them, and then
```

Daniel Fleischman 3/21/2024

```
 1    I can house any overage in that 50-man dorm.  I
 2    can house pre-trial.
 3            Nothing sets that dorm as DOC dorm.  I
 4    just can't house them together.
 5            But understand when I say this:  They
 6    can leave the jail this morning to court as a
 7    pre-trial, but when they come back to jail this
 8    afternoon, they're a DOC inmate because they've
 9    been sentenced.
10            So, again, it's not one situation that
11    dictates how many people I have, because what
12    shows up as a count as a pre-trial this morning,
13    this afternoon may be DOC because of the amount of
14    people they have tried, or convicted that day.
15       Q.   So this is the first time that I'm
16    hearing that it would ever be a consideration to
17    take even a dorm from DOC and allow --
18       A.   Probably it --
19       Q.   -- and allow pre-trial detainees to move
20    into there.
21            So is that just a hypothetical solution
22    or something that has been done or could be done?
23       A.   It is a hypothetical solution because
24    the chances of having 50 available beds out of 150
25    is pretty slim, but it could happen, and it
```

Daniel Fleischman 3/21/2024

```
 1    wouldn't be long-term because by the end of the
 2    week, you're going to have pretrials that turned
 3    into DOC based on how many went to trial that week
 4    or pled out.
 5         Q.   Am I correct you can transfer inmates to
 6    either DOC or federal out of your facility?
 7         A.   We can transfer them out.  I mean,
 8    somebody gets a life term, we don't keep them in a
 9    Parish jail.
10         Q.   Asked a different way, if you have an
11    overcrowding situation that's lasting in the
12    holding cells, you can call the DOC or feds and
13    say, "I need to free up space over here, so you
14    need to move some of your inmates," correct?
15         A.   Contractually, I'm obligated, but I
16    guess I could explain the situation, and if they
17    had room to place them other places, they would.
18         Q.   And do you know what the practice was
19    back in 2018 through '20 with respect to using a
20    whole dorm, for instance, on the DOC wing or a
21    whole dorm on the federal wing to alliev- -- or
22    alleviate overcrowding of holding cells?
23         A.   I am not aware of them having a whole
24    dorm available, no, sir.
25         Q.   No, no, my question was not if they had
```

Daniel Fleischman 3/21/2024

```
 1    one available, because you're not aware because
 2    you didn't review those records, correct?
 3          A.    Right.  That's what I said.
 4          Q.    My question was:  Do you know what the
 5    policy or practice was in the event that they
 6    didn't have one available?
 7          A.    No, sir.
 8          Q.    And that issue was never discussed with
 9    the expert?
10          A.    No, sir.
11          Q.    Did you ever tell the expert that one
12    option to alleviate overcrowding is to call the
13    DOC or the feds to move inmates?
14          A.    No, sir.
15          Q.    Did you ever discuss with the expert
16    that one option to relieve overcrowding is to use
17    a full dorm from the DOC or federal wing?
18          A.    Ask the question one more time.
19          Q.    Did you ever discuss with the expert
20    that one option -- in the event it presents -- one
21    option would be to use a full dorm from the DOC or
22    federal wing?
23          A.    No.
24          Q.    If you were asked, you would have told
25    them what you just told us here today, correct?
```

Daniel Fleischman 3/21/2024

```
 1          A.    Assuming there was an empty one, yes,
 2    sir.
 3          Q.    Have you ever heard the jail being
 4    referred to as "St. Slammany"?
 5          A.    No, sir.  As what?
 6          Q.    St. Slammany?
 7          A.    St. or stink?
 8          Q.    St.
 9          A.    No, sir.  Yes, sir.  I thought you said,
10    "Stank slam-any."
11          Q.    In what capacity have you heard that?
12          A.    Mostly social media. If you look at
13    comments in news articles, that's how some people
14    refer to it; mostly people that aren't from St.
15    Tammany.
16              COURT REPORTER:  You broke up.
17              THE WITNESS:  Because it's -- somebody
18          say something?
19              COURT REPORTER:  Yes, the distortion got
20          me.  I don't know.  Everybody, if you
21          could -- and I'm not trying to say it's
22          this -- but if you can move your phones away
23          from the computers, maybe that will help,
24          your cell phones.
25              (Off the record.)
```

Daniel Fleischman 3/21/2024

```
 1        Q.   (By Mr. Jacob)  I asked how you knew
 2   that they were not from St. Tammany?
 3        A.   Just by the comments they make, like,
 4   "Don't go to St. Slammany."  I mean, you assume it
 5   by what they're saying.
 6        Q.   Fair enough.
 7             But you've never verified that?
 8        A.   No.
 9        Q.   Did you ever come to understand from the
10   comments why they were referring to it in that
11   way?
12        A.   I can only assume that at one point it
13   had a very bad rating on Google, but I mean,
14   it's -- I don't -- I don't have an answer.
15        Q.   Fair enough.
16             Would you agree with me --
17             THE WITNESS:  Can we turn the volume up?
18        Q.   (By Mr. Jacob)  Can you hear me now?
19        A.   Yes.
20        Q.   Would you agree with me that at least
21   before you arrived as warden, the Parish was
22   underfunding the jail?
23        A.   I would -- based on the current level, I
24   would say yes, only because I am aware that the
25   tax that they had failed in 2018.
```

Daniel Fleischman 3/21/2024

```
 1                 So I would assume that since 2018 they
 2      had an issue funding at -- full funding.
 3           Q.   Is that something you discussed with the
 4      expert?
 5           A.   I don't recall talking about funding.
 6           Q.   Are you aware -- if I tell you Title 22,
 7      do you know what that refers to?
 8           A.   Yeah, Louisiana Administrative Code.
 9           Q.   Is that something that the jail is
10      expected to comply with?
11           A.   It's -- it's a guideline.  It's not
12      what -- I mean, it's not law, but it's a guideline
13      just like the BJ -- I'm sorry.
14           Q.   Go ahead.
15           A.   Just like the Louisiana Department of
16      Corrections' BJGs are:  Basic Jail Guidelines,
17      which is what we've kind of constructed our
18      followings on.
19           Q.   Do you know --
20           A.   Our policy, not guidelines.
21           Q.   Do you know if you're required -- the
22      jail is required to follow Title 22?
23           A.   It's Louisiana Administrative Code, so I
24      mean, we -- we follow it to the best we can.
25           Q.   Do you know if during 2018 through '20,
```

Daniel Fleischman 3/21/2024

```
 1    the jail was following Title 22?
 2         A.   I cannot speak to what they followed
 3    during 2018 to 2020.  I wasn't there.
 4         Q.   Did you discuss Title 22 with the
 5    expert?
 6         A.   I don't believe we specifically got into
 7    Title 22, no, sir.
 8         Q.   As you sit here today or when you were
 9    speaking with the expert, did you have any
10    evidence or provide any information to the expert
11    regarding plaintiffs' claims?
12         A.   No, sir.
13         Q.   I'm looking through the notes.  I don't
14    want to re-ask things, so just bear with me here.
15              Do you know in 2018 to '20, if there was
16    toilet paper stuck on the walls and ceilings?
17         A.   No, sir, I do not know that.
18         Q.   I'm sorry.  Do you know if it's there
19    today?
20         A.   I can almost say it's not there today
21    without doubt, because I walk through quite
22    frequently.
23         Q.   Do you know if it would have been there
24    any time while you were a warden?
25         A.   I walk through on a regular basis.  My
```

Daniel Fleischman 3/21/2024

```
 1    captain walks through on a regular basis, and I
 2    have never had to stop and say to anybody, "Get
 3    that toilet paper off the ceiling or wall."
 4          Q.    So any time between '21 when you took
 5    office to today, you walk through frequently, and
 6    you --
 7          A.    On my walk-throughs, I've never seen
 8    toilet paper on the ceiling or walls.
 9          Q.    Have you looked for it?
10          A.    No, sir, but I do look at basic
11    cleanliness, and that would be part of it.  No
12    different than trays being left on the floor or
13    cups being left on the floor.
14          Q.    Okay.  Am I correct, inmates in a
15    holding cell, they don't have access to fresh air,
16    meaning from the outside?
17          A.    I would, based on my experience as the
18    warden, say no, you are not correct.  And the only
19    reason I know this is because there was a freeze,
20    and -- shortly after I took over, and, apparently,
21    the fresh air dampers were not shut on the air
22    conditioners on the roof, and the coils froze up
23    on some of the units and busted.  So that repair
24    came out of my budget, and there is fresh air
25    dampers that is mixed with the air conditioned air
```

Daniel Fleischman 3/21/2024

 1    as well as exhaust fans in the holding unit to
 2    pull out the old air, so yes, there's fresh air
 3    mixed with the air conditioning.
 4              And it was explained to me by my
 5    maintenance people that it's just like in your
 6    car, when you have an ability to recirculate the
 7    inside air or if you don't select that little
 8    button, you -- it mixes with outside air, your air
 9    conditioning, and that's basically what -- how it
10    functions.
11         Q.   So if I understand you correctly, the
12    only outside air that an inmate in a holding cell
13    would receive is outside air that happened to mix
14    in the AC system to the extent that the dampers
15    were open?
16         A.   Yes, and they remain open unless there's
17    a hard freeze expected.
18         Q.   Did you ever discuss that issue of
19    whether inmates were being provided with things
20    that they asked for from guards in 2018 through
21    '20?
22         A.   Ask that again.  I'm sorry.
23         Q.   Yeah.
24              Did you ever discuss with the expert any
25    complaints or any issue with respect to whether

Daniel Fleischman 3/21/2024

```
 1   guards were providing or withholding items
 2   requested by inmates?
 3        A.   No, sir.
 4        Q.   And I should have said during the years
 5   '18 to '20.
 6        A.   No, sir, I don't.
 7        Q.   Do you know whether -- if I say the
 8   8th amendment to the federal Constitution, do you
 9   know whether that governs anything with respect to
10   jails?
11        A.   Yeah, cruel and unusual punishment.
12        Q.   And if I -- if a deputy asks you what
13   does that mean to you, what do you tell them?
14             MR. WHITTLE:  Objection, calls for a
15        legal conclusion.
16             You may answer.
17             THE WITNESS:  Cruel and unusual
18        punishment, I would say public flogging,
19        water boarding, tying a person up to a hook
20        on the ceiling.  I mean, that's cruel and
21        unusual punishment.
22             Putting somebody in -- I mean, putting
23        somebody in jail is not cruel and unusual
24        punishment.
25        Q.   (By Mr. Jacob)  Fair enough.
```

Daniel Fleischman 3/21/2024

```
 1        A.    Or judges wouldn't do it.
 2        Q.    Do you know if there is any law, state
 3   or federal, that governs how long an inmate can
 4   remain in a holding cell?
 5        A.    I don't believe there's a law.
 6        Q.    Do you know if there's any rule or
 7   regulation, either internally at the jail or if
 8   there's some other agency, that covers that issue?
 9        A.    There's a policy that says they have to
10   be classified within 48 hours, but it doesn't say
11   they have to be moved.
12        Q.    How about -- does Title 22 discuss that
13   issue?
14        A.    I believe it says, "may be moved after
15   72," but it doesn't say "shall," so it's not even
16   a mandated clause, meaning that's not a law.
17        Q.    I think you mentioned that DOC standards
18   that are --
19        A.    BJGs, the basic jail guidelines, our
20   policy follows those.
21        Q.    Do you know if that discusses how long
22   they can remain in holding?
23        A.    It says they have to be -- they should
24   be classified within 48 hours.  It doesn't say
25   "moved."
```

Daniel Fleischman 3/21/2024

```
 1        Q.    Does it discuss anything about temporary
 2   housing?
 3        A.    It doesn't say -- it doesn't give me a
 4   guideline on what temporary is.  It says,
 5   "temporary housing."
 6        Q.    I'm sorry, it does say, "temporary
 7   housing"?
 8        A.    I believe it says holding is used for
 9   temporary housing, and it doesn't give an
10   indication on what "temporary" is.
11        Q.    Does it say how long they can remain in
12   temporary housing?
13        A.    No, sir, I don't believe so.
14        Q.    Does it say anything about bedding?
15        A.    In temporary housing?  No, sir.
16        Q.    In general, to which an inmate's --
17        A.    In general, when they're admitted into
18   housing and admitted into the jail, then they
19   should be given their bedding, their clothing
20   allotment and all their stuff to maintain
21   personally.
22        Q.    You said, "admitted into jail."
23              Did you mean the holding, too?
24        A.    Negative.  No.  No, sir.  I meant when
25   they are moved into a housing unit.
```

Daniel Fleischman 3/21/2024

```
1        Q.   What about a DOC inmate who is DOC
2   pre-trial?
3        A.   DOCs aren't pre-trial.  DOCs are
4   convicted.  They don't -- I don't get a DOC
5   pre-trial.
6        Q.   Okay.  So what about federal pre-trial?
7        A.   Most of my feds are pre-trial, because
8   once they get convicted, they become Bureau of
9   Prison property, or people, and they usually get
10  airlifted to a federal penitentiary, but the
11  federal penitentiaries don't have a place to house
12  them while they are detainees, so they contract
13  with local parishes to house them.
14       Q.   So do you think that's pre-trial?
15       A.   Yes.
16       Q.   Why do they get that?
17       A.   Because they don't -- while they're in
18  holding, they don't.  When they move to their
19  dorm, they do.
20       Q.   So you do have federal pre-trial?
21       A.   Most of my federals are pre-trial.
22       Q.   Okay.
23       A.   If they are convicted, then they become
24  Bureau of Prisons, and they get airlifted to a
25  federal penitentiary.
```

Daniel Fleischman 3/21/2024

```
 1          Q.   So federal pre-trial, they get bedding?
 2          A.   When they're out of holding.  They make
 3     their initial jump into the jail in a holding
 4     cell.
 5          Q.   So federal inmates are held back in the
 6     holding area with Parish inmates or --
 7          A.   No, sir; no, sir.  They're held in a
 8     separate holding cell.
 9          Q.   And where is that holding located?
10          A.   It's one of those four that are in
11     holding.
12          Q.   So if you have a federal detainee,
13     you're not allowed to mix with the Parish?
14          A.   No, sir.
15          Q.   So if you have one federal detainee,
16     they get the entire holding cell?
17          A.   Yes, with the ability to move into
18     housing pretty quickly, and when I say "pretty
19     quickly," there's usually a bed available, and
20     since -- I know I'm making this sound terrible,
21     but since I've been the warden, there's always
22     been available -- bed availability for pretrials,
23     too.  I haven't experienced what they experienced
24     back then.
25          Q.   Until they're classified, you can have
```

Daniel Fleischman 3/21/2024

```
1     one federal pre-trial detainee in a holding cell?

2          A.    Potentially, yes, sir.

3          Q.    And 18 Parish detainees in a different

4     holding cell?

5          A.    Yes, sir.

6          Q.    And that's because of the contract that

7     says you can't mix them?

8          A.    Yes, sir.

9               As long as -- you said up to 18 in

10    another one.  As long as -- assuming the other two

11    had just as many in there because we would try to

12    divide them equally.

13         Q.    So if you have -- if you have 66 Parish

14    pre-trial detainees and one Federal, am I correct

15    you'd have probably 22 in each holding cell and

16    one federal in the other holding cell?

17         A.     If I only had one bed, is that the

18    hypothetical here?

19         Q.    No beds available back in DOC or

20    federal.

21         A.    Okay.  Then I have housing units,

22    restricted housing units that I would put that one

23    fed in to offset my 22, 22, 22.

24         Q.    Say housing --

25         A.    Say that again?
```

Daniel Fleischman 3/21/2024

```
 1        Q.    Let's say restricted housing is full.
 2        A.    One more time.  I'm sorry.  You said --
 3   I heard, "Let's say that's what restricted housing
 4   is for."
 5        Q.    Let's say restricted housing is full.
 6        A.    Okay.  If every -- then yes, you would
 7   be correct unless I got permission from the
 8   Marshal's office to specifically house him with
 9   Parish inmates.
10        Q.    So that federal detainee, he's not
11   getting turned away at the door.  He's being been
12   brought in, all the other Parish detainees would
13   be shifted to the other holding cells, correct?
14        A.    Not necessarily, because you said all
15   the beds were full, all the federal beds were
16   full, so I would tell them, "Hey, all your federal
17   beds are full.  You need to take them somewhere
18   else."
19              If I have no federal beds available,
20   then that means that I've met the contract, so
21   then they're required to find another place for
22   them.
23              So with the exception of no beds being
24   available or with one bed being available in a
25   federal place, I could move him, but if no beds
```

Daniel Fleischman 3/21/2024

1    were available, that means they were full, so I

2    could turn him away and make the Marshals take him

3    somewhere else, because contractually, we've met

4    the obligation.

5         Q.    I think I understand what you're saying.

6              You're saying that if that one federal

7    is open because the inmate hasn't -- or the

8    pre-trial detainee hasn't finished classification,

9    correct?

10        A.    You lost me.

11        Q.    I'm sorry.

12             You could have a situation where you

13   have one federal bed open and one federal detainee

14   in a holding cell because he hasn't gone through

15   classification yet?

16        A.    Right, but I could expedite that

17   classification to get him out of holding, because

18   he is a federal inmate.  I know he is a federal

19   inmate, so I move him back to the back, and then I

20   could divide those other 22, 22, 22 into the four,

21   whatever that math comes out to.

22        Q.    Fair enough.

23             MR. JACOB:  Let me just check my notes

24        here.  I might be done, but let me check.

25        Q.    (By Mr. Jacob)  Did you ever come to

Daniel Fleischman 3/21/2024

```
 1    wonder why it was that you were selected to be the
 2    one to speak to the expert?
 3         A.   The only thing I can assume is because
 4    I'm the warden, and he was directed to me.
 5         Q.   I'm not staring at you.  I'm reviewing
 6    my notes.
 7              (A short break was taken.)
 8         Q.   (By Mr. Jacob)  Sir, you've had an
 9    opportunity to take a break.  Are you prepared to
10    proceed?
11         A.   I am.
12         Q.   I noticed that the expert referred to
13    certain times where the fire marshal had found
14    over capacity.
15              Are you aware of the documents that he's
16    referring to?
17         A.   I am, yes.
18         Q.   And I'm also aware that the expert noted
19    that within a day, sometimes the same day, those
20    matters were corrected in that time frame.
21              Are you aware of that?
22         A.   I am.
23         Q.   If it was something that could be
24    corrected in less than a day, why was it that
25    there was ever an overcrowding situation?
```

Daniel Fleischman 3/21/2024

```
 1        A.    That one, I can't answer.  I don't know
 2    how they corrected it in a day is what I'm saying.
 3        Q.    Okay.  But you don't dispute that the
 4    records indicate that those matters were corrected
 5    within 24 hours?
 6        A.    I do not dispute that, and that was an
 7    independent organization that said they were, so I
 8    can't dispute that.
 9        Q.    And you don't recall any conversation
10    with the expert regarding why it was that they
11    became overcrowded to begin with if it was
12    something that could be fixed in less than a day?
13        A.    No, sir, I do not recall that, having
14    that discussion.
15        Q.    The expert reports aimed at incident
16    reports that he reviewed, indicated that a staff
17    response time was usually only one to two minutes
18    for an incident in the holding cell.
19              One to two minutes is a significant
20    amount of time for a response if they're literally
21    right there, am I correct?
22        A.    You -- depending on the situation,
23    you're going to wait for somebody to assist you.
24              You're not going to just run into a --
25    specific, I mean, if there's 15 people in there,
```

Daniel Fleischman 3/21/2024

```
 1    you're not going to just open the door and walk in
 2    on your own, and depending on the amount of people
 3    in the situation that's occurring, you're going to
 4    wait for one or two more people.
 5         Q.   I understand.  Thank you.
 6              Do you recall providing any documents or
 7    reviewing any documents related to -- let me see
 8    which inmate, I'm sorry -- Louviere's claims of
 9    assault?
10         A.   I do not.  I don't.
11              I recall gathering some or trying to
12    gather some medical documents with that name, I
13    think, but I'm not positive, and I didn't gather
14    them.  I directed the medical staff to.
15              I believe that was the name, but I'm not
16    positive.
17         Q.   Can you hear me okay?
18         A.   Yes, sir.
19         Q.   Do you recall the expert that food
20    service during the relevant period of time was
21    prepared daily and served properly, correct?
22         A.   During that time, no, sir.
23         Q.   Because you had no information with
24    respect to that period of time, correct?
25         A.   No, sir.
```

Daniel Fleischman 3/21/2024

```
 1        Q.   No, it's not correct, or, no, you had no
 2   information?
 3        A.   No, sir, I had no information.  I'm
 4   sorry.
 5        Q.   My bad.
 6             Do you recall looking into any issue
 7   with respect to an inmate Williams' medical
 8   records?
 9        A.   That could have been the one I was
10   referring to when I said Louviere.  I could not --
11   I just assumed it was.
12             I don't recall whose information I was
13   gathering for what, so one of them I know that I
14   directed medical to find his information because
15   it wasn't our current medical provider that did
16   it, so it wasn't readily accessible, and I don't
17   know if it was the Louviere or the Floyd Williams.
18             Whichever one it was, I did direct them
19   to try to find that information and make it
20   available.
21        Q.   Did you provide a document to the expert
22   indicating that Williams or a different inmate
23   received the two inhalers that --
24        A.   Yes, and that was medical documentation
25   I received from that.
```

Daniel Fleischman 3/21/2024

```
 1        Q.    We cut each other off just for a little
 2   bit.
 3              I'm aware that Williams disclosed that
 4   he was on them, but did you provide documentation
 5   that he, in fact, did receive them?
 6        A.    I believe that, yes, sir, I did.
 7              I didn't read it, but almost -- yeah, it
 8   was his medical paperwork, so I'm assuming they
 9   gave it to him.
10              It should say on there, but I don't
11   recall what it said.
12        Q.    The expert indicated that he randomly
13   sampled some of the videos from inside the holding
14   areas and found multiple recordings that showed
15   individuals wrapped up in blankets inside the
16   holding locations.
17              Did you ever discuss with him why he was
18   randomly sampling the videos as opposed to
19   checking the exact times when these inmates were
20   in there?
21        A.    No, sir.
22        Q.    I'm sorry?
23        A.    No, sir, I didn't discuss with him.
24        Q.    If he wanted to see the exact -- the
25   video from the exact times, he would have been
```

Daniel Fleischman 3/21/2024

```
 1   able to?

 2        A.   No, sir, I don't believe, unless an

 3   incident occurred, and I think that's what he was

 4   going by.

 5             Unless an incident occurred in that

 6   dorm, then that video is not going to be retained

 7   for '18, '19, '20, '21 -- six years.

 8        Q.   Then what would qualify an incident

 9   requiring a video?

10        A.   If there was a use of force incident, if

11   there was a fight, if there was a -- anything that

12   we would have made -- that we would have responded

13   to and required a report, whether it be use of

14   force or an unusual occurrence, usually the video

15   from that segment is marked and saved.  Otherwise,

16   every 14 days, depending on the traffic in the

17   area, the video is not saved.

18        Q.   You never told the expert that during

19   the relevant period of time, that the cells were

20   cleaned daily or even more frequently as needed,

21   correct?

22        A.   During this relevant time, no, sir, I

23   don't believe we discussed that.

24             I believe we discussed what was

25   happening at the time -- or my time.  I believe we
```

Daniel Fleischman 3/21/2024

```
1    discussed what was happening during my time.
2            MR. JACOB:  I have nothing further, sir.
3         Thank you.
4            MR. WHITTLE:  This is Kenneth Whittle.
5         I'm just going to have a few questions.
6    EXAMINATION BY MR. WHITTLE:
7         Q.   Regarding the claims the plaintiffs have
8    from the years 2019 to 2020, do you have any
9    personal, first-hand knowledge regarding their
10   claims?
11        A.   No, sir.
12        Q.   Just speaking of manpower at the jail,
13   is there currently any issues that any of you have
14   with manpower at the jail?
15        A.   Currently, yes, there is, and it's not
16   something that just St. Tammany Parish jail is
17   experiencing, it's nationwide, not just in jails
18   but in law enforcement in general.
19            We are short-staffed, but we make that
20   up with people from other divisions working
21   details at the jail.
22        Q.   So to your knowledge, has there always
23   been an issue with the manpower at the jail as far
24   as you know?
25        A.   I don't know because I was never
```

Daniel Fleischman 3/21/2024

```
 1    concerned with the jail.
 2              However, I think since COVID and how law
 3    enforcement has been portrayed recently, or in the
 4    last couple of years, I think that's affected law
 5    enforcement across the nation and jail, but that's
 6    just my opinion.
 7         Q.   All right.  So everything that happens
 8    in the jail, does that -- including moving inmates
 9    from one area to another, does that require like a
10    significant amount of manpower?
11         A.   Depending on how many you're moving.
12              If you're just moving one, it's not a
13    significant amount, but if you're moving eight to
14    10 people, you don't want to move them by
15    yourself.
16         Q.   So whenever you're moving them from, I
17    guess, pre-trial to the showers, how many do they
18    move at a time for that?
19         A.   When they're moving from a holding cell
20    to the showers, there are only -- there are
21    probably two people taking, and then they're
22    taking however many is in there.
23              If there's only three people in that
24    holding cell, yeah, you could probably do it with
25    one based on everybody else around you, but if
```

Daniel Fleischman 3/21/2024

1    there's 15, you might want to have another person,

2    because when they're coming out and going to the

3    shower, you have to unhand -- you should be

4    handcuffed in the transit, but at some point, you

5    have to unhandcuff all them people, and you don't

6    necessarily want to be there alone with all --

7    that big group of people.

8        Q.   So the issues that, I guess that y'all

9    have with manpower, does it make it more difficult

10   to move these pre-trial detainees from holding

11   cells to different areas, like as far as getting a

12   shower, stuff like that?

13       A.   Potentially, yes, but for the most part,

14   I have -- I have the luxury of not having that

15   many people in a holding cell at a time, so for

16   me, I have -- in my tenure as the warden, I have

17   the ability to get them a shower relatively with

18   one or two people.

19       Q.   Let's go quick to -- this is going to be

20   Defendant's Exhibit 1.  I sent it to y'all by

21   e-mail.

22            This is the Marshals -- this is the U.S.

23   Department of Justice, Marshal Service Prisoner

24   Operations Division contract with the St. Tammany

25   Parish Sheriff's Office.  Then cite that with that

Daniel Fleischman 3/21/2024

```
 1    as Exhibit 1.  I'll get it to the court reporter
 2    at the end of this.
 3              (Exhibit 1 marked for identification.)
 4        Q.   (By Mr. Whittle)  Mr. Fleischman, have
 5    you seen this contract before?
 6        A.   Yes, sir.
 7        Q.   So you're familiar with it?
 8        A.   Yes, sir.
 9        Q.   To your knowledge, is this contract
10    still in effect?
11        A.   Yes, sir.
12        Q.   So under this contract, what federal
13    agencies are permitted to house their prisoners at
14    the jail?
15        A.   The Marshals Service and the Bureau of
16    Prisons, and under the -- under the assumption
17    that Bureau of Prisons are going to be moved out,
18    very recent -- very soon.
19        Q.   So does this contract reserve a certain
20    number of beds?
21        A.   Yes, sir.
22        Q.   And how many beds is that?
23        A.   150 male and 30 female.
24        Q.   And these beds are only reserved for
25    these specific federal detainees?
```

Daniel Fleischman 3/21/2024

```
 1        A.    Yes, sir.
 2        Q.    So at the jail, are there any federal
 3   prisoners that are housed in a separate area from
 4   other inmates, like DOC, Parish or pre-trial?
 5        A.    Ask that one more time.
 6        Q.    So at the jail, are these federal
 7   prisoners in this contract, are they housed in a
 8   separate -- you know, separate area from other
 9   inmates in the jail, like the DOC, Parish or
10   pre-trial?
11        A.    Yes, sir.  They're in their own dorm or
12   tier.
13        Q.    Does the jail ever commingle pre-trial
14   detainees with these federal prisoners?
15        A.    No, sir.
16        Q.    And why would that be?
17        A.    One, because the Marshal Service don't
18   want them to be commingled; two, usually when
19   you're a federal inmate, you're a little more
20   violent than our typical shoplifter, drunk driver.
21             I mean, we have bad people, but we
22   have -- I say we have bad people that are
23   pre-trial, but those bad people we have places
24   for.
25             So we don't -- what we don't have,
```

Daniel Fleischman 3/21/2024

```
 1    unless somebody causes a problem inside the jail,
 2    is a special place for federal inmates.  They have
 3    150 beds available, so -- but they are separate
 4    from everybody else.
 5         Q.   As far as those beds, would you ever
 6    take like a pre-trial detainee -- is there any
 7    instance where you would take a pre-trial
 8    detainee, you know, because there's no beds, but
 9    there may be -- let's say you have 150 beds, but
10    you have, let's say, 20 open in Federal.
11              Would you take that pre-trial detainee
12    and put them in the beds -- one of these open beds
13    with these federal detainees?
14         A.   In the same dorm, no, sir.
15         Q.   Again, is this policy or is this
16    contract?
17         A.   It's contract.  It's not policy.  It's
18    for us, practice.
19         Q.   To the best of your knowledge, during
20    the years like 2019, 2020, was that same process
21    followed, as to not mixing them?
22         A.   I don't have direct knowledge, but I
23    would assume yes, because it's the same contract.
24         Q.   Do you have any knowledge about
25    whether -- with regard to the plaintiffs in this
```

Daniel Fleischman 3/21/2024

```
1    case -- whether they were held in a holding cell
2    longer than 48 hours for a punitive reason?
3         A.    I have no direct knowledge of that.
4         Q.    In general, does the jail or the
5    Sheriff's office keep people in a holding cell
6    longer than 48 hours for any punitive reason?
7         A.    I would say no, because our object is to
8    get them out of holding as quick as possible to
9    make room for the next group that comes to
10   holding.  So they have nothing to gain from
11   saying, "You're going to sit here longer."
12              I can definitely say, during my tenure
13   as the warden since February of 2021, we don't
14   hold anybody in holding longer than they're -- we
15   have to to get them a bed, and I don't think --
16   monthly average, I think I've always had more beds
17   than I've had people in holding.
18        Q.    And is that a result of, I guess, any of
19   the claims of the plaintiffs or for any other
20   reason?
21        A.    I think it's a result of COVID-19,
22   personally, because it just decreased the amount
23   of people I have in jail, and maybe one day,
24   they'll catch up and have that many arrested
25   again, but I don't know.
```

Daniel Fleischman 3/21/2024

```
 1        Q.   All right.  With regard to some of the
 2   policies for pre-trial detainees, regarding lights
 3   in the pre-trial -- like the holding cells, how is
 4   that done?  Is it 24/7?
 5        A.   They're on 24/7.
 6        Q.   And why is that?
 7        A.   Officer safety, inmate safety --
 8   detainee safety.  We're always bringing people in
 9   and out of those cells; new arrests, people
10   getting moved.  So it's --
11        Q.   Can you explain as far as detainee
12   safety, like, what might happen?
13        A.   If the lights ain't on, I can't see if
14   two people are fighting.  In that same respect, I
15   can't see if two inmates are huddled up close to
16   each other doing things they ain't supposed to be
17   doing.
18             So in that first 72 hours of
19   incarceration, that's the most critical time to
20   monitor these people, especially if they've never
21   been arrested before.  I mean, you don't know what
22   they're going to do.  You don't know their state
23   of mind, so you want to be in direct -- you want
24   to be able to see.
25        Q.   To the best of your knowledge, is that
```

Daniel Fleischman 3/21/2024

```
 1    policy with regard to the lights, is that any
 2    different from any other policy -- from the policy
 3    that was in effect in 2019 and 2020?
 4         A.   Not that I'm aware of.
 5         Q.   With regard to the temperature that they
 6    have in the cell, what is it?
 7         A.   I believe it's 68 to 70.
 8         Q.   And as far as showers, how often -- how
 9    often are they --
10         A.   The practice is three times a week.
11         Q.   Three times a week.
12              Are they provided anything after
13    showers?
14         A.   Fresh clothes.
15         Q.   And that's the current policy?
16         A.   That -- my understanding is that's
17    always been policy.
18              Can I say it's always been followed, no,
19    but it is followed now.
20         Q.   As far as food goes, how many times a
21    day are they fed?
22         A.   Three times a day.
23         Q.   And who cooks the food?
24         A.   Trinity Food Services.
25         Q.   And do they have any inmates help serve
```

Daniel Fleischman 3/21/2024

```
 1    or prepare?

 2         A.    No.

 3         Q.    And again, how many times a day is it?

 4         A.    I need to back up.  You asked if inmates

 5    cooked or served the food.  They do serve the

 6    food.  They take the trays out of the kitchen

 7    under the watch -- under the eyes of a corrections

 8    officer, take the carts of food to whatever

 9    building or whatever hallway they're going to, and

10    the inmates actually hand them -- inmate workers

11    actually hand the trays to the individual inmate.

12              That's done in the holding cells.  In

13    the dorm, the inmate workers hand the tray through

14    the slot in the door to the inmate in the dorm.

15              So the inmates -- to answer your

16    question correctly, yes, they help serve the food.

17         Q.    How many times a day?

18         A.    Three times a day.

19         Q.    Is that the same policy that was

20    previously practiced?

21         A.    They've -- as far as I know, they've

22    always been served three meals a day, two hot

23    meals and sandwiches.

24         Q.    With regard to medical treatment, are

25    they offered or are pre-trial detainees afforded
```

Daniel Fleischman 3/21/2024

```
 1    24/7 medical treatment or care?
 2         A.    Yes.
 3         Q.    How does that work?
 4         A.    There is usually a nurse in the intake
 5    area, and if there is not a nurse at the time in
 6    the intake area, then they will call one over the
 7    radio up to the intake area.
 8              If it's urgent, if somebody says, "I've
 9    got a sore throat," they will call back to Medical
10    and say, "Hey, so-and-so in holding cell one is
11    complaining of a sore throat."  Then when they do
12    their next set of rounds, they will talk to the
13    inmate and say, "You got a sore throat, you're
14    scheduled to see the doctor day after tomorrow.
15    In the meantime, here's Sudafed or here's..." --
16    whatever they give them.  I don't know what they
17    give them.  That's a medical issue.
18         Q.    And the jail contracts out with another
19    party, right?
20         A.    Again, yes.  Correct Health is who does
21    our medical, and they have their own policies and
22    their own set of rules.
23         Q.    And are they the ones that -- I guess
24    they deal with the prescription medications for
25    inmates?
```

Daniel Fleischman 3/21/2024

```
 1        A.   Yes, everybody.
 2             As a -- as a correctional officer, as a
 3   warden, as a captain, as a sergeant, we can't give
 4   out medication.  That has to be done by them.
 5        Q.   So the contractor is the one that --
 6   they have a set policy for how to give medication
 7   out; is that correct?
 8        A.   That's correct.
 9        Q.   With regard to cleaning of holding
10   cells, I know this has already been discussed, but
11   what is the current policy?
12        A.   Current practice is three times a day:
13   After each breakfast, after lunch, and then a very
14   deep cleaning when they move everybody out, so
15   that's the common -- that's the current practice.
16        Q.   Did you create this current practice or
17   was it already in place?
18        A.   It was already in place when I got
19   there.
20        Q.   Do you know about how long, when it was
21   first put in place?
22        A.   I do not.
23        Q.   Let's see.  Well, as far as like,
24   providing recreation -- recreational activities,
25   exercise for pre-trial detainees, are they allowed
```

Daniel Fleischman 3/21/2024

```
 1   to have any recreation?
 2        A.   No, sir.
 3        Q.   And why is that?
 4        A.   I don't actually know that there's a
 5   reason.  The only people that are required, I
 6   believe, to have any recreation is the DOCs, but
 7   we give it to everybody that's been -- not put in
 8   jail but that has been assigned permanent housing
 9   in the jail, weather and staff permitting.
10        Q.   So it's for people that are permanently
11   housed in the jail?
12        A.   Yes, sir.
13        Q.   So if you were to bring pre-trial
14   detainees -- if you were to bring them for
15   recreational exercise, where would that take place
16   at, at the jail?
17        A.   I guess, weather and staff permitting, I
18   would have to walk them through the jail to one of
19   the recreation yards.
20        Q.   Are those recreation yards, is that
21   where your inmates that are already -- that are
22   settled, they're staying there, that's where they
23   have the ability to go and exercise?
24        A.   Yes.  They have the ability to go out to
25   a rec yard, but they also have the ability to
```

Daniel Fleischman 3/21/2024

```
 1   exercise, and by "exercise," I mean sit-ups,
 2   push-ups, walking in the day room.  The day room
 3   is fairly large size in the dorms.
 4        Q.   If you were to bring those pre-trial
 5   detainees out there, wouldn't you also have to
 6   move all the other inmates that are located out
 7   there at the same time out from there?
 8        A.   If there was somebody out there, yes, I
 9   would, and then I would also have to have staff to
10   move them from point A to point B and also have to
11   have the staff to watch them while they were out
12   there.
13        Q.   Right.
14             So it would take more manpower to even
15   do that?
16        A.   To take them out to recreation, yes.
17        Q.   With regard to bedding in the holding
18   cell --
19        A.   Can I back up for a minute?
20        Q.   Yeah.
21        A.   In addition to that, keep in mind in the
22   three years I've been there, we've moved them out
23   of holding pretty rapidly, and that for 72 hours,
24   they need to be watched according -- do I want
25   to -- until I know somebody is capable of going
```

Daniel Fleischman 3/21/2024

```
 1    out there, at no point can I force somebody to go
 2    to recreation, even the people that are required
 3    to go to recreation three times a week, I can't
 4    force them out.
 5             So now, again, the people that I had
 6    watching them, now I have to replace them with
 7    somebody to watch the ones that don't want to go,
 8    so it creates a problem.
 9        Q.   With regard to bedding in the cell, why
10    isn't -- I guess why aren't pre-trial detainees
11    given a bed inside of the holding cell?
12        A.   Because that's going to cut the amount
13    you can put in there considerably because now
14    you've got to make room for the mattress.  It's
15    substantially larger than the space it takes for a
16    body, but I mean, I can't tell you the reasons
17    why.  It's just not given.
18        Q.   It would take up more space, so you
19    would have less people in the holding cell?
20        A.   You'd have less people in the holding
21    cell, and they would have to navigate over
22    mattresses and probably cause more issues than
23    not.
24        Q.   With regard to blankets, are pre-trial
25    detainees, are they provided a blanket in the
```

Daniel Fleischman 3/21/2024

```
 1    holding cell?

 2         A.    Yes.

 3         Q.    Is it just at night that they're

 4    provided this?

 5         A.    Currently, no.  We let them keep the

 6    blanket all day and night.  We do remove them to

 7    wash them.  If we have the blankets available, we

 8    replace it immediately and then wash and put into

 9    the locker the clean blankets.  If we don't have

10    the blankets available, then we wash them, dry

11    them and give them back.

12              We don't -- sometime in the last three

13    years, we stopped saying, okay, just here, you can

14    have the blanket.  There's no special reason.

15    It's just now they have a blanket.

16         Q.    To the best of your knowledge, has it

17    always been the policy of the jail for the

18    detainees to have a blanket, at least at night?

19         A.    Yes.

20         Q.    Would you find it odd or would you find

21    it odd that a detainee claims they were given a

22    blanket at 3:00 a.m.?

23         A.    I would find it odd, but, however, I

24    have no direct knowledge of that.

25              MR. WHITTLE:  We have no further
```

Daniel Fleischman 3/21/2024

```
 1          questions.  No further questions.
 2               I don't know if you heard me.
 3   EXAMINATION BY MR. JACOB:
 4        Q.   Sir, just a couple of follow-ups on what
 5   you were just asked by defense counsel.
 6               First of all, you -- just to be clear,
 7   everything that you just testified to now about
 8   policies and practices, it relates to the time
 9   period when you were warden?
10        A.   Yes, sir.
11        Q.   None of that relates to the time period
12   relevant to this litigation?
13        A.   No, sir.  I have no direct knowledge of
14   that.
15        Q.   Okay.  Now, with respect to you, in
16   particular, you've been disclosed as a witness who
17   may testify about plaintiffs' alleged claims.
18               What is it that you would testify to
19   about plaintiffs' alleged claims?
20        A.   I don't think I understand what
21   you're -- I've been -- say that again.  I don't
22   know what I've been designated as.
23        Q.   You've been designated as a witness.
24   You "may testify about plaintiffs' alleged
25   claims."
```

Daniel Fleischman 3/21/2024

```
 1              If I ask you, "What is it you plan to

 2    testify about these claims," what's your answer?

 3         A.   I don't know that I have one.  I can

 4    only -- I can only testify as to my knowledge --

 5    direct knowledge -- as to my term as the warden as

 6    to the conditions and practices and policies that

 7    we follow.

 8              Before me, before my term as a warden, I

 9    cannot -- anything -- I can't -- I can't say it

10    did happen, I can't say it didn't happen.

11              With the medical records in front of me,

12    I can say this is what was logged.  This is what

13    was written down.  I mean, I -- I don't know that

14    I can honest -- I can have an opinion on anything

15    that happened before me, but I don't have direct

16    knowledge of it.

17         Q.   And you're not -- you haven't been --

18    you're not an expert witness in this case,

19    correct?

20         A.   Not that I'm aware of, but I didn't know

21    I was a witness.

22         Q.   And to the extent you're called as a

23    fact witness, you have no firsthand knowledge

24    regarding the merits of any of plaintiffs' claims,

25    correct?
```

Daniel Fleischman 3/21/2024

```
 1       A.    Until I became warden in February 2021,
 2   I have no direct knowledge of anything that
 3   happened in there.
 4       Q.    Okay.  And so am I correct in the event
 5   it is proven that any of plaintiffs' claims with
 6   respect to how they were treated is true, you have
 7   no knowledge as to the reason why they were
 8   treated that way, meaning a punitive nature or a
 9   legitimate jail need?
10       A.    No direct knowledge, that's correct.
11       Q.    You were asked to look at that Exhibit
12   number 1, and am I correct that's the -- I think
13   you identified it as a document that you had seen
14   before and an agreement that remains in effect
15   today; is that correct?
16       A.    That is correct.
17       Q.    And you know this because you're the
18   warden, correct?
19       A.    That's correct.
20       Q.    And you would agree that this document
21   was signed in 2017, correct?
22       A.    Yes, sir.
23       Q.    Do you have -- was this document readily
24   available to be provided to the expert had it been
25   requested?
```

Daniel Fleischman 3/21/2024

1       A.   I believe so.  I mean, if he asked me

2   for it, I would have given it to him.

3       Q.   Fair enough.

4            Do you have any knowledge or reason why

5   the expert would have referenced the 1997

6   agreement?

7       A.   No, sir.

8       Q.   And would you agree with me on this

9   agreement in box 12 on page 1, the per diem rate

10  is $68 for housing a federal inmate?

11      A.   Yes, sir.

12      Q.   And would you agree with me on page 3 of

13  this document down towards the bottom, it says

14  that this agreement could be terminated for any

15  reason with 30 days' notice?

16      A.   Yes, sir, I would agree with that.

17           MR. JACOB:  No further questions.

18           (Time Noted:  1:44 p.m.)

19             SIGNATURE/NOT WAIVED

20

21  ORIGINAL:  DEVON M. JACOB, ESQ.

22  COPY:  KENNETH R. WHITTLE, ESQ.

23

24

25

Daniel Fleischman 3/21/2024

```
 1              CERTIFICATE OF DEPONENT
 2   DEPONENT:  DANIEL FLEISCHMAN
     DATE:  March 21, 2024
 3   CASE STYLE:  AHMED BAQER, et al. vs. ST. TAMMANY
     PARISH GOVERNMENT, et al.
 4   ORIGINAL TO:  DEVON M. JACOB, ESQ.
             I, the above-named deponent in the
 5   deposition taken in the herein styled and numbered
     cause, certify that I have examined the deposition
 6   taken on the date above as to the correctness
     thereof, and that after reading said pages, I find
 7   them to contain a full and true transcript of the
     testimony as given by me.
 8             Subject to those corrections listed
     below, if any, I find the transcript to be the
 9   correct testimony I gave at the aforestated time
     and place.
10   Page     Line                 Comments
     ____     ____     _____
11   ____     ____     _____
     ____     ____     _____
12   ____     ____     _____
     ____     ____     _____
13   ____     ____     _____
     ____     ____     _____
14   ____     ____     _____
     ____     ____     _____
15   ____     ____     _____
     ____     ____     _____
16   ____     ____     _____
     ____     ____     _____
17   ____              _____
18        This the ____ day of _____, 2024.
19
                        _____
                        DANIEL FLEISCHMAN
20   State of _____
     County of _____
21
          Subscribed and sworn to before me, this the
22   _____ day of _____, 2024.
23   My Commission Expires:
24   _____      _____
25                                  Notary Public
```

Daniel Fleischman 3/21/2024

```
 1              REPORTER'S CERTIFICATE
 2          I, A. VIRGINIA BROOKS, Certified Court
    Reporter in and for the state of Louisiana, as the
 3  officer before whom this testimony was
    administered, do hereby certify that DANIEL
 4  FLEISCHMAN after having been duly sworn by me upon
    authority of R.S. 37:2554, did testify as herein
 5  before set forth in the foregoing pages;
                That this testimony was reported by me
 6  in the stenotype reporting method; was prepared
    and transcribed by me or under my personal
 7  direction and supervision, and is a true and
    correct transcript to the best of my ability and
 8  understanding;
                That the foregoing transcript has been
 9  prepared in compliance with transcript format
    guidelines required by statute or by the rules of
10  the Louisiana Certified Shorthand Reporter Board;
                And that I am informed about the
11  complete arrangement, financial or otherwise, with
    the person or entity making arrangement for
12  deposition services; that I have acted in
    compliance with the prohibition on contractual
13  relationships, as defined by the Louisiana Code of
    Civil Procedure Article 1434 and in rules and
14  advisory opinions of the board;
                That I have no actual knowledge of any
15  prohibited employment or contractual relationship
    direct or indirect, between a court reporting firm
16  and any party litigant in this matter, nor is
    there any such relationship between myself and a
17  party litigant in this matter;
                That I am not of counsel, not related to
18  counsel or the parties herein, nor am I otherwise
    interested in the outcome of this matter.
19
20          This the 2nd day of April, 2024.
21
22          A. VIRGINIA BROOKS, CCR #2010023
            Certified Court Reporter
23          Registered Professional Reporter
24
25
```