UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| AHMED BAQER, KLABERT JOSEPH GUILLOT, JR., and KLABERT JOSEPH GUILLOT, SR. | * * * | NO. 2020-CV-980 |
| Plaintiffs | * | JUDGE PAPILLION |
| VERSUS | * * | |
| ST. TAMMANY PARISH GOVERNMENT, a/k/a ST. TAMMANY PARISH COUNCIL, ST. TAMMANY PARISH SHERIFF'S | * * * | MAGISTRATE DOSSIER |
| OFFICE, RANDY SMITH, in his official and individual capacity, RODNEY J. | * * | JURY DEMAND |
| STRAIN, in his official and individual capacity, GREG LONGINO, in his official and individual capacity, and LACEY KELLY, in her official and individual | * * * * | COMBINED WITH Louviere v. St. Tammany Parish Government No. 2:20-cv-01840-WBV-DPC |
| and individual capacity, and LACEY KELLY, in her official and individual capacity | * * * | ALL CASES |
| Defendants | | |

*****************************************************************************

**PLAINTIFF TERRY MATTHEW HALL, JR.'S ADDITIONAL STATEMENT OF FACTS**

NOW COMES the Plaintiff, TERRY MATTHEW HALL, JR., through his counsel of record, ROMANUCCI & BLANDIN, LLC; JACOB LITIGATION, INC.; and the GLORIOSO LAW FIRM; to provide the following Additional Facts in opposition to Defendants' Motion for Summary Judgment:

**A. <u>STPSO 30(b)(6) Deposition</u>**

1. The Sheriff is the sole policymaker for the St. Tammany Parish Sheriff's Office ("STPSO"). Doc. 238-7, STPSO 30(b)(6) Deposition, at 12:4-11.

2. The Sheriff did not adopt and implement a policy that limits the amount of time that a detainee may be housed in a holding cell. Doc. Doc. 238-7, STPSO 30(b)(6) Deposition, at 28:12-15.

3. The Sheriff did not adopt and implement a policy governing how the holding cells are to be utilized. Doc. Doc. 238-7, STPSO 30(b)(6) Deposition, at 33:9-34:3.

4. The Sheriff did not adopt and implement a policy dictating the minimum unencumbered floor space that must be available to each detainee in holding. Doc. 238-7, STPSO 30(b)(6) Deposition, at 40:2-18.

5. The Sheriff did not adopt and implement a policy regarding when pretrial detainees are to be provided with showers, but that the practice was to provide showers on Monday, Wednesday, and Friday. Doc. 238-7, STPSO 30(b)(6) Deposition, at 61:15-62:1.

6. The Sheriff did not adopt and implement a policy directing guards and supervisors on how to clean and sanitize the holding cells. Doc. 238-7, STPSO 30(b)(6) Deposition, at 69:3-70:25, 73:4-11.

7. The Sheriff did not adopt and implement a policy directing guards on what to do if a pretrial detainee claims he was taking prescription medication prior to being detained. Doc. 238-7, STPSO 30(b)(6) Deposition, at 92:5-15.

8. The Sheriff did not adopt and implement a policy directing guards when a pretrial detainee is to be referred to medical for medical processing. Doc. 238-7, STPSO 30(b)(6) Deposition, at 100:21-101:8.

9. The Sheriff did not adopt and implement a policy directing what bedding, if any, is to be provided to a pretrial detainee in holding. Doc. 238-7, STPSO 30(b)(6) Deposition, at 105:9-16.

10. The Sheriff did not adopt and implement a policy or process for guards to file complaints regarding jail conditions or operations. Doc. 238-7, STPSO 30(b)(6) Deposition, at 178:14-20.

11. STPJ has four 12x22 holding cells. Doc. 238-7, STPSO 30(b)(6) Deposition, at 17:18- 25.

12. Each holding cell has two flat concrete benches, with no padding, and a concrete floor. Doc. 238-7, STPSO 30(b)(6) Deposition, at 18:21-19:20.

13. On the back wall close to the ceiling – not at eye level – each holding cell has a small narrow window to the outside that does not open. Doc. 238-7, STPSO 30(b)(6) Deposition, at 22:24-23:16.

14. There is no fresh air from outside the facility that enters the holding cells. Doc. 238-7, STPSO 30(b)(6) Deposition, at 26:16-27:9.

15. A holding cell is designed for temporary housing. Doc. 238-7, STPSO 30(b)(6) Deposition, at 15:1-12.

16. The holdings cells were not designed to house detainees for more than a couple of days. Doc. 238-7, STPSO 30(b)(6) Deposition, at 111:3-12.

17. STPJ admits that because the Sheriff did not adopt and implement a holding cell policy, guards were left to simply figure out how and for what purpose to use the holding cells. Doc. 238-7, STPSO 30(b)(6) Deposition, at 34:24-35:4.

18. STPJ admits that because the Sheriff did not adopt and implement a holding cell

policy, “temporary” housing could last a year, because “temporary” was not defined for the staff. Doc. 238-7, STPSO 30(b)(6) Deposition, at 39:8-40:1.

19. STPJ admits that the Fire Marshal sets the maximum capacity for fire safety but not for the intended use. Doc. 238-7, STPSO 30(b)(6) Deposition, at 43:5-11.

20. STPJ admits that it is for the agency to determine if based on the intended use for the space, occupying the space to maximum capacity is appropriate. Doc. 238-7, STPSO 30(b)(6) Deposition, at 43:12-16.

21. STPJ admits that the Fire Marshal set the maximum capacity in the holding cells at 20 per cell. Doc. 238-7, STPSO 30(b)(6) Deposition, at 43:17-44:1.

22. STPJ admits that there were times when more than 20 pretrial detainees were housed in a single holding cell. Doc. 238-7, STPSO 30(b)(6) Deposition, at 85:14-16.

23. While STPJ tracks the total number of inmates in holding daily, STPJ does not track the number of detainees in each of the four holding cells; as such, STPJ does not have any evidence to rebut the Plaintiffs’ claims in this regard. Doc. 238-7, STPSO 30(b)(6) Deposition, at 78:25-79:8; 87:13-24.

24. STPJ admits that it knowingly filled holding cells to a capacity that exceeded the capacity that the Fire Marshal deemed to be safe. Doc. 238-7, STPSO 30(b)(6) Deposition, at 45:24-47:20.

25. STPJ admits that there were probably times when after the Fire Marshal told them to reduce capacity because of overcrowding, after the Fire Marshal left, STPJ still did not comply. Doc. 238-7, STPSO 30(b)(6) Deposition, at 45:13-23.

26. STPJ admits that the Sheriff could have declined to accept DOC or federal inmates or returned them to their respective agencies to comply with the Fire Marshal’s capacity limitation,

but STPJ never did so. Doc. 238-7, STPSO 30(b)(6) Deposition, at 51:20- 53:22.

27. STPJ admits that when it exceeded capacity, the more inmates that were housed in a single cell increased the risk of health problems, increased the risk of fights, andincreased the fire danger but engaged in the practice anyway. Doc. 238-7, STPSO 30(b)(6) Deposition, at 56:17-57:9.

28. STPJ admits that there could be a day when there were 114 open beds but only 11 of the open beds would be given to Parish pretrial detainees. Doc. 238-7, STPSO 30(b)(6) Deposition, at 81:20-25.

29. STPJ admits that even if the DOC and federal housing units were completely empty, there is no scenario wherein a pretrial detainee would be moved from holding into one of those units unless the detainee happened to be sentenced that day to a state or federal sentence. Doc. 238-7, STPSO 30(b)(6) Deposition, at 165:14-25.

30. STPJ admits that there was no penological interest that precluded pretrial detainees from being transferred to open beds in the DOC or federal housing units. Doc. 238-7, STPSO 30(b)(6) Deposition, at 81:4-9.

31. STPJ admits that because the Sheriff did not adopt and implement a policy directing guards and supervisors on how to clean and sanitize the holding cells, STPJ has no idea if the holding cells were ever cleaned or sanitized to Department of Health Standards. Doc. 238-7 STPSO 30(b)(6) Deposition, at 72:11-76:13.

32. Pretrial detainees in the holding cells must sleep on the concrete benches or the concrete floor. Doc. 238-7, STPSO 30(b)(6) Deposition, at 30:15-21.

33. STPJ admits that it has no evidence to rebut a claim that pretrial detainees slept on the holding cell floor with urine. Doc. 238-7, STPSO 30(b)(6) Deposition, at 87:25-88:4.

34. STPJ admits that its own policy directs that "The STPSO Jail facility shall provide adequate bedding and linen, including a clean mattress with integrated pillow." Doc. 238- 7, STPSO 30(b)(6) Deposition, at 105:25-106:4.

35. STPJ admits that bedding is provided to inmates because it is a "reasonable necessity." Doc. 238-7, STPSO 30(b)(6) Deposition, at 109:7-21.

36. STPJ admits that its policy does not exclude pretrial detainees in the holding cells from the bedding policy but a practice developed to exclude them. Doc. 238-7, STPSO 30(b)(6) Deposition, at 106:11-107:11.

37. In holding, pretrial detainees are only provided with a blanket at night– no pad, linens, or pillow. Doc. 238-7, STPSO 30(b)(6) Deposition, at 32:2-17, 105:9-13.

38. In general population, the lights turn off at 10:30 PM and turn back on at 6:00 AM, "so they [inmates] can rest and recoup for the next day" because STPJ understands that inmates need time daily to sleep. Doc. 238-7, STPSO 30(b)(6) Deposition, at 28:25-30:3.

39. STPJ admits that the lights turn off at night in general population because STPJ concluded that darkness to sleep is a necessity. Doc. 238-7, STPSO 30(b)(6) Deposition, at 110:17-111:24.

40. In the holding cells, however, the lights are left on 24/7, so pretrial detainees have to sleep with the light on. Doc. 238-7, STPSO 30(b)(6) Deposition, at 24:18-25:7.

41. With the lights on, the inside of the holding cell is bright, like an office. Doc. 238-7, STPSO 30(b)(6) Deposition, at 24:13-17.

42. STPJ admits that pretrial detainees in holding are not provided with opportunities for exercise or recreation. Doc. 238-7, STPSO 30(b)(6) Deposition, at 123:8-18.

43. STPJ admits that because the Sheriff did not adopt and implement a policy directing

the amount of toilet paper to be provided in a holding cell, guards were free to handle the issue however they wanted. Doc. 238-7, STPSO 30(b)(6) Deposition, at 120:9-121:22.

44. STPJ admits that because the Sheriff did not adopt and implement a shower policy, guards could not be disciplined for failing to provide showers. Doc. 238-7, STPSO 30(b)(6) Deposition, at 62:19-63:7.

45. In 2019-2020, the hierarchy in the STPSO was the following: sheriff, deputy chief, chief, major (also warden of STPJ), captain, lieutenant, sergeant, corporal, and deputy. O'Keefe Deposition, attached hereto as Exhibit 2, at 10:5-16; 19:14-20; 21:6-8.

**B. Randy Smith: Sheriff 2019 and 2020**

46. In 2019 and 2020, Randy Smith, was employed by STPSO, as the elected Sheriff, in charge of the St. Tammany Parish Sheriff's Office. Doc. 238-10, Smith Deposition, at 8:22-9:11.

47. In his capacity as Sheriff, Smith is also the supervisor of the St. Tammany Parish Jail (STPJ) – "the caretaker of that jail" – which houses approximately 1,200. Doc. 238-10, Smith Deposition, at 8:22-10:6.

48. The Sheriff is the final policymaker at the jail. Longino Deposition, attached hereto as Exhibit 1, at 34:1-4.

49. The authority with respect to the care, custody, and control of inmates in the Parish resides with the Sheriff. Doc. 296-3, Longino Deposition, Exhibit 1, at 35:10-13.

50. How the jail is operated, how many pretrial detainees are housed in a holding cell, and how many inmates are housed in other areas of the jail is ultimately the Sheriff's decision. Doc. 296-3, Longino Deposition, Exhibit 1, at 35:23-36:2.

51. The Sheriff's predecessor recognized that overcrowding was a regular problem in

STPJ and released inmates pursuant to a program that he implemented called, "Code 6." Doc. 296-3, Longino Deposition, Exhibit 1, at 57:7-59:15.

52. When the Sheriff was advised that he was not permitted to release inmates without court approval, the Code 6 program ended. Ex. 1, Longino Deposition at 58:2-75:15.

53. After the Code 6 program was terminated, he assigned an employee to keep the Commissioner informed of overcrowding issues in the holding cells, and if the Commissioner did not help to reduce the pretrial detainee population, the Chief Judge would be advised of the issue. Doc. 296-3, Longino Deposition, Exhibit 1, at 75:16-81:16.

54. The Sheriff ran into a jail funding issue when a sales tax that was up for renewal was not renewed by the taxpayers. Doc. 238-10, Smith Deposition, at 20:4-25.

55. The loss of the sales tax represented a $10 million loss in the Sheriff's $74 million budget. Doc. 238-10, Smith Deposition, at 39:25-40:10.

56. The decreased funding began in 2019.[1] Doc. 238-10, Smith Deposition, at 40:11-16.

57. Any deficit in STPJ's budget must be offset by funds from STPSO's general operating budget. Doc. 238-10, Smith Deposition, at 24:19-25:3.

58. The Sheriff testified that the funding from the Parish and taxes stays at the same level, whereas the cost to house inmates has increased. Doc. 238-10, Smith Deposition, at 28:10-14.

59. The Sheriff presented at his deposition having not read the federal complaints that are the subject of the instant litigation, and not knowing what has been alleged. Doc. 238-10, Smith Deposition, at 61:8-62:1.

---

[1] https://www.nola.com/news/northshore/st-tammany-parish-ponders-budget-cuts-after- tax-defeats/article_a1ea946b-d184-5878-ae9b-a67b78eeb07f.html

60. The Sheriff did not initiate an internal affairs investigation regarding the allegations stated in the lawsuits. Doc. 238-10, Smith Deposition, at 62:6-9.

61. The Sheriff presented at his deposition with the belief that the only complaint was about overcrowding. Doc. 238-10, Smith Deposition, at 64:19-65:11.

62. The Sheriff admits that he is required by law to house St. Tammany Parish pretrial detainees, but he is not required by law to house state or federal inmates. Doc. 238-10, Smith Deposition, at 11:14-25.

63. The Sheriff admits that state and federal inmates are housed at STPJ pursuant to contract. Doc. 238-10, Smith Deposition, at 12:14-23.

64. The Sheriff admits that STPJ houses state and federal inmates in exchange for money. Doc. 238-10, Smith Deposition, at 18:20-24.

65. The state also funds a $3 million early release program, which permits the STPJ to house related DOC inmates. Doc. 238-10, Smith Deposition, at 38:8-39:5.

66. Revenue from the state and federal contracts funds a portion of the STPJ budget. Doc. 238-10, Smith Deposition, at 24:6-18.

67. Importantly, the Sheriff explained that it's the number of state and federal inmates housed per year, *not the per day cost per inmate,* that determines if housing state and federal inmates is profitable. Doc. 238-10, Smith Deposition, at 25:9-27:3.

68. The Sheriff admits that to increase revenue he had two options: sue the Parish or increase the number of DOC and federal inmates housed at STPJ. Doc. 238-10, Smith Deposition, at 28:15-18.

69. The Sheriff admits that the following are policy-making decisions: how to fund the budget, cutting overtime, entering into or continuing DOC or federal contracts, and what services

to provide in the STPJ. Doc. 238-10, Smith Deposition, at 42:7-43:2.

70. The Sheriff admits that entering into and continuing the state and federal contracts was a policy decision. Doc. 238-10, Smith Deposition, at 18:9-19.

71. The Sheriff admits that like other government agencies have done, he could have sued St. Tammany Parish to obtain necessary funding, but he did not do so. Doc. 238-10, Smith Deposition, at 21:7-22.

72. Despite any claimed funding issue, in the fiscal years starting in July of 2018, and July of 2019, the Sheriff provided raises to all employees. Doc. 296-5, Exhibit 3, STPSO Statement.

73. The Sheriff operates STPJ and presented at his deposition having never heard of Title 22. Doc. 238-10, Smith Deposition, at 49:11-13.

74. The Sheriff admits that as Sheriff, he should know but does not know if (a) pretrial detainees received recreation time, (b) more than 20 detainees were held in a holding cell,

75. (c) pretrial detainees were held in holding in excess of 48 hours, and (d) bedding was provided. Doc. 238-10, Smith Deposition, at 81:1-86:5.

76. The Sheriff admits that because the allegations in the lawsuits were not investigated, he does not know if the allegations have merit, and if they do, whether the conduct occurred for a punitive reason or for a legitimate business reason. Doc. 238-10, Smith Deposition, at 128:22-146:20.

77. The Sheriff admits that he reviews the Count Sheets on a regular basis, at least weekly. Doc. 238-10, Smith Deposition, at 66:17-67:9.

78. The Sheriff admits that overcrowding presents a safety issue. Doc. 238-10, Smith Deposition, at 110:9-15.

79. But the Sheriff does not know what capacity constitutes overcrowding in the holding cells. Doc. 238-10, Smith Deposition, at 67:18-68:4.

80. The Sheriff admits that per his policy, at no time – even to eliminate overcrowding in the holding cells – is a pre-trial detainee transferred to an open DOC or federal bed. Doc. 238-10, Smith Deposition, at 90:3-91:23.

81. The following notable exchanges and admissions occurred during the Sheriff Randy Smith's deposition:

**Doc. 238-10, Smith Deposition at 74:5 to 75:25**

**74**

Q. Did you ever come to learn that inmates were sleeping on the floor where there was urine?
A. No.
Q. Did you ever come to learn that up to 20 inmates and sometimes more were in the holding cells and only taken out for showers?
A. No.
Q. Did you ever come to learn that inmates were sleeping on the floor because there was no other room to sleep?
A. Alleged.
Q. Well, it's on video. Did you know that?
A. No.
Q. It's on video, sir. Maybe --
A. I don't know how many were in the cell at the time the video was taken.
Q. Okay.
A. But alleged, yes, there were people -- the people in holding sleep on the floor and

75

on the benches that are in there.
Q. Did you know that these inmates were sleeping on cement --
A. Yes.
Q. -- for up to two weeks?
A. No.
Q. Did you know that these inmates were in a cell eating in the cell where they had --

some of them reported feces, blood, vomit, and urine on the floor?

A. I'm not aware of that, no, sir.
Q. Does that concern you?
A. It concerns me, yes.
Q. Why is that?
A. Because it's alleged, and I just -- I don't see it happening.
Q. If it happened, does that concern you?
A. Yes.
Q. And if it happened, why would that concern you?
A. Because it's not humane --
Q. Exactly. So --
A. -- and would be a violation on what we do there, what we're obligated to do there.

**Doc. 238-10, Smith Deposition at 78:8 to 78:20**

**78**

Q. What is the purpose of a holding cell as opposed to a general population cell?
A. A holding cell is temporary.
Q. And how long is temporary?
A. 48 hours.
Q. So if there's an inmate in a holding cell for more than 48 hours, it's your understanding that you have now exceeded the purpose of a holding cell?
MR. COLLINGS:
Object to the form.
THE WITNESS:
Yes.

**Doc. 238-10, Smith Deposition at 115:16 to 116:17**

**115**

Q. How long would it be okay for an inmate to lay on a floor, sleep on a floor with urine?
MR. COLLINGS:
Object to the form.
BY MR. JACOB:
Q. How many hours?
MR. COLLINGS:
Object to the form.
THE WITNESS:

**116**

For me?
BY MR. JACOB:
Q. Yes.
A. None.
Q. Why?
A. That's inhumane. I don't -- I wouldn't want that.
Q. Okay. You wouldn't want that for yourself?
A. No. For anyone.
Q. Okay. So you agree --
A. I've never heard of that.
Q. Okay. So you agree with me, though, that if an inmate is forced to sleep on a floor that has bodily fluids on it, that that would be inhumane even if it's for a few hours?
A. Yes.

## C. Gregory C. Longino: Deputy Chief of Corrections in 2019

82.In 2019, Gregory C. Longino, was employed by STPSO, as a Deputy Chief in Corrections, answering to the Sheriff. Doc. 296-3, Longino Deposition, Exhibit 1, at 11:12-17, 17:13-14.

83.Longino has heard the STPJ referred to as "St. Slammany." Doc. 296-3, Longino Deposition, Exhibit 1, at 118:22-24.

84.Longino testified that the Parish underfunded the jail with respect to the housing of pretrial detainees. Doc. 296-3, Longino Deposition, Exhibit 1, at 27:1-8.

85.STPJ received more money from housing DOC and federal inmates than it did housing pretrial detainees. Doc. 296-3, Longino Deposition, Exhibit 1, at 118:2-20.

86.Holding cells are not designed for long-term housing. Doc. 296-3, Longino Deposition, Exhibit 1, at 86:9- 13.

87.The purpose of a holding cell is to house a pretrial detainee until they are assigned to a permanent housing unit. Doc. 296-3, Longino Deposition, Exhibit 1, at 81:20-23.

88.Holding cells have concrete benches while the cells in the long term housing units have

89. actual beds that include a mattress, sheets, blankets, and a pillow. Doc. 296-3, Longino Deposition, Exhibit 1, at 83:13-84:1.

90.The DOC standard to provide a bed and bedding to general population pretrial detainees was adopted as a jail policy. Doc. 296-3, Longino Deposition, Exhibit 1, at 90:20-91:5, 95:3-7.

91.Longino understood that the Louisiana Administrative Code provided that a pretrial detainee must be moved from a holding cell to a general population bed within 48 hours. Doc. 296-3, Longino Deposition, Exhibit 1, at 96:22-98:9.

92.Longino understood that it was a law that needed to be followed. Doc. 296-3, Longino Deposition, Exhibit 1, at 98:23-25.

93.Longino admits that in 2019, STPSO did not follow the law that limited the time that a pretrial detainee is permitted to be housed in a holding cell to 48 hours. Doc. 296-3, Longino Deposition, Exhibit 1, at 99:1-5.

94.Longino testified that in 2019, the STPSO did not have a policy directing how long a pretrial detainee was permitted to be housed in a holding cell. Doc. 296-3, Longino Deposition, Exhibit 1, at 83:7-12.

95.Rather, Longino testified that the length of time that a pretrial detainee would remain in a holding cell would be determined by if they bonded out, if the court released them, or if they were going to serve a sentence of incarceration. Doc. 296-3, Longino Deposition, Exhibit 1, at 81:24-82:6.

96.Longino admits that overcrowding is a serious issue at STPJ and that it had been an ongoing issue since the 1990s. Doc. 296-3, Longino Deposition, Exhibit 1, at 55:18-57:5.

97.The maximum number of pretrial detainees permitted in the holding cells is 20 per cell

for a total of 80. Doc. 296-3, Longino Deposition, Exhibit 1, at 52:9-16.

98.Longino admits that the maximum capacity numbers were exceeded. Doc. 296-3, Longino Deposition, Exhibit 1, at 52:17-21.Longino admits that there were times that the holding cells were above the capacity that the Fire Marshal determined to be safe. Doc. 296-3, Longino Deposition, Exhibit 1, at 133:16-22.

99.Longino admits that in 2019, the practice in the STPJ was that pretrial detainees would remain in holding in excess of 48 hours – sleeping on concrete with only a blanket – even if there were empty beds in the DOC and/or federal housing units. Doc. 296-3, Longino Deposition, Exhibit 1, at 102:15 to 103:2.

100. Longino admits that in 2019, the practice in the STPJ was that overcrowding in the holding cells could continue even if it was possible to alleviate it by moving pretrial detainees into empty beds in the DOC and federal housing units. Doc. 296-3, Longino Deposition, Exhibit 1, at 103:4-12.

101. Longino admits that when the holding cells exceed capacity, it is necessary for pretrial detainees to sleep on the floor. Doc. 296-3, Longino Deposition, Exhibit 1, at 105:1-5.

102. Longino admits that overcrowded holding cells became dirtier than non-overcrowded cells but the frequency of cleaning the cells remained the same. Doc. 296-3, Longino Deposition, Exhibit 1, at 110:21-111:22.

103. Longino admits that in the holding cells, at times there was urine, feces, vomit, and blood, on the floors. Doc. 296-3, Longino Deposition, Exhibit 1, at 112:20-113:6.

104. Longino has no evidence to refute the Plaintiffs' claims that the holding cells were not cleaned or sanitized when there was urine, feces, vomit, and blood, on the floors. Doc. 296-3, Longino Deposition, Exhibit 1, at 116:1-10.

105. Longino admits that in 2019, STPJ did not have a policy or practice that required a holding cell to be emptied, mopped, and disinfected, immediately when there was urine, feces, vomit, and blood, on the floors. Doc. 296-3, Longino Deposition, Exhibit 1, at 115:1-118:1.

106. Longino admits that he has seen toilet paper on holding cell walls and ceilings. Doc. 296-3, Longino Deposition, Exhibit 1, at 111:23-112:1.

107. Unlike the lights in the general population housing units that turn off so that inmates can sleep, the lights in the holding cells do not turn off. Doc. 296-3, Longino Deposition, Exhibit 1, at 105:6- 107:17.

108. Longino admits that he knew that there were state regulations governing inmate recreation and access to fresh air that were not being followed with respect to pretrial detainees. Doc. 296-3, Longino Deposition, Exhibit 1, at 138:15-139:16.

109. Longino admits that no penological interest is served by not providing recreation time to pretrial detainees who were housed in the holding cells. Doc. 296-3, Longino Deposition, Exhibit 1, at 138:3-6.

110. The STPJ record keeping system, however, placed grievances in inmate files, so unless every inmate file is searched for a particular type of complaint, there was no way for the Sheriff or others to determine if there was a pattern of complaints developing about any particular issue. Doc. 296-3, Longino Deposition, Exhibit 1, at 127:9-133:14.

111. Regardless, Longino admits that pretrial detainees complained about guards not providing requested items in a timely manner. Doc. 296-3, Longino Deposition, Exhibit 1, at 125:2-19.

112. Longino admits that only one roll of toilet paper was provided to a holding cell at a time. Doc. 296-3, Longino Deposition, Exhibit 1, at 124:1-7.

113. Longino testified that a practice issue, not a lack of resources, is why pretrial detainees were not moved from holding cells to available DOC and federal beds. Doc. 296-3, Longino Deposition, Exhibit 1, at 157:12-160:1.

114. Longino testified that to alleviate overcrowding in the holding cells, the Sheriff or he could have moved pretrial detainees into available federal or DOC beds but that they chose not to do so. Doc. 296-3, Longino Deposition, Exhibit 1, at 36:3-21, 101:15-102:7.

115. Longino admits that had pretrial detainees been moved to DOC or federal housing units, they would have had no overcrowding, beds, lights out for sleeping, and recreation time. Doc. 296-3, Longino Deposition, Exhibit 1, at 141:1-142:1.

116. Longino admits that no penological interest was served by holding a pretrial detainee in an overcrowded holding cell when a bed is available in the DOC and/or federal housing units. Doc. 296-3, Longino Deposition, Exhibit 1, at 104:4-17.

117. Like the Sheriff, Longino admits that no one should have to live in the conditions present in the holding cells for the length of time that pretrial detainees were being forced to endure, stating "I don't think nobody should. Not just detainees." Doc. 296-3, Longino Deposition, Exhibit 1, at 143:3-7.

118. Longino admits that at times, he felt that the living conditions that pretrial detainees were subjected to was just wrong. Doc. 296-3, Longino Deposition, Exhibit 1, at 145:4-12.

**D. <u>Richard S. O'Keefe, Jr.: Captain 2019</u>**

119. In 2019, Richard S. O'Keefe, Jr., was employed by STPSO, as a Captain in Corrections, in charge of booking. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 12:5-15.

120. O'Keefe does not know if the Eighth or Fourteenth Amendments govern pretrial detainees, and does not know whether pretrial detainees enjoy greater rights than sentenced

inmates. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 77:1-78:2.

121. O'Keefe does not know if there are state or federal laws that govern the conditions of confinement for pretrial detainees. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 34:10-15.

122. O'Keefe does not know if there are state or federal standards or operating procedures that govern the conditions of confinement for pretrial detainees. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 34:16-21.

123. O'Keefe does not believe that there were rules or regulations that governed holding. Ex.2, O'Keefe Deposition, at 29:10-16.

124. O'Keefe does not know if policies governed holding and he does not recall ever reading one. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 28:16-24.

125. O'Keefe is not aware of any jail standard or law that governed the length of time that a person is permitted to be housed in a holding cell. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 23:20- 22.

126. O'Keefe testified that he does not believe that in 2019, STPJ had a policy or restriction that governed the length of time that a pretrial detainee was permitted to be housed in a holding cell. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 23:23-24:5.

127. O'Keefe never asked his subordinates if STPJ was in compliance with state and federal law. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 80:4-16.

128. O'Keefe regularly went into the control area, where he could observe the conditions of the holding cells. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 15:10-16:9.

129. O'Keefe admits that a holding cell is designed for short-term confinement. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 25:18-26:2.

130. O'Keefe, however, cannot define short-term and is not aware of a jail standard

that governs the issue. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 26:9-24.

131. In holding, an alleged murderer would be housed in the same cell as a scofflaw for parking tickets. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 46:23 to 47:12.O'Keefe admits that he received daily "counts" regarding the number of persons in holding – that "I saw the numbers." Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 22:13-23.

132. Other than the Fire Marshal's 20 person per holding cell capacity limit, O'Keefe is not aware of any jail standard or law that governed the issue. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 24:15-19.

133. O'Keefe admits that he would have known from the "count sheets" that he received regularly, if not daily, if there were open beds in the DOC or federal housing units at the same time there were pretrial detainees in holding waiting for a bed. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 56:3-18.

134. O'Keefe never directed that pretrial detainees should be moved from holding to available beds in the DOC or federal housing units. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 56:19-23.

135. O'Keefe admits that there were times that there were over 20 pretrial detainees in a holding cell when there were open beds in the DOC and/or federal housing units. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 57:25-58:15.

136. O'Keefe admits that regardless of the conditions of confinement, the practice that he was aware of and did not try to change was that pretrial detainees would not be moved to an available bed in the DOC or federal housing units. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 85:9- 87:24.

137. O'Keefe admits that pretrial detainees did not get moved from holding into open

beds in the DOC or federal housing units because of STPJ policy and practice, not because of a staffing or manpower issue. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 58:23-60:1, 97:9-14, 101:14- 18.

138. O'Keefe does not know if there is a state regulation that governs whether pretrial detainees must be provided with bedding. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 33:11-14.

139. O'Keefe never directed that pretrial detainees in holding should be provided with bedding and cannot explain why he did not do so. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 32:21-33:10.

140. O'Keefe admits that "two weeks seems like a long time" to be sleeping on concrete. Ex.2, O'Keefe Deposition, at 65:15-21.

141. O'Keefe does not know if detainees were provided with items to clean their hands before eating. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 49:19-21.

142. O'Keefe admits that detainees in holding were not provided with recreation time. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 49:22-50:1.

143. O'Keefe reviewed the lawsuits, and as the supervisor in holding during the relevant time, has no evidence to rebut any of the Plaintiffs' claims, including that pretrial detainees were forced to sleep on floors covered in feces, urine, vomit, and blood, for up to two weeks. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 80:19-83:20.

144. If there was a complaint received from staff regarding how holding was being operated, there was no process in place to address the complaint, and the complaint would not be logged anywhere. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 41:5-42:16.

145. O'Keefe admits that based on how the grievance system was designed, there was

no way for him to track if a pattern of complaints was developing about any particular guard. Doc. 296-4, O'Keefe Deposition, Exhibit 2, at 44:10-17.

**E. <u>Lacey Joi Kelly Robinson: Major/Warden: 2019 and 2020</u>**

146. In 2019 and 2020, Lacey Joi Kelly Robinson was employed by STPSO, as a Major/Warden, in charge of the corrections division. Doc. 234-8, STPSO 30(b)(6) Deposition, at 9:13-19.

147. Robinson was aware of the overcrowding issue in the holding cells and notified Longino of same. Doc. 238-7, STPSO 30(b)(6) Deposition, at 167:25-170:3.

148. Despite knowing that empty beds existed in the DOC and/or federal housing units, Robinson did not transfer pretrial detainees from holding into the open beds. Doc. 238- 7, STPSO 30(b)(6) Deposition, at 167:25-170:3.

149. Robinson testified that with the exception of her believing that the pretrial detainees received all necessities, she adopted the answers provided by the STPJ during its deposition as her own. Doc. 238-7, STPSO 30(b)(6) Deposition, at 183:21-184:20.

150. Sheriff Smith testified that "80-plus percent of the individuals we bring in are under some type of alcohol or illegal narcotic or both," and that those people are housed in the holding cells. Doc. 238-10, Smith Deposition, at 59:1-8.

151. Defendant Smith testified that he has no idea when the holding cells are above capacity, as he relies on the Fire Marshal to make that determination. Doc. 238-10, Smith Deposition, at 68:2-69:7.

**F. <u>Kevin Terry Matthew Hall, Jr.'s Incarceration</u>**

152. On October 18, 2019, Mr. Terry Matthew Hall, Jr. was housed in Male Holding Cell 1 (hereinafter referred to as MH1). See Dkt. 236-6, Inmate Movement Report.

153. For the entirety of Mr. Hall's confinement at STPJ he was held in MH1. See Doc.

236-5, Hall Deposition, at 20:3-9.

154. At various times the holding cell which Mr. Hall was housed in contained between fifteen and thirty other inmates. See Doc. 236-5, Hall Deposition, at 20:20-25; Doc. 294-6, Exhibit 4, Hall Declaration, at ¶¶ 6, 8.

155. The holding cell was approximately ten feet by twenty feet, contained two benches, contained no beds or mats, had one exposed toilet, and was kept at an uncomfortably cold temperature. See Doc. 294-6, Exhibit 4, Hall Declaration, at ¶¶ 5, 10, 11; Doc. 236-5, Hall Deposition, at 25:14-19.

156. Inmates, including Mr. Hall, were required to sleep on a cement bench, and sometimes cement floor, where they would use their shoes or toilet paper rolls as pillows because they were not provided with a pillow or mat. See Doc. 236-5, Hall Deposition, at 25:2- 14, Doc. 294-6, Exhibit 4, Hall Declaration, at ¶ 25.

157. Sleeping on cement for 15 days straight caused Mr. Hall to have significant back pain. See Doc. 236-5, Hall Deposition, at 29:5-8.

158. The toilets were dirty because detainees frequently urinated on and around them, the urine would spread throughout the entire holding unit as inmates walked through the urine when using or walking near the toilet. See Doc. 236-5, Hall Deposition, at 32:3-16, 33:2-10.

159. Due to the number of individuals held in the cell, Mr. Hall and other inmates would at times be required to sleep on this cement floor where urine had spread because there was not enough room on the cement bench intended for them to sleep on. See Doc. 236-5, Hall Deposition, at 22:11-14, 25:2-8, 33:11-24; Doc. 294-6, Exhibit 4, Hall Declaration, at ¶ 21.

160. Alongside urine, at times Plaintiff Hall and other inmates were also surrounded by old food when they were required to sleep on the ground because staff failed to clean the cell

promptly or provide cleaning cells for the inmates to clean any spills from meals. See Doc. 236-5, Hall Deposition, at 26:1-6, 34:18-24.

161. Despite these conditions, STPJ staff only cleaned one to two times a week during Mr. Hall's confinement. See Doc. 236-5, Hall Deposition, at 26:12-15, 35:14-16.

162. Alongside the smell of urine, the cell also smelled of intense human body odor as inmates were not able to shower more than once or twice a week, and STPJ staff did not promptly provide deodorant. See Doc. 236-5, Hall Deposition, at 35:1-6, 42:2-11.

163. During his entire 15-day confinement at STPJ, Mr. Hall was only allowed to shower a total of three times. See Doc. 236-5, Hall Deposition, at 21:8-15, 23:7-10, 23:11-13, 38:10-13; Doc. 294-6, Exhibit 4, Hall Declaration, at ¶¶ 29, 31.

164. Mr. Hall was only given clean clothes when he took a shower, which was a total of three times. See Doc. 236-5, Hall Deposition, at 21:8-15, 23:7-10, 23:11-13, 38:10-13; Doc. 294-6, Exhibit 4, Hall Declaration, at ¶¶ 29, 31.

165. Mr. Hall was only permitted to leave the holding cell to take a shower, meaning he was permitted to leave his cell a total of three times. See Doc. 236-5, Hall Deposition, at 20:6- 9, 23:7-10, 30:15-20, 37:4-7; Doc. 294-6, Exhibit 4, Hall Declaration, at ¶¶ 36, 37.

166. Mr. Hall was never permitted to leave the cell to engage in physical activity or recreation. See Doc. 236-5, Hall Deposition, at 37:4-7

167. At times, it took up to 10 hours for Mr. Hall and other inmates to receive supplies such as deodorant, toilet paper, and toothbrushes as Mr. Hall would have to ask guards all day to provide such supplies. See Doc. 236-5, Hall Deposition, at 24:13-23, 25:12-14, 42:2- 11; Doc. 294-6, Exhibit 4, Hall Declaration, at ¶¶ 14, 15, 18.

168. The combined conditions of filthy living quarters, the inability to shower

frequently, and the inability to attain other hygiene products resulted in Mr. Hall developing what he believed to be gangrene on his feet. See Doc. 236-5, Hall Deposition, at 27:13-22.

169. Mr. Hall did not see a nurse or doctor to evaluate his gangrene condition while he was confined at STPJ. See Doc. 236-5, Hall Deposition, at 26:16-23.

170. Mr. Hall and other inmates were subjected to frigid temperatures during their confinement, which resulted in inmates keeping their hands inside of their jumpers to keep them warm and using toilet paper to block the vents in causing the temperatures. See Doc. 236-5, Hall Deposition, at 25:14-19, 35:7-13; Doc. 294-6, Exhibit 4, Hall Declaration, at ¶¶ 10, 20.

171. Despite these uncomfortable temperatures Mr. Hill did not receive a blanket for at least two nights of his confinement, and when handed out, the blankets were sometimes torn up or not large enough to cover an inmate's entire body. See D Doc. 236-5, Hall Deposition, at 23:14-17, 36:8-11, 37:12-22; Doc. 294-6, Exhibit 4, Hall Declaration, at ¶ 27.

172. During Mr. Hall's confinement, when inmates got into arguments with STPJ guards they would punish all the inmates in the cell by withholding blankets. See Doc. 236-5, Hall Deposition, at 36:12-25, 37:1-3, 41:21-24; Doc. 294-6, Exhibit 4, Hall Declaration, at ¶ 26.

173. Mr. Hall and other detainees would try to convince the detainees in the cells to "calm down" because they needed the blankets to sleep. Doc. 236-5, Hall Deposition, at 41:18-24.

174. STPJ guards would make fun of inmates and the disgusting living conditions they were being subjected to. See Doc. 294-6, Exhibit 4, Hall Declaration, at ¶¶ 34, 35.

175. Spending 15 days in a windowless cell with dozens of other adult men, with no forms of recreation, no opportunities to leave the holding cell, an inability to shower frequently, and forced to sleep in unhygienic and filthy conditions caused Mr. Hill significant emotional

distress. Doc. 236-5, Hall Deposition, at 38:18-25, 39:1-16, 40:1-11, 43:2-5.

176. Mr. Hall went to urgent care a day or two after he was released from STPJ. Doc. 236-5, Hall Deposition, at 26:24-27:12.

177. While at urgent care, Mr. Hall was told that he had gangrene and was given ointment and antibiotics for his foot condition, which cleared up in approximately two weeks. Doc. 236-5, Hall Deposition, at 28:1-14.

178. Mr. Hall was also given a steroid shot after the doctor was informed that Mr. Hall had just been released from STPJ. Doc. 236-5, Hall Deposition, at 28:1-14.

179. STPJ guards verbally threatened to worsen the conditions by, for example, not providing blankets, as a means of controlling detainees' behavior when detainees would request help from the guards. Doc. 236-5, Hall Deposition, at 40:13-41:15.

180. For the first few weeks after his release, Mr. Hall yelled things in his sleep that indicated he thought he was still inside the jail, such as "y'all be quiet." Doc. 236-5, Hall Deposition, at 28:1.

**G. <u>Daniel Fleishman: Warden: 2021 through 2024</u>**

181. From February 22, 2021, through the date of his deposition March 21, 2024, Daniel Fleishman served as the Warden of STPJ. Doc. 388-9, Fleishman Deposition, at p. 7:9-18.

182. Prior to February 22, 2001, Fleishman had no correctional experience and had not worked at the jail in any capacity. Doc. 388-9, Fleishman Deposition, at pp. 7:19-8:12.

183. While Fleishman attended the police academy, he did not attend the corrections academy. Doc. 388-9, Fleishman Deposition, at p. 9:9-20.

184. Fleishman testified that he did not attend the academy because "I don't deal with that part of corrections. . . . That's for the people that [sic] work day-to-day, hands-on, boots on

the ground, interact daily with inmates." Doc. 388-9, Fleishman Deposition, at p. 9:19-25.

185. In his capacity as Warden, Fleishman is responsible for supervising the supervisors who supervise the day-to-day correctional officers. Doc. 388-9, Fleishman Deposition, at p. 10:1-11.

186. Fleishman testified that he never reviewed the policy manual that was in effect during the time period relevant to the instant litigation. Doc. 388-9, Fleishman Deposition, at p. 14:4-10.

187. Fleishman testified that he has no knowledge regarding the policies or practices in effect at the jail during the years 2019 or 2020. Doc. 388-9, Fleishman Deposition, at p. 25:8-20.

188. Fleishman testified that because he has never investigated or reviewed the jail policies and practices in effect during the time period relevant to the instant litigation, he does not know if any policies or practices have since been implemented or revised. Doc. 388-9, Fleishman Deposition, at p. 16:4-22.

189. Fleishman testified that the only knowledge that he has regarding jail policies or practices relates only to the policies and practices in effect during the time that he has been the Warden. Doc. 388-9, Fleishman Deposition, at p. 16:4-25.

190. Fleishman testified that his entire deposition testimony only relates to the time that he held the rank of Warden. Doc. 388-9, Fleishman Deposition, at p. 107:6-10.

191. Fleishman testified that none of his deposition testimony relates to the period of time relevant to the instant litigation. Doc. 388-9, Fleishman Deposition, at p. 107:11-14.

192. Fleishman testified that "Until I became Warden in February 2021, I have no direct knowledge of anything that happened in there." Doc. 388-9, Fleishman Deposition, at p. 109:1-3.

193. Fleishman testified that if Plaintiff's claims are proven true, he has no knowledge

regarding why the Plaintiffs would have been treated in such a manner, i.e., for punitive or legitimate reasons. Doc. 388-9, Fleishman Deposition, at p. 109:4-10.

194. Fleishman testified that the contract in effect during the period of time relevant to the instant litigation was available to the defense expert, so he does not know why the defense expert only referenced an agreement signed in 1997 that is of no relevance to the instant litigation. Doc. 388-9, Fleishman Deposition, at pp. 109:11-110:7.

195. Fleishman testified that the contract during the relevant period of time referenced a per diem rate of $68 a day for federal inmates, and with 30 days notice, the contract could be terminated for any reason. Doc. 388-9, Fleishman Deposition, at p. 110:8-16.

196. Despite the fact that the Defendants' expert's opinions rely in large part on information received from Fleishman only, none of the information that Fleishman provided to the expert pertained to the time period relevant to the instant litigation. Doc. 388-9, Fleishman Deposition, at pp. 17:1-18:22.

197. Like the Sheriff, Fleishman has never investigated the Plaintiffs' allegations. Doc. 388-9, Fleishman Deposition, at pp. 19:24-20:3.

198. Fleishman testified that despite the instant litigation, the jail still does not have a policy that sets a limit regarding how long a pretrial detainee may be housed in a holding cell. Doc. 388-9, Fleishman Deposition, at p. 7-14.

199. Fleishman testified that he has no knowledge regarding any policy or practice in effect during the relevant period of time regarding inmate showers. Doc. 388-9, Fleishman Deposition, at pp. 22:19-23:23; 24:21-25:5; and 52:11-25.

200. Fleishman testified that he has no knowledge regarding whether during the relevant period of time, the holding cells were being sanitized in accordance with the Department of Health

Standards. Doc. 388-9, Fleishman Deposition, at p. 39:1-10.

201. Fleishman testified that he has no evidence to rebut any Plaintiffs' allegations regarding the failure to clean and sanitize the holding cells. Doc. 388-9, Fleishman Deposition, at pp. 23:24-28:10.

202. Fleishman testified that he has no knowledge regarding any policy or practice in effect during the relevant period of time instructing guards on what to do if a pretrial detainee claims that he is supposed to be taking prescription medication. Doc. 388-9, Fleishman Deposition, at pp. 28:11-30:16.

203. Fleishman testified that he does not know if the jail tracked the number of inmates in the holding cells daily during the years 2018-2020. Doc. 388-9, Fleishman Deposition, at pp. 33:24-34:21.

204. Fleishman testified that he has no knowledge or evidence to rebut any Plaintiffs' allegation regarding the number of inmates held daily in each holding cell. Doc. 388-9, Fleishman Deposition, at pp. 34:22-35:6.

205. Fleishman testified that the only information he possesses regarding whether jail exceeded the fire marshal's capacity limit during the years 2018-2020, and if so, for how long, would be from the fire marshal's reports. Doc. 388-9, Fleishman Deposition, at pp. 35:9-36:3.

206. Fleishman testified that it is a matter of common sense that the more inmates you house in a single holding cell the higher the risk of a health problem. Doc. 388-9, Fleishman Deposition, at pp. 36:4-38:2.

207. Fleishman testified that he has no evidence to rebut Plaintiffs' claims that there were inmates sleeping on floors covered in urine. Doc. 388-9, Fleishman Deposition, at p. 39:11-18.

208. Fleishman testified that it is his belief that pretrial detainees were not provided with bedding (as directed by policy). Doc. 388-9, Fleishman Deposition, at pp. 39:19-40:20.

209. Fleishman testified that he could not identify a penological interest furthered by withholding bedding from pretrial detainees. Doc. 388-9, Fleishman Deposition, at p. 40:21-41:10.

210. Fleishman testified that he believes that "penological interest" means "a detainment level in an institution, penal institution." Doc. 388-9, Fleishman Deposition, at pp. 40:25-41:4.

211. Fleishman testified that he could not identify a business reason in the corrections or security setting furthered by withholding bedding from pretrial detainees. Doc. 388-9, Fleishman Deposition, at p. 41:5-10.

212. Fleishman testified that the fire marshal sets a maximum capacity limit based on square footage, not on intended usage. Doc. 388-9, Fleishman Deposition, at pp. 42:11-43:10.

213. Fleishman testified that the Louisiana Department of Health and Hospitals sets a maximum capacity limit based on the intended use of the space. Doc. 388-9, Fleishman Deposition, at pp. 42:15-43:14.

214. Fleishman testified that because only the fire marshal responds to complaints, STPJ is only concerned with the fire marshal's maximum capacity limit. Doc. 388-9, Fleishman Deposition, at pp. 44:2-8.

215. Despite being Warden, Fleishman testified that he does not know what maximum capacity limit the Louisiana Department of Health and Hospitals set for each holding cell. Doc. 388-9, Fleishman Deposition, at pp. 44:9-13.

216. Fleishman testified that if the holding cell exceeds the maximum capacity limit set by the Louisiana Department of Health and Hospitals, STPJ does not consider the holding cell to be overcrowded. 388-9, Fleishman Deposition, at pp. 50:3-51:5.

217. Fleishman testified that for the relevant period of time, he has no knowledge or information regarding the jail's policies or practices regarding the issue of providing toilet paper to pretrial detainees. Doc. 388-9, Fleishman Deposition, at pp. 51:15-52:7.

218. Fleishman testified that the jail is not required by state or federal law to house state or federal law to house state or federal inmates. Doc. 388-9, Fleishman Deposition, at pp. 53:24-54:2.

219. Fleishman testified that it is misleading to try to determine profitability of the housing of state and federal inmates based on a "per day" cost. Doc. 388-9, Fleishman Deposition, at pp. 54:8-56:1.

220. Fleishman testified that the profitability of the state and federal housing contracts could only be correctly determined looking at the "per year" cost. Doc. 388-9, Fleishman Deposition, at p. 55:12-19.

221. Fleishman testified that there are only three ways for the Sheriff to increase revenue for the jail: (1) transfer money from the general budget to the jail budget, (2) sue the parish to require the parish to pay more for jail services, or (3) increase the number of DOC and federal inmates being housed at the facility. Doc. 388-9, Fleishman Deposition, at p. 57:8-25.

222. Fleishman testified that he does not know if during the relevant period of time, pretrial detainees were provided with recreation time. Doc. 388-9, Fleishman Deposition, at pp. 57:16-58:1.

223. Fleishman testified that regarding the holding cells being considered "temporary housing," temporary is intended to mean "a very short period of time." Doc. 388-9, Fleishman Deposition, at pp. 58:7-20.

224. Fleishman testified that in practice, "temporary" means until there is a pretrial bed

available. Doc. 388-9, Fleishman Deposition, at pp. 65:2- 66:6.

225. Fleishman testified that in determining if a pretrial bed is available, he excludes DOC and federal beds. Doc. 388-9, Fleishman Deposition, at pp. 65:19-22.

226. Fleishman testified that in his opinion as Warden, after the tax failed in 2018 and before he became Warden, the Parish underfunded STPJ. Doc. 388-9, Fleishman Deposition, at p. 72:20-25.

227. Fleishman testified that he walks through the jail regularly and checks for cleanliness, which includes looking at the walls and ceilings, and that he has never seen toilet paper stuck on the ceilings. Doc. 388-9, Fleishman Deposition, at pp. 74:15-75:13.

228. A *prescheduled* inspection of the holding cells conducted on February 20, 2023, *while Fleishman was Warden*, tells a very different story:





229. Fleishman testified that his understanding of what constitutes cruel and unusual punishment would be “public flogging, water boarding, or tying a person up to a hook on the ceiling,” not jail. Doc. 388-9, Fleishman Deposition, at pp. 77:7-24.

230. Fleishman testified that because of the housing contract for federal inmates, federal pretrial detainees who are not permitted to be mixed in with non-federal pretrial detainees, are separated in holding. Doc. 388-9, Fleishman Deposition, at pp. 81:5-24.

231. Fleishman testified that even if the jail has only one federal pretrial detainee and

the remaining holding cells are over capacity, the one federal detainee would have a holding cell to himself and the other three holding cells would remain over capacity. Doc. 388-9, Fleishman Deposition, at pp. 82:13-84:21.

**H. 1996 the U.S. District Court M.D.La. Settlement Agreement**

232. In 1996, the United States District Court for the Middle District of Louisiana approved a Settlement Agreement that ended over 20 years of Court supervision and consent decrees in almost all of Louisiana's jails and prisons.[2]

233. The Louisiana Department of Public Safety and Corrections (DPS&C) and local public entities are authorized by law to execute Cooperative Endeavor Agreements, whereby local entities agree to provide jail space **in excess of local needs** in exchange for the State's commitment to utilize a fixed percentage of the space.[3]

234. "This facilitates financing of new jail space when other options are not available and allows expansion of the number of beds **for local as well as state use**."[4]

235. As part of the Settlement, the State established a formal partnership with the Louisiana Sheriffs' Association (LSA) for the housing of DPS&C offenders.[5]

236. The DPS&C has the authority to establish minimum standards that each parish jail must follow in order to be permitted to house people in DPS&C's custody.[6]

237. The partners – DPS&C and LSA – established Basic Jail Guidelines, which became effective on April 1, 1997.[7]

---

[2] Basic Jail Guidelines, at p.1, https://www.incarcerationtransparency.org/wp-content/uploads/2021/10/Basic-Jail-Guidelines-as-of-April-2019.pdf

[3] Louisiana Department of Public Safety and Corrections Master Plan, at p. 14 (Aug. 2003), https://doc.louisiana.gov/wp-content/uploads/2019/08/dps_20master_20plan_208-2003.pdf.

[4] Basic Jail Guidelines, at p.1, https://www.incarcerationtransparency.org/wp-content/uploads/2021/10/Basic-Jail-Guidelines-as-of-April-2019.pdf

[5] Id.

[6] USDOJ Investigation of the Louisiana Department of Public Safety & Corrections, at p. 4 (Jan. 25, 2023); https://www.justice.gov/opa/press-release/file/1564036/dl (last accessed July 11, 2024). *See also*, Louisiana Department of Public Safety and Corrections Master Plan, at p. 14 (Aug. 2003), https://doc.louisiana.gov/wp-content/uploads/2019/08/dps_20master_20plan_208-2003.pdf (last accessed July 11, 2024); Doc. 388-9, Fleischman Deposition, at 73:15-20.

[7] Basic Jail Guidelines, at p.1, https://www.incarcerationtransparency.org/wp-content/uploads/2021/10/Basic-Jail-Guidelines-as-of-April-2019.pdf

238. The Basic Jail Guidelines are "a comprehensive and meaningful set of provisions that must be adhered to by any parish prison or local jail facility as a condition of housing state inmates."[8]

239. The Basic Jail Guidelines "were designed to assure that the fundamental constitutional rights of DPS&C offenders housed in local jails would not be jeopardized by such housing arrangements."[9]

240. The Basic Jail Guidelines require that all facilities comply "with all applicable laws and regulations of the State Sanitation Officer and the State Fire Marshal."[10]

241. The Basic Jail Guidelines set operational capacity as follows:

> The number of offenders present, does not exceed the operational capacity as determined by the state fire marshal and state health officer.
>
> The state fire marshal will determine a capacity primarily based upon exiting capabilities. The state health officer will determine a capacity based upon the ratio of plumbing fixtures to offenders and square footage. The operational capacity will be the lower of these two figures.[11]

242. Fleischman testified about the Department of Health and Hospitals in Louisiana, but the correct name for the Department is the Department of Health.[12]

243. Title 40, § 5 of the Louisiana Revised Statutes provides that "The state health officer of the office of public health of the Louisiana Department of Health shall have exclusive jurisdiction, control, and authority…(3) To enforce a sanitary code for the entire state containing

---

[8] Master Plan, at p. 14 (Aug. 2003), https://doc.louisiana.gov/wp-content/uploads/2019/08/dps_20master_20plan_208-2003.pdf.
[9] Basic Jail Guidelines, at p.1, https://www.incarcerationtransparency.org/wp-content/uploads/2021/10/Basic-Jail-Guidelines-as-of-April-2019.pdf
[10] Basic Jail Guidelines, at I-A-001 (Apr. 25, 2019), https://www.incarcerationtransparency.org/wp-content/uploads/2021/10/Basic-Jail-Guidelines-as-of-April-2019.pdf
[11] Basic Jail Guidelines, at I-C-006 (Apr. 25, 2019), https://www.incarcerationtransparency.org/wp-content/uploads/2021/10/Basic-Jail-Guidelines-as-of-April-2019.pdf.
[12] Louisiana Department of Health, https://ldh.la.gov/ (last accessed July 11, 2024).

provisions for the improvement and amelioration of the hygienic and sanitary conditions of the state."[13]

244. Part XVIII – Jails, Prisons and Other Institutions of Detention or Incarceration of the Public Health—Sanitary Code states that when inmates are housed in dormitories,[14] the capacity of a space with one lavatory is 16 occupants.[15]

245. As there is one lavatory in each holding cell, per the Basic Jail Guidelines, the maximum capacity of each STPJ holding cell is 16 detainees.[16]

246. 9-29:8.

---

[13] LSA-R.S. 40:5 (Aug. 1, 2022).
[14] The Sanitary Code does not exclude holding, or the holding cells, from the common definition of a dormitory. To the contrary, the holding area and/or a holding cells fall squarely within the common definition. https://www.merriam-webster.com/dictionary/dormitory ("a room for sleeping" or "a residence hall providing rooms for individuals or for groups usually without private baths"); Sanitary Code, LAC 51:XVIII. 101.
[15] Sanitary Code, LAC 51:XVIII. 101.
[16] Id.

**Respectfully,**

**Date: July 12, 2024**

***/s/ Devon M. Jacob***
**Attorney for Plaintiffs**

Devon M. Jacob (PA89182) (*pro hac vice*)
**JACOB LITIGATION, INC.**
P.O. Box 837
Mechanicsburg, PA 17055-0837
Tel: (717) 796-7733
djacob@jacoblitigation.com

Antonio M. Romanucci (*pro hac vice*)
Bhavani K. Raveendran (*pro hac vice*)
Sam Harton (*pro hac vice*)
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark Street, Suite 900
Chicago, IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
aromanucci@rblaw.net
b.raveendran@rblaw.net
sharton@rblaw.net

Maria B. Glorioso (#24435), T.A.
Vincent J. Glorioso, Jr. (#6064)
**THE GLORIOSO LAW FIRM**
2716 Athania Parkway
Metairie, LA 70002
Tel: (504) 569-9999
Fax: (504) 569-9022
maria@gtorts.com