**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| AHMED BAQER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ST. TAMMANY PARISH GOVERNMENT, a/k/a/ ST. TAMMANY PARISH COUNCIL, et al.,<br><br>Defendants. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | **CIVIL ACTION NO.: 20-00980-DJP-DPC (Consolidated with 20-1840-WBV-DPC)**<br><br>DISTRICT JUDGE DARREL JAMES PAPILLION<br><br>MAGISTRATE JUDGE EVA J. DOSSIER<br><br>JURY TRIAL |

****************************************************************************

**PLAINTIFF FLOYD WILLIAM'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Contents ........ ii

Table of Authorities........ iv

I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 3

A. The holding cells at STPJ are chronically overcrowded as a result of Defendants' policies ........ 3

1. Overcrowding and length of stay........ 4

2. Sanitation and hygiene........ 7

3. Bedding and sleep ........ 8

4. Recreation and fresh air ........ 9

5. Medical care........ 9

6. Inmate grievances ........ 10

B. Defendants and STPSO officials are unable to identify a legitimate penological interest for the inhuman conditions in the STPJ holding cells........ 10

C. Mr. Williams' incarceration........ 12

III. LEGAL STANDARD ........ 16

IV. ARGUMENT........ 18

A. Plaintiffs have provided sufficient evidence for a jury to determine that as a pretrial detainee, Mr. Williams' Fourteenth Amendment right not to be punished was violated ........ 18

1. Actual, persistent conditions in the STPJ holding cells violate the Fourteenth Amendment........ 19

a. The conditions in the holding cell, including overcrowding, length of stay, sanitation, and inmates sleeping on the floor in filth, are all related, the result of policy decisions by Defendants, and must be considered together. ........ 21

b. Defendants have been on notice of the holding cell conditions since at least 2012 ........ 23

c. Overcrowding ....24

d. Length of stay ....31

e. Sanitation and hygiene products ....34

f. Bedding and sleeping on the holding cell floor in human waste ....42

g. Cell temperature, absence of recreation ....47

h. Inadequate medical care ....49

i. The combination of unconstitutional conditions in the STPJ holding cells caused cognizable harm to Mr. Williams ....52

2. Despite Defendants' argument to the contrary, Plaintiffs' evidence regarding the conditions inside the holding cells at STPJ are not episodic omission of individual STPJ staff ....54

B. Plaintiffs have sufficient evidence to show material questions of fact on their *Monell* claim ....55

1. Plaintiffs have shown a custom of unconstitutional conditions that amount to punishment inside the STPJ holding cells ....55

2. Plaintiffs have shown that Defendants had actual or constructive knowledge of the holding cell conditions. ....57

3. These customs were the moving force in Plaintiffs', including Mr. Williams', Fourteenth Amendment rights violation ....61

C. The individual capacity claims against Defendants Smith and Kelly should not be dismissed ....64

D. The official capacity claims against Defendant Smith should not be dismissed ....67

E. State claims ....70

F. Plaintiffs' claims are not frivolous, and Defendants should not be awarded attorney's fees under 42 U.S.C. § 1988 ....71

V. CONCLUSION ....73

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Tippah County, Mississippi*,

351 F.3d 626 (5th Cir. 2003) ............ 23, 31, 35, 44, 45, 46

*Allen v. St. Tammany Parish*,

No. 17-4091, 2018 WL 558503 (E.D. La. Jan. 2, 2018) ............ 42

*Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242 (1986) ............ 16

*Ates v. Terrebonne Parish*,

No. 13-5732, 2013 WL 6858455 (E.D. La. Dec. 30, 2013) ............ 69

*Bazan ex rel. Bazan v. Hidalgo County*,

246 F.3d 481 (5th Cir. 2001) ............ 16

*Bell v. Wolfish*,

441 U.S. 520 (1979) ............ 19, 25, 29, 30, 62, 66

*Bennett v. City of Slidell*,

728 F.2d 762 (5th Cir. 1984) ............ 58

*Bienvenu v. Beauregard Parish Police Jury*,

705 F.2d 1457 (5th Cir. 1983) ............ 47

*Board of the County Commissioners of Bryan County v. Brown*,

520 U.S. 397 (1997) ............ 61

*Booze v. City of Alexandria*,

637 So.2d 91 (La. 1994) ............ 67

*Broussard v. Kowalski*,

No. 03-2875, 2007 WL 1461023 (E.D. La. May 15, 2007) ............ 73

*Brown v. Borough of Chambersburg*,

903 F.2d 274 (3d Cir. 1990) ............ 72

*Brown v. Miller*,

519 F.3d 231 (5th Cir. 2008)....................17

*Burge v. Parish of St. Tammany*,

187 F.3d 452 (5th Cir. 1999)....................55

*Burge v. Parish of St. Tammany*,

1997 WL 10243 (E.D. La. Jan. 8, 1997)....................68

*Castillo v. Cameron County, Texas*,

238 F.3d 339 (5th Cir. 2001)....................24

*Celotex Corp. v. Catrett*,

477 U.S. 317 (1986)....................17

*Chavera v. Allison*,

No. 1:08cv256-JMR, 2009 WL 1011157 (S.D. Miss. Apr. 15, 2009)....................25, 26

*Christiansburg Garment Co. v. Equal Employment Opportunity Commission*,

434 U.S. 412 (1978)....................72

*City of Revere v. Massachusetts General Hospital*,

463 U.S. 239 (1983)....................70

*Cleveland v. Gautreaux*,

198 F. Supp. 3d 717 (M.D. La. Aug. 1, 2016) ....................49, 54

*Courteaux v. Larpenter*,

No. 19-13173, 2020 WL 2771755 (E.D. La. Apr. 27, 2020) ....................35

*Collins v. Ainsworth*,

382 F.3d 529 (5th Cir. 2004)....................25, 26

*Craig v. St. Martin Parish Sheriff*,

861 F. Supp. 1290 (W.D. La. 1994) ....................69

*Crook v. McGee*,

No. 2:07cv167-MTP, 2008 WL 53269 (S.D. Miss. Jan. 2, 2008)....................25, 26

*Daigre v. Maggio*,
719 F.2d 1310 (5th Cir. 1983) ....................................................................................34

*Davis v. Parish of St. Tammany*,
No. 10-364, 2011 WL 121902 (E.D. La. Jan. 12, 2011) ...................................................72

*Davis v. Scott*,
157 F.3d 1003 (5th Cir. 1998) ....................................................................................40

*Dean v. Riser*,
240 F.3d 505 (5th Cir. 2001) ......................................................................................71

*Dixon v. Godinez*,
114 F.3d 640 (7th Cir. 1997) ......................................................................................47

*Doe v. Silsbee Indep. School Dist.*,
440 Fed. Appx. 421 (5th Cir. 2011) (unpublished) .....................................................71. 72

*Duvall v. Dallas County, Texas*,
631 F.3d 203 (5th Cir. 2011) ...................................................................................19, 68

*E.E.O.C. v. LHC Group, Inc.*,
773 F.3d 688 (5th Cir. 2014) ......................................................................................17

*Edler v. Hockley County Commissioners Court*,
589 Fed. Appx. 664 (5th Cir. 2014) (unpublished) ..........................................................49

*Estate of Allison v. Wansley*,
524 Fed. Appx. 963 (5th Cir. 2013) (unpublished) ..........................................................68

*Estate of Bonilla by & through Bonilla v. Orange County, Texas*,
982 F.3d 298 (5th Cir. 2020) ......................................................................................63

*Estate of Henson v. Wichita County, Texas*,
795 F.3d 456 (5th Cir. 2015) ......................................................................................54

*Estelle v. Gamble*,
429 U.S. 97 (1976) .................................................................................................1, 19

*Farmer v. Brennan*,

511 U.S. 825 (1991) ....................19, 65

*Gates v. Collier*,

501 F.2d 1291 (5th Cir. 1974) ....................18, 61

*Gates v. Cook*,

376 F.3d 323 (5th Cir. 2004) ....................35, 53, 63, 66

*Gates v. Texas Department of Protective and Regulatory Services*,

537 F.3d 404 (5th Cir. 2008) ....................69

*Gobert v. Caldwell*,

463 F.3d 339 (5th Cir. 2006) .................... 49-50, 51

*Grogan v. Kumar*,

873 F.3d 273 (5th Cir. 2017) ....................52

*Hamilton v. Lyons*,

74 F.3d 99 (5th Cir. 1996) .................... 18, 19, 20, 37, 61-62

*Hare v. City of Corinth, Miss.*,

74 F.3d 633 (5th Cir. 1996) ....................18, 20, 54, 62, 70

*Harper v. Showers*,

174 F.3d 716 (5th Cir. 1999) .................... 36, 42-43, 47, 66

*Harris v. Angelina County, Texas*,

31 F.3d 331 (5th Cir. 1994) ....................19

*Heaton v. Normand*,

No. 17-405, 2017 WL 3268341 (E.D. La. June 22, 2017) ....................35

*Hebert v. Maxwell*,

214 Fed. Appx. 451 (5th Cir. 2007) (unpublished) ....................20, 45, 46, 61

*Hensley v. Eckerhart*,

461 U.S. 424 (1983) ....................71

*Hicks-Fields v. Harris County, Texas*,

860 F.3d 803 (5th Cir. 2017) ........................................................................ 55, 57-58, 59

*Hill v. Smith*,

No. 20-1042, 2020 WL 2226316 (E.D. La. Apt. 1, 2020) ................................................42

*Hines v. Cain*,

No. 06-3772, 2007 WL 891875 (E.D. La. Mar. 20, 2007)................................................36

*Hinshaw v. Doffer*,

785 F.2d 1260 (5th Cir. 1986) ..........................................................................................65

*Hinton v. Gonzalez*,

No. 4:18-cv-912, 2021 WL 4955915 (S.D. Tex. Sep. 16, 2021) ................................ 59-60

*Hope v. Pelzer*,

536 U.S. 730 (2002)..........................................................................................................32

*Houston v. Texas Department of Agriculture*,

17 F.4th 576 (5th Cir. 2021)..............................................................................................17

*Hutto v. Finney*,

437 U.S. 678 (1978)......................................................................................................1, 23

*International Woodworkers of America, ACL-CIO and its Local No. 5-376 v. Champion International Corp.*,

790 F.2d 1174 (5th Cir. 1986) ............................................................................................1

*Ion v. Chevron USA, Inc.*,

731 F.3d 379 (5th Cir. 2013)..............................................................................................17

*Jackson v. Gusman*,

No. 15-244, 2015 WL 5823295 (E.D. La. Oct. 6, 2015) ..................................................36

*Johnson v. Texas Board of Criminal Justice*,

281 Fed. Appx. 319 (5th Cir. 2008) (unpublished).....................................................47, 48

*Jaros v. Illinois Department of Corrections*,

684 F.3d 667 (7th Cir. 2012).................................................................................37, 38, 40

*Jenkins v. Jefferson Parish Sheriff's Office*,

402 So.2d 669 (La. 1981) ....................................................................................68

*Jones v. Diamond*,

636 F.2d 1364 (5th Cir. 1981) ..........................................................................1, 22

*Jones v. St. Tammany Parish Jail*,

4 F. Supp. 2d 606 (E.D. La. 1998) ...........................................................18, 54, 68

*Jordan v. Gautreaux*,

593 F. Supp. 3d 330 (M.D. La. Mar. 25, 2022)..................................................63

*Joseph on behalf of Estate of Joseph v. Bartlett*,

981 F.3d 319 (5th Cir. 2020) ......................................................................... 17-18

*Little v. Liquid Air Corp.*,

37 F.3d 1069 (5th Cir. 1994) (per curiam) .........................................................17

*Lucien v. Jones*,

No. 16-9591, 2016 WL 4942997 (E.D. La. Sep. 16, 2016) .................................72

*M.D. ex rel. Stukenberg v. Abbott*,

907 F.3d 237 (5th Cir. 2018)................................................................................63

*Matthews v. Murphy*,

No. 13-4963, 2013 WL 6002770 (E.D. La. Nov. 12, 2013) .................................41

*McClendon v. Smith*,

No. CIV. A. 96-4054, 1997 WL 433489 (E.D. La. Jul. 31, 1997) .......................73

*McCord v. Maggio*,

927 F.2d 844 (5th Cir. 1991)...........................................1, 22, 43, 44, 46, 61, 66

*Miller v. Carson*,

563 F.2d 741 (5th Cir. 1977)......................................................... 18, 48-49, 67

*Mitchell v. Jefferson Parish Correctional Center*,

No. 13-4963, 2013 WL 6002770 (E.D. La. Nov. 12, 2013) .................................40

*Myers v. City of West Monroe*,
211 F.3d 289 (5th Cir. 2000) ....................................................................................71

*Nagle v. Gusman*,
No. 12-1910, 2016 WL 768588 (E.D. La. Feb. 26, 2016) ..........................................54, 68

*Newbury v. City of Windcrest, Texas*,
991 F.3d 672 (5th Cir. 2021) ....................................................................................55

*Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*,
783 F.3d 527 (5th Cir. 2015) ...............................................................................16, 17

*Novak v. Beto*,
453 F.2d 661 (5th Cir. 1971) ....................................................................................34

*Oladipupo v. Austin*,
104 F. Supp. 2d 626 (W.D. La. Apr. 24, 2000) ..................................25, 53, 66, 67, 68, 69

*Palmer v. Johnson*,
193 F.3d 346 (5th Cir. 1999) ...............................................................................31, 47

*Partridge v. Two Unknown Police Officers of the City of Houston, Texas*,
791 F.2d 1182 (5th Cir. 1986) ..................................................................................18

*Payton v. Gusman*,
No. 12-2578, 2013 WL 5530280 (E.D. La. Oct. 7, 2013) ................................................35

*Pineda v. City of Houston*,
291 F.3d 325 (5th Cir. 2002) ....................................................................................55

*Piotrowski v. City of Houston*,
237 F.3d 567 (5th Cir. 2001) ....................................................................................18

*Porter v. Epps*,
659 F.3d 440 (5th Cir. 2011) ...............................................................................64, 66

*Porter v. Werner*,
No. 1:16CV69-RHW, 2017 WL 599418 (S.D. Miss. Feb. 14, 2017) ...............................48

*Poyer v. Stalder*,

No. 06-0792, 2006 WL 2054450 (W.D. La. Jun. 26, 2006)....................................22

*Rhodes v. Chapman*,

452 U.S. 337 (1981)....................................1

*Rhyne v. Henderson County*,

973 F.2d 386 (5th Cir. 1992)....................................64

*Rich v. Palko*,

920 F.3d 288 (5th Cir. 2019)....................................17

*Robertson v. Coahoma County, Mississippi*,

No 2:07CV78-SA-SAA, 2008 WL 3334091 (N.D. Miss. Aug. 6, 2008) ....................25, 26

*Royal v. CCC & R Tres Arboles, L.L.C.*,

736 F.3d 396 (5th Cir. 2003)....................................16

*Ruiz v. Estelle*,

679 F.2d 1115 (5th Cir. 1982) ....................................49

*Ruiz v. Estelle*,

688 F.2d 266 (5th Cir. 1982)....................................49

*Salcido as Next Friend of K.L. v. Harris County, Texas*,

No. H-15-2155, 2018 WL 4690276 (S.D. Tex. Sep. 28, 2018) ....................................59

*Sanchez v. Young County, Texas*,

956 F.3d 785 (5th Cir. 2020)....................................63

*Scott v. Moore*,

114 F.3d 51 (5th Cir. 1997) ....................................20, 22, 53, 54, 61

*Selestan v. Gusman*,

No. 13-6468, 2015 WL 6442345 (E.D. La. Oct. 23, 2015) ....................................36

*Shakka v. Smith*,

71 F.3d 162 (4th Cir. 1995)....................................38

*Shepherd v. Dallas County*,

591 F.3d 445 (5th Cir. 2009)........................................................18, 22, 34, 49, 54, 59, 61

*Sims v. Adams*,

537 F.2d 829 (5th Cir. 1976)..................................................................................................65

*Smith v. Brenoettsy*,

158 F.3d 908 (5th Cir. 1998)............................................................................................ 64-65

*Smith v. Wade*,

461 U.S. 30 (1983)..................................................................................................................67

*State v. Jacobs*,

67 So.3d 535 (La. App. 5 Cir. 5/24/11)..................................................................................70

*Strothers v. Samford*,

212 F.3d 594 (5th Cir. 2000) (unpublished)...........................................................................48

*Taylor v. Riojas*,

141 S. Ct. 52 (2020)............................................................................31, 32, 33, 36, 37

*Taylor v. Stevens*,

946 F.3d 211 (5th Cir. 2019)............................................................................................31, 32

*Terrebonne Parish School Board v. Mobil Oil Corp.*,

310 F.3d 870 (5th Cir. 2002)..................................................................................................52

*Terry v. Smith*,

No. 20-1163, 2020 WL 13788378 (E.D. La. Jul. 31, 2020)..................................................42

*Thomas v. Ouachita Correctional Center*,

No. 3:12-cv-0687, 2012 WL 1856514 (W.D. La. May 1, 2012).........................................53

*Thomas v. Owens*,

345 Fed. Appx. 892 (5th Cir. 2009) (unpublished)................................................................40

*Thompkins v. Belt*,

828 F.2d 298 (5th Cir. 1987)..................................................................................................57

*Trent v. Wade*,
776 F.3d 368 (5th Cir. 2015)....................16

*Turner v. Baylor Richardson Medical Center*,
476 F.3d 337 (5th Cir. 2007).................... 16-17

*Tuttle v. Todd*,
No. 22-20233, 2023 WL 4884853 (5th Cir. 2023)....................65

*United States v. $92,203.00 in U.S. Currency*,
537 F.3d 504 (5th Cir. 2008)....................17

*United States v. State of Mississippi*,
921 F.2d 604 (5th Cir. 1991)....................71

*Usea v. Manuel*,
No. 19-14704, 2022 WL 7037225 (E.D. La. Oct. 12, 2022) ....................72

*Valle v. City of Houston*,
613 F.3d 536 (5th Cir. 2010)....................61

*Vaughner v. Pulito*,
804 F.2d 873 (5th Cir. 1986)....................71, 72

*Williamson v. Louisiana*,
No. 08-4470, 2008 WL 4811178 (E.D. La. Oct. 29, 2008)....................69

*Wilson v. Seiter*,
501 U.S. 294 (1991)....................1, 49, 54

*Woods v. Edwards*,
51 F.3d 577 (5th Cir. 1995)....................47

*Young v. Ledet*,
No. 20-2165, 2021 WL 799683 (E.D. La. Jan. 15, 2021)....................19, 37, 57

**Federal Statutes**

42 USC. 1988 .......... 71, 72, 73

42 U.S.C. § 1997e(e) .......... 45

**Louisiana Civil Code**

Title 22, Part III, Subpart 2, Section 3301(F) .......... 33

**Congressional Record**

H.R. Rep. No. 94-1558, p. 1 (1976)) .......... 71

**PLAINTIFF FLOYD WILLIAM'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NOW COMES Plaintiff, Floyd Williams, by and through his counsel of record, Romanucci & Blandin, LLC; Jacob Litigation, Inc.; and The Glorioso Law Firm, and respectfully prays the Court enter an Order denying Defendants' Motion for Summary Judgment. In support of this response in opposition, Plaintiff states as follows:

Formatted: English (United States)

## I. INTRODUCTION

Defendants urge this Court to view each condition and each Plaintiff in this case in a silo, as evidenced by their arguments regarding the conditions of the St. Tammany Parish Jail ("STPJ") holding cells. But in a conditions of confinement case, like the case Plaintiffs have brought here, all conditions alleged by a Plaintiff must be considered in their totality, particularly if those conditions mutually reinforce one another.[1] Of course, each Plaintiff must prove their individual constitutional violations, but their descriptions of the conditions inside the STPJ holding cells should be considered in their totality when determining whether an unconstitutional custom and practice was occurring. Defendants' motions for summary judgment miss the forest for the trees.

---

[1] *See*, *McCord v. Maggio*, 927 F.2d 844, 846 (5th Cir. 1991) (Discussing Eighth Amendment "totality of the circumstances test" for cruel and unusual punishment: "Under this test, the Court determines whether conditions of confinement violate the constitutional prohibition against cruel and unusual punishment by looking to the totality of the conditions in the prison rather than institutional practices separately."); *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("*Some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise[.]"); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) ("Conditions other than those in *Gamble* and *Hutto*, alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities."); *Jones v. Diamond*, 636 F.2d 1364, 1368 (5th Cir. 1981), *overruled on other grounds*, *International Woodworkers of Amer., ACL-CIO and its Local No.5-376 v. Champion Intern. Corp.*, 790 F.2d 1174 (5th Cir. 1986), ("In determining whether conditions of confinement are unconstitutional under the eighth amendment or the fourteenth amendment, we do not assay separately each of the institutional practices but look to the totality of conditions.").

Defendants do not offer evidence to rebut Plaintiffs' claims regarding the conditions of the holding cells at STPJ, and during depositions STPSO officials admitted that they could not rebut Plaintiffs' evidence and were aware of such conditions.[2] Instead, Defendants offer this Court's ruling on the motion for preliminary injunction in April 2020, *three and a half years ago and before any discovery*, as their only argument that Plaintiffs cannot meet their burden of proof. Nevertheless, during the extensive discovery that took place in this case, several STPSO officials admitted that there were no penological interests furthered by the conditions suffered by Plaintiffs, including Mr. Williams, and the Sheriff admitted that if proven, the conditions were "inhumane."

Defendants argue that because each of the conditions (*i.e.*, length of incarceration, lack of sanitation, overcrowding, etc.) alleged by Plaintiffs, individually, is not *per se* unconstitutional, they should be granted summary judgment. However, as Plaintiffs will show, in the aggregate, the conditions were inhumane, and the direct result of the policy decisions, or the lack thereof, made by Defendants Smith and Kelly and widely accepted practices that sprang from the lack of supervision and guidance. Defendants had actual and constructive knowledge of those policies and practices; further, those customs and policies were the moving force behind the violation of Plaintiffs', including Mr. Williams', Fourteenth Amendment constitutional rights.

Most notable is the fact that to get out from under 20 years of Court supervision and consent decrees, the Sheriffs agreed to a Settlement Agreement that included an agreement that local jails that want to house state inmates – as STPJ chose to do – would agree to bring their jails in compliance with agreed upon Basic Jail Guidelines. Pursuant to these guidelines, STPJ was to

---

[2] The Defendants offer the testimony of Warden Daniel Fleishman despite knowing that Fleishman testified that all of his testimony relates solely to his time as Warden, which is after the time relevant to the instant litigation. As such, to the extent that Fleishman's testimony appears to rebut Plaintiffs' evidence, it does not. Fleishman's testimony is only relevant to undermining the Defendants' expert who apparently relied almost exclusively on information received from Fleischman without knowing that the information provided by Fleischman is not relevant to the instant litigation. See Pl's SOF at Section G.

comply with all laws (which would include the administrative code). Pursuant to the Basic Jail Guidelines, the jails had to follow the fire and sanitary codes. Pursuant to the Sanitary Code, no more than 16 inmates should ever be in a single living space that only has a single lavatory. As such, the maximum capacity for each STPJ holding cell is 16 pretrial detainees. The Defendants, however, readily admit that they ignore the Department of Health's maximum capacity number because the Department of Health does not respond to complaints. Importantly, the Sheriffs knew that if they took the State's money, they were only permitted to offer the State bed space **in excess of their local need.** The Sheriffs knew that taking the money was supposed to increase bed space for the State **and** local inmates, not just State inmates. Instead, the STPJ took the money, crammed the local pretrial detainees into overcrowded cells in inhumane conditions, and invested in themselves in the form of bonuses.

Resolving all reasonable inferences in favor of the Plaintiffs, the evidence establishes that the Defendants violated Plaintiffs' civil rights, so that they could profit from DOC and federal contracts that resulted in raises for all STPSO employees in the fiscal years starting in July of 2018 and July of 2019. Defendants have failed to meet their burden on summary judgment. Because there are material questions of fact that remain for a jury to decide, Defendants' motion for summary judgment and attorneys' fees should be denied.

## II. STATEMENT OF FACTS

### A. The holding cells at STPJ are chronically overcrowded as a result of Defendants' policies.

In 1996, the United States District Court for the Middle District of Louisiana approved a Settlement Agreement that ended over 20 years of Court supervision and consent decrees in almost all of Louisiana's jails and prisons. ~~Pl's~~Pl.'s SOF No. 253. The Louisiana Department of Public Safety and Corrections (DPS&C) and local public entities are authorized by law to execute

Cooperative Endeavor Agreements, whereby local entities agree to provide jail space in excess of local needs in exchange for the State's commitment to utilize a fixed percentage of the space. Pl'sPl.'s SOF No. 254. "This facilitates financing of new jail space when other options are not available and allows expansion of the number of beds for local as well as state use." Pl'sPl.'s SOF No. 255.

As part of the Settlement, the State established a formal partnership with the Louisiana Sheriffs' Association (LSA) for the housing of DPS&C offenders. Pl'sPl.'s SOF No. 256. The DPS&C has the authority to establish minimum standards that each parish jail must follow in order to be permitted to house people in DPS&C's custody. Pl'sPl.'s SOF No. 257. The partners – DPS&C and LSA – established Basic Jail Guidelines, which became effective on April 1, 1997. Pl'sPl.'s SOF No. 258. The Basic Jail Guidelines are "a comprehensive and meaningful set of provisions that must be adhered to by any parish prison or local jail facility as a condition of housing state inmates." Pl'sPl.'s SOF No. 259. The Basic Jail Guidelines "were designed to assure that the fundamental constitutional rights of DPS&C offenders housed in local jails would not be jeopardized by such housing arrangements." Pl'sPl.'s SOF No. 260.

The Basic Jail Guidelines require that all facilities comply "with all applicable laws and regulations of the State Sanitation Officer and the State Fire Marshal."[3] Pl'sPl.'s SOF No. 261. The Basic Jail Guidelines set operational capacity as follows: The number of offenders present does not exceed the operational capacity as determined by the state fire marshal and state health officer. The state fire marshal will determine a capacity primarily based upon exiting capabilities. The state health officer will determine a capacity based upon the ratio of plumbing fixtures to offenders and

[3] Fleischman testified about the Department of Health and Hospitals in Louisiana, but the correct name for the Department is the Department of Health.

square footage. Pl's SOF No. 262. The operational capacity will be the lower of these two figures. ~~Pl's~~Pl.'s SOF No. 262.

Title 40, § 5 of the Louisiana Revised Statutes provides that "The state health officer of the office of public health of the Louisiana Department of Health shall have exclusive jurisdiction, control, and authority…(3) To enforce a sanitary code for the entire state containing provisions for the improvement and amelioration of the hygienic and sanitary conditions of the state." ~~Pl's~~Pl.'s SOF No. 264. Part XVIII – Jails, Prisons and Other Institutions of Detention or Incarceration of the Public Health—Sanitary Code states that when inmates are housed in dormitories,[4] the capacity of a space with one lavatory is 16 occupants. ~~Pl's~~Pl.'s SOF No. 265. As there is one lavatory in each holding cell, per the Basic Jail Guidelines, the maximum capacity of each STPJ holding cell is 16 detainees. ~~Pl's~~Pl.'s SOF No. 266.

The St. Tammany Parish Sheriff is required by law to house pretrial detainees at STPJ; he is not required by law to house state or federal inmates. ~~Pl's~~Pl.'s SOF No. 62. In addition to local pretrial detainees, STPJ houses state ("DOC") and federal inmates by contract in exchange for money. ~~Pl's~~Pl.'s SOF Nos. 63-64. Louisiana also funds a $3 million early release program, which permits STPJ to house related DOC inmates. ~~Pl's~~Pl.'s SOF No. 65. Revenue from these state and federal contracts funds a portion of the STPJ budget. ~~Pl's~~Pl.'s SOF No. 66. In 2019, after losing a sales tax renewal that represented a $10 million loss in the Sheriff's $74 million budget, STPJ's funding for the housing of local inmates decreased. ~~Pl's~~Pl.'s SOF Nos. 54-56. Defendant Smith, as Sheriff, had two options to increase the STPJ's revenue: sue St. Tammany Parish for the jail funding he required or increase the number of DOC and federal inmates housed at STPJ. ~~Pl's~~Pl.'s

[4] The Sanitary Code does not exclude holding, or the holding cells, from the common definition of a dormitory. To the contrary, the holding area and/or a holding cells fall squarely within the common definition. https://www.merriam-webster.com/dictionary/dormitory ("a room for sleeping" or "a residence hall providing rooms for individuals or for groups usually without private baths"); Sanitary Code, LAC 51:XVIII. 101.

SOF No. 68; *see also* ~~Pl's~~Pl.'s SOF Nos. 46-50. Defendant Smith decided not to sue the Parish and admits that entering into and continuing the state and federal inmate contracts was a policy decision. ~~Pl's~~Pl.'s SOF Nos. 69-71. The Defendants speciously argue that their hands were tied by contract despite knowing that the contracts provide that they may be terminated for any reason with 30 days' notice.

**Formatted:** Font color: Text 1

**Formatted:** Font color: Text 1

The more DOC and federal inmates that STPJ agreed to house, the more money it received; which far exceeded the money received from housing pretrial detainees. ~~Pl's SOF~~Id. at Nos. 83, 84. As such, the Defendants crammed the parish pretrial detainees into four disgusting holding cells in inhumane conditions, so that the majority of the facility's beds could remain available to valuable DOC and federal inmates. ~~Pl's SOF~~Id. at Nos. 64, 67, 70, 71, 154-159. Despite the budgetary shortfall created by the loss of the sales tax renewal, as a result of Defendant Smith's policy decisions, Defendant Smith was able to provide raises to all STPSO employees in 2018 and 2019. ~~Pl's SOF~~Id. at No. 72. The Defendants' motion urges this Court to ratify the Defendants' unlawful conduct.

**1. Overcrowding and length of stay.**

STPJ has four 12x22 holding cells. ~~Pl'sPl.'s~~Pl.'s SOF No. 11. Each holding cell has two flat concrete benches with no padding and a concrete floor with a window that does not open to allow fresh air in. ~~Pl's SOF~~Id. at Nos. 12-14. Defendant Smith, the Sheriff of St. Tammany, who is the final policymaker for the St. Tammany Parish Sheriff's Office ("STPSO"), including the STPJ, has not adopted or implemented a policy governing how the holding cells at STPJ are to be utilized or that limits the amount of time that an inmate may be housed in a holding cell. ~~Pl's SOF~~Id. at Nos. 1-3, 92. Defendant Smith testified that he has no idea when the holding cells are above capacity, as he relies on the Fire Marshal to make that determination:

Q. Okay. How many can you house in a holding cell before it becomes overcrowding?
A. I don't know that number.
Q. Then how do you supervise if you don't know what's overcrowding or not?
A. That's a good question. We usually rely on the fire marshal to come in. And if they give us an order to say, you got too many, there's more than one holding cell.
Q. So does the fire marshal come in daily to tell you?
A. Normally, they come on a regular basis. I don't know how regular. But they do pay us a visit on a regular basis.
Q. Well, let's talk about regular. Is that once a month? Is that a once a quarter?
A. I would say monthly. Sometimes, unless there's a complaint, they come unannounced and say we have an overcrowding issue.
Q. So why does the fire marshal know how many is supposed to be in a holding cell, and the sheriff who's required to actually operate the jail doesn't?
A. Because I depend on my staff to make

69

sure that those numbers are -- that we're in compliance with those numbers with overcrowding.
Q. But don't they need to know what the numbers are in order to tell you whether they're --
A. They should. They're there every day.

~~Pl's SOF~~Id. at No. 151; *see* Doc. 238-10 at pp. 68-69.

The Fire Marshal has set the maximum capacity of the holding cells at 20 persons per cell, yet Defendant Lacey Kelly, the 30(b)(6) witness for STPSO and former Major/Warden in charge

of the corrections division in 2019 and 2020, admitted that STPSO knowingly filled the holding cells with more than 20 people but did not track the number of inmates in each of the four holding cells. ~~Pl's~~Pl.'s SOF Nos. 21-25, 146. She likewise testified that there were "probably" times when STPSO did not comply even after the Fire Marshal had come in to tell them the holding cells were over capacity. ~~Pl's SOF~~Id. at No. 25.

Regardless, STPJ admits that the Fire Marshal sets the maximum capacity for fire safety without consideration for the intended use. ~~Pl's SOF~~Id. at No. 19. As such, it is a specious argument to claim that because a Fire Marshal decided that 20 people can safely stand in a holding cell, locking 20 people in the same space and forcing them to sleep on urine-soaked concrete for days or weeks at a time passes constitutional muster. As admitted by Warden Fleischman, STPJ intentionally ignores the Sanitary Code's maximum capacity limit of 16. ~~Pl's SOF~~Id. at Nos. 233-37.

Gregory Longino, Deputy Chief of Corrections at STPSO in 2019, admitted that overcrowding is a serious and longstanding issue at STPJ and has been ongoing since the 1990s. ~~Pl's SOF~~Id. at Nos. 94, 147. Defendant Kelly, testifying on behalf of STPSO, admitted that overcrowded cells increase the risk of health problems, fights, and fire danger, but continued the practice of filling the STPJ holding cells beyond capacity; in addition, STPSO did not decline to accept DOC or federal inmates to reduce the overcrowding in the holding cells. ~~Pl's SOF~~Id. at Nos. 26-27. Defendant Smith also testified that overcrowding presents a safety issue. ~~Pl's SOF~~Id. at No. 77. Nevertheless, Defendant Smith's policy was that at no time—even to eliminate overcrowding in the holding cells—is a pretrial detainee transferred to an open bed reserved for DOC or federal inmates. ~~Pl's SOF~~Id. at Nos. 29, 79, 98-99, 112-113, 134, 136-137, 148. STPSO admitted that even if there were over 100 empty DOC and federal beds open and available, none

of the beds would be provided to any parish pretrial detainee. ~~Pl's SOF~~Id. at No. 28. Nor do Defendants assert, and there is no evidence to support, that the DOC or federal housing contracts disallow local inmates from being intermingled in the housing units. *See* Doc. 238-3 at pp. 16-18. However, as Former Deputy Chief Longino testified, had the pretrial detainees in the STPJ holding cells been moved into the available DOC and federal beds, there would have been no overcrowding and beds, recreation, and lights out for sleeping would have been provided to them. ~~Pl's~~Pl.'s SOF No. 114.

STPSO admits that their holding cells are designed for temporary housing of not more than a couple of days until inmates are assigned to a permanent housing unit, but Defendants did not adopt or implement a holding cell policy regarding how long pretrial detainees could be housed in the holding cells. ~~Pl's SOF~~Id. at Nos. 15-17, 85-86, 124-125, 128. Because the Sheriff did not have a holding cell policy, "temporary" housing could last a year, because "temporary" was not defined for the staff. ~~Pl's SOF~~Id. at No. 18, 122-123. The Louisiana Administrative Code Title 22 provides that a pretrial detainee must be moved from a holding cell to a general population bed within 48 hours, but Defendants chose not to follow this law. ~~Pl's SOF~~Id. at Nos. 89-92. This is not surprising since Defendant Smith presented at his deposition having never heard of Title 22. ~~Pl's SOF~~Id. at No. 73. At STPJ, the length of time that a pretrial detainee would remain in a holding cell was determined by external factors like whether the inmate bonded out, was released by a court, or was sentenced to incarceration. ~~Pl's SOF~~Id. at No. 93. Although Defendant Smith testified that he reviews inmate Count Sheets on a regular basis, he testified that he does not know at what capacity the holding cells become overcrowded. ~~Pl's SOF~~Id. at No. 76, 78.

**2. Sanitation and hygiene**

Defendant Smith did not adopt or implement a policy directing STPJ guards and supervisors on how to clean and sanitize the holding cells. ~~Pl's~~Pl.'s SOF No. 6. Because there was no policy regarding the cleaning and sanitization, STPSO has no idea if the holding cells were ever cleaned or sanitized to Department of Health Standards. ~~Pl's SOF~~Id. at No. 31. Former Deputy Chief Longino testified that although overcrowded holding cells become dirtier than non-overcrowded holding cells, the frequency of cleaning the holding cells at STPJ did not change based on whether the holding cells were overcrowded or not. ~~Pl's SOF~~Id. at No. 101. Defendant Smith acknowledged that "80-plus percent of the individuals we bring in are under some type of alcohol or illegal narcotic or both," and those people are housed in the holding cells. ~~Pl's SOF~~Id. at No. 150. In this regard, Longino admitted that there were times when the holding cells had urine, feces, vomit, and blood on the floors. ~~Pl's SOF~~Id. at No. 102. Longino further admitted that there was no evidence to refute Plaintiffs' claims that the holding cells were not cleaned or sanitized when urine, feces, vomit, and blood were on the floor and that there was no STPSO policy to mandate or require cleaning when those substances were present. ~~Pl's SOF~~Id. at Nos. 103-104. Further, although Defendant Smith did not adopt or implement a policy regarding when pretrial detainees are to be provided with showers, a practice developed that ostensibly provided showers to pretrial detainees on Monday, Wednesday, and Friday. ~~Pl's SOF~~Id. at No. 5. However, because Defendant Smith did not adopt and implement a shower policy, guards could not be disciplined for failing to provide showers to the pretrial detainees in STPJ holding cells. ~~Pl's SOF~~Id. at No. 44.

Defendant Smith did not adopt or implement a policy directing the amount of toilet paper to be provided in a holding cell, so guards were free to handle the issue however they wanted. ~~Pl's SOF~~Id. at No. 43. Former Deputy Chief Longino testified that only one roll of toilet paper was

provided to a holding cell at a time. ~~Pl's SOF~~Id. at No. 111. Longino testified that he has seen toilet paper on the ceilings and walls of the holding cells. ~~Pl's SOF~~Id. at No. 105. Richard O'Keefe, Jr., STPSO Captain of Corrections in 2019, testified that he did not know if pretrial detainees in the holding cells were provided with supplies to clean their hands before eating. ~~Pl's SOF~~Id. at No. 141. Longino testified that pretrial detainees complained about guards not providing requested items, like soap and toilet paper, in a timely manner. ~~Pl's SOF~~Id. at No. 110.

**3. Bedding and sleep**

Defendant Smith failed to adopt or implement a policy dictating the minimum unencumbered floor space to be available to each inmate in STPJ's holding cells. ~~Pl's~~Pl.'s SOF No. 4. Inmates in the STPJ holding cells must sleep on the concrete benches or the concrete floor in the holding cells, as there are no bunks or other places to sleep, while permanent housing units have actual beds that include a mattress, sheets, blankets, and a pillow. ~~Pl's SOF~~Id. at Nos. 32, 87. While the STPSO adopted as policy the DOC standard to provide a bed and bedding to inmates in permanent housing, Defendant Smith did not adopt or implement a policy directing what bedding, if any, is to be provided to a pretrial detainee in the holding cells. ~~Pl's SOF~~Id. at Nos. 9, 88. STPSO written policy states that "The STPSO Jail facility shall provide adequate bedding and linen, including a clean mattress with integrated pillow," to inmates, because bedding is recognized as a "reasonable necessity" for inmates. ~~Pl's SOF~~Id. at Nos. 34-35. STPSO officials admitted that pretrial detainees are not excluded from the written policy but that a custom and practice developed that excluded pretrial detainees in the holding cells from receiving bedding. ~~Pl's SOF~~Id. at No. 36. Instead, pretrial detainees in the holding cells are only provided with a blanket—no pad, linens, or pillow. ~~Pl's~~Id. at No. 37. Former Deputy Chief Longino testified that when holding cells exceed capacity, it is necessary for pretrial detainees in those cells to sleep on the floor of the holding cell.

~~Pl's SOF~~Id. at No. 100. Captain of Corrections, Richard O'Keefe, testified that "two weeks seems like a long time" to be sleeping on concrete. ~~Pl's SOF~~Id. at No. 140. Defendant Smith testified that sleeping on a floor in urine would be inhumane even for a few hours. ~~Pl's SOF~~Id. at No. 80.

In STPJ housing units, the lights turn off at 10:30 p.m. and turn back on at 6:00 a.m. "so the[] [inmates] can rest and recoup for the next day," and because STPSO determined that darkness is a necessity for sleep. ~~Pl's SOF~~Id. at Nos. 38-39. In the holding cells, however, the lights are left on, brightly illuminated, 24/7 so inmates have to sleep with the lights on. ~~Pl's SOF~~Id. at Nos. 40-41, 106.

**4. Recreation and fresh air.**

Former Deputy Chief Longino testified that he knew that there were Louisiana state regulations governing inmate recreation and access to fresh air that were not being followed with respect to the pretrial detainees in the holding cells. ~~Pl's~~Pl.'s SOF No. 107. Each of the holding cells at STPJ has a single window, above eye-level, which does not open. ~~Pl's SOF~~Id. at Nos. 13-14. Inmates in the STPJ holding cells were not provided with recreation time. ~~Pl's SOF~~Id. at Nos. 42, 142.

**5. Medical care.**

Defendant Smith did not adopt or implement a policy directing STPJ correctional officers on what to do if an inmate claims that he was taking prescription medication prior to being detained or when to refer a pretrial detainee to medical for medical processing. ~~Pl's~~Pl.'s SOF Nos. 7, 8. Nevertheless, Defendant Smith acknowledged in his deposition that "80-plus percent of the individuals we bring in are under some type of alcohol or illegal narcotic or both," and those people are housed in the holding cells. ~~Pl's SOF~~Id. at No. 150.

**6. Inmate grievances.**

Defendant Smith did not adopt or implement a policy or process for corrections guards to file complaints regarding jail conditions or operations. ~~Pl's~~Pl.'s SOF No. 10. The STPJ record keeping system placed inmate grievances in inmate files, so unless every inmate file is searched for a particular type of complaint, there was no way for the Sheriff or others to determine if there was a pattern of complaints developing about any particular issue. ~~Pl's SOF~~Id. at No. 109. If a complaint was received by staff regarding how holding was being operated, O'Keefe testified that there was no process in place to address that complaint, and the complaint would not be logged anywhere. ~~Pl's SOF~~Id. at No. 144. O'Keefe admitted in his testimony that there was no way for him to track if a pattern of complaints was developing about any particular guard. ~~Pl's SOF~~Id. at No. 145.

**B. Defendants and STPSO officials are unable to identify a legitimate penological interest for the inhumane conditions in the STPJ holding cells.**

Importantly, Defendants Smith and Kelly, along with other officials from STPJ who have been deposed in this case, were unable to articulate the penological interests behind: the holding cell policies outlined above, including not transferring pretrial detainees from the overcrowded holding cells into the open beds in the DOC or federal housing units (~~Pl's~~Pl.'s SOF No. 30); in not providing recreation time to pretrial detainees in the STPJ holding cells (~~Pl's SOF~~Id. at No. 108); and in holding pretrial detainees in overcrowded, filthy holding cells when beds were available in the DOC and federal inmate housing units (~~Pl's SOF~~Id. at No. 115). Nor does Defendant Smith know if the holding cell conditions described by Plaintiffs were imposed for penological or for punitive reasons because he never read the lawsuits or directed that the Plaintiffs' claims be investigated. ~~Pl's SOF~~Id. at Nos. 59, 60, 75.

Defendant Smith admitted at his deposition that, as Sheriff, he should know, but does not know, if pretrial detainees in the holding cells received recreation time; if more than 20 pretrial

detainees were housed in a holding cell; if pretrial detainees were held in holding in excess of 48 hours; and whether bedding was provided to pretrial detainees in the holding cells. ~~Pl's SOF~~Id. at No. 74. Further, Defendant Smith admitted that Plaintiffs' allegations regarding the conditions in STPJ holding cells were never investigated. ~~Pl's SOF~~Id. at Nos. 60, 75. Defendant Smith testified that allowing pretrial detainees to eat and sleep on the floor in cells with feces, blood, vomit, and urine on the floor was "inhumane." ~~Pl's SOF~~Id. at No. 80. Similarly, Former Deputy Chief Longino testified that the conditions the pretrial detainees were housed in were wrong, and that he does not think *anybody* should live like that, "not just detainees." ~~Pl's SOF~~Id. at 116-117. Longino also testified that he had heard of STPJ being referred to as "St. Slammany." ~~Pl's SOF~~Id. at No. 81-82.

Richard O'Keefe, Jr. served in 2019 as an STPSO Captain of Corrections and was in charge of booking in that role. ~~Pl's SOF~~Id. at No. 118. O'Keefe testified that he does not know if the Eighth or the Fourteenth Amendment protects the constitutional rights of pretrial detainees; does not know whether pretrial detainees enjoy greater rights than sentenced inmates; or if there are state or federal laws, standards, or operating procedures that govern the conditions of confinement for pretrial detainees. ~~Pl's SOF~~Id. at Nos. 118-121. O'Keefe testified that he regularly went into the control area of STPJ, where he could observe the condition of the holding cells, but never inquired as to whether STPJ was in compliance with state or federal law. ~~Pl's SOF~~Id. at Nos. 126-127. O'Keefe also admitted that he does not know if there is a Louisiana state regulation that governs whether pretrial detainees must be provided with bedding and could not explain why he never directed STPJ staff to provide pretrial detainees in the holding cells with bedding. ~~Pl's SOF~~Id. at Nos. 138-139. O'Keefe testified that holding cells were designed for short-term confinement but could not define "short-term" and was not aware of a jail standard that governs the issue. ~~Pl's SOF~~Id. at Nos. 128-129. He testified that in holding, pretrial detainees arrested for

murder would be intermixed with pretrial detainees who had unpaid parking tickets. ~~Pl's SOF~~Id. at No. 130. O'Keefe testified that he received daily inmate counts in the holding cells, claiming "I saw the numbers," and would have known that there were open beds in the DOC or federal housing units at the same time the holding cells were overcrowded with pretrial detainees waiting for permanent housing. ~~Pl's SOF~~Id. at Nos. 131, 133. O'Keefe testified that there were times that there were over 20 pretrial detainees in the STPJ holding cells when there were open beds in the DOC and federal housing units. ~~Pl's SOF~~Id. at No. 135. He was not aware of any jail standard or law that governed the issue of filling the holding cells beyond the capacity listed by the Fire Marshal. ~~Pl's SOF~~Id. at No. 132.

STPSO officials admit that they have no evidence to rebut Plaintiffs' claims that the holding cells were filled beyond capacity (~~Pl's SOF~~Id. at No. 23); that inmates slept on the holding cell floor in urine, feces, vomit, and blood (~~Pl's SOF~~Id. at Nos. 33, 143); that the holding cells were not cleaned or sanitized when there was urine, feces, vomit, and blood on the floors (~~Pl's SOF~~Id. at No. 103); or any of Plaintiffs' other claims regarding the holding cell conditions (~~Pl's SOF~~Id. at No. 143.).

**C. Mr. Williams' incarceration**

Plaintiff Floyd Williams was incarcerated at the St. Tammany Parish Jail in September 2019 after being arrested on non-violent misdemeanor charges. ~~Pl's~~Pl.'s SOF No. 152. Mr. Williams was held in Holding Cell #4 for five days, from September 28, 2019 to October 2, 2019. ~~Pl's SOF~~Id. at No. 154. During a previous and unrelated conversation with Defendant Smith when Smith was the police chief, he had told Mr. Williams that he "did not care about anyone's constitutional rights....We make our own laws." ~~Pl's SOF~~Id. at No. 153. Although the Fire Marshal set the capacity for the men's holding cells at 80 total detainees, *see* ~~Pl's SOF~~Id. at No. 95~~,~~.

**Formatted:** Font: Italic

Defendants' cell count sheets show that on each of the days Mr. Williams was incarcerated, a sufficient number of open beds in STPJ's permanent housing units were available and would have greatly reduced the overcrowding of the holding cells. ~~Pls' SOF~~Id. at Nos. 155-159. Mr. Williams testified that while he was incarcerated in Holding Cell #4 he shared the 12x22 foot cell with anywhere between 20 to 30 detainees at any given time, and testified that at times there were more than 30 detainees in the holding cell. ~~Pl's SOF~~Id. at Nos. 160-161.

Mr. Williams described Holding Cell #4 as containing two cement benches against the walls, with no beds or mats and an exposed toilet. ~~Pl's SOF~~Id. at No. 160. Although there was no beds or bedding in the holding cell, Mr. Williams testified that detainees would sometimes get a blanket or a sheet at night. ~~Pl's SOF~~Id. at No. 177. Mr. Williams testified that Holding Cell #4 had old food, urine, dirty toilet paper, blood, old Band-Aids, trash, and water on the floor, yet was not cleaned. ~~Pl's SOF~~Id. at No. 167. Detainees would urinate on the floor around the toilet, and the urine would track throughout the cell. ~~Pl's SOF~~Id. at No. 168. Mr. Williams testified that detainees got sick and vomited in the holding cells. ~~Pl's SOF~~Id. at No. 169. Mr. Williams also testified that while he was in Holding Cell #4, one of his cellmates defecated on himself and remained soiled in the holding cell for a day and a half before the STPSO staff gave the detainee a clean prison uniform to change into. ~~Pl's SOF~~Id. at No. 164. Mr. Williams likewise testified that one detainee entered the holding cell with sores and bleeding wounds, and the detainee bled on the floor of the holding cell for approximately two hours until medical came to get him in the middle of the night. ~~Pl's SOF~~Id. at No. 170. The inmate bled so severely that inmates had to stand up to avoid touching the blood on the floor, and the inmates were not able to clean up the blood because they were out of toilet paper. ~~Pl's SOF~~Id. at No. 171. Mr. Williams testified that the only space he could lay on to sleep was on the concrete floor which was covered in vomit, feces, and urine. ~~Pl's SOF~~Id. at

No. 173. Mr. Williams testified that STPJ guards provided two rolls of toilet paper per day, which all the detainees in the holding cell were required to share; if that amount of toilet paper was not sufficient for all the detainees in the holding cell, the guards would make the inmates beg for additional toilet paper but would nonetheless still often refuse to provide additional toilet paper. ~~Pl's SOF~~Id. at No. 162. Mr. Williams testified that because of the lack of toilet paper, he was not able to defecate when he needed to do so. ~~Pl's SOF~~Id. at No. 163.

Mr. Williams testified that he did not have access to soap, a shower, a toothbrush, or clean clothes until October 1, 2019, the fourth day of his incarceration. ~~Pl's SOF~~Id. at No. 165. He also testified that he was never given deodorant. ~~Pl's SOF~~Id. at No. 166. The same day, October 1, 2019, was the only time that Mr. Williams observed Holding Cell #4 be "cleaned"—an inmate trustee came into the cell while the pretrial detainees were allowed to shower and mopped the floor with a dirty mop and dirty brown mop water. ~~Pl's SOF~~Id. at No. 172. Even after being mopped, Mr. Williams testified that the holding cell smelled like human waste. ~~Pl's SOF~~Id. at No. 174. Despite these unsanitary conditions, Mr. Williams testified that he was forced to eat while sitting on the filthy cell floor. ~~Pl's SOF~~Id. at No. 175.

Mr. Williams testified that Holding Cell #4 was uncomfortable and "freezing cold." ~~Pl's SOF~~Id. at Nos. 160, 176. Despite the cold temperatures, STPJ guards threatened to withhold sheets and blankets if the detainees did not stay quiet. ~~Pl's SOF~~Id. at No. 178. Mr. Williams testified that there were some nights that he was not provided with a blanket. Id. As a result, Mr. Williams testified that he did not sleep throughout his incarceration in the STPJ holding cell. ~~Pl's SOF~~Id. at No. 179. He testified that detainees would "sleep right on" the urine, feces, vomit, and blood on the holding cell floor. ~~Pl's SOF~~Id. at No. 192. He further testified that "if everybody laid down, there was two people still standing every night." ~~Pl's SOF~~Id. at No. 191. Further, Mr. Williams

testified that the blankets from the holding cells would be placed in a 55-gallon tub and were returned to detainees the next night unwashed. Pl's SOFId. at No. 194.

Mr. Williams informed officers when he was arrested that he had several daily medications and asked STPJ staff to bring those medications with him but was told that the jail would throw the medications away. Pl's SOFId. at No. 194. Mr. Williams began to feel short of breath while being arrested, so the fire truck and ambulance were called for him. Pl's SOFId. at No. 195. At intake, Mr. Williams informed STPJ guards that he was on medications for chronic obstructive pulmonary disease (COPD), mild intermittent asthma, and essential hypertension, and explained his prescriptions, including his need for a rescue inhaler. Pl's SOFId. at No. 180, 196. Despite STPSO's knowledge of his medical conditions, Mr. Williams never received his own inhaler mediation for his COPD, received one "puff" from an inhaler that was used by the other detainees in Holding Cell #4 with him, and only received what he believed to be an aspirin or Bayer tablet. Pl's SOFId. at No. 181, 182, 197. He testified that he experienced shortness of breath while in Holding Cell #4 and informed both the nurse and the guards of this when they came around with other medications. Pl's SOFId. at Nos. 198, 199. Mr. Williams testified that he had enough trouble breathing in the holding cell that it kept him from sleeping at night. Pl's SOFId. at No. 200. Mr. Williams testified that he began to run a fever and feel sick on the third day of his incarceration at STPJ, and that his illness continued for about two weeks. Pl's SOFId. at No. 183. Mr. Williams testified that he and other inmates often begged for necessary medical attention to no avail while incarcerated in Holding Cell #4. Pl's SOFId. at No. 184. Mr. Williams testified that he was unable to go see a doctor after he was released from STPJ because he did not have insurance or the co-pay necessary to do so. Pl's SOFId. at No. 202.

Mr. Williams testified that when he and other detainees complained to guards about unhealthy living conditions in the holding cell, the guards would either ignore them, say something to the effect of "they don't call this St. Slamity for nothing," or "don't get arrested and you won't have this problem," or make fun of the detainees by rubbing their eyes like they were pretending to cry. ~~Pl's SOF No~~Id. at Nos. 185, 188. Mr. Williams testified that at least five STPJ guards told him and other inmates that the treatment they received in the holding cells was meant to teach the detainees a lesson and called the STPJ "St. Slamity." ~~Pl's SOF~~Id. at Nos. 186, 187. Mr. Williams testified that "whether you were in there because you committed a crime or, like me, didn't commit a crime, were just thrown in there, that people were being treated like this to show them that you don't act up in St. Tammany Parish. If you do, you come out of conformity, you will go and spend time in this rock. And it's known out there as St. Slamity, that you don't want to go there." ~~Pl's SOF~~Id. at No. 189. Mr. Williams testified that, as a result of the treatment and conditions he endured at STPJ, he has and continues to suffer from nightmares and feelings of depression, anxiety, and embarrassment. ~~Pl's SOF~~Id. at No. 190. He continues to feel anxiety and nervousness when he sees law enforcement. ~~Pl's SOF~~Id. at No. 201.

## III. LEGAL STANDARD

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015). "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (emphasis original). "A fact is '*material*' if it '*might affect* the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (emphasis original). "A genuine dispute of fact exists when the 'evidence is such that

a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, L.L.C. v. Haydel Enter. Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2003)). "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

"'A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (cleaned up). "Once the moving party fulfills this responsibility, the non-moving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536 (quoting *E.E.O.C.*, 773 F.3d at 694). "'If the moving party fails to meet this initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response.'" *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam)). "All facts and evidence are construed 'in the light most favorable to the nonmoving party,' and 'a court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence.'" *Houston v. Texas Dept. of Agri.*, 17 F.4th 576, 581 (5th Cir. 2021) (quoting *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013)).

"A plaintiff makes out a § 1983 claim if he 'shows a violation of the Constitution or of federal law, and then shows that the violation was committed by someone acting under color of

state law.'" *Rich v. Palko*, 920 F.3d 288, 293-94 (5th Cir. 2019) (quoting *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008)) (cleaned up). "A plaintiff suing for a constitutional violation has the ultimate burden to show that the defendant violated a constitutional right—that is, the plaintiff must make this showing whether or not qualified immunity is involved." *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 329 (5th Cir. 2020). "[M]unicipal liability under § 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

## IV. ARGUMENT

### A. Plaintiffs have provided sufficient evidence for a jury to determine that as a pretrial detainee, Mr. Williams' Fourteenth Amendment right not to be punished was violated.

The Defendants do not dispute Plaintiffs' status as pretrial detainees. Doc. 388-3 at p. 3. Under the Fourteenth Amendment, pretrial detainees' due process rights provide that because they have not been convicted of the crime with which they have been charged, they may not be punished for that crime. *Hamilton v. Lyons*, 74 F.3d 99, 104 (5th Cir. 1996). "Violation of an inmate's liberty interest in bodily integrity by denying him basic human needs such as reasonable medical care, personal safety, and sanitation can amount to punishment." *Jones v. St. Tammany Parish Jail*, 4 F. Supp. 2d 606, 610 (E.D. La. 1998) (citing *Partridge v. Two Unknown Police Officers of the City of Houston*, 791 F.2d 1182, 1186 (5th Cir. 1986)). "When the totality of conditions in a penal

institution violates the Constitution, the trial court's remedies are not limited to the redress of specific constitutional rights." *Miller v. Carson*, 563 F.2d 741, 751 (5th Cir. 1977) (citing *Gates v. Collier*, 501 F.2d 1291, 1309 (5th Cir. 1974)).

"Constitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a 'condition of confinement' or as an 'episodic act or omission.'" *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009). Challenges to "general conditions, practices, rules or restrictions of pretrial confinement" are not considered episodic violations. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 643 (5th Cir. 1996). Plaintiffs' constitutional challenge regarding the conditions in the STPJ holding cells fall under the conditions of confinement theory rather than the episodic acts and omissions theory of liability.

**1. Actual, persistent conditions in the STPJ holding cells violate the Fourteenth Amendment.**

Plaintiffs have provided sufficient evidence for a reasonable jury to determine that their conditions of confinement were intended as punishment and thereby violated the Fourteenth Amendment. As this Court has noted,

> The Eighth Amendment's prohibition on "cruel and unusual punishments" applies to both convicted and pretrial inmates through the Fourteenth Amendment's Due Process Clause and forbids conditions of confinement "which are incompatible with the evolving standards of decency that mark the progress of a maturing society...or which involve the unnecessary and wanton infliction of pain."

*Young v. Ledet*, No. 20-2165, 2021 WL 799683, *13 (E.D. La. Jan. 15, 2021) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) and *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (some internal quotation omitted); *see also*, *Harris v. Angelina Cnty., Tex.*, 31 F.3d 331, 334 (5th Cir. 1994) ("we think it sufficient to note that jail conditions which amount to 'cruel and unusual

punishment' under the Eighth Amendment surely amount to 'punishment' under the Fourteenth Amendment.").

To prove a conditions of confinement claim, Plaintiffs must demonstrate: (1) a rule, a restriction, an identifiable intended condition or practice, or a jail official's acts or omissions that were sufficiently extended or pervasive; (2) which were not reasonably related to a legitimate governmental objective; and (3) which caused the violation of plaintiff's constitutional rights. *Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203, 207 (5th Cir. 2011) (cleaned up). "Courts deciding the constitutionality of conditions of confinement of pretrial detainees must determine whether the conditions complained of are imposed for the purpose of punishment." *Hamilton*, 74 F.3d at 104 (citing *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)). "Courts may find a punitive purpose upon direct proof of an expressed intent by detention facility officers to punish the pretrial detainee for the crime with which the detainee has been charged but not yet convicted." *Id.* Courts may also "infer a punitive purpose if the challenged condition or restriction is not reasonably related to a legitimate governmental objective." *Id.*

Conditions themselves can constitute the harm. *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997). "This is true, for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions." *Id*. The Fifth Circuit has noted that "[i]n a condition of confinement case, the municipality is considered to have intended the alleged deprivation, and a constitutional violation occurs where we determine that 'the condition of confinement is not related to a legitimate, non-punitive governmental objective.'" *Hebert v. Maxwell*, 214 Fed. Appx. 451, 455 (5th Cir. 2007) (quoting *Scott*, 114 F.3d at 53). Indeed,

> In true jail conditions cases, an avowed or presumed intent by the State or its jail officials exists in the form of the challenged condition, practice, rule, or restriction. A State's imposition of a rule or restriction during pretrial confinement manifests an avowed intent to subject a pretrial detainee to that rule or restriction. Likewise,

> even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices. Thus, a true jail condition case starts with the assumption that the State intended to cause the pretrial detainee's alleged constitutional deprivation.

*Hare*, 74 F.3d at 644-45.

Here, Mr. Williams has testified that he was told by "[a]t least five" different employees something along the lines of "This is St. Slamity. If you don't like it, don't commit crimes in the parish," and that "the conditions of confinement were in place to teach inmates a lesson." *See*, ~~Pl's~~Pl.'s SOF Nos. 186-87. This evidence is supported by the Defendants' admitted intention to punish:

**O'Keefe, Jr., Major Richard, (Pages 69:9 to 70:7)**

69

Q. All right. So do you still want to stand by it was their choice to be in jail?
A. If we're discussing words, sir, your opinion is it's not their choice, and my opinion, it is their choice that they made a right or wrong decision.
Q. Fair enough. And because of that, too bad, they should just have to suffer whatever happens in the holding cells?
A. Suffer from how?
Q. Sleeping for two weeks on cement?
A. As stated, they were provided blankets in an environment that they were fed, provided medical attention. Somebody was watching over them.
Q. So if you can't do the time, don't do the crime, right?

70

MR. COLLINGS:
Object to the form.
THE WITNESS:
I've heard that phrase before.
BY MR. JACOB:
Q. Would you agree with that?
A. Sure. I would.

Ex. 2, O'Keefe Deposition, at 69:9-70:7.

Defendants' policies, or lack thereof, regarding pretrial detainees in STPJ holding cells created the nearly permanent overcrowding~~,~~ (Pl.'s SOF Nos. 2-4, 17, 80-81, 94, 96, 98-99, 126, 129, 135, 137), sanitation~~,~~ (Id. at Nos. 5-6, 31, 43-44, 81, 104-05, 111-12, 1127-18, 141), sleeping conditions~~,~~ (Id. at Nos. 9, 32-33, 36-37, 40, 81, 101-03, 143), and lack of medical care (Id. at Nos.

7-8) that Plaintiffs allege and which is shown by Plaintiffs' evidence. A reasonable juror could determine that these conditions were inflicted upon the pretrial detainees in STPJ holding cells for punitive rather than administrative purposes. This conclusion is underscored by the fact that the Defendants failed to provide this Court with legitimate governmental objectives justifying the conditions of confinement, instead merely arguing that independently, each condition has not been found *per se* to violate the constitution by courts. *See generally*, Doc. ~~238~~388-3~~.~~ at 12.

**a. The conditions in the holding cell, including overcrowding, length of stay, sanitation, and inmates sleeping on the floor in filth, are all related, the result of policy decisions by Defendants, and must be considered together.**

Defendants urge this Court to view the overcrowding, the abysmal sanitation, the sleeping on the floor, and the length of Mr. Williams' incarceration in the holding cells as independent events, each failing to rise to the level of a constitutional violation because they are "short-term" or episodic inconveniences. *See* Doc ~~238~~388-3 at ~~pp. 3, 10, 11,~~ 12~~, 15~~-14, 20. But Plaintiffs here bring a conditions of confinement case. *See*, *Scott*, 114 F.3d at 53 n.2 (collecting conditions of confinement cases that include length of pre-trial detention, placement of mattress on floor, and overcrowding). "[A] detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights.... In the absence of any legitimate penological or administrative goal, this amounts to punishment." *Shepherd*, 591 F.3d at 454; *cf*, *Scott*, 114 F.3d at 53 ("In contrast, where the complained-of harm is a particular act or omission of one or more officials, the action is characterized properly as an 'episodic act or omission' case...In

an 'episodic act or omission' case, an actor usually is interposed between the detainee and municipality, such that the detainee complains first of a particular act of, or omission by, the actor[.]").

"Conditions of confinement claims are analyzed under a 'totality of the conditions test.'" *Poyer v. Stalder*, No. 06-0792, 2006 WL 2054450, *5 (W.D. La. Jun. 26, 2006) (quoting *McCord*, 910 F.2d at 1250); *see also*, *Rhodes*, 452 U.S. at 362-63 (It is important to recognize that various deficiencies in prison conditions 'must be considered together.' The individual conditions 'exist in combination; each affects the other; and taken together they [may] have a cumulative impact on the inmates.' ... Even if no single condition of confinement would be unconstitutional in itself, 'exposure to the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment." (Citations omitted)); *Jones*, 636 F.2d at 1368. Similarly, "the length of time spent in the offensive conditions should be taken into account." *Alexander v. Tippah Cnty, Miss.*, 351 F.3d 626, 630 (5th Cir. 2003) (citing *Hutto v. Finney*, 437 U.S. 678, 686 (1978)). "A filthy, overcrowded cell...might be tolerable for a few days and intolerably cruel for weeks or months." *Hutto*, 437 U.S. at 686-87. Each Plaintiff's claims here are related in that each provides evidence of the general conditions, customs, and policies maintained in the STPJ holding cells by Defendants.

**b. Defendants have been on notice of the holding cell conditions since at least 2012.**

The holding cell conditions Plaintiffs, including Mr. Williams, have provided evidence of were essentially permanent and ongoing and the result of policy choices, or lack thereof, made by Defendants. Pl.'s SOF Nos. 2-10, 17-18, 21-37, 40-44, 80-81, 94, 96-109, 111-18, 129, 135, 137, 139, 140-43, 148. In 2012, while investigating a completely different matter—suicide prevention protocols at STPJ—the DOJ Civil Rights Division took time to inform STPSO that it observed

several matters which, although not part of their investigation, should be recognized and corrected. The DOJ[5] wrote:

> Beyond the staffing shortages that we noted during our tour, we observed, while on site, as many as 30 prisoners held in holding cells that are designed for 20 prisoners. Many prisoners complained of not being seen by medical staff for several days. Even more concerning, we noted that prisoners were sleeping on floors and benches in the holding cells with little or no bedding articles. When asked about the deplorable conditions in the holding cells and the delays in providing timely medical screenings, Jail staff admitted that overcrowded conditions at the Jail limited the ability to provide timely assessments of the prisoners held in the holding cells at the Jail. Jail staff further noted that because of security staffing shortages, prisoners were required to remain in the holding cells for days if not weeks before they were assigned to housing units.

2012 DOJ Letter to STPSO, attached hereto as Exhibit 6, at p. 5. Thus, Defendants had been on notice since ***at least 2012***, that the holding cells at STPJ were overcrowded, that adequate medical care was being denied to detainees in the holding cells, that detainees were being forced to sleep on the floor of the holding cells with little to no bedding, that the conditions inside the holding cells were "deplorable," and that it was taking days if not weeks to process pretrial detainees through holding into housing units. *Id.* These conditions had not changed by 2019 when Mr. Williams was incarcerated, and in fact, as Plaintiffs have shown, Defendant Smith had not adopted or implemented policies to correct these issues by the time Plaintiffs were incarcerated at STPJ. Pl.'s SOF Nos. 2-10, 17-18, 31, 43-44, 80, 99, 105, 108, 113-18, 123, 124, 125, 126, 136, 137, 139, 140-43, 148.

---

[5] Apparently, the DOJ was not aware that the Sheriffs had agreed to operate STPJ in accordance with the Basic Jail Guidelines, which as discussed above, by virtue of the Sanitary Code, set the maximum capacity of each holding cell at 16 inmates. Pl.'s SOF Nos. 264-266.

Additionally, Defendants have provided absolutely no evidence that the conditions in the STPJ holding cells were compelled by necessity or penological interests[6] and could not have been mitigated. *Compare* 388-3 at 12 ("every single action undertaken by the STPJ is dictated by what is allowable by the STPJ's available manpower at that time, which is as clear a penological interest as possible.") *with* Pl.'s SOF Nos. 30, 76, 109, 113, 116-18, 137. Nor do Defendants assert safety, security, inmate management, or administrative purposes for the following: overcrowding the holding cells while a sufficient number of open beds were available in permanent housing units for all the pretrial detainees in the holding cells during Mr. Williams' incarceration; maintaining pretrial detainees in the holding cells for days and weeks before processing them into the jail in a knowing violation of Louisiana law; keeping the pretrial detainees in the overcrowded holding cells 24 hours a day without recreation or showers; failing to provide adequate sanitation and medical attention; and having a non-existent grievance procedure for the pretrial detainees. *Id.* Indeed, Defendants present ***no reason whatsoever*** for a single one of the conditions Plaintiffs suffered in the STPJ holding cells, except a belief that Defendants are allowed to maintain these conditions as they please. *Id.*

**c. Overcrowding**

Plaintiffs provide sufficient evidence that the STPJ holding cells were chronically overcrowded, even when cells and beds were available in other areas of the jail. While overcrowding itself is not *per se* unconstitutional, it may give rise to unconstitutional conditions. *Castillo v. Cameron Cnty., Tex.*, 238 F.3d 339, 354 (5th Cir. 2001). The Fourteenth Amendment

[6] Defendants' jail expert Leonard Vare attempts to conflate the reasoning for the STPJ holding cell conditions by citing issues arising from the 2020 coronavirus pandemic; however, COVID-19 was not a consideration during Mr. Williams' 2019 incarceration in the STPJ holding cells. *See generally*, Doc. 234-7.

**Formatted:** Font: 12 pt

**Formatted:** Font: 12 pt

prohibits "the imposition of conditions of confinement on pretrial detainees that constitute punishment." *Collins v. Ainsworth*, 382 F.3d 529, 540 (5th Cir. 2004) (internal quotation marks omitted).

"In *Bell*, ... the Supreme Court recognized that subjecting a pretrial detainee to overcrowded conditions can, in some circumstances, violate the constitution." *Oladipupo v. Austin*, 104 F. Supp. 2d 626, 637 (W.D. La. Apr. 24, 2000) (citing *Bell*, 441 U.S. at 542). "Factors the Supreme Court considered in assessing whether 'overcrowding' amounts to a constitutional violation are the length of time an individual detainee must spend in a confined area both ultimately and on a daily basis, and the adequacy of the given sleeping space." *Id.* (citing *Bell*, 441 U.S. at 543). Further, the *Oladipupo* Court noted that "[t]he constitutional right of detainees to be free from overcrowding is firmly established." *Id.* In *Oladipupo*, the court denied defendants' summary judgment because they had failed to present evidence establishing that their detainment unit was not overcrowded. Likewise, Defendants here have not refuted that the STPJ holding cells were overcrowded, and in fact have admitted that the holding cells were regularly above capacity. Pl.'s SOF Nos. 22, 24, 28, 96-99, 113, 135, 147. Nor have they indicated any legitimate interests in maintaining the crowding in the holding cells when other beds were readily available inside the jail. Id. at Nos. 30, 116.

Defendants' cited cases do not support their argument that overcrowding is not unconstitutional and are factually dissimilar to the present case. *See* Doc. ~~238~~388-3 at p. ~~11~~10.[7] In *Collins*, 70-80 people, including the plaintiffs, were held in a 50-person capacity jail overnight. 382 F.3d at 535. The next morning, judges were brought to the jail to bond the arrestees. *Id.* The

[7] *See*, *Collins*; *Crook v. McGee*, No. 2:07cv167-MTP, 2008 WL 53269 (S.D. Miss. Jan. 2, 2008); *Chavera v. Allison*, No. 1:08cv256-JMR, 2009 WL 1011157, (S.D. Miss. Apr. 15, 2009); and *Robertson v. Coahoma County, Miss.*, No 2:07CV78-SA-SAA, 2008 WL 3334091 (N.D. Miss. Aug. 6, 2008).

*Collins* court determined that this temporary overnight overcrowding, where "there [was] nothing to indicate that unsanitary or unsuitable conditions amounting to punishment resulted," and where there was a legitimate interest in detaining the arrestees overnight until judges could arrive to determine bond, did not rise to the level of a constitutional violation. *Id.* at 545-46. In *Crook*, the plaintiff alleged that overcrowding forced him to sleep on a mattress on the floor, that his cell and the shower were covered in mold and were "unsanitary," and that he was forced to share his toothpaste with 30 inmates. 2008 WL 53269 at **2-3. The *Crook* Court found the plaintiff failed to allege overcrowding amounted to punishment and was not reasonably related to a legitimate governmental purpose and dismissed his claims *sua sponte*. *Id.*

In *Robertson*, the plaintiff alleged that overcrowding forced him "often" to lay on the floor, but the record showed a cot was available. 2008 WL 3334091 at *5. The *Robertson* Court found that the plaintiff failed to present evidence that the jail was overcrowded and not reasonably related to a legitimate governmental purpose. *Id.* In *Chavera*, the court noted that "the record is bereft of any facts tending to indicate that Defendant was actually aware of the allegedly unconstitutional conditions at [the jail]." 2009 WL 1011157 at *5. Without evidence that conditions at the jail were maintained either arbitrarily or purposelessly and that the Defendant was capable of operating the facility in a different matter, the *Chavera* Court determined that it was unable to conclude that the defendant violated plaintiff's constitutional rights. *Id.* These cases are inapposite to the issues before this Court.

In contrast, here, the overcrowding of the STPJ holding cells was chronic and long lasting and known to the Defendants. Pl.'s SOF Nos. 22, 24, 51, 96-100, 113-15, 135, 147. Defendants were put on notice as early as 2012 by the Department of Justice that the holding cells were concerningly overcrowded, that the conditions inside the holding cells were deplorable, and that,

because of the overcrowding, pretrial detainees were forced to sleep on the floor with little to no bedding. Ex. 6, 2012 DOJ Letter to STPJ, at p. 5. Former Deputy Chief Longino admitted at his deposition that overcrowding was a longstanding issue that had been ongoing at STPJ since the 1990s, (Pl.'s SOF No. 96) and noted that the previous Sheriff had developed a "Code 6" program to try and alleviate some of the overcrowding issues at STPJ., (Pl.'s SOF No. 51). Defendant Kelly admitted at deposition that the jail regularly filled the holding cells beyond capacity. Id. at No. 147. Defendant Smith, the Sheriff of St. Tammany Parish and the final policymaker for the jail, testified that he reviewed inmate count sheets on a regular basis, but somehow was not able to tell by the number of detainees in holding that the holding cells were overcrowded. Id. at Nos. 1, 48, 77, 79.

Captain of Corrections O'Keefe testified that he also looked at inmate counts regularly, (Id. at No. 133), and often observed the conditions inside the holding cells from the STPJ control area., (Id. at No. 128). O'Keefe testified that he knew there were times when more than 20 inmates were held in a holding cell while open beds in the DOC and federal housing units were available. Id. at No. 135. Defendant Smith testified that he did not know if the holding cell conditions were imposed for penological or punitive purposes because he never read the lawsuits or directed that Plaintiffs' claims be investigated. Id. at Nos. 59-60, 76. Defendants admit that they placed their voluntarily assumed contractual obligations to DOC and federal inmates, who Defendants housed for profit, above the legal duty owed to the pretrial detainees they were required to house. *See* Doc. ~~238~~388-3 at pp. ~~16-18~~8-11. Defendants have provided no penological reason for favoring DOC and federal inmates to be housed properly in the jail, beyond that those inmates are more profitable to them than local detainees in the holding cells. Pl.'s SOF Nos. 30, 61-68, 116. Nor have Defendants provided any evidence that they are contractually obligated to keep local pretrial

detainees separate from DOC and federal inmates. *Compare* Doc. 388-3 at 8-11 *with* Pl.'s SOF Nos. 67-69, 114-16. This extreme segregation is merely a policy choice made by Defendants Smith and Kelly. Pl.'s SOF Nos. 69-70, 80, 114, 147-48. Indeed, Longino admitted that there was no penological interest served by housing pretrial detainees in the overcrowded holding cells when beds were available in other housing units at the jail[8]. Id. at Nos. 114-16.




Surveillance camera view of STPJ holding cell. Toilet located top left behind blue partition. Toilet paper in vents.

Defendants' jail practices expert, Lenard Vare's, report succinctly shows that it was possible to quickly move pretrial detainees out of the holding cells to other beds to ease overcrowding. *See* Doc. 238-6 at pp. 29-32. In his report, Mr. Vare shows that when the Fire Marshal came and informed STPJ officials that they were overcrowding the holding cells, those numbers could be reduced significantly within 24 hours. *Id*. For example, Mr. Vare's report indicates that the Fire Marshal inspection of August 23, 2019 showed ***32 detainees*** in Holding Cell #1, ***25 detainees*** in Holding Cell #2, ***24 detainees*** in Holding Cell #3, and ***18 detainees*** in Holding

Formatted: Font: Italic

[8] In addition, Defendant Smith could not identify whether there was a penological reason for the conditions of the holding cells, testifying that he did not know if the holding cell conditions were imposed for penological or punitive purposes. Pl's SOF Nos. 74-76.

Cell #4, for a total of ***99 pretrial detainees*** in the holding cells.[9] *Id.* at p. 30. The next day, August 24, 2019, the Fire Marshal indicated that there were 8 detainees in Holding Cell #1, 14 detainees in Holding Cell #2, 9 detainees in Holding Cell #3, and 7 detainees in Holding Cell #4, for a total of 38 detainees. *Id.* That is a reduction of 61 detainees in holding within 24 hours. On October 14, the Fire Marshal indicated that the Holding Cells were over capacity with ***87 detainees***. *Id.* By October 15, 2019, the holding cells were down to 72 detainees, a reduction of 15 detainees within 24 hours. *Id.* at pp. 30-31. Similarly, on January 6, 2020 the Fire Marshall noted that there were ***90 detainees*** in the holding cells. *Id.* at p. 31. On January 7, 2020, the Fire Marshal noted that there were 68 detainees, a reduction of 22 inmates within 24 hours. *Id.* In all three instances, Defendants were able to reduce the number of pretrial detainees in holding significantly within 24 hours—but only after ordered to do so by the Fire Marshal. This indicates that Defendants had the ability to reduce the holding cell overcrowding at any time but chose not to do so. This custom or practice of routinely overcrowding the holding cells until the Fire Marshal ordered Defendants to come into compliance was arbitrary and lacked penological purpose. *See* Pl.'s SOF Nos. 30, 76, 116, 230, 235. A reasonable factfinder could infer that it was meant as punishment, in violation of the Fourteenth Amendment's protection against punishment before being adjudicated guilty of a crime.

In *Bell*, the Supreme Court was asked whether "double-bunking"—or having a bunkbed in each cell—was a violation of the cruel and unusual clause of the Eighth Amendment. 441 U.S. at 541. The Court looked to the amount of time the inmates were confined to the double-bunked cells, finding that inmates were generally locked into their cells for a total amount of seven or eight hours

Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic

---

[9] It should be noted that there are discrepancies between the Fire Marshal numbers and the numbers provided by Defendants in their Cell Count documents turned over during discovery in this case. *See*, Ex. 5, September 2019 Jail Counts.

a day, mostly at night; at all other times they were permitted to move freely between their cells and the common areas. *Id.* at 541, 543. The Court also noted that each of the cells had approximately 75 square feet of floor space for both occupants to utilize. *Id.* at 541. Given that the jail had seen an "unprecedented" increase in the number of persons committed to pretrial detention while the jail was being built, and that only two inmates were assigned to each cell, the *Bell* Court determined that the plaintiffs had not adequately pleaded unconstitutional cell crowding. *Id.*

In contrast, the STPSO places 10-15 times the number of detainees in the 12x22 holding cells than the *Bell* defendants did in their double-bunked cells, even though those cells have an area only 3 ½ times larger than the *Bell* cells. Pl.'s SOF Nos. 11, 21-25, 135, 146. Worse, the inmates in the crammed STPJ holding cells did not have beds, padding, a mat, or a mattress, unlike *Bell*. Id. at Nos. 12, 21-24, 37. The STPJ holding cells were so crowded that the adequacy of the given sleeping space was constitutionally deficient. In fact, pretrial detainees in the holding cells were unable to all lay down and sleep at once. As Mr. Williams testified, "I mean, if everybody laid down, there was two people still standing every night." *See*, ~~Pl's SOF~~Id. at No. 190. The STPJ pretrial detainees were not permitted to move freely between the holding cells and the common areas, and except for a periodic shower, were locked in the cells 24 hours a day without fresh air, recreation, or exercise. Id. at Nos. 14, 108-09, 115, 142. Because the cells were as crowded as they were, and without the requisite cleaning supplies and only a single roll of toilet paper to share, sanitation became an issue despite the pretrial detainees' efforts to keep the area clean. Id. at Nos. 102-04, 112, 168-72.

Further, only the STPJ holding cells were overcrowded while open beds were available in the permanent housing units—an arbitrary policy created by Defendants Smith and Kelly so that they could maximize profits and pay raises to employees. Id. at Nos. 28, 29, 64-70, 72, 79, 85, 98-

99, 112-13, 134, 136-37, 148; *See*, *Bell*, 441 U.S. at 539 ("if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees."). A reasonable jury could determine that pretrial detainees were intended to be punished by the overcrowding of the holding cells when open beds were readily available after processing at STPJ. Even if this arbitrary overcrowding does not, by itself, violate the constitution, a reasonable jury could find that its combination with the other holding cell conditions with which the overcrowding is inextricable violated Mr. Williams' Fourteenth Amendment rights.

Finally, Defendants' argument that Judge Vitter previously stated that Plaintiffs had failed to provide any evidence that the overcrowding in STPJ's holding cells was intended to be punitive is not applicable here. *See*, Doc ~~238~~388-3 at ~~pp. 11-12~~17. That finding was based on a motion for preliminary injunction in April 2020, before any discovery in this matter had been conducted, and before the Supreme Court decided *Taylor v. Riojas*, 141 S. Ct. 52 (2020). As established above, discovery revealed a significant amount of evidence from which a punitive purpose may be inferred, *i.e.*, the testimony and admissions of Defendants and other STPSO officials, the testimony of Mr. Williams that he was told as much by guards, and the testimony of the other Plaintiffs in this matter.

**d. Length of stay**

Defendants argue that Mr. Williams' five days in a holding cell was "such a short period of time" that it was insufficient to constitute a constitutional violation. *See* Doc. ~~238~~388-3 at ~~p.~~ 10. Nevertheless, the Fifth Circuit "has found violations of the Eighth Amendment for conditions lasting less than twenty-four hours." *Alexander*, 351 F.3d at 631 (citing *Palmer v. Johnson*, 193

F.3d 346, 354 (5th Cir. 1999)). Further, none of Defendants' cited cases address *Taylor v. Riojas*, in which the Supreme Court reversed a Fifth Circuit decision regarding whether jail officials had qualified immunity for housing an inmate in "a pair of shockingly unsanitary cells" for six days in 2013. 141 S. Ct. 52, 53 (2020). The Fifth Circuit found that although there were sufficient questions of fact regarding whether Taylor's Eighth Amendment rights had been violated, the jail officials were entitled to qualified immunity. *Taylor v. Stevens*, 946 F.3d 211, 222 (5th Cir. 2019). The Fifth Circuit reasoned, "The law wasn't clearly established. Taylor stayed in his extremely dirty cells for only six days. Though the law was clear that prisoners couldn't be housed in cells teeming with human waste for months on end, we hadn't previously held that a time period so short violated the Constitution," and therefore the jail officials lacked fair warning that their specific acts were unconstitutional. *Id.* The Supreme Court rejected the Fifth Circuit's reasoning wholesale, noting that no reasonable officer in 2013 could have concluded that it was constitutional to house an inmate in such conditions even "just" for six days, that the Fifth Circuit had "identified no evidence that the conditions of Taylor's confinement were compelled by necessity or exigency," nor did the record at summary judgment "reveal any reason to suspect that the conditions of Taylor's confinement could not have been mitigated, either in degree or duration." 141 S. Ct. at 54. "'The obvious cruelty inherent' in putting inmates in certain wantonly 'degrading and dangerous' situations provides officers 'with some notice that their alleged conduct violates' the Eighth Amendment." *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 745 (2002)) (cleaned up).

Of concern to the Supreme Court was the fact that Taylor had to sleep naked for two nights in "sewage" on a cell's floor because there was no bed and because the drain in the floor used as a toilet was backed up. *Taylor*, 141 S. Ct. at 53; *Stevens*, 946 F.3d at 218-19. Further, the Court noted that the record "suggests" that the guards intended the cells to be punishment, or were deliberately

indifferent to the cell conditions, looking to their statements that Taylor "was going to have a long weekend," and that they hoped Taylor would "fucking freeze." *Taylor*, 141 S. Ct. at 54. Here, although permitted to sleep in a prison uniform and at times a blanket, Mr. Williams had to sleep on the floor with human waste and other bodily fluids without the ability to clean the floor beforehand or himself afterward for a period of five days. Pl.'s SOF Nos. 173, 154. Likewise, Mr. Williams heard guards tell him and others not to engage in crime if they do not like the holding cell conditions, and that those conditions were meant to send pretrial detainees a message. Id. at Nos. 184-88. Captain O'Keefe testified to the same effect: pretrial detainees made a choice to commit crimes and therefore deserve the conditions; even though they have not yet been tried or convicted. Ex. 2, O'Keefe Dep., at 69:9-80:7.

Defendants admit that they regularly violated Title 22, Part III, Subpart 2, Section 3301(F) of the Louisiana Administrative Code, because they knowingly and regularly kept pretrial detainees in the holding cells for longer than 48 hours even when open beds were available in the federal and DOC permanent housing units. Pl.'s SOF Nos. 73-75, 91-93, 99. At his deposition, Defendant Smith shockingly admitted that he was not familiar with Title 22 and was unable to articulate his legal obligations to inmates beyond the state and federal policies adopted by STPJ when they began taking federal and DOC inmates. Id. at 73-75. Former Deputy Chief Longino testified that he knew that he needed to follow Title 22 but admitted that STPSO did not follow that law in 2019. Id. At Nos. 91-94, 99. While the regular and ongoing violation of the Sanitary Code and Title 22 is not a *per se* constitutional violation, it is probative evidence that Defendants' policies are legally insufficient and tends to show that Defendants had "some notice" that their conduct was unlawful and that they were deliberately indifferent to the legal rights of the local pretrial detainees housed in the holding cells at STPJ. *See*, *Taylor*, 141 S. Ct. at 54.

Defendants urge this Court to view the length of Mr. Williams' stay in a vacuum. Moreover, despite the fact that the conditions that Plaintiffs, including Mr. Williams, complain about were continual, Defendants refer to the conditions as "short-term." Doc. 388-3 at 20. They are not. Pl.'s SOF Nos. 73-75, 91-93, 99. Defendants are asking this Court to ratify their conduct of mistreating pretrial inmates and to dismiss the injuries caused as *de minimis*. To the contrary, the experience was anything but *de minimis*,. Rather, for the hundreds of inmates who experienced those conditions every month (including Mr. Williams and his Co-Plaintiffs here), as the Sheriff correctly noted, it was "inhumane." Id. at No. 81.

If STPJ were cycling inmates out of the holding cells in a reasonable amount of time, or even attempted to be somewhat compliant with Louisiana law, the argument might hold. Instead, Defendant Smith decided to cram the pretrial detainees into holding cells in inhumane conditions for the sole reason of profiting from same. *See,* Id. at Nos. 54-55, 64-72, 85. Being able to avoid additional taxes while providing raises to employees is sure to garner political favor.

While Defendants insist that parish detainees are not put in the holding cells as punishment, pretrial detainees are arbitrarily made to live in harsher conditions than those in permanent housing—without bedding, (Id. at Nos. 9, 36-37), without fresh air, (Id. at Nos. 14, 108), without recreation, (Id. at Nos. 42, 108, 142), without cleaning supplies, (Id. at Nos. 172-73), without clean clothing, (Id. at No. 165), without space to sleep, (Id. at Nos. 32, 81, 101-06, 173, 179, 190), without being able to sleep and eat free from human waste, (Id. at Nos. 101-06, 173-75), without regular showers, (Id. at Nos. 44, 165), and without having the lights turned out for days or weeks at a time, (Id. at Nos. 40-41), because they produce less yearly revenue than the DOC and federal inmates produce., (Id. at Nos. 62-80). There is absolutely no legitimate penological interest in this, particularly when those pretrial detainees have not been convicted of

a crime. Id. at Nos. 30, 109, 116. Despite the open question of whether Mr. Williams deserved to be incarcerated *at all*, he was subjected to conditions that Defendant Smith himself admitted were so inhumane that he would not tolerate them for even a few hours. Id. at No. 81. Regardless, Mr. Williams was punished for his "crime" by being locked in a holding cell for five days in inhumane conditions. That is hardly *de minimis*. Id. at No. 154, 180.

**e. Sanitation and hygiene products**

The Fifth Circuit has long held that the constitution "forbids deprivation of the basic elements of hygiene" from inmates. *Daigre v. Maggio*, 719 F.2d 1310, 1312 (5th Cir. 1983) (citing *Novak v. Beto*, 453 F.2d 661, 665 (5th Cir. 1971) (collecting cases)). "A condition is usually the manifestation of an explicit policy or restriction: the number of bunks per cell, mail privileges, disciplinary segregation, etc." *Shepherd*, 591 F.3d at 452. "In some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by jail officials, to prove an intended condition or practice.'" *Id.* (cleaned up). "To rise to the level of a constitutional violation, the conditions must be 'so serious as to deprive plaintiff of the minimal measure of life's necessities, in this case the basic human need for sanitary conditions.'" *Payton v. Gusman*, No. 12-2578, 2013 WL 5530280, *5 (E.D. La. Oct. 7, 2013) (quoting *Alexander*, 351 F.3d at 630) (cleaned up). "[T]here is a point beyond which a prison's conditions are so unsanitary as to render them unconstitutional." *Heaton v. Normand*, No. 17-405, 2017 WL 3268341, *4 (E.D. La. June 22, 2017). Plaintiffs are not complaining about mold, mildew, dust, or insects and vermin inside the holding cells, *see id.* at **4-5, *Courteaux v. Larpenter*, No. 19-13173, 2020 WL 2771755, *8 (E.D. La. Apr. 27, 2020), but rather that there was urine, feces, blood, and vomit on the floors of the holding cell where they were forced to sit, eat, and sleep 24 hours a day for the entirety of their

time in holding without adequate cleaning supplies to mitigate their exposure to human waste and other bodily fluids. Pl.'s SOF Nos. 31, 101-06, 141, 171-75, 165. These allegations are corroborated by Former Deputy Chief Longino, who admitted there were times when the holding cells were not cleaned and had feces, urine, vomit, and blood on the floors.. Id. at Nos. 101-05.

In *Gates v. Cook*, the Fifth Circuit determined that a jail that was aware of "ping-pong" toilets (connected toilet lines where one toilet would overflow when another toilet on the line was flushed) for over a decade was deliberately indifferent to a serious risk of substantial harm to inmates in violation of the Eighth Amendment and allowed an injunction to stand. 376 F.3d 323, 341 (5th Cir. 2004). "No one in civilized society should be forced to live under conditions that force exposure to another person's bodily wastes." *Id.* at 334. As the *Gates* Court noted, "exposure to waste may constitute cruel and unusual punishment" and that "the length of time a prisoner must endure unsanitary conditions is undoubtedly a factor in the constitutional calculus." *Id.* at 341 ("Frequent exposure to the waste of other persons can certainly present health hazards that constitute a serious risk of substantial harm.").

Likewise, in *Harper v. Showers*, the Fifth Circuit determined that an inmate who was often moved into "filthy, sometimes feces-smeared, cells" and other unacceptable conditions, had been "deprived...of cleanliness, sleep, and peace of mind" and had stated an Eighth Amendment claim. 174 F.3d 716, 717, 720 (5th Cir. 1999). The *Harper* Court noted that "sleep undoubtedly counts as one of life's basic needs. Conditions designed to prevent sleep, then, might violate the Eighth Amendment." *Id.* Courts in this District have taken these two cases to stand for the proposition "that *virtually permanent* conditions of cells that contained excrement and other filth violate the Eighth Amendment." *Hines v. Cain*, No. 06-3772, 2007 WL 891875, *9 (E.D. La. Mar. 20, 2007)

(emphasis original); *see also*, *Jackson v. Gusman*, No. 15-244, 2015 WL 5823295, *6 (E.D. La. Oct. 6, 2015); *Selestan v. Gusman*, No. 13-6468, 2015 WL 6442345, *8 (E.D. La. Oct. 23, 2015).

In *Taylor v. Riojas*, the Supreme Court determined in that, as of 2013, no reasonable correctional officer could conclude that it was constitutional to house an inmate in "deplorably unsanitary conditions" even for only six days. 141 S. Ct. 52, 53 (2020). There, inmate Taylor was placed in a cell "covered nearly floor to ceiling in massive amounts of feces: all over the floor, the ceiling, the windows, the walls, and even packed inside the water faucet." *Id.* (internal quotation marks omitted). Taylor was then moved to a "frigidly cold cell," with a clogged drain on the floor to use as a toilet. *Id.* While Taylor resisted as long as he could, he eventually relieved himself, causing raw sewage to spill across the floor. *Id.* Because the cell did not have a bunk, and Taylor had been denied clothing, Taylor was forced to sleep unclothed in the raw sewage from the drain. *Id.* Although the Fifth Circuit had determined that the prison officials responsible for Taylor's confinement did not have fair warning that housing Taylor in "'cells teeming with human waste' 'for only six days,'" was a constitutional violation and were therefore entitled to qualified immunity, the Supreme Court reversed. The *Taylor* Court noted that "[t]he Fifth Circuit identified no evidence that the conditions of Taylor's confinement were compelled by necessity or exigency," nor did the record at summary judgment "reveal any reason to suspect that the conditions of Taylor's confinement could not have been mitigated, either in degree or duration." *Id.* at 54.

Defendants cite *Young v. Ledet* in support of their contention that eight days without a shower has been found constitutional. *See* Doc. 238-3 at p. 25; 2021 WL 799683 at *54. *Young* is inapposite here, as the complaint about lack of showers in that case concerned the immediate aftermath of a hurricane evacuation—truly a temporary and emergency situation. 2021 WL 799683 at *20. This is diametrically opposed to Plaintiffs' claims here: that Mr. Williams, and other pretrial

detainees in the STPJ holding cells, were regularly denied access to showers and clean clothing without hurricanes or other emergencies creating the temporary necessity of those conditions. Pl. SOF No. 165.

Defendants' additional caselaw is equally distinguishable as the cases involve convicted individuals, temporary situations, and attempts at accommodation by the institutions. *Hamilton v. Lyons* dealt with a parolee who was arrested for a crime committed while on parole and was denied showers and other accommodations for three days until booked into Dallas County Jail. 74 F.3d at 106 ("Unlike the typical pretrial detainee, the justification for the detention of a detained parolee is dual. As noted by the Seventh Circuit, the detention and subsequent reincarceration of a parolee are only *triggered* by the new arrest; detention and reincarceration are *justified* by the prior conviction." (emphasis original~~)).~~). Parolees are in a very different legal position than pretrial detainees, who have not yet been adjudicated guilty of a crime. Likewise, in *Jaros v. Illinois Department of Corrections*, the showers did not adequately accommodate the inmate's physical disabilities, causing the inmate to limit himself to approximately one shower a week. 684 F.3d 667, 669 (7th Cir. 2012).[10] The Seventh Circuit reasoned that, although "[a]dequate food and facilities to wash and use the toilet are among the 'minimal civilized measures of life's necessities,' that must be afforded prisoners," the inmate had not alleged that he had been *denied access* to the showers, but merely that they were difficult for him to use without accommodations for his disability. *Id.* at 670-71 (internal citations omitted). The *Jaros* Court determined this was insufficient to state an Eighth Amendment claim. *Id.*

---

[10] It should be noted that *Jaros* was decided at the pleadings stage and not summary judgment. 684 F.3d at 669. Likewise, *Jaros* and *Shakka* both involve inmates who had been convicted of crimes, not pretrial detainees. 684 F.3d at 669; 71 F.3d at 165.

*Shakka v. Smith* is similarly unavailing. 71 F.3d 162 (4th Cir. 1995). There, a convicted inmate was temporarily placed in a cell without his wheelchair after pulling a sink and plumbing fixtures from a wall, flooding the entire floor, and using one of the pipes to break several windows. *Id.* at 165. During his temporary cell placement without his wheelchair, the inmate alleged that other inmates threw urine and feces into his cell, striking him. *Id.* On the second day, and immediately after alerting the guards to his assault by other inmates, he was provided his wheelchair, water, and cleaning materials to clean himself and his cell. *Id.* After three days, he was allowed to shower. *Id.* The Fourth Circuit reasoned that because the inmate was provided with water and cleaning supplies immediately after informing the guards of the assault, there had been no violation of the Eighth Amendment. *Id.* at 168.

Mr. Williams has provided sufficient evidence to survive summary judgment showing that in 2019, during his time in STPJ holding, the conditions in Holding Cell No. 4 were "nasty." Doc. 238-11, Williams Deposition, at 42:17-24, 43: 5-11, 66:12, 70: 11-23. While he was housed in the holding cell, the toilet would sometimes clog and overflow, allowing feces and urine to collect on the floor around the toilet to be tracked throughout the cell as individuals walked away from the toilet. Pl.'s SOF No. 168. Mr. Williams testified that although the inmates attempted to do their best to keep the holding cells as clean as possible, they were not provided with cleaning supplies and additional toilet paper until they had spent hours asking the guards for them. Id. at No. 162. Further, as Defendant Smith admitted, the vast majority of the people who are admitted into the holding cells are inebriated by alcohol or other substances, meaning those individuals detox in the holding cell over the course of days, without additional cell cleaning or cleaning supplies made available to the other pretrial detainees in the holding cells. Id. at Nos. 102-03, 150. Mr. Williams testified that inmates in Holding Cell 4 laid on the floor of the cell, with urine, feces, vomit, blood

and other substances on it: "you'd sleep right on it." *See*, Pl's SOFId. at No. 191. The inmates could not be selective about where they laid inside the holding cell due to the overcrowding of the holding cells—as Mr. Williams testified, "I mean, if everybody laid down, there was two people still standing every night." Pl's SOFId. at No. 190. While the inmates in the holding cells, including Mr. Williams in Holding Cell 4, were forced to sleep on the filthy holding cell floor for days and sometimes weeks at a time, (Id. at Nos. 101-06, 173), there were sufficient available beds inside the jail's regular housing units for every single person in holding to have slept off the floors of the holding cells. Id. at Nos. 113-16, 155-59. Further, while pretrial detainees were "sometimes" provided with blankets to sleep on, those blankets—which were exposed to the bodily fluids and other substances on the floor—were picked up in the morning, placed in "this 55-gallon plastic thing," and were returned to detainees the next night unwashed. Id. at No. 192. Guards would also threaten to punish the pretrial detainees by withholding the blankets if they did not stay quiet. Id. at No. 178. On the nights that Mr. Williams was not provided a blanket, he had to sleep on the floor without any protection from the bodily fluids and other substances on the floor. Id. at Nos. 173, 177.

Formatted: Underline

Although they slept on the floor in human waste, inmates in Holding Cell 4, including Mr. Williams, were only provided clean jail-issue clothing on the fourth day of Mr. Williams' incarceration, when detainees were brought to the showers. Id. at No. 165. Mr. Williams testified that one of the mentally ill men he shared Holding Cell 4 with defecated on himself and was not provided clean clothing for a day and a half until the other pretrial detainees convinced the guards to take care of the man. Id. at No. 164. Unlike the inmate in *Jaros*, Mr. Williams testified that he did not have access to cleaning supplies to clean himself after sleeping in waste. Id. at No. 165. Nor was he provided soap or a toothbrush until he was allowed to shower on the fourth day. Id.

Additionally, Mr. Williams testified that he was forced to eat while sitting on the filthy holding cell floor without access to soap to clean his hands before doing so. Id. at No. 175; *See*, *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) ("cleaning supplies were made available to Davis, mitigating any intolerable conditions."). His clothing remained dirty and reeked from sleeping on the floor of the holding cell with human waste until he was provided with clean clothing after he was allowed to shower. Pl.'s SOF Nos. 165, 173. On the same day that Mr. Williams was allowed to shower, trustees entered Holding Cell 4 for the first time to "clean." Id. at No. 172. Mr. Williams stated that the trustees sprayed a substance that was potentially disinfectant or soap and "mopped" the floor with brown, dirty mop water that was never changed. Id. Mr. Williams testified that the holding cell was not actually clean after it was mopped and the smell of human waste remained. Id. at Nos. 172, 174. Similarly, as Former Deputy Chief Longing testified, the detainees were given one roll of toilet paper at a time and had to spend hours requesting additional toilet paper once the roll was used up, even if an inmate had used the toilet before realizing that there was no more toilet paper available in the holding cell. Id. at Nos. 112, 162.

Defendants' cases are unpersuasive as to the lack of personal hygiene products provided to pretrial detainees in the STPJ holding cells. In *Thomas v. Owens*, Thomas was *punished* in part by losing access to cleaning supplies for attacking prison guards. 345 Fed. Appx. 892, 894 (5th Cir. 2009). And while the inmate in *Mitchell v. Jefferson Parish Correctional Center* was a pretrial detainee, his hygiene products were also confiscated when he was placed on lockdown after violating the jail rules. No. 13-4963, 2013 WL 6002770, *6 (E.D. La. Nov. 12, 2013).

In *Matthews v. Murphy*, a convicted inmate was deprived of hygiene products for 34 days after participating in a riot in which maximum security cellblock windows and walls were smashed, electrical fixtures and wiring were torn out, fires were set, and the housing unit was

flooded. 1992 WL 33902, **1, 4 (9th Cir. 1992). Two days later, the inmate participated in a second riot, destroying his own cell and a neighboring cell. *Id.* at *1. The inmate was then moved to an undamaged, less-secure cell where he was deprived of a towel, toothbrush, toothpowder, comb, soap, and other personal hygiene items. *Id.* at *4.

These cases stand for the proposition that withholding hygiene products from inmates as *a form of punishment* for violations of the law or jail rules can be constitutional. Here, Defendants ask this Court to allow them to also withhold hygiene products, without any justification necessitating such harsh treatment. Doc. 388-3 at 23. If confiscating hygiene products is considered punishment, as supported by the cases cited by Defendants, then a reasonable factfinder could determine that the practice of denying hygiene products to the Plaintiffs was intended to be punishment by Defendants in violation of the Fourteenth amendment.

In response to Mr. Williams' requests for sanitary supplies, as well as his medical needs, *see below*, staff at STPJ told him "'This is St. Slamity. If you don't like it, don't commit crimes in the parish.'" Pl's SOF No. 188. Likewise, staff at STPJ told Mr. Williams that the holding cell conditions were in place to teach inmates a lesson. Id. at No. 185. Defendants argue that this Court should simply dismiss Mr. Williams' sworn testimony regarding the statements made to him by corrections officers because he cannot name exactly who said what to him.[11] Doc. 388-3 at p. 35-38. However, the testimony is not offered to establish the personal involvement of a specific defendant in making the comment. Rather, the testimony is offered as evidence of a policy and practice with punitive intent.

[11] Mr. Williams was incarcerated at STPJ in 2019, nearly three years before he was deposed and asked by defense counsel to provide those names. Pl's SOF No. 152. It is entirely reasonable that he does not remember who said what to him while still remembering *what* was said. Mr. Williams testified that multiple guards made the statements to him.

Furthermore, Mr. Williams' testimony is substantiated by Mr. Louviere's testimony that, at a completely different time than Mr. Williams' was incarcerated at STPJ, guards told him that he was being treated so poorly because the pretrial detainees were criminals and junkies, and "this is what you get at St. Slammany." *See*, Louviere's SOF No. 194. Regardless, "[i]t is not the court's role on summary judgment to weigh competing evidence or make credibility determinations." *Grogan v. Kumar*, 873 F.3d 273, 279 (5th Cir. 2017). At summary judgment, "all of the evidence introduced and all of the factual inferences from the evidence are viewed in a light most favorable to the party opposing the motion and all reasonable doubts about the facts should be resolved in favor of the nonmoving party." *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002).

**f. Bedding and sleeping on the holding cell floor in human waste.**

Defendants cite *Hill v. Smith*, No. 20-1042, 2020 WL 2226316 (E.D. La. Apt. 1, 2020); *Allen v. St. Tammany Parish*, No. 17-4091, 2018 WL 558503 (E.D. La. Jan. 2, 2018); and *Terry v. Smith*, No. 20-1163, 2020 WL 13788378 (E.D. La. Jul. 31, 2020), *approved*, 2021 WL 242870 (E.D. La. Jan. 25, 2021) for the proposition that sleeping on the floor in holding without bedding for up to eighteen days is not a *per se* constitutional violation. None of these cases address Plaintiffs' other concerns with sleeping on the floors: that they were covered in human waste, (Pl.'s SOF Nos. 102-05, 171-74), that there were not sufficient supplies to clean the floor, (Id.), and that they were given the dirty blankets used on the floors the night before., (Id. at No. 92). The blankets were unwashed and most likely used by a different inmate the previous night, some of whom had defecated on themselves or were bleeding. Id. Guards threatened not to provide blankets to the detainees if they were too loud. Id. at No. 178. "[S]leep undoubtedly counts as one of life's basic needs. Conditions designed to prevent sleep, then, might violate the Eighth Amendment." *Harper*,

174 F.3d at 720. When Mr. Williams was not provided with a blanket, he had to sleep on the filthy floor in just his prison uniform.[12] Pl.'s SOF Nos. 177, 173. Because Mr. Williams was not given a clean set of clothing until allowed to shower on his fourth day in holding, all of the filth he slept in remained on his clothes and body for days. Id. at No. 165. When Mr. Williams complained about the conditions in the holding cell, he was told "'This is St. Slamity. If you don't like it, don't commit crimes in the parish,'" and that the holding cell conditions were in place to teach inmates a lesson. Id. at No. 187. Former Deputy Chief Longino testified that he had heard STPJ referred to as St. Slammany as well. Id. at No. 83.

Formatted: Underline

This scenario is much more akin to *McCord v. Maggio*, 927 F.2d 844 (5th Cir. 1991). There, McCord was confined in an unlighted solitary confinement cell and allowed one hour a day for recreation and a shower. *Id.* at 846. At night, the jail provided McCord a mattress which was placed on the floor. *Id.* at 847. When it rained, the ceiling would leak and sewer lines would back up, *causing* raw sewage to spill onto the cell floor where the mattress was located. *Id.* Reversing the district court, the Fifth Circuit found "the combination of the conditions detailed above clearly exceeded constitutional boundaries and converted the use of CCR [closed-cell restriction] in this instance 'from a viable prisoner disciplinary tool to cruel and unusual punishment.'" *Id.* While the cells were cleaned every day and prison administrators "made diligent efforts 'to keep things fixed and in working order,'" McCord still had to spend at least some part of each day "forced to choose between standing, or lying or sitting down in foul water and refuse." *Id.* The Court reasoned that even if inmates were at times responsible for the backup of wastewater, that was not dispositive of

[12] Defendants argue that Mr. Williams testified at deposition that he was provided a blanket every night. *See* Doc. 238-3 at p. 27. However, reading the exchange in the deposition in context, it is clear that Mr. Williams was describing the procedure that blankets were handed out every night and taken back. *See* Doc. 238-11 at 44:1-3.

whether McCord was cruelly and unusually punished. *Id.* The Court concluded, "McCord often slept on a bare mattress in filthy water contaminated with human waste, unquestionably a health hazard. We conclude that this environment was so unhygienic as to amount to a clear violation of the Eighth Amendment." *Id.* at 848.

Here, Mr. Williams testified that Holding Cell 4 was not mopped everyday—indeed, it was only mopped once with dirty brown water—nor was he allowed to shower daily. Pl.'s SOF Nos. 172, 165. Nevertheless, he was forced to sit or lie in human waste, vomit, and blood tracked throughout the holding cell 24 hours a day for several days. Id. at Nos. 167, 173. Defendants do not rebut this claim. Doc 388-3 at p. 20-23. Mr. Williams was rarely provided with cleaning products or soap to wash himself or his cell, was in a cell that was overcrowded, only sometimes provided with a dirty blanket likely used by other detainees, and otherwise slept and lived in dirty clothes, all while being told the conditions were to teach him a "lesson." Pl.'s SOF Nos. 113, 165, 154-59, 173, 192, 185. These conditions were not the result of budget constraints but rather to maximize profits to ensure raises. Mr. Williams was held in conditions "so unhygienic as to amount to a clear violation" for no penological purpose. Pl's SOF Nos. 30, 109, 113-16.

In *Alexander v. Tippah County*, two pretrial detainees were placed in a single isolation cell after a physical altercation with prison staff. 351 F.3d 626 (5th Cir. 2003). The isolation cell was 8x8, had no running water or toilet, and held a one-person concrete "bed." *Id.* at 628. The "toilet" was a grate-covered hole in the floor which could be flushed from outside the cell. *Id.* The plaintiffs were eventually given boxer shorts but no mattress, sheets, or blankets. *Id.* One detainee had to defecate into the drain, which obstructed it; the detainees tried to clear the clog further obstructing the drain. *Id.* Due to the drain clog, the detainees' urine sprayed onto the floor, and the smell of human waste nauseated one of the pretrial detainees, who then vomited into the drain as well. *Id.*

The guards attempted to flush the drain, but it did not work, so guards had a trustee spray water into the cell, spreading the waste across the floor. *Id.* Although the pretrial detainees requested a mop to clean the isolation cell, they were never provided with one. *Id.* The detainees were unable to wash their hands, as there was no running water or soap in the isolation cell, and were forced to eat with their hands. *Id.* at 629. After 24 hours, the detainees were released from the isolation cell. *Id.* Although the Fifth Circuit noted that the detainees were barred from recovery by 42 U.S.C. § 1997e(e), the Court noted that they could assume without deciding that the conditions in the isolation cell "were 'so serious as to deprive [them] of the minimal measure of life's necessities,' in this case the basic human need for sanitary living conditions." *Id.* at 630. The Court stated that the Fifth Circuit has found violations of the Eighth Amendment for conditions lasting less than 24 hours. *Id.* at 631.

While not precedential, *Hebert v. Maxwell* is also instructive. 214 Fed. Appx. 451 (5th Cir. 2007). In *Hebert*, the plaintiff was arrested and placed in a holding cell while officers "found out more information." *Id.* at 453. The cell had a hard wooden bench rather than a bed, and "reeked of human waste, which was strewn across the walls and the floor." *Id.* Like here, Hebert alleged that the overhead lights were never turned off, that he was not permitted to shower or exercise, and that he was not given soap, toilet paper, toothbrush, or toothpaste until shortly before his release. *Id.* Hebert also alleged that clean cells with mattresses were empty and available in the jail. *Id.* Two days after being detained, Hebert posted bond and was released. *Id.* Affirming the district court's denial of qualified immunity on Hebert's conditions of confinement claim, the Fifth Circuit stated "Hebert complains that he was not provided a bed, that the meals were inadequate, that he lacked basic supplies like toilet paper and toothpaste, and that the room was filthy" and determined that these allegations presented a claim of unconstitutional conditions of confinement, not episodic

violations. *Id.* at 455. The *Hebert* Court noted "in the absence of a compelling governmental interest, housing a detainee in a room without sleeping accommodations, when other available rooms had sleeping facilities, is enough to survive a summary judgment motion based on qualified immunity." *Id.* at 456; *see*, *id.* at 456 n.1 ("Some courts have held that forcing a detainee to sleep without a mattress, even for as little as thirty-six hours, states a due process violation. [Collecting cases]. We do not need to address this specific question, because in this case the governmental unit had mattresses available but refused to provide one to Hebert.").

Here, Mr. Williams has provided evidence that there were sufficient empty beds for every detainee to sleep on each night that he was detained. Pl.'s SOF Nos. 28-30, 100, 113-16, 137, 148, 155-59. Furthermore, Defendants and other STPJ officials testified that, as a matter of policy, no pretrial detainees from holding were transferred to open and available beds in the DOC and federal housing units for any reason, even significant overcrowding, and were unable to articulate any legitimate penological reason for such a policy. Id. More important than the mattress, and what brings Plaintiffs' claims into the realm of *McCord*, *Alexander*, and *Hebert*, however, is the fact that Mr. Williams was not only forced by Defendants' overcrowding practices to sleep on the floor without a mattress, he was forced to do so on top of urine, feces, vomit, and blood without being provided with adequate protection from those substances or the necessary cleaning supplies to ameliorate the problem, was given uncleaned blankets that were likely used by a different detainee the night before, and was not permitted to shower or change his clothing for four days. Id. at Nos. 6, 31, 37, 101-06, 113-16, 173, 177, 171, 192, 165. The condition of sleeping on the floor is thus inextricable from the overcrowding and sanitation issues Plaintiffs *also* experienced.

Further, Defendants admit that they have a policy of allowing the bright lights to remain on 24/7 in the holding cells, while allowing the lights to be turned off from 10:30 p.m. to 6:00 a.m.

in the permanent housing units to allow inmates to "rest and recoup for the next day" because STPSO recognizes darkness is a necessity for sleeping. Pl.'s SOF Nos. 38-41. As the Fifth Circuit has noted, "sleep undoubtedly counts as one of life's basic needs," and that "[c]onditions designed to prevent sleep" may be unconstitutional. *Harper*, 174 F.3d at 720. Mr. Williams noted that there were nights where the holding cell's conditions kept him from being able to sleep, depriving him of an obvious necessity of life. Pl.'s SOF No. 179. While this may be constitutional for short periods of time, when a pretrial detainee is subjected to the condition for days or weeks at a time without a legitimate penological interest requiring it, a reasonable factfinder could conclude that it is not constitutional.

**g. Cell temperature, absence of recreation**

Although cell temperature by itself violates the Constitution only in the most extreme circumstances, the temperature becomes more relevant in combination with other inadequacies. *See*, *Bienvenu v. Beauregard Parish Police Jury*, 705 F.2d 1457, 1460 (5th Cir. 1983) ("Bienvenu's statements that the defendant party intentionally subjected him to a cold, rainy, roach-infested facility and furnished him with inoperative, scum-encrusted washing and toilet facilities sufficiently alleges a cause of action cognizable under 42 U.S.C. § 1983 and the eighth and fourteenth amendments.").[13]

Mr. Williams testified that the holding cell was "freezing cold" when he tried to sleep. Pl.'s SOF No. 176. "'Prisoners have a right to protection from extreme cold.'" *Palmer*, 193 F.3d at 353 (quoting *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997)). In *Johnson v. Texas Board of Criminal Justice*, the Fifth Circuit noted that "[e]xposure to cold temperatures without adequate

[13] *See also c.f. Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995) (plaintiff failed to identify "a basic human need" that the prison failed to meet and the cell temperature by itself "cannot support a finding that the plaintiff was subjected to cruel and unusual punishment.")

protection can constitute an Eighth Amendment violation." 281 Fed. Appx. 319, 321 (5th Cir. 2008) (unpublished). The Fifth Circuit examined Johnson's claims that his cell was at varying times "uncomfortably hot" and at other times very cold and that it was inadequately ventilated and found that Johnson's allegations failed because they were not accompanied by allegations that Johnson also "was deprived of essential food, medical care, or sanitation" *id.*, unlike here. In *Strothers v. Samford*, the Fifth Circuit vacated dismissal of an inmate's complaint on her allegations that the temperature in her cell was 40 degrees and that the guards had been informed of such. 212 F.3d 594 (5th Cir. 2000) (unpublished). Thus, the temperature of Holding Cell #4 must be considered in combination with the other conditions suffered by Mr. Williams.

Defendants claim that the temperature in the holding cell had to be kept at 68 or 69 degrees because if it got "much higher than that" condensation would build up, windows would fog up, and the floors would get slick. Doc. 238-7 at 25:8-26:11. The facility inexplicably paid raises to employees instead of installing a dehumidification system, and there is no ventilation of fresh air into the facility. Doc. 238-7 at 26:12-27:1. Despite this, pretrial detainees, including Mr. Williams, were made to sleep on the concrete floor with a single blanket to both protect them from the human waste under them and the cold air, without another way to stay warm. Pl.'s SOF Nos. 173, 177. Even then, STPJ guards threatened to withhold blankets from the pretrial detainees if they were too loud. Id. at No. 178. And while there may be a non-punitive reason to blast an air conditioner in the "sweltering" summer months, *see*, *Porter v. Werner*, No. 1:16CV69-RHW, 2017 WL 599418, *3 (S.D. Miss. Feb. 14, 2017), the interest in doing so necessarily decreases as the outside temperature decreases. Here, Mr. Williams was incarcerated in late September and early October, not the very hot months of July and August. Pl.'s SOF No. 152.

Defendants similarly argue that lack of recreational opportunities are not *per se* unconstitutional. As the Fifth Circuit has held, however, "presumably innocent pretrial detainees who are not classified as security risks and who have not been shown to have violated the disciplinary rules of the jail have a fourteenth amendment and 1983 right to regular access to the outdoors." *Miller*, 563 F.2d at 750. This is particularly the case where outdoor recreation is reasonably possible, and the lack of recreation for pretrial detainees "is unnecessarily restrictive and therefore punishes the innocent in violation of procedural due process." *Id.* "Of particular importance in determining an inmate's need for regular exercise are the size of his cell, the amount of time the inmates spends locked in his cell each day, and the overall duration of his confinement." *Ruiz v. Estelle*, 679 F.2d 1115, 1152 (5th Cir. 1982), amended in part and vacated in part on other grounds by *Ruiz v. Estelle*, 688 F.2d 266 (5th Cir. 1982). Here, Plaintiffs, including Mr. Williams, were not allowed outside of the overcrowded holding cells for recreation or exercise at any time, except when occasionally allowed to shower, despite being pretrial detainees who had not been designated a security risk nor violated STPJ disciplinary rules. Pl.'s SOF Nos. 5, 42, 108, 142. In addition to the complete lack of access to exercise, pretrial detainees did not have access to outdoor air while they were in the holding cells, as the windows did not open and there was no ventilation of outside air into STPJ. Id. at Nos. 13-15. Along with overcrowding and the other conditions inside the holding cells, the cold temperatures at night and the lack of exercise establish that the totality of the STPJ holding cells' conditions were unconstitutional under the Fourteenth amendment.

**h. Inadequate medical care.**

"As a matter of law, 'inadequate medical care is a condition of confinement.'" *Cleveland v. Gautreaux*, 198 F. Supp. 3d 717, 738 (M.D. La. Aug. 1, 2016) (quoting *Wilson*, 501 U.S. at 303)

(cleaned up). "In such cases, when 'a jail's evaluation, monitoring, and treatment of inmates with chronic illness' is 'grossly inadequate due to poor or non-existent procedures and...caused...injury,' ***a court can 'reasonably infer a de facto jail policy of failing properly to treat inmates*** with chronic illness.'" *Id.* (quoting *Shepherd*, 591 F.3d at 453; citing *Edler v. Hockley Cnty. Comm'rs Ct.*, 589 Fed. Appx. 664, 668 (5th Cir. 2014)) (alterations original, emphasis added). "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006). It is undisputed that Mr. Williams here had serious medical needs in the form of heart disease, COPD, and asthma, for which he had been prescribed medications. Pl.'s SOF No. 195. Even without prescriptions, shortness of breath and heart problems are the types of serious medical needs which are so apparent that even laymen would recognize that care is required for those issues. Nevertheless, Defendant Smith testified that he did not adopt or implement a policy directing STPJ correctional officers on what to do if an inmate claims that he was taking prescription medication prior to being detained. Id. at No. 7. Nor did Defendant Smith adopt or implement a policy for when STPJ guards should refer a pretrial detainee to medical for medical processing. Id. at No. 8.

Mr. Williams testified that he informed officers when he was arrested that he had several daily medications and that he asked to bring those medications with him but was told that the jail would throw the medications away at booking. Id. at No. 193. Because he was short of breath at that time he was arrested, the fire truck and ambulance were called to his location. Id. at No. 194. Further, Mr. Williams testified that he told STPJ intake officers that he was on medications for COPD and his heart, *see* Docs. 238-4 at pp. 4, 15-16; 238-12 at pp. 2, 5-7, 21 (noting chronic diseases: essential (primary) hypertension; chronic obstructive pulmonary disease, unspecified;

and mild intermittent asthma, uncomplicated; as well as medications Lisinopril, Breo Ellipta inhaler, and Albuterol nebulizer). Mr. Williams' intake records show that at the time he was booked, he was assessed on STPSO Pre-Intake screening. Doc. 238-12 at p. 20.[14] Mr. Williams' vitals show somewhat elevated blood pressure (127/82) and list his "home medications" as two inhalers. At a later point, Mr. Williams experienced shortness of breath and chest pain and informed "the girl that was coming around to hand out the medication" that he could not breathe. Pl.'s SOF No. 197. Mr. Williams' also testified that he informed the guards handing out medication that he was short of breath during his stay in the STPJ holding cells. Id. at No. 198. Refusing to treat inmates, ignoring complaints, intentionally treating inmates incorrectly, and engaging in similar conduct is sufficient to show deliberate indifference. *See*, *Gobert*, 463 F.3d at 346. While Plaintiffs need not show deliberate indifference here—as they are alleging a policy of poor or non-existent procedures for medical treatment as a condition of confinement not an episodic act or omission—the fact that Mr. Williams continued to complain about his shortness of breath throughout his incarceration in the holding cells and not provided the breathing medication that he needed is sufficient to raise material questions of fact to be decided by a jury.

Mr. Williams' medical records released by STPJ show that his ordered inhalers were listed as "KOP" (keep on person), *see* Doc. 238-12 at p. 18, and show the reason for Mr. Williams' receipt of Levalbuterol Tartrate Xopenex inhaler as "shortness of breath." Doc. 238-12 at p. 18 ("PRN" or pro re nata means the medication is not scheduled but should be given as needed). Nevertheless, the medication order has specific directions for when Mr. Williams was to be provided his medications: Lisinopril 1 tablet by mouth in the morning; Levalbuterol Tartrate Xopenex inhaler

[14] Mr. Williams was actually booked into STPJ on September 28, 2019 at 9:56 a.m., *see* Doc. 238-4 at p. 1, so presumably the date is a mistake made by the LPN.

"QID" (four times a day: morning, noon, afternoon, before sleep); Ciclesonide Alvesco inhaler "BI" (twice a day: morning, afternoon). And while Defendants argue that Mr. Williams was provided with all of his medications, *see* Doc. 238-3 at pp. 22-23, the medical records do not support that contention. *See generally*, Doc. 238-12 at pp. 16-20. The records of Mr. Williams' medication orders show that Levalbuterol Tartrate "KOP" inhaler was given once, on October 28 at approximately 10:43 p.m. and lists nothing more regarding that medication, despite having usage directions: "give 2 HFA Aerosol Inhaler Inhalation QID AM Noon PM HS PRN for 30 days." Doc. 238-12 at p. 22. Likewise, the medication orders show the Ciclesonide inhaler as "KOP" but also give directions for the inhaler to be administered twice a day. Id. at pp. 16-22. The medical records, however, do not show that it was administered to Mr. Williams at any point during his stay in the holding cells at STPJ. Id.; Pl.'s SOF No. 196. While Defendants ask this Court to simply disregard Mr. Williams' testimony that he was never given his own inhalers and instead had to "puff" off the same inhaler as the other pretrial detainees with COPD or asthma, "[i]t is not the court's role on summary judgment to weigh competing evidence or make credibility determinations." *Grogan v. Kumar*, 873 F.3d 273, 279 (5th Cir. 2017). The records do not rebut that Mr. Williams was not given his inhalers to KOP. Doc. 238-12 at pp. 16-22; Pl.'s SOF No. 196. Nor is it somehow reasonable to assume that, despite all evidence to the contrary, STPJ was providing inhalers for detainees to keep with them in the holding cells. This is especially unlikely because, by Defendants' own accounts, the holding cells were for "temporary" or "short term" housing and allowing pretrial detainees to keep their medications with them inside the holding cells could lead to attacks and other confrontations. Pl.'s SOF Nos. 15-16, 81. At summary judgment, "all of the evidence introduced and all of the factual inferences from the evidence are viewed in a light most favorable to the party opposing the motion and all reasonable doubts about

the facts should be resolved in favor of the nonmoving party." *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002).

**i. The combination of unconstitutional conditions in the STPJ holding cells caused cognizable harm to Mr. Williams.**

When taken in combination, Plaintiffs have shown that the foregoing conditions inside the STPJ holding cells violate the Fourteenth Amendment rights of pretrial detainees, who **cannot be punished** and who are **not to be subjected to conditions of confinement that lack a penological justification,** including: the overcrowding~~,~~ (Pl.'s SOF Nos. 4, 20-25, 27, 30, 32, 78-80, 96-98, 113-16, 154-59), the length of stay, (Id. at Nos. 2-3, 17, 86-89, 91-94, 154) the lack of hygiene products~~,~~ (Id. at No. 6, 111-12, 165-66), the grossly unsanitary conditions~~,~~ (Id. at Nos. 5-6, 27, 32-33, 101-06, 113-18, 167-72), the lack of cleaning supplies~~,~~ (Id. at Nos. 6, 102-05, 112) forcing inmates to sleep in human waste even when other beds are available~~,~~ (Id. at Nos. 4-6, 9, 11-12, 31-32, 36, 102-05, 154-59, 172-73, 191) the unwashed blankets~~,~~ (Id. at Nos. 9, 192) the lack of clean clothes or showers after sleeping in human waste~~,~~ (Id. at Nos. 5, 9, 11-12, 32-33, 44, 101-05, 165), forcing inmates to eat on the floor with human waste and no soap to wash their hands~~,~~ (Id. at No. 175; Doc. 235-11, Guillot Deposition, at 58:11-25), a lack of fresh air and recreation~~,~~ (Pl.'s SOF Nos. 14, 42, 108), bright lights 24/7 to impede the ability to sleep~~,~~ (Id. at Nos. 39-41, 107), the cold temperature in the cells~~,~~ (Id. at No. 176), and the lack of adequate medical care~~.~~ (Id. at Nos. 7-8, 180-83). Because questions of material fact remain for a jury to determine, Defendants' motion for summary judgment should be denied.

Defendants next argue that, because Mr. Williams does not have proof of physical injuries, he has not been harmed by the conditions inside the STPJ. *See*, Doc. ~~238~~388-3 at ~~pp. 29-36~~51. "In [jail] condition cases, the harm is caused by the condition itself." *Oladipupo*, 104 F. Supp. 2d 626, 633 (W.D. La. Apr. 24, 2000); *see also*, *Thomas v. Ouachita Corr. Ctr.*, No. 3:12-cv-0687, 2012

WL 1856514, *3 (W.D. La. May 1, 2012). "This is true, for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions." *Scott*, 114 F.3d at 53. "It is also important to note that the inmate need not show that death or serious illness has occurred." *Gates*, 376 F.3d at 333.

Mr. Williams testified that he began to run a fever and feel sick on the third day of his incarceration in the holding cells. Pl.'s SOF No. 182. Mr. Williams testified that his illness continued for approximately two weeks. Id. Mr. Williams also testified that he did not go see a doctor when he was released from STPJ because he did not have insurance or the co-pay necessary to do so, not because he was not ill. Id. at No. 201. He testified that he had enough trouble breathing in the holding cells that it kept him from sleeping. Id. at No. 199. He also testified that he continues to feel anxiety and nervousness when he sees law enforcement as a result of his experiences at STPJ. Id. at No. 200. In addition to those injuries, Mr. Williams has provided sufficient evidence for a reasonable factfinder to determine that he was harmed by the unconstitutional conditions of confinement inside the STPJ holding cells.

**2. Despite Defendants' argument to the contrary, Plaintiffs' evidence regarding the conditions inside the holding cells at STPJ are not episodic omissions of individual STPJ staff.**

A challenge to a condition of confinement is a challenge to 'general conditions, practices, rules, or restrictions of pretrial confinement.'" *Estate of Henson v. Wichita Cnty., Tex.*, 795 F.3d 456, 463 (5th Cir. 2015) (quoting *Hare*, 74 F.3d at 644). Those conditions, practices, rules, and restrictions can be explicit; in some cases, however, a *de facto* policy can be "evidenced by a pattern of acts or omissions sufficiently extended or pervasive," that the practice or condition can be found to be intended. *Id.* (quoting *Shepherd*, 591 F.3d at 452). Further, "[a]s a matter of law, 'inadequate medical care...is a condition of his [or her] confinement.'" *Cleveland*, 198 F. Supp. 3d

at 738 (quoting *Wilson*, 501 U.S. at 303) (alteration original). "Traditional examples of condition-of-confinement cases include challenges to prison overcrowding, restrictions on inmate privileges, and disciplinary segregation, among other things." *Nagle v. Gusman*, No. 12-1910, 2016 WL 768588, *5 (E.D. La. Feb. 26, 2016).

"An episodic-acts-or-omissions claim, by contrast, 'faults specific jail officials for their acts or omissions.'" *Id.* (quoting *Shepherd*, 591 F.3d at 452). "In such a case, an actor is 'interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.'" *Id.* (quoting *Scott*, 114 F.3d at 53; *see also*, *Jones v. St. Tammany Parish Jail*, 4 F. Supp. 2d at 611 ("a[n] episodic case is shown where an actor is interposed between the detainee and the policy or practice of the local governmental entity that permitted the harm."). Plaintiffs make no such allegations here, instead pointing directly at longstanding policies and customs followed by STPJ staff writ large that were the moving force behind the violation of Plaintiffs', including Mr. Williams', Fourteenth Amendment rights while they were pretrial detainees at STPJ. *See* Pl.'s SOF Nos. 2-10, 17-18, 27, 31, 36, 41, 44, 69-70, 80, 94, 96, 99, 100, 105, 113-16, 126, 136-37, 219.

**B. Plaintiffs have sufficient evidence to show material questions of fact on their *Monell* claim.**

To prevail on a *Monell* claim, Plaintiffs "must show '(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom).'" *Newbury v. City of Windcrest, Tex.*, 991 F.3d 672, 680 (5th Cir. 2021) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)). Further, "[u]nlike various government officials, when sued in their

personal or individual capacities, municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983." *Burge v. Parish of St. Tammany*, 187 F.3d 452, 476 (5th Cir. 1999).

**1. Plaintiffs have shown a custom of unconstitutional conditions that amount to punishment inside the STPJ holding cells.**

To proceed on a custom claim, Plaintiffs must demonstrate that a persistent, widespread practice within STPJ "which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Hicks-Fields v. Harris County, Tex.*, 860 F.3d 803, 808 (5th Cir. 2017). Plaintiffs' evidence shows the following customs and practices at STPJ which, in combination, violated the Fourteenth Amendment rights of Plaintiffs, including Mr. Williams:

- Overcrowding leading to grossly unsanitary conditions, without adjusting the supposed cleaning schedule based on how many people were housed in the holding cells; (Pl.'s SOF Nos. 4-6, 20-25, 30, 32-33, 36-37, 43-44, 78-80, 96-98, 101-06, 113-18, 135, 137);
- Keeping pretrial detainees in holding cells for ~~nearly three~~two weeks; (Id. at No. 2-3, 17, 86-89, 91-94, 126, 129, 140; Doc. 239-6, Louviere Deposition, at 24:18-25:25; Doc. 236-5, Hall Deposition, at 29:5-8; 293-2, Guillot SOF at Nos. 153-68);
- Arbitrarily overcrowding the holding cells even when beds were available inside the jail without a penological purpose; (Pl.'s SOF Nos. 4, 20-25, 30, 32-33, 36-37, 43-44, 78-80, 96-98, 101-06, 113-16, 135, 137);
- Arbitrarily providing nothing but a blanket for the pretrial detainees inside the holding cells, while providing "adequate bedding and linen, including a clean mattress with integrated pillow" to inmates in the permanent housing units pursuant to STPSO policy; (Id. at Nos. 34-37, 88-89);
- Forcing the detainees to sleep on the floor in urine, feces, vomit, and blood without protection from, or the ability to clean, the bodily fluids; (Id. at Nos. 101-09, 177, 191);
- Providing unwashed blankets to inmates without regard to the fact that the blankets were likely soiled from the floor of the cell, or the previous inmate using it, and were likely used by a different pretrial detainee the night before; (Id. at Nos. 101-05, 192; *See also* Doc. 236-5, Hall Deposition, at 21:8-15, 23:7-10, 23:11-13, 38:10-13; Doc. 294-6, Exhibit 4, Hall Declaration, at ¶¶ 29, 31; Doc. 239-6, Louviere Deposition, at 62:2-21; Doc. 235-11, Guillot Deposition at 57:17-58:4).
- Not allowing pretrial detainees to change their uniforms after forcing them to sleep on the floor in urine, feces, vomit, and blood; (Pl.'s SOF Nos. 101-05, 113-18, 164-65);

**Formatted:** Don't add space between paragraphs of the same style

- Forcing pretrial detainees to sit on the floor with urine, feces, vomit, and blood while eating their meals and without soap to wash their hands first; (Pl.'s SOF Nos. 101-09, 141, 167-74, 175; Doc. 235-11, Guillot Deposition, at 58:11-25);
- Allowing guards to withhold the blankets as collective punishment for being loud; (Pl.'s SOF No. 178; Doc 235-11, Guillot Deposition at 57:17-58:4);
- Overcrowding the holding cells to the point that all the detainees inside could not lie down at the same time, denying them sleep; (Pl.'s SOF Nos. 101-05, 190-91);
- Failing to provide fresh air or recreation to pretrial detainees in the holding cells, even when they had been inside the holding cell for days and weeks; (Id. at Nos. 14, 42, 108);
- Leaving the lights on in the holding cells 24/7, denying pretrial detainees sleep; (Id. at No. 40);
- Not providing, or causing hours-long delays in providing, needed sanitation products; (Id. at Nos. 162, 165-66; *See also* Doc. 236-5, Hall Deposition, at 24:13-23, 25:12-14, 42:2-11; Doc. 294-6, Exhibit 4, Hall Declaration, at ¶¶ 14, 15, 18.; Doc. 239-6, Louviere Deposition, at 62:2-21); and
- Failing to provide adequate medical care and access to necessary prescriptions to pretrial detainees. (Pl.'s SOF Nos. 7-8, 180-81, 183).

In addition, jail guards told the pretrial detainees that if they were displeased with the conditions in holding to not commit crimes in St. Tammany Parish; even though, by definition, pretrial detainees have not been adjudicated to have committed a crime. Id. at No. 187. Jail guards also told the pretrial detainees that the holding cell conditions were in place to teach them a lesson. Id. at No. 185. O'Keefe, Captain of Corrections in 2019 testified of pretrial detainees: "it is their choice that they made a right or wrong decisions," and agreed with the statement "if you can't do the time, don't do the crime." Ex. 2, O'Keefe Dep., at 69:9-80:7. Defendants have not identified a single legitimate penological interest served by any one of these conditions, and STPSO officials agree that such conditions are improper. Pl.'s SOF Nos. 30, 81, 109, 113-18, 137, 176; Doc. 388-3 at p. 12. Furthermore, Former Deputy Chief Longino admitted that "nobody should" live in the conditions that be observed in the holding cells, "not just detainees." ~~Pl's~~Pl.'s SOF No. 116-18. Defendant Smith testified that allowing pretrial detainees to eat and sleep on the floor in cells with feces, blood, vomit, and urine on the floor would be "inhumane." ~~Pl's SOF~~Id. at No. ~~80~~81.

There is sufficient evidence that Defendant Smith is himself liable for the "inhumane" conditions he allowed to occur through the implementation of policy, or lack thereof, and the customs that flourished. Id. at Nos. 1-10. "[A] supervisory prison official may be liable for the conditions of the jail if the supervisor 'implements a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.'" *Young*, 2021 WL 799683 at *16 (quoting *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987)) (cleaned up). "A plaintiff can prove supervisory liability, without regard for intent, by showing that each named supervisory official implemented an unconstitutional policy that directly resulted in injury to the plaintiff." *Id.*

As Plaintiffs have already shown, Defendant Smith, in his official capacity as the Sheriff in St. Tammany Parish, is an appropriate municipal defendant here. Pl.'s SOF Nos. 46-50. Defendant Kelly, as the Warden of STPJ in 2019, implemented and/or acquiesced in Sheriff Smith's policies and customs for pretrial detainees named above and may also be held liable under *Monell*. Id. at Nos. 146-49. Thus, Plaintiffs have introduced sufficient evidence that Defendants Smith and Kelly were policymakers under § 1983 and that there is a longstanding custom at STPJ of creating punishing conditions inside of the holding cells where pretrial detainees, including Mr. Williams, were housed.

**2. Plaintiffs have shown that Defendants had actual or constructive knowledge of the holding cell conditions.**

Plaintiffs must also establish that Defendants had actual or constructive knowledge of these customs.

> Actual knowledge may be shown by such means as discussions at council meetings or receipt of written information. Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were

> so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.

*Hicks-Fields*, 860 F.3d at 808-09 (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984)).

Former Deputy Chief Longino testified at his deposition that overcrowding of the holding cells had been an ongoing issue since the 1990s. Pl.'s SOF No. 96. Longino testified that his position as Deputy Chief placed him between the Sheriff, Defendant Smith, to whom he reported directly, and the STPJ Warden, Defendant Kelly, who reported directly to Longino. Id. at Nos. 82, 146-47. Longino also testified that Defendant Smith's predecessor had developed a program he called "Code 6" to release pretrial detainees to ease overcrowding, recognizing that it was a regular problem, but was later told he could not use Code 6 to release detainees without prior court approval. Id. at Nos. 51-53. Defendant Smith admitted that he knows that overcrowding leads to safety issues. Id. at No. 78. Defendant Kelly admitted that she knew overcrowding of the holding cells was a problem. Id. at No. 147. Again, Longino testified that he personally observed the conditions inside the holding cells, including that there was urine, feces, vomit, and blood on the floor that pretrial detainees were supposed to sleep on. Id. at No. 101-03. He also testified that STPJ did not have a policy or practice that required the holding cells to be cleaned when urine, feces, vomit, or blood were observed on the floors. Id. at No. 105. Longino said that "nobody" should be housed in such conditions, but that he was unable to change the conditions for the pretrial detainees. Id. at No. 113-18. Longino further testified that the sanitation and overcrowding in the holding cells could have been mitigated by moving pretrial detainees to available DOC or federal beds, and that there was no penological interest in keeping the pretrial detainees in the overcrowded holding cells when other beds were available. Id. Constructive knowledge is clear because the violations were so persistent and widespread.

In addition, Plaintiffs' request that this Court take judicial notice of a single paragraph of the 2012 DOJ Letter for the purpose of showing notice to Defendants *only*, and not to establish a pattern or practice:

> Beyond the staffing shortages that we noted during our tour, we observed, while on site, as many as 30 prisoners held in holding cells that are designed for 20 prisoners. Many prisoners complained of not being seen by medical staff for several days. Even more concerning, we noted that prisoners were sleeping on floors and benches in the holding cells with little or no bedding articles. When asked about the deplorable conditions in the holding cells and the delays in providing timely medical screenings, Jail staff admitted that overcrowded conditions at the Jail limited the ability to provide timely assessments of the prisoners held in the holding cells at the Jail. Jail staff further noted that because of security staffing shortages, prisoners were required to remain in the holding cells for days if not weeks before they were assigned to housing units.

Ex. 6, 2012 DOJ Letter to STPJ, at p. 5. Defendants have asked this Court to exclude the DOJ letter as irrelevant because it was written seven years before Plaintiffs were incarcerated at STPJ. *See*, Doc. 258 at pp. 5-6. In *Hicks-Fields*, however, the Fifth Circuit upheld the admission of a DOJ report about jail conditions, noting that district courts retain broad discretion in their evidentiary rulings. 860 F.3d at 809. The Court observed that "[w]hether the DOJ report should have been admitted **for purposes other than establishing notice** under *Monell* is a close question," but still found that "[r]eports of this type may make it at least marginally more likely that patterns of unconstitutional conduct occurred." *Id.*; *see also*, *Salcido as Next Friend of K.L. v. Harris Cnty., Tex.*, No. H-15-2155, 2018 WL 4690276, **15-16 (S.D. Tex. Sep. 28, 2018) (refusing to strike DOJ letter regarding jail conditions written four years before incident at summary judgment because it was relevant to notice under *Monell*). In *Shepherd v. Dallas County*, the Fifth Circuit found that a district court did not abuse its discretion in admitting a DOJ letter about jail conditions written three years *after* an incident. 591 F.3d at 457-58. Likewise, the Court in *Hinton v. Gonzalez* found a 7-year-old DOJ letter concerning prison policies relevant as to notice that

certain jail policies placed detainees at an unacceptable risk of death or injury. No. 4:18-cv-912, 2021 WL 4955915, *4 (S.D. Tex. Sep. 16, 2021). The DOJ letter here is relevant to whether Defendants had actual or constructive notice of the constitutional violations at STPJ. While the bulk of the letter is admittedly irrelevant to the issues before this Court, the paragraph detailed above is directly relevant to whether or not Defendants had notice that their custom of overcrowding the holding cell was unconstitutional.

Even without the DOJ letter, Former Deputy Chief Longino's testimony shows that STPJ and Defendants had longstanding notice that overcrowding in the STPJ holding cells was occurring. Pl.'s SOF Nos. 96, 101-06, 113-18. Defendant Smith testified that the holding cell capacity is set by the Fire Marshal and that he relies on the Fire Marshal to tell STPJ when the holding cells are overcrowded. Id. at No. 21. He also testified that he looked at the inmate counts for the holding cells and other housing units regularly. Id. at No. 77. Former Warden Defendant Kelly testified that there were "probably" times when she was advised by the Fire Marshal that the holding cells were over capacity but chose not to move anyone out of the holding cells; she also testified that she informed Longino when the holding cells were overcrowded. Id. at Nos. 25, 147-48. Defendant Smith testified that the majority of pretrial detainees came into STPJ holding inebriated on alcohol and other substances. Id. at No. 150. This left those inebriated pretrial detainees to detox and go through withdrawal in the holding cells, where cleaning supplies were not provided and cleaning schedules were not changed to accommodate the amount of people and physical state of the pretrial detainees inside the holding cells. Id. at Nos. 102-06, 162. Longino testified that he knew that urine, feces, blood, and vomit would collect on the floors of the holding cells. Id. He also knew that pretrial detainees slept on the floors of the holding cells. Id. at No. 101. Longino likewise testified that he had heard STPJ be referred to as "St. Slammany." Id. at No. 83.

Several STPJ officials testified that the policy was *never* to reduce overcrowding in the holding cells by moving pretrial detainees into available beds in the DOC and federal housing units, even though that would mitigate the holding cell overcrowding that forced pretrial detainees to sleep on the floor in human waste and bodily fluids. Id. at Nos. 29, 79-80, 98-99, 112-14, 134, 136-37, 148. Plaintiffs have produced sufficient evidence to show that Defendants had actual and constructive notice that the conditions inside the holding cells violated the Fourteenth Amendment.

**3. These customs were the moving force in Plaintiffs', including Mr. Williams', Fourteenth Amendment rights violation.**

The third prong of the *Monell* analysis "requires a plaintiff to prove 'moving force' causation." *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010). To succeed in showing that Defendants' customs and practices were the moving force behind the violation of their constitutional rights, Plaintiffs "'must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.'" *Id.* (quoting *Board of the Cnty. Com'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)).

Plaintiffs, including Mr. Williams, can easily demonstrate the "requisite degree of culpability" as intent can be inferred from Defendants' decisions. When a plaintiff has "properly stated a claim as an attack on conditions of confinement, he is relieved from the burden of demonstrating a municipal entity's or individual jail official's actual intent to punish because, as discussed below, intent may be inferred from the decision to expose a detainee to an unconstitutional condition." *Shepherd*, 591 F.3d at 452. "In a conditions of confinement case, the municipality is considered to have intended the alleged deprivation, and a constitutional violation occurs where we determine that 'the condition of confinement is not related to a legitimate, non-punitive governmental objective.'" *Hebert*, 214 Fed. Appx. at 455 (quoting *Scott*, 114 F.3d at 53).

Importantly, lack of funds is *not* a sufficient justification for neglect of a citizen's rights. *See*, *McCord*, 927 F.2d at 847 (citing *Collier*, 501 F.2d at 1320). Further, "[c]ourts may find a punitive purpose upon direct proof of an expressed intent by detention facility officers to punish the pretrial detainee for the crime with which the detainee has been charged but not yet convicted." *Hamilton*, 74 F.3d at 104 (citing *Bell*, 441 U.S. at 538). "In addition, courts may infer a punitive purpose if the challenged condition or restriction is not reasonably related to a legitimate governmental objective." *Id.* (citing *Bell*, 441 U.S. at 539). "[E]ven where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices." *Hare*, 74 F.3d at 644. "Thus, a true jail condition case starts with the assumption that the State intended to cause the pretrial detainee's alleged constitutional deprivation." *Id.* at 644-45.

Here, a reasonable juror could infer that Defendants intended the conditions in the holding cell based on the following:

- decades of complaints about the STPJ holding cell overcrowding; (Pl.'s SOF No. 96);
- Defendant Smith's admission that while approximately "80-plus percent of the individuals we bring in are under some type of alcohol or illegal narcotic or both," those individuals are still placed in the holding cells to detox in the immediate vicinity of other pretrial detainees; (Id. at No. 150);
- that there is an erratic holding-cell cleaning policy that means that pretrial detainees in the holding cells are not given regular access to cleaning supplies and the cells are not regularly cleaned when there is urine, feces, blood, or vomit on the cell floors; (Id. at Nos. 6, 102-05, 171);
- that pretrial detainees were given only a blanket to sleep on the floor even when bodily fluids had not been cleaned from it; (Id. at Nos. 37, 99, 177, 191);
- that the lights in holding remained on 24/7 keeping Mr. Williams from being able to sleep; (Id. at Nos. 40-41, 107);
- that the holding cells were so overcrowded that some people did not have room to lie down on the holding cell floor; (Id. at No. 101-06, 190);

**Formatted:** Don't add space between paragraphs of the same style

- that blankets were withheld as punishment for pretrial detainees being "loud;" " (Id. at No. 178; See also Doc. 236-5, Hall Deposition, at 36:12-25, 37:1-3, 41:21-24; Doc. 294-6, Exhibit 4, Hall Declaration, at ¶ 26.);
- that pretrial detainees were made to sleep on the floor in human waste and were not provided with regular showers or clean jail uniforms or clothing; (Pl.'s SOF Nos. 101-05, 173, 191, 165; See also Doc. 236-5, Hall Deposition, at 38:18-25, 39:1-16, 40:1-11, 43:2-5; Doc. 239-6, Louviere Deposition, at 37:8-16, 62:2-21);
- that the blankets provided to the pretrial detainees were not clean and had likely been used by a different detainee the night before; (Pl.'s SOF No. 192);
- that the overcrowded cells forced pretrial detainees to eat on the holding cell floors with human waste without regularly providing soap; (Id. at Nos. 141, 175, 165);
- that pretrial detainees were forced to sleep on the floor in human waste even when beds were readily available in permanent housing units; (Id. at Nos. 29, 101-05, 113-18, 147-48, 155-59, 191); and
- that STPJ failed to provide fresh air or recreation to pretrial detainees. (Id. at Nos. 14, 42, 108, 142).

In light of Former Deputy Chief Longino's testimony indicating the alleged unsanitary conditions "were not atypical and were easily observed," *see*, *Gates*, 376 F.3d at 338, a reasonable juror could find that Defendants showed deliberate indifference to the risks presented by the holding cell conditions. Pl.'s SOF Nos. 101-18. Likewise, the statements by guards and Captain of Corrections O'Keefe that pretrial detainees should not have committed crimes if they dislike the holding cell conditions, rubbing their eyes like they were pretending to cry, and stating that the holding cell conditions were meant to teach the pretrial detainees a lesson could also allow a reasonable juror to infer that the conditions inside the STPJ holding cells were intended as punishment. Id. at Nos. 184-87.

Plaintiffs can also establish evidence of a direct causal link between Defendants' policy determinations and the harm to Mr. Williams. "'A direct causal connection must exist between the policy and the alleged constitutional deprivation. This connection must be more than a mere 'but for' coupling between cause and effect.'" *Jordan v. Gautreaux*, 593 F. Supp. 3d 330, 358 (M.D. La. Mar. 25, 2022) (quoting *Estate of Bonilla by & through Bonilla v. Orange Cnty., Tex.*, 982 F.3d

298, 312 (5th Cir. 2020)). However, the Fifth Circuit does "not require a plaintiff to show that a 'policy or practice was the *exclusive* cause of the constitutional deprivation." *Sanchez v. Young Cnty., Tex.*, 956 F.3d 785, 795 (5th Cir. 2020) (quoting *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 254 (5th Cir. 2018)). "Courts 'may...consider how individual policies or practices interact with one another within the larger system.'" *Id.* (quoting *Stukenberg*, 907 F.3d at 255). As discussed above in detail, Defendants' policies, lack thereof, and the customs that sprung up in the absence of policies, interacting with one another, were the direct cause of the violation of Mr. Williams' Fourteenth Amendment rights by creating degrading, cruel conditions of confinement inside the STPJ holding cells as punishment for "crime." Each and every harm and condition that befell Mr. Williams while he was in the STPJ holding cell was a direct and foreseeable result of the policy decisions made by Defendants. Defendants determined the policies of housing pretrial detainees, including determining to hold them in housing cells with deplorable conditions despite availability of beds, (*See* Pl.'s SOF Nos. 2-10, 17-18, 21-37, 40-44, 80-81, 94, 96-09, 111-18, 129, 135, 137, 139, 140-43, 148), and it is these conditions directly and precisely that created the circumstances Mr. Williams found himself in., (*See* Id. at Nos. 152-201).

A reasonable jury could find that Defendants intended the conditions to be punishment for whatever crime Mr. Williams was believed to have committed and that the policies that sprung from that intention led to Mr. Williams' constitutional violations. Because Mr. Williams has provided sufficient evidence to create questions of material fact on his *Monell* claims, Defendants' motion for summary judgment should be denied.

**C. The individual capacity claims against Defendants Smith and Kelly should not be dismissed.**

"A supervisory official may be held liable only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that

causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (cleaned up, internal quotation marks omitted). "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Id.* (quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)). Further, "[a] supervisory official may be held liable under section 1983 for the wrongful acts of a subordinate 'when the supervisory official breaches a duty imposed by state or local law, and this breach causes plaintiff's constitutional injury.'" *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998) (quoting *Sims v. Adams*, 537 F.2d 829, 831 (5th Cir. 1976)) (cleaned up); *see also*, *Tuttle v. Todd*, No. 22-20233, 2023 WL 4884853 (5th Cir. 2023). To hold a supervisory official liable, plaintiffs must show that (1) the supervisor failed to supervise the subordinate official; (2) a causal link exists between the failure to supervise and the violation of plaintiffs' rights; and (3) the failure to supervise amounts to deliberate indifference." *Id.* at 911-912 (citing *Hinshaw v. Doffer*, 785 F.2d 1260, 1263 (5th Cir. 1986)). "For an official to act with deliberate indifference, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* at 912 (quoting *Farmer*, 511 U.S. at 837).

Plaintiffs have provided adequate evidence to show that both Defendant Smith, as Sheriff, and Defendant Kelly, as Warden, were on notice of the following: that the STPJ holding cells were overcrowded, (Pl.'s SOF Nos. 4, 20-25, 27, 30, 32, 78-80, 101-05, 113-18, 96-98, 135, 137, 147, 154-59), that pretrial detainees were forced to sleep in human waste on the holding cell floors, (Id. at Nos. 6, 32-33, 101-05, 191), that the lights were on in the holding cells 24 hours a day, (Id. at Nos. 40-41, 107), that pretrial detainees were not given clean blankets or clothes after they were forced to sleep in human waste, (Id. at Nos. 165, 192; *See also* Doc. 236-5, Hall Deposition, at

21:8-15, 23:7-10, 23:11-13, 38:10-13; Doc. 294-6, Exhibit 4, Hall Declaration, at ¶¶ 29, 31; Doc. 239-6, Louviere Deposition, at 62:2-21; Doc. 235-11, Guillot Deposition at 57:17-58:4), that cleaning supplies were withheld for hours at a time, (Pl.'s SOF Nos. 6, 102-05, 112, 162, 165-66), that pretrial detainees were forced to stay in the holding cells for much longer than the 48 hours allowed by Louisiana law, (Id. at Nos. 1-3, 17, 86-89, 91-94, 126, 129, 140, 154), that the Fire Marshal regularly told STPJ officials that the holding cells were over capacity and ordered population reductions, (Id. at Nos. 24-25, 98), that a large majority of pretrial detainees were detoxing and withdrawing while in the holding cells, (Id. at No. 150), that pretrial detainees were forced to sit on the floor covered in human waste to eat their meals without soap available to wash their hands, (Id. at Nos. 141, 175; Doc. 235-11, Guillot Deposition, at 58:11-25), that only one roll of toilet paper was made available at a time to the pretrial detainees inside each holding cell, (Pl.'s SOF No. 112), that pretrial detainees were not provided clean air or recreation opportunities, (Id. at Nos. 14, 42, 108, 142), that prescription medications were withheld even when pretrial detainees informed booking officers about their serious medical needs, (Id. at Nos. 7-8, 180-81), and that they were aware of the general conditions inside of the STPJ holding cells. (Id. at Nos. 96, 101-06, 113-18). Despite being on notice, neither Defendant Smith nor Defendant Kelly changed the policies or customs that led to these conditions. *See* Id. at Nos. 1-10, 17-18, 25, 29, 70-80, 113-18, 147-48, 209, 219. Plaintiffs have established that there are genuine questions of material fact regarding whether Defendants Smith and Kelly were aware of and personally involved in the deprivations of Plaintiffs', including Mr. Williams', Fourteenth Amendment right not to be punished as a pretrial detainee. Id. Defendant Kelly, as STPJ warden, supervised all of the STPJ guards and allowed them to maintain the holding cells in the conditions described by Plaintiffs, despite having regular access to, and observation of, the holding cells. Id. at Nos. 45, 146-48.

The next inquiry is whether Defendants Smith and Kelly are entitled to qualified immunity. "A public official is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation." *Porter*, 659 F.3d at 445. Mr. Williams has sufficiently established that Defendants' policies and customs are not related to a legitimate government interest, and that Defendants persisted with those customs creating the holding cell conditions over an extended period of time, exposing not just Plaintiffs but all pretrial detainees in the holding cells to similar conditions. Further, Mr. Williams raised sufficient questions of material fact about whether his Fourteenth Amendment right not to be punished as a pretrial detainee was violated, and that this right was clearly established in 2019.[15]

The second prong of qualified immunity asks whether Defendants Smith and Kelly's conduct in persisting with their customs and policies regarding the holding cells was objectively reasonable. Defendants make no argument whatsoever that their conduct was objectively reasonable. *See* Doc. 388-3, *generally*. Like the defendants in *Oladipupo*, Defendants Smith and Kelly "do not even attempt to argue that they acted reasonably. Rather, they focus their arguments on disputing that any constitutional violation ever occurred." 104 F. Supp. 2d at 642. Like in

[15] *See*, *Oladipupo v. Austin*, 104 F. Supp. 2d 626, 637 (W.D. La. Apr. 24, 2000) (citing *Bell v. Wolfish*, 441 U.S. 520, 542 (1979)) ("[t]he constitutional right of detainees to be free from overcrowding is firmly established."); *Gates v. Cook*, 376 F.3d 323, 341 (5th Cir. 2004) ("Frequent exposure to the waste of other persons can certainly present health hazards that constitute a serious risk of substantial harm."); *Harper v. Showers*, 174 F.3d 716, 717, 720 (5th Cir. 1999) ("sleep undoubtedly counts as one of life's basic needs. Conditions designed to prevent sleep, then, might violate the Eighth Amendment."); *McCord v. Maggio*, 927 F.2d 848 (5th Cir. 1991) ("McCord often slept on a bare mattress in filthy water contaminated with human waste, unquestionably a health hazard. We conclude that this environment was so unhygienic as to amount to a clear violation of the Eighth Amendment."); *Miller v. Carson*, 563 F.3d 741, 750 (5th Cir. 1977) ("presumably innocent pretrial detainees who are not classified as security risks and who have not been shown to have violated the disciplinary rules of the jail have a fourteenth amendment and 1983 right to regular access to the outdoors.").

*Oladipupo*, because Mr. Williams has raised sufficient questions of material fact regarding whether Defendants Smith and Kelly's conduct was objectively reasonable, this Court should decline to award qualified immunity regarding the general conditions of the holding cells to Defendants, *see*, *Id.*

Regarding the individual capacity claims, Plaintiffs should be permitted to seek punitive damages at trial, as a reasonable factfinder could determine that Defendants' conduct "involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Despite Defendants' argument to the contrary, *see* Doc. 238-3 at pp. 47-48, this case is brought pursuant to § 1983 and punitive damages are permitted. Further, the Supreme Court of Louisiana determined in 1994 that punitive damages were recoverable under § 1983 even in suits filed in a Louisiana state court. *See*, *Booze v. City of Alexandria*, 637 So.2d 91, 92 (La. 1994).

**D. The official capacity claims against Defendant Smith should not be dismissed.[16]**

Defendants argue that all claims against Defendant Smith should be dismissed either because Plaintiffs make *respondeat superior* claims or because the St. Tammany Parish Sheriff is "a political subdivision of the State of Louisiana." *See* Doc. 238-3 at pp. 43-44. This argument is unavailing and should be summarily dismissed.

"Because a state may not punish a pretrial detainee, conditions of confinement for a [pretrial detainee] that amount to 'punishment' violate the Constitution." *Duvall*, 631 F.3d at 206. "To prevail on a condition-of-confinement claim, a plaintiff must show that the condition 'has no reasonable relationship to a legitimate governmental interest' and caused the complained-of constitutional violation." *Nagle*, 2016 WL 768588 at *5 (quoting *Duvall*, 631 F.3d at 206-07). "The

[16] Plaintiff concedes that the official capacity claim against Defendant Kelly cannot continue. *See*, *Oladipupo*, 104 F. Supp. 2d 626, 641-43.

plaintiff is not required to show deliberate indifference, although 'the reasonable-relationship test employed in conditions cases is functionally equivalent to the deliberate indifference standard employed in episodic cases." *Id.* (quoting *Duvall*, 631 F.3d at 207). "The Fifth Circuit has at least suggested that condition-of-confinement claims are cognizable against individual actors only in their official capacities." *Id.* (citing *Estate of Allison v. Wansley*, 524 Fed. Appx. 963, 970 n.4 (5th Cir. 2013)).

Defendant Smith "may be sued in his official capacity because under Louisiana law, administration of a parish jail, including the obligations to provide medical care for, feed and clothe the prisoners, is the province of the Sheriff of the parish." *Oladipupo*, 104 F. Supp. 2d at 641. "Sheriffs in Louisiana are final policy makers with respect to management of the jail. The Sheriff's policy-making authority over management of the jail is not the result of a delegation from the Parish or any other local governmental entity. The Sheriff's authority is derived from the state constitution[.]" *Jones v. St. Tammany Parish Jail*, 4 F. Supp. 2d at 613. Further, "The Sheriff in his official capacity is the appropriate governmental entity responsible for any constitutional violations committed by his office." *Id.* at 614 (citing *Jenkins v. Jefferson Parish Sheriff's Office*, 402 So.2d 669, 671 (La. 1981); *Burge v. Parish of St. Tammany*, 1997 WL 10243 (E.D. La. Jan. 8, 1997); *Craig v. St. Martin Parish Sheriff*, 861 F. Supp. 1290, 1301 (W.D. La. 1994)); *see also*, *Ates v. Terrebonne Parish*, No. 13-5732, 2013 WL 6858455, *3 (E.D. La. Dec. 30, 2013) ("the proper defendant for *Monell* claims concerning the conditions of confinement at the St. Tammany Parish Jail is the St. Tammany Parish Sheriff in his official capacity, *not* the parish government."); *Williamson v. Louisiana*, No. 08-4470, 2008 WL 4811178, *3 (E.D. La. Oct. 29, 2008) (same). Further, "governmental entities are not entitled to qualified immunity." *Gates v. Texas Dept. of Protective and Regul. Servs.*, 537 F.3d 404, 436 (5th Cir. 2008).

"Under section 1983, where a plaintiff challenges the general conditions of confinement, we assume, by the municipality's very promulgation and maintenance of the complained-of condition, that it intended to cause the alleged constitutional deprivation." *Oladipupo*, 104 F. Supp. 2d at 641. Since the Court is to assume that Defendant Smith intended the conditions in the holding cells at STPJ, "our sole inquiry is whether the conditions are reasonably related to a legitimate government objective." *Id.* In *Oladipupo*, the plaintiff complained that the Sheriff had a policy of housing INS detainees in an overcrowded, unsanitary unit lacking adequate opportunity for recreation, adequate meals and clothing, and emergency exits. *Id.* The Court found that because "the Sheriff alone has the responsibility to maintain his parish jail," and because defendants had "not proffered any legitimate government objective that justifies the conditions" that the plaintiff complained about, summary judgment for the Sheriff was inappropriate. *Id.* The same is true here. Defendant Smith has provided this Court with no legitimate penological interests or objectives that justify the conditions of which Mr. Williams and the other Plaintiffs complain. Because Mr. Williams has raised genuine issues of material fact regarding whether the conditions inside the holding cells, and the customs that have created those conditions, are reasonably related to governmental interests, Mr. Williams' conditions of confinement claim against Defendant Smith should not be foreclosed.

In addition, Plaintiffs do not make a failure to train claim, but rather point to the lack of training, as well as lack of supervision, as probative evidence of Defendants' longstanding practice and custom of deliberately violating the Fourteenth Amendment rights of those pretrial detainees in the STPJ holding cells, including Mr. Williams. *See*, Doc. 1 at pp. 18-20. Defendants further conflate Plaintiffs' allegations in the complaint, Doc. 1, and this Court's ruling on preliminary injunction in April 2020, Doc. 40, as the sum total of evidence that has been collected in this case.

*See generally*, Doc. 238-3. This line of argument should likewise be dismissed, as discovery in this case has provided overwhelming evidence to support Plaintiffs' claims.

**E. State claims**

Defendants merely ask this Court not to exercise supplemental jurisdiction, but do not brief the merits of Plaintiffs' state claims. Nevertheless, "[t]he Eighth Amendment to the U.S. Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment." *State v. Jacobs*, 67 So.3d 535, 592 (La. App. 5 Cir. 5/24/11). "Since the State *does* punish convicted prisoners, but *cannot* punish pretrial detainees, a pretrial detainee's due process rights are said to be 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Hare*, 74 F.3d at 639 (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)) (emphasis original). Plaintiffs have shown that the conditions inside the STPJ holding cells were paramount to punishment, and this Court should maintain its supplemental jurisdiction over them.

**F. Plaintiffs' claims are not frivolous, and Defendants should not be awarded attorney's fees under 42 U.S.C. § 1988.**

42 U.S.C. § 1988 allows a court, in its discretion, to award attorney's fees to the prevailing party in a § 1983 action. *United States v. State of Miss.*, 921 F.2d 604, 608 (5th Cir. 1991). "The purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (citing H.R. Rep. No. 94-1558, p. 1 (1976)). The Fifth Circuit has "recognized that private enforcement would be substantially diminished if parties who had good faith claims under the civil rights statutes faced the prospect of always having to pay their opponent's fees should they lose." *Vaughner v. Pulito*, 804 F.2d 873,

878 (5th Cir. 1986). Thus, "prevailing defendants are entitled to attorney fees *only* when a plaintiff's underlying claim is frivolous, unreasonable, or groundless." *Mississippi*, 921 F.2d at 608. This standard is more rigorous than for awarding attorney's fees to plaintiff. *Dean v. Riser*, 240 F.3d 505, 508 (5th Cir. 2001)). Attorney's fees for prevailing defendants "are presumptively unavailable unless a showing is made that the underlying civil rights suit was vexatious, frivolous, or otherwise without merit." *Id.*

Courts "review frivolity by asking whether the case was so lacking in merit that it was groundless, rather than whether the claim was ultimately successful." *Mississippi*, 921 F.2d at 608. Factors that may be examined to determine a claim's frivolity or groundlessness include "whether the plaintiff established a *prima facie* case, whether the defendant offered to settle, and whether the Court held a full trial." *Myers v. City of West Monroe*, 211 F.3d 289, 292 (5th Cir. 2000). "These factors are, however, guideposts, not hard and fast rules. Determinations regarding frivolity are to be made on a case-by-case basis." *Doe v. Silsbee Indep. School Dist.*, 440 Fed. Appx. 421, 425 (5th Cir. 2011). "In applying these criteria, it is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 421-22 (1978). "This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success." *Id.* at 422. "Decisive facts may not emerge until discovery or trial.... Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." *Id.* The Fifth Circuit has "generally affirmed awards of attorney's fees where the plaintiff's civil rights claim lacks a basis in fact or relies on an

undisputably meritless legal theory." *Silsbee Indep. Sch. Dist.*, 440 Fed. Appx. at 425 (quoting *Brown v. Borough of Chambersburg*, 903 F.2d 274, 277 (3d Cir. 1990)).

In contrast, Mr. Williams has established that his grounds for bringing suit are reasonable: to vindicate his Fourteenth Amendment rights not to be punished for a crime he has yet to be adjudicated to be guilty of committing. Mr. Williams' claims here are arguably meritorious and pursued in good faith. *See*, *Davis v. Parish of St. Tammany*, No. 10-364, 2011 WL 121902, *3 (E.D. La. Jan. 12, 2011). Mr. Williams has put forward credible evidence of his claims in opposition to summary judgment here. *See*, *Vaughner*, 804 F.2d at 878. Plaintiffs have also made good faith offers of settlement to Defendants. Even if this Court grants summary judgment to Defendants instead of proceeding to trial on the merits, that does not necessitate that Defendants be awarded attorneys' fees. *See*, *Davis*, 2011 WL 121902 at *3; *see also*, *Usea v. Manuel*, No. 19-14704, 2022 WL 7037225, *3 (E.D. La. Oct. 12, 2022) ("the Court carefully considered the merits of the arguments in deciding to grant summary judgment, further supporting the conclusion that this case was not frivolous. Although Plaintiff's claim was dismissed without a trial, litigation extended more than two years and well into discovery practice."); *Lucien v. Jones*, No. 16-9591, 2016 WL 4942997, *8 (E.D. La. Sep. 16, 2016) ("[w]hile Plaintiff's actions under federal law were ultimately unsuccessful, without further evidence from Defendants as to Plaintiff's frivolity, this Court is unwilling to award Defendants their attorney's fees associated with the filing of this motion."); *Broussard v. Kowalski*, No. 03-2875, 2007 WL 1461023, *5 (E.D. La. May 15, 2007) (denying motion for attorney's fees under § 1988 after finding the basis of plaintiff's claims objectively reasonable); *McClendon v. Smith*, No. CIV. A. 96-4054, 1997 WL 433489, *5 (E.D. La. Jul. 31, 1997) ("[e]ven though defendants have prevailed on their summary judgment motion, the Court finds that plaintiff has alleged sufficient facts to demonstrate that her claim is not without

a foundation.”). Defendants’ motion for attorneys’ fees does nothing more than punish Mr. Williams for bringing his claim and should be denied.

## V. CONCLUSION

Mr. Williams has established a material question of fact for all of his claims against Defendants. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an order denying Defendants Smith and Kelly’s Motion for Summary Judgment.

Respectfully Submitted,

By: /s/ Devon M. Jacob
Attorney for Plaintiffs

/s/ Sam Harton
Attorney for Plaintiffs

Formatted: Font: Not Bold

Formatted: Indent: Left: 2.5", First line: 0.5", Don't add space between paragraphs of the same style

Maria B. Glorioso (#24435), T.A.
Vincent J. Glorioso, Jr. (#6064)
**THE GLORIOSO LAW FIRM**
2716 Athania Parkway
Metairi, LA 70002
Tel: (504) 569-9999
Fax: (504) 569-9022
maria@gtorts.com

Devon M. Jacob (*pro hac vice*)
**JACOB LITIGATION, INC.**
P.O. Box 837
Mechanicsburg, PA 17055-0837
Tel: (717) 796-7733
djacob@jacoblitigation.com

Antonio M. Romanucci (*pro hac vice*)
Bhavani K. Raveendran (*pro hac vice*)
Sam Harton (*pro hac vice*)
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark Street, Suite 900
Chicago, IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
aromanucci@rblaw.net
b.raveendran@rblaw.net
sharton@rblaw.net