UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| AHMED BAQER, ET AL. | CIVIL ACTION |
| VERSUS | NO. 20-980 |
| ST. TAMMANY PARISH GOVERNMENT, ET AL. | SECTION: "P" (3) |

<u>ORDER AND REASONS</u>

Before the Court are five motions for summary judgment by Defendants, Sheriff Randy Smith, in his official and individual capacity, and Lacey Joi Kelly Robertson (also known as Lacey Kelly), in her official and individual capacity, related to the claims of each of the five remaining Plaintiffs, Ahmed Baqer, Klabert Joseph Guillot, Sr., Kevin Louviere, Terry Matthew Hall, Jr., and Floyd Williams.[1]  Also before the Court is Plaintiffs' motion to strike.[2]  Due to Plaintiffs' similar claims and the common evidence relied upon by each set of parties, the Court shall evaluate the motions together except where noted otherwise.

For the following reasons, **IT IS ORDERED** that Defendants' motions are **GRANTED IN PART** as to qualified immunity and otherwise **DENIED IN PART**.

## I.      BACKGROUND

Plaintiffs were pretrial detainees held at St. Tammany Parish Jail ("STPJ") in 2019 and 2020.  As detailed below, Plaintiffs allege they were subjected to unconstitutional conditions of confinement and brought claims against Defendants under 28 U.S.C. § 1983 and Louisiana state law.

---

[1] *See* R. Docs. 387, 388, 390, 391, and 392.
[2] R. Doc. 394.

In 2019 and 2020, Randy Smith was the sheriff of St. Tammany Parish, a position he still holds, and was responsible for managing STPJ.[3] Lacey Kelly was a major with the St. Tammany Parish Sheriff's Office ("STPSO") in 2019 and 2020, and in that role, she served as the warden of the corrections division.[4] As a sergeant in 2023, Kelly testified on behalf of the STPSO as its Rule 30(b)(6) corporate representative.[5] Since 2021, Major Daniel Fleischman has occupied the role of warden of the corrections division.[6] In October of 2019, Gregory Longino left STPSO as the deputy chief of corrections after serving in a corrections-related capacity at STPSO for 29 years.[7] Richard O'Keefe, Jr. served as a captain with STPSO in the corrections division from November 2018 until December 2019.[8]

At STPJ, pretrial detainees were placed in holding cells until there was space for them to be moved into general population housing.[9] Once in general population housing, pretrial detainees had their own beds, access to showers, and were able to exercise indoors and outdoors.[10] While in the holding cells, pretrial detainees were not permitted to leave their cells for exercise or recreation, only to shower.[11] Sheriff Smith admitted that STPJ's holding cells are temporary and only supposed to house pretrial detainees for 48 hours.[12] Likewise, former Deputy Chief of Corrections, Gregory Longino, understood that Louisiana law required pretrial detainees be moved out of holding cells within 48 hours but acknowledged that was not always feasible.[13] The Fire

---

[3] R. Doc. 238-10 at 8-10 (Smith Tr. 8-10).
[4] R. Doc. 239-8 at 9-10 (STPSO 30(b)(6) Tr. 9-10).
[5] *See generally* R. Doc. 239-8 (STPSO 30(b)(6) Tr.).
[6] R. Doc. 391-9 at 8 (Fleischman Tr. 8).
[7] R. Doc. 296-3 at 4, 39 (Longino Tr. 10-11, 151-52).
[8] R. Doc. 295-4 at 4 (O'Keefe Tr. 10-12).
[9] R. Doc. 238-7 at 15 (STPSO Tr. 15).
[10] *Id.* at 14, 121, 163 (STPSO Tr. 14, 121, 163).
[11] *Id.* at 122-23 (STPSO Tr. 122-23); R. Doc. 296-3 at 35-36 (Longino Tr. 137-40).
[12] R. Doc. 238-10 at 78 (Smith Tr. 78).
[13] R. Doc. 296-3 at 25-26 (Longino Tr. 96-99).

Marshal set the maximum capacity of the male holding cells at 20 persons;[14] with four holding cells, the STPJ had capacity for 80 male pretrial detainees in the holding cells.[15] Longino admitted that overcrowding in the holding cells had been a problem at STPJ since the 1990s,[16] and Kelly, testifying in her capacity as STPSO's corporate witness, agreed that overcrowding in the holding cells was a known problem.[17] The lights in the holding cells were kept on at all times.[18] While STPJ did not have a written policy for how the holding cells were to be cleaned, generally an inmate worker, supervised by STPJ staff, wiped down the holding cells with a disinfectant called "Hepacide Quat."[19]

Sheriff Smith testified that STPJ experienced budget difficulties.[20] One of the ways STPJ shored up its budget was to voluntarily enter into contracts to house federal and state inmates, in addition to the pretrial detainees it is required by Louisiana law to house.[21] STPJ entered into those contracts to offset its increasing costs in housing inmates without any increase in funding from the parish.[22] Sheriff Smith noted that entering into such contracts was needed to make up the budget shortfall.[23] Thus, a portion of STPJ was reserved for housing federal and state inmates and was not available for pretrial detainees like the Plaintiffs in this action.[24]

### A. Ahmed Baqer

Mr. Baqer was held in STPJ's holding cells for 16 days from December 2, 2019 until December 17, 2019.[25] He testified that, on average, 15 or 16 detainees were held in his holding

---

[14] R. Doc. 238-7 at 43-44 (STPSO 30(b)(6) Tr. 43-44).

[15] R. Doc. 296-3 at 14 (Longino Tr. 51-53); *see also* R. Doc. 296-4 at 7 (O'Keefe Tr. 23-25).

[16] R. Doc. 296-3 at 14-15 (Longino Tr. 52-57).

[17] R. Doc. 238-7 at 167 (STPSO 30(b)(6) Tr. 167).

[18] *Id.* at 24 (STPSO 30(b)(6) Tr. 24).

[19] *Id.* at 69-71 (STPSO 30(b)(6) Tr. 69-71).

[20] R. Doc. 238-10 at 19-20 (Smith Tr. 19-20).

[21] *Id.* at 11-12 (Smith Tr. 11-12).

[22] *Id.* at 26-27 (Smith Tr. 26-27).

[23] *Id.* at 20-22 (Smith Tr. 20-22).

[24] *See* R. Doc. 296-4 at 15-16 (O'Keefe Tr. 57-58).

[25] R. Doc. 234-6. Mr. Baqer also testified that he was in the holding cell for 14 days. *See* R. Doc. 234-13 at 44-45.

cell, but at times that number rose to 20 or 22 people.[26]  There was vomit "everywhere" from other detainees detoxing in the holding cell, and other pretrial detainees were "peeing all over the place," but the urine only extended a few feet from the toilet.[27]  Mr. Baqer testified that the vomit was mopped up after pretrial detainees begged guards for "about six hours" for a mop.[28]  Mr. Baqer usually slept away from the cell's toilet, but was still forced to sleep near urine or vomit "probably like two times."[29]  Other nights, the number of pretrial detainees in his holding cell meant that Mr. Baqer had no room to lie down and could not sleep.[30]  While toilet paper was provided, it quickly ran out, and pretrial detainees had to "ask for like five, six hours straight to get one roll."[31]  He also testified that detainees were only provided blankets for two hours of the night.[32]

Prior to his detainment at STPJ, Mr. Baqer had been diagnosed with anxiety and prescribed Xanax and another medication.[33]  Mr. Baqer did not have his medications (or evidence of his prescriptions) with him when he entered the jail, but he told the nurse during his initial medical screening that he had been prescribed Xanax and another mood stabilizing medication.[34]  He testified that he made multiple requests for medical attention but never received his prescribed medication.[35]

---

[26] R. Doc. 234-13 at 30.

[27] R. Doc. 234-12 at 67-68 (Baqer Tr. 67-68).

[28] R. Doc. 387-15 at 32.

[29] R. Doc. 234-13 at 32-33; R. Doc. 234-12 at 70-71 (Baqer Tr. 70-71).

[30] R. Doc. 234-12 at 70-71 (Baqer Tr. 70-71); *but see* R. Doc. 387-14 at 67 (Baqer Tr. 67) ("Q. When you did sleep, were you standing, sitting, laying down?  A. Laying down.").

[31] R. Doc. 234-12 at 68 (Baqer Tr. 68).

[32] R. Doc. 234-13 at 50-51.

[33] *Id.* at 45-46.

[34] *Id.* at 48-49; *but see* R. Doc. 387-14 at 60-61 (Baqer Tr. 60-61) (testifying that he had not been prescribed any medication at the time of his detainment).  Mr. Baqer refused detoxing medication.  *See* R. Doc. 234-14 at 26-36.

[35] R. Doc. 234-13 at 48-49.

### B. Klabert Joseph Guillot, Sr.[36]

Mr. Guillot was held in STPJ holding cells for at least 13 days from December 29, 2019 until January 10, 2020.[37]  During his detention, he was housed with approximately 19 to 26 other detainees in the same holding cell.[38]  There was "old food, blood, urine, dirty toilet paper, vomit, and water on the floor,"[39] and Mr. Guillot slept on the floor every night, at least five or six feet away from the cell's toilet.[40]  The holding cell, including the area around the toilet, was swept or mopped once or twice a day after meals.[41]  He was provided with a blanket for a "few hours" every night, though sometimes the blankets were torn in half and too small to cover his body.[42]  Mr. Guillot was only permitted to leave the holding cell to take a shower two or three times per week.[43]

### C. Kevin Louviere

Mr. Louviere testified that he was held in STPJ holding cells for 13 days,[44] though STPJ records reflect that he was moved out of the holding cells on June 26, 2019, 9 days after he was booked on June 17, 2019.[45]  Mr. Louviere recalled that there were, at most, 28 individuals housed

---

[36] Defendants argue for the first time in reply that Guillot has failed to administratively exhaust his claims because he filed suit in this action while he was still a pretrial detainee at STPJ and, therefore, subject to the requirements of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e.  *See* R. Doc. 422 at 1-6.  Defendants failed to raise this argument in their opening brief, *see generally* R. Doc. 391-3, and the argument is therefore waived.  *See Sanchez Duran v. Sheriff of Harris Cnty.*, No. 02-20651, 2003 WL 21108544, at *1 (5th Cir. Apr. 22, 2003) (remanding to determine whether "defendants waived compliance with the exhaustion requirement [of the PLRA] by failing to raise it").

[37] R. Doc. 235-5.  Plaintiffs assert that Mr. Guillot was detained in STPJ holding cells for 13 days, from December 29, 2019, until January 10, 2020.  R. Doc. 410-2 at 21.  However, it appears that Mr. Guillot may have been booked and first assigned to STPJ holding cells on December 27, 2019.  *See* R. Doc. 235-5.  Mr. Guillot also testified that he was transferred "to the general population" on January 4, 2020.  *See* R. Doc. 235-11 at 41 (Guillot Tr. 41).

[38] *See* R. Doc. 235-11 at 42 (Guillot Tr. 42) ("Well, sleeping on the floor with no blanket, no mat, one toilet, dirty all the time, 19, 20 people in the holding cell."); R. Doc. 293-6 at ¶ 8 ("I believe that I was housed with approximately 26 other inmates.").

[39] R. Doc. 293-6 at ¶ 23; *but see* R. Doc. 235-11 at 60 (Guillot Tr. 60) (testifying that he never saw anyone throw up on the floor).

[40] R. Doc. 235-11 at 54-55 (Guillot Tr. 54-55).

[41] *Id.* at 42, 50-51 (Guillot Tr. 42, 50-51).

[42] *Id.* at 55-57 (Guillot Tr. 55-57).

[43] *Id.* at 56-57 (Guillot Tr. 56-57).

[44] R. Doc. 239-6 at 25 (Louviere Tr. 25).

[45] R. Doc. 239-5.

in his holding cell.[46]  He slept on the floor of the holding cell within a foot of the cell's toilet; at times, there was blood and pus on the floor from another detainee with a staph infection.[47]

Mr. Louviere testified that detainees were only allowed to shower once a week, meaning that he showered twice during his confinement in the holding cells.[48]  He was provided "De-Licer" when showering, but went without soap, shampoo, and toothpaste, and he testified that he was not given clean clothes.[49]  Besides when they were allowed to shower, Mr. Louviere did not leave the holding cell until he was transferred to the general population area.[50]  He was given sandwiches with moldy bread and cheese, but he was also served red beans and rice for meals in the holding cells, which he found satisfactory.[51]

The intake screening form prepared by STPJ's medical provider, Correct Care Solutions, on Mr. Louviere's first day in STPJ noted his HIV-positive status and that he had a prescription for Genvoya, an HIV-related medication.[52]  Mr. Louviere testified that he asked officials at the STPJ for his HIV medication on multiple occasions but went without it for his entire detention at STPJ, even after he was moved out of the holding cells.[53]  As a result, Mr. Louviere testified, he was no longer able to take Genvoya and had to switch to a new HIV medication.[54]

---

[46] R. Doc. 239-6 at 27 (Louviere Tr. 27).

[47] *Id.* at 54-56 (Louviere Tr. 54-56).  Defendants note that Louviere's deposition testimony contradicts his sworn declaration as to whether there was fecal matter, urine, or vomit on the floor of his holding cell.  *Compare* R. Doc. 101-12 at ¶ 27 ("The cell had old food, urine, feces, dirty toilet paper, vomit, used bandages, trash, and water on the floor.") *with* R. Doc. 239-6 at 55 (Louviere Tr. 55) ("Q. Did any of those substances, the feces, urine or vomit, end up on the floor?  A. Not that I can recall.").

[48] R. Doc. 239-6 at 37 (Louviere Tr. 37).

[49] *Id.* at 62 (Louviere Tr. 62); *but see* R. Doc. 101-12 at ¶ 38 ("Inmates were provided clean clothes only after their shower.").

[50] R. Doc. 101-12 at ¶ 44.

[51] R. Doc. 239-6 at 32-36 (Louviere Tr. 32-36).

[52] R. Doc. 239-15 at 18-19.

[53] R. Doc. 239-6 at 29-30, 39-40 (Louviere Tr. 29-30, 39-40).

[54] *Id.* at 41-42 (Louviere Tr. 41-42).

### D.  Terry Matthew Hall, Jr.

Mr. Hall was held in an STPJ holding cell for 15 days.[55]  For a day or two of his detention, he counted 30 inmates in his holding cell, but there were always at least 15 others.[56]  Urine was frequently on the floor of the holding cell where Mr. Hall and other detainees slept, though Mr. Hall seems to have only slept on the floor for two nights.[57]  The cell was cleaned, but "not too often."[58]  He took three showers during his 15-day detention in the holding cell; otherwise, he was not permitted to leave the cell.[59]  While he described the temperature inside the cell as "freezing,"[60] Mr. Hall and the other detainees were given blankets on most nights, though the blankets were often too small or had holes in them.[61]  Mr. Hall testified that a doctor diagnosed him with gangrene shortly after he was released from the STPJ[62] and that he suffered back pain as a result of sleeping on the holding cell floor.[63]

### E.  Floyd Williams

Mr. Williams was held in STPJ holding cells for approximately five days, from September 28, 2019, to October 2, 2019.[64]  Mr. Williams's testimony suggests approximately twenty inmates were held in his holding cell.[65]  Urine and feces were on the holding cell floor, though the floor was cleaned on his fourth day in the cell, and detainees were given a wet rag to clean up vomit and

---

[55] R. Doc. 236-5 at 20-21 (Hall Tr. 20-21).

[56] *Id.* at 20-21 (Hall Tr. 20-21).

[57] *Id.* at 32-34 (Hall Tr. 32-34).  Mr. Hall testified that, as the days went by, he was able to secure a spot to sleep on one of the benches in his holding cell.  *Id.* at 22.

[58] *Id.* at 31 (Hall Tr. 31).

[59] *Id.* at 21-23 (Hall Tr. 21-23).

[60] *Id.* at 25 (Hall Tr. 25).

[61] *Id.* at 37 (Hall Tr. 37).

[62] *Id.* at 26-28 (Hall Tr. 26-28).

[63] *See* R. Doc. 447 at 63.

[64] R. Doc. 292-6 at ¶ 6.

[65] *See* R. Doc. 238-11 at 68-69 (Williams Tr. 67-68).  Williams suggests that more than 30 detainees were in the holding cell at certain times, but the portion of his declaration cited for that point suggests that he was held with more than 30 other inmates over the course of his detention, not at the same time.  R. Doc. 292-6 at ¶ 10 ("As a result, during the period of time that I was incarcerated, I was exposed to/housed with significantly more than 30 inmates.").

blood.[66]  Mr. Williams described the cell as "freezing cold" and, on a few nights, he was not provided with a blanket.[67]

Mr. Williams's medical intake form indicates that he told STPJ's medical services provider, Correct Care Solutions, that he suffered from chronic obstructive pulmonary disease ("COPD") and asthma, as well as essential hypertension.[68]  Mr. Williams was not given any medication until his fourth or fifth day in the holding cell, when he was provided aspirin and an inhaler to share with other detainees.[69]  He was not provided his prescribed medication, Lisinopril.[70]

\*          \*          \*

On February 8, 2024, this Court denied without prejudice Defendants' pending motions for summary judgment to allow Plaintiffs to depose one previously undisclosed defense witness.[71]  On May 16, 2024, Defendants re-filed their motions for summary judgment, which are now before the Court.[72]  Shortly thereafter, Plaintiffs filed a motion to strike, arguing that Defendants violated the Court's order denying without prejudice Defendants' original motions for summary judgment because, Plaintiffs contend, Defendants added additional arguments outside the scope of Major Fleischman's deposition.[73]

---

[66] R. Doc. 238-11 at 72-73 (Williams Tr. 72-73).
[67] *Id.* at 70-74 (Williams Tr. 70-74); R. Doc. 292-6 at ¶ 31.
[68] R. Doc. 238-12 at 7, 16.
[69] R. Doc. 292-6 at 4; R. Doc. 238-11 at 36-37; *but see* R. Doc. 388-14 at 22 (indicating that Williams was provided with an inhaler to keep on person ("KOP"), which Defendants contend means that Williams was provided with a personal inhaler).
[70] R. Doc. 238-11 at 36 (Williams Tr. 36).  *But see* R. Doc. 388-14 at 22 (Williams's jail medical records state that he was prescribed 10 milligrams of Lisinopril on September 29, 2019).
[71] R. Doc. 367.
[72] R. Docs. 387, 388, 390, 391, 392.
[73] *See* R. Doc. 394-2.

## II.    LEGAL STANDARD

Summary judgment is only proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[74]  "[C]ourts may not 'evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes.'"[75] Instead, courts "must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the nonmovant."[76]  "The sole question is whether a 'reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor.'"[77]  "If 'reasonable minds could differ' on the 'import of the evidence,' a court must deny the motion."[78]

While typically the movant bears the initial burden of demonstrating the absence of a material fact, a good faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting the burden to the plaintiff to show that the defendant is not entitled to the defense.[79]    The court must determine whether the plaintiff alleges the deprivation of a constitutional right and whether the right was clearly established at the time of the violation.[80]

## III.    LAW AND ANALYSIS

### A.  Plaintiffs' 42 U.S.C. § 1983 claims

The constitutional rights of pretrial detainees descend from the procedural and substantive due process guarantees embedded in the Fourteenth Amendment.[81]    "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to

---

[74] FED. R. CIV. P. 56(a).

[75] *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (quoting *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991)).

[76] *Sanchez v. Young Cnty.*, 956 F.3d 785, 791 (5th Cir. 2020) (citing *Walker v. Sears, Roebuck & Co.*, 853 F2d 355, 358 (5th Cir. 1988)).

[77] *Guzman*, 18 F.4th at 160 (quoting *Int'l Shortstop, Inc.*, 939 F.2d at 1263).

[78] *Sanchez*, 956 F.3d at 791 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

[79] *See Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 329–30 (5th Cir. 2020) (quoting *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016)).

[80] *Est. of Henson v. Wichita Cnty.*, 795 F.3d 456, 462 (5th Cir. 2015).

[81] *Id.* (citing *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc)).

care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause."[82]  But while the state may punish those convicted of crimes, short of imposing cruel and unusual punishment under the Eighth Amendment, it cannot punish pretrial detainees who have not yet been convicted of any crime.[83] The legal standard to evaluate Fourteenth Amendment due process claims brought by pretrial detainees depends on whether the detainee is challenging (1) a condition of confinement or (2) an individual state official's episodic act or omission.[84]  A plaintiff may plead both theories, and a court may properly evaluate each separately.[85]

A condition of confinement claim challenges "general conditions, practices, rules, or restrictions of pretrial confinement."[86]  A condition can be an explicit rule, like the number of beds in a cell, or a *de facto* policy or custom evidenced by "a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'"[87]  When evaluating a condition of confinement claim, the state's or municipality's intent is presumed because the imposition of the rule "manifests an avowed intent to subject a pretrial detainee to that rule or restriction."[88]  Thus, "even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices."[89]

---

[82] *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)).
[83] *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).
[84] *Henson*, 795 F.3d at 462 (citing *Hare*, 74 F.3d at 644-45).
[85] *Id.* at 464.
[86] *Hare*, 74 F.3d at 644.
[87] *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) (alteration in original) (quoting *Hare*, 74 F.3d at 645).
[88] *Hare*, 74 F.3d at 644.
[89] *Id.* at 644-45.

An episodic acts or omissions claim, by contrast, challenges the actions of a particular jail official.[90]  The question becomes "whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge."[91]  The official's intent cannot be presumed, and liability is only imposed when the prison official had subjective knowledge of "a substantial risk of serious harm" to the detainee and instead exercised deliberate indifference.[92]  "'[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"[93]

Here, Plaintiffs only bring conditions of confinement claims.  In *Bell v. Wolfish*, the Supreme Court set out the framework for evaluating such claims.[94]  The Court held that "the Government . . . may detain [a pretrial detainee] to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution."[95]  "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees."[96]

Nearly twenty years after *Bell*, the Fifth Circuit answered the question of "what standard applies when a pretrial detainee asserts a deprivation of a constitutional right held in common with convicted prisoners, albeit through a different textual source."[97]  Some courts had applied the *Bell* rational basis test—requiring plaintiffs show conditions were not reasonably related to a legitimate

---

[90] *Henson*, 795 F.3d at 463 (quoting *Shepherd*, 591 F.3d at 452).
[91] *Hare*, 74 F.3d at 645.
[92] *Id.* at 645, 650.
[93] *Est. of Henson v. Krajca*, 440 F. App'x 341, 343 (5th Cir. 2011) (quoting *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002)).
[94] 441 U.S. 520 (1979).
[95] *Id.* at 536-37.
[96] *Bell*, 441 U.S. at 539.
[97] *Hare*, 74 F.3d at 640.

government purpose—while others had required plaintiffs to show, as in the Eighth Amendment context, deliberate indifference.[98]  In *Hare v. City of Corinth*, the Fifth Circuit reinforced that the *Bell* rational basis test "retains vitality only when a pretrial detainee attacks general conditions, practices, rules, or restrictions of pretrial confinement."[99]  On the other hand, episodic acts or omissions are subject to a deliberate indifference standard.[100]  Nevertheless, "a proper application of *Bell*'s reasonable-relationship test is functionally equivalent to a deliberate indifference standard."[101]

At bottom, a plaintiff bringing a conditions of confinement claim must show the following elements: (1) a rule or restriction, or a sufficiently pervasive practice, or an intended condition or practice; (2) which is not reasonably related to a legitimate government objective; and (3) which constitutes a violation of the plaintiff's constitutional rights.[102]

"A formal, written policy is not required to establish a 'condition or practice.'"[103]  Instead, a sufficiently extended or pervasive pattern of acts, omissions, or misconduct by jail officials can constitute a *de facto* policy.[104]  This kind of pattern can be shown with "the consistent testimony of jail employees" or with reports, affidavits, and other documentary evidence.[105]  For example, in *Montano v. Orange County*, the Fifth Circuit reasoned that the testimony of multiple jail employees that detoxifying detainees were left in a special holding cell for as long as necessary until they detoxed could constitute a *de facto* policy, despite a written policy limiting detoxification periods to four-to-eight hours.[106]

---

[98] *Id.*
[99] *Id.* at 643.
[100] *Id.*
[101] *Id.*
[102] *Henson*, 795 F.3d at 468 (citing *Duvall v. Dallas Cnty.*, 631 F.3d 203, 207 (5th Cir. 2011)).
[103] 842 F.3d 865, 875 (5th Cir. 2016).
[104] *Id.* (citing *Shepherd*, 591 F.3d at 452).
[105] *Id.* at 875 (citing *Shepherd*, 591 F.3d at 453).
[106] *Id.* at 875-76.

Defendants argue that Plaintiffs have failed to meet their summary judgment burden because none of the conditions of confinement at issue are, on their own, *per se* constitutional violations.[107]  But a particular policy or practice need not be the sole cause of the constitutional deprivation.[108]  Rather, "confinement conditions may be constitutionally inadequate if, when viewed in combination, they have a 'mutually enforcing effect that produces the deprivation of a single, identifiable human need.'"[109]  The effects of the conditions identified below are magnified by the amount of time each pretrial detainee spent in the holding cells, each for longer than the 48 hour maximum period that Louisiana law appears to impose.[110]

Defendants also rely upon Eighth Amendment caselaw to argue that Plaintiffs cannot state claims for constitutional violations because there is no evidence of cognizable harms from the conditions of the holding cells.[111]  But "[i]n many jail condition cases, the conditions themselves constitute the harm."[112]  "This is true, for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions."[113]

Finally, to the extent Defendants acknowledge Plaintiffs' descriptions of the conditions at STPJ, they contend that those conditions were not the result of any punitive intent but were necessitated by STPJ's contracts to provide housing for state and federal inmates, or to prevent commingling pretrial detainees with convicts.  Those arguments are addressed below.

---

[107] *See, e.g.*, R. Doc. 387-3 at 4 ("Plaintiff's claims are not actionable as they consist of allegations and complaints that are not *per se* unconstitutional.").

[108] *Sanchez*, 956 F.3d at 794-95 (citing *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 254 (5th Cir. 2018)).

[109] *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

[110] *See* LA. ADMIN. CODE tit. 22, pt. III, § 3301(F) ("New arrivals may be housed in individual intake holding cells for a maximum of 48 hours before being classified and transferred to an appropriate housing area."); *see also* R. Doc. 296-3 at 25-26 (Longino Tr. 97-99).

[111] *See, e.g.*, R. Doc. 423 at 27 ("Defendants note that in order to succeed on a claim of denial of exercise, a Plaintiff, like Mr. Baqer, must show that the denial adversely affected his health.") (citing *Hernandez v. Velasquez*, 522 F.3d 556 (5th Cir. 2008) (finding no Eighth Amendment violation where inmate was denied exercise for 13 months with no showing that resulting "muscle atrophy, stiffness, loss of range of motion, and depression" posed substantial risk of harm)).

[112] *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997).

[113] *Id.*

\*          \*          \*

Plaintiffs' § 1983 claims essentially revolve around four identifiable human needs: (1) sanitation; (2) exercise; (3) sleep; and (4) medical care.

i.    *Sanitation*

Plaintiffs contend that STPJ had no clear policy governing cleaning the holding cells, provided only limited showers to the pretrial detainees in the holding cells,[114] and failed to provide Plaintiffs with basic hygiene supplies.[115]  But Plaintiffs' testimony indicates they were able to shower at least once or twice per week and that the holding cells were cleaned at least daily, with the exception of Mr. Williams, who testified that his holding cell was not cleaned until the fourth day.[116]  Likewise, Plaintiffs have failed to establish that STPJ had a policy of denying detainees in the holding cells hygiene products or clean clothes as some of the Plaintiffs testified they received such accommodations.[117]  These conditions do not reflect acts or omissions "sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by jail officials, to prove an intended condition or practice,"[118] and bear little resemblance to those discussed in the cases cited by Plaintiffs.[119]

---

[114] *See, e.g.*, R. Doc. 234-12 at 72 (Baqer Tr. 72) (testifying that he showered "four times max" in his 16-day detention in the holding cells); R. Doc. 236-5 at 21-23 (Hall Tr. 21-23) (testifying that he showered three times in his 15-day detention in the holding cells).

[115] *See, e.g.*, R. Doc. 449 at 55 ("Nor was [Mr. Williams] provided soap or a toothbrush until he was allowed to shower on the fourth day.").

[116] R. Doc. 238-11 at 72-73 (Williams Tr. 72-73).  Plaintiffs' claim that STPSO did not know if the holding cells were cleaned or sanitized to Louisiana Department of Health standards does not establish a federal constitutional violation.

[117] *See, e.g.*, R. Doc. 387-14 at 72 (Baqer Tr. 72) (testifying that he received soap and shampoo when showering and clean clothes after showering).

[118] *Shepherd*, 591 F.3d at 452.  Mr. Louviere's complaint that he received moldy sandwiches with his meals is not sufficiently pervasive to qualify as a condition of confinement when he was also served edible red beans and rice. Likewise, Mr. Hall's complaint about sanitation contributing to his contracting gangrene does not rise to the level of a pervasive condition.

[119] *See, e.g. Harper v. Showers*, 174 F.3d 716, 717, 720 (5th Cir. 1999) (finding plaintiff stated Eighth Amendment claims in alleging detention in "filthy, sometimes-feces-smeared, cells"); *Gates v. Cook*, 376 F.3d 323, 341 (5th Cir. 2004) (finding overflowing toilets exposing inmates to each other's waste created a substantial risk of serious harm).

There is no evidence indicating that the sanitary conditions of which Plaintiffs complain were imposed for punitive reasons. Plaintiffs point to a handful of statements by STPJ officials referring to STPJ as "St. Slammity" or "St. Slammany," calling the pretrial detainees "[c]riminals and junkies," or making statements to the effect of, "If you don't like it, don't commit crimes in the parish."[120] While unprofessional and inappropriate, these statements do not evince a cognizable punitive motive, but they do reflect the indisputable fact that jail, and STPJ in particular, is unpleasant.

    ii.   *Exercise*

"As the Supreme Court explained, 'Some conditions of confinement establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or *exercise* . . ..'"[121] In *Miller v. Carson*, the Fifth Circuit held that "presumably innocent pretrial detainees who are not classified as security risks and who have not been shown to have violated the disciplinary rules of the jail have a fourteenth amendment and 1983 right to regular access to the outdoors."[122]

However, the Fifth Circuit in *Mayfield v. Ellett* noted that this strong proclamation in *Miller* was presumably tempered by the Supreme Court's deference in *Bell* to the necessity of "maintaining institutional security and preserving internal order and discipline."[123] In *Mayfield*, the plaintiff complained that he was unable to engage in outdoor recreation during his confinement, though he was provided "regular access to the dayroom and the jail gymnasium," the latter of

---

[120] *See, e.g.*, R. Doc. 238-11 at 46 (Williams Tr. 45); R. Doc. 239-6 at 58-59 (Louviere Tr. 59-60).
[121] *Bonnet-Pritchett v. Washington Cnty.*, 1:21-CV-149-RP, 2023 WL 8421180, at *7 (W.D. Tex. Dec. 4, 2023) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)) (emphasis added).
[122] 563 F.2d 741, 750 (5th Cir. 1977).
[123] No. 96-40226, 1996 WL 670432, at *7 (5th Cir. Oct. 29, 1996) (citing *Bell*, 441 U.S. at 546-47).

which had a frosted skylight.[124]  The plaintiff was able to use the gymnasium at least three times a week, for an hour each time.[125]  Given the "physical constraints" of the jail facility, the Fifth Circuit determined that the plaintiff was provided with sufficient accommodations and declined to recognize a "constitutional right to exercise in *unfiltered* sunlight in an otherwise acceptable custodial facility regardless of the facility's physical constraints."[126]

STPJ policy only permitted pretrial detainees to leave holding cells to take showers; otherwise, pretrial detainees remained in the holding cells for 24 hours a day.[127]  The deleterious effects of this policy were compounded by the pervasive overcrowding in the male holding cells. For instance, in December of 2019, STPJ's four male holding cells exceeded the total maximum capacity of 80 persons, set by the Fire Marshal, on 15 of the month's 31 days.[128]  The next month, January of 2020, the four holding cells exceeded their total maximum capacity on 23 of its 31 days.[129]  Plaintiffs submit the below photograph of one of STPJ's holding cells that appears to show at least 19 pretrial detainees housed together.[130]

---

[124] *Id.* at *8.

[125] *Id.*

[126] *Id.* (emphasis in original).

[127] *See* R. Doc. 238-7 at 122-23 (STPSO Tr. 122-23); *see also*, R. Doc. 235-11 at 56-57 (Guillot Tr. 56-57) ("Q. Okay, but other than the . . . times that you left the cell for showers, were you provided with an opportunity to leave the cell for recreation or exercise?  A. No.").

[128] *See* R. Doc. 410-3 (listing 15 days in December 2019 on which STPJ's holding cells contained more pretrial detainees than the maximum capacity of the four holding cells); *see also* R. Doc. 238-7 at 78-79 (STPSO Tr. 78-79) (confirming that the column "Today's Holding Count" refers to the number of detainees in all four holding cells).

[129] *See* R. Doc. 410-4.

[130] Defendants contend that the photograph is undated, *see* R. Doc. 422 at 7, though it appears that it is dated January 20, 2020.

16



As Defendants note, Plaintiffs submit no evidence suggesting the above photograph was taken while any of the Plaintiffs in this case were housed in STPJ.  Nevertheless, this photograph shows how the subject holding cells could appear when holding 19 detainees, and thus illustrates the congested environment in which Plaintiffs were housed for between five and 16 days.

Defendants argue that STPJ lacked the resources to facilitate exercise or recreation for the pretrial detainees in the holding cells, though the 30(b)(6) testimony they cite for that point only states that exercise is not provided because detainees are held only temporarily in the holding cells.[131]  This Court recognizes the material reality of STPJ and STPSO's budgetary constraints. But a "lack of funds is not a sufficient justification for neglect of a citizen's constitutional rights,"[132] and Defendants cannot disclaim constitutional duties by freely entering into competing obligations.  Moreover, STPJ's contract with the U.S. Marshals Service appears to only require STPJ provide an "[e]stimated [n]umber" of beds without any requirement to reserve a certain

---

[131] *See* R. Doc. 238-7 at 123 (STPSO Tr. 123).
[132] *McCord v. Maggio*, 927 F.2d 844, 847 (5th Cir. 1991) (citing *Gates v. Collier*, 501 F.2d 1291, 1320 (5th Cir. 1974)).

number of beds for federal prisoners at all times, regardless of whether all such beds are needed.[133] The Court recognizes that Defendants' concern for commingling pretrial detainees and convicted inmates is certainly plausible, but a reasonable jury could nonetheless attribute this predicament to STPJ's decision to dedicate a significant portion of its facilities to housing federal and state convicted inmates or failing to properly allocate its resources to ensure that it complies with its baseline constitutional obligations.[134]

      iii.   *Sleep*

The Fifth Circuit has recognized that conditions disrupting sleep can form the basis of a constitutional violation. In *Hebert v. Maxwell*, the court considered a case in which the plaintiff alleged that his cell contained only a "hard wooden bench" without a bed and overhead lights that were never turned off.[135] In affirming the district court's denial of qualified immunity, the Fifth Circuit determined that, "[i]n the absence of a compelling governmental interest, housing a detainee in a room without sleeping accommodations, when other available rooms had sleeping facilities, is enough to survive a summary judgment motion based on qualified immunity."[136] Even before *Hebert*, the Fifth Circuit noted in *Martinez v. Harris County Jail* that denying a pretrial detainee a mattress and showers "could arguably constitute unconstitutional punishment of a pretrial detainee" without a legitimate purpose.[137]

---

[133] R. Doc. 391-10 at 1.

[134] *See* R. Doc. 388-3 at 11 ("Defendants further note that Warden Fleischman testified that detainees of the Marshals Service and Bureau of Prisons are never comingled with pre-trial detainees because: (1) the Marshal Services does not want them comingled and (2) because those federal detainees are more dangerous than pre-trial detainees.") (citing R. Doc. 388-9 at 95-96 (Fleischman Tr. 95-96)).

[135] 214 F. App'x 451, 453 (5th Cir. 2007).

[136] *Id.* at 456.

[137] No. 94-20699, 1995 WL 725414, at *3 (5th Cir. Nov. 3, 1995); *see also Palmer v. Johnson*, 193 F.3d 346, 352-53 (5th Cir. 1999) (holding that conditions lasting for 17 hours—including a night outside without shelter, blanket, or jacket, and with no toilet—had mutually reinforcing effect constituting constitutional violation).

STPJ does not provide mattresses to pretrial detainees in the holding cells, who instead must sleep on the concrete floor or on concrete benches.[138]  On some nights, Plaintiffs testified their holding cell was so overcrowded and cramped that they could not even lie down.[139]

Defendants argue that it would not be feasible to provide pretrial detainees in holding cells with mattresses because "[p]lacing mattresses or beds into the holding cells would further reduce the number of detainees that would be able to be held in the holding cells due to lack of space."[140] But a reasonable jury could infer that this explanation traces its source to STPJ's contracts to hold state and federal inmates, which uses up considerable bed space in STPJ and, as discussed above, is a voluntary obligation unrelated to STPJ's foundational purpose—housing pretrial detainees. Moreover, it appears that STPJ does not procure mattresses for pretrial detainees in the holding cells regardless of the number of detainees in the cell.  A reasonable jury could infer, therefore, that STPJ wields the no-mattress policy arbitrarily.

    iv.   *Medical care*

To show that STPJ's medical system was constitutionally inadequate, Plaintiffs must present evidence of "more than an isolated incident; they must demonstrate a pervasive pattern of serious deficiencies in providing for [their] basic needs."[141]  The evidence must be sufficient to

---

[138] R. Doc. 238-7 at 110 (STPSO 30(b)(6) Tr. 110).

[139] R. Doc. 234-12 at 70-71 (Baqer Tr. 70-71); *but see* R. Doc. 387-14 at 67 (Baqer Tr. 67) ("Q. When you did sleep, were you standing, sitting, laying down? A. Laying down.").  Plaintiffs also complain of fluorescent lights that shine 24 hours every day in the holding cells, the cells' temperature, and the inadequate blankets provided to detainees in the holding cells.  However, Plaintiffs failed to rebut Defendants' safety and security explanations for the constant lights and the cells' temperature, *see, e.g.*, R. Doc. 387-3 at 31-32, 46-67, and Plaintiffs have not identified a pervasive practice or policy related to the blankets.  *See* R. Doc. 234-13 at 50-51; R. Doc. 235-11 at 55-57 (Guillot Tr. 55-57); R. Doc. 238-11 at 74-75 (Williams Tr. 73-74); R. Doc. 292-6 at ¶ 31.

[140] *See, e.g.*, R. Doc. 392-3 at 23-24.

[141] *Henson*, 795 F.3d at 469 (quoting *Edler v. Hockley Cnty. C'mrs Ct.*, 589 F. App'x 664, 668 (5th Cir. 2014)) (cleaned up).

demonstrate that "'serious injury and death were the inevitable results of the jail's' staffing practices."[142]

In *Shepherd v. Dallas County*, the plaintiff presented a report commissioned by the county, a report by the Department of Justice, and affidavits from jail employees and others showing that the jail failed to properly treat inmates with chronic illness, through "poor or non-existent procedures and understaffing of guards and medical personnel."[143]  While "isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate," the plaintiff had shown that "serious injury and death were the inevitable results of the jail's gross inattention to the needs of inmates with chronic illness."[144]

Plaintiffs primarily take issue with STPJ's provision (or lack thereof) of prescription medications to pretrial detainees.  Mr. Louviere informed a nurse during his intake evaluation that he was prescribed medication to treat HIV, but he was never provided that drug for the 29 days that he spent in custody at STPJ (13 of which were spent in the holding cells).[145]  Mr. Baqer was allegedly denied his prescribed medication to treat anxiety,[146] and Mr. Williams did not receive medication to treat his COPD and related conditions, though he was given aspirin and an inhaler on his fourth or fifth day in the holding cell.[147]

Plaintiffs have not submitted any evidence indicating that "serious injury and death" were the natural result of these failures.  Moreover, other evidence in the record suggests that STPJ at least attempted to treat Plaintiffs' most pressing medical issues, including by providing Mr. Baqer

---

[142] *Id.* (quoting *Shepherd*, 591 F.3d at 454).
[143] 591 F.3d at 453.
[144] *Id.* at 454.
[145] R. Doc. 239-6 at 40 (Louviere Tr. 40).
[146] R. Doc. 234-13 at 45-46.
[147] R. Doc. 238-12 at 7, 16.  The parties dispute whether Mr. Williams was forced to share an inhaler with other pretrial detainees or whether he was given two inhalers to keep on his person, but that dispute does not create a material issue of fact.  *See* R. Doc. 426 at 31-32.

with detoxing medication, which he refused.[148]  Thus, Plaintiffs have failed to show evidence that STPJ's medical treatment policies were constitutionally inadequate.

*                    *                    *

Pursuant to the foregoing, Plaintiffs have submitted evidence of viable Section 1983 conditions of confinement claims as to exercise and sleep.  As such, Plaintiffs claims are not frivolous under 42 U.S.C. § 1988.[149]

## B. *Monell* claims[150]

Municipalities are not protected by qualified immunity,[151] and a municipality may be held liable for a constitutional violation if the plaintiff can show (1) there is an official policy or custom, (2) the policymaker had actual or constructive knowledge of the policy or custom, and (3) the policy or custom is the moving force behind the constitutional violation.[152]  Sheriff Smith, in his official capacity, is a municipal entity amenable to suit.[153]

There is "no meaningful difference between" a plaintiff's showing an official policy or widespread custom under *Monell* and in showing a sufficiently pervasive condition or practice in a conditions of confinement claim.[154]  "Moreover, the standard of causation appears to be the same:

---

[148] *See* R. Doc. 234-14 at 26-36.

[149] *See Loftin v. City of Prentiss*, 33 F.4th 774, 783 (5th Cir. 2022).

[150] Plaintiffs concede that their official capacity claims against Kelly cannot continue.  *See, e.g.*, R. Doc. 409 at 81 n.13.

[151] *Williams v. City of Yazoo*, 41 F.4th 416, 421 (5th Cir. 2022) (citing *Owen v. City of Indep.*, 445 U.S. 622, 638 & n.18 (1980)).

[152] *See Cope v. Coleman Cnty.*, No. 23-10414, 2024 WL 3177781, at *3 (5th Cir. Jun. 26, 2024); *see also Valle v. City of Hous.*, 613 F.3d 536, 541-42 (5th Cir. 2010).

[153] *See Cozzo v. Tangipahoa Par. Council-President Gov't*, 279 F.3d 273, 283 (5th Cir. 2002).  To the extent official capacity claims remain against Kelly and Sheriff Smith, apart from Sheriff Smith's legal status as a municipal entity, those claims are dismissed.  *See Ates v. Terrebonne Par.*, No. 13-5732, 2013 WL 6858455, at *3 (E.D. La. Dec. 30, 2013) ("[T]he proper defendant for *Monell* claims concerning the conditions of confinement at the St. Tammany Parish Jail is the St. Tammany Parish Sheriff in his official capacity, not the parish government."); *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001) (official capacity claims properly dismissed where "allegations duplicate claims against the respective governmental entities themselves").

[154] *Duvall*, 631 F.3d at 208.

the policy or custom must have been 'the moving force behind the violation.'"[155]  Having found

that Plaintiffs have satisfied those elements on their conditions of confinement claims, the Court

now turns to the only remaining element of Plaintiffs' *Monell* claims—whether Sheriff Smith had

actual or constructive knowledge of the relevant policies and customs.

Sheriff Smith testified that the Fire Marshal inspected STPJ's holding cells and found

"deficiencies in the capacity" related to overcrowding.[156]  He also testified that pretrial detainees

in holding cells do not have mattresses because the holding cells were "not designed for long-term

housing."[157]  Finally, Sheriff Smith testified that detainees in the holding cells have no opportunity

for exercise.[158]  Accordingly, there is sufficient evidence to conclude that Sheriff Smith had actual

or constructive knowledge of the conditions forming the basis of Plaintiffs' surviving conditions

of confinement claims, and Plaintiffs' *Monell* claims against Sheriff Smith therefore survive

summary judgment.

## C. Individual capacity claims

"In determining whether an official enjoys [qualified] immunity, we ask (1) whether the

plaintiff has demonstrated a violation of a clearly established federal constitutional or statutory

right and (2) whether the official's actions violated that right to the extent that an objectively

reasonable person would have known."[159]  As to the second prong, immunity applies "when an

officials' conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."[160]  Thus, "[a]lthough the Supreme Court's caselaw does

---

[155] *Est. of Bonilla by and through Bonilla v. Orange Cnty.*, 982 F.3d 298, 308 (5th Cir. 2020) (quoting *Sanchez*, 956 F.3d at 791).
[156] R. Doc. 239-8 at 43-45 (Smith Tr. 43-45).
[157] *Id.* at 110 (Smith Tr. 110).
[158] *Id.* at 123-24 (Smith Tr. 123-24).
[159] *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006) (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)).
[160] *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (per curiam)) (internal quotations omitted).

not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."[161]

While a reasonable jury could find that Plaintiffs' constitutional rights were violated as to their needs for sleep and exercise, the lack of clear authority from the Supreme Court or Fifth Circuit mandates the application of qualified immunity. The Fifth Circuit in *Mayfield* and *Hebert* recognized pretrial detainees need sleep and recreation, like any person.[162] But neither of those cases, nor any Fifth Circuit case since, provide sufficient guidance for a jail official to recognize the constitutional boundaries of those rights. And while the court in *Hebert* affirmed the district court's denial of qualified immunity, that decision was premised on the government's woefully inadequate proffered explanation—to "find out who [the plaintiff] was."[163] Here, by contrast, a reasonable jury could yet conclude that Defendants' proffered explanations for denying Plaintiffs mattresses are related to a legitimate governmental objective. Accordingly, Defendants' motions are granted as to the issue of qualified immunity.

### D. State law claims

Plaintiffs and Defendants merely argue whether the Court should exercise supplemental jurisdiction over Plaintiffs' state law claims, an argument that necessarily depends on the outcome of Plaintiffs' Section 1983 claims. As those claims survive summary judgment, the Court will continue to exercise supplemental jurisdiction over Plaintiffs' state law claims.

---

[161] *Id.* (quoting *White*, 580 U.S. at 79) (cleaned up).
[162] *See Mayfield*, 1996 WL 670432, at *8 (recognizing that "inmates need[] recreation and sunlight to the extent reasonably—and practically—available") (citing *Block v. Rutherford*, 468 U.S. 576, 589 (1984)); *Hebert*, 214 F. App'x at 455-56.
[163] *Hebert*, 214 F. App'x at 455-56.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment (R. Docs. 387, 388, 390, 391, and 392) are **GRANTED** as to qualified immunity and otherwise are **DENIED**. Plaintiffs' Motion to Strike (R. Doc. 394) is **DENIED**.

New Orleans, Louisiana, this 28th day of March 2025.

**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**