# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| Ahmed Baqer, *et al.*, | * | |
| | * | CASE NO. 20-00980-DJP-DPC |
| Plaintiffs, | * | |
| | * | *Consolidated with* |
| v. | * | CASE NO. 20-01840-WBV-DPC |
| | * | |
| St. Tammany Parish Government, *et al.*, | * | JUDGE PAPILLION |
| | * | |
| Defendants. | * | MAGISTRATE JUDGE |
| | * | PHILLIPS CURRAULT |
| | * | |
| | * | JURY TRIAL DEMANDED |
| | * | |

*************************************************************************

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT SHERIFF'S MOTION FOR RECONSIDERATION (ECF 464)

Plaintiffs, through their undersigned counsel, submit this response to the motion for reconsideration filed by Defendant Sheriff Randy Smith (ECF 464) and memorandum in support (ECF 464-1). Plaintiffs respectfully submit that the motion should be denied as set forth herein.

Sheriff Smith remains a defendant in his official capacity, and thus is sued as a representative of the relevant governmental entity. For the sake of clarity, Plaintiffs will refer to the defendant in this brief as the St. Tammany Parish Sheriff's Office ("STPSO").

## INTRODUCTION

The Court's summary judgment ruling, ECF 457, is straightforward: Plaintiffs, the Court held, had presented evidence showing (1) that the STPSO had entered into voluntary contracts to rent out large parts of the St. Tammany Parish

1

Jail ("STPJ") to the federal and state governments, (2) that this reduced the space available in for the STPJ's own detainees, (3) which forced the STPJ to confine dozens of detainees at a time in the jail's holding cells for lengthy periods, until space for them opened up in the small part of the jail that remained available for them, and (4) that this subjected the detainees in holding cells to miserable, overcrowded conditions—including lack of sanitation, exercise, bedding, and constant lighting that interfered with sleep.  *See* ECF 457 at 2-8, 17.  These deprivations were not imposed pursuant to a legitimate governmental interest, the Court held, because the STPSO "cannot disclaim constitutional duties [to house its own detainees adequately] by freely entering into competing obligations [*i.e.*, the rental contracts]."  ECF 457 at 17.

The STPSO had offered various practical reasons why it could not provide exercise, bedding, etc. for detainees in the holding cells, but the Court explained that "predicament" could be "attribute[d]" to the STPSO's "decision to dedicate a significant portion of [the STPJ] to housing federal and state inmates" instead of "properly allocate[ing] its resources to ensure that it complies with its baseline constitutional obligations."  *Id.* at 18.  The various reasons given by the defendants for the deprivations, such as their explanation that placing mattresses in the holding cells was impracticable, *see id.* at 19, were therefore inapposite, because each such "explanation traces its source to the STPJ's [rental] contracts . . . which uses up considerable bed space in the STPJ and, as discussed above, is a voluntary

obligation unrelated to the STPJ's foundational purpose—housing pretrial detainees." *Id.*

The STPSO's motion for reconsideration never challenges this basic holding—and indeed it could not, as the holding is well grounded in precedent applied to the facts put forward by the Plaintiffs. That leaves the STPSO to make a variety of arguments that either *ignore* what the Court said in its summary judgment decision, misinterpret established precedent, or advance half-formed invocations of state law that it never preserved and never introduced before. Those arguments do not identify any errors, much less manifest ones. The Court should reject them and deny the STPSO's motion for reconsideration.

## LEGAL STANDARD

The STPSO refers to the standard governing reconsideration motions in passing, *see* ECF 464-1 at 3-4, but it does not explain what that standard entails, or how it limits the arguments available to the STPSO at this stage. That is for good reason, because motions for reconsideration operate on hostile terrain. "A court's reconsideration of an earlier order is an extraordinary remedy, which should be granted sparingly." *Rackley v. Louisiana*, No. CIV.A. 07-504, 2007 WL 3407418, at *1 (E.D. La. Nov. 13, 2007). As relevant here, the "purpose of allowing [motions for reconsideration is to enable] a party to correct manifest errors of law or fact[.]" *Basinkeeper v. Bostick*, 663 F. App'x 291, 294 (5th Cir. 2016) (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989)). This purpose is a "narrow" one, *id.*, and courts are emphatic that "a motion for reconsideration is 'not the proper

3

vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before . . . .'" *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004).  Motions for reconsideration thus "should not be used to re-litigate prior matters that should have been urged earlier or that simply have been resolved to the movant's dissatisfaction," *Voisin v. Tetra Techs., Inc.*, No. CIV.A. 08-1302, 2010 WL 3943522, at *2 (E.D. La. Oct. 6, 2010) (citing 11 Wright, Miller & Kane, Federal Practice & Procedure § 2810.1 at 125-27), nor may a motion for reconsideration "be used to raise arguments which could, and should, have been made before the judgment issued." *Schiller v. Physicians Resource Group Inc.*, 342 F.3d 563, 567 (5th Cir. 2003).

An unhappy litigant might be tempted to evade these restrictions by wedging open the narrow "manifest error" window to urge new and improved versions of their various arguments.  But a manifest error is "one that 'is plain and indisputable, and that amounts to a complete disregard of controlling law.'" *GLF Constr. Corp. v. FEDCON Joint Venture*, No. 16-13022, 2017 WL 2653126, at *3 (E.D. La. June 20, 2017) (quoting *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)).  It is not enough, furthermore, to suggest the possibility of such error; rather, a party moving for reconsideration must "clearly establish" that a manifest error has occurred. *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005).

The STPSO's motion for consideration violates these rules from start to finish.  It fronts arguments and legal theories that it never advanced during its summary judgment briefing, and its substantive arguments fail to engage with this

Court's summary judgment decision, or simply make arguments that are not grounded in the law at all.  The Court should reject them.

## ARGUMENT

### A.    The STPSO's invocation of Louisiana Revised Statute § 15:707 has no impact on the Court's summary judgment decision.

The STPSO, for the first time in its motion for reconsideration, invokes Louisiana Revised Statute § 15:707 and argues that this state law absolves it of responsibility for the constitutional violations identified in the Court's summary judgment order.  ECF 464-1 at 5-9.  The STPSO'a argument is, essentially, that Section 15:707 forced the STPSO to house pretrial detainees in the STPJ's holding cells for extended periods because the law required STPSO to make room for federal inmates. The STPSO has never invoked Section 15:707 before—not among the STPSO's pleading of affirmative defenses, nor its motion for summary judgment, nor in its reply supporting summary judgment.  Nevertheless, the STPSO now says, "surely" the Court was aware of Section 15:707,[1] and as such the Court committed clear error by not relying on it to strike down Plaintiffs' claims.  ECF 464-1 at 6.

This argument fails—for a multitude of reasons.  The STPSO waived any invocation of Section 15:707 long ago, and it does not require STPSO to house pretrial detainees in the unconstitutional conditions Plaintiffs complaint of in any

---

[1]    Section 15:707, notably, is the definition of an obscure law:  Westlaw returns a total of four citations to the law, none by a court. And the Sheriff himself apparently did not know of its existence. In his deposition, the Sheriff testified that he was required by law to house pretrial detainees, but no law required him to house state or federal inmates. ECF 409-2, *Baqer* Statement of Additional Facts ¶¶ 28, 62.

event.  But even if Defendant's timely raised Section 15:707 (they did not), and even if the law tied STPSO's hands the way it now claims (it does not), it would have no impact on Plaintiffs' claims in this case, because there was plenty of room to house the pretrial detainees in the *other* portion of the jail that the STPSO had rented out, to the Louisiana Department of Corrections & Public Safety ("LDOC").  The "LDOC" portion of the jail could have accommodated everyone who was detained in the jail's holding cells—and the STPSO identifies no law compelling it to rent to the LDOC at all.  Plaintiff reviews these cascading failures in turn.

### 1.     STPSO has waived invocation of Section 15:707.

If one thing is true about motions for reconsideration, they are not places for parties to argue for reversing a court's decision on the basis of arguments and legal authorities they could have, but failed to, raise previously. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863 (5th Cir. 2003) (holding that motions for reconsideration "cannot be used to raise arguments which could, and should," have been raised previously).  At the threshold, and for this reason alone, the Court should reject the STPSO's invocation of Section 15:707 now.  Section 15:707 did not obligate the STPSO to rent out a 180-bed section of the jail and place it off-limits to the jail's detainees.

Even if the STPSO had timely invoked Section 15:707, it's motion for reconsideration fails to explain how the law provides the defense that the STPSO claims.  The STPSO suggests that it was "acting under [the] compulsion" of Section 15:707 when it took in federal prisoners, and therefore cannot be held liable for the

resulting extended confinement of the jail's detainees to the holding cells. ECF 464-1 at 8. The law, however, is much narrower than that, and does not compel the result that the STPSO claims.

As the STPSO presents Section 15:707, the law obligates the STPSO to take into custody any person "any person . . . sent or committed" by the federal government. ECF 464-1 at 6 (quoting La. Rev. Stat. § 15:707). The law, however, says nothing about where these prisoners should be housed, what conditions they should be housed under, whether they may be housed with the STPSO's regular detainees or must be kept apart, or any other provisos about the conditions or place of their confinement. Thus while Section 15:707 may require the STPSO to take in federal detainees, where the detainees are housed, under what conditions, and with whom, are left to the STPSO alone.

That fact is fatal to the STPSO's invocation of Section 15:707. In this case, the STPSO may have had an obligation to take in "any person" that the federal government committed to its custody, but it *chose* to enter into a contract with the federal government that set aside 180 beds for the purpose of housing people in federal custody, which a set-aside area of the jail, which could not be used by the jail's regular detainees, even if some or many of them were empty. ECF 464-1 at 7-9; ECF 409-2 at ¶ 29-30, 64. None of these conditions were compelled by Section 15:707. Instead, they were the terms of a contract that the STPSO voluntarily undertook in exchange for money from the federal government. *Id.*

7

That leaves open a multitude of choices that the STPSO could have made, *instead* of agreeing to the segregated, 180-bed contract. For example, the STPSO could have acceded to the taking in of federal prisoners pursuant to Section 15:707, but declined to segregate them from the remaining jail population (in order to help ensure that regular jail detainees could be housed properly). In that case, the federal government may simply have chosen not to house federal prisoners at the jail. Alternatively, the STPSO could have agreed to take in federal prisoners pursuant to Section 15:707, but treated them like it treated the putative class members—keeping the *federal* prisoners in holding cells, and housing its own detainees the 180-bed space instead. In that scenario, too, the federal government may simply have elected not to house any prisoners at the jail. Also, the 180-bed contract with the federal government has been in place since at least 2017. *See* ECF 331-4, DOJ Contract at 1. Given such a long-standing contract, the STPSO could have chosen to build out the STPJ to properly house both the federal prisoners and its own population, rather than confining its own detainees to the holding cells for extended periods.

All of these are choices that the STPSO could have made that would not have resulted in the extended, overcrowded, and unconstitutional confinement of the jail's detainees in the holding cells while still complying with Section 15:707. STPSO points to nothing showing it was compelled to subject Plaintiffs to extended

confinement in the holding cells because of Section 15:707.[2]  Even if the STPSO had

not waived invocation of the law by timely raising it, the existence of the law would

not provide the defense that the STPSO claims.

> **2.    Section 15:707 could not impact the Court's summary judgment decision because the STPSO also rented to the LDOC.**

As Plaintiff has explained *supra*, the STPSO has waived invocation of Section

15:707, and even if it had invoked the law in a timely manner, the existence of

Section 15:707 cannot be said to have compelled the STPSO to enter into the

segregated 180-bed contract that it did.  But even if the STPSO overcame both these

barriers, its invocation of Section 15:707 would have no impact on Plaintiff's claims

or the Court's summary judgment decision.  That is so because the STPSO rented

out *another* wing of the jail to the LDOC.  That wing, which could house at least 300

people (See ECF 410-4, January Jail Count Sheet reflecting 364 male DOC inmates

housed at the St. Tammany Parish Jail), was even larger than the 180-bed wing

rented out the federal government. The LDOC wing had more than enough space

to house the 80-odd jail detainees who were confined in holding at any one time.

The following monitoring report from 2019, for example, shows that the jail housed

more than 300 LDOC prisoners:

---

[2]  The STPSO's invocation of Section 15:707 is a classic affirmative defense, and as such STPSO would bear the burden of showing that the obligations it imposes imposed by the law would defeat the Plaintiffs' claims. *See LSREF2 Baron, L.L.C. v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014) ("An affirmative defense raises a new matter, which assuming the allegations in the petition are true, constitutes a defense to the action.").

|  | # MALE | # FEMALE | TOTAL |
|---|---|---|---|
| Number of DOC Offenders | 394 | 19 | 413 |
| Number of Local Offenders | 419 | 24 | 443 |
| Number of Out of State Offenders | 0 | 0 | 0 |
| Number of Federal Offenders | 90 | 4 | 94 |
| Number of ICE Detainees | 11 | 0 | 11 |
| TOTAL | 914 | 47 | 961 |

**Ex. 1** at 2.

All this matters because the STPSO has never identified any law compelling it to take in or house a single *LDOC* prisoner.  In other words, whatever can be said of the STPJ's 180-bed federal rental, housing the LDOC prisoners was an voluntary contractual undertaking that also caused the improper extended confinement of the STPSO's detainees in the jail's holding cells. That voluntary choice is entirely attributable to the STPSO, not to the operation of any law that bound the STPSO's hands.  Federal contract or no,  STPSO had room to place its pretrial detainees in constitutional conditions and instead chose to lock them in overcrowded, filthy holding cells nearly 24 hours per day, while it rented out the cells that could have housed them to the LDOC.  Even if the Court were to entertain STPSO's claims about Section 15:707 and accept them at face value, there would be no cause to revisit its summary judgment decision.

**B.    The STPSO identifies no error in the Court's due process analysis.**

The STPSO devotes much of its reconsideration brief to arguing that the Court was wrong to hold that Plaintiffs had put forward sufficient evidence to prove a due process violation.  The arguments, which are summarized below, are various. Ultimately they reflect a refusal to come to terms with the fact that the Due Process

clause prohibits the STPSO from imposing misery on hundreds of pretrial detainees in its custody so that it could rent out parts of its jail for profit. But the Constitution's prohibition of such misconduct is plain, and in this case it presents the STPSO with wholesale liability.

> 1.    **The STPSO confuses the relationship between qualified immunity for individuals and Section 1983 claims against municipalities.**

In its March 28 Order, the Court denied summary judgment on Plaintiff's *Monell* claims against the STPSO because there was a material issue of fact as to whether the STPSO's rental contracts and the resulting over-confinement in the jail's holding cells violated Plaintiffs' due process rights. ECF 457 at 15-19, 21-22. At the same time, the Court held that the individual defendants were entitled to qualified immunity on grounds that the rights those defendants had violated were not clearly established. *Id.* at 22-23.

This is a routine outcome in Section 1983 cases: a constitutional violation is found for which a municipality may be liable, but because the contours of the right at issue are not sufficiently well-established in advance by precedent, qualified immunity is granted to individual defendants. *See e.g. Howell v. Town of Ball*, 827 F.3d 515 (5th Cir. 2016) (finding a viable claim of municipal liability where a plaintiff asserted a violation of a right that was not clearly established); *Perkins v. Panola Cnty. Bd. of Supervisors*, 709 F. Supp. 3d 260 (N.D. Miss. 2024) (allowing official capacity claims to go forward regardless of whether the law had been clearly established). Such outcomes exist side by side because "what matters in a *Monell*

analysis is whether there was a violation of a constitutional right, not whether that right was clearly established at the time. *Ramirez v. Escajeda*, No. EP-17-CV-00193-DCG, 2022 WL 1744454, at *2 (W.D. Tex. May 31, 2022). The STPSO, however, seeks to take advantage of this "split" outcome by injecting confusion into the Court's qualified immunity decision. It does so by making two arguments. Both fail.

**First**, the STPSO argues that the Court's holding that the rights at issue were not clearly established means that the STPSO should also be dismissed from the case. ECF 464-1 at 12-13 ("[I]f there is not sufficient guidance from the Fifth Circuit for a jail official to be able to recognize the [relevant] constitutional boundaries . . . then, as a practical matter, there can be no *Monell* claim."). This is an invitation for the Court to expand the doctrine of qualified immunity from individuals to municipalities. This argument is a nonstarter. This Court has already noted that municipalities like the STPSO do not enjoy qualified immunity, ECF 457 at 21 ("Municipalities are not protected by qualified immunity."), a rule that is settled law. *See, e.g.*, *Johnson v. Bowe*, 856 F. App'x 487, 491 (5th Cir. 2021) ("Municipalities and public officials in their official capacity do not enjoy qualified immunity against § 1983 actions—only officials in their individual capacities may assert qualified immunity." (citing *Zarnow v. City of Wichita Falls, Tex.*, 500 F.3d 401, 406 (5th Cir. 2007)). The STPSO's suggestion that it too should be granted qualified immunity is frivolous.

*Second*, the STPSO points to several decisions in which the Section 1983 claims against a municipality were dismissed upon a finding by the court that the municipality's employee-defendants were entitled to qualified immunity, and it argues the same outcome must obtain here. *See* ECF 464-1 at 12-13. This argument, however, improperly conflates—without saying so—the two grounds on which qualified immunity can be granted to an individual defendant.

"In evaluating the qualified immunity defense, the familiar two-step analysis controlling [a court's] review is whether (1) the facts alleged show the officer's conduct violated a constitutional right; and (2), whether the right was clearly established." *Keller v. Fleming*, 952 F.3d 216, 221 (5th Cir. 2020). Qualified immunity may be granted to an individual on either ground. *Id.* In the cases cited by the STPSO, qualified immunity was granted on the *first* ground—that no constitutional right was violated at all. This is true in *Rusanowsky v. City of Dallas*, No. 24-10455, 2025 WL 855317 (5th Cir. Mar. 19, 2025) (cited in ECF 464-1 at 12), in which the court held the individual officer was qualified immunity because there was no constitutional violation, and therefore held that "[w]ithout a predicate constitutional violation, there can be no Monell liability." (quotation omitted). It is true in *Sanchez v. Edwards*, 433 F. App'x 272 (5th Cir. 2011) (cited in ECF 464-1 at 13), where the court granted summary judgment to the officers because they had not violated the plaintiff's rights, and that "[b]ecause we conclude that Sanchez's constitutional rights were not violated in this case, *we need not consider the issue of whether those rights were clearly established*." Sanchez, 433 F.

App'x at 274 (emphasis added). The court then upheld dismissal of the municipality because "plaintiffs are unable to show an underlying constitutional violation . . . ." *Id.* at 276. In *Fortune v. McGee*, 606 F. App'x 741 (5th Cir. 2015), meanwhile, the final decision cited by the STPSO, *see* ECF 464-1 at 13, qualified immunity was not even mentioned—instead the Court simply dismissed the claims against the individual employee because no constitutional violation had been established, *see id.* at 743-44, and then dismissed the claims *Monell* claims against the municipality for the same reason. *Id.*

*None* of these opinions dealt with the situation at bar: this Court's dual holdings that (1) there was evidence of a constitutional violation, but (2) that qualified immunity should be granted as to the individual claims because the right at issue was not clearly established by precedent. ECF 457 at 22-23. The STPSO's brief conflates the two distinct grounds for granting qualified immunity, without revealing that conflation to the Court. In reality, the STPSO's brief identifies no error of any form in the Court's application of the qualified immunity doctrine.

       2.     **Each "reason" offered by the STPSO for the conditions of confinement "traces its source" not to a legitimate governmental interest, but rather to the STPSO's rental contracts.**

The STPSO next argues that it "has provided sufficient reasons" for the various deprivations that the Court held could constitute constitutional violations. ECF 464-1 at 14. As such, the STPSO argues that the various conditions were reasonably related to a governmental interest, and therefore lawful. *Id.* The Court's March 28 Opinion, however, already considered and rejected these

14

arguments, because each explanation offered by the defendants for the conditions "traces its source to the STPJ's contracts to hold state and federal inmates," which relegated scores of the jail's own detainees to extended confinement in the jail's holding cells. ECF 457 at 19. In its motion for reconsideration the STPSO offers nothing new. Far from identifying an error in the Court's reasoning, the motion confirms and underscores that the deprivations at issue were caused by extended confinement in the holding cells—which in turn was the result of the STPSO's rental contracts, not a legitimate governmental imperative.

The STPSO argues that it could not have housed the numerous jail detainees in the parts of the jail rented out to for state and federal detainees, both because doing so would violate its contracts with the federal government and the LDOC, and because mingling pretrial detainees and convicted felons would be dangerous. ECF 464-1 at 16-19. The Court already considered and rejected these arguments, however, noting that "a reasonable jury could attribute this predicament to the [STPSO's] decision to dedicate a significant portion of its facilities to housing federal and state inmates" pursuant to the rental contracts. ECF 457 at 18.

The STPSO likewise argues that holding cells were only supposed to be short-term and thus were not set up for beds, and that it would be "physically impossible to place a mattress or bed in the holding cell for each detainee due to the lack of space" there. ECF 464-1 at 18. But as the Court has already held, these explanations all "trace[] [their] source to the STPJ's contracts to hold state and

federal inmates," which relegated the jail's own detainees to long-term confinement in its holding cells.  ECF 457 at 19.

The STPSO takes the same approach to the lack of exercise and overcrowding in the holding cells, arguing that it did not provide detainees in the holding cells with access to recreation because doing so would require "interaction with sentenced prisoners" in the rented parts of the STPJ.  ECF 464-1 at 19.  The STPSO emphasizes that this not a problem once detainees are in permanent housing in the area of the jail still reserved for STPJ detainees: "detainees are provided recreation as soon as they are moved from the holding cells into permanent housing in the jail when a bed is available."  *Id.*  This is not a defense—it is a confession.  The STPSO's brief makes clear that the *only* reason STPJ detainees are placed overcrowded conditions and denied exercise is because of the STPSO's rental contracts, and that, without the contracts, pretrial detainees would be living in permanent housing with access to recreation, exercise, and the ability to sleep.  As the Court already held, "a reasonable jury could attribute this predicament to the [STPSO's] decision" to rent out large portions of the jail instead of housing its own detainees in appropriate jail cells, and STPSO "cannot disclaim constitutional duties by freely entering into competing obligations." ECF 457 at 17-18.

### 3.    The STPSO's remaining due process arguments ignore or misconstrue case law applying *Bell* to conditions of confinement claims.

The STPSO finally argues that no due process violation occurred—and that the Court should defer to its judgments as a jailor—because the harms at issue

16

were not sufficiently serious to amount to constitutional violations.  *See* ECF 464-1 at 10-11, 21-28.  The logic of this argument appears to be that because the STPSO has identified legitimate reasons for the various deprivations imposed on detainees in the holding cells, any resulting punishment was not *intentional*.  As such, Defendant argues, the Court should have afforded considerable deference to the STPSO's decisions about conditions of confinement, and constitutional claims would lie only in cases of severe deprivation, such as when the lack of an opportunity to exercise results in an "adverse physical injury,"  ECF 464-1 at 26.  Under *this* standard, argues the STPSO, the conditions in the holding cells may have been "uncomfortable," but they were not so extreme as to amount to a constitutional violation.  *Id.* at 27.  This argument is grounded in the wrong constitutional standard, as it insists a proposition this Court has already rejected:  that the alleged deprivation is related to a *legitimate* governmental purpose. There is no requirement that Plaintiff prove express intent because without a legitimate government purpose, *punitive* purpose is inferred. *Hamilton v. Lyons*, 74 F.3d 99, 104 (5th Cir. 1996).

This basic principle puts the STPSO's arguments at war with the Fifth Circuit's conditions-of-confinement jurisprudence. In a conditions of confinement case, "the conditions themselves constitute the harm."  *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (*en banc*).  To analyze whether a condition violates due process, a court "assume[s], by the municipality's very promulgation and maintenance of the complained-of condition, that it intended to cause the alleged constitutional

17

deprivation." *Id.* at 53.  Given that the condition is presumed to be intended, the court "must employ the test announced in *Bell v. Wolfish*, 441 U.S. 520 (1979), and determine whether the condition of confinement is reasonably related to a legitimate, non-punitive governmental objective." *Campos v. Webb Cnty. Sheriff's Dep't*, No. 5:12-CV-7, 2014 WL 1379668, at *5 (S.D. Tex. Apr. 3, 2014), aff'd sub nom. *Campos v. Webb Cnty., Tex.*, 597 F. App'x 787 (5th Cir. 2015) (quoting *Scott*, 114 F.3d at 53).  Notably, in condition of confinement cases, the plaintiff need not demonstrate "a municipal entity's or individual jail official's actual intent to punish because . . . intent may be inferred from the decision to expose a detainee to an unconstitutional condition." *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009).  When a condition is found reasonably to relate to a legitimate governmental purpose, courts grant jailors considerable deference.  But it is another matter when a deprivation is found *not* to flow from a legitimate governmental imperative.  Specifically, a constitutional violation exists if the court finds that "the condition of confinement is not reasonably related to a legitimate, non-punitive governmental objective." *Scott*, 114 F.3d at 53.

That is what the Court has concluded here: the STPSO's confinement of Plaintiffs for extended periods in the jail's holding cells, and the miserable conditions this confinement caused, was not related to a legitimate governmental interest at all.  ECF 425 at 18-19. In *that* circumstance, courts "infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted on [pre-trial] detainees" like Plaintiffs and the other putative class

members who were confined to the jail's holding cells for days on end. *Bell*, 441 U.S. at 539.  Under a straightforward application of *Bell*, the Court held that the STPSO violated the due process rights of Plaintiffs and the other jail detainees who were subject to extended confinement in the STPJ's holding cells in order to enable the STPSO to rent out large portions of the jail.  *See* ECF 464-1 at 17-19

This Court's holding leaves the STPSO in the unenviable position of trying to argue that the Court should not have looked to the Fifth Circuit relied on in applying *Bell* to the facts of this case.  Thus the motion for reconsideration is relegated to arguing that the Court erred in following *Scott* because *Scott*'s analysis of the law concerning conditions of confinement was *dicta*.  ECF 464-1 at 25.[3]  The claim that *Scott*'s conditions analysis amounts to *dicta* is dubious, because that discussion sets up an analytical frame for *Scott*'s analysis of "occurrences." But even if it were *dicta*, why would that matter? "*Dictum* can be persuasive authority," *Ayoub v. I.N.S.*, 222 F.3d 214, 215 (5th Cir. 2000), and indeed numerous courts in the Fifth Circuit, including the Court of Appeals itself, have relied on the relevant passages of *Scott* to analyze conditions-of-confinement claims.  *See, e.g.*, *Cope v. Coleman Cnty.*, No. 23-10414, 2024 WL 3177781, at *8 (5th Cir. June 26, 2024) (citing *Scott* for the proposition that "the conditions themselves constitute the harm"); *Jones v. St. Tammany Par. Jail*, 4 F. Supp. 2d 606, 611 (E.D. La. 1998)

---

[3]  *Scott* stated, in discussing the standard under *Bell*, that "[i]n many jail condition cases, the conditions themselves constitute the harm. This is true, for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions."  *Scott*, 114 at 53.

(same); 2013 WL 4516022, at *2 (W.D. La. Aug. 22, 2013) (same); *Nichols v. Brazos Cnty.*, No. CV H-19-2820, 2020 WL 956239, at *7 (S.D. Tex. Feb. 26, 2020) (same); *Tuttle v. United States*, No. 2:22-CV-0670, 2022 WL 1819512, at *1 (W.D. La. May 17, 2022) (same). *Scott* is directly on point, and in relying on it the Court did not err in any way.

The STPSO also claims the Court erred in relying on *Hebert v. Maxwell*, 214 F. App'x 451, 456 (5th Cir. 2007)—another on-point conditions of confinement case plainly demonstrating that the defendants' conduct in this case was unlawful. *See* ECF 464-1 at 22. Its arguments fare no better. In *Herbert*, the plaintiff was confined for 48 hours in a holding cell reeking of human waste that had no bed 24-hour lighting, and offered no exercise or an ability to shower—meanwhile, he alleged, clean cells with mattresses were "empty and available in the jail." *Hebert*, 214 F. App'x at 453. The defendants' purpose in confining him in the holding cell, instead of the jail's empty cells, was to "find out who [he] was." *Id.* at 455-56. Citing *Scott* among other authorities, *Herbert* held that this was not a legitimate governmental interest, and that "housing a detainee in a room without sleeping accommodations, when other available rooms had sleeping facilities," was enough to state a due process claim. *Id.* The STPSO argues it was error for the Court to rely on *Herbert*, since the governmental interest there was to "find out who [the plaintiff] was," whereas in this case the adjudicated government interest is obtaining rental income. ECF 464-1 at 22. That is a distinction without a difference. *Herbert*'s point is that the deprivations at issue—which are strikingly similar to the ones at

issue in this case—were not rationally related to a legitimate governmental interest. The *specific* asserted governmental interest might have been different (in *Herbert* to find out who the plaintiff was; in this case to rent out the jail for money), but the *relevant* point is that both cases, the governmental interest was not a legitimate one. This Court was entirely right to rely on *Herbert* as presenting an analogous and therefore instructive holding.

### 4. The STPSO's "*de minimis*" arguments fail.

*Herbert* is instructive for an additional reason. In its brief the STPSO repeatedly suggests that the misery it imposed on hundreds of pretrial detainees in order to obtain rental revenue does not rise to a constitutional violation because the harms complained of are *de minimis*. *See, e.g.*, ECF 464-1 at 26-27. *Herbert* on its own puts a lie to this argument. Herbert involved confinement under conditions closely similar to this one, for a mere 48 hours, and the court there held that *because* there were appropriate facilities available within the jail where the plaintiff could have been housed instead, he had stated a due process violation. *Hebert*, 214 F. App'x at 453. *Herbert* goes even further, however: in a footnote, *Herbert* identifies a potential dispute among courts about whether forcing a detainee to sleep without a mattress "even for as little as thirty-six" hours constitutes a due process violation. *Id.* n.1 (citing cases). *Herbert* went on, however, explaining, "We do not need to address this specific question, because in this case the governmental unit had mattresses available but refused to provide one to [the plaintiff]." *Id.* *Herbert*, in other words, teaches that even the imposition of miserable conditions for

as little as 36 hours, when the jail had facilities readily available to eliminate those same conditions, is enough to state a due process violation. Here, plenty of cells and beds were available within the STPJ to house the putative class members, but the STPSO subjected them to weeks of misery, comparable in kind to that in *Herbert* but for far longer, in order to profit from rental contracts. That is more than enough evidence to state a due process violation against the STPSO.

### 5. The Court's medical-care and individual rulings do not conflict with its denial of summary judgment.

In issuing its ruling, the Court did grant summary judgment as to Plaintiffs' claims of inadequate medical care. ECF 457 at 19-21. The STPSO seizes on this holding and argues it contradicts the Court's other decisions. ECF 464-1 at 20-21. This holding as to medical care, argues the STPSO, mandates the same holding as to the other deprivations. *Id.* That is not so. Simply put, the Court held that Plaintiffs had offered evidence showing that the miserable conditions in their cells were the result of the STPSO's rental agreements, but they had not offered evidence to show that those agreements also caused the jail to offer inadequate medical care. ECF 457 at 19-21. The STPSO identifies nothing that is clearly erroneous about the making of such distinctions.

Similarly, the STPSO seizes on the Court's comment that "a reasonable jury could yet conclude" that the defendants' explanations for denying mattresses are related to a legitimate governmental objective." ECF 464-1 at 21 (quoting ECF 457 at 23). Whatever the Court meant in that passage, it has no bearing on the Court's summary judgment holding: the question at issue in the defendants' summary

judgment motions is whether a reasonable jury could find for *Plaintiffs*, who are the non-moving party.  Plaintiff notes that the quoted passage relates to individual defendants, while the Court elsewhere made clear that the STPSO's justification for failing to provide mattresses "traces its source to" the STPSO's rental contracts, which did not advance a legitimate governmental purpose.  ECF 457 at 19.

### C.    Plaintiffs pleaded a claim arising form their lack of exercise.

The STPSO argues that the Court erred in allowing Plaintiffs' claims for lack of "exercise/recreation" to go forward because Plaintiffs never pleaded them.  ECF 464-1 at 28-29.  But plaintiffs Baqer, Guillot Jr., and Guillot Sr. pleaded continued confinement and lack of recreation, *see* Case No. 2:20-cv-980, ECF 1 ⁋ 79, as did plaintiffs Louviere, Hall, and Williams, *see* Case No. 2:20-cv-1840, ECF 1 ⁋ 82. Once again the STPSO fails to identify an error.

### D.    The defendants waived their failure-to-exhaust defense.

The STPSO argues the Court erred in allowing Mr. Guillot Sr.'s claims to go forward because he failed to exhaust his administrative remedies pursuant to the PLRA.  ECF 464-1 at 29-30.  The Court, however, held that the defendants had waived this defense.  *See* ECF 457 at 5 n.36.  The STPSO's reconsideration brief does not explain why the Court's waiver holding was incorrect.  It has not demonstrated error.

### E.    Punitive damages.

The STPSO notes that the Court should have dismissed punitive damages against the STPSO, as Section 1983 does not permit the award of punitive damages

against municipalities.  ECF 464-1 at 4-5.  It is not clear that the Court *denied* the STPSO's request; that is unlikely as punitive damages indeed are not available against municipalities.  This matter could likely have been cleared up with a request for clarification, but in all events Plaintiff does not oppose the STPSO's request that punitive damages claims against the STPSO be struck from the case.

## CONCLUSION

For the foregoing reasons the Court should deny the STPSO's motion for reconsideration.

Date: May 6, 2025

Devon M. Jacob* (PA89182)
JACOB LITIGATION, INC.
P.O. Box 837
Mechanicsburg, PA 17055-0837
Tel: (717) 796-7733
djacob@jacoblitigation.com

Maria B. Glorioso (#24435)
T.A. Vincent J. Glorioso, Jr. (#6064)
THE GLORIOSO LAW FIRM
2716 Athania Parkway
Metairie, LA 70002
Tel: (504) 569-9999
Fax: (504) 569-9022
maria@gtorts.com

* Admitted pro hac vice

Respectfully submitted,

/s/ Stephen H. Weil

Antonio M. Romanucci*
Sam Harton*
Josh Levin*
Stephen H. Weil*
ROMANUCCI & BLANDIN, LLC
321 N. Clark Street, Suite 900
Chicago, IL 60654
Tel: (312) 458-1000
aromanucci@rblaw.net
sharton@rblaw.net
jlevin@rblaw.net
sweil@rblaw.net

Attorneys for Plaintiffs