**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| Ahmed Baqer, *et al.*, | * | |
| | * | CASE NO. 20-00980-DJP-DPC |
| Plaintiffs, | * | |
| | * | *Consolidated with* |
| v. | * | CASE NO. 20-01840-WBV-DPC |
| | * | |
| St. Tammany Parish Government, *et al.*, | * | JUDGE PAPILLION |
| | * | |
| Defendants. | * | MAGISTRATE JUDGE |
| | * | PHILLIPS CURRAULT |
| | * | |
| | * | JURY TRIAL DEMANDED |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR RENEWED MOTION FOR CLASS CERTIFICATION**

Named Plaintiffs, through their undersigned counsel, submit this memorandum in support of their renewed motion for class certification. Plaintiffs respectfully request that the Court revisit its original class certification decision (ECF 171) in light of the development of facts in this case and the Court's own decision on summary judgment, ECF 457, which has narrowed and clarified the issues in this case.

## INTRODUCTION

This putative class action challenges the Defendants' policy of imposing prolonged confinement—in open violation of Louisiana law limiting holding cell detention to 48 hours—of numerous detainees subject to extended confinement in the holding cells of the St. Tammany Parish jail ("STPJ"). Plaintiffs previously moved the Court to certify a class under Rule 23(b)(3) to challenge this prolonged confinement (ECF 158) and the Court denied that motion (ECF 171), holding that

Plaintiffs had not made a sufficient showing of numerosity under Rule 23(a)(1) or predominance under Rule 23(b)(3).

The case nevertheless proceeded, and the progress of litigation has revealed a single, common reason that St. Tammany Parish has been holding its pretrial detainees in holding cells for extended periods: the Defendants made a decision to rent out much of the space in the jail, for money, to outside entities to house their detainees or prisoners instead. In order to make this space available, the Defendants confined the Parish's own detainees in the jail's holding cells for extended periods, until one of the jail's few remaining un-rented general population cells opened up. The Court focused on these facts in its summary judgment decision, explaining that the municipal defendants "cannot disclaim constitutional duties by freely entering into competing obligations" through their cell-rental contracts. ECF 457 at 17.

That holding, and the Court's related conclusions at the summary judgment stage, have changed the face of this litigation. Indeed, each of the concerns driving the Court's previous denial of certification has been addressed:

The Defendants' decision to rent out parts of the jail for money is a policy choice common to all class members.

The effect of that decision—to force many Parish detainees to remain in the holding cells past 48 hours—is common to all class members as well.

Identifying who was detained in the holding cells past 48 hours, and whether those cells were overcrowded at the time, can be established using objective criteria

and computer records, effectively rendering those questions common evidence.

And the deprivation of exercise and sleeping accommodations to each of those persons experience can be established with common evidence, because both those deprivations were imposed as a matter of policy on all detainees in the STPJ's holding cells.

Each of those facts is common to the class. Common evidence will show that all class members were detained for more than 48 hours (in overcrowded cells, for members of the subclass) during which they were deprived recreation and sleeping opportunities—all so that the Defendants could rent out other parts of the STPJ for money. And the Court's summary judgment decision made clear that these common facts are sufficient to establish liability for a conditions of confinement claim, for every single person so detained. Such common causes of an alleged tort are the touchstone of cases in which common issues predominate, making them ideal for class treatment under Rule 23(b)(3).

All of this, Plaintiff submits, calls for a reassessment of the certifiability of this case under Rule 23. As things stand, given the Court's March 28, 2025 summary judgment decision (ECF 457), every member of the putative class Plaintiff had sought to certify in 2021 now has a viable claim to assert for their over-detention in the STPJ's holding cells. Were each of these people to bring their own individual suits, the Court could expect them to present the same evidence, over and over again, about the Defendants' policy of renting out large parts of the jail, the over-detention in holding cells that resulted, and the relevant conditions (lack of

exercise and sleeping accommodations) that the Defendants imposed on all detainees in the holding cells as a matter of policy.

These common, core facts will be the central evidence for the claims of every single person who Named Plaintiffs seek to represent under Rule 23. It would be impracticable and wasteful to hold trials at which each member presented the same, common evidence about their over-detention in holding cells and the same, single reason for that over-detention. The Rule 23 class action procedural device exists precisely to avoid such results.

* * *

The clarification and narrowing performed by the Court's summary judgment opinion presents an occasion to consider class certification anew. As a general matter, "courts have been willing to rule on motions for summary judgment prior to class certification in circumstances in which it would facilitate efficient resolution of the case." 3 Newberg and Rubenstein on Class Actions § 7:10 (6th ed.) (collecting cases). That is particularly true where doing so promotes efficiency. *See, e.g.*, *Van Sweden Jewelers, Inc. v. 101 VT, Inc.*, No. 1:10-CV-253, 2012 WL 4074620, at *3 (W.D. Mich. June 21, 2012) ("Deciding Defendants' summary judgment motion before Plaintiff's class certification motion is, in this Court's opinion, in the interest of overall efficiency."); *Coburn v. D & R Trucking, L.L.C.*, No. 3:09-CV-464, 2011 WL 73287, at *2 (M.D. Fla. Jan. 10, 2011) ("A decision on [Defendants' Motions for Summary Judgment] may affect the factors the Court must determine on the Motion for Class Certification, and thus efficiency mandates consideration of the Motions for Summary Judgment first."); *Lee v. Javitch, Block & Rathbone, LLP*, 522

F. Supp. 2d 945, 947 (S.D. Ohio 2007) (concluding that resolving the summary judgment motion prior to class certification "will assist in a more efficient resolution of the issues raised in all pending motions"). This is the right time in this case to determine whether, in light of the clarification and narrowing performed in the Court's summary judgment decision, class certification is appropriate. Considering class certification with the benefit of the Court's summary judgment decision and its distillation of the evidence and law applicable to this case carries considerable potential for the Court to adjudicate the claims of numerous detainees in an efficient manner.

## BACKGROUND

In analyzing whether a class should be certified pursuant to Rule 23, a court examines the "claims [and] defenses" as well as the "relevant facts" and the "evidence" put forward by the parties in the case. *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (quotations omitted). That task is considerably streamlined here. The parties' summary judgment submissions, particularly their respective statements of fact, organize much of the evidence relevant to class certification. Meanwhile, the Court's summary judgment Order and Reasons has already assessed Plaintiff's claims and identified those that are attributable to the Defendants' policy decision to voluntarily rent out large parts of the STPJ for money, with the effect of subjecting Named Plaintiffs and the members of the proposed class to extended confinement in the jail's holding cells. The Court's summary judgment ruling also performs another critical task: it applies the

governing standard for Fourteenth Amendment liability to those common claims and holds that due process liability can be established based on facts that would be common to all putative class members.

In setting out the relevant facts, therefore, Plaintiffs draw where possible from three sources: Defendants' Statement of Undisputed Fact (**ECF 387-2**); Plaintiff Baqer's Statement of Additional Facts (**ECF 409-2**); and the Court's summary judgment Order and Reasons (**ECF 457**). Citations to additional facts and evidence are also indicated.

### A. Relevant factual background.

#### 1. Defendants have a general policy of moving detainees from holding to general population as soon as possible, and in no event later than 48 hours.

The policy of the STPJ has been to place incoming "pretrial detainees . . . in holding cells until there was space for them to be moved into general population housing." ECF 457 at 2 n.9. The Defendants explain that it is the STPJ's policy that "[d]etainees are held in the holding cells within the STPJ until such time as a bed becomes available in the pre-trial detainee housing units within the STPJ." ECF 387-2 ⁋ 64. Indeed, "[t]he STPJ works daily to facilitate movement throughout the facility to decrease the occupancy of the holding cells." ECF 387-2 ⁋ 65. This is done to accomplish the STPJ's policy "to hold individuals in the holding cells *only* until such time as a bed opens up in one of the jail housing units." ECF 387-2 ⁋ 56 (emphasis added).

These policies are reflective of the undisputed reality that holding cells are only intended to be "temporary and [are] only supposed to house pretrial detainees for 48 hours." ECF 457 at 2 n.12. Indeed, as Defendants have understood, "Louisiana law require[s] pretrial detainees be moved out of holding cells within 48 hours." *Id.* at 2 n.13. *Accord* ECF 409-2 ¶¶ 91, 93.

**2. Because they prioritize their contractual rental obligations, Defendants have a policy of keeping Parish detainees in holding cells—including past 48 hours—until Parish general population cells open up.**

Notwithstanding their acknowledged obligation to move jail detainees out of the STPJ's holding cells within 48 hours, the Defendants voluntarily entered into contracts that took offline many general population beds that would have been available to Parish detainees confined in those holding cells.

The STPJ has a capacity of 1,200 detainees. ECF 387-2 ¶ 50. However, in addition to jailing its own detainees, the STPJ has entered into two different contracts—one to house prisoners of the Louisiana Department of Corrections ("DOC"), and the other to house persons detained or imprisoned by the federal government. *Id.* ¶ 62. The federal contract is for 150 male beds. *Id.* ¶ 74. The DOC contract is even larger, with space going above 390 male beds. *See e.g.*, ECF 413-3 at 2 (on October 9, 2019, there were 85 men in the four holding cells while . . . 392 [DOC] males . . . were assigned a bed . . . .").

The general population areas for the federal detainees, DOC prisoners, and the jail's own "Parish" detainees are each in separate housing units. *See* ECF 387-2 ¶ 41. Pursuant to the jail's policy—which fulfills the jail's contractual obligations—

these three groups are strictly segregated. *Id.* ⁋⁋ 57, 62. This means, Defendants explain, that "St. Tammany Parish pre-trial detainees are not eligible for housing in either of the DOC or the Federal housing units." *Id.* ⁋ 57.

The result is that STPJ's policy of moving Parish detainees out of the holding cells as soon as a bed opens up in general population is superseded by its policy that Parish detainees in the holding cells will remain their indefinitely even if there are empty beds in the parts of the STPJ that have been rented out to the federal government or the DOC. As the Defendants put it, "if there is an open bed in the [] DOC housing unit, a pretrial detainee in the holding cell who is a parish detainee would not be moved to that bed. Under no scenario will a parish detainee from a holding cell be put in the federal housing unit when there is an available bed." ECF 387-2 ⁋ 42. That is true even when the general population portion of the jail that remains for Parish detainees is full. Due to the STPJ's contractual obligations, Defendants explain that "when beds were not available in [the Parish portion of the] general population, detainees in the holding cells could not be put into DOC or federal beds." *Id.* ⁋ 59. The Defendants leave no doubt on this point:

> Under this arrangement of having the STPJ housing units segregated by DOC, Federal and pre-trial Parish detainees, if there is an open bed in a Federal or DOC housing unit, a pre-trial in a holding cell is not eligible to be moved to that open bed. Rather, pre-trial detainees are only eligible to be moved to open beds as they become available in the pre-trial detainee housing units within the STPJ.

*Id.* ⁋ 66. As a result, even when there are empty beds in the areas of the jail rented out to the Louisiana DOC or the federal government,

> [d]etainees are held in the holding cells within the STPJ until such time as a bed becomes available in the [Parish] pre-trial detainee

> housing units within the STPJ. Detainees are transferred to the [Parish] general population housing units when a bed [in the Parish part of the jail] becomes available . . . .

*Id.* ¶ 64.

### 3. The conditions of confinement in the holding cells.

There is a stark contrast between the conditions of confinement in the STPJ's general population units and its holding cells. "Once in general population housing, pretrial detainees had their own beds, access to showers, and were able to exercise indoors and outdoors." ECF 457 at 2 n.10. Additionally, in general population, the jail's policy is to "turn [lights] off at 10:30 PM and turn back on at 6:00 AM, "so [detainees] can rest and recoup for the next day," which is done because STPJ "understands that inmates need time daily to sleep," and because "STPJ concluded that darkness . . . is a necessity [to sleep]." ECF 409-2 ¶¶ 38-39.

By contrast, the STPJ's holding cells, designed as they are for short-term detention only, have none of these basic features imposed on all detainees in the holding cells as a matter of jail policy:

***Lack of exercise.*** "While in the holding cells, pretrial detainees were not permitted to leave their cells for exercise or recreation, only to shower." ECF 457 at 2 n.11. "STPJ policy only permitted pretrial detainees to leave holding cells to take showers; otherwise, pretrial detainees remained in the holding cells for 24 hours a day." *Id.* at 16 n.127. Indeed the defendants conceded that "exercise is not provided because detainees are held only temporarily in the holding cells." *Id.* at 17 n. 131.

***Lack of sleeping accommodations***. Holding cells also lack beds, forcing detainees to sleep on the floor, which is made of concrete. ECF 409-2 ¶¶ 88-89. And

in the holding cells, lights were kept on at all times. ECF 457 at 3 n.18. These lights are "bright, like an office." *Id.* ⁋⁋ 40-41. The lights must be kept on because jailors must be able to see if detainees, who are grouped together in the holding cells, are "fighting" or engaged in similar misconduct. ECF 387-2 ⁋ 83. Those precautions are no longer necessary once detainees are moved out of the holding cells and into the jail's general population, where lights are turned off at night to enable sleep, *supra*.

***Overcrowding***. The conditions in the holding cells were compounded by frequent overcrowding in the holding cells. Under the Basic Jail Guidelines, the maximum capacity of each STPJ holding cell is 16 detainees. ECF 409-2 ⁋⁋ 278-280. But the holding cells were frequently overcrowded, past even the 20 persons per cell rated by the Fire Marshal. ECF 457 at 15 nn. 127-130. This included overcrowding past 20 detainees on 15 out of 31 days in one month, and 23 out of 31 days in the next. *Id.* at 16 nn. 128-129. Such overcrowding compounded the lack of exercise and bedding available in the holding cells. *Id.* at 19 n. 139.

**B. The Named Plaintiffs.**

The Named Plaintiffs are all men who were confined for more than 48 hours in the STPJ's holding cells. Defendants subjected each of them to the conditions outlined above.

***Ahmed Baqer.*** Mr. Baqer was held in STPJ's holding cells for 16 days from December 2, 2019 until December 17, 2019. ECF 457 at 3 n. 25. He testified that, on average, 15 or 16 detainees were held in his holding cell, but at times that

number rose to 20 or 22 people. "[T]he number of pretrial detainees in his holding cell [frequently] meant that Mr. Baqer had no room to lie down and could not sleep. *Id.* at 4 n. 30.

***Klabert Joseph Guillot, Sr.*** Mr. Guillot Sr. was held in STPJ holding cells for at least 13 days from December 29, 2019, until January 10, 2020. ECF 457 at 5 n. 37. During his detention, he was housed with approximately 19 to 26 other detainees in the same holding cell. *Id.* at 5 n. 38. Mr. Guillot was only permitted to leave the holding cell to take a shower two or three times per week. *Id.* at 5 n. 43.

***Kevin Louviere.*** STPJ records reflect that Mr. Louviere was moved out of the holding cells on June 26, 2019, nine days after he was booked on June 17, 2019. ECF 457 at 5 n. 45. Mr. Louviere recalled that there were, at times, up to 28 individuals housed in his holding cell. *Id.* at 6 n. 46. Mr. Louviere testified that detainees were only allowed to shower once a week. *Id.* at 6 n. 48. Aside from when detainees were allowed to shower, Mr. Louviere did not leave the holding cell until he was transferred to the general population area. *Id.* at 6 n. 50.

***Terry Matthew Hall, Jr.*** Mr. Hall was held in an STPJ holding cell for 15 days. ECF 457 at 7 n. 55. For a day or two of his detention, he counted 30 inmates in his holding cell, but there were always at least 15 others. *Id.* at 7 n. 56. He took three showers during his 15-day detention in the holding cell; otherwise, he was not permitted to leave the cell. *Id.* at 7 n. 59.

***Floyd Williams.*** Mr. Williams was held in STPJ holding cells for approximately five days, from September 28, 2019, to October 2, 2019. ECF 457 at

7 n. 64. Mr. Williams's testimony suggests approximately twenty detainees were held in his holding cell. *Id.* at 7 n. 65.

**C. The Court's 2021 class certification decision.**

On May 7, 2021, Plaintiffs filed a class certification motion in which they sought to certify a class consisting of

> All detainees who have been or will be placed into the custody of the St. Tammany Parish Jail and were detained for at least two consecutive days in holding cells.[1]

ECF 158 at 2 ⁋ 5. The Court denied the Plaintiffs' motion for class certification, holding that Plaintiffs had not met their burden to show that the proposed class was certifiable under Rule 23. ECF 171. In that class certification decision, the Court examined only two of Rule 23's criteria—whether the proposed class satisfied Rule 23(a)(1)'s numerosity requirement and Rule 23(b)(3)'s predominance requirement. With respect to Rule 23(a)(1), the Court held that Plaintiffs had not carried their burden to show that the class was likely to be sufficiently numerous because Plaintiffs had not explained how to interpret a 735-page Inmate Cell Movement Report listing STPJ detainees to identify which of the listed detainees were class members, and which were not. *Id.* at 7-11. With respect to Rule 23(b)(3), the court held that individual issues predominated over common issues and thus prevented certification. Specifically, the Court held that individual "mini-trials" and individual proof would be required to adjudicate:

[1] The proposed class definition also contained a time period running from March 22, 2019 until the over-detention practice ends. ECF 158 at 2 ⁋ 5.

- How many days each class member had been detained in the holding cells.
- Whether the cells were overcrowded while each class member was there.
- Whether and to what extent the holding cells lacked sanitation during the class member's confinement.
- Whether class members were denied medical care.
- Whether a combination of the foregoing deprivations rose to a constitutional violation for a particular class member.

*See id.* at 19.[2] In reaching the conclusion that these questions were individualized, the Court was not presented with and did not opine on the *reason* that numerous detainees were being held for more than two days in the jail's holding cells, and whether the extended detention in the holding cells was imposed pursuant to a legitimate governmental interest. Ultimately the Court held that "based upon the record before [it]," Plaintiffs had not shown that the class was appropriate for certification as a class action under Rule 23. *Id.* at 21.

**D. The Court's 2025 summary judgment ruling.**

After the Court's class certification ruling, litigation continued. In 2023 the defendants moved for summary judgment. *See* ECF 211 *et seq*. On March 28, 2025, the Court issued its summary judgment Order and Reasons (ECF 457 ) in which it granted the Defendants' motions in part, but denied them in part as well.

In its summary judgment ruling, the Court grouped the Named Plaintiffs' claims arising from their extended confinement in the Jail's holding cells into four categories of conditions: sanitation, exercise, sleep, and medical care. It analyzed

---

[2] The Court's initial opinion does not state that Plaintiffs' denial of recreation and sleeping accommodations present individual questions.

each category in turn. *See* ECF 457 at 14-21. The Court granted summary judgment as to sanitation in the holding cells. *Id.* at 14-15. The Court noted that the jail did provide some sanitation services and access to showers and/or hygiene supplies, but those conditions "d[id] not reflect acts or omissions sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by jail officials, to prove an intended condition or practice[.]" *Id.* at 14 n. 118 (quotation omitted).

Likewise, the Court granted summary judgment as to Named Plaintiffs' claim for lack of medical care. Plaintiffs had presented evidence that some medications had not been received—but others, the Court observed, had been received or offered. ECF 457 at 20. As such, held the Court, Plaintiffs had failed to come forward adduce "evidence that STPJ's medical treatment policies were constitutionally inadequate." *Id.* at 21.

On the other hand, the Court denied summary judgment as to Named Plaintiffs' claims for lack of exercise and denial of appropriate sleeping conditions, holding that those conditions *could* be attributed to the STPJ's policies—specifically, the STPJ's policy decision to rent out large parts of the jail to third parties. Given the evidence in the record, the Court observed, a reasonable jury could conclude the STPJ's rental policy limited the general population bed space available to the Parish's own detainees, which in turn meant that numerous Parish detainees, including the Named Plaintiffs, had to spend inordinate amounts of time in holding cells waiting for a "Parish" general population bed to free up—which

meant, again in turn, that these detainees were subjected to extended periods in which they were deprived of exercise and did not have beds or other accommodations that would permit sleep.

Indeed, the Court noted, the Sheriff admitted that the jail did not provide exercise or bedding to people detained in the holding cells. ECF 457 at 16, 19. The Sheriff's defenses focused on why it was impracticable to provide these things in the holding cells, such that "to the extent Defendants acknowledge Plaintiffs' descriptions of the conditions at STPJ, they contend that those conditions were not the result of any punitive intent but were necessitated by STPJ's contracts to provide housing for state and federal inmates, or to prevent commingling pretrial detainees with convicts." *Id.* at 13. The Court held, however, that those excuses missed the point. As the Court put it, the extended confinement in the holding cells, and the extended exposure to inadequate exercise and sleep accommodations that resulted, were the result of the lack of general population beds for the Parish's own detainees, such that "a reasonable jury could . . . attribute this predicament to STPJ's decision to dedicate a significant portion of its facilities to housing federal and state . . . inmates or failing to properly allocate its resources to ensure that it complies with its baseline constitutional obligations." *Id.* at 18.

In reaching this conclusion, the Court repeatedly pointed to the direct link between the Defendants' decision to rent parts of the jail for money and the extended detention of Parish detainees in the holding cells, with the attendant deprivations of sleep and exercise. The Court observed, for example, that

"Defendants argue that STPJ lacked the resources to facilitate exercise or recreation for the pretrial detainees in the holding cells, though the [Rule] 30(b)(6) testimony they cite for that point only states that exercise is not provided because detainees are held only temporarily in the holding cells." ECF 457 at 17 n. 131. And the Court connected *that* condition to the STPJ's rental contracts, observing that the Defendants "cannot disclaim constitutional duties by freely entering into competing obligations." *Id.* at 17. The Court rejected the Defendants' justification for the STPJ's acknowledged failure to provide sleeping accommodations for the same reason:

> Defendants argue that it would not be feasible to provide pretrial detainees in holding cells with mattresses because "[p]lacing mattresses or beds into the holding cells would further reduce the number of detainees that would be able to be held in the holding cells due to lack of space." But *a reasonable jury could infer that this explanation traces its source to STPJ's contracts* to hold state and federal inmates, which uses up considerable bed space in STPJ and, as discussed above, is a voluntary obligation unrelated to STPJ's foundational purpose—housing pretrial detainees.

*Id.* at 19 (emphasis added).

The gravamen of the Court's summary judgment denial thus has three parts: ***First***, the lack of exercise and the lack of sleeping accommodations in the holding cells were both uniformly applied conditions purposefully imposed by the STPJ on all people in the holding cells as a matter of policy. ***Second***, the STPJ's imposition of these conditions on detainees confined to holding cells for extended periods (going beyond 48 hours) "traces its source to the STPJ's contracts" to rent out large parts of the jail's general population areas, which resulted in extended detention in the

holding cells. ECF 457 at 19. ***Third***, the rental contracts were "not a sufficient justification for neglect of a citizen's constitutional rights," since jailors "cannot disclaim constitutional duties by freely entering into competing obligations," meaning that the deprivations were not imposed pursuant to a legitimate governmental interest. *Id.* at 17. For these reasons, the Court concluded, there was sufficient evidence to create a genuine issue of material fact as to whether the conditions of confinement purposefully created by the Defendants violated the Named Plaintiffs' Fourteenth Amendment due process rights. *Id.*

**E. Amended proposed class definition.**

In this renewed motion for class certification Named Plaintiffs have modified the proposed classes they seek to certify in light of the Court's summary judgment ruling. Specifically, Plaintiffs seek to certify a class, along with a sub-class, under Rule 23(b)(3) and covering the period proposed by in the original class certification motion.[3] The class would consist of:

> Each person who was housed in a STPJ male holding cell for more than 48 hours (reflected as two calendar days) as a result of portions of the STPJ being rented to house federal or state detainees, and who were so held between March 22, 2019 and May 7, 2021.

The subclass would consist of:

> Each person who was housed in a STPJ male holding cell for more than 48 hours (reflected as two calendar days) as a result of portions of the jail being rented to house federal or state detainees, and who experienced overcrowding (defined as more

[3] The original class certification motion, which was filed on May 7, 2021, sought to certify a class beginning on March 22, 2019, one year prior to the filing of the original complaint in this case.

> than 16 detainees) during that detention, and who were so held between March 22, 2019 and May 7, 2021.

Plaintiffs seek certification of the class and subclass in order to obtain monetary and related relief for their members. For purposes of simplicity, this memorandum will refer to the classes collectively as "the class," except where it is necessary to address issues particular to the class or subclass.

**DISCUSSION**

"[T]he class action device exists primarily, if not solely, to achieve a measure of judicial economy, which benefits the parties as well as the entire judicial system. It preserves the resources of both the courts and the parties by permitting issues affecting all class members to be litigated in an efficient, expedited, and manageable fashion." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 410 (5th Cir. 1998). When a party proposes to try multiple claims together through the class action device instead of a series of individual actions, the question is whether combining claims in a class action would be a fair and efficient means of adjudicating them. *See Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178 (1974).

Courts answer that question using the analytical guideposts set out in Rule 23. This is done in part by examining the merits of the case at issue—not to determine which side is more likely to win, but rather to determine whether the claims can fairly and efficiently be tried together, or whether multiple discrete adjudications each class member's claims are necessary instead. *In re Deepwater Horizon*, 739 F.3d 790, 806 (5th Cir. 2014). To be certified as a class

action, a putative class must be ascertainable, it must satisfy each of the prerequisites of Rule 23(a), and it must fall within at least one of the three categories of class suits described in Rule 23(b). *Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir. 1980). Plaintiffs review these requirements below.

**A. The class is ascertainable.**

As a threshold matter, a Rule 23 class must be "adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970); *see also John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007). "A class is ascertainable if 'the general outlines of the membership of the class are determinable,' " *Rodriguez v. Flowers Foods, Inc.*, No. 4:16-cv-245, 2016 WL 7210943, at *4 (S.D. Tex. Dec. 13, 2016) (quoting 7A Wright & Miller, Federal Practice and Procedure § 1760 (3d ed.)), which ensures that class membership is "sufficiently defined so as to enable the court to determine whether a particular individual is a member of the class." *Wagner v. Cent. Louisiana Elec. Co.*, 99 F.R.D. 279, 282 (E.D. La. 1983) (citing *DeBremaecker*, 433 F.2d at 734).

The members of the proposed class are readily ascertainable in this case, using the STPJ's own movement records, called the Inmate Cell Movement Report. A 10-page excerpt of the Report is attached to this memorandum as **Exhibit 1**,[4] and the excerpt is analyzed in Plaintiffs' discussion of Rule 23(a)(1)'a numerosity requirement, *infra*. From the Report, which reflect dates of housing assignments of

[4] To protect their privacy, Plaintiffs have redacted the names of everyone on the **Exhibit 1**spreadsheet except Mr. Baqer. The other people who appear in Exhibit 1 can be identified by their unique inmate identification number, which appears to the left of their name in the spreadsheet.

each detainee within the jail, one can readily identify who was detained in the jail's four male holding cells for more than 48 hours, and which of these men was confined in the holding cells while they were overcrowded. The membership of the class can be ascertained.

**B. The class satisfies Rule 23(a).**

As set forth herein, the proposed class readily satisfies all of the prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy.

**1. Numerosity.**

Rule 23(a)(1)'s numerosity requirement is satisfied because the proposed class in this case is so numerous that joinder of all members is impracticable. Classes of more than 40 members are generally large enough to satisfy the numerosity requirement. *See Mullen v. Treasure Chest Casino*, L.L.C., 186 F.3d 620, 624 (5th Cir. 1999). That threshold is satisfied in this case by orders of magnitude.

While a party cannot satisfy the numerosity requirement merely by relying on "speculation" or "conclusory allegations," *Harrell v. CheckAGAIN, LLC*, 248 F.R.D. 199, 206 (S.D. Miss. 2006), nothing resembling a precise count of class members is required. *Id.* Rather, a plaintiff need only offer "some evidence or reasonable estimate of the number of members of the proposed class," *id.* at 205–06, and in assessing this evidence, "courts are quite willing to accept common sense assumptions in order to support a finding of numerosity." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. July 27, 1981) (quotation omitted).

As part of discovery in this case Defendants produced an excerpt of the STPJ's Inmate Cell Movement Report covering March 1, 2019 to August 21, 2020. That report runs to 735 pages. Named Plaintiffs submit an excerpt of that report here. *See* **Ex. 1**. When Plaintiffs originally moved for class certification in 2021 they submitted the full 735-page report as well. *See* ECF 158-28 (filed under seal). In opposing class certification, Defendants objected that Plaintiffs had not explained how the report worked, and thus had not provided an estimate of the size of the class that was sufficiently reasonable for purposes for Rule 23(a)(1). *See* ECF 164 at 3-4. In its class certification order the Court agreed. The Court held that that Platintiffs had not explained how the Inmate Cell Movement Report should be interpreted, and therefore that Plaintiffs had not carried their burden to show numerosity. ECF 171 at 7-11.

The progress of this litigation has resolved this problem: Defendants themselves have shown how to interpret the Inmate Cell Movement Report. In their summary judgment briefing, Defendants generated different extractions from the same database as the Inmate Cell Movement Report and explained the results, permitting the 735-page Inmate Cell Movement Report to be interpreted as well. *See* ECF 234-3 at 3 ("Mr. Baqer remained in the holding cell for sixteen (16) days, from December 2, 2019 until December 17, 2019, when he was ultimately moved to the C-Building Dorm." (citing Inmate Cell Movement Report attached as Exhibit 3 [ECF 234-6]). The extracted Inmate Cell Movement Report provided by the Defendants for Mr. Baqer makes plain that the December 2 and December 17 dates

cited by the Defendants were derived from comparing the "Booking Date" and "Assigned Date" fields in the spreadsheet:

| INMATE NAME | BOOKING DATE | HOLDS | ASSIGN. DATE | CURRENT CELL ASSIGNMENT |
|---|---|---|---|---|
| BAQER, Ahmed AL. | 03/21/19 | NO | 03/21/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- |
| BAQER, Ahmed AL. | 12/02/19 | NO | 12/02/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- |
| BAQER, Ahmed AL. | 12/02/19 | NO | 12/03/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- |
| BAQER, Ahmed AL. | 12/02/19 | NO | 12/17/19 | C BUILDING-DORM C100-BED C111- |

ECF 234-6 (excerpt; highlighting added). Mr. Baqer's individual Inmate Cell Movement Report reflects that he was booked on 12/02/19, and then reflects that on 12/02/19 he was assigned to Holding Cell 2; on 12/2/19 assigned to Holding Cell 4; and finally on 12/17/19 moved and assigned to C-Building-Dorm—*i.e.*, the STPJ's general population. *Id.*

The exact same information for Mr. Baqer appears on page 37 the full 735-page Inmate Cell Movement Report, which is represented here by **Ex. 1**, the 10-page excerpt:

| INMATE NAME | BOOKING DATE | HOLDS | ASSIGN. DATE | CURRENT CELL ASSIGNMENT |
|---|---|---|---|---|
| BAQER, Ahmed AL. | 03/21/19 | NO | 03/21/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- |
| BAQER, Ahmed AL. | 12/02/19 | NO | 12/02/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- |
| BAQER, Ahmed AL. | 12/02/19 | NO | 12/03/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- |
| BAQER, Ahmed AL. | 12/02/19 | NO | 12/17/19 | C BUILDING-DORM C100-BED C111- |

Ex. 1 at 37 (excerpt; highlighting added). These are precisely the same dates, with precisely the same cell-placement information, as the information Defendants introduced at summary judgment to identify the dates and locations of detention for Mr. Baqer. Using this key, identifying class members in the 735-page report is straightforward: one need only compare the "Booking Date" and "Assigned Date"

entries and identify those reflecting confinement in the holding cell extending for more than 48 hours, measured as two days.[5]

Using this method, the 10-page excerpt of the 735-page Inmate Cell Movement Report reveals two class members on page 28, one on page 29, one on page 30, one on page 31, one on page 32, four on page 33, three on page 34, one on page 35, two on page 36, three on page 37—a total of at least 19 class members in just 10 pages. *See* **Ex. 1** (highlighted entries). Presuming this pattern holds across the 735 pages of the report, there would be 1,396 class members covering just March 22, 2019 to August 2020—a period of approximately 540 days. Plaintiffs seek to represent a class of persons over-detained in the holding cells from March 22, 2019 through the filing of the original class certification motion on May 7, 2021. That is a period of more than 777 days, which, if the results of the 10-page portion of the Inmate Cell Movement Report are extrapolated, would result in a class of approximately 2,008 people.

Without estimating the size of the class with mathematical precision, these are "common sense assumptions" to arrive at a reasonable estimate of the number of people likely to be in the class. *Zeidman*, 651 F.2d at 1039. The foregoing is more than sufficient to demonstrate that the class size vastly exceeds the 40-member threshold typically used to assess numerosity under Rule 23(a)(1).

---

[5] This resolves the problem identified in the Court's original class certification decision, which noted that Plaintiffs had not explained the relationship between "Booking Date" and "Assign Date" fields. *See* ECF 171 at 9.

The same is true for the "overcrowding" subclass. The evidence strongly suggests widespread overcrowding. Defendants admitted that overcrowding was a persistent problem within the holding cells, to the point that the Fire Marshal told the Jail to reduce capacity because of overcrowding—an instruction that the Defendants ignored. ECF 409-2 ⁋ 25. That is corroborated by a two-month period examined by the Court in its summary judgment opinion, in which it noted that the Daily Count spreadsheets published by the STPJ overcrowding past 20 detainees on 15 out of 31 days in one month and 23 out of 31 days in the next. ECF 457 at 16 n. 128-129 (citing ECF 410-3). From these facts a commonsense assumption can be made that a significant portion—likely half or more—of the 2,000-plus class members who were confined to the holding cells while they were overcrowded well exceeds the 40-member threshold necessary to satisfy the numerosity requirement.[6] Numerosity is satisfied.

**2. Commonality.**

The members of the proposed class all share factual and legal issues because their claims "depend upon a common contention" that "is capable of classwide resolution" such that "determination of its truth or falsity will resolve an issue that

[6] Should the Court desire a more precise estimate, Plaintiff could use the Inmate Cell Movement Report or collected Daily Count spreadsheets to identify a more precise number of detainees in each of the male holding cells on any given day. Indeed if this class is certified, such an exercise would ultimately be necessary in order to provide class notice and prepare this case for trial. Plaintiff respectfully submits, however, that at this stage, the facts gathered here are sufficient to conclude that Rule 23(a)(1)'s numerosity requirement is satisfied.

is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Each member of the proposed class share the common claim that the Defendants' decision to rent out large parts of the jail, the resulting lack of general-population space for Parish detainees, and Parish detainees' resulting extended detention in the holding cells, were deprivations that were unrelated to a legitimate governmental interest and which therefore violated their due process rights under the Fourteenth Amendment. The basic questions driving those claims include:

- Did the Defendants, as a matter of policy, deny recreation and sleeping accommodations for detainees while they were in holding cells?
- Were the holding cells designed to hold detainees for more than 48 hours?
- Was the Defendants' policy to keep parish detainees in the holding cells for more than 48 hours when general-population cells were not available to Parish detainees?
- Were general population beds for Parish detainees limited as a result of the Defendants taking large parts of the jail offline in order to rent them out for money?
- Was imposing extended detention in the holding cells in order to rent out large parts of the jail for money a condition of confinement created by the Defendants pursuant to a legitimate governmental interest?

Those core questions are common to every single class member. Each of these common questions is "amenable to a common answer," *Jones v. Gusman*, 296 F.R.D. 416, 466 (E.D. La. 2013), and those answers are "apt to drive the resolution of the litigation," whether up or down, for every member of the proposed class. *Wal-Mart*, 564 U.S. at 350.

That is the essence of Rule 23(a)(2)'s commonality requirement, and it obtains here because the answers to the common questions set out above are driven by the STPJ's *policies*, which Defendants imposed uniformly on everyone detained in the STPJ's holding cells. Consider *O'Donnell v. Harris County, Texas*, No. 16-cv-1414, 2017 WL 1542457 (S.D. Tex. Apr. 28, 2017) (Rosenthal, J.). In that case the district court certified a class of people detained pre-trial on misdemeanor charges because they could not afford their money bond. In certifying the class, Judge Rosenthal held that the proposed class satisfied Rule 23(a)(2)'s commonality requirement because the "plaintiffs [were] challeng[ing] a municipal policy that, because it is a policy, applies to, and affects, indigent misdemeanor arrestees subjected to secured money bail the same way." *Id.* at *5.

The policy choice that Plaintiffs challenge here is the Defendants' decision to rent out large parts of the STPJ even though this decision subjected numerous Parish detainees to extended confinement in the jail's holding cells, which injured all class members in the same way. Indeed, Plaintiffs explain below in discussing Rule 23(b)(3)'s predominance requirement, *infra* Section III(C)(1), the Court's narrowing of Plaintiffs' claims on summary judgment focuses the claims in this case on those issues that are common to all members of the putative class. Accordingly, the proposed class satisfies the commonality requirement of Rule 23(a)(2).

**3. Typicality.**

The proposed class satisfies the typicality requirement because the Named Plaintiffs are members of the proposed class, and they share the same claims as the

other class members. "Typicality requires a showing that the claims of the named plaintiffs are in fact those asserted as the common class claims." *M.D. v. Perry*, 294 F.R.D. 7, 29 (S.D. Tex. 2013). "Often, once commonality is shown typicality will follow as a matter of course." *Id.* Named Plaintiffs' "claims arise from the same or a similar course of conduct and share the same legal theory" as the class members' claims, and are therefore typical of class members' claims. *See id.* Named Plaintiffs' situation, of course, can be expected to differ from class members' in terms of their specific dates and exactly how long past 48 hours they were over-detained in the holding cells. But the basis of liability in this case is not dependent upon such individual circumstances. Rather, it turns on upon the Sheriff's decision to rent out large parts of the STPJ for money, the resulting lack of general population space for the jail's own detainees, and the resulting over-detention of the jail's detainees in the jail's holding cells and the exercise and sleep deprivations that were imposed as a result for Parish detainees confined to the STPJ's holding cells for more than 48 hours. Typicality is satisfied.

**4. Adequacy.**

Named Plaintiffs are adequate representatives of the class because their interests in the vindication of the legal claims raised here are entirely aligned with the interests of the other class members, who each have the same basic claims. Named Plaintiffs are members of the class, and their interests coincide with those of the other class members. Named Plaintiffs and class members suffered the same harms. They assert the same legal claims, seek the same litigation outcomes, and

would benefit from the relief compensating persons confined to holding cells for times exceeding 48 hours. There is no financial conflict between Named Plaintiffs and absent class members, as all will benefit from compensation for the same essential harm.

Plaintiffs' counsel, meanwhile, have already devoted substantial time investigating the factual and legal issues in this case and have aggressively pursued the discovery required to put forward a claim for class-wide relief. Proposed class counsel are experienced in handling class actions and other complex litigation.[7] Class counsel have a detailed understanding of local law and practices as they relate to federal constitutional requirements. Plaintiffs respectfully submit that they, and their counsel, satisfy Rule 23(a)(4)'s adequacy requirement.

**C. The class satisfies Rule 23(b)(3).**

The focus of Rule 23(b)(3) is to ensure that courts "select the method best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (internal quotation marks and brackets omitted). Plaintiffs seek certification of their damage claims under Rule 23(b)(3), which is appropriate when common questions of law or fact predominate over individualized questions and when a class action is superior to other methods of adjudication. The Proposed class satisfies these criteria and is the most efficient means of adjudicating whether the STPJ's imposition of extended confinement in the jail's holding cells on thousands of detainees violated their constitutional rights.

[7] The credentials of class counsel are collected in **Exhibit 2.**

**1. Common issues predominate.**

The Rule 23(b)(3) predominance inquiry "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). The inquiry focuses on "how a trial on the merits would be conducted if a class were certified," *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (quotation omitted), which "begins . . . with the elements of the underlying cause of action." *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 636 (5th Cir. 2016). This analysis "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class," or whether proving those substantive issues would require "a series of individual trials." *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 254 (5th Cir. 2020) (quotations and citations omitted). Once the court has identified the relevant substantive questions, it determines whether they *could* be proved with evidence that is common to the class. In this case, the Court's summary judgment decision guides the assessment of the substantive issues that will "control the outcome" at trial. This case involves a challenge to conditions of confinement. In its summary judgment ruling, the Court identified the issues controlling a conditions of confinement claim:

> a plaintiff bringing a conditions of confinement claim must show the following elements: (1) . . . an intended condition or practice; (2) which is not reasonably related to a legitimate government objective; and (3) which constitutes a violation of the plaintiff's constitutional rights.

ECF 457 at 12 (citation omitted). As Plaintiffs explain herein, the Court's summary judgment decision makes plain that at trial, each of these three elements will be proved with common evidence.

**a) [A]n intended condition or practice.**

The Court explained at summary judgment that "[a] condition of confinement claim challenges general conditions, practices, rules, or restrictions of pretrial confinement," ECF 457 at 10 n. 86 (quotation omitted), and that a condition may be the result of "an explicit rule . . . or a *de facto*" one, so long as it reflects a "policy," with the result that the "municipality's intent is presumed because the imposition of the rule manifests an avowed intent to subject a pretrial detainee to that rule or restriction." ECF 457 at 10 (quotation omitted). The Court observed that Named Plaintiffs had gathered evidence showing:

> (1) The St. Tammany Parish Sherriff's office had entered into voluntary contracts to rent out large parts of the jail to the federal and state governments for money. *Id.* at 3, 13-14, 17-19.
>
> (2) This reduced the available general population space in jail for the STPJ's own detainees. *Id.* at 3.
>
> (3) As a matter of policy, recreation, exercise, bedding, and sleeping accommodations were available to detainees in general population, but these things were not available to detainees in holding. The holding cells were often overcrowded as well. *Id.* at 2-3, 15-19.
>
> (4) The rental contracts reduced general population space left for parish detainees, which forced the jail to confine numerous parish detainees in holding cells past the 48 hours permitted by law, until space for them opened up in the small general population part of the jail that remained available for parish detainees. *Id.* at 17-18.

(5) Pursuant to the jail's policies detainees subject to this extended confinement were not provided with sleeping accommodations or opportunities to exercise, and were frequently subjected to overcrowding during their extended detentions. *Id.* at 15-19.

This is common evidence. Each member of the class would use this same evidence to show that each of these conditions were imposed as a matter of policy on *them*, and thus were a condition of confinement that was intended by the STPJ. *Cf.* ECF 457 at 10. In other words, each member of the class would use the same evidence to show that the 48 hour-plus confinement in the holding cells, and the extended deprivation of exercise and sleeping accommodations that resulted, was the known and intended result of the Defendants' policy choice to rent out large areas of the jail for money. The Court's first element is satisfied, because each class member would prove it using the same evidence.

**b) [W]hich is not reasonably related to a legitimate government objective.**

Every class member would also use the same evidence to show that their extended confinement in the holding cells, and the resulting extended lack of exercise and sleeping accommodations, were not imposed pursuant to a legitimate governmental purpose or imperative. Once again, the Court's summary judgment ruling makes plain that the proof of this element, too, would turn on common evidence. In that opinion, the Court held that the evidence would permit "a reasonable jury . . . [to] attribute th[e] predicament [*i.e.*, forcing the jail to subject its own detainees to extended confinement in its holding cells] to STPJ's decision to dedicate a significant portion of its facilities to housing

federal and state convicted inmates" instead of allocating sufficient general population beds for Parish detainees in order "to ensure it complies with its baseline constitutional obligations." ECF 457 at 18. As such, held the Court, Plaintiffs had offered sufficient evidence to show that these deprivations were not imposed pursuant to a legitimate governmental interest, since the defendants "cannot disclaim constitutional duties [to house its own detainees adequately] by freely entering into competing obligations [*i.e.*, the rental contracts]." *Id.* at 17.

Each member of the class in this case would cite the same, centralized policy choice—*i.e.*, the decision to rent out large portions of the jail for money, notwithstanding the "predicament" of extended confinement in holding cells this led to—as the source of their extended confinement, and each would offer the same evidence to prove that that policy was not reasonably related to a legitimate governmental interest. Common issues, rather than individualized issues, thus predominate with respect to evidence supporting the "objective unreasonableness" (*i.e.*, "not reasonably related to a legitimate government objective," *supra*) element of Plaintiffs' Fourteenth Amendment claim.

**c) [W]hich constitutes a violation of the plaintiff's constitutional rights.**

Each member of the class will use the same evidence to show that the defendants violated their due process rights. As this Court held at summary judgment and as Plaintiffs have set out in the foregoing two sections, *supra*, there is sufficient evidence to prove that (1) the Defendants deliberately subjected the class

members to extended confinement in holding cells where, as a matter of policy, all detainees were denied exercise and sleeping accommodations; and (2) the Defendants imposed these deprivations for the purpose of renting out large parts of their STPJ for money—which is not reasonably related to a legitimate governmental interest. That is enough, under *Bell v. Wolfish*, 441 U.S. 520 (1979), make out a *prima facie* case of a violation of each class member's due process rights. That is so because as *Bell* explained,

> if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.

441 U.S. at 539. In its summary judgment decision, this Court, quoting this passage from *Bell*, held that the Defendants' imposition of extended detention on the Named Plaintiffs in the holding cells for the purpose of renting out parts of the jail for money, with the resulting lack of exercise and sleeping accommodations, violated each Named Plaintiff's due process rights. *See* ECF 457 at 11-12 (quoting *Bell*), 17-18 (holding lack of exercise and sleeping conditions violated due process because they were not reasonably related to legitimate governmental interest).

This straightforward holding can be applied every member of the class, in the same way, for the same reasons, using the same, common evidence. As the Court noted in its summary judgment opinion, the Defendants conceded "that STPJ's holding cells are temporary and only *supposed* to house pretrial detainees for 48

hours," ECF 457 at 2 (emphasis added), and that they knew that "Louisiana law required pretrial detainees be moved out of holding cells within 48 hours," yet they flouted those laws in order to rent out large parts of the STPJ for non-parish detainees. *Id.* Mr. Jeffrey Eiser, Plaintiffs' jail operations expert, likewise explains that the STPJ's policy confining detainees to holding cells for periods in excess of 48 hours "deviated from accepted practices in the industry" and "served no legitimate penological or custodial interest," and amounted to unlawful punishment as a result. *See* **Exhibit 3** (Eiser Report) ¶ 25.

These facts are common to each proposed class member. Each class member would introduce these facts to make out a *prima facie* case that their confinement in holding cells past 48 hours violated their due process rights.[8] But that is not all. In its summary judgment ruling, the Court looked for guidance to *Hebert v. Maxwell*, 214 F. App'x 451, 453 (5th Cir. 2007), which held that confining a man over a weekend in a holding cell that had "only a 'hard wooden bench' without a bed and overhead lights that were never turned off" made out a constitutional violation, because " '[i]n the absence of a compelling governmental interest, housing a detainee in a room without sleeping accommodations, *when other available rooms had sleeping facilities*, is enough to survive a summary judgment motion based on

---

[8] While state laws and industry and professional standards certainly do not *establish* a constitutional violation, they are a "relevant normative backdrop against which to evaluate" the STPSO's policy of imposing extended confinement in the jail's holding cells notwithstanding laws that prohibited that confinement from extending more than 48 hours. *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 257 (5th Cir. 2018). As one court put it, "compliance or lack of compliance with a professional standard, if admissible, can be *evidence* for or against finding a constitutional violation. Such standards are just not the *substance* of a constitutional duty." *M.D. v. Perry*, 294 F.R.D. 7, 35-36 (S.D. Tex. 2013).

qualified immunity.' " ECF 457 at 18 (emphasis added; quoting *Hebert*). *Hebert* involved detention for 48 hours—the same period as the 48-hour line Plaintiffs propose in their class definition here. *See Hebert*, 214 F. App'x at 452. Notably, however, *Hebert* indicated that even *shorter* detentions in such conditions, when they were not imposed for a legitimate governmental purpose, would also violate due process. Specifically, *Hebert* observed that "[s]ome courts have held that forcing a detainee to sleep without a mattress, even for as little as thirty-six hours, states a due process violation." *Id.* at 456 n.1. *Hebert* noted some debate on the point, *id.* but went on to say that "[w]e do not need to address this specific question [the debate about length of detention without a mattress], because in this case the governmental unit had mattresses available but refused to provide one to [the plaintiff]." *Id.* In other words, because the jail in *Hebert* did not have a legitimate reason for depriving the plaintiff of a mattress, even periods well short of 48 hours without bedding were enough to assert a constitutional violation.

*Hebert*'s implication for this case is unmistakable: because there was no legitimate governmental reason for depriving the class members of a bed to sleep in for even *one night*, the members of the class might have a claim for periods well short of the 48 hour line that Named Plaintiffs have proposed for their class definition. The 48-hour line is, if anything, a conservative definition of the due process claim asserted on behalf of each absent class member.

The nature of the violation in this case is common to the class members as well. As the Court noted in its summary judgment opinion " '[i]n many jail

condition cases, the conditions themselves constitute the harm. This is true, for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions.' " ECF 457 at 13 (quoting *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997)). In this instance, Defendants inflicted miserable conditions on the entire putative class as a matter of policy by confining them to holding cells for over 48 hours without providing any appropriate sleeping accommodations, or recreation or exercise, all to enable large parts of the STPJ to be rented out for money. The evidence of the STPJ's extended-detention policy, and the impact of that policy on each of the class members, would be the same for every single class member, because the evidence of the conditions imposed and the reasons for those conditions would be the same for every class member. It would, in other words, be common evidence that each class member would use at trial to make out a *prima facie* case that in detaining them in holding cells past 48 hours for no legitimate governmental purpose, their Fourteenth Amendment rights were violated. These common issues predominate over individual issues in this case.

**2. The proposed class is superior.**

"In requiring a court to find 'that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy,' Fed. R. Civ. P. 23(b)(3), Rule 23 necessarily suggests a comparative process." *In re TWL Corp.*, 712 F.3d 886, 896 (5th Cir. 2013). The salient analysis thus compares "the relative advantages of alternative procedures for handling the total controversy." *Id.* Under Rule 23(b)(3), courts consider four factors to determine whether the class

action format is superior to other methods of adjudication: the class members' interest in individually controlling their separate actions, the extent and nature of existing litigation by class members concerning the same claims, the desirability of concentrating the litigation in the particular forum, and the likely difficulties in class management. Fed. R. Civ. P. 23(b)(3).

Each of these factors supports certification in this case. The first two factors—the class members' interest in individually controlling their separate actions and the extent and nature of existing litigation by class members concerning the same claims—both suggest superiority of the class mechanism.

Plaintiffs are aware of no significant litigation by other people challenging the STPJ's rental-and-overdetention policy, and certainly not the hundreds of suits one would expect if a meaningful percentage of the putative class were suing about their over-detention in the holding cells. Certainly any small number of individualized cases pales in comparison to the size of the putative class. The dearth of individual suits, compared to the thousands of likely putative class members, suggests that individual class members have little interest in controlling separate actions, and that a class action is the most efficient mechanism for affording class-wide relief. *See Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 610 (E.D. La. 2006) (finding class action superior where there was "little existing litigation of these claims outside of the lawsuits filed in this Court"). The class is likely comprised largely of poor people with limited ability or capacity to individually assert their legal rights, and absent class certification it is highly likely

that the overwhelming majority of the putative class members will never seek or obtain relief for their mistreatment. A class action is therefore not only the superior mechanism of affording relief to the class; it is likely the only mechanism capable of affording relief to the bulk of the putative class.

The third factor—the desirability of concentrating the litigation in the particular forum—also favors certification. Plaintiffs are pursuing federal claims in federal court in the district in which STPJ is located. There is no other feasible forum for class members' claims to be heard.

Finally, there would be little difficulty in managing the class. As explained in Plaintiffs' discussion of the numerosity requirement, the identity of each putative class member is easily ascertainable from the defendants' own jail movement records.

**D. The certification problems identified in the Court's initial class certification decision have been resolved and no longer apply.**

In its initial class certification decision, ECF 171, the Court identified three principal barriers to class certification, focused on the identification of class members, determining which class members experienced which conditions of confinement, and identifying constitutional injuries. The progress of this case has resolved each of these problems. ***First***, Plaintiffs have now shown how to interpret the Inmate Cell Movement Report, making the identification of class members (and subclass members) a clerical matter that can be determined objectively, not one in which individual issues predominate. ***Second***, the Court's summary judgment decision narrowed the case to focus only on those conditions—lack of exercise and

sleep accommodations—that the Defendants imposed as a policy matter on everyone in the holding cells, while eliminating other conditions—lack of sanitation and inadequate medical care—that would have required individual determinations. And ***third***, in its summary judgment the Court also held that there was evidence showing that the over-detention of the class members in the holding cells was not imposed for a legitimate governmental purpose, meaning that under *Bell*, a trier of fact could *infer* that the conditions defendants imposed on all class members as a matter of policy were imposed as unconstitutional punishment—eliminating the intertwining liability with individual damages over which the Court expressed concern in its original class certification decision.

That leaves the question of damages. As narrowed on summary judgment, this is a conditions of confinement case where "the conditions themselves constitute the harm" by inflicting misery on the class. *See Scott*, 114 F.3d at 53. While individual class members may be called on to prove the *amount* of damages caused by such harm, the constitutional violation at issue is established with common evidence. In such circumstances, the need for damage calculations and evidence alone cannot defeat class certification on the ground that individual questions predominate over common questions. *Menocal v. GEO Group, Inc.*, 882 F.3d 905 (10th Cir. 2018). This case, moreover, presents a ready, common measure of damages: the length of time each class member spent in the holding cells when they should have been in general population. That measure may make damage calculations practicable, and if it is not, "the question of damages can be severed

from that of liability and tried on an individual basis." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 n.16 (5th Cir. 2003) (quotation omitted).

## CONCLUSION

Plaintiffs have come forward with evidence showing that the Defendants in this case subject people to miserable, illegal conditions STPJ's holding cells in order to rent out large parts of the jail for money. The Court has held that subjecting detainees to those conditions amounts to unconstitutional punishment. This is common evidence that would be used by every person who was subject to these illegal conditions. The Court should certify the class and subclass proposed here, to permit the numerous people who have been harmed by this illegal conduct to vindicate their rights in a trial.

**Dated:** June 29, 2025

Respectfully submitted,

*/s/ Sam Harton*
Samantha Harton
Attorney for Plaintiffs

Devon M. Jacob* (PA89182)
JACOB LITIGATION, INC.
P.O. Box 837
Mechanicsburg, PA 17055-0837
Tel: (717) 796-7733
djacob@jacoblitigation.com

Maria B. Glorioso (#24435)
T.A. Vincent J. Glorioso, Jr. (#6064)
THE GLORIOSO LAW FIRM
2716 Athania Parkway
Metairie, LA 70002
Tel: (504) 569-9999
Fax: (504) 569-9022
maria@gtorts.com

Antonio M. Romanucci*
Sam Harton*
Josh Levin*
Stephen H. Weil*
ROMANUCCI & BLANDIN, LLC
321 N. Clark Street, Suite 900
Chicago, IL 60654
Tel: (312) 458-1000
aromanucci@rblaw.net
sharton@rblaw.net
jlevin@rblaw.net
sweil@rblaw.net

** Admitted pro hac vice*
*Attorneys for Plaintiffs*