**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **KEVIN LOUVIERE, TERRY MATHEW HALL, JR., and FLOYD WILLIAMS,** <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **ST. TAMMANY PARISH GOVERNMENT a/k/a/ ST. TAMMNAY PARISH COUNCIL, et al.,** <br><br> **Defendants.** | ) | **Case No. 20-cv-01840-WBV-DPC** |
| **AHMED BAQER, KLABERT JOSEPH GUILLOT, JR., and KLABERT JOSEPH GUILLOT, SR.,** <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **ST. TAMMANY PARISH GOVERNMENT a/k/a/ ST. TAMMNAY PARISH COUNCIL, et al.,** <br><br> **Defendants.** | ) | **Case No. 20-cv-00980-WBV-DPC** |

**REPORT OF JAIL OPERATIONS EXPERT JEFF EISER**

1. I was retained to review case records and analyze jail operational issues associated with the detention of Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr. in the St. Tammany Parish Jail (STPJ), located in Covington, Louisiana, during the time period of June 2019 through January 2020.

Specifically, I have been asked to provide my professional opinions concerning: (1) what happened during the detention of Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr. from a jail operational perspective; (2) any applicable or recommended regulatory standards and contemporary corrections industry standards and practices as they relate to the operational procedures and practices of STPJ Administration and their staff; and (3) the duties and responsibilities of the STPJ Administration and their staff to (a) take reasonable and proper steps to protect Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr. from harm, (b) ensure their basic human needs are met, and (c) ensure the necessary and incidental requirements of daily life are made available to them while they were in custody; and (4) the STPJ Administration and their staff's execution of those duties.

## EXPERIENCE AND QUALIFICATIONS

2. My professional opinions are a function of the unique facts and circumstances in this case and are based on my training, education, practical experience and the contemporary jail industry standards and practices that existed at the time of the plaintiffs' incarceration in the STPJ; specifically, the (1) regulatory standards contained in the Louisiana Administrative Code – Title 22: Part III; Subpart 2 – Minimum Jail Standards, (2) advisory standards contained in the Basic Jail Guidelines (April 15, 2019) promulgated by the Louisiana Sheriff's Association, (3) Performance Based Standards for Adult Local Detention Facilities (4th Edition, June 2004), (4) Core Jail Standards (1st Edition, 2010) promulgated by the American Correctional Association (ACA), and (5) Standards for Health Services in Jails (2018) promulgated by the National Commission on Correctional Health Care (NCCHC). Although not mandatory by law, the ACA and NCHCC standards are recognized throughout

the jail and detention industry as the principal authority for gauging reasonable conduct (i.e., the standard of care) in jail and detention operations. The ACA and NCHCC standards essentially set the floor in the corrections industry regarding how to safely and lawfully operate jail and detention facilities throughout the country.

3. I have over 29 years of practical work experience in the operation and administration of one of the largest local corrections systems in the United States. I also have extensive experience and expertise in the operation and staffing of small, medium, and large jail facilities. During my career as a corrections administrator, I assisted and led teams that planned, opened, and transitioned into two new major corrections facilities (800+ beds); negotiated labor contracts from the side of management; and testified in verbal and written form in arbitration hearings. I assisted in the creation and drafting of requisitions for Bids or RFPs (Request for Proposals) which were sent to potential vendors supplying medical and food services to the detainees in our detention facilities, and monitored the contract compliance and performance of the selected vendors. I researched, authored, and administered, promotional exams and assessment board interviews for supervisory and administrative positions; and I researched, authored, and updated, departmental policies, procedures, and post orders, for over 20 years.

4. In conjunction with the Ohio Bureau of Adult Detention, as co-author of the <u>Ohio Jail Administrator's Handbook</u>, I have written extensively on the subject of jail administration. I have also personally researched and authored a significant portion of the curriculum used by the Ohio Peace Officer Training Council to certify corrections officers, supervisors, and jail administrators.

5. Since 2002, I have been invited to serve as an adjunct instructor of criminal justice in the College of Evening and Continuing Education at the University of Cincinnati. I have been retained as a consultant and trainer for small, medium, and large jails. I have participated as an instructor at national training seminars for the American Jail Association and the National Institute of Corrections – U.S. Department of Justice. I hold a Bachelor of Science Degree in Criminal Justice from the University of Dayton, and a Master's Degree in Education from Xavier University (Cincinnati, Ohio). As a result of my experience in correctional facility operations, administration, and staff training, I am familiar with the basic constitutional, statutory, and common law obligations that apply to detention facilities – such as the one located in St. Tammany Parish, Louisiana, in 2019-2020. My resume/curriculum vitae, fee schedule, list of publications, and a list of cases in which I have been retained as a jail operations expert in the last 5 years, are attached hereto.

6. Since 1994, I have testified as a jail operations expert in civil rights and tort litigation for both plaintiffs and defendants. During the past 28 years, I have been retained and/or testified in jail operations cases pending in almost every state in the country, including the State of Louisiana. My expertise is in all areas of jail facility operations, including: staffing, staff evaluation and discipline, inmate assault (failure to protect), staff use-of-force, prisoner access to basic human needs including adequate medical and mental health care, in-custody deaths, inmate suicide, sexual assault by staff/other prisoner, conditions of confinement, inmate supervision, cross-gender supervision, inmate initial screening and booking, classification and housing, managing female and youthful offenders, strip/body cavity searches, inmate grievance procedures, facility records procedures, operational policies

and procedures, monitoring contract compliance and performance of private health care and food service providers, and the training of jail staff, supervisors, and administrators.

**FACTS AND DATA CONSIDERED**

7. The opinions that I set forth in this report are based on the professional standards listed earlier, my education, training, and experience, and my review of the following documents listed below:

a. Complaint (Case No. 2:20-cv-00980)
b. Complaint (Case No. 2:20-cv-01840)
c. Answer to Plaintiff's Complaint at Law and Affirmative Defenses on Behalf of Defendant, St. Tammany Parish Government (Case No. 2:20-cv-01840)
d. Answer of Sheriff Randy Smith and Major Lacey Kelly (Case No. 2:20-cv-00980)
e. STPSO Defendants' Responses to Plaintiff's First Interrogatories Requests for Production of Documents
f. U.S. Department of Justice – Civil Rights Division report of the findings of their investigation concerning the conditions of confinement in the STPJ dated July 12, 2012
g. Transcript of Hearing on Preliminary Injunction
h. Affidavit of Major Lacey Kelly (Ex 1 to Defendants Response to Motion for Preliminary Injunction)
i. The following video files entitled:
    i. 103f 12-25-19
    ii. 103f c800 040220 p1.
    iii. 103f c800 040220 p2
    iv. 103f mh3 1-1-20
    v. 103f mh3 12-25-2019
    vi. 103f mh3 mh4 12-21-2019
    vii. UOF INTAKE 1.2.2020 PT.1
    viii. UOF INTAKE 1.2.2020 PT.2
    ix. UOF INTAKE 1.2.2020 PT.3
    x. UOF INTAKE 1.2.2020 PT.4
    xi. UOF INTAKE 1.2.2020 PT.5
    xii. 2020-06-09/Disk 1/420a6000614
    xiii. 2020-06-09/Disk 1/420a6001114
    xiv. 2020-06-09/Disk 1/421a6001143
    xv. 2020-06-09/Disk 1/041929a600
    xvi. 2020-06-09/Disk 1/041920a600guillot
    xvii. 2020-06-09/Disk 1/a6004.28.20
    xviii. 2020-06-09/Disk 1/c8005.5.20

xix. 2020-06-09/Disk 2/[ch16]042120_100921_042120_101021
xx. 2020-06-09/Disk 2/041920a600
xxi. 2020-06-09/Disk 2/041920guillot
xxii. 2020-06-09/Disk 3/420a6000614
xxiii. 2020-06-09/Disk 3/420a6001114
xxiv. 2020-06-09/Disk 3/421a6001143
xxv. 2020-06-09/Disk 3/422a6000728
xxvi. 2020-06-09/Disk 3/42120a6001608
xxvii. 2020-06-09/Disk 4/5-27-20 Guillott
xxviii. 2020-06-09/Disk 4/52020guillot
xxix. 2020-06-09/Disk 4/5272020guillot
xxx. 2020-06-10/HYGEINE-Disk 1/03-13-20 h2 teethbr
xxxi. 2020-06-10/HYGEINE-Disk 1/03-13-20 h4 brteeth
xxxii. 2020-06-10/HYGEINE-Disk 1/03-13-2020 Holding 2
xxxiii. 2020-06-10/HYGEINE-Disk 1/03-13-2020 Holding 4
xxxiv. 2020-06-10/HYGEINE-Disk 2/03-16-20 h2 deot
xxxv. 2020-06-10/HYGEINE-Disk 2/03-16-2020 Holding 2
xxxvi. 2020-06-10/HYGEINE-Disk 3/03-16-20 h3 deot
xxxvii. 2020-06-10/HYGEINE-Disk 3/0316-20 h4 deot
xxxviii. 2020-06-10/HYGEINE-Disk 3/03-16-2020 Holding 3
xxxix. 2020-06-10/HYGEINE-Disk 3/03-16-2020 Holding 4
xl. 2020-06-10/THUMBDRIVE 1/001
xli. 2020-06-10/THUMBDRIVE 1/002
xlii. 2020-06-10/THUMBDRIVE 1/003
xliii. 2020-06-10/THUMBDRIVE 1/004
xliv. 2020-06-10/THUMBDRIVE 1/005
xlv. 2020-06-10/THUMBDRIVE 1/006
xlvi. 2020-06-10/THUMBDRIVE 1/007
xlvii. 2020-06-10/THUMBDRIVE 1/008
xlviii. 2020-06-10/THUMBDRIVE 1/009
xlix. 2020-06-10/THUMBDRIVE 2/001
l. 2020-06-10/THUMBDRIVE 2/002
li. 2020-06-10/THUMBDRIVE 2/003
lii. 2020-06-10/THUMBDRIVE 2/004
liii. 2020-06-10/THUMBDRIVE 2/005
liv. 2020-06-10/THUMBDRIVE 2/006
lv. 2020-06-10/THUMBDRIVE 2/007
lvi. 2020-06-10/THUMBDRIVE 2/008
lvii. 2020-06-10/THUMBDRIVE 2/009
lviii. 2020-06-10/THUMBDRIVE 2/010
lix. 2020-06-10/THUMBDRIVE 2/011
lx. 2020-06-10/THUMBDRIVE 2/012
lxi. 2020-06-10/THUMBDRIVE 2/013
lxii. 2020-06-10/THUMBDRIVE 2/014
lxiii. 2020-06-10/THUMBDRIVE 2/015
lxiv. 2020-06-10/THUMBDRIVE 2/016

lxv. 2020-06-10/THUMBDRIVE 2/017
lxvi. 2020-06-10/THUMBDRIVE 2/018
lxvii. 2020-06-10/THUMBDRIVE 2/019

j. St. Tammany Parish Sheriff' Office Rule 26 Initial Disclosures:
   i. Jail Folder for Ahmed Baqer
   ii. Jail Folder for Klabert Gulliot, Jr.
   iii. Jail Folder for Klabert Gulliot, Sr.
   iv. STPJ Policies and Procedures
   v. Basic Jail Guidelines (4/25/19)
   vi. STPSO Policies and Procedures Manual
   vii. 2019 Jail Counts (EXCEL Spreadsheet)
   viii. 2020 Jail Counts (EXCEL Spreadsheet)
   ix. Office of State Fire Marshall Inspection reports (5/30/19, 7/1/19, 10/14/19, 10/15/19)
   x. STPSO Holding cell specs
   xi. STPSO One-man Holding cell – Restrictive Housing photo

k. St. Tammany Parish Sheriff' Office Supplemental Disclosures:
   i. New Hire Orientation folder
   ii. Louisiana POST Corrections Course Curriculum (92 Hours)
   iii. STPJ Field Training Officer's Program Manual
   iv. STPJ Guard Tower SOP's
   v. Grievances
   vi. Inmate Cell Movement Report from 3/1/19 – 8/21/20 Sorted by last name

l. Expert Disclosures of Michael Brady
m. Deposition of Captain Greg Longino
n. Deposition of Major Richard O'Keefe
o. Deposition of Sheriff Randy Smith
p. Deposition of St. Tammany Parish Sheriff's Office, through its representative, Sgt. Lacey Joi Kelly Robertson
q. 41 Photographs taken on 2/20/2023 of the STPJ holding cells

## METHODOLOGY

8. I employ the same methodology in forming my expert opinions that I employed in the field as an operations administrator. Specifically, I gather the relevant information, review the governing regulatory and industry standards, and analyze and assess the relevant facts and issues with those points in mind through the lens of experience, training, and education. Here, I considered the facts and data set forth above and formed

opinions regarding the actions that were taken based on my training, education, and experience and in the setting of the specific facts of this case. To start this process, I reviewed the allegations in the complaint to help orient my analysis, but I formed my professional opinions independently of those allegations, except insofar as they helped focus the scope of my review.

## OVERVIEW OF ALLEGATIONS CONCERNING JAIL OPERATIONAL DEFICIENCIES

9. In their Complaint, Plaintiffs alleged the following: On varying dates between June of 2019 through January 2020, Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr., were pre-trial detainees who were incarcerated in the St. Tammany Parish Jail (STPJ), which is located in Covington, Louisiana. The St. Tammany Parish Jail (STPJ) is designed to house more than 1200 pre-trial and sentenced individuals at four facilities. The STPJ serves as overflow for the Louisiana Department of Corrections and the federal prison system. Nearly half of the jail population of the STPJ comes from the Louisiana Department of Corrections and the federal prison system. The STPJ collects revenue for housing Louisiana Department of Corrections and federal inmates. The STPJ maintained a custom, practice, and de facto policy of housing St. Tammany Parish pretrial detainees in four intake holding cells, in excess of forty-eight (48) hours, without classifying and transferring them into appropriate housing. This custom, practice, and de facto policy was put in place as early as April of 2011.

10. In their Complaint, Plaintiffs alleged the following: In 2012, the United States Department of Justice (DOJ) conducted an investigation of the St. Tammany Parish Jail. In the report resulting from the investigation, the DOJ notified the St. Tammany Parish Council (STPC), and the current Sheriff, Rodney Strain, that "as many as 30 prisoners [were] held in

holding cells that are designed for 20 prisoners." The DOJ report further provided, "Even more concerning, we noted that prisoners were sleeping on floors and benches in holding cells with little or no bedding articles". The DOJ further noted, that "prisoners were required to remain in the holding cells for days if not weeks before they were assigned to housing units."

11. In their Complaint, Plaintiffs alleged the following: During 2019-2020, the majority of pre-trial detainees who were housed in the holding cells were housed longer than the statutory 48-hour limit, with a significant number of detainees housed in the holding cells for between 7 and 14 days. The STPC and Sheriff Strain indicated that pre-trial detainees were housed in this manner due to "overcrowding" in the jail, however, empty beds were available for the pre-trial detainees in general housing. As early as July 12, 2012, not only were the STPC and Sheriff Strain on notice that such practices existed but that the DOJ had concerns regarding the constitutionality of such practices.

12. In their Complaint, Plaintiffs alleged the following: During all relevant times, the STPJ maintained four (4) individual intake holding cells. The plaintiffs assert that each holding cell measured approximately twenty (20) feet in length by ten (10) feet in width. The holding cells had no showers, no beds, and a toilet without privacy. The STPJ housed as many as twenty-four (24) St. Tammany Parish pretrial detainees in a single intake holding cell, for as long as eighteen (18) days, prior to classifying and transferring them to appropriate housing. Due to the overcrowding, St. Tammany Parish pretrial detainees were forced to sleep on concrete floors within the holding cells.

13. In their Complaint, Plaintiffs alleged the following: As late as March 3, 2020, in holding cells 1-4, the number of detainees held in each cell ranged from 17-21. In January

2020, the STPJ had as many as one hundred and thirty-seven (137) open beds. In January 2020, the STPJ housed as many as sixty-three (63) federal inmates. In January 2020, the STPJ housed as many as three-hundred eighty-seven (387) Louisiana Department of Corrections inmates. In January 2020, the STPJ housed as many as ninety-eight (98) St. Tammany Parish pretrial detainees in total in its four (4) holding cells.

14. In their Complaint, Plaintiffs alleged the following: STPJ administrators, supervisors, and staff only permitted St. Tammany Parish pretrial detainees to shower once every three days. STPJ administrators, supervisors, and staff, denied St. Tammany Parish pretrial detainees the ability to participate in any recreational activity. STPJ administrators, supervisors, and staff, housed violent and non-violent offenders in the same holding cell, thereby placing non-violent offenders in unnecessary danger. STPJ administrators, supervisors, and staff, failed to intervene in altercations that would occur between detainees in the crowded cells, thereby placing the detainees in danger.

15. In their Complaint, Plaintiffs alleged the following: STPJ administrators, supervisors, and staff, housed St. Tammany Parish pretrial detainees in unsanitary holding cells by allowing inmates to vomit and/or bleed on the floor of the holding cells and failing to promptly and properly clean the holding cells. STPJ supervisors and staff observed inmates vomiting and experiencing difficulty breathing, but failed to render aid or ensure that the detainees were seen by a medical professional. STPJ administrators, supervisors, and staff, kept detainees in the holding cells with unbandaged wounds and staph infections. STPJ administrators, supervisors, and staff, permitted food to remain on the floor of the holding cells for four days without cleaning. When blankets were provided to the detainees, the blankets were damp, wet, or musky. When it would rain, at least one holding cell would

flood due to a leak in the window at the top of the holding cell. STPJ supervisors and staff withheld hygiene items, blankets, and medication from inmates as a form of punishment.

16. In their Complaint, Plaintiffs alleged the following: Beginning on December 2, 2019, Mr. Ahmed Baqer was held as a pre-trial detainee at the STPJ. Upon arrival, STPJ administrators, supervisors, and staff, forced Mr. Baqer to reside in a holding cell with 19 other pre-trial detainees. The holding cell was 10 feet by 20 feet, held cement benches, no beds, and one exposed toilet. STPJ administrators, supervisors, and staff, held Mr. Baqer in the holding cell for 17 days. Mr. Baqer slept on the bare concrete floor amidst 19 other prisoners for more than 16 days despite the availability of cell space and empty beds in other areas of the jail. On or around December 19, 2019, STPJ administrators, supervisors, and staff, moved Mr. Baqer out of the inadequate holding cell to general population. On or around December 20, 2019, Defendants released Mr. Baqer.

17. In their Complaint, Plaintiffs alleged the following: Beginning on December 22, 2019, STPJ administrators, supervisors, and staff, held Mr. Klabert Guillot, Sr. as a pre-trial detainee at the STPJ. Upon admission, STPJ administrators, supervisors, and staff, assigned Mr. Guillot, Sr. to a holding cell with 19 other pre-trial detainees. The holding cell was 10 feet by 20 feet, held cement benches, no beds, and one exposed toilet. STPJ administrators, supervisors, and staff, held Mr. Guillot, Sr., in a holding cell for 13 days. Mr. Guillot, Sr. slept on the bare concrete floor amidst 19 other prisoners for 13 days despite the availability of cell space and empty beds in other areas of the jail. On or around January 4, 2020, STPJ administrators, supervisors, and staff, moved Mr. Guillot, Sr., to general population.

18. In their Complaint, Plaintiffs alleged the following: Beginning on June 17, 2019, STPJ administrators, supervisors, and staff, held Mr. Kevin Louviere as a pre-trial detainee at the STPJ. STPJ administrators, supervisors, and staff, forced Mr. Louviere to reside in a holding cell with at least 22 other pre-trial detainees. The holding cell was 10 feet by 20 feet, held cement benches, no beds, and one exposed toilet. STPJ administrators, supervisors, and staff, held Mr. Louviere in the holding cell for 12 days. The overcrowding often prevented Mr. Louviere from being able to lay down on the concrete floor to sleep. When Mr. Louviere did sleep, he slept on the bare concrete floor amidst 22-30 other prisoners, despite the availability of cell space and empty beds in other areas of the jail. Mr. Louviere and other detainees were provided with blankets only between the hours of 3 a.m. and 5 a.m. Mr. Louviere was deprived of the ability to shower until his seventh day at STPJ. Mr. Louviere was only provided with clean clothes following showers. The only meals provided to Mr. Louviere were made up of cold and spoiled food. Violent detainees battered Mr. Louviere twice, resulting in bruises to his head and face. Guards failed to prevent the assaults, and did not provide him with necessary medical care after the assaults. Jail staff cleaned the holding cells every four days, only when the holding cells had become very dirty and unbearable. Mr. Louviere was only allowed to leave the holding cell for showers. Mr. Louviere was not provided with an opportunity for recreational or physical activity. On or around June 29, 2019, STPJ administrators, supervisors, and staff, moved Mr. Louviere out of the inadequate holding cell.

19. In their Complaint, Plaintiffs alleged the following: Beginning on October 18, 2019, STPJ administrators, supervisors, and staff, held Mr. Terry Matthew Hall, Jr., as a pre-trial detainee at the STPJ. STPJ administrators, supervisors, and staff, forced Mr. Louviere to

reside in a holding cell with at least 15 other pre-trial detainees. The holding cell was 10 feet by 20 feet, held cement benches, no beds, and one exposed toilet. STPJ administrators, supervisors, and staff, held Mr. Hall in the holding cell for 15 days. Mr. Hall slept on the bare concrete floor amidst 15-30 other prisoners despite the availability of cell space and empty beds in other areas of the jail. Mr. Hall was only permitted to shower twice a week, and was only provided with clean clothes twice a week. The temperature in the holding cell was always set to an uncomfortably low temperature, described by Mr. Hall as freezing. For seven days, Mr. Hall was not provided with a blanket. Mr. Hall and other inmates were told that if they were not quiet, they would be denied blankets. STPJ staff cleaned the floor of the holding cells only once a week. Mr. Hall was permitted out of the holding cell only twice per week, and only then to shower. Mr. Hall was not provided with an opportunity for recreational or physical activity. Mr. Hall was subjected to inhumane conditions of confinement, exhibited by toilet paper hanging from the ceilings and air conditions vents, urine covering the cell floor around the toilet, and ever-present odors caused by the unsanitary conditions. On November 1, 2019, STPJ administrators, supervisors, and staff, moved Mr. Hall out of the inadequate holding cell.

20. In their Complaint, Plaintiffs alleged the following: Beginning on September 28, 2019, STPJ administrators, supervisors, and staff, held Mr. Floyd Williams as a pre-trial detainee at the STPJ. STPJ administrators, supervisors, and staff, forced Mr. Williams to reside in a holding cell with up to 30 other pre-trial detainees. The holding cell was 10 feet by 20 feet, held cement benches, no beds, and one exposed toilet. The overcrowding often prevented Mr. Louviere from being able to lay down on the concrete floor to sleep. STPJ administrators, supervisors, and staff, held Mr. Williams in the holding cell for 5 days. Mr.

Williams slept on the bare concrete floor amidst 30 other prisoners despite the availability of cell space and empty beds in other areas of the jail. Mr. Williams was not provided with a medical or mental health screening until his last day in the holding cells, despite having told jail staff that he needed medications for his heart and breathing. Mr. Williams was not provided with his heart medication. On the fifth day of his detention, Mr. Williams was provided with an inhaler and told to share it with other inmates. As a result of being deprived medication, following his release from STPJ, Mr. Williams became ill for 2 weeks. The holding cell was cleaned by jail staff only on the fourth day of Mr. Williams' incarceration . Mr. Williams was not provided with a toothbrush until his fifth day of incarceration. Mr. Williams was only permitted to shower on his fifth day of incarceration. Mr. Williams was not provided with clean clothes until his fourth day of incarceration. The plaintiff asserts during that time, the temperature of the holding cell was always set to an uncomfortably low temperature. The plaintiff asserts during that time, Mr. Williams and other inmates were only allowed to exit the holding cells to shower. Mr. Williams was subjected to inhumane conditions of confinement, including without limitation, detainees begging for medical help only to be ignored, detainees asking for sanitary items and cleaning of the cells only to be met with rolled eyes. In response to detainees' requests for medical assistance and sanitation, guards responded, "This is St. Slamity,' if you don't like it, don't commit crimes in the parish." Jail staff admitted that the conditions of confinement were in place to teach detainees a lesson. On October 3, 2019, STPJ administrators, supervisors, and staff, moved Mr. Williams out of the inadequate holding cell.

## DISCUSSION OF ISSUES AND OVERVIEW OF CASE RECORD

21. **Discussion of Jail Operational Issues:** The pre-trial detainees in the St.

Tammany Parish Jail (STPJ) rely upon the facility staff for their personal needs and safety. Contemporary jail industry standards and practices recognize that all facilities are required to provide prisoners with the basic necessities of life and take reasonable steps to protect them from harm. The fact of being in jail does not mean that human essentials and protection from known health and safety risks can be taken away. Taking reasonable steps to protect all detainees from harm and ensuring that basic human needs are met, are two of the core responsibilities of a jail and its staff.

22. Jails with adequate bed space capacity are those with sufficient bedspace to house the number and type of persons incarcerated by the local criminal justice system. Jails should be able to accomplish this without regularly exceeding capacity and without the need for the local criminal justice system to make compromises in its incarceration policies. Crowded conditions often have the following adverse effects on jail operations:

a. Compromises in classification

b. Reduced levels of security

c. Increases in violence, tension, and availability of contraband

d. Overloaded programs and services

e. Deterioration in levels of sanitation and maintenance

Jail officials must reach agreement with key decision makers on capacity of the jail and work with them to keep the jail population within agreed upon limits. Jail officials must be prepared to implement internal and external management strategies when bedspace demand exceeds available capacity. A safe, clean, and well-maintained jail is essential to the health and safety of inmates and staff. Poor conditions increase tension, contribute to injuries, the spread of disease, vandalism and negatively affects the morale and productivity of the jail

and its staff. Detainees have a right to a safe, humane living conditions. The quality of the jail environment affects not only the health and safety of those who occupy and work in the facility but also their emotional wellbeing and performance. Poor conditions often lead to low morale of inmates and staff, increased inmate health care costs, increased disciplinary problems, higher staff absenteeism and turnover, and an overall negative atmosphere. Attention to the basic human needs of detainees, including taking reasonable steps to protect detainees from harm, are a basic duty and responsibility of every Sheriff and their staff who operate a jail facility, regardless of size.

23. **Review and Analysis of job performance and actions of St. Tammany Parish Government, former Sheriff Rodney Strain, Sheriff Randy Smith and his staff, from a jail operational and administrative perspective (RE: Ensuring the basic human needs of detainees are met and their joint responsibility to ensure take reasonable steps are taken to protect pre-trial detainees from harm while being held in the STPJ holding cells):** Based upon my training, education and experience, I started my analysis of the issues in this case with a review of what the St. Tammany Parish Council and Sheriff Randy Smith and his staff knew (or should have known) about the living conditions experienced by St. Tammany Parish detainees while being held in the holding cells at the St. Tammany Parish Jail (STPJ) during the time period of June 2019 through January 2020. I then assessed their actions/inactions in the performance of their duties and responsibilities to take reasonable steps to protect detainees from harm and to ensure that the basic human needs of the detainees in their care and custody are met during their incarceration in the STPJ. My results are as follows:

*(NOTE: As is the situation in almost every civil case, there are some conflicting versions of what happened during the incidents which led to these lawsuits. It is important to note that all the defendants deposed in this case to date, were unable to provide any written documentation or records to refute the allegations of the plaintiffs. It is not the role of the expert witness to determine the credibility of witnesses. That is the role and responsibility of the judge and/or jury in this case. My analysis of this case assumes that the allegations of the plaintiffs are accurately recounted in their hearing testimony and/or affidavits.)*

24. *Issue #1: Overcrowding and Long-Term Confinement in Holding Cells Designed for Short-Term Confinement* – It is my professional opinion that the holding cells at the STPJ were designed and intended for short-term confinement. These types of short-term holding cells are common in all full-service jail facilities for the limited purpose of overnight processing or brief initial processing of a newly arrived detainee. Similarly, the design and construction of the holding cells at the STPJ suggest that they were intended for very short detentions only, as they had no beds and were not designed for sleeping. The case record indicates the holding cells were 10 feet by 20 feet, held cement benches, no beds, and one exposed toilet. The holding cells at the STPJ had a maximum occupancy number of 20 as determined by the Fire Marshall, but based upon my training, education, and experience, that number reflects the use of holding cell only as a short-term processing cell with inmates sitting on one of the four benches or standing up in the cell. The cell was not designed or approved as a sleeping cell for inmates in any of the Fire Marshall Inspections provided in the case record. Jail video of the holding cells shows detainees crowded into cells and forced to lie on concrete floors to sleep or rest. STPJ administrators, supervisors, and staff, routinely

packed so many detainees into each holding cell that detainees were regularly forced to lie down on the concrete floors around the toilet stall. The case record indicates that some pre-trial detainees were kept in these holding cells for up to 15 days, despite it being a violation of Title 22, Part III, Subpart 2, Section 3301(F) of the Louisiana Administrative code requiring that new inmates be kept in holding cells for no longer than 48 hours.

25. Based upon my training, education, and experience there is widespread consensus among corrections officials, based on their experience and supported by considerable research that goes back at least 30 years, that overcrowded living conditions in a jail increase the risk to safety and security for prisoners. That consensus is consistent with my own correctional experience. It is my professional opinion that the STPJ policy, practice, and custom of using the STPJ holding cells to house pretrial detainees in excess of 48 hours, and overcrowding the holding cells, deviated from accepted practices in the industry, served no legitimate penological or custodial interest, and amounted to nothing more than cruel punishment.

26. *Issue #2:* _*Sanitation*_ - Similarly, overcrowding in the STPJ holding cells has a direct effect on sanitation. The fact that 15-20 detainees must share a single toilet with little to no privacy is one exacerbating factor and seems unnecessarily humiliating for detainees. This lack of privacy makes overcrowding in the holding cells even more of an issue. Additionally, having 15-20 detainees sharing the same toilet ensures that the detainees will frequently run out of toilet paper. Because the detainees are completely dependent on STPJ staff, staff must frequently restock this critical hygiene item, which based on the allegations of the detainees, did not occur. STPJ staff deposition testimony indicates that the STPJ apparently has no policies with respect to how often the holding cells must be cleaned, and it

appears that there are no cleaning supplies or a trash can in the holding cells. Since the cells are housing 15-20 (or more) detainees without immediate access to basic cleaning supplies and equipment, the cells are left dirty and unsanitary (i.e., dirty toilet, urine soaked floor, toilet paper and other materials hanging from the ceiling) for long periods of time. Unfortunately, coupled with the overcrowding, some detainees were forced to lay in urine near a dirty toilet in order to sleep. In essence, the use of the holding cell as a sleeping cell means that the person using the toilet and the person trying to sleep both experience difficulties, creating unnecessary tension in the cell, especially when it is overcrowded. All of these factors lead me to conclude that detainees needlessly suffered indignities and tension as they were forced to compete for access to the most basic necessities of everyday life. It is my professional opinion that the STPJ policy, practice, and custom of depriving detainees in the holding cells of proper sanitation deviated from accepted practices in the industry, served no legitimate penological or custodial interest, and amounted to nothing more than cruel punishment.

27. *Issue #3:* *Deprivation of Sleep* - Additionally, detainees are frequently forced to endure constant illumination in the holding cells both day and night. Staff testimony and video surveillance shows holding cell lights on in the middle of the night. Detainees will commonly shield the light by hiding their faces under their blankets, but not all detainees are given a blanket or sheet. Add to this mix the undisputed acknowledgement by STPJ officials that the lights in the holding cell are left on 24 hours a day. Furthermore, it is a matter of common sense that a lack of sleep will cause emotional distress. It is also likely that the lack of sleep exacerbated tension in the overcrowded environment. It is my professional opinion that the STPJ policy, practice, and custom of depriving detainees of sleep, deviated from

accepted practices in the industry, served no legitimate penological or custodial interest, and amounted to nothing more than cruel punishment.

28. *Issues #4 and #5: Ability to Maintain Personal Hygiene and Access to Potable Water* - It is a basic requirement that detainees be provided with access to potable water, but since the STPJ holding cells were not designed for long-term housing, all 15-20 (or more) detainees were reliant on a single water faucet located in the single sink/toilet unit located in the holding cell. Detainees often arrive dirty and need an opportunity to clean themselves and change their clothing. Detainees also need to be able to clean their hands prior to eating and after using the bathroom. Based upon the allegations of the detainees, detainees were unable to adequately clean themselves. Hot water was virtually nonexistent, soap was not always available, there were no towels, and showers and clean clothing were rarely available. In my professional opinion, based on the overcrowded and unsanitary conditions, and the fact that the only sink is connected to the toilet, it is unlikely that detainees housed in the STPJ holding cells would be able to maintain basic personal hygiene at a safe level. The inability to maintain personal hygiene would cause emotional distress. In addition, in a detention facility where detainees are held in overcrowded conditions, the inability to maintain personal hygiene creates an unreasonable risk for the spread of disease or infection among the detainees and the staff who work there. I would think that STPJ administration would want to do more to protect their own staff if for no other reason. Again, this is simple and basic protocol for the operation of a detention facility. Typically, general population jail inmates can shower daily. Since the detainees are constantly locked in their cells, they do not have an opportunity to shower during out of cell time like a jail population inmate. It is my professional opinion that the STPJ policy, practice, and custom of depriving detainees in the

holding cells of the ability to maintain their personal hygiene, deviated from accepted practices in the industry, served no legitimate penological or custodial interest, and amounted to nothing more than cruel punishment.

29. *Issue #6: Lack of Mattresses and Proper Bedding Items* – Based upon the case record, pre-trial detainees forced to live and sleep in the holding cells were not given a mattress, sheet or pillow, or many did not receive a blanket. Given the lack of blankets and mattresses and nothing to do all day, detainees were left to sit or lay down on concrete, which is a very cold experience. Concrete benches and floors can be very cold and seep heat from your body. The confirmed fact in the deposition testimony of the STPJ Command staff indicates that detainees are not issued a mattress while being housed in the holding cells. This policy, practice, and custom is shockingly inhumane and needlessly exposed each detainee to serious and substantial health risks and potential orthopedic injuries on a nightly basis. It is my professional opinion that the STPJ policy, practice, and custom of depriving detainees in the holding cells of a basic mattress and appropriate bedding deviated from accepted practices in the industry, served no legitimate penological or custodial interest, and amounted to nothing more than cruel punishment.

30. *Issue #7: Access to Adequate Medical Care* - Plaintiff, Mr. Floyd Williams, asserted that during his 12 days confined in the STPJ holding cells, he was not provided with a medical or mental health screening until his last day in the holding cells; despite having told jail staff that he needed medications for his heart and breathing. Mr. Williams asserted that on the fifth day of his detention, he was provided with an inhaler to share with other inmates. Mr. Williams asserted that as a result of being deprived medication, he became ill for 2 weeks following his release. If the jury finds the testimony of Mr. Williams to be

credible, then there were sufficient facts and circumstances which should have alerted those responsible for Mr. Williams' care and custody of his potential serious medical needs. Officials cannot sidestep the obligation to acknowledge or verify a detainee's medical condition by refusing to get involved, or by simply passing it on to someone else without assurance that the detainee's condition is in fact addressed and properly handled. It is the duty of the STPJ supervisors and staff to ensure unimpeded access for Mr. Williams to adequate medical assessment, care, and treatment. In a detention facility or jail setting, the supervisors and officers are the "gatekeepers" who determine whether access to medical services will be provided. To keep the "gate" shut when medical attention is needed would be the height of irresponsibility and a betrayal of an officer's crucial responsibility to assure for the health and safety of others. Detainees' lives depend upon officers to uphold these responsibilities. It is my professional opinion that the STPJ policy, practice, and custom of depriving detainees in the holding cells of access to adequate medical assessment, care, and treatment, deviated from accepted practices in the industry, served no legitimate penological or custodial interest, and amounted to nothing more than cruel punishment.

31. *Contracting Jail Beds to Outside Agencies* – Based upon my training, education, and personal experience the need to manage and adjust inmate population and housing assignments on a daily basis is a common and necessary part of operating a safe and humane jail. During my almost 20 years as a jail administrator, I personally managed an average daily inmate population that had grown to approximately 2400 inmates per day housed in four separate facilities during the time period of 2000-2009. Our agency processed between 45,000 to 50,000 inmates through our intake facility each year. We also had to plan for new legislation passed in Ohio that required the county jails to house state prisoners that



PL JEFF EISER 000022

were sentenced to short term incarceration, and we also contracted with the U.S. Marshall's Service to hold an unlimited amount of federal prisoners for a per diem fee. This practice by local jails is not a new or unknown practice in the jail industry, but it does require careful planning and execution of those plans to ensure that local detainees which you are statutorily required to house, are housed appropriately, safely and humanely. This can only be accomplished if the inmate population is managed on a daily basis (or more often, if necessary, based upon need) to fit all the "pieces" into the available "spaces". Our agency communicated and collaborated with other similar jails throughout the country to create a cell assignment process that ensures the objectives of our inmate classification and inmate safety responsibilities. It took time and effort to develop a program that worked in our complex system, but it was the only reasonable step to pursue in order to ensure we do our best to protect all detainees from harm. One of the most critical components of our plan was to ensure that no detainee was forced to stay in a holding cell for a longer period than was necessary (usually only for a few hours), and never forcing any detainee to sleep overnight on a concrete bench or floor without a mattress, bedding, or personal hygiene items for more than one night. The only reasonable thing to do when faced with a potential overcrowding situation is to use every cell in your system on a continuous basis. It does not cost a jail facility any additional cost to direct the administrators to create and operate a population and cell assignment management plan that ensures the health and safety of the inmate population. Our plan required supervisors to communicate with the classification staff on a continuous basis to select temporary cell locations for new detainees who have not been fully processed yet, but who needed a place to sleep for the night. This requires jail staff at the evening lockdown time to secure all the cells in their units and place new detainees temporary in each

empty cell to sleep. A Master List is used to track were all the detainees are assigned at any one time, so they can be retrieved if needed, or moved back to a holding cell in the morning. The housing officer in each unit where the new detainees were assigned would then have their inmate “porters” clean the individual cells and bedding used and collect the linens to be sent to the laundry. As stated previously, our system processed 45,000 – 50,000 inmates a year, so it required a lot of planning and teamwork by jail staff on a daily basis to ensure each open cell is identified and utilized, if necessary. This process did not require any significant personnel expense. The plan also consists of a method of constant communication and collaboration with the outside agencies that were housing inmates in our jail. Any valid agreement with an outside agency must always include the qualification that the jail’s primary responsibility is to properly and safely house their own inmates before accepting any additional inmates from the outside agency. This process must happen on a continuous basis and may require the jail to have the outside agency pick up and remove some of their inmates if space is needed to house inmates who we were statutorily required to house. A custom and practice to block off sections of cells and use them only for outside inmates is naïve and could be disastrous for the safe operation of a jail, and almost ensures that the jail will have serious issues finding bedspace for their own inmates. This process and plan cannot be governed by a financial motive on the part of the jail. Rather, it must be governed by what is necessary in order to safely and humanely house inmates. It is my professional opinion that the STPJ policy, practice, and custom of blocking off sections of the jail to be used inmates from outside agencies, while depriving detainees in the holding cells of safe and humane housing conditions, deviated from accepted practices in the industry, served no legitimate penological or custodial interest, and amounted to nothing more than cruel punishment.

32. Based upon my training, education, and personal experience, I found the systemic policies, practices, and customs, of the St. Tammany Parish Government and Sheriff Randy Smith in the long-term housing of St. Tammany Parish pre-trial detainees in holding cells, in addition to deviating from the standards in the industry, to be shocking, unnecessary and inhumane. The case record indicates that Sheriff Smith made the decision to continue the policies, practices, and customs, of the past administration of former Sheriff Rodney Strain. Despite being placed on notice by a U.S. Department of Justice investigation and report in 2012, about the serious problems and issues concerning the policies, practices, and customs, Sheriff Smith continued the practice of housing Parish pre-trial detainees in the holding cells long-term, without adequate bedding, blankets, personal hygiene items and proper sanitation. Notably, and most troubling, is that the policies, practices, and customs, required that a certain number of jail beds (i.e., up to a 100 for each agency) were always left open and available pursuant to a per diem contract with both the Louisiana Department of Corrections and the U.S. Marshall's Service. These empty beds could and should have been provided to the St. Tammany Parish pre-trial detainees. It was clear in the depositions of the jail command staff that as a direct result of policy and established practice, they were never permitted to use the beds reserved for the contracted agencies, even if it meant housing Parish pre-trial detainees in an overcrowded, unsafe, and inhumane manner. None of the command staff could give a reason for this policy and established practice other than the "contract" with the outside agencies. Although, all admitted that STPJ could have limited the number of contract inmates they accepted at any one time because of facility maintenance repairs, no one seemed to grasp the gravity of the situation faced by the Parish pre-trial detainee forced to live 24/7 in the holding cells for long periods of time sharing a small area

and a single toilet with 15-20 other detainees. Sheriff Smith testified in his sworn deposition that housing Parish pre-trial detainees "is our primary obligation" (Randy Smith deposition: 14; 17-18) and that "Pre-trial detainees are our primary responsibility" (Randy Smith deposition: 16; 15-16). Sheriff Smith also testified that "we followed the previous administration to bring in additional funds to operate the jail effectively, efficiently and most important, safely." (Randy Smith deposition: 18; 14-19). Unfortunately, it appears his actions (or lack of appropriate actions) speak much louder than his words, and his choice to ignore the problems reported by the USDOJ concerning the customs and practices of the previous administration practices, more likely than not, indicates the money generated by the outside contracts was a higher priority than ensuring the basic human needs of the Parish pre-trial detainees and taking reasonable steps to protect them from harm.

33. Based upon my training, education and experience, it is more likely than not, that Sheriff Smith knew (or should have known) the STPJ did not always have adequate bed space for the Parish pre-trail detainees when he required staff to block off the open cells for outside agencies. An official cannot simply ignore, or "stick their head in the sand" when a serious detainee health and safety issue is so obvious. Sheriff Smith testified that he knew it would not be humane to house a pre-trial detainee in the manner alleged by the plaintiffs and stated it "would be a violation on what we do here, what we're obligated to do here." (Randy Smith deposition: 75; 22-25). It should have been obvious to any reasonable official responsible for the operation of a local jail facility that their policy and practice would result in the creation of an unnecessary dangerous condition and serious and substantial risks to the health and safety of pretrial Parish detainees. The policy and established practice of placing a higher priority on the generation of revenue for the jail than taking steps to protect Parish

pretrial detainees from obvious risks to their health and safety, and then not acknowledging and ignoring the risks created by the policy and established practice indicates an intentional and callous indifference to the health and safety of the Parish pre-trial detainees in violation of the Louisiana Administrative Code – Title 22: Part III; Subpart 2 – Minimum Jail Standards, and clearly established corrections industry standards and practices.

34. It is my opinion that the intentional and callous indifference to the basic rights of Parish pretrial detainees exhibited by the St. Tammany Parish Government and Sheriff Randy Smith and his staff is appalling and violates the basic foundation and principles of our American criminal justice system. The policies and established practice of punishing pretrial detainees who are not able to make bond, in an effort to protect a revenue stream associated with renting out available inmate beds, is offensive to human decency and violates the basic responsibility of a government agency and its officials who choose to operate a jail facility. Almost every jail facility in this country deals with overcrowding issues but the St. Tammany Parish Government and Sheriff Randy Smith, more likely than not, chose to create unnecessary safety and health risks for Parish pre-trial detainees to ensure their revenue stream from the rental of jail beds to outside agencies. The development and implementation of a comprehensive population and cell assignment plan for operation of the STPJ using free resources available (i.e., National Institute of Corrections – Jail Center, American Jail Association, etc.) would have cost nothing, but would have significantly reduced or eliminated the serious and substantial risks to the health and safety of the Parish pre-trial detainees housed for long periods of time in the STPJ. Instead, the case record indicates the St. Tammany Parish Government and Sheriff Randy Smith and his staff made a conscious decision to maximize the risks to the health and safety of their Parish pre-trial detainee

population. During my career I have studied and taught the history of punishment used in our criminal justice system over the last 200+ years and it truly saddens me to see this type of horrendous practice still being utilized in 2019. It reminds me of some very dark times in our nation's history. Any reasonable jail administrator would realize that housing 15-20 inmates for more than a short time will create safety, sanitation and health issues. Combining that with making them sleep and or sit all day on a concrete floor is simply unimaginable in this day and age. No legitimate penological interest is served by these money driven policies and established practices.

35. **Review of the Regulatory and Clearly Established Corrections Industry Standards:** The failure of the St. Tammany Parish Government and Sheriff Randy Smith and his staff to take reasonable steps to protect all pre-detainees (including Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr.) from harm and to ensure their access to all basic human needs during their incarceration in the holding cells of the St. Tammany County Jail, places them in violation of the mandatory regulatory standards contained in the Louisiana Administrative Code – Title 22: Part III; Subpart 2 – Minimum Jail Standards, the advisory standards contained in the Basic Jail Guidelines (April 15, 2019) promulgated by the Louisiana Sheriff's Association, and clearly established corrections industry standards including the Performance-Based Standards for Adult Local Detention Facilities (4th Edition - June 2004), the Core Jail Standards (2010) promulgated by the American Correctional Association (ACA), and the Standards for Health Services in Jails (2018) from the National Commission on Correctional Health Care (NCCHC) as follows:

**LA Admin Code**
**Subpart 2 - Minimum Jail Standards**
**Chapter 33 - Inmate Management**
**Section III-3301 - Intake Reception**

F. New arrivals may be housed in individual intake holding cells for a maximum of 48 hours before being classified and transferred to an appropriate housing area.

**LA Admin Code**
**Subpart 2 - Minimum Jail Standards**
**Chapter 33 - Inmate Management**
**Section III-3303 – Inmate Management**

C. Initial classification assignments shall be completed according to the written schedule within 48 hours of admission.

D. The classification process shall be completed within 72 hours.

**ACA Standard 4-ALDF-1A-10** and **CORE Jail Standard 1-CORE-1A-07:** "Multiple-occupancy rooms/cells house between two and sixty-four occupants and provide 25 square feet of unencumbered space per occupant. When confinement exceeds ten hours per day, at least 35 square feet of unencumbered space is provided for each occupant."

**ACA Standard 4-ALDF-1A-14** and **CORE Jail Standard 1-CORE-1A-09:** "All inmate rooms/cells provide the occupants with access to natural light. Lighting throughout the facility is sufficient for the tasks performed."

**ACA Standard and CORE Jail Standard 4C:** "Inmates maintain good health. Inmates have unimpeded access to a continuum of health care services so that their health care needs, including prevention and health education, are met in a timely and efficient manner."

**ACA Standard 4-ALDF-4B-02** and **CORE Jail Standard 1-CORE-4B-01:** "Inmates are issued suitable, clean bedding and linens. There is provision for linen exchange, including towels, at least weekly."

**ACA Standard 4-ALDF-4B-03** and **CORE Jail Standard 1-CORE-4B-02:** "Inmates are issued clothing that is properly fitted and suitable for the climate. There are provisions for inmates to exchange clothing at least twice weekly."

**ACA Standard 4-ALDF-4B-06** and **CORE Jail Standard 1-CORE-4B-03:** "Articles and services necessary for maintaining proper personal hygiene are available to all inmates including items specifically needed for females."

**ACA Standard 4-ALDF-4B-08/09** and **CORE Jail Standard 1-CORE-4B-04:** "Inmates have access to showers, toilets, and washbasins with temperature controlled hot and cold running water twenty-four hours per day. Inmates are able to use toilet facilities without staff assistance when they are confined in their cells/sleeping areas."

**ACA Standard 4-ALDF-5C-01, 02** and **CORE Jail Standard 1-CORE-5C-01:** "Inmates have access to exercise and recreation opportunities. When available at least one hour daily is outside the cell or outdoors when weather permits."

**ACA Standard 4-ALDF-6A-07** and **CORE Jail Standard 1-CORE-6A-07:** "Inmates are not subjected to personal abuse, corporal punishment, personal injury, disease, property damage, or harassment."

**ACA Standard and CORE Jail Standard 4B:** "Inmates maintain acceptable personal hygiene practices."

**ACA Standard and CORE Jail Standard 4D:** "Health Services are provided in a professionally acceptable manner."

**ACA Standard and CORE Jail Standard 1A:** "Staff, volunteers, contractors, and inmates are protected from injury and illness in the workplace."

**ACA Standard and CORE Jail Standard 2A**: "The community, staff, volunteers, contractors, and inmates are protected from harm. The number and severity of events are minimized."

**NCCHC Standard J-A-01:** "Inmates have access to care to meet their serious medical, dental, and mental health needs."

*Compliance Indicator:*

The responsible health authority identifies and eliminates any barriers to inmates receiving health care.

## SUMMARY OF OPINIONS

36. In summary, the duty of the St. Tammany Parish Government and Sheriff Randy Smith and his staff was to take reasonable steps to protect all pre-detainees (including Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr.) from harm and ensure their access to all their basic human needs during incarceration in the holding cells of the St. Tammany County Jail. They failed on all counts and actually created, then ignored, serious and substantial risks to the health and safety of all pre-trial detainees (including Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr.) held in their holding cells. The case record indicates the St. Tammany Parish Government and the St. Tammany Parish Sheriff's Office

and their staff were already placed on notice through an U.S. Department of Justice investigation and report from 2012, which directed them to correct their custom and practice of creating serious and substantial risks to the health and safety of newly arrived pre-trial detainees who remained housed in the facility holding cells for long periods of time (in excess of 48 hours and up to 15 days) when open beds were available throughout the facility. The case record is clear that all levels of command in the STPJ were aware (during the time period of June 2019 through January 2020 referenced in this case) of pre-trial inmates continuing to be housed in the same manner (in STPJ holding cells) for long periods of time even though they knew the jail had plenty of open cells available to safely and humanely house the Parish inmates. The case record clearly indicates a continued custom and practice of creating serious and substantial risks to the health and safety of newly arrived pre-trial detainees (including Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr.) and a continued policy and established practice of ignoring their responsibility to provide all detainees (including Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr.) with basic human needs, including humane living conditions.

37. The case record indicates a lack of concern, and a callous indifference by the St. Tammany Parish Government and Sheriff Randy Smith and his staff toward the most fundamental and basic duties of running a jail facility; i.e., taking reasonable steps to protect inmates from harm, and ensuring that all basic human needs of inmates are always available, including humane living conditions. Instead, they made a conscious choice to put newly arrived detainees (including Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr.) at substantial risk of serious harm, and caused

them to suffer the indignity and discomfort associated with living in inhumane conditions, simply to maximize the revenue generated from housing inmates from outside agencies. Their actions and conscious choice to ignore prior warnings created dangerous conditions and serious risks to his health and safety of all newly arrived pre-trial detainees (including Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr.) and their actions are directly related to creating the unsafe and inhumane living conditions suffered by the Plaintiffs. As stated earlier, taking reasonable steps to protect detainees from harm and ensuring the basic human needs of all detainees are two of the most sensitive and important obligations a governmental body operating a jail facility and Sheriff and their staff have towards their detainees. Unfortunately, in this case the exact opposite occurred, the governing authority and elected official charged with operating the jail facility implemented policies and established practices that they knew maximized the health and safety risks of all newly arrived pre-trial detainees while causing them to suffer the indignity and discomfort associated with living in inhumane conditions. The key to the operation of a safe and secure jail facility is a combination of humane treatment and adherence to accepted custody practices — not a focus on conditions which generate additional revenue for the agency while in essence, punishing Parish pre-trial detainees at the same time, which appears to be the misguided approach taken in the operation of STPJ.

38. I have worked in local jail operations as a practitioner and administrator for close to 30 years and have served as a jail operations consultant and expert witness for almost 30 years. I have visited and reviewed hundreds of jails over the years, but I have never experienced a jail facility that treats those confined in a manner which the STPJ treats its Parish pre-trial detainees. I have seen and experienced the effects of overcrowding but have

never seen a jurisdiction who would cram so many people into so little space for long periods of time, without beds and bedding, as routinely occurs in the STPJ. The conditions of confinement in the holding cells at the STPJ alleged in this case are unthinkable for any reasonable and competent jail administrator. The St. Tammany Parish Government and Sheriff Randy Smith are housing Parish pre-trial detainees in conditions that are unnecessarily harsh, dangerous and contrary to accepted industry practices and standards.

39. Based upon my review of the case record (listed in this report), I render all the foregoing opinions (contained in paragraphs 21-38) within a reasonable degree of professional certainty. Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions in this case. I also reserve the right to update my opinions if additional information is provided to me in this case. Accordingly, these opinions are preliminary and subject to modification.

Signed this 31st of March, 2023 in Cincinnati, Ohio.



Jeff Eiser

Attachments (2):
Exhibit #1 - Resume/CV
Exhibit #2 - List of Publications, fee schedule and list of all cases where I testified in a trial or deposition as a jail operations expert witness in the last five years.