**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| Ahmed Baqer, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>St. Tammany Parish Government, *et al.*,<br><br>Defendants. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | CASE NO. 20-00980-DJP-DPC<br><br>*Consolidated with*<br>CASE NO. 20-01840-WBV-DPC<br><br>JUDGE PAPILLION<br><br>MAGISTRATE JUDGE PHILLIPS CURRAULT<br><br>JURY TRIAL DEMANDED<br><br>*This memorandum applies to ALL CASES* |

**<u>PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR RENEWED MOTION FOR CLASS CERTIFICATION</u>**

Named Plaintiffs, through their undersigned counsel, submit this memorandum in support of their renewed motion for class certification. Plaintiffs respectfully request that the Court revisit its original class certification decision (ECF 171) in light of the development of facts in this case and the Court's own decision on summary judgment, ECF 457, which has narrowed and clarified the issues in this case.

## INTRODUCTION

This putative class action challenges the Defendants' policy of imposing prolonged confinement—in open violation of Louisiana law limiting holding cell detention to 48 hours—of numerous detainees subject to extended confinement in the holding cells of the St. Tammany Parish jail ("STPJ"). Plaintiffs previously moved the Court to certify a class under Rule 23(b)(3) to challenge this prolonged confinement (ECF 158) and the Court denied that motion (ECF 171), holding that

Plaintiffs had not made a sufficient showing of numerosity under Rule 23(a)(1) or predominance under Rule 23(b)(3).

The case nevertheless proceeded, and the progress of litigation has revealed a single, common reason that St. Tammany Parish has been holding its pretrial detainees in holding cells for extended periods: the Defendants made a decision to rent out much of the space in the jail, for money, to outside entities to house their detainees or prisoners instead. In order to make this space available, the Defendants confined the Parish's own detainees in the jail's holding cells for extended periods, until one of the jail's few remaining un-rented general population cells opened up. The Court focused on these facts in its summary judgment decision, explaining that the municipal defendants "cannot disclaim constitutional duties by freely entering into competing obligations" through their cell-rental contracts. ECF 457 at 17.

That holding, and the Court's related conclusions at the summary judgment stage, have changed the face of this litigation. Indeed, each of the concerns driving the Court's previous denial of certification has been addressed:

The Defendants' decision to rent out parts of the jail for money is a policy choice common to all class members.

The effect of that decision—to force many Parish detainees to remain in the holding cells past 48 hours—is common to all class members as well.

Identifying who was detained in the holding cells past 48 hours, and whether those cells were overcrowded at the time, can be established using objective criteria

and computer records, effectively rendering those questions common evidence.

And the deprivation of exercise and sleeping accommodations to each of those persons experience can be established with common evidence, because both those deprivations were imposed as a matter of policy on all detainees in the STPJ's holding cells.

Each of those facts is common to the class. Common evidence will show that all class members were detained for more than 48 hours (in overcrowded cells, for members of the subclass) during which they were deprived recreation and sleeping opportunities—all so that the Defendants could rent out other parts of the STPJ for money. And the Court's summary judgment decision made clear that these common facts are sufficient to establish liability for a conditions of confinement claim, for every single person so detained. Such common causes of an alleged tort are the touchstone of cases in which common issues predominate, making them ideal for class treatment under Rule 23(b)(3).

All of this, Plaintiff submits, calls for a reassessment of the certifiability of this case under Rule 23. As things stand, given the Court's March 28, 2025 summary judgment decision (ECF 457), every member of the putative class Plaintiff had sought to certify in 2021 now has a viable claim to assert for their over-detention in the STPJ's holding cells. Were each of these people to bring their own individual suits, the Court could expect them to present the same evidence, over and over again, about the Defendants' policy of renting out large parts of the jail, the over-detention in holding cells that resulted, and the relevant conditions (lack of

exercise and sleeping accommodations) that the Defendants imposed on all detainees in the holding cells as a matter of policy.

These common, core facts will be the central evidence for the claims of every single person who Named Plaintiffs seek to represent under Rule 23. It would be impracticable and wasteful to hold trials at which each member presented the same, common evidence about their over-detention in holding cells and the same, single reason for that over-detention. The Rule 23 class action procedural device exists precisely to avoid such results.

* * *

The clarification and narrowing performed by the Court's summary judgment opinion presents an occasion to consider class certification anew. As a general matter, "courts have been willing to rule on motions for summary judgment prior to class certification in circumstances in which it would facilitate efficient resolution of the case." 3 Newberg and Rubenstein on Class Actions § 7:10 (6th ed.) (collecting cases). That is particularly true where doing so promotes efficiency. *See, e.g.*, *Van Sweden Jewelers, Inc. v. 101 VT, Inc.*, No. 1:10-CV-253, 2012 WL 4074620, at *3 (W.D. Mich. June 21, 2012) ("Deciding Defendants' summary judgment motion before Plaintiff's class certification motion is, in this Court's opinion, in the interest of overall efficiency."); *Coburn v. D & R Trucking, L.L.C.*, No. 3:09-CV-464, 2011 WL 73287, at *2 (M.D. Fla. Jan. 10, 2011) ("A decision on [Defendants' Motions for Summary Judgment] may affect the factors the Court must determine on the Motion for Class Certification, and thus efficiency mandates consideration of the Motions for Summary Judgment first."); *Lee v. Javitch, Block & Rathbone, LLP*, 522

F. Supp. 2d 945, 947 (S.D. Ohio 2007) (concluding that resolving the summary judgment motion prior to class certification "will assist in a more efficient resolution of the issues raised in all pending motions"). This is the right time in this case to determine whether, in light of the clarification and narrowing performed in the Court's summary judgment decision, class certification is appropriate. Considering class certification with the benefit of the Court's summary judgment decision and its distillation of the evidence and law applicable to this case carries considerable potential for the Court to adjudicate the claims of numerous detainees in an efficient manner.

**BACKGROUND**

In analyzing whether a class should be certified pursuant to Rule 23, a court examines the "claims [and] defenses" as well as the "relevant facts" and the "evidence" put forward by the parties in the case. *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (quotations omitted). That task is considerably streamlined here. The parties' summary judgment submissions, particularly their respective statements of fact, organize much of the evidence relevant to class certification. Meanwhile, the Court's summary judgment Order and Reasons has already assessed Plaintiff's claims and identified those that are attributable to the Defendants' policy decision to voluntarily rent out large parts of the STPJ for money, with the effect of subjecting Named Plaintiffs and the members of the proposed class to extended confinement in the jail's holding cells. The Court's summary judgment ruling also performs another critical task: it applies the

governing standard for Fourteenth Amendment liability to those common claims and holds that due process liability can be established based on facts that would be common to all putative class members.

In setting out the relevant facts, therefore, Plaintiffs draw where possible from three sources: Defendants' Statement of Undisputed Fact (**ECF 387-2**); Plaintiff Baqer's Statement of Additional Facts (**ECF 409-2**); and the Court's summary judgment Order and Reasons (**ECF 457**). Citations to additional facts and evidence are also indicated.

### A. Relevant factual background.

#### 1. Defendants have a general policy of moving detainees from holding to general population as soon as possible, and in no event later than 48 hours.

The policy of the STPJ has been to place incoming "pretrial detainees . . . in holding cells until there was space for them to be moved into general population housing." ECF 457 at 2 n.9. The Defendants explain that it is the STPJ's policy that "[d]etainees are held in the holding cells within the STPJ until such time as a bed becomes available in the pre-trial detainee housing units within the STPJ." ECF 387-2 ⁋ 64. Indeed, "[t]he STPJ works daily to facilitate movement throughout the facility to decrease the occupancy of the holding cells." ECF 387-2 ⁋ 65. This is done to accomplish the STPJ's policy "to hold individuals in the holding cells *only* until such time as a bed opens up in one of the jail housing units." ECF 387-2 ⁋ 56 (emphasis added).

These policies are reflective of the undisputed reality that holding cells are only intended to be "temporary and [are] only supposed to house pretrial detainees for 48 hours." ECF 457 at 2 n.12. Indeed, as Defendants have understood, "Louisiana law require[s] pretrial detainees be moved out of holding cells within 48 hours." *Id.* at 2 n.13. *Accord* ECF 409-2 ¶¶ 91, 93.

**2. Because they prioritize their contractual rental obligations, Defendants have a policy of keeping Parish detainees in holding cells—including past 48 hours—until Parish general population cells open up.**

Notwithstanding their acknowledged obligation to move jail detainees out of the STPJ's holding cells within 48 hours, the Defendants voluntarily entered into contracts that took offline many general population beds that would have been available to Parish detainees confined in those holding cells.

The STPJ has a capacity of 1,200 detainees. ECF 387-2 ¶ 50. However, in addition to jailing its own detainees, the STPJ has entered into two different contracts—one to house prisoners of the Louisiana Department of Corrections ("DOC"), and the other to house persons detained or imprisoned by the federal government. *Id.* ¶ 62. The federal contract is for 150 male beds. *Id.* ¶ 74. The DOC contract is even larger, with space going above 390 male beds. *See e.g.*, ECF 413-3 at 2 (on October 9, 2019, there were 85 men in the four holding cells while . . . 392 [DOC] males . . . were assigned a bed . . . .").

The general population areas for the federal detainees, DOC prisoners, and the jail's own "Parish" detainees are each in separate housing units. *See* ECF 387-2 ¶ 41. Pursuant to the jail's policy—which fulfills the jail's contractual obligations—

these three groups are strictly segregated. *Id.* ⁋⁋ 57, 62. This means, Defendants explain, that "St. Tammany Parish pre-trial detainees are not eligible for housing in either of the DOC or the Federal housing units." *Id.* ⁋ 57.

The result is that STPJ's policy of moving Parish detainees out of the holding cells as soon as a bed opens up in general population is superseded by its policy that Parish detainees in the holding cells will remain their indefinitely even if there are empty beds in the parts of the STPJ that have been rented out to the federal government or the DOC. As the Defendants put it, "if there is an open bed in the [] DOC housing unit, a pretrial detainee in the holding cell who is a parish detainee would not be moved to that bed. Under no scenario will a parish detainee from a holding cell be put in the federal housing unit when there is an available bed." ECF 387-2 ⁋ 42. That is true even when the general population portion of the jail that remains for Parish detainees is full. Due to the STPJ's contractual obligations, Defendants explain that "when beds were not available in [the Parish portion of the] general population, detainees in the holding cells could not be put into DOC or federal beds." *Id.* ⁋ 59. The Defendants leave no doubt on this point:

> Under this arrangement of having the STPJ housing units segregated by DOC, Federal and pre-trial Parish detainees, if there is an open bed in a Federal or DOC housing unit, a pre-trial in a holding cell is not eligible to be moved to that open bed. Rather, pre-trial detainees are only eligible to be moved to open beds as they become available in the pre-trial detainee housing units within the STPJ.

*Id.* ⁋ 66. As a result, even when there are empty beds in the areas of the jail rented out to the Louisiana DOC or the federal government,

> [d]etainees are held in the holding cells within the STPJ until such time as a bed becomes available in the [Parish] pre-trial detainee

> housing units within the STPJ. Detainees are transferred to the [Parish] general population housing units when a bed [in the Parish part of the jail] becomes available . . . .

*Id.* ⁋ 64.

### 3. The conditions of confinement in the holding cells.

There is a stark contrast between the conditions of confinement in the STPJ's general population units and its holding cells. "Once in general population housing, pretrial detainees had their own beds, access to showers, and were able to exercise indoors and outdoors." ECF 457 at 2 n.10. Additionally, in general population, the jail's policy is to "turn [lights] off at 10:30 PM and turn back on at 6:00 AM, "so [detainees] can rest and recoup for the next day," which is done because STPJ "understands that inmates need time daily to sleep," and because "STPJ concluded that darkness . . . is a necessity [to sleep]." ECF 409-2 ⁋⁋ 38-39.

By contrast, the STPJ's holding cells, designed as they are for short-term detention only, have none of these basic features imposed on all detainees in the holding cells as a matter of jail policy:

***Lack of exercise.*** "While in the holding cells, pretrial detainees were not permitted to leave their cells for exercise or recreation, only to shower." ECF 457 at 2 n.11. "STPJ policy only permitted pretrial detainees to leave holding cells to take showers; otherwise, pretrial detainees remained in the holding cells for 24 hours a day." *Id.* at 16 n.127. Indeed the defendants conceded that "exercise is not provided because detainees are held only temporarily in the holding cells." *Id.* at 17 n. 131.

***Lack of sleeping accommodations***. Holding cells also lack beds, forcing detainees to sleep on the floor, which is made of concrete. ECF 409-2 ⁋⁋ 88-89. And

in the holding cells, lights were kept on at all times. ECF 457 at 3 n.18. These lights are "bright, like an office." *Id.* ⁋⁋ 40-41. The lights must be kept on because jailors must be able to see if detainees, who are grouped together in the holding cells, are "fighting" or engaged in similar misconduct. ECF 387-2 ⁋ 83. Those precautions are no longer necessary once detainees are moved out of the holding cells and into the jail's general population, where lights are turned off at night to enable sleep, *supra*.

***Overcrowding***. The conditions in the holding cells were compounded by frequent overcrowding in the holding cells. Under the Basic Jail Guidelines, the maximum capacity of each STPJ holding cell is 16 detainees. ECF 409-2 ⁋⁋ 278-280. But the holding cells were frequently overcrowded, past even the 20 persons per cell rated by the Fire Marshal. ECF 457 at 15 nn. 127-130. This included overcrowding past 20 detainees on 15 out of 31 days in one month, and 23 out of 31 days in the next. *Id.* at 16 nn. 128-129. Such overcrowding compounded the lack of exercise and bedding available in the holding cells. *Id.* at 19 n. 139.

**B. The Named Plaintiffs.**

The Named Plaintiffs are all men who were confined for more than 48 hours in the STPJ's holding cells. Defendants subjected each of them to the conditions outlined above.

***Ahmed Baqer.*** Mr. Baqer was held in STPJ's holding cells for 16 days from December 2, 2019 until December 17, 2019. ECF 457 at 3 n. 25. He testified that, on average, 15 or 16 detainees were held in his holding cell, but at times that

number rose to 20 or 22 people. "[T]he number of pretrial detainees in his holding cell [frequently] meant that Mr. Baqer had no room to lie down and could not sleep. *Id.* at 4 n. 30.

***Klabert Joseph Guillot, Sr.*** Mr. Guillot Sr. was held in STPJ holding cells for at least 13 days from December 29, 2019, until January 10, 2020. ECF 457 at 5 n. 37. During his detention, he was housed with approximately 19 to 26 other detainees in the same holding cell. *Id.* at 5 n. 38. Mr. Guillot was only permitted to leave the holding cell to take a shower two or three times per week. *Id.* at 5 n. 43.

***Kevin Louviere.*** STPJ records reflect that Mr. Louviere was moved out of the holding cells on June 26, 2019, nine days after he was booked on June 17, 2019. ECF 457 at 5 n. 45. Mr. Louviere recalled that there were, at times, up to 28 individuals housed in his holding cell. *Id.* at 6 n. 46. Mr. Louviere testified that detainees were only allowed to shower once a week. *Id.* at 6 n. 48. Aside from when detainees were allowed to shower, Mr. Louviere did not leave the holding cell until he was transferred to the general population area. *Id.* at 6 n. 50.

***Terry Matthew Hall, Jr.*** Mr. Hall was held in an STPJ holding cell for 15 days. ECF 457 at 7 n. 55. For a day or two of his detention, he counted 30 inmates in his holding cell, but there were always at least 15 others. *Id.* at 7 n. 56. He took three showers during his 15-day detention in the holding cell; otherwise, he was not permitted to leave the cell. *Id.* at 7 n. 59.

***Floyd Williams.*** Mr. Williams was held in STPJ holding cells for approximately five days, from September 28, 2019, to October 2, 2019. ECF 457 at

7 n. 64. Mr. Williams's testimony suggests approximately twenty detainees were held in his holding cell. *Id.* at 7 n. 65.

**C. The Court's 2021 class certification decision.**

On May 7, 2021, Plaintiffs filed a class certification motion in which they sought to certify a class consisting of

> All detainees who have been or will be placed into the custody of the St. Tammany Parish Jail and were detained for at least two consecutive days in holding cells.[1]

ECF 158 at 2 ⁋ 5. The Court denied the Plaintiffs' motion for class certification, holding that Plaintiffs had not met their burden to show that the proposed class was certifiable under Rule 23. ECF 171. In that class certification decision, the Court examined only two of Rule 23's criteria—whether the proposed class satisfied Rule 23(a)(1)'s numerosity requirement and Rule 23(b)(3)'s predominance requirement. With respect to Rule 23(a)(1), the Court held that Plaintiffs had not carried their burden to show that the class was likely to be sufficiently numerous because Plaintiffs had not explained how to interpret a 735-page Inmate Cell Movement Report listing STPJ detainees to identify which of the listed detainees were class members, and which were not. *Id.* at 7-11. With respect to Rule 23(b)(3), the court held that individual issues predominated over common issues and thus prevented certification. Specifically, the Court held that individual "mini-trials" and individual proof would be required to adjudicate:

---

[1] The proposed class definition also contained a time period running from March 22, 2019 until the over-detention practice ends. ECF 158 at 2 ⁋ 5.

- How many days each class member had been detained in the holding cells.
- Whether the cells were overcrowded while each class member was there.
- Whether and to what extent the holding cells lacked sanitation during the class member's confinement.
- Whether class members were denied medical care.
- Whether a combination of the foregoing deprivations rose to a constitutional violation for a particular class member.

*See id.* at 19.[2] In reaching the conclusion that these questions were individualized, the Court was not presented with and did not opine on the *reason* that numerous detainees were being held for more than two days in the jail's holding cells, and whether the extended detention in the holding cells was imposed pursuant to a legitimate governmental interest. Ultimately the Court held that "based upon the record before [it]," Plaintiffs had not shown that the class was appropriate for certification as a class action under Rule 23. *Id.* at 21.

**D. The Court's 2025 summary judgment ruling.**

After the Court's class certification ruling, litigation continued. In 2023 the defendants moved for summary judgment. *See* ECF 211 *et seq.* On March 28, 2025, the Court issued its summary judgment Order and Reasons (ECF 457 ) in which it granted the Defendants' motions in part, but denied them in part as well.

In its summary judgment ruling, the Court grouped the Named Plaintiffs' claims arising from their extended confinement in the Jail's holding cells into four categories of conditions: sanitation, exercise, sleep, and medical care. It analyzed

[2] The Court's initial opinion does not state that Plaintiffs' denial of recreation and sleeping accommodations present individual questions.

each category in turn. *See* ECF 457 at 14-21. The Court granted summary judgment as to sanitation in the holding cells. *Id.* at 14-15. The Court noted that the jail did provide some sanitation services and access to showers and/or hygiene supplies, but those conditions "d[id] not reflect acts or omissions sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by jail officials, to prove an intended condition or practice[.]" *Id.* at 14 n. 118 (quotation omitted).

Likewise, the Court granted summary judgment as to Named Plaintiffs' claim for lack of medical care. Plaintiffs had presented evidence that some medications had not been received—but others, the Court observed, had been received or offered. ECF 457 at 20. As such, held the Court, Plaintiffs had failed to come forward adduce "evidence that STPJ's medical treatment policies were constitutionally inadequate." *Id.* at 21.

On the other hand, the Court denied summary judgment as to Named Plaintiffs' claims for lack of exercise and denial of appropriate sleeping conditions, holding that those conditions *could* be attributed to the STPJ's policies—specifically, the STPJ's policy decision to rent out large parts of the jail to third parties. Given the evidence in the record, the Court observed, a reasonable jury could conclude the STPJ's rental policy limited the general population bed space available to the Parish's own detainees, which in turn meant that numerous Parish detainees, including the Named Plaintiffs, had to spend inordinate amounts of time in holding cells waiting for a "Parish" general population bed to free up—which

meant, again in turn, that these detainees were subjected to extended periods in which they were deprived of exercise and did not have beds or other accommodations that would permit sleep.

Indeed, the Court noted, the Sheriff admitted that the jail did not provide exercise or bedding to people detained in the holding cells. ECF 457 at 16, 19. The Sheriff's defenses focused on why it was impracticable to provide these things in the holding cells, such that "to the extent Defendants acknowledge Plaintiffs' descriptions of the conditions at STPJ, they contend that those conditions were not the result of any punitive intent but were necessitated by STPJ's contracts to provide housing for state and federal inmates, or to prevent commingling pretrial detainees with convicts." *Id.* at 13. The Court held, however, that those excuses missed the point. As the Court put it, the extended confinement in the holding cells, and the extended exposure to inadequate exercise and sleep accommodations that resulted, were the result of the lack of general population beds for the Parish's own detainees, such that "a reasonable jury could . . . attribute this predicament to STPJ's decision to dedicate a significant portion of its facilities to housing federal and state . . . inmates or failing to properly allocate its resources to ensure that it complies with its baseline constitutional obligations." *Id.* at 18.

In reaching this conclusion, the Court repeatedly pointed to the direct link between the Defendants' decision to rent parts of the jail for money and the extended detention of Parish detainees in the holding cells, with the attendant deprivations of sleep and exercise. The Court observed, for example, that

"Defendants argue that STPJ lacked the resources to facilitate exercise or recreation for the pretrial detainees in the holding cells, though the [Rule] 30(b)(6) testimony they cite for that point only states that exercise is not provided because detainees are held only temporarily in the holding cells." ECF 457 at 17 n. 131. And the Court connected *that* condition to the STPJ's rental contracts, observing that the Defendants "cannot disclaim constitutional duties by freely entering into competing obligations." *Id.* at 17. The Court rejected the Defendants' justification for the STPJ's acknowledged failure to provide sleeping accommodations for the same reason:

> Defendants argue that it would not be feasible to provide pretrial detainees in holding cells with mattresses because "[p]lacing mattresses or beds into the holding cells would further reduce the number of detainees that would be able to be held in the holding cells due to lack of space." But *a reasonable jury could infer that this explanation traces its source to STPJ's contracts* to hold state and federal inmates, which uses up considerable bed space in STPJ and, as discussed above, is a voluntary obligation unrelated to STPJ's foundational purpose—housing pretrial detainees.

*Id.* at 19 (emphasis added).

The gravamen of the Court's summary judgment denial thus has three parts: ***First***, the lack of exercise and the lack of sleeping accommodations in the holding cells were both uniformly applied conditions purposefully imposed by the STPJ on all people in the holding cells as a matter of policy. ***Second***, the STPJ's imposition of these conditions on detainees confined to holding cells for extended periods (going beyond 48 hours) "traces its source to the STPJ's contracts" to rent out large parts of the jail's general population areas, which resulted in extended detention in the

holding cells. ECF 457 at 19. ***Third***, the rental contracts were "not a sufficient justification for neglect of a citizen's constitutional rights," since jailors "cannot disclaim constitutional duties by freely entering into competing obligations," meaning that the deprivations were not imposed pursuant to a legitimate governmental interest. *Id.* at 17. For these reasons, the Court concluded, there was sufficient evidence to create a genuine issue of material fact as to whether the conditions of confinement purposefully created by the Defendants violated the Named Plaintiffs' Fourteenth Amendment due process rights. *Id.*

**E. Amended proposed class definition.**

In this renewed motion for class certification Named Plaintiffs have modified the proposed classes they seek to certify in light of the Court's summary judgment ruling. Specifically, Plaintiffs seek to certify a class, along with a sub-class, under Rule 23(b)(3) and covering the period proposed by in the original class certification motion.[3] The class would consist of:

> Each person who was housed in a STPJ male holding cell for more than 48 hours (reflected as two calendar days) as a result of portions of the STPJ being rented to house federal or state detainees, and who were so held between March 22, 2019 and May 7, 2021.

The subclass would consist of:

> Each person who was housed in a STPJ male holding cell for more than 48 hours (reflected as two calendar days) as a result of portions of the jail being rented to house federal or state detainees, and who experienced overcrowding (defined as more

[3] The original class certification motion, which was filed on May 7, 2021, sought to certify a class beginning on March 22, 2019, one year prior to the filing of the original complaint in this case.

> than 16 detainees) during that detention, and who were so held between March 22, 2019 and May 7, 2021.

Plaintiffs seek certification of the class and subclass in order to obtain monetary and related relief for their members. For purposes of simplicity, this memorandum will refer to the classes collectively as "the class," except where it is necessary to address issues particular to the class or subclass.

**DISCUSSION**

"[T]he class action device exists primarily, if not solely, to achieve a measure of judicial economy, which benefits the parties as well as the entire judicial system. It preserves the resources of both the courts and the parties by permitting issues affecting all class members to be litigated in an efficient, expedited, and manageable fashion." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 410 (5th Cir. 1998). When a party proposes to try multiple claims together through the class action device instead of a series of individual actions, the question is whether combining claims in a class action would be a fair and efficient means of adjudicating them. *See Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178 (1974).

Courts answer that question using the analytical guideposts set out in Rule 23. This is done in part by examining the merits of the case at issue—not to determine which side is more likely to win, but rather to determine whether the claims can fairly and efficiently be tried together, or whether multiple discrete adjudications each class member's claims are necessary instead. *In re Deepwater Horizon*, 739 F.3d 790, 806 (5th Cir. 2014). To be certified as a class

action, a putative class must be ascertainable, it must satisfy each of the prerequisites of Rule 23(a), and it must fall within at least one of the three categories of class suits described in Rule 23(b). *Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir. 1980). Plaintiffs review these requirements below.

**A. The class is ascertainable.**

As a threshold matter, a Rule 23 class must be "adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970); *see also John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007). "A class is ascertainable if 'the general outlines of the membership of the class are determinable,' " *Rodriguez v. Flowers Foods, Inc.*, No. 4:16-cv-245, 2016 WL 7210943, at *4 (S.D. Tex. Dec. 13, 2016) (quoting 7A Wright & Miller, Federal Practice and Procedure § 1760 (3d ed.)), which ensures that class membership is "sufficiently defined so as to enable the court to determine whether a particular individual is a member of the class." *Wagner v. Cent. Louisiana Elec. Co.*, 99 F.R.D. 279, 282 (E.D. La. 1983) (citing *DeBremaecker*, 433 F.2d at 734).

The members of the proposed class are readily ascertainable in this case, using the STPJ's own movement records, called the Inmate Cell Movement Report. A 10-page excerpt of the Report is attached to this memorandum as **Exhibit 1**,[4] and the excerpt is analyzed in Plaintiffs' discussion of Rule 23(a)(1)'a numerosity requirement, *infra*. From the Report, which reflect dates of housing assignments of

[4] To protect their privacy, Plaintiffs have redacted the names of everyone on the **Exhibit 1**spreadsheet except Mr. Baqer. The other people who appear in Exhibit 1 can be identified by their unique inmate identification number, which appears to the left of their name in the spreadsheet.

each detainee within the jail, one can readily identify who was detained in the jail's four male holding cells for more than 48 hours, and which of these men was confined in the holding cells while they were overcrowded. The membership of the class can be ascertained.

**B. The class satisfies Rule 23(a).**

As set forth herein, the proposed class readily satisfies all of the prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy.

**1. Numerosity.**

Rule 23(a)(1)'s numerosity requirement is satisfied because the proposed class in this case is so numerous that joinder of all members is impracticable. Classes of more than 40 members are generally large enough to satisfy the numerosity requirement. *See Mullen v. Treasure Chest Casino*, L.L.C., 186 F.3d 620, 624 (5th Cir. 1999). That threshold is satisfied in this case by orders of magnitude.

While a party cannot satisfy the numerosity requirement merely by relying on "speculation" or "conclusory allegations," *Harrell v. CheckAGAIN, LLC*, 248 F.R.D. 199, 206 (S.D. Miss. 2006), nothing resembling a precise count of class members is required. *Id.* Rather, a plaintiff need only offer "some evidence or reasonable estimate of the number of members of the proposed class," *id.* at 205–06, and in assessing this evidence, "courts are quite willing to accept common sense assumptions in order to support a finding of numerosity." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. July 27, 1981) (quotation omitted).

As part of discovery in this case Defendants produced an excerpt of the STPJ's Inmate Cell Movement Report covering March 1, 2019 to August 21, 2020. That report runs to 735 pages. Named Plaintiffs submit an excerpt of that report here. *See* **Ex. 1**. When Plaintiffs originally moved for class certification in 2021 they submitted the full 735-page report as well. *See* ECF 158-28 (filed under seal). In opposing class certification, Defendants objected that Plaintiffs had not explained how the report worked, and thus had not provided an estimate of the size of the class that was sufficiently reasonable for purposes for Rule 23(a)(1). *See* ECF 164 at 3-4. In its class certification order the Court agreed. The Court held that that Platintiffs had not explained how the Inmate Cell Movement Report should be interpreted, and therefore that Plaintiffs had not carried their burden to show numerosity. ECF 171 at 7-11.

The progress of this litigation has resolved this problem: Defendants themselves have shown how to interpret the Inmate Cell Movement Report. In their summary judgment briefing, Defendants generated different extractions from the same database as the Inmate Cell Movement Report and explained the results, permitting the 735-page Inmate Cell Movement Report to be interpreted as well. *See* ECF 234-3 at 3 ("Mr. Baqer remained in the holding cell for sixteen (16) days, from December 2, 2019 until December 17, 2019, when he was ultimately moved to the C-Building Dorm." (citing Inmate Cell Movement Report attached as Exhibit 3 [ECF 234-6]). The extracted Inmate Cell Movement Report provided by the Defendants for Mr. Baqer makes plain that the December 2 and December 17 dates

cited by the Defendants were derived from comparing the "Booking Date" and "Assigned Date" fields in the spreadsheet:

| INMATE NAME | BOOKING DATE | HOLDS | ASSIGN. DATE | CURRENT CELL ASSIGNMENT |
|---|---|---|---|---|
| BAQER, Ahmed AL. | 03/21/19 | NO | 03/21/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- |
| BAQER, Ahmed AL. | 12/02/19 | NO | 12/02/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- |
| BAQER, Ahmed AL. | 12/02/19 | NO | 12/03/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- |
| BAQER, Ahmed AL. | 12/02/19 | NO | 12/17/19 | C BUILDING-DORM C100-BED C111- |

ECF 234-6 (excerpt; highlighting added). Mr. Baqer's individual Inmate Cell Movement Report reflects that he was booked on 12/02/19, and then reflects that on 12/02/19 he was assigned to Holding Cell 2; on 12/2/19 assigned to Holding Cell 4; and finally on 12/17/19 moved and assigned to C-Building-Dorm—*i.e.*, the STPJ's general population. *Id.*

The exact same information for Mr. Baqer appears on page 37 the full 735-page Inmate Cell Movement Report, which is represented here by **Ex. 1**, the 10-page excerpt:

| INMATE NAME | BOOKING DATE | HOLDS | ASSIGN. DATE | CURRENT CELL ASSIGNMENT |
|---|---|---|---|---|
| BAQER, Ahmed AL. | 03/21/19 | NO | 03/21/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- |
| BAQER, Ahmed AL. | 12/02/19 | NO | 12/02/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- |
| BAQER, Ahmed AL. | 12/02/19 | NO | 12/03/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- |
| BAQER, Ahmed AL. | 12/02/19 | NO | 12/17/19 | C BUILDING-DORM C100-BED C111- |

Ex. 1 at 37 (excerpt; highlighting added). These are precisely the same dates, with precisely the same cell-placement information, as the information Defendants introduced at summary judgment to identify the dates and locations of detention for Mr. Baqer. Using this key, identifying class members in the 735-page report is straightforward: one need only compare the "Booking Date" and "Assigned Date"

entries and identify those reflecting confinement in the holding cell extending for more than 48 hours, measured as two days.[5]

Using this method, the 10-page excerpt of the 735-page Inmate Cell Movement Report reveals two class members on page 28, one on page 29, one on page 30, one on page 31, one on page 32, four on page 33, three on page 34, one on page 35, two on page 36, three on page 37—a total of at least 19 class members in just 10 pages. *See* **Ex. 1** (highlighted entries). Presuming this pattern holds across the 735 pages of the report, there would be 1,396 class members covering just March 22, 2019 to August 2020—a period of approximately 540 days. Plaintiffs seek to represent a class of persons over-detained in the holding cells from March 22, 2019 through the filing of the original class certification motion on May 7, 2021. That is a period of more than 777 days, which, if the results of the 10-page portion of the Inmate Cell Movement Report are extrapolated, would result in a class of approximately 2,008 people.

Without estimating the size of the class with mathematical precision, these are "common sense assumptions" to arrive at a reasonable estimate of the number of people likely to be in the class. *Zeidman*, 651 F.2d at 1039. The foregoing is more than sufficient to demonstrate that the class size vastly exceeds the 40-member threshold typically used to assess numerosity under Rule 23(a)(1).

---

[5] This resolves the problem identified in the Court's original class certification decision, which noted that Plaintiffs had not explained the relationship between "Booking Date" and "Assign Date" fields. *See* ECF 171 at 9.

The same is true for the "overcrowding" subclass. The evidence strongly suggests widespread overcrowding. Defendants admitted that overcrowding was a persistent problem within the holding cells, to the point that the Fire Marshal told the Jail to reduce capacity because of overcrowding—an instruction that the Defendants ignored. ECF 409-2 ⁋ 25. That is corroborated by a two-month period examined by the Court in its summary judgment opinion, in which it noted that the Daily Count spreadsheets published by the STPJ overcrowding past 20 detainees on 15 out of 31 days in one month and 23 out of 31 days in the next. ECF 457 at 16 n. 128-129 (citing ECF 410-3). From these facts a commonsense assumption can be made that a significant portion—likely half or more—of the 2,000-plus class members who were confined to the holding cells while they were overcrowded well exceeds the 40-member threshold necessary to satisfy the numerosity requirement.[6] Numerosity is satisfied.

**2. Commonality.**

The members of the proposed class all share factual and legal issues because their claims "depend upon a common contention" that "is capable of classwide resolution" such that "determination of its truth or falsity will resolve an issue that

[6] Should the Court desire a more precise estimate, Plaintiff could use the Inmate Cell Movement Report or collected Daily Count spreadsheets to identify a more precise number of detainees in each of the male holding cells on any given day. Indeed if this class is certified, such an exercise would ultimately be necessary in order to provide class notice and prepare this case for trial. Plaintiff respectfully submits, however, that at this stage, the facts gathered here are sufficient to conclude that Rule 23(a)(1)'s numerosity requirement is satisfied.

is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Each member of the proposed class share the common claim that the Defendants' decision to rent out large parts of the jail, the resulting lack of general-population space for Parish detainees, and Parish detainees' resulting extended detention in the holding cells, were deprivations that were unrelated to a legitimate governmental interest and which therefore violated their due process rights under the Fourteenth Amendment. The basic questions driving those claims include:

- Did the Defendants, as a matter of policy, deny recreation and sleeping accommodations for detainees while they were in holding cells?
- Were the holding cells designed to hold detainees for more than 48 hours?
- Was the Defendants' policy to keep parish detainees in the holding cells for more than 48 hours when general-population cells were not available to Parish detainees?
- Were general population beds for Parish detainees limited as a result of the Defendants taking large parts of the jail offline in order to rent them out for money?
- Was imposing extended detention in the holding cells in order to rent out large parts of the jail for money a condition of confinement created by the Defendants pursuant to a legitimate governmental interest?

Those core questions are common to every single class member. Each of these common questions is "amenable to a common answer," *Jones v. Gusman*, 296 F.R.D. 416, 466 (E.D. La. 2013), and those answers are "apt to drive the resolution of the litigation," whether up or down, for every member of the proposed class. *Wal-Mart*, 564 U.S. at 350.

That is the essence of Rule 23(a)(2)'s commonality requirement, and it obtains here because the answers to the common questions set out above are driven by the STPJ's *policies*, which Defendants imposed uniformly on everyone detained in the STPJ's holding cells. Consider *O'Donnell v. Harris County, Texas*, No. 16-cv-1414, 2017 WL 1542457 (S.D. Tex. Apr. 28, 2017) (Rosenthal, J.). In that case the district court certified a class of people detained pre-trial on misdemeanor charges because they could not afford their money bond. In certifying the class, Judge Rosenthal held that the proposed class satisfied Rule 23(a)(2)'s commonality requirement because the "plaintiffs [were] challeng[ing] a municipal policy that, because it is a policy, applies to, and affects, indigent misdemeanor arrestees subjected to secured money bail the same way." *Id.* at *5.

The policy choice that Plaintiffs challenge here is the Defendants' decision to rent out large parts of the STPJ even though this decision subjected numerous Parish detainees to extended confinement in the jail's holding cells, which injured all class members in the same way. Indeed, Plaintiffs explain below in discussing Rule 23(b)(3)'s predominance requirement, *infra* Section III(C)(1), the Court's narrowing of Plaintiffs' claims on summary judgment focuses the claims in this case on those issues that are common to all members of the putative class. Accordingly, the proposed class satisfies the commonality requirement of Rule 23(a)(2).

**3. Typicality.**

The proposed class satisfies the typicality requirement because the Named Plaintiffs are members of the proposed class, and they share the same claims as the

other class members. "Typicality requires a showing that the claims of the named plaintiffs are in fact those asserted as the common class claims." *M.D. v. Perry*, 294 F.R.D. 7, 29 (S.D. Tex. 2013). "Often, once commonality is shown typicality will follow as a matter of course." *Id.* Named Plaintiffs' "claims arise from the same or a similar course of conduct and share the same legal theory" as the class members' claims, and are therefore typical of class members' claims. *See id.* Named Plaintiffs' situation, of course, can be expected to differ from class members' in terms of their specific dates and exactly how long past 48 hours they were over-detained in the holding cells. But the basis of liability in this case is not dependent upon such individual circumstances. Rather, it turns on upon the Sheriff's decision to rent out large parts of the STPJ for money, the resulting lack of general population space for the jail's own detainees, and the resulting over-detention of the jail's detainees in the jail's holding cells and the exercise and sleep deprivations that were imposed as a result for Parish detainees confined to the STPJ's holding cells for more than 48 hours. Typicality is satisfied.

**4. Adequacy.**

Named Plaintiffs are adequate representatives of the class because their interests in the vindication of the legal claims raised here are entirely aligned with the interests of the other class members, who each have the same basic claims. Named Plaintiffs are members of the class, and their interests coincide with those of the other class members. Named Plaintiffs and class members suffered the same harms. They assert the same legal claims, seek the same litigation outcomes, and

would benefit from the relief compensating persons confined to holding cells for times exceeding 48 hours. There is no financial conflict between Named Plaintiffs and absent class members, as all will benefit from compensation for the same essential harm.

Plaintiffs' counsel, meanwhile, have already devoted substantial time investigating the factual and legal issues in this case and have aggressively pursued the discovery required to put forward a claim for class-wide relief. Proposed class counsel are experienced in handling class actions and other complex litigation.[7] Class counsel have a detailed understanding of local law and practices as they relate to federal constitutional requirements. Plaintiffs respectfully submit that they, and their counsel, satisfy Rule 23(a)(4)'s adequacy requirement.

**C. The class satisfies Rule 23(b)(3).**

The focus of Rule 23(b)(3) is to ensure that courts "select the method best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (internal quotation marks and brackets omitted). Plaintiffs seek certification of their damage claims under Rule 23(b)(3), which is appropriate when common questions of law or fact predominate over individualized questions and when a class action is superior to other methods of adjudication. The Proposed class satisfies these criteria and is the most efficient means of adjudicating whether the STPJ's imposition of extended confinement in the jail's holding cells on thousands of detainees violated their constitutional rights.

---

[7] The credentials of class counsel are collected in **Exhibit 2.**

### 1. Common issues predominate.

The Rule 23(b)(3) predominance inquiry "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). The inquiry focuses on "how a trial on the merits would be conducted if a class were certified," *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (quotation omitted), which "begins . . . with the elements of the underlying cause of action." *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 636 (5th Cir. 2016). This analysis "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class," or whether proving those substantive issues would require "a series of individual trials." *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 254 (5th Cir. 2020) (quotations and citations omitted). Once the court has identified the relevant substantive questions, it determines whether they *could* be proved with evidence that is common to the class. In this case, the Court's summary judgment decision guides the assessment of the substantive issues that will "control the outcome" at trial. This case involves a challenge to conditions of confinement. In its summary judgment ruling, the Court identified the issues controlling a conditions of confinement claim:

> a plaintiff bringing a conditions of confinement claim must show the following elements: (1) . . . an intended condition or practice; (2) which is not reasonably related to a legitimate government objective; and (3) which constitutes a violation of the plaintiff's constitutional rights.

ECF 457 at 12 (citation omitted). As Plaintiffs explain herein, the Court's summary judgment decision makes plain that at trial, each of these three elements will be proved with common evidence.

**a) [A]n intended condition or practice.**

The Court explained at summary judgment that "[a] condition of confinement claim challenges general conditions, practices, rules, or restrictions of pretrial confinement," ECF 457 at 10 n. 86 (quotation omitted), and that a condition may be the result of "an explicit rule . . . or a *de facto*" one, so long as it reflects a "policy," with the result that the "municipality's intent is presumed because the imposition of the rule manifests an avowed intent to subject a pretrial detainee to that rule or restriction." ECF 457 at 10 (quotation omitted). The Court observed that Named Plaintiffs had gathered evidence showing:

> (1) The St. Tammany Parish Sherriff's office had entered into voluntary contracts to rent out large parts of the jail to the federal and state governments for money. *Id.* at 3, 13-14, 17-19.
>
> (2) This reduced the available general population space in jail for the STPJ's own detainees. *Id.* at 3.
>
> (3) As a matter of policy, recreation, exercise, bedding, and sleeping accommodations were available to detainees in general population, but these things were not available to detainees in holding. The holding cells were often overcrowded as well. *Id.* at 2-3, 15-19.
>
> (4) The rental contracts reduced general population space left for parish detainees, which forced the jail to confine numerous parish detainees in holding cells past the 48 hours permitted by law, until space for them opened up in the small general population part of the jail that remained available for parish detainees. *Id.* at 17-18.

(5) Pursuant to the jail's policies detainees subject to this extended confinement were not provided with sleeping accommodations or opportunities to exercise, and were frequently subjected to overcrowding during their extended detentions. *Id.* at 15-19.

This is common evidence. Each member of the class would use this same evidence to show that each of these conditions were imposed as a matter of policy on *them*, and thus were a condition of confinement that was intended by the STPJ. *Cf.* ECF 457 at 10. In other words, each member of the class would use the same evidence to show that the 48 hour-plus confinement in the holding cells, and the extended deprivation of exercise and sleeping accommodations that resulted, was the known and intended result of the Defendants' policy choice to rent out large areas of the jail for money. The Court's first element is satisfied, because each class member would prove it using the same evidence.

**b) [W]hich is not reasonably related to a legitimate government objective.**

Every class member would also use the same evidence to show that their extended confinement in the holding cells, and the resulting extended lack of exercise and sleeping accommodations, were not imposed pursuant to a legitimate governmental purpose or imperative. Once again, the Court's summary judgment ruling makes plain that the proof of this element, too, would turn on common evidence. In that opinion, the Court held that the evidence would permit "a reasonable jury . . . [to] attribute th[e] predicament [*i.e.*, forcing the jail to subject its own detainees to extended confinement in its holding cells] to STPJ's decision to dedicate a significant portion of its facilities to housing

federal and state convicted inmates" instead of allocating sufficient general population beds for Parish detainees in order "to ensure it complies with its baseline constitutional obligations." ECF 457 at 18. As such, held the Court, Plaintiffs had offered sufficient evidence to show that these deprivations were not imposed pursuant to a legitimate governmental interest, since the defendants "cannot disclaim constitutional duties [to house its own detainees adequately] by freely entering into competing obligations [*i.e.*, the rental contracts]." *Id.* at 17.

Each member of the class in this case would cite the same, centralized policy choice—*i.e.*, the decision to rent out large portions of the jail for money, notwithstanding the "predicament" of extended confinement in holding cells this led to—as the source of their extended confinement, and each would offer the same evidence to prove that that policy was not reasonably related to a legitimate governmental interest. Common issues, rather than individualized issues, thus predominate with respect to evidence supporting the "objective unreasonableness" (*i.e.*, "not reasonably related to a legitimate government objective," *supra*) element of Plaintiffs' Fourteenth Amendment claim.

**c) [W]hich constitutes a violation of the plaintiff's constitutional rights.**

Each member of the class will use the same evidence to show that the defendants violated their due process rights. As this Court held at summary judgment and as Plaintiffs have set out in the foregoing two sections, *supra*, there is sufficient evidence to prove that (1) the Defendants deliberately subjected the class

members to extended confinement in holding cells where, as a matter of policy, all detainees were denied exercise and sleeping accommodations; and (2) the Defendants imposed these deprivations for the purpose of renting out large parts of their STPJ for money—which is not reasonably related to a legitimate governmental interest. That is enough, under *Bell v. Wolfish*, 441 U.S. 520 (1979), make out a *prima facie* case of a violation of each class member's due process rights. That is so because as *Bell* explained,

> if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.

441 U.S. at 539. In its summary judgment decision, this Court, quoting this passage from *Bell*, held that the Defendants' imposition of extended detention on the Named Plaintiffs in the holding cells for the purpose of renting out parts of the jail for money, with the resulting lack of exercise and sleeping accommodations, violated each Named Plaintiff's due process rights. *See* ECF 457 at 11-12 (quoting *Bell*), 17-18 (holding lack of exercise and sleeping conditions violated due process because they were not reasonably related to legitimate governmental interest).

This straightforward holding can be applied every member of the class, in the same way, for the same reasons, using the same, common evidence. As the Court noted in its summary judgment opinion, the Defendants conceded "that STPJ's holding cells are temporary and only *supposed* to house pretrial detainees for 48

hours," ECF 457 at 2 (emphasis added), and that they knew that "Louisiana law required pretrial detainees be moved out of holding cells within 48 hours," yet they flouted those laws in order to rent out large parts of the STPJ for non-parish detainees. *Id.* Mr. Jeffrey Eiser, Plaintiffs' jail operations expert, likewise explains that the STPJ's policy confining detainees to holding cells for periods in excess of 48 hours "deviated from accepted practices in the industry" and "served no legitimate penological or custodial interest," and amounted to unlawful punishment as a result. *See* **Exhibit 3** (Eiser Report) ⁋ 25.

These facts are common to each proposed class member. Each class member would introduce these facts to make out a *prima facie* case that their confinement in holding cells past 48 hours violated their due process rights.[8] But that is not all. In its summary judgment ruling, the Court looked for guidance to *Hebert v. Maxwell*, 214 F. App'x 451, 453 (5th Cir. 2007), which held that confining a man over a weekend in a holding cell that had "only a 'hard wooden bench' without a bed and overhead lights that were never turned off" made out a constitutional violation, because " '[i]n the absence of a compelling governmental interest, housing a detainee in a room without sleeping accommodations, *when other available rooms had sleeping facilities*, is enough to survive a summary judgment motion based on

[8] While state laws and industry and professional standards certainly do not *establish* a constitutional violation, they are a "relevant normative backdrop against which to evaluate" the STPSO's policy of imposing extended confinement in the jail's holding cells notwithstanding laws that prohibited that confinement from extending more than 48 hours. *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 257 (5th Cir. 2018). As one court put it, "compliance or lack of compliance with a professional standard, if admissible, can be *evidence* for or against finding a constitutional violation. Such standards are just not the *substance* of a constitutional duty." *M.D. v. Perry*, 294 F.R.D. 7, 35-36 (S.D. Tex. 2013).

qualified immunity.' " ECF 457 at 18 (emphasis added; quoting *Hebert*). *Hebert* involved detention for 48 hours—the same period as the 48-hour line Plaintiffs propose in their class definition here. *See Hebert*, 214 F. App'x at 452. Notably, however, *Hebert* indicated that even *shorter* detentions in such conditions, when they were not imposed for a legitimate governmental purpose, would also violate due process. Specifically, *Hebert* observed that "[s]ome courts have held that forcing a detainee to sleep without a mattress, even for as little as thirty-six hours, states a due process violation." *Id.* at 456 n.1. *Hebert* noted some debate on the point, *id.* but went on to say that "[w]e do not need to address this specific question [the debate about length of detention without a mattress], because in this case the governmental unit had mattresses available but refused to provide one to [the plaintiff]." *Id.* In other words, because the jail in *Hebert* did not have a legitimate reason for depriving the plaintiff of a mattress, even periods well short of 48 hours without bedding were enough to assert a constitutional violation.

*Hebert*'s implication for this case is unmistakable: because there was no legitimate governmental reason for depriving the class members of a bed to sleep in for even *one night*, the members of the class might have a claim for periods well short of the 48 hour line that Named Plaintiffs have proposed for their class definition. The 48-hour line is, if anything, a conservative definition of the due process claim asserted on behalf of each absent class member.

The nature of the violation in this case is common to the class members as well. As the Court noted in its summary judgment opinion " '[i]n many jail

condition cases, the conditions themselves constitute the harm. This is true, for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions.' " ECF 457 at 13 (quoting *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997)). In this instance, Defendants inflicted miserable conditions on the entire putative class as a matter of policy by confining them to holding cells for over 48 hours without providing any appropriate sleeping accommodations, or recreation or exercise, all to enable large parts of the STPJ to be rented out for money. The evidence of the STPJ's extended-detention policy, and the impact of that policy on each of the class members, would be the same for every single class member, because the evidence of the conditions imposed and the reasons for those conditions would be the same for every class member. It would, in other words, be common evidence that each class member would use at trial to make out a *prima facie* case that in detaining them in holding cells past 48 hours for no legitimate governmental purpose, their Fourteenth Amendment rights were violated. These common issues predominate over individual issues in this case.

**2. The proposed class is superior.**

"In requiring a court to find 'that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy,' Fed. R. Civ. P. 23(b)(3), Rule 23 necessarily suggests a comparative process." *In re TWL Corp.*, 712 F.3d 886, 896 (5th Cir. 2013). The salient analysis thus compares "the relative advantages of alternative procedures for handling the total controversy." *Id.* Under Rule 23(b)(3), courts consider four factors to determine whether the class

action format is superior to other methods of adjudication: the class members' interest in individually controlling their separate actions, the extent and nature of existing litigation by class members concerning the same claims, the desirability of concentrating the litigation in the particular forum, and the likely difficulties in class management. Fed. R. Civ. P. 23(b)(3).

Each of these factors supports certification in this case. The first two factors—the class members' interest in individually controlling their separate actions and the extent and nature of existing litigation by class members concerning the same claims—both suggest superiority of the class mechanism.

Plaintiffs are aware of no significant litigation by other people challenging the STPJ's rental-and-overdetention policy, and certainly not the hundreds of suits one would expect if a meaningful percentage of the putative class were suing about their over-detention in the holding cells. Certainly any small number of individualized cases pales in comparison to the size of the putative class. The dearth of individual suits, compared to the thousands of likely putative class members, suggests that individual class members have little interest in controlling separate actions, and that a class action is the most efficient mechanism for affording class-wide relief. *See Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 610 (E.D. La. 2006) (finding class action superior where there was "little existing litigation of these claims outside of the lawsuits filed in this Court"). The class is likely comprised largely of poor people with limited ability or capacity to individually assert their legal rights, and absent class certification it is highly likely

that the overwhelming majority of the putative class members will never seek or obtain relief for their mistreatment. A class action is therefore not only the superior mechanism of affording relief to the class; it is likely the only mechanism capable of affording relief to the bulk of the putative class.

The third factor—the desirability of concentrating the litigation in the particular forum—also favors certification. Plaintiffs are pursuing federal claims in federal court in the district in which STPJ is located. There is no other feasible forum for class members' claims to be heard.

Finally, there would be little difficulty in managing the class. As explained in Plaintiffs' discussion of the numerosity requirement, the identity of each putative class member is easily ascertainable from the defendants' own jail movement records.

### D. The certification problems identified in the Court's initial class certification decision have been resolved and no longer apply.

In its initial class certification decision, ECF 171, the Court identified three principal barriers to class certification, focused on the identification of class members, determining which class members experienced which conditions of confinement, and identifying constitutional injuries. The progress of this case has resolved each of these problems. ***First***, Plaintiffs have now shown how to interpret the Inmate Cell Movement Report, making the identification of class members (and subclass members) a clerical matter that can be determined objectively, not one in which individual issues predominate. ***Second***, the Court's summary judgment decision narrowed the case to focus only on those conditions—lack of exercise and

sleep accommodations—that the Defendants imposed as a policy matter on everyone in the holding cells, while eliminating other conditions—lack of sanitation and inadequate medical care—that would have required individual determinations. And ***third***, in its summary judgment the Court also held that there was evidence showing that the over-detention of the class members in the holding cells was not imposed for a legitimate governmental purpose, meaning that under *Bell*, a trier of fact could *infer* that the conditions defendants imposed on all class members as a matter of policy were imposed as unconstitutional punishment—eliminating the intertwining liability with individual damages over which the Court expressed concern in its original class certification decision.

That leaves the question of damages. As narrowed on summary judgment, this is a conditions of confinement case where "the conditions themselves constitute the harm" by inflicting misery on the class. *See Scott*, 114 F.3d at 53. While individual class members may be called on to prove the *amount* of damages caused by such harm, the constitutional violation at issue is established with common evidence. In such circumstances, the need for damage calculations and evidence alone cannot defeat class certification on the ground that individual questions predominate over common questions. *Menocal v. GEO Group, Inc.*, 882 F.3d 905 (10th Cir. 2018). This case, moreover, presents a ready, common measure of damages: the length of time each class member spent in the holding cells when they should have been in general population. That measure may make damage calculations practicable, and if it is not, "the question of damages can be severed

from that of liability and tried on an individual basis." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 n.16 (5th Cir. 2003) (quotation omitted).

## CONCLUSION

Plaintiffs have come forward with evidence showing that the Defendants in this case subject people to miserable, illegal conditions STPJ's holding cells in order to rent out large parts of the jail for money. The Court has held that subjecting detainees to those conditions amounts to unconstitutional punishment. This is common evidence that would be used by every person who was subject to these illegal conditions. The Court should certify the class and subclass proposed here, to permit the numerous people who have been harmed by this illegal conduct to vindicate their rights in a trial.

**Dated:** June 29, 2025

Respectfully submitted,

*/s/ Sam Harton*
Samantha Harton
Attorney for Plaintiffs

Antonio M. Romanucci*
Sam Harton*
Josh Levin*
Stephen H. Weil*
ROMANUCCI & BLANDIN, LLC
321 N. Clark Street, Suite 900
Chicago, IL 60654
Tel: (312) 458-1000
aromanucci@rblaw.net
sharton@rblaw.net
jlevin@rblaw.net
sweil@rblaw.net

Devon M. Jacob* (PA89182)
JACOB LITIGATION, INC.
P.O. Box 837
Mechanicsburg, PA 17055-0837
Tel: (717) 796-7733
djacob@jacoblitigation.com

Maria B. Glorioso (#24435)
T.A. Vincent J. Glorioso, Jr. (#6064)
THE GLORIOSO LAW FIRM
2716 Athania Parkway
Metairie, LA 70002
Tel: (504) 569-9999
Fax: (504) 569-9022
maria@gtorts.com

** Admitted pro hac vice*
*Attorneys for Plaintiffs*

# EXHIBIT 1

# INMATE CELL MOVEMENT REPORT

Sorted By Last Name

| INMATE ID | INMATE | BOOKING DATE | HOLDS | ASSIGN. DATE | CURRENT CELL ASSIGNMENT | CURRENT |
|---|---|---|---|---|---|---|
| 206797 | [redacted] | 01/07/20 | NO | 07/04/20 | B BUILDING-DORM B200-BED B217- | NO |
| 206797 | [redacted] | 01/07/20 | NO | 07/04/20 | B BUILDING-DORM B100-BED B133- | NO |
| 206797 | [redacted] | 01/07/20 | NO | 07/24/20 | B BUILDING-DORM B200-BED B240- | NO |
| 213535 | [redacted] | 11/07/19 | NO | 11/07/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 145032 | [redacted] | 10/28/19 | NO | 10/28/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 199551 | [redacted] | 10/10/19 | NO | 10/10/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 199551 | [redacted] | 10/10/19 | NO | 10/11/19 | B BUILDING-DORM B200-BED B236- | NO |
| 199551 | [redacted] | 10/10/19 | NO | 10/26/19 | B BUILDING-DORM B200-BED B253- | NO |
| 199551 | [redacted] | 02/06/20 | NO | 02/06/20 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 2- | NO |
| 199551 | [redacted] | 02/06/20 | NO | 02/07/20 | B BUILDING-DORM B200-BED B263- | NO |
| 199551 | [redacted] | 02/06/20 | NO | 02/07/20 | B BUILDING-DORM B200-BED B242- | NO |
| 199551 | [redacted] | 02/06/20 | NO | 02/16/20 | B BUILDING-DORM B200-BED B263- | NO |
| 214123 | [redacted] | 12/06/19 | NO | 12/06/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 214123 | [redacted] | 12/06/19 | NO | 12/07/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 214123 | [redacted] | 07/26/20 | NO | 07/26/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 214123 | [redacted] | 07/26/20 | NO | 07/26/20 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 217139 | [redacted] | 06/28/20 | NO | 06/28/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 217139 | [redacted] | 06/28/20 | NO | 06/29/20 | A BUILDING-TIER A100-CELL A105-BUNK TOP- | NO |
| 217139 | [redacted] | 06/28/20 | NO | 07/02/20 | D BUILDING-DORM D400-BED D423- | NO |
| 217139 | [redacted] | 06/28/20 | NO | 07/14/20 | C BUILDING-DORM C700-BED C707- | NO |
| 176745 | [redacted] | 01/28/20 | NO | 01/28/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 176745 | [redacted] | 01/28/20 | NO | 01/31/20 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 215911 | [redacted] | 02/27/20 | NO | 02/27/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 215911 | [redacted] | 06/18/20 | NO | 06/18/20 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 215911 | [redacted] | 07/30/20 | NO | 07/30/20 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 2- | NO |
| 186133 | [redacted] | 11/08/19 | NO | 11/08/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 186133 | [redacted] | 11/08/19 | NO | 11/11/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 186133 | [redacted] | 11/08/19 | NO | 11/12/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 194175 | [redacted] | 03/07/19 | NO | 03/07/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 194175 | [redacted] | 03/25/19 | NO | 03/25/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 194175 | [redacted] | 03/25/19 | NO | 03/25/19 | A BUILDING-TIER A300-CELL A303-BUNK TOP- | NO |
| 194175 | [redacted] | 04/22/19 | NO | 04/22/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 194175 | [redacted] | 04/22/19 | NO | 04/22/19 | D BUILDING-DORM D500-BED D516- | NO |
| 131208 | [redacted] | 07/20/19 | NO | 07/20/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 196197 | [redacted] | 10/18/19 | NO | 10/18/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 196197 | [redacted] | 10/18/19 | NO | 10/19/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |

# INMATE CELL MOVEMENT REPORT

Sorted By Last Name

| INMATE ID | INMATE NAME | BOOKING DATE | HOLDS | ASSIGN. DATE | CURRENT CELL ASSIGNMENT | CURRENT |
|---|---|---|---|---|---|---|
| 213741 | [redacted] | 11/18/19 | NO | 11/18/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 213741 | | 11/18/19 | NO | 11/18/19 | D BUILDING-DORM D200-BED D203- | NO |
| 29834 | | 08/09/19 | NO | 08/09/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 29834 | | 08/09/19 | NO | 08/10/19 | B BUILDING-DORM B100-BED B154- | NO |
| 29834 | | 08/09/19 | NO | 11/29/19 | B BUILDING-DORM B200-BED B226- | NO |
| 163583 | | 03/06/20 | NO | 03/06/20 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 2- | NO |
| 163583 | | 03/06/20 | NO | 03/06/20 | B BUILDING-DORM B200-BED B215- | NO |
| 163583 | | 03/06/20 | NO | 03/07/20 | B BUILDING-DORM B200-BED B246- | NO |
| 212361 | | 09/06/19 | NO | 09/06/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 212361 | | 09/06/19 | NO | 09/06/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 212361 | | 09/06/19 | NO | 09/21/19 | C BUILDING-DORM C600-BED C636- | NO |
| 217689 | | 08/15/20 | NO | 08/15/20 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 211541 | | 07/28/19 | NO | 07/28/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 208485 | | 03/04/19 | NO | 03/04/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 210789 | | 06/21/19 | NO | 06/21/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 210789 | | 06/21/19 | NO | 06/21/19 | D BUILDING-DORM D200-BED D215- | NO |
| 212987 | | 10/11/19 | NO | 10/11/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 212987 | | 10/11/19 | NO | 10/11/19 | B BUILDING-DORM B100-BED B137- | NO |
| 210899 | | 06/26/19 | NO | 06/26/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 210899 | | 06/26/19 | NO | 06/26/19 | D BUILDING-DORM D200-BED D225- | NO |
| 209283 | | 04/09/19 | NO | 04/09/19 | D BUILDING-DORM D200-BED D206- | NO |
| 209787 | | 05/03/19 | NO | 05/03/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 209787 | | 05/03/19 | NO | 05/03/19 | B BUILDING-DORM B200-BED B207- | NO |
| 209787 | | 10/10/19 | NO | 10/10/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 209787 | | 10/10/19 | NO | 10/11/19 | B BUILDING-DORM B100-BED B125- | NO |
| 216333 | | 03/29/20 | NO | 03/29/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 216333 | | 03/29/20 | NO | 03/29/20 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 209475 | | 04/17/19 | NO | 04/17/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 209475 | | 04/17/19 | NO | 04/24/19 | D BUILDING-DORM D100-BED D116- | NO |
| 199871 | | 07/15/19 | NO | 07/15/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 209161 | | 04/04/19 | NO | 04/04/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 209161 | | 04/04/19 | NO | 04/04/19 | D BUILDING-DORM D200-BED D202- | NO |
| 42928 | | 04/08/19 | NO | 04/08/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 42928 | | 04/08/19 | NO | 04/08/19 | D BUILDING-DORM D800-BED D817- | NO |
| 42928 | | 04/08/19 | NO | 04/15/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |

# INMATE CELL MOVEMENT REPORT

Sorted By Last Name

| INMATE ID | INMATE NAME | BOOKING DATE | HOLDS | ASSIGN. DATE | CURRENT CELL ASSIGNMENT | CURRENT |
|---|---|---|---|---|---|---|
| 129962 | [redacted] | 02/17/20 | NO | 02/17/20 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 2- | NO |
| 129962 | | 02/17/20 | NO | 02/19/20 | B BUILDING-DORM B200-BED B255- | NO |
| 213025 | | 10/14/19 | NO | 10/14/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 213025 | | 10/14/19 | NO | 10/14/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 213025 | | 10/14/19 | NO | 10/14/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 213025 | | 10/14/19 | NO | 10/14/19 | D BUILDING-DORM D800-BED D850- | NO |
| 213111 | | 10/17/19 | NO | 10/17/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 213111 | | 10/17/19 | NO | 11/01/19 | C BUILDING-DORM C800-BED C813- | NO |
| 213111 | | 10/17/19 | NO | 11/02/19 | C BUILDING-DORM C100-BED C111- | NO |
| 46449 | | 09/30/19 | NO | 09/30/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 46449 | | 01/08/20 | NO | 01/08/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 46449 | | 01/08/20 | NO | 01/10/20 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 46449 | | 01/08/20 | NO | 01/22/20 | C BUILDING-DORM C100-BED C134- | NO |
| 46449 | | 01/08/20 | NO | 01/23/20 | D BUILDING-DORM D300-BED D315- | NO |
| 46449 | | 07/30/20 | YES | 07/30/20 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 46449 | | 07/30/20 | YES | 07/31/20 | D BUILDING-DORM D400-BED D418- | NO |
| 46449 | | 07/30/20 | YES | 08/07/20 | C BUILDING-DORM C700-BED C710- | YES |
| 209119 | | 04/02/19 | NO | 04/02/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 209119 | | 04/22/20 | NO | 04/22/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 209119 | | 04/22/20 | NO | 04/24/20 | A BUILDING-TIER A100-CELL A105-BUNK BOTTOM- | NO |
| 215043 | | 01/23/20 | NO | 01/23/20 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 209577 | | 04/23/19 | NO | 04/23/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 209577 | | 04/23/19 | NO | 04/23/19 | D BUILDING-DORM D200-BED D204- | NO |
| 214163 | | 12/09/19 | NO | 12/09/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 214163 | | 12/09/19 | NO | 12/09/19 | D BUILDING-DORM D200-BED D202- | NO |
| 106261 | | 10/24/18 | NO | 04/24/19 | D BUILDING-DORM D700-BED D709- | NO |
| 106261 | | 10/24/18 | NO | 07/03/19 | D BUILDING-DORM D600-BED D631- | NO |
| 181635 | | 06/21/20 | NO | 06/21/20 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 215321 | | 02/04/20 | NO | 02/04/20 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 178287 | | 03/04/20 | NO | 03/04/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 178287 | | 03/04/20 | NO | 03/07/20 | C BUILDING-DORM C700-BED C724- | NO |
| 213471 | | 11/04/19 | NO | 11/04/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 213471 | | 11/04/19 | NO | 11/04/19 | D BUILDING-DORM D200-BED D204- | NO |
| 23983 | | 08/28/19 | NO | 08/28/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 33198 | | 10/03/19 | NO | 10/03/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 162891 | | 02/08/20 | NO | 02/08/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 162891 | | 02/08/20 | NO | 02/09/20 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 130186 | | 08/01/19 | NO | 08/01/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |



STPSO_BAQUER_SUPPLEMENTAL_001151

# INMATE CELL MOVEMENT REPORT

Sorted By Last Name

| INMATE ID | INMATE NAME | BOOKING DATE | HOLDS | ASSIGN. DATE | CURRENT CELL ASSIGNMENT | CURRENT |
|---|---|---|---|---|---|---|
| 130186 | [redacted] | 08/01/19 | NO | 08/13/19 | C BUILDING-DORM C600-BED C646- | NO |
| 130186 | [redacted] | 08/01/19 | NO | 10/18/19 | C BUILDING-DORM C500-BED C547- | NO |
| 130186 | [redacted] | 08/01/19 | NO | 10/21/19 | D BUILDING-DORM D600-BED D605- | NO |
| 130186 | [redacted] | 08/01/19 | NO | 11/21/19 | C BUILDING-DORM C800-BED C831- | NO |
| 130186 | [redacted] | 08/01/19 | NO | 11/25/19 | D BUILDING-DORM D300-BED D307- | NO |
| 130186 | [redacted] | 08/01/19 | NO | 12/12/19 | C BUILDING-DORM C800-BED C815- | NO |
| 130186 | [redacted] | 08/01/19 | NO | 12/16/19 | C BUILDING-DORM C100-BED C116- | NO |
| 214033 | [redacted] | 12/03/19 | NO | 12/03/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 214033 | [redacted] | 12/03/19 | NO | 12/10/19 | A BUILDING-RESTRICTIVE HOU-CELL A48- | NO |
| 214033 | [redacted] | 12/03/19 | NO | 03/02/20 | C BUILDING-DORM C200-BED C203- | YES |
| 210845 | [redacted] | 06/24/19 | NO | 06/24/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 210845 | [redacted] | 06/24/19 | NO | 06/25/19 | D BUILDING-DORM D700-BED D720- | NO |
| 210845 | [redacted] | 06/24/19 | NO | 08/16/19 | A BUILDING-DORM A900a-BED A903a- | NO |
| 210845 | [redacted] | 05/27/20 | YES | 05/27/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 210845 | [redacted] | 05/27/20 | YES | 05/27/20 | A BUILDING-DORM K-BED K29- | NO |
| 210845 | [redacted] | 05/27/20 | YES | 06/28/20 | A BUILDING-DORM A900b-BED A929b- | NO |
| 210845 | [redacted] | 05/27/20 | YES | 08/11/20 | A BUILDING-DORM A900a-BED A929a- | NO |
| 210845 | [redacted] | 05/27/20 | YES | 08/18/20 | A BUILDING-DORM K-BED K01- | YES |
| 134918 | [redacted] | 02/14/19 | NO | 04/24/19 | D BUILDING-DORM D600-BED D643- | NO |
| 134918 | [redacted] | 02/14/19 | NO | 06/18/19 | D BUILDING-DORM D500-BED D517- | NO |
| 134918 | [redacted] | 08/12/19 | NO | 08/12/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 134918 | [redacted] | 08/12/19 | NO | 08/13/19 | D BUILDING-DORM D500-BED D538- | NO |
| 134918 | [redacted] | 08/12/19 | NO | 08/26/19 | A BUILDING-DORM A900a-BED A928a- | NO |
| 134918 | [redacted] | 08/12/19 | NO | 08/27/19 | A BUILDING-DORM A900a-BED A929a- | NO |
| 134918 | [redacted] | 08/12/19 | NO | 10/11/19 | C BUILDING-DORM C600-BED C650- | NO |
| 134918 | [redacted] | 08/12/19 | NO | 11/24/19 | TENT CITY 1-TENT CITY-T-032- | NO |
| 134918 | [redacted] | 08/12/19 | NO | 11/24/19 | D BUILDING-DORM D300-BED D324- | NO |
| 134918 | [redacted] | 08/12/19 | NO | 02/11/20 | D BUILDING-DORM D500-BED D531- | NO |
| 38811 | [redacted] | 05/29/20 | NO | 05/29/20 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 39314 | [redacted] | 03/03/20 | NO | 03/03/20 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 39314 | [redacted] | 03/03/20 | NO | 03/03/20 | B BUILDING-DORM B100-BED B120- | NO |
| 108301 | [redacted] | 07/19/19 | NO | 07/19/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 153969 | [redacted] | 05/23/19 | NO | 05/23/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 153969 | [redacted] | 06/12/19 | NO | 06/12/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 2- | NO |
| 153969 | [redacted] | 06/12/19 | NO | 06/15/19 | B BUILDING-DORM B100-BED B156- | NO |
| 153969 | [redacted] | 09/19/19 | NO | 09/19/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |

**INMATE CELL MOVEMENT REPORT**

Sorted By Last Name

| INMATE ID | INMATE | BOOKING DATE | HOLDS | ASSIGN. DATE | CURRENT CELL ASSIGNMENT | CURRENT |
|---|---|---|---|---|---|---|
| 153969 | [redacted] | 09/19/19 | NO | 09/19/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 153969 | | 09/19/19 | NO | 09/21/19 | B BUILDING-DORM B200-BED B250- | NO |
| 153969 | | 09/19/19 | NO | 10/04/19 | B BUILDING-DORM B100-BED B140- | NO |
| 179585 | | 07/05/19 | NO | 07/05/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 179585 | | 07/05/19 | NO | 07/07/19 | B BUILDING-DORM B200-BED B233- | NO |
| 209393 | | 04/14/19 | NO | 04/14/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 210475 | | 06/05/19 | NO | 06/05/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 2- | NO |
| 212285 | | 09/02/19 | NO | 09/02/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 217003 | | 06/14/20 | NO | 06/14/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 197215 | | 12/23/19 | NO | 12/23/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 197215 | | 12/23/19 | NO | 12/24/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 20175 | | 01/23/20 | NO | 01/23/20 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 101378 | | 07/24/19 | NO | 07/24/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 101378 | | 07/24/19 | NO | 07/25/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 101378 | | 07/24/19 | NO | 08/06/19 | C BUILDING-DORM C600-BED C609- | NO |
| 101378 | | 05/05/20 | NO | 05/05/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 101378 | | 05/05/20 | NO | 05/07/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 101378 | | 08/03/20 | NO | 08/03/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 101378 | | 08/03/20 | NO | 08/05/20 | D BUILDING-DORM D400-BED D434- | NO |
| 155773 | | 04/15/19 | NO | 04/15/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 155773 | | 04/15/19 | NO | 04/16/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 155773 | | 04/15/19 | NO | 04/16/19 | D BUILDING-DORM D600-BED D621- | NO |
| 155773 | | 04/15/19 | NO | 06/24/19 | A BUILDING-DORM K-BED K20- | NO |
| 155773 | | 04/15/19 | NO | 09/06/19 | A BUILDING-DORM A900a-BED A959a- | NO |
| 155773 | | 04/15/19 | NO | 10/04/19 | A BUILDING-DORM A900a-BED A953a- | NO |
| 155773 | | 04/15/19 | NO | 11/05/19 | D BUILDING-DORM D500-BED D525- | NO |
| 155773 | | 04/15/19 | NO | 12/27/19 | A BUILDING-DORM A900a-BED A942a- | NO |
| 155773 | | 06/03/20 | YES | 06/03/20 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 155773 | | 06/03/20 | YES | 06/04/20 | A BUILDING-TIER A100-CELL A101-BUNK TOP- | NO |
| 155773 | | 06/03/20 | YES | 06/08/20 | D BUILDING-DORM D400-BED D408- | NO |
| 155773 | | 06/03/20 | YES | 06/10/20 | A BUILDING-DORM K-BED K27- | NO |
| 155773 | | 06/03/20 | YES | 06/28/20 | A BUILDING-DORM A900b-BED A925b- | NO |
| 155773 | | 06/03/20 | YES | 07/15/20 | A BUILDING-DORM K-BED K05- | NO |
| 155773 | | 06/03/20 | YES | 07/16/20 | D BUILDING-DORM D200-BED D222- | NO |
| 155773 | | 06/03/20 | YES | 08/18/20 | D BUILDING-DORM D600-BED D618- | YES |
| 209653 | | 04/26/19 | NO | 04/26/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |

# INMATE CELL MOVEMENT REPORT

Sorted By Last Name

| INMATE ID | INMATE NAME | BOOKING DATE | HOLDS | ASSIGN. DATE | CURRENT CELL ASSIGNMENT | CURRENT |
|---|---|---|---|---|---|---|
| 209653 | [redacted] | 04/26/19 | NO | 04/27/19 | B BUILDING-DORM B200-BED B209- | NO |
| 209653 | | 04/26/19 | NO | 04/28/19 | B BUILDING-DORM B200-BED B204- | NO |
| 213167 | | 10/20/19 | NO | 10/20/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 214301 | | 12/14/19 | NO | 12/14/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 214301 | | 12/14/19 | NO | 12/14/19 | B BUILDING-DORM B100-BED B107- | NO |
| 214301 | | 12/14/19 | NO | 12/16/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 214301 | | 12/14/19 | NO | 12/16/19 | B BUILDING-DORM B100-BED B150- | NO |
| 216037 | | 03/03/20 | NO | 03/03/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 216037 | | 03/03/20 | NO | 03/06/20 | C BUILDING-DORM C500-BED C507- | NO |
| 216175 | | 03/11/20 | NO | 03/11/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 216175 | | 03/11/20 | NO | 03/13/20 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 216755 | | 05/23/20 | NO | 05/23/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 216755 | | 05/23/20 | NO | 05/26/20 | A BUILDING-TIER A100-CELL A101-BUNK TOP- | NO |
| 20945 | | 06/09/19 | NO | 06/09/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 20945 | | 06/16/19 | NO | 06/16/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 20945 | | 06/23/19 | NO | 06/23/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 20945 | | 06/30/19 | NO | 06/30/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 216997 | | 06/13/20 | NO | 06/13/20 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 2- | NO |
| 203143 | | 12/09/18 | NO | 12/22/19 | A BUILDING-TIER A300-CELL A306-BUNK BOTTOM- | NO |
| 203143 | | 12/09/18 | NO | 02/05/20 | A BUILDING-RESTRICTIVE HOU-CELL A80- | NO |
| 203143 | | 12/09/18 | NO | 03/09/20 | A BUILDING-TIER A300-CELL A304-BUNK TOP- | NO |
| 209333 | | 04/11/19 | NO | 04/11/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 209333 | | 04/11/19 | NO | 04/17/19 | C BUILDING-DORM C700-BED C748- | NO |
| 213083 | | 10/16/19 | YES | 10/16/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 213083 | | 10/16/19 | YES | 10/16/19 | C BUILDING-DORM C300-BED C335- | NO |
| 213083 | | 10/16/19 | YES | 08/07/20 | A BUILDING-TIER A400-CELL A406-BUNK TOP- | NO |
| 213083 | | 10/16/19 | YES | 08/08/20 | A BUILDING-TIER A400-CELL A414-BUNK- | NO |
| 213083 | | 10/16/19 | YES | 08/08/20 | A BUILDING-TIER A400-CELL A402-BUNK TOP- | YES |
| 213579 | | 11/09/19 | NO | 11/09/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 214177 | | 12/09/19 | NO | 12/09/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 214177 | | 12/09/19 | NO | 12/09/19 | D BUILDING-DORM D400-BED D410- | NO |
| 214177 | | 12/09/19 | NO | 01/08/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 214177 | | 12/09/19 | NO | 01/08/20 | D BUILDING-DORM D700-BED D712- | NO |
| 217211 | | 07/06/20 | NO | 07/06/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 217211 | | 07/06/20 | NO | 07/07/20 | A BUILDING-TIER A100-CELL A115-BUNK- | NO |
| 217427 | | 07/25/20 | NO | 07/25/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 217427 | | 07/25/20 | NO | 07/25/20 | A BUILDING-TIER A200-CELL A209-BUNK TOP- | NO |

# INMATE CELL MOVEMENT REPORT

Sorted By Last Name

| INMATE ID | INMATE NAME | BOOKING DATE | HOLDS | ASSIGN. DATE | CURRENT CELL ASSIGNMENT | CURRENT |
|---|---|---|---|---|---|---|
| 196855 | [redacted] | 11/06/19 | NO | 11/06/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 2- | NO |
| 196855 | | 11/06/19 | NO | 11/08/19 | B BUILDING-DORM B200-BED B210- | NO |
| 197993 | | 09/09/19 | NO | 09/09/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 197993 | | 09/09/19 | NO | 09/09/19 | D BUILDING-DORM D200-BED D205- | NO |
| 210315 | | 05/28/19 | NO | 05/28/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 210315 | | 05/28/19 | NO | 05/29/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 212295 | | 09/02/19 | NO | 09/02/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 104404 | | 06/07/19 | NO | 06/07/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 104404 | | 06/07/19 | NO | 06/07/19 | D BUILDING-DORM D700-BED D727- | NO |
| 104404 | | 01/14/20 | NO | 01/14/20 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 104404 | | 01/14/20 | NO | 01/15/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 104404 | | 03/10/20 | NO | 03/10/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 104404 | | 03/14/20 | NO | 03/14/20 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 104404 | | 03/14/20 | NO | 03/17/20 | C BUILDING-DORM C100-BED C109- | NO |
| 104404 | | 03/14/20 | NO | 07/15/20 | D BUILDING-DORM D600-BED D607- | NO |
| 138505 | | 03/15/20 | YES | 03/15/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 138505 | | 03/15/20 | YES | 03/18/20 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 138505 | | 03/15/20 | YES | 03/18/20 | C BUILDING-DORM C700-BED C721- | NO |
| 138505 | | 03/15/20 | YES | 03/20/20 | D BUILDING-DORM D400-BED D418- | NO |
| 138505 | | 03/15/20 | YES | 05/04/20 | C BUILDING-DORM C800-BED C826- | NO |
| 138505 | | 03/15/20 | YES | 07/15/20 | D BUILDING-DORM D700-BED D712- | YES |
| 168093 | | 05/24/19 | NO | 05/24/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 212277 | | 09/01/19 | YES | 09/01/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 212277 | | 09/01/19 | YES | 09/04/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 212277 | | 09/01/19 | YES | 09/17/19 | D BUILDING-DORM D100-BED D132- | NO |
| 212277 | | 09/01/19 | YES | 11/24/19 | TENT CITY 1-TENT CITY-T-168- | NO |
| 212277 | | 09/01/19 | YES | 11/24/19 | C BUILDING-DORM C500-BED C530- | YES |
| 210331 | | 05/29/19 | NO | 05/29/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 210661 | | 06/15/19 | NO | 06/15/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 210661 | | 06/15/19 | NO | 06/17/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 210661 | | 06/15/19 | NO | 06/25/19 | C BUILDING-DORM C700-BED C710- | NO |
| 213641 | | 11/13/19 | NO | 11/13/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 35830 | | 03/03/20 | NO | 03/03/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 35830 | | 03/03/20 | NO | 03/04/20 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 128356 | | 05/02/19 | NO | 05/02/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 190921 | | 09/01/19 | NO | 09/01/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 190921 | | 09/01/19 | NO | 09/17/19 | C BUILDING-DORM C700-BED C723- | NO |
| 190921 | | 09/01/19 | NO | 10/08/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 190921 | | 11/04/19 | NO | 11/04/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 190921 | | 11/04/19 | NO | 11/05/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |

# INMATE CELL MOVEMENT REPORT

Sorted By Last Name

| INMATE ID | INMATE NAME | BOOKING DATE | HOLDS | ASSIGN. DATE | CURRENT CELL ASSIGNMENT | CURRENT |
|---|---|---|---|---|---|---|
| 190921 | [redacted] | 11/04/19 | NO | 11/05/19 | D BUILDING-DORM D600-BED D641- | NO |
| 190921 | | 11/04/19 | NO | 11/25/19 | A BUILDING-DORM K-BED K25- | NO |
| 190921 | | 11/04/19 | NO | 12/27/19 | A BUILDING-DORM A900a-BED A955a- | NO |
| 190921 | | 11/04/19 | NO | 12/27/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 190921 | | 11/04/19 | NO | 12/27/19 | A BUILDING-DORM A900a-BED A957a- | NO |
| 190921 | | 11/04/19 | NO | 12/30/19 | D BUILDING-DORM D700-BED D742- | NO |
| 203087 | | 08/01/19 | NO | 08/01/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 203087 | | 08/01/19 | NO | 08/13/19 | C BUILDING-DORM C800-BED C815- | NO |
| 216763 | | 05/23/20 | NO | 05/23/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 130322 | | 02/16/19 | NO | 08/17/19 | B BUILDING-DORM B100-BED B121- | NO |
| 130322 | | 02/16/19 | NO | 08/17/19 | B BUILDING-DORM B100-BED B131- | NO |
| 130322 | | 02/16/19 | NO | 08/18/19 | B BUILDING-DORM B100-BED B123- | NO |
| 130322 | | 08/04/20 | YES | 08/04/20 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 130322 | | 08/04/20 | YES | 08/05/20 | B BUILDING-DORM B200-BED B206- | YES |
| 217075 | | 06/21/20 | NO | 06/21/20 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 217753 | | 08/20/20 | NO | 08/20/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 210941 | | 06/28/19 | NO | 06/28/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 210941 | | 10/21/19 | NO | 10/21/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 210941 | | 04/17/20 | NO | 04/17/20 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 2- | NO |
| 209371 | | 04/12/19 | NO | 04/12/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 209371 | | 04/12/19 | NO | 04/12/19 | D BUILDING-DORM D200-BED D209- | NO |
| 214487 | | 12/23/19 | NO | 12/23/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 214487 | | 12/23/19 | NO | 12/23/19 | D BUILDING-DORM D200-BED D205- | NO |
| 210389 | | 05/31/19 | NO | 05/31/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 210389 | | 05/31/19 | NO | 05/31/19 | D BUILDING-DORM D200-BED D213- | NO |
| 214073 | | 12/05/19 | NO | 12/05/19 | D BUILDING-DORM D200-BED D224- | NO |
| 206399 | | 06/05/19 | NO | 06/05/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 206399 | | 06/05/19 | NO | 06/06/19 | B BUILDING-DORM B200-BED B243- | NO |
| 207227 | | 03/08/20 | NO | 03/08/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 207227 | | 03/08/20 | NO | 03/10/20 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 207227 | | 03/08/20 | NO | 03/12/20 | C BUILDING-DORM C700-BED C743- | NO |
| 209231 | | 04/08/19 | NO | 04/08/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 209231 | | 04/08/19 | NO | 04/10/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 209231 | | 04/08/19 | NO | 04/16/19 | D BUILDING-DORM D300-BED D329- | NO |
| 209231 | | 04/08/19 | NO | 04/16/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |

# INMATE CELL MOVEMENT REPORT

Sorted By Last Name

| INMATE ID | INMATE NAME | BOOKING DATE | HOLDS | ASSIGN. DATE | CURRENT CELL ASSIGNMENT | CURRENT |
|---|---|---|---|---|---|---|
| 214755 | [redacted] | 01/08/20 | NO | 01/08/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 215091 | | 01/26/20 | NO | 01/26/20 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 215697 | | 02/19/20 | NO | 02/19/20 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 215697 | | 02/19/20 | NO | 02/20/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 215697 | | 02/19/20 | NO | 03/01/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 215697 | | 02/19/20 | NO | 03/03/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 216343 | | 03/30/20 | NO | 03/30/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 216343 | | 03/30/20 | NO | 03/30/20 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 23018 | | 05/03/19 | NO | 05/03/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 23018 | | 05/03/19 | NO | 05/07/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 23018 | | 05/03/19 | NO | 05/09/19 | D BUILDING-DORM D300-BED D314- | NO |
| 23018 | | 05/03/19 | NO | 05/12/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 23018 | | 05/03/19 | NO | 05/12/19 | C BUILDING-DORM C600-BED C602- | NO |
| 23018 | | 05/03/19 | NO | 06/27/19 | A BUILDING-RESTRICTIVE HOU-CELL A78- | NO |
| 23018 | | 05/03/19 | NO | 07/22/19 | D BUILDING-DORM D400-BED D410- | NO |
| 23018 | | 12/16/19 | NO | 12/16/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 176979 | | 07/29/20 | NO | 07/29/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 176979 | | 07/29/20 | NO | 07/31/20 | D BUILDING-DORM D400-BED D406- | NO |
| 176979 | | 07/29/20 | NO | 08/07/20 | C BUILDING-DORM C700-BED C702- | YES |
| 212013 | | 08/18/19 | NO | 08/18/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 208849 | BAQER, Ahmed AL. | 03/21/19 | NO | 03/21/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 208849 | BAQER, Ahmed AL. | 12/02/19 | NO | 12/02/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 208849 | BAQER, Ahmed AL. | 12/02/19 | NO | 12/03/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 208849 | BAQER, Ahmed AL. | 12/02/19 | NO | 12/17/19 | C BUILDING-DORM C100-BED C111- | NO |
| 214429 | [redacted] | 12/19/19 | NO | 12/19/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 214429 | | 12/19/19 | NO | 12/20/19 | D BUILDING-DORM D200-BED D202- | NO |
| 203499 | | 01/08/20 | NO | 01/08/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 203499 | | 01/08/20 | NO | 01/08/20 | D BUILDING-DORM D200-BED D209- | NO |
| 214675 | | 01/03/20 | NO | 01/03/20 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 214675 | | 01/03/20 | NO | 01/03/20 | D BUILDING-DORM D200-BED D203- | NO |
| 214433 | | 12/19/19 | NO | 12/19/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 214433 | | 12/19/19 | NO | 12/20/19 | C BUILDING-DORM C300-BED C310- | NO |
| 8505 | | 10/14/19 | NO | 10/14/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 204909 | | 05/03/20 | NO | 05/03/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 216619 | | 05/08/20 | NO | 05/08/20 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 2- | NO |
| 124363 | | 07/01/19 | NO | 07/01/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 124363 | | 07/01/19 | NO | 07/01/19 | D BUILDING-DORM D800-BED D820- | NO |
| 124363 | | 07/01/19 | NO | 07/24/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 124363 | | 07/01/19 | NO | 07/24/19 | D BUILDING-DORM D500-BED D510- | NO |
| 124363 | | 07/01/19 | NO | 09/05/19 | C BUILDING-DORM C200-BED C203- | NO |

# INMATE CELL MOVEMENT REPORT

Sorted By Last Name

| INMATE ID | INMATE NAME | BOOKING DATE | HOLDS | ASSIGN. DATE | CURRENT CELL ASSIGNMENT | CURRENT |
|---|---|---|---|---|---|---|
| 124363 | [redacted] | 07/01/19 | NO | 09/06/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 124363 | | 07/01/19 | NO | 09/06/19 | D BUILDING-DORM D500-BED D545- | NO |
| 211393 | | 07/22/19 | NO | 07/22/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 211393 | | 07/22/19 | NO | 07/22/19 | A BUILDING-TIER A100-CELL A102-BUNK TOP- | NO |
| 215017 | | 01/21/20 | NO | 01/21/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 215017 | | 01/21/20 | NO | 01/23/20 | C BUILDING-DORM C200-BED C229- | NO |
| 215017 | | 01/21/20 | NO | 02/02/20 | A BUILDING-RESTRICTIVE HOU-HALL ISOL RIGHT- | NO |
| 215017 | | 01/21/20 | NO | 02/04/20 | A BUILDING-RESTRICTIVE HOU-CELL A82- | NO |
| 215017 | | 01/21/20 | NO | 02/11/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 215017 | | 01/21/20 | NO | 02/11/20 | C BUILDING-DORM C200-BED C223- | NO |
| 215017 | | 01/21/20 | NO | 02/14/20 | A BUILDING-RESTRICTIVE HOU-CELL A78- | NO |
| 215017 | | 01/21/20 | NO | 02/15/20 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 215017 | | 01/21/20 | NO | 02/15/20 | A BUILDING-RESTRICTIVE HOU-CELL A45- | NO |
| 215017 | | 01/21/20 | NO | 08/16/20 | A BUILDING-RESTRICTIVE HOU-CELL A78- | NO |
| 215017 | | 01/21/20 | NO | 08/18/20 | A BUILDING-RESTRICTIVE HOU-CELL A77- | YES |
| 216701 | | 05/18/20 | NO | 05/18/20 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 117560 | | 08/14/19 | NO | 08/14/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 117560 | | 08/14/19 | NO | 08/15/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 180379 | | 01/05/19 | NO | 04/05/19 | 8 to 4 Program-DORM 8 to 4-8 to 4- | NO |
| 180379 | | 01/05/19 | NO | 06/20/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 180379 | | 01/05/19 | NO | 06/26/19 | B BUILDING-DORM B100-BED B106- | NO |
| 180379 | | 01/05/19 | NO | 07/06/19 | B BUILDING-DORM B100-BED B105- | NO |
| 194835 | | 04/01/19 | NO | 04/01/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 194835 | | 04/01/19 | NO | 04/01/19 | B BUILDING-DORM B200-BED B216- | NO |
| 194835 | | 04/01/19 | NO | 04/04/19 | B BUILDING-DORM B100-BED B106- | NO |
| 203467 | | 12/06/19 | NO | 12/06/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 203467 | | 12/06/19 | NO | 12/06/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 203467 | | 12/06/19 | NO | 12/18/19 | C BUILDING-DORM C100-BED C113- | NO |
| 207051 | | 08/18/20 | NO | 08/18/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 137245 | | 02/10/20 | NO | 02/10/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 137245 | | 02/10/20 | NO | 02/13/20 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 137245 | | 02/10/20 | NO | 02/16/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 214591 | | 12/29/19 | NO | 12/29/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 49071 | | 08/22/19 | NO | 08/22/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 49071 | | 08/22/19 | NO | 09/04/19 | C BUILDING-DORM C500-BED C519- | NO |
| 49071 | | 06/30/20 | NO | 07/01/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 49071 | | 06/30/20 | NO | 07/01/20 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |

# INMATE CELL MOVEMENT REPORT

Sorted By Last Name

| INMATE ID | INMATE NAME | BOOKING DATE | HOLDS | ASSIGN. DATE | CURRENT CELL ASSIGNMENT | CURRENT |
|---|---|---|---|---|---|---|
| 49071 | [redacted] | 06/30/20 | NO | 07/02/20 | A BUILDING-TIER A100-CELL A101-BUNK BOTTOM- | NO |
| 49071 | [redacted] | 06/30/20 | NO | 07/07/20 | D BUILDING-DORM D400-BED D431- | NO |
| 49071 | [redacted] | 06/30/20 | NO | 07/14/20 | C BUILDING-DORM C700-BED C745- | NO |
| 104759 | [redacted] | 07/17/19 | NO | 07/17/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 104759 | [redacted] | 11/03/19 | NO | 11/03/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 104759 | [redacted] | 11/03/19 | NO | 11/05/19 | B BUILDING-DORM B200-BED B205- | NO |
| 127141 | [redacted] | 03/15/19 | NO | 03/15/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 127141 | [redacted] | 03/15/19 | NO | 03/21/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 127141 | [redacted] | 03/15/19 | NO | 03/25/19 | C BUILDING-DORM C700-BED C734- | NO |
| 127141 | [redacted] | 03/15/19 | NO | 04/17/19 | D BUILDING-DORM D600-BED D643- | NO |
| 127141 | [redacted] | 03/15/19 | NO | 04/24/19 | A BUILDING-DORM A900a-BED A943a- | NO |
| 144652 | [redacted] | 04/11/19 | NO | 04/11/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 144652 | [redacted] | 04/11/19 | NO | 04/18/19 | D BUILDING-DORM D100-BED D110- | NO |
| 144652 | [redacted] | 11/14/19 | NO | 11/14/19 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 144652 | [redacted] | 11/14/19 | NO | 11/14/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 144652 | [redacted] | 11/14/19 | NO | 11/20/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 144652 | [redacted] | 11/14/19 | NO | 11/26/19 | C BUILDING-DORM C500-BED C518- | NO |
| 144652 | [redacted] | 11/14/19 | NO | 11/29/19 | D BUILDING-DORM D300-BED D325- | NO |
| 144652 | [redacted] | 11/14/19 | NO | 01/02/20 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 144652 | [redacted] | 01/21/20 | YES | 01/21/20 | HOLDING CELL-MALE HOLDING-MALE HOLD2- | NO |
| 144652 | [redacted] | 01/21/20 | YES | 01/21/20 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 144652 | [redacted] | 01/21/20 | YES | 01/21/20 | D BUILDING-DORM D500-BED D536- | YES |
| 156927 | [redacted] | 03/18/19 | NO | 03/18/19 | HOLDING CELL-MALE HOLDING-MALE HOLD3- | NO |
| 156927 | [redacted] | 08/04/19 | NO | 08/04/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 193731 | [redacted] | 09/06/19 | NO | 09/06/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 193731 | [redacted] | 09/06/19 | NO | 09/06/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 193731 | [redacted] | 09/06/19 | NO | 09/22/19 | C BUILDING-DORM C600-BED C643- | NO |
| 193929 | [redacted] | 03/20/19 | NO | 03/20/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 1- | NO |
| 193929 | [redacted] | 03/20/19 | NO | 03/20/19 | HOLDING CELL-FEMALE HOLDING-FEMALE HOLD 2- | NO |
| 193929 | [redacted] | 03/20/19 | NO | 03/21/19 | B BUILDING-DORM B100-BED B101- | NO |
| 195609 | [redacted] | 04/03/19 | NO | 04/03/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 195609 | [redacted] | 04/03/19 | NO | 04/10/19 | C BUILDING-DORM C600-BED C602- | NO |
| 195609 | [redacted] | 04/03/19 | NO | 05/12/19 | D BUILDING-DORM D100-BED D136- | NO |
| 195609 | [redacted] | 04/03/19 | NO | 05/21/19 | HOLDING CELL-MALE HOLDING-MALE HOLD1- | NO |
| 195609 | [redacted] | 06/10/19 | NO | 06/10/19 | HOLDING CELL-MALE HOLDING-MALE HOLD4- | NO |
| 195609 | [redacted] | 06/10/19 | NO | 06/11/19 | D BUILDING-DORM D700-BED D717- | NO |

# EXHIBIT 2

## Qualifications of Counsel

Plaintiffs are represented by three law firms with experience in class actions, civil rights litigation, and trial advocacy. Counsel are pleased to provide additional information to the Court upon request.

***Romanucci & Blandin LLC.***

Romanucci & Blandin, LLC focuses a significant part of its practice on civil rights cases, including prison and police matters, and mass torts. Romanucci & Blandin, LLC also has extensive experience serving plaintiffs in federal and state class action cases. Romanucci & Blandin, LLC was appointed class- co-counsel in a red-light class action lawsuit against the City of Chicago. *See Willis v. City of Chicago*, 16 CH 14304 (Cook Cty. Cir. Ct.), The putative class included approximately 1.2 million individuals. The case recently settled for $38.5 million and $85 million in debt relief. Romanucci & Blandin, LLC served as co-counsel on the stop and frisk class action pending against the City of Chicago. *See, Smith, et al. v. City of Chicago*, *et al.*, 15 CV 3467 (N.D. Ill.). The proposed putative class of over 700,000 people. Romanucci & Blandin, LLC is also currently lead or co-counsel on the following: a proposed class action lawsuit against Southwest Airlines for violations of the Illinois Biometric Information Privacy Act, *Miller, et al. v. Southwest Airlines Co.*, 18 CV 86 (N.D. Ill.) (co-counsel); mass tort litigation on behalf of 80 plaintiffs arising from the Pulse Night Club Shooting *Colon, et al. v. G4S, et al.*, 502017CA003447 MB AG (lead counsel); mass tort litigation on behalf of up to 20,000 people) at the Mandalay Bay shooting in Las Vegas, Nevada (leadership committee); mass tort litigation against Sterigenics International, Inc. for toxic air pollution (co-counsel); mass tort litigation against manufacturers of vape pens; and mass tort litigation for Business Interruption Insurance.

**Antonio Romanucci** is the founding partner of Romanucci & Blandin. Mr. Romanucci has thirty-nine (39) years of legal experience. As lead counsel, Mr. Romanucci has obtained numerous significant verdicts and settlements, including a $17.6 million verdict against the City of Chicago; a $4.5 million settlement against the City of Chicago; a $2.3 million verdict in the Middle District of Florida; a $1.31 million settlement in the District Court of New Jersey; a $1.1 million settlement in a wrongful shooting case of a suicidal person in the Eastern District of Wisconsin; a $44.7 million verdict including a complex *Monell* claim against the City of Chicago; and most recently a $21.3 million verdict against the City of Chicago in a police pursuit case.

**Stephen H. Weil** is a Senior Attorney at Romanucci & Blandin LLC. Mr. Weil has practiced complex civil litigation with two nationally regarded defense firms, O'Melveny & Myers LLP in Washington D.C and Eimer Stahl LLP in Chicago. While at these firms Mr. Weil represented multiple clients in class action cases, including serving as part of a trial team representing Fidelity Investments in *Tussey v. ABB*, No. 06-cv-04305 (W.D. Mo.), in a month-long ERISA class action bench trial; and CITGO Petroleum in *New Hampshire v. Hess*, No. 03-c-550 (Sup. Ct. Merrimack Cty., N.H.), reputed to be the largest case in New Hampshire state court history. Hess was a *parens patriae* action that shares many of the complexities of class action litigation, and Mr. Weil was one of the principal drafters of briefs addressing the aggregating factors in that case.

Mr. Weil also has a depth of experience in civil rights class action litigation, based on service as a litigation fellow with the MacArthur Justice Center at Northwestern University Law School, and as a litigator with Loevy & Loevy, a national civil rights firm. While practicing with these organizations Mr. Weil represented a class of detainees at the Cook County Jail suing over the conditions of their confinement in *Hudson v. Preckwinkle*, No. 13-cv-8752 (N.D. Ill.); a class of detainees at Cook County Jail over COVID-19 protections during the pandemic in *Mays. v. Dart*, No. 20-cv-1792 (N.D. Ill.); and a class of juvenile detainees challenging their placement on lockdown in order to facilitate the filming of scenes for a commercial television show in *T.S. v. Twentieth Century Fox*, No. 16-cv-8303 (N.D. Ill.), where the district court appointed Mr. Weil as class counsel.

Mr. Weil received his undergraduate degree at the University of Chicago and his law degree from the University of Pennsylvania Law School. After law school he served as a law clerk to Judge Robert E. Payne of the United States District Court for the Eastern District of Virginia.

**Benjamin Berkman** is a Senior Attorney at Romanucci & Blandin, LLC. He has been an attorney for over 9 years, during which time he has clerked for federal judges, worked on complex litigation at Quinn Emanuel Urquhart & Sullivan, LLP, and worked as an attorney at the City of Chicago Office of Inspector General.

While an attorney at Quinn Emanuel from 2015-2016 and 2018-2021, Mr. Berkman worked on numerous mass actions, including: (1) a putative product liability class action lawsuit regarding an allegedly defective decking product; (2) a class action on behalf of health insurers against the United States for failure to make "risk corridor" payments under the Affordable Care Act; (3) mass arbitrations on behalf of

"gig economy" workers alleging misclassification as independent contractors; and (4) mass arbitrations on behalf of consumers alleging that a product violated applicable privacy laws. In addition, Mr. Berkman served as counsel for the plaintiff in a lawsuit in the United States District Court for the Northern District of Illinois alleging that prison medical staff were deliberately indifferent to an inmate's medical needs (*Ryburn v. Obaisi*, 14-cv-04308 (N.D. Ill.)).

Mr. Berkman served as an attorney in the City of Chicago Office of Inspector General from 2023 to 2025, initially as an Assistant Inspector General before being promoted to Chief Assistant Inspector General for Legal Counsel. At OIG, Mr. Berkman conducted investigations and led a team of attorneys who conducted investigations into government misconduct and abuse, including misconduct and abuse on the part of law enforcement. During his time at OIG, OIG investigations, audits, and evaluations resulted in the discipline of public employees and contractors who engaged in misconduct as well as changes to the municipal code and municipal policies aimed designed to correct systemic flaws.

Mr. Berkman attended the University of Chicago Law School, where he received a J.D. with honors in 2015. Mr. Berkman has completed clerkships for Judge Jill Pryor of the United States Court of Appeals for the Eleventh Circuit, Judge John Tharp of the United States District Court for the Northern District of Illinois, and Magistrate Judge Beth Jantz of the United States District Court for the Northern District of Illinois. Mr. Berkman is a member in good standing of the bars of the State of Illinois and the State of New York.

**Sam Harton** is an attorney at Romanucci & Blandin, LLC, in Chicago, Illinois, where she represents clients in complex civil rights cases and primarily litigates issues related to jail and prison conditions. This includes her role as lead counsel for plaintiffs in cases alleging deliberate indifference towards an incarcerated patient's risk of suicide inside of a mental health facility (*Berlin v. Guethle,* 3:23-cv-01912, Southern District of Illinois), an inmate's need for referral to a hospital to treat an infected wound (*Lee v. Henze, et al,* 25-cv-01772, Northern District of Illinois), and an incarcerated juvenile's need for treatment of a medical emergency (*Sluder, et al, v. Phillips, et al,* 4:24-cv-00181, Northern District of Georgia). She received her law degree in 2022 from the Ohio State University, during which time she served as a judicial extern for Justice Michael P. Donnelly of the Supreme Court of Ohio and received the College of Law's Dean's Highest Honors in Public Service. She is a

member in good standing of the bar of the State of Illinois. In the instant matter, she argued all five summary judgment motions before the Court on March 13, 2025.

***Jacob Litigation***.

**Devon Jacob** has been practicing law for 22 years. He previously served as a deputy attorney general for the Commonwealth of Pennsylvania, working extensively in civil rights cases. Mr. Jacob subsequently served as the head of civil litigation at a plaintiffs' law firm, supervising staff and overseeing a practice devoted largely to the prosecution of civil rights cases. Mr. Jacob has been principal of Jacob Litigation, a firm practicing civil rights law in jurisdictions across the country, since November of 2013. Mr. Jacob has served as lead counsel in civil rights cases in federal courts in twelve jurisdictions, and has obtained a verdict in excess of $4,000,000.00 in a federal civil rights matter. In 2019, Attorney Jacob recently conducted an eight-day federal jury trial, as lead counsel in the civil rights case of *L. Alicia Rascon, et al. v. Clinton H. Brookins*, No. CV-14-00749-PHX-JJT (D. AZ). He is an active member of the National Police Accountability Project (NPAP). Mr. Jacob is also an active member of the AAJ. In 2015, Attorney Jacob was elected Chair of the national civil rights section of AAJ. In 2017, the Honorable Richard A. Posner, former judge for the Seventh Circuit Court of Appeals selected Attorney Jacob to be the Director of Team Posner, Inc., a national *pro bono* organization created to assist *pro se* litigants for the Commonwealth of Pennsylvania. In July of 2018, Attorney Jacob was elected Chair of the national police misconduct litigation group of AAJ.

***Glorioso Law Firm.***

**Maria B. Glorioso**, managing partner of The Glorioso Law Firm, has been licensed in the State of Louisiana and practicing for 27 years and is admitted to practice in all Louisiana courts including all State District Courts, all Federal District Courts, Fifth Circuit Court of Appeals and the Louisiana Supreme Court. She has handled cases in state and federal courts involving complex litigation, multi-district litigation, mass tort and class actions, including but not limited to: asbestos litigation, breast implant litigation, pedicle screw litigation, Wal-Mart wage litigation, 3M Combat Ear Plug litigation, child car seat defect litigation, auto manufacturer defect litigation, and medical malpractice litigation. She has taught trial advocacy to lawyers and law students all over the country, and has co-chaired AAJ's Law School Trial Advocacy program for over 20 years.

**Vincent J. Glorioso, Jr.**, with the Glorioso Law Firm, has been practicing law for over 57 years. He is admitted to practice in all Louisiana state and U.S. District Courts, the Louisiana Supreme Court, the U..S. Supreme Court, the United States Court of Military Appeals, and the U.S. Court of Appeals for the Fifth Circuit. He has served on the faculty of the Tulane School of Law Trial Advocacy Program, as an adjunct professor of law at the Loyola School of Law, and a member of the faculty of the National College of Advocacy ("NCA") at Hastings School of Law, San Francisco, California. He chaired the NCA Advance College on proof of damages at Hastings College of Law. He has previously taught similar courses at Yale University, Stanford University and the National Judicial College at Reno, Nevada. Mr. Glorioso has been a lecturer for the Association of Trial Lawyers of America, Louisiana Trial Lawyers Association, Louisiana State Bar Association CLE, Tulane University Law School CLE, Loyola School of Law CLE programs and various state trial lawyers' association programs. He is a past president of the Southern Trial Lawyers Association and has received its prestigious War Horse Award for his extraordinary contributions to the trial bar of the nation. He has served on the President's Advisory Committee of the Louisiana Trial Lawyers Association since its inception, as well as on its Board of Governors. He is also the co-author of Trial Advocacy in Louisiana, National Business Institute (NBI). He has held leadership positions in the American Bar Association's Section of Tort and Insurance Practice (TIPS) including, Past Vice Chair of the Admiralty and Economics of Torts and Insurance Law Practice Committees.

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **KEVIN LOUVIERE, TERRY MATHEW HALL, JR., and FLOYD WILLIAMS,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 20-cv-01840-WBV-DPC** |
| **ST. TAMMANY PARISH GOVERNMENT a/k/a/ ST. TAMMNAY PARISH COUNCIL, et al.,** | ) | |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| **AHMED BAQER, KLABERT JOSEPH GUILLOT, JR., and KLABERT JOSEPH GUILLOT, SR.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 20-cv-00980-WBV-DPC** |
| **ST. TAMMANY PARISH GOVERNMENT a/k/a/ ST. TAMMNAY PARISH COUNCIL, et al.,** | ) | |
| **Defendants.** | ) | |

**REPORT OF JAIL OPERATIONS EXPERT JEFF EISER**

1. I was retained to review case records and analyze jail operational issues associated with the detention of Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr. in the St. Tammany Parish Jail (STPJ), located in Covington, Louisiana, during the time period of June 2019 through January 2020.

Specifically, I have been asked to provide my professional opinions concerning: (1) what happened during the detention of Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr. from a jail operational perspective; (2) any applicable or recommended regulatory standards and contemporary corrections industry standards and practices as they relate to the operational procedures and practices of STPJ Administration and their staff; and (3) the duties and responsibilities of the STPJ Administration and their staff to (a) take reasonable and proper steps to protect Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr. from harm, (b) ensure their basic human needs are met, and (c) ensure the necessary and incidental requirements of daily life are made available to them while they were in custody; and (4) the STPJ Administration and their staff's execution of those duties.

## EXPERIENCE AND QUALIFICATIONS

2. My professional opinions are a function of the unique facts and circumstances in this case and are based on my training, education, practical experience and the contemporary jail industry standards and practices that existed at the time of the plaintiffs' incarceration in the STPJ; specifically, the (1) regulatory standards contained in the Louisiana Administrative Code – Title 22: Part III; Subpart 2 – Minimum Jail Standards, (2) advisory standards contained in the Basic Jail Guidelines (April 15, 2019) promulgated by the Louisiana Sheriff's Association, (3) Performance Based Standards for Adult Local Detention Facilities (4th Edition, June 2004), (4) Core Jail Standards (1st Edition, 2010) promulgated by the American Correctional Association (ACA), and (5) Standards for Health Services in Jails (2018) promulgated by the National Commission on Correctional Health Care (NCCHC). Although not mandatory by law, the ACA and NCHCC standards are recognized throughout

the jail and detention industry as the principal authority for gauging reasonable conduct (i.e., the standard of care) in jail and detention operations. The ACA and NCHCC standards essentially set the floor in the corrections industry regarding how to safely and lawfully operate jail and detention facilities throughout the country.

3. I have over 29 years of practical work experience in the operation and administration of one of the largest local corrections systems in the United States. I also have extensive experience and expertise in the operation and staffing of small, medium, and large jail facilities. During my career as a corrections administrator, I assisted and led teams that planned, opened, and transitioned into two new major corrections facilities (800+ beds); negotiated labor contracts from the side of management; and testified in verbal and written form in arbitration hearings. I assisted in the creation and drafting of requisitions for Bids or RFPs (Request for Proposals) which were sent to potential vendors supplying medical and food services to the detainees in our detention facilities, and monitored the contract compliance and performance of the selected vendors. I researched, authored, and administered, promotional exams and assessment board interviews for supervisory and administrative positions; and I researched, authored, and updated, departmental policies, procedures, and post orders, for over 20 years.

4. In conjunction with the Ohio Bureau of Adult Detention, as co-author of the Ohio Jail Administrator's Handbook, I have written extensively on the subject of jail administration. I have also personally researched and authored a significant portion of the curriculum used by the Ohio Peace Officer Training Council to certify corrections officers, supervisors, and jail administrators.

5. Since 2002, I have been invited to serve as an adjunct instructor of criminal justice in the College of Evening and Continuing Education at the University of Cincinnati. I have been retained as a consultant and trainer for small, medium, and large jails. I have participated as an instructor at national training seminars for the American Jail Association and the National Institute of Corrections – U.S. Department of Justice. I hold a Bachelor of Science Degree in Criminal Justice from the University of Dayton, and a Master's Degree in Education from Xavier University (Cincinnati, Ohio). As a result of my experience in correctional facility operations, administration, and staff training, I am familiar with the basic constitutional, statutory, and common law obligations that apply to detention facilities – such as the one located in St. Tammany Parish, Louisiana, in 2019-2020. My resume/curriculum vitae, fee schedule, list of publications, and a list of cases in which I have been retained as a jail operations expert in the last 5 years, are attached hereto.

6. Since 1994, I have testified as a jail operations expert in civil rights and tort litigation for both plaintiffs and defendants. During the past 28 years, I have been retained and/or testified in jail operations cases pending in almost every state in the country, including the State of Louisiana. My expertise is in all areas of jail facility operations, including: staffing, staff evaluation and discipline, inmate assault (failure to protect), staff use-of-force, prisoner access to basic human needs including adequate medical and mental health care, in-custody deaths, inmate suicide, sexual assault by staff/other prisoner, conditions of confinement, inmate supervision, cross-gender supervision, inmate initial screening and booking, classification and housing, managing female and youthful offenders, strip/body cavity searches, inmate grievance procedures, facility records procedures, operational policies

and procedures, monitoring contract compliance and performance of private health care and food service providers, and the training of jail staff, supervisors, and administrators.

## FACTS AND DATA CONSIDERED

7. The opinions that I set forth in this report are based on the professional standards listed earlier, my education, training, and experience, and my review of the following documents listed below:

a. Complaint (Case No. 2:20-cv-00980)
b. Complaint (Case No. 2:20-cv-01840)
c. Answer to Plaintiff's Complaint at Law and Affirmative Defenses on Behalf of Defendant, St. Tammany Parish Government (Case No. 2:20-cv-01840)
d. Answer of Sheriff Randy Smith and Major Lacey Kelly (Case No. 2:20-cv-00980)
e. STPSO Defendants' Responses to Plaintiff's First Interrogatories Requests for Production of Documents
f. U.S. Department of Justice – Civil Rights Division report of the findings of their investigation concerning the conditions of confinement in the STPJ dated July 12, 2012
g. Transcript of Hearing on Preliminary Injunction
h. Affidavit of Major Lacey Kelly (Ex 1 to Defendants Response to Motion for Preliminary Injunction)
i. The following video files entitled:
    i. 103f 12-25-19
    ii. 103f c800 040220 p1.
    iii. 103f c800 040220 p2
    iv. 103f mh3 1-1-20
    v. 103f mh3 12-25-2019
    vi. 103f mh3 mh4 12-21-2019
    vii. UOF INTAKE 1.2.2020 PT.1
    viii. UOF INTAKE 1.2.2020 PT.2
    ix. UOF INTAKE 1.2.2020 PT.3
    x. UOF INTAKE 1.2.2020 PT.4
    xi. UOF INTAKE 1.2.2020 PT.5
    xii. 2020-06-09/Disk 1/420a6000614
    xiii. 2020-06-09/Disk 1/420a6001114
    xiv. 2020-06-09/Disk 1/421a6001143
    xv. 2020-06-09/Disk 1/041929a600
    xvi. 2020-06-09/Disk 1/041920a600guillot
    xvii. 2020-06-09/Disk 1/a6004.28.20
    xviii. 2020-06-09/Disk 1/c8005.5.20

xix. 2020-06-09/Disk 2/[ch16]042120_100921_042120_101021
xx. 2020-06-09/Disk 2/041920a600
xxi. 2020-06-09/Disk 2/041920guillot
xxii. 2020-06-09/Disk 3/420a6000614
xxiii. 2020-06-09/Disk 3/420a6001114
xxiv. 2020-06-09/Disk 3/421a6001143
xxv. 2020-06-09/Disk 3/422a6000728
xxvi. 2020-06-09/Disk 3/42120a6001608
xxvii. 2020-06-09/Disk 4/5-27-20 Guillott
xxviii. 2020-06-09/Disk 4/52020guillot
xxix. 2020-06-09/Disk 4/5272020guillot
xxx. 2020-06-10/HYGEINE-Disk 1/03-13-20 h2 teethbr
xxxi. 2020-06-10/HYGEINE-Disk 1/03-13-20 h4 brteeth
xxxii. 2020-06-10/HYGEINE-Disk 1/03-13-2020 Holding 2
xxxiii. 2020-06-10/HYGEINE-Disk 1/03-13-2020 Holding 4
xxxiv. 2020-06-10/HYGEINE-Disk 2/03-16-20 h2 deot
xxxv. 2020-06-10/HYGEINE-Disk 2/03-16-2020 Holding 2
xxxvi. 2020-06-10/HYGEINE-Disk 3/03-16-20 h3 deot
xxxvii. 2020-06-10/HYGEINE-Disk 3/0316-20 h4 deot
xxxviii. 2020-06-10/HYGEINE-Disk 3/03-16-2020 Holding 3
xxxix. 2020-06-10/HYGEINE-Disk 3/03-16-2020 Holding 4
xl. 2020-06-10/THUMBDRIVE 1/001
xli. 2020-06-10/THUMBDRIVE 1/002
xlii. 2020-06-10/THUMBDRIVE 1/003
xliii. 2020-06-10/THUMBDRIVE 1/004
xliv. 2020-06-10/THUMBDRIVE 1/005
xlv. 2020-06-10/THUMBDRIVE 1/006
xlvi. 2020-06-10/THUMBDRIVE 1/007
xlvii. 2020-06-10/THUMBDRIVE 1/008
xlviii. 2020-06-10/THUMBDRIVE 1/009
xlix. 2020-06-10/THUMBDRIVE 2/001
l. 2020-06-10/THUMBDRIVE 2/002
li. 2020-06-10/THUMBDRIVE 2/003
lii. 2020-06-10/THUMBDRIVE 2/004
liii. 2020-06-10/THUMBDRIVE 2/005
liv. 2020-06-10/THUMBDRIVE 2/006
lv. 2020-06-10/THUMBDRIVE 2/007
lvi. 2020-06-10/THUMBDRIVE 2/008
lvii. 2020-06-10/THUMBDRIVE 2/009
lviii. 2020-06-10/THUMBDRIVE 2/010
lix. 2020-06-10/THUMBDRIVE 2/011
lx. 2020-06-10/THUMBDRIVE 2/012
lxi. 2020-06-10/THUMBDRIVE 2/013
lxii. 2020-06-10/THUMBDRIVE 2/014
lxiii. 2020-06-10/THUMBDRIVE 2/015
lxiv. 2020-06-10/THUMBDRIVE 2/016

lxv. 2020-06-10/THUMBDRIVE 2/017
lxvi. 2020-06-10/THUMBDRIVE 2/018
lxvii. 2020-06-10/THUMBDRIVE 2/019

j. St. Tammany Parish Sheriff' Office Rule 26 Initial Disclosures:
i. Jail Folder for Ahmed Baqer
ii. Jail Folder for Klabert Gulliot, Jr.
iii. Jail Folder for Klabert Gulliot, Sr.
iv. STPJ Policies and Procedures
v. Basic Jail Guidelines (4/25/19)
vi. STPSO Policies and Procedures Manual
vii. 2019 Jail Counts (EXCEL Spreadsheet)
viii. 2020 Jail Counts (EXCEL Spreadsheet)
ix. Office of State Fire Marshall Inspection reports (5/30/19, 7/1/19, 10/14/19, 10/15/19)
x. STPSO Holding cell specs
xi. STPSO One-man Holding cell – Restrictive Housing photo

k. St. Tammany Parish Sheriff' Office Supplemental Disclosures:
i. New Hire Orientation folder
ii. Louisiana POST Corrections Course Curriculum (92 Hours)
iii. STPJ Field Training Officer's Program Manual
iv. STPJ Guard Tower SOP's
v. Grievances
vi. Inmate Cell Movement Report from 3/1/19 – 8/21/20 Sorted by last name

l. Expert Disclosures of Michael Brady
m. Deposition of Captain Greg Longino
n. Deposition of Major Richard O'Keefe
o. Deposition of Sheriff Randy Smith
p. Deposition of St. Tammany Parish Sheriff's Office, through its representative, Sgt. Lacey Joi Kelly Robertson
q. 41 Photographs taken on 2/20/2023 of the STPJ holding cells

## METHODOLOGY

8. I employ the same methodology in forming my expert opinions that I employed in the field as an operations administrator. Specifically, I gather the relevant information, review the governing regulatory and industry standards, and analyze and assess the relevant facts and issues with those points in mind through the lens of experience, training, and education. Here, I considered the facts and data set forth above and formed

opinions regarding the actions that were taken based on my training, education, and experience and in the setting of the specific facts of this case. To start this process, I reviewed the allegations in the complaint to help orient my analysis, but I formed my professional opinions independently of those allegations, except insofar as they helped focus the scope of my review.

## OVERVIEW OF ALLEGATIONS CONCERNING JAIL OPERATIONAL DEFICIENCIES

9. In their Complaint, Plaintiffs alleged the following: On varying dates between June of 2019 through January 2020, Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr., were pre-trial detainees who were incarcerated in the St. Tammany Parish Jail (STPJ), which is located in Covington, Louisiana. The St. Tammany Parish Jail (STPJ) is designed to house more than 1200 pre-trial and sentenced individuals at four facilities. The STPJ serves as overflow for the Louisiana Department of Corrections and the federal prison system. Nearly half of the jail population of the STPJ comes from the Louisiana Department of Corrections and the federal prison system. The STPJ collects revenue for housing Louisiana Department of Corrections and federal inmates. The STPJ maintained a custom, practice, and de facto policy of housing St. Tammany Parish pretrial detainees in four intake holding cells, in excess of forty-eight (48) hours, without classifying and transferring them into appropriate housing. This custom, practice, and de facto policy was put in place as early as April of 2011.

10. In their Complaint, Plaintiffs alleged the following: In 2012, the United States Department of Justice (DOJ) conducted an investigation of the St. Tammany Parish Jail. In the report resulting from the investigation, the DOJ notified the St. Tammany Parish Council (STPC), and the current Sheriff, Rodney Strain, that "as many as 30 prisoners [were] held in

holding cells that are designed for 20 prisoners." The DOJ report further provided, "Even more concerning, we noted that prisoners were sleeping on floors and benches in holding cells with little or no bedding articles". The DOJ further noted, that "prisoners were required to remain in the holding cells for days if not weeks before they were assigned to housing units."

11. In their Complaint, Plaintiffs alleged the following: During 2019-2020, the majority of pre-trial detainees who were housed in the holding cells were housed longer than the statutory 48-hour limit, with a significant number of detainees housed in the holding cells for between 7 and 14 days. The STPC and Sheriff Strain indicated that pre-trial detainees were housed in this manner due to "overcrowding" in the jail, however, empty beds were available for the pre-trial detainees in general housing. As early as July 12, 2012, not only were the STPC and Sheriff Strain on notice that such practices existed but that the DOJ had concerns regarding the constitutionality of such practices.

12. In their Complaint, Plaintiffs alleged the following: During all relevant times, the STPJ maintained four (4) individual intake holding cells. The plaintiffs assert that each holding cell measured approximately twenty (20) feet in length by ten (10) feet in width. The holding cells had no showers, no beds, and a toilet without privacy. The STPJ housed as many as twenty-four (24) St. Tammany Parish pretrial detainees in a single intake holding cell, for as long as eighteen (18) days, prior to classifying and transferring them to appropriate housing. Due to the overcrowding, St. Tammany Parish pretrial detainees were forced to sleep on concrete floors within the holding cells.

13. In their Complaint, Plaintiffs alleged the following: As late as March 3, 2020, in holding cells 1-4, the number of detainees held in each cell ranged from 17-21. In January

2020, the STPJ had as many as one hundred and thirty-seven (137) open beds. In January 2020, the STPJ housed as many as sixty-three (63) federal inmates. In January 2020, the STPJ housed as many as three-hundred eighty-seven (387) Louisiana Department of Corrections inmates. In January 2020, the STPJ housed as many as ninety-eight (98) St. Tammany Parish pretrial detainees in total in its four (4) holding cells.

14. In their Complaint, Plaintiffs alleged the following: STPJ administrators, supervisors, and staff only permitted St. Tammany Parish pretrial detainees to shower once every three days. STPJ administrators, supervisors, and staff, denied St. Tammany Parish pretrial detainees the ability to participate in any recreational activity. STPJ administrators, supervisors, and staff, housed violent and non-violent offenders in the same holding cell, thereby placing non-violent offenders in unnecessary danger. STPJ administrators, supervisors, and staff, failed to intervene in altercations that would occur between detainees in the crowded cells, thereby placing the detainees in danger.

15. In their Complaint, Plaintiffs alleged the following: STPJ administrators, supervisors, and staff, housed St. Tammany Parish pretrial detainees in unsanitary holding cells by allowing inmates to vomit and/or bleed on the floor of the holding cells and failing to promptly and properly clean the holding cells. STPJ supervisors and staff observed inmates vomiting and experiencing difficulty breathing, but failed to render aid or ensure that the detainees were seen by a medical professional. STPJ administrators, supervisors, and staff, kept detainees in the holding cells with unbandaged wounds and staph infections. STPJ administrators, supervisors, and staff, permitted food to remain on the floor of the holding cells for four days without cleaning. When blankets were provided to the detainees, the blankets were damp, wet, or musky. When it would rain, at least one holding cell would

flood due to a leak in the window at the top of the holding cell. STPJ supervisors and staff withheld hygiene items, blankets, and medication from inmates as a form of punishment.

16. In their Complaint, Plaintiffs alleged the following: Beginning on December 2, 2019, Mr. Ahmed Baqer was held as a pre-trial detainee at the STPJ. Upon arrival, STPJ administrators, supervisors, and staff, forced Mr. Baqer to reside in a holding cell with 19 other pre-trial detainees. The holding cell was 10 feet by 20 feet, held cement benches, no beds, and one exposed toilet. STPJ administrators, supervisors, and staff, held Mr. Baqer in the holding cell for 17 days. Mr. Baqer slept on the bare concrete floor amidst 19 other prisoners for more than 16 days despite the availability of cell space and empty beds in other areas of the jail. On or around December 19, 2019, STPJ administrators, supervisors, and staff, moved Mr. Baqer out of the inadequate holding cell to general population. On or around December 20, 2019, Defendants released Mr. Baqer.

17. In their Complaint, Plaintiffs alleged the following: Beginning on December 22, 2019, STPJ administrators, supervisors, and staff, held Mr. Klabert Guillot, Sr. as a pre-trial detainee at the STPJ. Upon admission, STPJ administrators, supervisors, and staff, assigned Mr. Guillot, Sr. to a holding cell with 19 other pre-trial detainees. The holding cell was 10 feet by 20 feet, held cement benches, no beds, and one exposed toilet. STPJ administrators, supervisors, and staff, held Mr. Guillot, Sr., in a holding cell for 13 days. Mr. Guillot, Sr. slept on the bare concrete floor amidst 19 other prisoners for 13 days despite the availability of cell space and empty beds in other areas of the jail. On or around January 4, 2020, STPJ administrators, supervisors, and staff, moved Mr. Guillot, Sr., to general population.

18. In their Complaint, Plaintiffs alleged the following: Beginning on June 17, 2019, STPJ administrators, supervisors, and staff, held Mr. Kevin Louviere as a pre-trial detainee at the STPJ. STPJ administrators, supervisors, and staff, forced Mr. Louviere to reside in a holding cell with at least 22 other pre-trial detainees. The holding cell was 10 feet by 20 feet, held cement benches, no beds, and one exposed toilet. STPJ administrators, supervisors, and staff, held Mr. Louviere in the holding cell for 12 days. The overcrowding often prevented Mr. Louviere from being able to lay down on the concrete floor to sleep. When Mr. Louviere did sleep, he slept on the bare concrete floor amidst 22-30 other prisoners, despite the availability of cell space and empty beds in other areas of the jail. Mr. Louviere and other detainees were provided with blankets only between the hours of 3 a.m. and 5 a.m. Mr. Louviere was deprived of the ability to shower until his seventh day at STPJ. Mr. Louviere was only provided with clean clothes following showers. The only meals provided to Mr. Louviere were made up of cold and spoiled food. Violent detainees battered Mr. Louviere twice, resulting in bruises to his head and face. Guards failed to prevent the assaults, and did not provide him with necessary medical care after the assaults. Jail staff cleaned the holding cells every four days, only when the holding cells had become very dirty and unbearable. Mr. Louviere was only allowed to leave the holding cell for showers. Mr. Louviere was not provided with an opportunity for recreational or physical activity. On or around June 29, 2019, STPJ administrators, supervisors, and staff, moved Mr. Louviere out of the inadequate holding cell.

19. In their Complaint, Plaintiffs alleged the following: Beginning on October 18, 2019, STPJ administrators, supervisors, and staff, held Mr. Terry Matthew Hall, Jr., as a pre-trial detainee at the STPJ. STPJ administrators, supervisors, and staff, forced Mr. Louviere to

reside in a holding cell with at least 15 other pre-trial detainees. The holding cell was 10 feet by 20 feet, held cement benches, no beds, and one exposed toilet. STPJ administrators, supervisors, and staff, held Mr. Hall in the holding cell for 15 days. Mr. Hall slept on the bare concrete floor amidst 15-30 other prisoners despite the availability of cell space and empty beds in other areas of the jail. Mr. Hall was only permitted to shower twice a week, and was only provided with clean clothes twice a week. The temperature in the holding cell was always set to an uncomfortably low temperature, described by Mr. Hall as freezing. For seven days, Mr. Hall was not provided with a blanket. Mr. Hall and other inmates were told that if they were not quiet, they would be denied blankets. STPJ staff cleaned the floor of the holding cells only once a week. Mr. Hall was permitted out of the holding cell only twice per week, and only then to shower. Mr. Hall was not provided with an opportunity for recreational or physical activity. Mr. Hall was subjected to inhumane conditions of confinement, exhibited by toilet paper hanging from the ceilings and air conditions vents, urine covering the cell floor around the toilet, and ever-present odors caused by the unsanitary conditions. On November 1, 2019, STPJ administrators, supervisors, and staff, moved Mr. Hall out of the inadequate holding cell.

20. In their Complaint, Plaintiffs alleged the following: Beginning on September 28, 2019, STPJ administrators, supervisors, and staff, held Mr. Floyd Williams as a pre-trial detainee at the STPJ. STPJ administrators, supervisors, and staff, forced Mr. Williams to reside in a holding cell with up to 30 other pre-trial detainees. The holding cell was 10 feet by 20 feet, held cement benches, no beds, and one exposed toilet. The overcrowding often prevented Mr. Louviere from being able to lay down on the concrete floor to sleep. STPJ administrators, supervisors, and staff, held Mr. Williams in the holding cell for 5 days. Mr.

Williams slept on the bare concrete floor amidst 30 other prisoners despite the availability of cell space and empty beds in other areas of the jail. Mr. Williams was not provided with a medical or mental health screening until his last day in the holding cells, despite having told jail staff that he needed medications for his heart and breathing. Mr. Williams was not provided with his heart medication. On the fifth day of his detention, Mr. Williams was provided with an inhaler and told to share it with other inmates. As a result of being deprived medication, following his release from STPJ, Mr. Williams became ill for 2 weeks. The holding cell was cleaned by jail staff only on the fourth day of Mr. Williams' incarceration . Mr. Williams was not provided with a toothbrush until his fifth day of incarceration. Mr. Williams was only permitted to shower on his fifth day of incarceration. Mr. Williams was not provided with clean clothes until his fourth day of incarceration. The plaintiff asserts during that time, the temperature of the holding cell was always set to an uncomfortably low temperature. The plaintiff asserts during that time, Mr. Williams and other inmates were only allowed to exit the holding cells to shower. Mr. Williams was subjected to inhumane conditions of confinement, including without limitation, detainees begging for medical help only to be ignored, detainees asking for sanitary items and cleaning of the cells only to be met with rolled eyes. In response to detainees' requests for medical assistance and sanitation, guards responded, "This is St. Slamity,' if you don't like it, don't commit crimes in the parish." Jail staff admitted that the conditions of confinement were in place to teach detainees a lesson. On October 3, 2019, STPJ administrators, supervisors, and staff, moved Mr. Williams out of the inadequate holding cell.

## DISCUSSION OF ISSUES AND OVERVIEW OF CASE RECORD

21. **Discussion of Jail Operational Issues:** The pre-trial detainees in the St.

Tammany Parish Jail (STPJ) rely upon the facility staff for their personal needs and safety. Contemporary jail industry standards and practices recognize that all facilities are required to provide prisoners with the basic necessities of life and take reasonable steps to protect them from harm. The fact of being in jail does not mean that human essentials and protection from known health and safety risks can be taken away. Taking reasonable steps to protect all detainees from harm and ensuring that basic human needs are met, are two of the core responsibilities of a jail and its staff.

22. Jails with adequate bed space capacity are those with sufficient bedspace to house the number and type of persons incarcerated by the local criminal justice system. Jails should be able to accomplish this without regularly exceeding capacity and without the need for the local criminal justice system to make compromises in its incarceration policies. Crowded conditions often have the following adverse effects on jail operations:

a. Compromises in classification

b. Reduced levels of security

c. Increases in violence, tension, and availability of contraband

d. Overloaded programs and services

e. Deterioration in levels of sanitation and maintenance

Jail officials must reach agreement with key decision makers on capacity of the jail and work with them to keep the jail population within agreed upon limits. Jail officials must be prepared to implement internal and external management strategies when bedspace demand exceeds available capacity. A safe, clean, and well-maintained jail is essential to the health and safety of inmates and staff. Poor conditions increase tension, contribute to injuries, the spread of disease, vandalism and negatively affects the morale and productivity of the jail

and its staff. Detainees have a right to a safe, humane living conditions. The quality of the jail environment affects not only the health and safety of those who occupy and work in the facility but also their emotional wellbeing and performance. Poor conditions often lead to low morale of inmates and staff, increased inmate health care costs, increased disciplinary problems, higher staff absenteeism and turnover, and an overall negative atmosphere. Attention to the basic human needs of detainees, including taking reasonable steps to protect detainees from harm, are a basic duty and responsibility of every Sheriff and their staff who operate a jail facility, regardless of size.

23. **Review and Analysis of job performance and actions of St. Tammany Parish Government, former Sheriff Rodney Strain, Sheriff Randy Smith and his staff, from a jail operational and administrative perspective (RE: Ensuring the basic human needs of detainees are met and their joint responsibility to ensure take reasonable steps are taken to protect pre-trial detainees from harm while being held in the STPJ holding cells):** Based upon my training, education and experience, I started my analysis of the issues in this case with a review of what the St. Tammany Parish Council and Sheriff Randy Smith and his staff knew (or should have known) about the living conditions experienced by St. Tammany Parish detainees while being held in the holding cells at the St. Tammany Parish Jail (STPJ) during the time period of June 2019 through January 2020. I then assessed their actions/inactions in the performance of their duties and responsibilities to take reasonable steps to protect detainees from harm and to ensure that the basic human needs of the detainees in their care and custody are met during their incarceration in the STPJ. My results are as follows:

*(NOTE: As is the situation in almost every civil case, there are some conflicting versions of what happened during the incidents which led to these lawsuits. It is important to note that all the defendants deposed in this case to date, were unable to provide any written documentation or records to refute the allegations of the plaintiffs. It is not the role of the expert witness to determine the credibility of witnesses. That is the role and responsibility of the judge and/or jury in this case. My analysis of this case assumes that the allegations of the plaintiffs are accurately recounted in their hearing testimony and/or affidavits.)*

24. *Issue #1: Overcrowding and Long-Term Confinement in Holding Cells Designed for Short-Term Confinement* – It is my professional opinion that the holding cells at the STPJ were designed and intended for short-term confinement. These types of short-term holding cells are common in all full-service jail facilities for the limited purpose of overnight processing or brief initial processing of a newly arrived detainee. Similarly, the design and construction of the holding cells at the STPJ suggest that they were intended for very short detentions only, as they had no beds and were not designed for sleeping. The case record indicates the holding cells were 10 feet by 20 feet, held cement benches, no beds, and one exposed toilet. The holding cells at the STPJ had a maximum occupancy number of 20 as determined by the Fire Marshall, but based upon my training, education, and experience, that number reflects the use of holding cell only as a short-term processing cell with inmates sitting on one of the four benches or standing up in the cell. The cell was not designed or approved as a sleeping cell for inmates in any of the Fire Marshall Inspections provided in the case record. Jail video of the holding cells shows detainees crowded into cells and forced to lie on concrete floors to sleep or rest. STPJ administrators, supervisors, and staff, routinely

packed so many detainees into each holding cell that detainees were regularly forced to lie down on the concrete floors around the toilet stall. The case record indicates that some pre-trial detainees were kept in these holding cells for up to 15 days, despite it being a violation of Title 22, Part III, Subpart 2, Section 3301(F) of the Louisiana Administrative code requiring that new inmates be kept in holding cells for no longer than 48 hours.

25. Based upon my training, education, and experience there is widespread consensus among corrections officials, based on their experience and supported by considerable research that goes back at least 30 years, that overcrowded living conditions in a jail increase the risk to safety and security for prisoners. That consensus is consistent with my own correctional experience. It is my professional opinion that the STPJ policy, practice, and custom of using the STPJ holding cells to house pretrial detainees in excess of 48 hours, and overcrowding the holding cells, deviated from accepted practices in the industry, served no legitimate penological or custodial interest, and amounted to nothing more than cruel punishment.

26. *Issue #2:* *Sanitation* - Similarly, overcrowding in the STPJ holding cells has a direct effect on sanitation. The fact that 15-20 detainees must share a single toilet with little to no privacy is one exacerbating factor and seems unnecessarily humiliating for detainees. This lack of privacy makes overcrowding in the holding cells even more of an issue. Additionally, having 15-20 detainees sharing the same toilet ensures that the detainees will frequently run out of toilet paper. Because the detainees are completely dependent on STPJ staff, staff must frequently restock this critical hygiene item, which based on the allegations of the detainees, did not occur. STPJ staff deposition testimony indicates that the STPJ apparently has no policies with respect to how often the holding cells must be cleaned, and it

appears that there are no cleaning supplies or a trash can in the holding cells. Since the cells are housing 15-20 (or more) detainees without immediate access to basic cleaning supplies and equipment, the cells are left dirty and unsanitary (i.e., dirty toilet, urine soaked floor, toilet paper and other materials hanging from the ceiling) for long periods of time. Unfortunately, coupled with the overcrowding, some detainees were forced to lay in urine near a dirty toilet in order to sleep. In essence, the use of the holding cell as a sleeping cell means that the person using the toilet and the person trying to sleep both experience difficulties, creating unnecessary tension in the cell, especially when it is overcrowded. All of these factors lead me to conclude that detainees needlessly suffered indignities and tension as they were forced to compete for access to the most basic necessities of everyday life. It is my professional opinion that the STPJ policy, practice, and custom of depriving detainees in the holding cells of proper sanitation deviated from accepted practices in the industry, served no legitimate penological or custodial interest, and amounted to nothing more than cruel punishment.

27. *Issue #3:* *Deprivation of Sleep* - Additionally, detainees are frequently forced to endure constant illumination in the holding cells both day and night. Staff testimony and video surveillance shows holding cell lights on in the middle of the night. Detainees will commonly shield the light by hiding their faces under their blankets, but not all detainees are given a blanket or sheet. Add to this mix the undisputed acknowledgement by STPJ officials that the lights in the holding cell are left on 24 hours a day. Furthermore, it is a matter of common sense that a lack of sleep will cause emotional distress. It is also likely that the lack of sleep exacerbated tension in the overcrowded environment. It is my professional opinion that the STPJ policy, practice, and custom of depriving detainees of sleep, deviated from

accepted practices in the industry, served no legitimate penological or custodial interest, and amounted to nothing more than cruel punishment.

28. *Issues #4 and #5: Ability to Maintain Personal Hygiene and Access to Potable Water* - It is a basic requirement that detainees be provided with access to potable water, but since the STPJ holding cells were not designed for long-term housing, all 15-20 (or more) detainees were reliant on a single water faucet located in the single sink/toilet unit located in the holding cell. Detainees often arrive dirty and need an opportunity to clean themselves and change their clothing. Detainees also need to be able to clean their hands prior to eating and after using the bathroom. Based upon the allegations of the detainees, detainees were unable to adequately clean themselves. Hot water was virtually nonexistent, soap was not always available, there were no towels, and showers and clean clothing were rarely available. In my professional opinion, based on the overcrowded and unsanitary conditions, and the fact that the only sink is connected to the toilet, it is unlikely that detainees housed in the STPJ holding cells would be able to maintain basic personal hygiene at a safe level. The inability to maintain personal hygiene would cause emotional distress. In addition, in a detention facility where detainees are held in overcrowded conditions, the inability to maintain personal hygiene creates an unreasonable risk for the spread of disease or infection among the detainees and the staff who work there. I would think that STPJ administration would want to do more to protect their own staff if for no other reason. Again, this is simple and basic protocol for the operation of a detention facility. Typically, general population jail inmates can shower daily. Since the detainees are constantly locked in their cells, they do not have an opportunity to shower during out of cell time like a jail population inmate. It is my professional opinion that the STPJ policy, practice, and custom of depriving detainees in the

holding cells of the ability to maintain their personal hygiene, deviated from accepted practices in the industry, served no legitimate penological or custodial interest, and amounted to nothing more than cruel punishment.

29. *Issue #6: Lack of Mattresses and Proper Bedding Items* – Based upon the case record, pre-trial detainees forced to live and sleep in the holding cells were not given a mattress, sheet or pillow, or many did not receive a blanket. Given the lack of blankets and mattresses and nothing to do all day, detainees were left to sit or lay down on concrete, which is a very cold experience. Concrete benches and floors can be very cold and seep heat from your body. The confirmed fact in the deposition testimony of the STPJ Command staff indicates that detainees are not issued a mattress while being housed in the holding cells. This policy, practice, and custom is shockingly inhumane and needlessly exposed each detainee to serious and substantial health risks and potential orthopedic injuries on a nightly basis. It is my professional opinion that the STPJ policy, practice, and custom of depriving detainees in the holding cells of a basic mattress and appropriate bedding deviated from accepted practices in the industry, served no legitimate penological or custodial interest, and amounted to nothing more than cruel punishment.

30. *Issue #7: Access to Adequate Medical Care* - Plaintiff, Mr. Floyd Williams, asserted that during his 12 days confined in the STPJ holding cells, he was not provided with a medical or mental health screening until his last day in the holding cells; despite having told jail staff that he needed medications for his heart and breathing. Mr. Williams asserted that on the fifth day of his detention, he was provided with an inhaler to share with other inmates. Mr. Williams asserted that as a result of being deprived medication, he became ill for 2 weeks following his release. If the jury finds the testimony of Mr. Williams to be

credible, then there were sufficient facts and circumstances which should have alerted those responsible for Mr. Williams' care and custody of his potential serious medical needs. Officials cannot sidestep the obligation to acknowledge or verify a detainee's medical condition by refusing to get involved, or by simply passing it on to someone else without assurance that the detainee's condition is in fact addressed and properly handled. It is the duty of the STPJ supervisors and staff to ensure unimpeded access for Mr. Williams to adequate medical assessment, care, and treatment. In a detention facility or jail setting, the supervisors and officers are the "gatekeepers" who determine whether access to medical services will be provided. To keep the "gate" shut when medical attention is needed would be the height of irresponsibility and a betrayal of an officer's crucial responsibility to assure for the health and safety of others. Detainees' lives depend upon officers to uphold these responsibilities. It is my professional opinion that the STPJ policy, practice, and custom of depriving detainees in the holding cells of access to adequate medical assessment, care, and treatment, deviated from accepted practices in the industry, served no legitimate penological or custodial interest, and amounted to nothing more than cruel punishment.

31. *Contracting Jail Beds to Outside Agencies* – Based upon my training, education, and personal experience the need to manage and adjust inmate population and housing assignments on a daily basis is a common and necessary part of operating a safe and humane jail. During my almost 20 years as a jail administrator, I personally managed an average daily inmate population that had grown to approximately 2400 inmates per day housed in four separate facilities during the time period of 2000-2009. Our agency processed between 45,000 to 50,000 inmates through our intake facility each year. We also had to plan for new legislation passed in Ohio that required the county jails to house state prisoners that

were sentenced to short term incarceration, and we also contracted with the U.S. Marshall's Service to hold an unlimited amount of federal prisoners for a per diem fee. This practice by local jails is not a new or unknown practice in the jail industry, but it does require careful planning and execution of those plans to ensure that local detainees which you are statutorily required to house, are housed appropriately, safely and humanely. This can only be accomplished if the inmate population is managed on a daily basis (or more often, if necessary, based upon need) to fit all the "pieces" into the available "spaces". Our agency communicated and collaborated with other similar jails throughout the country to create a cell assignment process that ensures the objectives of our inmate classification and inmate safety responsibilities. It took time and effort to develop a program that worked in our complex system, but it was the only reasonable step to pursue in order to ensure we do our best to protect all detainees from harm. One of the most critical components of our plan was to ensure that no detainee was forced to stay in a holding cell for a longer period than was necessary (usually only for a few hours), and never forcing any detainee to sleep overnight on a concrete bench or floor without a mattress, bedding, or personal hygiene items for more than one night. The only reasonable thing to do when faced with a potential overcrowding situation is to use every cell in your system on a continuous basis. It does not cost a jail facility any additional cost to direct the administrators to create and operate a population and cell assignment management plan that ensures the health and safety of the inmate population. Our plan required supervisors to communicate with the classification staff on a continuous basis to select temporary cell locations for new detainees who have not been fully processed yet, but who needed a place to sleep for the night. This requires jail staff at the evening lockdown time to secure all the cells in their units and place new detainees temporary in each

empty cell to sleep. A Master List is used to track were all the detainees are assigned at any one time, so they can be retrieved if needed, or moved back to a holding cell in the morning. The housing officer in each unit where the new detainees were assigned would then have their inmate "porters" clean the individual cells and bedding used and collect the linens to be sent to the laundry. As stated previously, our system processed 45,000 – 50,000 inmates a year, so it required a lot of planning and teamwork by jail staff on a daily basis to ensure each open cell is identified and utilized, if necessary. This process did not require any significant personnel expense. The plan also consists of a method of constant communication and collaboration with the outside agencies that were housing inmates in our jail. Any valid agreement with an outside agency must always include the qualification that the jail's primary responsibility is to properly and safely house their own inmates before accepting any additional inmates from the outside agency. This process must happen on a continuous basis and may require the jail to have the outside agency pick up and remove some of their inmates if space is needed to house inmates who we were statutorily required to house. A custom and practice to block off sections of cells and use them only for outside inmates is naïve and could be disastrous for the safe operation of a jail, and almost ensures that the jail will have serious issues finding bedspace for their own inmates. This process and plan cannot be governed by a financial motive on the part of the jail. Rather, it must be governed by what is necessary in order to safely and humanely house inmates. It is my professional opinion that the STPJ policy, practice, and custom of blocking off sections of the jail to be used inmates from outside agencies, while depriving detainees in the holding cells of safe and humane housing conditions, deviated from accepted practices in the industry, served no legitimate penological or custodial interest, and amounted to nothing more than cruel punishment.

32. Based upon my training, education, and personal experience, I found the systemic policies, practices, and customs, of the St. Tammany Parish Government and Sheriff Randy Smith in the long-term housing of St. Tammany Parish pre-trial detainees in holding cells, in addition to deviating from the standards in the industry, to be shocking, unnecessary and inhumane. The case record indicates that Sheriff Smith made the decision to continue the policies, practices, and customs, of the past administration of former Sheriff Rodney Strain. Despite being placed on notice by a U.S. Department of Justice investigation and report in 2012, about the serious problems and issues concerning the policies, practices, and customs, Sheriff Smith continued the practice of housing Parish pre-trial detainees in the holding cells long-term, without adequate bedding, blankets, personal hygiene items and proper sanitation. Notably, and most troubling, is that the policies, practices, and customs, required that a certain number of jail beds (i.e., up to a 100 for each agency) were always left open and available pursuant to a per diem contract with both the Louisiana Department of Corrections and the U.S. Marshall's Service. These empty beds could and should have been provided to the St. Tammany Parish pre-trial detainees. It was clear in the depositions of the jail command staff that as a direct result of policy and established practice, they were never permitted to use the beds reserved for the contracted agencies, even if it meant housing Parish pre-trial detainees in an overcrowded, unsafe, and inhumane manner. None of the command staff could give a reason for this policy and established practice other than the "contract" with the outside agencies. Although, all admitted that STPJ could have limited the number of contract inmates they accepted at any one time because of facility maintenance repairs, no one seemed to grasp the gravity of the situation faced by the Parish pre-trial detainee forced to live 24/7 in the holding cells for long periods of time sharing a small area

and a single toilet with 15-20 other detainees. Sheriff Smith testified in his sworn deposition that housing Parish pre-trial detainees "is our primary obligation" (Randy Smith deposition: 14; 17-18) and that "Pre-trial detainees are our primary responsibility" (Randy Smith deposition: 16; 15-16). Sheriff Smith also testified that "we followed the previous administration to bring in additional funds to operate the jail effectively, efficiently and most important, safely." (Randy Smith deposition: 18; 14-19). Unfortunately, it appears his actions (or lack of appropriate actions) speak much louder than his words, and his choice to ignore the problems reported by the USDOJ concerning the customs and practices of the previous administration practices, more likely than not, indicates the money generated by the outside contracts was a higher priority than ensuring the basic human needs of the Parish pre-trial detainees and taking reasonable steps to protect them from harm.

33. Based upon my training, education and experience, it is more likely than not, that Sheriff Smith knew (or should have known) the STPJ did not always have adequate bed space for the Parish pre-trail detainees when he required staff to block off the open cells for outside agencies. An official cannot simply ignore, or "stick their head in the sand" when a serious detainee health and safety issue is so obvious. Sheriff Smith testified that he knew it would not be humane to house a pre-trial detainee in the manner alleged by the plaintiffs and stated it "would be a violation on what we do here, what we're obligated to do here." (Randy Smith deposition: 75; 22-25). It should have been obvious to any reasonable official responsible for the operation of a local jail facility that their policy and practice would result in the creation of an unnecessary dangerous condition and serious and substantial risks to the health and safety of pretrial Parish detainees. The policy and established practice of placing a higher priority on the generation of revenue for the jail than taking steps to protect Parish

pretrial detainees from obvious risks to their health and safety, and then not acknowledging and ignoring the risks created by the policy and established practice indicates an intentional and callous indifference to the health and safety of the Parish pre-trial detainees in violation of the Louisiana Administrative Code – Title 22: Part III; Subpart 2 – Minimum Jail Standards, and clearly established corrections industry standards and practices.

34. It is my opinion that the intentional and callous indifference to the basic rights of Parish pretrial detainees exhibited by the St. Tammany Parish Government and Sheriff Randy Smith and his staff is appalling and violates the basic foundation and principles of our American criminal justice system. The policies and established practice of punishing pretrial detainees who are not able to make bond, in an effort to protect a revenue stream associated with renting out available inmate beds, is offensive to human decency and violates the basic responsibility of a government agency and its officials who choose to operate a jail facility. Almost every jail facility in this country deals with overcrowding issues but the St. Tammany Parish Government and Sheriff Randy Smith, more likely than not, chose to create unnecessary safety and health risks for Parish pre-trial detainees to ensure their revenue stream from the rental of jail beds to outside agencies. The development and implementation of a comprehensive population and cell assignment plan for operation of the STPJ using free resources available (i.e., National Institute of Corrections – Jail Center, American Jail Association, etc.) would have cost nothing, but would have significantly reduced or eliminated the serious and substantial risks to the health and safety of the Parish pre-trial detainees housed for long periods of time in the STPJ. Instead, the case record indicates the St. Tammany Parish Government and Sheriff Randy Smith and his staff made a conscious decision to maximize the risks to the health and safety of their Parish pre-trial detainee

population. During my career I have studied and taught the history of punishment used in our criminal justice system over the last 200+ years and it truly saddens me to see this type of horrendous practice still being utilized in 2019. It reminds me of some very dark times in our nation's history. Any reasonable jail administrator would realize that housing 15-20 inmates for more than a short time will create safety, sanitation and health issues. Combining that with making them sleep and or sit all day on a concrete floor is simply unimaginable in this day and age. No legitimate penological interest is served by these money driven policies and established practices.

35. **Review of the Regulatory and Clearly Established Corrections Industry Standards:** The failure of the St. Tammany Parish Government and Sheriff Randy Smith and his staff to take reasonable steps to protect all pre-detainees (including Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr.) from harm and to ensure their access to all basic human needs during their incarceration in the holding cells of the St. Tammany County Jail, places them in violation of the mandatory regulatory standards contained in the Louisiana Administrative Code – Title 22: Part III; Subpart 2 – Minimum Jail Standards, the advisory standards contained in the Basic Jail Guidelines (April 15, 2019) promulgated by the Louisiana Sheriff's Association, and clearly established corrections industry standards including the Performance-Based Standards for Adult Local Detention Facilities (4th Edition - June 2004), the Core Jail Standards (2010) promulgated by the American Correctional Association (ACA), and the Standards for Health Services in Jails (2018) from the National Commission on Correctional Health Care (NCCHC) as follows:

**LA Admin Code**
**Subpart 2 - Minimum Jail Standards**
**Chapter 33 - Inmate Management**
**Section III-3301 - Intake Reception**

F. New arrivals may be housed in individual intake holding cells for a maximum of 48 hours before being classified and transferred to an appropriate housing area.

**LA Admin Code**
**Subpart 2 - Minimum Jail Standards**
**Chapter 33 - Inmate Management**
**Section III-3303 – Inmate Management**

C. Initial classification assignments shall be completed according to the written schedule within 48 hours of admission.

D. The classification process shall be completed within 72 hours.

**ACA Standard 4-ALDF-1A-10** and **CORE Jail Standard 1-CORE-1A-07:** "Multiple-occupancy rooms/cells house between two and sixty-four occupants and provide 25 square feet of unencumbered space per occupant. When confinement exceeds ten hours per day, at least 35 square feet of unencumbered space is provided for each occupant."

**ACA Standard 4-ALDF-1A-14** and **CORE Jail Standard 1-CORE-1A-09:** "All inmate rooms/cells provide the occupants with access to natural light. Lighting throughout the facility is sufficient for the tasks performed."

**ACA Standard and CORE Jail Standard 4C:** "Inmates maintain good health. Inmates have unimpeded access to a continuum of health care services so that their health care needs, including prevention and health education, are met in a timely and efficient manner."

**ACA Standard 4-ALDF-4B-02** and **CORE Jail Standard 1-CORE-4B-01:** "Inmates are issued suitable, clean bedding and linens. There is provision for linen exchange, including towels, at least weekly."

**ACA Standard 4-ALDF-4B-03** and **CORE Jail Standard 1-CORE-4B-02:** "Inmates are issued clothing that is properly fitted and suitable for the climate. There are provisions for inmates to exchange clothing at least twice weekly."

**ACA Standard 4-ALDF-4B-06** and **CORE Jail Standard 1-CORE-4B-03:** "Articles and services necessary for maintaining proper personal hygiene are available to all inmates including items specifically needed for females."

**ACA Standard 4-ALDF-4B-08/09** and **CORE Jail Standard 1-CORE-4B-04:** "Inmates have access to showers, toilets, and washbasins with temperature controlled hot and cold running water twenty-four hours per day. Inmates are able to use toilet facilities without staff assistance when they are confined in their cells/sleeping areas."

**ACA Standard 4-ALDF-5C-01, 02** and **CORE Jail Standard 1-CORE-5C-01:** "Inmates have access to exercise and recreation opportunities. When available at least one hour daily is outside the cell or outdoors when weather permits."

**ACA Standard 4-ALDF-6A-07** and **CORE Jail Standard 1-CORE-6A-07:** "Inmates are not subjected to personal abuse, corporal punishment, personal injury, disease, property damage, or harassment."

**ACA Standard and CORE Jail Standard 4B:** "Inmates maintain acceptable personal hygiene practices."

**ACA Standard and CORE Jail Standard 4D:** "Health Services are provided in a professionally acceptable manner."

**ACA Standard and CORE Jail Standard 1A:** "Staff, volunteers, contractors, and inmates are protected from injury and illness in the workplace."

**ACA Standard and CORE Jail Standard 2A**: "The community, staff, volunteers, contractors, and inmates are protected from harm. The number and severity of events are minimized."

**NCCHC Standard J-A-01:** "Inmates have access to care to meet their serious medical, dental, and mental health needs."

*Compliance Indicator:*

The responsible health authority identifies and eliminates any barriers to inmates receiving health care.

## SUMMARY OF OPINIONS

36. In summary, the duty of the St. Tammany Parish Government and Sheriff Randy Smith and his staff was to take reasonable steps to protect all pre-detainees (including Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr.) from harm and ensure their access to all their basic human needs during incarceration in the holding cells of the St. Tammany County Jail. They failed on all counts and actually created, then ignored, serious and substantial risks to the health and safety of all pre-trial detainees (including Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr.) held in their holding cells. The case record indicates the St. Tammany Parish Government and the St. Tammany Parish Sheriff's Office

and their staff were already placed on notice through an U.S. Department of Justice investigation and report from 2012, which directed them to correct their custom and practice of creating serious and substantial risks to the health and safety of newly arrived pre-trial detainees who remained housed in the facility holding cells for long periods of time (in excess of 48 hours and up to 15 days) when open beds were available throughout the facility. The case record is clear that all levels of command in the STPJ were aware (during the time period of June 2019 through January 2020 referenced in this case) of pre-trial inmates continuing to be housed in the same manner (in STPJ holding cells) for long periods of time even though they knew the jail had plenty of open cells available to safely and humanely house the Parish inmates. The case record clearly indicates a continued custom and practice of creating serious and substantial risks to the health and safety of newly arrived pre-trial detainees (including Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr.) and a continued policy and established practice of ignoring their responsibility to provide all detainees (including Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr.) with basic human needs, including humane living conditions.

37. The case record indicates a lack of concern, and a callous indifference by the St. Tammany Parish Government and Sheriff Randy Smith and his staff toward the most fundamental and basic duties of running a jail facility; i.e., taking reasonable steps to protect inmates from harm, and ensuring that all basic human needs of inmates are always available, including humane living conditions. Instead, they made a conscious choice to put newly arrived detainees (including Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr.) at substantial risk of serious harm, and caused

them to suffer the indignity and discomfort associated with living in inhumane conditions, simply to maximize the revenue generated from housing inmates from outside agencies. Their actions and conscious choice to ignore prior warnings created dangerous conditions and serious risks to his health and safety of all newly arrived pre-trial detainees (including Kevin Louviere, Terry Mathew Hall, Jr., Floyd Williams, Ahmed Baqer, and Klabert Joseph Guillot, Sr.) and their actions are directly related to creating the unsafe and inhumane living conditions suffered by the Plaintiffs. As stated earlier, taking reasonable steps to protect detainees from harm and ensuring the basic human needs of all detainees are two of the most sensitive and important obligations a governmental body operating a jail facility and Sheriff and their staff have towards their detainees. Unfortunately, in this case the exact opposite occurred, the governing authority and elected official charged with operating the jail facility implemented policies and established practices that they knew maximized the health and safety risks of all newly arrived pre-trial detainees while causing them to suffer the indignity and discomfort associated with living in inhumane conditions. The key to the operation of a safe and secure jail facility is a combination of humane treatment and adherence to accepted custody practices — not a focus on conditions which generate additional revenue for the agency while in essence, punishing Parish pre-trial detainees at the same time, which appears to be the misguided approach taken in the operation of STPJ.

38. I have worked in local jail operations as a practitioner and administrator for close to 30 years and have served as a jail operations consultant and expert witness for almost 30 years. I have visited and reviewed hundreds of jails over the years, but I have never experienced a jail facility that treats those confined in a manner which the STPJ treats its Parish pre-trial detainees. I have seen and experienced the effects of overcrowding but have

never seen a jurisdiction who would cram so many people into so little space for long periods of time, without beds and bedding, as routinely occurs in the STPJ. The conditions of confinement in the holding cells at the STPJ alleged in this case are unthinkable for any reasonable and competent jail administrator. The St. Tammany Parish Government and Sheriff Randy Smith are housing Parish pre-trial detainees in conditions that are unnecessarily harsh, dangerous and contrary to accepted industry practices and standards.

39. Based upon my review of the case record (listed in this report), I render all the foregoing opinions (contained in paragraphs 21-38) within a reasonable degree of professional certainty. Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions in this case. I also reserve the right to update my opinions if additional information is provided to me in this case. Accordingly, these opinions are preliminary and subject to modification.

Signed this 31st of March, 2023 in Cincinnati, Ohio.

Jeff Eiser

Jeff Eiser

Attachments (2):
Exhibit #1 - Resume/CV
Exhibit #2 - List of Publications, fee schedule and list of all cases where I testified in a trial or deposition as a jail operations expert witness in the last five years.